IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

JANE DOE 1, JANE DOE 2, JANE DOE 3,
JANE DOE 4, JANE DOE 5, K.T. and M.T.,
Personal Representatives to JANE DOE 6,
JANE DOE 7, JANE DOE 8, and JANE DOE 9,

      Plaintiffs,

v.                                      No:

                                              **PLAINTIFFS DEMAND JURY TRIAL**

CITY OF JOHNSON CITY, TENNESSEE,
a government entity,

KARL TURNER, individually and in his
official capacity as Chief of the
Johnson City Police Department,

KEVIN PETERS, individually and in his
official capacity as Captain in the
Johnson City Police Department,

TOMA SPARKS, individually and in his
official capacity as Detective in the
Johnson City Police Department, and

DOES 5-10, inclusive,

      Defendants.

_____/

## <u>COMPLAINT</u>

      For years, Sean Williams drugged and raped women in Johnson City, Tennessee, and for

years, officers of the Johnson City Police Department ("JCPD") let him get away with it. From

November 2019– 2020, JCPD received at least six reports alleging Williams had attempted to drug

and/or sexually assault women in his apartment in downtown Johnson City. Instead of arresting

1

Williams, however, JCPD officers treated Williams as though he were, in the words of Detective Toma Sparks, "untouchable."

On or around June 23, 2022, Plaintiffs, all women, learned of JCPD's unlawful treatment of complaints against Williams. Specifically, with the filing of former federal prosecutor Kateri Dahl's civil complaint, Plaintiffs became aware of JCPD's institutionalized policy to ignore complaints of criminal activity and bodily harm, including allegations of rape and drug activity by Williams and his accomplices, made by multiple women under Johnson City's jurisdiction. Not only were the complaints of women being ignored or diminished, JCPD, including Chief Karl Turner, Captain Kevin Peters, and Detective Toma Sparks, knowingly failed to investigate Williams' crimes against women; knowingly failed to refer charges for prosecution and/or referred charges in a piecemeal and incomplete manner so as to undermine the prosecution; knowingly intimidated and dissuaded Plaintiffs from pursuing criminal charges; and, in the case of Detective Sparks, knowingly made false statements to Plaintiffs in an effort to obstruct and interfere with the criminal investigation. Dahl's allegations also exposed JCPD's interference with the federal criminal investigation into Williams.

JCPD's actions evidence a sex-based bias against female crime victims. These actions, known and authorized by Johnson City, Tennessee, were knowing, reckless, negligent, and deprived Plaintiffs of their constitutional rights to equal protection and due process, as well as their rights under Title IX of the Education Amendments Act of 1972, and the common law.

## JURISDICTION AND VENUE

1.     Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, the Tennessee Governmental Tort Liability Act, T.C.A. 29-20-205, Title IX of the Education Amendments Act if 1972, 20 U.S.C. § 1681, and the common law.

2

2.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

3.     Venue is proper under 28 U.S.C. § 1391 as Defendants are located in Washington County, in the Greeneville Division of the Eastern District of Tennessee.

## PARTIES

4.     Plaintiff, Jane Doe 1, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

5.     Plaintiff, Jane Doe 2, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

6.     Plaintiff, Jane Doe 3, a female, was a citizen and resident of Kingsport, Tennessee, during the operative time.

7.     Plaintiff, Jane Doe 4, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

8.     Plaintiff, Jane Doe 5, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

9.     Personal Representatives to Plaintiff, Jane Doe 6, a deceased female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

10.     Plaintiff, Jane Doe 7, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

11.     Plaintiff, Jane Doe 8, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

12.     Plaintiff, Jane Doe 9, a female, was a citizen and resident of Elizabethton, Carter County, Tennessee, during the operative time.

3

13. Defendant Johnson City, Tennessee, ("Defendant City"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee. Defendant City has substantial control over the Johnson City Police Department and its employees.

14. Defendant Chief Karl Turner is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

15. Defendant Captain Kevin Peters is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

16. Defendant Detective Toma Sparks is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

17. Defendant Officers John Does 5 through 10 are Johnson City Police Officers. Plaintiffs name them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.

## FACTUAL BACKGROUND

### A. Williams Conspired to Drug and Rape Women in Johnson City

18. Beginning in at least 2018 and continuing to 2021, Sean Williams, a known drug dealer and convicted felon, conspired with Alvaro Fernando Diaz-Vargas and others to drug and rape women in his apartment in downtown Johnson City.

19. Upon information and belief, Williams directed multiple coconspirators, including Diaz-Vargas and Female 1, to recruit local women and bring them directly to Williams' garage and apartment, where he would drug and sexually assault them.

20. In return, Williams provided Diaz-Vargas and Female 1 with money, free housing, food, and illicit drugs. Specifically, Diaz-Vargas resided at Williams' apartment without paying for housing.

4

**B.    Jane Doe 1's Factual Allegations**

21.    Around 2018-2019, Jane Doe 1, a Johnson City resident, was frequently brought to Williams' apartment by mutual acquaintances to party.

22.    During this time, Jane Doe 1 believed it was the "cool thing" to be invited up to Williams' apartment for parties. Williams provided alcohol and illicit drugs, including marijuana and cocaine, to people who came to his apartment socially.

23.    Jane Doe 1 was often provided alcoholic beverages or drugs by Williams. In particular, Jane Doe 1 never saw anyone but Williams distribute cocaine to the partiers. At every party, Jane Doe 1 saw Williams keep his stash of cocaine in a specific box that no one else had access to.

24.    At Williams' apartment, Jane Doe 1 saw multiple cameras set up in and around the apartment.

25.    Jane Doe 1 met Diaz-Vargas around 2012-2013 and they became good friends.

26.    She frequently observed Diaz-Vargas meet women at the local downtown bars and bring them back to Williams' apartment. While Williams rarely left his apartment, Diaz-Vargas would consistently drink and party at the local bars and bring women back to Williams' property.

27.    In or around November 2018, Jane Doe 1 attended a party at Williams' apartment by herself. She arrived at Williams' apartment while a party was in full swing and was immediately handed an alcoholic beverage. She has no memories of the rest of the evening.

28.    When Jane Doe 1 woke the next morning, she was lying on her back on Williams' couch in the apartment's living room. Her skirt was pushed up around her hips and Williams was orally copulating her.

29.     Jane Doe 1 immediately tried to lift her hand and push Williams off her, but she was too physically weak to move her arm properly. She felt mentally and physically incapacitated, beyond the average level of incapacitation associated with alcohol.

