IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

JANE DOE 1, JANE DOE 2, JANE DOE 3,
JANE DOE 4, JANE DOE 5, K.T. and M.T.,
Personal Representatives to JANE DOE 6,
JANE DOE 7, JANE DOE 8, and JANE DOE 9,

       Plaintiffs,

v.                                                    No: 2:23-cv-00071-TRM-CRW

                                                      **PLAINTIFFS DEMAND JURY TRIAL**

CITY OF JOHNSON CITY, TENNESSEE,
a government entity,

KARL TURNER, individually and in his
official capacity as Chief of the
Johnson City Police Department,

KEVIN PETERS, individually and in his
official capacity as Captain in the
Johnson City Police Department,

TOMA SPARKS, individually and in his
official capacity as Detective in the
Johnson City Police Department,

JUSTIN JENKINS, individually and in his
official capacity as Investigator in the
Johnson City Police Department, and

DOES 6-20, inclusive,

       Defendants.

_____/

## <u>AMENDED COMPLAINT</u>

For years, Sean Williams drugged and raped women in Johnson City, Tennessee, and for

years, officers of the Johnson City Police Department ("JCPD") let him get away with it. From

1

November 2019 – 2020, JCPD received at least six reports alleging Williams had attempted to drug and/or sexually assault women in his apartment in downtown Johnson City. Instead of arresting Williams, however, JCPD officers treated Williams as though he were, in the words of Detective Toma Sparks, "untouchable." In exchange for turning a blind eye, JCPD officers seized hundreds of thousands of dollars in cash from Williams, all while refusing to take meaningful steps to protect women and children in Johnson City and to stop his known sexually predatory behavior.

On or around June 23, 2022, Plaintiffs, all women, learned of JCPD's unlawful treatment of complaints against Williams. Specifically, with the filing of former federal prosecutor Kateri Dahl's civil complaint, Plaintiffs became aware of JCPD's institutionalized policy to ignore complaints of criminal activity and bodily harm, including allegations of rape and drug activity by Williams and his accomplices, made by multiple women under Johnson City's jurisdiction. Not only were the complaints of women being ignored or diminished, JCPD, including Chief Karl Turner, Captain Kevin Peters, Detective Toma Sparks, and Investigator Justin Jenkins knowingly failed to investigate Williams' crimes against women; knowingly failed to refer charges for prosecution and/or referred charges in a piecemeal and incomplete manner so as to undermine the prosecution; knowingly allowed for the destruction of evidence; knowingly intimidated and dissuaded Plaintiffs from pursuing criminal charges; and, in the case of Detective Sparks, knowingly made false statements to Plaintiffs with the intent to obstruct and interfere with the criminal investigation. Dahl's allegations also exposed JCPD's interference with the federal criminal investigation into Williams.

In August 2022, only after public outcry, Johnson City retained a third-party expert to conduct a review of JCPD's sexual assault investigations during 2018 – 2022. The resulting report is damning. Released by Defendant City on July 18, 2023, four weeks after the filing of the initial

complaint in this case, the report from the City's own expert found that JCPD investigators engaged in a pattern and practice of discriminatory and biased conduct towards women victims of rape and sexual assault. This unlawful and unconstitutional conduct discouraged victims from pursuing their cases. JCPD supervisors then permitted investigators to close sexual assault cases improperly, based on the purported reluctance of the victims, even when prosecution would have otherwise been possible.

In November 2022, the U.S. Department of Justice ("DOJ") Human Trafficking Prosecution Unit and the Federal Bureau of Investigation ("FBI") opened a federal sex trafficking investigation into Williams. The evidence the FBI collected in the sex trafficking investigation proved to be overwhelming: On Williams' digital media, the FBI found images which Williams had taken of himself sexually assaulting unconscious women, including several Plaintiffs in this case. Williams saved these images in labeled folders and titled them with the women's first names and the word "drugged."

On information and belief, this same digital evidence could have been, or worse, may have been, recovered by JCPD over two years earlier in September 2020, but instead of properly seizing and searching Williams' digital devices, JCPD, including Defendants Officers Sparks and Jenkins, allowed Williams to destroy and conceal evidence. In return, JCPD officers seized hundreds of thousands of dollars in cash from Williams' safe.

Defendant JCPD officers knowingly participated in a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(1), (2), by benefiting financially in the form of seized narcotics assets—either by corrupt use of search warrants or by other unlawful collection efforts—from Williams and his coconspirators, which Williams provided JCPD and Defendant officers in furtherance of the sex trafficking conspiracy. Moreover, by interfering with Dahl's investigation into Williams'

3

assaults, intimidating and discouraging Williams' victims, and concealing and/or failing to collect critical evidence, JCPD officers obstructed the enforcement of the federal sex trafficking statute, a crime under 18 U.S.C. § 1591(d), thereby delaying prosecution of Williams under 18 U.S.C. § 1591(a) for years. Indeed, Johnson City Officials, including its City Manager Cathy Ball, have continued JCPD's practice of intimidation, corruption, and obstruction by taking public positions with the press to insinuate the victims are at fault for Williams' crimes, a tactic to discourage additional victims from coming forward.

Johnson City and the JCPD's actions also evidence a sex-based bias against female crime victims. These actions, known and authorized by Johnson City, Tennessee, were knowing, reckless, negligent, and deprived Plaintiffs and unknown victims of rape of their constitutional rights to equal protection and due process, as well as their rights under Title IX of the Education Amendments Act of 1972, and the common law.

## JURISDICTION AND VENUE

1.     Plaintiffs bring this Trafficking Victims Protection Act and civil rights action pursuant to 18 U.S.C. §§ 1591(a)(1), (2), 1591(d), and 1595, 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, the Tennessee Governmental Tort Liability Act, T.C.A. 29-20-205, Title IX of the Education Amendments Act if 1972, 20 U.S.C. § 1681, and the common law.

2.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

3.     Venue is proper under 28 U.S.C. § 1391 as Defendants are located in Washington County, in the Greeneville Division of the Eastern District of Tennessee.

4

## PARTIES

4. Plaintiff, Jane Doe 1, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

5. Plaintiff, Jane Doe 2, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

6. Plaintiff, Jane Doe 3, a female, was a citizen and resident of Kingsport, Tennessee, during the operative time.

7. Plaintiff, Jane Doe 4, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

8. Plaintiff, Jane Doe 5, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

9. Personal Representatives to Plaintiff, Jane Doe 6, a deceased female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

10. Plaintiff, Jane Doe 7, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

11. Plaintiff, Jane Doe 8, a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

12. Plaintiff, Jane Doe 9, a female, was a citizen and resident of Elizabethton, Carter County, Tennessee, during the operative time.

13. Defendant Johnson City, Tennessee, ("Defendant City"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee. Defendant City has substantial control over the Johnson City Police Department and its employees.

14.     Defendant Chief Karl Turner is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

15.     Defendant Captain Kevin Peters is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

16.     Defendant Detective Toma Sparks is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

17.     Defendant Investigator Justin Jenkins is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

18.     Defendant Officers John Does 6 through 20 are Johnson City Police Officers. Plaintiffs name them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.

## FACTUAL BACKGROUND

### A.     Williams Conspired to Drug and Rape Women in Johnson City

19.     Beginning in at least 2018 and continuing to 2021, Sean Williams, a known drug dealer and convicted felon, conspired with Alvaro Fernando Diaz-Vargas and others to drug and rape women in his apartment in downtown Johnson City, in violation of 18 U.S.C. §§ 1591(a), 1594(c).

20.      Upon information and belief, Williams directed multiple coconspirators, including Diaz-Vargas and Female 1, to recruit local women and bring them directly to Williams' garage and apartment, where he would drug and sexually assault them.

21.     In return, Williams provided Diaz-Vargas and Female 1 with money, free housing, food, and illicit drugs. Specifically, Diaz-Vargas resided at Williams' apartment without paying for housing.

6

**B.     Jane Doe 1's Factual Allegations**

22.     Around 2018-2019, Jane Doe 1, a Johnson City resident, was frequently brought to Williams' apartment by mutual acquaintances to party.

23.     During this time, Jane Doe 1 believed it was the "cool thing" to be invited up to Williams' apartment for parties. Williams provided alcohol and illicit drugs, including marijuana and cocaine, to people who came to his apartment socially.

24.     Jane Doe 1 was often provided alcoholic beverages or drugs by Williams. In particular, Jane Doe 1 never saw anyone but Williams distribute cocaine to the partiers. At every party, Jane Doe 1 saw Williams keep his stash of cocaine in a specific box that no one else had access to.

25.     At Williams' apartment, Jane Doe 1 saw multiple cameras set up in and around the apartment.

26.     Jane Doe 1 met Diaz-Vargas around 2012-2013 and they became good friends.

27.     She frequently observed Diaz-Vargas meet women at the local downtown bars and bring them back to Williams' apartment. While Williams rarely left his apartment, Diaz-Vargas would consistently drink and party at the local bars and bring women back to Williams' property.

28.     In or around November 2018, Jane Doe 1 attended a party at Williams' apartment by herself. She arrived at Williams' apartment while a party was in full swing and was immediately handed an alcoholic beverage. She has no memories of the rest of the evening.

29.     When Jane Doe 1 woke the next morning, she was lying on her back on Williams' couch in the apartment's living room. Her skirt was pushed up around her hips and Williams was orally copulating her.

7

30.     Jane Doe 1 immediately tried to lift her hand and push Williams off her, but she was too physically weak to move her arm properly. She felt mentally and physically incapacitated, beyond the average level of incapacitation associated with alcohol.

31.     Unable to stay awake, Jane Doe 1 passed back out.

32.     Sometime later that morning, Jane Doe 1 woke a second time to find Williams asleep on the other side of the couch. She immediately left the apartment.

33.     After the assault, Jane Doe 1 was scared to report what happened to JCPD, as she feared retaliation from Williams and believed JCPD would not protect her.

34.     On November 9, 2018, in an attempt to report the assault as safely as possible, Jane Doe 1 sent a text message to an individual who worked for JCPD, asking to speak about a personal matter. Still traumatized and embarrassed, however, she never followed up on the text and was never able to report the sexual assault.

