IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

B.P., H.A., and S.H., individually, and on
behalf of all others similarly situated,

        Plaintiffs,

v.

CITY OF JOHNSON CITY, TENNESSEE,
a government entity,

KARL TURNER, individually and in his
official capacity as Chief of the
Johnson City Police Department,

KEVIN PETERS, individually and in his
official capacity as Captain in the
Johnson City Police Department,

TOMA SPARKS, individually and in his
official capacity as Investigator in the
Johnson City Police Department,

JUSTIN JENKINS, individually and in his
official capacity as Investigator in the
Johnson City Police Department,

JEFF LEGAULT, individually and in his
official capacity as Investigator in the
Johnson City Police Department,

BRADY HIGGINS, individually and in his
official capacity as Investigator in the
Johnson City Police Department, and

DOES 8-20, inclusive,

        Defendants.

**No: 2:23-cv-00071-TRM-JEM**

**PLAINTIFFS DEMAND JURY TRIAL**

1

## SECOND AMENDED CLASS ACTION COMPLAINT

For years, Sean Williams drugged and raped women and sexually exploited children in Johnson City, Tennessee, and for years, officers of the Johnson City Police Department ("JCPD") let him get away with it. From November 2019 – June 2022, JCPD received at least eight reports alleging Williams had drugged and/or sexually assaulted women in his apartment in downtown Johnson City. Instead of arresting Williams, however, JCPD officers treated Williams as though he were, in the words of Investigator Toma Sparks, "untouchable." In exchange for turning a blind eye, JCPD officers took hundreds of thousands of dollars in cash from Williams, all while refusing to take meaningful steps to protect women and children in Johnson City and to stop his known sexually predatory behavior. It was later revealed that JCPD was not only turning a blind eye to Williams' crimes, but also engaging in a pattern and practice of discriminatory conduct towards women who reported rape and sexual assault by Williams *and other perpetrators*.

On or around June 23, 2022, former federal prosecutor Kateri Dahl filed a civil complaint against Johnson City and others, revealing JCPD's institutionalized policy to ignore complaints of criminal activity and bodily harm, including allegations of rape and drug activity by Williams and his accomplices, made by multiple women under Johnson City's jurisdiction. Not only were the complaints of women being ignored or minimized, JCPD, including then-Chief Karl Turner, Captain Kevin Peters, Investigator Toma Sparks, Investigator Justin Jenkins, Investigator Jeff Legault, and Investigator Brady Higgins, affirmatively refused to investigate Williams' crimes against women; affirmatively refused to refer charges for prosecution and/or referred charges in a piecemeal and incomplete manner so as to undermine the prosecution; knowingly conspired to destroy and conceal evidence; knowingly intimidated and dissuaded women from pursuing criminal charges; and, in the case of Investigator Sparks, knowingly made false statements to

2

women with the intent to obstruct and interfere with the criminal investigation. Dahl's allegations also exposed JCPD's interference with a federal criminal investigation into Williams.

In August 2022, only after public outcry, Defendant Johnson City retained a third-party expert to conduct a review of JCPD's sexual assault investigations during 2018 – 2022. The resulting report is damning. Released by the City on July 18, 2023, four weeks after the filing of the initial complaint in this case, the report from the City's own expert found that JCPD's overall handling of women's reports of sexual assault and rape was severely deficient and rife with discriminatory conduct based on hostility and bias towards women. According to the report, this unlawful and unconstitutional conduct discouraged victims from pursuing their cases. JCPD supervisors further permitted investigators to close sexual assault cases improperly, based on the purported reluctance of the victims, even when prosecution would have otherwise been possible.

In November 2022, the U.S. Department of Justice ("DOJ") Human Trafficking Prosecution Unit and the Federal Bureau of Investigation ("FBI") opened a federal sex trafficking investigation into Williams. The evidence the FBI collected in the sex trafficking investigation proved to be overwhelming: on Williams' digital media, the FBI found images and videos that Williams had taken of himself sexually assaulting unconscious women, including Plaintiffs and Class Members in this case. Williams saved these images in labeled folders and titled them with the women's first names and the word "drugged."

Federal investigators also learned that over two years earlier, in September 2020, JCPD had seized digital devices from Williams' apartment which contained images and videos of Williams sexually assaulting women, as well as child sexual abuse material. On information and belief, JCPD had either intentionally or negligently failed to search these devices—or worse—had corruptly concealed this egregious evidence against Williams. JCPD officers, including

3

Defendants Sparks and Jenkins, had also corruptly allowed Williams to destroy and conceal other digital evidence contained and accessed on his cellphone. In return, and as payment, JCPD officers took hundreds of thousands of dollars in cash from Williams' safe.

Defendant JCPD officers knowingly participated in a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(1), (2), by benefiting financially from the venture. Defendants effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts, including an extortion scheme. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid pro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

Moreover, by interfering with Dahl's investigation into Williams' assaults, intimidating and discouraging Williams' victims, and concealing and/or conspiring to destroy critical evidence, JCPD officers obstructed the enforcement of the federal sex trafficking statute, a crime under 18 U.S.C. § 1591(d), thereby delaying prosecution of Williams under 18 U.S.C. § 1591(a) for years. Indeed, Johnson City Officials, including its City Manager Cathy Ball, have continued JCPD's practice of intimidation, corruption, and obstruction by taking public positions with the press to insinuate the victims are at fault for Williams' crimes, a tactic to discourage additional victims from coming forward.

Johnson City and the JCPD's actions also evidence a sex-based bias against women crime victims. These actions, known and authorized by Johnson City, Tennessee, were knowing, reckless, negligent, and deprived Plaintiffs and class members of their constitutional rights to equal protection and due process on the basis of their sex.

4

## JURISDICTION AND VENUE

1.      Plaintiffs bring this Trafficking Victims Protection Act and civil rights action pursuant to 18 U.S.C. §§ 1591(a)(1), (2), 1591(d), 1594, and 1595; 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution; the Tennessee Governmental Tort Liability Act, T.C.A. 29-20-205; and the common law.

2.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

3.      Venue is proper under 28 U.S.C. § 1391 as Defendants are located in Washington County, in the Greeneville Division of the Eastern District of Tennessee.

## PARTIES

4.      Plaintiff B.P., a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

5.      Plaintiff H.A., a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

6.      Plaintiff S.H., a female, was a citizen and resident of Gainesville, Georgia, and was visiting Johnson City, Washington County, Tennessee, during the operative time.

7.      Defendant Johnson City, Tennessee, ("Defendant City"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee. Defendant City has substantial control over the Johnson City Police Department and its employees.

8.      Defendant Chief Karl Turner is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

9.      Defendant Captain Kevin Peters is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

5

10.     Defendant Investigator Toma Sparks is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

11.     Defendant Investigator Justin Jenkins is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

12.     Defendant Investigator Jeff Legault is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

13.     Defendant Investigator Brady Higgins is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

14.     Defendant Officers John Does 8 through 20 are Johnson City Police Officers. Plaintiffs name them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.

15.     Plaintiffs are informed and believe and thereon allege that each of the Defendants is responsible individually and as an agent, contributor, and co-conspirator in a single enterprise with and as the alter ego of all other Defendants.

16.     At all relevant times, the unlawful conduct against Plaintiffs and class members as described herein was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, upon information and belief, the unlawful conduct described herein was committed under actual or apparent authority granted by Defendants such that all of the unlawful conduct of all Defendants is legally attributable to all other Defendants.

17.     At all relevant times, all Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described herein, unless otherwise indicated, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

# FACTUAL BACKGROUND

I. **JCPD Officers Benefited Financially from Sean Williams' Conspiracy to Drug and Rape Women and Sexually Exploit Children in Johnson City, Tennessee**

18.    Beginning in at least 2018 and continuing to 2021, Sean Williams, a known drug dealer and convicted felon, conspired with Alvaro Fernando Diaz-Vargas and others to drug and rape women, and sexually exploit children, in his apartment in downtown Johnson City, in violation of 18 U.S.C. §§ 1591(a), 1594(c).

A.    **The Sex Trafficking Conspiracy**

19.    At all relevant times, Williams resided in a loft apartment in downtown Johnson City, Tennessee, and operated the business Glass and Concrete Contracting LLC, along with coconspirators Female 4 and Female 5 and others.

20.    Upon information and belief, in addition to any legitimate business, Glass and Concrete Contracting LLC also served as a front for Williams to engage in narcotics trafficking in Tennessee and other states. This included facilitating his interstate travel to buy and sell narcotics.

21.    Upon information and belief, Glass and Concrete Contracting LLC had annual revenue in the millions of dollars.

22.    Williams used three primary means and methods to recruit, entice, harbor, provide, obtain, maintain, and solicit women and children, including children under the age of 14, including but not limited to: (1) providing benefits in the form of drugs, cash, and free lodging to coconspirators, including Diaz-Vargas, Female 1, and others, to recruit, obtain, transport, maintain, and provide women; (2) using drugs to addict and control women who would then recruit, obtain, transport, maintain, and provide other women; and (3) offering something of value to women, including free lodging and money, at times under the guise of hiring women for purportedly legitimate purposes, so that he could obtain and gain access to the women and their minor children.

7

*Recruitment and Sexual Assault of B.P.*

23.     In the fall of 2019, Female 1 befriended B.P. and introduced her to Diaz-Vargas and Williams. Female 1 invited and encouraged B.P. to party at Williams' apartment numerous times.

24.     Upon information and belief, Williams' apartment was only accessible by entering a certain code; Williams only provided the code to people who recruited victims into his apartment.

25.     B.P. often observed Female 1 enter the code into Williams' apartment before leading B.P. and other women up.

26.     On or about October 29, 2019, Female 1 invited B.P. and another female friend, Female 6, back to Williams' apartment.

27.     Once in the apartment, B.P. was offered cocaine by Williams. Williams poured lines of cocaine on a black tray that was only offered and used by the female partygoers. The male partygoers, including Williams and Diaz-Vargas, used cocaine from a different tray.

28.     After using the cocaine, B.P. began to feel woozy and physically and mentally incapacitated.

29.     Concerned, she attempted to leave the apartment, but was stopped by Williams. He told B.P. that she could not leave and if she did, she would be pulled over for a "DUI." He told her to stay in his apartment and sleep on his couch.

30.     In an attempt to get away, B.P. lied to Williams, saying she had to work the next day and that her dog needed to be let out at her house.

31.     Eventually, B.P. was able to leave and tried to drive home. During the drive, she felt increasingly confused and dizzy and became alarmed when her vision began to blur. She pulled into a parking lot and passed out.

8

32.     B.P. awoke the next morning to find the car door open, one of her legs out of the car, and the key still in the ignition.

33.     On or about November 7, 2019, B.P. was out with a friend in downtown Johnson City. While she was out, Diaz-Vargas sought her out and invited B.P. and her friend back to Williams' apartment.

34.     When B.P. arrived, Williams handed her an already opened beer. After taking a sip, she immediately began to feel the same physical and mental incapacitation as she had felt on the prior occasion and was unable to move her body properly.

35.     While B.P. was unconscious, Williams sexually assaulted her. Williams took photographs and/or videos of the assault.

36.     Upon information and belief, the photographs and/or videos Williams took depicting the sexual assault of B.P. are now in the custody and control of the FBI.

37.     Upon information and belief, these photographs and/or videos may have been separately seized by JCPD in September 2020, and retained in JCPD custody for years.

***Recruitment and Sexual Assault of Female 13***

38.     In or about the summer of 2019, Female 13 was out with a friend, Female 7, in downtown Johnson City when Female 7 received a phone call from Williams. Female 13 could hear Female 7 speaking to Williams and heard Williams ask something to the effect of, "Do I need to use a condom?" Female 7 responded with something to the effect of, "Unless you want to have babies." Female 13 asked what Female 7 was talking about with Williams and Female 7 dismissed the comments as nothing.

39.     Later that night, Female 7 invited Female 13 to come back to Williams' apartment with her. After a short time in the apartment, Female 7 told Female 13 that she was leaving. Female

9

13 asked Female 7 not to go. Female 7 and Williams assured Female 13 that "nothing was going to happen."

40.    As Female 7 was leaving, Williams gave her an eighth of an ounce of cocaine, which is referred to as an "eight-ball."

41.    Upon information and belief, Williams provided the eight-ball of cocaine in exchange for Female 7 obtaining, recruiting, and providing Female 13 to Williams, so that Williams could sexually assault Female 13.

42.    Upon information and belief, Williams had provided cocaine to Female 7 in the past, effectively addicting her to the drug. Over the course of her addiction, Female 7 went from being a practicing doctor to losing her medical license.

43.    Williams gave Female 13 a pill that he claimed was Klonopin but was in fact a substance that was strong enough to render her unconscious.

44.    Once Female 13 was drugged and fully unconscious, Williams proceeded to sexually assault her. Williams took photographs of himself forcibly sexually assaulting her.

45.    The next morning, Female 13 left Williams' apartment, unaware that she had been sexually assaulted by Williams.

46.    On or about September 13, 2023, Female 13 was contacted by a law enforcement agent working with the District Attorney's Office for the First Judicial District of Tennessee. During subsequent meetings with law enforcement agents, she was informed that there were photographs of her which depicted her sexual assault by Williams. Female 13 has no memory of the sexual assaults and is clearly unconscious in the photographs.

