IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

**JANE DOES 1-9,**

    **Plaintiffs,**

v.                                                                    No: 2:23-cv-00071-TRM-JEM

**CITY OF JOHNSON CITY, TENNESSEE, et al.,**

    **Defendants.**

    _____/

**REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

On December 12, 2023, Plaintiffs moved for leave to file a second amended complaint. Notwithstanding that this was the date set by the Court for Plaintiffs to file such a motion, all Defendants opposed Plaintiffs' request to amend for, among other reasons, alleged bad faith delay. (ECF 97). Defendants' Response relies entirely on arguments of no moment here. Rather than genuinely engaging in the well-settled factors courts consider when analyzing a motion for leave to amend, Defendants contort the procedural posture of the case to gin up supposed bad faith and prejudice, and then assert that their eventual Rule 12(b)(6) motion will likely succeed in knocking out causes of action. Since Defendants show nothing in their Response that would warrant denial of Plaintiffs' request, Plaintiffs respectfully ask the Court to grant them leave to amend.

**ARGUMENT**

**A. Plaintiffs Have Investigated and Prosecuted their Claims Diligently**

Federal Rule of Civil Procedure 15 provides that the court should freely give leave for a party to amend its pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). In *Foman*, the Supreme Court set forth four factors, the "*Foman* factors," for analyzing this standard: whether

1

the proposed amendment (1) is made in bad faith, (2) is unduly delayed, (3) would be futile, and (4) causes prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011). Plaintiffs' Motion sets forth why each of the *Foman* factors supports granting leave to amend. (ECF 93).

Defendants argue the Motion should be denied, citing the closeness (as opposed to delay) in the timing of Plaintiffs' amendments (ECF 97 at 5, 10) and the anonymity of the Jane Doe Plaintiffs prior to the Court's entry of a Protective Order (*see id.* at 6-9). In other words, Defendants make arguments that have nothing to do with the standard for granting leave to amend under the *Foman* factors.

> 1. *Defendants fail to demonstrate any bad faith in the timing of Plaintiffs' filed pleadings and disclosure of Plaintiffs' identities.*

Even if the Court were inclined to entertain Defendants' immaterial arguments, none are persuasive. The suggestion that Plaintiffs requested leave to amend too soon relative to their prior amendment[1] is erroneous, and it is certainly not grounds for denying leave to amend. Requesting leave to amend promptly upon appreciating than an amendment is warranted is good for all involved because it allows parties to prepare the case for trial without needless delay and unfair surprise. *Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 874 (6th Cir. 1973). Defendants would apparently have had Plaintiffs wait *longer* to seek leave to amend. But delay, unlike promptness, actually is grounds for denying leave. *Stewart v. Shelby Tissue, Inc.*, 189 F.R.D. 357, 360 (W.D.

---

[1] Defendants emphasize the two-day time window between the filing of the amended complaint and the motion for leave to file the second amended class complaint as evidence of bad faith. (ECF 97 at 10.) But, in fact, the operative time span is the two-week window between August 26, 2023, the date on which Plaintiffs moved to amend the first time (ECF 12), and September 8, 2023, the date Plaintiffs filed the motion to amend (ECF 23). During those two weeks, as reflected by the docket, new class counsel made their initial appearance on the case, and a new Plaintiff was identified and added to the second amended class complaint.

Tenn. 1999). The timing of Plaintiffs' second amended complaint demonstrates adherence to the Court ordered deadlines and an intent to move the litigation forward efficiently with up-to-date pleadings.

Confusingly, Defendants seem to argue that Plaintiffs both filed their initial Second Amended Class Complaint too quickly, but then unreasonably delayed the filing of the revised Second Amended Class Complaint. (ECF 97 at 5). This argument is nonsensical. Plaintiffs' initial motion was pending before the Court as of the scheduling conference on November 21, 2023. Following the scheduling conference, the Court set a new deadline for Plaintiffs to file their revised Second Amended Class Complaint. (ECF 86). Plaintiffs complied with this deadline, providing a draft copy of the Second Amended Class Complaint to Defendants on December 7, and filing the final version on December 12, 2023.[2] The revised version of the Second Amended Class Complaint added new allegations based on evidence obtained in September-November 2023, and reduced the number of representative Plaintiffs in order to streamline discovery and focus the litigation. Rather than being dilatory, Plaintiffs have worked diligently to account for newly obtained evidence in a fast-moving case involving multiple ongoing criminal investigations and have complied with all the Court's deadlines.

