**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**GREENEVILLE DIVISION**

B.P., et al.,

      Plaintiffs,

v.                          No: 2:23-cv-00071-TRM-JEM

CITY OF JOHNSON CITY,
TENNESSEE, et al.,

      Defendants.

_____/

## OMNIBUS OPPOSITION IN RESPONSE TO MOTIONS TO DIMISS FILED BY DEFENDANTS' PETERS, SPARKS, JENKINS, HIGGINS, AND LEGAULT IN THEIR INDIVIDUAL CAPACITIES

Defendants Kevin Peters, Toma Sparks, Justin Jenkins, Brady Higgins, and Jeff Legault bring motions to dismiss in their individual capacities, challenging Plaintiffs B.P.'s and H.A.'s claims under the Trafficking Victims Protection Reauthorization Act ("TVPA") and their claim under 42 U.S.C. § 1983 for violations of their substantive due process rights. These claims are based on facts in the Second Amended Class Complaint which allege that Johnson City Police Department ("JCPD") officer Toma Sparks and others benefited financially by taking cash from Sean Williams and his co-conspirator, and, in exchange, the Defendants protected Williams from prosecution for his sex trafficking crimes, allowing Williams to continue victimizing women and children for years with impunity. This corrupt scheme continued until at least April 19, 2023, with Defendants Higgins and Legault taking steps to cover up the unlawful actions of their co-conspirators until at least March and April 2023, respectively. For the reasons set forth below, their motions should be denied.

1

## INTRODUCTION AND BACKGROUND

For years, Sean Williams terrorized Johnson City, Tennessee. Sean Williams drugged and raped over 52 women. Sean Williams sexually exploited children. And Sean Williams funded his trafficking of women and children by buying and selling cocaine and laundering the proceeds through his construction company, Glass and Concrete Contracting LLC.

For years, the Johnson City Police Department let Williams get away with it. JCPD officers destroyed evidence, intimidated, and lied to victims—even physically assaulting one victim in retaliation for her reporting Williams to the Federal Bureau of Investigation ("FBI")—all to protect a serial rapist at the expense of the lives and safety of the women and children of Johnson City. The officers' conduct shocks the conscience.

The Plaintiffs' Second Amended Class Complaint ("SAC") alleges three theories to explain why JCPD officers did this: (1) Sparks (and other JCPD officers) were corruptly taking money from Williams and his co-conspirator, and Defendants knowingly obstructed the investigations into Williams' rapes to cover up JCPD corruption; (2) JCPD systematically denied law enforcement services to female reporters of sexual violence based on a discriminatory animus towards women, discrediting women, discounting their reports, and ultimately refusing to investigate the crimes committed against them[1]; and (3) JCPD negligently failed to train and supervise their officers, which proximately caused the harms Williams' victims suffered. The only theory at issue in the instant set of motions to dismiss is the first: that a group of JCPD officers led by Sparks conspired with each other to benefit financially from Williams' sex trafficking venture, all the Defendant officers obstructed the investigation into Williams' sex

---

[1] While this conduct harmed Williams' victims and members of the Reporter Class, because the instant motions deal only with allegations specific to Williams, this opposition only addresses facts and claims specific to the Sex Trafficking Survivor Class and Williams Survivor Subclass.

trafficking venture in an effort to cover up JCPD misconduct, and that this conduct was such an egregious violation of the victims' basic constitutional rights that it shocks the conscience and resulted in a state-created danger.

| Theory of the Case | Claims | Defendants | Alleged Facts[2] |
|---|---|---|---|
| Criminal Conspiracy/ Corruption/ Obstruction | • Count II (Obstruction of TVPA) <br> • Count VI (Substantive Due Process) | • ALL <br><br> • ALL <br><br> [Counts I (TVPA), III (aiding & abetting), and IV (conspiracy) alleged only as to the City, Turner, and Sparks[3]] | • Witness intimidation, harassment, and retaliation. <br> • Destruction and concealment of evidence relating to Williams' crimes. <br> • Interfering with former federal prosecutor Kateri Dahl's investigation of Williams' sexual assaults. <br> • Interfering with the execution of a federal arrest warrant for Williams. <br> • Covering up Williams' crimes by conspiring to terminate Dahl. <br> • Evidence that JCPD officers received or took cash from Williams and Female 4. |

**RELEVANT FACTUAL ALLEGATIONS**

**I. Williams' Sex Trafficking Conspiracy**

Beginning in at least 2018 and continuing to 2021, Williams drugged and raped women and sexually exploited children as part of a sex trafficking conspiracy. The details of this conspiracy are laid out in detail in the SAC. SAC ¶¶ 18-56. In sum, Williams used three means and methods to traffic women and children: (1) providing benefits in the form of drugs, cash, and free lodging to co-conspirators to recruit, obtain, transport, maintain, and provide women, so that he could drug and rape them; (2) using drugs to addict and control women who would then recruit, obtain, transport, maintain, and provide other women; and (3) offering something of

---

[2] The full table outlining all theories of the case, associated claims, defendants, and alleged facts is included as Exhibit 1 to the Declaration of Vanessa Baehr-Jones.

[3] In light of the Court's February 23, 2024, order (ECF 119), Plaintiffs concede that the facts in the SAC are insufficient to allege a beneficiary theory of liability under §§ 1595, 1591(a) as to Peters and Jenkins.

3

value to women, including free lodging and money, at times under the guise of hiring women for purportedly legitimate purposes, so that he could obtain and gain access to the women and their minor children. *Id.* ¶ 22. In their motions, Defendants do not dispute—nor could they—that Plaintiffs have sufficiently alleged the elements of a sex trafficking conspiracy, under 18 U.S.C. §§ 1591(a)(1), 1594(c), as to Williams and his co-conspirators.

## II.    JCPD Extortion Scheme and Defendants' Cover Up

Beginning on an unknown date, a group of JCPD officers, led by Sparks, conspired to benefit from an extortion scheme of Williams' business, and by extension, his narcotics and sex trafficking ventures. SAC ¶¶ 57-183, 311-66. The scheme worked like this: Williams' business partner and co-conspirator, Female 4, laundered funds from Glass and Concrete Contracting LLC through subcontracting companies, from which she would take "owner draws" to pay $2,000/week in cash to Sparks and the other JCPD officers involved in the scheme. *Id.* ¶ 63. JCPD officers also unlawfully seized cash from Williams' safe. *Id.* ¶ 81-86. In exchange, there was either an implied or explicit agreement that Sparks and others would shield Williams, permitting him to continue his criminal activities of abuse and trafficking with impunity. *Id.* ¶¶ 80, 87, 313-16; *see also id.* ¶¶ 88-94 (detailing Williams' rape of H.A. during the time Sparks and other JCPD officers benefited financially from the extortion scheme and protected Williams).

