| | |
|---|---|
| B.P., H.A., and S.H., individually, and on Behalf of all others similarly situated,     Plaintiffs, | ) ) ) |
| | ) |
| VERSUS | )     No. 2:23-cv-00071-TRM-CRW |
| | ) |
| CITY OF JOHNSON CITY, TENNESSEE, *et al*     Defendants. | ) ) |

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
REGARDING DEPOSITION CONDUCT**

In the recent deposition of independent non-party witness Female 4, Plaintiffs' attorney Vanessa Baehr-Jones asked some 1,588 questions[1] on direct examination, covering approximately 186 pages (not including Plaintiffs' re-direct). In the instant Motion (DE 217), in Plaintiffs' first section entitled "Improper Speaking Objections," the Plaintiffs quoted exactly eleven (11) of Plaintiffs' counsel's questions, with just four (4) objections by the undersigned. The attachment reflects the same four (4) objections. Every objection was proper, discussed *infra*. Plaintiff's *ad hominem* motion should be flatly denied.

The circumstances of this deposition – established months prior to the deposition in Female 4's own words – were that according to the deponent herself, Plaintiffs' counsel Ms. Baehr-Jones "*harassed*" and "*attacked*" Female 4, and Plaintiffs' counsel Mr. Osborne "*attacked*" and "*tried to intimidate*" her, all after Female 4 would not change her story to support Plaintiffs' false narrative. [See Ex. 1, Transcript of phone recording between Female 4 and Plaintiff H.A., p. 13 lines 21-25; p. 14 lines 1-7; p. 31 lines 1-12; p. 39 line

---

[1] Tabulated by finding for "Q. " within the approximately 186 pages comprising Plaintiffs' direct interrogation. There should be no occurrence of this character set other than a question, and none was noted upon review.

2]. The undersigned does not himself suggest any *intentional* misconduct by Plaintiffs' counsel (though Female 4 unquestionably did exactly that), but undersigned *does* suggest that Plaintiffs were so clearly frustrated by their inability to influence Female 4 to provide testimony favorable to their untrue corruption narrative that the instant motion abandons all sense of reason. Their frustration stems only from the fact that Plaintiffs' narrative about corruption is plainly untrue. Female 4's testimony and the documents confirmed that Plaintiffs' narrative about large cash payments to police officers is nothing but a figment of Plaintiffs' imagination. But Plaintiffs' counsel continued her tactic during the deposition when Female 4 would not change her story to match Plaintiffs' narrative. [Ex. 2 Deposition of Female 4, p. 192-194]. Now, they wrongly seek to demonize Defendant's counsel.

With respect to the four (4) objections by Defendant's counsel which are the subject of the motion, they each simply state the basis for the objection. In that vein, Plaintiffs appear to be operating from the legally incorrect proposition that the only proper objection is the single word "Objection" or "Object to the form." But this Court specifically has held that such a statement is not a proper objection, as an objection requires a statement of the basis of the objection to preserve same: "**the Court reminds the parties that objections to the form of the question are not proper objections**, and that '[c]ounsel's statements when making objections should be succinct, stating the basis of the objection and nothing more.'" *ChampionX, LLC v. Resonance Systems, Inc*., 2023 WL 11156855 (E.D. Tenn. 2023) (McCook, J.). It was and is essential for the undersigned to state the basis for the objection, and that is precisely what occurred. There were no lengthy "speaking" objections among these four (4) objections to the 1,588 questions or otherwise.

2

Indeed, the actual relief Plaintiff's motion seeks is "sanctions" in that they expect the Court to order that the undersigned "may only state 'objection' on the record in any deposition in this litigation when any other attorney is examining the witness." (DE 217, PageID# 4403). This is directly contrary to the holding of this Court in *ChampionX* <u>requiring</u> an objection state the basis. It is also inconsistent with the Court's standard order, requiring an objection state the basis. (DE 4[2]). No relief is appropriate, or warranted.[3]

With respect to Plaintiff's contention that the undersigned did not act properly with his own questioning, Plaintiffs were free to properly object, stating the basis for it as required. *ChampionX*.

