1         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TENNESSEE
2            GREENEVILLE DIVISION

3

4  B.P., H.A., and S.H.,     )
   individually, and on behalf of)
5  all other similarly      )
   situated,               )
6                       )
                       )
7          Plaintiffs,   )
                       )
8                       )
                       )
9  v.                  )   No. 2:23-CV-00071
                       )      TRM-JEM
10                     )
   City of Johnson City,     )
11  Tennessee, et al,       )
                       )
12                     )
          Defendants.   )
13

14             * * * * * * * * * * * * * * * *

15

16        DEPOSITION OF  FEMALE 4

17

18           June 4, 2024

19

20  =====================================================
            LEXITAS LEGAL
21

22      Jeffrey D. Rusk, RPR, LCR, CLVS

23

24

25

```
 1    from the plaintiffs' lawyers; is that correct?
 2    Several months ago .
 3              A.        Uh-huh.
 4              Q.        All right.  You've done a good job
 5    answering questions today, but I know we're kind of
 6    getting a little late in the day, and we all get a
 7    little bit tired.  And you're saying uh-huh and
 8    huh-uh, and I understand you just fine, but that
 9    makes his job unmercifully --
10              A.        I'm sorry.  I will say yes or no.
11              Q.        All right.  If I ask you if
12    something is a yes or a no, I'm not at all trying to
13    be difficult.  I'm just trying to make a clear
14    record, okay?
15                        MS. BAEHR-JONES:  I'm going to
16              object.  Defense counsel is's characterizing
17              her testimony.
18                        MR. RADER:  I don't know what
19              you're talking about, Mr. Baehr-Jones, but
20              I'm going to keep on going.
21              Q.        (BY MR. RADER) You were -- I'm
22    going to start back at the exhibits.
23                        Do you have the exhibits?
24              A.        I do.
25              Q.        Let's put them in order.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 2 of 42   PageID #: 5384

```
22          Q.         (BY MR. RADER) All right.  Now, you

23   were asked about speaking to Kevin Peters.

24          A.         Yes.

25          Q.         Of course, his name has been said
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 3 of 42   PageID #: 5385

1   today I know by me.

2               When you were shown the email by

3   Ms. Baehr-Jones from Tyler Whitlock, did that

4   refresh your memory?

5        A.     It triggered that I had that in my

6   phone.  Tyler JCPD.  Not Kevin JCPD.

7        Q.     Did anybody at all coach you to

8   change your testimony or say a different name?

9               MS. BAEHR-JONES:  Objection.

10       A.     No, sir.

11       Q.     (BY MR. RADER) All right.  And

12   nobody told you to change your phone or create a

13   contact in your phone.

14               MS. BAEHR-JONES:  Objection.

15       A.     No, sir.

16       Q.     (BY MR. RADER) It's offensive when

17   people make these kinds of allegations, isn't it?

18               MS. BAEHR-JONES:  Objection.

19       A.     It's horribly offensive.

20               MS. BAEHR-JONES:  Objection.

21       Q.     (BY MR. RADER) All right.  I want

22   to show you the Tennessee Secretary of State entry

23   for Skyline Restoration.

24               MR. RADER:  This is one that is

25     not Bate stamped, Ms. Baehr-Jones, and I'm

*Lexitas - TENNESSEE*           *203*
*(615)595-0073*
Case 2:23-cv-00071-TRM-JEM  Document 232-2  Filed 06/25/24  Page 4 of 42  PageID #: 5386

```
 1            trying to hand you a copy if you'd like it.
 2                    MS. BAEHR-JONES:  Thank you.
 3            Q.      (BY MR. RADER) And what name does
 4    it say on there as the principal contact?
 5            A.      Avery Myers.
 6            Q.      All right.  You don't have any
 7    interest in that business at all, do you?
 8            A.      No, sir.  I never have.
 9            Q.      Down in the bottom right-hand
10    corner of that box in the middle of the page it
11    says, "Number of members."
12                    Do you see that?
13            A.      Uh-huh.
14            Q.      How many members does it say?
15            A.      One.
16            Q.      You're not one of those one member,
17    are you?
18            A.      I'm not Avery Myers.  No.
19            Q.      Okay.  You -- just because you had
20    a business with a similar name, Skyline Contracting,
21    that I think that you said never really got off the
22    ground, that doesn't mean you're connected with
23    every entity that uses the word Skyline, are you?
24            A.      No.  I'm definitely not.
25                    MR. RADER: All right.  We'll make
```

```
1          that Exhibit No. 92.

2                    (Exhibit 92 marked).

3          Q.       (BY MR. RADER) Now, Skyline is the

4    company that you used as a subcontractor on your

5    Public Service Building; is that correct?

6          A.       That is correct.

7          Q.       Do they do good work?

8          A.       They do good work.  And I would

9    work with them again.  I think they feel the same

10   way.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 6 of 42   PageID #: 5388

13      Q.      Okay.  Ms. Baehr-Jones asked you a

14 number of questions about entries on some of these

15 exhibits for commercial cash, and you explained what

16 you understood that to be.

17              Do you remember that?

18      A.      I do.

19      Q.      I'm going to show you just a few

20 statements.  And we will look at the bank statement

21 for Glass & Concrete Contracting for April 30th,

22 2018 through May 31st, 2018, which is RENASANT611.

23              And will you take a minute, ma'am,

24 and go through that and look for -- there should be

25 a $30,000 entry for commercial cash about May 23rd.

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 7 of 42   PageID #: 5389

```
 1              Do you see that?

