# Exhibit 19

# B.P.

## vs.

# City of Johnson City, Tennessee, et al,

---

## Female 4

### June 04, 2024



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TENNESSEE
 2                      GREENEVILLE DIVISION

 3

 4    B.P., H.A., and S.H.,          )
      individually, and on behalf of)
 5    all other similarly           )
      situated,                     )
 6                                   )
                                     )
 7                  Plaintiffs,      )
                                     )
 8                                   )
                                     )
 9    v.                             )    No. 2:23-CV-00071
                                     )         TRM-JEM
10                                   )
      City of Johnson City,          )
11    Tennessee, et al,             )
                                     )
12                  Defendants.      )
13

14

               * * * * * * * * * * * * * * * *
15

16         DEPOSITION OF    ███████ Female 4 ███████

17

                        June 4, 2024
18

19

20    ====================================================
                        LEXITAS LEGAL
21

22         Jeffrey D. Rusk, RPR, LCR, CLVS

23

24

25
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3    Vanessa Baehr-Jones, Esq.
      4200 Park Boulevard No. 413
 4    Oakland, California  94602
      Vanessa@AdvocatesForSurvivors.com
 5

 6    Heather M. Collins, Esq.
      Collins & Hunter
 7    7000 Executive Center Drive
      Suite 320
 8    Brentwood, Tennessee  37027

 9

10    FOR THE DEFENDANTS:

11    For Johnson City, Tennessee, Karl Turner, Kevin
      Peters, and Toma Sparks in their official
12    capacities:

13    Emily Taylor, Esq.
      Watson Roach Batson & Lauderback
14    1500 Riverview Tower
      900 South Gay Street
15    Knoxville, Tennessee  37902
      ETaylor@WatsonRoach.com
16

17    K. Erickson Herrin, Esq.
      Herrin McPeak & Associates
18    515 East Unaka Avenue
      Johnson City, Tennessee  37605
19    Lisa@hbm-lawfirm.com

20

21    For Kevin Peters in his individual capacity:

22    Daniel H. Rader, IV, Esq.
      Moore Rader Fitzpatrick & York
23    46 North Jefferson Avenue
      Cookeville, Tennessee  38501
24    Danny@MooreRader.com

25
```

```
 1    For Justin Jenkins in his individual capacity:

 2    Laura Rufolo, Esq.
       Robinson Smith & Wells
 3    Republic Centre
       633 Chestnut Street
 4    Suite 700
       Chattanooga, Tennessee  37450
 5    LRufolo@rswlaw.com

 6


 7    For City of Johnson City, Tennessee:

 8    Jonathan P. Lakey, Esq.
       Burch, Porter & Johnson, PLLC
 9    130 North Court Avenue
       Memphis, Tennessee  38103
10    JLakey@bpjlaw.com

11


12    For Toma Sparks in his individual capacity:

13    Kristin Ellis Berexa
       Farrar Bates Berexa
14    12 Cadillac Drive
       Suite 480
15    Brentwood, Tennessee  37027
       KBerexa@fbb.law
16


17


18    For the Witness:

19    Jerome Cochran, Esq.
       Garza Law
20    118 E Watauga Ave.
       Johnson City, Tennessee  37601
21


22


23


24


25
```

1                          I N D E X

2      EXAMINATION BY                          PAGE

3      MR. RADER                               186

4      Ms. Berexa                              289

5      Ms. Rufolo                              296

6      Ms. Taylor                              307

7      Mr. Rader                               308

8      Ms. Baehr-Jones                         312

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lexitas - TENNESSEE
(615) 595-0073

| 1 | NO. | INDEX OF EXHIBITS | PAGE |
|---|---|---|---|
| 2 | | | |
| 3 | Exhibit 68 | Checks, RENASANT000166 and 1178 — 1179 | 17 |
| 4 | Exhibit 69 | Checks, various Bates beginning with RENASANT001201 (24 pgs) | 20 |
| 5 | | | |
| 6 | Exhibit 70 | 2020 Annual Report for Davis Brothers Roofing LLC | 28 |
| 7 | Exhibit 71 | Bank Document, RENASANT000141 | 50 |
| 8 | Exhibit 72 | Tennessee Secretary of State Filing Information, Southern Construction & Consulting, LLC | 57 |
| 9 | | | |
| 10 | Exhibit 73 | Bank Document, RENASANT000042 | 62 |
| 11 | Exhibit 74 | Bank Document, RENASANT000055, 0057 | 66 |
| 12 | | | |
| 13 | Exhibit 75 | Checks, RENASANT001196 — 1197 | 73 |
| 14 | Exhibit 76 | Checks, RENASANT000811 — 0812 | 75 |
| 15 | Exhibit 77 | Bank Documents, various Bates numbers beginning with RENASANT000938 (21 pgs) | 82 |
| 16 | | | |
| 17 | Exhibit 78 | LinkedIn Profile | 102 |
| 18 | Exhibit 79 | Bank Documents, various Bates numbers beginning with RENASANT001352, (12 pgs) | 104 |
| 19 | | | |
| 20 | Exhibit 80 | GCC Bank Document, RENASANT000010 | 112 |
| 21 | Exhibit 81 | Bank Document, RENASANT001176 | 114 |
| 22 | Exhibit 82 | Bank Documents, RENASANT000011 — 0024 | 116 |
| 23 | | | |
| 24 | Exhibit 83 | Bank Documents, various Bates numbers beginning with RENASANT001129, (8 pgs) | 121 |
| 25 | | | |

TENNESSEE
(615) 595—0073

| | | |
|---|---|---|
| Exhibit 84 | Bank Documents, various Bates numbers beginning with RENASANT001149, (5 pgs) | 126 |
| Exhibit 85 | Bank Documents, RENASANT000043 – 0054 | 139 |
| Exhibit 86 | Email, CITY-0076004 | 154 |
| Exhibit 87 | Facebook Post | 172 |
| Exhibit 88 | Photograph of Tattoo Shop | 190 |
| Exhibit 89 | Business Entity Detail, Davis Brothers Roofing | 197 |
| Exhibit 90 | Photograph of Public Service Building | 198 |
| Exhibit 91 | Bank Document, Renasant002227 | 200 |
| Exhibit 92 | Business Entity Detail, Skyline Restoration and Maintenance, LLC. | 205 |
| Exhibit 93 | Bank Documents, RENASANT000611 – 0626 | 211 |
| Exhibit 94 | Bank Documents, RENASANT001182 | 212 |
| Exhibit 95 | Bank Documents, RENASANT000579 – 0593 | 213 |
| Exhibit 96 | Bank Documents, RENASANT001179 | 214 |
| Exhibit 97 | Bank Documents, RENASANT000663 – 0681 | 215 |
| Exhibit 98 | Bank Documents, RENASANT001188 | 215 |
| Exhibit 99 | Bank Documents, RENASANT001188 | 216 |
| Exhibit 100 | Bank Documents, RENASANT001189 | 218 |
| Exhibit 101 | Bank Documents, RENASANT001190 | 219 |
| Exhibit 102 | Bank Documents, RENASANT001191 | 219 |
| Exhibit 103 | Bank Documents, RENASANT000965 | 226 |

1   Exhibit 104 Bank Documents, RENASANT000989    227

2   Exhibit 105 Facebook Post, Page ID 1323 –     243
                1327
3
    Exhibit 106 Business Entity Detail, Glass     265
4               and Concrete Contracting LLC

5   Exhibit 107 Filing Acknowledgement, Glass     266
                and Concrete Contracting LLC
6
    Exhibit 108 Business Entity Detail, Southern  269
7               Construction & Consulting, LLC

8   Exhibit 109 Bank Documents, Renasant001403    271

9   Exhibit 110 Bank Documents, Renasant001761    272

10  Exhibit 112 Quitclaim Deed, Roll 1097 Image   280
                1077 – 1078
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                D E P O S I T I O N,

 2          The deposition of    Female 4   , taken

 3     at the request of the Plaintiffs, pursuant to the

 4     Federal Rules of Civil Procedure, on the 4th day of

 5     June, 2024, at the Keyston Community Center, Johnson

 6     City, Tennessee, before Jeffrey D. Rusk, Registered

 7     Professional Reporter and Notary Public at Large for

 8     the State of Tennessee.

 9          It is agreed that the deposition may be

10     taken in machine shorthand by Jeffrey D. Rusk,

11     Registered Professional Reporter and Notary Public,

12     and that he may swear the witness and thereafter

13     transcribe his notes to typewriting and sign the

14     name of the witness thereto, and that all

15     formalities touching caption, certificate, filing,

16     transmission, etc., are expressly waived.

17          It is further agreed that all objections

18     except as to the form of the questions are reserved

19     to on or before the hearing.

20

21

22

23

24

25
```

```
1              VIDEOGRAPHER:  We are on the

2       record.  Today is June the 4th, 2024.  The

3       time is 10:31 a.m. Eastern time.

4              We are here today taking the

5       deposition of  ███ Female 4 ███  in the case

6       of B.P., et al, versus Johnson City, et al,

7       in the United States District Court for the

8       Eastern District of Tennessee.

9              Let's see.  The court reporter is

10      Jeff Rusk.  My name is Kelly Rusk.  We are

11      here with Lexitas Legal.

12             Will the attorneys please identify

13      themselves and who they represent?

14             MS. BAEHR-JONES:  Vanessa

15      Baehr-Jones for the plaintiffs.

16             MS. COLLINS:  Heather Collins for

17      the plaintiffs.

18             MR. RADER:  I'm Danny Rader.  I

19      represent Kevin Peters.

20             MS. BEREXA:  Kristin Berexa.  I

21      represent Officer Sparks.

22             MS. RUFOLO:  Laura Beth Rufolo on

23      behalf of Brady Higgins, Jeff Legault, and

24      Justin Jenkins.

25             MR. HERRIN:  Erick Herrin, the City
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              of Johnson City and Chief Karl Turner.

 2                     MS. TAYLOR:  Emily Taylor, City of

 3              Johnson City and Chief Karl Turner.

 4                     MR. COCHRAN:  Jerome Cochran for

 5              Ms.  Female 4 .

 6                     MS. BAKER:  Joy Baker, City of

 7              Johnson City.

 8                     MS. BALL:  Cathy Ball, City of

 9              Johnson City.

10                     MR. DOUGHERTY:  Eric Dougherty,

11              City of Johnson City.

12                     MR. PETERSON:  Kevin Peters.

13                     MR. TURNER:  Karl Turner.

14                     MR. HIGGINS:  Brady Higgins, City

15              of Johnson City.

16                     MR. JENKINS:  Justin Jenkins, City

17              of Johnson City.

18                     MR. SPARKS:  Toma Sparks, City of

19              Johnson City.

20                     COURT REPORTER:  Okay.

21              Ms.  Female 4 , I'm going to go ahead and

22              swear you in.

23                     Would you raise your right hand,

24              please?

25                     Do you swear or affirm the
```

```
 1            testimony you're about to give will be the

 2            truth, the whole truth, and nothing but the

 3            truth?

 4                    THE WITNESS:  I do.

 5                    COURT REPORTER:  Okay.  Thank you

 6            very much.

 7                    ████ Female 4 ████,

 8    called as a witness on behalf of the Plaintiffs,

 9    after having been first duly sworn, was examined and

10    testified as follows:

11                    EXAMINATION

12    BY MS. BAEHR-JONES:

13        Q.        Good morning, Ms. ██ Female 4 ██.  I'm

14    going to start by asking you questions today.

15                    Have you ever testified before?

16        A.        No.

17        Q.        Do you understand that you're under

18    oath today, and that everything you say has to be

19    truthful?

20        A.        Of course.

21        Q.        Okay.  What's your full name?

22        A.        ████ Female 4 ████.

23        Q.        What's your date of birth?

24        A.        ██████.

25        Q.        And can you tell me your phone
```

```
 1   numbers?
 2           A.      I only have one.
 3           Q.      Okay.  What's it?
 4           A.      ███████████.
 5           Q.      And that's a cell phone?
 6           A.      Yes.
 7           Q.      How long have you used that number?
 8           A.      15 years.  Somewhere around there.
 9           Q.      Have you ever used a burner phone?
10           A.      No.
11           Q.      Do you know what that is?
12           A.      Movie references.  I have an idea,
13   but I've never had one.
14           Q.      Tell me what it is.
15           A.      I think it's a phone that you buy
16   so you can throw away.
17           Q.      Why?
18           A.      I'm assuming to hide something.
19           Q.      Okay.  What's your current address?
20           A.      ████████████████████
21           Q.      And I've lost my microphone.
22                   How long have you been there?
23           A.      Seven and a half years, I think.
24   It will be eight in October.  Yeah, almost eight
25   years.
```

Louidia S. TENNESSEE
(615)591-0073

```
 1          Q.      Do you own the house?

 2          A.      Yes.

 3          Q.      When did you buy it?

 4          A.      October of 2018.

 5          Q.      Do you have a mortgage?

 6          A.      Yes.

 7          Q.      How much is the mortgage?

 8          A.      Monthly?

 9          Q.      Yes.

10          A.      $721.

11          Q.      Do you know the value of the house

12   approximately?

13          A.      Yes.

14          Q.      What is it?

15          A.      Right now, probably around 300.

16   Not -- that's not what it was when I bought it,

17   but --

18          Q.      It appreciated to $300,000?

19          A.      I would say.

20          Q.      Okay.  Do you have any roommates?

21          A.      No.

22          Q.      Have you had any roommates there?

23          A.      No.

24          Q.      So you've been there for the last

25   seven years, no roommates.
```

```
 1                    Where were you living before then?
 2          A.        ███████████████████████████
 3          Q.        Okay.  And did you have roommates
 4    there?
 5          A.        Sean Williams.
 6          Q.        And how long were you at that
 7    address?
 8          A.        I don't recall specifically.  It
 9    was a couple years, at least.
10          Q.        And where were you before then?
11          A.        ███████████████████████████████,  I
12    think.
13          Q.        And how long were you there?
14          A.        A year and a half.  Maybe two
15    years.  Something like that.
16          Q.        And what about before that?
17          A.        I had an apartment that I lived in
18    when I was in college.
19          Q.        Where did you go to college?
20          A.        East Tennessee State.
21          Q.        When did you meet Sean Williams?
22          A.        I can't remember exactly what year
23    it was.
24          Q.        Do you remember how you met him?
25          A.        Yes.
```

TENNESSEE
(615) 595-0073

```
 1          Q.      How?

 2          A.      I was at a salon getting my hair

 3   done.  He pulled up outside and I said, "Now, I've

 4   seen that car downtown.  I like it."  And the

 5   hairdresser was like, "You should meet him."  And

 6   that's how I met him.

 7          Q.      What kind of car was it?

 8          A.      A Lotus Elise.

 9          Q.      I know nothing --

10                  MR. RADER:  I'm sorry to interrupt

11          you, ma'am.

12                  I want the record to reflect that

13          Plaintiff H.A. has come into the room, along

14          with ███████████████

15                  MS. COLLINS:  Another officer came

16          in as, well.

17                  MR. RADER:  Is that right?

18                  MS. COLLINS:  That's right.  Jeff

19          Legault has walked in on.

20                  MS. BAEHR-JONES:  Welcome,

21          everybody.

22          Q.      (BY MS. BAEHR-JONES) Who are

23   your -- who are your parents?

24          A.      ███████████████████████.

25          Q.      And where do they live?
```

```
 1          A.       ████████████████.

 2          Q.       What other family members do you

 3     have?

 4          A.       I have two siblings.

 5          Q.       What are their names?

 6          A.       █████████████████████████████

 7     ███████

 8          Q.       And what are their addresses?

 9          A.       I do not know their addresses off

10     the top of my head.

11          Q.       Okay.  What about █████████

12     █████████  Is that a relative of yours?

13          A.       I don't believe so.

14          Q.       Do you recognize that name?

15          A.       No.

16          Q.       What about ███████████████████  Is

17     that a relative of yours?

18          A.       No.

19          Q.       Do you recognize that name?

20          A.       No.

21              MS. BAEHR-JONES:  Okay.  I'm going

22          to mark the next exhibit and -- 68?

23              COURT REPORTER:  Yes.

24              MS. BAEHR-JONES:  This is Bates

25          RENASANT166.
```

Exhibit 35 - TENNESSEE
(615) 595-0073

```
1                    (Exhibit 68 marked).

2          Q.      (BY MS. BAEHR-JONES) Here you go,

3    Ms. ████Female 4███, and here are some copies.

4                    Can you take a look at the check

5    that's in the right-hand corner of this?

6                    At the top of that it says the name

7    ████████████████████, correct?

8          A.       It does.  I'm no relation to these

9    people.  They owned a tattoo shop and Glass &

10   Concrete Contracting performed work on the

11   exterior --

12         Q.       Of their --

13         A.       Yeah.  I see the State Street

14   there.

15         Q.       Okay.  And what was the name of

16   their shop?

17         A.       I cannot remember that.  This has

18   been so long ago.

19         Q.       Okay.  Look at the handwriting for

20   that check.

21                    Does that look like your

22   handwriting, Ms. ████Female 4████?

23         A.       That is not my handwriting.

24         Q.       Okay.  Well, I want you to flip the

25   page.
```

CAROLINA TENNESSEE
(615) 595-0073

```
 1                    Do you see what -- this is
 2      RENESANT1178.
 3                    Do you see the deposit slip that's
 4      in the upper-right hand corner?
 5                    Is that your handwriting?
 6           A.       That is my handwriting.
 7           Q.       And if you look back at the check
 8      that's on 166, the first page, does that look like
 9      the exact same handwriting?
10           A.       No, it does not.
11           Q.       Okay.  So you're no relation to no
12      to them.
13           A.       No.
14           Q.       And do you know them still?
15           A.       No.
16           Q.       And what's the name of that shop
17      again?
18           A.       I don't know it.
19           Q.       No.  What's the name of the shop
20      that you said that you did work for?
21           A.       I don't know the name of the tattoo
22      shop.
23           Q.       So was it a tattoo shop in Bristol?
24           A.       Yep.  I'm pretty sure that's what
25      that was for.
```

TENNESSEE
(615) 595-0073

```
 1            Q.        And what kind of work was Glass &
 2    Concrete doing for that tattoo shop?
 3            A.        It had to be something on the
 4    exterior, because that's all we did.
 5            Q.        Okay.  What kind of work was that?
 6            A.        It could be waterproofing.  It
 7    could be painting.  It could be pressure cleaning.
 8            Q.        Am I going to find a tattoo shop
 9    run by ███████████████████████ in Bristol,
10    Ms. █Female 4█?
11            A.        Since it's 2024 and this was in
12    2018, I don't know.
13            Q.        Are these real people,
14    Ms. █Female 4█?
15            A.        Yes.
16            Q.        Okay.  I want to ask you about some
17    other people.
18                      Who is ████████████████
19            A.        I don't even know.
20            Q.        You don't know that name?
21            A.        I may know her if I seen a photo of
22    her, but I'm not really good with name recognition
23    like that.  I don't know off the top of my head.
24            Q.        Did she ever work at Glass &
25    Concrete?
```

```
1        A.        Not that I'm aware of.

2                  MS. BAEHR-JONES:  Okay.  The next

3        exhibit is going to be marked 69.

4                  (Exhibit 69 marked).

5        Q.        (BY MS. BAEHR-JONES) I'll hand this

6    to the witness, and this is RENASANT1201.

7                  Okay.  I want you to look at the

8    transfer slip at the top of this page.

9                  Is that your handwriting there,

10   "Transfer to Skyline Restoration for Invoices

11   No. 1051, 1066, 1067, 1069, and 1070"?

12       A.        That is not my handwriting.

13       Q.        Whose handwriting is it?

14       A.        I'm assuming someone from the bank

15   or someone from the office at that time.

16       Q.        Okay.  Do you see where it says,

17   "Authorizing Signature, ████████████"?

18       A.        Yes.

19       Q.        Who is she?

20       A.        That may be the lady from the bank.

21       Q.        Well, she has an authorizing

22   signature for Glass & Concrete.

23       A.        I don't know who that is, unless

24   it's from the bank.

25                 MR. RADER:  Object to the form of
```

```
 1            that question.
 2            Q.        (BY MS. BAEHR-JONES) Well, does it
 3   look like her signature is in where it says
 4   authorizing signature?
 5            A.        Yeah, I can see the signature.
 6            Q.        Right.
 7                      And it's transferring $32,000 to
 8   Skyline Restoration, which is your company, right?
 9            A.        That's not my company.
10            Q.        It's not your company?
11            A.        No.
12            Q.        Well, let's talk about that.  We're
13   going to come back to that.
14                      You did list Skyline Contracting
15   Group, LLC as your -- on your LinkedIn page,
16   correct?
17            A.        Skyline Contracting Group.
18            Q.        Okay.
19            A.        Not Skyline Restoration.  Those are
20   two separate entities.
21            Q.        Okay.  And for Skyline Contracting
22   Group, you said you were the owner from January 2018
23   through November of 2022.
24            A.        Yes.
25            Q.        And that's a company in New York?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          A.       No.
 2          Q.       Where is it based?
 3          A.       It was my company here.  I don't
 4  know why that there would be something for New York
 5  unless my -- I may have had to have a registered
 6  agent for that, but it seems like that would be in
 7  Tennessee.  I have no idea why you would think it
 8  was New York.
 9          Q.       So you might have had a registered
10  agent in New York?
11          A.       No, in Tennessee.
12          Q.       Okay.  So it was registered in the
13  state of Tennessee?
14          A.       Yes.
15          Q.       To what address?
16          A.       I'm not sure what I would have
17  registered that to.  I never actually used that LLC.
18          Q.       Why did you have it?
19          A.       I was planning on starting a
20  consulting firm, specifically, just on my own and
21  going in that direction.  And it wasn't the right
22  time for me to do so.
23          Q.       But you listed yourself as the
24  owner for four years on LinkedIn, correct?
25          A.       Yes.
```

```
 1          Q.      But you never used the company.

 2          A.      No.

 3          Q.      Did the company have a bank

 4     account?

 5          A.      I don't think I ever had a bank

 6     account for that company.  I never made money on it.

 7     I kind of just switched gears.

 8          Q.      So you don't know the address where

 9     it would have been registered?

10          A.      I don't know what I would have used

11     at that point in time, because that was a really

12     long time ago.

13          Q.      Well, it was 2018 to 2022, wasn't

14     it?

15          A.      What LinkedIn says is different

16     from the reality.  So I don't want to misspeak and

17     say something incorrect.

18          Q.      Well, when was it opened?

19          A.      It never really opened.  I think I

20     filed the paperwork for the LLC, and then I never

21     really used it.  Like I said, I went into a

22     different direction.

23          Q.      When do you think you would have

24     filed the paperwork?

25          A.      I'm not sure when I would have done
```

TENNESSEE
(615) 595-0073

```
 1   that.  I mean, I'm assuming 2018, 2019, somewhere
 2   around there.
 3           Q.      Were you opening a lot of LLC's in
 4   2018 and 2019?
 5           A.      No.
 6           Q.      Well, you opened Southern
 7   Construction, right?
 8           A.      Yes.
 9           Q.      And you opened Skyline, correct?
10           A.      Those are the only two.
11           Q.      Well, what about the -- what about
12   Davis Brothers Roofing?
13           A.      That's not an LLC I registered.
14   That is actually a roofing company that I worked
15   for.
16           Q.      Okay.  When did you work for them?
17           A.      About a year and a half.  I was
18   their general contractor.
19           Q.      What did you do?
20           A.      I was the general contractor.  I
21   held their licensing, not in the state of Tennessee,
22   in Florida.
23           Q.      Okay.
24           A.      And reviewed permits.
25           Q.      Who did you work with?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          A.          ███████████████ was my supervisor,

 2     and ██████████ was the owner.

 3          Q.          Okay.  What is ████████████████

 4     number?

 5          A.          I have no idea.

 6          Q.          What is her address?

 7          A.          I know she lives in Port St. Lucie,

 8     but I don't know her address.

 9          Q.          Did you call her to get work

10     assignments?

11          A.          That's not really how a qualifying

12     position for a construction company works.

13          Q.          So how does it work?  How do you

14     communicate with them?

15          A.          Well, you had phone conversations,

16     but you don't get assigned assignments.

17          Q.          Okay.  Well, how did you

18     communicate with Ms. ██████████

19          A.          Text.  Phone.

20          Q.          Okay.  Would you have her phone

21     number saved on your phone?

22          A.          Possibly still, yeah.

23          Q.          Okay.  How often would she text

24     you?

25          A.          Not that often.
```

```
 1          Q.       Okay.  Well, how many projects
 2  would you work on for them?
 3          A.       I don't keep track of numbers in
 4  that way when I'm a qualifier for a company.  That's
 5  not how the industry itself works at all.  You sign
 6  on as an agreement for an extended period of time,
 7  whatever that may be, to hold the licensing for the
 8  company.
 9          Q.       What does that mean?
10          A.       I hold the construction licensing,
11  whether that's for roofing, general contracting,
12  whatever it may be.  And they do their jobs and they
13  run the business.  I am just there for licensing
14  purposes.
15          Q.       But what do you do?
16          A.       I hold the license.
17          Q.       You held a license in the state of
18  Florida for a general contracting business and you
19  did no work; is that --
20          A.       They do work.  I don't actually do
21  the work.  They produce the work.
22          Q.       Okay.  And how were you paid?
23          A.       Salary, I think.
24          Q.       Well, how much were you paid?
25          A.       That was not a good contract.  It
```

1    was like $500 a week, I think.

2          Q.      How would you have gotten that

3    money?

4          A.      It was through a payroll company,

5    and then they switched payroll companies.  And the

6    payroll company was in Florida also.  I remember

7    that.

8          Q.      So how many years did you get paid

9    from that payroll company?

10         A.      A year, year and a half is all I

11   worked for them.

12         Q.      So 500 a week for a year to a year

13   and a half from 2021 to 2022?

14         A.      That sounds about right, yeah.

15         Q.      Did you report that income on your

16   taxes?

17         A.      I'm still working on my taxes for

18   2022 right now but --

19         Q.      What about 2021?

20         A.      -- I would have.  I don't know that

21   that even started in 2021.  But again, yes, I would

22   have.

23         Q.      Was it W-2 income?  1099?

24         A.      It was W-2.

25         Q.      Is this business still in

```
 1   operation?
 2         A.       They are, but not the Florida
 3   location.
 4         Q.       Where are they now?
 5         A.       They're always here in Tennessee.
 6   That was just an additional branch that they opened.
 7                 MS. BAEHR-JONES:  There are a lot
 8         of records here.  Okay.
 9                 The binder is not cooperating.
10         Okay.
11                 MS. BEREXA:  Vanessa, did you
12         mark -- what is Exhibit 69?  That one you --
13                 MS. BAEHR-JONES:  No.  We're going
14         to come back to it.
15                 Okay.  Can I mark the next one?
16         And then we'll come back to 69.
17                 MS. COLLINS:  What is it?
18                 MS. BAEHR-JONES:  So it doesn't
19         have a Bates.
20                 (Exhibit 70 marked).
21         Q.       (BY MS. BAEHR-JONES) Okay.  So take
22   a look at this.  Tell me what this is.
23         A.       It's an annual report for that
24   company.
25         Q.       Okay.  And what's the year?
```

```
 1              A.       2020.

 2              Q.       So you did work there in 2020.

 3              A.       I don't think I was actually

 4    working.  We were processing the paperwork then.

 5              Q.       Okay.  And you said that this is

 6    normally a Tennessee company, but it was in Florida.

 7                       For what reason?

 8              A.       It was an additional branch.

 9              Q.       Okay.  And so ███████████ is no

10    longer at that branch?

11              A.       I don't know if they're still open

12    in Florida or not.

13              Q.       Do you know where she is?

14              A.       I'm assuming in Florida.

15              Q.       Who works for this company here in

16    Tennessee?

17              A.       I don't.  So I have no idea what

18    their company structure is here in Tennessee.

19              Q.       Okay.  Can you tell me a project

20    that you worked on for them?

21              A.       That's not how the industry works,

22    nor my position, so no.

23              Q.       Can you tell me anything

24    specifically that you did for them?

25              A.       I held their licensing for that
```

LexitasⓇ · TENNESSEE
(615) 595-0073

```
 1    period of time.

 2          Q.      But can you describe for $500 a

 3    week what you were doing?

 4          A.      So not everyone has a contractor's

 5    license.  In Florida it's very difficult to attain

 6    one.  You have to go through pretty rigorous exams.

 7    It's not like it is in Tennessee or even any other

 8    states that I've worked.  I hold multiple licenses

 9    in the state of Florida.  I will come into a company

10    when they've either had to terminate someone,

11    they've had a sudden loss of an employee for

12    whatever reason, and I will sign on as the general

13    contractor for that company so they can continue to

14    do construction jobs in that state.

15          Q.      When did you take that exam in

16    Florida?

17          A.      I've taken so many.  One of them I

18    took probably in 2018 or 2019.  The other one I

19    think I had taken years prior that actually was

20    grandfathered into the state of Florida.

21          Q.      Do you have a record of your

22    certification?

23          A.      Yes.

24          Q.      Okay.  Where would that be?

25          A.      At my house.
```

```
 1          Q.        Okay.  And right now, how much do
 2     you make per week?
 3          A.        I make a monthly salary from a
 4     different company.
 5          Q.        What company?
 6          A.        Not -- I work for ████████
 7     ██████████████████    now.
 8          Q.        And what do they do?
 9          A.        Roofing.
10          Q.        And how much do you get from that?
11          A.        3500 a month.
12          Q.        And is that through payroll?
13          A.        Yes.
14          Q.        Is it W-2?
15          A.        Yes.
16          Q.        Okay.  Why don't I see that in your
17     bank records right now, Ms.  █Female 4█?
18          A.        I just started this position a few
19     months ago but --
20          Q.        Okay.  But when did you --
21                    MR. RADER:  Let her finish the
22               answer, please.
23          A.        It's on my bank statements, because
24     it's direct deposit to my bank statement.  So if you
25     don't see it, that's a mistake, I think.
```

```
 1           Q.      Okay.  When did you start?
 2           A.      I believe two months ago.  It may
 3     have been three months ago.  Somewhere around there.
 4           Q.      Okay.  And who do you work for?
 5           A.      ███████████████
 6           Q.      Which person do you report to?
 7           A.      The sole owner of the company.
 8           Q.      And who is that?
 9           A.      A guy named ███████████
10           Q.      Okay.  And what is his phone
11     number?
12           A.      I do not know his phone number off
13     the top of my head.
14           Q.      How do -- do you text him?
15           A.      We usually speak.
16           Q.      How do you speak?
17           A.      Over the phone.
18           Q.      Do you have his phone number in
19     your phone?
20           A.      Yes, I do.
21           Q.      Do you email with him?
22           A.      Occasionally.
23           Q.      What email does he use?
24           A.      I do not know his email off the top
25     of my head.  I'd have to look at my actual email.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Okay.  Is it an address that's tied
 2    to that company?
 3          A.      I think so.  Yeah, I think it is a
 4    company email.
 5          Q.      Do you have a company email?
 6          A.      No.
 7          Q.      What email do you use to email him?
 8          A.      ████████████████████████.
 9          Q.      And what work do you do for ████████
10    ████████████
11          A.      Same position as what I held for
12    Davis Brothers Roofing.  I hold the licensing.
13          Q.      Okay.  So tell me what that
14    entails.
15          A.      It's the exact same as Davis
16    Brothers.  I hold the licensing.
17          Q.      So do you do any work?
18          A.      If I have to do anything, it will
19    be a consulting level where I review building
20    permits and make sure that they're up to building
21    code and everything is doing -- quality assurance is
22    what I would call that.
23          Q.      Can you tell me a building that you
24    reviewed a permit for?
25          A.      Off the top of my head, no.
```

```
 1          Q.          What area does ███████████
 2   do roofs in?
 3          A.          Orlando and the surrounding area.
 4          Q.          Do you have a record of a building
 5   permit that you reviewed for your work there?
 6          A.          In my email I would, but that would
 7   be it.
 8          Q.          Okay.  Can you think of any
 9   projects specifically?
10                      So this is pretty recent, right?
11   This is what you're doing right now.
12          A.          They're a new company.  I've
13   actually only looked at one or two documents at all.
14          Q.          So you've only looked at one or two
15   documents in the two to three months that you've
16   worked there?
17          A.          Yes.  They're new.  They're just
18   starting.
19          Q.          So you've made $3,500 a month for
20   the last two to three months, and you've looked at
21   one or two documents.
22          A.          Yeah.
23          Q.          And you've done no other work.
24          A.          Right.
25          Q.          Okay.  What were you doing before
```

Lexitas  TENNESSEE
(615) 595-0073

```
 1   you worked for ████████████████████

 2        A.       I worked for another roofing

 3   company.  That's kind of my niche market, and it was

 4   ████████████

 5        Q.       What's it called?

 6        A.       ████████████████

 7        Q.       Where is that located?

 8        A.       That was located in ██████████████.

 9        Q.       And who owns that company?

10        A.       ████████████████  is his name.

11        Q.       How do you spell that?

12        A.       ████████████████, I think.

13        Q.       Isn't it true that you've been

14   working as a server?

15        A.       On and off I have over the years,

16   yes.

17        Q.       Well, weren't you recently working

18   as a server?

19        A.       I did for like two or three months

20   because a friend worked at a restaurant and needed

21   help.  Yeah.

22        Q.       And how much did you make at that?

23        A.       $2.13 an hour.

24        Q.       So it's fair to say it's a much

25   better deal to work as the licensing --
```

(615) 595-0073

```
 1          A.        Yeah.

 2          Q.        Do you have ████████████ phone

 3    number?

 4          A.        In my phone, yes.

 5          Q.        And what's the address for that

 6    company for ██████████?

 7          A.        It's in ████████████████

 8    ██████████.

 9          Q.        Do you have the address?

10          A.        I don't remember the address.

11          Q.        How did you get paid?

12          A.        Salary.

13          Q.        And how much were you paid?

14          A.        I don't know what my paychecks

15    were, but there I was not doing the licensing.  I

16    was an actual production manager there.  I oversaw

17    all construction.  My annual salary, I think, was 76

18    or 78,000 there.

19          Q.        And how much did you get paid

20    every -- were you paid biweekly?

21          A.        It was biweekly.

22          Q.        How much?

23          A.        I can't recall, but the breakdown

24    of 77, 78, something.

25          Q.        Was it direct deposit?
```

```
 1          A.      Yes.

 2          Q.      And did you fill out W-2 forms for

 3  that?

 4          A.      Of course.

 5          Q.      So you said that you do not own

 6  Skyline Restoration & Manufacturing.

 7                  Who owns that company?

 8          A.      ████████████████

 9          Q.      Where does she live?

10          A.      It's a he.

11          Q.      Okay.  Where does he live?

12          A.      Greenville.

13          Q.      Where in Greenville?

14          A.      I don't know the address.

15          Q.      Have you met ████████████ in person?

16          A.      Of course.

17          Q.      Okay.  Do you have a photograph of

18  ████████████████

19          A.      Possibly.  I don't -- I don't think

20  that I do, though.  I mean, we've known each other

21  for like ten years.

22          Q.      So how did you meet?

23          A.      He started working at Glass

24  & Concrete Contracting a long time ago, just as a

25  day employee, and he branched out and started his
```

```
 1    own company.
 2         Q.        Okay.  So you've known him for
 3    ten years?
 4         A.        Close to it, if not.
 5         Q.        What's his phone number?
 6         A.        I would have to look at my phone.
 7    I don't know that.
 8         Q.        Have you ever been to his house?
 9         A.        His business and his house are one
10    and the same.  So, yes, I've been to the business.
11         Q.        What kind of projects does Skyline
12    Contracting -- Skyline Construction work on?
13         A.        Skyline Restoration.
14         Q.        Sorry.  Skyline Restoration.  There
15    are a lot of Skylines.
16                   Skyline Restoration, what kind of
17    projects do they work on?
18         A.        Exterior restoration.  High rise.
19    There's probably 30 different scopes of work.  I
20    mean, essentially anything on the exterior of a
21    building like that.
22         Q.        Okay.  Who works for Skyline
23    Restoration & Manufacturing?
24         A.        He has employees.  I'm not sure.
25         Q.        Who are they?
```

```
 1          A.      I don't know them.

 2          Q.      Have you ever met any?

 3          A.      I've met two of them. ████ and

 4  ██████████

 5          Q.      What is ████ last name?

 6          A.      I cannot remember.

 7          Q.      Okay.  What projects has Skyline

 8  Restoration & Manufacturing worked on over the

 9  years?

10          A.      It depends on what company you're

11  referring to, or them as a company.  I'm not sure.

12          Q.      You're not sure what projects

13  Skyline Restoration has worked on?

14          A.      I kind of know, but are you talking

15  about for my company, or are you talking about for

16  other people, or are you talking about for GCC?

17  What are you talking about?

18          Q.      So when you say my company, what do

19  you mean by that?

20          A.      The Southern Construction &

21  Consulting.  They did do work for me.

22          Q.      Okay.  What work did they do for

23  you?

24          A.      They've done a regular -- or larger

25  project in Asheville for me in 2022, I believe.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1           Q.      What was that?

 2           A.      It was the Self-Help building in

 3   Asheville.

 4           Q.      What's the address of that?

 5           A.      I think Hayward Street, but I can't

 6   recall the actual address.

 7           Q.      What was the nature of the project?

 8           A.      I referred to it as the Public

 9   Service Building.

10           Q.      What did they do for that building?

11           A.      The entire east elevation, I think.

12   I may be wrong on the elevation, but it was one

13   entire elevation where I went in to waterproof, redo

14   the windows, the units.  A lot of tuckpointing and

15   masonry on that project I remember.

16           Q.      Okay.  And that was in 2022?

17           A.      Pretty sure.

18           Q.      Okay.  And what was -- did you say

19   the address for Hayward Street?

20           A.      Asheville confuses me.  I'm pretty

21   sure it was close to -- I think it turns around down

22   there and everything's one way.  So I'm not sure?

23   But if you look it up, you can find the address

24   fairly easy.

25           Q.      Well, what was -- what was -- who
```

```
 1    was the person there who you were coordinating with

 2    at the Public Service Building?

 3             A.        It was a management company.

 4             Q.        What was the company?

 5             A.        Off the top of my head, I can't

 6    remember the name of the management firm at the

 7    time.

 8             Q.        Well, who did you speak to when you

 9    were working on the project?

10             A.        He's retired now, and I cannot

11    remember his name directly.

12             Q.        So you don't know the name of the

13    person you worked with.

14             A.        I can't remember the name of the

15    person that I worked with.

16             Q.        And you can't remember the name of

17    the management company that you worked with.

18             A.        No.

19             Q.        And you can't remember the address

20    for where that project was.

21             A.        No.  That's not something that I

22    would retain.

23             Q.        Was that the only project that

24    Southern Construction worked on in 2022?

25             A.        No.  There was a few other smaller
```

```
 1    jobs, but that was the primary one.

 2         Q.        Do you have any records from that

 3    work?  Any invoices?

 4         A.        I don't know if I still have them

 5    or not.  I don't think so, though.

 6         Q.        Is there anyone in Asheville who

 7    would know about the work on that project who you

 8    can think of?

 9         A.        The subcontractors I hired to do

10    the work would know about it.

11         Q.        Okay.  And what are their names?

12         A.        That's Skyline Restoration.

13         Q.        Okay.  So ███████████

14         A.        Uh-huh.

15         Q.        And you said you have his phone

16    number in your phone?

17         A.        Uh-huh.

18         Q.        What's his address?

19         A.        I don't know his address.

20         Q.        And he's in Greenville?

21         A.        Uh-huh.

22         Q.        Where does he bank?

23         A.        I'm not sure where he banks.

24         Q.        Well, isn't it true that he banks

25    at Renasant?
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          A.        That's one of them, but I don't
 2   know what -- I don't know where he goes now.
 3          Q.        What about ███████████ Who is
 4   ████████████████
 5          A.        I don't know ██████████ I don't
 6   believe.
 7          Q.        Okay.  Well, let's look at
 8   Renasant -- this is going to be in -- this is 69.
 9   So let's go back to 69.
10                    MS. BAEHR-JONES:  Did you mark this
11          one?
12                    This is 70.
13          Q.        (BY MS. BAEHR-JONES) Let me go to
14   69, and I want you to turn to RENASANT1200.  It's
15   the second page.
16                    And if you look up here at the top
17   it says -- if you look in the right-hand, do you see
18   where it says, "Transfer to ███████████████ per
19   phone call with ████████ "
20          A.        Uh-huh.
21          Q.        And it says authorized signature.
22                    Can you read what that last name is
23   there?  ██████ something.
24          A.        Yeah.  ██████████████
25          Q.        ███████████████████
```