30.      Unable to stay awake, Jane Doe 1 passed back out.

31.     Sometime later that morning, Jane Doe 1 woke a second time to find Williams asleep on the other side of the couch. She immediately left the apartment.

32.     After the assault, Jane Doe 1 was scared to report what happened to JCPD, as she feared retaliation from Williams and believed JCPD would not protect her.

33.     On November 9, 2018, in an attempt to report the assault as safely as possible, Jane Doe 1 sent a text message to an individual who worked for JCPD, asking to speak about a personal matter. Still traumatized and embarrassed, however, she never followed up on the text and was never able to report the sexual assault.

**C.     Jane Doe 2's Factual Allegations**

34.     In the fall of 2019, Female 1 befriended Jane Doe 2 and introduced her to Diaz-Vargas and Williams.

35.     Female 1 invited and encouraged Jane Doe 2 to party at Williams' apartment numerous times.

36.     Upon information and belief, Williams' apartment was only accessible by entering a certain code; Williams only provided the code to people who recruited victims into his apartment.

37.     Jane Doe 2 often observed Female 1 enter the code into Williams' apartment before leading Jane Doe 2 and other women up.

38.     On or about October 29, 2019, Female 1 invited Jane Doe 2 and Jane Doe 11 back to Williams' apartment.

6

39.     Once in the apartment, Jane Doe 2 was offered cocaine by Williams. Williams poured lines of cocaine on a black tray that was only offered and used by the female partygoers. The male partygoers, including Williams and Diaz-Vargas, used cocaine from a different platform.

40.     After using the cocaine, Jane Doe 2 began to feel woozy and physically and mentally incapacitated.

41.     Concerned, she attempted to leave the apartment, but was stopped by Williams. He told Jane Doe 2 that she could not leave and if she did, she would be pulled over for a "DUI." He told her to stay in his apartment and sleep on his couch.

42.     In an attempt to get away, Jane Doe 2 lied to Williams, saying she had to work the next day and that her dog needed to be let out at her house.

43.     Eventually, Jane Doe 2 was able to leave and tried to drive home. During the drive, she felt increasingly confused and dizzy and became alarmed when her vision began to blur. She pulled into a parking lot and passed out.

44.     Jane Doe 2 awoke the next morning to find the car door open, one of her legs out of the car, and the key still in the ignition.

45.     On or about November 7, 2019, Jane Doe 2 was out with a friend in downtown Johnson City. While out, Diaz-Vargas sought her out and invited Jane Doe 2 and her friend back to Williams' apartment. Jane Doe 2 agreed because her friend seemed romantically interested Diaz-Vargas.

46.     When she arrived, Williams handed her an already opened beer. She immediately began to feel the same physical and mental incapacitation as she had felt on the prior occasion and was unable to move her body properly.

47.     The next thing Jane Doe 2 remembers is waking up in Williams' bed. Williams was straddled over her, and her sweater was ripped. Upon information and belief, Williams had vaginally penetrated and/or orally copulated her while Jane Doe 2 was unconscious.

48.     Once she awoke, Jane Doe 2 shoved Williams off her and tried to run out of Williams' apartment. However, she did not have full control of her movements and she fell over in the hallway and hit her head against the wall.

49.     Once she escaped, Jane Doe 2 asked a friend to drive her to an urgent care to receive a rape kit.

50.     At the urgent care, Jane Doe 2 told the nurse that she believed she had been raped and wanted to report the rape to the police.

51.     The urgent care administered a rape kit and two JCPD officers arrived at the clinic to take a statement from Jane Doe 2 and her friend. Jane Doe 2 told the officers she had been assaulted by Williams and pointed out Williams' apartment on a map.

52.     In response, the JCPD officers mentioned that they had heard of women complaining of sexual assault by Williams before.

53.     The JCPD officers took Jane Doe 2's clothes and placed them in a garbage bag. They did not provide her with any type of evidence receipt.

54.     Jane Doe 2 told the police she wanted to press charges against Williams.

55.     Jane Doe 2 did not hear anything more from JCPD for a year and a half.

56.     In or around May 2021, she received a call from Detective Sparks, a JCPD detective who, upon information and belief, is in the narcotics investigation unit. Detective Sparks told Jane Doe 2 that the results from her rape kit showed that she had benzodiazepine in her system the night

of the assault. She had never voluntarily or knowingly taken benzodiazepine. The rape kit also showed that the DNA of another person was present in the sample collected.

57.     After relaying this information, Detective Sparks discouraged Jane Doe 2 from pursuing charges against Williams. He told Jane Doe 2 that even if he was able to get a warrant to collect and test Williams' DNA, Williams would have to willingly submit to the testing, and he would never do that. In fact, this statement was false as a warrant would require Williams to submit to testing. Detective Sparks described Williams as "untouchable."

58.     Detective Sparks went on to say that he didn't know if JCPD would be able to do anything if Jane Doe 2 did press charges, and JCPD would "probably not" be able to protect Jane Doe 2 from retaliation if she did.

59.     A few days later, after consulting her family and friends, Jane Doe 2 called Detective Sparks back to tell him she wanted to proceed with pressing charges against Williams. She never received a response.

60.     To date, no charges have been brought against Williams or Diaz-Vargas for Jane Doe 2's sexual assault.

**D.     JCPD Officers Fail to Investigate Female 2's Report of Sexual Assault**

61.     According to allegations in the complaint of former Special Assistant United States Attorney ("SAUSA") Kateri Dahl ("Dahl Complaint"), *see* CV 22-00072-KAC-JEM (EDTN), on or around June 2, 2020, a woman (Female 2) woke up in Williams' apartment to discover that she had been sexually assaulted. Female 2 fled Williams' apartment in great distress, shoeless and screaming.

62.     Female 2 encountered JCPD officers in the lobby of Williams' apartment building and told them what had happened in Williams' apartment.

63.     The JCPD officers drove her to her parents' house but declined to help her seek medical attention. The officers also failed to assist her in getting a rape kit done. The officers did not prepare a full police report, nor did they follow up with her in any way. The officers also declined to get a statement from the suspect, Williams.

64.     On December 15, 2020, Female 2 came into the Johnson City Police Department, and was cooperative. She gave a very credible statement to SAUSA Dahl and to another prosecutor alleging she had been raped by Williams; her statement closely mirrored that of other Jane Doe victims.

65.     To date, no charges have been brought against Williams for Female 2's sexual assault.

**E.     Jane Doe 3's Factual Allegations**

66.     In the Fall of 2019, Jane Doe 3 met and became friends with Female 1. Almost immediately, Female 1 began to try to bring Jane Doe 3 to Williams' apartment by promising access to alcohol and drugs.