**C.     Jane Doe 2's Factual Allegations**

35.     In the fall of 2019, Female 1 befriended Jane Doe 2 and introduced her to Diaz-Vargas and Williams.

36.     Female 1 invited and encouraged Jane Doe 2 to party at Williams' apartment numerous times.

37.     Upon information and belief, Williams' apartment was only accessible by entering a certain code; Williams only provided the code to people who recruited victims into his apartment.

38.     Jane Doe 2 often observed Female 1 enter the code into Williams' apartment before leading Jane Doe 2 and other women up.

39.     On or about October 29, 2019, Female 1 invited Jane Doe 2 and Jane Doe 11 back to Williams' apartment.

8

40.     Once in the apartment, Jane Doe 2 was offered cocaine by Williams. Williams poured lines of cocaine on a black tray that was only offered and used by the female partygoers. The male partygoers, including Williams and Diaz-Vargas, used cocaine from a different platform.

41.     After using the cocaine, Jane Doe 2 began to feel woozy and physically and mentally incapacitated.

42.     Concerned, she attempted to leave the apartment, but was stopped by Williams. He told Jane Doe 2 that she could not leave and if she did, she would be pulled over for a "DUI." He told her to stay in his apartment and sleep on his couch.

43.     In an attempt to get away, Jane Doe 2 lied to Williams, saying she had to work the next day and that her dog needed to be let out at her house.

44.     Eventually, Jane Doe 2 was able to leave and tried to drive home. During the drive, she felt increasingly confused and dizzy and became alarmed when her vision began to blur. She pulled into a parking lot and passed out.

45.     Jane Doe 2 awoke the next morning to find the car door open, one of her legs out of the car, and the key still in the ignition.

46.     On or about November 7, 2019, Jane Doe 2 was out with a friend in downtown Johnson City. While out, Diaz-Vargas sought her out and invited Jane Doe 2 and her friend back to Williams' apartment. Jane Doe 2 agreed because her friend seemed romantically interested Diaz-Vargas.

47.     When she arrived, Williams handed her an already opened beer. She immediately began to feel the same physical and mental incapacitation as she had felt on the prior occasion and was unable to move her body properly.

9

48. The next thing Jane Doe 2 remembers is waking up in Williams' bed. Williams was straddled over her, and her sweater was ripped. Upon information and belief, Williams had vaginally penetrated and/or orally copulated her while Jane Doe 2 was unconscious.

49. Once she awoke, Jane Doe 2 shoved Williams off her and tried to run out of Williams' apartment. However, she did not have full control of her movements and she fell over in the hallway and hit her head against the wall.

50. Once she escaped, Jane Doe 2 asked a friend to drive her to an urgent care to receive a rape kit.

51. At the urgent care, Jane Doe 2 told the nurse that she believed she had been raped and wanted to report the rape to the police.

52. The urgent care administered a rape kit and two JCPD officers arrived at the clinic to take a statement from Jane Doe 2 and her friend. Jane Doe 2 told the officers she had been assaulted by Williams and pointed out Williams' apartment on a map.

53. In response, the JCPD officers mentioned that they had heard of women complaining of sexual assault by Williams before.

54. The JCPD officers took Jane Doe 2's clothes and placed them in a garbage bag. They did not provide her with any type of evidence receipt.

55. Jane Doe 2 told the police she wanted to press charges against Williams.

56. Jane Doe 2 did not hear anything more from JCPD for a year and a half.

57. In or around May 2021, she received a call from Detective Sparks, a JCPD detective who, upon information and belief, is in the narcotics investigation unit. Detective Sparks told Jane Doe 2 that the results from her rape kit showed that she had benzodiazepine in her system the night

10

of the assault. She had never voluntarily or knowingly taken benzodiazepine. The rape kit also showed that the DNA of another person was present in the sample collected.

58.     After relaying this information, Detective Sparks discouraged Jane Doe 2 from pursuing charges against Williams. He told Jane Doe 2 that even if he was able to get a warrant to collect and test Williams' DNA, Williams would have to willingly submit to the testing, and he would never do that. In fact, this statement was false as a warrant would require Williams to submit to testing. Detective Sparks described Williams as "untouchable."

59.     Detective Sparks went on to say that he didn't know if JCPD would be able to do anything if Jane Doe 2 did press charges, and JCPD would "probably not" be able to protect Jane Doe 2 from retaliation if she did.

60.     Jane Doe 2 asked Det. Sparks whether any images or videos might exist of her assault given the number of video cameras she had seen in Williams' apartment. Det. Sparks told her there was no such evidence.

61.     In fact, JCPD had seized digital devices from Williams' apartment in September 2020, including video cameras, which may have contained images of Williams' sexual assaulting his victims.

62.     A few days later, after consulting her family and friends, Jane Doe 2 called Detective Sparks back to tell him she wanted to proceed with pressing charges against Williams. She never received a response.

63.     To date, no charges have been brought against Williams or Diaz-Vargas for Jane Doe 2's sexual assault.

**D.      JCPD Officers Fail to Investigate Female 2's Report of Sexual Assault**

64.     According to allegations in the complaint of former Special Assistant United States Attorney ("SAUSA") Kateri Dahl ("Dahl Complaint"), *see* CV 22-00072-KAC-JEM (EDTN), on

11

or around June 2, 2020, a woman (Female 2) woke up in Williams' apartment to discover that she had been sexually assaulted. Female 2 fled Williams' apartment in great distress, shoeless and screaming.

65.     Female 2 encountered JCPD officers in the lobby of Williams' apartment building and told them what had happened in Williams' apartment.

66.     The JCPD officers drove her to her parents' house but declined to help her seek medical attention. The officers also failed to assist her in getting a rape kit done. The officers did not prepare a full police report, nor did they follow up with her in any way. The officers also declined to get a statement from the suspect, Williams.

67.     On December 15, 2020, Female 2 came into the Johnson City Police Department, and was cooperative. She gave a very credible statement to SAUSA Dahl and to another prosecutor alleging she had been raped by Williams; her statement closely mirrored that of other Jane Doe victims.

68.     To date, no charges have been brought against Williams for Female 2's sexual assault.

**E.     Jane Doe 3's Factual Allegations**

69.     In the Fall of 2019, Jane Doe 3 met and became friends with Female 1. Female 1 quickly began to try to bring Jane Doe 3 to Williams' apartment by promising access to alcohol and drugs.

70.     On October 29, 2019, Female 1 encouraged Jane Doe 3, and Jane Doe 2 to come to Williams' apartment to party.

71.     Once there, Williams offered the women cocaine off a black tray.

72.     Jane Doe 3 did a line of cocaine off the same black tray offered to Jane Doe 2 and Female 1.

12

73.     Almost immediately upon using the cocaine, Jane Doe 3 began to feel incapacitated, unable to think clearly or move her body properly.

74.     Female 1, who had also used cocaine from the black tray, completely passed out on the living room couch.

75.     Jane Doe 3 attempted to wake Female 1, slapping her across the face, but could not rouse her.

76.     Scared for their safety, Jane Doe 3 tried to carry Female 1 out of Williams' apartment but was physically stopped by Diaz-Vargas.

77.     Williams then told Jane Doe 3 that she could not leave, as she was too "fucked up."

78.     Jane Doe 3 was able to escape the apartment by herself.

79.     Once she made it to her car, Jane Doe 3 locked herself in and passed out.

80.     In the weeks following the assault, Williams continuously harassed and threatened Jane Doe 3. He said he would report Jane Doe 3 to the police and sue her for libel if she told anyone about his drugging and attempted sexual assault. At one point, Williams accused her of being "an angry coke whore that no one even wanted to fuck that night."

81.     Williams also recruited others in the community to contribute to this pattern of harassment. In one of the bathrooms in a Johnson City bar, the words "[Jane Doe 3's] a coke whore that sucks dick for coke" were written on the wall. Jane Doe 3 was approached on the street by strangers who made various derogatory comments about her.

82.     Jane Doe 3 became terrified to go out in public. She felt forced to ask her boss to walk her to her car after each shift she worked at a downtown Johnson City bar.

83.     After hearing about Jane Doe 2's failed attempt to report her assault to JCPD, Jane Doe 3 was too frightened to report her own. She believed JCPD would not help Williams' victims.

13

### F. Jane Doe 4's Factual Allegations

84. Jane Doe 4 met Williams around 2012/2013 through Alunda Rutherford, Williams' romantic and business partner. She did not interact with him again until 2018/2019 when she began to be invited to Williams' apartment to party.

85. On or around September or October 2020, Jane Doe 4 was invited to Williams' apartment with a group of acquaintances. Both Williams and Diaz-Vargas were present.

86. Jane Doe 4 was offered both alcohol and cocaine by Williams and shortly after lost consciousness.

87. She later woke up to find Williams pressing his penis and testicles into her face. She tried and failed to push Williams off, as she could not properly move her limbs. She again lost consciousness.

88. When she awoke a second time, she was able to push Williams off her. She questioned Williams, asking if she had dreamed of the assault.

89. Williams responded, saying she had not been dreaming and that he had needed to use her because he didn't have his blow dryer and had to "make do." Upon information and belief, Williams regularly uses a blow dryer to stimulate himself sexually.

90. Immediately following the assault, Jane Doe 4 told her sister, her fiancé, and multiple friends about it.

91. She did not feel safe reporting the assault to JCPD, as she had been told that the police would take no action, as they never did when women reported assault by Williams, and/or would "slut shame" her if she reported.

14

## G.     Jane Doe 5's Factual Allegations

92.     In the summer and fall of 2020, Jane Doe 5 was befriended by Female 1 and Diaz-Vargas. Both Female 1 and Diaz-Vargas began to invite Jane Doe 5, along with other women, back to Williams' apartment for free alcohol and illicit drugs.

93.     In or around mid-October 2020, Jane Doe 5 was at a party in Williams' apartment when he offered her an alcoholic beverage. Shortly after consuming the drink, Jane Doe 5 lost consciousness.

94.     She woke up to find herself slumped over Williams' couch. Her pants and underwear had been pulled down to her feet, and Williams lay asleep on the other end of the couch.

95.     Still feeling dazed, Jane Doe 5 fled the apartment on foot.

96.     She called the Tennessee Department of Health to report that she had been raped and needed to be examined.

97.     On October 23, 2020, she received a rape kit exam. The nurse administering the exam told Jane Doe 5 that other women had reported sexual assaults by Williams and gave her the number for Detective Sparks to report the assault.

98.     Shortly after, Jane Doe 5 called Detective Sparks and reported the sexual assault by Williams.

99.     Detective Sparks told Jane Doe 5 she should wait to make a police report until she received the rape kit results.