47.    Upon information and belief, the photographs Williams took depicting the sexual assault of Female 13 are now in the custody and control of the FBI.

10

48.     Upon information and belief, these photographs may have been separately seized by JCPD officers in September 2020, and retained in JCPD custody for years.

### *Recruiting Female 8; Obtaining Minor Victim 1*

49.     Starting in or around October 2020, Williams asked Female 8 if she would help clean his apartment in exchange for cash. Female 8 agreed and began cleaning Williams' apartment in exchange for cash.

50.     A couple weeks later, Williams told Female 8 she was "too pretty" to just clean for him and asked her to do other tasks for him as well. Williams asked Female 8 to hang out at his apartment and run errands. In exchange, he would provide her with cash, as well as other benefits like drugs and alcohol while they were hanging out.

51.     Sometime later, Williams told Female 8 that he was going to hire her as an employee of his company, Glass and Concrete Contracting LLC.

52.     On at least one occasion, Female 8 drove Williams to Asheville, North Carolina for a purported business meeting for his company, Glass and Concrete Contracting LLC.

53.     In fact, it did not appear to Female 8 that Williams was traveling to participate in a legitimate business meeting. When Female 8 dopped Williams off at what appeared to be an upscale hotel in Asheville, he seemed high on drugs, extremely anxious, and fidgety. Williams did not tell her the purpose of the meeting and told her to stay in the car. She waited for approximately two hours in the parking lot before he returned and she drove him back to Johnson City, Tennessee.

54.     Female 8 continued to run errands for Williams until around the end of December 2020.

55.     During the time Williams had access to Female 8 through her work for him, Williams drugged, and sexually assaulted Female 8. Williams took videos of these sexual assaults.

11

56.    On or about December 23, 2020, Female 8 went to Williams' apartment and brought her infant son, Minor Victim 1. Later that day, Williams sexually exploited Minor Victim 1 by taking photographs of himself engaged in a sex act with Minor Victim 1.

**B.    JCPD Officers Benefited Financially from Participation in Williams' Sex Trafficking Venture**

57.    Beginning on an unknown date and continuing until at least April 2023, Defendant JCPD officers conspired with Williams to participate in a venture, the purpose of which was to recruit, entice, harbor, provide, obtain, maintain, and solicit women and children, who had not attained the age of 14 years, for the purpose of engaging in commercial sex acts.

58.    Defendant JCPD officers engaged in a pattern of conduct that created a tacit agreement between themselves and Williams and/or his coconspirators whose purpose was to support, facilitate, or otherwise further the victimization of Plaintiffs and all similarly situated class members. This conduct included a de facto continuous business relationship, through an extortion scheme, in which Williams' company, Glass and Concrete Contracting LLC, paid money to JCPD officers in exchange for facilitation of the sex trafficking venture.

59.    Defendant JCPD officers also effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts. The warrants were, on their face, obtained and used to seize unlawfully obtained currency or narcotics assets. In fact, the seizures were quid pro quo payments made to Defendants with either the implied or explicit understanding that, in exchange, Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity.

60.    All Defendants knew or should have known that their participation in such a venture was for the purpose of facilitating or supporting Williams' sex trafficking crimes.

61.     All Defendants took overt acts in furtherance of the sex trafficking venture as set forth below.

### *JCPD Extortion Scheme*

62.     In or around August and September 2023, Williams began posting messages to Facebook through a female coconspirator. According to the posts, Williams wrote these statements himself from jail, using a contraband cellphone to send them to his coconspirator who would then post them to his Facebook page.

63.     On or about September 2, 2023, Williams wrote a message describing an extortion scheme involving JCPD officers. According to the post, beginning on an unknown date, and continuing until at least September 2020, JCPD officers, including Defendant Sparks, extorted cash from Williams through his coconspirator, Female 4, at the rate of $2,000.00 per week. To facilitate the extortion scheme, Williams' company Glass and Concrete Contracting LLC used false Internal Revenue Service ("IRS") 1099 Forms to pay the money out of the business. Williams' coconspirator then made "owner draws" from these separate business entities to obtain the cash to pay the JCPD officers:

> The corruption....
>
> ▮▮▮▮▮ my ex and business partner, was paying officials at JCPD with money from my company for years because she got caught selling cocaine and the corrupt officers targeted her for extortion probably due to her association to me. When ▮▮▮▮▮ fell, it created a problem. The corruption could potentially be exposed.
>
> ▮▮▮▮▮ made $2000 a week payments to Sparks and other unnamed officers using bogus fraudulent 1099 names and forged owner's draws.

13

64.     On September 19, 2020, at approximately 2:34 a.m., Female 3 fell, or was pushed, out of Williams' apartment window, suffering life-threatening injuries. First responders, including JCPD officers, arrived at Williams' apartment shortly after the incident occurred that night.

65.     According to the above Facebook post, the incident involving Female 3 had the potential to reveal evidence of the officers' extortion scheme.

66.     According to the Government's response to Williams' motion to suppress in the now-dismissed felon in possession of ammunition case, *see* United States v. Williams, 2:21-cr-00027-DCLC-CRW, Doc. No. 38 ("Government's response"), Defendants Sparks and Jenkins arrived at Williams' apartment on September 19, 2020, after Female 3 fell from the window, sometime after the first JCPD officers arrived on scene. The two officers shouted up to Williams' apartment from the street, asking to be let in, and eventually obtained the passcode to enter the apartment from someone on the scene.

67.     Although Sparks and Jenkins were not the first JCPD officers to arrive, it appears they took control of interviewing Williams and securing any digital evidence stored on Williams' cellphone, which linked to cameras located throughout Williams' apartment.

68.     Within two hours of arriving at Williams' apartment on September 19, 2020, Defendants Sparks escorted Williams to JCPD headquarters, purportedly to participate in an interview with Jenkins. Sparks and Jenkins allowed Williams to maintain custody of his cellphone, which could access the video surveillance cameras in his apartment remotely. Once at JCPD headquarters, Sparks and Jenkins placed Williams in an interview room. For the next 30 minutes, while Jenkins interviewed him—and then left him alone in the room—Williams maintained custody and control of his cellphone. According to the Government's response, Williams

14

manipulated his cellphone and made phone calls from his cellphone during this time. By the end of the interview, Williams had been able to erase all the data from his cellphone. Only then did Defendant Sparks seize Williams' cellphone and apply for a search warrant for Williams' apartment.

69. During this time, Williams' apartment was left unsecured and Diaz-Vargas and/or other coconspirators were able to move and/or destroy evidence.

70. At 8:52 a.m. on September 19, 2020, Sparks applied for a warrant for Williams' apartment to search for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide, as part of the investigation into Female 3's fall from Williams' window.

71. According to the Government's response, by the time JCPD officers returned to execute the search warrant for Williams' apartment, the video surveillance cameras which officers had observed hours before had all been taken down and hidden in a closet under paper towels.

72. JCPD officers seized a number of digital devices from Williams' apartment on September 19, 2020, including four phones, four computers and three memory cards.

73. Upon information and belief, the digital devices seized on September 19, 2020, remained in the custody of JCPD for over two years without being properly searched for evidence.

74. Had JCPD officers properly secured, seized, and searched the digital evidence in Williams' apartment that night, they would have found the following evidence: images and videos that Williams had taken of himself sexual assaulting women whom he had rendered unconscious, including class members in this case. Williams had saved these files to folders on his computer which he had labeled with the victims' first names and the word "drugged." Upon information and belief, JCPD officers also would have found images of Williams sexually assaulting minor children, as well as other child sexual abuse material ("CSAM").

15

75. On September 19, 2020, JCPD officers also found and seized a handwritten note from Williams' nightstand with the word "Raped" written atop a list of 23 women's first names in black ink. This list included the first names of some of the Plaintiffs and class members in this case.

76. Upon information and belief, none of the sexual assault victims who had reported Williams to JCPD were informed of this list, nor told whether their names appeared therein.

77. JCPD officers did not arrest Williams before leaving on September 19, 2020.

78. Upon information and belief, Female 3 later reported to JCPD that she believed she had been drugged by Williams that night prior to falling or being pushed out of the window.

79. To date, the attempted homicide investigation has yielded no charges against Williams.

80. Because of JCPD officers' overt acts to cover up their extortion scheme, Williams was able to continue to perpetrate his sex trafficking crimes with impunity and continue to victimize class members, including, on December 23, 2020, Minor Victim 1.

### *JCPD Officers Take Cash from Williams' Safe*

81. During JCPD's search of Williams' apartment on September 19, 2020, JCPD officers seized a safe. Female 9 had previously seen large amounts of cash (hundreds of thousands of dollars) kept within the safe.

82. On September 23, 2020, Defendant Sparks applied for a second search warrant in the attempted homicide investigation to search this safe for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide.

83.     In support of this search, Sparks explained that a narcotics trained police canine had alerted on the safe for the presence of narcotics. Sparks applied to seize, among other items, "any currency" found in this safe.[1]

84.     There were no facts stated in Sparks' warrant which connected "any currency" with the offense under investigation, the attempted homicide of Female 3, or showed how "any currency" was evidence or fruits of this crime. The warrant therefore lacked probable cause to justify seizure of "any curr .mnency."

85.     Although Diaz-Vargas, Williams, and/or other coconspirators had time to move and/or destroy other evidence in Williams' apartment, they left hundreds of thousands of dollars in cash in the safe which JCPD officers seized.

86.     According to a Facebook post made by Williams, the safe held $500,000.00 in cash when JCPD officers seized it, but only $81,000.00 remained when the safe was returned to him:

> Sparks and other unnamed officers are now a half
> million dollars richer after taking my safe with 500k in
> it and returning it with only 81k.

87.     Upon information and belief, in exchange for the cash JCPD officers seized and illegally took from Williams, there was an implied agreement that JCPD officers would take overt acts in furtherance of Williams' sex trafficking conspiracy, namely, JCPD officers would facilitate Williams' evasion of any criminal accountability for his unlawful sex acts by (1) intimidating and threatening victims and potential witnesses; (2) making false statements to victims to discourage them from pursuing their claims; (3) assisting in the destruction or concealment of evidence;

---

[1] It is not clear that JCPD officers had court approval to use a narcotic sniffing dog. Sparks' September 19, 2020, warrant did not seek authority to use this investigative technique, nor would it have been appropriate given the scope of the first warrant which only included seizing video surveillance equipment, video surveillance storage devices, electronic devices capable of connecting to a camera system, and any trace evidence that would suggest an assault or struggle occurred.

(4) retaliating against victims who attempted to report Williams; (5) interfering with the federal criminal investigation into Williams' sexual assaults; (6) retaliating against Kateri Dahl, a former Special Assistant United States Attorney ("SAUSA"), for her attempts to investigate Williams' sexual assaults; and (7) assisting in Williams' efforts to evade arrest and incarceration.

### *Williams Continues to Sexually Assault Women and Children*

88.     Throughout the time that JCPD officers benefitted financially from participating in Williams' sex trafficking conspiracy, Williams and his coconspirator Diaz-Vargas continued to recruit, entice, harbor, provide, obtain, maintain, and solicit women and children, including children under the age of 14, for the purpose of drugging and raping them and/or sexually exploiting them. On information and belief, Williams' sex trafficking conspiracy resulted in the victimization of at least 56 women, and three children.

89.     On or around September or October 2020, H.A. was invited to Williams' apartment with a group of acquaintances. Both Williams and Diaz-Vargas were present. She was offered both alcohol and cocaine by Williams and shortly after lost consciousness. While she was unconscious, Williams sexually assaulted her. Williams took photographs of her sexual assault.

90.     H.A. woke up twice during the assault, the first time to find Williams pressing his penis and testicles into her face. She tried and failed to push Williams off, as she could not properly move her limbs. She again lost consciousness.

91.     When she awoke the second time, she was able to push Williams off her. She questioned Williams, asking if she had dreamed of the assault. Williams responded, saying she had not been dreaming and that he had needed to use her because he didn't have his blow dryer and had to "make do." Upon information and belief, Williams regularly uses a blow dryer to stimulate himself sexually.

18

92.    Immediately following the assault, H.A. told her sister, her fiancé, and multiple friends about it.

93.    H.A. did not feel safe reporting the assault to JCPD, as she had been told that the police would take no action, as they never did when women reported assault by Williams, and/or would "slut shame" her if she reported.

94.    Upon information and belief, the photographs Williams took depicting the sexual assault of H.A. are now in the custody and control of the FBI.

## C.    Defendant JCPD Officers Knew or Should Have Known that They Were Participating in a Sex Trafficking Venture

### B.P. Reports Williams' Sexual Assault to JCPD

95.    JCPD officers were aware of rape complaints against Williams at least as early as November 7, 2019, when B.P. reported her sexual assault by Williams to JCPD.

96.    Immediately upon leaving Williams' apartment the morning after her assault, B.P. asked a friend to drive her to an urgent care so she could receive a rape kit.