Similarly, Defendants repeated contention that leave should be denied because the Jane Doe Plaintiffs remained anonymous until the Court's issuance of a protective order is meritless and moot. The ability to sue anonymously was the subject of separate briefing and has no bearing

---

[2] Defendants claim the additional allegations in the final version of the Second Amended Class Complaint filed on December 12, as compared to the draft provided to Defendants on December 7, are evidence of bad faith. They are not. The allegations added to the final draft are not new. Plaintiffs had inadvertently omitted the allegations for H.A., which had been included in both the initial and amended complaints. (*Compare* ECF 21 ¶¶ 84-91 *with* ECF 93-1 ¶¶ 89-94.) As Defendants had already indicated they would oppose the motion, any further meet-and-confer would have been futile.

3

on the standard for leave to amend. Moreover, pursuant to the Court's instructions, the Parties negotiated a protective order wherein Plaintiffs themselves proposed to disclose their identities within a framework intended to protect their privacy. Plaintiffs made that disclosure on December 22, 2023.[3] Defendants attempt to construe that timing as dilatory, when, in fact, Plaintiffs provided this information within four business days of the Court's issuance of the protective order (ECF 94), and during a holiday week with limited staffing.

Defendants have not been prejudiced in their ability to investigate Plaintiffs' claims. Indeed, Defendants are well-aware of the reports of sexual assault against Williams, and their counsel cited to these reports during the November 21, 2023, scheduling conference. Similarly, Defendants have all the materials provided to their own expert, the Daigle Law Group, which resulted in the Daigle Report's findings that the Johnson City Police Department had a pattern and practice of handling reports of sexual violence by women in a discriminatory manner. (*See* ECF 93-1 ¶¶ 184-216). Indeed, it is Plaintiffs who have yet to receive any of these reports or documents in response to their numerous discovery requests and public records requests. Defendants—not Plaintiffs—possess the bulk of discovery. Nothing has delayed their ability to begin investigating Plaintiffs' claims here.

    2. *Precedent does not require disclosure of named plaintiffs' identities; it weighs in favor of protecting survivors of sexual violence.*

Defendants are also wrong that the filing of a class action requires publicly naming the

---

[3] Upon learning that Defendants could not open the password-protected file, Plaintiffs timely provided the password. Plaintiffs have requested the Parties hold a meet-and-confer regarding Defendant City's disclosure of the identities of the Plaintiffs and unnamed Females to members of JCPD. Specifically, Plaintiffs intend to request that Defendants maintain a log of which officers or Department personnel receive access to this list, as well as the date and purpose of this disclosure. Plaintiffs submit that some additional protection is necessary here, where one victim has already been violently assaulted by JCPD officers and evicted from her home in retaliation for her participation in a federal criminal investigation. (*See* ECF 97-1 ¶¶ 175-83).

representative Plaintiffs. Plaintiffs seek to represent hundreds of individuals whose reports of sexual violence were ignored by police officers because of systemic gender discrimination. In putative class actions raising constitutional challenges, the "public interest is not being able to identify any one plaintiff, but in being able to follow the case to determine how the constitutional issues are resolved." *Doe v. City of Apple Valley*, 2020 WL 1061442, at *3 (D. Minn. Mar. 5, 2020) (quoting *Does v. City of Indianapolis, Ind.*, 2006 WL 2289187 (S.D. Ind. August 7, 2006)).