Plaintiffs have alleged facts in the SAC that demonstrate how Defendant Sparks intentionally acted as part of this scheme, and how Defendants Turner, Peters, Jenkins, Higgins, and Legault intentionally obstructed the investigation into Williams' sex trafficking venture as part of the cover up. *See* SAC ¶¶ 143-83. Because the payments from Williams were made in cash as part of a covert criminal conspiracy, Plaintiffs cannot yet allege the specific amounts of individual cash payments to each Defendant officer. However, Plaintiffs have alleged acts on the part of Sparks which show his knowing and intentional participation in the scheme to benefit

4

financially from Williams, and his knowledge of, or reckless disregard of, the fact that Williams was engaged in drugging and raping women as part of a sex trafficking venture. *See id.*; *see also id.* ¶¶ 95-142 (detailing notice to officers). Further, Plaintiffs have alleged that Sparks' actions as part of the scheme were for the purpose of obtaining illicit cash from Williams, and that all Defendants, including Turner, Peters, Jenkins, Higgins and Legault, intentionally obstructed the investigation into Williams' sex trafficking venture. *Id.* ¶¶ 314-15, 327-37. The facts specific to each officer bringing the instant motions are set forth below.

### A. Inv. Toma Sparks

Sparks acted as the ringleader of the extortion scheme and the Defendant officers' attempts to cover-up their corruption. *See* SAC ¶¶ 63-87. Sparks directly received cash from Williams' co-conspirator, Female 4, on behalf of the Defendant officers. *Id.* ¶ 63. When Female 3 fell from the window of Williams' apartment, Sparks, along with Jenkins, arrived on the scene for the purpose of destroying evidence that could inculpate Williams, and by extension the Defendant officers, in the extortion scheme. *Id.* ¶ 64-69. To this end, Sparks and Jenkins left Williams' apartment unsecured, allowing Williams' co-conspirator to conceal and move evidence, *id.* ¶ 69; they permitted Williams to manipulate evidence remotely from his cellphone, even though they were aware that Williams could access video cameras in his apartment remotely from his phone, *id.* ¶ 67-68; and they delayed seizing Williams' phone until after Williams had the chance to wipe it completely, *id.* ¶ 67. Following execution of Sparks' search warrants for Williams' apartment and safe, Sparks failed to search Williams' digital devices—or worse, searched these devices, saw the video evidence of Williams raping his drugged victims, and concealed this evidence. *Id.* at 3, ¶ 73. Sparks and the other officers in the scheme then unlawfully took cash from Williams' safe to enrich themselves. *Id.* ¶ 86-87.

In furtherance of the scheme, Sparks intentionally and affirmatively refused to investigate and prosecute Williams' sex trafficking crimes, including the sexual assaults of B.P., Female 9, and Female 12. *Id.* ¶¶ 145-55, 109-15, 130-39. With respect to B.P., for example, Sparks intimidated and harassed her, told her that Williams was "untouchable," and discouraged her from pursuing her case. *Id.* ¶¶ 145-52. When B.P. asked whether there might be video evidence of her rape, Sparks lied and stated no such evidence existed even though Sparks knew there was digital evidence in JCPD custody which might contain such evidence—and, in fact, these devices did contain video evidence of Williams' rapes. *Id.* ¶ 151. Moreover, B.P. has since learned from the FBI that such evidence existed on Williams' devices with respect to her own rape. *Id.* Sparks delayed writing a search warrant for Williams' DNA for over two years, even though B.P.'s rape kit had come back with the positive DNA evidence of her potential perpetrator. *Id.* ¶ 153. Sparks took all these actions with the intent to obstruct the investigation into Williams' sex trafficking venture to protect himself and the other officers involved in the extortion scheme.

### B. Capt. Kevin Peters

Plaintiffs allege that Defendant Peters acted in a supervisory role as part of the scheme, playing a key role in dismissing complaints by Williams' victims, which Dahl brought to his and Chief Turner's attention, and conspiring with Turner to fire Dahl in order to stop her investigation into Williams. *Id.* ¶¶ 160-62, 166. Peters acted to undermine the credibility of Williams' victims, making sexist and victim-blaming statements about them, for the purpose of minimizing and dismissing their complaints. *Id.* ¶ 166. These acts were done to obstruct the criminal investigations into Williams and as part of the cover up of JCPD officers' criminal corruption. *Id.* ¶¶ 328-31.

### *New Evidence as to Defendant Peters*

Since filing the SAC on December 13, 2023, Plaintiffs have learned additional facts

regarding Peters' role in protecting Williams.[4] Specifically, Plaintiffs would allege the following

in an amendment to the SAC:

> On information and belief, Peters provided a false narrative of facts for purposes
> of a JCPD police report documenting the investigation into a Williams' victim's
> report of sexual assault. Although Peters was not assigned to the case, he acted to
> discourage the victim from pursuing her report, and then misrepresented his
> involvement in the investigation. At the time that Peters engaged in this
> obstructive conduct, he knew about B.P.'s report of sexual assault against
> Williams and was acting as part of the cover up scheme to shield Williams.

### C. Inv. Justin Jenkins

As set forth above, Jenkins and Sparks arrived at Williams' apartment on September 19,

2020, for the purpose of destroying evidence that could inculpate Williams, and by extension

Sparks and other JCPD officers, in the extortion scheme. SAC ¶¶ 64-80. Jenkins participated

with Sparks in this corrupt cover-up, the outcome of which was that evidence of Williams'

heinous conduct—drugging and raping over 52 women—was concealed for years, Williams

avoided any charges relating to the sex trafficking venture, and JCPD officers enriched

themselves by taking $419,000 from Williams' safe. *Id.* ¶¶ 64-87. Jenkins took these actions in

furtherance of the conspiracy to obstruct the investigations into Williams' sexual assaults. *Id.*

¶¶ 87, 329(f).

---

[4] Plaintiffs do not rely on any new facts for purposes of responding to Defendants' motions to
dismiss. In the event the Court does dismiss any counts in ruling on Defendants' motions,
however, Plaintiffs request such dismissal be without prejudice so that Plaintiffs can amend
where new facts provide a sufficient factual basis.

Since filing the SAC on December 13, 2023, Plaintiffs have learned additional facts

regarding Jenkins' finances. Specifically, Plaintiffs would allege the following in an amendment

to the SAC:

> Jenkins used cash he received from the conspiracy to purchase real property and
> other assets, which, on information and belief, surpassed the amount available
> from his legitimate sources of income, including but not limited to, the following:
> (1) 5.77 acres of undeveloped real property on Shady Rest and Poplar Road, in
> Johnson City, on which Jenkins constructed a new house, and (2) several
> recreational vehicles.

**D. Inv. Brady Higgins**

Plaintiffs allege that Higgins knew about victims' reports of rape at the hands of Williams

but refused to investigate them, instead, intimidating, and dissuading witnesses, and refusing to

refer charges for prosecution and/or referring charges in a piecemeal and incomplete manner so

as to undermine the prosecution. SAC at 2, ¶¶ 142, 329.