There was a clear and very appropriate basis for the undersigned's line of questioning with respect to Plaintiffs' treatment of Female 4 and Plaintiffs' lack of objective good faith basis for pursuing these frivolous bribery and corruption claims, where Plaintiffs falsely claim in their suit that Female 4 paid off Officer Sparks or others. Plaintiffs continue to pursue these patently false claims even as it is extraordinarily clear from the proof there is simply no good faith basis to do so. Upon successful defense of this case, Plaintiffs' continued pursuit of these claims will warrant an award of attorneys' fees to the Defendants who have been shamelessly smeared by these false claims. See, e.g., *Christianburg Garment Co. v. EEOC*, 434 U.S. 412 (1978); *Fox v. Vice*, 563 U.S. 826, 834 (2011).

---

[2] "Counsel's statements when making objections should be succinct, <u>stating the basis of the objection</u> and nothing more."

[3] Plaintiff failed to meet and confer, filing the motion initially late one Friday night without any notice. Had Plaintiffs met and conferred as is mandatory by Fed. R. Civ. P. 37(a)(1) before seeking discovery "sanctions," and/or by Fed. R. Civ. P. 26(c)(1) to the extent Plaintiffs' motion is deemed one for a protective order, the undersigned could have provided Plaintiffs caselaw from this very Court establishing that stating the basis for the objection is appropriate. The Plaintiffs' Motion should be denied for Plaintiffs' failure to meet and confer.

Months before the deposition, Plaintiff H.A. held a lengthy (nearly two hour) telephone call with Female 4, which Plaintiff H.A. surreptitiously recorded.[4]  In that call, Female 4 clearly told Plaintiff H.A. that there was no basis for these allegations, and **Plaintiff H.A. herself admitted** that Female 4 had <u>not</u> engaged in any criminal activity. <u>Just as alarmingly</u>, Female 4 told Plaintiff H.A. that two months before that call, and many months before this deposition, Plaintiffs' counsel Ms. Baehr-Jones "<u>harassed</u>" Female 4, that Plaintiffs' counsel Ms. Baehr-Jones and Mr. Osborne each "<u>attacked</u>" Female 4, and that Mr. Osborne "<u>tried to intimidate</u>" her.  [See Ex.1, p. 13-14, 31, 37-39, quoted *infra*.]

But first, Plaintiff H.A. – who stated in the call and testified in her own deposition that she had known Female 4 for many years – <u>admitted</u> that Plaintiff did not think that Female 4 had committed any crime:

```
 8         Female 4:  Here's the deal with me.  I just want
 9    you to know this.  Never have I ever committed a
10    goddamned crime.  I just want you to know.
11             H.A:  I don't think that you have.  I don't
12    think that you have.
```

[Ex. 1, Transcript of recording between H.A. and Female 4, p. 13, lines 8-12]

This, of course, begs the question as to why Plaintiff H.A., as a representative of this putative class, would file and pursue a lawsuit making this claim she <u>admits</u> she <u>knows</u> to be false – and why Plaintiffs' counsel would pursue a claim that their client and putative class representative admitted to be false well before the first deposition in this entire case.

---

[4] Plaintiffs failed to produce this recording seasonably after Plaintiff herself made the recording, and it was obviously in her possession.  Plaintiffs only eventually produced it on April 25, immediately before the discovery hearing the Court held on May 2.

Further, even though Plaintiff H.A. <u>admitted</u> that she did not think that Female 4 had committed any crime, Female 4 alleges that Plaintiffs' counsel pressured her to change her story to support the false narrative, in a manner that Female 4 apparently believed was improper:



[Ex. 1, Transcript of recording between H.A. and Female 4, p. 13, lines 21-25 through p. 14, lines 1-7].

**Female 4 then alarmingly told Plaintiff H.A. that <u>both</u> Plaintiffs' counsel Vanessa Baehr-Jones and Plaintiffs' counsel Mr. Osborne "attacked" her:**

5

> 1  **Female 4:** Your lawyer -- your lawyer attacked me.
> 2  You have no idea.
> 3       H.A:  No.  I hear you.  And I'm sorry it went
> 4  down that way.
> 5  **Female 4:** And not only did she attack me -- and
> 6  that happened two months ago -- but her partner Kevin
> 7  attacked me.  And I finally called him tonight and
> 8  said, I don't want to have anything to do with you.
> 9  Leave me alone.  Do not contact me again.
> 10      H.A:  Yeah.
> 11 **Female 4:** But -- but do you understand what I'm
> 12 saying to you?