 2              MS. BAEHR-JONES:  Danny, are you

 3    going to be providing me with copies of the

 4    exhibits that you're using with the witness?

 5              MR. RADER:  I've just told you the

 6    Bates.

 7              MS. BAEHR-JONES:  Does it look like

 8    I have a computer in front of me?

 9              MR. RADER:  Your co-counsel has it.

10    You can look at hers.

11              MS. BAEHR-JONES:  Are you going to

12    be giving copies of the exhibits that you

13    use to --

14              MR. RADER:  Ms. Baehr-Jones, I'm

15    not going to repeat myself.  I've already

16    had this conversation with you.

17              If you have an objection, just make

18    it.

19              MS. BAEHR-JONES:  I need to take a

20    break.

21    A.        I do see that.

22              MR. RADER:  Opposing counsel wants

23    to take a break.

24              COURT REPORTER:  Do you want to go

25    off the record?
```

```
 1              MS. BAEHR-JONES:  Actually, let's
 2         stay on the record.  Let me just confer with
 3         counsel to see if there's a possibility to
 4         use the computer.
 5              VIDEOGRAPHER:  Going off the record
 6         at 3 --
 7              COURT REPORTER:  No.
 8              MR. RADER:  If you want to take a
 9         break of this length, we'll go ahead and go
10         off the record.
11              COURT REPORTER:  Okay.  Kelly,
12         we'll go off the record now.
13              VIDEOGRAPHER:  Going off the record
14         at 3:50.
15         (Off the record at 3:50 p.m.)
16         (On the record at 4:12 p.m.)
17              VIDEOGRAPHER:  And we're on the
18         record at 4:12.
19    BY MR. RADER:
20         Q.      All right.  We've taken a break
21    there,  FEMALE 4   and I appreciate that.
22              You have this document that starts
23    with RENASANT611, which is the monthly statement for
24    this May 31st, 2018, month ending.
25              And you've turned and you found an
```

```
 1    entry for commercial cash on May the 23rd?
 2           A.      Yes, sir.
 3           Q.      On Bate 619, correct?
 4           A.      Correct.
 5           Q.      And was that a cash withdrawal?
 6           A.      No.
 7           Q.      All right.  If you turn to
 8    Page 626 --
 9                   MS. BAEHR-JONES:  Objection.
10                   MR. RADER:  I haven't finished my
11           question yet, but you're welcome to object
12           in advance if you want to.
13                   MS. BAEHR-JONES:  That was to your
14           last question.  Go ahead.  Go ahead.  Go
15           ahead.
16           Q.      (BY MR. RADER) If you turn to
17    Page 626, do you see a checking withdrawal ticket
18    there in the same amount?
19           A.      I do.
20           Q.      Does it have the same date on it?
21           A.      It does.
22           Q.      And does it have a reason over on
23    the left side?
24           A.      It's a line of credit payment.
25                   MR. RADER:  All right.  And I'll --
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 10 of 42   PageID #: 5392

```
 1              let me make that document Exhibit 96 --
 2                   COURT REPORTER:  90 --
 3                   MR. RADER:  96.
 4                   MS. BAEHR-JONES:  93.
 5                   MR. RADER:  93.  I'm going sideways
 6         instead of down.
 7                   (Exhibit 93 marked).
 8                   MS. BAEHR-JONES:  Sorry.  What was
 9         the dates Bates for this?  We're scrolling
10         here and we kind of got lost.
11                   MR. RADER:  Sure.  We started on
12         611.  Then we went to 619.  Then we went to
13         626.
14                   MS. BAEHR-JONES:  And what are you
15         making the exhibit?
16                   MR. RADER:  The package, that
17         entire bank statement for the month of
18         May 2018, 611 through 626.
19         Q.       (BY MR. RADER) And I'll ask you now
20    to look at RENASANT1182.
21                   MS. BAEHR-JONES:  Give us a second
22         to get there.
23                   MR. RADER:  Sure.
24                   We'll make that 94 while we wait
25         for them to get there.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 11 of 42   PageID #: 5393