Carden & Associates
(615) 595-0073

```
 1          A.      Uh-huh.

 2          Q.      Is that your handwriting,

 3   Ms. ██Female 4██?

 4          A.      No, it is not.

 5          Q.      Okay.

 6          A.      That's an employee of the bank, and

 7   so is ███████       That's -- yeah, but it's not my

 8   handwriting.

 9          Q.      Okay.  What about -- what about

10   ████████████, is she an employee of the bank?

11          A.      No.   ███████████was an employee

12   of Glass & Concrete Contracting after I kind of

13   separated.

14          Q.      Okay.  What about ██████████?

15          A.      She was an employee.

16          Q.      Of Glass & Concrete?

17          A.      Uh-huh.

18          Q.      Okay.  What about ██████████

19          A.      She was, too.

20          Q.      An employee of Glass & Concrete?

21          A.      Uh-huh.

22          Q.      Okay.  What ██████████

23          A.      I don't know an████████████

24          Q.      Okay.  Didn't you pay him $9,000 on

25   April 18th of 2022?
```

```
 1          A.       I did not.

 2          Q.       What about  [Female 5]

 3          A.       She was an employee there.

 4          Q.       Okay.  So if I asked Renasant Bank,

 5   are they going to tell me that ████████████ and

 6   Stephany Brewer are employees there?

 7          A.       Yeah.

 8          Q.       Okay.  Why did they have

 9   authorizing signatures for your bank -- for Glass &

10   Concrete's bank accounts?

11                   MR. RADER:  Object to the form.

12          A.       I guess those were done over the

13   phone.

14          Q.       (BY MS. BAEHR-JONES) Okay.  What

15   about ████████████? Who's ██████████████?

16          A.       ██████████████is a boyfriend of

17   mine, and we worked together quite extensively

18   through 2021 and 2022, I think.  2022, primarily.

19          Q.       Okay.  What's his current address?

20          A.       ████████████████

21          Q.       Okay.  What is it?

22          A.       ██████████████████████████

23          Q.       What's the address?

24          A.       I don't know.

25          Q.       Do you know his phone number?
```

```
 1           A.        It's in my phone.
 2           Q.        Okay.  I want you to take a look
 3    at -- did he ever live with you?
 4           A.        He did.
 5           Q.        Okay.  You just testified earlier
 6    that no one ever lived with you at the 705 --
 7                     MR. RADER:  Object to the form.
 8           A.        I didn't have roommates.  I didn't
 9    have roommates.
10           Q.        (BY MS. BAEHR-JONES) So he did live
11    with you.
12           A.        Yes.
13           Q.        Okay.  Did he use your address?
14           A.        I'm not sure if he did or not.
15           Q.        Okay.  Well, let's look at 1171,
16    which is going to be -- I'll ask you to flip two
17    more pages, and then I'm going to ask you to look at
18    the bottom left corner of this page.
19                     MR. RADER:  Hold on just a moment.
20                     Are these -- is this package all
21         out of order?
22                     MS. BAEHR-JONES:  It is all --
23         everything will be out of order today.  So
24         you just follow along with the Bates
25         numbers.
```

```
 1                    MR. RADER:  Well, then tell me

 2        which page you're turning to.

 3                    MS. BEREXA:  Well, we don't have

 4        enough copies, so it's taking us a little

 5        while to pull up the document on our

 6        computers.

 7                    MS. BAEHR-JONES:  And if you want

 8        to give me more than three and a half hours,

 9        we can wait.  But let's go on.

10                    We're going to go to 11 --

11        RENASANT1171, please.

12                    MS. BEREXA:  Do you have a copy for

13        me?

14                    MS. BAEHR-JONES:  There are copies

15        that have been handed out.

16                    MS. BEREXA:  Do you have a copy for

17        each of us?  That's what I'm asking.

18                    MS. BAEHR-JONES:  I have a lot of

19        copies, and we're going to keep going.

20                    MS. BEREXA:  Well, can you

21        please --

22                    MS. BAEHR-JONES:  I just gave you

23        the Bates number, Kristen.

24                    MS. BEREXA:  I'm trying.  It's

25        pulling up right now.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1                    MS. BAEHR-JONES:  Okay.  You can

 2          look on --

 3                    MS. BEREXA:  It takes a while for

 4          the images.

 5                    MS. BAEHR-JONES:  You can look on

 6          with Danny.

 7                    MR. RADER:  I'm glad for Kristin to

 8          look on with me but --

 9                    MS. BAEHR-JONES:  Let's look at --

10                    MR. RADER:  -- this is very

11          unprofessional.

12          Q.        (BY MS. BAEHR-JONES) Look on the

13     bottom of the left-hand page.

14                    And do you see where it says ██████

15     ████████████?

16          A.        I do.

17          Q.        And what's the date on that check?

18          A.        3/1/2022.

19          Q.        So were you still dating then or

20     not?

21          A.        We were dating then.

22          Q.        Okay.  And how much is the check

23     for?

24          A.        He -- it is $7,642.

25          Q.        Okay.  What's his address listed
```

```
 1   as?

 2            A.       My address.

 3            Q.       That's right.

 4                     He actually received money from

 5   Glass & Concrete Contracting for many years; isn't

 6   that right?

 7            A.       He worked for Glass & Concrete

 8   Contracting for many years.  Yeah.

 9            Q.       What did he do?

10            A.       Anything that fell in line with the

11   scope of work.  He was an independent contractor for

12   most of the time, so --

13            Q.       What projects did he work on?

14            A.       I don't really know how to answer

15   that.  I'm not sure.

16            Q.       Well, you --            ████████ paid

17   him $7,000 on March 1st of 2022.  That's only two

18   years ago.

19                     What was he doing then?

20            A.       I'm not sure what the job would

21   have been but, I mean, it was something on the

22   exterior of a building.

23            Q.       Well, what projects was Glass &

24   Concrete Contracting working on in March of 2022?

25            A.       I have very little knowledge of
```

```
 1    what projects they were working on from 2018 all the
 2    way to them finally closing.  I was not a part of
 3    daily operations.
 4            Q.      But you controlled a lot of the
 5    financials, right?
 6            A.      I didn't.  I wasn't even on the
 7    bank statements.  I wasn't listed.  I couldn't pull
 8    money, anything else.  I didn't control any of the
 9    money, really.
10                    MS. BAEHR-JONES:  Okay.  We're
11            going to look at -- give me a hot second to
12            flip backwards.
13                    Okay.  I'm going to hand out the
14            next exhibit and mark it.  It's RENASANT141,
15            and we're marking this as 71.
16                    (Exhibit 71 marked).
17            Q.      (BY MS. BAEHR-JONES) So you just
18    testified that you didn't control Glass & Concrete
19    Contracting during 2022.
20                    Can you take a look at this
21    document?
22                    Do you see that it says it's for
23    Glass & Concrete Contracting, LLC?
24            A.      Yep.
25            Q.      Do you see that in the left-hand
```

```
1    bottom corner it's your signature with --

2            A.      I do.

3            Q.      -- a date of February 14th, 2022.

4            A.      That was them adding me to the

5    account, I'm pretty sure.

6            Q.      And you see that Sean Williams'

7    signature is here and that -- and his Social

8    Security number, correct?

9            A.      Uh-huh.

10           Q.      That's not actually his signature,

11   is it?

12           A.      It kind of looks like it.

13           Q.      Well, we can look at his signature

14   later, but that is your signature, right, in Line 4?

15           A.      Yes.

16           Q.      Okay.  So you did have access to

17   these accounts in March of 2022.

18           A.      I think I only had access to these

19   accounts for like two or three weeks.  And I didn't

20   actually -- yeah, I think it was for two or three

21   weeks, and that was it.

22           Q.      Well, then didn't you open up

23   another bank account also in the name of Glass &

24   Concrete Contracting in April of 2022?

25           A.      I did, but it wasn't Glass &
```

Cynthia S. TENNESSEE
(615) 595-0073

```
 1    Concrete Contracting.

 2                    Sean was completely gone.  Nobody

 3    could get in touch with him.  We don't know what's

 4    going on.  And there was still active projects going

 5    on.  And I was receiving phone calls from like

 6    customers saying, "Hey, you know, what's going on?"

 7                    So I was thinking, "How am I going

 8    to pay subcontractors?  How am I going to pay

 9    suppliers?  What the hell do I do in this

10    situation?"  It's not something you have a game plan

11    for.

12                    And I opened up an account, just

13    GCC, so I could deposit and pay subcontractors out

14    of it, just to close those final jobs out.  I think

15    there might have been one or two of them.

16         Q.        Which were the subcontractors that

17    you paid?

18         A.        I remember one guy.  I think his

19    name was ███████, was one of them that I had to pay,

20    and that was quite a bit.

21         Q.        What was his last name?

22         A.        I cannot remember his last name.

23         Q.        What was the project?

24                    MR. RADER:  She was finishing --

25            let me -- you need to finish your answer and
```

TENNESSEE
(615) 591-0073

```
 1              don't let her interrupt you.
 2                   MS. BAEHR-JONES:  I wasn't
 3              interrupting her, Danny.
 4                   MR. RADER:  She was talking, and
 5              the video will show it.  I would like for --
 6                   MS. BAEHR-JONES:  You know what?
 7              I've been very polite, and I'd like you to
 8              be polite with me.
 9                   MR. RADER:  I am being extremely
10              polite, and I'm saying that the witness has
11              the --
12                   MS. BAEHR-JONES:  She will finish
13              her question.  We can go off --
14                   MR. RADER:  Now you won't even let
15              me finish my statement.  So you're just
16              going to interrupt everybody until they --
17                   MS. BAEHR-JONES:  Okay.  We're
18              going to go off the record.
19                   MR. RADER:  No, we're going to stay
20              on the record.
21                   MS. COLLINS:  We're going to stay
22              on the record.
23                   MR. RADER:  Jeff, we're staying on
24              the record.
25                   MS. COLLINS:  Staying on the
```

```
 1              record.
 2                      MR. RADER:  I would like the
 3              witness to have an opportunity to finish her
 4              answer.
 5                      MS. BAEHR-JONES:  She does have an
 6              opportunity to speak, to answer her
 7              question.
 8                      MR. RADER:  As you speak over me,
 9              you say so.
10                      MS. COLLINS:  Okay.  Let's go
11              back --
12                      MR. RADER:  Ma'am, do you have
13              anything else that you wanted to say?
14                      THE WITNESS:  Probably not.  I kind
15              of lost my train.
16                      MS. BAEHR-JONES:  What's the
17              question?
18                      COURT REPORTER:  Okay.
19                      What was his last name?
20                      Answer:  I cannot remember his last
21              name.
22                      Question:  What was the project he
23              was finishing?
24                      And then we had the interruption.
25              Q.      (BY MS. BAEHR-JONES) What was the
```

```
 1    project he was finishing?

 2           A.       I cannot remember the name of it,

 3    but I do recall that it was a window cleaning

 4    project, because that's pretty much all he did.

 5           Q.       Do you remember the name of any of

 6    the customers that you paid off during that time?

 7                    MR. RADER:  Object to the form.

 8           A.       I didn't pay off any customers.

 9           Q.       (BY MS. BAEHR-JONES) You just said

10    that customers were calling with active projects,

11    right?

12           A.       They paid me.

13           Q.       Okay.  So you were getting money

14    from projects?

15           A.       For those final projects, yeah.

16           Q.       Okay.  Which projects were those?

17           A.       One of them was a window cleaning

18    project, and I think another one was a small

19    pressure cleaning project that I just had to close

20    out.

21           Q.       What are the names of those

22    projects.

23           A.       I cannot remember the names of

24    those.

25                    You have to understand something.
```

TENNESSEE
(615) 595-0073

```
 1    I've done so many different projects that there's
 2    just no way that I can have a name for every single
 3    one of them.  I'm more likely to be able to drive by
 4    a building and say, "Hey, I did this here.  I did
 5    that over there," but I can't remember the name of
 6    every project or the address of them.
 7              Q.     Do you have invoices for those?
 8              A.     For those, I think that -- I don't
 9    even know that I've done invoices for them,
10    honestly.  I think it was just, "We're closing out.
11    This is it.  This is what you owe."
12              Q.     Are there any records?
13              A.     Of those, I'm sure that there would
14    be in that GCC account.  Not Glass & Concrete
15    account, the GCC one.
16              Q.     But no records of where that money
17    was going?
18              A.     Oh, I paid the subcontractors.  I
19    lost money on the window cleaning project, because
20    it had been so mismanaged before I was involved.  I
21    might have actually had to put some of my own money
22    in to pay the Kelvin guy.  I think I did, actually.
23              Q.     But you can't remember his last
24    name?
25              A.     I cannot remember his last name.
```

```
 1          Q.      Where does he live?

 2          A.      I do not know.

 3          Q.      What company does he work for?

 4          A.      He had his own window cleaning

 5   company.  I don't know.  I don't know the name.

 6          Q.      Do you have a phone number for him?

 7          A.      I don't think I even have a phone

 8   number for him now, no.

 9               MS. BAEHR-JONES:  I'm going to go

10          over to -- so let's mark the next exhibit.

11               COURT REPORTER:  This will be 72.

12               MS. BEREXA:  Is there a Bates

13          number on this?

14               MS. BAEHR-JONES:  Nope.

15               Oh, yeah.  Can you mark it for me?

16          Thank you.

17               So you have copies, and this is for

18          you.

19               Sorry.  Let me actually grab that

20          one back, and you guys can share that one.

21          Thank you.

22               (Exhibit 72 marked).

23          Q.      (BY MS. BAEHR-JONES) Okay.  So what

24   is this?

25          A.      This is my company that I started.
```

TENNESSEE
(615) 595-0073

```
 1          Q.      Okay.  And how long was Southern
 2    Construction & Consulting in operation for?
 3          A.      Almost a year.  Yeah, almost a
 4    year.
 5          Q.      Okay.  And why did you dissolve
 6    this company?
 7          A.      Because things were coming out
 8    about my previous business partner, and I did not
 9    want to be associated with him.  And I knew that if
10    I stayed in the construction industry in this area
11    that I was going to have to deal with that, and that
12    was something professionally that I wasn't prepared
13    to do.  I think that's understandable.
14          Q.      Can you say that again?
15          A.      Things for coming out, you know.
16    In the industry people were talking about my
17    previous business partner, and I did not want to be
18    associated with that on a professional level.
19          Q.      Which business partner are you
20    talking about?
21          A.      Sean Williams.
22          Q.      How was he associated with Southern
23    Construction?
24          A.      He wasn't at all.
25          Q.      So then why did you close down
```

1  Southern Construction based on that?

2          A.          Reputation and things like that, I

3  did not want to have to combat or defend myself

4  ever, or explain any association that I ever had

5  with him.

6          Q.          But then you listed yourself as the

7  owner of Skyline Contracting, correct?

8                      MR. RADER:  Object to the form.

9          A.          That's completely different.

10  You're overlapping things.

11                      So Skyline was a company that I

12  opened to do consulting.  I decided not to do that.

13  It was not the right time in the market or industry.

14  I let it go.  I never made money off it.  It just

15  dissolved.  It's done.

16                      I did decide -- I have so many

17  contacts in 2022.  I knew everybody.  I knew every

18  project going on at that time.  Why not start my own

19  and do this?  Hell, I could do it better, and that's

20  what I did.

21                      But what happened is I reached a

22  point where I did not want to be associated with

23  Sean Williams or Glass & Concrete Contracting in any

24  capacity.  And people in the industry knew me as

25  someone that used to be at GCC and things like that.

```
 1    I didn't want that professionally.  So I decided to
 2    take my career and go into a completely different
 3    area.
 4           Q.      (BY MS. BAEHR-JONES) But what
 5    doesn't make sense to me is you're saying you closed
 6    down Southern Construction because you didn't want
 7    to have your reputation be associated with this
 8    contracting, those businesses, but then you opened
 9    Skyline --
10           A.      No, I didn't.
11           Q.      Well, from 2018 to 2022 you listed
12    yourself --
13           A.      That's not -- on LinkedIn.
14           Q.      Ms.  Female 4   --
15           A.      On LinkedIn.
16           Q.      Let me finish the question and then
17    you can answer.
18                   You listed yourself as the owner of
19    Skyline for four years on LinkedIn.  I don't
20    understand what you mean when you say you didn't
21    want to be associated with these businesses.
22                   Why would you leave yourself listed
23    as --
24           A.      I have to have a professional.
25           Q.      You have to let me finish the
```

```
 1   question.  Otherwise, I --

 2          A.      Oh, yeah, I've got to let you

 3   finish.

 4          Q.      Yes, you do, in fact.  And you're

 5   under oath.

 6                  Now I'm going to finish the

 7   question.

 8                  Why would you list yourself as the

 9   owner for four years on LinkedIn, and now you're

10   testifying that the reason you closed Southern

11   Construction was for reputational reasons?

12          A.      Because I want a consulting venue.

13   I want people to be able to look at my LinkedIn and

14   say, "Okay, she does have that experience.  She does

15   have this experience."  And to be quite honest with

16   you, I don't think very many people's LinkedIn

17   profile are 110 percent legit.  Like I'm not sure

18   the last time I looked at my LinkedIn credentials,

19   but that is inaccurate on LinkedIn, and it's not

20   something that I feel like we should even be

21   discussing at this point.

22          Q.      So were you lying on LinkedIn?

23                  MS. BEREXA:  Object to the form.

24                  MR. RADER:  Yes.

25                  MS. COLLINS:  Same.
```

TENNESSEE
(615) 595-0073

```
 1          Q.        (BY MS. BAEHR-JONES) Are you lying
 2     now?
 3                    MS. BEREXA:  Object to the form.
 4          A.        No.
 5                    MS. BAEHR-JONES:  Okay.  Let's look
 6          at this.  This is going to be marked as
 7          Exhibit -- what are we on?
 8                    COURT REPORTER:  73.
 9                    MS. BAEHR-JONES:  73.  It's
10          RENASANT42.
11                    (Exhibit 73 marked).
12                    MS. BEREXA:  We've been at it quite
13          a while.
14                    Do you want to take a break for
15          like five minutes?
16                    MS. BAEHR-JONES:  Do you want to
17          just get this into the record and then we'll
18          take a break?
19                    MS. BEREXA:  Yeah, that's fine.
20                    MS. BAEHR-JONES:  Just because
21          otherwise we're going to lose the copies.
22                    MS. BEREXA:  No, that's fine.
23          Q.        (BY MS. BAEHR-JONES) What is this?
24          A.        This is the bank for Southern
25     Construction & Consulting.
```

```
 1          Q.      And who's listed as the
 2   signatories?
 3          A.      Me and ███████████
 4          Q.      When did you break up with
 5   Mr. █████
 6          A.      We've never really broken up, quite
 7   honestly.
 8          Q.      Okay.  So where does he live now
 9   again?
10          A.      Sometimes at my house.  Sometimes
11   at his mother's house.
12          Q.      Okay.  Where is his mother's house?
13          A.      ████████████
14          Q.      And what's her name?
15          A.      ███████
16          Q.      What's her last name?
17          A.      ██████
18          Q.      ████████
19                  Do you know what her address is?
20          A.      No.
21          Q.      Well, you said that sometimes he
22   lives there and you're currently dating him.
23                  What's the address of her house?
24          A.      I don't know the address of her
25   house.
```

TENNESSEE
(615) 595-0073

```
 1          Q.        Have you ever been there?

 2          A.        Yes.

 3          Q.        What's her number?

 4          A.        I don't know anyone's phone number

 5     off the top of my head.

 6          Q.        So you're saying there's a ███████

 7     ██████ who lives in ███████████████

 8          A.        Yes.

 9          Q.        Okay.  Why did you list ████████

10     ████████ as an authorizing signatory for Southern

11     Construction?

12          A.        The reason is because at that time

13     I was thinking he could do more project manager and

14     I could do more of the behind the scenes, the

15     negotiating, the planning, the preparation and all

16     of that, and we could possibly build a business

17     together.

18          Q.        But then you shut the business down

19     a few months later, right?

20          A.        Essentially, yeah, because I

21     started to realize I didn't want to be associated

22     with my previous business partner.

23          Q.        But was Southern Construction ever

24     associated with Sean Williams?

25          A.        No.
```

```
 1          Q.      Who knew about your work for
 2   Southern Construction?
 3          A.      What do you mean?
 4          Q.      Well, you say you shut it down
 5   because you were worried about your reputation.
 6                  Who knew that you were working for
 7   Southern Construction?
 8          A.      It wasn't that people knew Southern
 9   Construction.  It was that people knew me, and I
10   didn't want to try to work my ass off to build a
11   successful construction company and have that stigma
12   follow me around from Sean Williams.
13          Q.      But you're still --
14          A.      It's pretty sad, isn't it?
15          Q.      But you're still doing licensing
16   for construction companies, right?
17          A.      Licensing.  I do not own them.  I
18   do not represent them.  This is a completely
19   different thing from that.
20          Q.      Isn't it true that you shut down
21   this company because it was a way to launder money?
22          A.      No.
23                  MR. RADER:  Object to the form.
24                  MS. BAEHR-JONES:  I want to hand
25          out -- do you want to take a break now?
```

```
 1                    MS. BEREXA:  It's been an hour.

 2                    I mean, it's up to the witness, I

 3            suppose.

 4                    THE WITNESS:  I don't want to take

 5            a break right now.  Let's just keep going.

 6                    MS. BAEHR-JONES:  Okay.  I'm going

 7            to hand out what's marked as RENASANT55.

 8                    Can I have the next exhibit number?

 9                    COURT REPORTER:  74.

10                    (Exhibit 74 marked).

11                    MS. BAEHR-JONES:  Thank you.

12            Q.       (BY MS. BAEHR-JONES) What is this,

13    Ms. █Female 4█?

14                    MR. RADER:  I guess we're sharing.

15            A.       It looks like I had just gotten

16    paid from the Self-Help building in Asheville, and I

17    was so happy about that.  After I paid everyone else

18    off, I paid off my car.

19            Q.       (BY MS. BAEHR-JONES) Okay.  So

20    we're looking at a commercial cash withdrawal on

21    September 13th, correct?

22            A.       Uh-huh.

23                    MR. RADER:  Object to the form.

24            Q.       (BY MS. BAEHR-JONES) And that's for

25    7,500?
```

```
 1         A.      Uh-huh.

 2         Q.      What car was that?

 3         A.      That's not it.  The next one is my

 4    car payment.

 5         Q.      Oh, I see.

 6                 Okay.  What was the 7,500 cash

 7    withdrawal for?

 8         A.      I'm not sure why I withdraw money

 9    at that point.  It was -- it could have been just to

10    kind of put away, don't use unless something else

11    comes up or -- I'm not sure.

12         Q.      Do you keep large amounts of cash

13    around your house?

14         A.      Not large amounts, no.

15         Q.      Would you say $7,500 is a large

16    amount of cash?

17         A.      It's a pretty large amount, but I'm

18    not sure what I was doing with that at that time.

19         Q.      Okay.  But that was you withdrawing

20    $7,500 in cash --

21         A.      Most likely, yeah.

22         Q.      -- on September 13th of 2022.

23         A.      Uh-huh.

24         Q.      And you have no recollection what

25    that was for?
```

1    A.      I actually may have even used that

2    to pay ██ for his contributions to that project.

3    I might have done that, but I'm not sure what I used

4    that money for.

5    Q.      When you say ██ who is ██

6    A.      ████████████

7    Q.      So you call him ██

8    A.      Yes.

9    Q.      So you might have given the money

10   to ██

11   A.      I don't think I would have given

12   that all to him.  I'm not sure.  So I can't really

13   answer that.

14   Q.      Okay.  Do you see that the previous

15   balance listed here is 97,267, right?

16   A.      Uh-huh.

17   Q.      And then by the end of the month

18   it's gone, right?

19   A.      Yeah.  I paid subcontractors, and I

20   paid all of the materials that I needed for that

21   and -- all of that before I do anything else.  I

22   usually try to do that for any project.

23   Q.      Well, you just said that you paid

24   your car off for 39,000.

25   A.      That was after I paid the

Gendron & Associates
(615) 595-0073

```
 1   subcontractors and materials.

 2            Q.       So when you say the subcontractors

 3   and materials, are you referring to the check for

 4   49,000?

 5            A.       Yes.

 6            Q.       So you paid one check.

 7            A.       That was to the subcontractors,

 8   yeah.

 9            Q.       Who was that?

10            A.       Skyline Restoration & Maintenance.

11            Q.       Okay.  What was the project for

12   that 49,000?

13            A.       The Public Service Building.

14            Q.       Whose name am I going to see when I

15   get the Renasant Bank records for Skyline

16   Restoration?

17            A.       ████████████

18            Q.       Okay.  Who else?

19            A.       I'm not sure.

20            Q.       Am I going to see your name?

21            A.       Maybe.

22            Q.       Why would --

23            A.       I have helped ████ over the years

24   do certain things.  I've advised him on a business

25   sense, but I don't have anything to do with him.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    Like I don't own any part of that company or

 2    anything like that.  He's paid me for consulting

 3    over the years.

 4            Q.      But I am going to see your name on

 5    the bank records, right?

 6            A.      It's possible at a certain point in

 7    time, yeah.

 8            Q.      What about at this point of time

 9    when $49,000 moves through that company?

10            A.      I'm -- I don't think he would have

11    had me listed at that point.  I mean, we're pretty

12    good friends, but because we banked at the same

13    place, I do know that I pay -- I called Renasant and

14    I told them to transfer that money to him.

15            Q.      Okay.  So you told them to transfer

16    that?

17            A.      Yeah, into his business account.

18            Q.      Am I going to see that money coming

19    out in cash?

20            A.      No.

21            Q.      Okay.  Well, how is it going to

22    come out of that company?

23            A.      I don't know.

24            Q.      Okay.

25            A.      But -- I don't know.  He has a lot
```

TENNESSEE
(615) 595-0073

```
1    of employees.  His payroll is pretty exponential.

2             Q.        Who are his employees?

3             A.        I only know two of them, as I spoke

4    before.

5             Q.        Since you're one of the people on

6    the bank statements for that company, are there

7    invoices for those?

8                       You said $49,000 going to

9    subcontractors in September of 2022.

10            A.        No.  ██████ and I have a working

11   relationship where he'll review the scope of work --

12   or at the time he reviewed the scope of work.  I

13   said, "Give me your numbers."  I'm going to give him

14   mine.  We'll go back and forth on a few things.  We

15   agreed on a number.  I don't even think that me and

16   him signed a contract before he started that work.

17            Q.        So I'm not going to find a

18   contract?

19            A.        If I don't -- I don't know, but I

20   don't think that me and him even done one on that.

21            Q.        And I'm not going to find any

22   invoices?

23            A.        No.  I just went ahead and paid

24   him.  He didn't even have to invoice me.

25            Q.        Who's your bookkeeper?
```

TENNESSEE
(615) 595-0073

```
 1          A.        I don't have a bookkeeper.
 2          Q.        Sean's bookkeeper was ███████
 3  ███████████  is that correct?
 4          A.        As far as I know, up until 2018.
 5          Q.        Okay.  But you didn't have a
 6  bookkeeper for Southern Construction?
 7          A.        No.  It was just starting.  I
 8  really didn't need one.
 9          Q.        How did you pay your taxes?
10          A.        I haven't been able to do my 2022
11  taxes.  I'm working on that currently.
12                    MS. BAEHR-JONES:  You have to
13            forgive me.  There's lots of paper, and I've
14            lost track of where.  So let's go back.
15                    Okay.  Let's go to our next
16            exhibit.
17          Q.        (BY MS. BAEHR-JONES) Can you tell
18  me about the Paramount project that Skyline worked
19  on?
20          A.        Not too much, because I was kind of
21  already out of the day-to-day operations.  They done
22  that for Glass & Concrete, not for me.
23          Q.        What year was that?
24          A.        I don't know.  That was an
25  on-and-on thing.  I have no idea.
```

```
 1          Q.       So you were out of the daily
 2   business?
 3          A.       Yeah.
 4          Q.       What do you mean by that?
 5          A.       From late 2017 on, I didn't even go
 6   into the business or to the office or anything for
 7   GCC.
 8          Q.       But you were still getting paid?
 9          A.       Yeah.
10          Q.       What were you doing?
11          A.       Again, I held the licensing.  I did
12   give them the option, like if something major goes
13   on, you can give me a call, things like that, but I
14   wasn't day-to-day.
15          Q.       Okay.  But you were listed as an
16   authorizing signature on the bank records, correct?
17          A.       Not the whole time.
18          Q.       Well, you were authorizing checks
19   throughout this period, weren't you?
20          A.       No, I was not.
21               MS. BAEHR-JONES:  Okay.  Well,
22          let's look at that.
23               Okay.  We'll mark this 75.
24               (Exhibit 75 marked).
25               MS. BAEHR-JONES:  This is
```

```
 1          RENASANT1196.  So.
 2          Q.        (BY MS. BAEHR-JONES) Do you see the
 3     check -- sorry.  It's the transfer -- withdrawal,
 4     check and withdrawal in the upper right-hand corner
 5     there?
 6          A.        Uh-huh.
 7          Q.        What's the date for that?
 8          A.        1/23.
 9          Q.        And what's the name of the company
10     that's for?
11          A.        It's for Glass & Concrete
12     Contracting.
13          Q.        And who's the authorizing signature
14     for that?
15          A.        That was me.
16                    This isn't money going to or from a
17     company to company.  This is a payment from GCC to a
18     line of credit.  We had an open line of credit, and
19     so I told them to transfer it, and they did that.
20          Q.        So it's fair to say that you were
21     involved in the financials for Glass & Concrete
22     during this period, right?
23          A.        I don't know why that I would have,
24     unless Yvonne was out of town or something.  This
25     was not a daily thing for me, but it was -- I make a
```

Enochs TENNESSEE
(615) 595-0073

```
 1    payment on a line of credit.

 2            Q.      So you were an authorizing

 3    signature for the account?

 4            A.      I had very limited access to the

 5    account.  I knew that I could make payments on the

 6    line of credit, but I couldn't make withdrawals, and

 7    I couldn't -- I don't think I was allowed to sign

 8    checks or anything like that.  Why that I would

 9    have -- I don't know, but this is for a payment for

10    a line of credit, which is pretty common for any

11    construction company to have.

12            Q.      I want to go back to what's been

13    marked as Exhibit 71, and you said that that looked

14    like Sean Williams' signature in Line 1.

15            A.      Yeah, I believe so.

16            MR. RADER:  Okay.  I'm going to

17            hand out what's been marked as Exhibit --

18            Let's mark this.

19            COURT REPORTER:  This will be

20            Exhibit 76.

21            (Exhibit 76 marked).

22            MS. BAEHR-JONES:  Okay.  It's --

23            and this is going to be RENASANT811 and 812.

24            Q.      (BY MS. BAEHR-JONES) I want you to

25    flip through this.
```

```
 1                    What do these look like?
 2          A.        Yeah, that's how he'd sign checks.
 3          Q.        So is that actually his signature?
 4          A.        For checks, yeah.  He always done
 5   that.  He started doing that because a really long
 6   time ago somebody did take some of the checks, and
 7   it was -- they were forging his signature, and he
 8   started doing that long before I ever come along.
 9          Q.        Wouldn't it be easier to forge just
10   two initials than a full signature?
11          A.        That was his logic, not mine.  I
12   can't speak on it.
13          Q.        Okay.  Sean Williams was a fugitive
14   in April -- sorry -- in February of 2022, wasn't he?
15          A.        I believe so, yeah.
16          Q.        So did he come into the bank to
17   sign this authorizing signature form with you?
18          A.        No, we probably didn't.  No, we
19   didn't even sign these at the same time.
20                    In fact, actually, of 2022 -- was
21   it 2021 or 2022?
22                    I found out that he was a fugitive
23   in the second week of March of either 2021 -- I
24   think it was 2022.  I would have to look, but yeah.
25          Q.        So your testimony is that you were
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    unaware that he was a fugitive from May of 2021

 2    until March of 2022?

 3            A.      I don't know if it was March of

 4    2021 or March of 2022 when I found out.

 5            Q.      So you could have found out in

 6    March of 2021?

 7            A.      I have to look.  I can tell you if

 8    I look at my phone when it was.

 9            Q.      Well, going back to this exhibit,

10    where were you when you signed this?

11            A.       I probably went by the office and

12    signed it.

13            Q.      Okay.  Who else is listed here?

14            A.      Female 5 and ██████████████.

15            Q.      Was ████████████ still working

16    for the company then?

17            A.      She was.

18            Q.      What's her phone number?

19            A.      I don't know anyone's phone number

20    off the top of my head.

21            Q.      Do you have it in your phone?

22            A.      Probably, yeah.

23            Q.      What's her address?

24            A.      I have no idea.

25            Q.      Does she still live in Johnson
```

TENNESSEE
(615) 595-0073

```
 1    City?
 2              A.       I do not know.
 3              Q.       When was the last time you spoke to
 4    her?
 5              A.       Since Glass & Concrete Contracting
 6    had closed.
 7                       MS. BAEHR-JONES:  Okay.  Since
 8              there's a lot of information that is listed
 9              on your phone that you can't remember, I
10              think we should take a break.  And when we
11              come back, you can give me those phone
12              numbers.
13                       VIDEOGRAPHER:  Okay.  We're going
14              off the record at 11:40.
15                  (Off the record at 11:40 a.m.)
16                  (On the record at 12:06 p.m.)
17                       VIDEOGRAPHER:  We're on the record
18              at 12:06 p.m.
19                       MS. BAEHR-JONES:  Okay.  We're
20              back.
21              Q.       (BY MS. BAEHR-JONES) Thank you,
22    Ms.  Female 4 .
23                       Can I ask you, do you see that man
24    down there in the blue sports coat?
25              A.       With the gray hair?
```

TENNESSEE
(615) 595-0073

```
 1          Q.      Yes.

 2          A.      Yes.

 3          Q.      Have you seen him before?

 4          A.      No.

 5          Q.      Have you ever talked to somebody

 6   named Mr. Erick Herrin?

 7          A.      Not that I recall.

 8          Q.      What do you mean by not that I

 9   recall?

10          A.      I don't believe I've talked to him.

11          Q.      Okay.  What about any of the other

12   defense counsel at this table, other than your

13   attorney?

14          A.      I spoke with her.

15          Q.      Okay.  What did you talk about with

16   her?

17                  And, sorry, can you identify who

18   you're talking about for the record?

19                  MS. BEREXA:  It's Ms. Berexa.

20                  THE WITNESS:  Thank you.  Sorry .

21          A.      I briefly spoke with her about

22   never meeting her client.

23          Q.      (BY MS. BAEHR-JONES) Did she call

24   you or did you call her?

25          A.      She left a note, and I called her.
```

```
 1              Q.       When --
 2              A.       Got in touch with her.  She left a
 3    business card.
 4              Q.       Where?
 5              A.       My house.
 6              Q.       So she came by your house herself,
 7    or did she send a private investigator?
 8              A.       I'm not sure.  I didn't answer the
 9    door.
10              Q.       So you got a business card?
11              A.       Uh-huh.
12              Q.       When was that?
13                       THE WITNESS:  A month or so ago
14          when I called you about that?
15                       MR. COCHRAN:  Yeah, approximately
16          four weeks.
17              Q.       (BY MS. BAEHR-JONES) And when you
18    called her back -- I'm sorry.
19                       You said that you called her then
20    once you got her business card?
21              A.       I believe so, yeah.
22              Q.       Okay.  And what did you talk about
23    again?
24              A.       That I've never met her client.
25              Q.       Who is her client?
```