67.     On October 29, 2019, Female 1 encouraged Jane Doe 3, and Jane Doe 2 to come to Williams' apartment to party.

68.     Once there, Williams offered the women cocaine off a black tray.

69.     Jane Doe 3 did a line of cocaine off the same black tray offered to Jane Doe 2 and Female 1.

70.     Almost immediately upon using the cocaine, Jane Doe 3 began to feel incapacitated, unable to think clearly or move her body properly.

71.     Female 1, who had also used cocaine from the black tray, completely passed out on the living room couch.

72.     Jane Doe 3 attempted to wake Female 1, slapping her across the face, but could not rouse her.

73.     Scared for their safety, Jane Doe 3 tried to carry Female 1 out of Williams' apartment but was physically stopped by Diaz-Vargas.

74.     Williams then told Jane Doe 3 that she could not leave, as she was too "fucked up."

75.     Jane Doe 3 was able to escape the apartment by herself.

76.     Once she made it to her car, Jane Doe 3 locked herself in and passed out.

77.     In the weeks following the assault, Williams continuously harassed and threatened Jane Doe 3. He said he would report Jane Doe 3 to the police and sue her for libel if she told anyone about his drugging and attempted sexual assault. At one point, Williams accused her of being "an angry coke whore that no one even wanted to fuck that night."

78.     Williams also recruited others in the community to contribute to this pattern of harassment. In one of the bathrooms in a Johnson City bar, the words "[Jane Doe 3's] a coke whore that sucks dick for coke" were written on the wall. Jane Doe 3 was approached on the street by strangers who made various derogatory comments about her.

79.     Jane Doe 3 became terrified to go out in public. She felt forced to ask her boss to walk her to her car after each shift she worked at a downtown Johnson City bar.

80.     After hearing about Jane Doe 2's failed attempt to report her assault to JCPD, Jane Doe 3 was too frightened to report her own. She believed JCPD would not help Williams' victims.

**F.      Jane Doe 4's Factual Allegations**

81.     Jane Doe 4 met Williams around 2012/2013 through Alunda Rutherford, Williams' romantic and business partner. She did not interact with him again until 2018/2019 when she began to be invited to Williams' apartment to party.

11

82.     On or around September or October 2020, Jane Doe 4 was invited to Williams' apartment with a group of acquaintances. Both Williams and Diaz-Vargas were present.

83.     Jane Doe 4 was offered both alcohol and cocaine by Williams and shortly after lost consciousness.

84.     She later woke up to find Williams pressing his penis and testicles into her face. She tried and failed to push Williams off, as she could not properly move her limbs. She again lost consciousness.

85.     When she awoke a second time, she was able to push Williams off her. She questioned Williams, asking if she had dreamed of the assault.

86.     Williams responded, saying she had not been dreaming and that he had needed to use her because he didn't have his blow dryer and had to "make do." Upon information and belief, Williams regularly uses a blow dryer to stimulate himself sexually.

87.     Immediately following the assault, Jane Doe 4 told her sister, her fiancé, and multiple friends about it.

88.     She did not feel safe reporting the assault to JCPD, as she had been told that the police would take no action, as they never did when women reported assault by Williams, and/or would "slut shame" her if she reported.

## G.     Jane Doe 5's Factual Allegations

89.     In the summer and fall of 2020, Jane Doe 5 was befriended by Female 1 and Diaz-Vargas. Both Female 1 and Diaz-Vargas began to invite Jane Doe 5, along with other women, back to Williams' apartment for free alcohol and illicit drugs.

90.     In or around mid-October 2020, Jane Doe 5 was at a party in Williams' apartment when he offered her an alcoholic beverage. Shortly after consuming the drink, Jane Doe 5 lost consciousness.

91.     She woke up to find herself slumped over Williams' couch. Her pants and underwear had been pulled down to her feet, and Williams lay asleep on the other end of the couch.

92.     Still feeling dazed, Jane Doe 5 fled the apartment on foot.

93.     She called the Tennessee Department of Health to report that she had been raped and needed to be examined.

94.     On October 23, 2020, she received a rape kit exam. The nurse administering the exam told Jane Doe 5 that other women had reported sexual assaults by Williams and gave her the number for Detective Sparks to report the assault.

95.     Shortly after, Jane Doe 5 called Detective Sparks and reported the sexual assault by Williams.

96.     Detective Sparks told Jane Doe 5 she should wait to make a police report until she received the rape kit results.

97.     Jane Doe 5 followed up with Detective Sparks by phone at least two more times, but she never heard anything further about her report.

98.     To date, no charges have been filed against Williams for Jane Doe 5's sexual assault.

99.     To date, Jane Doe 5 has not received the results of her rape kit.

## H.     Jane Doe 6's Factual Allegations

100.     Jane Doe 6 is a former resident of Johnson City who is now deceased.

101.     On November 10, 2020, Jane Doe 6 was celebrating her sister's (Sister 1) birthday with family and friends at a brewery in downtown Johnson City.

102.     Upon information and belief, when Jane Doe 6 left the brewery, she was coherent and in complete control of her physical and mental capacities.

13

103.     After leaving the brewery, Jane Doe 6 and her boyfriend stopped by Williams' garage, a property directly across the street from his apartment. Jane Doe 6's boyfriend returned to the brewery to retrieve his cell phone.

104.     Upon information and belief, Williams offered Jane Doe 6 an alcoholic beverage while she was in his garage and/or his apartment.

105.     About an hour later, Sister 1 received a call from Jane Doe 6. It was clear Jane Doe 6 was driving and was completely incoherent, using slurred speech and not making sense.

106.     Despite driving in the town in which she had lived her whole life, Jane Doe 6 did not know where she was and could not recall any locations or street names.

107.     Jane Doe 6 would periodically start screaming expletives and was clearly upset about something that had just happened. At one point, she began to cry hysterically.

108.     Jane Doe 6's other sister, Sister 2, became concerned and also called and tried to speak with Jane Doe 6. Sister 2 experienced the same issues communicating with Jane Doe 6, as Jane Doe 6 remained out of her mind and incoherent.

109.     For over an hour, Sister 1 and Sister 2 called Jane Doe 6 over a dozen times in an attempt to find her and help her get home.

110.     At approximately 2:29 a.m., Jane Doe 6's car hit a concrete base of a light pole in Carter County, the county next to Washington County, where Johnson City is located. Jane Doe 6 died on impact.