100.     Jane Doe 5 followed up with Detective Sparks by phone at least two more times, but she never heard anything further about her report.

101.     To date, no charges have been filed against Williams for Jane Doe 5's sexual assault.

102.     To date, Jane Doe 5 has not received the results of her rape kit.

## H.     Jane Doe 6's Factual Allegations

103.    Jane Doe 6 is a former resident of Johnson City who is now deceased.

104.    On November 10, 2020, Jane Doe 6 was celebrating her sister's (Sister 1) birthday with family and friends at a brewery in downtown Johnson City.

105.    Upon information and belief, when Jane Doe 6 left the brewery, she was coherent and in complete control of her physical and mental capacities.

106.    After leaving the brewery, Jane Doe 6 and her boyfriend stopped by Williams' garage, a property directly across the street from his apartment. Jane Doe 6's boyfriend returned to the brewery to retrieve his cell phone.

107.    Upon information and belief, Williams offered Jane Doe 6 an alcoholic beverage while she was in his garage and/or his apartment.

108.    About an hour later, Sister 1 received a call from Jane Doe 6. It was clear Jane Doe 6 was driving and was completely incoherent, using slurred speech and not making sense.

109.    Despite driving in the town in which she had lived her whole life, Jane Doe 6 did not know where she was and could not recall any locations or street names.

110.    Jane Doe 6 would periodically start screaming expletives and was clearly upset about something that had just happened. At one point, she began to cry hysterically.

111.    Jane Doe 6's other sister, Sister 2, became concerned and also called and tried to speak with Jane Doe 6. Sister 2 experienced the same issues communicating with Jane Doe 6, as Jane Doe 6 remained out of her mind and incoherent.

112.    For over an hour, Sister 1 and Sister 2 called Jane Doe 6 over a dozen times in an attempt to find her and help her get home.

113.    At approximately 2:29 a.m., Jane Doe 6's car hit a concrete base of a light pole in Carter County, the county next to Washington County, where Johnson City is located. Jane Doe 6 died on impact.

114.    Several days later, Sister 1 contacted JCPD to report that Jane Doe 6's crash was suspicious, and that Jane Doe 6 had last been seen entering Williams' apartment. She expressed concern that a crime may have occurred and asked the police to look into it.

115.    When the JCPD officer learned that the crash occurred in Carter County, he told Sister 1 she needed to contact their Sheriff's Department, as JCPD could not help her because it was a "Carter County problem."

116.    A JCPD officer further told Sister 1 that JCPD had no jurisdiction to investigate the circumstances of the crash.

117.    Conversely, the Carter County Sheriff's Department told Sister 1 that JCPD had jurisdiction over an investigation because Williams' apartment was located in Johnson City.

118.    In or around January 2021, Sister 1 called JCPD again and asked to speak with a detective.

119.    By this point, Sister 1 had spoken with Williams and Diaz-Vargas and had learned that Williams had given Jane Doe 6 a drink on the night of her death, shortly before Jane Doe 6 left Williams' apartment and attempted to drive home.

120.    Sister 1 related everything she knew to the JCPD detective and explained that she suspected something had happened to Jane Doe 6 while she was in Williams's apartment.

121.    The JCPD detective asked no follow up questions and did not invite Sister 1 to come in person to give a statement. The detective also failed to disclose to Sister 1 that JCPD had

17

already received complaints from other women who had been drugged and raped by Williams while in his apartment.

122.     JCPD failed to return any of Sister 1's calls or queries into Jane Doe 6's death.

123.     Upon information and belief, JCPD has not investigated the circumstances of Jane Doe 6's death.

## I.     Jane Doe 7's Factual Allegations

124.     Jane Doe 7 met Williams in 2019.

125.     On or around October 31, 2019, Jane Doe 7 met Female 1 at Williams' apartment before going out in downtown Johnson City for Halloween. Female 1 acted very friendly to Jane Doe 7; she did Jane Doe 7's makeup and brought her to the bar where Williams was partying.

126.     At the bar, Williams handed Jane Doe 7 a drink.

127.     The next thing Jane Doe 7 remembered she was waking up in William's bed wearing only her underwear.

128.     Williams was asleep on top of her with his genitals and anus in Jane Doe 7's face.

129.     Jane Doe 7 pushed Williams off her and left.

130.     From around March through May or June 2020, Jane Doe 7 lived with Williams and would cook, clean, and run errands for him.

131.     Williams and Diaz-Vargas, who also lived with Williams, began to tell Jane Doe 7 to go down to the bars and "find hos" for them, meaning random women. Jane Doe 7 refused.

132.     In the summer and fall of 2020, Jane Doe 7 left Johnson City.

133.     By in or around November 24, 2020, Jane Doe 7 had returned to Johnson City. She asked Williams whether she could come to his apartment to shower and to use his washing machine. Williams agreed.

18

134.    When she arrived at Williams' apartment, he offered her cocaine and alcohol. Jane Doe 7 declined the alcohol but partook in the cocaine.

135.    She immediately began to feel drowsy. Williams told her that if she was feeling tired, she could go use his bed, and then walked her to his bedroom.

136.    The next thing Jane Doe 7 remembers is waking up in Williams' bed, with Williams naked and pressed against her.

137.    Williams moved Jane Doe 7 onto her back, put his knees on her shoulders, pushed his genitals into her face, spread her legs apart, and proceeded to rape Jane Doe 7 with his fist.

138.    Jane Doe 7 told him to stop, but Williams continued to assault her. Williams then tried to push his fingers inside her anus, at which point, Jane Doe 7 screamed and was able to push Williams off her.

139.    Jane Doe 7 waited in the bathroom, hoping Williams would fall back asleep. Then she went to collect her things in the living room so she could leave. The door to Williams' apartment, however, was locked with a complex locking mechanism that she was unable to open.

140.    Jane Doe 7 then asked another male who was in the living room to help her get out. Williams appeared from behind and told her, "Get out, ho."

141.    Jane Doe 7 decided to report the assault to the Federal Bureau of Investigation instead of JCPD, as she did not trust JCPD to take sexual assault seriously.

142.    She reported the assault in person at the FBI's Johnson City field office. An agent took her cell phone for what Jane Doe 7 believed was a forensic investigation.

143.    The FBI agent called Detective Sparks, who came to the field office and met with Jane Doe 7.

144.    Detective Sparks then accompanied Jane Doe 7 to the hospital, where she received a rape kit.

145.    After leaving the hospital, Jane Doe 7 went to JCPD offices where she spoke with a female investigator and/or attorney and explained that she wished to press charges.

146.    Detective Sparks told her falsely that she was the first woman who wished to go forward with charges, the other women were too scared.

147.    Jane Doe 7 never received the results from her rape kit. To date, no charges have been brought against Williams for Jane Doe 7's sexual assault.

**J.    Jane Doe 8's Factual Allegations**

148.    Jane Doe 8 worked as a bartender and server at a downtown Johnson City establishment during the operative time period.

149.    In or around 2018 and 2019, Jane Doe 8 became good friends with Female 1. Jane Doe 8 and Female 1 would often drink and party together.

150.    Eventually, Female 1 began to invite Jane Doe 8 to Williams' apartment so they could get free alcohol and drugs.

151.    In her capacity as a local bartender, Jane Doe 8 frequently witnessed Diaz-Vargas speak with women and invite and encourage them to go to Williams' apartment.

152.    As Diaz-Vargas was young and good looking, particularly compared to Williams, Diaz-Vargas would socially engage with women, buying them drinks and flirting with them. Diaz-Vargas would then invite the women back to Williams' apartment and promise access to free alcohol and illicit drugs.

153.    Diaz-Vargas invited Jane Doe 8 to Williams' apartment on numerous occasions.

154.    When she would party at Williams' apartment, Jane Doe 8 saw Williams keep a separate batch of cocaine that he would only share with particular women.

155.    She witnessed Williams bring small groups of women back to his bedroom to do cocaine out of that jar.

156.    In or about January or February 2020, Jane Doe 8 went to Williams' apartment with Female 1. There, Williams offered Jane Doe 8, Female 1, and another woman cocaine.

157.    Shortly after taking the drug, Female 1 passed out on Williams' couch.

158.    After using the cocaine, Jane Doe 8 began to feel incapacitated, as though she had taken a "downer" rather than an "upper" drug like cocaine.

159.    Jane Doe 8 texted her then-boyfriend and told him that she felt funny.

160.    As Jane Doe 8 and Diaz-Vargas were sitting on the couch in Williams' living room, Diaz-Vargas began to touch and grope Jane Doe 8 inappropriately, grabbing her and touching her buttocks.

161.    Jane Doe 8 repeatedly told Diaz-Vargas no, but he would not stop grabbing her.

162.    She made multiple attempts to leave the apartment, but every time Diaz-Vargas would tell her to stay.

163.    Eventually, Jane Doe 8's friend came into the living room and told Diaz-Vargas to stop.

164.    Jane Doe 8 had heard that Williams and Diaz-Vargas harassed and threatened women they didn't like, so she waited a short amount of time before leaving the apartment.

165.    Jane Doe 8 decided not to report Diaz-Vargas' assault to JCPD, as she feared retaliation by Williams and that JCPD would not take action.

K.    **Jane Doe 9's Factual Allegations**

166.    Jane Doe 9 first met both Williams and Diaz-Vargas in or around the summer of 2020.

21

167.     While out in the Johnson City downtown bars, Jane Doe 9 often observed Diaz-Vargas approach women and use his looks and his flirtation to lure them back to Williams' apartment.

168.     One three to four occasions, Jane Doe 9 was brought to Williams' apartment by either Diaz-Vargas or Female 1 to party after the bars closed.

169.     When she was in Williams' apartment, Jane Doe 9 noticed that Williams always poured women drinks from a different bottle of alcohol than the one from which he drank.

170.     Williams also kept a separate bag of cocaine for serving women versus himself and other men.

171.     One night, while partying at Williams' apartment, Jane Doe 9 saw a woman leaving Williams' bedroom looking distraught. The woman was pulling up her underwear as she walked out and fled the apartment.

172.     In or about August or September 2020, Jane Doe 9 went back to Williams' apartment with Female 1, Diaz-Vargas, a friend of hers, and several other people.