97.    At the urgent care, B.P. told the nurse that she believed she had been raped and wanted to report the rape to the police.

98.    The urgent care administered a rape kit and two JCPD officers arrived at the clinic to take a statement from B.P. and her friend. B.P. told the officers she had been assaulted by Williams and pointed out Williams' apartment on a map.

99.    In response, the JCPD officers mentioned that they had heard of women complaining of sexual assault by Williams before.

100.    The JCPD officers took B.P.'s clothes and placed them in a garbage bag. They did not provide her with any type of evidence receipt.

101.    B.P. told the police she wanted to press charges against Williams.

19

102. B.P. did not hear anything more from JCPD for a year and a half.

### *JCPD Receives at Least Six More Complaints Against Williams*

103. Over the next two years, JCPD received at least six more complaints relating to Williams and his alleged attempts to drug and/or sexually assault women. These reports include, but are not limited to, the following:

104. **Female 2:** On or around June 2, 2020, Female 2 woke up in Williams' apartment to discover that she had been sexually assaulted. Female 2 fled Williams' apartment in great distress, shoeless and screaming.

105. Female 2 encountered JCPD officers in the lobby of Williams' apartment building and told them what had happened in Williams' apartment.

106. The JCPD officers drove her to her parents' house but declined to help her seek medical attention. The officers also failed to assist her in getting a rape kit done. The officers did not prepare a full police report, nor did they follow up with her in any way. The officers also declined to get a statement from Williams.

107. On December 15, 2020, Female 2 again reported her rape by Williams to JCPD, providing a statement to SAUSA Dahl and to another prosecutor at JCPD offices.

108. To date, no charges have been brought against Williams for Female 2's sexual assault.

109. **Female 9:** On or about October 23, 2020, Female 9 attempted to report her rape by Williams to JCPD. While she was receiving a rape kit, the nurse administering the exam told Female 9 that other women had also reported sexual assaults by Williams and gave her the number for Defendant Sparks so she could report the assault.

110.    Shortly thereafter, Female 9 called Sparks and reported the sexual assault by Williams.

111.    Sparks told Female 9 she should wait to make a police report until she received the rape kit results.

112.    Female 9 followed up with Sparks by phone at least two more times, but she never heard anything further about her report.

113.    In or around August 2023, Female 9 learned from the FBI that Williams had taken images and/or videos of himself sexually assaulting her. These images were found on Williams' digital devices at the time of his arrest in April 2023.

114.    To date, no charges have been filed against Williams for Female 9's sexual assault.

115.    To date, Female 9 has not received the results of her rape kit.

116.    **Female 10:** On November 10, 2020, Female 10 was in downtown Johnson City when Williams invited her to his apartment. There, he offered her alcohol. Upon information and belief, Williams laced the drink(s) he gave Female 10 with a substance that was intended to render her unconscious.

117.    Female 10 managed to leave Williams' apartment and attempted to drive home.

118.    As Female 10 was driving, both of her sisters spoke to her over the phone. Her sisters urged her to pull over the car when it became clear that Female 10 was completely incoherent, using slurred speech and not making sense.

119.    At approximately 2:29 a.m., Female 10's car hit a concrete base of a light pole in Carter County, the county next to Washington County, where Johnson City is located. Female 10 died on impact.

120.     Several days later, one of Female 10's sisters, Female 11, contacted JCPD to report that Female 10's crash was suspicious, and that Female 10 had last been seen entering Williams' apartment. She expressed concern that a crime may have occurred and asked the police to look into it.

121.     When the JCPD officer learned that the crash occurred in Carter County, he told Female 11 she needed to contact their Sheriff's Department, as JCPD could not help her because it was a "Carter County problem."

122.     A JCPD officer further told Female 11 that JCPD had no jurisdiction to investigate the circumstances of the crash.

123.     Conversely, the Carter County Sheriff's Department told Female 11 that JCPD had jurisdiction over an investigation because Williams' apartment was located in Johnson City.

124.     In or around January 2021, Female 11 called JCPD again and asked to speak with a detective.

125.     By this point, Female 11 had spoken with Williams and Diaz-Vargas and had learned that Williams had given Female 10 a drink on the night of her death, shortly before Female 10 left Williams' apartment and attempted to drive home.

126.     Female 11 related everything she knew to the JCPD detective and explained that she suspected something had happened to Female 10 while she was in Williams's apartment.

127.     The JCPD detective asked no follow up questions and did not invite Female 11 to come in person to give a statement. The detective also failed to disclose to Female 11 that JCPD had already received multiple complaints from other women who had been drugged and/or raped by Williams while in his apartment.

128.     JCPD failed to return any of Female 11's calls or queries into Female 10's death.

22

129. Upon information and belief, JCPD has never investigated the circumstances of Female 10's death.

130. **Female 12:** In or around November 24, 2020, Female 12 was sexually assaulted by Williams after he provided her with a substance that rendered her unconscious. She woke up with Williams naked and pressed against her.

131. Williams then moved Female 12 onto her back, put his knees on her shoulders, pushed his genitals into her face, spread her legs apart, and proceeded to rape Female 12 with his fist.

132. Female 12 told him to stop, but Williams continued to assault her. Williams then tried to push his fingers inside her anus, at which point, Female 12 screamed and was able to push Williams off her. Female 12 fled Williams' apartment.

133. Shortly thereafter, Female 12 reported the assault to the FBI. She decided to report her assault to the FBI rather than JCPD because she did not trust JCPD to take the sexual assault seriously.

134. The FBI agent with whom she met at the FBI field office in Johnson City called Defendant Sparks, who came to the field office and met with Female 12.

135. Sparks then accompanied Female 12 to the hospital, where she received a rape kit.

136. After leaving the hospital, Female 12 went to JCPD offices where she spoke with a female investigator and/or attorney and explained that she wished to press charges.

137. Sparks told her falsely that she was the first woman who wished to go forward with charges, claiming the other women were too scared.

138. Female 12 never received the results from her rape kit. To date, no charges have been brought against Williams for Female 12's sexual assault.

139. In or around August 2023, Female 12 learned from the FBI that Williams had taken images and/or videos of himself sexually assaulting her. These images were found on Williams' digital devices at the time of his arrest in April 2023.

140. Accordingly, beginning at least as early as November 2019, JCPD officers were aware of rape complaints against Williams. These officers were not limited to those within the Special Victims Unit, the unit responsible for sex crimes. For instance, although Defendant Sparks was <u>not</u> a Special Victims Investigator assigned to sex crimes, numerous complaints involving Williams were routed to him.

141. Upon information and belief, by the fall of 2020, JCPD officers in the Special Investigations Squad, including Defendant Jeff Legault, among others, were aware of the allegations that Williams was drugging and raping women.

142. Upon information and belief, Defendants Turner, Peters, Sparks, and Higgins had actual knowledge of rape complaints against Williams starting at least in or around November 2019.

**D.     JCPD's Overt Acts in Furtherance of the Sex Trafficking Conspiracy and to Obstruct the Federal Criminal Investigation into Williams' Sexual Assaults**

143. Defendant JCPD officers took overt acts in furtherance of Williams' sex trafficking venture. These acts facilitated and supported Williams' continued victimization of class members by assisting Williams in perpetrating and concealing his crimes and obstructed the investigation and prosecution of Williams for these crimes.

*Witness Intimidation*

144. Defendant JCPD officers engaged in witness intimidation of Williams' victims to facilitate and support Williams' sex trafficking venture.

24

145.   **Intimidation of B.P.:** In or around May 2021, B.P. received a call from Defendant Sparks. Although Sparks was not assigned to the Special Victims Unit, the JCPD unit which handled sex crimes, he nevertheless took over the investigation of B.P.'s rape case.

146.   Upon information and belief, Sparks took over her case for the purpose of derailing the investigation in order to protect Williams, as part of the JCPD officers' continuous business relationship with Williams and his business Glass and Concrete Construction LLC.

147.   Defendant Sparks told B.P. that the results from her rape kit showed that she had benzodiazepine in her system the night of the assault. The rape kit also showed that the DNA of another person was present in the sample collected.

148.   After relaying this information, Defendant Sparks discouraged B.P. from pursuing charges against Williams. He told B.P. that even if he was able to get a warrant to collect and test Williams' DNA, Williams would have to willingly submit to the testing, and he would never do that. In fact, this statement was false as a warrant would require Williams to submit to testing. Defendant Sparks described Williams as "untouchable."

149.   Defendant Sparks went on to say that he did not know if JCPD would be able to do anything if B.P. did press charges, and JCPD would "probably not" be able to protect B.P. from retaliation if she did.

150.   B.P. asked Sparks whether any images or videos might exist of her assault given the number of video cameras she had seen in Williams' apartment. Sparks told her there was no such evidence.

151.   In fact, JCPD had seized digital devices from Williams' apartment in September 2020, including video cameras, which contained images of Williams' sexually assaulting his

victims. In or around August 2023, B.P. learned from the FBI that Williams had taken photographs of her sexual assault and stored these images on his digital devices.

152.    A few days after this conversation with Sparks, after consulting her family and friends, B.P. called Sparks back to tell him she wanted to proceed with pressing charges against Williams. She never received a response.

153.    On or about June 1, 2023, over two years after Sparks called B.P. about the results from her rape kit, Sparks authored a search warrant for Williams' DNA based on the facts in B.P.'s case. By then, the FBI was actively investigating Williams for engaging in a sex trafficking conspiracy and had seized Williams' digital devices.

154.    No one from JCPD ever informed B.P., or counsel for B.P., that Sparks was drafting an affidavit for a search warrant in her case. By then, Sparks was a named defendant in Dahl's civil rights case—a case which case included allegations that he had corruptly mishandled the Williams' sexual assault investigations—and had been in litigation of that case for nearly a year.

155.    On June 23, 2023, JCPD finally stopped its involvement, or the involvement of its officers, in the investigations into Williams "[t]o avoid any possible appearance of impropriety," according to counsel for Defendant City.

### *Interference with the Federal Criminal Investigation of Williams*

156.    On November 13, 2020, Sparks presented a potential felon in possession of ammunition case against Williams to SAUSA Dahl for her review. This was an unusual charge to bring because of the minimal federal sentence available under the U.S. Sentencing Guidelines for this offense.

157.    According to the complaint in her civil rights case, *Dahl v. Turner*, 2:22-cv-00072-KAC-JEM ("the Dahl Complaint"), as Dahl began to investigate this charge, she became aware of

the multiple reports of sexual assault against Williams, which had not resulted in any prosecutions, and grew concerned that a felon in possession of ammunition was not the appropriate charge.

158.  Dahl expressed these concerns to Sparks, explaining that she would bring the charge of felon in possession of ammunition, but that she also intended to build a broader case against Williams based on the substantial evidence of the more serious charges, including the conduct of drugging and raping women.

159.  Although crimes of rape and sexual assault are typically prosecuted by local prosecutors, the crime of sex trafficking is a federal offense, enforced under 18 U.S.C. § 1591. The conduct Dahl began to investigate—the conspiracy between Williams, Diaz-Vargas, and others to recruit, entice, obtain, transport, and maintain women who were drugged and forced to engage in sex acts on account of which something of value was exchanged—constituted sex trafficking violations, although at the time, no federal law enforcement agency had yet opened a sex trafficking investigation.

160.  Once Dahl began her investigation, JCPD officers took numerous steps to obstruct, attempt to obstruct, and/or to interfere with her investigation into Williams' sexual assault crimes, including but not limited to the following:

161.  Defendant Turner's dismissal of the "Raped" list, claiming that it did not demonstrate evidence of nonconsensual sex.

162.  Chief Turner and Captain Peters' dismissal of victims' accounts, claiming that the victims were not credible despite the overwhelming evidence that Williams was drugging and raping women.

163.  Sparks falsely indicating to Dahl that a victim was uncooperative, when in fact the victim wished to pursue charges against Williams.

27

164.    JCPD failing to inform Dahl of Female 10's death and her sister's efforts to initiate an investigation into Williams' culpability.

165.    JCPD's refusal to investigate a victim's account of rape.

166.    Defendant Peters ridiculing and making jokes about a victim's appearance prior to the victim providing a statement about Williams' sexual assault to JCPD and Dahl.

167.    Shortly after Dahl initiated JCPD taking a second statement from one of Williams' victims—a victim JCPD had previously ignored and maligned—Chief Turner called Dahl's supervisor to complain about her job performance. Chief Turner knowingly took this action to intimidate Dahl, interfere with her investigation into Williams, and to attempt to stop the investigation.

168.    From December 2020 to March 2021, Dahl continued to press Chief Turner and JCPD investigators to take investigative steps related to the complaints of Williams' sexual assaults. Instead of investigating Williams, officers made statements questioning the credibility of victims, and made harassing comments to Dahl.

169.    For example, one male investigator stated to Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour."

170.    JCPD unreasonably delayed producing requested documents to Dahl, including failing to provide information necessary for a federal search warrant until the information was too stale to support probable cause; failing to alert Dahl when yet another victim of Williams made a report to JCPD; and failing to provide a certified copy of Williams's felony conviction.