Defendants' claims of undue prejudice to themselves and to absent class members are meritless where the named Plaintiffs have disclosed their identities to both the Court and Defendants. By doing so, "Defendants ability to conduct discovery, assess standing, and respond to any potential motion for class certification will not be impeded." *E.B. v. Landry*, 2020 WL 5775148, at *6 (M.D. La., Sept. 28, 2020). The Court is "more than capable of ensuring the Plaintiffs are fair representatives of the proposed classes" as part of its role protecting the interests of absent class members. *City of Apple Valley*, 2020 WL 1061442, at *3; *see also U.S. Navy SEALs 1-26 v. Austin* 594 F.Supp.3d 767, 782–783 (N.D. Tex. 2022) (details about pseudonymous plaintiffs' claims in the lawsuit are "more relevant and informative" than actual names, such that "potential class members can determine whether conflicts exist and whether they agree to representation") (subsequent treatment omitted).

Defendants cite two cases where courts required class representatives to proceed under their real names. (ECF 97 at 9). The analysis in both supports anonymity here. The *Ashley Madison* case involved individuals who sued the website they were using to facilitate extra-marital intimate relationships after a data breach resulted in the disclosure of their personally identifiable information. The court observed that "factors common to cases in which a plaintiff has been permitted to proceed under a fictitious name" include "where the plaintiff is challenging

5

Case 2:23-cv-00071-TRM-JEM   Document 101   Filed 01/05/24   Page 5 of 16   PageID #: 1379

government activity" and "allegations of sexual abuse and assault," as well as threat of "harm to the plaintiffs" if their names are in the public record. *In re Ashley Madison Customer Data Security Breach Litigation*, 2016 WL 1366616, at *2-3 (E.D. Mo., Apr. 6, 2016) (collecting cases). Having determined that the *Ashley Madison* plaintiffs' "privacy interests are not as pronounced" as compared to those cases, that the information they were seeking to protect had "already been released on the internet," and that plaintiffs in related *Ashley Madison* cases were using their real names (*id*.), the court declined to allow using pseudonyms. *Id.* at *3-4. Here, the factors justifying anonymity are clearly met: Plaintiffs are alleging police misconduct harming survivors of sexual violence, who remain in the city where several Defendants continue to wield power, and where one of the perpetrators previously escaped law enforcement custody.

In the other case cited by Defendants, the court required the use of real names because the plaintiff had "not sufficiently demonstrated that disclosure of his identity would reveal highly sensitive, personal information that would result in social stigma or the threat of real and imminent physical harm." *Sherman v. Trinity Teen Solutions, Inc*., 339 F.R.D. 203-206 (D. Wyo. 2021). Moreover, the court determined that the sensitive nature of the lawsuit was decreased because the allegations had occurred nine years ago. *Id.* Here, Plaintiffs submitted evidence in support of their motion to proceed anonymously, which was granted (ECF 7), the alleged sexual violence is recent, information concerning the alleged police misconduct is continually unfolding, and as described above, Plaintiffs have a legitimate fear of harm should their names be revealed.

**B. Defendants' Arguments Fail on the Merits**

As set forth above, the Johnson City Defendants argue against leave to amend because they claim they are likely to prevail on a future motion to dismiss claims under Rule 12(b)(6), or in opposition to a motion for class certification under Federal Rule of Civil Procedure 23. These

6

arguments are premature, as this is neither a motion to dismiss nor an opposition to class certification. Courts are encouraged to allow amendment based on "the principle that cases 'should be tried on their merits rather than the technicalities of pleadings.'" *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986) (quoting *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982)). Sixth Circuit courts also note that judicial economy is often not served when the primary basis of a defendant's opposition to a plaintiff's motion to amend is futility. *Durthaler v. Accts. Receivable Mgmt., Inc.*, 2011 WL 5008552, at *4 (S.D. Ohio Oct. 20, 2011).

> [R]ather than determining the actual legal sufficiency of the new claim, in many cases it will suffice to determine if there is a substantial argument to be made on that question and, if so, to allow the amended pleading to be filed with the understanding that a motion to dismiss for failure to state a claim may follow.

*Id.*; *All Pro Brace, LLC v. United States Department of Health and Human Services*, 2022 WL 17067459, at *3 (N.D. Ohio, Nov. 17, 2022) (better to address futility arguments on dispositive motion, rather motion for leave to amend). Regardless, Plaintiffs' claims here are sound as pleaded and, contrary to the Johnson City Defendants' claims, will survive a motion to dismiss.