*New Evidence as to Defendants Higgins*

Plaintiffs would allege the following additional facts as to Higgins in an amendment to

the SAC:

> JCPD officer Brady Higgins intimidated, harassed, and discouraged Female 8
> over the course of months from pursuing a criminal case against Williams,
> including but not limited to the following conduct. In or around July 2022,
> Female 8 called JCPD headquarters to report that she had been drugged and
> sexually assaulted on multiple occasions by Williams. Instead of properly
> investigating Female 8's report, however, Defendant Higgins subjected Female 8
> to multiple rounds of interviews at JCPD headquarters, demanding she provide
> her statement repeatedly, effectively interrogating her about her experiences of
> sexual assault. Defendant Higgins then intimidated Female 8 by driving an
> unmarked car to her residence on multiple occasions, knocking on her door in the
> company of other unnamed, male police officers dressed in civilian attire, and
> telling her she needed to come back to JCPD headquarters to provide additional
> statements. Conduct like this continued for months. When Female 8 was not at
> home, Defendant Higgins would leave handwritten notes on her door, telling her
> to come down to JCPD headquarters. Defendant Higgins also approached Female

8

8's family members, showing up unannounced at her mother's residence, her sister's residence, and at the residence of her son's father, from whom she was estranged.[5] Defendant Higgins' conduct had the effect of harassing, intimidating, and discouraging Female 8 from pursuing her case. Female 8 has since learned that images and videos of her sexual assaults existed on Williams' digital devices, which were seized at the time of his arrest.

Female 8 also told Higgins during her initial interview that she had seen images that appeared to depict the sexual exploitation of children on Williams' cellphone. On information and belief, Higgins took no action to investigate this, nor did he attempt to obtain a search warrant for Williams' digital devices which were still in the custody of JCPD. On information and belief, had Higgins obtained a search warrant for these devices, he would have found images and videos of child sexual abuse material, including evidence that Williams sexually exploited children for the purpose of producing these materials.

Defendant Higgins intentionally engaged in witness intimidation and harassment of Female 8 with the goal of discouraging her from pursuing her claims against Williams as part of a conspiracy to obstruct the criminal investigations into Williams.

### E.  Inv. Jeff Legault

Plaintiffs allege Defendant Legault knowingly retaliated against Female 9, a Williams' survivor and witness in the sex trafficking investigation, by overseeing her arrest, the use of excessive and violent force against her, and ultimately causing her eviction from Johnson City Public Housing. SAC ¶¶ 175-83. Plaintiffs also incorporate allegations from the Dahl Complaint that Legault conspired with Turner and others in June 2021 to create a pretext to fire Dahl after she pushed JCPD to investigate Williams' sexual assaults. *Id.* ¶ 183.

### LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as

---

[5] These facts are corroborated by Higgins' own police report, documenting his conduct with respect to Female 8, as well as Female 8's handwritten statement, which Defendant City has designated confidential and which Plaintiffs have filed under seal with the Court. *See* Baehr-Jones Decl., Ex. 2 (filed under seal).

9

true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc., v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Against that backdrop, the court considers whether the complaint "contain[s] sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

## ARGUMENT

**I. Plaintiff B.P. Alleges Facts Showing that Peters, Jenkins, Higgins, and Legault Knowingly Obstructed the Investigation into Williams' Sex Trafficking Venture[6]**

Plaintiff B.P., on behalf of the Sex Trafficking Survivor Class, relies on a perpetrator theory of liability to allege Count II, Obstruction of Enforcement of the Sex Trafficking Statute, pursuant to 18 U.S.C. §§ 1594, 1595 and 1591(d).[7] Section 1595 provides for civil liability for any "perpetrator" who engages in a "violation of this chapter." 18 U.S.C. § 1595(a). Sections 1594(a) and (c) establish attempt and conspiracy liability for any provision of § 1591, and § 1591(d) proscribes, "obstruct[ing], attempt[ing] to obstruct, or in any way interfer[ing] with or prevent[ing] the enforcement of this section[.]" *Id.* §§ 1594, 1591(d). Thus, B.P. alleges that <u>all</u> Defendants obstructed, attempted to obstruct, and conspired with one another to obstruct the investigation into Williams' sex trafficking venture and, as perpetrators of this offense, are liable under § 1595 for civil remedies.[8]

---

[6] Sparks does not move to dismiss any of the TVPA claims against him. *See* ECF 133.

[7] In contrast, and as set forth in Plaintiffs' Reply in Support of their Motion to Amend, B.P. relies on a beneficiary theory of liability as to Counts I, III, and IV. ECF 101 at 11. In light of the Court's February 23, 2024, Order (ECF 119), Plaintiffs concede that the SAC does not state facts sufficient to support this theory as to Peters and Jenkins, and requests the Court dismiss Counts I, III, and IV as to Peters and Jenkins without prejudice.

[8] Because Count II is premised on perpetrator liability—not beneficiary liability—the Court need not consider Defendants' arguments regarding whether Plaintiffs have pled sufficient facts showing they benefitted financially from Williams' sex trafficking venture. *See* ECF 130 at 16-18; ECF 146 at 17; ECF 148 at 13-15. Moreover, Defendants are incorrect in stating, "Plaintiffs in this case only assert [Defendant] is liable under the beneficiary theory, not as a perpetrator." ECF 146 at 16; ECF 148 at 14. Plaintiff's Reply brief argued Defendants were liable under a

10

**A. Defendants' Conduct Was Knowingly Obstructive, Not Merely Negligent**

In their motions, Defendants attempt to minimize their culpability under § 1591(d) by ignoring the full scope of the allegations against them and parsing individual allegations from their broader context. Considered as a whole, the facts in the SAC set forth in detail the obstruction conspiracy and each of the Defendants' roles within it.

As to Jenkins, the SAC describes his integral role in the effort to cover up the extortion scheme by destroying and concealing evidence on September 19, 2020. Contrary to Jenkins' assertion, his actions amount to much more than "simple negligence." ECF 130 at 14. Jenkins arrived on the scene that night with Sparks not as part of the initial law enforcement response, but for the corrupt purpose of covering up the extortion scheme. SAC ¶¶ 67-68. To this end, Jenkins and Sparks (1) left the crime scene unsecured for hours while they took Williams to JCPD headquarters, allowing for Diaz-Vargas to move and hide evidence, *id.* ¶ 69; (2) intentionally allowed Williams to manipulate his cellphone while in their custody—leaving him alone in the interview room with the cellphone—even though they knew Williams could access digital equipment which remained unsecured in his apartment, *id.* ¶ 68[9]; and (3) waited to seize and secure Williams' cellphone until he had already been able to wipe the phone, *id.* The SAC specifically alleges that this was intentional conduct on the part of Jenkins as part of a cover up of Sparks' extortion scheme (the SAC even titles this section "JCPD Cover Up"). *See*

---

beneficiary theory for the TVPA claims pled under this theory in Counts I, III, and IV, but not in discussing liability under § 1591(d) [Count II]. *See* ECF 101 at 13-14.