Perhaps worse, Female 4 stated that she offered to tell Mr. Osborne "whatever you want to know, if I can help you in any form or fashion" – but that Female 4 had not engaged in any illegal activity and certainly had not bribed any police officers, as Plaintiff H.A. then admitted.  But Female 4 told Plaintiff H.A. that this caused Plaintiffs' counsel Mr. Osborne to attempt to "intimidate" her, by insinuating that she would need to *change* her story and seek immunity *instead* of testifying to the truth she had told all of them:

> 2  **Female 4:** That's fine.  I actually tried to.  I
> 3  didn't with Vanessa, because she was so hostile with
> 4  me, but I did with Kevin.
> 5       H.A:  Right.
> 6  **Female 4:** And guess what?  The day after I talked
> 7  to Kevin, and I said, look, I will tell you whatever
> 8  you want to know, if I can help you in any form or
> 9  fashion.  I was very professional with him, basically.
> 10      H.A:  Sure.  Sure.

```
39:00  20        Female 4:  And said -- he goes -- this is what he
       21   called and said to me.  And this is your attorneys,
       22   representatives, by the way, okay, when I tell you
       23   this.  He says to me, if there's anything you've ever
39:15  24   said before and you counter-speak in your deposition,
       25   it's going to be -- what did he say?  It's going to be

        1   on record, and you're under oath.  And then he like
        2   tried to intimidate me, and he said, maybe you need
        3   a -- maybe you need a criminal defense attorney.
39:38   4          And I said, I don't need a criminal defense
        5   attorney.  I might need an attorney, because I don't
        6   speak legal language --
        7          H.A:  Yeah.  Right, right.
        8              -- but I don't need a criminal defense
        9   attorney.  And then he -- he hammered down again, and
39:51  10   what he said to me was, don't you want immunity?  Don't
       11   you want immunity, Female 4?  And I said, I don't need
       12   fucking immunity, buddy.
```

[Ex. 1, Transcript of recording between H.A. and Female 4, p. 38 lines 1-10 and lines 20-25, through p. 39, lines 1-12].

In her deposition, Female 4 confirmed that Plaintiffs' counsel Ms. Baehr-Jones had "attacked" her before the deposition, and that Plaintiffs' counsel Mr. Osborne had been "bullying" her:

```
       23        A.     I don't feel like I deserve to be
       24   treated like this in any capacity.
       25        Q.     (BY MR. RADER) All right.  This
```

```
 1    isn't the first time that Mr. Baehr-Jones has
 2    personally attacked you, is it?
 3              MS. BAEHR-JONES:  Objection.
 4        A.    It is not.
 5        Q.    (BY MR. RADER) And you have told
 6    her client who is here, H.A., about that, haven't
 7    you?
 8              MS. BAEHR-JONES:  Objection.
 9        A.    Yes, I did.
10        Q.    (BY MR. RADER) Would you tell us
11    about it so that we have it in the record?
12              MS. BAEHR-JONES:  Objection.
13        A.    I'll be happy to.  I was reached
14    out to by Vanessa, and then -- that was a pretty
15    hostile phone conversation, in my opinion.  It was
16    very -- I'm not sure how she anticipated me to
17    respond, but it was appalling.
18                   Then I was reached out to by an
19    associate of hers, and I think his last name is --
20    is it Osborne?  I believe.  And that was really,
21    really a bad conversation.  I'm not an emotional
22    person, but I did start to cry after that phone
23    conversation.  I thought I was going to have an
24    anxiety attack.  He talked to me in a manner that
25    I've never been spoken to before in my life.


 1                   He told me that I needed to go
 2    ahead and start talking, that I better do this
 3    before -- because I needed immunity.  And it
 4    actually took me about five to ten seconds after he
 5    said that word to me for me to be like, "I don't
 6    need immunity, and I don't need this.  Like you need
 7    to stop."  It was -- it was bullying, the only way
 8    that I know how to describe it.
```

[Ex. 2, Deposition of Female 4, p. 192 line 23 through p. 194 line 8].

**Female 4 testified that Plaintiffs' counsel's insinuations concerning alleged "cash withdrawals" was a false narrative.** The bank records presented by Plaintiffs' counsel in Female 4's deposition <u>do not reflect a single *cash* withdrawal by Female 4 at all, and only one over a period of several years by anyone else</u>.

```
14        Q.        (BY MR. RADER) No cash involved in
15   that transaction either, was it?
16             MS. BAEHR-JONES:  Objection.
17        A.        No.  There was not cash involved.
18        Q.        (BY MR. RADER) When plaintiffs'
19   counsel is insinuating that there are all of these
20   large cash transactions, is that borne out by the
21   exhibits that you've reviewed today?
22             MS. BAEHR-JONES:  Objection.
23        A.        It's not.
24        Q.        (BY MR. RADER) Has plaintiffs'
25   counsel showed you a transaction that was actually a

 1   withdrawal in cash, other than that 7500 that was
 2   signed by Ryan Akers, in this entire day of
 3   deposition?
 4        A.        No.
```

[Ex. 2, Deposition of Female 4, p. 224 line 14 through p. 225 line 4].