```
 1                      (Exhibit 94 marked).
 2           Q.         (BY MR. RADER) 1182, and that is
 3    the same withdrawal ticket that you saw on 626,
 4    isn't it, ma'am?
 5           A.         It is.
 6           Q.         And it goes with a --
 7                      MS. BAEHR-JONES:  Objection.
 8                      Can we wait?  We're not there.
 9                      MR. RADER:  No.
10                      MS. BEREXA:  Can you do just a
11           control F?  That seems to be easy.
12           Q.         (BY MR. RADER) And so it also has a
13    credit ticket there for the loan account; is that
14    correct?
15           A.         That's correct.
16           Q.         And so that entry on the May 2018
17    bank statement, $30,000 for, "commercial cash,"
18    didn't have anything to do with cash at all, did it?
19                      MS. BAEHR-JONES:  Objection.
20           A.         That's correct.
21           Q.         (BY MR. RADER) That's exactly what
22    you testified to earlier, right?  That it could be a
23    transfer or any other sort of thing, correct?
24                      MS. BAEHR-JONES:  Objection.
25           A.         That is correct.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 12 of 42   PageID #: 5394

```
 1          Q.        (BY MR. RADER) All right.  Let's
 2   look at Bate stamp 579, which is the bank statement
 3   for March 31st, 2018, and which I will make Exhibit
 4   No. 95.
 5                    MS. BEREXA:  95?  I'm sorry.
 6                    MR. RADER:  Yeah.
 7                    (Exhibit 95 marked).
 8          Q.        (BY MR. RADER) Okay.  And if you
 9   will look at that Bate page down at the bottom, do
10   you see an entry for commercial cash there?
11          A.        I do.
12          Q.        For how much?
13          A.        50,000.
14          Q.        And what's the date on that?
15          A.        That is 3/2.
16          Q.        Of 2018?
17          A.        Of 2018.  Yes, sir.
18          Q.        All right.  If you look at the very
19   last page of that bank statement, which is what Bate
20   number on the bottom right?
21          A.        593.
22          Q.        All right.  Do you see a withdrawal
23   ticket there for that same $50,000 amount?
24          A.        I do.
25          Q.        All right.  I will ask you to look
```

```
 1    now at Bate 1179 which, again, is the loans.

 2                    MR. RADER:  And I'm marking that

 3            Exhibit No. 96.

 4                    (Exhibit 96 marked).

 5            Q.      (BY MR. RADER) Do you see that same

 6    withdrawal ticket on that page, 1179?

 7            A.      I do.

 8            Q.      For $50,000.

 9            A.      That's correct.

10            Q.      And does it show the credit tickets

11    there above it?

12                    MS. BAEHR-JONES:  Danny, we can't

13            get the exhibit out.

14            A.      Yes.

15                    MS. BAEHR-JONES:  Can you please

16            wait for us to get the exhibit out?

17            Q.      (BY MR. RADER) And what does the

18    credit show?

19                    MS. BAEHR-JONES:  Danny, we

20            can't --

21            A.      $50,000 to the line of credit.

22            Q.      (BY MR. RADER) All right.  Is there

23    any cash involved in that transaction?

24                    MR. RADER:  Objection.

25            A.      No cash involved in that one.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 14 of 42   PageID #: 5396

```
 1          Q.        (BY MR. RADER) All right.  I want
 2    to ask you to look at the bank statement for
 3    August 31st, 2018.  It begins on Bate 663, and that
 4    bank statement ends on 681.
 5                    MR. RADER:  And we are going to
 6              look at it and we're going to compare it to
 7              Bate 1187 through 1191, if you all want to
 8              be pulling those two sets up, but we'll
 9              start first with the bank statement 663.
10              And I've marked it Exhibit No. 97.
11                    (Exhibit 97 marked).
12          Q.        (BY MR. RADER) Will you take a
13    moment to look through there,  FEMALE 4     and
14    see if you see any commercial cash transactions on
15    that bank statement?
16          A.        I do on 8/6.
17          Q.        All right.  And how much is it?
18          A.        20,000.
19          Q.        All right.  Let's stop there.
20    There are others, and we'll go through each one .
21          A.        Okay.
22          Q.        But let's do them one at a time.
23                    Will you look at Bates 1187, which
24    I'm marking as Exhibit No. 98.
25                    (Exhibit 98 marked).
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 15 of 42   PageID #: 5397

```
 1          Q.        (BY MR. RADER) Does that show a

 2   $20,000 withdrawal on 8/6?

 3          A.        It does.

 4          Q.        And does it have a credit that goes

 5   with it?

 6          A.        It does.

 7          Q.        And what is that money going to?

 8          A.        Line of credit.

 9          Q.        All right.  So, again, no cash

10   involved in that, even though the bank statement

11   says "commercial cash," right?

12                    MS. BAEHR-JONES:  Objection.

13          A.        Correct.

14                    (Exhibit 99 marked).

15          Q.        Okay.  Now, if you'll return back

16   to Exhibit 97, which is that bank statement, will

17   you look and see if you see any other commercial

18   cash entries?

19          A.        8/16.

20          Q.        For how much?

21          A.        One is for 403 and one is for

22   10,000.

23          Q.        All right.  Let's start with the

24   one that's 403.  I'll show you Bate stamp 1188 that

25   we'll mark as Exhibit No. 99.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 16 of 42   PageID #:
5398