TENNESSEE
(615) 595-0073

```
 1          A.      Mr. Toma Sparks.

 2          Q.      What else did you talk about?

 3          A.      That was it.

 4          Q.      Did you talk about getting counsel?

 5          A.      I told her I already had counsel.

 6          Q.      When did you get counsel?

 7          A.      When did I?  When I come back from

 8   my trip.  I can't remember.  Yeah, I don't know the

 9   date.

10          Q.      What trip are you referencing?

11          A.      I just got back from vacation.

12          Q.      And how did you find your counsel?

13          A.      Online.

14          Q.      Okay.  Who's paying for your

15   counsel?

16          A.      Me.

17                  MS. BAEHR-JONES:  Okay.  Let's turn

18          towards the next exhibit.  It may be in the

19          next binder.

20                  Oh, shoot.  I need my -- can you

21          hear me better now?

22                  Okay.  What are we marking this as?

23                  COURT REPORTER:  77.

24                  MS. BAEHR-JONES:  Here are copies.

25                  (Exhibit 77 marked).
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.        (BY MS. BAEHR-JONES) Okay.  What
 2     does this look like?
 3                    Looking at the top of the left-hand
 4     corner here, what is this?
 5                    MR. RADER:  First of all, call
 6          out -- there are multiple different --
 7                    MS. BAEHR-JONES:  Oh, shoot.
 8          Shoot.  Shoot.  Shoot.  Sorry.  Sorry.
 9          Those are not meant for this.
10                    Okay.  Let me grab this back.
11                    MR. RADER:  So what you're trying
12          to do is the bank statement pages?
13                    MS. BAEHR-JONES:  Yes.  Let me just
14          take these back.  Yes.
15                    MS. BEREXA:  What are the Bates?
16                    MS. BAEHR-JONES:  So we're going to
17          start with Bates RENASANT938.
18                    (Exhibit 77 marked).
19                    MR. RADER:  This is 76.
20                    MS. BEREXA:  Is this 77 or --
21                    COURT REPORTER:  Exhibit 77 is the
22          one I just marked.
23                    MR. RADER:  These bank pages are 76
24          that were just handed to me, that the
25          witness has in her hand, not 77.  This is
```

```
 1            77.
 2                      MS. BAEHR-JONES:  Yes.
 3            Q.        (BY MS. BAEHR-JONES) Okay.  So
 4    during 2020, you're being paid by Glass & Concrete
 5    Contract -- excuse me, Glass & Concrete Contracting,
 6    correct?
 7            A.        Yes.
 8            Q.        How much were you being paid?
 9            A.        I can't remember exactly.
10            Q.        How often were you being paid?
11            A.        I think it was weekly, maybe
12    biweekly then .
13            Q.        You were taking this money in cash,
14    correct?
15            A.        No.
16            Q.        Okay.  Well, let's look at that.
17                      Can I ask you to look at the first
18    page of this exhibit, which is RENASANT938?
19                      Do you see a line that says 3/23 --
20    sorry -- 3/24, commercial cash, and you see 33,282,
21    correct?
22            A.        Uh-huh.
23            Q.        And then I want you to look down to
24    3/27.  So that's the second to last line.  It says
25    commercial cash, 850, correct?
```

Courier & TENNESSEE
(615) 595-0073

```
 1          A.       Uh-huh.

 2          Q.       Now, if you flip to the next page,

 3    this is RENASANT944, do you see on 3/27, transfer to

 4    Female 4.  850.  That's same amount that's taken out as

 5    commercial cash.

 6                   That would be in the left -- bottom

 7    left-hand corner of that page.

 8          A.       Yeah.

 9          Q.       So that was taken out in commercial

10    cash, wasn't it?

11          A.       Someone from the office transferred

12    that to my bank account, I believe.

13          Q.       But it says that it was -- if you

14    look back on RENASANT938, right, it says 850 taken

15    out in cash on March 27th of 2020?

16                   MR. RADER:  Object to form.  That's

17          not what it says.

18          A.       That's not what it says.  It says

19    commercial cash.  And if you actually look at this

20    on that page, it says transfer to a lender.

21          Q.       (BY MS. BAEHR-JONES) Correct.

22                   And that date is March 27th, 2020,

23    right?

24          A.       Uh-huh.

25          Q.       It's for an amount of 850, correct?
```

Lexitas - TENNESSEE
(615)595-0073

```
 1        A.        Uh-huh.

 2        Q.        And then if you look back at the

 3   bank record, it says that amount, correct, 850 on

 4   March 27th was taken out in commercial cash, right?

 5                  MR. RADER:  Object to the form.

 6        A.        That's what -- that's what it's

 7   referred to on a bank statement if you transfer

 8   funds.  That doesn't mean you actually go in and get

 9   cash in that amount.

10        Q.        Okay.  And if a representative from

11   Renasant Bank comes in here to testify, and I asked

12   them, "What does it mean when it says commercial

13   cash being withdrawn on a bank statement," what do

14   you think they're going to tell me?

15                  MS. BEREXA:  Object to the form.

16                  MR. RADER:  Same objection.

17                  MS. RUFOLO:  Same.

18        A.        Exactly what I just said, I'm

19   assuming.

20        Q.        (BY MS. BAEHR-JONES) Okay.  But you

21   remember seeing those deposits -- those withdrawals

22   that we talked about earlier, right, where you took

23   out $7,000 and --

24        A.        That is not from --

25        Q.        Let me -- let me finish my
```

```
 1    question.
 2                    Do you remember looking at that
 3    statement where there was a withdrawal and it said
 4    commercial cash for 7,500?
 5         A.       Uh-huh.
 6         Q.       So that is what it says when you
 7    take out commercial cash, correct?
 8         A.       Or transfer.  It doesn't
 9    specifically mean a cash withdrawal.
10                    I think you understand that, right?
11         Q.       Well, as a representative from the
12    bank who's going to come in and testify about these
13    bank records, what are they going to tell me?
14                    MS. BEREXA:  Object to the form.
15         A.       The same thing I'm saying right
16    now.
17         Q.       (BY MS. BAEHR-JONES) They're going
18    to say that commercial cash means a transfer?
19                    MS. BEREXA:  Object to the form.
20         A.       It can mean a transfer or an actual
21    cash withdrawal.
22                    But also, on Exhibit 74 here, if
23    you look at the back of that, that 7,500, ████████
24    actually withdrew that.  That was most likely for
25    the materials and things that I was referring to.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    It's right on the back there.
 2           Q.       (BY MS. BAEHR-JONES) And by ███
 3    you mean ████████████████?
 4           A.       Yeah.
 5           Q.       Okay.  So you agree that that does
 6    represent a commercial cash withdrawal.
 7           A.       It can represent both a transfer or
 8    a cash withdrawal.
 9           Q.       So is it fair to say that you're
10    very familiar with these bank records,
11    Ms. Female 4 ?
12           A.       No, but I understand what it means
13    on a business account when it says commercial cash.
14           Q.       Okay.  Let's look at the next page
15    of this.  So let's keep flipping.  So this is
16    Page 950.
17                    Excuse me.  And if you look again
18    at April 24th -- excuse me -- 2020, do you see those
19    two commercial cash withdrawals?
20           A.       Yes.
21           Q.       And what are those amounts?
22           A.       850 and $29,040.
23           Q.       And it's still your testimony that
24    that was, in fact, not a commercial cash withdrawal
25    but a transfer?
```

TENNESSEE
(615) 595-0073

```
 1                    MS. BEREXA:  Object to the form of
 2          the question.
 3                    MR. RADER:  Same objection.
 4          A.        It says right here there was a
 5   transfer, ma'am.
 6          Q.        Which page?  Can you tell me the
 7   Bates number?
 8          A.        If you switch over to the back
 9   side, it says right here, "Transfer from GCC."
10          Q.        Sorry.  Just read the Bates number
11   on the bottom of the page.
12          A.        12110.
13          Q.        Okay.  So that's a transfer to
14   ███ Female 4 ███ of 850, correct?
15          A.        Uh-huh.
16          Q.        And a transfer from Glass &
17   Concrete to ███ Female 4 ███ for another 850,
18   correct?
19          A.        Uh-huh.
20          Q.        But those are not for that day, I
21   don't believe.
22                    If you look at 1211 -- look at
23   1211.
24                    Do you have that in front of you?
25          A.        Uh-huh.
```

```
 1          Q.      So those are for that day.

 2                  That says April 24th, 2020,

 3    correct?

 4                  MR. RADER:  Object to the form.

 5          A.      Yes.

 6          Q.      (BY MS. BAEHR-JONES) And that's for

 7    29,040?

 8          A.      Uh-huh.

 9          Q.      Invoice No. 1072?

10          A.      Uh-huh.

11          Q.      Where would I find that invoice in?

12          A.      In Glass & Concrete Contracting's

13    records somewhere.

14          Q.      Who keeps those records?

15          A.      I have no idea where they're at.

16          Q.      Okay.  Do you think that I would

17    find them with ███████████████████

18          A.      I'm not sure.

19          Q.      Who kept those records when you

20    were signing checks in 2022.

21                  MS. BEREXA:  Object to the form.

22          A.      I did not have anything to do with

23    the day-to-day operations of the business.  I'm not

24    sure who it would have been that was employed by

25    Glass & Concrete then.
```

```
 1            Q.        (BY MS. BAEHR-JONES) But you were
 2   making checks from Glass & Concrete and transfers,
 3   correct?
 4                      MR. RADER:  Object to form.
 5            A.        I don't think I signed checks.
 6            Q.        (BY MS. BAEHR-JONES) Not in 2022?
 7            A.        I don't believe so.
 8            Q.        Well, you did open -- you did
 9   become a signatory in April of 2022, right?
10            A.        Right.
11            Q.        And you added your name to the
12   account.
13            A.        Uh-huh.
14            Q.        And then you added a new account
15   that only was you and ███████ also in that --
16            A.        For a completely separate business.
17            Q.        Right.
18                      But you also created another
19   account for Glass & Concrete Contracting during that
20   time, right?
21            A.        No, I didn't.
22            Q.        Didn't you create a new account
23   that was just for signatory line that was doing
24   business as Glass & Concrete?
25            A.        I opened an account called GCC to
```

TENNESSEE
(615)595-0073

```
 1    specifically cash out the few jobs that were

 2    remaining.

 3           Q.      Okay.  So you were writing checks

 4    for Glass & Concrete in 2022.

 5           A.      There was -- there was no more

 6    Glass & Concrete Contracting at that point.  Sean

 7    was nowhere around.  The office was dissolved.

 8    There was no money to even pay people.

 9                   I took the money from clients that

10    were owed on jobs, put it into that account, because

11    that was the only way that I could do it, and pay

12    people.  I just wanted to make sure people were

13    getting paid.

14           Q.      Okay.  But your name is a signatory

15    on checks and transfers in 2020, correct?

16           A.      For a short period of time, yes.

17           Q.      And in 2021, correct?

18           A.      I don't believe so.

19           Q.      I see that you're looking -- are

20    you looking at defense counsel?  Because I'd like

21    you to look at me.

22                   MR. RADER:  She can look wherever

23           she wants.  That's ridiculous.

24                   MS. BAEHR-JONES:  I just want to

25           make sure that -- I want to make sure that
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              nobody is coaching the witness.
 2                   MR. RADER:  All right.  This is a
 3              video deposition.
 4                   MS. BEREXA:  Please.  This is a
 5              video deposition, and I take serious offense
 6              at that, Ms. Baehr-Jones.
 7                   MS. BAEHR-JONES:  Okay.
 8                   MS. BEREXA:  There is no reason for
 9              you to say something like that.
10                   MS. BAEHR-JONES:  You can take
11              serious offense.
12                   Let's keep going.
13                   MS. BEREXA:  And I did.
14                   MS. BAEHR-JONES:  I'm glad you did.
15                   Let's keep going.
16                   MS. BEREXA:  And it's on the
17              record.
18                   MS. BAEHR-JONES:  Okay.  And I'd
19              like the record to note that the witness has
20              continually looked in the direction of
21              Ms. Berexa and the defendants the entire
22              time that I've been asking her questions.
23                   MS. BEREXA:  I can --
24                   MS. BAEHR-JONES:  Okay.  Let's keep
25              going.
```

```
 1                    MS. BEREXA:  Fine.  You can say
 2          whatever you want to.
 3                    MR. RADER:  Object, and the witness
 4          can look at anybody she wants to.
 5          Q.       (BY MS. BAEHR-JONES) We're going to
 6     keep going.  Let's turn to the next page.
 7                    So this is Bates RENASANT962.
 8          A.       Uh-huh.
 9          Q.       Do you see a commercial cash
10     withdrawal of 41,179 on May 29th of 2020?
11          A.       What number is this?
12          Q.       So if you look at the bottom of the
13     page, it's going to say RENASANT962.
14          A.       Uh.huh.
15          Q.       Do you see a commercial cash
16     withdrawal of $41,179?
17          A.       Yes.
18          Q.       Okay.  Looking to the next page,
19     this is RENASANT982.
20                    MR. RADER:  So you're not showing
21          the rest of that bank statement that shows
22          the transaction?  You're skipping to another
23          month, three months later?
24                    MS. BAEHR-JONES:  Are you making a
25          speaking objection?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    MR. RADER:  I'm asking you what

 2          you're doing.

 3                    MS. BAEHR-JONES:  I am doing --

 4                    MR. RADER:  I object to the

 5          introduction of these exhibits that are

 6          incomplete and misrepresentative to the

 7          extent that they skip --

 8                    MS. BAEHR-JONES:  Okay.  We're

 9          going to go off the record if you're going

10          to start testifying for the witness,

11          counsel.

12                    MR. RADER:  I'm going to make --

13                    MS. BAEHR-JONES:  We're going off

14          the record.

15                    MR. RADER:  On the record.

16                    MS. BAEHR-JONES:  We're going off

17          the record.

18                    MR. RADER:  I make objections on

19          the record.

20                    MS. BAEHR-JONES:  If you're

21          testifying for the witness, we are going to

22          go off the record.

23                    MR. RADER:  I make objections on

24          the record.

25                    MS. BAEHR-JONES:  Are you done?
```

TENNESSEE
(615) 595-0073

```
 1                    MR. RADER:  I think, until you ask
 2           the next question that's objectionable.
 3                    MS. BAEHR-JONES:  I would ask that
 4           you not testify for the witness, and we will
 5           go off the record and call the Court if you
 6           continue to do so.
 7                    MR. RADER:  I am going to make
 8           objections when I think it's appropriate and
 9           in the manner that I think is appropriate.
10           And I will answer to the judge if you think
11           that I have done something wrong.  You just
12           file your motion.
13                    MS. BAEHR-JONES:  If you start
14           testifying for the witness again, we will go
15           off the record and I will call the Court.
16                    Let's keep going.
17           Q.       (BY MS. BAEHR-JONES) We're looking
18     at RENASANT982.
19                    Do you see on July 17th a
20     commercial cash withdrawal -- of 2020, for $1,000 --
21     sorry -- for 850?
22           A.       Yes.
23           Q.       Okay.  Let's turn to the next page,
24     RENASANT988.
25           A.       Uh-huh.
```

```
 1         Q.        Do you see that that's a transfer
 2    to  Female 4  of $850, correct?
 3         A.        Yeah.
 4         Q.        Okay.  Let's keep going.
 5                   Let's look at the next page,
 6    RENASANT985, and that's a date at the top -- this is
 7    Glass & Concrete Contracting, LLC, correct,
 8    July 31st, 2020 bank statement?
 9         A.        Uh-huh.
10         Q.        And if you look at 7/31, what do
11    you see next to commercial cash?
12         A.        850.
13         Q.        And then what's underneath?
14         A.        That is $9,273.
15         Q.        Isn't that 19,000?
16         A.        19,000.
17         Q.        Was it common to pay contractors in
18    cash?
19         A.        That's not cash.  If you refer back
20    to -- so the $850 was being transferred to me, yes,
21    as my payment.
22         Q.        For what?
23         A.        For holding the license.
24         Q.        So during this time, during 2020,
25    did you do any work for Glass & Concrete?
```

```
 1          A.        Yeah.  I held the license.

 2          Q.        What does that entail?

 3          A.        The same as we talked about

 4    earlier.

 5          Q.        Can you describe what you were

 6    doing for Glass & Concrete?

 7          A.        I would be available if they had a

 8    question, but they barely reached out to me.  And I

 9    held the license.  That was it.

10          Q.        Did you ever go into the office

11    during that time?

12          A.        Hardly ever.  No.  I only recall

13    one time, and I met with ███████ and ███████ and they

14    were asking me some questions about jobs, and I

15    think that was it for a couple of years.

16          Q.        Who is ███████████ again?

17          A.        She worked there.

18          Q.        What about ███████

19          A.        She worked there.

20          Q.        Okay.  What projects was Glass &

21    Concrete Contracting working on during this time?

22          A.        I'm not sure.

23          Q.        But as the person who was holding

24    the license, certainly you'd have to know that,

25    wouldn't you?
```

TENNESSEE
(615) 595-0073

```
 1          A.        Not necessarily, no.

 2          Q.        Did you communicate with Sean

 3    Williams during that time?

 4          A.        Very little.

 5          Q.        Why did they keep you on the

 6    payroll, then?

 7          A.        Again, I held the license and --

 8    I'm not sure.  I gave them the option to just buy me

 9    out, hire another contractor, leave me alone, and

10    they didn't take that.

11          Q.        Do you remember having a phone call

12    with me?

13          A.        Yeah.

14          Q.        Do you remember telling me that you

15    had no financial relationship with Glass & Concrete

16    Contracting for many, many years?

17                    MR. RADER:  Object to the form.

18          A.        I wasn't in control.  I didn't --

19          Q.        (BY MS. BAEHR-JONES) But you were

20    being paid $850 every week, it looks like.

21          A.        Yeah.  I was making money, as I

22    should.

23          Q.        So that wasn't true, what you told

24    me over the phone.

25                    MR. RADER:  Object to the form.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    MS. BEREXA:  Object to the form.

 2           A.        What you were inferring over the --

 3   what you were insinuating over the phone was

 4   completely inappropriate, and it wasn't pertaining

 5   to my payroll.

 6           Q.        (BY MS. BAEHR-JONES) What I'm

 7   talking about is what you said to me, your words

 8   about your relationship with Glass & --

 9           A.        In response to statements --

10           Q.        Let me finish --

11           A.        -- that you made that were not

12   specific.

13           Q.        Ms. ▮Female 4▮, you have to let me

14   finish the question before you try to answer it.

15                     When I asked you about Glass &

16   Concrete, you stated that you had no financial

17   connection to that company for years.

18                     That was not true, was it?

19           A.        I don't believe that I said I had

20   no financial connection.

21           Q.        Well, you told me --

22           A.        I do believe that I told you I

23   didn't have control over that company.  I was not

24   working there from day to day.

25           Q.        Do you --
```

Lexitas   TENNESSEE
(615) 595-0073
#9925

```
 1          A.          But I would like to go back to the

 2    last question, though, and I just want to state the

 3    $850, yes, that was my salary for my licensing.  But

 4    the other numbers that you've referenced, like the

 5    40,000, the 19,000, those were to other

 6    subcontractors for physical labor on a job.  Those

 7    were not to me.  So I don't know why you're bringing

 8    those up in reference to my $850, but just --

 9          Q.          How do you know that?

10          A.          It's on these.  Where else --

11          Q.          Where is it going?

12          A.          To subcontractors.  Primarily

13    Skyline Restoration.  I've just seen one of them.

14          Q.          But you testified earlier that your

15    name would appear on Skyline's bank accounts,

16    correct?

17          A.          Not -- I don't think at that time.

18    I've helped Avery over the years do a lot of things,

19    but I was -- the only money I ever made from

20    Skyline -- typically, I was the one paying them

21    because of their physical labor.  The only money I

22    ever made, I charged them a hourly rate for

23    consulting.

24          Q.          Okay.  When would your name first

25    start appearing on Skyline's bank accounts?
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          A.          I'm not sure if it's actually
 2   listed on their bank accounts.  I just know that I
 3   could pay their line of credit if I needed to.  I
 4   could collaborate with ██████ and say, "Okay, this is
 5   what I would do if I were you.  This is what" -- a
 6   consultant.
 7          Q.          Can you name one project that you
 8   worked on with Skyline?
 9          A.          It was less about a project basis
10   and more about a business directive.
11          Q.          Okay.  Can you name one person that
12   you coordinated with for Skyline outside of the
13   company?
14          A.          What do you mean, outside of the
15   company?
16          Q.          Anybody -- anybody who was on a
17   project that you worked on for them?
18          A.          Again, it wasn't a project basis.
19   It was more of the directive of his entire company.
20   I would advise him.
21          Q.          And that company was getting tens
22   of thousands of dollars from Glass & Concrete,
23   correct?
24          A.          For work, yeah.
25          Q.          And it's listed as commercial cash
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    on these records, right?
 2           A.        Because it was a transfer from GCC
 3    to them.
 4                     MS. BAEHR-JONES:  Okay.  We're
 5           going to just have this admitted.  Let's
 6           just do the next exhibit.
 7                     COURT REPORTER:  The next exhibit
 8           is 78.
 9                     (Exhibit 78 marked).
10           Q.        (BY MS. BAEHR-JONES) Okay.
11    Ms. ▮Female 4▮, can you take a look at this and tell
12    me what this is?
13                     MS. BEREXA:  Is there a Bates
14           number?
15                     MS. BAEHR-JONES:  No, there's not.
16           There's copies.
17           Q.        (BY MS. BAEHR-JONES) What is this?
18           A.        It's my LinkedIn profile.
19           Q.        And can you look on Page 2, I think
20    it might be on the back, and tell me what it lists
21    under experience.
22           A.        Uh-huh.
23           Q.        What does it say there?
24           A.        "Experience:  Owner, Skyline
25    Contractors Group."
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          Q.      And what dates?

 2          A.      January 2018 to November 2022.

 3          Q.      Where did you bank with Skyline

 4   Contractors Group?

 5          A.      I never made money from that.

 6          Q.      But you're listed as an owner.

 7          A.      I was the -- it was my company.  No

 8   one else was involved in that.  It was designed for

 9   me to branch out and to start consulting.  I decided

10   the climate, the industry at the time, it wasn't the

11   appropriate time for me to do that.  So I didn't.  I

12   never made money from that.

13          Q.      But that wasn't my question.

14                  I said where did you bank?

15          A.      I don't think I even opened the

16   bank -- actually, I didn't have a bank account for

17   that company.

18          Q.      So there was no bank account.

19                  Did you ever have any invoices?

20          A.      I never made money from it.  There

21   would be no invoices.

22          Q.      Ever any projects?

23          A.      No.

24          Q.      But you listed it as that you were

25   the owner for four years.
```

```
1          A.       Yes, on my LinkedIn profile.
2          Q.       Okay.  I'm going to hand you what's
3    been marked as RENASANT --
4               MS. BAEHR-JONES:  I'm sorry.  We'll
5          mark it as Exhibit --
6               COURT REPORTER:  79.
7               MS. BAEHR-JONES:  -- 79.
8               (Exhibit 79 marked).
9               MS. BEREXA:  Can you tell us the --
10              MS. BAEHR-JONES:  We will get to
11         that.  I have copies, and everything is Bate
12         stamped in this.
13              MS. BEREXA:  Let's put the Bates
14         number on the record.
15              MS. BAEHR-JONES:  So this is going
16         to be -- we'll start with Bates 1352.
17         Q.       (BY MS. BAEHR-JONES) But let me
18   just ask you, once Williams was on the run, and you
19   testified that at some point you knew that he was a
20   fugitive, correct?
21         A.       Yeah.  I can tell you exactly when
22   if you need me to.
23         Q.       Well, before you couldn't remember,
24   but now you can?
25         A.       I have to look at my phone.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1                    MR. RADER:  Object to the form.
 2         A.         And I said that before.
 3         Q.         (BY MS. BAEHR-JONES) Okay.  What
 4   did you find on your phone?
 5         A.         I haven't done that yet.  I did not
 6   look at my phone yet.
 7         Q.         But now you do remember?
 8         A.         I can look at my phone and tell you
 9   when, as I said earlier.
10         Q.         Well, let me ask you this:  Do you
11   remember when he went -- when you realized or when
12   you knew that he was a fugitive?
13         A.         The exact date?
14         Q.         Well, you just said you do
15   remember.
16                    Do you not remember?
17         A.         I have to look at my phone for the
18   exact date.  How many times do I need to say that?
19         Q.         Okay.  What are you looking for on
20   your phone?
21         A.         I can reference a photograph,
22   because I was out of town when it happened, and I
23   remember where I was when I got the phone call.
24         Q.         Okay.  Do you want to look at your
25   phone right now and do that?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1            A.        Sure.

 2            Q.        Okay.  Great.

 3                      MR. RADER:  While she's doing that,

 4            I'm going to object to this Exhibit No. 79

 5            being a bunch of pages out of order and not

 6            connected with each other.

 7                      MS. BAEHR-JONES:  Okay.  Thank you.

 8                      MR. RADER:  You're welcome.

 9            A.        I found out March the 7th of 2022.

10            Q.        (BY MS. BAEHR-JONES) And what are

11     you looking at on your phone?

12            A.        A photograph.

13            Q.        What's the photograph of?

14            A.        Of my mother sitting on the beach.

15            Q.        Why does that refresh your memory?

16            A.        Because I was having a nice,

17     relaxing day on the beach with my mother, and I got

18     a phone call discussing that he was on the run.

19            Q.        What date did you say it was?

20            A.        March the 7th of 2022.

21            Q.        Where were you with your mom?

22            A.        Daytona.

23            Q.        And who made the phone call to you?

24            A.        I believe that that was Kevin

25     Peters.
```

LEXITAS TENNESSEE
(615) 595-0073

```
 1          Q.      Kevin Peters called you to tell you
 2   that --
 3          A.      I believe -- I believe that it was
 4   someone with the Johnson City Police Department.
 5          Q.      How often have you talked to Kevin
 6   Peters?
 7          A.      A few times right around that
 8   point.
 9          Q.      Okay.  What did you talk about?
10          A.      Sean Williams being on the run.
11          Q.      Why did he call you to tell you
12   that?
13          A.      I'm not really sure.
14          Q.      Do you remember being on Daytona
15   Beach and having a conversation with Kevin Peters
16   about Sean Williams being on the run?
17          A.      Yeah.
18          Q.      When did you first start talking to
19   Kevin Peters?
20          A.      I think that was the first time I'd
21   ever talked to him.  I know it was the first time I
22   ever talked to him.
23          Q.      But you said you've talked to him
24   several times.
25          A.      Right around that period, maybe two
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    or three phone calls.

 2            Q.        Okay.  So in March of 2022.

 3            A.        Yeah.

 4            Q.        What else did you talk about with

 5    him?

 6            A.        That was it.

 7            Q.        So he called you.  You're in

 8    Daytona Beach, right?  You're with your mother, and

 9    he tells you that you should know Sean Williams is

10    on the run?

11            A.        Yes.

12            Q.        Did you ask any questions?

13            A.        I'm -- I don't really recall every

14    single thing that happened in that conversation.  I

15    think that I was just kind of like, "Wow, that's

16    serious," and it's not every day you get a phone

17    call like that.

18            Q.        Do you know how he had his -- your

19    phone number?

20            A.        I do not.

21            Q.        How did you know who -- did you

22    know who Kevin Peters was?  Did he introduce

23    himself?

24            A.        Yeah, he introduced -- of course.

25            Q.        What did he say?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          A.        He was very nice.  I think he just
 2    called to basically say, you know, he is on the run
 3    and he might have asked, you know, like do you know
 4    where he's at or anything like that, and I would
 5    tell him what I knew.  That was that.
 6          Q.        How did he introduce himself?
 7          A.        I don't recall.
 8          Q.        Did you know that he was a captain
 9    in the Johnson City Police Department?
10          A.        I didn't know his position.
11          Q.        Sitting here today, do you know his
12    position?
13          A.        Not until you just said he was a
14    captain, no.
15          Q.        What did you think his position
16    was?
17          A.        I didn't really think about it.  I
18    just heard police department.  That was it.
19          Q.        So he told you he was a police
20    officer?
21          A.        He said he was with the Johnson
22    City Police Department.
23          Q.        Okay.
24          A.        That's all I retained.  He very
25    well may have said, you know, that.  But that's all
```

LEXITAS TENNESSEE
(615) 595-0073

```
 1    I registered on the beach.

 2          Q.       Okay.  So you talked to Kevin

 3    Peters on March --

 4                    VIDEOGRAPHER:  Can we go off the

 5          record?

 6                    I'm sorry.  We've got a back-up

 7          problem over here.

 8                    MS. BAEHR-JONES:  Okay.

 9                    VIDEOGRAPHER:  Going off the record

10          at 12:37.

11          (Off the record at 12:37 p.m.)

12           (On the record at 12:39 p.m.)

13                    VIDEOGRAPHER:  We're back on the

14          record at 12:39.

15    BY MS. BAEHR-JONES:

16          Q.       When was the next time you spoke to

17    Kevin Peters?

18          A.       I'm not sure.

19          Q.       What would you have talked about

20    next?

21          A.       I believe that I actually called

22    him to say, "Hey, I'm kind of worried.  I don't want

23    to have to deal with, you know, this."  But I

24    don't -- I don't recall him calling me again after

25    that.  So it may have been me calling him.  I'm not
```

1    sure.

2              Q.        So you called him again, and he

3    called you.  You said several times you spoke to

4    him.

5                        What else did you talk about?

6                        MR. RADER:  Object to the form of

7              the question.

8              A.        The only thing we talked about was

9    Sean Williams.

10             Q.        (BY MS. BAEHR-JONES) What else was

11   there to say at that point?

12             A.        I mean, once I found that out, I

13   mean, I felt like it was kind of -- you don't

14   know -- it's not a phone call you expect.  This is

15   not a situation that you anticipate in any sort of

16   situation.

17                       But I think a lot of it was me

18   being anxious and very concerned, not just about

19   what the hell do I do about the business and what am

20   I going to do, but also -- you know, I think I

21   offered to help in any way I can, like that kind of

22   thing.  But I think that's all.  I know that's all.

23             Q.        Well, Sean had been on the run

24   since May of 2021.

25                       So why did Kevin Peters call you in

Lexitas  TENNESSEE
(615) 595-0073

```
 1   March of 2022, to your knowledge?

 2                  MR. RADER:  Object to form.

 3        A.        I'm not sure.

 4        Q.        (BY MS. BAEHR-JONES) Did he say why

 5   he was calling then?

 6        A.        I think it was really to inform me.

 7        Q.        And the next month you opened an

 8   account that only had your signature on it that was

 9   doing business as Glass & Concrete, correct?

10        A.        I wasn't doing business with -- as

11   Glass & Concrete Contracting.  There was no DBA set

12   up.  It wasn't anything like that.

13        Q.        Okay.  Well, let's look at that

14   record then.

15        A.        It was to close out those existing

16   jobs, as I've stated I think three times now, that

17   were open.  And I did feel that it was my due

18   diligence and the right thing to do to not just

19   simply walk away if I could pay subcontractors,

20   which is what I tried to do at that moment.

21                  MS. BAEHR-JONES:  Okay.  We're

22            going to mark this as Exhibit --

23                  COURT REPORTER:  No. 80.

24                  (Exhibit 80 marked).

25        Q.        (BY MS. BAEHR-JONES) What is this
```

Lexitas - TENNESSEE
(615) 595-0073

1    document?

2         A.      This is the account that I opened

3    up, GCC, the abbreviation, just so I could deposit

4    those few checks that were out there and pay people.

5         Q.      And it's a DBA, correct?

6         A.      On banking documents, yes, but it

7    wasn't like an actual company or anything.  It was

8    just the closing out of GCC.

9         Q.      And at this date, it's just your

10   signature on the account, correct?

11        A.      Yeah, because I was the only one

12   doing anything.  No one else was associated with

13   this.

14        Q.      It was a way for you to move funds

15   from the old Glass & Concrete Contracting accounts

16   to a new account that only you controlled, correct?

17                MR. RADER:  Object to the form.

18        A.      No, that is incorrect.

19        Q.      (BY MS. BAEHR-JONES) Well, the

20   funds moved from the old account to this account,

21   right?

22        A.      That is incorrect.

23        Q.      What's the number for the account

24   at the top, the last four numbers in that?

25                So we're looking at Exhibit No. 80.

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    In the top right corner, do you see
 2     those last four digits of the account number?
 3           A.      It says ████
 4           Q.      ████ correct.
 5                   And that's the account number for
 6     the new bank account that you opened only in your
 7     name, right?
 8           A.      Uh-huh.
 9                   MS. BAEHR-JONES:  Okay.  I'm going
10           to find out what the mark is, RENASANT1176,
11           and this is going to be marked as Exhibit --
12                   COURT REPORTER:  81.
13                   MS. BAEHR-JONES:  -- 81.
14                   (Exhibit 81 marked).
15                   MS. BAEHR-JONES:  I think we need
16           to go to -- I'm sorry.  I'm too fast for the
17           tabs.
18           Q.      (BY MS. BAEHR-JONES) Okay.  So
19     looking at the last four digits on this account,
20     what are those?
21           A.      ████
22           Q.      And what does it say as the address
23     line for this?
24           A.      ██████████
25           Q.      Sorry.  For the company.
```

```
 1            A.        ████████████████████████

 2            Q.        No, I apologize.

 3                      What is the name of the company in

 4     the address line?

 5            A.        Glass & Concrete Contracting.

 6            Q.        So is this the account that Glass &

 7     Concrete Contracting was using with Renasant Bank

 8     during the time -- for many, many years?

 9            A.        I believe so.

10            Q.        So this is the old account ending

11     in ██████  right?

12            A.        Uh-huh.

13            Q.        And this is a statement from April

14     to May of 2022.

15                      And what is the balance at the end

16     of that time period?

17            A.        Negative $10.

18            Q.        Right.

19                      So this account no longer has any

20     money in it, right?

21            A.        Yeah.

22                      MS. BAEHR-JONES:  Okay.  We're

23            going to hand out what we'll mark as

24            Exhibit -- what are we on?

25                      COURT REPORTER:  82.
```

```
 1                    MS. BAEHR-JONES:  82.

 2                    (Exhibit 82 marked).

 3          Q.       (BY MS. BAEHR-JONES) What's the

 4    last four digits on this account, if you look at the

 5    top?

 6          A.       ████

 7          Q.       So this is now the account that you

 8    control, correct?

 9          A.       Yes.

10          Q.       And it has your name and DBA GCC

11    Contracting on it.

12          A.       Yep.

13          Q.       Okay.  And what is the months for

14    this statement?

15          A.       4/26.

16          Q.       So this is a statement for April of

17    2022.

18          A.       Uh-huh.

19          Q.       And we're looking at RENASANT11.

20          A.       Uh-huh.

21          Q.       And what -- can you just tell me

22    what's the additions and subtractions line, just the

23    amounts for that month?

24          A.       The additions were 17,220.  The

25    subtractions for 13,535.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          Q.      And if you look at April 29th, it
 2   says a direct deposit.
 3                  Who is that from?
 4          A.      Tessier & Associates.  That was for
 5   a job --
 6          Q.      Which job?
 7          A.      -- that was not wrapped up.  And
 8   since GCC was no more, I went ahead and cashed that
 9   and paid everyone.
10          Q.      When did you cash that check?
11                  MR. RADER:  Object to the form.
12          A.      I deposited it on 4/29.  It's on
13   the first page.
14          Q.      (BY MS. BAEHR-JONES) Okay.  What
15   was the project that you were getting paid on for
16   that?
17          A.      I believe that was the Capital
18   Center.
19          Q.      Okay.  Where's that?
20          A.      Asheville.
21          Q.      Where in Asheville?
22          A.      I don't recall locations again.  If
23   I do, I'll tell you.
24          Q.      Who was the person that was the
25   point person for Capital Center project?
```

Lexitas—TENNESSEE
(615) 595-0073

```
 1        A.       I cannot remember my point of
 2   contact.
 3        Q.       Who at Tessier & Associates were
 4   you speaking with?
 5        A.       That's what I'm saying.  I do not
 6   remember my point of contact.
 7        Q.       Okay.  Would they be in your phone?
 8        A.       I don't know who it would have been
 9   from that company.  It's a pretty large company.
10   It's a project management company.
11        Q.       Do you have an invoice from that?
12        A.       Most likely just emails from them,
13   their primary office or accounts payable.
14        Q.       From what email would you have
15   emailed them?
16        A.       At this time,
17   ███████████████████████ probably.  I don't think
18   I was using anything to do with GCC.
19        Q.       So how do you know it was for the
20   Capital Center project?
21        A.       I can recognize from Tessier.
22        Q.       How many projects did you work on
23   for them?
24        A.       Just me?
25        Q.       Well, let's start with just you.
```

1    Let's start with just you.

2              A.        I mean, I think after I closed that

3    one out, I didn't do any more work with them.

4    They -- that was just a customer that I couldn't

5    retain and bring over to my own company because GCC

6    had been so mismanaged.

7              Q.        Which customer?

8              A.        Tessier & Associates, the one we're

9    talking about.

10             Q.        Did you get that -- okay.  That was

11   a direct deposit.

12                       Do you know where they bank?

13             A.        No.

14             Q.        How long did Glass & Concrete work

15   with them?

16             A.        Years.

17             Q.        Since when?

18             A.        I do not know.

19             Q.        What other projects did they work

20   on with them?

21             A.        Over the years, I'm not sure.  The

22   only reason that I recall that one is because I had

23   to actually step in and finish it.

24             Q.        Okay.  So you recall what it was

25   for, but you don't recall who was working on it.

```
 1              A.       No.

 2              Q.       Do you recall any employee who

 3       worked on it for Glass & Concrete?

 4              A.       Huh-uh.

 5              Q.       You said you cashed it out so you

 6       could pay the subcontractors.

 7                       Who are you paying?

 8              A.       Well, subcontractors and employees

 9       are different.  No employees were even around at

10       this time.  There was no GCC.  There was no more

11       employees.  Nobody was going into the office at this

12       point.  It was done.  It was dissolved, I'm pretty

13       sure.

14                       And there had to be a subcontractor

15       on there, and I'm sure that I had the bank either

16       pay them or I did.  It was most likely this $13,535

17       right there.  That's probably what I paid the

18       subcontractor.

19              Q.       Which subcontractor?

20                       Sorry.

21              A.       I do not know.

22                       MS. BAEHR-JONES:  Okay.  I want to

23              hand you what's been marked as exhibit --

24              what's our next one.

25                       COURT REPORTER:  83.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    MS. BAEHR-JONES:  83.

 2                    (Exhibit 83 marked).

 3                    MS. BEREXA:  What's the Bates

 4          number?

 5                    MS. BAEHR-JONES:  Well, we're going

 6          to move around.

 7          Q.        (BY MS. BAEHR-JONES) It starts with

 8     Bates 129, but I want you to flip to what's been

 9     marked as Bates -- let's look to the end.  Let's go

10     to March 31st.  Bates 11172.

11          A.        So we're going back to -- sorry.

12          Q.        So we're going to go flip -- we're

13     going to flip all the way to the last two pages of

14     this, Pages 1172 and 1168.  This is from March to

15     April of 2022.  And it's 1395, which is the last

16     four digits of Glass & Concrete Contracting

17     Company's bank account.  And I want you to turn to

18     the second page of this, and this is 1168.

19          A.        Uh-huh.

20          Q.        Do you see where it says payroll,

21     payroll, payroll, payroll, payroll, 2,875?