111.     Several days later, Sister 1 contacted JCPD to report that Jane Doe 6's crash was suspicious, and that Jane Doe 6 had last been seen entering Williams' apartment. She expressed concern that a crime may have occurred and asked the police to look into it.

112.    When the JCPD officer learned that the crash occurred in Carter County, he told Sister 1 she needed to contact their Sheriff's Department, as JCPD could not help her because it was a "Carter County problem."

113.    A JCPD officer further told Sister 1 that JCPD had no jurisdiction to investigate the circumstances of the crash.

114.    Conversely, the Carter County Sheriff's Department told Sister 1 that JCPD had jurisdiction over an investigation because Williams' apartment was located in Johnson City.

115.    In or around January 2021, Sister 1 called JCPD again and asked to speak with a detective.

116.    By this point, Sister 1 had spoken with Williams and Diaz-Vargas and had learned that Williams had given Jane Doe 6 a drink on the night of her death, shortly before Jane Doe 6 left Williams' apartment and attempted to drive home.

117.    Sister 1 related everything she knew to the JCPD detective and explained that she suspected something had happened to Jane Doe 6 while she was in Williams's apartment.

118.    The JCPD detective asked no follow up questions and did not invite Sister 1 to come in person to give a statement. The detective also failed to disclose to Sister 1 that JCPD had already received complaints from other women who had been drugged and raped by Williams while in his apartment.

119.    JCPD failed to return any of Sister 1's calls or queries into Jane Doe 6's death.

120.    Upon information and belief, JCPD has not investigated the circumstances of Jane Doe 6's death.

**I.      Jane Doe 7's Factual Allegations**

121.    Jane Doe 7 met Williams in 2019.

15

122.     On or around October 31, 2019, Jane Doe 7 met Female 1 at Williams' apartment before going out in downtown Johnson City for Halloween. Female 1 acted very friendly to Jane Doe 7; she did Jane Doe 7's makeup and brought her to the bar where Williams was partying.

123.     At the bar, Williams handed Jane Doe 7 a drink.

124.     The next thing Jane Doe 7 remembered she was waking up in William's bed wearing only her underwear.

125.     Williams was asleep on top of her with his genitals and anus in Jane Doe 7's face.

126.     Jane Doe 7 pushed Williams off her and left.

127.     From around March through May or June 2020, Jane Doe 7 lived with Williams and would cook, clean, and run errands for him.

128.     Williams and Diaz-Vargas, who also lived with Williams, began to tell Jane Doe 7 to go down to the bars and "find hos" for them, meaning random women. Jane Doe 7 refused.

129.     In the summer and fall of 2020, Jane Doe 7 left Johnson City.

130.     In or around November 24, 2020, Jane Doe 7 had returned to Johnson City. She asked Williams whether she could come to his apartment to shower and to use his washing machine. Williams agreed.

131.     When she arrived at Williams' apartment, he offered her cocaine and alcohol. Jane Doe 7 declined the alcohol but partook in the cocaine.

132.     She immediately began to feel drowsy. Williams told her that if she was feeling tired, she could go use his bed, and then walked her to his bedroom.

133.     The next thing Jane Doe 7 remembers is waking up in Williams' bed, with Williams naked and pressed against her.

134.     Williams moved Jane Doe 7 onto her back, put his knees on her shoulders, pushed his genitals into her face, spread her legs apart, and proceeded to rape Jane Doe 7 with his fist.

135.     Jane Doe 7 told him to stop, but Williams continued to assault her. Williams then tried to push his fingers inside her anus, at which point, Jane Doe 7 screamed and was able to push Williams off her.

136.     Jane Doe 7 waited in the bathroom, hoping Williams would fall back asleep. Then she went to collect her things in the living room so she could leave. The door to Williams' apartment, however, was locked with a complex locking mechanism that she was unable to open.

137.     Jane Doe 7 then asked another male who was in the living room to help her get out. Williams appeared from behind and told her, "Get out, ho."

138.     Jane Doe 7 decided to report the assault to the Federal Bureau of Investigation instead of JCPD, as she did not trust JCPD to take sexual assault seriously.

139.     She reported the assault in person at the FBI's Johnson City field office. An agent took her cell phone for what Jane Doe 7 believed was a forensic investigation.

140.     The FBI agent called Detective Sparks, who came to the field office and met with Jane Doe 7.

141.     Detective Sparks then accompanied Jane Doe 7 to the hospital, where she received a rape kit.

142.     After leaving the hospital, Jane Doe 7 went to JCPD offices where she spoke with a female investigator and/or attorney and explained that she wished to press charges.

143.     Detective Sparks told her falsely that she was the first woman who wished to go forward with charges, the other women were too scared.

144.    Jane Doe 7 never received the results from her rape kit. To date, no charges have been brought against Williams for Jane Doe 7's sexual assault.

**J.    Jane Doe 8's Factual Allegations**

145.    Jane Doe 8 worked as a bartender and server at a downtown Johnson City establishment during the operative time period.

146.    In or around 2018 and 2019, Jane Doe 8 became good friends with Female 1. Jane Doe 8 and Female 1 would often drink and party together.

147.    Eventually, Female 1 began to invite Jane Doe 8 to Williams' apartment so they could get free alcohol and drugs.

148.    In her capacity as a local bartender, Jane Doe 8 frequently witnessed Diaz-Vargas speak with women and invite and encourage them to go to Williams' apartment.

149.    As Diaz-Vargas was young and good looking, particularly compared to Williams, Diaz-Vargas would socially engage with women, buying them drinks and flirting with them. Diaz-Vargas would then invite the women back to Williams' apartment and promise access to free alcohol and illicit drugs.

150.    Diaz-Vargas invited Jane Doe 8 to Williams' apartment on numerous occasions.

151.    When she would party at Williams' apartment, Jane Doe 8 saw Williams keep a separate batch of cocaine that he would only share with particular women.

152.    She witnessed Williams bring small groups of women back to his bedroom to do cocaine out of that jar.

153.    In or about January or February 2020, Jane Doe 8 went to Williams' apartment with Female 1. There, Williams offered Jane Doe 8, Female 1, and another woman cocaine.

154.    Shortly after taking the drug, Female 1 passed out on Williams' couch.

18

155.     After using the cocaine, Jane Doe 8 began to feel incapacitated, as though she had taken a "downer" rather than an "upper" drug like cocaine.

156.     Jane Doe 8 texted her then-boyfriend and told him that she felt funny.

157.     As Jane Doe 8 and Diaz-Vargas were sitting on the couch in Williams' living room, Diaz-Vargas began to touch and grope Jane Doe 8 inappropriately, grabbing her and touching her buttocks.