173.     At first, everyone hung around partying, but Williams abruptly claimed to have received a call from the police and told everyone they needed to leave.

174.     Williams pulled Jane Doe 9 aside, however, and told her that she was so "fucked up" that if she left, the police would stop her at his front door, and she would get into trouble.

175.     Jane Doe 9, beginning to feel physically and mentally incapacitated and terrified that the police were just on the other side of the door, believed Williams and waited while most of the party left. At one point, a friend of Jane Doe 9's attempted to come back into the apartment to find her, pounding on the front door to be let in, but Williams would not unlock the door.

176. Williams then took Jane Doe 9 to a couch in the living room and proceeded to grope her, kiss her, touch her breasts and buttocks, and penetrate her vagina with his fingers. Jane Doe 9 told Williams to stop but he did not listen.

177. Jane Doe 9 struggled to move her body as she was being sexually assaulted and felt as though she were in a dream. She struggled to form words or comprehend what was happening around her. The sexual assault lasted for hours, during which time Jane Doe 9 may have passed in and out of consciousness.

178. At one point during the assault, in an attempt to stop Williams, Jane Doe 9 threatened to report Williams to the police. Williams laughed at her when she said this and told her that he had a lot of money and connections, and no one would ever believe her.

179. After four or five hours, Williams finally stopped sexually assaulting Jane Doe 9 and took her down to his garage where her car was parked. By then it was morning. Williams forced Jane Doe 9 to give him a hug goodbye.

180. Jane Doe 9 felt like she could not tell anyone or report the assault as the event was too traumatizing.

**L.    Williams Destroys Evidence While Johnson City Police Department Delays Search of His Apartment**

181. On September 19, 2020, at approximately 2:34 a.m., a woman (Female 3) fell, or was pushed, out of Williams' apartment window, suffering life-threatening injuries.

182. JCPD officers arrived at Williams' apartment shortly after the incident occurred that night.

183. According to the Government's response to Williams' motion to suppress in the pending felon in possession of ammunition case, *see United States v. Williams*, 2:21-cr-00027-DCLC-CRW, Doc. No. 38 ("Government's response"), Det. Sparks arrived sometime thereafter

with another JCPD officer, Justin Jenkins. The two officers shouted up to Williams' apartment from the street, asking to be let in, and eventually obtained the passcode to enter the apartment from someone on the scene.

184.    Inside the apartment, Williams showed Det. Sparks and Officer Jenkins video clips taken from cameras positioned around his apartment, including a camera facing the entrance door to the apartment and a camera facing the elevators. Williams used his cellphone to show these videos to the officers and even offered to text the videos to Officer Jenkins. Williams claimed that the video cameras inside his apartment which pointed towards the window out of which Female 3 fell were not recording on September 19, 2020.

185.    On information and belief, shortly thereafter, Williams told the officers to leave the apartment.

186.    Rather than secure Williams' apartment or any of the digital media which may have contained evidence while they sought a search warrant for the attempted homicide investigation, JCPD officers left.[1]

187.    After the officers left, on information and belief, Williams and/or Diaz-Vargas moved and hid firearms and illicit drugs located throughout the apartment. Williams and/or Diaz-Vargas placed the items in a duffle bag and moved them to the roof.

188.    According to the Government's response, later that morning at approximately 4:17 a.m., Det. Sparks and Officer Jenkins interviewed Williams at JCPD headquarters.

_____

[1] Nor did JCPD officers conduct a search under the exigency exception to the warrant requirement under the Fourth Amendment in order to prevent the destruction of relevant evidence, and/or the escape of the potential suspect, among other consequences which would improperly frustrate their legitimate law enforcement efforts. *See Missouri v. McNeely*, 569 U.S. 141 (2013).

24

189. Sometime before this interview (the exact time is not stated in the Government's response), Det. Sparks offered to drive Williams to JCPD headquarters from Williams' apartment downtown. Williams agreed. Det Sparks then gave Williams a ride in his car. Williams was not handcuffed, and he rode in the front passenger seat next to Det. Sparks. There is no record in the Government's response, nor in the affidavits of Det. Sparks, of what the two spoke about during this ride.

190. Williams' interview at JCPD headquarters was video recorded.[2]

191. At approximately 4:17 a.m., Williams was placed in an interview room. The door was left open, and Williams was not handcuffed.

192. Even though Williams had just shown Det. Sparks digital evidence of the crime under investigation on his cellphone—demonstrating to Det. Sparks that Williams could access, and therefore likely manipulate, the camera footage from his phone—the officers permitted Williams to retain possession of his cellphone for the next 30 minutes while he sat in the interview room.

193. From 4:17 a.m. to 4:20 a.m., Officer Jenkins got paperwork together while Williams sat in the interview room with his cellphone.

194. Once the interview began, at approximately 4:20 a.m., Officer Jenkins closed the door. Officer Jenkins and Williams began to speak about whether the surveillance cameras captured video of Female 3 falling. Williams continued to maintain possession of his cellphone throughout this conversation.

---

[2] Plaintiffs do not have a copy of this video recording. The facts alleged are based on the summary of the video provided in the Government's response.

195.    Williams then told Officer Jenkins that he could text Jenkins the videos he had previously shown them (Officer Jenkins and Det. Sparks). Officer Jenkins asked Williams to email the videos instead. Williams stated he believed he could email the videos and proceeded to look at his cellphone. According to the Government's response, Williams "became distracted" while looking at his cellphone. He then told Officer Jenkins that he could not find any videos of Female 3 falling.

196.    Based on the timeline provided in the Government's response, it appears that Williams spent the next several minutes manipulating data on his cellphone while Officer Jenkins watched and took no action.

197.    Approximately eight minutes into their conversation, Officer Jenkins asked Williams for a statement about the incident. Officer Jenkins then read Williams *Miranda* warnings.[3]

198.    Williams remarked that he thought it was strange that he was being read his rights. Officer Jenkins told Williams that he (Williams) was not under arrest and Officer Jenkins was simply reading *Miranda* warnings because he (Jenkins) was going to ask questions.

199.    Williams asked for a lawyer to be present, but then stated that he would give a statement but would not answer questions. Officer Jenkins and Williams began to discuss what Williams meant by wanting a lawyer but still agreeing to answer some questions, but not all. Officer Jenkins told Williams that they needed to come to an agreement before they could proceed

---

[3] In *Miranda v. Arizona*, 384 US 436 (1966), the U.S. Supreme Court held that a defendant cannot be questioned by police in the context of a custodial interrogation until the defendant is made aware of the right to remain silent, the right to consult with an attorney and have the attorney present during questioning, and the right to have an attorney appointed if indigent. These warnings only apply when a suspect is in a custodial setting, *i.e.*, when the suspect is not free to leave.

26

with an interview. Officer Jenkins provided Williams with the written *Miranda* waiver for review, but Willims did not agree to sign it and instead asked for his lawyer.

200.     At approximately 4:35 a.m., Officer Jenkins left the room, continuing to allow Willims to maintain custody of his cellphone.

201.     For the next six minutes, Williams spoke to several people on the phone while purportedly attempting to call his lawyer.

202.     According to the Government's response, at some point Williams stated to someone over the phone that since he could not contact his lawyer he would just leave and come back to speak to the investigators later.

203.     At approximately 4:41 a.m., Williams knocked on the door of the interview room. Det. Sparks opened the door. Williams told Det. Sparks that he needed a charger for his phone so that he could call his attorney. Williams then asked what they would do if he could not contact his lawyer. Williams and Det. Sparks then discussed whether Williams wanted to speak to them without a lawyer.

204.     At this point, over 30 minutes into Williams' interview and approximately two hours after Williams' first encounter with JCPD police on September 19, 2020, Det. Sparks seized Williams' cellphone. Det. Sparks then told Williams that he was getting a search warrant for its contents.

205.     According to the Government's response, Det. Sparks and Williams then argued over whether Det. Sparks could seize Williams' cellphone.

206.     Williams asked whether Det. Sparks would give him a ride home, and Det. Sparks agreed to drive him home.

207.    At approximately 4:46 a.m., Det. Sparks told Williams he would be right back. At Approximately 4:51 a.m., Williams opened the door of the interview room and asked to leave. Williams asked for his cellphone but was told it had been seized pending a search warrant.

208.    At some point thereafter—the Government's response does not state the time—Williams left JCPD headquarters and walked back to his apartment.

209.    At 8:52 a.m. on September 19, 2020, Det. Sparks applied for a warrant for Williams' apartment to search for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide.

210.    According to Det. Sparks' September 19, 2020, affidavit in support of this warrant, JCPD officers "powered off" Williams' cellphone at some point that morning and then powered the phone back on "after Williams left" with the intent to place the phone in airplane mode. The affidavit goes on to state: "When the phone was powered on, it had a message displaying that it was lost, which would suggest that Sean Williams has access to other devices in the residence that could be connected to the camera system."

211.    In his affidavit, Det. Sparks then sought permission to seize: "video surveillance cameras; video surveillance storage devices; any electronic device capable of connecting to the camera system, including but not limited to: Cell phones, computers, tablets, and personal digital assistants; any trace evidence that would suggest an assault or struggle occurred."

212.    In the September 19, 2020, affidavit, Det. Sparks failed to include any information about the 45-minute interview which he and Officer Jenkins had conducted of Williams at JCPD headquarters that morning. Nor did Det. Sparks explain that he had permitted Williams to retain custody of his cellphone during the entirety of this interview.

28

213. When JCPD officers returned with a search warrant at approximately 10 a.m. on September 19, 2020, they seized a number of digital devices from Williams' apartment, including four phones, four computers and three memory cards.

214. According to the Government's response, JCPD officers seized, among other items, video cameras which had been hidden in a closet under paper towels. The video surveillance cameras which officers had observed hours before in the apartment had all been taken down while JCPD had left the apartment unsecured.

215. On information and belief, the digital devices seized on September 19, 2020, remained in the custody of JCPD for over two years without being properly searched for evidence.

216. Had JCPD officers properly secured, seized, and searched the digital evidence in Williams' apartment that night, they would have found the following evidence: Images that Williams had taken of himself sexual assaulting women whom he had rendered unconscious, including several of the Plaintiffs in this case. Williams had saved these files to folders on his computer which he had labeled with the victims' first names and the word "drugged." On information and belief, JCPD officers also would have found images of Williams sexually assaulting minor children, including an infant boy and a girl who was less than eight years old.