171.    JCPD officers, including Sparks, refused to execute a valid federal arrest warrant for Williams approximately 30 times in the weeks after Dahl obtained the warrant on April 13, 2021.

172.    Upon information and belief, JCPD officers failed to arrest Williams on May 6, 2021, improperly alerting him to the arrest warrant before executing it and allowing him to remain inside his apartment. JCPD officers then left the premises, enabling Williams to abscond for the next two years. Williams' unlawful flight was possible only because of JCPD's knowing interference with Dahl's investigation.

173.    During May 2021, Dahl continued to investigate Williams, taking statements from eight witnesses who corroborated the accounts of the victims that Williams was drugging and raping women in Johnson City. Dahl also heard directly from another victim whose account mirrored the other victims of Williams. In May 2021, Dahl reported her concerns about Williams' history of predation and JCPD's inaction to an FBI agent. On reasonable inference, Chief Turner learned of Dahl's efforts to investigate Williams and her report to the FBI, and on June 25, 2021, terminated her employment.

### *Destruction of Evidence*

174.    As set forth above in paragraphs 64-81, Defendants Sparks and Jenkins conspired with Williams to destroy and conceal evidence following Female 3's fall from Williams' apartment on September 19, 2020. These overt acts by Sparks and Jenkins facilitated and supported Williams' continued victimization of class members, all in furtherance of the sex trafficking venture, and as part of the ongoing scheme in which Williams' business paid money to JCPD officers.

29

*Retaliation Against Female 9*

175.    Upon information and belief, on December 7, 2022, JCPD officers obtained information that Female 9 was meeting with civil rights attorneys at her public housing unit in Johnson City.

176.    The next day, on December 8, 2022, Female 9 met with an FBI Special Agent to provide a statement about her sexual assault at the hands of Williams as a witness in the FBI's sex trafficking investigation into Williams.

177.    Over the next several months, the FBI continued to interview additional victims of Williams and investigate the conspiracy.

178.    Either late at night on April 18 or early in the morning on April 19, 2023, Female 9 was standing outside Tipton's Street Pub in downtown Johnson City with a male companion, waiting for her ride in an otherwise empty parking lot, when at least two JCPD patrol cars drove up and stopped. JCPD officers approached the male to handcuff him. Female 9 pulled out her cellphone to start videoing as there appeared to be no legitimate law enforcement purpose for this encounter. One of the officers took hold of her arm. When she pulled her arm back, the officer proceeded to physically assault her. Her head hit the ground so hard, she urinated herself. While she was on the ground, several officers pinned her down while other officers continued to assault her. The next day, she had bruises all over her body.

179.    The JCPD police report documenting the incident stated that a security guard for Tipton's reported that the male had refused to leave Tipton's and that the male and Female 9 were arguing in the parking lot. In fact, by the time JCPD officers arrived, neither Female 9 nor the male were inside Tipton's, nor were they arguing. The police report provides no additional facts (i.e., any evidence of physical violence) which would justify the officers' immediate arrest of the male.

30

In other words, even based on the version of the facts contained in the police report, it appears that the officers' arrest of Female 9's companion lacked probable cause and constituted an unlawful arrest.

180. According to the police report, JCPD officers justified their arrest of Female 9 based on her "disorderly conduct and resisting arrest." Once the officers had arrested Female 9, they conducted a search incident to arrest of her backpack. The report claims that a small baggy containing a white substance, which a preliminary field test showed to be cocaine, was found in the backpack. In fact, Female 9 did not possess any narcotic substance in her backpack and JCPD officers planted the evidence.

181. Later that same day, on April 19, 2023, Female 9 received an eviction letter from the Johnson City Housing Authority stating that the Department of Community Safety had "completed an investigation" into her arrest and would be terminating her lease. She was given four days to vacate the premises. She also received notice that if she was seen on the property after the four days, she would be arrested for trespassing.

182. Female 9 fought the eviction unsuccessfully. She has been without permanent housing since in or around July 2023. As a result of her eviction, she was unable to maintain custody of her minor children.

183. Defendant Legault was the supervisory patrol officer who signed off on the police report documenting Female 9's arrest. Upon information and belief, the unlawful arrest, physical assault, and subsequent eviction of Female 9 was part of an effort by JCPD officers, including

31

Defendant Legault, to retaliate against and intimidate Female 9, who was a witness in an ongoing federal sex trafficking investigation.[2]

## II.  Johnson City's Internal Investigation Reveals JCPD Had a Pattern and Practice of Discriminating Against Women Sexual Assault Victims and that this Practice Compromised Sexual Assault and Rape Prosecutions

184.  In August 2022, responding to community protest following the Dahl Complaint, Defendant City initiated an independent third-party review of JCPD's handling of sexual assault investigations. Defendant City hired the Daigle Law Group (DLG) to review JCPD's processes and procedures specific to sexual assault investigations during the period of January 2018 through December 2022—the same period within which Plaintiffs suffered sexual assaults at the hands of Williams and during which JCPD knowingly failed to investigate Williams' crimes.

185.  Nearly a year later, on July 18, 2023, Defendant City released DLG's findings, which were summarized by DLG in a 45-page report. This report is attached hereto as Exhibit 1.

186.  According to the report, DLG considered JCPD's practices and procedures to determine whether the agency's "pattern and practice" or "custom" with respect to sexual assault investigations met Constitutional standards of policing. It found they did not.

187.  To reach this conclusion, DLG reviewed case files for more than 325 reports of sexual assault made to the JCPD between January 2018 and December 2022. DLG also conducted an onsite inspection in December 2022, and interviewed Defendants Turner and Peters, as well as six JCPD officers, left unidentified in the report.

188.  DLG found that JCPD's practices discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process

---

[2] In Dahl's proposed First Amended Complaint, she alleges that Legault conspired with Turner and others in June 2021 to create a pretext to fire her after she pushed JCPD to investigate Williams' sexual assaults. *See Dahl v. Turner*, 2:22-cv-00072-KAC-JEM (Doc. No. 40-1, at 4.).

and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault. The DLG investigation revealed that no legitimate law enforcement purpose—or any other reason—justified these inadequacies. Instead, the JCPD's practice of discouraging women from pursuing sexual assault charges stemmed from misconceptions and stereotypes about women and victims of sexual assault—in other words, sex-based bias.

189.    DLG further found that JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD had failed to train officers to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

190.    DLG specifically noted JCPD's deficiency in responding to non-stranger and alcohol or drug-facilitated sexual assault—exactly the type of reports Plaintiffs had made to JCPD about Williams.

191.    DLG concluded: "JCPD's investigative practices were found to compromise the effectiveness of their response to sexual assault and lead to under-enforcement of sexual assault laws in Tennessee. At times, JCPD failed to employ key investigative practices that, if properly implemented, would safeguard potential evidence, protect the rights of victims and suspects, and facilitate a thorough investigation. For instance, our review found that JCPD too often fails to collect evidence and does not take proper steps to obtain timely, credible statements from suspects and witnesses. Our review revealed instances where JCPD officers likely would have obtained statements and facts to support a prosecution if they had used the investigative tactics known to be effective and essential in sexual assault investigations, especially investigations of non-stranger

33

sexual assault. These investigative deficiencies compromise the investigative process and unnecessarily place victims at an increased risk of harm."

192. DLG also found that JCPD's investigations into sexual assault reports were inconsistent, ineffective, and incomplete. JCPD often failed to collect evidence or failed to document the collection of evidence. JCPD also failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers failed to document their statements, even though the investigative files indicated that such statements had been taken.

193. From 2018 – 2022, of the 133 cases where rapes had been reported to JCPD, 105 cases had an identified suspect, but only 36 of these suspects (or 34% of the known suspects) were ever interviewed. In the rare cases where JCPD officers did interview suspects, their practice was to call to schedule the interview, sometimes weeks in advance, providing the suspects the opportunity to modify or coordinate their stories. DLG found this practice "baffling," as it "undermine[d] the integrity of sexual assault investigations."

194. DLG found that JCPD practices actively discouraged sexual assault victims from pursuing charges and participating in investigations.

195. In one example provided in the report, a JCPD investigator insisted that a sexual assault victim come to JCPD headquarters to provide a written statement of her assault. When she came in and provided a 15-page written statement describing her assault, the investigator required her to re-write the statement on a JCPD form, and then called her back into the office one month later to question her about purported inconsistencies between the two statements. After questioning the victim on "numerous suspicious and inconsistent statements," the victim changed her mind and said she no longer wished to pursue the case. There was no suspect interview and no mention of sexual assault kit results.

196.    The report also identified JCPD practices which made reporting sexual assaults "unnecessarily burdensome" to the victims, including practices motivated by gender bias and discriminatory animus against women, such as the following:

197.    Reluctance of the officers/investigators to continue investigative steps unless the victim comes to the Department to give a statement.

198.    JCPD requires that victims and witnesses be interviewed at the police station, rather than at the location most convenient and comfortable for the victim.

199.    The interview rooms at the JCPD are suspect oriented with visible restraining devices.

200.    JCPD investigators asked victims whether they wished to seek criminal prosecution early in the investigation and whether they would testify against the accused. Statements by JCPD investigators focus on the emotional toll of prosecution and the victim's unwillingness to participate in the prosecution.

201.    JCPD's sexual assault investigations are sometimes compromised by an investigator's unwarranted gender-based assumptions and stereotypes about women.

202.    JCPD generally does not invite advocates to be present during victim interviews. Instead, two JCPD detectives typically interview a victim without advocate participation. This practice is more appropriate for an interrogation of a suspect than an interview of a crime victim and sometimes prevents detectives from developing the necessary rapport with women victimized by sexual assault.

203.    Reporting a sexual assault, including the time spent at hospitals and with JCPD, can take many hours.

204. JCPD too often does not follow up with victims to document evolving injuries, such as bruises.

205. DLG further found that JCPD failed to secure crime scenes in responding to reports of sexual assault.[3] Specifically, the report concluded, "JCPD's securing of crime scenes and using search warrants to document evidence were found to be insufficient."

206. The report cites an example that appears to match the facts alleged herein describing Female 2's interaction with JCPD officers immediately following her assault by Williams. The report faults JCPD for failing to respond to the apartment in question and failing to secure the apartment and search for additional evidence.

207. In fact, had JCPD officers conducted an effective search of Williams' apartment in June 2020, they likely would have discovered critical evidence proving—beyond any doubt—that he was drugging and raping women, namely, as described above, images of him sexually assaulting victims while they were unconscious which he had saved to folders on this computer titled with the victims' first names and the word "drugged."

208. JCPD's systemic failures of improperly documenting sexual assault investigations not only violated their own internal orders, but also standard police practice which are intended to protect and serve their community.

209. DLG found that JCPD's interactions with women reporting sexual assault "reflect reliance on gender-based stereotypes and bias, and that this discrimination is responsible in part for the deficiencies in JCPD's response to sexual assault."

---

[3] The purpose of securing a crime scene while precuring a warrant is to ensure evidence is not destroyed, manipulated, or lost.

Case 2:23-cv-00071-TRM-JEM   Document 93-1   Filed 12/12/23   Page 36 of 79   PageID #: 1100

210. This conduct included "overtly discriminatory statements from JCPD officers, investigators, or leadership."

211. JCPD investigators also improperly relied on a woman's sexual history in evaluating the veracity of the sexual assault report.

212. DLG found that JCPD supervisors were allowing sexual assault cases to be closed even when prosecution was still possible. The report concluded that the "JCPD process of closing [sexual assault] investigations is flawed and inaccurate."

213. The report found that JCPD investigators were improperly using the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, often where the requirements for closure under this basis were not met.

214. For instance, the report cited closure of rape cases: Of 133 rape cases reported during 2018 – 2022, 66 (nearly 50%) were closed based on "exceptional circumstances." Of these 66, 25% were based on JCPD's claim that the victim was reluctant to participate, 31% were based on of the reporting officer's claim that the victim was uncooperative (based on non-returned phone calls or messages, and/or the inability of the officer to contact the victim), and 40% were based on the prosecutor's office declining to prosecute. However, of those declinations, the reason usually provided was that the victim was declining to participate in the prosecution. But closure based on a victim's cooperation or reluctance to participate in the prosecution is <u>not</u> a proper basis for closure under JCPD's own internal reporting requirements.

215. Thus, according to the DLG report, JCPD officers engaged in discriminatory and biased conduct to discourage women from pursuing cases of sexual assault and rape, and then used the resulting reluctance on the part of victims to close rape cases improperly and in violation of department rules and requirements.

37

216.    As a result, between 2018 – 2022, only 11.27% of reported rape cases ended in arrest of the suspect. It is not clear from the DLG report how many—or if any—of these arrests resulted in convictions.

## III.    According to the DLG Report, Evidence in the Williams' Sexual Assault Investigations Is Now Missing

217.    The DLG report also considered the JCPD internal review process following the Dahl Complaint and found it violated industry standards, accreditation standards, and model policies.

218.    Significantly, the DLG report states that reports and documentation concerning the sexual assault investigations of Williams were missing or unidentified because JCPD failed to initiate an internal affairs ("IA") investigation in response to the allegations of JCPD corruption in the Dahl Complaint.