　　1. *Plaintiffs will be able to show typicality and commonality.*

Evaluating Rule 23 certification requirements at this stage—before discovery, without any merits' rulings, and long before briefing on a motion for class certification—is completely premature. *See Jackson v. Cuyahoga County,* 2021 WL 3679507, at *3 (N.D. Ohio, Aug. 19, 2021) (courts may only strike class allegations before a class certification motion "when the complaint itself shows that the potential class cannot meet certification requirements" and suffers from "*irreparable* defect") (emphasis in original).

Still, Defendants arguments fail. First, they argue that Plaintiffs cannot show typicality and commonality of the Sex Trafficking Survivor Class because the class members will have different harm based on whether they reported their sexual assaults by Williams to JCPD. (ECF 97 at 13).

Plaintiffs agree that the Sex Trafficking Survivor Class members may have different damages as a result of many factors, but that is *not* an argument precluding class certification under Federal Rule of Civil Procedure 23. "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (internal quotations and alterations omitted).

Here, the common issues of fact and law include (1) whether Defendants conspired with Williams as part of a sex trafficking venture; (2) whether Defendants benefited financially from this venture; and (3) whether Defendants obstructed an investigation into this venture. All those key legal and factual issues will be common to all Sex Trafficking Survivor Class members and will decide liability as to *all* class members.

Defendants next argue that their statute of limitations defense will be unique to each Sex Trafficking Survivor Class member based on when the claims accrued and therefore Plaintiffs will not be able to show typicality. (ECF 97 at 13). However, the operative statute of limitations for claims brought under 18 U.S.C. § 1595 is ten years. *See* 18 U.S.C. § 1595(c)(1). Thus, a statute of limitations defense will be unavailable to Defendants as to *all* Sex Trafficking Survivor Class members based on the facts alleged in the Second Amended Class Complaint.

With respect to the one-year statute of limitations for claims brought under 18 U.S.C. § 1983, Plaintiffs have alleged that these claims accrued for the class members—at the earliest—with the filing of the Kateri Dahl complaint on June 23, 2022, within a year of the filing of the initial complaint in this case. (*See* ECF 93-1 ¶¶ 251-58). While Plaintiffs, including H.A., may have mistrusted the JCPD before that date, they would not have had been able to allege an Equal Protection violation based solely on their own personal mistrust. It was only with the filing of the Dahl complaint that Plaintiffs could have possibly learned specific facts showing that JCPD's

conduct with respect to reports of rape against Williams was systematic and motivated by gender discrimination. JCPD's unconstitutional customs, practices, and policies arguably could not have been known until the Daigle Report was published on July 18, 2023, when Daigle offered his conclusion that JCPD had a pattern and practice of discriminating against women reporters of sexual violence on the basis of their sex. (*See* ECF 96-1). Accordingly, Defendants cannot assert a statute of limitations defense that will undermine typicality or commonality since the lawsuit was filed within one year of the earliest possible accrual date for *all* class members.

With respect to the Reporter Survivor Class, Defendants argue that Plaintiffs will not be able to show typicality and commonality, contending that class members who reported their crimes of sexual violence and had their cases prosecuted, or those who may have recanted their allegations, have suffered no harm. (ECF 97 at 10). Experiencing systemic sex discrimination, however, *is* a harm, regardless of the outcome of the class member's individual case. In fact, one of the Daigle Report's findings was that the discriminatory practices of JCPD officers often resulted in women *not* pursuing their reports of rape or recanting because of police pressure. (*See* ECF 93-1 ¶¶ 194-95, 186-216). The Daigle Report also found that even women whose cases were ultimately prosecuted experienced harm from JCPD's unconstitutional conduct. *Id.* ¶¶ 199, 202. Discrimination based on an entity's practices and policies is precisely the kind of harm that is appropriate for class treatment. *Card v. City of Cleveland*, 270 F.R.D. 280, 293 (N.D. Ohio 2010) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)) ("Allegations of race or gender discrimination resulting from policies or practices are often 'by their very nature class suits, involving classwide wrongs' and 'common questions of law or fact are typically present.'").