[9] Indeed, according to the Government's Response in *United States v. Williams*, 2:21-cr-00027-DCLC-CRW, filed on July 28, 2023 (Doc. No. 38), which Plaintiffs cite at length in their allegations, Williams told Jenkins that he could access the videos remotely from his cellphone during the interview. *Id.* at 3. There is no doubt that Jenkins understood what he was doing when he left Williams alone to manipulate his cellphone.

*id.* ¶¶ 64-80, 329(f). At the pleading stage, these facts must be accepted as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Similarly, Peters attempts to minimize his role in obstructing the investigations into Williams, claiming Plaintiffs have only alleged that he made a handful of sexist remarks about Williams' victims. ECF 139 at 12. In fact, Plaintiffs have alleged that his conduct was part of the conspiracy with Chief Turner to fire Dahl in order to stop her investigation into Williams. SAC ¶¶ 160, 162, 166.[10] Plaintiffs allege Higgins intimidated witnesses and refused to investigate Williams, knowing about the rape allegations against Williams, *id.* at 2, ¶¶ 142, 329; and Legault knowingly retaliated against Female 9, a Williams' survivor, by overseeing her brutal and physically violent arrest, and ultimately causing her eviction from Johnson City Public Housing, *id.* ¶¶ 175-83. The SAC sets forth that Defendants' conduct was knowingly obstructive and for the purpose of thwarting the investigations into Williams. And Defendants' obstruction was effective: after Dahl was terminated, over a year would pass before federal authorities began investigating the sex trafficking conspiracy. *Id.* ¶ 229. The Court should reject Defendants' misstatements of the alleged facts.

### B.  Defendants Had the Requisite Knowledge Under § 1591(d)

Defendants misconstrue the requirements of § 1591(d) to argue that the SAC does not sufficiently allege that they knowingly violated the statute. Jenkins urges the Court to take a narrow approach in applying §1591(d) so that his obstructive conduct falls outside the statute's scope. ECF 130 at 19-22. First, Jenkins contends that obstructive conduct of a criminal

---

[10] "Once Dahl began her investigation, JCPD officers took numerous steps to obstruct, attempt to obstruct, and/or to interfere with her investigation into Williams' sexual assault crimes, including but not limited to the following: . . . Chief Turner and Captain Peters' dismissal of victims' accounts, claiming that the victims were not credible despite the overwhelming evidence that Williams was drugging and raping women." SAC ¶¶ 160, 162.

12

investigation can only amount to an offense under § 1591(d) if the federal sex trafficking investigation has already been opened. *Id.* at 20. Here, JCPD officers had opened criminal investigations into the reports of rape against Williams as early as November 2019, but Dahl would not begin her federal investigation into Williams until November 2020, and the FBI's federal sex trafficking investigation would not open until November 2022. Jenkins therefore contends that even if he intentionally destroyed and concealed evidence on September 19, 2020, he cannot be held liable under § 1591(d).

Second, Jenkins and Legault argue that, for § 1591(d) to apply, they needed to know that the criminal investigation with which they were interfering could result in prosecution under the federal sex trafficking statute. ECF 130 at 20 ("Given there are no allegations that Jenkins was aware, as of September 19, 2020, that Williams was involved in sex-trafficking, the complaint does not state a cause of action against Jenkins for allegedly obstructing such investigation."); ECF 146 at 19 ("[T]here are no allegations that Legault was aware of any sex trafficking investigation[.]"). Defendants argue that their ignorance forecloses liability under § 1591(d).

Both attempts to limit § 1591(d)'s scope fail, however, because they demand an unworkable reading of the statute, unsupported by case law, and would result in arbitrary and unjust outcomes. A temporal limit like the one Jenkins suggests would mean that liability would arbitrarily depend on when a case file happened to have been opened by a federal official, rather than on the defendant's intent and conduct. Under this interpretation of the statute, a criminal defendant could shoot a sex trafficking victim cooperating with the local police in an effort to silence that victim, but, assuming the federal prosecutor had not yet opened the federal sex trafficking case, there would be no liability under § 1591(d). And a knowledge limit—requiring knowledge of the specific sex trafficking statute under investigation or that specific conduct met

13

the elements of § 1591—would unjustly punish a defendant who happened to have a sophisticated understanding of the federal criminal code, while undermining Congress's intent to proscribe "any" interference with the enforcement of the sex trafficking statute.

While there is no controlling authority in the Sixth Circuit defining the scope of obstructive conduct proscribed under § 1591(d),[11] the court has interpreted broadly a similar provision in § 1519, which proscribes obstructing a federal investigation, holding that a defendant need not have specific knowledge of the federal nature of the investigation at the time of the obstructive conduct to be held accountable under the provision. *See United States v. Kernell*, 667 F.3d 746 (6th Cir. 2012). The *Kernell* court also held that a defendant could <u>not</u> escape liability simply because the federal investigation may not have been officially opened. *Id.* at 753 ("[§ 1519] . . . does not allow a defendant to escape liability for shredding documents with intent to obstruct a foreseeable investigation of a matter within the jurisdiction of a federal agency just because the investigation has not yet commenced.") (cleaned up).

In *Robinson v. United States*, the district court applied the well-established case law interpreting § 1519 in similarly defining the knowledge requirement of § 1591(d). No. 114CR176RWSJSA1, 2022 WL 19001971, at *16-17 (N.D. Ga. Nov. 30, 2022), *report and recommendation adopted*, No. 1:14-CR-176-RWS (1), 2023 WL 2186433 (N.D. Ga. Feb. 23, 2023), *certificate of appealability denied*, No. 23-10799, 2023 WL 5835796 (11th Cir. June 14, 2023). As the *Robinson* court explained, § 1519 does not require that a defendant know his conduct would obstruct a federal investigation or violate a federal statute. *Id.* (citing *United States v. Fontenot*, 611 F.3d 734, 736 (11th Cir. 2010) (upholding jury instruction related to obstruction under § 1519 that "[t]he government is not required to prove that the defendant knew

---

[11] In *United States v. Farah*, the Sixth Circuit held § 1591(d) was not unconstitutionally vague and applied a "knowing" *mens rea* standard. 766 F.3d 599, 613–14 (6th Cir. 2014).

14

his conduct would obstruct a federal investigation, or that a federal investigation would take place, or that he knew of the limits of federal jurisdiction")). Nor does a defendant "have to know the federal nature of the crime, *i.e.*, that it 'might become the subject of a federal, rather than state, investigation.'" *Id.* (citing *United States v. Yielding*, 657 F.3d 688, 714 (8th Cir. 2011). The *Robinson* court applied this reasoning to § 1591(d), extending the same findings as to the knowledge requirement under that statute. *Id.* at *17. This reading avoids an arbitrary outcome where criminal liability only arises once the federal investigation itself is officially opened and a defendant becomes aware of this investigation.