Where numerous entries in the bank records do say the words "Commercial Cash" with respect to several transactions, <u>it is crystal clear to anyone reading the bank statements with an even slightly objective eye</u>, that such an entry does <u>not</u> actually mean that there

was a *cash* withdrawal or *cash* transaction or that any currency changed hands whatsoever.[5] The bank statements actually conclusively prove the *opposite* – but only if one looks at all the pages and read them together.  The latter pages of each bank statement contain copies of the counter-tickets that bank tellers or other bank employees use to transfer funds from one account to another – along with the credit-tickets that clearly show where the funds went.  These actual transaction instruments which are included in the bank statements match – *exactly* – the entries that Plaintiffs' counsel continually misrepresents to be "cash" withdrawals.  They are simply transfers from one account to another.  In response to Plaintiffs' questions, Female 4 tried to explain this to Plaintiffs' counsel, who did not want to hear it.  It was clear that Plaintiffs may have been determined to try and cause the witness to testify to something inaccurate, by providing stapled packages of pages as exhibits, with isolated and selected pages from multiple bank statements, many of which were also out of order.  One must look at the entire statement for the particular month to see the complete picture.  Plaintiffs' creation of stapled packages of isolated, unconnected pages creates the false narrative, whether intentionally or simply by virtue of being ill-informed.[6]

That "Commercial Cash" computer entry simply appears on internal bank account transfers, such as funds being transferred to another bank account at the same bank, or a

---

[5] The undersigned does not wish to impute intentional misconduct to Plaintiffs' counsel, and chooses to accept the only alternative explanation: that Plaintiffs' counsel simply does not appear to understand how to fully read the bank statements that they have obtained by subpoena and produced.

[6] Again, one prefers to assume that Plaintiffs simply do not know how to read the bank statements.  But ill-informed or otherwise, producing randomized exhibit packages was improper and objectionable.  Defendant did object, which objections are the specific subject of this motion. Defendant then provided complete packages on cross-examination. At one point during the deposition, Plaintiffs' co-counsel Ms. Collins who was present with Ms. Baehr-Jones finally whispered to other Defendant's counsel: "**I get it.**"  Yet Ms. Collins appears not to have the ear of her colleagues, or the others have not come to accept the truth: that this claim of corruption is utterly specious.

line of credit. It does <u>not</u> mean that any currency whatsoever changed hands. And the bank statements conclusively <u>disprove</u> the Plaintiffs' allegations that Female 4 withdrew large amounts of cash that she then used to pay off police officers.

```
14              Q.      (BY MR. RADER) All right.  So we've
15      looked through this entire statement.  We've seen
16      tens of thousands of dollars worth of entries that
17      say commercial cash, but there's not the first
18      dollar bill being changed hands, is there?
19                      MS. BAEHR-JONES:  Objection.
20              A.      It's not.
21              Q.      (BY MR. RADER) It's all just an
22      electronic transfer, just like you talked about,
23      right?
24                      MS. BAEHR-JONES:  Objection.
25              A.      That's correct.
```

[Ex. 2, Deposition of Female 4, p. 220, lines 14-25].

Thus, Defendants' questions were highly probative. And Plaintiffs' failure to provide complete copies of each month's statements created a grossly misleading picture, <u>hence Defendant's proper objections stating precisely that</u>. On cross-examination, this Defendant was able to provide Plaintiff the rest of the pages, which confirmed Female 4's repeated and very consistent testimony that there were no such withdrawals.

Entirely separate from the bank statements, Plaintiff's counsel – without any factual basis identifiable by the undersigned – made several attempts in the deposition to insinuate that Female 4 fabricated the existence of (or was related to) certain customers or subcontractors or even jobs. Female 4 firmly rejected each attempt, but there is no doubt

11

that Plaintiffs' counsel's baseless and aggressive attempts to discredit the independent, non-party witness – from the very beginning of the deposition or even before – set the tone for the entire day. Plaintiffs' counsel undoubtedly felt they had no other tactic, having made no inroads during their pre-deposition attempts to influence the witness's testimony (as Female 4 then discussed with Plaintiff H.A. on H.A.'s surreptitious recording). But if the deposition was impeded, it was impeded _only_ by Plaintiffs themselves, by their own conduct toward the independent non-party witness, and they are the authors of their own misfortune.