```
 1                     And do you see that withdrawal with
 2     the same date?
 3          A.      I do .
 4          Q.      What's the amount?
 5          A.      403.46.
 6          Q.      Same amount as on that bank
 7     statement for commercial cash, right?
 8          A.      Correct.
 9          Q.      And is there a credit ticket that
10     goes with that?
11          A.      There is.
12          Q.      And what is that money going to?
13          A.      Line of credit.
14                  MS. BAEHR-JONES:  Objection.
15          Q.      (BY MR. RADER) All right.  No cash
16     involved in that transaction either, is it?
17          A.      No.
18                  COURT REPORTER:  Did you mark 99
19          yet?
20                  MR. RADER:  Yes.  I tried to.  99.
21          Q.      (BY MR. RADER) Now, you said there
22     was another cash transaction on 8/16.
23          A.      Yes, sir.
24          Q.      How much was that?
25          A.      10,000.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 17 of 42   PageID #:
5399

```
 1          Q.      All right.  Take a look, if you
 2   will, at Bate stamp 1189, which I'm going to mark as
 3   Exhibit 100.
 4                   (Exhibit 100 marked).
 5          Q.      (BY MR. RADER) Do you see that
 6   debit ticket for that $10,000?
 7          A.      I do.
 8          Q.      Is it the same date?
 9          A.      It's the same date.
10          Q.      Does it have a credit ticket that
11   goes with it?
12          A.      10,000 to the line of credit.
13          Q.      All right.  Once again, no
14   commercial -- no cash involved in that transaction.
15                  MS. BAEHR-JONES:  Objection.
16          A.      No.
17          Q.      (BY MR. RADER) All right.  Keep
18   looking down that statement and see if you see any
19   more entries for commercial cash.
20          A.      I do several pages over on 672.
21          Q.      All right.
22          A.      And it's for eight -- on 8/22.
23          Q.      Okay.  How much?
24          A.      Commercial cash, 20,000.
25          Q.      All right.  Well, please look at
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 18 of 42   PageID #: 5400

```
 1   RENASANT1190, which we will mark as Exhibit 101.

 2                   (Exhibit 101 marked).

 3        Q.        (BY MR. RADER) Do you see that

 4   withdrawal?

 5        A.        I do.

 6        Q.        And do you have a credit ticket

 7   that goes with it?

 8        A.        In the same amount.

 9        Q.        All right.  And what's that money

10   going to?

11                   MS. BAEHR-JONES:  Objection.

12        A.        Line of credit.

13        Q.        (BY MR. RADER) All right.  Is there

14   any cash involved in that transaction?

15                   MS. BAEHR-JONES:  Objection.

16        A.        No cash.

17        Q.        (BY MR. RADER) All right.  And you

18   said you saw one more on that same page.

19        A.        Yep.  8/27.  20,000.

20        Q.        All right.  I'll ask you to look at

21   Bate 1191, which I'm now marking as Exhibit 102.

22                   (Exhibit 102 marked).

23        Q.        (BY MR. RADER) Do you see that

24   $20,000 withdrawal?

25        A.        I do.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 19 of 42   PageID #: 5401

```
 1          Q.      How much?

 2          A.      20,000.

 3          Q.      Same day?

 4          A.      Same date.

 5          Q.      And does it have a credit ticket?

 6          A.      It does.

 7          Q.      And where does that money go?

 8                  MS. BAEHR-JONES:  Objection.

 9          A.      Line of credit.

10          Q.      (BY MR. RADER) Is there any cash

11  involved in that transaction?

12                  MS. BAEHR-JONES:  Objection.

13          A.      No cash involved.

14          Q.      (BY MR. RADER) All right.  So we've

15  looked through this entire statement.  We've seen

16  tens of thousands of dollars worth of entries that

17  say commercial cash, but there's not the first

18  dollar bill being changed hands, is there?

19                  MS. BAEHR-JONES:  Objection.

20          A.      It's not.

21          Q.      (BY MR. RADER) It's all just an

22  electronic transfer, just like you talked about,

23  right?

24                  MS. BAEHR-JONES:  Objection.

25          A.      That's correct.
```

```
 1          Q.      (BY MR. RADER) All right.  Let's
 2   look at Exhibit 77.
 3                  All right.  On the first page of
 4   Exhibit 77, which is RENASANT938, do you see a
 5   commercial cash transaction on March 24th?
 6          A.      I do.
 7          Q.      How much?
 8          A.      $33,282.
 9          Q.      And 50 cents, right?
10          A.      And 50 cents.
11          Q.      If you turn to the very next page
12   in that package, which is Bates 944 --
13          A.      Yes.
14          Q.      -- do you see down in the bottom
15   left the withdrawal ticket for that same amount?
16          A.      Yes.
17          Q.      And what does it say that that
18   money is going to?
19          A.      It's going to pay invoices for
20   Skyline Restoration, 1051, 1066, 1067, 1069, 1070.
21          Q.      And those numbers, 1051, 1066,
22   1067, 1069, and 1070, those are invoice numbers?
23          A.      Those are invoice numbers.
24          Q.      All right.  Is that the kind of
25   transaction that would be a legitimate thing for a
```

```
 1    commercial contracting business to pay?

 2                    MS. BAEHR-JONES:  Objection.

 3         A.        Yes, sir.

 4         Q.        (BY MR. RADER) If you look on that

 5    first page of Exhibit No. 77 again, there was

 6    another entry that says commercial cash for $850.

 7         A.        Yes.

 8         Q.        If you turn to the next page of

 9    that, do you see that debit ticket?

10         A.        I do.

11         Q.        And is that -- what is that?

12         A.        It's a transfer to me.

13         Q.        And is that for your -- holding

14    your license?

15         A.        Yes, sir.

16                    MS. BAEHR-JONES:  Objection.

17         Q.        (BY MR. RADER) The same arrangement

18    that you had all along?

19         A.        The whole time.

20                    MS. BAEHR-JONES:  Objection.

21         Q.        (BY MR. RADER) All right.  And that

22    is signed by -- both of those, in fact, on 944, the

23    second page of Exhibit 77, both have a signature on

24    them.

25                    Whose signature is that?
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 22 of 42   PageID #: 5404

```
 1        A.       Stephany Brewer.