22          A.        Yep.

23                    MR. RADER:  All right.  Hold on.

24                    I object to the lengthy speech that

25          wasn't a question.  I object to the
```

Lexitas TENNESSEE
(615) 595-0073

```
 1              introduction of Exhibit No. 83.  It's a
 2              number of scattered pages out of order.
 3                        MS. BAEHR-JONES:  Okay.  Great.
 4         Q.        (BY MS. BAEHR-JONES) So looking at
 5    RENASANT1168, do you see that in front of you?
 6         A.        Yeah.
 7         Q.        And the date is March 31st, 2022.
 8         A.        Uh-huh.
 9         Q.        You just testified there was no one
10    on payroll.  There were no employees for Glass &
11    Concrete Contracting.
12         A.        From April, the end of April, and
13    then you just bounce back to the beginning of March.
14         Q.        Oh, okay.
15         A.        This was the ending period.
16         Q.        So who was being paid in March of
17    2022?
18         A.        The only employees that I know of
19    were ███████████████, and Female 5.  And then everyone
20    else was subcontractors.
21         Q.        So there's pretty large amounts of
22    payroll being withdrawn here.
23                   Who is that going to?
24         A.        Those employees.  But also, when
25    you go through a payroll company or you do
```

Lexitas   TENNESSEE
(615)595-0073

```
 1    QuickBooks, it bunches them together on a bank
 2    statement.  So that doesn't mean that somebody
 3    actually got paid $2800 or whatever it was.
 4         Q.       Okay.  So your testimony is that
 5    these payroll withdrawals would be to ████████
 6    ████████  and  Female 5 ?
 7                   MR. RADER:  Object to the form.
 8         A.       Those were the only employees that
 9    were there.
10         Q.       (BY MS. BAEHR-JONES) Were you
11    still --
12         A.       And ████████
13         Q.       Were you still getting money from
14    withdrawals?
15         A.       At the end I believe that it was
16    questionable whether payroll could be made or not.
17    And I think I started foregoing any sort of payment,
18    because I wanted to make sure that they had
19    paychecks.
20         Q.       Which payroll company did you use?
21         A.       They used QuickBooks.  They didn't
22    use a payroll company.  Someone in there done it.
23         Q.       And who was their bookkeeper at
24    this time?
25         A.       I do not know.
```

```
 1          Q.       Where -- do you know where these
 2   records are?
 3          A.       No, I do not.
 4          Q.       Okay.  I want you to look at
 5   March 4th.  There's a withdrawal that says Blount
 6   Investment Sale.
 7                   What was that for?
 8          A.       I do not know.  I wasn't involved
 9   enough to know what some of this is.
10          Q.       So who was controlling the finances
11   at this point for Glass & Concrete?
12          A.       The office was pretty self -- I
13   mean, nobody was in charge there.  They were just
14   doing whatever they had to do.
15                   I guess it would be ███████ or
16   ███████
17          Q.       ████████████████
18          A.       Uh-huh, or ███████
19          Q.       So they were still working at Glass
20   & Concrete?
21          A.       Up until the very end, yeah.
22          Q.       Were you in charge?  Were you
23   making any of these transactions in March of 2022?
24          A.       I don't believe so.
25          Q.       Well, you signed authorization
```

Lexitas - TENNESSEE
#: 5895
(615) 595-0073

```
 1    slips during that time, didn't you?
 2              A.       I'd have to see them, but I wasn't
 3    signing checks or anything.
 4                   MS. BAEHR-JONES:  Let's go off the
 5              record.
 6                   VIDEOGRAPHER:  Going off the record
 7              at 12:58.
 8                 (Off the record at 12:58 p.m.)
 9                 (On the record at 2:05 p.m.)
10                   VIDEOGRAPHER:  Okay.  We're back on
11              the record at 2:05.
12                   MS. BAEHR-JONES:  Okay.  Welcome
13              back, Ms.  Female 4 .
14                   I want to ask the court reporter to
15              read back some of your testimony from right
16              before we took a break.
17                   Can I ask you to read back just the
18              last few questions and the answers, please?
19                   COURT REPORTER:  Sure.  Okay.
20                   Question:  So who was controlling
21              the finances at this point for Glass &
22              Concrete?
23                   Answer:  The office was pretty -- I
24              mean, nobody was in charge there.
25                   Question:  You were just doing
```

Lexitas  TENNESSEE
(615) 595-0073

```
 1          whatever they had to do.
 2                    Answer:  I guess it would be
 3          ██████████████████████
 4                    Question:  ████████████████████
 5          Or ████████████
 6                    So they were still working at Glass
 7          & Concrete?
 8                    Up until the very end, yeah.
 9                    Question:  Were you in charge?
10          Were you making any of these transactions in
11          March of 2022?
12                    Answer:  I don't believe so.
13                    Question:  Well, you signed the
14          authorization slips during that time, didn't
15          you?
16                    Answer:  I'd have to see them, but
17          I wasn't signing checks or anything.
18                    Then we went off the record.
19                    MS. BAEHR-JONES:  Thank you.
20                    So I'm going to mark the next
21          exhibit, which should be -- can you give
22          me --
23                    COURT REPORTER:  This will be
24          Exhibit 84.
25                    (Exhibit 84 marked).
```

Lexitas TENNESSEE
(615) 595-0073

```
 1                    MS. BAEHR-JONES:  Thank you.  And

 2          there's some copies.

 3   BY MS. BAEHR-JONES:

 4          Q.      I'm going to ask you to turn to --

 5                    MS. BEREXA:  What's the Bates

 6          number?

 7                    MS. BAEHR-JONES:  Well, I'm going

 8          to give it.

 9                    MS. BEREXA:  I need to pull it up.

10          Q.      (BY MS. BAEHR-JONES) I'm going to

11   ask you to turn to RENASANT1175, which is the last

12   page of this exhibit.

13                    MR. RADER:  All right.  Before you

14          do, let me just raise the same objection

15          with respect to this exhibit being selected

16          pages, missing pages, and out of order.

17                    MS. BAEHR-JONES:  Okay.  Great.

18          Q.      (BY MS. BAEHR-JONES) So this is --

19   if you look at the top here, what's the date at the

20   very top of the page?

21          A.      4/29.

22          Q.      Of what year?

23          A.      2022.

24          Q.      And if you look at some of these

25   transfers, do you see your name listed on one from
```

Lexitas - TENNESSEE
(615) 595-0073
#: 5995

```
 1    February 1st of 2022?

 2                      Correct?

 3           A.         February 1st?

 4           Q.         Sorry.  Sorry.  I apologize.

 5    April 1st of 2022.

 6                      That's Glass & Concrete to [Female 4]

 7    [Female 4].  That's your signature, right, of

 8    $1,000?  It's the second one down on the left.

 9           A.         Yes.

10           Q.         And then below that is a transfer.

11    It says, "Description of withdrawal:  Glass &

12    Concrete to [Female 4]," on April 18th, 2022,

13    correct?

14           A.         Uh-huh.

15           Q.         And that's for $2,450?

16           A.         Uh-huh.

17           Q.         And that's your signature

18    underneath?

19           A.         That is.

20           Q.         And that's from the account ending

21    in ▇▇▇▇ correct?

22           A.         Yes.

23           Q.         And when we were looking at

24    Exhibit 71, that's an account that you added your

25    signature to in February of '22, 2022, correct?
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          A.      Yes.
 2          Q.      So is it fair to say that in April,
 3    around April 18th, 2022, you're moving money out of
 4    the Glass & Concrete account and transferring it to
 5    yourself?  Correct?
 6          A.      I don't know where that was
 7    transferred to.
 8          Q.      Well, it says to [Female 4],
 9    right?
10          A.      I know, but that's probably for
11    payment for something that I was doing.
12          Q.      But you're the one authorizing that
13    movement.
14          A.      Yes.
15          Q.      Okay.  And then I want you to look
16    at the next -- on the other side of that, it says
17    also on 4/18 also your authorizing it, and that's,
18    "Description of withdrawal:  Glass & Concrete,"
19    8,250 to [          ]  8,000 to [          ] and 250
20    to Vertical Access Pros.
21          A.      Uh-huh.
22          Q.      What's Vertical Access Pros?
23          A.      It would be a subcontractor used.
24          Q.      Okay.  Where are they located?
25          A.      I'm not sure who works there.  I do
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    not know.

 2         Q.       Have you ever talked to anyone at

 3    that company?

 4         A.       I'm sure that I have, but I don't

 5    know who actually owns that.

 6         Q.       What city are they located in?

 7         A.       I don't know.

 8         Q.       Are they a Johnson City company?

 9    Somewhere else?

10         A.       I doubt it.  It's probably

11    Asheville.

12         Q.       Okay.  And then above that, there's

13    another one on April 8th, "Female 4 account, per

14    Female 4 by phone."

15                  Do you see that?

16         A.       Uh-huh.

17         Q.       And then there's one, a deposit on

18    April 18th, 2022 to Glass & Concrete of 11,400.

19                  Do you know what that was for?

20         A.       A job.

21         Q.       Which one?

22         A.       I don't know.

23         Q.       Well, what jobs was Glass &

24    Concrete doing during that time?

25         A.       I don't know.
```

```
 1          Q.      Were they doing any jobs?

 2          A.      Yeah, they were doing jobs.  It was

 3     a business.

 4          Q.      Well, who was working for the

 5     company then?

 6          A.      ███████████████  Female 5 , and

 7     subcontractors.

 8          Q.      You said before the break that it

 9     was basically dissolved by that point and you

10     were --

11          A.      I'm sure --

12                  MR. RADER:  Object to the form.

13          A.      I'm pretty sure that it was,

14     though.  I don't know.  This could be one of those

15     payments where I actually had to get it, and then

16     immediately pay it back out.  I'm not sure.

17          Q.      (BY MS. BAEHR-JONES) Okay.  I want

18     you to turn to the second page of this exhibit.

19     It's RENASANT1157, and I want you to look at what's

20     been marked on the bottom.

21                  This is -- looking at the top it

22     says January 31st, 2022, correct?

23          A.      Uh-huh.

24          Q.      And if you look at the line on

25     January 14th, it says a direct deposit.
```

#: 6235
Lexitas TENNESSEE
(615) 595-0073

```
 1                    Where is that from?

 2                    Sorry.  This is Page 2.  If you

 3      look down in the deposit description area --

 4           A.       Tessier & Associates.

 5           Q.       And how much was that for?

 6           A.       $7,225?

 7           Q.       What project was that for?

 8           A.       I do not know.

 9           Q.       Okay.  Do you know what any of

10      these other deposits are for in that time period?

11           A.       It would be for jobs.

12           Q.       What jobs were going on then?

13           A.       I do not know.

14           Q.       Who would know?

15           A.       Anybody who has access to the GCC

16      records.

17           Q.       Who would that have been in 2022?

18           A.       ████████████████████

19           Q.       ███████████ who?

20           A.       █████████

21           Q.       ███████████████ and ███████ who?

22           A.       ████████

23           Q.       ████████

24                    Do you have their phone numbers?

25           A.       Possibly.
```

TENNESSEE
(615) 525-0073

```
 1          Q.      Okay.  Let's look at 1169.  It's
 2    the next page in the exhibit.  It's RENASANT1169.
 3                  Do you see here -- I want you to
 4    look very -- at the bottom.  Again, this is Glass &
 5    Concrete Contracting, LLC at the top.
 6                  And you see that it's ending in
 7    ████████ correct?
 8          A.      Uh-huh.
 9          Q.      Sorry.  At the top it says
10    March 31st, 2022.
11          A.      Uh-huh.
12          Q.      Now, if you look down here at the
13    bottom on March 29th, do you see where it says
14    incoming wire?
15          A.      Yeah.
16          Q.      Who is that from?
17          A.      I have no idea.
18          Q.      It says ████████████; is that
19    correct?
20          A.      Uh-huh.
21          Q.      And █████████ something, and
22    it's for $8,102.
23          A.      I have no idea what that is.
24          Q.      What about the one underneath it?
25    It says, "Incoming wire, Org ████████████ OBI
```

Lexitas - TENNESSEE
(615)522-0073

```
 1    Sean Williams."
 2              A.        I have no idea what that is.
 3              Q.        But by this point you had added
 4    your name to the account just the prior month in
 5    February, correct?
 6              A.        Yeah, but I still wasn't dealing
 7    with stuff day-to-day.  I was only doing what I had
 8    to do out of necessity, and I have no idea what
 9    these are.
10              Q.        Well, when we go back and get
11    further bank records, who is it going to show came
12    into the bank to deal with all of these deposits and
13    transfers?
14                        MR. RADER:  Object to the form.
15              A.        I don't know.
16              Q.        (BY MS. BAEHR-JONES) Is it going to
17    show that it was only you at that time?
18              A.        I doubt that.
19                        MR. RADER:  Object to the form.
20              A.        I'm not sure.
21              Q.        (BY MS. BAEHR-JONES) You're not
22    sure.
23                        What was this transfer from Sean
24    Williams?
25                        MR. RADER:  Object to the form.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          A.       That's -- I don't believe that's a

 2    transfer from Sean Williams.

 3          Q.       Is it -- OBI.

 4                   Does OBI mean for the benefit of

 5    Sean Williams?

 6          A.       I do not know.

 7          Q.       Was this a wire transfer that was

 8    meant to go to Sean Williams in March 29th, 2022?

 9          A.       I do not know what those are,

10    again.

11          Q.       Okay.  I want to turn your

12    attention to Exhibit No -- what's already been

13    marked as Exhibit 79.  So it should be in front of

14    you.  If you could go ahead and grab that, I want

15    you to look at the first page of this.

16                   MR. RADER:  Which exhibit number?

17                   MS. BAEHR-JONES:  79.

18                   MR. RADER:  Thank you.

19                   MS. BAEHR-JONES:  And the Bates is

20          going to be RENASANT1352.

21          Q.       (BY MS. BAEHR-JONES) So if you look

22    at the check, it's called Official Check -- up in

23    the right-hand corner on this page, it's for an

24    account ending in ████  is that correct?

25          A.       It is.
```

Lexitas - TENNESSEE
(615) 525-0073

```
 1          Q.      And it's to -- it's made out to

 2   Sean Williams; is that correct?

 3          A.      Yes.

 4          Q.      What's the date of that check?

 5          A.      March 29th, 2022.

 6          Q.      And how much is that check for?

 7          A.      $9,670.

 8          Q.      And if we go back, we were just

 9   talking about a transfer that happened on March 29th

10   of 2022, correct?

11                  And that transfer was for $8,100,

12   and it was for the benefit of Sean Williams,

13   correct?

14                  MR. RADER:  Object to the form.

15          A.      Correct.

16          Q.      (BY MS. BAEHR-JONES) And now we're

17   looking at a check also dated that same day written

18   to Sean Williams; is that right?

19          A.      Yes.

20          Q.      By this time you knew that Sean

21   Williams was a fugitive?

22          A.      Isn't this a check from the bank?

23          Q.      Well, that's what I was going to

24   ask you.

25                  In the authorization line, the
```

LEXITAS TENNESSEE
(615) 525-0073

```
 1   people signing for this check, it says ████████
 2   ███████  But then next to █████████████  there's a
 3   big A.
 4                   Is that an A?
 5        A.         That's not an A.
 6        Q.         What is that?
 7        A.         Compare that signature to the ones
 8   on his checks that he signed earlier.  That's Sean
 9   Williams' signature.
10        Q.         So you're saying that the signature
11   that's on this check is Sean Williams's signature?
12        A.         Yes, and ███████████.
13        Q.         So is it █████████ or is it Sean
14   Williams?
15        A.         It's both on that.  You can see
16   that.  You were the one that pointed out there's two
17   signatures.
18        Q.         I see.  So you think that's Sean
19   Williams' signature next to hers?
20        A.         I do.
21        Q.         Okay.  So why does ████████████████
22   has -- why does she have authority to sign checks
23   for Glass & Concrete?
24                   MR. RADER:  Object to form.
25        A.         I don't think that's what this is.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    This is from the bank.  She works for the bank.

 2            Q.       (BY MS. BAEHR-JONES) So how would

 3    she sign a check for Glass & Concrete?

 4            A.       I do not know the rules or

 5    regulations on any of that.  I have no idea.

 6            Q.       Will I find a record for ████████

 7    ██████ at Renaissance Bank?

 8                     MR. RADER:  Object to the form.

 9            A.       I believe so.

10            Q.       (BY MS. BAEHR-JONES) I will find a

11    record that she was employed there?

12                     MS. BEREXA:  Object to the form.

13                     MR. RADER:  Object to the form.

14            Q.       (BY MS. BAEHR-JONES) Will I?

15                     MS. BEREXA:  Object to the form.

16                     MR. RADER:  Same objection.

17            A.       Possibly.  I'm pretty sure she

18    works there.

19            Q.       (BY MS. BAEHR-JONES) Is she a real

20    person, Ms. █Female 4█?

21                     MS. BEREXA:  Object to the --

22            A.       Are you kidding?  Clearly there's a

23    ████████████████ that I believe works at Renasant

24    Bank.

25            Q.       (BY MS. BAEHR-JONES) Who was
```

Lexitas - TENNESSEE
(615) 525-0073

1   signing checks with Sean Williams in March of 2022?

2          A.       Again, I don't think that she was

3   signing checks.  She -- I believe that she was doing

4   her job at the bank.  I'm not sure what the rules

5   and regulations again on this are.  I have no idea,

6   but she was not employed by us.  I believe she's a

7   Renasant Bank employee.

8          Q.       Okay.  And you see that she then --

9   also on March 29th, the ███████████████ makes a

10  transfer of 9,670 to Sean Williams.

11                  Is that for that check?

12         A.       I don't know.  I would imagine,

13  being the same amount.

14                  MS. BAEHR-JONES:  Okay.  I want to

15          hand the witness the next exhibit if I can,

16          please.

17                  COURT REPORTER:  This will be 85.

18                  MS. BAEHR-JONES:  And here's

19          copies.

20                  (Exhibit 85 marked).

21         Q.       (BY MS. BAEHR-JONES) And we're

22  going to start with what's been marked as

23  RENASANT43.  RENASANT43.

24                  And can you just tell me what the

25  date of this statement is for this first?

Lexitas TENNESSEE
(615) 595-0073

```
 1              A.        May of 2022.
 2              Q.        And what is this for?
 3              A.        Southern Construction & Consulting.
 4              Q.        And what's the current balance --
 5      the previous balance that's listed on this account?
 6              A.        It was $0.
 7              Q.        Okay.  I want you to go all the way
 8      to the very end of this exhibit to what's been
 9      marked as RENASANT66, so this last page.
10              A.        Uh-huh.
11              Q.        And is this for the same company,
12      Southern Construction?
13              A.        Yes.
14              Q.        And what's the statement date on
15      that?
16              A.        Negative $18.
17              Q.        What's the date, though, at the
18      top?
19              A.        The date is February of 2023.
20              Q.        Okay.  And let's just work
21      backwards from there.  So if you go to the next page
22      back, it's going to be RENASANT62.
23                        What's the date on the top of that?
24              A.        November 2022.
25              Q.        And this is, again, for Southern
```

```
 1   Construction, right?
 2          A.      Uh-huh.
 3          Q.      The account that you controlled?
 4          A.      The company that I owned, yes.
 5          Q.      And what's the ending balance
 6   there?
 7          A.      $7.89.
 8          Q.      Okay.  And let's just work our way
 9   backwards.
10                  The next one -- actually, let's go
11   back to RENASANT58, so a couple pages back.  If you
12   can see the Bates at the bottom, it should be 58.
13   On the top it should be September 2022.
14                  What's the ending balance there?
15          A.      33.
16          Q.      Okay.  I want you to go to the next
17   page back.  This is RENASANT54.
18          A.      Uh-huh.
19          Q.      Do you see there at the top those
20   two slips?
21          A.      Yes, I do.
22          Q.      What are the dates for those?
23          A.      8/29 and 8/29.
24          Q.      And when it says transfer in the
25   right one, transfer for account ending in ████ is
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    that your bank account?
 2          A.     Yes.
 3          Q.     And that's your signature on that?
 4          A.     Yes.
 5          Q.     And then the one over it says
 6    97,190, and that's a deposit to the account of
 7    Southern Construction.
 8                 Is that your handwriting there?
 9          A.     No.  That's someone from the bank.
10          Q.     Okay.  And what's the date on that
11    one?
12          A.     8/29.
13          Q.     What was that for?  What was that
14    deposit of $97,000?
15          A.     That was for the job that I done
16    for the Public Service Building in Asheville.
17          Q.     And what was the job again?
18          A.     It was facade restoration for one
19    elevation of the building.
20          Q.     And who did that work for you?
21          A.     Southern Construction -- or shit.
22    Sorry.  Skyline Restoration.
23          Q.     Who at Skyline?
24          A.     The entire team.
25          Q.     Who was that?
```

Lexitas-TENNESSEE
(615) 595-0073

```
 1          A.       I don't dictate who another company

 2    sends out to a job.  So you would have to ask them.

 3    But there was at least two different crews of five

 4    to ten guys on that project for six weeks.

 5          Q.       For six weeks.

 6                   Did you have an invoice with them?

 7          A.       I'm not sure.  That's the job where

 8    I said me and ███████ have been doing business a

 9    long -- we have a trusting relationship.  It's just,

10    "Let's get this done."

11          Q.       So who did you --

12                   MR. RADER:  I'm sorry to interrupt

13          you, Mr. Baehr-Jones.

14                   I've just realized that this

15          Exhibit No. 85 is missing one of the monthly

16          statements and it, like the others, is out

17          of order.  So I'm going to raise that

18          objection.

19                   MS. BAEHR-JONES:  Okay.  Thank you

20          for that.

21          Q.       (BY MS. BAEHR-JONES) Looking back

22    at this, though, who did you get the $97,000 from?

23          A.       It was a management company that

24    oversaw that building, and I think several others.

25          Q.       Which company?
```

Lexitas  TENNESSEE
(615)595-0073

```
 1         A.        I cannot remember the name of that
 2    company.
 3         Q.        So you got a check for $97,000, and
 4    you don't remember the company?
 5         A.        Yeah.
 6         Q.        And it was the only job you did
 7    with Southern Construction?
 8         A.        It was.  I can't -- well, I mean, I
 9    remember the building.  I remember the project.  I
10    don't remember the management company name.
11         Q.        Do you have any record of that?
12         A.        Well, it's right here.
13         Q.        No.  Do you have any record of your
14    communications with that management company?
15         A.        I probably still have a scope of
16    work.
17         Q.        Where would that be?
18         A.        At my house.
19         Q.        Would you have emailed with them?
20         A.        Possibly, but I think I went and
21    met with them.
22         Q.        Where did you meet?
23         A.        I think on the job site one day.  I
24    think I went down there to talk to them and go back
25    over the numbers and everything.
```

Lexitas TENNESSEE
(615)595-0073

```
 1          Q.        Well, how did you first get in

 2    contact with them?

 3          A.        They were a customer of GCC years

 4    prior, and I knew that they still wanted work to be

 5    done.  There was no GCC left.  And I'm like, "I can

 6    do this on my own."  And so I reached out to him and

 7    I said, "I know you still have work to be done.  Let

 8    me give you a proposal.  Let's do this."  They took

 9    me up on that.

10          Q.        So why go through Southern

11    Construction if your name is on the bank accounts

12    for Skyline and --

13          A.        No.  No.  No.  I do not own any

14    portion of Skyline, and I feel like there's

15    intentionally some gray area -- or, you know, it's

16    getting cloudy.  Skyline is a company that I brought

17    in to do work for me.  I do consult back and forth

18    with them on occasion, but this is two totally

19    separate.

20                    At this point in time, I wanted to

21    start a company and to continue doing it.  And I

22    thought I could be very successful at it, and I

23    still do.  Again, the only reason I stopped was

24    because I didn't want the association.

25          Q.        But you testified earlier that your
```

Lexitas - TENNESSEE
(615)595-0073

```
 1    name would maybe be on -- or probably be on the bank
 2    statements for Skyline.
 3            A.      I don't think I'm actually on the
 4    bank account.  I think that my name may be somewhere
 5    on their business stuff, but it would only be like
 6    through a consulting form.  I do not own a
 7    percentage of it.  The only money I've ever made
 8    from that is an hourly consulting fee.  I said that
 9    earlier also.
10            Q.      So I'm confused then.
11                    How did you make money off of this
12    business deal?
13            A.      Well, I bid the job for $97,000,
14    and after materials and everything else, and me
15    paying Skyline Restoration for their labor, which I
16    think was like 47, $48,000, the rest was profit on
17    that job, because I was able to complete it so
18    quickly.
19            Q.      But if you look back at RENASANT52,
20    so turn back a few pages, this is still in -- this
21    is in the new exhibit, so 85.
22                    You see that in the month of July
23    of 2022, that $97,000 came into the bank account and
24    then went out of the bank account, correct?
25            A.      Yeah.
```

LexitasTENNESSEE
(615) 595-0073

```
 1          Q.      So where's the profit to you?
 2          A.      Well, if you had the rest of the
 3   bank statement here or anything else, I could
 4   explain to you.  I paid ████ and then, since I was
 5   not needing capital to continue, I'd already decided
 6   I'm going to take my career in a different direction
 7   at this point, I used the profits of that project to
 8   pay off my car.
 9          Q.      Okay.  Well, let's look at that.
10                  So this is Exhibit 74.  Let's take
11   a look at that.  So this shows what happened in
12   August of 2022 with Southern Construction.
13                  MS. TAYLOR:  What's the Bate stamp
14          number?
15                  MS. BAEHR-JONES:  This is
16          RENASANT55, and we're at Exhibit 74.
17          A.      I don't see 74 over here.
18                  MR. RADER:  It's a single page,
19          front and back.
20                  Okay.  Here it is.
21          Q.      (BY MS. BAEHR-JONES) Okay.  So
22   looking at the front here, it says 97,000.  And then
23   by the end of the month that's gone, correct?
24                  And so you paid yourself $40,000 by
25   paying off a car payment, and then you testified
```

LEXITAS TENNESSEE
(615) 595-0073

```
 1   earlier that ████████ got 7,500 --
 2            A.       Actually, what I said earlier was
 3   I'm not sure about that 7500.  But if you flip over
 4   to the back of that, you can see where ████ had went
 5   and withdraw that, and that was for materials.
 6            Q.       So now you're testifying that that
 7   was for material?
 8            A.       I believe so.
 9            Q.       That cash on September 13th?
10            A.       Uh-huh.
11            Q.       Okay.  What did you -- you just
12   said, though, that there was nobody from your
13   company who was doing any work on that.
14                     So why was he getting money from
15   materials?
16            A.       Well, ████ would do running back
17   and forth to a job.  If they ran out of something,
18   he would go get it.  If there was materials that
19   needed to be moved.  There's a lot of logistics that
20   go into construction projects, as you can imagine.
21   He would help with that.
22            Q.       What materials?
23            A.       It depends on what the project is.
24            Q.       Do you have receipts?
25            A.       Not right now, but I'm sure that I
```

```
 1    can tell you what materials were used on a job if

 2    you need me to.

 3                Q.      Would he have receipts?

 4                A.      I'm not sure.

 5                Q.      Why did you get paid $40,000 for

 6    that job in one month?

 7                A.      It wasn't one month.  It took --

 8    there was a lot of planning ahead, and I had pulled

 9    permits.  I had planned.  I had done the scope of

10    work.  And at the time, especially right after

11    COVID, things were really, really overpriced.  If I

12    do manage a construction project, I do anticipate

13    somewhere between 30 and 50 percent, depending on

14    the scope of work.

15                Q.      You said lots of planning.

16                        Who were you planning with?

17                A.      I was planning?

18                Q.      Who?  With who?

19                A.      No one.

20                Q.      Well, what were you doing?

21                A.      I'm planning on the different

22    phases, the logistics of the construction project.

23                Q.      Did you have spreadsheets?

24                A.      I don't really use a construct -- I

25    don't use spreadsheets for the way that I do things.
```

LexitasTENNESSEE
(615) 595-0073

```
1    What I do is I'll look at the building, and I kind
2    of map out the logistics of where we need to be on
3    said building, how we're going to get to that,
4    access materials, how many guys need to be there and
5    things like that.
6              Q.       And you said you pulled -- well,
7    would you have a record of that?
8              A.       Asheville would have a record of
9    the permit pulled for that project.
10             Q.       So you pulled a bunch of permits
11   and it would have been --
12             A.       They would have been pulled way
13   before the project started.
14             Q.       Well, when would they have been
15   pulled?
16             A.       Possibly two months ahead of time.
17             Q.       So sometime in 2022 you pulled a
18   bunch of permits from Asheville under Southern
19   Construction & Consulting?
20             A.       Yeah.
21             Q.       Okay.  How did you keep a record of
22   when you would go to the site and do all of that
23   planning of the work?  What did you -- what did you
24   keep that in?  What kind of document?
25             A.       That's not how I do -- I can do it
```

Lexitas TENNESSEE
(615) 595-0073

1   from on site, but it's too distracting.  Most of the

2   time I look at a photo of a building and I visually

3   break it down into subsections, and then I usually

4   do it old school and pull out a piece of paper and

5   start taking notes, and then revise, revise, revise

6   until I get it to a point where I'm happy with it,

7   and then go from there.

8           Q.      So your testimony is that you were

9   paid $50,000 to pull some permits and make some

10  handwritten notes about the --

11          A.      I completed --

12                  MS. BEREXA:  Object to the form.

13                  MR. RADER:  Same objection.

14          A.      I completed an entire building.

15  The entire facade of that building was restored,

16  ma'am.  So language is very important here.  And

17  construction projects of that size, that's not

18  uncommon.

19          Q.      (BY MS. BAEHR-JONES) What's the

20  address of that building?

21          A.      I do not know the address of the

22  building.  I can pull it up online, if you want me

23  to.  I think it's very easy to find.

24          Q.      Yeah.  Let's find it on a map

25  during the next break so I can get that from your

```
 1    attorney.

 2                  MR. RADER:  Let's just do it right

 3          here on the record.

 4                  MS. BAEHR-JONES:  No, because we're

 5          not going to use up that time.

 6                  MR. RADER:  Then don't ask the

 7          question.

 8                  MS. BAEHR-JONES:  I'm going to ask

 9          her attorney to find a map with her and

10          provide it to me.

11                  MR. RADER:  I'll object to that.

12          You don't give directions to her attorney.

13          Q.      (BY MS. BAEHR-JONES) Okay.  Well,

14    how long do you think it will take you to pull it up

15    on a map?

16          A.      I can do it right now.  Actually,

17    you can do it.  I mean, you can do it very quickly.

18    Google the Public Service Building.  I've done an

19    entire facade restoration for one side of that,

20    ma'am.

21          Q.      In 2022?

22          A.      You have the dates, yes.

23                  MS. BAEHR-JONES:  I'll ask my

24          co-counsel if she can find the Public

25          Service Building in Asheville, North
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Carolina.

 2                    MR. RADER:  I'll help you.  It's at

 3          34 Wall Street.

 4                    MS. BAEHR-JONES:  34 Wall Street.

 5          Okay.

 6                    MR. RADER:  It's a beautiful

 7          building.

 8                    THE WITNESS:  It is now.

 9          Q.        (BY MS. BAEHR-JONES) You were

10     interviewed by Gerald Ray of the TBI, correct?

11          A.        Can't remember his name, but I was

12     interviewed by the TBI.

13          Q.        What date was that?

14          A.        I'm not sure.

15          Q.        Would it have been this fall?

16          A.        Yeah.

17          Q.        Was anyone else there?

18          A.        Another representative from the TBI

19     was there.

20          Q.        Do you have any kind of immunity

21     deal?

22          A.        No.

23          Q.        Have you ever worked as a

24     confidential informant?

25          A.        No.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Has Sean Williams ever worked as a
 2   confidential informant?
 3          A.      I have no idea.
 4          Q.      I'm going to hand you what I will
 5   mark as Exhibit --
 6                  COURT REPORTER:  86.
 7                  MS. BAEHR-JONES:  Thank you.
 8                  (Exhibit 86 marked).
 9          Q.      (BY MS. BAEHR-JONES) Just take a
10   second to read that.
11                  MR. RADER:  Did we make this 86?
12                  Thank you.
13          Q.      I have a question.
14                  Did Sean Williams used to say that
15   he was protected by law enforcement?
16                  Did you hear him say that?
17          A.      He never said that to me.
18          Q.      Did he ever act that way?
19                  MR. RADER:  Object to the form.
20          A.      I don't know how one acts when they
21   are.
22          Q.      (BY MS. BAEHR-JONES) Do you know
23   that he called JCPD on you in 2019 to tell them that
24   you had assaulted him?
25          A.      Yes, I do.
```

LexitasTENNESSEE
(615)595-0073

```
 1        Q.      What was that about?

 2        A.      He said to me -- this is years

 3   after a horrible relationship, and I was already

 4   moved out and everything else.  He said to me, "I

 5   hope you lose everything you own," and he

 6   antagonized me.  And I did -- I did hit him.

 7        Q.      When was that?

 8        A.      I can't -- I don't remember the

 9   date.

10        Q.      Why did you stay associated with

11   his business if you and him had such an

12   antagonistic --

13        A.      I actually did not --

14        Q.      Let me finish the question,

15   Ms.  Female 4 .

16                MR. RADER:  Object.

17                MS. BAEHR-JONES:  And you can do

18        your objection.

19                MR. RADER:  I will.  I thought you

20        were finished.  I'm sorry.  I didn't mean to

21        interrupt you.

22                MS. BAEHR-JONES:  I wasn't.

23        Q.      (BY MS. BAEHR-JONES) Why did you

24   continue doing business with him when you had such

25   an antagonistic relationship with him starting in
```

Lexitas – TENNESSEE
(615) 595-0073

```
1    2018, you say?

2                    MR. RADER:  All right.  I'll object

3         to the form.

4         A.      So I really didn't want to have any

5    sort of business dealings with him, but I was making

6    money still from the company, and I just reached a

7    point to where I thought, "I'm going to continue

8    making money until it" -- I knew he couldn't manage

9    a construction company by himself.  So I thought he

10   could go under, whatever.  And I even asked to get

11   bought out.  "Just please buy me out.  Let me go on

12   and do my own thing," and they would not do that

13   unless I signed a non-compete, and I refused to do

14   that.

15        Q.      So when you say they, who is they?

16        A.      Well, Sean.  And he, you know,

17   had -- I think he had somebody in the office like

18   present it to me, because I don't even think he

19   wanted to.  He knew I wouldn't do it, but I refused

20   to sign anything like that.

21        Q.      Can you look at what's been marked

22   as Exhibit 86?

23                    Have you had a chance to look

24   through that?

25        A.      I see this.
```

Lexitas – TENNESSEE
(615) 595-0073

```
 1          Q.       Is that true that you contacted

 2   JCPD on April 19th, 2022 to ask for their help?

 3          A.       Yes.

 4          Q.       Who did you call?

 5          A.       I do not know who I called.  It was

 6   the guy that called me the first time.  I think

 7   that's the only number that I had.  So that's who I

 8   reached out to.

 9          Q.       So that would be Kevin Peters?

10          A.       It may not be Kevin Peters.

11          Q.       You said that's the number that you

12   had in your phone.

13                   MR. RADER:  She was speaking.

14                   You can finish your answer.

15          A.       I can't remember his name.  I

16   thought it was Kevin that had reached out to me when

17   I was at the beach.  It may not have been.  It may

18   have been this guy.  But, yeah, I was -- I was

19   slightly worried.

20          Q.       (BY MS. BAEHR-JONES) Is it true

21   that Sean had just frozen his account at Renasant

22   Bank?

23          A.       Yes.

24          Q.       How did you know that?

25          A.       I think one of the girls in the
```

```
 1   office told me that.
 2          Q.        She called you?
 3          A.        I think someone called and told me
 4   that, yeah.  And there was a lot of talks going on
 5   like, "What is happening?  What's going on," and --
 6   but --
 7          Q.        What are your bank records -- I
 8   mean, what are your phone records going to show
 9   about who was calling you that day?
10                    MR. RADER:  Object to the form.
11          A.        Who called me that day?
12          Q.        (BY MS. BAEHR-JONES) Is it going to
13   show that someone from the bank called you?
14                    MR. RADER:  Object to form.
15          A.        I don't think someone from the bank
16   called me and told me that.  I'm not sure how I --
17   no, someone from the bank didn't call me that -- I'm
18   not sure.  I don't know how I found out.
19          Q.        (BY MS. BAEHR-JONES) Did Sean
20   Williams call you?
21          A.        I doubt that.
22          Q.        Did Sean Williams call you because
23   he was angry that you, in fact, had started to drain
24   the bank account?
25          A.        I didn't drain the bank account.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   Yeah.
 2          Q.       Did officers from JCPD come by your
 3   house, as they say they were going to do in this, to
 4   provide you with protection?
 5          A.       If they drove by, I don't know
 6   about it.  But no one ever like came to my front
 7   door or anything or to my house, no.
 8          Q.       There are a number of checks that
 9   are being written to Sean Williams from Glass &
10   Concrete Contracting in 2021 when he's on the run.
11                   What do you know about those?
12                   MR. RADER:  Object to the form.
13          A.       No one knew he was on the -- well,
14   I didn't know he was on the run then.  And so, you
15   know, it was his business.  If he wanted to pull out
16   money from it, then he could do so at that time.
17          Q.       (BY MS. BAEHR-JONES) Was Sean
18   Williams still in Johnson City during that time?
19          A.       As far as I know.
20          Q.       Did you see him around?
21          A.       Not really.  I had only seen him a
22   few times.
23          Q.       Did you hear about him from other
24   people?
25          A.       Of course.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.        Who?

 2          A.        Through hearsay, you know.  If I

 3   was out or something, people would tell me stuff,

 4   things like that.  No one particular.

 5          Q.        Who were your good friends during

 6   that time?

 7          A.        The same good friends that I have

 8   right now.

 9          Q.        Who are they?

10          A.        ███████████████████████████

11   My mother.

12          Q.        What's her name?

13          A.        ██████    You asked that earlier.

14          Q.        What's her last name?

15          A.        ████████████████

16          Q.        What's her address?

17          A.        ██████████████████████

18   ████████████

19          Q.        Who else were you talking to during

20   2021 on a regular basis?

21          A.        ██████████  my boyfriend.

22          Q.        Anyone else?

23          A.        Not on the regular.

24          Q.        Were you going in to any place of

25   employment during that time?
```

```
 1          A.       In 2021?  I don't believe so.

 2          Q.       When did Skyline Restoration's bank

 3    accounts close out?

 4                    MR. RADER:  Object to the form.

 5          A.       Skyline Restoration?

 6          Q.       (BY MS. BAEHR-JONES) Sorry.

 7    Skyline -- yeah, Skyline Restoration.

 8                    Have they closed their bank

 9    accounts or not?

10          A.       No.  They're still a very

11    successful business.