158.     Jane Doe 8 repeatedly told Diaz-Vargas no, but he would not stop grabbing her.

159.     She made multiple attempts to leave the apartment, but every time Diaz-Vargas would tell her to stay.

160.     Eventually, Jane Doe 8's friend came into the living room and told Diaz-Vargas to stop.

161.     Jane Doe 8 had heard that Williams and Diaz-Vargas harassed and threatened women they didn't like, so she waited a short amount of time before leaving the apartment.

162.     Jane Doe 8 decided not to report Diaz-Vargas' assault to JCPD, as she feared retaliation by Williams and that JCPD would not take action.

**K.     Jane Doe 9's Factual Allegations**

163.     Jane Doe 9 first met both Williams and Diaz-Vargas in or around the summer of 2020.

164.     While out in the Johnson City downtown bars, Jane Doe 9 often observed Diaz-Vargas approach women and use his looks and his flirtation to lure them back to Williams' apartment.

165.     One three to four occasions, Jane Doe 9 was brought to Williams' apartment by either Diaz-Vargas or Female 1 to party after the bars closed.

19

166. When she was in Williams' apartment, Jane Doe 9 noticed that Williams always poured women drinks from a different bottle of alcohol than the one from which he drank.

167. Williams also kept a separate bag of cocaine for serving women versus himself and other men.

168. One night, while partying at Williams' apartment, Jane Doe 9 saw a woman leaving Williams' bedroom looking distraught. The woman was pulling up her underwear as she walked out and fled the apartment.

169. In or about August or September 2020, Jane Doe 9 went back to Williams' apartment with Female 1, Diaz-Vargas, a friend of hers, and several other people.

170. At first, everyone hung around partying, but Williams abruptly claimed to have received a call from the police and told everyone they needed to leave.

171. Williams pulled Jane Doe 9 aside, however, and told her that she was so "fucked up" that if she left, the police would stop her at his front door, and she would get into trouble.

172. Jane Doe 9, beginning to feel physically and mentally incapacitated and terrified that the police were just on the other side of the door, believed Williams and waited while most of the party left. At one point, a friend of Jane Doe 9's attempted to come back into the apartment to find her, pounding on the front door to be let in, but Williams would not unlock the door.

173. Williams then took Jane Doe 9 to a couch in the living room and proceeded to grope her, kiss her, touch her breasts and buttocks, and penetrate her vagina with his fingers. Jane Doe 9 told Williams to stop but he did not listen.

174. Jane Doe 9 struggled to move her body as she was being sexually assaulted and felt as though she were in a dream. She struggled to form words or comprehend what was happening

20

around her. The sexual assault lasted for hours, during which time Jane Doe 9 may have passed in and out of consciousness.

175. At one point during the assault, in an attempt to stop Williams, Jane Doe 9 threatened to report Williams to the police. Williams laughed at her when she said this and told her that he had a lot of money and connections, and no one would ever believe her.

176. After four or five hours, Williams finally stopped sexually assaulting Jane Doe 9 and took her down to his garage where her car was parked. By then it was morning. Williams forced Jane Doe 9 to give him a hug goodbye.

177. Jane Doe 9 felt like she could not tell anyone or report the assault as the event was too traumatizing.

**L.    Johnson City Police Department's Search of Williams' Apartment**

178. On or around September 20, 2020, a woman (Female 3) fell, or was pushed, out of Williams' apartment window, suffering life-threatening injuries.

179. Upon information and belief, JCPD officers arrived at Williams' apartment shortly after the incident occurred that night.

180. Williams told the officers to leave the apartment.

181. Rather than secure Williams' apartment while seeking a search warrant for an attempted homicide investigation, JCPD officers left.[1] Williams then locked the front door behind them.

---

[1] Nor did JCPD officers conduct a search under the exigency exception to the warrant requirement under the Fourth Amendment in order to prevent the destruction of relevant evidence, and/or the escape of the potential suspect, among other consequences which would improperly frustrate their legitimate law enforcement efforts. *See Missouri v. McNeely*, 569 U.S. 141 (2013).

182.    After the officers left, Jane Doe 5 witnessed Williams and Diaz-Vargas move and hide firearms and illicit drugs located throughout the apartment. Jane Doe 5 saw Williams and Diaz-Vargas place the items in a duffle bag and move them to the roof.

183.    When JCPD officers returned with a search warrant, Jane Doe 5 saw them seize digital devices from Williams' apartment, including video cameras, a cellphone, and a computer.

184.    Upon information and belief, Williams kept video cameras throughout his apartment which he used to record his and his guests' activities.

185.    To date, Plaintiffs have not been informed about any evidence which may have been found on Williams' seized digital devices.

186.    Jane Doe 5 also witnessed JCPD officers seize a safe from Williams' apartment. Jane Doe 5 had previously seen large amounts of cash kept within the safe.

187.    JCPD officers also found and seized a handwritten note from Williams' nightstand with the word "Raped" written atop a list of 23 women's first names in black ink.

188.    Upon information and belief, none of the sexual assault victims who had reported Williams to JCPD were informed of this list, nor told whether their names appeared therein.

189.    JCPD officers did not arrest Williams before leaving.

190.    Upon information and belief, Female 3 later reported to JCPD that she believed she had been drugged by Williams that night prior to falling or being pushed out of the window.

191.    To date, no charges have been filed against Williams as a result of the attempted homicide investigation.

**M.    Johnson City Police Department Interfere with the Federal Criminal Investigation into Williams**

192.    Plaintiffs re-allege and incorporate by reference each and every allegation in the Complaint as though fully set forth herein.

22

193.    On November 13, 2020, Detective Sparks presented a potential felon in possession of ammunition case against Williams to SAUSA Dahl for her review.

194.    This was an unusual federal charge to bring within the U.S. Attorney's Office because of the relatively minimal sentences available under the U.S. Sentencing Guidelines for this offense.

195.    According to the Dahl Complaint, the "compelling reason" given to her for recommending this paltry charge – counterintuitively – was that Williams was under investigation for attempted homicide. Additionally, while executing a search warrant in the attempted homicide investigation, officers had recovered a handwritten note from Williams' nightstand with the word "Raped" atop a list of 23 women's names.

196.    Upon information and belief, one potential reason for law enforcement officers to propose a relatively minimal charge against a suspect facing far more serious criminal charges is to protect and/or to provide a benefit to the offender if he or she is working as a confidential informant (CI). This accomplishes two ends: (1) it provides a benefit and/or incentive to the CI in exchange for information, and (2) it assists in maintaining the CI's credibility, and the credibility of the prosecution and law enforcement agency if the CI is needed to testify in court.