217. On September 19, 2020, JCPD officers also found and seized a handwritten note from Williams' nightstand with the word "Raped" written atop a list of 23 women's first names in black ink. This list included the first names of some of the Plaintiffs in this case.

218. Upon information and belief, none of the sexual assault victims who had reported Williams to JCPD were informed of this list, nor told whether their names appeared therein.

219. JCPD officers did not arrest Williams before leaving on September 19, 2020.

29

220.    Upon information and belief, Female 3 later reported to JCPD that she believed she had been drugged by Williams that night prior to falling or being pushed out of the window.

221.    To date, no charges have been filed against Williams as a result of the attempted homicide investigation.

## M.    Det. Sparks Applies for a Second Search Warrant to Seize "Currency" Found in Williams' Safe

222.    During JCPD's search of Williams' apartment on September 19, 2020, JCPD officers seized a safe. Jane Doe 5 had previously seen large amounts of cash (hundreds of thousands of dollars) kept within the safe.

223.    On September 23, 2020, Det. Sparks applied for a second search warrant in the attempted homicide investigation to search this safe for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide.

224.    In support of this search, Det. Sparks explained that a narcotics trained police canine had alerted on the safe for the presence of narcotics.

225.    In this second warrant, Det. Sparks applied to seize, among other items, "any currency" found in this safe.

226.    There were no facts stated in Det. Sparks' warrants which connected "any currency" with the offense under investigation, the attempted homicide of Female 3.

227.    To date, it is unknown exactly how much currency JCPD seized from Williams based on the September 23, 2020, search warrant.

228.    On information and belief, JCPD obtains substantial funds from asset seizures in narcotics investigations. For example, seven months after the search of Williams' apartment, in or about April 30, 2021, JCPD officers seized $805,624 in currency and seven vehicles in a drug bust

which resulted in the arrest of 21 defendants charged in a cocaine trafficking conspiracy. Williams was not among the 21 charged or arrested.

## N. Johnson City Police Department Interferes with the Federal Criminal Investigation into Williams

229. Plaintiffs re-allege and incorporate by reference each and every allegation in the Complaint as though fully set forth herein.

230. On November 13, 2020, Detective Sparks presented a potential felon in possession of ammunition case against Williams to SAUSA Dahl for her review.

231. This was an unusual federal charge to bring within the U.S. Attorney's Office because of the relatively minimal sentences available under the U.S. Sentencing Guidelines for this offense.

232. According to the Dahl Complaint, the "compelling reason" given to her for recommending this paltry charge – counterintuitively – was that Williams was under investigation for attempted homicide. Additionally, while executing a search warrant in the attempted homicide investigation, officers had recovered a handwritten note from Williams' nightstand with the word "Raped" atop a list of 23 women's names.

233. Upon information and belief, one potential reason for law enforcement officers to propose a relatively minimal charge against a suspect facing far more serious criminal charges is to protect and/or to provide a benefit to the offender if he or she is working as a confidential informant (CI). This accomplishes two ends: (1) it provides a benefit and/or incentive to the CI in exchange for information, and (2) it assists in maintaining the CI's credibility, and the credibility of the prosecution and law enforcement agency if the CI is needed to testify in court.

31

234.    SAUSA Dahl agreed to pursue the case, but quickly became concerned that JCPD had made errors in their investigation into Williams and that the far more serious offenses of sexual assault and attempted homicide were not being pursued.

235.    According to her complaint, SAUSA Dahl expressed these concerns to Detective Sparks, explaining that she would bring the charge of felon in possession of ammunition, but that she also intended to build a broader case against Williams based on the substantial evidence of the more serious charges, including the conduct of drugging and raping women.

236.    Although crimes of rape and sexual assault are typically prosecuted by local prosecutors, the crime of sex trafficking is a federal offense, enforced under 18 U.S.C. § 1591. The conduct SAUSA Dahl began to investigate – the conspiracy between Williams, Diaz-Vargas, and Jane Roe to recruit, entice, obtain, transport, and maintain women who were drugged and forced to engage in sex acts on account of which something of value was exchanged – constituted sex trafficking violations.

237.    As set forth in detail in SAUSA Dahl's complaint, once Dahl began her investigation, JCPD officers took numerous steps to obstruct, attempt to obstruct, and/or to interfere with her investigation into Williams' sexual assault crimes, including but not limited to the following:

238.    Chief Turner's dismissal of the "Raped" list, claiming that it did not demonstrate evidence of nonconsensual sex.

239.    Chief Turner and Captain Peters' dismissal of victims' accounts, claiming that the victims were not credible despite the overwhelming evidence that Williams was drugging and raping women.

32

240.     Detective Sparks falsely indicating to SAUSA Dahl that a victim was uncooperative, when in fact the victim wished to pursue charges against Williams.

241.     JCPD failing to inform SAUSA Dahl of Jane Doe 6's death and her sister's efforts to initiate an investigation into Williams' culpability.

242.     JCPD's refusal to investigate a victim's account of rape.

243.     Captain Peters ridiculing and making jokes about a victim's appearance prior to the victim providing a statement about Williams' sexual assault to JCPD and SAUSA Dahl.

244.     Shortly after SAUSA Dahl initiated JCPD taking a second statement from one of Williams' victims – a victim JCPD had previously ignored and maligned – Chief Turner called SAUSA Dahl's supervisor to complain about her job performance. Chief Turner knowingly took this action to intimidate SAUSA Dahl, interfere with her investigation into Williams, and to attempt to stop the investigation. In fact, JCPD investigators who worked directly with SAUSA Dahl had made no such complaints about SAUSA Dahl's job performance.

245.     From December 2020 to March 2021, SAUSA Dahl continued to press Chief Turner and JCPD investigators to take investigative steps related to the complaints of Williams' sexual assaults. Instead of investigating Williams, officers made statements questioning the credibility of victims, and made harassing comments to SAUSA Dahl.

246.     For example, one male investigator stated to SAUSA Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour." Instead of refuting the allegations, the investigator's words suggested SAUSA Dahl would have better luck assembling evidence if she voluntarily made herself a victim of sexual assault.

33

247.    JCPD unreasonably delayed producing requested documents to SAUSA Dahl, including failing to provide information necessary for a federal search warrant until the information was too stale to support probable cause; failed to alert SAUSA Dahl when yet another victim of Williams made a report to JCPD; and failed to provide a certified copy of Williams's felony conviction.

248.    JCPD officers, including Detective Sparks, refused to execute a valid federal arrest warrant for Williams approximately 30 times in the weeks after SAUSA Dahl obtained the warrant on April 13, 2021.

249.    Upon information and belief, JCPD officers failed to arrest Williams on May 6, 2021, improperly alerting him to the arrest warrant before executing it and allowing him to remain inside his apartment. JCPD officers then left the premises, enabling Williams to abscond for the next two years. Williams' unlawful flight was possible only because of JCPD's knowing interference with SAUSA Dahl's investigation.

250.    During May 2021, SAUSA Dahl continued to investigate Williams, taking statements from eight witnesses who corroborated the accounts of the victims that Williams was drugging and raping women in Johnson City. SAUSA Dahl also heard directly from another victim whose account mirrored the other victims of Williams. In May 2021, SAUSA Dahl reported her concerns about Williams' history of predation and JCPD's inaction to an FBI agent. On reasonable inference, Chief Turner learned of SAUSA Dahl's efforts to investigate Williams and her report to the FBI, and on Jun 25, 2021, terminated her employment.

**O.    Johnson City's Internal Investigation Reveals JCPD Had a Pattern and Practice of Discriminating Against Women Sexual Assault Victims and that this Practice Compromised Sexual Assault and Rape Prosecutions**

251.    In August 2022, responding to community protest following the Dahl Complaint, Defendant City initiated an independent third-party review of JCPD's handling of sexual assault

34

investigations. Defendant City hired the Daigle Law Group (DLG) to review JCPD's processes and procedures specific to sexual assault investigations during the period of January 2018 through December 2022—the same period within which Plaintiffs suffered sexual assaults at the hands of Williams and during which JCPD knowingly failed to investigate Williams' crimes.

252.   Nearly a year later, on July 18, 2023, Defendant City released DLG's findings, which were summarized by DLG in a 45-page report.

253.   According to the report, DLG considered JCPD's practices and procedures to determine whether the agency's "pattern and practice" or "custom" with respect to sexual assault investigations met Constitutional standards of policing. It found they did not.

254.   To reach this conclusion, DLG reviewed case files for more than 325 reports of sexual assault made to the JCPD between January 2018 and December 2022. DLG also conducted an onsite inspection in December 2022, and interviewed Defendants Turner and Peters, as well as six JCPD officers, left unidentified in the report.

255.   DLG found that JCPD's practices discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault. The DLG investigation revealed that no legitimate law enforcement purpose—or any other reason—justified these inadequacies. Instead, the JCPD's practice of discouraging women from pursuing sexual assault charges stemmed from misconceptions and stereotypes about women and victims of sexual assault—in other words, sex-based bias.

256.   DLG further found that JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD had

failed to train officers to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

257. DLG specifically noted JCPD's deficiency in responding to non-stranger and alcohol or drug-facilitated sexual assault—exactly the type of reports Plaintiffs had made to JCPD about Williams.

258. DLG concluded: "JCPD's investigative practices were found to compromise the effectiveness of their response to sexual assault and lead to under-enforcement of sexual assault laws in Tennessee. At times, JCPD failed to employ key investigative practices that, if properly implemented, would safeguard potential evidence, protect the rights of victims and suspects, and facilitate a thorough investigation. For instance, our review found that JCPD too often fails to collect evidence and does not take proper steps to obtain timely, credible statements from suspects and witnesses. Our review revealed instances where JCPD officers likely would have obtained statements and facts to support a prosecution if they had used the investigative tactics known to be effective and essential in sexual assault investigations, especially investigations of non-stranger sexual assault. These investigative deficiencies compromise the investigative process and unnecessarily place victims at an increased risk of harm."

259. DLG also found that JCPD's investigations into sexual assault reports were inconsistent, ineffective, and incomplete. JCPD often failed to collect evidence or failed to document the collection of evidence. JCPD also failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers failed to document their statements, even though the investigative files indicated that such statements had been taken.