219.    According to the DLG report, this failure was inexplicable since "[JCPD] was concerned that the [Dahl] complaint involved criminal conduct on the part of Department members."

220.    The DLG report also recognizes the role of the office of the First Judicial District Attorney ("DA") General Steven Finney in its failure to investigate properly Dahl's claims of criminal corruption on the part of JCPD.

221.    Specifically, on August 24, 2022, City Manager Cathy Ball delivered a letter to the newly-elected DA Finney asking his office or the Tennessee Bureau of Investigation ("TBI") to "conduct a preliminary investigation to determine whether there was a basis to open a public corruption investigation" based on Dahl's allegations.

222.    Eight days later, on September 1, 2022, DA Finney replied. He stated— incorrectly—that as DA, he was the "only person" who could request a TBI investigation into this

conduct. He further stated—also incorrectly—that there was no such thing as a "preliminary investigation."

223.    In fact, according to the DLG report, DA Finney should have inquired whether JCPD had conducted an Internal Affairs ("IA") investigation into the allegations.

224.    DA Finney then concluded that he did not have "enough information to request a TBI investigation at this point."

225.    DA Finney had no basis to conclude the allegations were unfounded because, by his own admission, there had been no internal investigation.

226.    According to the DLG report, the failure to conduct an IA investigation had grave consequences for any subsequent investigation to uncover what happened in JCPD's sexual assault investigations of Williams. The DLG report notes that because of the lack of any IA investigation, there are now documents that cannot be located or identified relating to the sexual assault investigations of Williams, documents which "were not discovered during the DLG audit."

227.    In other words, in response to the Dahl Complaint, JCPD violated "industry standards, accreditation standards, and model policies" by failing to investigate her allegations, and as a result, key documents have gone missing.

## IV.    The DOJ and FBI Open a Criminal Sex Trafficking Investigation of Williams

228.    On June 23, 2021, Dahl filed a public complaint outlining her allegations against JCPD, and Chief Turner. For the first time, Plaintiffs learned of the number of similar complaints of sexual assault against Williams and of JCPD's efforts to obstruct and interfere with Dahl's investigation.

229.    In or about November 2022, the FBI opened a federal sex trafficking investigation, investigating possible violations of 18 USC § 1591, into Williams.

230. JCPD's actions to obstruct, attempt to obstruct, and to interfere with Dahl's federal investigation effectively delayed the sex trafficking investigation by at least two years.

## V. Johnson City Police Department – Deprivation of Constitutional Right to Equal Protection under the Law

231. Beginning in at least November 2019, JCPD had knowledge that Williams was drugging and raping women.

232. Following B.P.'s report of sexual assault and attempt to press charges against Williams in November 2019, the JCPD failed to conduct an investigation of sexual assault against Williams, failed to properly document B.P.'s report, failed to test her rape kit timely, and failed to retain or preserve evidence properly.

233. JCPD followed this pattern with at least Females 2, 3, 9, 10, and 12.

234. Defendant Sparks had vast knowledge of Williams' sexual assaults.

235. Sparks spoke with B.P., Female 9, Female 10's family members, and Female 12, all of whom told Sparks that they wanted to report Williams for drugging and sexual assault or possible drugging and attempted sexual assault.

236. By not investigating multiple complaints of sexual assault by Williams and discouraging female reporters of sexual assault from pursuing charges against Williams, JCPD failed to believe or address women's accounts of crime within its jurisdiction.

237. As a direct result of JCPD's discriminatory policies and practices towards women, Williams was able to continue to victimize women after B.P.'s report, including H.A. and Females 2, 3, 6, 9, 10, and 12, and other class members, resulting in their bodily injury, extreme emotional distress, psychological harm, and, in the case of Female 10, death.

238. Upon information and belief, JCPD's failure to protect female victims of Williams' sexual assault was consistent with an institutional practice and ongoing policy of JCPD of failing

to protect female victims of sex crimes, which was motivated by JCPD officers' actual discriminatory animus towards women.

239.    Upon information and belief, these practices and policies were known and ratified by JCPD policy makers.

240.    Upon information and belief, Defendant City failed to prevent JCPD from engaging in the policy and practices that disproportionately affected women.

241.    Upon information and belief, Defendant City approved an ongoing institutional practice of discrimination toward women by, among other actions:

   a.   Failing to properly supervise JCPD;

   b.   Failing to properly train JCPD;

   c.   Failing to forward to the District Attorney's Office for the First Judicial District of Tennessee evidence of criminal acts committed in Washington County, and/or forwarding reports of rape in a piecemeal fashion so as to undermine the larger case against Williams;

   d.   Failing to protect and ensure evidence was not discarded;

   e.   Failing to protect and ensure evidence was not lost or mishandled; and

   f.   Failing to discipline, restrict, and control JCPD employees for failing to investigate crimes of sexual assault against females.

## VI.   JCPD's Policy and Procedures Were Motivated by Discriminatory Animus Towards Women

242.    JCPD's failure to protect victims of Williams' sexual assaults was consistent with an institutional practice and ongoing policy of JCPD, and was motived, in part, by the officers' discriminatory animus towards women.

243. As outlined in the DLG report, JCPD investigators routinely take steps which discourage victims of sexual assault from pursuing charges based on "an investigator's unwarranted gender-based assumptions and stereotypes about women," thereby compromising the investigations.

244. As alleged above, JCPD officers, and in particular, Sparks, deployed these practices here in attempting to discourage and dissuade Williams' victims from reporting Williams' crimes. Specifically, JCPD officers failed to record victim statements properly—or at all, in the case of Female 9; required victims to provide multiple statements or to come in to JCPD headquarters to report their assaults even after already providing a statement (B.P. and Female 12); and failed to obtain search warrants or properly secure crime scenes (B.P., Female 2, 3, and 12), among other investigative failures.

245. As set forth in the Dahl Complaint, JCPD officers made statements to her which evidenced their discriminatory animus towards women victims of sexual assault, including, among other statements, the following:

246. Chief Turner cast doubt on the credibility of Williams' victims even after their names appeared on the "Raped" list, dismissing their cases as potentially "consensual sex."

247. On another occasion, JCPD Captain Peters made jokes about Williams' victims' clothing and appearances.

248. One JCPD investigator stated in response to the rape complaints against Williams, "In my 20 years on the force, I've only encountered one real rape."

249. JCPD officers made statements questioning the credibility of victims and made harassing comments to Dahl.

250.     One male investigator stated to Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour."

## VII.    Plaintiffs B.P. and H.A. and the Williams Survivor Subclass Could Not Have Learned of JCPD's Discriminatory Animus Towards Women Victims of Williams Until June 23, 2022

251.     Plaintiffs B.P. and H.A. and members of the Williams Survivor Subclass learned of JCPD's policy and practice of discrimination towards women victims of Williams no earlier than the filing of the Dahl Complaint on June 23, 2022.

252.     Although Plaintiff B.P., and class members, including Females 2, 9, and 12, among others, were aware before this date that JCPD had failed to file charges based on their individual sexual assault and/or attempted sexual assault and/or drugging complaints against Williams, they had no knowledge that this was part of an unwritten policy and practice of JCPD motivated by discriminatory animus towards women.

253.     Plaintiffs and class members were not aware of the number of complaints of sexual assault filed with JCPD by other victims of Williams, nor of JCPD's inaction in response to these other complaints.

254.     The Dahl Complaint revealed for the first time that Chief Turner, Det. Sparks, and other JCPD officers had a policy and practice of failing to process and investigate complaints of sexual assault against Williams, and that this failure was motivated by their actual discriminatory animus towards women.

255.     Before this, Plaintiffs and class members did not know, nor did they have reason to know, the constitutional injury they had suffered on the basis of their sex, nor of the state actions that shocked the conscience and constituted a state created danger, which deprived them of life, liberty, or property.

43

256.    It is now known, in part through subsequent news reports about the various state and federal investigations, that there are at least 52 victims of sex-based crimes perpetuated by Williams. Since July 2023, Plaintiffs B.P. and H.A. as well as numerous class members have been informed Williams kept images and videos of their sexual assaults. Additionally, Plaintiff H.A. and class members learned that they were identified on Williams' "Raped" list.

257.    Prior to the allegations in the Dahl Complaint, Plaintiff B.P. and class members, including Females 9, and 12, among others, had no reason to doubt Sparks' statements to them regarding the status of JCPD's investigations into their assaults. B.P., for instance, had no reason to know that Sparks' discouraging statements to her were part of a pattern and practice of discriminatory conduct towards women victims of sexual violence. Similarly, Female 12 had no reason to doubt Sparks' false statement that she was the only victim who wished to pursue charges. Moreover, all Williams Survivor Subclass members had no way to know, prior to the filing of the Dahl Complaint, that Defendant City had negligently, and in violation of their constitutional rights, permitted a serial rapist to remain at large for years, thereby proximately causing their injuries.

258.    The statute of limitations for the causes of action brought by Plaintiffs B.P. and H.A. and members of the Williams Survivor Subclass did not begin to run until June 23, 2022, at the earliest, and their claims are therefore timely. To the extent any earlier date could be asserted, the statutes of limitation were tolled, and Defendants are equitably estopped from asserting the statute of limitations as a defense, by reason of their wrongful conduct.

## VIII.    S.H.'s Factual Allegations

259.    In November 2021, S.H. was a 17-year-old high school student who lived with her parents in Gainesville, Georgia.

260.    The weekend before Thanksgiving, S.H. traveled to Johnson City, Tennessee, and stayed with the family of a young girl whom she regularly babysat. Specifically, she stayed with

44

the grandparents of this girl, Male 1 and Female 14, who had full custody of the child. She planned to care for the girl over the following week and spend Thanksgiving with the family.

261. On or about November 22, 2021, the Monday before Thanksgiving, Male 2, the son-in-law to Male 1, brought his four children over to the house of Male 1 and Female 14. Female 14, along with Male 2's wife and others, went out, while Male 1, Male 2, and S.H. stayed at home to watch the five children.

262. Before that night, from approximately 2019 – 2020, Male 2 had worked as the dean of the high school which S.H. attended. Male 2 had previously been inappropriately physically affectionate with S.H., giving her full body hugs and kissing her on the forehead. S.H. had never reported this conduct to anyone, as she had been confused by his actions and unsure whether they constituted sexual abuse.

263. Male 2 is approximately two decades older than S.H.

264. During the evening of November 22, 2021, Male 1 and Male 2 drank several glasses of bourbon. Male 1 and Male 2 offered S.H. bourbon as well. Male 1 even poured her a glass and handed it to her, but S.H. did not drink any.

265. At one point in the evening, Male 1, Male 2, and S.H. were all sitting inside on the couch talking while the children played outside. S.H. got up to go to the kitchen to get some water and Male 2 followed her.

266. When S.H. got to the kitchen, Male 2 approached her from behind and hugged her tightly against him so that S.H. could feel his erect penis pressing into her back.

267. Male 2 began kissing S.H.'s neck and rubbing his hands all over S.H.'s body, touching her breasts, and then moving his hands down to her vagina. S.H. froze in shock.

268.     For several minutes, Male 2 continued to grope S.H., touching her vagina through her clothing.

269.     After some time, S.H. was able to move away from Male 2. She began walking towards the children outside to get away from him.

270.     The next morning, S.H. called her older sister and told her what happened. S.H. then called her parents and told them about the sexual battery as well.

271.     S.H.'s parents insisted they come and get her immediately, but S.H. did not want to leave the little girl for whom she was caring. S.H.'s parents instructed her to let Male 1 and Female 4 know about what had happened.

272.     S.H. then told Male 1 and Female 4 about the sexual battery. After hearing S.H.'s account, Male 1 told S.H. that this explained a text message he had received that morning from Male 2 which stated that something might have happened the night before with S.H.

273.     Male 1 initially told S.H. that he would not allow Male 2 to be around her anymore. S.H. therefore told her parents she wanted to stay for the remainder of the week.

274.     S.H.'s mother immediately called a rape crisis center, Rape Response in Gainesville, Georgia, after learning of the sexual battery of her daughter. Rape Response told S.H.'s mother that they would call the relevant Tennessee agency, the Tennessee Department of Children's Services to report the crime.

275.     On Thanksgiving, S.H. was eating Thanksgiving lunch when she learned that Male 2 would be coming over to the residence again, despite what Male 1 had told her. She immediately called her parents and her father drove to come get her and bring her home.

276.     When S.H.'s father arrived, he noted that Male 1 and Female 14 seemed supportive of S.H. and appeared to believe S.H. that she had been groped by their son-in-law, Male 2.

46

277. On December 10, 2021, S.H.'s mother received a phone call from JCPD Investigator Kara Lowe. Investigator Lowe explained that she had received the report about S.H.'s sexual battery and would be investigating the complaint.

278. On December 29, 2021, a Hall County Sheriff's Deputy interviewed S.H. at the Edmonton Telford Center for Children, a Child Advocacy Center ("CAC") in Gainesville, Georgia. S.H. recounted the sexual battery to the Deputy.