In sum, persuasive indicia of both typicality and commonality are already established, and any further inquiry on those requirements that the Court deems appropriate can be addressed at the certification stage.

2. *Plaintiffs allege facts sufficient to establish beneficiary liability under the TVPRA.*

Defendants next set forth a series of arguments properly brought in a motion to dismiss. Again, none have merit.

In support of their futility argument, Defendants contend that Plaintiffs have not alleged a claim under 18 U.S.C. §§ 1591(a)(1), (2), because (1) Plaintiffs have not alleged with sufficient particularity how individual officers benefitted financially from the cash unlawfully seized from Williams (ECF 97 at 17); (2) Plaintiffs have conflated perpetrator and beneficiary liability (*id.* at 16) [4]; (3) cash obtained through facially legitimate legal process cannot be the basis for a corrupt, quid-pro-quo payment as part of a sex trafficking conspiracy (*id*. at 19-20); and (4) cash obtained from the alleged extortion scheme cannot be the basis for Trafficking Victim Protection Reauthorization Act ("TVPRA") liability because the scheme did not involve sex trafficking (*id.* at 18). None of these arguments, however, forms the basis for dismissal of the sex trafficking claims.

As an initial matter, Defendants do not dispute—nor could they—that Plaintiffs have alleged facts showing that Williams and his coconspirators engaged in a venture to traffic women and children, and specifically, that Williams exchanged something of value with his coconspirators on account of which the coconspirators recruited, enticed, harbored, provided, obtained,

---

[4] Other than asserting this point, Defendants do not explain this argument. Plaintiffs are alleging beneficiary liability against the Defendants—i.e., Plaintiffs do *not* allege any Defendants themselves "recruited, enticed, harbored, provided, obtained, maintained, and solicited" women and children, or engaged in forced sex acts with them.

10

maintained, and solicited women and children, including children under the age of 14, so that Williams could use the women and children for forced sex acts. (*See* ECF 93-1 ¶¶ 19-56). The only issue, then, is what role Defendants played in Williams' sex trafficking conspiracy.

In the Second Amended Class Complaint, Plaintiffs have alleged that there was a group of JCPD officers who conspired with one another and with Williams in furtherance of this sex trafficking conspiracy. (ECF 93-1 ¶¶ 57-61). The nature of this conspiracy is straightforward: (1) Defendant Sparks used corrupt means to obtain money from Williams, this included cash from the extortion scheme and cash taken through the corrupt use of a search warrant (*id.* ¶¶ 62-63, 81-87); (2) other JCPD officers benefitted financially through receiving a cut of these funds (*id.* ¶¶ 63, 86); (3) all the officers had actual or constructive knowledge that Williams was engaged in a sex trafficking conspiracy by drugging and raping women (*id.* ¶¶ 95-142); and (4) each named JCPD officer took overt acts in furtherance of this conspiracy, specifically, overt acts which allowed Williams to continue to victimize women and children (*id.* ¶¶ 143-83). These allegations constitute the elements of beneficiary liability based on the plain language of the statute. S*ee A.R. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-CV-04935, 2022 WL 17741054, at *3 (S.D. Ohio Dec. 16, 2022)

Contrary to Defendants' claim, Plaintiffs have articulated facts supporting the elements of beneficiary liability for each of the named Defendants. Plaintiffs have alleged how each Defendant they took specific overt acts to participate in the sex trafficking venture.[5] For instance, Defendants

---

[5] In fact, Plaintiffs need not even allege overt acts to state a claim of beneficiary liability, since § 1595 creates a negligence standard for civil liability under the TVPRA. *See J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1062 (D. Colo. 2021) ("The Court agrees with plaintiff that an 'overt act' is not required under the TVPRA. In fact, most district courts to have examined the issue have rejected the overt act argument."). Here, though, Defendants' actions went beyond mere negligence.