*United States v. McRae*, 702 F.3d 806, 834 (5th Cir. 2012), cited by *Robinson*, bolsters this reading. There, the defendant police officer tampered with the body of a shooting victim. Because the victim was shot by another police officer, this obstructive conduct qualified under § 1519 since the investigation <u>could</u> be federal. *Id.* at 835-36. But the defendant did not need to know that fact to be guilty of obstruction under § 1519, nor did the federal case need to be opened at the time of his conduct. *Id.* Indeed, the federal investigation into the officer's crimes began after the fact and took another five years to yield a federal indictment. *Id*. at 816.

Other courts applying § 1591(d) have confirmed that a defendant need only intend to obstruct an investigation <u>in general</u> and have not required specific knowledge of a sex trafficking prosecution. *See, e.g.*, *United States v. Stennis*, No. 20-CR-0019 (PJS/BRT), 2022 WL 2312214, at *7 (D. Minn. June 27, 2022), *vacated and remanded as moot*, No. 22-1889, 2023 WL 2374267 (8th Cir. Mar. 3, 2023) (finding evidence sufficient for conviction under § 1591(d) because after his arrest by state police, "[t]here [wa]s little dispute that [the defendant] knew that he was being investigated for *something*") (emphasis in original); *United States v. Delay*, CR No. 2:15-cr-00175RSL-1, Doc. No. 586 at 2 (W.D. Wash. Feb. 6, 2018) (rejecting argument that § 1591(d)

required that the government prove defendant knew of the investigation's federal nature because "[h]e need not have known the nature or details of those enforcement efforts to violate the statute"), *aff'd*, 788 F. App'x 551 (9th Cir. 2019).

What matters is that the <u>conduct being investigated</u> is ultimately determined to constitute a sex trafficking offense under §1591, not the timing of when the federal case happened to be opened, nor the defendant's subjective knowledge that the conduct constituted a violation of the federal sex trafficking statute. *Stennis*, 2022 WL 2312214, at *6. Any other application of the obstruction provision would result in arbitrary outcomes and prove unworkable.[12]

Here, JCPD began investigating Williams' sexual assaults—conduct which constitutes violations of § 1591(a)(1)—at least as early as November 7, 2019, when B.P. provided her report to JCPD officers and told them that Diaz-Vargas had brought her and her friend back to Williams' apartment where she was ultimately drugged and raped by Williams. That the officers had not yet pieced together the larger conspiracy does not matter to the analysis; they knew Williams was using Diaz-Vargas to recruit and obtain women for forced sex acts. And by September 19, 2020, Sparks and Jenkins were aware of multiple reports of rape against Williams. *See* SAC ¶¶ 95-142, 174, 329(f) ("Defendants Sparks and Jenkins knowingly conspired with Williams to destroy and conceal evidence, including digital evidence that showed Williams raping unconscious women whom he had drugged. This evidence included images of Plaintiffs in

---

[12] In fact, a contrary reading of § 1591(d) here would have the perverse effect of rewarding the Defendant officers for their obstruction. By obstructing the investigations into Williams, Defendants effectively delayed the opening of the federal sex trafficking investigation for years. *See* SAC at 4. This is not hypothetical: the digital devices which ended up sitting in JCPD custody without being properly searched contained evidence of Williams raping his victims. *Id.* ¶ 74. But-for Sparks' and Jenkins' interference with the search of Williams' apartment, this evidence could have been the basis for opening a sex trafficking investigation in 2020. *Id.* Instead, the FBI only discovered this evidence by chance when Williams was finally arrested in April 2023. *Id.* ¶ 113.

this case."). Jenkins acted to destroy and conceal evidence knowing that he would be impeding and interfering with investigations into Williams. *Id.* Indeed, the digital devices, which ended up hidden under a paper towel in Williams' closet, contained video footage of the sex trafficking victims' rapes. *Id.* ¶¶ 74, 329(f). Section 1591(d) applies to Defendants' conduct.

## II. Plaintiffs Timely Filed Their Substantive Due Process Claim

Defendants contend that the one-year statute of limitations governing the Substantive Due Process claim against them has run because Plaintiffs B.P. and H.A. should have been aware of the officers' unconstitutional conduct before June 22, 2022, the date on which the Dahl Complaint was filed. ECF 130 at 5-9; ECF 139 at 21-25; ECF 146 at 4-8; ECF 148 at 4-7. In B.P.'s case, Defendants argue the statute began to run as soon as JCPD officers took no action to investigate her case and, in H.A.'s case, as soon as she felt discouraged with respect to reporting her assault to JCPD. *Id.* Strangely, Defendants appear to concede that JCPD's mishandling of B.P.'s case was so egregious and so clearly constituted unconstitutional conduct that B.P. should have been on notice almost immediately. *See* ECF 130 at 7.

But Defendants confuse which claim is alleged against the individual officers. Plaintiffs have alleged that the individual officers violated the Substantive Due Process rights of B.P. and H.A. by corruptly protecting Williams in exchange for cash, and intentionally obstructing justice—conduct which shocks the conscience.[13] Thus, Sparks' mishandling of B.P.'s case— without the additional facts showing his corrupt intent—would not have established an injury upon which to bring this claim. Similarly, H.A.'s mistrust of JCPD—without more—would not have provided a basis upon which to bring this claim. The claim only began to accrue once B.P.

---

[13] For this reason, Peters' arguments relating to Count V, the Equal Protection claim, *see* ECF 139 at 4-10, are not properly before the court in his motion to dismiss, as that count is alleged only against Defendant City and the Defendant officers in their official capacities. *See* SAC ¶¶ 367-81.

and H.A. discovered the facts underpinning their injuries, namely, the factual allegations listed above under the first theory of the case: (1) witness intimidation, harassment, and physical harm for the purpose of shielding Williams; (2) destruction and concealment of evidence relating to Williams' crimes; (3) interfering with Dahl's investigation of Williams' sexual assaults; (4) interfering with the execution of a federal arrest warrant for Williams; (5) covering up Williams' crimes by conspiring to terminate Dahl; and (6) evidence that JCPD officers received or took cash from Williams, including unexplained income and large asset purchases. *See Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs*., 606 F.3d 301, 307 (6th Cir. 2010) ("The statute of limitations generally begins to run when the plaintiff knows or has reason to know of the injury which is the basis of the action.").