Finally, at one point Female 4 became confused about the name of a police officer who had contacted her years earlier when Sean Williams was on the run from an indictment. A contemporaneous email – that Plaintiffs' counsel later showed Female 4 and exhibited – reflected the correct name of this officer, non-party Tyler Whitlock. Once Plaintiff's counsel made the Whitlock email an exhibit and Female 4 saw the name on the email Plaintiffs' counsel had handed to her, Female 4 apparently remembered that the name was Tyler and not Kevin (a name she had heard earlier in the deposition due to Plaintiffs' counsel's insistence that everyone in the room orally identify themselves and who they all represent, even though everyone had also just introduced themselves informally moments earlier), so that the names were said multiple times. Significantly, Female 4 also remembered she had contemporaneously saved the officer's number in her phone contacts, which phone she went and retrieved at Plaintiffs' counsel's insistence during a break. The phone further confirmed the number had been contemporaneously saved under "Tyler JCPD," the same name as the contemporaneous email.

```
18          Q.      Ms. ████████, I want to ask you
19   about you changing your testimony after the break
20   from saying that you talked to Kevin Peters several
21   times to that you talked to Tyler JCPD.
22                  Can you explain that?
23          A.      I actually didn't remember the
24   name.  I just knew that it was in my phone.  I
25   didn't remember whether it was Tyler or Kevin.  I


1    actually don't know whether I've ever talked to
2    Kevin.  I'm -- and like I said, I was standing on
3    the beach and Tyler JCPD was all I could retain, and
4    I'm not sure.  Yeah.
5           Q.      Did you program his number into
6    your phone at that point when you're standing on the
7    beach?
8           A.      I think I did.
9           Q.      How did you come up with Kevin
10   Peters then?
11          A.      I thought that when I first heard
12   Kevin Peters and how, have I talked to him, I
13   thought that must have been the guy that called me
14   on the beach.
```

[Ex. 2, Deposition of Female 4, p. 178 line 18 through p. 179 line 14].

But Plaintiffs' counsel was clearly irritated about their failure to tag some activity (which they also baselessly found suspicious) to Defendant Peters.  In their instant Motion (DE 217), Plaintiff uses this occurrence to raise insinuations of impropriety against all of the Defendants' various counsel, even based on the direction that Plaintiffs claim that the witness looked around the room at times during the deposition instead of exclusively at

Ms. Baehr-Jones.[7]  This is especially ironic considering that the only <u>testimony</u> about malfeasance before, during,[8] or after the deposition was Female 4's accusations of witness intimidation by Plaintiffs' counsel.[9]

Finally, Plaintiff H.A. told Female 4 in the recorded call that the Plaintiffs only wanted to know what Female 4 knew.  And that once Female 4 told H.A.'s lawyers what she told the FBI and TBI, that Plaintiff's lawyers would drop it.  They clearly didn't.

```
37:47  17            H.A:  That's what I'm -- again, what I'm
       18  trying to say to you, too, [Female 4], is, like, if
       19  there's -- again, I'm not saying this in a way --
       20  don't -- I don't know how else to say this.  If there
       21  is nothing that you have to hide, like, just tell my
       22  lawyers what you have told the police and the FBI and
       23  whoever else, and they will fucking drop it.
```

---

[7] Most offensively, this *ad hominem* attack makes no sense.  Defendant Peters would be <u>delighted</u> to have testimony that confirmed that he and the other officers were actively trying to contact people connected with Sean Williams while Williams was missing and wanted, as it proves that they were all trying to find Williams to capture him. Plaintiffs' accusation or characterization of this testimony as "damaging" makes absolutely no sense at all.

[8] Plaintiffs' Footnote #2 (DE 217, PageID# 4394) insinuating that all "defense counsel" for the various individual Defendants were doing something untoward, and claiming without basis that Defendant Sparks's attorney specifically had some clandestine "cough" signal, makes clear that Plaintiffs' counsel's fantastical imagination knows absolutely no bounds.