 2        Q.       Is that the same bank employee who

 3  signed the official check of Renasant Bank that we

 4  looked at earlier?

 5        A.       That is.

 6                 MS. BAEHR-JONES:  Objection to that

 7        question.

 8                 COURT REPORTER:  When you put the

 9        papers on that microphone --

10                 MR. RADER:  I'm sorry.

11        Q.       (BY MR. RADER) All right.  If

12  you'll turn to the next page, which is RENASANT950

13  on Exhibit 77, do you see two commercial cash

14  entries there on April 24th?

15        A.       Yes.

16        Q.       If you turn to the next page, do

17  you see those -- do you see a transaction in the

18  same amount of one of those?

19        A.       I do.

20        Q.       And what is that amount?

21        A.       $29,040.

22        Q.       All right.  And that's entered on

23  the prior page as "commercial cash," right?

24        A.       It is.

25        Q.       But if you look here, you've got
```

```
 1    two tickets on what is Bate stamped 1211 with that

 2    same amount, right?

 3         A.      Yes, for an invoice.

 4         Q.      And do you see the invoice number?

 5         A.      1072.

 6         Q.      Okay.  And on the left side, that

 7    left ticket says checking deposit, right?

 8         A.      It does.

 9         Q.      So that money left account number

10  [redacted]and went into Skyline Restoration account [redacted]

11    correct?

12                 MS. BAEHR-JONES:  Objection.

13         A.      That's correct.

14         Q.      (BY MR. RADER) No cash involved in

15    that transaction either, was it?

16                 MS. BAEHR-JONES:  Objection.

17         A.      No.  There was not cash involved.

18         Q.      (BY MR. RADER) When plaintiffs'

19    counsel is insinuating that there are all of these

20    large cash transactions, is that borne out by the

21    exhibits that you've reviewed today?

22                 MS. BAEHR-JONES:  Objection.

23         A.      It's not.

24         Q.      (BY MR. RADER) Has plaintiffs'

25    counsel showed you a transaction that was actually a
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 24 of 42   PageID #: 5406

```
1    withdrawal in cash, other than that 7500 that was
2    signed by Ryan Akers, in this entire day of
3    deposition?
4              A.       No.
5                       MS. BAEHR-JONES:  Objection.
6              Q.       (BY MR. RADER) If you look at
7    Bates -- staying with Exhibit 77, if you look at
8    Bate stamp No. 962 --
9              A.       Yes.
10             Q.       -- do you see a direct deposit
11   there on May 15th?
12             A.       I do.
13             Q.       How much is that?
14             A.       $15,899.
15             Q.       What does -- who does it say it's
16   from just below the words direct deposit?
17             A.       Paramount.
18             Q.       Is that a job that was being worked
19   on?
20             A.       It is.
21             Q.       Can you tell us a little bit about
22   that?
23             A.       I don't know a lot about it because
24   I wasn't like the day-to-day, but it's Paramount
25   Theater.
```

```
 1        Q.        Okay.  Above that, there's one

 2   that's listed for commercial cash on May 29th on

 3   Page 962.

 4        A.        Yes.

 5        Q.        I'll ask you to look at Bates 965,

 6   which I'm going to mark as Exhibit 103.

 7                  (Exhibit 103 marked).

 8        Q.        (BY MR. RADER) Do you see a

 9   transaction in that same amount?

10        A.        I do.

11        Q.        And does it say what it's for?

12   Does it say transfers or xfer?

13        A.        It does.

14        Q.        All right.  Does it say per

15   customer request?

16        A.        It does.

17        Q.        And it references a person named

18   Carrie Keys.

19        A.        It does.

20        Q.        And did you say Carrie Keys was

21   somebody that worked for Glass & Concrete at the

22   time?

23        A.        Yes, sir.

24        Q.        So nothing that indicates that that

25   was a cash withdrawal either, right?
```

```
 1                    MS. BAEHR-JONES:  Objection.
 2         A.         Correct.
 3         Q.         (BY MR. RADER) Do you think that
 4   the plaintiffs' attorney just doesn't understand how
 5   to read these bank statements, or do you think she's
 6   insinuating that there are really all these cash
 7   withdrawals?
 8                    MS. BAEHR-JONES:  Objection.
 9         A.         I think it was intentional.
10         Q.         (BY MR. RADER) All right.  If
11   you'll turn -- staying with Exhibit 77, please turn
12   to RENASANT985.
13         A.         Yes.
14         Q.         Do you see a two commercial cash
15   transactions there on July 31st?
16         A.         I do.
17         Q.         I want to show you what is
18   RENASANT989, which I'm marking as Exhibit 104.
19                    (Exhibit 104 marked).
20         Q.         (BY MR. RADER) Do you see
21   withdrawal tickets in the same amounts as those
22   commercial cash entries?
23         A.         I do.
24         Q.         All right.  Let's start with the
25   big one.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 27 of 42   PageID #: 5409

```
 1                    What was the big amount?