12          Q.       Okay.  Who is running it?

13          A.       Again, ██████████.

14          Q.       Anyone else?

15          A.       Not that I'm aware of.

16          Q.       Does a JCPD officer live next door

17    to you?

18          A.       Not that I know of.

19                    MR. RADER:  Let the record reflect

20          that A.J. comes and goes and has arrived

21          again.

22          Q.       (BY MS. BAEHR-JONES) Have you had

23    any other calls with any other JCPD officer other

24    than Kevin Peters?

25                    MR. RADER:  Object to the form.
```

Lexitas-TENNESSEE
(615) 595-0073

```
 1            A.       I don't think so.

 2            Q.       (BY MS. BAEHR-JONES) Is Kevin

 3   Peters listed as a contact in your phone?

 4            A.       I don't actually know which one is

 5   in my phone.  It just says a first name that I

 6   thought that's what they introduced themselves as,

 7   and JCPD.  So I don't actually know whose number I

 8   have in my phone.

 9            Q.       What's the first name?

10            A.       I'd have to look.

11            Q.       Can you look right now?

12            A.       If you really need me to.  Yeah, I

13   can look.

14                     It's listed under my phone as Tyler

15   JCPD.

16            Q.       What's the phone number?

17            A.       ███████████.

18                     And again, I do not remember like

19   who he works for or what his title was or anything.

20   That's just all that my brain could comprehend from

21   that initial call.

22            Q.       Did you talk to someone during the

23   break?

24            A.       Yeah.

25            Q.       Who did you talk to?
```

```
 1          A.      My boyfriend's mom.

 2          Q.      What's her name?

 3          A.      ███

 4          Q.      Isn't that your mom's name?

 5          A.      Yeah.

 6          Q.      How long did you talk to her?

 7          A.      Like five minutes.

 8          Q.      Did you talk about what you were

 9   testifying about?

10          A.      No.  I talked to her about my

11   French bulldog that probably needs to use the

12   restroom.

13          Q.      Who else did you talk to?

14          A.      That's it.

15                  MS. BAEHR-JONES:  Okay.  Can we go

16          off the record for a second and take a

17          break?

18                  VIDEOGRAPHER:  Going off the record

19          at 2:43.

20              (Off the record at 2:43 p.m.)

21              (On the record at 2:52 p.m.)

22                  VIDEOGRAPHER:  And we're back on

23          the record at 2:52.

24                  MS. BAEHR-JONES:  Thank you.

25
```

```
 1   BY MS. BAEHR-JONES:
 2        Q.        Ms.  █Female 4█, who was your
 3   realtor when you bought your property at ████████
 4   ██████?
 5        A.        Hold on a minute.  Is his name
 6   ██████?  I think his name is Justin.  I think that's
 7   what his name was.
 8        Q.        Last name?
 9        A.        I can't remember his last name.
10        Q.        Do you know what realty group he
11   worked with?
12        A.        No.
13        Q.        Okay.  What do you know about Sean
14   Williams selling his properties?
15        A.        Nothing.
16        Q.        Were you involved in that in any
17   way?
18        A.        Not at all.
19        Q.        Okay.  I want to ask you to take
20   out your phone again, please.
21                  The list -- can you pull up the
22   phone number for Tyler JCPD, please, the contact?
23        A.        The one I just gave you?
24        Q.        Uh-huh.
25        A.        Yes.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Can you show it to me, please?
 2                  Can you hold it out and show it to
 3     me, please?
 4                  Okay.  Can I see that?  Can you
 5     scroll to the bottom?
 6                  Okay.  Is it going to show you --
 7     can you go to any text messages with that number?
 8          A.      I don't think I have any on my
 9     phone, because I lost the majority of my text
10     messages.
11          Q.      When did that happen?
12          A.      When I was camping last summer.
13          Q.      Okay.  Can you go and bring up
14     ████████ phone number, please?
15          A.      He's cute, isn't he?
16          Q.      Okay.  And let me just write that
17     down.
18                  That's ██████████████ correct?
19          A.      Uh-huh.
20          Q.      Can you bring up for me ████████
21     ████████ phone number?
22                  Okay.  And that's ██████████████
23          A.      Uh-huh.
24          Q.      What about ██████████████?
25          A.      It's his email saved.
```

TENNESSEE
(615) 595-0073

```
1    Q.          ██████████████████████████?

2    A.          Uh-huh.

3    Q.          So did you never call him?

4    A.          We talked, but he usually just

5    calls me.  I'm not sure why it's not pulling it up

6    automatically.

7    Q.          What about ████████████ --

8    ██████     I'm sorry.

9                A picture of her?

10   A.          That's her family.

11   Q.          ████████████.

12               What about ████████████

13   A.          I don't know if I have ████████ or

14   not.

15               I don't.

16   Q.          What about ████████?

17   A.          Yes.

18   Q.          I thought her name was ████████

19   ██████

20               Did she --

21   A.          That's her maiden name.

22   Q.          ████████████ at ████████████.

23               What about   FEMALE 5

24               ████████████.

25               Can you look for a ████████ on your
```

```
 1    phone?  You said there was a ████████ that you were

 2    doing business with.

 3            A.       Yeah, and that was -- I highly

 4    doubt that I have that.

 5                     Yeah, I do.  I don't know how

 6    accurate this is.

 7                     MR. RADER:  Can you read that one

 8            out loud so we have it in the record?

 9                     MS. BAEHR-JONES:  ██████████████

10            and that is ████████████  and the email is

11    ██████████████████   █████████ is

12    ████████████████

13            Q.       (BY MS. BAEHR-JONES) Okay.  Let's

14    see if there's anyone else.  I think that's all I

15    have.

16                     When you were living with Sean

17    Williams, did he traffic drugs?

18            A.       No.

19            Q.       He never sold drugs?

20            A.       He smoked pot and on occasion he

21    would buy marijuana or sell marijuana, but that was

22    it.

23            Q.       So you never saw him do cocaine?

24            A.       Not when I lived with him, no.

25            Q.       And what years was that?
```

```
 1           A.       That was up until 2019.
 2           Q.       Did you ever do cocaine at his
 3    apartment?
 4           A.       I did.
 5           Q.       Who was giving you the cocaine?
 6           A.       He did.
 7           Q.       So he gave out cocaine, but he
 8    didn't use it himself?
 9           A.       That was not -- the timelines are
10    different.
11           Q.       Well, you tell me.  What was the
12    timeline then?
13           A.       Probably at some point in 2019.
14           Q.       So he did start using cocaine in
15    2019?
16           A.       Yes.
17           Q.       And you started using cocaine with
18    him?
19           A.       I done it once with him.
20           Q.       Did you know where he got cocaine?
21           A.       I do not.
22           Q.       And before 2019, you never used
23    cocaine?
24           A.       Not to my knowledge.
25           Q.       Who else was there when you were
```

Lexitas - TENNESSEE
(615)595-0073

1   using cocaine with Sean Williams?

2         A.     I think he had some guy friend over

3   there, but I don't know his name.  Yeah, I don't

4   know.

5         Q.     Who else?

6         A.     That was it.

7         Q.     Well, there were big parties at

8   Sean Williams' apartment, right?

9         A.     I did not attend big parties with

10   Sean Williams.

11         Q.     So when you were living with him,

12   there weren't big parties?

13         A.     No.  In fact, the entire time we

14   had one small party.  That was a Halloween party.

15   And that was actually the first time I ever seen him

16   get drunk.

17         Q.     When was that?

18         A.     Years and years prior to any of

19   this.  Probably maybe '16.

20         Q.     2016?

21         A.     Maybe.  I would have to look.  I

22   don't remember the year.

23         Q.     And let me just clarify, because I

24   don't remember what you testified earlier.

25                When did your relationship with

Lexitas - TENNESSEE
(615) 595-0073

```
 1    Sean Williams begin?

 2         A.      I don't remember the exact year

 3    that it did.  I would have to like go through photo

 4    albums and stuff like that to figure out when it

 5    did.

 6         Q.      Well, before 2016?

 7         A.      Yeah, it was before 2016.

 8         Q.      Before 2010?

 9         A.      I don't believe so.  I would have

10    to look.  I don't feel comfortable putting a date on

11    it.  I can't remember.

12         Q.      And how long would you say that you

13    were together?

14         A.      I think it was around seven years.

15    Seven and a half years.

16         Q.      And why did you break up?

17    ████████████████████████████████████████████████████
18    ██████████████████ ATTORNEYS EYES ONLY ██████████████
19    ████████████████████████████████████████████████████

20         Q.      I'm sorry.

21                 Are you a survivor of Sean

22    Williams?

23         A.      ██ATTORNEYS██
                   ██EYES ONLY██

24         Q.      How do you know that?

25    ██████████████ ATTORNEYS EYES ONLY ██████████████
```

Lexitas TENNESSEE
(615) 595-0073

ATTORNEYS EYES ONLY

```
 9        Q.        Do you think that any of the
10   defendants have your best interests at heart?
11                  MR. RADER:  Object to the form.
12        A.        Can you explain the question?
13        Q.        (BY MS. BAEHR-JONES) Do you think
14   that Kevin Peters has your best interests at heart?
15                  MR. RADER:  Object to the form.
16        A.        I believe that they do.
17        Q.        (BY MS. BAEHR-JONES) I want to show
18   you what's been marked -- why do you say that?
19        A.        Why do I say I believe they do?
20        Q.        Uh-huh.
21        A.        Because I don't believe that they
22   don't.
23        Q.        Do you have any reason, sitting
24   here today, to believe they have your best interests
25   at heart?
```

TENNESSEE
(615) 595-0073

```
 1          A.          I mean, again, I don't believe that
 2    they don't have my best interest in mind.
 3          Q.          Have you talked to them?
 4          A.          No.
 5          Q.          So what is that belief based on?
 6          A.          I don't have a reason to think that
 7    they don't.  I mean -- and when I did talk to them,
 8    they were -- he was a very nice person on the phone.
 9    So I don't have a reason to believe that.
10               MS. BAEHR-JONES:  Okay.  I'm going
11          mark the next exhibit.
12               COURT REPORTER:  This would be 87.
13               (Exhibit 87 marked).
14          Q.          (BY MS. BAEHR-JONES) Okay.  I want
15    to hand you what's been marked as Exhibit 87.
16          A.          It's a photo of my sweet father,
17    just so everyone knows.
18          Q.          I'm sorry I handed you --
19               MS. BAEHR-JONES:  Did that get the
20          exhibit tag?
21               Okay.  Great.
22          Q.          (BY MS. BAEHR-JONES) What is this?
23          A.          It's a Facebook post that I made of
24    me and my dad.  My dad helped me build a little
25    platform bed in the back of my SUV, and that was the
```

```
 1    day that he was helping me do that.

 2              Q.        When was that?

 3              A.        I don't know the exact date.  I

 4    don't post anything in real time.  So I would have

 5    to actually look at my phone to get an exact date.

 6              Q.        Do you want to look at your phone

 7    and get the exact date for me?

 8              A.        Sure.

 9                        That was March the 9th.

10              Q.        So March 9th of this year?

11              A.        Yeah.

12              Q.        And do you see where it says, "A

13    couple weeks ago, I called my dad and told him I

14    wanted to camp my way across the U.S. and into

15    Mexico"?

16              A.        Yes.

17              Q.        Did you plan to travel to Mexico?

18              A.        Yes.

19              Q.        What made you change your mind?

20              A.        I did.

21              Q.        You did go to Mexico?

22              A.        Yeah.

23              Q.        How long were you there?

24              A.        Only a few hours.  I -- and let me

25    explain the few hours.  I actually entered New
```

```
 1    Mexico inside of the national park, Big Bend.  And I
 2    rented a donkey, and I rode over the Rio Grande into
 3    Boquillas, Mexico.  It's within the national park,
 4    technically, and I visited that town, and then I
 5    come back.
 6             Q.        When was that?
 7             A.        I'm not sure when that was
 8    actually.  It was a long road trip.
 9             Q.        How long were you gone?
10             A.        About three weeks.
11             Q.        Where did you go?
12             A.        I went to Big Bend National Park.
13    I went to -- well, where all did I go?  I stayed on
14    a working ranch in Texas.
15             Q.        Which working ranch?
16             A.        I don't know.  It was just a random
17    one that I found that I could stay at, because I was
18    car camping.  And then I went to Tucson, Arizona,
19    and I stayed a few days.  And then when I went into
20    Joshua Tree National Park and I hiked.  Then I went
21    to Death Valley National Park and I hiked.  And then
22    I come back through New Mexico, and I stopped in
23    White Sands.  I've been there before, but it's
24    beautiful.  And then a couple other places, and then
25    I made my way back to Tennessee.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1         Q.         What was the name of the place
 2    where you stayed in White Sands?
 3         A.         I didn't stay in White Sands.  I
 4    just -- it was along the way.  I stayed mostly in my
 5    car, and then I also tent camped, depending upon
 6    where I was at.  And most of that was done on Bureau
 7    of Land Management land.
 8         Q.         Do you have any receipts from this
 9    trip?
10         A.         You don't actually pay for Bureau
11    of Land Management.  It's free for all U.S. people
12    to partake in, just like most national parks and
13    things.
14         Q.         What about buying gas?
15         A.         Yeah, I bought gas.  Of course.
16         Q.         Do you have receipts from that?
17         A.         I used my credit card.
18         Q.         Okay.  So it should be in your
19    credit card records?
20         A.         Yeah.
21         Q.         Do you have any receipts from that?
22         A.         Not on me.
23         Q.         Do you have any other receipts from
24    any of the other vendors that you used along that
25    trip to Mexico and back?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          A.      Well, I went to Luckenbach, Texas,
 2   and I bought myself a $13 ring and a T-shirt there.
 3   That was on my credit card, too.
 4          Q.      Where do you bank with your credit
 5   card?  What credit card do you have?
 6          A.      I think it's -- I think it's a
 7   Capital One card, because I get points for gas.
 8          Q.      Well, do you have your wallet with
 9   you?
10          A.      Yes.
11          Q.      Can you pull it out and check?
12          A.      It's an American Airlines Citi
13   Card.
14          Q.      Is that the one that you used on
15   the trip?
16          A.      For my gas, yeah.
17          Q.      What's the number on that?
18          A.      You want me to announce my credit
19   card number?
20          Q.      Give me the last four.  Just do the
21   last four.
22          A.      ████
23          Q.      What other credit cards do you
24   have?
25          A.      Old faithful.  It's really been
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   through a lot.
 2         Q.      Capital One, what's the last four
 3   on that?
 4         A.      ████
 5         Q.      What else?
 6         A.      That's actually all the credit
 7   cards I have with me.
 8               I mean, I have a Victoria's Secrets
 9   credit card.
10               Do you want the last four on it,
11   too?
12         Q.      Sure.
13         A.      Or like a -- actually, an Ulta.
14   I've got my Ulta with me.
15         Q.      What's that?  I don't even know
16   that.
17         A.      I can tell.    ████
18         Q.      What do you mean I can tell?  What
19   is Ulta?
20               I honestly don't know.  I'm not
21   sure if this is an insult that you're laughing at
22   me.
23               What is Ulta?
24         A.      No, I didn't mean it like that.
25         Q.      That's okay.
```

```
 1                    What's Ulta?
 2          A.         It's a beauty supply place.
 3          Q.         Okay.  I do not take it personally.
 4   So you can --
 5                    ████ Ulta.
 6                    Anything else?  You have a
 7   Victoria's Secret.  Ulta.
 8                    Actually, can I get the last four
 9   on the Victoria's Secret?
10          A.         I don't have it with me.
11          Q.         Okay.  Capital One.  American
12   Express Citi Card.
13                    And when you were on this trip, you
14   used your American Express Citi Card.
15                    Did you use your Capital One, too?
16          A.         I don't think so.  I really don't
17   use it for stuff like that.
18          Q.         Ms.  Female 4 , I want to ask you
19   about you changing your testimony after the break
20   from saying that you talked to Kevin Peters several
21   times to that you talked to Tyler JCPD.
22                    Can you explain that?
23          A.         I actually didn't remember the
24   name.  I just knew that it was in my phone.  I
25   didn't remember whether it was Tyler or Kevin.  I
```

```
 1    actually don't know whether I've ever talked to

 2    Kevin.  I'm -- and like I said, I was standing on

 3    the beach and Tyler JCPD was all I could retain, and

 4    I'm not sure.  Yeah.

 5          Q.      Did you program his number into

 6    your phone at that point when you're standing on the

 7    beach?

 8          A.      I think I did.

 9          Q.      How did you come up with Kevin

10    Peters then?

11          A.      I thought that when I first heard

12    Kevin Peters and how, have I talked to him, I

13    thought that must have been the guy that called me

14    on the beach.

15          Q.      Well, I didn't use the name.  You

16    used the name.

17          A.      No, I didn't.  No, I did not.

18          Q.      So your testimony is that you

19    didn't say the name Kevin Peters yourself?

20          A.      No.  I may have repeated it after

21    you said it, but I wouldn't have just come up with

22    that on my own, no.

23          Q.      Well, we can go back and look at

24    the testimony you gave.

25                  Should we do that?
```

Lexitas TENNESSEE
(615) 595-0073

```
 1            A.      Go ahead.
 2            Q.      Or should we just -- you know, I
 3    want to ask you something.  So you're on the beach.
 4    You program in this phone number as Tyler JCPD.
 5    This was in March of 2022.
 6            A.      Uh-huh.
 7            Q.      How many more times did you talk to
 8    Tyler?
 9            A.      It was a couple times, but maybe
10    two or three times.
11            Q.      And your testimony is that he
12    called you?
13            A.      He called me when I was there,
14    yeah.
15            Q.      And then he called you again?
16            A.      He may have.  Not on that trip, but
17    like he may have later on.  I know that I did him
18    when I got back.
19            Q.      Okay.  Have you ever met Tyler in
20    person?
21            A.      No.
22            MS. BAEHR-JONES:  Okay.  Let's
23            actually go back and let's -- let's go back
24            to her testimony from earlier.
25            VIDEOGRAPHER:  Should we do a DVD
```

Lexitas TENNESSEE
(615) 595-0073

```
 1        change now?  Because it's going to be in the
 2        next --
 3               MS. BAEHR-JONES:  Sure.  Let's go
 4        off the record.
 5               VIDEOGRAPHER:  Going off the record
 6        at 3:14.
 7           (Off the record at 3:14 p.m.)
 8            (On the record at 3:17 p.m.)
 9               VIDEOGRAPHER:  We're back on the
10        record at 3:17.
11               MS. BAEHR-JONES:  Okay.  Can I have
12        the court reporter read back the testimony
13        from prior -- from earlier this morning?
14               COURT REPORTER:  I'm going to go
15        back and read the question to put it in
16        context.
17               Question:  Why does that refresh
18        your memory?
19               Answer:  Because I was having a
20        nice, relaxing day on the beach with my
21        mother, and I got a phone call discussing
22        that he was on the run.
23               Question:  What day did you say it
24        was?
25               Answer:  March the 7th of 2022.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1              Question:  Where were you with your

 2        mom?

 3              Answer:  Daytona.

 4              Question:  And who made the phone

 5        call to you?

 6              Answer:  I believe that was Kevin

 7        Peters.

 8              Question:  Kevin Peters called you

 9        to tell you that?

10              Answer:  I believe -- I believe

11        that it was someone with the Johnson City

12        Police Department.

13              THE WITNESS:  His name was brought

14        up before then though.

15   BY MS. BAEHR-JONES:

16        Q.      Well, let me ask you a question.

17        A.      Uh-huh.

18        Q.      So you just heard the testimony you

19   gave earlier today.

20              Do I bring up the name Kevin Peters

21   when I'm asking you about that phone call or not?

22        A.      What?

23        Q.      Did I bring up the name Kevin

24   Peters when I was asking you --

25        A.      I think you had --
```

Lexitas TENNESSEE
(615) 595-0073

```
1          Q.       Let me finish the question.
2                   Did I bring up the name Kevin
3   Peters when I asked you the question about who you
4   talked to on that phone call or not?
5          A.       Not right at that moment, but I
6   think you had prior, as I was trying to say.
7          Q.       When?
8          A.       I thought earlier today.  I'm not
9   sure, but I just know that I talked to someone and
10  that was it, whether it was Tyler or Kevin, I -- and
11  it's Tyler.
12         Q.       How do you know that now?
13         A.       Well, that's what I have it saved
14  in my phone as.  I'm assuming it's Tyler.
15         Q.       Did you change that during the
16  break?
17         A.       No.  And that has actually been
18  spoke of before, previously.  I gave the D.A. that
19  same phone number.
20         Q.       When did you give the D.A. that
21  phone number?
22         A.       Months and months ago.
23         Q.       Who at the D.A.'s office did you
24  give that phone number?
25         A.       Mike Little.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      When was that?
 2          A.      Months ago.
 3          Q.      What was the context?
 4          A.      We were discussing it.  He said,
 5    "Have you talked to anyone?"  And I said, "Yeah,
 6    just one other person."  And I gave him that phone
 7    number.  So, no, it wasn't changed in break.
 8          Q.      What else was Mike Little asking
 9    you about?
10          A.      Just about my knowledge of Sean
11    Williams in general, ████████████████████████████
12    ████████████████████████████████
13          Q.      Who else was there for that
14    interview?
15          A.      There was several others.  I can't
16    remember everyone from that office that was there.
17          Q.      Was there a prosecutor there?
18          A.      I'm not sure.
19          Q.      Was there a woman there?
20          A.      Yes.
21          Q.      Was her name Abby Wallace?
22          A.      I don't remember.
23          Q.      Was there another male agent there?
24          A.      Yes.
25          Q.      Okay.  ████████████████████████
```

Lexitas - TENNESSEE
(615) 595-0073



ATTORNEY'S EYE'S ONLY

22    MS. BAEHR-JONES:  Can I get our
23  time?  Can I ask you the time?
24    COURT REPORTER:  How much time?
25    VIDEOGRAPHER:  At the DVD change,

Lexitas - TENNESSEE
(615) 595-0073

```
 1              it was two hours and 48.

 2                      MS. BAEHR-JONES:  Can we take a

 3              quick break, just five minutes?

 4                      VIDEOGRAPHER:  Going off the record

 5              at 3:22.

 6                  (Off the record at 3:22 p.m.)

 7                  (On the record at 3:28 p.m.)

 8                      EXAMINATION

 9    BY MR. RADER:

10          Q.      Ms.  Female 4 , my name is Danny

11    Rader.  I introduced myself to you at the start of

12    the deposition on the record.  And I told you that I

13    represent Kevin Peters, and I said his name.  I'm

14    probably the first person who said his name in the

15    deposition.

16          A.      Okay.

17          Q.      That's who I represent.

18                  I've got a number of questions for

19    you today, and I appreciate you being here .

20                  I subpoenaed you through your

21    attorney.

22                  Are you aware of that?

23          A.      No, I didn't know how this

24    happened.

25          Q.      You had already received a subpoena
```

Lexitas - TENNESSEE
(615) 595-0073

```
1   from the plaintiffs' lawyers; is that correct?
2   Several months ago .
3             A.      Uh-huh.
4             Q.      All right.  You've done a good job
5   answering questions today, but I know we're kind of
6   getting a little late in the day, and we all get a
7   little bit tired.  And you're saying uh-huh and
8   huh-uh, and I understand you just fine, but that
9   makes his job unmercifully --
10            A.      I'm sorry.  I will say yes or no.
11            Q.      All right.  If I ask you if
12  something is a yes or a no, I'm not at all trying to
13  be difficult.  I'm just trying to make a clear
14  record, okay?
15                    MS. BAEHR-JONES:  I'm going to
16            object.  Defense counsel is's characterizing
17            her testimony.
18                    MR. RADER:  I don't know what
19            you're talking about, Mr. Baehr-Jones, but
20            I'm going to keep on going.
21            Q.      (BY MR. RADER) You were -- I'm
22  going to start back at the exhibits.
23                    Do you have the exhibits?
24            A.      I do.
25            Q.      Let's put them in order.
```

Lexitas TENNESSEE
(615) 595-0073

```
1          A.      Okay.

2          Q.      Let's start with 68.

3                  MR. RADER:  Does anybody have any

4          of the exhibits over there?  68 was the very

5          first one.

6                  MS. TAYLOR:  Yes, we have some

7          right here, Danny.

8                  MS. RUFOLO:  It looks like that.

9                  MR. RADER:  I can hand her mine,

10         but -- let me just do that.  Let's not waste

11         any time.

12         Q.      (BY MR. RADER) This is a copy of

13   Exhibit 68.  And do you see where it says -- that's

14   the one that you were asked about earlier that

15   involves a ██████████████████ and a ██████

16   ██████████████

17         A.      Yes, sir.

18         Q.      Do you remember those questions?

19         A.      I do.

20         Q.      And -- here it is.

21                 You testified, Ms. █Female 4█, that

22   that was a job that involved a tattoo parlor at 502

23   State Street.

24         A.      Yes, sir.

25         Q.      And I believe that you commented
```

```
1    that 502 State Street was down in the memo line of

2    that check during your original testimony; is that

3    correct?

4            A.      That's correct.

5            Q.      All right.  And Mr. Baehr-Jones

6    asked you some questions that insinuated -- in my

7    opinion insinuated that there was no such tattoo

8    parlor.

9                    Do you remember that?

10           A.      Yes.

11                   MS. BAEHR-JONES:  Objection.

12           Q.      (BY MR. RADER) And she accused you

13   of being related to this ████████████████ and

14   ████████████████████.

15           A.      Yes.

16                   MS. BAEHR-JONES:  Objection.

17           Q.      (BY MR. RADER) I'll show you a

18   picture of 502 State Street from Google Maps --

19           A.      It is --

20           Q.      -- I printed.

21                   What kind of business is there?

22           A.      It is a tattoo shop.

23           Q.      So is that the tattoo shop that you

24   were saying --

25           A.      That's the tattoo shop I worked on.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.       All right.  And that was a
 2   legitimate job, wasn't it?
 3          A.       It was.
 4               MS. BAEHR-JONES:  Objection.
 5               MR. RADER:  We'll make that the
 6          next exhibit.
 7               COURT REPORTER:  That will be
 8          Exhibit No. 88.
 9               (Exhibit 88 marked).
10               MR. RADER:  Jeff, do you want to
11          hand me stickers so I can just do this for
12          you?
13               COURT REPORTER:  What was the last
14          sticker on the second page?  So I just know.
15               MR. RADER:  The next one will be
16          89, and the bottom one is 103.
17               COURT REPORTER:  Okay.  Just so I
18          know when we get close.
19               MS. BAEHR-JONES:  Sorry.  Which one
20          was this?
21               COURT REPORTER:  That was 88.
22               MS. BAEHR-JONES:  Okay.  Great.
23          Thanks.
24          Q.       (BY MR. RADER) All right.  Let's go
25   to Exhibit 69.
```

```
 1          A.      Okay.

 2          Q.      And you were asked a bunch of

 3   questions about who is ████████████

 4          A.      Yes, sir.

 5          Q.      All right.  Now, if you will, turn

 6   to about the third page, which has got the Bates

 7   number RENASANT545.

 8                  Do you see that at the bottom?

 9          A.      Uh-huh.

10          Q.      And do you see -- what is that a

11   picture of on that RENASANT545?

12          A.      That is a picture of a check from

13   Renasant or --

14          Q.      Is this an official check of

15   Renasant?

16          A.      It is.

17          Q.      Like is a cashier's check?

18          A.      Yes.

19          Q.      And who signed that?

20          A.      ██████████████

21          Q.      All right.  Do you think they just

22   let anybody sign those official checks of Renasant

23   Bank or just bank employees?

24                  MS. BAEHR-JONES:  Objection.

25          A.      Bank employees.
```

```
 1          Q.        (BY MR. RADER) All right.  And
 2    that's exactly what you testified to, isn't it?
 3    ████████████ was a bank employee.
 4          A.        I tried to.
 5                    MS. BAEHR-JONES:  Objection.
 6          Q.        (BY MR. RADER) You got a bunch of
 7    questions about it like you were making it up.
 8                    MS. BAEHR-JONES:  Objection.
 9          Q.        (BY MR. RADER) Were you making that
10    up?
11                    MS. BAEHR-JONES:  Objection.
12          A.        I was not.
13          Q.        (BY MR. RADER) You've told the
14    truth here today, haven't you, Ms. █Female 4█?
15                    MS. BAEHR-JONES:  Objection.
16          A.        Yes, sir.
17          Q.        (BY MR. RADER) Do you deserve to be
18    treated by plaintiffs' counsel like you haven't been
19    telling the truth?
20                    MS. BAEHR-JONES:  Objection, and we
21          can take a break if you want to keep doing
22          that.
23          A.        I don't feel like I deserve to be
24    treated like this in any capacity.
25          Q.        (BY MR. RADER) All right.  This
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    isn't the first time that Mr. Baehr-Jones has

 2    personally attacked you, is it?

 3                    MS. BAEHR-JONES:  Objection.

 4         A.        It is not.

 5         Q.        (BY MR. RADER) And you have told

 6    her client who is here, H.A., about that, haven't

 7    you?

 8                    MS. BAEHR-JONES:  Objection.

 9         A.        Yes, I did.

10         Q.        (BY MR. RADER) Would you tell us

11    about it so that we have it in the record?

12                    MS. BAEHR-JONES:  Objection.

13         A.        I'll be happy to.  I was reached

14    out to by Vanessa, and then -- that was a pretty

15    hostile phone conversation, in my opinion.  It was

16    very -- I'm not sure how she anticipated me to

17    respond, but it was appalling.

18                    Then I was reached out to by an

19    associate of hers, and I think his last name is --

20    is it Osborne?  I believe.  And that was really,

21    really a bad conversation.  I'm not an emotional

22    person, but I did start to cry after that phone

23    conversation.  I thought I was going to have an

24    anxiety attack.  He talked to me in a manner that

25    I've never been spoken to before in my life.
```

Lauretta A. WEST, LLC
TENNESSEE
(615) 595-0073

He told me that I needed to go ahead and start talking, that I better do this before -- because I needed immunity.  And it actually took me about five to ten seconds after he said that word to me for me to be like, "I don't need immunity, and I don't need this.  Like you need to stop."  It was -- it was bullying, the only way that I know how to describe it.

And then, you know, **H.A.** had reached out to me, just, "Hey, I want to catch up with you."  I've known **H.A.** for a long time, and I thought it's probably about this, but I'm going to give it the benefit of the doubt.  And I did talk to her.  And the only things that she really asked me at first was she was being kind of nosy about my job.  "Well, oh, you work in Florida?  You live there, too, don't you?"  And I'm like, "I've never lived in Florida, no."

And then we had a phone conversation.  I actually kind of figured that she was recording me at this point, and I basically told **H.A.** "I'm -- I'm telling you that -- please speak to your legal counsel.  This is not right.  I don't want to be dragged into this.  I want to go on with my life.  I wish you the best.  I hope every" -- you

Lexitas TENNESSEE
(615) 595-0073

```
 1   know, I feel bad for any victim.  But, "This is --
 2   this is insanity.  So please just leave me alone."
 3              Q.      (BY MR. RADER) All right.  Talking
 4   about the work in Florida, you mentioned Davis
 5   Brothers Roofing.
 6              A.      Yeah.
 7              Q.      Is that a company here in Tennessee
 8   that --
 9              A.      It is.  They are a company --
10   people probably know them around here.  That's a
11   company that's out of Church Hill, and they decided
12   to expand into Florida.  I mean, you can imagine
13   roofing in Florida is quite a good thing with storms
14   and hurricanes.  So they decided to do that, and
15   they were looking for somebody local and a friend
16   suggested they reach out to me.  So I got a job.
17              Q.      And what you do is that you've got
18   a contractor's license.
19              A.      I have like 23 of them, sir.
20              Q.      Okay.
21              A.      I think.
22              Q.      But you are the contractor's
23   license for these companies.  And if you need to
24   review something or approve something, you can do
25   that as part of your service.
```

Lexitas-TENNESSEE
(615) 595-0073

```
 1                    MS. BAEHR-JONES:  Objection.

 2          A.        That's correct.

 3          Q.        (BY MR. RADER) Is that a pretty

 4   typical thing that's done in your industry?

 5                    MS. BAEHR-JONES:  Objection.

 6          A.        Especially in other states,

 7   Florida, New Mexico, a lot of other -- it's not

 8   really typical here in Tennessee, just because the

 9   way that you go about getting a contractor's

10   license, it's a little easy here.  So not here, but

11   elsewhere, yes.

12          Q.        (BY MR. RADER) All right.  I want

13   to show you the Tennessee Secretary of State's

14   registry for Davis Brothers Roofing.

15          A.        Yeah.

16          Q.        And you said -- where did you --

17   what city did you say that was in?

18          A.        Church Hill.

19          Q.        And that's -- is that what that

20   document shows, as well?

21          A.        Church Hill.

22          Q.        And what does the year that that

23   company was founded on the first -- on the first

24   page, I think.

25          A.        2000.
```

```
1                    Well, I think -- oh, no.  1994.
2         Q.        All right.  So this company has
3    existed for, gosh, is that 30 years now?
4         A.        He's old.  Yeah.
5         Q.        Okay.  You didn't start that
6    company 30 years ago, did you?
7         A.        I did not.  I was nine.
8                   MR. RADER:  All right.  We'll make
9              that the next exhibit.  I've got the
10             sticker, 89.
11                  (Exhibit 89 marked).
12        Q.        (BY MR. RADER) You were asked about
13   a building in Asheville, and you called it -- you
14   had two different names that you called it.  You
15   called it the Self-Help building and the Public
16   Service Building.
17        A.        Yes.
18        Q.        Is that a picture of that building?
19        A.        It is the building.
20        Q.        All right.  And, of course, that's
21   from Google Maps, as well, right?
22        A.        That is.
23        Q.        And that's an old, nice, historic
24   building in Asheville.
25        A.        It's a beautiful building.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          Q.      And it's called the Self-Help

 2   building because there's a credit union there called

 3   Self-Help Credit Union, right?

 4          A.      Yeah, and I always referred to it

 5   wrong.  And then I tried to switch to Public

 6   Service.  But, yes, it's one and the same.  Public

 7   Service or Self-Help is this building.

 8          Q.      Okay.  And it's a real building

 9   that real work was done on, isn't it?

10          A.      It is.

11          Q.      And when they paid you, you used

12   that money to pay off your car, correct?

13          A.      After I paid the subcontractor and

14   the materials, yes.

15          Q.      And we'll go through that statement

16   and give you an opportunity to show that again, but

17   I just want to be sure that we have a record that

18   this isn't just a made up building.

19                  MS. BAEHR-JONES:  Objection.

20          A.      No, sir.

21                  MR. RADER:  All right.  We'll make

22          that Exhibit No. 90.

23                  (Exhibit 90 marked).

24          Q.      (BY MR. RADER) Now, Ms. Baehr-Jones

25   asked you about ██████████████
```

```
 1           A.       Yes, that I'm with now.

 2           Q.       And that is a business that you

 3    were making $3,500 a month at, correct?

 4           A.       Yes.

 5           Q.       All right.  Mr. Baehr-Jones asked

 6    you if she would see that on your bank statement.

 7           A.       Yes.

 8           Q.       And frankly insinuated that she

 9    hadn't seen it on your bank statement.

10                    Do you remember that?

11                    MS. BAEHR-JONES:  Objection.

12           A.       I do remember that.

13           Q.       (BY MR. RADER) I want to show you a

14    page from your bank statement that will be

15    RENASANT2227.

16                    If you will look at the --

17           A.       It should be around the 14th.

18           Q.       (BY MR. RADER) Look towards the

19    bottom of the page.

20                    MS. BAEHR-JONES:  Do you have

21           copies of this?

22                    MR. RADER:  These are your records

23           that you produced to me.  It's RENASANT2227.

24                    MS. BAEHR-JONES:  No, you need

25           copies of what you're going to provide to
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              the witness.
 2                        MR. RADER:  No, I don't.
 3                        MS. BAEHR-JONES:  Yes, you do.
 4                        MR. RADER:  Not if it's a Bate
 5              stamped document.
 6                        MS. BAEHR-JONES:  That's not
 7              correct.
 8                        MR. RADER:  Yes, it is.
 9                        MS. BAEHR-JONES:  Then let me look
10              at it with the witness, because I don't have
11              a copy in front of me.
12              A.        This is where I got paid From
13   ██████████████████████ $3,500.
14              Q.        (BY MR. RADER) And what date of the
15    month was that?
16              A.        On the 14th.  That's when I get
17    paid.  It's supposed to be the 15th, but I'm not
18    going to complain about it being early.
19                        MR. RADER:  All right.  We'll make
20              this page, RENASANT2227, Exhibit No. 91.
21                        (Exhibit 91 marked).
22                        MS. BAEHR-JONES:  I'm going to need
23              copies of the exhibits.
24                        MR. RADER:  Then I suggest that you
25              get them out.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1                    MS. BEREXA:  They're on the
 2         computer.  They're all your production.
 3                    MR. RADER:  You produced them to
 4         me.
 5                    MS. BAEHR-JONES:  I flew to
 6         Tennessee and produced huge numbers of Bates
 7         numbered copies for all of you all.  If you
 8         can't produce a single copy for the
 9         plaintiffs' side of this, just one --
10                    MR. RADER:  I will provide --
11                    MS. BAEHR-JONES:  -- that we can
12         look at.
13                    MR. RADER:  I will provide you a
14         copy of any document that I use today that
15         is not Bates stamped.  But if it's Bates
16         stamped, I expect you to do what has been
17         asked of me yesterday all day.
18                    MS. BAEHR-JONES:  No, that's not
19         correct.
20                    MR. RADER:  It's absolutely
21         correct.
22                    MS. BAEHR-JONES:  I handed out
23         exhibits to all of you today.
24                    MS. BEREXA:  Not all of us.
25                    MR. RADER:  You only get it to --
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    MS. BAEHR-JONES:  I make five
 2          exhibits of everything that I use.  I'm not
 3          going to make nine copies for all of the
 4          defense counsel, but it is --
 5                    MR. RADER:  I didn't ask you to.
 6                    MS. BAEHR-JONES:  So is that how
 7          we're going to do depos from now on?  We're
 8          not going to give copies to each other of
 9          anything that's Bates stamped?
10                    MR. RADER:  I don't care what you
11          do.  I'm going to ask my questions, and I'm
12          going to -- if it's a Bate stamped document,
13          I'm going to read off the Bate stamps
14          number.  If it's a document that's not Bate
15          stamped, I have a copy for you.
16                    So we'll go on.
17                    MS. BAEHR-JONES:  I'm going to
18          object to that practice that you produce not
19          one single copy of an exhibit to provide the
20          plaintiffs' counsel during the deposition of
21          the exhibits that you're using.
22          Q.        (BY MR. RADER) All right.  Now, you
23     were asked about speaking to Kevin Peters.
24          A.        Yes.
25          Q.        Of course, his name has been said
```

Lexitas TENNESSEE
(615) 595-0073

1  today I know by me.

2                      When you were shown the email by

3  Ms. Baehr-Jones from Tyler Whitlock, did that

4  refresh your memory?

5          A.      It triggered that I had that in my

6  phone.  Tyler JCPD.  Not Kevin JCPD.

7          Q.      Did anybody at all coach you to

8  change your testimony or say a different name?

9                      MS. BAEHR-JONES:  Objection.

10         A.      No, sir.

11         Q.      (BY MR. RADER) All right.  And

12  nobody told you to change your phone or create a

13  contact in your phone.

14                     MS. BAEHR-JONES:  Objection.

15         A.      No, sir.

16         Q.      (BY MR. RADER) It's offensive when

17  people make these kinds of allegations, isn't it?

18                     MS. BAEHR-JONES:  Objection.

19         A.      It's horribly offensive.

20                     MS. BAEHR-JONES:  Objection.

21         Q.      (BY MR. RADER) All right.  I want

22  to show you the Tennessee Secretary of State entry

23  for Skyline Restoration.

24                     MR. RADER:  This is one that is

25         not Bate stamped, Ms. Baehr-Jones, and I'm

Lexitas TENNESSEE
(615) 595-0073

```
1           trying to hand you a copy if you'd like it.
2                     MS. BAEHR-JONES:  Thank you.
3           Q.        (BY MR. RADER) And what name does
4    it say on there as the principal contact?
5           A.        ███████████
6           Q.        All right.  You don't have any
7    interest in that business at all, do you?
8           A.        No, sir.  I never have.
9           Q.        Down in the bottom right-hand
10   corner of that box in the middle of the page it
11   says, "Number of members."
12                    Do you see that?
13          A.        Uh-huh.
14          Q.        How many members does it say?
15          A.        One.
16          Q.        You're not one of those one member,
17   are you?
18          A.        I'm not ████████████  No.
19          Q.        Okay.  You -- just because you had
20   a business with a similar name, Skyline Contracting,
21   that I think that you said never really got off the
22   ground, that doesn't mean you're connected with
23   every entity that uses the word Skyline, are you?
24          A.        No.  I'm definitely not.
25                    MR. RADER:  All right.  We'll make
```

Lexitas-TENNESSEE
(615)595-0073

```
 1              that Exhibit No. 92.