197.    SAUSA Dahl agreed to pursue the case, but quickly became concerned that JCPD had made errors in their investigation into Williams and that the far more serious offenses of sexual assault and attempted homicide were not being pursued.

198.    According to her complaint, SAUSA Dahl expressed these concerns to Detective Sparks, explaining that she would bring the charge of felon in possession of ammunition, but that she also intended to build a broader case against Williams based on the substantial evidence of the more serious charges, including the conduct of drugging and raping women.

199. As set forth in detail in SAUSA Dahl's complaint, once Dahl began her investigation, JCPD officers took numerous steps to obstruct, attempt to obstruct, and/or to interfere with her investigation into Williams' sexual assault crimes, including but not limited to the following:

   a. Chief Turner's dismissal of the "Raped" list, claiming that it did not demonstrate evidence of nonconsensual sex.

   b. Chief Turner and Captain Peters' dismissal of victims' accounts, claiming that the victims were not credible despite the overwhelming evidence that Williams was drugging and raping women.

   c. Detective Sparks falsely indicating to SAUSA Dahl that a victim was uncooperative, when in fact the victim wished to pursue charges against Williams.

   d. JCPD failing to inform SAUSA Dahl of Jane Doe 6's death and her sister's efforts to initiate an investigation into Williams' culpability.

   e. JCPD's refusal to investigate a victim's account of rape.

   f. Captain Peters ridiculing and making jokes about a victim's appearance prior to the victim providing a statement about Williams' sexual assault to JCPD and SAUSA Dahl.

   g. Shortly after SAUSA Dahl initiated JCPD taking a second statement from one of Williams' victims – a victim JCPD had previously ignored and maligned – Chief Turner called SAUSA Dahl's supervisor to complain about her job performance. Chief Turner knowingly took this action to intimidate SAUSA Dahl, interfere with her investigation into Williams, and

to attempt to stop the investigation. In fact, JCPD investigators who worked directly with SAUSA Dahl had made no such complaints about SAUSA Dahl's job performance.

h.  From December 2020 to March 2021, SAUSA Dahl continued to press Chief Turner and JCPD investigators to take investigative steps related to the complaints of Williams' sexual assaults. Instead of investigating Williams, officers made statements questioning the credibility of victims, and made harassing comments to SAUSA Dahl.

i.  For example, one male investigator stated to SAUSA Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour." Instead of refuting the allegations, the investigator's words suggested SAUSA Dahl would have better luck assembling evidence if she voluntarily made herself a victim of sexual assault.

j.  JCPD unreasonably delayed producing requested documents to SAUSA Dahl, including failing to provide information necessary for a federal search warrant until the information was too stale to support probable cause; failed to alert SAUSA Dahl when yet another victim of Williams made a report to JCPD; and failed to provide a certified copy of Williams's felony conviction.

k.  JCPD officers, including Detective Sparks, refused to execute a valid federal arrest warrant for Williams approximately 30 times in the weeks after SAUSA Dahl obtained the warrant on April 13, 2021.

l. Upon information and belief, JCPD officers failed to arrest Williams on May 6, 2021, improperly alerting him to the arrest warrant before executing it and allowing him to remain inside his apartment. JCPD officers then left the premises, enabling Williams to abscond for the next two years. Williams' unlawful flight was possible only because of JCPD's knowing interference with SAUSA Dahl's investigation.

m. During May 2021, SAUSA Dahl continued to investigate Williams, taking statements from eight witnesses who corroborated the accounts of the victims that Williams was drugging and raping women in Johnson City. SAUSA Dahl also heard directly from another victim whose account mirrored the other victims of Williams. In May 2021, SAUSA Dahl reported her concerns about Williams' history of predation and JCPD's inaction to an FBI agent. On reasonable inference, Chief Turner learned of SAUSA Dahl's efforts to investigate Williams and her report to the FBI, and on Jun 25, 2021, terminated her employment.

## N. Johnson City Police Department – Deprivation of Constitutional Right to Equal Protection under the Law

200.    Beginning in at least November 2019, JCPD had knowledge that Williams was drugging and raping women.

201.    Following Jane Doe 2's report of sexual assault and attempt to press charges against Williams in November 2019, the JCPD failed to conduct an investigation of sexual assault against Williams, failed to properly document Jane Doe 2's report, failed to test her rape kit timely, and failed to retain or preserve evidence properly.

202.    JCPD followed this pattern with at least Jane Doe 5, Jane Doe 6, Jane Doe 7, Female 2, and Female 3.

203.    Detective Sparks had vast knowledge of Williams' sexual assaults.

204.    Sparks spoke with Jane Doe 2, Jane Doe 5, Jane Doe 6's family members, and Jane Doe 7, all of whom told Sparks that they wanted to report Williams for drugging and sexual assault or possible drugging and attempted sexual assault.

205.    By not investigating multiple complaints of sexual assault by Williams and discouraging female reporters of sexual assault from pursuing charges against Williams, JCPD failed to believe or address women's accounts of crime within its jurisdiction.

206.    As a direct result of JCPD's discriminatory policies and practices towards women, Williams was able to continue to victimize women after Jane Doe 2's report, including Jane Does 3, 4, 5, 6, and 7, and Females 2 and 3, resulting in their bodily injury, extreme emotional distress, psychological harm, and, in the case of Jane Doe 6, death.

207.    Upon information and belief, JCPD's failure to protect female victims of Williams' sexual assault was consistent with an institutional practice and ongoing policy of JCPD of failing to protect female victims of sex crimes, which was motivated by JCPD officers' actual discriminatory animus towards women.

208.    Upon information and belief, these practices and policies were known and ratified by JCPD policy makers.

209.    Upon information and belief, Defendant City failed to prevent JCPD from engaging in the policy and practices that disproportionately affected women.

210.    Upon information and belief, Defendant City approved an ongoing institutional practice of discrimination toward women by, among other actions:

a. Failing to properly supervise JCPD;

b. Failing to properly train JCPD;

c. Failing to forward to the District Attorney's Office of Washington County evidence of criminal acts committed in Washington County, and/or forwarding reports of rape in a piecemeal fashion so as to undermine the larger case against Williams;

d. Failing to protect and ensure evidence was not discarded;

e. Failing to protect and ensure evidence was not lost or mishandled; and

f. Failing to discipline, restrict, and control JCPD employees for failing to investigate crimes of sexual assault against females.