260. From 2018-2022, of the 133 cases where rapes had been reported to JCPD, 105 cases had an identified suspect, but only 36 of these suspects (or 34% of the known suspects) were

36

ever interviewed. In the rare cases where JCPD officers did interview suspects, their practice was to call to schedule the interview, sometimes weeks in advance, providing the suspects the opportunity to modify or coordinate their stories. DLG found this practice "baffling," as it "undermine[d] the integrity of sexual assault investigations."

261.    DLG found that JCPD practices actively discouraged sexual assault victims from pursuing charges and participating in investigations.

262.    In one example provided in the report, a JCPD investigator insisted that a sexual assault victim come to JCPD headquarters to provide a written statement of her assault. When she came in and provided a 15-page written statement describing her assault, the investigator required her to re-write the statement on a JCPD form, and then called her back into the office one month later to question her about purported inconsistencies between the two statements. After questioning the victim on "numerous suspicious and inconsistent statements," the victim changed her mind and said she no longer wished to pursue the case. There was no suspect interview and no mention of sexual assault kit results.

263.    The report also identified JCPD practices which made reporting sexual assaults "unnecessarily burdensome" to the victims, including practices motivated by gender bias and discriminatory animus against women, such as the following:

264.    Reluctance of the officers/investigators to continue investigative steps unless the victim comes to the Department to give a statement.

265.    JCPD requires that victims and witnesses be interviewed at the police station, rather than at the location most convenient and comfortable for the victim.

266.    The interview rooms at the JCPD are suspect oriented with visible restraining devices.

267.     JCPD investigators asked victims whether they wished to seek criminal prosecution early in the investigation and whether they would testify against the accused. Statements by JCPD investigators focus on the emotional toll of prosecution and the victim's unwillingness to participate in the prosecution.

268.     JCPD's sexual assault investigations are sometimes compromised by an investigator's unwarranted gender-based assumptions and stereotypes about women.

269.     JCPD generally does not invite advocates to be present during victim interviews. Instead, two JCPD detectives typically interview a victim without advocate participation. This practice is more appropriate for an interrogation of a suspect than an interview of a crime victim and sometimes prevents detectives from developing the necessary rapport with women victimized by sexual assault.

270.     Reporting a sexual assault, including the time spent at hospitals and with JCPD, can take many hours.

271.     JCPD too often does not follow up with victims to document evolving injuries, such as bruises.

272.     DLG further found that JCPD failed to secure crime scenes in responding to reports of sexual assault.[4] Specifically, the report concluded, "JCPD's securing of crime scenes and using search warrants to document evidence were found to be insufficient."

273.     The report cites an example that appears to match the facts alleged herein describing Female 2's interaction with JCPD officers immediately following her assault by Williams. The

---

[4] The purpose of securing a crime scene while precuring a warrant is to ensure evidence is not destroyed, manipulated, or lost.

38

report faults JCPD for failing to respond to the apartment in question and failing to secure the apartment and search for additional evidence.

274. In fact, had JCPD officers conducted an effective search of Williams' apartment in June 2020, they likely would have discovered critical evidence proving—beyond any doubt—that he was drugging and raping women, namely, as described above, images of him sexually assaulting victims while they were unconscious which he had saved to folders on this computer titled with the victims' first names and the word "drugged."

275. JCPD's systemic failures of improperly documenting sexual assault investigations not only violated their own internal orders, but also standard police practice which are intended to protect and serve their community.

276. DLG found that JCPD's interactions with women reporting sexual assault "reflect reliance on gender-based stereotypes and bias, and that this discrimination is responsible in part for the deficiencies in JCPD's response to sexual assault."

277. This conduct included "overtly discriminatory statements from JCPD officers, investigators, or leadership."

278. JCPD investigators also improperly relied on a woman's sexual history in evaluating the veracity of the sexual assault report.

279. DLG found that JCPD supervisors were allowing sexual assault cases to be closed even when prosecution was still possible. The report concluded that the "JCPD process of closing [sexual assault] investigations is flawed and inaccurate."

280. The report found that JCPD investigators were improperly using the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, often where the requirements for closure under this basis were not met.

39

281.    For instance, the report cited closure of rape cases: Of 133 rape cases reported during 2018-2022, 66 (nearly 50%) were closed based on "exceptional circumstances." Of these 66, 25% were based on JCPD's claim that the victim was reluctant to participate, 31% were based on of the reporting officer's claim that the victim was uncooperative (based on non-returned phone calls or messages, and/or the inability of the officer to contact the victim), and 40% were based on the prosecutor's office declining to prosecute. However, of those declinations, the reason usually provided was that the victim was declining to participate in the prosecution. But closure based on a victim's cooperation or reluctance to participate in the prosecution is <u>not</u> a proper basis for closure under JCPD's own internal reporting requirements.

282.    Thus, according to the DLG report, JCPD officers engaged in discriminatory and biased conduct to discourage women from pursuing cases of sexual assault and rape, and then used the resulting reluctance on the part of victims to close rape cases improperly and in violation of department rules and requirements.

283.    As a result, between 2018-2022, only 11.27% of reported rape cases ended in arrest of the suspect. It is not clear from the DLG report how many—or if any—of these arrests resulted in convictions.

**P.    According to the DLG Report, Evidence in the Williams' Sexual Assault Investigations Is Now Missing**

284.    The DLG report also considered the JCPD internal review process following the Dahl Complaint and found it violated industry standards, accreditation standards, and model policies.

285.    Significantly, the DLG report states that reports and documentation concerning the sexual assault investigations of Williams were missing or unidentified because JCPD failed to

40

initiate an internal affairs ("IA") investigation in response to the allegations of JCPD corruption in the Dahl Complaint.

286.    According to the DLG report, this failure was inexplicable since "[JCPD] was concerned that the [Dahl] complaint involved criminal conduct on the part of Department members."

287.    The DLG report also recognizes the role of the office of the First Judicial District Attorney ("DA") General Steven Finney in its failure to investigate properly Dahl's claims of criminal corruption on the part of JCPD.

288.    Specifically, on August 24, 2022, City Manager Cathy Ball delivered a letter to the newly-elected DA Finney asking his office or the Tennessee Bureau of Investigation ("TBI") to "conduct a preliminary investigation to determine whether there was a basis to open a public corruption investigation" based on Dahl's allegations.

289.    Eight days later, on September 1, 2022, DA Finney replied. He stated—incorrectly—that as DA, he was the "only person" who could request a TBI investigation into this conduct. He further stated—also incorrectly—that there was no such thing as a "preliminary investigation."

290.    In fact, according to the DLG report, DA Finney should have inquired whether JCPD had conducted an Internal Affairs ("IA") investigation into the allegations.

291.    DA Finney then concluded that he did not have "enough information to request a TBI investigation at this point."

292.    DA Finney had no basis to conclude the allegations were unfounded because, by his own admission, there had been no internal investigation.

293.     According to the DLG report, the failure to conduct an IA investigation had grave consequences for any subsequent investigation to uncover what happened in JCPD's sexual assault investigations of Williams. The DLG report notes that because of the lack of any IA investigation, there are now documents that cannot be located or identified relating to the sexual assault investigations of Williams, documents which "were not discovered during the DLG audit."

294.     In other words, in response to the Dahl Complaint, JCPD violated "industry standards, accreditation standards, and model policies" by failing to investigate her allegations, and as a result, key documents have gone missing.

**Q.     The DOJ and FBI Open a Criminal Sex Trafficking Investigation of Williams**

295.     On June 23, 2021, SAUSA Dahl filed a public complaint outlining her allegations against JCPD, and Chief Turner. For the first time, Plaintiffs learned of the number of similar complaints of sexual assault against Williams and of JCPD's efforts to obstruct and interfere with Dahl's investigation.

296.     In or about November 2022, the FBI opened a federal sex trafficking investigation, investigating possible violations of 18 USC § 1591, into Williams.

297.     JCPD's actions to obstruct, attempt to obstruct, and to interfere with Dahl's federal investigation effectively delayed the sex trafficking investigation by at least two years.

**R.     Johnson City Police Department – Deprivation of Constitutional Right to Equal Protection under the Law**

298.     Beginning in at least November 2019, JCPD had knowledge that Williams was drugging and raping women.

299.     Following Jane Doe 2's report of sexual assault and attempt to press charges against Williams in November 2019, the JCPD failed to conduct an investigation of sexual assault against

42

Williams, failed to properly document Jane Doe 2's report, failed to test her rape kit timely, and failed to retain or preserve evidence properly.

300.    JCPD followed this pattern with at least Jane Doe 5, Jane Doe 6, Jane Doe 7, Female 2, and Female 3.

301.    Detective Sparks had vast knowledge of Williams' sexual assaults.

302.    Sparks spoke with Jane Doe 2, Jane Doe 5, Jane Doe 6's family members, and Jane Doe 7, all of whom told Sparks that they wanted to report Williams for drugging and sexual assault or possible drugging and attempted sexual assault.

303.    By not investigating multiple complaints of sexual assault by Williams and discouraging female reporters of sexual assault from pursuing charges against Williams, JCPD failed to believe or address women's accounts of crime within its jurisdiction.

304.    As a direct result of JCPD's discriminatory policies and practices towards women, Williams was able to continue to victimize women after Jane Doe 2's report, including Jane Does 3, 4, 5, 6, and 7, and Females 2 and 3, resulting in their bodily injury, extreme emotional distress, psychological harm, and, in the case of Jane Doe 6, death.

305.    Upon information and belief, JCPD's failure to protect female victims of Williams' sexual assault was consistent with an institutional practice and ongoing policy of JCPD of failing to protect female victims of sex crimes, which was motivated by JCPD officers' actual discriminatory animus towards women.

306.    Upon information and belief, these practices and policies were known and ratified by JCPD policy makers.

307.    Upon information and belief, Defendant City failed to prevent JCPD from engaging in the policy and practices that disproportionately affected women.

308.    Upon information and belief, Defendant City approved an ongoing institutional practice of discrimination toward women by, among other actions:

309.    Failing to properly supervise JCPD;

310.    Failing to properly train JCPD;

311.    Failing to forward to the District Attorney's Office of Washington County evidence of criminal acts committed in Washington County, and/or forwarding reports of rape in a piecemeal fashion so as to undermine the larger case against Williams;

312.    Failing to protect and ensure evidence was not discarded;

313.    Failing to protect and ensure evidence was not lost or mishandled; and

314.    Failing to discipline, restrict, and control JCPD employees for failing to investigate crimes of sexual assault against females.