279. The Gainesville CAC mailed a copy of the recording of S.H.'s interview to JCPD.

280. S.H.'s parents waited weeks to hear anything from JCPD. Approximately a month later, S.H.'s parents had another conversation with Investigator Lowe to ask whether she had received the copy of the forensic interview.

281. S.H.'s parents then waited several more weeks before hearing anything further from Investigator Lowe. Finally, Investigator Lowe called S.H.'s parents and told them she did not anticipate that the District Attorney's Office for the First Judicial District in Tennessee would be pursuing charges against Male 2.

282. Investigator Lowe offered several reasons, none of which appeared to S.H.'s parents to be proper reasons to close the case. Investigator Lowe explained that when she had interviewed Male 1 and Female 14, the perpetrator's parents-in-law, they had told her about S.H.'s past as a rape survivor. Investigator Lowe seemed to imply that because S.H. was a survivor of rape, she would be less credible and/or able to testify in the sexual battery case. Investigator Lowe also told S.H.'s parents that she had learned about S.H.'s mental health struggles following her rape, also suggesting that this was a reason to decline prosecution.

283. Investigator Lowe stated that the District Attorney did not want to put S.H. through the difficult process of testifying. S.H.'s parents insisted, however, that it was not appropriate to

close the case. This case was important both for their daughter and because Male 2 was in a position of authority around children.

284. Investigator Lowe then explained that Male 2 had hired an expensive, high powered defense attorney from Knoxville, TN, who was arguing that S.H. lacked credibility based on her past. Investigator Lowe then stated that this would make bringing a criminal case difficult.

285. S.H.'s parents were surprised and disappointed as this did not seem like a legitimate reason to close the case and decline prosecution.

286. S.H.'s parents explained that they had learned from S.H. that Male 1 likely possessed a text message which would be an admission by Male 2 that something had happened that night and would corroborate S.H.'s testimony. They asked Investigator Lowe to use criminal process to obtain the text message, and again insisted it was not right to close the case without trying to get this critical evidence first.

287. Investigator Lowe implied that she would not be able to obtain this text message without the District Attorney's permission. Investigator Lowe told S.H.'s parents she would call them back if the DA decided to pursue charges.

288. After this conversation, S.H.'s parents waited several more weeks to hear back from Investigator Lowe, but never received another phone call. Both parents left voicemails for Investigator Lowe imploring her to use criminal process to obtain the text message and to continue to investigate their daughter's case. They never heard anything further from JCPD.

289. S.H.'s father has over five years of law enforcement training and has himself investigated hundreds of cases as a law enforcement officer. He was shocked and surprised by Investigator Lowe's actions in his daughter's case, including: 1) JCPD's failure to use criminal process to obtain a critical piece of evidence; 2) JCPD's failure to interview S.H.'s older sister,

whose testimony could corroborate S.H. and lend credibility to S.H.'s account; 3) JCPD's failure to promptly interview the suspect; 4) JCPD's refusal to pursue charges, purportedly, based on S.H.'s past rape; and 5) JCPD's decision to decline prosecution based, in part, on the fact that the perpetrator had hired an expensive defense attorney.

290.    The circumstances of S.H.'s sexual battery by Male 2 meet the elements of a criminal offense under Tennessee Code § 39-13-527, Sexual battery by an authority figure.

291.    To date, no charges have been brought in S.H.'s case against Male 2.

292.    Male 2 is now a pastor at a church.

## IX.    Plaintiff S.H. and the Reporter Survivor Class Learned of JCPD's Pattern and Practice of Discriminatory Animus Towards Women Victims of Sexual Violence No Earlier than July 18, 2023

293.    S.H. was not a victim of Williams. S.H., and other members of the Reporter Survivor Class who were not victims of Williams, were devastated, confused, and shocked by JCPD's failure to properly investigate their cases. However, they had no reason to know that this conduct was part of a pattern and practice of discriminatory conduct towards female victims of sexual violence, until, at the earliest, the release of the DLG Report on or about July 18, 2023, and the resulting national press coverage of the Williams' civil rights cases.

294.    On or about August 26, 2023, S.H.'s mother first learned of JCPD's misconduct in investigating sexual assault complaints when she read an article on the Fox News website about the Sean Williams case. The article described how the Williams case was not investigated properly in a similar way to how JCPD failed to investigate S.H.'s sexual battery. Shortly after, S.H.'s mother shared this information with S.H.

295.    Similarly, other members of the Reporter Survivor Class who were not victims of Williams could not have become aware of JCPD's pattern and practice of not helping women who came forward with their cases of sexual assault, sexual battery, and rape.

49

296.     The statute of limitations for the causes of action brought by S.H. and members of the Reporter Survivor Class did not begin to run until July 18, 2023, at the earliest and their claims are therefore timely. To the extent any earlier date could be asserted, the statutes of limitation were tolled, and Defendants are equitably estopped from asserting the statute of limitations as a defense, by reason of their wrongful conduct.

## X.     Plaintiffs Experienced and Continue to Experience Severe Harm and Damages

297.     At all times material hereto, Plaintiffs and class members have been and are continuously harmed by Johnson City Officials and JCPD's ongoing policy and practice of refusing to believe, investigate, or address their complaints of sexual assault by Williams and others, and continuing a public campaign to dissuade victims from coming forward. Plaintiffs and class members' ongoing injuries include, but are not limited to:

    a.   bodily injury;

    b.   death;

    c.   extreme psychological harm;

    d.   deprivation of property;

    e.   economic harm;

    f.   deprivation of a right to privacy; and

    g.   emotional distress.

## CLASS ACTION ALLEGATIONS

298.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following classes:

Sex Trafficking Survivor Class (represented by B.P.): All individuals, including minors, who were sexually abused, drugged, or trafficked by Sean Williams or Alvaro Fernando Diaz-Vargas.

50

Williams Survivor Subclass (represented by H.A.): All members of the Sex Trafficking Survivor Class who were sexually assaulted by Sean Williams following the first report to the JCPD of Sean Williams' alleged sexual violence on or about November 7, 2019.

299.    Reporter Survivor Class (represented by S.H.): All women, including minors, who reported sexual abuse or trafficking by any person to JCPD from January 1, 2018, to April 25, 2023.

300.    The Sex Trafficking Survivor Class asserts the following:

    a.    Sex Trafficking, 18 U.S.C. §§ 1591, 1594, and 1595 against all Defendants;

    b.    Obstruction of Enforcement of 18 U.S.C. § 1591, 18 U.S.C. §§ 1594, 1595 and 1591(d) against all Defendants;

    c.    Aiding and Abetting a Sex-Trafficking Venture, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595 against all Defendants;

    d.    Conspiracy to Commit Violations of the TVPA, 18 U.S.C. §§ 1594(c), 1591, 1595 against all Defendants;

    e.    Negligence, Failure to Train against Defendant City; and

    f.    Negligence, Failure to Supervise against Defendant City.

301.    The Williams Survivor Subclass asserts the following:

    a.    Equal Protection, 42 U.S.C. § 1983, Unconstitutional Pattern or Practice as to Women Reporters of Sexual Assault against Defendant City;

    b.    Equal Protection, 42 U.S.C. § 1983, Violation of Substantive Rights to Due Process against all Defendants;

    c.    Negligence, Failure to Train against Defendant City; and

    d.    Negligence, Failure to Supervise against Defendant City.

302. The <u>Reporter Survivor Class</u> asserts the following:

    a. Equal Protection, 42 U.S.C. § 1983, Unconstitutional Pattern or Practice as to Women Reporters of Sexual Assault against Defendant City;

    b. Negligence, Failure to Train against Defendant City; and

    c. Negligence, Failure to Supervise against Defendant City.

303. Plaintiffs reserve the right to seek modification of these classes, including expanding the relevant time period for the Reporter Survivor Class, upon further investigation and discovery.

304. Numerosity. Joinder of the class members in a single litigation is not practicable. There are at least 56 individuals in the Sex Trafficking Survivor Class, at least 41 in the Williams Survivor Subclass, and at least 325 in the Reporter Survivor Class. Their identities can be determined from JCPD records, evidence obtained by law enforcement, or by self-identification.

305. Commonality and predominance. Questions of law and fact common to class members predominate over any questions that may affect only individual class members. Additionally, class treatment of issues under Fed. R. Civ. P 23(c)(4) will materially advance the litigation. Questions of law and fact common to the classes include:

    a. whether the Williams sex-trafficking venture and conspiracy violated the Trafficking Victims Protection Act, 18 U.S.C. § 1591;

    b. whether Defendants knowingly benefited from participation in the Williams sex-trafficking venture and conspiracy;

    c. whether Defendants obstructed enforcement of the Trafficking Victims Protection Act, 18 U.S.C. § 1591(d);

d. whether Defendant City carried out an unconstitutional custom, practice, or policy with respect to handling reports of sexual abuse by women and girls;

e. whether Defendant City's custom, practice, or policy with respect to handling reports of sexual abuse by women and girls violated the substantive due process rights established by the Equal Protection Clause;

f. whether Defendant City breached a duty of care owed to Plaintiffs; and

g. whether Defendant City acted negligently, including with respect to training and supervising JCPD personnel.

306. Common evidence that supports class treatment for Plaintiffs' equal protection claims includes JCPD case files and interviews showing that JCPD's interactions with women reporting sexual assault regularly relied on gender-based stereotypes and bias, resulting in discriminatory outcomes and a tendency to respond to women's allegations of sexual assault with undue skepticism. The case files demonstrate that investigators systematically relied on women's sexual history in evaluating the veracity of their reports of sexual assault, which hindered what should have been objective investigation processes.

307. Additional common evidence supporting class treatment for Plaintiffs' equal protection claims includes recorded statements made by JCPD investigators and Department leadership to women reporting sexual assault. These documented statements establish JCPD personnel frequently made assumptions that women reporting non-stranger sexual assault were lying, and that such assaults were less severe and traumatic to victims than other serious crimes. These documented statements support the conclusion that JCPD personnel relied on stereotypes of female survivors of sexual assault that systematically interfered with their obligation to conduct objective investigations, causing women who were reporting sexual assault to mistrust or refuse

to cooperate with law enforcement or refuse to report crimes if they had previously encountered skepticism or knew of women whose reports met with skepticism. These statements also include overtly discriminatory statements from JCPD officers, investigators, or leadership towards women.

308. Additional common evidence supporting class treatment for Plaintiffs' equal protection claims includes training records for JCPD officers, investigators, and supervisors. These records establish JCPD personnel were not trained in conducting objective and unbiased investigations. Consequently, investigations were conducted through the lens of gender-based stereotypes and bias, resulting in discriminatory outcomes and a tendency to respond to women's allegations of sexual assault with undue skepticism.

309. Typicality. Plaintiffs' claims are typical of the claims of the class or classes they seek to represent. The same pattern and practice causing constitutional violations, and the same forms of sexual misconduct give rise to the claims of all class members Plaintiffs seek to represent.

310. Adequacy of representation. Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have no interests antagonistic to the interests of other class members and are committed to vigorously prosecuting this action on their behalf. Plaintiffs have retained counsel experienced in prosecuting class actions, including class actions involving sexual misconduct.

311. Superiority. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the allegations in this case elicit severe emotional distress, fear, shame, and retraumatization—and considering the financial and political power of the Defendants—many class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. Classwide adjudication of central common questions, such as the constitutionality of JCPD's customs and practices with respect to handling reports of

sexual abuse by women and girls, is superior to multiple individual actions and will conserve judicial and party resources while promoting consistency of adjudication.

## COUNT I
## Sex Trafficking, 18 U.S.C. §§ 1591, 1594, and 1595
## (on behalf of B.P. and the Sex Trafficking Survivor Class against all Defendants)

312.    Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

313.    B.P. and the Sex Trafficking Survivor Class  bring claims under 18 U.S.C. § 1591(a)(1), (2), 1595 based on each of the Defendants' respective financial benefits garnered from participating in a venture in which Williams, Diaz-Vargas, and other known and unknown coconspirators knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited by any means B.P. and the Sex Trafficking Survivor Class, where Williams' use of force, *i.e.*, drugging women to render them unconscious, was used to cause them to engage in commercial sex acts.

314.    Each of the Defendants knowingly participated in a sex trafficking venture by benefiting financially. Defendants effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts, including an extortion scheme. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid pro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

315.    Defendant JCPD officers knew multiple women had reported Williams' forced sex acts, including, at least, B.P., Females 2, 9, and 12. Defendants further knew, based on these

women's reports, that Williams used Diaz-Vargas and other coconspirators to recruit and obtain women in exchange for things of value, including among other things, illicit drugs, and free lodging. Instead of arresting Williams and pursuing charges against him, Defendants knowingly and corruptly mishandled women's rape reports in exchange for payments, all in furtherance of the sex trafficking venture.

316. The reason JCPD and Defendant officers engaged in a uniform practice that ignored, dismissed, and diminished the numerous reports of sexual assault about Williams was to receive financial benefits from Williams and his sex-trafficking venture. JCPD officers knew that they would gain financial benefits by ignoring the women victims' complaints associated with Williams and by participating in his sex-trafficking venture.