11

Chief Karl Turner and Captain Keven Peters dismissed Williams' victims' accounts, claiming that the victims were not credible despite the overwhelming evidence that Williams was drugging and raping women, and then conspired to terminate Dahl's employment in an effort to interfere with her investigation of Williams. (ECF 93-1 ¶¶ 160-62, 166, 168, 173). Defendants Toma Sparks and Justin Jenkins conspired with Williams to conceal and destroy evidence—evidence which included digital files depicting Williams' sexual assault of his sex trafficking victims. *Id.* ¶¶ 64-81, 174. Defendants, individually and collectively, engaged in numerous acts of obstruction, witness intimidation, and retaliation, in an effort to interfere with the investigation into Williams' sex trafficking conspiracy. *Id.* ¶¶ 143-83.

At the pleading stage, Plaintiffs have identified overt acts which the named Defendants took in furtherance of the sex trafficking conspiracy. Plaintiffs have alleged that these acts were taken *because* the officers were benefiting from the conspiracy, and Plaintiffs have identified two means of payments from Williams to the JCPD officers through Defendant Sparks. This is more than sufficient under Rule 12(b)(6) to support the TVPRA claims here.

Defendants next contend that the alleged extortion scheme could not form the basis for beneficiary liability under the TVPRA because the scheme did not involve sex trafficking. ECF 97 at 18. But the TVPRA does not require that the continuous business relationship underpinning the financial benefit be the sex trafficking business itself. *See, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 965 (S.D. Ohio 2019); *H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019) ("the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard").

Here, Defendants' extortion scheme may have begun as a profitable—and grossly corrupt—collection effort against a drug trafficker, with the protection of Williams' sex trafficking venture as incidental to this continuous business relationship. But Plaintiffs have alleged a direct connection between Defendants' financial benefits from Williams and the overt acts they took in furtherance of the sex trafficking conspiracy. When Defendant officers intimidated Williams' victims, retaliated against Williams' victims, and unlawfully and corruptly interfered with the investigation and prosecution of Williams' sex trafficking crimes, they became a part of the sex trafficking conspiracy. Plaintiffs have alleged that they took these acts *because* they were being paid by Williams and did not want their scheme discovered. It does not matter whether JCPD officers' goal in enriching themselves through the extortion scheme and corrupt use of search warrants was to facilitate the sex trafficking conspiracy. The fact that Defendants took overt acts to participate in the conspiracy *because* they were benefitting financially is enough to establish liability under the TVPA.

This case is not at the summary judgment stage and Plaintiffs need only provide Defendants with "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). Plaintiffs have alleged that Williams' seized assets were unlawfully and corruptly taken by Defendants as part of the sex trafficking conspiracy. This is sufficient to provide notice to Defendants and to allege beneficiary liability under §§ 1591(a)(1), (2).

   3. *Plaintiffs allege facts sufficient to state a claim of obstruction under § 1591(d).*

Finally, Defendants argue Plaintiffs do not state a claim under 18 U.S.C. § 1591(d). Section 1591(d) makes it unlawful to "obstruct[], attempt[] to obstruct, or in any way interfere[] with or prevent[] the enforcement of" 18 U.S.C. § 1591(d). For a defendant to be liable for obstructing the enforcement of the TVPRA, it must (1) know of an effort to enforce the TVPRA and

13

(2) intentionally obstruct or attempt to obstruct that enforcement effort. *See Doe 1 v. Deutsche Bank Aktiengesellschaft*, No. 22-CV-10018 (JSR), 2023 WL 3167633, at *11 (S.D.N.Y. May 1, 2023) (citing *United States v. Farah*, 766 F.3d 599, 612 (6th Cir. 2014)).