For example, B.P. had no reason to distrust or disbelieve what Sparks told her about her case in March 2021 until she learned of the broader allegations of corruption in the Dahl Complaint. B.P. had no basis to know that Sparks was intentionally delaying obtaining a search warrant for Williams' DNA in her case because he was corruptly protecting Williams. Similarly, until the filing of the Dahl Complaint, B.P. had no way of knowing that the reason Williams was "untouchable" was because the police themselves were protecting him. It was the totality of the evidence—including circumstantial evidence and evidence that JCPD officers had financially benefited—that put B.P. and H.A. on notice of the substantive due process violation. Thus, the statute of limitations only began to run, at the earliest, on June 22, 2022, with the filing of the Dahl complaint.[14]

_____

[14] Defendants' argument would also fail in the context of the Equal Protection Claim, because neither B.P. nor H.A. had any knowledge of JCPD's discriminatory animus towards women as a class until the filing of the Dahl complaint, at the earliest. Neither Plaintiff would have been able to allege an Equal Protection claim based solely on the conduct associated with her own individual case without the additional evidence in Dahl's complaint showing the officers were

Plaintiffs amended the complaint to add Defendants Jenkins, Higgins, and Legault as soon as they discovered their involvement in the corrupt scheme to protect Williams. For instance, Plaintiffs first learned of Jenkins' role in destroying and concealing evidence during the search of Williams' apartment from the Government's Response in *United States v. Williams*, 2:21-cr-00027-DCLC-CRW, filed on July 28, 2023 (Doc. No. 38). SAC ¶ 66. Between September and December 2023, Plaintiffs first learned about Higgins' role in intimidating and harassing Female 8 and obtained the eviction records for Female 9 which showed Legault's role in retaliating against her. ECF 93 at 2. Plaintiffs brought their claims against each of these individual officers well within a year of discovering their involvement in the scheme to protect Williams.

Moreover, the one-year statute of limitations would not have begun to run for Higgins and Legault until March 16 and April 19, 2023, respectively, because their obstructive conduct continued <u>after</u> the Dahl complaint was filed. As set forth in Higgins' report, he closed Female 8's case on March 16, 2023. Baehr-Jones Decl., Ex. 2. Legault caused Female 9's eviction on April 19, 2023. SAC ¶¶ 181-83. Thus, the substantive due process claim under § 1983 is timely as to all the individual Defendants.

### III. Plaintiffs Adequately Allege Violations of Substantive Due Process

Defendants move to dismiss the claim by Plaintiffs and the Williams Survivor Subclass under § 1983 alleging that Defendants violated their right to substantive due process under the Fourteenth Amendment. In doing so, Defendants mischaracterize and ignore Plaintiffs'

---

motivated by sexism and displayed a <u>systemic</u> and <u>intentional</u> bias against the protected class. Similarly, the Reporter Class would have had no basis upon which to allege a pattern and practice of sex-based discriminatory treatment until, at the earliest, the Daigle Report was released. The facts of their own cases, however egregious, would not have been sufficient to plead an Equal Protection claim that alleged systematic discrimination.

19

allegations, misconstruing Plaintiffs' claim as alleging merely that Defendants failed to investigate Williams. That is <u>not</u> the theory alleged in support of Count VI. Instead, Plaintiffs adequately plead that Defendants' conduct shocks the conscience because Defendants engaged in a criminal conspiracy to obstruct the investigations into Williams' sex trafficking venture <u>for the purpose of</u> covering up police corruption. The Court should reject Defendants' misstatement of the claim and deny the motions.

The substantive due process clause "prevents government from abusing its power, or employing it as an instrument of oppression." *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992). The Supreme Court has held that the liberty interests secured by the Due Process Clause include the right not to be subjected to arbitrary and capricious government action that "shocks the conscience and violates the decencies of civilized conduct." *Cnty. Of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). Accordingly, a cause of action under § 1983 exists when a government actor's conduct "shocks the conscience" or increases the risk of danger. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1986). As set forth below, both of these circumstances exist here.

## A. Defendants' Conduct Shocks the Conscience

Whether government conduct "shocks the conscience" is subjective and highly fact-specific. *Guertin v. State,* 912 F.3d 907, 923 (6th Cir. 2019); *Lewis*, 523 U.S. at 847-48. Courts are to place the alleged conduct on a spectrum, "[t]he bookends [of which] present the easier cases." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). On the one end is conduct that "is categorically beneath the threshold of constitutional due process," such as mere negligence. *Lewis*, 523 U.S. at 849. Conduct that is "intended to injure without any justifiable government interest" represents the other end. *Id.* This involves showing that "the governmental actor chose

to act (or failed to act) despite a subjective awareness of substantial risk of serious injury" and "did not act in furtherance of a countervailing governmental purpose that justified taking that risk." *Guertin,* 912 F.3d at 924.

The outrageous and egregious conduct alleged by Plaintiffs puts this case at the far end of the spectrum. This is not a case involving valid, competing policy decisions or a reasonable exercise of discretion. As alleged, Defendants' conduct was knowing and intentional. Sparks conspired with other JCPD officers to take money from Williams and his co-conspirator, thereby benefitting financially from Williams' sex trafficking venture, and all Defendants obstructed the investigation into this sex trafficking venture to cover up police corruption. These actions amount to a criminal scheme that shocks the conscience.

Other courts in this Circuit have found similar allegations to be "conscience shocking." *See, e.g., Meyers v. Cincinnati Bd. of Educ.,* 343 F. Supp. 3d 714, 726 (S.D. Ohio 2018) (allegations regarding "concealing and cover[ing]-up the level of violence of school bullying, destroying surveillance recordings for purpose of covering up the danger [and] encouraging injuries from violence to be minimized" were "conscience shocking"). The circumstances of this case (police officers protecting a known serial rapist) and the grievous and foreseeable consequences of Defendants' conduct (that Williams would continue to sexually assault women and children) make it especially heinous. This is not a close case; this is a bookend case. Plaintiffs respond to each of Defendants' arguments below.

***Sparks:*** Citing *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845 (6th Cir. 2012), Sparks argues that soliciting a bribe does not shock the conscience even when the bribe is solicited directly from the plaintiff. The facts and circumstances of the case at bar put Sparks' extortion efforts in a different ballpark than those in *EJS. EJS* involved a thwarted commercial

real estate deal. 698 F.3d at 851-54. This case involves life and death at the hands of a known serial rapist who Sparks intentionally protected so as to continue an extortion scheme despite knowing this would put Plaintiffs and Subclass Members at significant risk of violent sexual assault. This context matters greatly. *See Doe v. Jackson Local School Dist. Board of Education*, 954 F.3d 925, 933 (6th Cir. 2020) (whether something shocks the conscience is highly fact specific). *EJS* is also distinguishable as it involved discretionary conduct of government officials—that is, granting or denying a re-zoning request. 698 F.3d at 856. Extorting a criminal defendant in exchange for protection from investigation is not simply an exercise of discretion; it is knowing and intentional criminal conduct.

Moreover, Sparks' extortion is but the tip of the iceberg, and it makes little sense to analyze it in a vacuum as opposed to in the context of the numerous other allegations leveled at him. *See* SAC ¶¶ 145-55, 109-15, 130-39 (affirmative refusal to investigate Williams' sex trafficking crimes), 153, 171 (delay and failure to execute the Williams arrest warrant), 145-52 (intimidating and lying to victims including B.P.), and 64-69 (destruction and concealment of evidence). Sparks understandably wants to ignore these other allegations, but the Court may not.