In Footnote #3 (DE 217, PageID# 4396), Plaintiffs' counsel inexplicably admonishes the undersigned's utterly routine practice of making clear at the very start of his questioning that it was important a witness to say "yes or no" instead of "uh-huh or huh-uh" in order to make the record clear.  <u>Indeed, the witness had just responded "uh-huh" to the preceding question.</u>  Plaintiffs claim that it was improper to tell the witness, that she had done a good job with answering "yes and no" as opposed to "uh-huh and huh-uh" answers and to keep it up.  See Ex. 2, Deposition of Female 4, page 187.

[9] One of Plaintiffs' criticisms involved undersigned counsel providing the street address to one of the buildings where Female 4 testified on p. 153 near the end of Plaintiff's several hours of questioning, that Female 4 had worked on a large construction project in Asheville.  The written transcript does not reflect the pause before undersigned's statement or the fact that Plaintiffs' co-counsel Ms. Collins, sitting in front of the undersigned, visibly appeared to be trying to find the address of the building on her own laptop as Ms. Baehr-Jones requested of her in the transcript. Defendant's counsel was genuinely trying to be helpful to Plaintiff's counsel who appeared to be actively looking for the address by providing it, but the undersigned does acknowledge that he should have simply kept quiet while they looked, and the comment about the building's aesthetic was not helpful.  But this offhand statement out of 1,588 questions by Plaintiffs, several hours into a very full day, hardly impeded the deposition, is hardly sanctionable.

14

Thus, it is the height of hypocrisy that Plaintiffs claim that Defendant "abandoned any meaningful effort at fact-finding," as it is Plaintiffs who simply do not want to hear what Female 4 has to say about the falsity of their truly specious corruption allegations.

<u>LAW AND ARGUMENT</u>

Plaintiffs' Motion is conspicuously light on substantive law. Plaintiffs cite a single out-of-district unreported case from 15 years ago, quoting generic language about professionalism, without drawing this Court's attention to its own recent decision addressing these very types of claims and the specific legal issues in a sanctions motion. This Court has thoughtfully addressed these issues very recently, identifying and citing numerous cases on the subject in its analysis. *ChampionX, LLC v. Resonance Systems, Inc.*, 2023 WL 11156855 (E.D. Tenn. 2023) (McCook, J.). Whatever Plaintiffs claim Defendant or undersigned counsel to have done, the legal standard requires the Court to consider – in addition to whether there was even anything improper in the first place – whether the deposition was <u>actually impeded</u>. With all due respect to Plaintiff's counsel, the only actions impeding their rapport with the witness were Plaintiffs' own failed pre-deposition attempts to influence Female 4 to change her story to match their narrative.[10]

As noted, Plaintiffs' entire Motion appears to proceed from the false premise that an objecting attorney should simply say "Objection" or "Object to the form." Numerous

---

[10] Once again, the undersigned does not wish to accuse Plaintiffs' attorneys of intentionally peddling a narrative they themselves know to be false (though that is exactly what Plaintiff H.A. said on the recording and what Female 4 testified was happening). As has been stated in previous filings, it appears more likely that Plaintiffs' counsel have so thoroughly convinced themselves of the existence of this "corruption" that they appear to wholly disregard countervailing evidence – even as there has been never been any evidence to support the claim in the first place.

courts, including this one, have held that Plaintiffs' premise is fundamentally incorrect, and

that such an "objection" is legally meaningless:

> **Generic objections to the form of the question are deemed waived.**
> *Fletcher v. Honeywell Int'l, Inc.*, No. 3:16-CV-302, 2017 WL 775852, at *1
> (S.D. Ohio Feb. 28, 2017) ("To the extent that counsel made a generic
> objection to 'form,' but failed to specify the basis for the objection, the Court
> also considers those objections to be waived." (citations omitted)); see also
> *Henderson v. B & B Precast & Pipe, LLC*, No. 4:13- CV-528 CDL, 2014 WL
> 4063673, at *1 (M.D. Ga. Aug. 14, 2014) ("[I]f a question is propounded in
> an improper form, the objection should be stated concisely on the record
> during the deposition in a manner that provides the questioner with a
> reasonable opportunity to correct the form of the question. Failure to do so
> waives the objection. **Simply stating "objection to form" does not
> necessarily preserve the objection.**").

*ChampionX, LLC v. Resonance Systems, Inc*., 2023 WL 11156855 at *6 (E.D. Tenn.
2023) (McCook, J.).