 2          A.        $19,273.

 3          Q.        All right.  Now, does it say where

 4    that money went?

 5          A.        That went to Skyline Restoration.

 6          Q.        All right.  Any cash involved in

 7    that transaction?

 8                    MS. BAEHR-JONES:  Objection.

 9          A.        No cash involved in that.

10          Q.        (BY MR. RADER) All right.  Now,

11    it's a little hard to read on the small copy, so I'm

12    going to pull it up big on my computer screen here

13    so you can see it.

14          A.        It actually says, "Final payment

15    for Paramount."

16          Q.        All right.  So you can -- you've

17    got better eyes than I do.  I had to blow it up to

18    look at it.

19                    But now Paramount, is that the

20    business that we just talked about?

21          A.        It's the job that we just talked

22    about.

23          Q.        All right.  It's a theater that

24    they worked on?

25          A.        That's correct.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 28 of 42   PageID #:
5410

```
 1        Q.        All right.  Anything unusual about
 2   a transaction like that?
 3                  MS. BAEHR-JONES:  Objection.
 4        A.        There's nothing unusual about this
 5   for a commercial construction company, no.
 6        Q.        (BY MR. RADER) All right.  And the
 7   850 that was the other commercial cash transaction
 8   there on that same page, is that also reflected on
 9   this Exhibit 104 that I just provided you?
10        A.        It is.
11        Q.        And is that a payment -- your $850
12   payment for your license?
13        A.        That is.
14        Q.        All right.  Now, do you -- this
15   Exhibit 77 has a lot of pages to it.
16        A.        It does.
17        Q.        Plaintiffs' counsel gave this to
18   you, right?
19        A.        That's correct.
20        Q.        She omitted these pages that we've
21   marked as Exhibits 104 and 103, didn't she?
22                  MS. BAEHR-JONES:  Objection.
23        A.        I understand.  Yes, she did.
24        Q.        (BY MR. RADER) And when we put
25   those together with this Exhibit 77, we see the
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 29 of 42   PageID #:
5411

```
 1    complete picture, don't we?

 2                    MS. BAEHR-JONES:  Objection.

 3         A.        Yes, we do.

 4         Q.        (BY MR. RADER) Do you have any idea

 5    why plaintiffs' counsel would withhold these

 6    important pages in order to give you complete

 7    context?

 8                    MS. BAEHR-JONES:  Objection.

 9         A.        To confuse me, and they also don't

10    suit the narrative.

11                    MS. BAEHR-JONES:  Objection.

12         Q.        (BY MR. RADER) All right.  When you

13    look at the additional pages, does it give you the

14    complete story so that you can explain what these

15    transactions are about?

16                    MS. BAEHR-JONES:  Objection.

17         A.        Yes.

18         Q.        (BY MR. RADER) Plaintiffs' counsel

19    asked you what a bank employee would testify to.

20                    Do you think a bank employee would

21    have an opportunity to look at their own complete

22    paperwork?

23                    MS. BAEHR-JONES:  Objection.

24         A.        They would.

25         Q.        (BY MR. RADER) Okay.  But once
```

```
 1    again, as we've gone through this entire Exhibit 77,

 2    we didn't see a single cash transaction, right?

 3                    MS. BAEHR-JONES:  Objection.

 4         A.        That's correct.

 5         Q.        (BY MR. RADER) And even though

 6    these entries say commercial cash, it's just like

 7    you described, which is that it's a transfer,

 8    correct?

 9                    MS. BAEHR-JONES:  Objection.

10         A.        Described multiple times.

11         Q.        (BY MR. RADER) All right.  Now, the

12    person that you talked to when you were with your

13    mother in Daytona on March 7th, 2022, was that

14    person nice to you?

15                    MS. BAEHR-JONES:  Objection.

16         A.        They were.

17         Q.        (BY MR. RADER) Whoever it was, did

18    they treat you professionally?

19         A.        They did.

20                    MS. BAEHR-JONES:  Objection.

21         Q.        (BY MR. RADER) Did they tell you

22    why they were calling you?

23         A.        I believe it was just to inform me

24    that he was on the run, and I think they might have

25    asked, you know, where he's at or something to that
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 31 of 42   PageID #: 5413

```
 1    extent.  But, yeah, they did tell me.

 2          Q.      Is that a thing that you think the

 3    police would want to know, where he's at?

 4                  MS. BAEHR-JONES:  Objection.

 5          A.      I do.

 6          Q.      (BY MR. RADER) Is that a legitimate

 7    reason for somebody to call you and ask you where

 8    he's at?

 9                  MS. BAEHR-JONES:  Objection.

10          A.      At that time, yeah, 100 percent.

11          Q.      (BY MR. RADER) You didn't know

12    where he was, though.

13                  MS. BAEHR-JONES:  Objection.

14          A.      No.

15          Q.      (BY MR. RADER) And if you had,

16    would you have told them?

17                  MS. BAEHR-JONES:  Objection.

18          A.      100 percent.

19          Q.      (BY MR. RADER) All right.

20          A.      I would have done a citizen's

21    arrest.

22          Q.      All right.  Well, I won't get into

23    The Andy Griffith Show about how that works, but if

24    a law enforcement officer calls you looking for a

25    fugitive, is that law enforcement officer doing his
```