 2                  (Exhibit 92 marked).

 3         Q.      (BY MR. RADER) Now, Skyline is the

 4    company that you used as a subcontractor on your

 5    Public Service Building; is that correct?

 6         A.      That is correct.

 7         Q.      Do they do good work?

 8         A.      They do good work.  And I would

 9    work with them again.  I think they feel the same

10    way.

11         Q.      All right.  I want to find those

12    pages.  Give me just one second.

13                 Have you found Exhibit No. 74?  Is

14    that the one you're looking at?

15                 Exhibit No. 74 is for the month

16    August 31st, 2022 through September 30th, 2022,

17    correct?

18         A.      Correct.

19         Q.      And it's -- the first page is

20    RENASANT55 at the bottom right-hand corner?

21         A.      That's correct.

22         Q.      All right.  And it shows a withdraw

23    or a check of 49,345 which is on the back of that

24    RENASANT57.

25         A.      Uh-huh.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Is that a yes?

 2          A.      That's a yes.

 3          Q.      All right.  And it says it's a

 4    transfer to Skyline Restoration in that amount,

 5    correct?

 6          A.      That's correct.

 7          Q.      And they're the subcontractor --

 8          A.      For the Public Service Building.

 9    That is what I paid them.

10          Q.      All right.  And then the other

11    entry that's listed on RENASANT55 on that first page

12    of 74, it says withdrawal, Wells Fargo auto fee and

13    payments of 39,372.

14          A.      Correct.

15          Q.      That's the payoff for your car?

16          A.      It was the payoff for my car at

17    that time.

18          Q.      So that's -- the profit that you

19    received you used to pay down your debt, correct?

20                  MS. BAEHR-JONES:  Objection.

21          A.      That's correct.

22          Q.      (BY MR. RADER) All right.  And then

23    you were asked about, on RENASANT57, the $7,500

24    withdrawal.

25                  As you look at that, can you see
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    who the signature is?

 2           A.      Yes.  That's ███████████

 3           Q.      All right.  And that's not you,

 4    correct?

 5           A.      That's not me.

 6           Q.      He was an authorized signer on this

 7    account, correct?

 8           A.      Yes.

 9                   MS. BAEHR-JONES:  Objection.

10           Q.      (BY MR. RADER) And as far as you

11    know, he used that money to pay for materials.

12           A.      Yes.

13           Q.      Okay.  Ms. Baehr-Jones asked you a

14    number of questions about entries on some of these

15    exhibits for commercial cash, and you explained what

16    you understood that to be.

17                   Do you remember that?

18           A.      I do.

19           Q.      I'm going to show you just a few

20    statements.  And we will look at the bank statement

21    for Glass & Concrete Contracting for April 30th,

22    2018 through May 31st, 2018, which is RENASANT611.

23                   And will you take a minute, ma'am,

24    and go through that and look for -- there should be

25    a $30,000 entry for commercial cash about May 23rd.
```

```
 1                    Do you see that?

 2              MS. BAEHR-JONES:  Danny, are you

 3         going to be providing me with copies of the

 4         exhibits that you're using with the witness?

 5              MR. RADER:  I've just told you the

 6         Bates.

 7              MS. BAEHR-JONES:  Does it look like

 8         I have a computer in front of me?

 9              MR. RADER:  Your co-counsel has it.

10         You can look at hers.

11              MS. BAEHR-JONES:  Are you going to

12         be giving copies of the exhibits that you

13         use to --

14              MR. RADER:  Ms. Baehr-Jones, I'm

15         not going to repeat myself.  I've already

16         had this conversation with you.

17                    If you have an objection, just make

18         it.

19              MS. BAEHR-JONES:  I need to take a

20         break.

21         A.      I do see that.

22              MR. RADER:  Opposing counsel wants

23         to take a break.

24              COURT REPORTER:  Do you want to go

25         off the record?
```

```
 1                   MS. BAEHR-JONES:  Actually, let's
 2           stay on the record.  Let me just confer with
 3           counsel to see if there's a possibility to
 4           use the computer.
 5                   VIDEOGRAPHER:  Going off the record
 6           at 3 --
 7                   COURT REPORTER:  No.
 8                   MR. RADER:  If you want to take a
 9           break of this length, we'll go ahead and go
10           off the record.
11                   COURT REPORTER:  Okay.  Kelly,
12           we'll go off the record now.
13                   VIDEOGRAPHER:  Going off the record
14           at 3:50.
15               (Off the record at 3:50 p.m.)
16               (On the record at 4:12 p.m.)
17                   VIDEOGRAPHER:  And we're on the
18           record at 4:12.
19     BY MR. RADER:
20           Q.      All right.  We've taken a break
21     there, Ms.  Female 4 , and I appreciate that.
22                   You have this document that starts
23     with RENASANT611, which is the monthly statement for
24     this May 31st, 2018, month ending.
25                   And you've turned and you found an
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    entry for commercial cash on May the 23rd?

 2             A.       Yes, sir.

 3             Q.       On Bate 619, correct?

 4             A.       Correct.

 5             Q.       And was that a cash withdrawal?

 6             A.       No.

 7             Q.       All right.  If you turn to

 8    Page 626 --

 9                      MS. BAEHR-JONES:  Objection.

10                      MR. RADER:  I haven't finished my

11             question yet, but you're welcome to object

12             in advance if you want to.

13                      MS. BAEHR-JONES:  That was to your

14             last question.  Go ahead.  Go ahead.  Go

15             ahead.

16             Q.       (BY MR. RADER) If you turn to

17    Page 626, do you see a checking withdrawal ticket

18    there in the same amount?

19             A.       I do.

20             Q.       Does it have the same date on it?

21             A.       It does.

22             Q.       And does it have a reason over on

23    the left side?

24             A.       It's a line of credit payment.

25                      MR. RADER:  All right.  And I'll --
```

Lexitas — TENNESSEE
(615) 595-0073

```
 1              let me make that document Exhibit 96 --
 2                   COURT REPORTER:  90 --
 3                   MR. RADER:  96.
 4                   MS. BAEHR-JONES:  93.
 5                   MR. RADER:  93.  I'm going sideways
 6              instead of down.
 7                   (Exhibit 93 marked).
 8                   MS. BAEHR-JONES:  Sorry.  What was
 9              the dates Bates for this?  We're scrolling
10              here and we kind of got lost.
11                   MR. RADER:  Sure.  We started on
12              611.  Then we went to 619.  Then we went to
13              626.
14                   MS. BAEHR-JONES:  And what are you
15              making the exhibit?
16                   MR. RADER:  The package, that
17              entire bank statement for the month of
18              May 2018, 611 through 626.
19              Q.      (BY MR. RADER) And I'll ask you now
20         to look at RENASANT1182.
21                   MS. BAEHR-JONES:  Give us a second
22              to get there.
23                   MR. RADER:  Sure.
24                   We'll make that 94 while we wait
25              for them to get there.
```

```
 1                  (Exhibit 94 marked).

 2         Q.       (BY MR. RADER) 1182, and that is

 3    the same withdrawal ticket that you saw on 626,

 4    isn't it, ma'am?

 5         A.       It is.

 6         Q.       And it goes with a --

 7                  MS. BAEHR-JONES:  Objection.

 8                  Can we wait?  We're not there.

 9                  MR. RADER:  No.

10                  MS. BEREXA:  Can you do just a

11         control F?  That seems to be easy.

12         Q.       (BY MR. RADER) And so it also has a

13    credit ticket there for the loan account; is that

14    correct?

15         A.       That's correct.

16         Q.       And so that entry on the May 2018

17    bank statement, $30,000 for, "commercial cash,"

18    didn't have anything to do with cash at all, did it?

19                  MS. BAEHR-JONES:  Objection.

20         A.       That's correct.

21         Q.       (BY MR. RADER) That's exactly what

22    you testified to earlier, right?  That it could be a

23    transfer or any other sort of thing, correct?

24                  MS. BAEHR-JONES:  Objection.

25         A.       That is correct.
```

```
 1            Q.        (BY MR. RADER) All right.  Let's
 2    look at Bate stamp 579, which is the bank statement
 3    for March 31st, 2018, and which I will make Exhibit
 4    No. 95.
 5                      MS. BEREXA:  95?  I'm sorry.
 6                      MR. RADER:  Yeah.
 7                      (Exhibit 95 marked).
 8            Q.        (BY MR. RADER) Okay.  And if you
 9    will look at that Bate page down at the bottom, do
10    you see an entry for commercial cash there?
11            A.        I do.
12            Q.        For how much?
13            A.        50,000.
14            Q.        And what's the date on that?
15            A.        That is 3/2.
16            Q.        Of 2018?
17            A.        Of 2018.  Yes, sir.
18            Q.        All right.  If you look at the very
19    last page of that bank statement, which is what Bate
20    number on the bottom right?
21            A.        593.
22            Q.        All right.  Do you see a withdrawal
23    ticket there for that same $50,000 amount?
24            A.        I do.
25            Q.        All right.  I will ask you to look
```

Lexitas - TENNESSEE
(615) 595-0073
#: 5995

```
 1     now at Bate 1179 which, again, is the loans.
 2                     MR. RADER:  And I'm marking that
 3            Exhibit No. 96.
 4                     (Exhibit 96 marked).
 5            Q.       (BY MR. RADER) Do you see that same
 6     withdrawal ticket on that page, 1179?
 7            A.       I do.
 8            Q.       For $50,000.
 9            A.       That's correct.
10            Q.       And does it show the credit tickets
11     there above it?
12                     MS. BAEHR-JONES:  Danny, we can't
13            get the exhibit out.
14            A.       Yes.
15                     MS. BAEHR-JONES:  Can you please
16            wait for us to get the exhibit out?
17            Q.       (BY MR. RADER) And what does the
18     credit show?
19                     MS. BAEHR-JONES:  Danny, we
20            can't --
21            A.       $50,000 to the line of credit.
22            Q.       (BY MR. RADER) All right.  Is there
23     any cash involved in that transaction?
24                     MR. RADER:  Objection.
25            A.       No cash involved in that one.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1        Q.        (BY MR. RADER) All right.  I want
 2   to ask you to look at the bank statement for
 3   August 31st, 2018.  It begins on Bate 663, and that
 4   bank statement ends on 681.
 5                  MR. RADER:  And we are going to
 6             look at it and we're going to compare it to
 7             Bate 1187 through 1191, if you all want to
 8             be pulling those two sets up, but we'll
 9             start first with the bank statement 663.
10             And I've marked it Exhibit No. 97.
11                  (Exhibit 97 marked).
12        Q.        (BY MR. RADER) Will you take a
13   moment to look through there, Ms. Female 4 , and
14   see if you see any commercial cash transactions on
15   that bank statement?
16        A.        I do on 8/6.
17        Q.        All right.  And how much is it?
18        A.        20,000.
19        Q.        All right.  Let's stop there.
20   There are others, and we'll go through each one .
21        A.        Okay.
22        Q.        But let's do them one at a time.
23                  Will you look at Bates 1187, which
24   I'm marking as Exhibit No. 98.
25                  (Exhibit 98 marked).
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.        (BY MR. RADER) Does that show a
 2   $20,000 withdrawal on 8/6?
 3          A.        It does.
 4          Q.        And does it have a credit that goes
 5   with it?
 6          A.        It does.
 7          Q.        And what is that money going to?
 8          A.        Line of credit.
 9          Q.        All right.  So, again, no cash
10   involved in that, even though the bank statement
11   says "commercial cash," right?
12                    MS. BAEHR-JONES:  Objection.
13          A.        Correct.
14                    (Exhibit 99 marked).
15          Q.        Okay.  Now, if you'll return back
16   to Exhibit 97, which is that bank statement, will
17   you look and see if you see any other commercial
18   cash entries?
19          A.        8/16.
20          Q.        For how much?
21          A.        One is for 403 and one is for
22   10,000.
23          Q.        All right.  Let's start with the
24   one that's 403.  I'll show you Bate stamp 1188 that
25   we'll mark as Exhibit No. 99.
```

TENNESSEE
Lexitas
(615) 595-0073

```
 1                    And do you see that withdrawal with
 2    the same date?
 3          A.       I do .
 4          Q.       What's the amount?
 5          A.       403.46.
 6          Q.       Same amount as on that bank
 7    statement for commercial cash, right?
 8          A.       Correct.
 9          Q.       And is there a credit ticket that
10    goes with that?
11          A.       There is.
12          Q.       And what is that money going to?
13          A.       Line of credit.
14                   MS. BAEHR-JONES:  Objection.
15          Q.       (BY MR. RADER) All right.  No cash
16    involved in that transaction either, is it?
17          A.       No.
18                   COURT REPORTER:  Did you mark 99
19          yet?
20                   MR. RADER:  Yes.  I tried to.  99.
21          Q.       (BY MR. RADER) Now, you said there
22    was another cash transaction on 8/16.
23          A.       Yes, sir.
24          Q.       How much was that?
25          A.       10,000.
```

```
 1          Q.          All right.  Take a look, if you
 2    will, at Bate stamp 1189, which I'm going to mark as
 3    Exhibit 100.
 4                      (Exhibit 100 marked).
 5          Q.          (BY MR. RADER) Do you see that
 6    debit ticket for that $10,000?
 7          A.          I do.
 8          Q.          Is it the same date?
 9          A.          It's the same date.
10          Q.          Does it have a credit ticket that
11    goes with it?
12          A.          10,000 to the line of credit.
13          Q.          All right.  Once again, no
14    commercial -- no cash involved in that transaction.
15                      MS. BAEHR-JONES:  Objection.
16          A.          No.
17          Q.          (BY MR. RADER) All right.  Keep
18    looking down that statement and see if you see any
19    more entries for commercial cash.
20          A.          I do several pages over on 672.
21          Q.          All right.
22          A.          And it's for eight -- on 8/22.
23          Q.          Okay.  How much?
24          A.          Commercial cash, 20,000.
25          Q.          All right.  Well, please look at
```

Lexitas-TENNESSEE
(615) 595-0073

```
 1    RENASANT1190, which we will mark as Exhibit 101.
 2                    (Exhibit 101 marked).
 3         Q.      (BY MR. RADER) Do you see that
 4    withdrawal?
 5         A.      I do.
 6         Q.      And do you have a credit ticket
 7    that goes with it?
 8         A.      In the same amount.
 9         Q.      All right.  And what's that money
10    going to?
11                    MS. BAEHR-JONES:  Objection.
12         A.      Line of credit.
13         Q.      (BY MR. RADER) All right.  Is there
14    any cash involved in that transaction?
15                    MS. BAEHR-JONES:  Objection.
16         A.      No cash.
17         Q.      (BY MR. RADER) All right.  And you
18    said you saw one more on that same page.
19         A.      Yep.  8/27.  20,000.
20         Q.      All right.  I'll ask you to look at
21    Bate 1191, which I'm now marking as Exhibit 102.
22                    (Exhibit 102 marked).
23         Q.      (BY MR. RADER) Do you see that
24    $20,000 withdrawal?
25         A.      I do.
```

Lexitas — TENNESSEE
(615) 595-0073

```
 1          Q.      How much?

 2          A.      20,000.

 3          Q.      Same day?

 4          A.      Same date.

 5          Q.      And does it have a credit ticket?

 6          A.      It does.

 7          Q.      And where does that money go?

 8                  MS. BAEHR-JONES:  Objection.

 9          A.      Line of credit.

10          Q.      (BY MR. RADER) Is there any cash

11   involved in that transaction?

12                  MS. BAEHR-JONES:  Objection.

13          A.      No cash involved.

14          Q.      (BY MR. RADER) All right.  So we've

15   looked through this entire statement.  We've seen

16   tens of thousands of dollars worth of entries that

17   say commercial cash, but there's not the first

18   dollar bill being changed hands, is there?

19                  MS. BAEHR-JONES:  Objection.

20          A.      It's not.

21          Q.      (BY MR. RADER) It's all just an

22   electronic transfer, just like you talked about,

23   right?

24                  MS. BAEHR-JONES:  Objection.

25          A.      That's correct.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          Q.        (BY MR. RADER) All right.  Let's
 2   look at Exhibit 77.
 3                     All right.  On the first page of
 4   Exhibit 77, which is RENASANT938, do you see a
 5   commercial cash transaction on March 24th?
 6          A.        I do.
 7          Q.        How much?
 8          A.        $33,282.
 9          Q.        And 50 cents, right?
10          A.        And 50 cents.
11          Q.        If you turn to the very next page
12   in that package, which is Bates 944 --
13          A.        Yes.
14          Q.        -- do you see down in the bottom
15   left the withdrawal ticket for that same amount?
16          A.        Yes.
17          Q.        And what does it say that that
18   money is going to?
19          A.        It's going to pay invoices for
20   Skyline Restoration, 1051, 1066, 1067, 1069, 1070.
21          Q.        And those numbers, 1051, 1066,
22   1067, 1069, and 1070, those are invoice numbers?
23          A.        Those are invoice numbers.
24          Q.        All right.  Is that the kind of
25   transaction that would be a legitimate thing for a
```

Lexitas — TENNESSEE
(615) 595-0073

```
 1    commercial contracting business to pay?

 2                    MS. BAEHR-JONES:  Objection.

 3           A.       Yes, sir.

 4           Q.       (BY MR. RADER) If you look on that

 5    first page of Exhibit No. 77 again, there was

 6    another entry that says commercial cash for $850.

 7           A.       Yes.

 8           Q.       If you turn to the next page of

 9    that, do you see that debit ticket?

10           A.       I do.

11           Q.       And is that -- what is that?

12           A.       It's a transfer to me.

13           Q.       And is that for your -- holding

14    your license?

15           A.       Yes, sir.

16                    MS. BAEHR-JONES:  Objection.

17           Q.       (BY MR. RADER) The same arrangement

18    that you had all along?

19           A.       The whole time.

20                    MS. BAEHR-JONES:  Objection.

21           Q.       (BY MR. RADER) All right.  And that

22    is signed by -- both of those, in fact, on 944, the

23    second page of Exhibit 77, both have a signature on

24    them.

25                    Whose signature is that?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          A.          ███████████████

 2          Q.          Is that the same bank employee who

 3     signed the official check of Renasant Bank that we

 4     looked at earlier?

 5          A.          That is.

 6                      MS. BAEHR-JONES:  Objection to that

 7               question.

 8                      COURT REPORTER:  When you put the

 9               papers on that microphone --

10                      MR. RADER:  I'm sorry.

11          Q.          (BY MR. RADER) All right.  If

12     you'll turn to the next page, which is RENASANT950

13     on Exhibit 77, do you see two commercial cash

14     entries there on April 24th?

15          A.          Yes.

16          Q.          If you turn to the next page, do

17     you see those -- do you see a transaction in the

18     same amount of one of those?

19          A.          I do.

20          Q.          And what is that amount?

21          A.          $29,040.

22          Q.          All right.  And that's entered on

23     the prior page as "commercial cash," right?

24          A.          It is.

25          Q.          But if you look here, you've got
```

```
 1    two tickets on what is Bate stamped 1211 with that
 2    same amount, right?
 3            A.      Yes, for an invoice.
 4            Q.      And do you see the invoice number?
 5            A.      1072.
 6            Q.      Okay.  And on the left side, that
 7    left ticket says checking deposit, right?
 8            A.      It does.
 9            Q.      So that money left account number
10    1395 and went into Skyline Restoration account ███
11    correct?
12                    MS. BAEHR-JONES:  Objection.
13            A.      That's correct.
14            Q.      (BY MR. RADER) No cash involved in
15    that transaction either, was it?
16                    MS. BAEHR-JONES:  Objection.
17            A.      No.  There was not cash involved.
18            Q.      (BY MR. RADER) When plaintiffs'
19    counsel is insinuating that there are all of these
20    large cash transactions, is that borne out by the
21    exhibits that you've reviewed today?
22                    MS. BAEHR-JONES:  Objection.
23            A.      It's not.
24            Q.      (BY MR. RADER) Has plaintiffs'
25    counsel showed you a transaction that was actually a
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    withdrawal in cash, other than that 7500 that was

 2    signed by ████████████ in this entire day of

 3    deposition?

 4              A.        No.

 5                       MS. BAEHR-JONES:  Objection.

 6              Q.        (BY MR. RADER) If you look at

 7    Bates -- staying with Exhibit 77, if you look at

 8    Bate stamp No. 962 --

 9              A.        Yes.

10              Q.        -- do you see a direct deposit

11    there on May 15th?

12              A.        I do.

13              Q.        How much is that?

14              A.        $15,899.

15              Q.        What does -- who does it say it's

16    from just below the words direct deposit?

17              A.        Paramount.

18              Q.        Is that a job that was being worked

19    on?

20              A.        It is.

21              Q.        Can you tell us a little bit about

22    that?

23              A.        I don't know a lot about it because

24    I wasn't like the day-to-day, but it's Paramount

25    Theater.
```

```
 1          Q.      Okay.  Above that, there's one

 2     that's listed for commercial cash on May 29th on

 3     Page 962.

 4          A.      Yes.

 5          Q.      I'll ask you to look at Bates 965,

 6     which I'm going to mark as Exhibit 103.

 7                  (Exhibit 103 marked).

 8          Q.      (BY MR. RADER) Do you see a

 9     transaction in that same amount?

10          A.      I do.

11          Q.      And does it say what it's for?

12     Does it say transfers or xfer?

13          A.      It does.

14          Q.      All right.  Does it say per

15     customer request?

16          A.      It does.

17          Q.      And it references a person named

18     ███████████

19          A.      It does.

20          Q.      And did you say ███████████  was

21     somebody that worked for Glass & Concrete at the

22     time?

23          A.      Yes, sir.

24          Q.      So nothing that indicates that that

25     was a cash withdrawal either, right?
```

LEXITAS - TENNESSEE
(615) 595-0073

```
 1                    MS. BAEHR-JONES:  Objection.
 2           A.       Correct.
 3           Q.       (BY MR. RADER) Do you think that
 4   the plaintiffs' attorney just doesn't understand how
 5   to read these bank statements, or do you think she's
 6   insinuating that there are really all these cash
 7   withdrawals?
 8                    MS. BAEHR-JONES:  Objection.
 9           A.       I think it was intentional.
10           Q.       (BY MR. RADER) All right.  If
11   you'll turn -- staying with Exhibit 77, please turn
12   to RENASANT985.
13           A.       Yes.
14           Q.       Do you see a two commercial cash
15   transactions there on July 31st?
16           A.       I do.
17           Q.       I want to show you what is
18   RENASANT989, which I'm marking as Exhibit 104.
19                    (Exhibit 104 marked).
20           Q.       (BY MR. RADER) Do you see
21   withdrawal tickets in the same amounts as those
22   commercial cash entries?
23           A.       I do.
24           Q.       All right.  Let's start with the
25   big one.
```

```
 1                  What was the big amount?

 2          A.        $19,273.

 3          Q.        All right.  Now, does it say where

 4   that money went?

 5          A.        That went to Skyline Restoration.

 6          Q.        All right.  Any cash involved in

 7   that transaction?

 8                    MS. BAEHR-JONES:  Objection.

 9          A.        No cash involved in that.

10          Q.        (BY MR. RADER) All right.  Now,

11   it's a little hard to read on the small copy, so I'm

12   going to pull it up big on my computer screen here

13   so you can see it.

14          A.        It actually says, "Final payment

15   for Paramount."

16          Q.        All right.  So you can -- you've

17   got better eyes than I do.  I had to blow it up to

18   look at it.

19                    But now Paramount, is that the

20   business that we just talked about?

21          A.        It's the job that we just talked

22   about.

23          Q.        All right.  It's a theater that

24   they worked on?

25          A.        That's correct.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          Q.       All right.  Anything unusual about
 2   a transaction like that?
 3                   MS. BAEHR-JONES:  Objection.
 4          A.       There's nothing unusual about this
 5   for a commercial construction company, no.
 6          Q.       (BY MR. RADER) All right.  And the
 7   850 that was the other commercial cash transaction
 8   there on that same page, is that also reflected on
 9   this Exhibit 104 that I just provided you?
10          A.       It is.
11          Q.       And is that a payment -- your $850
12   payment for your license?
13          A.       That is.
14          Q.       All right.  Now, do you -- this
15   Exhibit 77 has a lot of pages to it.
16          A.       It does.
17          Q.       Plaintiffs' counsel gave this to
18   you, right?
19          A.       That's correct.
20          Q.       She omitted these pages that we've
21   marked as Exhibits 104 and 103, didn't she?
22                   MS. BAEHR-JONES:  Objection.
23          A.       I understand.  Yes, she did.
24          Q.       (BY MR. RADER) And when we put
25   those together with this Exhibit 77, we see the
```

```
 1   complete picture, don't we?
 2                   MS. BAEHR-JONES:  Objection.
 3        A.        Yes, we do.
 4        Q.        (BY MR. RADER) Do you have any idea
 5   why plaintiffs' counsel would withhold these
 6   important pages in order to give you complete
 7   context?
 8                   MS. BAEHR-JONES:  Objection.
 9        A.        To confuse me, and they also don't
10   suit the narrative.
11                   MS. BAEHR-JONES:  Objection.
12        Q.        (BY MR. RADER) All right.  When you
13   look at the additional pages, does it give you the
14   complete story so that you can explain what these
15   transactions are about?
16                   MS. BAEHR-JONES:  Objection.
17        A.        Yes.
18        Q.        (BY MR. RADER) Plaintiffs' counsel
19   asked you what a bank employee would testify to.
20                   Do you think a bank employee would
21   have an opportunity to look at their own complete
22   paperwork?
23                   MS. BAEHR-JONES:  Objection.
24        A.        They would.
25        Q.        (BY MR. RADER) Okay.  But once
```

```
1    again, as we've gone through this entire Exhibit 77,
2    we didn't see a single cash transaction, right?
3                    MS. BAEHR-JONES:  Objection.
4         A.        That's correct.
5         Q.        (BY MR. RADER) And even though
6    these entries say commercial cash, it's just like
7    you described, which is that it's a transfer,
8    correct?
9                    MS. BAEHR-JONES:  Objection.
10        A.        Described multiple times.
11        Q.        (BY MR. RADER) All right.  Now, the
12   person that you talked to when you were with your
13   mother in Daytona on March 7th, 2022, was that
14   person nice to you?
15                   MS. BAEHR-JONES:  Objection.
16        A.        They were.
17        Q.        (BY MR. RADER) Whoever it was, did
18   they treat you professionally?
19        A.        They did.
20                   MS. BAEHR-JONES:  Objection.
21        Q.        (BY MR. RADER) Did they tell you
22   why they were calling you?
23        A.        I believe it was just to inform me
24   that he was on the run, and I think they might have
25   asked, you know, where he's at or something to that
```

```
 1    extent.  But, yeah, they did tell me.
 2           Q.      Is that a thing that you think the
 3    police would want to know, where he's at?
 4                   MS. BAEHR-JONES:  Objection.
 5           A.      I do.
 6           Q.      (BY MR. RADER) Is that a legitimate
 7    reason for somebody to call you and ask you where
 8    he's at?
 9                   MS. BAEHR-JONES:  Objection.
10           A.      At that time, yeah, 100 percent.
11           Q.      (BY MR. RADER) You didn't know
12    where he was, though.
13                   MS. BAEHR-JONES:  Objection.
14           A.      No.
15           Q.      (BY MR. RADER) And if you had,
16    would you have told them?
17                   MS. BAEHR-JONES:  Objection.
18           A.      100 percent.
19           Q.      (BY MR. RADER) All right.
20           A.      I would have done a citizen's
21    arrest.
22           Q.      All right.  Well, I won't get into
23    The Andy Griffith Show about how that works, but if
24    a law enforcement officer calls you looking for a
25    fugitive, is that law enforcement officer doing his
```

Lexitas  MIDDLE TENNESSEE
(615)595-0073

```
 1    or her job?
 2            A.      Due diligence, yes.
 3            Q.      All right.  And they made the
 4    contact with you and, in fact, you saved the number
 5    and did contact them back later, correct?
 6            A.      I did.
 7            Q.      And when you contacted them back
 8    later, that was memorialized in an email; is that
 9    correct?
10                    MS. BAEHR-JONES:  Objection.
11            A.      That's correct.
12            Q.      (BY MR. RADER) You were provided
13    that today by plaintiffs' counsel, correct?
14            A.      That's correct.
15                    MS. BAEHR-JONES:  Objection.
16            Q.      (BY MR. RADER) And that
17    individual's name was Tyler Whitlock, correct?
18                    MS. BAEHR-JONES:  Objection.
19            A.      That's correct.
20            Q.      (BY MR. RADER) And Mr. Whitlock
21    noted -- it's Exhibit 86.
22                    MS. BAEHR-JONES:  Is that a
23            question?
24                    MR. RADER:  I was waiting for the
25            witness to collect her exhibit.
```

```
 1          Q.          (BY MR. RADER) Mr. Whitlock noted,

 2    "I was just contacted by        Female 4         who

 3    helped manage his properties.  Sean just froze his

 4    business account at Renasant Bank on West King

 5    Street by phone.  There is a good chance he will be

 6    going there to officially close the account or try

 7    to get money from the account."

 8                    Is that -- you may or may not have

 9    told him those exact words, but did you give him

10    information to that effect?

11          A.      Yeah.  I mean, I gave them any

12    information that I had.  Pertaining to this, managed

13    his properties, is obviously not the correct

14    language or anything.  But, yes, I did give them

15    that information.

16          Q.      All right.  And they indicated that

17    they needed to do extra patrol at your office and

18    your home, correct?

19          A.      Yes.

20          Q.      And if they -- if he had come to

21    your home when that extra patrol was there, they

22    might have been able to catch him, couldn't they?

23                    MS. BAEHR-JONES:  Objection.

24          A.      Yes.

25          Q.      (BY MR. RADER) Of course, he didn't
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    come to your home that day, did he?

 2            A.      He did not.

 3            Q.      You wanted the police to find him,

 4    didn't you?

 5            A.      Oh, yeah.

 6            Q.      And they wanted to find him, too,

 7    didn't they?

 8            A.      I would think so.

 9                    MS. BAEHR-JONES:  Objection.

10            A.      Yes.

11            Q.      (BY MR. RADER) I'm just going to

12    ask you straight out, have you ever paid cash to any

13    police officer for any reason?

14                    MS. BAEHR-JONES:  Objection.

15            A.      I have never paid a single dollar

16    to any police officer.

17            Q.      (BY MR. RADER) All right.  You

18    certainly haven't bribed anybody, have you?

19                    MS. BAEHR-JONES:  Objection.

20            A.      I have never bribed anyone.

21            Q.      (BY MR. RADER) You haven't paid off

22    officers to try to cover for Sean Williams, have

23    you?

24                    MS. BAEHR-JONES:  Objection.

25            A.      Absolutely not.
```

Lexitas-TENNESSEE
(615)595-0073

```
 1          Q.      (BY MR. RADER) You haven't paid
 2   Kevin Peters.
 3                  MS. BAEHR-JONES:  Objection.
 4          A.      I have never met Kevin Peters.
 5          Q.      (BY MR. RADER) And haven't paid
 6   Tyler Whitlock.
 7          A.      I did not.
 8          Q.      Hadn't paid Toma Sparks.
 9                  MS. BAEHR-JONES:  Objection.
10          A.      I have never met him, talked to
11   him, or paid him, no.
12          Q.      (BY MR. RADER) Hadn't paid or
13   talked to or met Justin Jenkins, have you?
14                  MS. BAEHR-JONES:  Objection.
15          A.      No.
16          Q.      (BY MR. RADER) All right.  Hadn't
17   paid or talked to Jeff Legault.
18                  MS. BAEHR-JONES:  Objection.
19          A.      No.
20          Q.      (BY MR. RADER) Hadn't paid or
21   talked to Brady Higgins?
22                  MS. BAEHR-JONES:  Objection.
23          A.      No.
24          Q.      (BY MR. RADER) Hadn't paid or
25   talked to Karl Turner.
```

Lexitas — TENNESSEE
(615) 595-0073

```
 1            A.       No.

 2                     MS. BAEHR-JONES:  Objection.

 3            Q.       (BY MR. RADER) Hadn't paid or

 4     talked to any other police officer with the City of

 5     Johnson City.

 6                     MS. BAEHR-JONES:  Objection.

 7            A.       No one.

 8            Q.       (BY MR. RADER) Haven't paid or

 9     talked to any other employee of the City of Johnson

10     City.

11                     MS. BAEHR-JONES:  Objection.

12            A.       No one.

13            Q.       (BY MR. RADER) Would you ever do

14     such a thing?

15                     MS. BAEHR-JONES:  Objection.

16            A.       I would not.  I'm offended that

17     I've been accused of -- or allegations have been

18     made of me like that.

19            Q.       (BY MR. RADER) Well, I'll represent

20     to you the police officers are, too.

21                     MS. BAEHR-JONES:  Objection.  That

22            is improper.

23                     MR. RADER:  All right.

24                     MS. BAEHR-JONES:  And you know it.

25                     MR. RADER:  No, I don't know that.
```

LEXITAS TENNESSEE
(615) 595-0073

```
1                    MS. BAEHR-JONES:  You do.
2                    MR. RADER:  I'm not going to argue
3          with you on the record.  I'll do it later.
4          Q.        (BY MR. RADER) Have you cooperated
5    with the TBI?
6          A.        I have.
7          Q.        Have you cooperated with JCPD, as
8    reflected by these records?
9                    MS. BAEHR-JONES:  Objection.
10         A.        Yes, I have.
11         Q.        (BY MR. RADER) Have you cooperated
12   with the FBI?
13                   MS. BAEHR-JONES:  Objection.
14         A.        Yes, sir.
15         Q.        (BY MR. RADER) Have you cooperated
16   with any law enforcement agency or attorney that has
17   contacted you?
18                   MS. BAEHR-JONES:  Objection.
19         A.        I have.
20         Q.        (BY MR. RADER) Do you want the man
21   to be found?
22                   MS. BAEHR-JONES:  Objection.
23         A.        I definitely do.  The reason I
24   asked for additional patrol at my house is because I
25   was, in fact, afraid that he would come to my house.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    I was afraid.  Of course I wanted him caught.

 2           Q.        (BY MR. RADER) Until this lawsuit

 3    filed by these Jane Does or B.P. or H.A. that we are

 4    here about today, had you ever been accused of

 5    bribing these police officers?

 6                     MS. BAEHR-JONES:  Objection.

 7           A.        No, sir.

 8           Q.        (BY MR. RADER) And Sean Williams

 9    never accused you of bribing these police officers

10    before they filed this lawsuit?

11                     MS. BAEHR-JONES:  Objection.

12           A.        No.

13           Q.        (BY MR. RADER) Have you ever

14    laundered funds from Glass & Concrete Contracting,

15    LLC?

16           A.        No.

17           Q.        Have you ever laundered money

18    through real or artificial subcontractor companies?

19                     MS. BAEHR-JONES:  Objection.

20           A.        I have not.

21           Q.        (BY MR. RADER) You ever taken any

22    owner draws to amount to $2,000 a week?

23                     MS. BAEHR-JONES:  Objection.

24           A.        I have never.

25           Q.        (BY MR. RADER) Have you ever paid
```

LEXITAS TENNESSEE
(615) 595-0073

```
1    $2,000 a week in cash to Toma Sparks?

2                    MS. BAEHR-JONES:  Objection.

3          A.        I have never.

4          Q.        (BY MR. RADER) Have you ever paid

5    $2,000 a week in cash to Toma Sparks or any other

6    JCPD officers?

7                    MS. BAEHR-JONES:  Objection.

8          A.        I have not.

9          Q.        (BY MR. RADER) Have you seen this

10   Facebook post?

11         A.        I have.

12         Q.        Have you read it?

13         A.        I read it.

14         Q.        And we're talking about the

15   Facebook post that's in Sean Williams' name, but

16   couldn't possibly have been posted by him because he

17   was in prison, right?

18                    MS. BAEHR-JONES:  Objection.

19         A.        That's correct.

20         Q.        (BY MR. RADER) And do you know who

21   posted it?