## O.   JCPD's Policy and Procedures Were Motivated by Discriminatory Animus Towards Women

211.   JCPD's failure to protect victims of Williams' sexual assaults was consistent with an institutional practice and ongoing policy of JCPD, and was motived, in part, by the officers' discriminatory animus towards women.

212.   As set forth in the Dahl Complaint, JCPD officers made statements to her which evidenced their discriminatory animus towards women victims of sexual assault, including, among other statements, the following:

a. Chief Turner cast doubt on the credibility of Williams' victims even after their names appeared on the "Raped" list, dismissing their cases as potentially "consensual sex."

b. On another occasion, JCPD Captain Peters made jokes about Williams' victim's clothing and appearances.

28

c. One JCPD investigator stated in response to the rape complaints against Williams, "In my 20 years on the force, I've only encountered one real rape."

d. JCPD officers made statements questioning the credibility of victims and made harassing comments to SAUSA Dahl.

e. One male investigator stated to SAUSA Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour." Instead of refuting the allegations, the investigator's words suggested SAUSA Dahl would have better luck assembling evidence if she voluntarily made herself a victim of sexual assault.

**P. Plaintiffs Learned of JCPD's Discriminatory Animus Towards Women on June 23, 2022**

213. Plaintiffs first learned of JCPD's policy and practice of discrimination towards women victims of Williams with the filing of the Dahl Complaint on June 23, 2022.

214. Although Plaintiffs Jane Does 2, 5, and 7, and the personal representatives to Jane Doe 6 were aware before this date that JCPD had failed to file charges based on their individual sexual assault and/or attempted sexual assault and/or drugging complaints against Williams, they had no knowledge that this was part of an unwritten policy and practice of JCPD motivated by discriminatory animus towards women.

215. The Plaintiffs were not aware of the number of complaints of sexual assault filed with JCPD by other victims of Williams, nor of JCPD's inaction in response to these other complaints.

216. The Dahl Complaint revealed for the first time that Chief Turner, Det. Sparks, and other JCPD officers had a policy and practice of failing to process and investigate complaints of sexual assault against Williams, and that this failure was motivated by their actual discriminatory animus towards women.

217. Before this, Plaintiffs did not know, nor did they have reason to know, the constitutional injury they had suffered on the basis of their sex, nor of the state actions that shocked the conscience and constituted a state created danger, which deprived them of life, liberty, or property.

**Q. Plaintiffs Experienced and Continue to Experience Severe Harm and Damages**

218. At all times material hereto, Plaintiffs have been and are continuously harmed by JCPD's ongoing policy and procedures of not believing, investigating, or addressing their complaints of sexual assault by Williams.

219. Plaintiffs' ongoing injuries include, but are not limited to:

    a. Bodily injury,

    b. Death,

    c. Extreme psychological harm,

    d. Deprivation of property,

    e. Deprivation of a right to privacy, and

    f. Emotional distress.

**COUNT I**
**Equal Protection, 42 U.S.C. § 1983**
**Unconstitutional Policy**

220. Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

221. Defendants Chief Turner, Captain Peters, and Detective Sparks acted under the color of state law and pursuant to an adopted policy or a longstanding practice of custom of Defendant City.

222. Defendants maintained the following unconstitutional customs, practices, or policies:

    a. Failure to document reports of sexual assault by Sean Williams made by women under Defendant City's jurisdiction;

    b. Failure to investigate reports of sexual assault by Williams made by women under Defendant City's jurisdiction;

    c. Failure to or delayed in testing the rape kits of women who made complaints of sexual assault by Williams;

    d. Failure to seize or retain evidence properly from women who made complaints of sexual assault by Williams; and

    e. Failure to credit women's accounts of sexual assault within Defendant City's jurisdiction, failure to investigate women's complaints of sexual assault and rape within Defendant City's jurisdiction, and failure to test rape kits of women who made complaints in a timely fashion.

    f. These policies and practices were motived by actual discriminatory animus towards women.

223. On or about June 23, 2022, Plaintiffs learned that Defendants and the JCPD had a custom, policy and practice of failing to investigate sexual assault reports made by women.

224. At all times relevant hereto, sexual assault was perpetrated almost entirely against females. According to federal crime statistics, females constitute over 90% of sexual assault victims.

225. By reason of the aforementioned acts, Plaintiffs have suffered bodily injury, emotional distress, deprivation of property, deprivation of the right to privacy, and, in the case of Jane Doe 6, death.

226. Defendants had either actual or constructive knowledge of the unconstitutional policies, practices and customs alleged above. Despite having knowledge, Defendants condoned, tolerated, and ratified such policies. Defendants acted with deliberate indifference to the foreseeable effects of these policies with respect to the constitutional rights of Plaintiffs and all women under their jurisdiction.

227. Defendants had a duty to diligently investigate *all* crimes. Defendants breached this duty by routinely and systemically failing and/or refusing to do so in the case of sexual assault and rape. Defendants' deliberate indifference to sexual assault crimes, which was an institutional policy so pervasive as to rise to the level of intentional conduct, served to deprive Plaintiffs of equal protection under the law on the basis of their gender.

228. In committing the acts and/or failures as alleged herein, Defendants were at all times relevant hereto acting under the color of the State. The constitutional injury inflicted by Defendants was caused by a person(s) with final policymaking authority at the Defendant City. Defendants knew about the above-described conduct and facilitated it, approved it, condoned it, and/or turned a blind eye to it.

229. The above-described conduct of Defendants constitutes a violation of 42 U.S.C., Section 1983. Plaintiffs are entitled to compensatory damages for emotional pain, suffering, mental

anguish and other non-pecuniary losses, and injunctive relief pursuant to 42 U.S.C., Section 1983 for violations of their civil rights under the U.S. Constitution directly and proximately caused by Defendants.

### COUNT II
### Equal Protection, 42 U.S.C. § 1983
### Violation of Substantive Rights to Due Process

230.    Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

231.    Plaintiffs have a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, and which constitute a state created danger.

232.    The aforementioned actions of JCPD, including but not limited to the actions of Defendants Chief Turner, Captain Peters, and Detective Sparks, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Plaintiffs with a purpose to harm that was unrelated to any legitimate law enforcement objective.

233.    The aforementioned actions of JCPD, including but not limited to the actions of Defendants Chief Turner, Captain Peters, and Detective Sparks, compromise affirmative acts that caused an increased risk to Plaintiffs, specifically, of being exposed to an act of violence by a third party.

234.    The conduct of Defendants was willful, knowing, wanton, malicious, and done with reckless disregard for the rights and safety of all Plaintiffs.