**S.    JCPD's Policy and Procedures Were Motivated by Discriminatory Animus Towards Women**

315.    JCPD's failure to protect victims of Williams' sexual assaults was consistent with an institutional practice and ongoing policy of JCPD, and was motived, in part, by the officers' discriminatory animus towards women.

316.    As outlined in the DLG report, JCPD investigators routinely take steps which discourage victims of sexual assault from pursuing charges based on "an investigator's unwarranted gender-based assumptions and stereotypes about women," thereby compromising the investigations.

317.    As alleged above, JCPD officers, and in particular, Det. Sparks, deployed these practices here in attempting to discourage and dissuade Williams' victims from reporting Williams' crimes. Specifically, JCPD officers failed to record victim statements properly—or at all, in the case of Jane Doe 5; required victims to provide multiple statements or to come in to JCPD

44

headquarters to report their assaults even after already providing a statement (Jane Does 2 and 7); and failed to obtain search warrants or properly secure crime scenes (Jane Does 2, 7, and Females 2 and 3), among other investigative failures.

318.    As set forth in the Dahl Complaint, JCPD officers made statements to her which evidenced their discriminatory animus towards women victims of sexual assault, including, among other statements, the following:

319.    Chief Turner cast doubt on the credibility of Williams' victims even after their names appeared on the "Raped" list, dismissing their cases as potentially "consensual sex."

320.    On another occasion, JCPD Captain Peters made jokes about Williams' victim's clothing and appearances.

321.    One JCPD investigator stated in response to the rape complaints against Williams, "In my 20 years on the force, I've only encountered one real rape."

322.    JCPD officers made statements questioning the credibility of victims and made harassing comments to SAUSA Dahl.

323.    One male investigator stated to SAUSA Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour." Instead of refuting the allegations, the investigator's words suggested SAUSA Dahl would have better luck assembling evidence if she voluntarily made herself a victim of sexual assault.

**T.    Plaintiffs Learned of JCPD's Discriminatory Animus Towards Women on June 23, 2022**

324.    Plaintiffs first learned of JCPD's policy and practice of discrimination towards women victims of Williams with the filing of the Dahl Complaint on June 23, 2022.

45

325. Although Plaintiffs Jane Does 2, 5, and 7, and the personal representatives to Jane Doe 6 were aware before this date that JCPD had failed to file charges based on their individual sexual assault and/or attempted sexual assault and/or drugging complaints against Williams, they had no knowledge that this was part of an unwritten policy and practice of JCPD motivated by discriminatory animus towards women.

326. The Plaintiffs were not aware of the number of complaints of sexual assault filed with JCPD by other victims of Williams, nor of JCPD's inaction in response to these other complaints.

327. The Dahl Complaint revealed for the first time that Chief Turner, Det. Sparks, and other JCPD officers had a policy and practice of failing to process and investigate complaints of sexual assault against Williams, and that this failure was motivated by their actual discriminatory animus towards women.

328. Before this, Plaintiffs did not know, nor did they have reason to know, the constitutional injury they had suffered on the basis of their sex, nor of the state actions that shocked the conscience and constituted a state created danger, which deprived them of life, liberty, or property.

329. It is now known, in part through subsequent news reports about the various state and federal investigations, there are at least 52 victims of sex-based crimes perpetuated by Williams. At least five of the Jane Does in the lawsuit have been informed Williams kept images and videos of their sexual assaults and at least two were identified on Williams' "Raped" list.

**U.   Plaintiffs Experienced and Continue to Experience Severe Harm and Damages**

330. At all times material hereto, Plaintiffs have been and are continuously harmed by Johnson City Officials and JCPD's ongoing policy and procedures of not believing, investigating,

46

or addressing their complaints of sexual assault by Williams, and continuing a public campaign to dissuade Plaintiffs and other victims from coming forward.

331.    Plaintiffs' ongoing injuries include, but are not limited to:

    a.    Bodily injury,

    b.    Death,

    c.    Extreme psychological harm,

    d.    Deprivation of property,

    e.    Deprivation of a right to privacy, and

    f.    Emotional distress.

## COUNT I
### Sex Trafficking, 18 U.S.C. §§ 1595 and 1591

332.    Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

333.    Plaintiffs bring claims under 18 U.S.C. § 1595 based on each of the Defendants' respective financial benefits garnered from participating in a venture in which Williams, Diaz-Vargas, and other known and unknown coconspirators knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited by any means Plaintiffs, where Williams' use of force, *i.e.*, drugging women to render them unconscious, was used to cause them to engage in commercial sex acts.

334.    Each of the Defendants knowingly participated in a sex trafficking venture by receiving value in the form of seized narcotics assets—either by corrupt use of search warrants or by other unlawful collections efforts—from Williams and his coconspirators, which Williams provided JCPD and Defendant officers in furtherance of the sex trafficking conspiracy.

47

335. Defendant JCPD officers knew multiple women had reported Williams' forced sex acts, including Plaintiffs Jane Does 2, 5, and 7, and Female 2. Defendants further knew, based on these women's reports, that Willliams used Diaz-Vargas and other coconspirators to recruit and obtain women in exchange for things of value, including among other things, illicit drugs and free lodging. Instead of arresting Williams and pursuing charges against him, Defendants knowingly and corruptly mishandled women's rape reports in exchange for seized narcotics assets, all in furtherance of the sex trafficking venture.

336. As a result of Defendants' participation in a sex trafficking venture by receiving currency and cash from Williams, Williams was able to continue to perpetrate his sex trafficking crimes for years, resulting in the damages to Plaintiffs, including bodily harm, psychological and psychiatric harm, emotional pain and suffering, and mental anguish.

337. Each of the Defendants knew or should have known that it received value for its respective ongoing law enforcement practices that allowed Williams and his coconspirators to engage in the sex trafficking conspiracy.

338. Each of the Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1), (2) and 1595(a) occurring within the territorial jurisdiction of the United States.

339. The conduct of each of the Defendants was in or affected interstate and/or foreign commerce.

340. Each of the Defendants knowingly benefited from participation in what it knew or should have known was a sex trafficking venture in violation of 18 U.S.C. §§ 1591(a)(2) and/or 1595(a).

48

341.     Each Defendant knowingly benefited from, and/or received value for participation in the venture in which Defendant knew that Plaintiffs would be forced to engage in commercial sexual acts by use of force.

342.     Defendant JCPD officers had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of raped women.

343.     Each of the Defendant JCPD officers knowingly benefited financially from the sex-trafficking venture.

344.     Defendants' conduct caused Plaintiffs serious harm including, without limitation, physical, psychological, financial, and reputational harm.

345.     The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

346.     Plaintiffs demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT II
## Obstruction of Enforcement of 18 U.S.C. § 1591, 18 U.S.C. §§ 1595 and 1591(d)

347.     Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

348. Plaintiffs bring claims under 18 U.S.C. § 1595 based on each of the Defendants' actions to obstruct, attempt to obstruct, and in any way interfere with and prevent the enforcement of 18 U.S.C. §§ 1591(a)(1), (2), in violation of 18 U.S.C. § 1591(d).

349. Defendants took the following actions knowingly, all in violation of 18 U.S.C. § 1591(d):

    a. Defendants knowingly failed to investigate Williams' crimes against women.

    b. Defendants knowingly failed to refer charges for prosecution and/or referred charges in a piecemeal and incomplete manner so as to undermine the prosecution.

    c. Defendants knowingly intimidated and dissuaded Plaintiffs from pursuing criminal charges.

    d. Defendant Sparks knowingly made false statements to Plaintiffs in an effort to obstruct and interfere with the criminal investigation.

    e. Defendants Sparks and Jenkins knowingly conspired with Williams to destroy evidence, including digital evidence which showed Williams raping unconscious women whom he had drugged. This evidence included images of Plaintiffs in this case.

350. At the time of each of the Defendants' obstructive acts, each Defendant had actual knowledge, based on rape victims' reports, that Williams was drugging and raping women, and that Williams used Diaz-Vargas, and other coconspirators, to recruit and obtain women in exchange for things of value, in furtherance of this conspiracy.

50

351.    Each of the Defendants knew or should have known that their obstructive acts would have the effect of interfering with and preventing the enforcement of 18 U.S.C. §§ 1591(a)(1), (2).

352.    Each of the Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(d) and 1595(a) occurring within the territorial jurisdiction of the United States.

353.    The conduct of each of the Defendants was in or affected interstate and/or foreign commerce.

354.    Defendant JCPD officers had actual knowledge that they were obstructing, attempting to obstruct, and interfering in any way and preventing the enforcement of 18 U.S.C. §§ 1591(a)(1), (2).

355.    The conduct of each Defendant caused Plaintiffs serious harm including, without limitation, physical, psychological, financial, and reputational harm.

356.    The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

357.    Plaintiffs demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**<u>COUNT III</u>**
**<u>Equal Protection, 42 U.S.C. § 1983</u>**

51

## Unconstitutional Policy

358.     Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

359.     Defendants Chief Turner, Captain Peters, and Detective Sparks acted under the color of state law and pursuant to an adopted policy or a longstanding practice of custom of Defendant City.

360.     Defendants maintained the following unconstitutional customs, practices, or policies:

>    a.   Failure to document reports of sexual assault by Sean Williams made by women under Defendant City's jurisdiction;
>
>    b.   Failure to investigate reports of sexual assault by Williams made by women under Defendant City's jurisdiction;
>
>    c.   Failure to or delayed in testing the rape kits of women who made complaints of sexual assault by Williams;
>
>    d.   Failure to seize or retain evidence properly from women who made complaints of sexual assault by Williams; and
>
>    e.   Failure to credit women's accounts of sexual assault within Defendant City's jurisdiction, failure to investigate women's complaints of sexual assault and rape within Defendant City's jurisdiction, and failure to test rape kits of women who made complaints in a timely fashion.
>
>    f.   These policies and practices were motived by actual discriminatory animus towards women.

361.     On or about June 23, 2022, Plaintiffs learned that Defendants and the JCPD had a custom, policy and practice of failing to investigate sexual assault reports made by women.

362.    At all times relevant hereto, sexual assault was perpetrated almost entirely against females. According to federal crime statistics, females constitute over 90% of sexual assault victims.

363.    By reason of the aforementioned acts, Plaintiffs have suffered bodily injury, emotional distress, deprivation of property, deprivation of the right to privacy, and, in the case of Jane Doe 6, death.