317. As a result of Defendants' participation in a sex trafficking venture by receiving currency and cash from Williams, Williams was able to continue to perpetrate his sex trafficking crimes for years, resulting in the damages to B.P. and the Sex Trafficking Survivor Class, including economic harm, bodily harm, psychological and psychiatric harm, emotional pain and suffering, and mental anguish.

318. Each of the Defendants knew or should have known that it received value for its respective ongoing law enforcement practices that allowed Williams and his coconspirators to engage in the sex trafficking conspiracy, and either knew, or was in reckless disregard to the fact that, Williams would use means of force, *i.e.*, drugging women to render them unconscious, to cause the women to engage in commercial sex acts.

319. Each of the Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1), (2) and 1595(a) occurring within the territorial jurisdiction of the United States.

320. The conduct of each of the Defendants was in or affected interstate and/or foreign commerce.

321. Each of the Defendants knowingly benefited from participation in what it knew or should have known was a sex trafficking venture in violation of 18 U.S.C. §§ 1591(a)(2) and/or 1595(a).

322. Each Defendant knowingly benefited from, and/or received value for participation in the venture in which Defendant knew that B.P. and the Sex Trafficking Survivor Class would be forced to engage in commercial sexual acts by use of force.

323. Defendant JCPD officers had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of raped women.

324. Each of the Defendant JCPD officers knowingly benefited financially from the sex-trafficking venture.

325. Defendants' conduct caused B.P. and the Sex Trafficking Survivor Class serious harm including, without limitation, physical, psychological, financial, and reputational harm.

326. The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

327. B.P. and the Sex Trafficking Survivor Class demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT II
## Obstruction of Enforcement of 18 U.S.C. § 1591, 18 U.S.C. §§ 1594, 1595 and 1591(d)
## (on behalf of B.P. and the Sex Trafficking Survivor Class against all Defendants)

328.    Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

329.    B.P. and the Sex Trafficking Survivor Class bring claims under 18 U.S.C. § 1595 based on each of the Defendants' actions to obstruct, attempt to obstruct, and in any way interfere with and prevent the enforcement of 18 U.S.C. §§ 1591(a)(1), (2), in violation of 18 U.S.C. § 1591(d).

330.    Defendants took the following actions knowingly, all in violation of 18 U.S.C. § 1591(d):

    a.    Defendants effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid pro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

    b.    Defendants affirmatively refused to initiate formal investigations into Williams' crimes against women.

    c.    Defendants affirmatively refused to refer charges for prosecution and/or referred charges in a piecemeal and incomplete manner so as to undermine the prosecution.

58

d. Defendants affirmatively intimidated and dissuaded Plaintiffs and other class members from pursuing criminal charges.

e. Defendant Sparks made knowingly false statements to obstruct and interfere with the criminal investigation.

f. Defendants Sparks and Jenkins knowingly conspired with Williams to destroy and conceal evidence, including digital evidence that showed Williams raping unconscious women whom he had drugged. This evidence included images of Plaintiffs in this case.

g. Defendant Legault and other JCPD officers knowingly retaliated against Female 9, a Williams' survivor and a witness in the federal sex trafficking investigation, physically assaulting her, arresting her, and ultimately causing her eviction from Johnson City Public Housing.

331. At the time of each of the Defendants' obstructive acts, each Defendant had actual knowledge, based on rape victims' reports, including, at least, the reports of B.P, and Females 2, 9, and 12, that Williams was drugging and raping women, and that Williams used Diaz-Vargas, and other coconspirators, to recruit and obtain women in exchange for things of value, in furtherance of this conspiracy.

332. Each of the Defendants knew or should have known that their obstructive acts would have the effect of interfering with and preventing the enforcement of 18 U.S.C. §§ 1591(a)(1), (2).

333. Each of the Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(d) and 1595(a) occurring within the territorial jurisdiction of the United States.

59

334. The conduct of each of the Defendants was in or affected interstate and/or foreign commerce.

335. Defendant JCPD officers had actual knowledge that they were obstructing, attempting to obstruct, and interfering in any way and preventing the enforcement of 18 U.S.C. §§ 1591(a)(1), (2).

336. The conduct of each Defendant caused B.P. and the Sex Trafficking Survivor Class serious harm including, without limitation, physical, psychological, financial, and reputational harm.

337. The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

338. B.P. and the Sex Trafficking Survivor Class demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### COUNT III
### Aiding and Abetting a Sex-Trafficking Venture,
### 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595
### (on behalf of B.P. and the Sex Trafficking Survivor Class against all Defendants)

339. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

340. B.P. and the Sex Trafficking Survivor Class bring claims under 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595.

60

341.     Acting through its officers and supervising officers (including Defendants Turner, Peters, Sparks, Jenkins, Higgins, and Legault), Defendant City aided and abetted Williams' sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

342.     Under 18 U.S.C. § 2, Defendants are punishable as principals under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when they aided and abetted Williams' sex-trafficking venture and the sex trafficking of B.P. and members of the Sex Trafficking Survivor Class class members.

343.     Under 18 U.S.C. § 2, Defendants committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding and abetting Williams' and his conspirators' sex-trafficking venture and sex trafficking of B.P. and other members of the Sex Trafficking Survivor Class. As a consequence, B.P. and other members of the Sex Trafficking Survivor Class are victims of Defendants' criminally aiding and abetting Williams' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2). These actions were in and affecting interstate and foreign commerce.

344.     The crimes that Defendants aided and abetted are (1) Williams' perpetrating of sex trafficking by force, in violation of 18 U.S.C. § 1591(a)(1), and (2) Williams' co-conspirators' knowingly benefitting from sex trafficking by force, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate and foreign commerce.

345.     Williams' co-conspirators benefitted financially and received things of value from their participation in the Williams sex-trafficking venture, including payments, illicit drugs, free lodging, and other compensation from Williams. The co-conspirators who benefitted include Diaz-Vargaz, Female 1, and other unknown coconspirators.

346. Acting through its officers and supervising officers (including Defendants Turner, Peters, Sparks, Jenkins, Higgins, and Legault), Defendant City itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding and abetting a sex-trafficking venture and the sex trafficking of B.P., as well as other Sex Trafficking Survivor class members. Defendant City itself directly violated Chapter 77 by committing and perpetrating these violations.

347. Among other things, Defendants aided and abetted Williams' sex-trafficking venture and sex trafficking of B.P. and other members of the Sex Trafficking Survivor Class, knowing that Williams would use means of force, *i.e.*, drugging, to cause B.P. and other members of the Sex Trafficking Survivor Class, to engage in commercial sex acts.

348. By aiding and abetting Williams' sex-trafficking venture and sex trafficking of B.P. and other members of the Sex Trafficking Survivor Class, Defendants knowingly benefited, both financially and by receiving things of value, from participating in Williams' sex-trafficking venture.

349. Defendant JCPD officers knew multiple women had reported Williams' forced sex acts, including, at least, B.P., and Females 2, 9, and 12, and therefore had actual knowledge that they were aiding and abetting Williams' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide B.P. and other members of the Sex Trafficking Survivor Class, to engage in commercial sex acts, through the means of force. Defendants knew, and should have known, that Williams had engaged in acts in violation of the TVPA.

350. Despite such knowledge, Defendants intentionally aided and abetted Williams' and his co-conspirators' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), through their corrupt and

62

unlawful law enforcement practices, which constituted perpetrating violations of those laws under 18 U.S.C. § 2. Defendants knew, and acted in reckless disregard of the fact that, Williams would force B.P. and other members of the Sex Trafficking Survivor Class, to engage in commercial sex acts.

351. Defendants' affirmative conduct of aiding and abetting Williams' and his co-conspirators' violations were committed knowingly, and in reckless disregard of the facts, that Williams used his position of impunity as a means to further the sex trafficking venture. Defendants' conduct was outrageous and intentional.

352. Acting within this District and in attempting to further the Williams' sex-trafficking venture, Defendants knowingly and intentionally took substantial and significant steps to aid and abet Williams' sex trafficking venture, including:

    a. Defendants effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid pro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

    b. Defendants affirmatively refused to initiate formal investigations into Williams' crimes against women.

c.  Defendants affirmatively refused to refer charges for prosecution and/or referred charges in a piecemeal and incomplete manner so as to undermine the prosecution.

d.  Defendants affirmatively intimidated and dissuaded Plaintiffs and other class members from pursuing criminal charges.

e.  Defendant Sparks made knowingly false statements to obstruct and interfere with the criminal investigation.

f.  Defendants Sparks and Jenkins knowingly conspired with Williams to destroy and conceal evidence, including digital evidence that showed Williams raping unconscious women whom he had drugged. This evidence included images of Plaintiffs in this case.

g.  Defendant Legault and other JCPD officers knowingly retaliated against Female 9, a Williams' survivor and a witness in the federal sex trafficking investigation, physically assaulting her, arresting her, and ultimately causing her eviction from Johnson City Public Housing.

353.   Defendants' knowing and intentional conduct of aiding and abetting Williams' violations has caused B.P. and other members of the Sex Trafficking Survivor Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

354.   The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City

residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

355. B.P. and the Sex Trafficking Survivor Class demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT IV**
**Conspiracy to Commit Violations of the TVPA, 18 U.S.C. §§ 1594(c), 1591, 1595**
**(on behalf of Plaintiffs and the Sex Trafficking Survivor Class against all Defendants)**

356. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357. Plaintiffs and the Sex Trafficking Survivor Class bring claims under 18 U.S.C. §§ 1594(c), 1591, 1595.

358. Defendants intentionally conspired with others, including Williams and his other co-conspirators, by agreement and understanding, to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2) & 1591(d), and to further Williams' sex-trafficking venture to force commercial sex acts from Plaintiffs and members of the Sex Trafficking Survivor Class, all in violation of 18 U.S.C. § 1594(c). Defendant Sparks directly conspired with Williams himself to further the sex-trafficking venture.

359. Defendants' conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Plaintiffs and members of the Sex Trafficking Survivor Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Plaintiffs and members of the Sex Trafficking Survivor Class.

360.     Defendants' conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Plaintiffs and members of the Sex Trafficking Survivor Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Plaintiffs and members of the Sex Trafficking Survivor Class.

361.     Defendants conspired with Williams and his other co-conspirators to further the Williams sex-trafficking venture and with the purpose of facilitating Williams' illegal sex trafficking. Defendants had actual knowledge of Williams' sex-trafficking venture based on the reports of, at least, B.P. and Females 2, 9, and 12. Defendants acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of Williams' sex-trafficking venture and with the specific intent to further the venture. Defendants and Williams had a meeting of the minds as to the essential nature of the plan.

362.     Defendants' conspiracy with Williams was part of their participation in his sex-trafficking venture. Without Defendants agreeing to facilitate the venture (by, for example, conspiring to receive payments in return for turning a blind eye to Williams' forced sex acts), Williams would not have been a position to move forward with his sex-trafficking venture and to recruit and obtain victims of the venture.

363.     Defendants also conspired with Williams and his other co-conspirators to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d). The conspiracy included an agreement to keep Williams' sex-trafficking venture secret or, at least, concealed to the greatest extent possible. Among the means for keeping the venture secret were affirmatively refusing to investigate and prosecute Williams' sex trafficking

66

crimes, concealing and/or destroying evidence, intimidating witnesses/victims, and making false statements to witnesses/victims. In exchange, Defendants effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid pro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

364.    Defendants knew, acted in reckless disregard of the fact, and should have known, that their conspiracy would directly and proximately lead to unlawful forced commercial sex acts by Williams with women, including Plaintiffs and members of the Sex Trafficking Survivor Class.

365.    Defendants' knowing and intentional conduct of conspiring with Williams has caused Plaintiffs and members of the Sex Trafficking Survivor Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

366.    The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

367.    Plaintiffs and members of the Sex Trafficking Survivor Class demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

67

## COUNT V
## Equal Protection, 42 U.S.C. § 1983
## Unconstitutional Pattern and Practice as to Women Reporters of Sexual Assault
## (on behalf of S.H. and the Reporter Survivor Class and B.P. and the Williams Survivor
## Subclass against Defendant City)

368.    Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

369.    Defendant City and Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, Investigator Higgins, and Investigator Legault acted under the color of state law and pursuant to an adopted policy or a longstanding practice of custom of Defendant City.

370.    Defendants maintained the following unconstitutional customs, practices, or policies:

  a. Failure to document reports of sexual assault by Sean Williams made by women under Defendant City's jurisdiction;

  b. Failure to investigate reports of sexual assault by Williams made by women under Defendant City's jurisdiction;

  c. Failure to or delayed in testing the rape kits of women who made complaints of sexual assault by Williams;

  d. Failure to seize or retain evidence properly from women who made complaints of sexual assault by Williams; and

  e. Failure to credit women's accounts of sexual assault within Defendant City's jurisdiction, failure to investigate women's complaints of sexual assault and rape within Defendant City's jurisdiction, and failure to test rape kits of women who made complaints in a timely fashion.

  f. These policies and practices were motived by actual discriminatory animus towards women.

371.     Defendant City developed, ratified, enforced, and continues to enforce these longstanding customs and practices.