Defendants incorrectly state in their Response that Plaintiffs have alleged that SAUSA Dahl was conducting a sex trafficking investigation in 2020-2021. ECF 97 at 21. Plaintiffs do not allege this. (*See* ECF 93-1 ¶¶ 156-73). Plaintiffs allege that Dahl was investigating conduct that met the elements of the federal sex trafficking statute, § 1591, that Defendants were aware of these efforts, and their obstructive conduct therefore constituted obstruction of "an effort to enforce the TVPA." *See id.; Farah*, 766 F.3d at 612. Indeed, the Federal Bureau of Investigation and the Department of Justice Human Trafficking Prosecution Unit eventually did open a sex trafficking investigation into Williams' sex crimes. (ECF 93-1 ¶¶ 228-30). But for Defendants' conduct, it is possible that Dahl's investigation would have led to enforcement of the sex trafficking statute years earlier. Plaintiffs have thus stated a plausible claim for relief.

    4. *Defendants' Rule 8(a) argument fails.*

Defendants next accuse Plaintiffs of violating Federal Rule of Civil Procedure 8(a), by filing a lengthy and complex second amended class complaint. (ECF 50 at 15-16). The second amended class complaint is no longer than necessary to allege the facts, however, in a case involving a multi-year sex trafficking conspiracy, obstruction of an investigation into this conspiracy, as well as civil rights claims under the Equal Protection and Due Process Clauses. Defendants have not offered any specific basis on which to strike any portion of the second amended class complaint, nor should the Court entertain Defendants' general complaints about the length of the document.

14

# CONCLUSION

Accordingly, Plaintiffs request the Court grant Plaintiffs leave to file the Second Amended Class Complaint.

Dated this January 5, 2024.　　　　　　　　Respectfully submitted,

*s/ Heather Moore Collins*
Heather Moore Collins (#026099)
Ashley Shoemaker Walter (#037651)
**HMC Civil Rights Law, PLLC**
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

—and—

*s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones (California Bar #281715)
*Pro Hac Vice*
**Advocates for Survivors of Abuse PC**
4200 Park Boulevard No. 413
Oakland, CA 94602
510-500-9634
vanessa@advocatesforsurvivors.com

—and—

*s/ Elizabeth Kramer*
Julie C. Erickson (California Bar # 293111)
Elizabeth A. Kramer (California Bar # 293129)
Kevin M. Osborne (California Bar #261367)
*Pro Hac Vice*
**Erickson Kramer Osborne LLP**
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

*Attorneys for the Plaintiffs and the Proposed Classes*

# CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been filed and served via the court's electronic filing system on January 5, 2024 to counsel of record:

| | |
|---|---|
| K. Erickson Herrin<br>HERRIN, McPEAK & ASSOCIATES<br>515 East Unaka Avenue<br>P. O. Box 629<br>Johnson City, TN 37605-0629<br>Email: lisa@hbm-lawfirm.com<br><br>Emily C. Taylor<br>WATSON, ROACH, BATSON & LAUDERBACK, P.L.C.<br>P.O. Box 131<br>Knoxville, TN 37901-0131<br>Email: etaylor@watsonroach.com<br><br>*Attorneys to Defendants, Johnson City, Tennessee, Karl Turner, in his individual and official capacities, Captain Kevin Peters, in his official capacity, and Investigator Toma Sparks, in his official capacity* | Daniel H. Rader III<br>Daniel H. Rader IV<br>MOORE, RADER & YORK PC<br>46 N. Jefferson Avenue<br>P.O. Box 3347<br>Cookeville, TN 38502-3347<br>danrader@moorerader.com<br>danny@moorerader.com<br>*Counsel for Kevin Peters in his individual capacity*<br><br>Kristin Ellis Berexa<br>Ben C. Allen<br>FARRAR BATES BEREXA<br>12 Cadillac Drive, Suite 480<br>Brentwood, TN 37027-5366<br>kberexa@fbb.law<br>ballen@fbb.law<br>*Counsel for Toma Sparks in his individual capacity*<br><br>Keith H. Grant<br>Robinson, Smith & Wells, PLLC<br>633 Chestnut Street, Suite 700<br>Chattanooga, TN 37450<br>E-mail: kgrant@rswlaw.com<br>*Counsel for Justin Jenkins in his individual capacity* |

                                        */s Heather Moore Collins*
                                        Heather Moore Collins

16

Case 2:23-cv-00071-TRM-JEM   Document 101   Filed 01/05/24   Page 16 of 16   PageID #: 1390