Finally, Sparks is incorrect that, to state a claim for a violation of substantive due process, the government actor's conduct must be directed towards the plaintiff. The case cited by Sparks, *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), simply does support such a proposition. *Id.* at 359-360 (explaining the different standards of proof when a § 1983 claim involves exigent circumstances versus a situation where the defendant had time to deliberate).

**Jenkins:** Jenkins asks the Court to ignore the full scope of the allegations against him and consider each of his actions in isolation. Under this framing, he contends that allowing Williams

to keep his cellphone on the night of Female 3's fall was mere negligence.[15] But, in ruling on a motion to dismiss, the Court is obligated to accept all alleged facts as true and draw all reasonable inferences in Plaintiffs' favor. As the Sixth Circuit noted in *Guertin*, rejecting a similar argument:

> One can place a benign construction on the factual allegations and draw inferences so that the facts amount to a negligent mismanagement of priorities and risks; but the allegations also support a reasonable inference…[of] reckless indifference to the likely results [of creating a] substantial risk to [plaintiff's and the public's] health.

*Guertin*, 912 F.3d at 927.

Read in the context of the surrounding paragraphs about the night of September 19, 2020, and in conjunction with the other timeline of alleged events, the allegations against Jenkins support a reasonable inference that Jenkins allowed Williams to keep his cellphone with the intent that Williams delete incriminating evidence (or, at minimum, with deliberate and reckless indifference to that likely result). This created a substantial risk to Plaintiffs and the Subclass Members that Williams would continue his violent sexual assaults—which he did, sexually exploiting Minor Victim 1 on December 23, 2020. SAC ¶ 56. This intentional obstruction of justice shocks the conscience.

***Peters***: Peters' motion depicts the complaint as alleging only one thing against him—that is, that he joked about a victim's appearance and clothing. But this ignores all other allegations against Peters and improperly asks the Court to analyze this single paragraph in a vacuum as opposed to in the context of the complaint's other allegations. As shown above, Plaintiffs

---

[15] Jenkins also makes an unsubstantiated contention that there were valid reasons for him to allow Williams to retain his phone. ECF 130 at 14 n.1. This is an improper argument for a motion to dismiss and should be stricken. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009) (in ruling on motion to dismiss, court may not consider matters beyond the allegations pled in the complaint).

adequately allege Peters' involvement in the conspiracy to obstruct the investigations into Williams, specifically conspiring with Turner to fire Dahl. *See* Sec. III.A, *supra*. Moreover, it is reasonable to infer that the other Defendants' actions could not have been carried out without Peters' knowledge, considering that Peters was the second-highest ranking member of the relatively small Johnson City police department.

Peters also argues the officers' actions obstructing the Williams investigation were "nothing more than a discretionary policy decision about the allocation of police resources" or, at worst, "mere laziness, incompetence, or negligence." ECF 139 at 17, *see also id.* at 18 ("nothing more than a criticism of and disagreement about the priority of allocating limited government resources"). This is a disingenuous and inaccurate portrayal of Plaintiffs' complaint. Peters attempts to analogize this case to *Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir. 2005), in which the court found that a city's exercise of discretionary judgment in setting a speed limit at 25 mph instead of 15 mph as urged by plaintiff did not shock the conscience. *Id.* at 729-30. This case could not be more different. Here, Plaintiffs have alleged Peters engaged in a conspiracy with Turner and others to terminate Dahl in order to obstruct the investigations into Williams. This was done knowingly, and it was done to cover up police corruption.

Notably, Peters and the other Defendant officers committed these acts over time—Dahl began pushing for an investigation into Williams' sexual assaults in November 2020 and was finally fired in June 2021—a factor courts have considered in a "shocks the conscience" analysis. This extended time period shows the state actor had a chance to deliberate and chose an illegitimate end purposefully. *See Durham v. Estate of Losleben*, 744 F. App'x 268, 271 (6th Cir. 2018). In total, the alleged obstruction conspiracy here spanned approximately three and a half years (November 2019-April 2023). Unlike cases involving the use of excessive force or an

24

unreasonable search and seizure where sometimes split-second decisions must be made under exigent circumstances, Defendants made calculated decisions to benefit and protect themselves at the expense of Plaintiffs and the Subclass on an ongoing basis for *years*.

Moreover, the relationship between Plaintiffs and Defendants was completely involuntary. It cannot be said that Plaintiffs or Subclass Members *voluntarily* put themselves at risk of being harmed by Defendants' conspiracy and obstructive conduct either by being victimized by Williams or choosing to report their assaults to the JCDP (nor could they have, as they were not aware of the corruption within the JCDP until, at the earliest, June 2022). Finally, no legitimate government purpose could possibly justify this egregious conduct. Indeed, the DLG report found that there was "no legitimate law enforcement purpose—or any other reason—[that] justified the[] inadequacies" in the investigative processes with respect to sexual assault cases. SAC ¶ 188. These factors weigh in favor of a "shocks the conscience" finding.

**Legault**: Legault similarly tries to minimize his conduct by divorcing his actions in causing Female 9's eviction from the allegations which precede it: that she was a witness cooperating in an FBI investigation in Williams' sex trafficking conspiracy, and that Legault's acts were taken <u>knowingly</u> and for the purpose of retaliating against Female 9's participation in this federal investigation.[16] Moreover, Plaintiffs have alleged that Legault was well aware of the number of rape complaints against Williams by the time he took these actions—in fact, by April 2023, Dahl's civil rights case alleged police misconduct with respect to these complaints—and

---

[16] Legault repeatedly references Female 9's guilty plea as supposed proof that Legault did not knowingly target her for corrupt ends. Notwithstanding that this evidence is not properly before the Court on a motion to dismiss, Female 9's guilty plea to avoid additional jail time does not negate the fact that police engaged in illegal conduct by physically assaulting her, arresting her without probable cause, and evicting her in retaliation for her participation in the FBI sex trafficking investigation. Nor does it change Legault's role in this retaliatory conduct. Plaintiffs stand by their allegations.

that his actions were part of a conspiracy to obstruct the investigations into Williams in order to cover up police corruption. Viewed in light of the totality of the complaint's facts, Legault's actions in targeting Female 9 for arrest and eviction are egregious and shock the conscience.

**Higgins:** Higgins raises similar arguments that the facts with respect to his obstructive conduct are not sufficient to meet the "shocks the conscience" standard. But while the SAC admittedly provides limited allegations as to Higgins' conduct, it does specifically allege that Higgins knowingly interfered with the investigations into Williams while having actual knowledge of rape complaints against Williams. SAC at 2, ¶¶ 142, 329. And the SAC describes the larger obstruction conspiracy at length and in extensive detail. It is within this context, that the allegations against Higgins rise to the level of egregious government misconduct.[17]

At this motion to dismiss stage, the Court is to draw all reasonable inferences in favor of Plaintiffs. The allegations in the SAC either expressly allege or support the reasonable inferences that Peters, Sparks, Jenkins, Higgins, and Legault "knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights." *Range*, 763 F.3d at 591 (cleaned up).