It is <u>necessary</u> to state the basis of the objection. In *ChampionX*, this Court's

analysis matches the situation concerning the instant motion at bar:

> The Court does not find that Attorney Weber coached Chapman, made
> objections in bad faith, or impeded, frustrated, or delayed the deposition in a
> manner to warrant sanctions. Attorney Weber, however, did make some
> speaking objections [see, e.g., Doc. 97 p. 17], and he should avoid doing so
> in the future. *Pogue v. Nw. Mut. Life Ins. Co.*, No. 3:14-CV-598-CRS, 2017
> WL 3044763, at *11 (W.D. Ky. July 18, 2017) ("It is the attorney's job to
> make an objection and then stop talking."). Even so, when reading the
> transcript as a whole, the Court finds that Attorney Weber did not misuse his
> objections or coach Chapman in such a way that impeded the deposition.
> *Lipian v. Univ. of Mich*., No. 18-13321, 2020 WL 3402013, at *10 (E.D.
> Mich. June 19, 2020) (**"But improper speaking objections to suggest
> responses or otherwise coach a witness do not necessarily warrant
> sanctions, or even an order to reconvene the deposition or to permit
> other additional discovery. Courts assess whether the inappropriate
> interjections and other improper obstruction <u>actually impeded</u> deposing
> counsel's questioning or the witness' testimony."** (citations omitted));
> *Pogue*, 2017 WL 3044763, at *11 ("Moreover, in the context of this case as
> a whole and in the context of the Rule 30(b)(6) deposition in particular, it is
> understandable, even expected that [defense] counsel provided more detail

than usual when objecting in the course of deposition[,] <u>explaining that the "case had endured an unusual number of discovery disputes</u>").

Defendants contend that Attorney Weber objected to the "form" on forty-seven questions, but upon review of the transcript, Attorney Weber's objections to the form did not impede, frustrate, or delay the deposition. *See Webster v. Target Corp.*, No. 22-11293, 2023 WL 2652780, at \*2 (E.D. Mich. Mar. 27, 2023) ("When defense objected (and there were many objections), for example on the basis of "form," the objections were short with few words, not taking up an inordinate amount of time. **In other words, on review of the transcript, the objections did not seriously interfere with counsel's ability to question [the witness]; the objections were not a reason why Plaintiff did not complete the deposition.").** Notwithstanding the above, **the Court reminds the parties that <u>objections to the form of the question are not proper objections</u>, and that "[c]ounsel's statements when making objections should be succinct, <u>stating the basis of the objection</u> and nothing more."**

*Id*. at \*6-\*7 (emphasis added).

In the case at bar, Plaintiffs were not impeded at all, and were not ultimately limited in time, having well over an hour of questioning left available that Plaintiffs did not use. In advance of the deposition, there was a dispute as to who would question first, and the division of the seven-hour limit. The parties were able to resolve the dispute but only barely before court intervention was required. (See DE May 31, 2024, setting a conference call to resolve this dispute and then canceling same). The parties agreed that Plaintiffs would go first, and could use up to 3 ½ hours, and that Defendants would go next, and collectively use 3 ½ hours, but that whatever Defendants did not use, Plaintiffs could use. Plaintiffs did not even use up their full 3 ½ hours initially, and Defendants did not come close to their allotment. Thus, Plaintiffs had at least one and maybe two more hours available for additional questions should they have been so inclined. This evidences the fact that Plaintiffs were not impeded with their deposition of Female 4.

Likewise, the individual objections Plaintiff complains about all simply state the basis for the objection and no more:

- "MR. RADER: I object to the introduction of these exhibits that are incomplete and misrepresentative to the extent that they skip – [interrupted and cut off by Ms. Baehr-Jones bizarrely demanding that the objection be "off the record."]" [DE 217, PageID#4389]

- "MR. RADER: I'm sorry to interrupt you, Mr. Baehr-Jones. I've just realized that this Exhibit No. 85 is missing one of the monthly statements and it, like the others, is out of order. So I'm going to raise that objection." [DE 217, PageID#4390]

- "MR. RADER: Object to form. That's not what it says." [DE 217, PageID# 4390]

- "MR. RADER: I'll object to that. You don't give directions to her attorney." [DE217, PageID# 4391].

None of these objections impeded the deposition. None of them state anything at all beyond than the basis for the objection. Plaintiffs' counsel may not agree that these objections are legally meritorious (though they all are), but there is nothing improper about preserving these objections in this fashion. Indeed, this is exactly what this Court required in *ChampionX* to adequately preserve an objection. They certainly did not impede Plaintiffs in their deposition.