Case 2:23-cv-00071-TRM-JEM  Document 232-2  Filed 06/25/24  Page 32 of 42  PageID #: 5414

```
 1   or her job?

 2            A.       Due diligence, yes.

 3            Q.       All right.  And they made the

 4   contact with you and, in fact, you saved the number

 5   and did contact them back later, correct?

 6            A.       I did.

 7            Q.       And when you contacted them back

 8   later, that was memorialized in an email; is that

 9   correct?

10                     MS. BAEHR-JONES:  Objection.

11            A.       That's correct.

12            Q.       (BY MR. RADER) You were provided

13   that today by plaintiffs' counsel, correct?

14            A.       That's correct.

15                     MS. BAEHR-JONES:  Objection.

16            Q.       (BY MR. RADER) And that

17   individual's name was Tyler Whitlock, correct?

18                     MS. BAEHR-JONES:  Objection.

19            A.       That's correct.

20            Q.       (BY MR. RADER) And Mr. Whitlock

21   noted -- it's Exhibit 86.

22                     MS. BAEHR-JONES:  Is that a

23            question?

24                     MR. RADER:  I was waiting for the

25            witness to collect her exhibit.
```

```
 1        Q.        (BY MR. RADER) Mr. Whitlock noted,

 2   "I was just contacted by  FEMALE 4   who

 3   helped manage his properties.  Sean just froze his

 4   business account at Renasant Bank on West King

 5   Street by phone.  There is a good chance he will be

 6   going there to officially close the account or try

 7   to get money from the account."

 8                Is that -- you may or may not have

 9   told him those exact words, but did you give him

10   information to that effect?

11        A.        Yeah.  I mean, I gave them any

12   information that I had.  Pertaining to this, managed

13   his properties, is obviously not the correct

14   language or anything.  But, yes, I did give them

15   that information.

16        Q.        All right.  And they indicated that

17   they needed to do extra patrol at your office and

18   your home, correct?

19        A.        Yes.

20        Q.        And if they -- if he had come to

21   your home when that extra patrol was there, they

22   might have been able to catch him, couldn't they?

23                MS. BAEHR-JONES:  Objection.

24        A.        Yes.

25        Q.        (BY MR. RADER) Of course, he didn't
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 34 of 42   PageID #: 5416

```
 1   come to your home that day, did he?

 2        A.      He did not.

 3        Q.      You wanted the police to find him,

 4   didn't you?

 5        A.      Oh, yeah.

 6        Q.      And they wanted to find him, too,

 7   didn't they?

 8        A.      I would think so.

 9             MS. BAEHR-JONES:  Objection.

10        A.      Yes.

11        Q.      (BY MR. RADER) I'm just going to

12   ask you straight out, have you ever paid cash to any

13   police officer for any reason?

14             MS. BAEHR-JONES:  Objection.

15        A.      I have never paid a single dollar

16   to any police officer.

17        Q.      (BY MR. RADER) All right.  You

18   certainly haven't bribed anybody, have you?

19             MS. BAEHR-JONES:  Objection.

20        A.      I have never bribed anyone.

21        Q.      (BY MR. RADER) You haven't paid off

22   officers to try to cover for Sean Williams, have

23   you?

24             MS. BAEHR-JONES:  Objection.

25        A.      Absolutely not.
```

```
 1        Q.        (BY MR. RADER) You haven't paid
 2   Kevin Peters.
 3                  MS. BAEHR-JONES:  Objection.
 4        A.        I have never met Kevin Peters.
 5        Q.        (BY MR. RADER) And haven't paid
 6   Tyler Whitlock.
 7        A.        I did not.
 8        Q.        Hadn't paid Toma Sparks.
 9                  MS. BAEHR-JONES:  Objection.
10        A.        I have never met him, talked to
11   him, or paid him, no.
12        Q.        (BY MR. RADER) Hadn't paid or
13   talked to or met Justin Jenkins, have you?
14                  MS. BAEHR-JONES:  Objection.
15        A.        No.
16        Q.        (BY MR. RADER) All right.  Hadn't
17   paid or talked to Jeff Legault.
18                  MS. BAEHR-JONES:  Objection.
19        A.        No.
20        Q.        (BY MR. RADER) Hadn't paid or
21   talked to Brady Higgins?
22                  MS. BAEHR-JONES:  Objection.
23        A.        No.
24        Q.        (BY MR. RADER) Hadn't paid or
25   talked to Karl Turner.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 36 of 42   PageID #: 5418

```
 1              A.       No.

 2                       MS. BAEHR-JONES:  Objection.

 3              Q.       (BY MR. RADER) Hadn't paid or

 4    talked to any other police officer with the City of

 5    Johnson City.

 6                       MS. BAEHR-JONES:  Objection.

 7              A.       No one.

 8              Q.       (BY MR. RADER) Haven't paid or

 9    talked to any other employee of the City of Johnson

10    City.

11                       MS. BAEHR-JONES:  Objection.

12              A.       No one.

13              Q.       (BY MR. RADER) Would you ever do

14    such a thing?

15                       MS. BAEHR-JONES:  Objection.

16              A.       I would not.  I'm offended that

17    I've been accused of -- or allegations have been

18    made of me like that.

19              Q.       (BY MR. RADER) Well, I'll represent

20    to you the police officers are, too.

21                       MS. BAEHR-JONES:  Objection.  That

22          is improper.

23                       MR. RADER:  All right.

24                       MS. BAEHR-JONES:  And you know it.

25                       MR. RADER:  No, I don't know that.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 37 of 42   PageID #: 5419

```
1              MS. BAEHR-JONES:  You do.