22         A.        I believe so.

23         Q.        Who do you think posted it?

24         A.        I think it was Ms. ███

25         Q.        ████████████████
```

TENNESSEE
(615) 525-0073

A. Yes.

Q. And have you ever said anything to [redacted] about any scheme to pay off any officers?

A. No, I have not.

Q. Have you ever said anything to Sean Williams about any scheme to pay off officers?

A. No, I have not.

Q. Have either -- what about Female 5 Female 5? Have you ever talked to Female 5 about a scheme to pay off officers?

A. I have not, but I will say I have a great relationship with her. She even worked for me for a while, while I was trying to complete that bigger job.

Q. Okay. Is she involved in any scheme to pay off any officers?

MS. BAEHR-JONES: Objection.

A. Definitely not.

Q. (BY MR. RADER) What about the other people that you said worked for Sean, [redacted]?

A. Uh-huh.

Q. Where is she now?

A. She moved for relocating with her

```
1    husband, her job, and I can't remember where.  It's
2    close to an airport, because I know he's air traffic
3    control.
4              Q.        Okay.  Did that happen before or
5    after Sean Williams?
6              A.        It was before or right on the cusp
7    of, and she did attempt to work remotely for a
8    little bit.
9              Q.        All right.  What about ██████████
10   or ██████████████?
11             A.        She was terminated and long gone
12   before then, I think.  She might have quit,
13   actually.
14             Q.        Do you know where she is now?
15             A.        She lives somewhere around here
16   close.
17             Q.        What about ████████████████?
18             A.        She lives around here, too.  I know
19   that.  I don't know where exactly.  I've never been
20   to their house or anything.
21             Q.        All right.  I had this Facebook
22   post.  Did you get it back?
23                       I made -- I'll show it to you.
24   It's been -- it's part of the docket in this case,
25   Docket Entry 97-4.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    Is this a Facebook post you've
 2    read?
 3           A.       This is it.
 4           Q.       Are any of the statements in there
 5    about you true at all?
 6                    MS. BAEHR-JONES:  Objection.
 7           A.       There's nothing -- there's nothing
 8    true about me in this.
 9                    MS. BAEHR-JONES:  Object, as well.
10           Q.       (BY MR. RADER) Who is ████████
11    ████?
12           A.       She's a friend of Sean Williams.
13                    MR. RADER:  I'll mark this Facebook
14           post Exhibit 105.
15                    (Exhibit 105 marked).
16           Q.       (BY MR. RADER) It says that you,
17    quote, "was paying off officials at JCPD with money
18    from my company for years because she got caught
19    selling cocaine and the corrupt officers targeted
20    her for extortion, probably due to her association
21    with me."
22                    Is that statement true?
23                    MS. BAEHR-JONES:  Objection.
24           A.       That is not true.
25           Q.       (BY MR. RADER) Have you ever sold
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    cocaine?

 2                 MS. BAEHR-JONES:  Objection.

 3         A.      I've never sold cocaine and

 4    definitely was never caught selling cocaine, neither

 5    of those.

 6         Q.      I take it, since you didn't get

 7    caught selling cocaine and you weren't selling

 8    cocaine, you didn't pay off any officers out of an

 9    extortion scheme either.

10                 MS. BAEHR-JONES:  Objection.

11         A.      I definitely did not.

12                 MR. RADER:  All right.  What do you

13            find objectionable about that question,

14            Ms. Baehr-Jones?

15                 MS. BAEHR-JONES:  Assumes facts not

16            in the record.

17                 MS. BEREXA:  I'm sorry.  I didn't

18            hear what you said.

19                 MS. BAEHR-JONES:  And the State's

20            prior testimony.

21                 I said assumes facts not in the

22            record and the State's prior testimony.

23                 MR. RADER:  Okay.

24                 MS. BAEHR-JONES:  I believe she

25            testified that she did do cocaine.
```

TENNESSEE
(615) 595-0073

```
 1              MS. BEREXA:  Can you speak up?

 2              MS. BAEHR-JONES:  I'm sorry.  I'm

 3         starting to lose my voice.  So I will speak

 4         up.

 5              But anyway, keep -- keep going.

 6         Q.      (BY MR. RADER) All right.  Do you

 7    remember that telephone call with   H.A.   ?

 8         A.      I do.

 9         Q.      Do you remember Ms.  H.A.  telling

10    you that Sean was not trustworthy, can't be

11    believed?

12         A.      Yeah.

13         Q.      Is that true?

14         A.      No, he could not be believed.  I

15    hope everyone in here knows that he cannot be

16    believed.

17         Q.      Why do you think Ms.  H.A.  now

18    wants to rely on some statement attributable to Sean

19    Williams if she knows he can't be believed?

20              MS. BAEHR-JONES:  Objection.

21         A.      Because it fits the narrative of

22    their case.  And to be quite honest, it's -- it's

23    been horribly offensive to me.  She's known me for a

24    long time.  She knows better than that.

25         Q.      (BY MR. RADER) I guess she told us
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    a little bit about how she got to meet you, but I'm,
 2    quite frankly, not sure anything she said is
 3    reliable.  So I'm just going to ask you about it a
 4    little bit myself.
 5                   Can you tell me when you first met
 6    H.A.?
 7                   MS. BAEHR-JONES:  Objection.
 8         A.        I don't recall when.  I think it
 9    was probably at the Acoustic Coffee House.
10         Q.        (BY MR. RADER) All right.
11         A.        And that would have been really,
12    really early on, before Sean.  And then after that,
13    I knew her a little bit because, when I was in
14    college, I had a job at Mid City Grill.
15         Q.        Okay.
16         A.        And we didn't hang out or anything
17    then.  I just knew of her.
18         Q.        Okay.  She testified in her
19    deposition that you knew or were friends with an
20    individual named ███████ at Mid City Grill.
21         A.        That was my boss.
22                   MS. BAEHR-JONES:  Objection.
23         Q.        (BY MR. RADER) Okay.  Is he
24    somebody that socialized with her?
25         A.        I think that she was just a patron
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    of the restaurant.  I don't think that they were

 2    like pals.

 3            Q.      All right.  Did she know you before

 4    you came to know Sean Williams?

 5            A.      Only through like seeing -- you

 6    know, out and about.

 7            Q.      Okay.  You weren't friends with her

 8    and didn't hang out with her?

 9            A.      No.

10            Q.      Did there come a time when she was

11    around Sean Williams in your presence?

12            A.      Yes.

13                    MS. BAEHR-JONES:  Objection.

14            Q.      (BY MR. RADER) Tell me about that.

15            A.      And out of my presence I think they

16    hung out, too.  They would hang out, I mean, at the

17    Acoustic Coffee House.  I know that, and several

18    other friends.  And, yeah, I mean, I don't know

19    about all the times that they hung out or, you know

20    or were even around.  But I know that she would --

21    she did come up to the apartment, I believe, and

22    hang out, too, with him.

23            Q.      All right.  And when was that in

24    time?

25            A.      She was actually more of his friend
```

```
 1   than she was mine throughout that.  I mean, we --
 2   like I said, we knew each other and everything else,
 3   but her and another one of her friends, ████ they
 4   kind of -- you know, they hung out with him.
 5        Q.        Is that ██████████████?
 6        A.        It is.
 7        Q.        Tell me about ██████████████
 8                  What does she do?
 9                  MS. BAEHR-JONES:  Objection.
10        A.        I know less about her.  I mean, I
11   just know her through acquaintances over the years
12   and seeing her out and about and seeing her with
13   H.A.
14        Q.        (BY MR. RADER) All right.
15        A.        I've really never hung out with
16   ████ that much, if at all.
17
18
19
20
21
22
23
24
25        Q.        H.A. is the class representative or
```

```
 1    putative class representative for members of a sex

 2    trafficking survivor class who were sexually

 3    assaulted by Sean Williams.

 4                   Do you believe that she is an

 5    adequate person to represent that class of people?

 6                   MS. BAEHR-JONES:  Objection.

 7         A.        Absolutely not.

 8         Q.        (BY MR. RADER) Is she trustworthy?

 9                   MS. BAEHR-JONES:  Objection.

10         A.        No.

11         Q.        (BY MR. RADER) Do you know who B.P.

12    is?

13                   MS. BAEHR-JONES:  Objection.

14         A.        B.P.?

15         Q.        (BY MR. RADER) It's one of the

16    plaintiffs in the case, and I'm just asking if you

17    know who she is.

18                   MS. BAEHR-JONES:  Objection.

19         A.        Not off the top of my head, I

20    don't.

21         Q.        (BY MR. RADER) You are a

22    third-party witness, and there's a protective order.

23    And since you don't know her, I'm not going to say

24    her name to you.

25         A.        I understand.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1           Q.        But as far as you know, you don't

 2    know anybody with the initials B.P. that is

 3    connected with Sean Williams.

 4                     MS. BAEHR-JONES:  Objection.

 5           A.        Not off the top of my head --

 6           Q.        (BY MR. RADER) That's okay.

 7           A.        -- right at this moment.

 8           Q.        I didn't think you did.  I just

 9    wanted to be sure.

10           A.        Okay.

11           Q.        Let's do just a few other names.

12                     Do you know a person named Female 1

13    Female 1 ?

14           A.        I do.

15           Q.        Can you tell me about Female 1

16    Female 1 ?

17                     MS. BAEHR-JONES:  Objection.

18           A.            Female 1    is a decent friend

19    of mine.  We -- I actually met her because she was

20    hanging out at Sean's and stuff, and got to know

21    her.  And I kind of felt like I needed to -- I know

22    I'm a lot older than Female 1 is and stuff, but --

23           Q.        (BY MR. RADER) Do you know where

24    Ms. Potter is now?

25           A.        Las Vegas.  Well, she lives here.
```

Lexitas   TENNESSEE
(615) 595-0073

```
 1    She's just going there to see a concert.

 2         Q.        Oh, okay.  You're keeping up with

 3    her in real time.

 4                    MS. BAEHR-JONES:  Objection.

 5         A.        She was at my house at a pool party

 6    last week.

 7         Q.        (BY MR. RADER) Do you know if

 8    Ms. [Female 1] is a victim of Sean Williams?

 9                    MS. BAEHR-JONES:  Objection.

10         A.        I don't feel comfortable speaking

11    on that.

12         Q.        (BY MR. RADER) That's fine.

13                    Do you have any reason to believe

14    that Ms. [Female 1] was a conspirator to bring victims

15    to Sean Williams?

16                    MS. BAEHR-JONES:  Objection.

17         A.        She 100 percent was not.

18         Q.        (BY MR. RADER) Did you know

19    [Female 1] during her association with Sean

20    Williams, whenever that may have been in time?

21         A.        I did.

22                    MS. BAEHR-JONES:  Objection.

23         Q.        (BY MR. RADER) And were you still

24    associated with Sean Williams in any way, other than

25    having the license with the business?
```

Lexitas-TENNESSEE
(615)595-0073

```
 1                    MS. BAEHR-JONES:  Objection.
 2            A.       Not really other than the license.
 3   That's actually how I met her, like I said.  But I
 4   kind of felt like I kind of got her away from that a
 5   little bit, or tried to.  Yeah.
 6            Q.       (BY MR. RADER) Do you know who
 7   [Female 2]  is?
 8            A.       I do.
 9            Q.       Who is  [Female 2] ?
10            A.       I know her because I bartended with
11   her.
12            Q.       At Mid City?
13            A.       At -- no, just for fun.  After I
14   bought my house, I got a job working at a place
15   called Tulips, and I wanted to meet people, and I
16   met [Female 2]
17            Q.       Okay.
18            A.       But me and her never associated
19   around Sean Williams.  I was already completely
20   separated with him.  And I think that she did,
21   because she dated a guy that was friends with him.
22            Q.       Do I understand that you dated Sean
23   Williams for a period of time and then didn't
24   anymore?
25            A.       That's correct.
```

```
 1          Q.       Can you tell me approximately when
 2   in time it was that you weren't dating him anymore?
 3          A.       That would have been July of 2017,
 4   I think.
 5          Q.       All right.  But you continued to
 6   allow your license to be contracted through the
 7   business?
 8          A.       Yes.
 9          Q.       All right.  So just a business
10   relationship at that point?
11          A.       Yes.
12                   MS. BAEHR-JONES:  Objection.
13          Q.       (BY MR. RADER) Okay.  And is
14   that -- did you start dating Mr. ████ thereafter?
15          A.       I had a -- no, I dated a different
16   guy for a little bit, just kind of talking, dating,
17   and then later on started dating Daniel.
18          Q.       But tell me -- now, you say you
19   were talking, and that's the equivalent of what I
20   think of as dating.
21          A.       We dated for a few months.
22          Q.       Okay.  Do you know who Female 3
23   Female 3 is?
24          A.       I do know who she is.
25          Q.       Okay.  Do you know anything about
```

Lexitas-TENNESSEE
(615)595-0073

```
 1    her?

 2           A.      I've never met her or talked to

 3    her.

 4           Q.      Do you know  Female 6 ?

 5           A.      No.  I don't think so, no.

 6           Q.      Do you know    Female 7    ?

 7           A.      Yes.

 8           Q.      Who is    Female 7    ?

 9           A.      She was -- she lived on the third

10    floor of the building, I believe.

11           Q.      Where Mr. Williams lived?

12           A.      Yeah.

13                   And I knew the guy that she dated a

14    long time ago.

15           Q.      Did you ever know her to have any

16    connection or affiliation with Sean Williams of any

17    kind?

18                   MS. BAEHR-JONES:  Objection.

19           A.      Yeah, they were friends.

20           Q.      (BY MR. RADER) Okay.

21           A.      They like traveled together and

22    stuff.

23           Q.      Okay.  And you may not know, but

24    I'm just asking if you do, were they more than

25    friends?  Did they have any kind of relationship?
```

Lexitas TENNESSEE
(615) 595-0073

```
 1           A.      I -- I don't know 100 percent.  So
 2    I can't speak on it.  I always thought that, but no.
 3           Q.      Was that before or after you ended
 4    your relationship?
 5           A.      That was after.
 6           Q.      All right.   Female 8   , have
 7    you ever heard of an   Female 8   ?
 8           A.      No.
 9           Q.      Have you ever heard of an  Female 9
10    Female 9 ?
11           A.      I don't think I know her.
12                   MS. BAEHR-JONES:  We're going to
13           need to take a break, I think.
14                   THE WITNESS:  I don't need a break.
15                   MS. BAEHR-JONES:  I think we need
16           to talk to counsel for a second outside.
17                   VIDEOGRAPHER:  Off the record at
18           4:53.
19              (Off the record at 4:53 p.m.)
20              (On the record at 5:13 p.m.)
21                   VIDEOGRAPHER:  We are on the record
22           at 5:13.
23    BY MR. RADER:
24           Q.      Ma'am, we're back on the record.
25    We've taken a break to address an issue.
```

Lexitas TENNESSEE
(615) 595-0073

```
1              I had asked you just before the
2   break if you knew a person named [Female 9].  I
3   don't know if you answered that question.
4              Do you know who that is?
5       A.    No, I don't think so.
6       Q.    Do you know who [Female 10] is?
7       A.    I don't think so, no.
8       Q.    Do you know who [Female 11] is?
9       A.    I don't.
10      Q.    Do you know who [Female 12] is?
11      A.    I don't believe so, no.
12      Q.    Do you know who [Female 13] is?
13      A.    No.
14      Q.    Do you know [          ] is?
15      A.    No.
16      Q.    Do you know who [Jane Doe 1] is?
17      A.    No.
18      Q.    Do you know who [Jane Doe 8] is?
19      A.    No.
20      Q.    Do you know who [Jane Doe 9] is?
21      A.    No.
22      Q.    Do you know who [          ] is?
23      A.    No.
24      Q.    Do you know who [          ] is?
25      A.    No.
```

```
 1        Q.        Do you know who ████████████
 2   is?
 3        A.        Yes.
 4        Q.        Who is ████████████?
 5        A.        ████████████ rented one of the
 6   condos he owned on the third floor.
 7        Q.        All right.  And do you know any --
 8   did she have any other connection with Mr. Williams
 9   besides renting from him?
10        A.        Not that I know of.
11        Q.        Did she pay rent to him, to your
12   knowledge?
13        A.        Yes.  Yeah.  There was like an HOA
14   back a long time ago, and then I think they
15   dissolved it.  Something happened.
16        Q.        Okay.  Do you know where
17   Ms. ██████ is now?  Is she still in that building?
18        A.        I don't know.
19        Q.        Okay.  Do you know what she did for
20   a living?
21        A.        She was in esthetics.  What do you
22   call it?  She does like facials and waxing and stuff
23   like that.
24        Q.        Okay.  Do you know if she
25   socialized with Sean Williams in any way?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1            A.       I don't really think she did.

 2            Q.       Do you know who ██████████ is?

 3            A.       No.

 4            Q.       Do you know who this Alvie Diaz

 5     Vargas person is?

 6            A.       I do.

 7            Q.       What do you know about Mr. Diaz

 8     Vargas?

 9            A.       I met him because he was friends

10     with Sean, and he had a brief relationship with

11     Female 5 until she basically was like, "Hit the road."

12     And that's about all I know.

13            Q.       Do you know when Mr. Diaz Vargas

14     first came to be friends with Sean?

15            A.       I don't.  I wasn't around during

16     any of that.

17            Q.       Was he friends with Sean before you

18     started dating Sean, or did he become friends with

19     Sean after?

20            A.       No, it was after I was done.

21            Q.       So during the time you dated Sean,

22     Mr. Diaz Vargas was not in the picture at all?

23            A.       Nope.

24            Q.       All right.  Do you know where

25     Mr. Diaz Vargas is now?
```

```
 1          A.      No.

 2          Q.      Have you heard anything about

 3   Mr. Diaz Vargas in the last year or two at all?

 4                  MS. BAEHR-JONES:  Objection.

 5          A.      No.

 6          Q.      (BY MR. RADER) Other than this

 7   lawsuit and whatever is being said about him in the

 8   media.

 9                  MS. BAEHR-JONES:  Objection.

10          A.      Yeah.  I don't -- I try not to look

11   at media because of the current allegations.

12          Q.      (BY MR. RADER) All right.

13   Plaintiffs' counsel has subpoenaed some records for

14   a number of businesses.  They've referenced

15   something called Lauren Madison Bastidas Property,

16   LLC.

17                  Have you ever heard of that?

18          A.      No.

19          Q.      Plaintiff's counsel asked you a

20   question about a New York company called Skyline

21   Contractor something or another.  And I looked it

22   up, and it has a registered agent named Juan

23   Bastidas.

24                  Have you ever heard of Juan

25   Bastidas?
```

```
 1              A.      No.

 2              Q.      Have you ever heard of a company

 3     called Strategic Investigations and Security, LLC?

 4              A.      No.

 5              Q.      Have you heard of a company called

 6     Universal TSCM Group, LLC?

 7              A.      No.

 8              Q.      And you've told us about Southern

 9     Construction & Consulting.  That was your --

10              A.      That's mine.

11              Q.      All right.  And then you told us

12     about Davis Brothers Roofing.

13              A.      I worked for them, yes.

14              Q.      Have you been contacted by or had

15     any contact at all with Kateri Dahl, Kat Dahl?

16              A.      No, not directly.  But a long time

17     ago, when all of this was going on, someone reached

18     out to me, I have no idea who, and they asked if I

19     wanted like -- basically like a whistleblower

20     attorney and stuff like that.  And I'm like, "No,

21     I'm good."

22              Q.      How was -- how did that reach out

23     to her?

24              A.      I think that -- I think I got a

25     cold call like, "Hey, do you want to talk?"  And
```

```
 1    then it was like -- it led into that discussion, but
 2    nothing ever came of that.
 3             Q.      Just a random call to your number,
 4    somebody starts asking you questions like that.
 5                     Did they pretend to know you?
 6             A.      No, they didn't pretend to know me.
 7    They introduced themselves and everything else, but
 8    at that stage in all of this, I was just thinking,
 9    "I don't even need to worry about that.  That's not
10    pertaining to me and just go on."
11             Q.      Have you ever been contacted by a
12    media person named Ronan Farrow?
13             A.      I believe so.
14             Q.      Can you tell me about that contact?
15             A.      I think that he sent me Facebook
16    messages.
17             Q.      Okay.
18             A.      Wanting to do a documentary.
19             Q.      Okay.  Did you respond to any of
20    those?
21             A.      No.
22             Q.      Do you remember how many times he
23    tried to send you something?
24             A.      It was one or two.
25             Q.      All right.  Just no response from
```

Lexitas TENNESSEE
#: 6694
(615) 595-0073

```
1    you at all?
2             A.        No.
3             Q.        Has anybody else reached out to you
4    in any other mechanism besides Facebook, either by
5    him or on his behalf?
6             A.        Other media outlets have, but I've
7    declined to speak to them in any capacity.  I don't
8    want to be on the news.
9             Q.        Do you know which other media
10   outlets have reached out to you?
11            A.        Hold on a second.  I would have
12   to -- I'd have to look at my phone to tell you which
13   one it was, but there was -- yeah, it's like a kind
14   of far right news source.  They just really --
15            Q.        Did you respond to them at all?
16            A.        No.  They've showed up at my house
17   also.
18            Q.        Ms. H.A. , during her recorded
19   phone call with you, suggested that you speak to a
20   journalist named Jeff Keeling.
21            A.        I talked to him a long time ago,
22   like years ago.  And he asked me like, you know, "Do
23   you know anything about this?  Do you think that
24   there's any truth to it?"  I'm like, "No, but please
25   don't report on me, sir."
```

Lexitas TENNESSEE
(615) 595-0073

```
1          Q.        All right.
2          A.        I recently ran into him at the
3   grocery store.  I said, "Hello," and he said it
4   back, but that was it.
5          Q.        All right.  Any other media
6   personalities that you are aware of trying to reach
7   out to you or contact you?
8          A.        I think that's about it.
9          Q.        All right.  Let me ask you about
10  this.  This is the Tennessee Secretary of State page
11  concerning Glass & Concrete Contracting, LLC.  Of
12  course, it shows that it's a dissolved entity now.
13                   Does it -- is that -- did I give
14  you the one with the -- it has your name on it,
15  doesn't it, as the contact?
16         A.        It does.
17         Q.        Were you part of it when it
18  originated?
19         A.        I was not.
20         Q.        And how did you -- do you know how
21  your name came to be on it?
22         A.        I do.
23         Q.        When did that happen?
24         A.        I didn't have a contractor's
25  license then.  I had just started kind of working
```

```
 1    and everything else.  And then I started getting
 2    licensing and more and more and more and different
 3    certifications.  And one thing led to another, and
 4    it was better for it to be an LLC.  I remember that.
 5    I think it had expired or something beforehand or
 6    went -- what's it called where it's just like not
 7    filed?
 8                  And I wanted to make sure that it
 9    was an LLC for just business purposes, quite
10    frankly.  I mean, it's better for a construction
11    company to be one.
12         Q.      Did you have an ownership interest
13    in it at one time?
14         A.      Starting in like 2016, I think,
15    somewhere around there.  I can look and see.  I
16    owned one percent, and that was because that was
17    better to do contractually for the licensing.
18         Q.      Okay.
19         A.      I didn't want Sean Williams to be
20    my boss technically, and it was better to keep it
21    separate.
22         Q.      But you did have a small ownership
23    percentage.
24         A.      One percent.
25         Q.      Did you get K-1 forms for your tax
```

Lexitas TENNESSEE
(615) 595-0073

```
 1   returns?

 2           A.      I did for one year, and then that's

 3   when things started to go haywire and -- yeah.

 4           Q.      And by things going haywire, you

 5   mean with Sean personally?

 6                   MS. BAEHR-JONES:  Objection.

 7           A.      Both.  It was kind of a -- it was

 8   as his personal life went, then so did the business.

 9           Q.      (BY MR. RADER) And what do you mean

10   about his personal life going -- what are you -- are

11   you referring to these allegations against him, or

12   are you referring to -- did he have a change in his

13   lifestyle or --

14           A.      Oh, definitely.

15           Q.      I don't know what you're meaning.

16           A.      Well, sorry.  I should clarify.

17   His -- things on the business end just completely

18   fell to the wayside, and it was undoubtedly because

19   of his drinking and drug use and things of that

20   nature and -- yeah.

21                   MR. RADER:  Okay.  I want to make

22           that Exhibit No. 106.

23                   (Exhibit 106 marked).

24           Q.      (BY MR. RADER) I'll show you an

25   Article of Amendment.  It was registered on May 8th,
```

LEXITAS TENNESSEE
(615) 595-0073

```
 1   2017.
 2           A.      Uh-huh.
 3           Q.      And if you look at the
 4   attachment --
 5           A.      Oh, this is -- yeah.
 6           Q.      Can you tell me what this is?
 7           A.      Yeah.  This is where I actually
 8   became one percent owner.
 9           Q.      Okay.
10           A.      And this is a filing acknowledgment
11   with the State.  I thought it was in 2016.  Sorry.
12   It was 2017.
13           Q.      Okay.  And he changed it from -- to
14   be a manager managed company where the manager was
15   in charge, as opposed to the members.
16                   MS. BAEHR-JONES:  Objection.
17           A.      Yes.
18           Q.      (BY MR. RADER) All right.  And he
19   signed it as the director?
20           A.      Yes.
21                   MR. RADER:  All right.  And we'll
22           make this Exhibit No. 107.
23                   (Exhibit 107 marked).
24           Q.      (BY MR. RADER) It was a short time
25   after this in 2017 that your relationship, your
```

```
 1    personal relationship, ended?

 2          A.      Yes.

 3          Q.      I don't -- something along the

 4    lines of this may have been made an exhibit earlier.

 5    If it was, it was in a different form from the one I

 6    have.  And so I just want to look at this, if you

 7    will.

 8                  Is this Tennessee Secretary of

 9    State for Southern Construction & Consulting, LLC?

10          A.      Yes.

11          Q.      And that was the company that you

12    created?

13          A.      That is.

14          Q.      And the initial filing date is

15    April 21st, 2022.

16          A.      Uh-huh.

17          Q.      Is that a yes?

18          A.      That's a yes.

19          Q.      And, of course, it then ended in a

20    dissolution on August 8th, 2023.

21          A.      That's correct.

22          Q.      And it lists two members.

23          A.      Uh-huh.

24          Q.      Is that a yes?

25          A.      That's a yes.
```

LexitasTENNESSEE
(615) 595-0073

```
 1        Q.        And I'm not trying to fuss at you.
 2        A.        I know.  I'm sorry.
 3        Q.        And is that you and Mr. ████?
 4        A.        It is.
 5        Q.        All right.  And why did you start
 6   this business in April 21st, 2022?
 7        A.        I knew that I could, and I had
 8   business contacts at that time.  And I don't want to
 9   sound too egotistical, but I am very good in
10   commercial construction contracting and the
11   negotiation process that's required.  And that's why
12   I started that.
13        Q.        At this time in April of 2022,
14   Mr. Williams is a fugitive at this point in time,
15   and Glass & Concrete has a few jobs that are
16   incomplete.
17                  Were you going to try to take over
18   some of that business on your own?
19                  MS. BAEHR-JONES:  Objection.
20        A.        Not necessarily take it over
21   because GCC was no more, but I was going to utilize
22   my contacts, of course.
23        Q.        (BY MR. RADER) Okay.  Is that part
24   of the reason that you formed this business was so
25   you'd have a mechanism to go forward?
```

Lexitas TENNESSEE
(615)595-0073
#: 6670

```
 1              A.        It was.  Yeah.

 2                        MS. BAEHR-JONES:  Objection.

 3              A.        And it was very easy.  I

 4      transferred my license over and boom, you know.

 5      That's the main part of the whole thing.

 6                        MR. RADER:  We'll make that Exhibit

 7              No. 108.

 8                        (Exhibit 108 marked).

 9                        MR. RADER:  I didn't do a very good

10              job.  I'll get in trouble with the court

11              reporter.

12              Q.        (BY MR. RADER) You were a

13      one percent -- you were still an owner of Glass &

14      Concrete in 2018; is that correct?

15              A.        Yes.

16              Q.        All right.  You bought your

17      property where you live on --

18              A.        2018.

19              Q.        --  ████████████  in October of

20      2018; is that right?

21              A.        That's correct.

22              Q.        And you were asked this morning

23      about the mortgage that you had by Ms. Baehr-Jones,

24      and I think you said it was 700 something dollars a

25      month.
```

```
 1              A.       Uh-huh.

 2              Q.       Did you -- you had to pay a down

 3    payment on that; is that correct?

 4              A.       I did.

 5              Q.       I want to show you what's Bate

 6    stamped as RENASANT1403.

 7                       Is that a check from Glass &

 8    Concrete to you in an amount for your down payment

 9    on your house?

10              A.       It is.

11              Q.       Can you tell us how that came to

12    pass?

13                       MS. BAEHR-JONES:  Objection.

14              A.       For sure.  At that time, I was -- I

15    just wanted to be out of the office and done and

16    everything to be over.  I didn't want to have to

17    work in the office in any capacity or be around

18    Sean, and I contributed a lot more than $850 in

19    years prior, and I knew that.  And, quite frankly,

20    he did, too.  And it got to a point to where I said,

21    "Let's just do that."  And plus, it would have

22    avoided me going to my parents or anything else.  I

23    mean, I could have, but I felt like I was rightfully

24    owed that, and he agreed to it.

25                       MS. BAEHR-JONES:  Can I take a look
```

```
 1            at the exhibit?

 2                    MR. RADER:  Sure.

 3                    MS. BAEHR-JONES:  We can't pull it

 4        up.

 5                    MR. RADER:  Let's make it 109.

 6                    MS. BAEHR-JONES:  Okay.  Thank you.

 7                    MS. BEREXA:  What's the Bate on it?

 8                    MR. RADER:  I'm sorry.  It's 1403.

 9                    We'll make this 109.

10                    (Exhibit 109 marked).

11                    MR. RADER:  I'm going to hand it

12        down and show them.

13                    Did you need another one?

14            Q.      (BY MR. RADER) There was one other

15        transaction I wanted to ask you about.  It's

16        RENASANT1761 out of your personal checking account.

17        In the bottom left-hand corner there is a check.

18                    Can you tell me what that is for,

19        if you can remember?

20            A.      It was probably for the electric at

21        the office, for whatever reason, but I don't

22        remember this.

23            Q.      All right.  It's $85.

24            A.      Yeah.

25                    MR. RADER:  We'll make it
```

Lexitas-TENNESSEE
(615) 595-0073

```
 1              Exhibit 110, just so we have it in the

 2         record.

 3                   (Exhibit 110 marked).

 4         A.        Yeah.  I'm not sure.  It's a check

 5    for -- if it said the electric bill, that's what it

 6    was.  I'm just not sure for where that would have

 7    been.

 8         Q.        (BY MR. RADER) Of course, you had

 9    just moved in a short time prior, in October of

10    2018.

11                   Could somebody have advanced your

12    electric bill for a month or something?

13                   MS. BAEHR-JONES:  Objection.

14         A.        No.  In fact, it may have been

15    where I was transferring stuff, because the electric

16    there was in my name and everything else.  That may

17    have been the difference.

18         Q.        (BY MR. RADER) So the electric at

19    Sean Williams' condo at 200 East Main Street was in

20    your name when you were --

21         A.        It was in -- it was in my name.

22         Q.        So it could be a deposit or

23    something being paid back?

24                   MS. BAEHR-JONES:  Objection.

25         A.        Yeah.  I think I did get credit
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   back or something to that extent.  That's probably
 2   what it is.
 3          Q.       (BY MR. RADER) Okay.  And I just
 4   want to ask you, as I was going through the various
 5   records in their voluminous bank records, when you
 6   were getting these payments per week, sometimes the
 7   amounts changed.
 8              Can you tell me why the amounts
 9   would change?
10              And I'm not suggesting they would
11   change week to week but, you know, for several
12   months it would be one amount, for several months it
13   would be another amount.
14              Do you understand what I'm saying?
15          A.       I do.
16              MS. BAEHR-JONES:  Objection.
17          A.       I do.
18          Q.       (BY MR. RADER) So let me ask the
19   question since she's objected to it.
20              Can you tell me why the amounts
21   would change from time to time on the payments that
22   you were receiving?
23          A.       Yeah.  That was my doing.  I
24   basically would -- I mean, it was -- I would call
25   and be like, "This is bullshit.  You know, like if
```

Lexitas - TENNESSEE
(615) 595-0073

1   you don't want to buy me out, whatever else, it's
2   going to cost this much."  And there was increases.
3          Q.       Okay.
4          A.       And there were some increases.  And
5   honestly, right before the end, I considered doing
6   another one, being like, "You're going to pay me
7   this much or you're going to buy me out, A or B."
8          Q.       And they had to have your license
9   in order to do the work, right?
10                  MS. BAEHR-JONES:  Objection.
11         A.       That's correct.
12         Q.       (BY MR. RADER) When did you first
13  start getting these contractors licenses?
14         A.       I think it was like 2015 maybe, but
15  it happened really quick.  Like I started in one
16  state, and then it was three, and then I started
17  going -- you know, I just kept going with it.
18         Q.       And how many states do you have
19  licenses in?
20         A.       I think it's up to like 23, but
21  that includes like tradesman licenses or specialty
22  licenses in certain states, depending upon what they
23  require.
24         Q.       I'm just trying to run down some
25  loose ends, Ms. Female 4 .  I had one bank

Lexitas TENNESSEE
(615) 595-0073

```
 1    transaction, I can find the document and show it to

 2    you, but it was in January of 2024, this year, and

 3    it was an incoming wire into your account for

 4    $14,000.

 5                    Do you know where that came from?

 6         A.        I do.

 7         Q.        Can you tell me where that was

 8    from?

 9         A.        I sold a piece of jewelry that I've

10    had for 13, 14 years.

11         Q.        What was the name of that company

12    that sold it for you or that sent you the money?

13         A.        Luxury Labels or something to that

14    extent.

15         Q.        Is that a consignment?

16         A.        Yes, it is.

17         Q.        All right.  Okay.

18         A.        Yeah.

19         Q.        Have you ever heard of a company

20    called LeFerney, Inc., L-e-f-e-r-n-e-y, Inc.?

21         A.        No.

22         Q.        When Mr. ████ would do work for

23    the business, would he actually do physical work?

24         A.        Uh-huh.

25         Q.        Is that a yes?
```

```
 1           A.      That's a yes.

 2           Q.      Okay.

 3           A.      Sorry.

 4           Q.      On April 19th, 2022, when you

 5    contacted the JCPD officer that I think we now

 6    understand is Mr. Whitlock --

 7                   MS. BAEHR-JONES:  Objection.

 8           A.      Yes.

 9           Q.      (BY MR. RADER) -- do you remember

10    how you found out that Mr. Williams had frozen the

11    business account at the bank?

12           A.      I don't know how I remember finding

13    that out.  Yeah, I'm not sure.

14           Q.      Did you at one time ever have a

15    power of attorney for Mr. Williams?

16           A.      No.  Actually, I had a power of

17    attorney to talk to the IRS for his taxes.  But it

18    was very specifically for like one year.

19           Q.      All right.  Just on that IRS form?

20           A.      Yeah.  That was it.

21           Q.      I want to show you this document,

22    and I will represent to you that this was recorded

23    with the Register's Office here in Washington

24    County, and it's signed by Mr. -- it was signed on

25    May the 6th, 2022.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    Is that Mr. Williams' signature, to
 2    the best of your knowledge?
 3         A.        It is, but I never had power of
 4    attorney on him.
 5         Q.        All right.  He's got the
 6    typewritten date of this as any power of attorney
 7    prior to April 19, 2022.  That's the same day that
 8    you got word that he was freezing the business
 9    account.
10                    MS. BAEHR-JONES:  Objection.
11         Q.        (BY MR. RADER) Did he tell you he
12    was doing this or have any contact with you about
13    this?
14         A.        I don't think -- no.
15         Q.        Have you ever seen this before
16    today?
17         A.        No, but it's funny.
18         Q.        Okay.  Have you ever heard of Kelly
19    Jones?
20         A.        I don't know Kelly Jones.
21         Q.        Did you ever do any business with
22    this law firm, Hunter, Smith & Davis?
23         A.        I don't think so, no.
24         Q.        All right.  As far as you know,
25    you've never had any kind of power of attorney
```

LEXITAS TENNESSEE
(615) 595-0073

```
1    besides the IRS form or something.
2                    MS. BAEHR-JONES:  Objection.
3         A.        That's all I ever had.
4                    MR. RADER:  All right.  We'll make
5         this Exhibit 111.
6                    (Exhibit 111 marked).
7         Q.        (BY MR. RADER) Do you know anything
8    about the properties that Mr. Williams owned,
9    besides the 200 East Main Street condo?
10        A.        He owned a condo on the third
11   floor, too.
12        Q.        Do you know of any other properties
13   anywhere else?
14        A.        He owned, across the street, the
15   garage.  And right before I found out that he was on
16   the run, I did reach out to him.  And I knew that
17   that had been used for collateral and the line of
18   credit, and I also knew that there was going to be
19   subcontractors and there was going to be vendors and
20   things like that that were possibly not going to get
21   paid.  And I was actually able to talk him into
22   putting that into the business name.  And that was
23   my only way that I could possibly secure and make
24   sure that people were getting paid.
25        Q.        All right.  And are you referring
```

```
 1    to the garage?

 2          A.      That's -- yeah.

 3          Q.      Okay.  I'll show you a deed.  It

 4    appears to have been dated March the 1st.

 5          A.      Yes.  I had the signed copy, I

 6    think, for a while.  And then I left to go on

 7    vacation.  Then I got that call.  And then I come

 8    back and took it to the -- what do you call it?

 9    To -- to register it, I guess.

10          Q.      Okay.  And who engaged this

11    attorney, Shults & Shults, if you know, to prepare

12    the deed?

13          A.      I think that Sean had used them

14    before for some property thing.  I called them.

15          Q.      You called them?

16          A.      I think -- I think he called them.

17          Q.      Okay.  He called.

18          A.      Yeah.  I was just relieved that I

19    could secure something in that form to possibly pay

20    subcontractors and vendors.

21          Q.      All right.  And so this property

22    then went into the business.

23                  MS. BAEHR-JONES:  Objection.

24          A.      It did.

25          Q.      (BY MR. RADER)  Okay.  Do you -- to
```

LEXITAS TENNESSEE
(615) 595-0073

1    the best of your knowledge, is this the deed that

2    did that?

3         A.      Yes.

4         Q.      Okay.

5         A.      There was also -- the company was

6    in such dire financial situations at the end, they

7    really maxed out that line of credit, too, without

8    making payments back into it.  And this was

9    collateral.  So the bank could actually use this to

10   recoup.

11        Q.      Did the bank, in fact, eventually

12   foreclose on that later that summer?

13        A.      They did.

14              MS. BAEHR-JONES:  Objection.

15        A.      They did.

16              MR. RADER:  We'll make this deed

17        Exhibit 112.

18              (Exhibit 112 marked).

19        Q.      (BY MR. RADER) And my records

20   reflect, you tell me if I'm right or wrong, or if

21   you know, that the bank foreclosed on August 26th,

22   2022.

23        A.      I quit keeping up with it.  You

24   know, I knew that I would find out.  And basically,

25   if anybody was left out in the cold, didn't receive

Lexitas TENNESSEE
(615) 595-0073

```
 1    payment or GCC owed them money that I didn't know

 2    about, I was just going to refer them to that as an

 3    option.