235.    As a direct and proximate result of Defendants' actions, Plaintiffs experienced extreme pain and suffering in the form of bodily injury, emotional distress, and in the case of Jane Doe 6, death. Defendants deprived Plaintiffs of their right to be protected and safeguarded from actions that risked their lives, as well as physical and emotional injury.

33

236.    The above-described conduct of Defendants constitutes a violation of 42 U.S.C., Section 1983. Plaintiffs are entitled to compensatory damages for emotional pain, suffering, mental anguish and other non-pecuniary losses, and injunctive relief pursuant to 42 U.S.C., Section 1983 for violations of their civil rights under the U.S. Constitution directly and proximately caused by Defendants.

**COUNT III**
**Title IX, 20 U.S.C. § 1681**

237.    Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

238.    Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participating in, be denied the benefit of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance."

239.    Defendant City and the Johnson City Police Department receive federal funding.

240.    Plaintiffs have been sexually assaulted within JCPD's jurisdiction.

241.    Plaintiffs' reports of sexual assault to JCPD were not investigated properly, not documented properly, and did not result in charges filed by and/or sent to the District Attorney's Office of Washington County.

242.    Plaintiffs were denied the benefits of an educational program or activity engaged in by the Johnson City Police Department pursuant to federal funding.

243.    The assaults and JCPD's failure to address Plaintiffs' complaints of crime were severe, pervasive, and objectively offensive and upsetting.

244.    Defendant City was in a position to prevent all these events but instead acted willfully, intentionally, and/or deliberately indifferent to it and, in allowing the same, illegally discriminated against Plaintiffs.

245.    As a direct and proximate consequence of the deliberate indifferent with regard to the aforementioned events shown by Defendants, Plaintiffs have suffered damages and the Defendants are liable for all injuries sustained by Plaintiffs proximately caused by their violation of law.

**COUNT IV**
**Tennessee Governmental Tort Liability Act, T.C.A. 29-20-205**

246.    Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

247.    Chief Turner, Captain Peters, and Detective Sparks were aware of numerous complaints of sexual assault and drugging by Williams, including those made by Plaintiffs Jane Does 2, 5, and 7, Jane Doe 6's surviving family member, and Females 2 and 3 as early as 2019.

248.    Despite this knowledge, Chief Turner, Captain Peters, and Detective Sparks failed to investigate Williams, refer all reports of his criminal activity to the District Attorney's Office, or provide protection for the Plaintiffs in this case. These actions do not exercise the care that a reasonable or prudent individual in their capacities would hold.

249.    Chief Turner, Captain Peters, and Detective Sparks negligent actions were the proximate cause of the Plaintiffs' injuries, including but not limited to bodily injury, emotional distress, deprivation of property, deprivation of right to privacy, and, in the case of Jane Doe 6, death.

250.    Defendant City is liable for the injuries proximately caused by the negligent acts or omissions of Chief Turner, Captain Peters, and Detective Sparks.

251.    As a direct and proximate consequence of the negligent acts and omissions with regard to the aforementioned events caused by Defendants, Plaintiffs have suffered damages and Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violation of law.

## COUNT V
## Negligence, Failure to Train

252. Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

253. Defendant City had a duty to train its Police Department officers and employees to not discriminate against citizens on the basis of sex, as well as to properly investigate legitimate complaints of criminal activity and protect citizens under its jurisdiction from criminal activity.

254. Defendant City breached its duty of care to Plaintiffs when JCPD officers and employees were made aware by women of numerous complaints of sexual assault by Williams, failed to investigate those complaints, and failed to protect female citizens of Johnson City from further criminal activity by Williams.

255. By breaching its duty of care, Defendant City proximately caused each Plaintiff bodily injury, emotional distress, the deprivation of property, the deprivation of the right to privacy, and in the case of Jane Doe 6, death.

256. Plaintiffs suffered actual emotional and physical damages due to Defendant City's breach of care.

257. As a direct and proximate consequence of the acts and omissions with regard to the aforementioned events shown by Defendants, Plaintiffs have suffered damages and Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violation of law.

## COUNT VI
## Negligence, Failure to Supervise

258. Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

259. Defendant City had a duty to supervise its Police Department officers and employees to ensure they were not discriminating against citizens on the basis of sex, as well as

36

properly investigating legitimate complaints of criminal activity and protecting citizens under its jurisdiction from criminal activity.

260. Defendant City had a duty to maintain and enforce policies and procedures that ensured all of its citizens, regardless of sex, were protected from criminal activity.

261. Defendant City breached its duty of care to Plaintiffs when the JCPD officers and employees were made aware of the numerous complaints of Williams' sexual assault, failed to investigate those complaints, and failed to protect female citizens of Johnson City from further criminal activity by Williams.

262. By breaching its duty of care, Defendant City proximately caused each Plaintiff bodily injury, emotional distress, the deprivation of property, the deprivation of the right to privacy, and in the case of Jane Doe 6, death.

263. Plaintiffs suffered actual emotional and physical damages due Defendant City's breach of care.

264. As a direct and proximate consequence of the acts and omissions with regard to the aforementioned events shown by Defendants, Plaintiffs have suffered damages and the Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violation of law.

## RELIEF REQUESTED

Plaintiffs respectfully request:

1. A jury trial;

2. Compensatory damages for emotional distress, mental anguish, and disruption to Plaintiff's family life, physical injury, pain and suffering, medical expenses, and all compensatory damages and or economic damages caused by the actions of Defendants.

3. Attorneys' fees and expenses;

4. Prejudgment interest and, if applicable, post-judgment interest;

5. Injunctive and declaratory relief; and

6. Any such general relief to which Plaintiffs may be entitled.

Respectfully submitted,

HMC Civil Rights Law, PLLC

*s/ Heather Moore Collins*
Heather Moore Collins (# 026099)
Caroline Drinnon (#037016)
Ashley Shoemaker Walter (#037651)
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
caroline@hmccivilrights.com
ashley@hmccivilrights.com

*—and --*

Advocates for Survivors of Abuse PC

*/s Vanessa Baehr-Jones*
Vanessa Baehr-Jones CABN # 281715
(*Pro Hac Vice* Forthcoming)[2]
**Advocates for Survivors of Abuse PC**
4200 Park Boulevard No. 413
Oakland, CA 94602
(510) 500-9634
vanessa@advocatesforsurvivors.com

*Attorneys for the Plaintiffs*

---

[2] The motion to appear *pro hac vice* for Vanessa Baehr-Jones will be filed upon receipt of a certificate of good standing from the U.S. District Court for the Northern District of California.