364.    Defendants had either actual or constructive knowledge of the unconstitutional policies, practices and customs alleged above. Despite having knowledge, Defendants condoned, tolerated, and ratified such policies. Defendants acted with deliberate indifference to the foreseeable effects of these policies with respect to the constitutional rights of Plaintiffs and all women under their jurisdiction.

365.    Defendants had a duty to diligently investigate *all* crimes. Defendants breached this duty by routinely and systemically failing and/or refusing to do so in the case of sexual assault and rape. Defendants' deliberate indifference to sexual assault crimes, which was an institutional policy so pervasive as to rise to the level of intentional conduct, served to deprive Plaintiffs of equal protection under the law on the basis of their gender.

366.    In committing the acts and/or failures as alleged herein, Defendants were at all times relevant hereto acting under the color of the State. The constitutional injury inflicted by Defendants was caused by a person(s) with final policymaking authority at the Defendant City. Defendants knew about the above-described conduct and facilitated it, approved it, condoned it, and/or turned a blind eye to it.

367.    The above-described conduct of Defendants constitutes a violation of 42 U.S.C., Section 1983. Plaintiffs are entitled to compensatory damages for emotional pain, suffering, mental

anguish and other non-pecuniary losses, and injunctive relief pursuant to 42 U.S.C., Section 1983

for violations of their civil rights under the U.S. Constitution directly and proximately caused by

Defendants.

**COUNT IV**
**Equal Protection, 42 U.S.C. § 1983**
**Violation of Substantive Rights to Due Process**

368.    Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

369.    Plaintiffs have a cognizable interest under the Due Process Clause of the Fourteenth

Amendment of the United States Constitution to be free from state actions that deprive them of

life, liberty, or property in such a manner as to shock the conscience, and which constitute a state

created danger.

370.    The aforementioned actions of JCPD, including but not limited to the actions of

Defendants Chief Turner, Captain Peters, and Detective Sparks, shock the conscience, in that they

acted with deliberate indifference to the constitutional rights of Plaintiffs with a purpose to harm

that was unrelated to any legitimate law enforcement objective.

371.    The aforementioned actions of JCPD, including but not limited to the actions of

Defendants Chief Turner, Captain Peters, and Detective Sparks, compromise affirmative acts that

caused an increased risk to Plaintiffs, specifically, of being exposed to an act of violence by a third

party.

372.    The conduct of Defendants was willful, knowing, wanton, malicious, and done with

reckless disregard for the rights and safety of all Plaintiffs.

373.    As a direct and proximate result of Defendants' actions, Plaintiffs experienced

extreme pain and suffering in the form of bodily injury, emotional distress, and in the case of Jane

Doe 6, death. Defendants deprived Plaintiffs of their right to be protected and safeguarded from

actions that risked their lives, as well as physical and emotional injury.

54

374. The above-described conduct of Defendants constitutes a violation of 42 U.S.C., Section 1983. Plaintiffs are entitled to compensatory damages for emotional pain, suffering, mental anguish and other non-pecuniary losses, and injunctive relief pursuant to 42 U.S.C., Section 1983 for violations of their civil rights under the U.S. Constitution directly and proximately caused by Defendants.

## COUNT V
## Title IX, 20 U.S.C. § 1681

375. Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

376. Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participating in, be denied the benefit of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance."

377. Defendant City and the Johnson City Police Department receive federal funding.

378. Plaintiffs have been sexually assaulted within JCPD's jurisdiction.

379. Plaintiffs' reports of sexual assault to JCPD were not investigated properly, not documented properly, and did not result in charges filed by and/or sent to the District Attorney's Office of Washington County.

380. Plaintiffs were denied the benefits of an educational program or activity engaged in by the Johnson City Police Department pursuant to federal funding.

381. The assaults and JCPD's failure to address Plaintiffs' complaints of crime were severe, pervasive, and objectively offensive and upsetting.

382. Defendant City was in a position to prevent all these events but instead acted willfully, intentionally, and/or deliberately indifferent to it and, in allowing the same, illegally discriminated against Plaintiffs.

55

383.     As a direct and proximate consequence of the deliberate indifferent with regard to the aforementioned events shown by Defendants, Plaintiffs have suffered damages and the Defendants are liable for all injuries sustained by Plaintiffs proximately caused by their violation of law.

<u>**COUNT VI**</u>
<u>**Tennessee Governmental Tort Liability Act, T.C.A. 29-20-205**</u>

384.     Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

385.     Chief Turner, Captain Peters, and Detective Sparks were aware of numerous complaints of sexual assault and drugging by Williams, including those made by Plaintiffs Jane Does 2, 5, and 7, Jane Doe 6's surviving family member, and Females 2 and 3 as early as 2019.

386.     Despite this knowledge, Chief Turner, Captain Peters, and Detective Sparks failed to investigate Williams, refer all reports of his criminal activity to the District Attorney's Office, or provide protection for the Plaintiffs in this case. These actions do not exercise the care that a reasonable or prudent individual in their capacities would hold.

387.     Chief Turner, Captain Peters, and Detective Sparks negligent actions were the proximate cause of the Plaintiffs' injuries, including but not limited to bodily injury, emotional distress, deprivation of property, deprivation of right to privacy, and, in the case of Jane Doe 6, death.

388.     Defendant City is liable for the injuries proximately caused by the negligent acts or omissions of Chief Turner, Captain Peters, and Detective Sparks.

389.     As a direct and proximate consequence of the negligent acts and omissions with regard to the aforementioned events caused by Defendants, Plaintiffs have suffered damages and Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violation of law.

390.     Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

391.     Defendant City had a duty to train its Police Department officers and employees to not discriminate against citizens on the basis of sex, as well as to properly investigate legitimate complaints of criminal activity and protect citizens under its jurisdiction from criminal activity.

392.     Defendant City breached its duty of care to Plaintiffs when JCPD officers and employees were made aware by women of numerous complaints of sexual assault by Williams, failed to investigate those complaints, and failed to protect female citizens of Johnson City from further criminal activity by Williams.

393.     By breaching its duty of care, Defendant City proximately caused each Plaintiff bodily injury, emotional distress, the deprivation of property, the deprivation of the right to privacy, and in the case of Jane Doe 6, death.

394.     Plaintiffs suffered actual emotional and physical damages due to Defendant City's breach of care.

395.     As a direct and proximate consequence of the acts and omissions with regard to the aforementioned events shown by Defendants, Plaintiffs have suffered damages and Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violation of law.

## COUNT VIII
## Negligence, Failure to Supervise

396.     Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

397.     Defendant City had a duty to supervise its Police Department officers and employees to ensure they were not discriminating against citizens on the basis of sex, as well as

properly investigating legitimate complaints of criminal activity and protecting citizens under its jurisdiction from criminal activity.

398.    Defendant City had a duty to maintain and enforce policies and procedures that ensured all of its citizens, regardless of sex, were protected from criminal activity.

399.    Defendant City breached its duty of care to Plaintiffs when the JCPD officers and employees were made aware of the numerous complaints of Williams' sexual assault, failed to investigate those complaints, and failed to protect female citizens of Johnson City from further criminal activity by Williams.

400.    By breaching its duty of care, Defendant City proximately caused each Plaintiff bodily injury, emotional distress, the deprivation of property, the deprivation of the right to privacy, and in the case of Jane Doe 6, death.

401.    Plaintiffs suffered actual emotional and physical damages due Defendant City's breach of care.

402.    As a direct and proximate consequence of the acts and omissions with regard to the aforementioned events shown by Defendants, Plaintiffs have suffered damages and the Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violation of law.

## **RELIEF REQUESTED**

Plaintiffs respectfully request:

1.    A jury trial;

2.    Compensatory damages for emotional distress, mental anguish, and disruption to Plaintiff's family life, physical injury, pain and suffering, medical expenses, and all compensatory damages and or economic damages caused by the actions of Defendants.

3.    Attorneys' fees and expenses;

58

4.      Prejudgment interest and, if applicable, post-judgment interest;

5.      Injunctive and declaratory relief; and

6.      Any such general relief to which Plaintiffs may be entitled.


                          Respectfully submitted,

                          HMC Civil Rights Law, PLLC

                          *s/ Heather Moore Collins*
                          Heather Moore Collins (# 026099)
                          Caroline Drinnon (#037016)
                          Ashley Shoemaker Walter (#037651)
                          7000 Executive Center Dr., Suite 320
                          Brentwood, TN 37027
                          615-724-1996
                          615-691-7019 FAX
                          heather@hmccivilrights.com
                          caroline@hmccivilrights.com
                          ashley@hmccivilrights.com

                          *—and --*

                          Advocates for Survivors of Abuse PC

                          */s Vanessa Baehr-Jones*
                          Vanessa Baehr-Jones CABN # 281715
                          *Pro Hac Vice*
                          **Advocates for Survivors of Abuse PC**
                          4200 Park Boulevard No. 413
                          Oakland, CA 94602
                          (510) 500-9634
                          vanessa@advocatesforsurvivors.com

                          *Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been filed and served via the court's electronic filing system on September 6, 2023 to counsel of record:

K. Erickson Herrin
HERRIN, McPEAK & ASSOCIATES
515 East Unaka Avenue
P. O. Box 629
Johnson City, TN 37605-0629
Email: lisa@hbm-lawfirm.com

Emily C. Taylor
WATSON, ROACH, BATSON & LAUDERBACK, P.L.C.
P.O. Box 131
Knoxville, TN 37901-0131
Email: etaylor@watsonroach.com

*Attorneys to Defendants, Johnson City, Tennessee, Karl Turner, in his individual and official capacities, Captain Kevin Peters, in his official capacity, and Investigator Toma Sparks, in his official capacity*

Daniel H. Rader III
Daniel H. Rader IV
MOORE, RADER & YORK PC
46 N. Jefferson Avenue
P.O. Box 3347
Cookeville, TN 38502-3347
danrader@moorerader.com
danny@moorerader.com
*Counsel for Kevin Peters in his individual capacity*

Kristin Ellis Berexa
Ben C. Allen
FARRAR BATES BEREXA
12 Cadillac Drive, Suite 480
Brentwood, TN 37027-5366
kberexa@fbb.law
ballen@fbb.law
*Counsel for Toma Sparks in his individual capacity*

*/s Heather Moore Collins*
Heather Moore Collins

60