372.     Defendant City perpetuated these unconstitutional customs and practices by allowing and at times encouraging JCPD officers to engage in unconstitutional conduct, and by failing to train and supervise JCPD officers to address and act upon evidence of unconstitutional conduct.

373.     Pursuant to the Defendants' persistent, widespread custom and unofficial policy, Defendant City and its employees denied law enforcement services to Plaintiffs and class members with reckless disregard for their constitutional rights.

374.     By reason of the conduct described herein, Defendants deprived Plaintiffs and class members of the rights, immunities, and privileges guaranteed to every person in the United States, in violation of 42 U.S.C. § 1983, including rights guaranteed by the Fourteenth Amendment of the United States Constitution.

375.     On or about June 23, 2022, Plaintiffs learned that Defendants and the JCPD had a custom, policy and practice of failing to investigate sexual assault reports made by women.

376.     At all times relevant hereto, sexual assault was perpetrated almost entirely against females. According to federal crime statistics, females constitute over 90% of sexual assault victims.

377.     By reason of the aforementioned acts, Plaintiffs and class members have suffered bodily injury, emotional distress, deprivation of property, economic harm, deprivation of the right to privacy, and, in the case of Female 10, death.

378.     Defendants had either actual or constructive knowledge of the unconstitutional policies, practices and customs alleged above. Despite having knowledge, Defendants condoned,

69

tolerated, and ratified such policies. Defendants acted with deliberate indifference to the foreseeable effects of these policies with respect to the constitutional rights of Plaintiffs, class members, and all women under their jurisdiction.

379. Defendants had a duty to diligently investigate *all* crimes. Defendants breached this duty by routinely and systemically failing and/or refusing to do so in the case of sexual assault and rape. Defendants' deliberate indifference to sexual assault crimes, which was an institutional policy so pervasive as to rise to the level of intentional conduct, served to deprive Plaintiffs and class members of equal protection under the law on the basis of their gender.

380. In committing the acts and/or failures as alleged herein, Defendants were at all times relevant hereto acting under the color of the State. The constitutional injury inflicted by Defendants was caused by a person(s) with final policymaking authority at the Defendant City. Defendants knew about the above-described conduct and facilitated it, approved it, condoned it, and/or turned a blind eye to it.

381. With respect to the Sean Williams Survivor Subclass, but for the longstanding unconstitutional policy of Defendant City described above, JCPD officers would have taken reasonable steps to investigate and responded to the first known report of Sean Williams' sex crimes, which, due to circumstances surrounding that report, would have resulted in arrest. Defendants are therefore responsible for creating the risk, and ultimately causing the harm suffered by Members of the Sean Williams Survivor Subclass, who would not otherwise have been assaulted by Sean Williams.

382. The above-described conduct of Defendants constitutes a violation of 42 U.S.C., Section 1983. Plaintiffs and class members are entitled to compensatory damages for emotional pain, suffering, mental anguish and other non-pecuniary losses, and injunctive relief pursuant to

70

42 U.S.C., Section 1983 for violations of their civil rights under the U.S. Constitution directly and proximately caused by Defendants.

**COUNT VI**
**Equal Protection, 42 U.S.C. § 1983**
**Violation of Substantive Rights to Due Process**
**(on behalf of B.P. and the Williams Survivor Subclass against all Defendants)**

383.     Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

384.     B.P. and members of the Williams Survivor Subclass have a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, and which constitute a state created danger.

385.     The aforementioned actions of JCPD, including but not limited to the actions of Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, Investigator Higgins, and Investigator Legault, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of B.P. and members of the Williams Survivor Subclass with a purpose to harm that was unrelated to any legitimate law enforcement objective.

386.     The aforementioned actions of JCPD, including but not limited to the actions of Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, Investigator Higgins, and Investigator Legault, compromise affirmative acts that caused an increased risk to Plaintiffs and class members, specifically, of being exposed to an act of violence by a third party, as well as police violence in the case of Female 9.

387.     The conduct of Defendants was willful, knowing, wanton, malicious, and done with reckless disregard for the rights and safety of all Plaintiffs and class members.

388.     As a direct and proximate result of Defendants' actions, B.P. and members of the Williams Survivor Subclass experienced extreme pain and suffering in the form of economic harm,

bodily injury, emotional distress, and in the case of Female 10, death. Defendants deprived B.P. and members of the Williams Survivor Subclass of their right to be protected and safeguarded from actions that risked their lives, as well as physical and emotional injury.

389. The above-described conduct of Defendants constitutes a violation of 42 U.S.C., Section 1983. B.P. and members of the Williams Survivor Subclass are entitled to compensatory damages for emotional pain, suffering, mental anguish and other non-pecuniary losses, and injunctive relief pursuant to 42 U.S.C., Section 1983 for violations of their civil rights under the U.S. Constitution directly and proximately caused by Defendants.

## COUNT VIII
## Tennessee Governmental Tort Liability Act, T.C.A. 29-20-205
## (on behalf of Plaintiffs individually against Defendant City)

390. Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

391. Chief Turner, Captain Peters, Investigator Higgins, and Investigator Sparks were aware of numerous complaints of sexual assault and drugging by Williams, including those made by B.P., and Females 2, 3, 9, and 12, and Female 10's surviving family member as early as 2019.

392. Despite this knowledge, Chief Turner, Captain Peters, Investigator Higgins, and Investigator Sparks failed to investigate Williams, refer all reports of his criminal activity to the District Attorney's Office, or provide protection for the Plaintiffs in this case. These actions do not exercise the care that a reasonable or prudent individual in their capacities would hold.

393. Chief Turner, Captain Peters, Investigator Higgins, and Investigator Sparks' negligent actions were the proximate cause of the Plaintiffs' injuries, including but not limited to bodily injury, emotional distress, deprivation of property, economic harm, deprivation of right to privacy, and, in the case of Female 10, death.

394.    Defendant City is liable for the injuries proximately caused by the negligent acts or omissions of Chief Turner, Captain Peters, Investigator Higgins, and Investigator Sparks.

395.    As a direct and proximate consequence of the negligent acts and omissions with regard to the aforementioned events caused by Defendants, Plaintiffs have suffered damages and Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violation of law.

### COUNT IX
### Negligence, Failure to Train
### (on behalf of Plaintiffs and the Classes against Defendant City)

396.    Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

397.    Defendant City had a duty to train its Police Department officers and employees to not discriminate against citizens on the basis of sex, as well as to properly investigate legitimate complaints of criminal activity and protect citizens under its jurisdiction from criminal activity.

398.    Defendant City breached its duty of care to Plaintiffs and class members when JCPD officers and employees were made aware by women of numerous complaints of sexual assault by Williams, failed to investigate those complaints, and failed to protect female citizens of Johnson City from further criminal activity by Williams.

399.    Defendant City breached its duty of care to Plaintiffs and class members by negligently failing to investigate and refer for prosecution cases of sexual violence against women victims, who reported their cases to JCPD, out of discriminatory animus towards women victims of sexual violence as a class.

400.    JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD negligently failed to train officers

to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

401. JCPD's investigations into sexual assault reports were negligently inconsistent, ineffective, and incomplete. JCPD negligently failed to collect evidence or failed to document the collection of evidence. JCPD also negligently failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers negligently failed to document their statements, even though the investigative files indicated that such statements had been taken.

402. JCPD's practices negligently discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault. No legitimate law enforcement purpose—or any other reason—justified these inadequacies.

403. JCPD supervisors negligently allowed sexual assault cases to be closed even when prosecution was still possible.

404. JCPD investigators negligently and improperly used the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, where the requirements for closure under this basis were not met.

405. JCPD's investigative deficiencies compromised the investigative process and negligently placed all Plaintiffs at an increased risk of harm.

406. The culture of impunity caused and ratified by Defendant City resulted in Plaintiffs and class members to suffer increased risk of harm, retraumatization, and emotional distress. These

Case 2:23-cv-00071-TRM-JEM   Document 93-1   Filed 12/12/23   Page 74 of 79   PageID #: 1138

damages were a result of Defendant City's unjust law enforcement system where sexual violence was not punished or deterred.

407.    Further, in the specific case of Williams, Defendant City's negligence resulted in the failure to apprehend, prosecute, and imprison a serial rapist, thereby allowing Williams to perpetrate his crimes for years. By breaching its duty of care, Defendant City proximately caused Plaintiffs and members of the Conspiracy Survivor Class to suffer bodily injury, emotional distress, the deprivation of property, the deprivation of the right to privacy, and in the case of Female 10, death.

408.    Plaintiffs and class members suffered actual, psychological, and physical damages due to Defendant City's breach of care, including retraumatization and emotional distress as a result of negligent investigative practices, botched investigations, and improperly declined prosecutions.

409.    As a direct consequence of Defendant City's acts and omissions described herein, Plaintiffs and class members have suffered damages and the Defendant City is liable for all injuries sustained by Plaintiffs and class members proximately caused by its violations of law.

## COUNT X
### Negligence, Failure to Supervise
### (on behalf of Plaintiffs and the Classes against Defendant City)

410.    Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

411.    Defendant City had a duty to supervise its Police Department officers and employees to ensure they were not discriminating against citizens on the basis of sex, as well as properly investigating legitimate complaints of criminal activity and protecting citizens under its jurisdiction from criminal activity.

412.     Defendant City had a duty to maintain and enforce policies and procedures that ensured all of its citizens, regardless of sex, were protected from criminal activity.

413.     Defendant City breached its duty of care to Plaintiffs and class members by negligently failing to investigate and refer for prosecution cases of sexual violence against women victims, who reported their cases to JCPD, out of discriminatory animus towards women victims of sexual violence as a class.

414.     JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD negligently failed to train officers to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

415.     JCPD's investigations into sexual assault reports were negligently inconsistent, ineffective, and incomplete. JCPD negligently failed to collect evidence or failed to document the collection of evidence. JCPD also negligently failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers negligently failed to document their statements, even though the investigative files indicated that such statements had been taken.

416.     JCPD's practices negligently discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault. No legitimate law enforcement purpose—or any other reason—justified these inadequacies.

417.     JCPD supervisors negligently allowed sexual assault cases to be closed even when prosecution was still possible.

418. JCPD investigators negligently and improperly used the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, where the requirements for closure under this basis were not met.

419. JCPD's investigative deficiencies compromised the investigative process and negligently placed Plaintiffs and class members at an increased risk of harm.

420. The culture of impunity caused and ratified by Defendant City resulted in Plaintiffs and class members suffering increased risk of harm, retraumatization, and emotional distress. These damages were a result of Defendant City's unjust law enforcement system where sexual violence was not punished or deterred.

421. Further, in the specific case of Williams, Defendant City breached its duty of care to Plaintiffs when the JCPD officers and employees were made aware of the numerous complaints of Williams' sexual assault, failed to investigate those complaints, and failed to protect female citizens of Johnson City from further criminal activity by Williams. By breaching its duty of care, Defendant City proximately caused Plaintiffs and members of the Sex Trafficking Survivors Class to suffer bodily injury, emotional distress, the deprivation of property, the deprivation of the right to privacy, and in the case of Female 10, death.

422. Plaintiffs and class members suffered actual emotional and physical damages due to Defendant City's breach of care, including retraumatization and emotional distress as a result of negligent investigative practices, botched investigations, and improperly declined prosecutions.

423. Plaintiffs and class members suffered actual, emotional, and physical damages due Defendant City's breach of care.

424.    As a direct consequence of Defendant City's acts and omissions described herein, Plaintiffs and class members have suffered damages and the Defendant City is liable for all injuries sustained by Plaintiffs and class members proximately caused by its violations of law.

## RELIEF REQUESTED

Plaintiffs, individually and behalf of the Classes, respectfully request that this Court:

1.    Certify the class under Federal Rule of Civil Procedure 23, appoint Plaintiffs as class representatives, and appoint their attorneys as class counsel;

2.    Enter judgment against Defendants and in favor of Plaintiffs and the Classes;

3.    Award compensatory damages for emotional distress, mental anguish, and disruption to each plaintiffs' family life, physical injury, pain and suffering, medical expenses, and all compensatory damages and or economic damages caused by the actions of Defendants.

4.    Award punitive damages;

5.    Award reasonable attorney's fees and costs;

6.    Attorneys' fees and expenses;

7.    Prejudgment interest and, if applicable, post-judgment interest;

8.    Injunctive and declaratory relief; and

9.    Any such general relief to which Plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

*s/ Heather Moore Collins*
Heather Moore Collins (#026099)
Ashley Shoemaker Walter (#037651)
**HMC Civil Rights Law, PLLC**
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

*—and—*

*s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones (California Bar #281715)
*Pro Hac Vice*
**Advocates for Survivors of Abuse PC**
4200 Park Boulevard No. 413
Oakland, CA 94602
510-500-9634
vanessa@advocatesforsurvivors.com

*—and—*

*s/ Elizabeth Kramer*
Julie C. Erickson (California Bar # 293111)
Elizabeth A. Kramer (California Bar # 293129)
Kevin M. Osborne (California Bar #261367)
*Pro Hac Vice*
**Erickson Kramer Osborne LLP**
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

*Attorneys for the Plaintiffs and the Proposed Classes*

79