### B. State-Created Danger

Plaintiffs' substantive due process claim against Defendants Sparks and Jenkins is also adequately pleaded under the state-created danger exception.[18] In order to succeed on a claim under the "state-created danger" exception, Plaintiffs must show (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed

---

[17] If the Court finds the facts alleged in the SAC insufficient as to Count VI, Plaintiffs request the Court dismiss without prejudice to allow Plaintiffs to amend.

[18] Plaintiffs do not seek to apply the state-created danger exception to Defendants Peters, Legault, or Higgins.

the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff. *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006). The focus is on the defendant's conduct, their "subjective awareness of substantial risk of serious injury," and whether their actions were made "in furtherance of a countervailing governmental purpose that justified taking that risk." *Hunt v. Sycamore Comm. School Dist. Bd. Of Educ.*, 542 F.3d 529, 541 (6th Cir. 2008); *see also Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065-67 (6th Cir. 1998) (state-created danger exception applied).

### *Affirmative Act Increasing Risk of Danger to Plaintiffs and Subclass Members:*

Numerous affirmative acts committed by Sparks and Jenkins increased the risk of danger to Plaintiffs and members of the Williams Survivor Subclass.

- Evidence that JCPD officers received or took cash from Williams and Female 4, SAC ¶¶ 63-87 (Sparks). *See United States v. deVegter,* 198 F.3d 1324, 1328 (11th Cir.1999) ("When official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated."); *Rao v. City of New York*, 2018 WL 1582289, at *10-11 (E.D.N.Y. Mar. 29, 2018) (the "unlawfulness of soliciting a bribe is apparent").
- Witness intimidation, harassment, and retaliation, SAC ¶¶ 145-52 (Sparks intimidated and lied to victims, including B.P.). *See Richardson v. Huber Heights City Sch. Bd. Of Educ.*, 651 F.Appe'x 362, 363 (6th Cir. 2016) (finding "mere words" can be an affirmative act that increases the risk of danger).
- Destruction and concealment of evidence relating to Williams' crime, SAC ¶¶ 64-87 (Sparks and Jenkins). *See Meyers*, 343 F. Supp. 3d at 723 (complaint alleged affirmative acts of "concealing and cover[ing]-up" extent of crime, including destroying evidence).
- Interfering with investigations of Williams' sexual assaults, SAC ¶¶ 95-142, 174, 329(f) (Sparks and Jenkins), 151-153 (Sparks); 74 (Sparks and Jenkins)).
- Interfering with the execution of a federal arrest warrant for Williams, SAC ¶ 171 (Sparks).

Sparks nevertheless argues there is no affirmative act alleged against him that increased the risk of danger to Plaintiffs because Williams would have raped B.P. and the others even in the absence of JCPD's paid-for protection and obstructive practices. But this argument defies

basic logic and ignores Plaintiffs' basic claim: if the police had not allowed a serial rapist to run rampant, the other victims of Williams' crimes would not have been harmed. Plaintiffs' allegations set forward a straight but-for causation chain between the JCPD officers' misconduct and the harm to the Subclass, and at this stage, Plaintiffs' allegations must be presumed true.

**_Special Danger to Plaintiff_**: Sparks also argues that any risk created by this conduct was not specific to B.P. This is false. Defendant Sparks took Plaintiff B.P.'s police report regarding her assault by Williams. At the time, Sparks knew B.P. was afraid of Williams and that Williams was trafficking drugs and posed an ongoing risk to B.P. *See* SAC ¶ 149 (Sparks told B.P. that JCPD would "probably not" be able to protect B.P. from retaliation by Williams if she pressed charges). Despite this subjective knowledge, Sparks intentionally refused to execute the arrest warrant for Williams 30 times. *Id.* ¶ 171. When JCPD officers finally undertook to execute the arrest warrant, they deliberately botched the arrest allowing Williams to escape and go on the run for two years. *Id.* ¶ 172. This put <u>all</u> victims, including Plaintiff B.P., at an increased risk of danger, as Sparks knew B.P. had reported Williams and it is reasonably inferred that Williams was similarly aware—or could have been tipped off—that B.P. had reported him. This put her in special danger of violent retaliation by Williams. *Id.* ¶ 149.

**_Culpable Mental State_**: Finally, as shown above, Defendants knew or should have known that their actions endangered Plaintiffs and the putative class members but acted anyway. *See* Sec. V.A ("shocks the conscience").

## IV. Defendants Are Not Entitled to Qualified Immunity

Qualified immunity does not serve as a defense to knowing and intentional conduct that violates an existing criminal statute. Qualified immunity is meant to protect public officials acting on matters of discretion where the law is not clearly established. *Hope v. Pelzer*, 536 U.S. 730, 819 (2002) (qualified immunity is to protect government officials performing discretionary

functions; it does not provide a "license to lawless conduct"). No such argument can be made for the allegations in Plaintiffs' complaint as to the claims at issue here (Counts II and VI), that is, <u>knowingly obstructing</u> criminal investigations into sex trafficking to cover up <u>police corruption</u> and participating in <u>an extortion scheme</u> to benefit financially from a sex trafficking venture.

Notwithstanding that this defense fails on the merits, it is also raised prematurely in Defendants' motions to dismiss. *See Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) ("it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity"). The Court should decline to dismiss any claims at this stage of the litigation based on an assertion of qualified immunity.

## CONCLUSION

For the foregoing reasons, Plaintiffs request the Court (1) dismiss Counts I, III, and IV as to Defendants Peters and Jenkins without prejudice; and (2) deny Defendants' motions to dismiss as to all other Counts.

Respectfully submitted,

HMC Civil Rights Law, PLLC

*s/ Heather Moore Collins*
Heather Moore Collins (# 026099)
Caroline Drinnon (#037016)
Ashley Shoemaker Walter (#037651)
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
caroline@hmccivilrights.com
ashley@hmccivilrights.com

Advocates for Survivors of Abuse PC

*/s Vanessa Baehr-Jones*
Vanessa Baehr-Jones CABN # 281715

29

*Pro Hac Vice*
**Advocates for Survivors of Abuse PC**
4200 Park Boulevard No. 413
Oakland, CA 94602
(510) 500-9634
vanessa@advocatesforsurvivors.com


*s/ Elizabeth Kramer*
Julie Erickson (California Bar # 293111)
Elizabeth Kramer (California Bar # 293129)
Kevin Osborne (California Bar #261367)
Pro Hac Vice
Erickson Kramer Osborne LLP
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

Attorneys for Plaintiffs and Proposed Class