The instant Motion is little more than an *ad hominem* and retaliatory attack against counsel for a Defendant who has vigorously defended this specious claim, and the grossly defamatory allegations that Plaintiffs are pursuing, despite any discernible good faith basis to do so. In their footnotes, Plaintiffs broadly take shot at counsel for the other individual defendants as well, but the undersigned is clearly the prime target of their ire, only because

the agreed division of work among the Defendant's counsel has had the undersigned front-and-center on the Plaintiffs' failure to tender discovery responses. Plaintiffs all but admit their retaliatory motive on DE 217, PageID# 4402.

The undersigned will not be deterred in vigorous advocacy for what is true and right by Plaintiffs' demonization of the individual undersigned. The Defendant's deposition conduct was proper in all respects, and Plaintiffs' claims are truly shameless.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should simply deny Plaintiffs' Motion.

Respectfully submitted,

MOORE, RADER AND YORK, P. C.

s/DANIEL H. RADER IV, BPR #025998
  DANIEL H. RADER IV / BPR #025998
  P. O. Box 3347
  Cookeville, TN  38502
  Phone: (931) 526-3311
  danny@moorerader.com
  Attorneys for Kevin Peters, individually

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

Ashley Walter
HMC Civil Rights Law, PLLC
7000 Executive Center Dr.
Brentwood, TN 37027
615-724-1996
Email: ashley@hmccivilrights.com

Caroline Drinnon
HMC Civil Rights Law, PLLC
7000 Executive Center Dr.
Brentwood, TN 37027
615-724-1996
Email: caroline@hmccivilrights.com

Heather Moore Collins
HMC Civil Rights Law, PLLC
7000 Executive Center Dr.
Suite 320
Brentwood, TN 37027
615-724-1996
Email: heather@hmccivilrights.com

Vanessa Baehr-Jones
Advocates for Survivors of Abuse
4200 Park Blvd., No. 413
Oakland, CA 94602
Email: vanessa@advocatesforsurvivors.com
*Pro Hac Vice Attorney for Plaintiff*

Ms. Elizabeth A. Kramer
Mr. Kevin M. Osborne
Erickson, Kramer Osborne LLP
44 Tehama Street
San Francisco CA 94105
(415-635-0631)
Email: elizabeth@eko.law
Email: kevin@eko.law

Mr. Keith H. Grant
Mr. Philip Aaron Wells
Ms. Laura Beth Rufolo
Robinson, Smith & Wells
633 Chestnut Street
Suite 700 Republic Centre
Chattanooga, TN 37450
Email: kgrant@rswlaw.com
Email: awells@rswlaw.com
Email: lrufolo@rswlaw.com

Emily C. Taylor
Watson Roach Batson & Lauderback
P. O. Box 131
Knoxville, TN 37901-0131
865-637-1700
Email: etaylor@watsonroach.com
*Attorney for the City of Johnson City, Tennessee, and Karl Turner, in his Individual Capacity*

K. Erickson Herrin
Herrin McPeak & Associates
515 E. Unaka Avenue
P. O. Box 629
Johnson City, TN 37605-0629
(423-929-7113)
*Attorney for the City of Johnson City, Tennessee, Karl Turner, in his individual and official capacities, Toma Sparks, in his official capacity, and Kevin Peters, in his official capacity*

Thomas J. Garland, Jr.
Milligan & Coleman, PLLP
230 W Depot St.
Greeneville, TN  37743
Email:  tgarland@milligancoleman.com
*Attorney for the City of Johnson City,*
*Tennessee, and Karl Turner, in his*
*Individual capacity*

Ms. Kristin E. Berexa
Mr. Benjamin C. Allen
Farrar Bates Berexa
12 Cadillac Drive, Suite 480
Brentwood, TN  37027
615-254-3060
*Email:  kberexa@fbb.law*
*ballen@fbb.law*
*Attorneys for Toma Sparks*

Vanessa Baehr-Jones
Advocates for Survivors of Abuse PC
4200 Park Boulevard No. 413
Oakland, CA  94602
510-500-9634
Email: vanessa@advocatesforsurvivors.com

This the 25th day of June, 2024.

MOORE, RADER AND YORK, P. C.

s/DANIEL H. RADER IV, BPR 025998
 DANIEL H. RADER IV / BPR #025998
 P. O. Box 3347
 Cookeville, TN  38502
 (931-526-3311)
 danny@moorerader.com