2              MR. RADER:  I'm not going to argue

3      with you on the record.  I'll do it later.

4      Q.      (BY MR. RADER) Have you cooperated

5  with the TBI?

6      A.      I have.

7      Q.      Have you cooperated with JCPD, as

8  reflected by these records?

9              MS. BAEHR-JONES:  Objection.

10     A.      Yes, I have.

11     Q.      (BY MR. RADER) Have you cooperated

12 with the FBI?

13             MS. BAEHR-JONES:  Objection.

14     A.      Yes, sir.

15     Q.      (BY MR. RADER) Have you cooperated

16 with any law enforcement agency or attorney that has

17 contacted you?

18             MS. BAEHR-JONES:  Objection.

19     A.      I have.

20     Q.      (BY MR. RADER) Do you want the man

21 to be found?

22             MS. BAEHR-JONES:  Objection.

23     A.      I definitely do.  The reason I

24 asked for additional patrol at my house is because I

25 was, in fact, afraid that he would come to my house.
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 38 of 42   PageID #: 5420

```
 1    I was afraid.  Of course I wanted him caught.

 2            Q.          (BY MR. RADER) Until this lawsuit

 3    filed by these Jane Does or B.P. or H.A. that we are

 4    here about today, had you ever been accused of

 5    bribing these police officers?

 6                    MS. BAEHR-JONES:  Objection.

 7            A.      No, sir.

 8            Q.          (BY MR. RADER) And Sean Williams

 9    never accused you of bribing these police officers

10    before they filed this lawsuit?

11                    MS. BAEHR-JONES:  Objection.

12            A.      No.

13            Q.          (BY MR. RADER) Have you ever

14    laundered funds from Glass & Concrete Contracting,

15    LLC?

16            A.      No.

17            Q.          Have you ever laundered money

18    through real or artificial subcontractor companies?

19                    MS. BAEHR-JONES:  Objection.

20            A.      I have not.

21            Q.          (BY MR. RADER) You ever taken any

22    owner draws to amount to $2,000 a week?

23                    MS. BAEHR-JONES:  Objection.

24            A.      I have never.

25            Q.          (BY MR. RADER) Have you ever paid
```

Case 2:23-cv-00071-TRM-JEM  Document 232-2  Filed 06/25/24  Page 39 of 42  PageID #: 5421

```
1    $2,000 a week in cash to Toma Sparks?

2                    MS. BAEHR-JONES:  Objection.

3         A.        I have never.

4         Q.        (BY MR. RADER) Have you ever paid

5    $2,000 a week in cash to Toma Sparks or any other

6    JCPD officers?

7                    MS. BAEHR-JONES:  Objection.

8         A.        I have not.

9         Q.        (BY MR. RADER) Have you seen this

10   Facebook post?

11        A.        I have.

12        Q.        Have you read it?

13        A.        I read it.

14        Q.        And we're talking about the

15   Facebook post that's in Sean Williams' name, but

16   couldn't possibly have been posted by him because he

17   was in prison, right?

18                   MS. BAEHR-JONES:  Objection.

19        A.        That's correct.

20        Q.        (BY MR. RADER) And do you know who

21   posted it?

22        A.        I believe so.

23        Q.        Who do you think posted it?

24        A.        I think it was Ms. Vance.

25        Q.        Nicole Storm Vance?
```

Case 2:23-cv-00071-TRM-JEM   Document 232-2   Filed 06/25/24   Page 40 of 42   PageID #: 5422

```
1           A.        Yes.

2           Q.        And have you ever said anything to

3    Nicole Storm Vance about any scheme to pay off any

4    officers?

5           A.        No, I have not.

6           Q.        Have you ever said anything to Sean

7    Williams about any scheme to pay off officers?

8           A.        No, I have not.
```

```
 1                    C E R T I F I C A T E

 2      STATE OF TENNESSEE:

 3      COUNTY OF KNOX:

 4

 5                    I, Jeffrey D. Rusk, Registered

 6      Professional Reporter and Notary Public, do hereby

 7      certify that I reported in machine shorthand the

 8      foregoing proceedings; that the foregoing pages,

 9      inclusive, were prepared by me using computer-aided

10      transcription and constitute a true and accurate

11      record of said proceedings.

12                    I further certify that I am not an

13      attorney or relative of any attorney or counsel

14      connected with the action, nor financially

15      interested in the action.

16                    Witness my hand and official seal

17      this the 4th day of June, 2024.

18

19

20      _____

21      Jeffrey D. Rusk, RPR, CLVS
        Notary Public at Large
22      My Commission Expires:  4/29/2026
        TCRB License No. 212

23

24

25
```