 4            Q.      But you talked Sean Williams into

 5    putting this in the company, hoping that the

 6    property would be available for people to get paid?

 7                    MS. BAEHR-JONES:  Objection.

 8            A.      Yes.

 9            Q.      (BY MR. RADER) All right.  Of

10    course, if you'd had a power of attorney for Sean

11    Williams, you wouldn't have had to have him sign

12    this, would you?

13                    MS. BAEHR-JONES:  Objection.

14            A.      He's an idiot.

15            Q.      (BY MR. RADER) Has Sean Williams

16    attempted to contact you at all since he's been in

17    jail?

18            A.      Yes.

19            Q.      Can you tell us about that?

20            A.      He's tried to contact me three

21    times.

22            Q.      Do you recall when the first one

23    was?

24            A.      It was after he was apprehended in

25    Florida, and a strange number showed up.  And I was
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    like, "Well, I've applied to some jobs.  That might
 2    be somebody, you know."  And I answered the phone,
 3    and it was like a prerecorded thing at first.  And
 4    then I heard his voice say, "Sean Williams," and I
 5    just hung up the phone.
 6              Q.       Was it like one of the -- like a
 7    prison recording?
 8              A.       Yeah.
 9              Q.       And they give you the option to
10    hang up so you don't have to talk to the person?
11              A.       Yeah.  And so, you know, click.
12              Q.       All right.  And you said there were
13    a couple of other times.
14              A.       I think like the day after, maybe,
15    it might have been a day or two days after that he
16    did again.  And then there was one other time.
17    Yeah.
18              Q.       Did you ever talk to him?
19              A.       No.
20              Q.       So it was -- he attempted to
21    contact you on three occasions and you didn't --
22    wouldn't talk to him?
23              A.       No.
24                       MS. BAEHR-JONES:  Objection.
25              Q.       (BY MR. RADER) All right.  The
```

```
 1    Public Service Building in Asheville was -- is
 2    that -- was it one job for that building or more
 3    than one job?
 4              A.      There was multiple jobs on that
 5    building because, at the time, the management
 6    company didn't have enough funds to completely
 7    restore.  So it was broke down into phases, and I
 8    knew that they had multiple phases left on that
 9    project, and that's why I reached out to them.
10              Q.      All right.  And, you know,
11    Ms. Baehr-Jones asked you who the management company
12    was.
13                      Have you -- you haven't remembered
14    that by any chance, have you?
15              A.      I have not, but --
16              Q.      In your experience dealing with
17    these companies that own these commercial buildings
18    for rent, do you know -- has it been your experience
19    that they're owned by LLC's with unusual names for
20    that building and/or managed by third-party
21    management company?
22                      MS. BAEHR-JONES:  Objection.
23              A.      They're most always managed by a
24    third-party management group, you know, so --
25              Q.      Is it usually the management group
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   that you contract with, or is it the owner of the

 2   building that you contract with?

 3           A.      The management group.

 4           Q.      So if you have a building that's

 5   got a Self-Help Bank in it, but it's being run by a

 6   management group, it might be easy to forget the

 7   name of that --

 8                   MS. BAEHR-JONES:  Objection.

 9           Q.      (BY MR. RADER) -- management

10   company?

11           A.      Well, you have to -- it's very easy

12   to, yeah.  Yeah.

13           Q.      Did you have a project called

14   Oxford?

15           A.      Yeah.  That was a -- that was a

16   project -- well, that wasn't my project.  That was a

17   GCC project.

18           Q.      All right.  Can you -- do you know

19   what kind of project that was?

20           A.      It was a restoration project, but I

21   don't have the details on it because I wasn't like

22   involved in day-to-day at that point.

23           Q.      Do you know if it was in Johnson

24   City or elsewhere?

25           A.      No.  I think Oxford is in
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    Asheville, too.
 2         Q.      Asheville, North Carolina?
 3         A.      I think so.  Yeah, I think it's
 4    down there.
 5         Q.      Do you have a contractor's license
 6    in North Carolina?
 7         A.      I do.
 8         Q.      Do you know a business that's
 9    called Urban Redevelopment Alliance, LLC?  Have you
10    ever heard of that?
11         A.      I have, yeah.
12         Q.      What is that, if you know?
13         A.      It's a management company.
14         Q.      Do you know what it -- what it is
15    or who has it?
16         A.      Not right now, no.
17         Q.      Okay.
18         A.      Wait.  Urban Redevelopment, that's
19    URA.  That's Johnson City.
20         Q.      Okay.
21         A.      That's not Asheville.
22         Q.      Is it --
23         A.      They used to manage a bunch of
24    properties downtown.
25         Q.      Okay.  Is it owned by Sean
```

Lexitas-TENNESSEE
(615)595-0073

```
 1    Williams, to your knowledge?

 2                    MS. BAEHR-JONES:  Objection.

 3            A.      No, it's not.  It's a management

 4    company.

 5            Q.      (BY MR. RADER) Too many legal pads.

 6            A.      I'm sorry.

 7            Q.      It's all right.

 8                    MR. RADER:  Give me just a minute

 9            to speak to some of these lawyers.  I'm

10            going to take a short break.

11                    MR. COCHRAN:  Before we go off the

12            record, can I ask a -- just to be clear, I

13            know there's a protective order here.  I

14            assume the names that you went through, that

15            whole list of names here, that's the names

16            under this protective order, just for her

17            knowledge so she knows.

18                    MR. RADER:  Just keep those names

19            confidential.  I haven't told you who they

20            are or what it's about.  Don't assume what

21            they're connected with.  I am not

22            representing to you that they have anything

23            to do with anything.  I'm just trying to

24            find out who people are.  But the names are

25            confidential, if you'll keep them
```

```
 1          confidential.

 2                    MR. COCHRAN:  I just wanted to make

 3          sure so she's clear about it also.

 4                    MS. BAEHR-JONES:  Thank you.

 5                    VIDEOGRAPHER:  Going off the record

 6          at 5:49.

 7              (Off the record at 5:49 p.m.)

 8               (On the record at 5:52 p.m.)

 9                    VIDEOGRAPHER:  We're back on the

10          record at 5:52.

11  BY MR. RADER:

12          Q.        Ms.  Female 4 ,  I've got -- were

13  you provided by plaintiffs' counsel a copy of the

14  bank statements that they subpoenaed concerning your

15  bank account?

16          A.        No.

17                    MS. BAEHR-JONES:  Objection.

18          A.        I was not.

19          Q.        (BY MR. RADER) Did the bank notify

20  you that they had subpoenaed your bank account?

21                    MS. BAEHR-JONES:  Objection.

22          A.        I didn't -- I don't think they did.

23  I might have gotten a letter and not seen it.

24          Q.        (BY MR. RADER) Okay.  Were you

25  aware that the plaintiffs have filed some of your
```

```
 1    bank statements with the court in this case?
 2                   MS. BAEHR-JONES:  Objection.
 3         A.        I was not.
 4         Q.        (BY MR. RADER) Okay.  Have you
 5    understood all of my questions today?
 6         A.        I have.
 7                   Actually, I was -- I just realized
 8    what you asked me.
 9                   I was aware that statements were
10    made about me coming in here and the $100,000
11    payment and things like that and extortion and all
12    of that.  I seen what was entered.
13         Q.        That the plaintiffs filed?
14         A.        Yes, I did see that.
15         Q.        And did you see the actual filing
16    or the news media coverage where the news media --
17         A.        I've seen the filing from him.
18                   MR. RADER:  Okay.  All right.  I do
19              not have any more questions for you at this
20              time.
21                   Pursuant to our agreement with
22              plaintiffs' counsel, I'm reserving
23              30 minutes beyond what they ask, but I'm
24              handing it down the line first to
25              Ms. Berexa, I guess.
```

```
 1                    EXAMINATION
 2   BY MS. BEREXA:
 3          Q.      Good afternoon, Ms.  Female 4 .
 4                  COURT REPORTER:  Can you put the
 5          microphone --
 6                  MR. RADER:  Do you want this one?
 7                  COURT REPORTER:  No, that's okay.
 8          I just want it kind of closer to you.
 9          Q.      (BY MS. BEREXA) Good afternoon
10   Ms.  Female 4 .  As usual, Mr. Rader has been very
11   thorough.  So I just have a very few follow-up
12   questions for you.  And I'm going to try not to ask
13   you what Mr. Rader has already asked, but I
14   apologize if there's a couple I do.
15                  Have you ever heard the name --
16   and, again, these would be names protected under
17   this protective order we had you sign --  B.P.
18   B.P. ?
19          A.      No.
20          Q.      And Mr. Rader may have asked you
21   this, but I didn't make a good note.
22                            ██████████ have you ever heard
23   of her?
24          A.      No.
25          Q.      And ██████████████████?
```

TENNESSEE
(615) 595-0073

```
 1              A.       Yes.

 2              Q.       And how do you know her?

 3              A.       Only through the association of

 4    Sean.  You know, I knew that she was kind of driving

 5    it around and everything else.  And when that

 6    Facebook post was made, I did -- I kind of figured

 7    it was -- it was her.

 8              Q.       Do you know where she is right now?

 9              A.       No.

10              Q.       Do you know if she's in Johnson

11    City?

12              A.       I don't.

13              Q.       In questioning from Mr. Rader, you

14    denied today that you had ever paid off any Johnson

15    City Police Department officers, correct?

16              A.       That is correct.

17              Q.       Did you ever tell anyone that you

18    had done that, paid off the cops?

19              A.       Never.

20              Q.       So if people are saying that, that

21    would not be accurate or truthful?

22              MS. BAEHR-JONES:  Objection.

23              A.       That would be a lie.

24              Q.       (BY MS. BEREXA) Other than this

25    alleged Facebook post that we've talked about -- or
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    Facebook post, and the lawsuit that's been filed

 2    that your attorney has showed you, are you aware of

 3    anyone else that has accused you of extortion or

 4    paying off JCPD cops?

 5                    MS. BAEHR-JONES:  Objection.

 6            A.         I'm unaware of anyone.  I think

 7    Vanessa and the Facebook post are the only ones that

 8    have ever said anything like that.

 9            Q.         (BY MS. BEREXA) You said you had

10    spoken with the TBI; is that correct?

11            A.         That is correct.

12            Q.         When you were speaking with the

13    TBI, did they ask you any questions about this

14    alleged extortion scheme or paying off the cops?

15                    MS. BAEHR-JONES:  Objection.

16            A.         They specifically referenced the

17    Facebook post that had been made, and they asked if

18    they could ask me a few questions.  They were really

19    great.  They said, "Do you know anything about it?"

20    I said, "No."  They said, "Okay.  Sorry, but we have

21    to ask like very specifically."  And I'm like, "I

22    understand."  And we went through everything.

23            Q.         (BY MS. BEREXA) So you told them

24    that you had no knowledge of --

25            A.         No knowledge.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.        And had never done any of the

 2    things in that Facebook post.

 3          A.        That's correct.

 4          Q.        And did you ever talk to the FBI,

 5    as well?

 6          A.        I did.

 7          Q.        Did you talk to them about this

 8    Facebook post and the allegations in the Complaint

 9    about JCPD?

10          A.        No, I did not.

11          Q.        What did you talk to the FBI about?

12          A.        They originally -- they originally

13    just asked me if I had any like -- could I give them

14    any insight on him or was I aware, and they just

15    wanted to kind of pick my brain on names or places

16    or characteristics, honestly.

17          Q.        So you've never had a conversation

18    with the FBI about these alleged --

19          A.        No.

20          Q.        -- police corruption or extortion

21    allegations?

22          A.        No.

23          Q.        Had you ever heard the name Toma

24    Sparks before this lawsuit?

25                    MS. BAEHR-JONES:  Objection.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              A.      I had not.
 2              Q.      (BY MS. BEREXA) And you'd never met
 3      him?
 4                      MS. BAEHR-JONES:  Objection.
 5              A.      Never met him.
 6              Q.      (BY MS. BEREXA) Never talked to
 7      him?
 8                      MS. BAEHR-JONES:  Objection.
 9              A.      Never talked to him.
10              Q.      (BY MS. BEREXA) And did you ever
11      provide any kind of financial benefit to him ever?
12                      MS. BAEHR-JONES:  Objection.
13              A.      Never.
14              Q.      (BY MS. BEREXA) Did he ever ask you
15      for money at any point in time?
16                      MS. BAEHR-JONES:  Objection.
17              A.      I've never talked to him.
18              Q.      (BY MS. BEREXA) Did he ever send
19      you an email or text or any sort of written
20      communication?
21                      MS. BAEHR-JONES:  Objection.
22              A.      I've never had any communication
23      with Toma Sparks.
24              Q.      (BY MS. BEREXA) Did you, on behalf
25      of Glass & Concrete Contracting, LLC, use false IRS
```

Lexitas - TENNESSEE
(615) 595-0073
#: 5992

```
 1    forms to pay money to JCPD officers as alleged in --

 2              A.        No.

 3                        MS. BAEHR-JONES:  Objection.

 4              Q.        (BY MS. BEREXA) In this phone call

 5    that you had with Ms.  H.A. , do you recall telling

 6    her that you had never paid off the cops?

 7              A.        Yes.

 8                        MS. BAEHR-JONES:  Objection.

 9              Q.        (BY MS. BEREXA) Do you recall what

10    her response to that was?

11                        MS. BAEHR-JONES:  Objection.

12              A.        Not exactly.

13              Q.        (BY MS. BEREXA) Did she say, "I

14    don't fucking think you did."

15                        MS. BAEHR-JONES:  Objection.

16              A.        It's possible she did, because I

17    remember it was a very good conversation.  I mean, I

18    think that it was going good up until the very end

19    of that conversation.  There was two.  So I don't

20    know which one you have that she recorded and which

21    one she didn't.  But at the very end of one specific

22    conversation, she waited until right before we were

23    ending our conversation.  I felt like we were in

24    alliance, like maybe she might even talk to her

25    legal, things like that.  And then she said, "Well,
```

1   you could end all this now.  You just need to go

2   talk to him.  Just go talk to him."  And it was

3   like, "Did you not just have the same conversation I

4   had?"  So I'm not sure which one of those that

5   you're looking at.

6           Q.      (BY MS. BEREXA) During the recorded

7   conversation or any conversation you had with

8   Ms. H.A., did she ever try and convince you to go

9   to Knoxville with her?

10          A.      She did.  She asked me to go.  She

11  was going the next day with her sister.

12          Q.      Do you know what the purpose of

13  that trip was?

14                  MS. BAEHR-JONES:  Objection.

15          A.      She wanted me to meet with her

16  legal to talk to them and to -- yeah, she did.

17          Q.      (BY MS. BEREXA) And do you know

18  what she wanted -- what she was wanting you to say

19  or why she wanted you to go?

20                  MS. BAEHR-JONES:  Objection.

21          A.      It was insinuated throughout

22  multiple conversations.  I mean, she wanted me to

23  say that JCPD in some way had done something wrong,

24  but it wasn't the case.

25                  MS. BEREXA:  I think that's all I

Lexitas-TENNESSEE
(615) 595-0073

```
 1            have right now.

 2                    Again, I may, if I need to,

 3            follow-up during our time that we all

 4            reserve.

 5                        EXAMINATION

 6     BY MS. RUFOLO:

 7            Q.      Ms.  Female 4 , can you hear me?

 8     Am I good?

 9            A.      Yes.

10            Q.      Okay.  All right.  I think that you

11     already answered this, but I don't know.  I didn't

12     hear it.

13                    When did you start -- when did you

14     first get your license for contracting?

15            A.      So I need to look it up, but that's

16     something I can answer.  I just can't right now.  I

17     think it was --

18            Q.      I mean, has it been over a decade?

19     Two decades?

20                    MS. BAEHR-JONES:  Objection.

21            A.      It's close to a decade, if not

22     over.

23            Q.      (BY MS. RUFOLO) And in that amount

24     of time, could you estimate how many projects that

25     you've been involved in, whether they were big or
```

Lexitas TENNESSEE
(615) 595-0073

```
 1  small?
 2          A.      That's across all companies?
 3          Q.      Yes, ma'am.
 4          A.      Oh, geez.  Thousands across all
 5  companies.
 6          Q.      And on all those projects, would
 7  you have to deal with several subcontractors,
 8  management companies?
 9                  MS. BAEHR-JONES:  Objection.
10          A.      Depending on the size of the job.
11  Sometimes there was, you know, five.  Sometimes
12  there was ten subcontractors.  Sometimes it was one
13  management company.  Unfortunately, there were those
14  that had more or they were about to change hands,
15  and those are the jobs you don't really want.
16          Q.      (BY MS. RUFOLO) But thinking back
17  over the thousands of projects that you said you've
18  had, putting all the subcontractors with each one of
19  those, would it be reasonable to say that you're not
20  going to remember every single one of those
21  subcontractor's names?
22                  MS. BAEHR-JONES:  Objection.
23          A.      I don't think there's a way that
24  anyone could.
25          Q.      (BY MS. RUFOLO) And the same
```

LEXITAS TENNESSEE
(615) 595-0073

```
 1    question with the different management companies
 2    that you've had to deal with.
 3                    MS. BAEHR-JONES:  Objection.
 4         A.        There's no way.
 5         Q.        (BY MS. RUFOLO) And, you know, none
 6    of us are in construction.
 7                    So when we're talking about this
 8    line of credit that was paid off through Renasant,
 9    what's the purpose of the line of credit?
10         A.        So a lot of times before you go
11    under contract, especially for commercial projects,
12    they want to make sure that you have enough money or
13    a nest sitting there in case something goes awry.
14    They don't want to have to halt a job because
15    someone's not getting paid or something's going
16    wrong.  So it's just reassurance.
17                    A lot of companies, if the job
18    exceeds a certain amount, they'll actually want to
19    see that on top of a bond even.  Sometimes you'll
20    have to show both.  It depends on the cost of the
21    project, really.
22         Q.        But each time you take out a line
23    of credit, you're going to have to pay that off.
24         A.        Yeah.
25         Q.        You said a little bit earlier that
```

```
 1   you actually had two phone conversations with
 2   Ms. H.A.; is that correct?
 3          A.       It may have been three, but I
 4   remember two very specific ones where it was like,
 5   "What?  What the fuck are we talking about?  Are you
 6   having a different conversation than what I'm having
 7   right now?"  And then at the end it flip-flopped.
 8          Q.       So we have one that we have a
 9   recorded audio of.  We do not have a second one.
10                   Do you remember when the -- well,
11   when each one of them took place?
12                   MS. BAEHR-JONES:  Objection.
13          A.       I do not, no.
14          Q.       (BY MS. RUFOLO) We have one phone
15   call that I think was March 17, 2024.
16          A.       Okay.
17          Q.       Does that help at least with one of
18   them for you?
19                   MS. BAEHR-JONES:  Objection.
20          A.       It -- that was probably the last
21   one.
22          Q.       (BY MS. RUFOLO) Okay.  Do you
23   remember how long before the March 17th one took --
24          A.       It was probably a few weeks.
25          Q.       And as best you can recall, what
```

Lexitas TENNESSEE
(615) 595-0073

1     did you discuss at that time?

2          A.        I was really, really starting to

3     get upset, because I know, and everyone else

4     involved in any of this lawsuit -- well, not this

5     lawsuit, but across the board with any of this, they

6     know that I didn't have any -- that this never

7     happened.  The D.A. knows it.  The FBI knows it.

8     The Johnson City Police know it.  The TBI knows it.

9     And then all of a sudden, I have an attorney that is

10    making these ridiculous allegations against me.

11               So to say that I was upset is an

12    understatement, okay?  I'm worried about my

13    reputation.  I'm worried about my career.  I'm

14    worried about what people think.  What if some nut

15    job drops by my house thinking that I did have

16    something to do with this?  Because of what -- you

17    know, this is very serious.

18               And I was desperate.  I'm like I've

19    done everything but beg **H.A.** to talk to them.  I'm

20    like, "Please, just fucking help me here.  This is

21    ridiculous.  You know me enough to know this."

22          Q.        And how did she respond?

23          A.        At first she was like, you know,

24    going along with it, until right towards the end of

25    the conversation.

```
1          Q.        Something you said earlier when

2    Mr. Rader was questioning you, you said that

3    Ms. H.A. was not trustworthy.

4                    Why do you feel like that?

5                    MS. BAEHR-JONES:  Objection.

6          A.        If she were trustworthy, I probably

7    wouldn't be sitting here where I am at right at this

8    moment.  I think that she has tried to propel the

9    involvement of me into this in some capacity, and

10   it's really unnecessary.  And a --

11         Q.        (BY MS. RUFOLO) In the recorded

12   phone conversation that we have --

13         A.        I made a statement to her on that

14   phone conversation.  I said, "There's one thing.  I

15   don't have to be under oath to tell the truth," and

16   I've told this over and over again.  I really just

17   want to be left alone.  And it's just --

18         Q.        And today you have told the truth?

19                    MS. BAEHR-JONES:  Objection.

20         A.        Yes.  Of course.

21         Q.        (BY MS. RUFOLO) In that

22   conversation, the one that was recorded -- well, let

23   me ask you this first.

24                    Did you know you were being

25   recorded?
```

```
 1          A.      I did not.  I didn't trust her

 2    before the phone conversations, really.  After the

 3    first one I had -- I was like, "Okay.  This is --

 4    she's not here to help me in any capacity.  This is

 5    not a good situation."

 6                    I thought it in the back of my mind

 7    but, again, I didn't know.  I didn't want to believe

 8    that, but sure enough.

 9          Q.      When did you finally found out --

10    find out that it was --

11          A.      I found out when my attorney told

12    me.

13          Q.      In that conversation, there's a

14    mention of a girl from Jonesboro, and then you said

15    something about, "She threw me under the bus."

16                    Do you know who you were talking

17    about at that time?

18                    MS. BAEHR-JONES:  Objection.

19          A.      I would have to see the entire

20    thing.

21          Q.      (BY MS. RUFOLO) Okay.

22          A.      I'm happy to answer it.  I'm sure I

23    can tell you, but --

24          Q.      Do you consider any statement by

25    Sean Williams to be trustworthy or credible?
```

Lexitas — TENNESSEE
(615) 595-0073

```
 1                    MS. BAEHR-JONES:  Objection.

 2           A.        No.

 3           Q.        (BY MS. RUFOLO) There was an

 4    objection during Mr. Rader's questioning about

 5    misrepresenting your testimony.  So I want to just

 6    make sure that we have it very clear.

 7                    In that Facebook post, there is a

 8    paragraph that says, " Female 4  my ex and business

 9    partner, was paying officials at JCPD with money

10    from my company for years because she got caught

11    selling cocaine."

12                    Have you ever sold any cocaine?

13           A.        I have never sold cocaine.

14                    I can't believe that that's coming

15    out of my mouth right now, but no.

16           Q.        The rest of the sentence was, "And

17    the corrupt officers targeted her for extortion

18    probably due to her association to me."

19                    Have you ever been targeted by

20    anybody from the JCPD for extortion?

21                    MS. BAEHR-JONES:  Objection.

22           A.        I've never been extorted by anyone

23    on the JCPD or employed in Johnson -- any of it.

24    No.

25           Q.        (BY MS. RUFOLO) There were a couple
```

```
 1    of names that you were asked about, and they both
 2    have your same last name, the ████████████
 3    ████████ and maybe ██████████████    I may
 4    have her first name incorrect.
 5            A.      Yeah.
 6            Q.      You were questioned about whether
 7    those were names you made up.
 8                    Did you ever make up any names?
 9            A.      I've never made up a name for a
10    business or an individual, no.
11            Q.      In the phone conversation that you
12    had with Ms. H.A., you told her that Kevin Osborne
13    had intimidated you on the phone.
14                    In what way did he intimidate you?
15                    MS. BAEHR-JONES:  Objection.
16            A.      100 percent.
17            Q.      (BY MS. RUFOLO) In what way did he
18    intimidate you?
19            A.      The tone of the conversation, as
20    well as what he was saying, it was -- it was
21    basically like, "Don't you want us to help you?
22    Don't you need help?"  And I'm like -- you know,
23    "Don't you want immunity?"  And then I'm like, "Wait
24    a minute.  No, I don't.  I don't need it.  What is
25    wrong with you?  I haven't done anything wrong."
```

Lexitas TENNESSEE
(615) 595-0073

```
 1            And then it turned, and I said -- I
 2  actually asked him this.  I remember this very
 3  specifically.  I said, "I'm very confused.  If
 4  you're representing victims, well, you don't want to
 5  represent me?  I'll ask you, since I know you can't
 6  ask me.  Do you want to represent me?"  And he's
 7  like, "Oh, no, no, no, no, no."
 8            And it was like on from that point
 9  of -- he just really, really tried to intimidate me,
10  to make me feel like I had done something wrong, and
11  I know I haven't.
12       Q.    Is that the first person who's ever
13  mentioned to you immunity?
14            MS. BAEHR-JONES:  Objection.
15       A.    Vanessa may have on that first
16  conversation, but definitely Kevin.
17       Q.    (BY MS. RUFOLO) Okay.  Are you
18  still dating Mr. ████████
19       A.    I am.
20       Q.    Have you -- I'm going to ask you
21  about three different people, because I represent
22  three.
23            Have you ever met, talked to,
24  communicated with Jeff Legault?
25       A.    Don't know that person.
```

```
 1          Q.      Okay.  Same question.

 2                  Have you ever communicated, talked

 3      to Justin Jenkins?

 4          A.      Don't know that person.

 5          Q.      Same questions for Brady Higgins.

 6                  Have you ever communicated, talked

 7      to, in any way, to Brady Higgins?

 8          A.      Don't know that person.

 9          Q.      And there are some police officers

10      in this room that, when we all sat down, they

11      introduced themselves.

12                  If you had not heard their names,

13      would you even recognize Justin Jenkins, Brady

14      Higgins, or Jeff Legault?

15                  MS. BAEHR-JONES:  Objection.

16          A.      I actually still don't recognize

17      any of them.

18          Q.      (BY MS. RUFOLO) And have you

19      provided any type of financial benefit to Justin

20      Jenkins?

21                  MS. BAEHR-JONES:  Objection.

22          A.      No.

23          Q.      (BY MS. RUFOLO) Have you provided

24      any financial benefit to Brady Higgins?

25                  MS. BAEHR-JONES:  Objection.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          A.       No.

 2          Q.       (BY MS. RUFOLO) And have you

 3  provided any financial benefit to Jeff Legault?

 4                  MS. BAEHR-JONES:  Objection.

 5          A.       No.

 6                  MS. RUFOLO:  That's all I have.

 7          Thank you.

 8                          EXAMINATION

 9  BY MS. TAYLOR:

10          Q.       I'll just stand up.  My question

11  was -- I just have a few.

12                  Ms.  Female 4 , I'm Emily Taylor.

13  I represent the City of Johnson City and Karl

14  Turner.  This will take hopefully just a minute.

15                  Do you know who Karl Turner is?

16          A.       I do now, but only because of the

17  newspaper and stuff.

18          Q.       Okay.  To your knowledge, have you

19  ever met Karl Turner?

20          A.       I've not.

21          Q.       To your knowledge, have you ever

22  spoken to Karl Turner?

23          A.       I've not.

24          Q.       To your knowledge, have you ever

25  interacted on Facebook with Karl Turner?
```

```
 1            A.      I have not.

 2            Q.      Have you ever provided a benefit to

 3    Karl Turner?

 4                    MS. BAEHR-JONES:  Objection.

 5            A.      I have not.

 6                    MS. TAYLOR:  That's all the

 7            questions I have.

 8                    MS. BEREXA:  Should we chat?  Let's

 9            take a quick break and let us chat.

10                    VIDEOGRAPHER:  Going off the record

11            at 6:16.

12                (Off the record at 6:16 p.m.)

13                (On the record at 6:31 p.m.)

14                    VIDEOGRAPHER:  And we're back on

15            the record at 6:31.

16                        REEXAMINATION

17    BY MR. RADER:

18            Q.      Ms. Female 4 , I've just got a few

19    questions I want to be sure we've got testimony on.

20                    Have you ever given a statement or

21    video recording to anyone regarding Sean Williams or

22    the circumstances of this case, other than the FBI

23    and the TBI when you talked to them?

24            A.      No.

25            Q.      Okay.  Have you -- I believe that
```

```
 1    I've already asked these questions generally, but I
 2    want to be sure I'm crystal clear on it.
 3                    You have not bribed any of the
 4    officers, correct?
 5                    MS. BAEHR-JONES:  Objection.
 6         A.        No.
 7         Q.        (BY MR. RADER) Have you ever seen
 8    Sean Williams bribe any officers?
 9                    MS. BAEHR-JONES:  Objection.
10         A.        No.
11         Q.        (BY MR. RADER) Have you ever heard
12    Sean Williams say anything about bribing any
13    officers?
14         A.        No.
15                    MS. BAEHR-JONES:  Objection.
16         Q.        (BY MR. RADER) Have you ever seen
17    anything that would suggest to you or lead you to
18    believe that Sean Williams had ever bribed any
19    officers?
20                    MS. BAEHR-JONES:  Objection.
21         A.        No.
22         Q.        (BY MR. RADER) When you dated Sean
23    Williams for this period of years, did he ever
24    behave in a way that would lead you to believe that
25    he had ever bribed any officer?
```

```
 1          A.      No.

 2                  MS. BAEHR-JONES:  Objection.

 3          Q.      (BY MR. RADER) Did -- when you

 4    dated Sean Williams for this period of years, did he

 5    ever do anything that would lead you to believe that

 6    he had any relationship of any kind with any police

 7    officer that would provide him any benefit or

 8    protection of any kind?

 9                  MS. BAEHR-JONES:  Objection.

10          A.      No.

11          Q.      (BY MR. RADER) In the time after

12    you dated Sean Williams and that you remained

13    connected in some way with this Glass & Concrete

14    Contracting business, did you ever see anything or

15    hear anything that would give you any indication

16    that Sean Williams or anyone connected with him had

17    any relationship with any Johnson City Police

18    officer that would provide him any benefit or

19    protection of any kind?

20                  MS. BAEHR-JONES:  Objection.

21          A.      No.

22          Q.      (BY MR. RADER) And has anyone ever

23    told you that they made any bribe of any police

24    officer on their own behalf or Sean Williams'

25    behalf?
```

```
 1                    MS. BAEHR-JONES:  Objection.

 2          A.        No.

 3          Q.        (BY MR. RADER) Has anyone -- have

 4   you ever heard of anyone saying or heard any

 5   communication of any kind that suggests that anyone

 6   has ever bribed any Johnson City Police officer for

 7   their benefit or the benefit of Sean Williams?

 8          A.        No.

 9                    MS. BAEHR-JONES:  Objection.

10          Q.        (BY MR. RADER) Have you ever seen

11   anything in the time that you dated Sean Williams,

12   or in the time that you -- after you dated him, that

13   you were connected with this business or otherwise,

14   that would lead you to believe that anyone had any

15   kind of relationship with any Johnson City Police

16   officer that would benefit Sean Williams or protect

17   him in any way?

18          A.        No.

19                    MS. BAEHR-JONES:  Objection.

20          Q.        (BY MR. RADER) Is there any reason,

21   as far as you know, for any lawyer or anyone else to

22   have a good faith basis to claim that Sean Williams

23   had bribed or had some other relationship with a

24   Johnson City Police officer to protect him in any

25   way?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    MS. BAEHR-JONES:  Objection.

 2          A.        No.

 3          Q.        (BY MR. RADER) If a lawyer filed

 4    that kind of Complaint in court, would you agree

 5    that there's no good faith basis to make that kind

 6    of allegation?

 7                    MS. BAEHR-JONES:  Objection.

 8          A.        There's not.

 9                    MR. RADER:  Thank you, ma'am, for

10          taking time to be here today and answer our

11          questions.  We appreciate it.

12                    I reserve 30 minutes for rebuttal

13          beyond redirect.

14                    MS. BAEHR-JONES:  Give me one

15          second.

16                    REEXAMINATION

17    BY MS. BAEHR-JONES:

18

19

20

21                Attorneys Eyes Only

22

23

24

25
```

TENNESSEE
(615) 595-0073



Attorneys Eyes Only

Attorneys Eyes Only

          Q.      (BY MS. BAEHR-JONES) Were you aware
that you were possibly being followed by the Johnson
City Police Department when you left the bank on or
about April 27th, 2022?

```
 1          A.      I don't recall that.
 2          Q.      Did you ever notice being followed
 3  by the Johnson City Police Department by any police
 4  officers?
 5          A.      No.
 6          Q.      You talked about a wire transfer
 7  for jewelry.
 8                  Who gave you the jewelry that you
 9  sold?
10          A.      It was present about 12, 13 years
11  ago, maybe longer, from Sean.
12          Q.      What was it?
13          A.      It was a necklace.
14          Q.      What kind of necklace?
15          A.      It was a gold necklace.
16          Q.      And you testified that you sold it
17  to a consignment shop.
18          A.      I did.
19          Q.      And what was the name of the shop?
20          A.      I've already answered.  I believe
21  it was Luxury -- it was -- I'm not sure.  They're in
22  Nashville.  It was Luxury Consignment of some sort.
23          Q.      They're in Asheville?
24          A.      Nashville.
25          Q.      Nashville.
```

LexitasTENNESSEE
(615) 595-0073

```
 1                  You testified early -- earlier --
 2      you were asked questions earlier about something
 3      called class representation.
 4                  What did you base your testimony
 5      that H.A. is not an adequate class representative
 6      on?
 7           A.     Is she an expert on survivors?  Is
 8      she any form of a counselor?  Does she have any
 9      credentialing as far as that goes?  Because she's
10      involved in this lawsuit definitely doesn't make her
11      an adequate resource to be the director.
12           Q.     Are you a lawyer who is able to
13      opine on what adequacy for class representation is?
14                  MS. BEREXA:  Object to the form.
15                  MR. RADER:  Object to form.
16           A.     I'm not an attorney.
17           Q.     (BY MS. BAEHR-JONES) Do you know
18      what adequacy for class representation means?
19           A.     I do.
20           Q.     What does it mean?
21           A.     Like adequacy for class
22      representation.  Is she adequate to actually lead or
23      represent a group in any form of the survivors?  And
24      my answer was no, and I stand by that.
25           Q.     Do you know the legal definition of
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    conspirator?

 2              A.        Yes.

 3              Q.        Okay.  What is it?

 4              A.        Basically like -- well, actually,

 5    no.  No.

 6                        Will you tell me that one?

 7              Q.        Well, I'm asking that because you

 8    testified earlier that you -- that   Female 1

 9    is definitely not a coconspirator.  And so I wanted

10    to ask whether you understood the legal definition

11    of coconspirator to be able to testify to that.

12              A.        Isn't that along the lines of

13    aiding someone in a certain capacity?

14              Q.        Okay.  But you don't know the legal

15    definition.

16              A.        I'm not a lawyer.  I know what the

17    definition of the word means.

18              Q.        Did   Female 7   live in an

19    apartment owned by Sean Williams?

20              A.        No, not that I'm aware of.

21                        MS. BAEHR-JONES:  Can you give me

22              one moment just to see if we're -- actually,

23              I'm sorry.

24                        You mentioned -- so this is not

25              attorney eyes only.
```

1      Q.      (BY MS. BAEHR-JONES) You mentioned
2   line of credits.
3              Where would the documentation for a
4   line of credit be?  Would that be with the bank or
5   somewhere else?
6      A.      I don't understand what you mean.
7      Q.      You mentioned that there were
8   payments that were being transferred to a line of
9   credit, right?
10     A.      Yeah.
11     Q.      And line of credits are important
12  in terms of running a construction business.
13     A.      Yeah.
14     Q.      Where is the documentation for that
15  line of credit?  Would that be a line of credit with
16  Renasant Bank or with another financial institution?
17     A.      We literally reviewed the documents
18  from Renasant Bank where the payments were made to.
19  Of course it's at Renasant.
20     Q.      Okay.  And the documentation for
21  taking out those specific lines of credit, where
22  would those be?
23     A.      There on all of your bank
24  statements there.
25     Q.      Okay.  So outside of those bank

Lexitas-TENNESSEE
(615) 595-0073

```
1    records that are at Renasant Bank, do you have any
2    documentation for the lines of credit?
3            A.      No.
4            Q.      Did Glass & Concrete have any of
5    those documentations?
6            A.      Yeah.
7            Q.      Where would those be now?
8            A.      I do not know.
9            MS. BAEHR-JONES:  Okay.  I think
10       we're fine.
11           MR. RADER:  So let's -- why don't
12       we go off the record?  We'll send all of
13       these gentlemen out, and why don't you have
14       a conversation with her?
15
16
17
18
19
20                    Attorneys Eyes Only
21
22
23
24
25
```



Attorneys Eyes Only

Lexitas – TENNESSEE
(615) 595-0073

Attorneys Eyes Only

```
1
2
3
4
5
6
7
8
9
10
11
12
13    A.        That is, in part, how and --
14            MS. BAEHR-JONES:  Okay.  Thank you.
15    I have no further questions.
16            MR. RADER:  Thank you, ma'am.
17            MS. TAYLOR:  Thank you very much
18    for your time today.
19            THE WITNESS:  Thank you, guys.
20            VIDEOGRAPHER:  Going off the record
21    at 6:45.
22        (Off the Record at 6:45 PM)
23            FURTHER THIS DEPONENT SAITH NOT.
24
25
```

```
 1                    C E R T I F I C A T E

 2    STATE OF TENNESSEE:

 3    COUNTY OF KNOX:

 4

 5                    I, Jeffrey D. Rusk, Registered

 6    Professional Reporter and Notary Public, do hereby

 7    certify that I reported in machine shorthand the

 8    foregoing proceedings; that the foregoing pages,

 9    inclusive, were prepared by me using computer-aided

10    transcription and constitute a true and accurate

11    record of said proceedings.

12                    I further certify that I am not an

13    attorney or relative of any attorney or counsel

14    connected with the action, nor financially

15    interested in the action.

16                    Witness my hand and official seal

17    this the 4th day of June, 2024.

18

19

20    _____

21    Jeffrey D. Rusk, RPR, CLVS
      Notary Public at Large
22    My Commission Expires:  4/29/2026
      TCRB License No. 212

23

24

25
```