# Exhibit 22

# B.P.

## vs.

## City of Johnson City, Tennessee, et al,

---

## CATHY BALL

## June 03, 2024



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073

Case 2:23-cv-00071-TRM-JEM   Document 235-21   Filed 06/28/24   Page 2 of 193   PageID #: 6015

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TENNESSEE
 2                    GREENEVILLE DIVISION


 3


 4   B.P., H.A., and S.H.,          )
     individually, and on behalf of)
 5   all other similarly           )
     situated,                     )
 6                                  )
                                    )
 7                 Plaintiffs,      )
                                    )
 8                                  )
                                    )
 9   v.                             )   No. 2:23-CV-00071
                                    )        TRM-JEM
10                                  )
     City of Johnson City,          )
11   Tennessee, et al,             )
                                    )
12                 Defendants.      )

13


14

                 * * * * * * * * * * * * * *
15

16              DEPOSITION OF CATHY BALL

17                    June 3, 2024

18


19


20   ===================================================
                    LEXITAS LEGAL
21

22        Jeffrey D. Rusk, RPR, LCR, CLVS
               805 Eleanor Street, N.E.
23          Knoxville, Tennessee  37917
                    (865) 246-7656
24               Jeff@JeffRusk.com

25
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3    Heather M. Collins, Esq.
      Collins & Hunter
 4    7000 Executive Center Drive
      Suite 320
 5    Brentwood, Tennessee  37027

 6

 7    FOR THE DEFENDANTS:

 8    For Johnson City, Tennessee, Karl Turner, Kevin
      Peters, and Toma Sparks in their official
 9    capacities:

10    Emily Taylor, Esq.
      Watson Roach Batson & Lauderback
11    1500 Riverview Tower
      900 South Gay Street
12    Knoxville, Tennessee  37902
      ETaylor@WatsonRoach.com
13

14    K. Erickson Herrin, Esq.
      Herrin McPeak & Associates
15    515 East Unaka Avenue
      Johnson City, Tennessee  37605
16    Lisa@hbm-lawfirm.com

17

18    For Kevin Peters in his individual capacity:

19    Daniel H. Rader, IV, Esq.
      Moore Rader Fitzpatrick & York
20    46 North Jefferson Avenue
      Cookeville, Tennessee  38501
21    Danny@MooreRader.com

22

23

24

25
```

```
 1    For Justin Jenkins in his individual capacity:

 2    Laura Rufolo, Esq.
      Robinson Smith & Wells
 3    Republic Centre
      633 Chestnut Street
 4    Suite 700
      Chattanooga, Tennessee  37450
 5    LRufolo@rswlaw.com

 6

 7    For City of Johnson City, Tennessee:

 8    Jonathan P. Lakey, Esq.
      Burch, Porter & Johnson, PLLC
 9    130 North Court Avenue
      Memphis, Tennessee  38103
10    JLakey@bpjlaw.com

11

12    For Toma Sparks in his individual capacity:

13    Kristin Ellis Berexa
      Farrar Bates Berexa
14    12 Cadillac Drive
      Suite 480
15    Brentwood, Tennessee  37027
      KBerexa@fbb.law
16

17

18

19

20

21

22

23

24

25
```

```
 1                       I N D E X

 2   EXAMINATION BY                                PAGE

 3   CATHY BALL

 4   Ms. Collins                                      8

 5   Mr. Rader                                      267

 6

 7   NO.          INDEX OF EXHIBITS               PAGE

 8
     Exhibit 46 Letter, CITY-0073258 - 3259          83
 9
     Exhibit 47 Letter, CITY-0073460 - 3461          95
10
     Exhibit 48 Email, CITY-0075953                 109
11
     Exhibit 49 Email, CITY-0073462                 113
12
     Exhibit 50 Email, CITY-0073310                 117
13
     Exhibit 51 Email, CITY-0073457                 119
14
     Exhibit 52 Letter, CITY-0073312 - 3313         119
15
     Exhibit 53 Email, CITY-0075958                 126
16
     Exhibit 54 Text Messages, CITY-0076022         138
17
     Exhibit 55 Affidavit in Support of Search      143
18              Warrant, CITY-0076243 - 6254

19   Exhibit 56 Audit of Sex Related Crimes,        148
                CITY-0066540 - 6585
20
     Exhibit 57 Calendar and Notes, CITY-0139814    150
21              - 9844

22   Exhibit 58 Notes, Ball000001 - 0046            214

23   Exhibit 59 Audit Report of Sexual Assault      220
                Investigations Details 8 Key
24              Findings -CITY-0073464 - 3465

25   Exhibit 60 Email, CITY-0073635                 222
```

```
 1   Exhibit 61 Letter, CITY-0073636           223

 2   Exhibit 62 Text Messages, SPARKS000042 -   229
                0043
 3
     Exhibit 63 Text Message Document,          232
 4                SPARKS000004 - 0005

 5   Exhibit 64 Email, CITY-73481 - 3482        236

 6   Exhibit 65 Letter, CITY-0073263            238

 7   Exhibit 66 Text Messages, CITY-73260       240

 8   Exhibit 67 Press Conference Transcript     243

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              D E P O S I T I O N,

 2         The deposition of CATHY BALL, taken at the

 3    request of the Plaintiffs, pursuant to the Federal

 4    Rules of Civil Procedure, on the 3 day of June,

 5    2024, at the Keyston Community Center, Johnson City,

 6    Tennessee, before Jeffrey D. Rusk, Registered

 7    Professional Reporter and Notary Public at Large for

 8    the State of Tennessee.

 9         It is agreed that the deposition may be

10    taken in machine shorthand by Jeffrey D. Rusk,

11    Registered Professional Reporter and Notary Public,

12    and that he may swear the witness and thereafter

13    transcribe his notes to typewriting and sign the

14    name of the witness thereto, and that all

15    formalities touching caption, certificate, filing,

16    transmission, etc., are expressly waived.

17         It is further agreed that all objections

18    except as to the form of the questions are reserved

19    to on or before the hearing.

20

21

22

23

24

25
```

Lexitas TENNESSEE
(615) 595-0073
5055

```
 1              (Deposition began at 9:02 a.m.)
 2                   VIDEOGRAPHER:  We're on the record.
 3         Today is the June the 3rd, 2024.  The time
 4         is 9:02 a.m. Eastern.
 5                   We are here today taking the
 6         deposition of Cathy Ball in the case of
 7         B.P., et al, Johnson City, et al, in the
 8         United States District Court for the Eastern
 9         District of Tennessee.
10                   The court reporter is Jeff Rusk.
11         My name is Kelly Rusk.  We are with Lexitas
12         Legal.
13                   Will the attorneys please identify
14         themselves and who they represent?
15                   MS. COLLINS:  Heather Collins for
16         the plaintiffs.
17                   MS. BAEHR-JONES:  Vanessa
18         Baehr-Jones for the plaintiffs.
19                   MS. TAYLOR:  Emily Taylor for the
20         City of Johnson City and Karl Turner.
21                   MR. LAKEY:  John Lakey for the City
22         of Johnson City.
23                   MR. HERRIN:  Erick Herrin, City of
24         Johnson City and Karl Turner.
25                   MR. RADER:  Danny Rader for Kevin
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              Peters.

 2                        MS. RUFOLO:  Laura Beth Rufolo on

 3              behalf of Officers Higgins, Jenkins, and

 4              █████████.

 5                        CATHY BALL,

 6   called as a witness at the instance of the

 7   Plaintiffs, having been first duly sworn, was

 8   examined and deposed as follows:

 9                        COURT REPORTER:  Okay.  Ms. Ball,

10              I'm going to go ahead and swear you in.

11                        Would you raise your right hand,

12              please?

13                        Do you swear or affirm that the

14              testimony you're about to give will be the

15              truth, the whole truth, and nothing but the

16              truth?

17                        THE WITNESS:  I do.

18                        COURT REPORTER:  Okay.  Thank you.

19                        MS. COLLINS:  We also need to get

20              the other people in the room on the record.

21                        MS. BAKER:  Do you want me to

22              start?

23                        MS. TAYLOR:  Yes.

24                        COURT REPORTER:  And speak up so I

25              can make sure I can hear you guys.
```

```
 1                    MS. BAKER:  Yes, sir.
 2                    Joy Baker, City of Johnson City.
 3                    MR. DARBY:  Eric Darby, City of
 4        Johnson City.
 5                    MR. WOODALL:  Jeff Woodall, City of
 6        Johnson City.
 7                    MR. TURNER:  Karl Turner.
 8                    MS. BEREXA:  Kristin Berexa on
 9        behalf of Toma Sparks.
10                    MR. HIGGINS:  Brady Higgins, City
11        of Johnson City.
12                    MR. JENKINS:  Justin Jenkins, City
13        of Johnson City.
14                    MR. SPARKS:  Toma Sparks, City of
15        Johnson City.
16                         EXAMINATION
17   BY MS. COLLINS:
18        Q.       Okay.  Could you state your full
19   name for the record, please?
20        A.       Cathy Deaton Ball.
21        Q.       And Ms. Ball, what's your current
22   address?
23        A.       ███████████████████████████
24   ██████████████████.
25        Q.       How long have you lived there?
```

```
 1          A.      Since July of 2022.
 2          Q.      Do you live with anyone at that
 3   address?
 4          A.      No.
 5          Q.      Do you have any relatives in the
 6   area?
 7          A.      Yes.
 8          Q.      What are their names?
 9          A.      ████████████████████████.
10          Q.      Anyone else?
11          A.      No.
12          Q.      Okay.  ████████.  What is the first
13   name of the ██████ that live here?
14          A.      ████████████████████████████████
15   ██████████
16          Q.      Anyone else?
17          A.      No.
18          Q.      What is their degree of relative to
19   you?
20          A.      Brother, sister-in-law, and nephew.
21          Q.      Okay.  And then the ████████?
22          A.      My mother was one of 11, so there's
23   numerous?
24          Q.      Okay.  And the ██████, the names?
25          A.      ████████████████████████████████.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1         Q.      And what degree of relative are
 2    they to you?
 3         A.      My ex-husband's sister and
 4    brother-in-law.
 5              COURT REPORTER:  Could we go off
 6         the record for just a second?  I've got to
 7         fix one thing.
 8              MS. COLLINS:  Yes.
 9              VIDEOGRAPHER:  Going off the record
10         at 9:06.
11         (Off the record at 9:06 a.m.)
12         (On the record at 9:09 a.m.)
13              VIDEOGRAPHER:  Okay.  We're back on
14         the record at 9:09.
15              THE WITNESS:  May I correct
16         something that I said earlier?
17              MS. COLLINS:  Sure.
18              THE WITNESS:  ████████████████
19    ███████████████████████████████████████.
20    BY MS. COLLINS:
21         Q.      Okay.  What is your current phone
22    number?
23         A.      My phone number is ████████████.
24         Q.      Is that a cell, or what is that?
25         A.      Cell.
```

```
1       Q.      Okay.  Is that personal or work?
2       A.      Work.
3       Q.      Do you have a personal cell?
4       A.      Yes.
5       Q.      What is it?
6               MS. TAYLOR:  I'm going to object to
7       making this part of the public record.
8               MS. COLLINS:  Okay.
9       A.      ████████████████.
10      Q.      (BY MS. COLLINS) Tell me about your
11  educational background.
12      A.      I graduated from high school,
13  Unicoi County High School, in 1983.  I went to
14  Tennessee Tech University in Cookeville, Tennessee.
15  I graduated in 1987 with a bachelor's degree in
16  civil engineering.  I went to school at Western
17  Carolina University in and around the early 2000s'.
18  I graduated in 2003 with a master's in public
19  affairs.
20      Q.      Tell me about your employment for
21  the past ten years.
22              Where have you worked?
23      A.      I worked for the City of Asheville,
24  North Carolina from 1997 until 2021, and I've worked
25  for the City of Johnson City from 2021 until now.
```

```
 1        Q.        What did you do when you were
 2   employed by the City of Asheville?
 3        A.        I had various responsibilities.  I
 4   began my career with them as a City Engineer.  I
 5   took on different roles and responsibilities of
 6   Transportation Director, Public Works Director, and
 7   then became Assistant City Manager.  And at one
 8   point in my career, I was the Interim City Manager.
 9        Q.        When you were the Assistant City
10   Manager and the Interim City Manager for Asheville,
11   what were your job duties?
12        A.        When I was the Assistant City
13   Manager, I had a portfolio that included the public
14   works department, engineering department,
15   transportation department, water and sewer
16   department, planning department, community
17   development department, parks and recreation
18   department, and I may be leaving out a few.
19        Q.        Okay.  Were you involved in any big
20   development projects when you worked for Asheville?
21        A.        Yes, ma'am.
22        Q.        Did you have any dealings with Sean
23   Williams or companies that he owned at the time in
24   your role at Asheville?
25                  MS. TAYLOR:  Objection to form.
```

```
 1              Q.       (BY MS. COLLINS) You can answer.

 2              A.       No.

 3              Q.       Were you aware that Sean Williams

 4     had applied for permits with the City of Asheville

 5     during your time there?

 6                       MS. TAYLOR:  Object to form.

 7              A.       No.

 8              Q.       (BY MS. COLLINS) Have you ever done

 9     any work with Tessier & Associates of Asheville?

10              A.       Yes.

11              Q.       Tell me about that.

12              A.       I worked with him -- he was a real

13     estate agent and developer in Asheville, North

14     Carolina, and I worked with him -- I worked with him

15     some on potential for redevelopment of a section of

16     Asheville across from the Civic Center.

17              Q.       When was that?

18              A.       Early 2000's.  Maybe -- maybe

19     even -- it lasted a number of years.

20              Q.       What about the Biltmore Condominium

21     Association?

22              A.       I'm not recalling the name of that

23     project right now.

24              Q.       Were you -- did you have any

25     involvement with the Grove Arcade Restoration, LLC?
```

A. No.

Q. What about Central United Methodist of Asheville?

A. No.

Q. With respect to your job at Johnson City, who hired you?

A. The City Commission.

Q. Who did you interview with?

A. The City Commission.

Q. Who was that?

A. The Mayor was Joe Wise, Vice Mayor Todd Fowler, Commissioner Jenny Brock, Commissioner John Hunter, and Commissioner Aaron Murphy.

Q. Why did you apply for the job in Johnson City?

A. My sister-in-law has brain cancer. She lives in Erwin, Tennessee. I moved back to be closer to her, my nieces, and nephew.

Q. And were those the names that you gave earlier?

A. [redacted] is my nephew. My niece is [redacted].

Q. Okay. Are they both over the age of 18?

A. Yes.

```
 1          Q.      How did you hear about the job in
 2   Johnson City?
 3          A.      I saw the posting on the website.
 4          Q.      What is your current salary?
 5          A.      2,000 -- $209,000 annually.
 6          Q.      What was your salary in Asheville
 7   before you left?
 8          A.      I can't recall.
 9          Q.      Prior to taking the job with
10   Johnson City, did you know Karl Turner?
11          A.      No.
12          Q.      What about Kevin Peters?
13          A.      No.
14          Q.      What about Toma Sparks?
15          A.      No.
16          Q.      Justin Jenkins?
17          A.      No.
18          Q.      ███████████?
19          A.      No.
20          Q.      Brady Higgins?
21          A.      No.
22          Q.      Ken Baldwin?
23          A.      No.
24          Q.      Don Shepard?
25          A.      No.
```

TENNESSEE
(615) 595-0073

```
 1           Q.      David Hilton?

 2           A.      No.

 3           Q.      Steve Finney?

 4           A.      No.

 5           Q.      Kat Dahl?

 6           A.      No.

 7           Q.      Sunny Sandos?

 8           A.      No.

 9           Q.      Bill Church?

10           A.      No.

11           Q.      Blake Watson?

12           A.      No.

13           Q.      Robin Ray?

14           A.      No.

15           Q.      Abby Wallace?

16           A.      No.

17           Q.      Was the first time you met the City

18    Commission when you came here to apply for the job?

19           A.      Yes.

20           Q.      Tell me about your job duties here.

21           A.      As the City Manager of Johnson

22    City, I oversee the daily operations of the City

23    that include all the functions within the

24    department -- or within the City.

25           Q.      Okay.  How does that -- what are
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    your job duties with respect to the --

 2                    MS. TAYLOR:  Can we go off?  Can we

 3          go off the record for a second?

 4                    Someone new just walked into the

 5          room.  So I think it's appropriate.

 6                    VIDEOGRAPHER:  Going off the record

 7          at 9:18.

 8              (Off the record at 9:18 a.m.)

 9              (On the record at 9:18 a.m.)

10                    VIDEOGRAPHER:  We're back on the

11          record at 918.

12                    MS. TAYLOR:  Let the record reflect

13          that ████████████ is now in the room and

14          ██████ has left the room.

15    BY MS. COLLINS:

16          Q.      Okay.  What are your job duties

17    with respect to the Johnson City Police Department?

18          A.      I work closely with the police

19    chief and the command staff, oversee the -- mostly

20    delegate responsibilities around operation to the

21    police department, but provide any guidance around

22    interactions with Commission, policy as it relates

23    to Commission recommendations, and the

24    implementation of the Commission's strategic plan.

25          Q.      Okay.  When you say that you
```

1    delegate operations and you work closely with the
2    command staff to oversee, what do you mean by that?
3    Can you tell me -- give me a little bit more
4    specifics?
5          A.      So I am ultimately responsible for
6    the City, the responsibility of the City.  So a
7    lot -- I do not have expertise within the police
8    department operational functions.  So I meet with
9    them regularly to understand what's happening
10   operationally, and then provide input, and then
11   communicate back to the Commission.
12         Q.      Okay.  When you say meet regularly,
13   what do you mean by that?
14         A.      I meet bi-weekly with
15   commissioners.
16         Q.      How often do you meet with the
17   command staff?
18         A.      Depending on the issues, it just
19   depends on what issue is occurring, but typically I
20   have a set meeting every two weeks.
21         Q.      Do you take notes at those
22   meetings?
23         A.      Not regularly.
24         Q.      What about the meetings that you
25   have with the Commission?  Do you take notes at

Lexitas - TENNESSEE
(615) 595-0073

```
1    those meetings?
2          A.     I have an agenda.  I typically do
3    not take notes.
4          Q.     Is anyone else at these meetings
5    taking notes for you?
6          A.     Not that I'm aware.
7          Q.     With respect to the meetings that
8    you have with the command staff with the Johnson
9    City Police Department, who would that be?
10          A.     That would be our police chief, the
11    deputy police chief, the two majors, as well as our
12    staff attorney.
13          Q.     Okay.  Has this practice that --
14    where you've met with these people been consistent
15    throughout your employment?
16          A.     No.
17          Q.     When did it change?
18          A.     March of 2023.
19          Q.     Okay.  Why did it change?
20          A.     At that point we were -- the police
21    chief, Karl Turner, had announced his retirement,
22    and so we were in the process of working with a new
23    team of people.
24          Q.     Okay.  Prior to March of 2023, how
25    often did you meet with the command staff?
```

LEXITAS TENNESSEE
(615) 595-0073

```
 1          A.       I only met with Chief Turner
 2   approximately once every two weeks.
 3          Q.       Did you meet with anyone else on
 4   the command staff or just Chief Turner?
 5          A.       Just Chief Turner.
 6          Q.       Okay.  Why did you start meeting
 7   with additional people?
 8          A.       I was trying to learn the team,
 9   develop a relationship.
10          Q.       Okay.  And when you started meeting
11   with more people, you gave me their rank, but tell
12   me their names.
13          A.       Billy Church, Scott Jenkins, ███
14   ███████, Scotty Carrier, Blake Shelton -- or not
15   Blake Shelton.  Blake Watson.
16          Q.       Wishful thinking.
17          A.       Too much country music.
18          Q.       Okay.  In your role as City
19   Manager, do you text with the command staff at the
20   police department?
21          A.       Yes.
22          Q.       Okay.  Like for what?
23          A.       For operational reasons.
24          Q.       Anything else?
25          A.       Communication.
```

(615) 595-0073

```
 1          Q.      Anything else?

 2          A.      No, ma'am.

 3          Q.      When you say operational reasons,

 4   what do you mean by that?  Can you explain?

 5          A.      Events that are occurring in the

 6   police department.

 7          Q.      Can you give me an example?

 8          A.      I have asked our command staff to

 9   make me aware if there are incidents like a murder,

10   a bad traffic accident, so that I can pass it along

11   to the Commission.

12          Q.      Has that always been the case since

13   you've been City Manager that you've done that?

14          A.      Yes.

15          Q.      Okay.  And when you said

16   communications, what did you mean by communications?

17          A.      Words.

18          Q.      Can you give me an example of

19   communications that you would pass along?

20          A.      To the Commission?

21          Q.      No, when you're texting with

22   officers or the command staff.

23                  MS. TAYLOR:  Object to form.

24          A.      Can you ask the question again?

25          Q.      (BY MS. COLLINS) Sure.
```

Coomler v. TENNESSEE
#2935
(615) 595-0073

```
 1                     When I asked you if you texted with
 2    the command staff, you said yes, and you listed two
 3    types of communications that -- you said one would
 4    be operational, the other would be communications.
 5                     So I'm asking you, when you say
 6    communications, what do you mean by that, other than
 7    words, which I understand.
 8                     What do you mean?
 9         A.        Specific information about
10    incidences that have occurred in the city, such as a
11    car crash location.
12         Q.        Okay.  Do anyone other than command
13    staff text you or call you on your phone, your cell
14    phone, at the JCPD?
15         A.        Yes.
16         Q.        For what reason would they do that?
17         A.        Purposes of encouragement, support.
18    How are you doing?
19         Q.        Do you do that with all the JCPD
20    officers?
21                   MS. TAYLOR:  Objection.  Form.
22         A.        No.
23         Q.        (BY MS. COLLINS) Okay.  Which ones
24    do you do that with?
25         A.        Can you be more specific?
```

Lexitas - TENNESSEE
(615) 595-0073

```
1          Q.      Sure.
2                  Which JCPD officers, other than the
3      command staff that we've already discussed, would
4      you text?
5          A.      I have texted those officers
6      involved in this lawsuit, and I'm trying to recall
7      if there are any others that I may have texted.
8      I've texted officers when their family members have
9      passed away, when I know of an illness in one of --
10     with one of their family members.  I have
11     communicated with those members of staff that I
12     know.  I have checked on the health of some of the
13     officers, other than the ones involved in this
14     lawsuit.
15         Q.      What have you texted with for the
16     officers that are involved in this lawsuit?
17         A.      I don't recall specifically.
18         Q.      Okay.  Is it about the lawsuit?
19         A.      No.  It's about how they're doing.
20         Q.      Okay.  In the course of this
21     litigation, have you had your personal cell phone
22     imaged or copied?
23         A.      No.
24         Q.      What about with respect to the Kat
25     Dahl litigation?
```

```
1        A.      No.
2        Q.      Have you had your work cell phone
3   imaged or copied for this litigation?
4        A.      No.
5        Q.      What about the Kat Dahl litigation?
6        A.      No.
7        Q.      Has any discovery been collected
8   from your phones, either one of them?
9                MS. TAYLOR:  Object to the form.
10       A.      Yes.
11       Q.      (BY MS. COLLINS) Okay.  What?
12       A.      I specifically recall a text
13  message that I provided to Steve Finney.
14       Q.      Okay.  Anything else that you can
15  recall?
16       A.      None that I can recall.
17       Q.      When you applied for your role as
18  City Manager, who provided you references?
19       A.      The previous fire chief in
20  Asheville, who was no longer with Asheville, and his
21  name escapes me right now.  Jeff Richardson, who was
22  my boss and was Assistant City Manager when I was
23  the Public Works Director, as well as the City
24  Engineer, and I can't recall who else.
25       Q.      Okay.  Do you know who you
```

TENNESSEE
(615)595-0073

```
 1    replaced?

 2              A.         Yes.

 3              Q.         Who was that?

 4              A.         Pete Peterson.

 5              Q.         Did you have any conversations with

 6    Mr. Peterson about him leaving?

 7              A.         Yes.

 8              Q.         Okay.  Do you know why he left?

 9                         MS. TAYLOR:  Object to the form.

10              A.         He said he felt like he had a shelf

11    life.

12              Q.         (BY MS. COLLINS) Did he explain

13    what he meant by that?

14              A.         No.

15              Q.         Okay.  What else did you talk with

16    Mr. Peterson about before you replaced him?

17              A.         I reviewed a number of different

18    projects that the City was working on, the status of

19    those projects.  I met with him several times to

20    understand more about the City and the priorities of

21    the City, the strategic goals, what he saw as

22    opportunities within the City.

23              Q.         Did you have any conversations with

24    Mr. Peterson about the JCPD?

25              A.         Only one that I recall.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Tell me about that.
 2          A.      It was a disciplinary issue with
 3   someone in the police department.
 4          Q.      With who?
 5          A.      I -- I did not recall at the time,
 6   but I've since come to learn that it is Corey Shoun.
 7          Q.      Could you spell that last name for
 8   me?
 9          A.      S-h-u-n.
10          Q.      Okay.  What was Corey's
11   disciplinary issue?
12          A.      I did not know at the time.  He
13   simply said he was going to resolve it before I came
14   on board.
15          Q.      Okay.  Have you had to deal with
16   any disciplinary issues since you became City
17   Manager with the JCPD?
18          A.      Yes, ma'am.
19          Q.      Tell me about that.
20          A.      I have terminated employment with
21   Jason Lewis.
22          Q.      Anyone else?
23          A.      I have -- I'm trying to think of
24   the name of it -- suspended, leave without pay, two
25   other officers.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Who were they?

 2          A.      ███████████████████

 3          Q.      So it is within your authority as

 4   City Manager to take employment actions against the

 5   JCPD officers.

 6          A.      Yes.

 7          Q.      Okay.  Does the chief have the

 8   authority to do that?

 9          A.      It depends on the level of

10   disciplinary action.

11          Q.      Okay.  Up to what level can the

12   chief handle disciplinary actions against employees

13   of the JCPD?

14          A.      I don't recall.

15          Q.      Okay.  What did -- is it Mr. Lewis?

16          A.      Yes, ma'am.

17          Q.      What did he do to get terminated?

18          A.      He raised a dog that was a K9 dog

19   and took it to Ohio to be certified, and it ended up

20   being sold back to the Johnson City Police

21   Department as a dog for use within the department.

22          Q.      Okay.  So what was the specific or

23   the exact reason for his termination?  Was it

24   profiting off of that training and then reselling to

25   the department?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    MS. TAYLOR:  Object to the form.
 2           A.        Misuse of personal -- of the
 3    purchasing department.  Additionally, Mr. Lewis had
 4    an extensive record of disciplinary action within
 5    the department.
 6           Q.        (BY MS. COLLINS) Does the dog still
 7    work for the department?
 8           A.        I don't know.
 9           Q.        The ones that you were involved
10    with suspension, leave without pay, Officer ████,
11    what happened there?
12           A.        Officer ████ was his supervisor
13    and was aware that the dog was being looked at for
14    purposes of the City purchasing it.
15           Q.        Anything else?
16           A.        (Witness shakes head in the
17    negative).
18           Q.        And Officer ████?
19           A.        Officer ████ was, I think,
20    Captain ████ at the time, was also a
21    supervisor.
22           Q.        Have you been involved in any other
23    discipline of JCPD officers since you've been City
24    Manager?
25           A.        I have signed off on other
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    disciplinary and internal affairs actions.  I cannot

 2    recall the specifics of those.

 3           Q.      Okay.  What is your involvement

 4    when it comes to internal affairs investigations?

 5           A.      Depending on the level of the

 6    disciplinary action, I'm required to sign off on

 7    those.

 8           Q.      Do you have the authority to

 9    request that an internal affairs investigation be

10    initiated?

11           A.      I do.

12           Q.      Okay.  Have you ever done that?

13           A.      No, not that I can recall.

14           Q.      Would allegations of corruption

15    give rise to an internal affairs investigation?

16                   MS. TAYLOR:  Object to the form.

17           A.      Can you repeat the question?

18                   MS. COLLINS:  Sure.

19                   Can you repeat the question,

20           please?

21                   COURT REPORTER:  Would allegations

22           of corruption give rise to an internal

23           affairs investigation?

24           A.      Yes.

25           Q.      (BY MS. COLLINS) Are there any
```

Corriveau TENNESSEE
(615) 595-0073

1    policies or procedures of the JCPD that you're aware

2    of that govern internal affairs investigations?

3              A.        Can you repeat the question?

4                        MS. COLLINS:  Sure.

5                        Can you repeat the question?

6                        COURT REPORTER:  Are there any

7              other -- are there any policies or

8              procedures of the JCPD that you're aware of

9              that govern internal affairs investigations?

10             A.        I'm not familiar enough with the

11   policies and procedures of the police department to

12   be able to answer that question adequately.

13             Q.        (BY MS. COLLINS) Okay.  And sitting

14   here today, you can't recall if you've requested an

15   internal affairs investigation for allegations of

16   corruption; is that correct?

17                       MS. TAYLOR:  Objection to form.

18             A.        Can you be more specific about your

19   question?

20             Q.        (BY MS. COLLINS) Sure.

21                       As you sit here today, have you

22   requested an internal affairs investigation be

23   initiated for allegations of corruption with respect

24   to the JCPD?

25             A.        I have requested that one be opened

```
 1   pending the outcome of a civil lawsuit.
 2        Q.      Okay.  Tell me about that.
 3                Which civil lawsuit?
 4        A.      The Doe lawsuit.
 5        Q.      This lawsuit that we're sitting
 6   here today for?
 7        A.      Yes, ma'am.
 8        Q.      Okay.  So you've requested an
 9   internal affairs investigation into corruption after
10   this lawsuit is resolved?
11                MS. TAYLOR:  Object to the form.
12        Q.      (BY MS. COLLINS) Is that what
13   you're saying?
14        A.      Not into corruption.  Into all the
15   allegations that were made within the lawsuit.  Not
16   the corruption specifically.
17        Q.      Why are you -- why are you waiting
18   until after this is resolved for an internal affairs
19   investigation to be initiated with respect to the
20   claims?
21                MS. TAYLOR:  Object to the form,
22           and I'm going to instruct the witness not to
23           answer as to anything that has to do with
24           attorney/client privileged communications.
25        Q.      (BY MS. COLLINS) Is it your belief
```

```
 1    that the allegations in this lawsuit suit would give

 2    rise to the initiation of an internal affairs

 3    investigation?

 4                    MS. TAYLOR:  Object to the form.

 5         A.       No.

 6         Q.       (BY MS. COLLINS) Why wait?

 7                    MS. TAYLOR:  Answer the question,

 8         if you can.

 9                    Object to the form.  And same

10         objection regarding attorney/client

11         privileged communications.

12         A.       Because I believe the facts of the

13    case will come through in terms of the outcome of

14    the civil lawsuit.

15         Q.       (BY MS. COLLINS) What is your

16    understanding as to the purpose of an internal

17    affairs investigation?

18         A.       To evaluate the facts of the matter

19    in any case that a police officer is being accused

20    of.

21         Q.       And what is the goal of an internal

22    affairs investigation?

23         A.       It is -- the goal is to find out

24    the facts of the matter and to take appropriate

25    action, depending upon the outcome of that -- those
```

Lexitas - TENNESSEE
(615) 595-0073

```
1    facts.

2           Q.       And if the facts are serious,

3    wouldn't it be important to know what's going on

4    sooner rather than later?

5                    MS. TAYLOR:  Object to the form.

6           A.       It depends on the nature of the

7    facts.

8           Q.       (BY MS. COLLINS) So if there are

9    allegations that a JCPD officer didn't do their job,

10   wouldn't you rather know that sooner rather than

11   later?

12                   MS. TAYLOR:  Object to the form.

13          A.       Yes.

14          Q.       (BY MS. COLLINS) Okay.  So why are

15   you holding off on conducting an internal affairs

16   investigation with respect to the facts that have

17   been alleged in this lawsuit?

18                   MS. TAYLOR:  Object to the form.

19          A.       Because I'm waiting for facts of

20   this case to come out before completing an internal

21   investigation.

22          Q.       (BY MS. COLLINS) As of today, has

23   any internal affairs investigation been launched

24   with respect to the fact -- the underlying facts for

25   this lawsuit or the Kat Dahl lawsuit?
```

```
 1          A.          An internal affairs investigation
 2    has been opened, and we are in the process, through
 3    this, of determining those facts.
 4          Q.          Okay.  An internal affairs
 5    investigation has been opened?
 6          A.          Yes.
 7          Q.          Okay.  Against whom?
 8          A.          Toma Sparks, Justin Jenkins, Brady
 9    Higgins, and ███████████.
10          Q.          Why specifically those people has
11    an internal affairs investigation been opened?
12          A.          Because a complaint has been made
13    on the part of the Jane Does in the term -- in terms
14    of a legal civil lawsuit.
15          Q.          All right.  So an internal
16    investigation is open with respect to those
17    officers, but is it being investigated?
18                      MS. TAYLOR:  Object to the form.
19          A.          No.
20          Q.          (BY MS. COLLINS) Who typically
21    conducts internal affairs investigations at the
22    Johnson City Police Department?
23          A.          We have a sergeant -- or, excuse
24    me, a lieutenant that does internal affairs.
25          Q.          Who is that?
```

Lexitas - TENNESSEE
(615) someone-0073

```
 1          A.       Hilton.
 2          Q.       Okay.  And when you say no, it's
 3    not actively being investigated, was that for the
 4    reasons that you outlined a moment ago?
 5          A.       It is for the reasons of -- that
 6    this case and the depositions taken in this case and
 7    the way the court, finding of fact, will make that
 8    determination.
 9          Q.       So are you saying that whatever the
10    court says about this case determines the outcome of
11    the internal affairs investigation?
12                   MS. TAYLOR:  Object to the form.
13          A.       It depends on the outcome, and then
14    additional information by Lieutenant Hilton will be
15    completed pending the outcome of this lawsuit.
16          Q.       (BY MS. COLLINS) Have you been
17    advised by counsel to wait?
18                   MS. TAYLOR:  Object to the form.
19          Attorney/client privilege.
20          Q.       (BY MS. COLLINS) Isn't it important
21    to know whether there's been corruption in the
22    Johnson City Police Department?
23          A.       Yes.
24                   MS. TAYLOR:  Object to form.
25          Q.       (BY MS. COLLINS) Is it important to
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    know that sooner rather than later?

 2                   MR. RADER:  Objection.  Asked and

 3         answered twice.

 4                   MS. COLLINS:  Okay.  Who's

 5         objecting here?

 6                   MS. TAYLOR:  He's allowed to object

 7         on behalf of his client.

 8                   MR. RADER:  I'm going to object

 9         anytime I want to.

10         Q.       (BY MS. COLLINS) Has anyone been

11    interviewed for the internal affairs investigation?

12         A.       I do not know.

13         Q.       Okay.  And when you say Hilton, are

14    you talking about Officer David Hilton?

15         A.       Yes, ma'am.

16         Q.       Are you aware of a public

17    corruption inquiry by the U.S. Attorney's Office?

18                   MS. TAYLOR:  Objection to form.

19         A.       Can you repeat the question?

20         Q.       (BY MS. COLLINS) Are you aware of a

21    public corruption inquiry by the U.S. Attorney's

22    Office?

23                   MS. TAYLOR:  Same objection.

24         A.       I don't know the specifics of that.

25         Q.       (BY MS. COLLINS) So you are aware
```

```
 1    of a public corruption inquiry by the U.S.
 2    Attorney's Office.
 3                    MS. TAYLOR:  Object to the form.
 4         Q.        (BY MS. COLLINS) Is that correct?
 5         A.        Yes.
 6         Q.        Have you been interviewed?
 7         A.        No.
 8         Q.        Do you know anyone with the JCPD
 9    who has been interviewed by the U.S. Attorney's
10    Office?
11         A.        No.
12         Q.        Do you know if anyone with the JCPD
13    has been interviewed with the U.S. Attorney's
14    Office?
15         A.        Not specifically.
16         Q.        When you say not specifically, do
17    you know generally?
18                    MS. TAYLOR:  Object to the form.
19         A.        I am not sure when you say -- in
20    your question, whether it's the DOJ or whether it's
21    the FBI.  So I don't feel like I can truthfully
22    answer your question, because I don't know which
23    agency you're specifically referring to.
24         Q.        (BY MS. COLLINS) Okay.  Well, let's
25    break it down.
```

```
 1                    Start with the DOJ.
 2                    Do you know of any JCPD officers
 3      that have been interviewed as part of a Department
 4      of Justice investigation into corruption?
 5            A.      No, ma'am.
 6            Q.      Have you been interviewed by the
 7      Department of Justice?
 8            A.      No.
 9            Q.      Okay.  Do you know anyone with
10      Johnson City as a whole, and that works in
11      leadership like you, that's been interviewed by the
12      DOJ?
13            A.      No.
14            Q.      Okay.  What about the FBI?
15            A.      No.
16            Q.      No one with JCPD or in leadership
17      with Johnson City?
18            A.      I do not know specifically who has
19      been interviewed by the FBI from the Johnson City
20      Police Department.
21            Q.      Do you know generally that people
22      with the police department have been interviewed by
23      the FBI?
24            A.      I know that there was a request,
25      but I don't know who specifically has been
```

```
 1    interviewed --
 2            Q.      Who was the request --
 3            A.      -- or whether that interview has
 4    happened.
 5            Q.      Okay.  Who was the request made by?
 6            A.      A local representative of the FBI.
 7            Q.      Do you recall their name?
 8            A.      I do not.
 9            Q.      Was it Paul Durant?
10            A.      No.
11            Q.      Okay.  Did you receive the request
12    in writing?
13            A.      No.
14            Q.      How did you receive the request?
15                    MS. TAYLOR:  Object to the form.
16            A.      I did not receive a request.
17            Q.      (BY MS. COLLINS) How do you know
18    about the request?
19            A.      In discussions with someone with
20    the FBI.
21            Q.      When did these discussions take
22    place?
23            A.      The fall of 2023.
24            Q.      Okay.  Since the fall of 2023, has
25    anything come from that initial discussion?
```

TENNESSEE
(615) 555-0073

```
 1                    MS. TAYLOR:  Objection to the form.
 2          A.        I don't know what you mean when you
 3   say, "Has anything come from that?"
 4                    Can you be more specific?
 5          Q.        (BY MS. COLLINS) Have there been
 6   any further requests?  Have there been any
 7   interviews that you're aware of?
 8          A.        No.
 9          Q.        Have you provided documentation?
10          A.        I'm sorry that I interrupted you.
11          Q.        Has the City provided any kind of
12   documentation to the FBI or to the DOJ?
13                    MS. TAYLOR:  Object to form.
14          A.        None that I'm aware of.
15          Q.        (BY MS. COLLINS) Is there anyone
16   else that that request -- those requests would have
17   been directed to?
18          A.        The police chief.
19          Q.        Okay.  Are you aware as to whether
20   or not the police chief has received any further
21   requests for information from either the Department
22   of Justice or the FBI with respect to public
23   corruption?
24                    MS. TAYLOR:  Object to form.
25          A.        No.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.         (BY MS. COLLINS) Have you had any
 2   discussions with D.A. Finney about the FBI's public
 3   corruption investigation?
 4                      MR. RADER:  Object to the form.
 5          A.         No.
 6          Q.         (BY MS. COLLINS) And you mentioned
 7   that you were speaking with somebody at the local
 8   FBI in the fall of 2023, right?
 9          A.         Yes, ma'am.
10          Q.         And you couldn't remember their
11   name; is that correct?
12          A.         I think his initials are J.D., but
13   I don't know his last name.
14          Q.         Okay.  Did he provide you a card?
15          A.         Not that I recall.
16          Q.         Who was he asking to interview?
17                      MS. TAYLOR:  Objection to form.
18          A.         I do not recall.
19          Q.         (BY MS. COLLINS) Did you take
20   notes?
21          A.         I do not recall.
22          Q.         Is it your practice in the course
23   of your job duties to take notes like in a journal
24   or a notebook?
25          A.         Yes.
```

```
 1          Q.       Okay.  Tell me about that practice
 2    a little bit more.
 3          A.       Since I started my career as a
 4    civil engineer, I have worked on projects that often
 5    involve inspection of construction, and it has been
 6    my practice to write down as much information as I
 7    can.  It has helped me focus on listening early in
 8    my career.  It also helped to provide information
 9    that I could go back and recall in terms of meetings
10    with -- over construction projects, the status of
11    projects.  It has been a practice that I have done
12    for 35 years.
13          Q.       What sort of book do you keep them
14    in?  Like a spiral notebook or what?
15          A.       I keep them in a binder notebook,
16    and that has changed throughout my career, just
17    depending upon the type of notebook that's available
18    at the time.
19          Q.       Do you keep those notebooks?
20          A.       Yes.
21          Q.       Okay.  When -- have you gone back
22    to look to see if you have any notes from that
23    conversation from the fall of 2023 with an FBI
24    representative and produce them in this lawsuit?
25          A.       I have produced everything I could
```

1    find to my attorneys.

2        Q.      Have you looked for those specific

3    notes, or did you just provide the entire notebook?

4            MS. TAYLOR:  Object to the form.

5        A.      I looked specifically through all

6    of my notebooks and provided anything that I thought

7    was in response to my attorney's question.

8        Q.      (BY MS. COLLINS) Okay.  But if you

9    had this conversation with someone from the FBI in

10   the fall of 2023, do you think you would have

11   written notes about that in one of your notebooks?

12           MS. TAYLOR:  Object to form.

13       A.      I don't -- I don't recall.

14       Q.      (BY MS. COLLINS) If you had written

15   notes, would they still be preserved?

16       A.      Yes.

17       Q.      Okay.  What, if any, role does the

18   City Manager have in the selection and purchase of

19   insurance?

20       A.      I delegate that authority under the

21   charter.  I'm responsible for the daily operations

22   within the Johnson City Government.  I delegate much

23   of the authority around specific technical

24   requirements to various department directors within

25   the City.

```
 1            Q.        Okay.  So did you delegate the
 2     selection and purchase of insurance to someone else?
 3            A.        Yes.
 4            Q.        Okay.  To who?
 5            A.        Joy Baker.
 6            Q.        When did you delegate that to Joy
 7     Baker?
 8            A.        I cannot tell you a specific date.
 9            Q.        Has it been this year?  Last year?
10            A.        It has been since the beginning of
11     my tenure with the City.
12            Q.        To your knowledge, have there been
13     any changes in the City's insurance since the filing
14     of Kat Dahl's lawsuit?
15            A.        No.
16            Q.        Have you had any communications
17     with the insurance companies about Kat Dahl's
18     lawsuit?
19                 MS. TAYLOR:  Object to the form of
20            the question.  I don't -- I'm not sure
21            that's discoverable, because that speaks to
22            pending litigation.  We've got work product
23            issues.
24                 MS. COLLINS:  Are you instructing
25            her not to answer?
```

```
 1                MS. TAYLOR:  I'm asking you to
 2         rephrase your question in a way that doesn't
 3         require the witness to reveal work product
 4         information regarding pending litigation.
 5                MS. COLLINS:  I just asked her if
 6         she had communications with the insurance
 7         company.  That's not asking for work
 8         product.
 9         Q.      (BY MS. COLLINS) Did you have any
10   communications with the insurance company?
11         A.      Yes.
12         Q.      Did you have any communications
13   with the insurance company about this case?
14                MS. TAYLOR:  Object to the form.
15         A.      Yes.
16         Q.      (BY MS. COLLINS) Okay.  What is the
17   insurance company?
18         A.      PEP.
19         Q.      Is the insurance company paying for
20   the defense of this lawsuit?
21                MS. TAYLOR:  Object to the form.
22         A.      That is my understanding.
23         Q.      (BY MS. COLLINS) What is Joy
24   Baker's job?
25         A.      Risk manager, and also serves in
```

```
 1    the role of Interim Assistant City Manager.
 2         Q.       What is -- as far as Interim City
 3    Manager, is that just if you're not available or are
 4    you --
 5         A.       Interim Assistant City Manager.
 6         Q.       Okay.  Is -- has the Assistant City
 7    Manager left or resigned recently?
 8         A.       No, ma'am.
 9         Q.       Why is it interim?
10         A.       It was for a purpose before we
11    hired a permanent.
12         Q.       Okay.  Who was the previous
13    Assistant City Manager?
14         A.       There was not one.
15         Q.       Okay.  How long has she been
16    Interim City Manager?
17                  MS. TAYLOR:  Object to the form.
18         A.       I don't recall.
19         Q.       (BY MS. COLLINS) What are her job
20    duties as a risk manager?
21         A.       She's responsible for overseeing
22    all claims within the City of Johnson City.
23         Q.       Okay.  Do you know how long that
24    role has existed?
25         A.       I do not.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Do you know who held that before
 2   Ms. Baker?
 3          A.      I do not.
 4          Q.      When you say she oversees all
 5   claims with the City, can you explain that a little
 6   bit more?
 7          A.      If someone has filed a lawsuit.  If
 8   someone has asked questions about coverage, asked
 9   questions about anything related to risk that the
10   City has.  She also has the responsibility of
11   providing safety training throughout the City to
12   mitigate any potential damage to the City, to either
13   employee health issues.
14          Q.      Okay.  But she's the one that's
15   responsible for filing a claim with the insurance
16   company?
17                  MS. TAYLOR:  Object to the form.
18          A.      Yes, ma'am.
19          Q.      (BY MS. COLLINS) Okay.  Would she
20   typically do that -- or would you direct her to file
21   one of those claims if you had received a lawsuit?
22                  MS. TAYLOR:  Object to the form.
23          A.      I would consult with her and look
24   for her recommendation.  I -- that is not an area of
25   expertise that I'm -- that I know much about.  So I
```

Lexitas - Tennessee
(615) 595-0073

```
 1   rely upon staff to provide me that recommendation.
 2        Q.        (BY MS. COLLINS) Okay.  So when you
 3   received this lawsuit, was Ms. Baker directed to
 4   file a claim with the insurance company?
 5        A.        There are things that happen as a
 6   matter of process and policy.  I would not say that
 7   she was directed.  I would say that we have policies
 8   that guide how we handle these types of lawsuits.
 9        Q.        Okay.  Which policies are you
10   referring to?
11        A.        I cannot tell you specifically.
12        Q.        Okay.  Have you reported to any
13   other City officials about this lawsuit?
14        A.        Yes, ma'am.
15        Q.        Tell me about that.
16                  Who?
17        A.        City Commission.
18        Q.        Who else?
19        A.        No one that I can recall at this
20   time.
21        Q.        Okay.  Do you primarily report to
22   the City Commission?
23        A.        Yes, ma'am.
24        Q.        Is there one person -- is there
25   like a chair on that Commission that you have more
```

```
 1   contact with than the other?
 2         A.       There's the Mayor and then a Vice
 3   Mayor.
 4         Q.       Okay.  Who is the Mayor?
 5         A.       Todd Fowler.
 6         Q.       How long has he been the Mayor?
 7         A.       Since December of 2022.
 8         Q.       Okay.  And the Vice Mayor?
 9         A.       Aaron Murphy.
10         Q.       How long has Aaron Murphy been the
11   Vice Mayor?
12         A.       December '22.
13         Q.       Okay.  A moment ago, when you
14   mentioned policies about lawsuits, where would those
15   be located?
16                  Does the City have some kind of
17   manual or handbook or anything?
18         A.       We have ordinances.  So an
19   ordinance is something that the City Commission has
20   approved and signed off on, and then we have
21   policies and procedures.  And I am not sure where
22   they would be located.
23         Q.       Does the City have some kind of
24   City Recorder or some person like that that would
25   keep track of that sort of information?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              A.      Yes, ma'am.

 2              Q.      Okay.  Who is that?

 3              A.      Stephanie Loas.

 4              Q.      Could you spell her last name?

 5              A.      L-o-a-s.

 6              Q.      Okay.  And how long has she been

 7    with the City?

 8              A.      I don't recall.

 9              Q.      A while?

10              A.      No.

11              Q.      Oh, she's relatively new?

12              A.      Yes.

13              Q.      Okay.  Who was the City Recorder

14    before her?

15              A.      Janet Jennings.

16              Q.      Do you have any direct reports?

17              A.      Yes.

18              Q.      Who are they?

19              A.      Assistant City Managers, both of

20    them.  Excuse me.  There's two permanent and one

21    interim.

22              Q.      Okay.  What are their names?

23              A.      Randy Trivette, Steve Willis, and

24    the Interim Assistant is Joy Baker.

25              Q.      Okay.
```

CAPITAL COURT REPORTERS - TENNESSEE
(615) 555-0073

```
 1              A.        I have the senior staff attorney,
 2      Blake Watson.  Public Affairs Director Keisha Shoun.
 3      Police Chief Church.  Fire Chief Bell.  I'm just
 4      trying to recall if there's any other direct
 5      reports.  Administrative -- or Executive Assistant
 6      Beth Green.  And if you'll give me a minute, I'll
 7      try to recall if there's any others.
 8              Q.        Take your time.
 9              A.        Thank you.
10              Q.        If anybody comes to mind, just let
11      us know.
12              A.        Okay.
13              Q.        Why did Ms. Jennings leave?
14              A.        She retired.
15              Q.        How often do you meet with the
16      Mayor?
17              A.        Every two weeks.
18              Q.        Is the Mayor job here a full-time
19      position?
20              A.        No, ma'am.
21              Q.        When you meet with the Mayor every
22      two weeks, where do you typically meet and what do
23      you typically discuss?
24                        MS. TAYLOR:  Object to the form.
25              Q.        (BY MS. COLLINS) Let's start with
```

```
 1    the first one.

 2                     Where do you typically meet?

 3          A.         There is a conference room that's

 4    adjacent to my office that we meet at.

 5          Q.         What do you typically discuss?

 6          A.         The agenda for the upcoming

 7    Commission meeting.

 8          Q.         Okay.  Is anyone else present

 9    during these meetings?

10          A.         Yes, ma'am.

11          Q.         Who?

12          A.         The Assistant City Managers.

13          Q.         Anyone else?

14          A.         No.

15          Q.         Okay.  The Vice Mayor, do you have

16    any sort of regular meetings with the Vice Mayor?

17          A.         Every two weeks.

18          Q.         Is that when you meet with the

19    Mayor, or is that a different meeting?

20          A.         A different meeting.

21          Q.         Where is that meeting typically

22    held?

23          A.         The conference room adjacent to my

24    office.

25          Q.         Okay.  What sort of things do you
```

```
 1    typically discuss with the Vice Mayor when you meet

 2    with him?

 3              A.        The agenda for the upcoming

 4    meeting.

 5              Q.        Do you typically circulate a

 6    written agenda before the meeting?

 7              A.        Yes, ma'am.

 8              Q.        In the meetings that you've had

 9    with the Mayor or the Vice Mayor, have you discussed

10    this lawsuit?

11              A.        I have provided updates.

12              Q.        In the meetings that you have had

13    with the Mayor or the Vice Mayor, have you discussed

14    any sort of disciplinary action with respect to the

15    JCPD concerning the allegations of this lawsuit?

16                   MS. TAYLOR:  Object to the form.

17              A.        Can you repeat the question?

18                   MS. COLLINS:  Can you repeat the

19              question, please?

20                   COURT REPORTER:  In the meetings

21              that you have had with the Mayor or the Vice

22              Mayor, have you discussed any sort of

23              disciplinary action with respect to the JCPD

24              concerning the allegations of this lawsuit?

25                   MS. TAYLOR:  Objection of the form.
```

```
 1          A.      No, ma'am.

 2          Q.      (BY MS. COLLINS) Have you had any

 3    discussions in your regular meetings with the Mayor

 4    or Vice Mayor about initiating an internal affairs

 5    investigation?

 6                  MS. TAYLOR:  Object to the form.

 7          A.      No, ma'am.

 8          Q.      (BY MS. COLLINS) Other than your

 9    attorneys, the City's attorneys, which I don't want

10    to really know about, have you had any discussions

11    with anyone else about an internal affairs

12    investigation that relates to the allegations of

13    this lawsuit?

14                  MS. TAYLOR:  Object to the form.

15          A.      No, ma'am.

16          Q.      (BY MS. COLLINS) Okay.  And none

17    with District Attorney General Finney?

18          A.      No, ma'am.

19                  If I may, I'm assuming that you're

20    talking about the lawsuit that we're sitting here

21    today talking about.

22          Q.      Yes.

23          A.      No, ma'am.

24          Q.      Okay.  Have you had any discussions

25    about any other lawsuits?  Any discussions about an
```

```
1    internal affairs investigation about any other

2    lawsuits?

3                    MS. TAYLOR:  Object to the form.

4         A.        No discussion.

5         Q.        (BY MS. COLLINS) Okay.  What about

6    claims of public corruption?  Have you had any

7    discussions with anyone about initiating a public --

8    strike that.

9                    About initiating an internal

10   affairs investigation with respect to allegations of

11   corruption?

12                   MS. TAYLOR:  Object to the form.

13        A.        Not that I can recall.

14        Q.        (BY MS. COLLINS) What have you

15   talked about with the Vice Mayor or the Mayor

16   regarding this lawsuit?

17                   MS. TAYLOR:  Object to the form.

18        A.        Provide them an update on what's

19   happening at the current time, provide information

20   like status report of depositions are being taken at

21   this time.  General information.

22                   MS. TAYLOR:  You've been going

23        about an hour.

24                   MS. COLLINS:  Yeah, I was going to

25        say.
```

```
 1                    MS. TAYLOR:  Whenever you get to
 2          it.
 3                    MS. COLLINS:  No.  Why don't we go
 4          ahead and take a quick break?
 5                    MS. TAYLOR:  Okay.  Thank you.
 6                    VIDEOGRAPHER:  Okay.  We are going
 7          off the record at 10:15.
 8              (Off the record at 10:15 a.m.)
 9              (On the record at 10:35 a.m.)
10                    VIDEOGRAPHER:  And we're back on
11          the record with DVD No. 2 at 10:35.
12     BY MS. TAYLOR:
13          Q.    All right.  Ms. Ball, have you ever
14     instructed JCPD leadership to tell you if someone
15     has been interviewed in a public corruption
16     investigation?
17                    MS. TAYLOR:  Object to the form.
18          A.    Could you repeat the question?
19          Q.    (BY MS. COLLINS) Sure.
20                Have you ever instructed anyone in
21     JCPD leadership to tell you if someone with the JCPD
22     has been interviewed in conjunction with a public
23     corruption investigation?
24                    MS. TAYLOR:  Object to the form.
25          A.    No.
```

```
1           Q.        (BY MS. COLLINS) Would you know if
2   someone had been interviewed?
3                     MS. TAYLOR:  Object to the form.
4           A.        No.
5           Q.        (BY MS. COLLINS) Okay.  Other than
6   the FBI contacting you in the fall of 2023, I
7   believe is what you said, about the public
8   corruption, have you received any other inquiry from
9   any other law enforcement agency?
10                    MS. TAYLOR:  Object to the form.
11          A.        The TBI.
12          Q.        (BY MS. COLLINS) Okay.  Anyone
13  else?
14          A.        No, ma'am.
15          Q.        Okay.  Do you recall who from the
16  TBI contacted you?
17          A.        I believe his first name is Chris.
18          Q.        Okay.  What did Chris contact you
19  about?  What do you recall about that conversation?
20          A.        I don't recall specifically.
21          Q.        What do you recall generally about
22  the conversation?
23          A.        That they were in the process of
24  doing what they referred to as an assessment.
25          Q.        Okay.  What else?
```

```
 1        A.      That they hoped to have it complete
 2   in the spring of 2024.
 3        Q.      Okay.  Do you know if it has been
 4   completed?
 5        A.      I do not.
 6        Q.      Okay.  Have you been -- received
 7   any other follow-up from the TBI about that
 8   assessment?
 9        A.      No.
10        Q.      Do you know if the TBI has
11   interviewed any JCPD officers about that assessment?
12        A.      I do not.
13        Q.      Do you know if they've talked with
14   anyone else in Johnson City leadership about that
15   assessment?
16              MS. TAYLOR:  Object to the form.
17        A.      I do not.
18        Q.      (BY MS. COLLINS) Have you provided
19   any documentation or files with respect to that
20   assessment?
21        A.      I have not.
22        Q.      What about the District Attorney's
23   Office?  Do you know if the District Attorney's
24   Office has requested an internal affairs
25   investigation be opened?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    MS. TAYLOR:  Object to the form of
 2          the question.
 3          A.         I do not know.
 4          Q.         (BY MS. COLLINS) Okay.
 5          A.         I don't -- I will clarify by saying
 6    some of the terminology that you're referring to in
 7    terms of being open, I don't -- because I'm not in
 8    law enforcement, I don't have that background.  I
 9    don't specifically know what things are called or
10    necessarily understand when you say something has
11    been opened or specifically the action that's taken.
12    So I would just clarify that.
13          Q.         Okay.  Has an internal affairs
14    investigation, to your knowledge, been discussed
15    with the D.A.?
16                    MS. TAYLOR:  Objection to the form.
17          A.         Not to my knowledge.
18          Q.         (BY MS. COLLINS) Okay.  Are you
19    familiar with the policies of the JCPD?
20          A.         Generally, no.
21          Q.         Okay.  Do you have a practice of
22    reviewing police reports?
23          A.         No.
24          Q.         Have you reviewed any police
25    reports in conjunction with the allegations in this
```

```
 1    lawsuit?
 2                    MS. TAYLOR:  Object to the form.
 3          A.        Yes.
 4          Q.        (BY MS. COLLINS) Okay.  What police
 5    reports have you reviewed in conjunction with this
 6    lawsuit?
 7          A.        I have reviewed generally
 8    investigation notes around victims who reported
 9    assault to the Johnson City Police Department.
10          Q.        Okay.  When did you do that?
11          A.        I don't recall.
12          Q.        Was it this year or last year?  Can
13    you give me a general time frame?
14          A.        Last year.
15          Q.        In the fall or the spring or the
16    summer?
17          A.        I can't -- I don't recall.
18          Q.        Okay.  Who did you get those notes
19    from?
20          A.        From someone in our CID Division.
21          Q.        Okay.
22          A.        Criminal Investigation Division.
23          Q.        Do you recall who that was?
24          A.        I don't recall specifically.  I
25    know they were provided to me at one of the meetings
```

```
 1    that we had, bi-weekly meetings that we had with the
 2    command staff.
 3           Q.     Do you recall which victims'
 4    investigation notes you reviewed?
 5           A.     I do not.
 6           Q.     Would you have kept a record of
 7    that somewhere?
 8           A.     I don't recall.
 9           Q.     Do you review the CID staff
10    notes --
11                  MS. TAYLOR:  Object to the form.
12           Q.     (BY MS. COLLINS) -- when they have
13    their meeting?  Do you review those CID staff
14    meeting notes?
15           A.     Generally, no.
16           Q.     Okay.  You've qualified that and
17    said generally, no.
18                  Have you reviewed them?
19           A.     I have reviewed three that have
20    been provided to me from the CID captain at the
21    time.
22           Q.     Okay.  Why those three?
23           A.     I had a meeting with the CID
24    captain at the time, and he handed me the minutes to
25    those meetings.
```

Lexitas - TENNESSEE
(615) 595-0073

```
1          Q.        Who is the captain?
2          A.        The captain at that time was Kevin
3    Peters.
4          Q.        Okay.  What was the context of him
5    providing you those notes?  What was being
6    discussed?
7          A.        He was discussing the fact that --
8    we were discussing the fact that the Daigle audit
9    was being performed.
10         Q.        What did he say about the Daigle
11   audit that was being performed?
12         A.        It was at the time that Mr. Daigle
13   was going to be coming into Johnson City to meet
14   with investigators.
15         Q.        So it was before --
16         A.        The minutes from that meeting.
17         Q.        Okay.  So when you had this meeting
18   with Captain Peters, was it before Mr. Daigle came
19   to town to meet with everyone or after?
20         A.        After.
21         Q.        Okay.  Was he upset as a result of
22   Mr. Daigle meeting with people from the JCPD?
23         A.        I don't know.
24         Q.        What were the concerns that he was
25   raising that he was giving you copies of these
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    meeting minutes?

 2                    MS. TAYLOR:  Object to the form.

 3         A.         I don't know that he was raising

 4    any concerns.

 5         Q.         (BY MS. COLLINS) Well, what was he

 6    discussing in the context of giving you these

 7    meeting minutes?

 8         A.         Can you reframe that question so --

 9         Q.         Sure.

10         A.         -- I can understand?

11         Q.         As I understand it, it sounds like

12    Mr. Daigle came to town met with everyone, and then

13    you had a separate meeting with Captain Peters after

14    he met with Mr. Daigle.  And you -- in the context

15    of that meeting, he provided you three of the CID

16    staff meeting notes.

17                    What was your understanding as to

18    why he did that?

19                    MS. TAYLOR:  Object to the form.

20                    MR. RADER:  Object to the form of

21         the question.

22         A.         Yeah, I would have to ask you to

23    repeat that.  I'm not sure I understand the

24    question.

25         Q.         (BY MS. COLLINS) Why did he provide
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    you those notes?
 2                    MS. TAYLOR:  Object to the form.
 3         Q.        (BY MS. COLLINS) What was your
 4    understanding as to why he provided you those notes?
 5                    MR. RADER:  Same objection.
 6         A.        There were questions about
 7    conversations that had occurred in those staff
 8    meetings.
 9         Q.        (BY MS. COLLINS) What were the
10    questions about what had occurred in staff meetings?
11         A.        The questions were around what had
12    been discussed in the staff meetings.  And he
13    brought me the minutes to the meetings to provide me
14    information about what was discussed.  At that point
15    in time, I was not aware that they even took and
16    kept minutes to the meetings.
17         Q.        Okay.  What were the notes about?
18                    MS. TAYLOR:  Object to form.
19         A.        The notes were about all of the
20    discussions that were talked about in the meeting.
21         Q.        (BY MS. COLLINS) Okay.
22    Specifically why did he provide you those three
23    notes?
24                    MR. RADER:  Object to the form.
25                    MS. TAYLOR:  Object to the form.
```

Lexitas - TENNESSEE
(615) 595-0073

```
1           A.        We were having a discussion about
2    the events leading up to Daigle coming into town,
3    and he provided me with minutes of the meetings.
4           Q.        (BY MS. COLLINS) Was it about the
5    need for officers to update their sexual assault
6    cases?
7                     MS. TAYLOR:  Object to the form.
8           A.        At the time that this was
9    occurring, General Finney, who had taken office on
10   September 1st, 2022, had provided a new protocol
11   around how to handle sexual assault cases and the --
12   as captain of the CID, he had been working with
13   staff to develop a checklist around those.  And the
14   minutes to the meetings that he brought were -- in
15   addition to a lot of other information, they
16   included discussions around making sure that the
17   staff knew that that protocol had been put in place,
18   and that there was a checklist attached to that.
19          Q.        (BY MS. COLLINS) Was the protocol
20   not being followed as a result of Daigle's meeting?
21                    MS. TAYLOR:  Object to the form.
22                    MR. RADER:  Same objection.
23          Q.        (BY MS. COLLINS) Or had Daigle
24   discovered that the protocol was not being followed
25   when he came and met with everyone in December?
```

Lexitas TENNESSEE
(615) 595-0073
#: 5585

```
1                    MS. TAYLOR:  Object to the form.
2                    MR. RADER:  Same objection.
3          A.        The protocol was not even put in
4    place until September 1st, 2022.  And so immediately
5    when that was received, our CID staff began the
6    process of implementing the protocol and developing
7    a checklist that was attached to the protocol to
8    make sure the protocol was followed.
9                    And I just want to make sure I
10   understand your question and that I've answered it.
11   So if you don't mind asking it again.
12         Q.        (BY MS. COLLINS) Mr. Daigle came
13   and interviewed officers in December 2022, correct?
14         A.        Yes, ma'am.
15         Q.        Okay.  So when Captain Peters
16   brought you the CID meeting notes, it was after
17   December 2022, correct?
18         A.        Yes, ma'am.
19         Q.        Okay.  And he was bringing you
20   these notes -- what was the purpose of him bringing
21   you these notes?
22                    MS. TAYLOR:  Object to the form.
23         A.        I can't speculate on what his
24   purpose was.  You would have to ask him that
25   question.
```

Lexitas - TENNESSEE
(615) someone-0073

```
 1          Q.       (BY MS. COLLINS) What did he tell

 2    you why he was bringing you those notes?

 3          A.        He was demonstrating that from

 4    August or -- excuse me.  I don't remember the first

 5    date of the meetings.  There were three separate

 6    meeting minutes, but in each of those there was

 7    information provided to our CID staff about Finney's

 8    new protocol that included remembering to follow the

 9    checklist.  The checklist had been provided.  If

10    they had any questions about it.  That's what I

11    recall from those minutes.

12          Q.        When Mr. Daigle came and met with

13    officers in December of 2022, was he critical of the

14    information that he obtained?

15                MS. TAYLOR:  Object to the form.

16          A.        My first meeting with Daigle

17    following that meeting -- I was out of town for work

18    when he came into town.  So I did not have a

19    conversation with him immediately following that.

20                My first meeting with him was

21    January 19th of 2023, and he provided me with an

22    overview of interview, as well as review of notes he

23    had received and files and partial files that he had

24    received as a part of that visit and through a

25    portal that we had provided him.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.        (BY MS. COLLINS) Okay.  Was he

 2    critical of the information that he had received

 3    from the officers that he had interviewed?

 4                    MS. TAYLOR:  Object to the form.

 5          A.        Some of it.

 6          Q.        (BY MS. COLLINS) Okay.  What was he

 7    critical of?

 8                    MS. TAYLOR:  Object to the form.

 9          A.        I don't recall specifically.

10          Q.        (BY MS. COLLINS) Generally what do

11    you recall?

12          A.        Having incomplete records.  I know

13    that, from my perspective of the meeting with him,

14    he was very critical of the lack of record keeping,

15    lack of all the reports being located in the same

16    place, having two different reporting systems, one

17    in patrol, a different one in CID.

18                    He indicated concern about being

19    able to pull together a complete file from some of

20    the investigations.  That was the first item of

21    discussion with him, and he was most critical about

22    the length of time it had taken him, and he had not

23    anticipated having to spend so much time trying to

24    pull together records and complete files with all of

25    the information in the same location.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    He specifically said that he was

 2     used to having that all digitally all located in one

 3     location.  And even at the point in time that I met

 4     with him in January, he still had concerns about

 5     having complete files.

 6           Q.       So the notes that Captain Peters

 7     brought you, did they have to do with Finney's

 8     protocol?

 9           A.       Did they -- can you tell me what

10     you mean by did they have to do with?

11           Q.       Did they discuss?  Did they

12     reference?

13                    MS. TAYLOR:  Object to the form.

14           A.       Yes.

15           Q.       (BY MS. COLLINS) Okay.  What do you

16     recall?

17           A.       I recall that he reminded them to

18     follow the protocol, reminded them that there was a

19     checklist available, and if they had any questions

20     they should ask.

21           Q.       Which files were not complete?

22                    Were they all sexual assault

23     related files?

24                    MS. TAYLOR:  Object to the form.

25           A.       The only records that Daigle was
```

TENNESSEE
(615) 595-0073

```
 1    charged with looking at were sexual assault cases.
 2    That was the -- that was what he was asked to do.
 3    He did not look at any other cases other than sexual
 4    assault cases.
 5              Q.      (BY MS. COLLINS) Do you know if any
 6    of the files with respect to the plaintiffs in this
 7    case were not complete?
 8                      MS. TAYLOR:  Object to the form.
 9              A.      I do not.
10              Q.      (BY MS. COLLINS) With respect to
11    the notes that Captain Peters brought you after he
12    met with Mr. Daigle, was -- when he brought you
13    those notes, was anyone else present?
14              A.      Yes, ma'am.
15              Q.      Who?
16              A.      Chief Turner.
17              Q.      So it was a meeting with Chief
18    Turner and Captain Peters?
19              A.      Yes, ma'am.
20              Q.      Anyone else?
21              A.      No, ma'am.
22              Q.      Where was the meeting?
23              A.      The conference room adjacent to my
24    office.
25              Q.      Okay.  All right.  You told me
```

```
 1    that.
 2                    Do you know if anyone recorded the
 3    meeting?
 4         A.        No.
 5         Q.        Other than those three CID staff
 6    meeting notes, did they bring you anything else?
 7         A.        No.
 8         Q.        How long was the meeting?
 9         A.        How long -- can you repeat the
10    question?
11         Q.        Sure.
12                   How long did the meeting take?
13         A.        30 minutes.
14         Q.        Do you know if it was before or
15    after you spoke with Mr. Daigle on January 19th?
16         A.        After.
17         Q.        When did Chief Turner notify you
18    that he was going to resign?
19                   MS. TAYLOR:  Object to the form of
20         the question.
21         A.        Chief Turner did not resign.
22         Q.        (BY MS. COLLINS) What did -- he's
23    no longer employed by the JCPD, right?
24         A.        He retired.
25         Q.        Okay.  All right.  So you draw a
```

Lexitas - TENNESSEE
(615) 595-0073
#: 5085

```
 1    distinction between resign and retired?

 2            A.          Absolutely.

 3            Q.          Okay.  Was that notification

 4    after --

 5                        MR. RADER:  Object to the

 6            commentary and laughing.

 7            Q.          (BY MS. COLLINS) The notification

 8    of him leaving the department, was that after this

 9    meeting were you and Captain Peters talked about

10    Mr. Daigle coming and speaking with everyone?

11            A.          Can you repeat the question again?

12            Q.          Sure.

13                        When Chief Turner notified you that

14    he was going to resign, retire, was it after this

15    meeting that you had with him and Captain Peters?

16                        MR. RADER:  Object to the form of

17            the question.

18            A.          Chief Turner notified me prior to

19    this meeting that he was going to retire.

20            Q.          (BY MS. COLLINS) How did he notify

21    you?

22            A.          Conversation.

23            Q.          Okay.  Was anyone else present?

24            A.          Not that I can recall.

25            Q.          Okay.  Did he submit any kind of
```

```
1   letter?

2             A.        There was a process that we had to

3   fill out paperwork in human resources that he

4   completed.

5             Q.        Did the allegations in this lawsuit

6   have anything to do with his decision to retire, to

7   your knowledge?

8                       MS. TAYLOR:  Object to the form.

9             A.        Not to my knowledge.  You would

10  have to ask him specifically.

11            Q.        (BY MS. COLLINS) Did he tell you

12  why he was retiring?

13            A.        The City offered a voluntary

14  retirement incentive, and he told me he had decided

15  to take advantage of that retirement incentive.

16            Q.        Who was that volunteer retirement

17  incentive offered to?

18            A.        Any employee in the City that had

19  30 years of employment with the City of Johnson City

20  and was eligible under the -- what we call the --

21  our retirement system.  And I'm sorry.  It's TCRS,

22  but I can't remember the acronyms right now.

23            Q.        Okay.  How many people took

24  advantage of that?

25            A.        I don't recall specifically.
```

Lunietta's  TENNESSEE
(615) 595-0073
#: 5095

```
 1          Q.      Was it more than -- was it more
 2    than one?
 3          A.      Yes, ma'am.
 4          Q.      Okay.  Was it more than five?
 5          A.      Yes, ma'am.
 6          Q.      Where would those records be kept?
 7          A.      In our human resources department.
 8          Q.      The people that retired were -- did
 9    any other JCPD officers retire as a result of that
10    incentive that was being offered?
11          A.      Yes, ma'am.
12          Q.      Who else?
13          A.      Deputy Chief Vitiello, Captain
14    Peters, and I do not recall the name -- there may
15    have been two others, but I don't recall their name
16    at this point in time.
17          Q.      When was that incentive offered?
18          A.      It began -- enrollment for the
19    retirement began -- I can't recall the exact date.
20    My best guess is it was December of 2023 -- or
21    excuse me.  December 2022 or either early
22    January 2023.
23          Q.      Did the allegations that were made
24    in this lawsuit or the Kat Dahl lawsuit have
25    anything to do with offering that retirement
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   incentive?

 2            A.        No, ma'am.

 3                      MS. TAYLOR:  Object to form.

 4            Q.        (BY MS. COLLINS) Have you ever

 5   requested any JCPD officer take early retirement?

 6            A.        Have I ever --

 7            Q.        Requested any JCPD officer or

 8   employee take any kind of early retirement.

 9            A.        No, ma'am.

10            Q.        What about resign?

11            A.        No, ma'am.

12            Q.        Okay.  Do you know if any JCPD

13   officer has been requested to resign?

14                      MS. TAYLOR:  Object to the form.

15            A.        I would not know the answer to that

16   question, as I wouldn't know who would offer that.

17            Q.        (BY MS. COLLINS) Okay.  When did

18   the Kat Dahl case first come to your attention?

19            A.        I do not specifically recall.  It

20   was in the same -- within the same day or the next

21   day of it being filed.

22            Q.        As a result of that lawsuit, was

23   any internal affairs investigation launched?

24                      MS. TAYLOR:  Object to the form of

25            the question.
```

```
 1          A.        No.  We requested that the D.A. at

 2    the time evaluate the allegations within the

 3    lawsuit.

 4          Q.        (BY MS. COLLINS) Okay.  And who was

 5    the D.A. at the time?

 6          A.        I don't recall his name at this

 7    time.  I should, but I'm just blanking on his name.

 8          Q.        Prior to the Kat Dahl lawsuit being

 9    filed, were you aware of the allegations that had

10    been made against Sean Williams?

11                    MS. TAYLOR:  Object to the form.

12          A.        I -- which allegations?

13          Q.        (BY MS. COLLINS) That he was a

14    serial rapist.

15          A.        No.

16          Q.        Did you have any information prior

17    to Kat Dahl's lawsuit being filed that allegations

18    had been made that he had sexually assaulted women?

19          A.        No.

20          Q.        What is your role in coordinating

21    with the District Attorney's Office for the First

22    Judicial District?

23                    MS. TAYLOR:  Object to the form.

24          A.        Can you repeat the question,

25    please?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.        (BY MS. COLLINS) Sure.

 2                    Do you have any role in

 3     coordinating with the District Attorney's Office for

 4     the First Judicial District?

 5                    MS. TAYLOR:  Object to the form.

 6          A.        I do not have any specific role

 7     that I'm aware of by law or anything, other than

 8     just having a relationship as part of an inner

 9     agency that works together.  I'm not aware that

10     there's any state law or anything that requires that

11     I have any formal role with the D.A.

12          Q.        Okay.  Do you communicate with the

13     D.A.'s office in the course of your job duties as

14     City Manager?

15          A.        I have before.

16          Q.        And can you give me an example of

17     what you would communicate to the District

18     Attorney's Office in your role as City Manager?

19          A.        The most -- the specific one that I

20     can tell you about is that we have an organization

21     that's called the Child Advocacy Center.  And within

22     that organization, they do forensic interviews for

23     children who are either part of domestic abuse,

24     sexual assault abuse and any other -- for any other

25     reason that the court may need the testimony of a
```

```
 1   child.  That is all handled within what we refer to

 2   as the CAC, but that's the Child Advocacy Center.

 3                   D.A. Finney reached out to me

 4   through a phone call and had asked if I could have a

 5   conversation with him about the City providing some

 6   level of support to fund some additional resources,

 7   in terms of a forensic interviewer, and explained to

 8   me that he wanted to make sure that they had the

 9   staffing they needed and could get children, minors,

10   interviewed in a timely manner in order to be able

11   to move forward on cases against children.

12        Q.      Okay.  Was this a new procedure

13   that came about when District Attorney General

14   Finney took over?

15        A.       I would not describe any of this as

16   a new procedure.  To my knowledge, the CAC, the

17   Child Advocacy Center, had been providing forensic

18   interviews for children.  I'm not aware of when that

19   started or a specific procedure around it.

20        Q.      Do you communicate about civil

21   lawsuits against the City with the District

22   Attorney's Office?

23        A.       Not typically.

24        Q.      Okay.  Have you ever done that?

25        A.       Can you repeat the question again?
```

Loretta E. Vanhook, TENNESSEE
(615) 695-0073

1      Q.      Sure.

2              Have you ever communicated with the

3   District Attorney General's Office about civil

4   lawsuits that have been filed against the City?

5      A.      Yes.

6      Q.      Okay.  In what context?

7      A.      When this case was filed, the case

8   that I'm taking this deposition for, I made him

9   aware of it.

10     Q.      Okay.  Any others?

11     A.      Not any that I can think of right

12  now.

13     Q.      Okay.  Why did you communicate with

14  him about this case?

15     A.      I felt it was important to make him

16  aware because his -- he relies heavily on the

17  investigations that our officers do in order to move

18  forward.  So I felt like it was important that we

19  reach out and communicate with him in the event that

20  he was unaware of it, so that any decision that

21  he -- and this is me and my rationale behind it.  So

22  that any decision that he would make, that he would

23  be aware of it and be fully knowledgeable about it.

24  It was a professional courtesy.

25     Q.      How did you communicate with him

TENNESSEE
(615) 595-0073

1   about this lawsuit?

2          A.        With a phone call.  That's the best

3   of my recollection.

4          Q.        Okay.  At any point in time, was it

5   determined that the Johnson City Police Department

6   was conflicted off of working on the sexual assault

7   cases related to this lawsuit?

8                    MS. TAYLOR:  Object to the form.

9          A.        I would not characterize it at all

10  as conflicted.  What I was -- what I understood

11  through a memorandum from D.A. Finney is that he

12  wanted to make sure and protect the integrity of the

13  cases and, therefore, we, the Johnson City Police

14  Department, would not be involved in interviewing

15  any of the victims of Sean Williams.

16         Q.        (BY MS. COLLINS) Do you know if

17  D.A. Finney had to reopen some cases with respect to

18  the plaintiffs in this lawsuit?

19         A.        I do not.

20         Q.        The prior District Attorney was Ken

21  Baldwin.

22                   Does that sound correct?

23         A.        That's correct.

24         Q.        Okay.  When did you find out he was

25  retiring?

LexitasⓇ LEGAL TENNESSEE
(615) 595-0073

```
 1              A.      I don't remember.

 2              Q.      Okay.  Did you get any information

 3      as to why he was retiring?

 4              A.      No.

 5              Q.      Did you discuss his retirement with

 6      him?

 7              A.      I never met him.

 8              Q.      Okay.  So you didn't have any

 9      discussions with him about the Kat Dahl termination?

10              MS. TAYLOR:  Object to the form.

11              A.      No.

12              Q.      (BY MS. COLLINS) Okay.  Did you

13      have any discussions with him about Sean Williams?

14              MS. TAYLOR:  Object to the form.

15              A.      No.

16              Q.      (BY MS. COLLINS) When did you find

17      out that Steven Finney was running for District

18      Attorney?

19              A.      I don't know that I knew until he

20      was elected.

21              Q.      Okay.  So is it fair to say that

22      your first communications with Steven Finney was

23      after he was elected?

24              A.      Yes, ma'am.

25              Q.      Okay.  Did you know him prior to
```

Lexitas - TENNESSEE
(615)595-0073

```
1    him being elected?

2           A.       No.

3           Q.       Okay.  A minute ago when you said

4    that when District Attorney General Finney notified

5    you that the JCPD would not be working on the cases

6    that were related to this, and you said that it was

7    to protect the integrity of the cases, what was your

8    understanding of that?

9                MS. TAYLOR:  Object to the form.

10          A.       Not -- my understanding was what

11   was in the letter.  So if you have a copy of the

12   letter, I'm happy to look at it.  But that is the

13   only way that I received information, was his

14   letter.  I recall it was to the police chief, and I

15   was copied on it.

16               MS. COLLINS:  I'm going to mark

17          this as Exhibit -- what number are we on?

18               MS. TAYLOR:  47.

19               MS. COLLINS:  47.

20               COURT REPORTER:  Exhibit 46 is what

21          I show next.

22               MS. COLLINS:  46.

23               (Exhibit 46 marked).

24               MS. TAYLOR:  Give the witness, and

25          I can share.
```

```
 1          Q.          (BY MS. COLLINS) Okay.  Let me get
 2    to that letter.
 3                    Just let me know when you've had a
 4    moment to review this document.
 5                    Have you seen this document before,
 6    Exhibit 46?
 7          A.          Yes, ma'am.
 8          Q.          Okay.  Is that your signature on
 9    the second page?
10          A.          Yes, ma'am.
11          Q.          Okay.  Why did you send this letter
12    on August 24th, 2022?
13          A.          Because we had received a lawsuit,
14    civil lawsuit, from Kat Dahl, and it alleged that
15    there was corruption.  And we had asked D.A. Baldwin
16    at the time to do whatever he needed to do to look
17    into it.
18                    My understanding at the time --
19    and, again, I'm relatively new to the processes and
20    procedures around law enforcement, but the goal was
21    that the -- my understanding was that the way that
22    the TBI would investigate it is if -- that the D.A.
23    had to ask them to.  So our letter was written to
24    the D.A. at the time to request that they look into
25    any of these allegations.
```

TENNESSEE
(615) 595-0073

```
 1          Q.      Okay.  And the Kat Dahl lawsuit
 2     had, as you noted in here, that there was an
 3     attempted coverup or an attempt to cover up
 4     corruption, correct?
 5          A.      Correct.
 6          Q.      All right.  And the Kat Dahl
 7     lawsuit, it's my understanding, was filed in June of
 8     2022.
 9                  Does that sound correct to you?
10          A.      Yes, ma'am.
11          Q.      Okay.  Specifically June 23rd,
12     2022.
13          A.      Yes, ma'am.
14          Q.      Why did you wait several months to
15     send this letter to Kenneth Baldwin about conducting
16     an investigation into attempted corruption?
17          A.      As I said earlier, I was new.  My
18     role as City Manager and previous roles in
19     Asheville, I had only spent one year working
20     directly with law enforcement.  So I was still
21     trying to understand the correct process and
22     procedure that would be followed in this type of
23     case.  And so I was in the process of trying to gain
24     knowledge and understanding about the best way to
25     move forward.
```

```
 1          Q.      Did anyone direct you to write this

 2    letter?

 3                  MS. TAYLOR:  Object to the form.

 4          A.      No.

 5          Q.      (BY MS. COLLINS) Did you write this

 6    letter?

 7          A.      I had it drafted by our City

 8    Attorney.

 9          Q.      Who was that?

10          A.      Sunny Sandos.

11          Q.      Did you discuss this with Sunny

12    Sandos before you drafted it?

13          A.      Yes, ma'am.

14          Q.      When you wrote this letter, had you

15    already hired the Daigle Law Group?

16          A.      Yes.

17          Q.      Okay.  Did anyone at the Daigle Law

18    Group instruct you to write this letter?

19          A.      No.

20          Q.      Did anyone at the Daigle Law Group

21    suggest that communicating something to either the

22    District Attorney's Office or the TBI would be a

23    good idea or something that needed to take place?

24                  MS. TAYLOR:  Object to form.

25          A.      Not that I recall.
```

```
 1          Q.       (BY MS. COLLINS) When you wrote
 2    this letter on August 24th, 2022, did you have an
 3    understanding as to who Robert Voe was?
 4          A.       I don't recall.  I do not recall
 5    when I knew that Robert Voe and Sean Williams were
 6    one and the same.
 7          Q.       Okay.  And on the third paragraph
 8    of the letter you wrote, "The purpose of this letter
 9    is to make your office aware of her allegations of
10    public corruption and to request that either your
11    office or the Tennessee Bureau of Investigation
12    conduct a preliminary investigation to determine
13    whether there is a basis to open a public corruption
14    investigation based on the evidence in the
15    possession of Attorney Dahl and her ability to
16    identify Johnson City officers she is accusing of
17    corruption."
18                   You wrote that sentence, right?
19          A.       It was drafted by Sunny Sandos.
20          Q.       Okay.
21          A.       I reviewed it.
22          Q.       Okay.  And do you know if a
23    preliminary investigation was initiated?
24          A.       I received a letter in response to
25    this letter from Steve Finney dated September 1st,
```

```
1    2022.  And without, again, having it in front of me,

2    I could not recall specifically what it said, but I

3    recall that it -- well, I wouldn't speculate on

4    exactly the conversations that he had with his

5    office around what would happen next.

6                    I do recall getting the letter from

7    Mr. Finney introducing himself to me in the letter

8    that was hand-delivered and that stated his response

9    to this request.

10           Q.        Okay.  Had you met Mr. Finney

11   before this?

12           A.        No, ma'am.

13           Q.        Okay.  Why did you CC him on this

14   letter?

15           A.        I was advised that he was going to

16   be the next -- I did not know him, but I was advised

17   that he was going to be the next District Attorney.

18           Q.        Okay.

19           A.        And I believe we're moving into

20   conversations with counsel at this point in time.

21           Q.        When -- did you ever contact the

22   TBI directly about the allegations that were made by

23   Attorney Dahl?

24           A.        Absolutely not, and I would view

25   that as inappropriate.
```

Tennessee Reporters
(615) 595-0073

```
 1          Q.        Why do you view that as
 2   inappropriate?
 3          A.        I would not want to interfere with
 4   any investigation that's being done, or the
 5   appearance of such.
 6          Q.        What investigation are you
 7   referring to?
 8          A.        The evaluation and investigation
 9   into any potential corruption within the Johnson
10   City Police Department.
11          Q.        Okay.  But my question is, is
12   that -- in the sentence that we just went over, that
13   it was a request that either your office or the
14   Tennessee Bureau of Investigation conduct a
15   preliminary investigation, and it looks like you
16   just sent it to the attorney general's office.
17                    Why didn't you also send it to the
18   TBI, if you're requesting either one or the other
19   look into conducting a preliminary investigation?
20          A.        My understanding is that General
21   Finney or the D.A. is the only one who can request
22   that the TBI -- so my request was -- whether the
23   procedure be that he investigate it or that he
24   assign it to the TBI to be investigated would be his
25   decision.
```

```
 1              Q.      Okay.  But at the time you sent
 2    this letter, did you have that understanding?
 3              A.      Yes.
 4              Q.      Where did you get that
 5    understanding from?
 6                      MS. TAYLOR:  I'm going to object to
 7              the extent this requires her to reveal
 8              confidential attorney/client communications.
 9                      MS. COLLINS:  Are you refusing to
10              answer the question?
11                      MS. TAYLOR:  Well, I'm just making
12              an objection that you're potentially asking
13              her to disclose confidential attorney/client
14              communications.  So I am instructing the
15              witness not to provide any answer that
16              discloses confidential attorney/client
17              information.  To the extent the witness can
18              answer without disclosing confidential
19              attorney/client information, she's free
20              to -- free to answer.
21              Q.      (BY MS. COLLINS) Can you answer the
22    question?
23              A.      Will you repeat the question?
24                      MS. COLLINS:  Can you repeat the
25              question?
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              COURT REPORTER:  I do the question
 2        before.
 3              At the time you sent this letter,
 4        did you have that understanding?
 5              Answer:  Yes.
 6              Question:  Where did you get that
 7        understanding from?
 8              MS. TAYLOR:  Same objection.
 9        A.        I'm sorry.  I don't understand.
10   I'm not following, and I don't feel like I can
11   adequately answer the question.
12        Q.        (BY MS. COLLINS) Okay.
13        A.        If you want to reask the question,
14   I'm happy to try to answer it, to the extent that my
15   attorney advises me as such.  I'm not trying to be
16   evasive.  I'm just trying to make sure I understand
17   the question.
18        Q.        Sure.
19              You discussed this letter with City
20   Attorney Sunny Sandos before you sent it, correct?
21        A.        And with my counsel.
22        Q.        Okay.  Who is the other counsel
23   you're referring to?
24        A.        Erick Herrin.
25        Q.        Okay.  And I'm going to go back to
```

1    my original question.

2                     In the sentence here in the letter

3    that you sent, that you signed from August 24th, you

4    state, "The purpose of the letter is to make your

5    office aware of her allegations of public corruption

6    and to request that either your office or the TBI,

7    the Tennessee Bureau of Investigation, conduct a

8    preliminary investigation."

9                     My question is why didn't you also

10   send a copy of this letter to the TBI since it

11   concerned them?

12                    MS. TAYLOR:  Object to the form.

13        A.        My understanding is that the

14   District Attorney is the only one who can require

15   that the TBI do an investigation.  That was my

16   understanding at the time.  That's my understanding

17   today.

18        Q.        (BY MS. COLLINS) Can you initiate

19   an internal affairs investigation as the City

20   Manager?

21        A.        Yes.

22        Q.        Okay.  Did you do that at this

23   time?

24        A.        No.

25        Q.        Why not?

Lexitas - TENNESSEE
(615) 595-0073

1          A.      I -- the only way that an internal

2    investigation is done is through the Office of

3    Internal Affairs within the police department.  This

4    allegation was made against the chief of police, and

5    there was a conflict.  So I was trying to figure out

6    how to make sure that I requested from the

7    appropriate person to conduct the investigation, so

8    that there would not be an internal conflict between

9    someone of a lower rank within the police department

10   of the chief of police.  So this was the mechanism

11   that I used in order to start that request, that

12   investigation.

13          Q.      Okay.  Do you know if Mr. Herrin

14   talked to Mr. Finney about this letter?

15                  MS. TAYLOR:  Object to the form of

16          the question.

17                  That's ridiculous.  That's

18          attorney/client confidential information.

19          Q.      (BY MS. COLLINS) Do you know?

20          A.      I do not.

21                  MS. COLLINS:  And just for the

22          record, ridiculous is not a valid objection

23          that I'm aware of under the Federal Rules of

24          Evidence or Procedure.  So I --

25                  MS. TAYLOR:  It's appropriate when

```
 1           you're asking my client repeatedly about

 2           confidential attorney/client information.

 3           It's appropriate.

 4                    MS. BAEHR-JONES:  It's not

 5           attorney/client --

 6                    MR. LAKEY:  Do you want me to

 7           start?

 8                    Only Mr. Rader has spoken and she

 9           has spoken.  They represent different

10           clients.

11                    MS. BAEHR-JONES:  Okay.  Well, I

12           will pipe down then.  Thank you.

13                    MR. RADER:  You're welcome.

14                    MS. COLLINS:  Can we please not do

15           this during the deposition?

16                    If you want to instruct your client

17           not to answer the question based on

18           privilege, then if you would keep the

19           objection to form or either or instructing

20           her not to answer on the basis of privilege,

21           but --

22                    MS. TAYLOR:  That's exactly what

23           I've done.

24                    MS. COLLINS:  No.  I don't think

25           asserting an objection on the basis of
```

```
 1              privilege, unless that that's the way that
 2              things are going here, then sure, we can do
 3              that for the rest of the umpteen thousand
 4              depositions we have here.
 5                        MR. RADER:  I object to your
 6              statement.
 7                        MS. COLLINS:  I'm sure you do,
 8              Danny.
 9                        Okay.  We're going to mark the next
10              exhibit as 47.
11                        (Exhibit 47 marked).
12              Q.        (BY MS. COLLINS) Okay.  Have you
13    seen this document before?
14              A.        Yes, ma'am.
15              Q.        Okay.  When you received this
16    document, had you met Steven Finney yet?
17              A.        No.
18              Q.        It looks like, based on this
19    letter, that he said he was sworn into office on
20    September 1st, 2022; is that correct?
21              A.        That's my understanding.
22              Q.        Okay.  So he wrote this letter, it
23    appears, the same day that he was sworn into office.
24              A.        It's dated that day.
25              Q.        Okay.  So if he was just sworn into
```

```
 1    office on September 1st, 2022, and he's writing in
 2    response to your letter of August 24th, 2022, that's
 3    a time lapse of approximately a week, correct?
 4           A.        Yes, ma'am.
 5           Q.        All right.  Did you have any
 6    discussions with him in that week between
 7    August 24th and September 1st, 2022?
 8           A.        No, ma'am.
 9           Q.        When he writes that he's the only
10    person that can request a TBI investigation, did you
11    discuss that with anyone?
12           A.        No.
13           Q.        And he writes in here there's no
14    mechanism for a preliminary investigation.
15                     What was your understanding of
16    that?
17                     MS. TAYLOR:  Object to the form.
18           A.        Exactly what he said.
19           Q.        (BY MS. COLLINS) Do you know if
20    your counsel had any discussions on your behalf
21    about this letter?
22                     MS. TAYLOR:  Objection to the form
23           of the question.
24                     You can answer to the extent you
25           can answer without disclosing confidential
```

Lexitas - TENNESSEE
(615) 595-0073

```
1              attorney/client information.
2         A.        I do not know.
3         Q.        (BY MS. COLLINS) And when he wrote
4    on September 1st, 2022, the first day he was sworn
5    into office, "I do not have enough information to
6    request a TBI investigation at this point," do you
7    know what he based that on?
8         A.        I do not.
9              MS. TAYLOR:  Object to the form.
10        Q.        (BY MS. COLLINS) To your knowledge,
11   has that changed?
12             MS. TAYLOR:  Object to the form.
13        A.        I do not know.
14        Q.        (BY MS. COLLINS) So you don't know
15   if, since September 1st, 2022, Mr. Finney had any
16   more information to request a TBI investigation?
17             MS. TAYLOR:  Object to the form.
18        A.        I -- I want to be clear that I'm
19   assuming that we're talking about the Dahl case.
20   All of this is associated with the Kat Dahl lawsuit.
21             With regard to that lawsuit, no.
22        Q.        (BY MS. COLLINS) Okay.  But one has
23   been investigated -- initiated with respect to the
24   allegations in this lawsuit that we're here about
25   today?
```

```
1          A.       That is my understanding.

2                   MS. TAYLOR:  Object to the form.

3          Q.       (BY MS. COLLINS) Okay.

4          A.       And may I clarify something?

5          Q.       Sure.

6          A.       My understanding and all that I

7    have heard is that it is an assessment.  So I don't

8    know the difference between an assessment versus an

9    investigation.  And so I don't want to speak out of

10   turn, and I want to be really careful because I know

11   how important this is.  My understanding and all

12   that I've heard is about an assessment.

13         Q.       Okay.  What do you mean?  What do

14   you mean by that, that an assessment --

15         A.       I wish I could explain it to you

16   again.  I have a background in civil engineering and

17   my -- most of my experience and my education is in

18   civil engineering.  What I -- it was described to me

19   as being an assessment, did not rise to the level of

20   investigation.  And that is -- that is the extent of

21   my knowledge of understanding about that.

22         Q.       How did you come to this

23   distinction or understanding about assessment versus

24   investigation?

25         A.       In conversation with the TBI and
```

Lexitas TENNESSEE
(615) 595-0073

```
 1   FBI agent that I previously mentioned before.
 2        Q.        What did they explain to you about
 3   the difference between the two?
 4        A.        That it had not risen to the level
 5   of an investigation, that they considered it to be
 6   an assessment.
 7        Q.        Okay.  To your knowledge, is it
 8   still at the assessment level, or has that -- or is
 9   it at the investigation level?
10        A.        I have not heard of any change in
11   the level of the investigation.
12        Q.        Okay.  Did they tell you whether or
13   not they would inform you if it was changed from an
14   assessment to an investigation?
15        A.        They did not.
16        Q.        Okay.  Do you know if District
17   Attorney General Finney has the authority to
18   initiate an internal affairs investigation --
19                  MS. TAYLOR:  Object to the form.
20        Q.        (BY MS. COLLINS) -- of the JCPD?
21        A.        I do not.
22        Q.        Okay.  Did you have any discussion
23   about Kat Dahl's claims with Chief Turner?
24        A.        Yes.
25        Q.        Okay.  Tell me about them.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          A.          We had several discussions of me

 2     asking him and trying to understand.  I'm not

 3     familiar with the role of a Special U.S. Attorney.

 4     They call it a SAUSA.  That is not something that I

 5     was familiar with.  So there was a lot of questions

 6     that I had about what role did she play.  That --

 7     that is -- that is not something in my experience in

 8     the state of North Carolina or in South Carolina

 9     that I had been familiar with, nor the governments

10     that I worked in had had those contract employees.

11               And so a lot of my questions were

12     to try to understand more about how it was funded,

13     what role it played, why did we have such a person

14     who did this.  It was -- it was me asking a lot of

15     questions at the time that this case came to be.

16               I had very little knowledge of the

17     contract the City had with her, with the terms and

18     conditions of it, with who had served in the role

19     before, for how long it had been in place.  So I

20     would say the conversations were extensive to the

21     point of me asking a lot of questions to understand

22     the role of that person, how it interacted with the

23     U.S. Attorney's Office.  It was a lot of knowledge

24     gathering on my part.

25          Q.          Okay.  Did you discuss any of the
```

Lexitas TENNESSEE
#: 6595
(615) 595-0073

```
1    claims made by Ms. Dahl?
2              MS. TAYLOR:  Object to the form of
3         the question.
4         A.      I discussed questions about the
5    contract status that the City had with her.  I
6    reviewed the contract with her.  I reviewed an
7    extension to that contract, because I learned that
8    the contract was to be terminated on June 30th,
9    2021, and that there was an extension of that
10   contract for one month.  I reviewed that document.
11        Q.      (BY MS. COLLINS) Okay.  Did you
12   discuss with Chief Turner the claims of corruption
13   that she had made?
14             MS. TAYLOR:  Objection to the form
15        of the question.
16        A.      I did not.  I asked him why the
17   contract was not renewed, and he expressed concerns
18   over her performance, that there were cases that had
19   not been brought before the grand jury that were
20   supposed to be.
21             I'm trying to recall, because I --
22   I do not recall specific conversations about
23   corruption, except asking was he aware of anything.
24        Q.      (BY MS. COLLINS) What was his
25   answer?
```

```
 1              A.      No.

 2              Q.      And the claims of corruption were

 3       made against him, right?

 4                      MS. TAYLOR:  Object to the form of

 5              the question.

 6              A.      Yes.

 7              Q.      (BY MS. COLLINS) Did you take any

 8       notes of this conversation?

 9              A.      I don't recall taking any notes of

10       this conversation.

11              Q.      Where did the conversation take

12       place?

13              A.      I don't recall.  Most of our

14       meetings were held in my office.

15              Q.      Did you record the conversation in

16       any way?

17              A.      No.

18              Q.      Do you know if Chief Turner

19       recorded the conversation?

20              A.      I do not know.

21              Q.      Did you observe him taking notes?

22              A.      No.

23              Q.      Did you go over any documents?

24              A.      No.

25              Q.      Did -- with respect to the letter
```

LexitasⓇ TENNESSEE
#(615) 595-0073

```
 1   that Mr. Finney sent you on September 1st, 2022, did
 2   there come a point in time when Mr. Daigle told you
 3   that District Attorney General Finney was wrong,
 4   that an internal investigation should have been
 5   initiated?
 6                   MS. TAYLOR:  Object to the form.
 7          A.       I don't recall him ever saying that
 8   Finney was wrong.  I know that in his report that he
 9   indicated that anytime a lawsuit was brought
10   forward, it should initiate an internal
11   investigation.
12          Q.       (BY MS. COLLINS) Okay.  If he told
13   you that anytime a lawsuit is brought that it should
14   initiate an internal affairs investigation, then why
15   has one not been initiated and is ongoing with
16   respect to the claims in this lawsuit?
17                   MS. TAYLOR:  Object to the form of
18          the question.
19          A.       There were -- and I'm repeating
20   this again because I'm not an expert in this area.
21          Q.       (BY MS. COLLINS) Sure.
22          A.       Mr. Finney was hired to provide
23   advice, recommendations.  He was not hired to advise
24   us legally.  And through evaluation of that, we
25   evaluated his recommendations, and some of those, in
```

Lexitas - TENNESSEE
(615) 595-0073

1    some form, because his report had recommendations as

2    a command staff within the police department and

3    working with staff, many of those recommendations

4    were either added to, furthered, but I was under no

5    obligation, without consultation with our attorneys,

6    to take a recommendation from a report and treat it

7    as if it was a directive to me.

8                    And so I would be disclosing, in my

9    opinion, conversations with legal advice about the

10   process of which he recommended that in his report.

11   He had no authority to direct me to do anything.

12   Everything we did was based on trying to improve the

13   Johnson City Police Department and build confidence

14   and transparency.

15            Q.        Okay.  So you hired Mr. Daigle to

16   fix problems in the Johnson City Police Department.

17            A.        No.

18                    MS. TAYLOR:  Object to the form.

19            Q.        (BY MS. COLLINS) What did you hire

20   Mr. Daigle to do?

21            A.        We hired him to come in and assess

22   the department and recommend improvements to the way

23   that we handle sexual assault cases.

24            Q.        Okay.  And one of the

25   recommendations he made was to initiate an internal

1    affairs investigation, wasn't it?

2         A.      It was that -- his recommendation

3    was that in cases that involve civil litigation,

4    that that was considered the same as a complaint,

5    and that his recommendation was that it should -- we

6    should open up an internal investigation.  We

7    implemented part of that by opening the

8    investigation, but we put it in abeyance until the

9    civil litigation was complete.

10        Q.      Okay.  And you hired Mr. Daigle

11   because he's a national expert in police procedure,

12   correct?

13                MS. TAYLOR:  Object to the form.

14                MR. RADER:  Object to form.

15        A.      I am not in a position to say -- to

16   speak to his level of expertise.  I came about

17   finding about him through Chief Turner and other

18   folks who had attended classes and seminars that he

19   had completed.  I did an interview with him via Zoom

20   and talked to him about what the lawsuit was and

21   that my model and my leadership style is always

22   continuous improvement, and that our police

23   department would welcome him coming in and

24   evaluating that in order to gain public trust.

25                And that was the understanding of

1    which we brought Mr. Daigle in on, was for the
2    purpose of doing continuous improvement within the
3    department, specifically as it related to the way we
4    handled sexual assault cases.
5            Q.     (BY MS. COLLINS) Well, he's not
6    just some guy off the street, right?
7                    MS. TAYLOR:  Object to the form of
8            the question.
9            Q.     (BY MS. COLLINS) He knows what he's
10   doing.
11                   MR. RADER:  Object to the form.
12                   MS. TAYLOR:  Object to the form.
13           A.     I believe that he has credentials,
14   and he demonstrated to me a level of understanding
15   and knowledge that I felt comfortable hiring him to
16   do this assessment, a level of understanding and
17   knowledge of what -- of police practices, of the law
18   as it related to police practices.
19                   I asked him specifically about
20   any -- anything he had done in the state of
21   Tennessee.  So I felt comfortable that he would be
22   able to help the department and be able to evaluate
23   the practices and policies within the department and
24   make recommendations for improvement.
25           Q.     (BY MS. COLLINS) Okay.  What did he

Lexitas - TENNESSEE
(615) 525-0073

1    tell you about his knowledge of the practices in the

2    state of Tennessee?

3            A.        He said he had done work in the

4    state of Tennessee, and he provided some specific

5    examples that I took notes on and I think have been

6    provided to you.

7            Q.        Okay.  And you -- and you sought

8    him out.  You mentioned his credentials.

9                      What are those credentials that you

10   can recall that you sought him out for?

11           A.        He -- he was a -- in law

12   enforcement for 20 years, and then he went and I

13   think pursued getting his law degree.  And since he

14   had done so, he'd been working with a number of

15   police departments in order to help them improve

16   throughout the years that he had been in practice.

17           Q.        Okay.

18           A.        And I can't specifically recall the

19   examples that he provided to me.

20           Q.        Okay.  So is it fair to say that

21   you had confidence that he knew what he was talking

22   about when it came to police policies and

23   procedures?

24           A.        I had confidence that he could help

25   improve the practices and policies within the

```
 1   Johnson City Police Department and provide a

 2   transparent, independent assessment of those

 3   practices and policies.

 4        Q.       Okay.  And so despite Mr. Daigle's

 5   recommendation in his report that an internal

 6   affairs investigation be initiated whenever a

 7   lawsuit is filed against the police department, the

 8   decision was made not to complete the investigation

 9   because the lawsuit is pending; is that correct?

10              MS. TAYLOR:  Object to the form.

11        A.       Yes.

12              MS. TAYLOR:  We're probably due for

13        another break, whenever you get to an

14        appropriate --

15              MS. COLLINS:  Sure.  We can take a

16        break.

17              MS. TAYLOR:  At a good point?

18              VIDEOGRAPHER:  Okay.  We're going

19        off the record at 11:54.

20          (Off the record at 11:54 a.m.)

21           (On the record at 12:59 p.m.)

22              VIDEOGRAPHER:  Okay.  We're back on

23        the record, and the time is 12:59.

24              MS. COLLINS:  Okay.  I'm going to

25        mark the next document as Exhibit No. 48.
```

```
1                    (Exhibit 48 marked).

2     BY MS. COLLINS:

3          Q.        Just let me know when you've had a

4     moment to review this.

5                    Okay.  Did this email come from

6     you?

7          A.        Yes, ma'am.

8          Q.        And the letter that you provided,

9     was it the document that we already went over as

10    Exhibit No. 47, the letter from Mr. Finney?

11         A.        Yes, ma'am.

12         Q.        Okay.  And where you state what

13    D.A. Finney stated that he did not have enough

14    information to move forward on an investigation, did

15    that determination change at any point in time?

16                   MS. TAYLOR:  Object to the form of

17         the question.

18         A.        Not to my knowledge.

19         Q.        (BY MS. COLLINS) Okay.  So the

20    conclusion that D.A. Finney drew on September 1st,

21    2022, the first day that he took office, that there

22    was not enough information to move forward on an

23    investigation, that conclusion is the same.

24                   MS. TAYLOR:  Object to the form of

25         the question.
```

```
 1          A.       Do you mind repeating it, ma'am?

 2          Q.       (BY MS. COLLINS) Sure.

 3                   It's the same conclusion that he

 4   made on September 1st, 2022, the first day he took

 5   office, that he wasn't -- he didn't have enough

 6   information to move forward with an investigation.

 7                   MS. TAYLOR:  Object to the form of

 8          the question.

 9          A.       What was the same?

10          Q.       (BY MS. COLLINS) He still did not

11   have enough information to move forward with an

12   investigation.

13          A.       So I want to be clear.  This is

14   September 1st, and this date on this one is

15   September 7th.  So between those two dates, nothing

16   had changed.

17          Q.       Okay.  And you also write in the

18   email that you reported that to WJHL in a listening

19   session.  You did an on-camera interview.

20                   Why did you do that?

21          A.       So I am -- as City Manager, I have

22   a professional obligation.  I'm part of the

23   International Association of City and County

24   Managers, and with that comes a level of ethics

25   requirements.  And part of that is to inform the
```

Lexitas - TENNESSEE
(615) 595-0073
#: 6125

```
 1    public of matters affecting the public.  And so it

 2    is very common and -- in practice, that information

 3    that is relevant to the public, that I'm able to

 4    stand before them as the City Manager and provide

 5    updates.

 6            Q.        Okay.  And the -- in this email

 7    that you sent to the Commission, you state that it

 8    was an opportunity for folks to address the concerns

 9    with the way sexual assaults cases were investigated

10    by the JCPD.

11                      Specifically what are you referring

12    to?

13            A.        We held -- I'm referring -- and I

14    think that this was poor language on my part.  We

15    held two listening sessions for people who had

16    concerns and had been coming to Commission meetings

17    with concerns, for them to come and meet with myself

18    at the public library to be able to talk to us

19    specifically about what those concerns were.  And we

20    wanted the public to know that those listening

21    sessions were going to be available and that we

22    would hear any concerns that they had during those

23    sessions.

24            Q.        Okay.  So you knew as of

25    September 7th, 2022 that people were coming forward
```

Lexitas TENNESSEE
(615) 595-0073

1   about concerns with the way that sexual assault

2   cases were being investigated by the JCPD.

3           A.      I knew -- I did not know of any

4   concern until after the Dahl lawsuit was filed, and

5   then there was a number of folks who were protesting

6   in front of the City Hall and who had created a

7   Facebook page called Terminate Turner.  And so we

8   were trying -- and it is my role and responsibility

9   to hear concerned citizens and understand what their

10  issues were.  And so as a part of that, we held

11  listening sessions.

12          Q.      Okay.  As a result of those people

13  coming forward about concerns with the way sexual

14  assault investigations were being handled, at this

15  time did you ask for an internal affairs

16  investigation to be started?

17                  MS. TAYLOR:  Object to the form.

18          A.      I did not learn anything new in

19  those listening sessions that would have caused my

20  opinion to have changed from the request I made to

21  D.A. Baldwin and then received a response from

22  General Finney on.

23          Q.      (BY MS. COLLINS) Did you document

24  the listening sessions?

25          A.      I did.

```
 1          Q.       Okay.  How did you document it?

 2          A.       I wrote -- took notes.

 3          Q.       Okay.  Do you still have those

 4   notes?

 5          A.       I do.

 6          Q.       Have they been produced in this

 7   litigation?

 8          A.       Yes.  I will say they've been

 9   turned over to my attorney.

10          Q.       Okay.  Did you write down the names

11   of any people that raised concerns in these

12   listening sessions?

13          A.       I may have.  I don't recall.

14          Q.       If you wrote down names, would they

15   be in your notes?

16          A.       Yes.

17                   MS. COLLINS:  I'll mark the next

18          document as Exhibit 49.

19                   (Exhibit 49 marked).

20                   MS. BEREXA:  Heather, if it has a

21          Bates number on it, could you just read that

22          off?  That way we all have copies over here.

23                   MS. COLLINS:  Sure.  This is Bates

24          No. CITY-0073462.

25                   MS. BEREXA:  Thanks.
```

```
 1                    MS. COLLINS:  Yeah.
 2        Q.        (BY MS. COLLINS) Okay.  It looks
 3   like on June 1st, 2023 that General Finney requested
 4   a meeting with you.
 5                    Do you recall what that was about?
 6                    He said that it concerned the
 7   matter involving Sean Williams.
 8        A.        Yes, ma'am.
 9        Q.        What was it about?
10        A.        He had the meeting to provide us
11   with an update on the findings from the data that
12   was recovered from the computer and USB drives from
13   Western Carolina University when Sean Williams was
14   arrested.
15        Q.        Okay.  And what was that, the
16   findings?
17        A.        He had a number of -- he provided
18   us information about a number of videos that were
19   taken of women who had been sexually assaulted by
20   Sean Williams and provided us with information about
21   the numbers that he had, and essentially an update
22   that was very disturbing.
23        Q.        Okay.  Who all was in this meeting?
24        A.        Myself.  General Finney.  Abby.  I
25   can't recall Abby's last name with General Finney's
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    office.  Investigator Mike Little with the D.A.'s
 2    Office.  The chief of police and Major Dougherty,
 3    and I believe our deputy chief was there, as well.
 4    And I can't recall if any other of the command staff
 5    were in the meeting.
 6              Q.      Okay.  ██████████, what's his
 7    first name?
 8              A.      ████.
 9              Q.      Okay.  And who else did you say?
10    I'm sorry.
11              A.      Deputy Chief Scott Jenkins.
12              Q.      Okay.  How long did this meeting
13    last?
14              A.      Approximately an hour and a half.
15              Q.      And did you take notes for this
16    meeting?
17              A.      I took very sketchy notes.  And
18    when I say sketchy, I mean just writing down one
19    word here or there.  There was never a complete
20    sentence.
21              Q.      Okay.
22              A.      That I recall.
23              Q.      You mentioned that Investigator
24    Little was at this meeting.
25                      At this time, had you been provided
```

Lexitas-TENNESSEE
(615) 595-0073

1  a copy of his affidavit from reviewing materials in

2  North Carolina?

3       A.      Not that I recall.

4       Q.      Okay.  What did you do in response

5  to the information that General Finney provided you?

6       A.      I don't think there was anything

7  that I did.  I think that he had made a request to

8  have an investigator assigned as a backup to help

9  investigate.  He was -- he was wanting -- he had

10 indicated that he wanted as many of the victims to

11 come forward to the D.A.'s office, and that they

12 were going to start reaching out to folks to ask

13 them to come in.

14            He had made a request of us that we

15 provide someone within our department, and I believe

16 that he requested Investigator Younce, Lauren

17 Younce, if I remember her name correctly, to be able

18 to be a part of those interviews, along with having

19 advocates there and having, I believe her name is

20 Abby Wallace, was the D.A. that was going to be a

21 part of trying to get as many women as possible who

22 had been -- who were in -- who were videoed to be

23 able to come forward.

24      Q.      Okay.  Having these women come in

25 again, was that consistent with the recommendations

Lexitas TENNESSEE
(615) 595-0073

```
 1    made by Daigle?
 2                   MS. TAYLOR:  Object to the form.
 3         A.         There was no recommendation that
 4    Daigle made about any of this.  There was no
 5    recommendation about -- the Daigle report had been
 6    completed months prior to this, and there was
 7    nothing within his recommendations that spoke to, to
 8    the best of my knowledge, anything of having these
 9    women come in.
10         Q.         (BY MS. COLLINS) Okay.  Was there
11    any recommendation in The Daigle Report about making
12    people come in repeatedly, victims repeatedly come
13    in?
14         A.         I don't recall.
15                   MS. COLLINS:  Okay.  All right.
16              Let's mark the next one as Exhibit 50.  This
17              is Bates stamp 73310.
18                   (Exhibit 50 marked).
19         Q.         (BY MS. COLLINS) Okay.  Have you
20    seen this document before?
21         A.         I have.
22         Q.         Okay.  And it looks like you
23    initially had a media release that said, "We will
24    continue to work hand-in-hand with the District
25    Attorney's Office."
```

LEXITAS - TENNESSEE
(615)522-0073

```
 1                    And it looks like District Attorney

 2   General Finney requested that statement be removed,

 3   correct?

 4        A.        Correct.

 5        Q.        Did you have any understanding or

 6   were you given any understanding as to why they

 7   requested that statement be removed?

 8                  MS. TAYLOR:  Object to the form.

 9        A.        I don't know.

10        Q.        (BY MS. COLLINS) You don't know

11   what?

12        A.        I don't know what he -- why he

13   wanted that removed.

14        Q.        Okay.  Did you have any

15   understanding as to why?  Were you told why he

16   wanted that removed?

17                  MS. TAYLOR:  Objection to form.

18        Q.        (BY MS. COLLINS) Before or after

19   the fact, were you given an explanation as to why it

20   needed to be removed?

21        A.        No.  At that point, we were working

22   very closely with the District Attorney, and I think

23   that's normal protocol.  And I knew that anything

24   that would be released I wanted to -- I did not want

25   anything to jeopardize the case, the cases.  And so
```

```
 1    anything that was released, I wanted to make sure

 2    that he was okay with it.  So I sent him this

 3    information.  And when he sent it back to me, I

 4    essentially was going to comply with whatever his

 5    request was so that we did not interfere with any

 6    investigation.  So I didn't question it, nor was I

 7    told.

 8                    MS. COLLINS:  I'm going to mark the

 9           next document as Exhibit 51, and this is

10           73457.

11                    I'm going to go ahead and Mark 52,

12           and this is 73312 through 73313.

13                    (Exhibit 51 marked).

14                    (Exhibit 52 marked).

15           Q.      (BY MS. COLLINS) Okay.  I'll hand

16    you 51 and 52.

17                    Okay.  This is an email that

18    appears to be attaching the document -- the email is

19    Exhibit No. 51, and the document that appears

20    attached is Exhibit 52.

21                    Have you seen these documents

22    before?

23           A.      Yes, ma'am.

24           Q.      Okay.  Do you agree with the

25    District Attorney General's summary of the meeting
```

```
1    from June 2nd, 2023 with Abby Wallace, Mike Little,

2    the chief, ███████████, Mike Adams, and yourself?

3               MS. TAYLOR:  Object to the form.

4          A.      Are you referring to the first

5    paragraph where it states, "The crux of the

6    conversation was that we wished we had a female

7    investigator"?

8          Q.      (BY MS. COLLINS) I'm asking you

9    where he says, "and discuss the Williams

10   investigation as to the new evidence that was

11   discovered as a result of the North Carolina

12   investigation.  Without going into detail, we

13   described the magnitude of the situation.  The crux

14   of the conversation was that we wished to have a

15   female investigator assist my office in interviews

16   with potential victims, if we could get them to come

17   forward."

18              Do you recall that being discussed?

19         A.      Yes, ma'am.

20         Q.      Okay.  And when it states, "We

21   described the magnitude of the situation," what is

22   your interpretation of that?

23              MS. TAYLOR:  Object to the form.

24         A.      This -- this was a horrible

25   situation.  This was devastating.  It was horrendous
```

Lexitas - TENNESSEE
(615) 595-0073

1    to find out that -- what had happened and what he

2    had explained had happened and the evidence that

3    they had.  And we understood that this was very

4    important that we do everything we could to bring

5    the -- the assailant to justice.  And we were going

6    to, in any way, cooperate to do that.

7          Q.        (BY MS. COLLINS) Okay.  But when it

8    refers to magnitude, did -- was there any discussion

9    about liability on the part of the City?

10         A.        No.

11         Q.        When it discusses magnitude, was

12   there discussion about the number of victims?

13         A.        Yes.

14         Q.        When it discusses magnitude, was

15   there discussion about the fact that the JCPD had in

16   its possession, before he was apprehended in North

17   Carolina, a copy of a raped list from -- that they

18   had gotten from Sean Williams' apartment?

19                   MS. TAYLOR:  Object to the form.

20         A.        I don't recall that.

21         Q.        (BY MS. COLLINS) When did you first

22   find out that they had a copy of a raped list from

23   Sean Williams' apartment?

24                   MS. TAYLOR:  Object to the form.

25         A.        I don't recall.

```
 1          Q.        (BY MS. COLLINS) When they came in
 2   possession of a raped list from Sean Williams'
 3   apartment, do you think that should have been
 4   investigated at that time?
 5                     MS. TAYLOR:  Object to the form.
 6          A.        I am not a police officer, and I
 7   am -- in no way feel knowledgeable enough to answer
 8   your question.
 9          Q.        (BY MS. COLLINS) Was anyone ever
10   subject to an internal affairs investigation as a
11   result of the failure to investigate the raped list
12   that the Johnson City Police Department came in
13   possession of?
14                     MS. TAYLOR:  Object to the form.
15                     MR. RADER:  Object to the form.
16          A.        Not to my knowledge.
17          Q.        (BY MS. COLLINS) So no officer has
18   been subjected to an internal affairs investigation
19   as a result of them obtaining a copy of a raped list
20   and doing nothing about it?
21                     MS. TAYLOR:  Object to the form.
22                     MR. RADER:  Object to the form.
23          A.        I would say I don't know that
24   they -- I don't know enough to know that they did
25   nothing about it, but I do not -- I'm not aware of
```

```
1     any internal investigation that was opened up as a
2     result of that list.
3                Q.        (BY MS. COLLINS) Do you think
4     that's a problem?
5                          MS. TAYLOR:  Object to the form.
6                A.        I don't -- I don't know enough
7     about the law to be able to tell you.  I don't know
8     enough about the law to be able to tell you.  And if
9     I speculated, I'm not -- I have never taken the oath
10    of office.  I do not know the laws around it, and I
11    would be speculating.
12               Q.        (BY MS. COLLINS) As City Manager,
13    as a citizen of Johnson City, do you think that's a
14    problem?
15                         MS. TAYLOR:  Object to the form.
16               A.        I don't know the context in which
17    the list was found.  I can't answer your question.
18               Q.        (BY MS. COLLINS) We discussed
19    earlier that you have the authority to hire or fire
20    officers, right?
21               A.        I do.
22               Q.        And you have not hired -- you have
23    not fired anyone as a result of the failure to
24    investigate the raped list, have you?
25                         MS. TAYLOR:  Object to the form of
```

```
 1          the question.

 2                    MR. RADER:  Same objection.

 3          A.        If there was no internal

 4  investigation done, then there would not be anybody

 5  terminated as a result of that.  The answer is no.

 6          Q.        (BY MS. COLLINS) Okay.  And there

 7  hasn't been an internal affairs investigation

 8  because it's being held in abeyance because this

 9  lawsuit has been filed, correct?

10                    MS. TAYLOR:  Object to the form.

11          A.        I would -- I'm wondering if you're

12  asking me a question about the specific internal

13  investigation associated with the list that was

14  found or about the whole lawsuit, because this is

15  a -- this evidence is a part of the lawsuit.

16                    So I answered you before in telling

17  you that there have been open cases on officers.

18  We've opened internal investigations, but on all of

19  the information contained within these two lawsuits,

20  there has been no movement on that until this civil

21  litigation is complete.

22          Q.        (BY MS. COLLINS) Has there been an

23  internal affairs investigation just dealing with the

24  failure to investigate the raped list?

25                    MS. TAYLOR:  Object to the form.
```

Lexitas - TENNESSEE
(615) 595-0073
#: 6135

```
 1            A.       No, ma'am.  That is considered to

 2    be a part of this investigation.

 3            Q.       (BY MS. COLLINS) And do you know,

 4    sitting here today, how long the department has been

 5    in possession of the raped list?

 6                      MS. TAYLOR:  Object to the form of

 7            the question.

 8                      MS. COLLINS:  What is the basis of

 9            the objection?

10                      MS. TAYLOR:  It's not in evidence

11            that the City is in possession of a copy of

12            the raped list.

13                      MS. COLLINS:  What do you mean, not

14            in evidence?

15                      MS. TAYLOR:  Facts have not been

16            established.

17            Q.       (BY MS. COLLINS) You're aware of

18    the raped list, right?

19            A.       Yes, ma'am.

20            Q.       Okay.  Do you know if this is --

21    when the City came in possession of that?

22                      MS. TAYLOR:  Object to the form.

23            A.       I -- I don't know when the City

24    came into possession of that.

25                      MS. COLLINS:  I'm providing you
```

```
 1              another document we're going to mark as
 2              Exhibit 53, and this is Bates labeled 75958.
 3                   (Exhibit 53 marked).
 4         Q.        (BY MS. COLLINS) Why did you have
 5    statistics pulled for a one-mile radius from 200
 6    East Main Street?
 7         A.        I moved -- I started working for
 8    the City of Johnson City on December 20th, 2021.  I
 9    lived downtown above the Tipton Street Pub.  I was
10    looking for a place to buy in Johnson City, and so I
11    was made aware through a realtor that there was a
12    condominium available for sale.  And so I had asked
13    the chief if he would provide me with information
14    within a one-mile radius of the condominium that I
15    was looking at.
16         Q.        And the condominium you were
17    looking at, was it 200 East Main Street?
18         A.        Yes, ma'am.
19         Q.        Is that also the building where
20    Sean Williams lived?
21         A.        Yes, ma'am.
22         Q.        When you had these statistics run,
23    what information were you provided?
24         A.        I was provided an Excel -- two
25    Excel spreadsheets, one for the year 2020, and one
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    for the year 2021.

 2                    When I got the information back, it

 3    had thousands of reports that were pulled.  I

 4    quickly realized that what I had asked for was, from

 5    my perspective, a ridiculous request on my part,

 6    because the number of incidents that occurred within

 7    that year, within that time frame, was overwhelming.

 8         Q.        Did anyone discuss with you at this

 9    time that 200 East Main Street was where Sean

10    Williams lived?

11         A.        No.

12         Q.        Okay.  What was the name of the

13    building?

14         A.        Oh, it had a bank building name,

15    and I can't recall what the name of the building

16    was.

17         Q.        Do you know who owned it?

18         A.        Who owned the building?

19         Q.        The condominium that you're looking

20    to buy.

21         A.        Sean Williams.

22         Q.        So you were considering buying a

23    condominium from Sean Williams?

24         A.        Yes, ma'am.

25         Q.        In April of 2022?
```

LexitasLEGAL TENNESSEE
(615) 595-0073

```
 1        A.       Yes, ma'am.

 2        Q.       Did you buy that condominium?

 3        A.       No ma'am.

 4        Q.       Why not?

 5        A.       Because I found out that he was a

 6   fugitive.  I had a realtor and I had an attorney,

 7   and when we were setting the closing date, he

 8   contacted my attorney and asked if he could do a

 9   remote closing, and he disclosed to my attorney that

10   he was a fugitive.

11        Q.       So were you looking to buy the

12   actual apartment or condominium where Sean Williams

13   lived and committed all these assaults?

14             MS. TAYLOR:  Objection to form.

15        A.       I was looking to buy the

16   condominium at 200 East Main Street, Unit No. 50 --

17   No. 5.

18        Q.       (BY MS. COLLINS) Unit 5, was that

19   the one where Sean Williams lived?

20        A.       That is what I've come to

21   understand.

22             MS. COLLINS:  Okay.  I need to take

23        a break.

24             VIDEOGRAPHER:  Going off the record

25        at 1:28.
```

```
 1                (Off the record at 1:28 p.m.)

 2                (On the record at 1:35 p.m.)

 3                VIDEOGRAPHER:  On the record at

 4         1:35.

 5    BY MS. COLLINS:

 6         Q.        Ms. Ball, going back to Exhibit 53,

 7    you didn't -- did you go through with the sale?

 8         A.        No.

 9         Q.        Okay.  Why not?

10         A.        Because my -- because Mr. Williams

11    contacted my attorney, asked to do the closing

12    remotely, and disclosed to her that he was a

13    fugitive, and I did not move forward on the sale.

14         Q.        Okay.  Who is your attorney?

15         A.        Marcy Walker.

16         Q.        Is Ms. Walker -- what kind of

17    attorney is she?

18         A.        I would say she's a real estate

19    attorney.

20         Q.        Okay.  Did you discuss with anyone

21    about this, him contacting your attorney and

22    disclosing that he was a fugitive?

23                MS. TAYLOR:  Objection to form.

24         A.        There were a lot of my -- including

25    commissioners who knew that I was interested in the
```

1    condominium, that I had put in an offer for it, and
2    I said that I was not going to go through with it.
3    So family, the Commission was aware that I was
4    looking for a place downtown.  So I'm sure I had
5    conversations with people to say -- I then began
6    asking questions about him and found out he was
7    wanted for possession of ammunition while being a
8    felon, and that the U.S. marshals had been looking
9    for him.
10           Q.       (BY MS. COLLINS) Prior to this
11   contact from Mr. Williams to your attorney that he
12   was a fugitive, did you know who the seller of the
13   apartment was?
14           A.       I did.
15           Q.       Okay.  Who told you who the seller
16   was?
17           A.       The realtor.
18           Q.       Did she say anything about him at
19   that time?
20           A.       She said he's squirrely.  She said
21   he's aware -- she -- I had contacted her and said
22   I'm looking to buy a place downtown.  I enjoyed
23   living downtown.  And she said that someone had
24   contacted her and was looking to put two -- three
25   units on the market, and the three units were the

```
1     one at East 200 East Main on the fifth floor, and

2     then there were two units on the third floor.  And

3     she said, "Would you like to look at them?"

4                      Did that answer your question?

5          Q.        Yes.  Yes, it did.  Thank you.

6                      You said that you had talked with

7     some -- did she tell you anything else then, other

8     than he was squirrely and describing that there were

9     three units?

10         A.        She said that he seemed to have a

11    lot of parties up there and posted on Facebook.  I

12    think she was Facebook friends with him, and she

13    said he posted about having parties up there.

14         Q.        Did you know about ███████████████?

15         A.        I did not know who ███████████████

16    was at that time.

17         Q.        Okay.  So you -- when you initially

18    had the conversation with your realtor that Sean

19    Williams was the owner and that he was squirrely,

20    you went to look at the condominium.

21         A.        I did.

22         Q.        Okay.  Knowing that Sean Williams

23    was the owner.

24         A.        Yes.  I did not know who Sean

25    Williams was in the context of everything that has
```

Lexitas TENNESSEE
(615) 595-0073

```
1    occurred.
2         Q.        Okay.  Even if you didn't know
3    about ███████████ specifically or her name, did
4    you know about a girl falling out of a window from
5    that address?
6                   MS. TAYLOR:  Object to the form.
7         A.        I recall some -- someone saying
8    that somebody fell out of a unit in that building.
9    I did not specifically know that it was that floor,
10   but I remember -- I recall there being something
11   about somebody falling out of a window and
12   surviving.
13        Q.        (BY MS. COLLINS) Okay.  And when
14   you said that you spoke with some commissioners
15   about buying the condominium, who were the specific
16   commissioners that you spoke to?
17        A.        I know -- I believe that I spoke to
18   all of them.  I know I spoke to Jimmy Brock.  I
19   spoke to Joe Wise, who was the Mayor at that time,
20   and I cannot recall who else I spoke to.
21        Q.        How much did you offer to buy it?
22        A.        $416,000.
23        Q.        Was that below asking price or
24   above asking price?
25        A.        He had not yet put it on the
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    market.  So I had not seen an asking price
 2    identified.
 3              Q.      Did you end up finding a place
 4    downtown?
 5              A.      I found a place on Wilson Avenue,
 6    which is about half a mile from downtown.
 7              Q.      When Karl Turner ran this report
 8    for you on April 6th, 2022, were there any specific
 9    discussions about Sean Williams?
10              A.      There were some -- I don't recall.
11              Q.      Do you recall generally if there
12    were discussions about Sean Williams or the owner of
13    the condominium?
14              A.      I recall saying that I was looking
15    at a condominium in that building.  I cannot recall
16    the specifics of the conversation that I had with
17    him around that.
18              Q.      Generally, did Sean Williams' name
19    come up?
20              A.      I can't remember.  I -- I would
21    be -- I would be speculating, when I asked him for
22    this information in these conversations, if Sean
23    Williams was discussed.  I later came to know who he
24    was, as I have provided you with information.
25              Q.      Do you know if the condominium was
```

Lexitas TENNESSEE
(615) 595-0073

```
 1   eventually listed for sale?
 2          A.       I don't think it was.
 3          Q.       Do you know how much it was sold
 4   for eventually?
 5          A.       I came to find out that it was sold
 6   for $400,000.
 7          Q.       Do you know who bought it?
 8          A.       I don't know the name of the person
 9   that bought it.  I heard the name.  I did not know
10   the name.
11          Q.       When was the first time you heard
12   about Sean Williams?
13          A.       The first time I heard about him
14   was when his name was on a contract.  That's the
15   first time I saw his name.
16          Q.       The contract to buy the
17   condominium?
18          A.       Yes, ma'am.
19          Q.       Okay.  When was the first time you
20   heard about him in the context of your job duties?
21          A.       After I found out he was a
22   fugitive.
23          Q.       Okay.  Tell me about that.
24          A.       I learned then that he -- the
25   information that we've come to know because I
```

```
1    started asking a lot of questions about what he had

2    done, what he was a fugitive from.  I learned that

3    ███████████████  had fallen out of the -- from that

4    same floor or that same unit, everything up into

5    this case.

6                    So if you have specifics, I'm happy

7    to answer those, but specifically everything I've

8    learned in the past two years.

9         Q.        Did you know that he was the John

10   Voe that was referred to in Kat Dahl's lawsuit?

11        A.        Are you referring to Robert Voe?

12        Q.        Robert Voe.

13        A.        I did not.  At the time the lawsuit

14   was provided, I did not know who Robert Voe was.

15        Q.        Did there come a point in time

16   during the Kat Dahl litigation that you learned who

17   that was?

18        A.        Yes.

19        Q.        Okay.  When was that?

20        A.        I think you asked me this question

21   before, and I can't recall the exact timing of it.

22   It was -- it was in the course of the -- I would say

23   the month of July, the end of June, the month of

24   July, that I was able to find out that Robert Voe

25   was, in fact -- and Sean Williams were one and the
```

```
 1    same.
 2              Q.        Okay.  And are you saying -- Kat
 3    Dahl's lawsuit was filed in June of 2021.
 4                        So would that have --
 5              A.        '22.
 6              Q.        I said it was filed.
 7              A.        Kat Dahl's lawsuit was filed in
 8    June of 2022.
 9              Q.        Okay.  So you found out in June,
10    you think, June or July of --
11              A.        Yes.
12              Q.        -- the year the lawsuit Kat Dahl
13    lawsuit was filed.
14              A.        The Dahl lawsuit was filed
15    June 23rd, 2022, and either toward the end of
16    June 2022 or July, I learned that Robert Voe and
17    Sean Williams were the same person.  But I knew
18    there was a protective order that publicly I was not
19    able to be able to speak to anyone about knowing the
20    name of that connection.
21              Q.        Okay.  And prior to the contract
22    that you put on Sean Williams' condominium, you had
23    no prior dealings with him?
24              A.        None.
25              Q.        Any dealings with him or his
```

Lexitas TENNESSEE
(615) 655-0073

```
 1    companies in North Carolina?
 2         A.        No, ma'am.
 3         Q.        And I believe I've asked you this,
 4    but I'm not sure.  As you've noticed, I might ask
 5    something twice.
 6                   Have you reviewed the police
 7    reports documenting the women in this lawsuit's
 8    allegations of sexual assault or rape?
 9                   MS. TAYLOR:  Object to the form.
10         A.        I have only reviewed the women who
11    filed complaints with the Johnson City Police
12    Department.
13         Q.        (BY MS. COLLINS) Okay.
14         A.        There are several women named, but
15    there are only reports where a few of them filed
16    reports with the Johnson City Police Department.
17         Q.        Have you ever spoken with a victim
18    or a victim's family --
19                   MS. TAYLOR:  Object to the form.
20         A.        Of Sean Williams?
21         Q.        (BY MS. COLLINS) Yes.
22         A.        Not that I'm aware of.
23         Q.        Do you know if Sean Williams was a
24    confidential informant?
25         A.        I do not.
```

Lexitas-TENNESSEE
(615) 522-0073

```
 1              MS. COLLINS:  I'll mark the next

 2         document as Exhibit 54.  This is 76022.

 3              (Exhibit 54 marked).

 4         Q.        (BY MS. COLLINS) Have you seen this

 5    before?

 6         A.        No, ma'am.

 7         Q.        Okay.  Do you know if you received

 8    a text message like this from someone within JCPD?

 9         A.        I'm -- I'm -- if you'll give me a

10    minute, because I'm trying to get -- look at the

11    dates, the context, and I'm -- I'm having a little

12    bit of a hard time.

13         Q.        Sure.  Take the time you need.

14         A.        Thank you.

15         Q.        Sure.

16         A.        Okay.

17         Q.        All right.  Really I'm focusing

18    more on the top thread.

19              Is this something that would

20    typically be in the course of your job duties as

21    City Manager, to be notified when something like

22    this was happening?

23              MS. TAYLOR:  Object to the form.

24         A.        I don't know what's happening.

25         Q.        (BY MS. COLLINS) Yeah.  That was
```

LexAmica - TENNESSEE
(615) 655-0073

```
 1   going to be my question.

 2                   It looks like you received -- it

 3   says, "Cathy."  It says, "Cathy Ball, officers had

 4   no contact with Williams.  The fifth floor apartment

 5   was locked."

 6                   This appears to be from July 4th,

 7   2022, and you appear to have written back, "Thanks,"

 8   at 2:25 a.m.

 9                   Do you recall what this was about?

10        A.        I don't.  I mean, this was on

11   July 4th, 2022.  I'm -- I don't.  Without context

12   before or after, I don't know what this is.

13        Q.        Okay.  The second text thread just

14   looks like that someone -- it appears to be someone

15   named Karl because it says Karl at the end of it.

16   It says, "We had a mutual aid request from the TBI

17   for our SWAT team, and they'll let you know when the

18   team is clear."

19                   Was that -- this the sort of

20   typical communication that you would receive from

21   leadership at the JCPD?

22        A.        Yes, ma'am.

23        Q.        Okay.  What phone would this have

24   been to you?  Do you know?

25                   Would this have been to your
```

Lexitas - TENNESSEE
(615) 651-0073
#3455

1    personal phone or your work phone?

2          A.        I would have assumed that it would

3    have been to my work phone.  I have the same phone

4    number to one device.

5          Q.        Okay.

6          A.        So when it rings I -- it says

7    primary and secondary on my phone, but I have the

8    ability for two numbers to come into one device.  So

9    I would assume I -- I had my work number before I

10   started with the City in December 2021, and so I

11   would not have necessarily known because I would

12   have actually picked up the same device.

13                   I provided, for emergency purposes,

14   folks my personal and my work number and was

15   comfortable with them calling either one and/or

16   disclosing information from either one.

17         Q.        Okay.  Were those -- did the City

18   pay for that phone?

19         A.        I receive an allowance for a phone.

20   It's my -- I own the phone, but as part of my

21   contract I get an allowance.  I pay for the phone.

22   I pay for the phone line to it, and I receive a

23   stipend compensation for that.  It's either 125 or

24   $150 a month.

25         Q.        Okay.  What is the carrier?

LexitasLEGAL TENNESSEE
(615) 595-0073

```
1              A.        Verizon.

2              Q.        What kind of phone is it?

3              A.        It's an Apple or iPhone.

4              Q.        Okay.  How long have you had your

5    current device?

6              A.        Since January of 2024.

7              Q.        Did you have an Apple device before

8    that?

9              A.        Yes, ma'am.

10             Q.        Was it the same setup that you just

11   described?

12             A.        Yes, ma'am.

13             Q.        And it -- was it those same two

14   numbers that you provided at the beginning of the

15   deposition that you respond to?

16             A.        Okay.

17             Q.        And it sounds like, sitting here

18   today, you just aren't sure who this thread was

19   from; is that correct?

20             A.        I would be assuming it -- I would

21   be assuming just based on initials, but I -- I don't

22   want to speculate.

23             Q.        What do you -- what would be your

24   assumption based on the initials?

25             A.        Well, the initials say B.C.  So I'm
```

```
 1    assuming that it would be Billy Church, but I'm not
 2    sure of that.
 3            Q.      Okay.  I was thinking that B.C. was
 4    Ball, Cathy, was you.
 5            A.      Oh, that could be.
 6            Q.      And then the one on the right side
 7    of the page where it just says device owner --
 8            A.      Yeah.  I think you probably figured
 9    that out before I did.
10            Q.      Okay.  Now, these are kind of
11    confusing, I think, the text threads.
12                    In this one, the second one lower
13    down on the page where it says, "Cathy, we have a
14    mutual aid request," and then it's signed Karl.
15                    Could that be Chief Turner?
16            A.      Yes, ma'am.
17            Q.      Okay.  Was there some kind of --
18    did the JCPD have some kind of centralized text
19    messaging system where it could be somebody
20    different?
21                    For example, if it was -- it
22    doesn't matter who the chief is, whether it's one
23    person or the next person, it transfers over through
24    a central messaging system because it's owned by the
25    City.
```

Lexitas - TENNESSEE
(615) 551-0073
#:6155

```
 1                    Does that make any sense?
 2                    MS. TAYLOR:  Objection to form.
 3          A.        If I am understanding your
 4   question, and I'm going to repeat it so that I'm --
 5   there's no chance that I'm answering the wrong
 6   question.
 7          Q.        (BY MS. COLLINS) Sure.
 8          A.        If you're asking me, based on my
 9   experience, if there is a centralized line that
10   anyone could have sent this message to me and it
11   said Karl, I would say I've not experienced that.
12          Q.        Okay.
13          A.        If it says Karl, that would be the
14   person who sent it.
15                    MS. COLLINS:  Okay.  I'm going to
16          mark the next document as Exhibit 55,
17          please.  This starts with Bates No. 76243.
18                    (Exhibit 55 marked).
19          Q.        (BY MS. COLLINS) Just let me know
20   when you're finished reviewing it.
21                    Okay.  Have you seen this document
22   before?
23          A.        I have.
24          Q.        Okay.  Earlier when we were talking
25   about Exhibit No. 52, and that was the letter from
```

LEXITAS - TENNESSEE
(615) 655-0073

```
 1   District Attorney General Finney, had you seen a
 2   copy of this affidavit?
 3             A.        I would say in and about the same
 4   time.
 5             Q.        Okay.  All right.
 6             A.        Between June the 2nd and the date
 7   of this letter, June 27th, I was aware that there
 8   had been three search warrants for additional
 9   information around Sean Williams, and the one that
10   you provided me is access to the computers, USB
11   drives, anything that was taken from Sean Williams
12   apartment the night after the -- the search warrant
13   that was issued for his apartment after ████████
14   ██████ fell out the window.
15             Q.        Okay.  And that was September 19th,
16   2020.
17             A.        That is my understanding.  I was
18   not here at that time.
19             Q.        Okay.  And in this affidavit, it
20   was discussed that on September 19th, 2020 that
21   Officer Seth Roberts was flagged down by individuals
22   downtown who alerted him to a female lying on the
23   sidewalk, which was later identified as ████████
24   ██████, correct?
25             A.        Are you looking at Item No. 4 on
```

```
1    the second page?

2              Q.        Yes.

3              A.        Yes, ma'am.

4              Q.        Okay.  And in Item No. 5 on the

5    next page, it listed that between June 20th, 2020 --

6    or June 2nd, 2020 and November 23rd, 2020, JP --

7    JCPD received at least three additional complaints

8    of alleged sexual assaults.

9                        In all three complaints, the female

10   victims reported that while at the apartment of Sean

11   Williams they woke up and they had been assaulted,

12   correct?

13             A.        That is what I understand from

14   reading this.

15             Q.        Okay.  And between June 20th,

16   2020 -- or June 2nd, 2020 and November 23rd, 2020,

17   no indictments had been issued against Sean Williams

18   for sexual assault regarding these three complaints,

19   had they?

20                       MS. TAYLOR:  Object to the form.

21             A.        I was not here at that time.

22             Q.        (BY MS. COLLINS) Okay.  You don't

23   have any knowledge that there were, do you?

24                       MS. TAYLOR:  Object to the form.

25             A.        I don't -- I don't know.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.        (BY MS. COLLINS) To your knowledge,
 2    to date, have any indictments been issued against
 3    Sean Williams by Johnson City with respect to those
 4    complaints that are listed in Item No. 5, the three
 5    complaints of alleged sexual assault?
 6                    MS. TAYLOR:  Object to the form.
 7          A.        Can you repeat the question again?
 8          Q.        (BY MS. COLLINS) Sure.
 9                    MS. COLLINS:  Can you repeat the
10              question?
11                    COURT REPORTER:  To your knowledge,
12              to date, have any indictments been issued
13              against Sean Williams by Johnson City with
14              respect to those complaints that are listed
15              in Item No. 5, the three complaints of
16              alleged sexual assault?
17                    MS. TAYLOR:  Object to the form.
18          A.        Not to my knowledge.
19          Q.        (BY MS. COLLINS) Okay.  And I
20    should say have any indictments been issued by the
21    District Attorney, to your knowledge?
22          A.        We are sealed off from that, and I
23    wouldn't -- if it had, I would not have any
24    knowledge of that, unless it had been made public.
25          Q.        Okay.  Before you got sealed off
```

1    from it, no indictments were issued, to your

2    knowledge, by the District Attorney's Office

3    regarding those three complaints in 2020, were they?

4              A.        I don't have any knowledge of that.

5              Q.        Was this Affidavit in Support of

6    Search Warrant, was this one of the reasons why you

7    ultimately hired Mr. Daigle?

8              A.        No.  The Daigle report was complete

9    well before this was completed.  The Daigle report

10   was complete -- we received the first draft on

11   July 10th -- excuse me.  We hired Daigle on August

12   the 2nd of 2022.  So, no, this would have had

13   nothing to do with hiring Daigle.

14             Q.        Okay.  When you received this

15   report, you received the -- you had received the

16   Daigle report just after this, correct -- or just

17   before this in the prior year.  July 10th, 2022 was

18   when you received the Daigle report.

19                       MS. TAYLOR:  Object to the form.

20             Q.        (BY MS. COLLINS) Is that correct?

21             A.        No.

22             Q.        What -- when did you receive it?

23             A.        We received the Daigle Report on --

24   the first draft of the Daigle Report on July 10th,

25   2023.

```
1          Q.      Okay.  That was the one that was
2    the final version, July 10th, 2023.
3          A.      Correct.  I'm sorry.
4          Q.      Okay.  So you had this before the
5    Daigle report was finalized.
6                  MS. TAYLOR:  Object to the form of
7            the question.
8          A.      I don't know when he finalized it.
9    I will tell you when we received it, but I don't
10   know when he completed the report.
11                 MS. COLLINS:  Okay.  Let's mark the
12           next document as Exhibit 56, and this starts
13           at Bates No. 66540.
14                 (Exhibit 56 marked).
15         Q.      (BY MS. COLLINS) Okay.  You've seen
16   this report, correct?
17         A.      Yes, ma'am.
18         Q.      And down at the bottom of it it's
19   dated July 10th, 2023.
20         A.      Yes, ma'am.
21         Q.      And this is the final version of
22   the report, correct?
23         A.      Let me just look through to make
24   sure.
25                 Based on me knowing where there was
```

```
1    one error in the report that had been corrected in
2    this copy, I would say this is our final report.
3              Q.      Okay.  Where is the error that
4    you're referring to?
5              A.      On Page 5 at the top, the first
6    word is Peters.  His name was misspelled in the
7    first draft that we received.
8              Q.      Okay.
9              A.      And there were other edits that had
10   to be made in terms of typos, form, nothing of
11   content, that were made in -- the first time that I
12   looked at the report.  So based on that one having
13   been corrected now, I would say that is the final
14   draft that we received.
15             Q.      Okay.  Now, if you could just set
16   that aside for just a moment --
17             A.      Sure.
18             Q.      -- I'm going to go through a few
19   other things.
20                     Did you approve this, the Daigle
21   report, before it was issued and disseminated to the
22   public?
23             A.      I would not say I approved it.  I
24   reviewed it.
25                     MS. COLLINS:  Okay.  I'm going to
```

```
 1              mark the next set of documents as

 2              Exhibit 57, and these start at 139814.

 3                    (Exhibit 57 marked).

 4         Q.        (BY MS. COLLINS)  Okay.  Is this a

 5    copy of your calendar, the first page?

 6         A.        Yes, ma'am.

 7         Q.        All right.  And if you could turn

 8    to the next page, is that your handwriting?

 9         A.        Yes, ma'am.

10         Q.        And just flipping through this, are

11    these notes that you created and provided to the

12    City's attorneys?

13         A.        Yes, it appears to be.  I would

14    look through every page just to make sure, but I

15    would say, based upon just flipping through them,

16    they appear to be my notes that I provided to our

17    attorneys.

18         Q.        All right.  If you could turn to --

19    and I'm going to refer to the Bates number at the

20    top of the page.

21         A.        So I'm not familiar with the term

22    Bates.

23         Q.        The numbers at the top of the page,

24    those numbers.

25         A.        So if it says City dash, is that a
```

1    Bates number?

2         Q.      Yes.

3                 I'm just going to refer to the

4    numbers.  They're in sequential order.  So I'm just

5    going to go through some, but I'm going to be going

6    out of order and asking you to flip around.

7         A.      Okay.  Thank you.

8         Q.      If you could turn to Page 139814,

9    that's the first page, was this the first meeting

10   that you had with Sunny, Joy, and Keisha about

11   hiring Mr. Daigle?

12        A.      No.

13                Excuse me.  Wait just a minute.

14   Let me -- let me look at the dates again.  I'm

15   getting my years confused.  So I apologize.

16                Yes.

17        Q.      Okay.

18        A.      August -- they're copied weird.

19   This date is July 1, 2022.

20                Are we looking at the same one?

21        Q.      July 21st, 2022.

22        A.      Yes, ma'am.  Yes.

23        Q.      Okay.  Now, if you could turn to

24   Page 139814 -- oh, we were just on that one.  Sorry.

25                139 -- 138549.  Wait a second.

Lexitas - TENNESSEE
(615) 595-0073
#: 6995

```
 1    Strike that.  I'm not even introducing that one.

 2                    Let's go to 139816.  This was the

 3    next meeting that you had.

 4                    MS. TAYLOR:  I'm going to move over

 5         here, counsel, so I can make sure she's

 6         looking at the right pages.

 7                    MS. COLLINS:  Sure.

 8         Q.        (BY MS. COLLINS) Okay.  So we went

 9    through -- you had the initial meeting on 7/21, and

10    then the next meeting here shows a calendar entry on

11    August 3rd.

12                    Does that sound right?  And that's

13    139816.

14         A.        Yes, ma'am.

15         Q.        All right.  If you could flip back

16    to 139815 for the 7/21 meeting, can you read what

17    the major concerns were that were discussed?

18         A.        So that says Mayor.

19         Q.        Okay.  Mayor concerns.

20         A.        So that was actually not a part of

21    the conversation.  This was a conversation with our

22    Mayor.  I think I had told you earlier that I meet

23    with him every two weeks.  So it was a conversation

24    with the Mayor that we wanted to show transparency,

25    and then there were other updates that I provided.
```

Lexitas-TENNESSEE
(615)595-0073

```
 1    So those first few comments were around a meeting
 2    that I had with the Mayor.
 3           Q.       Okay.  The -- so where you note a
 4    Mayor concern, where it says, "Lack of
 5    transparency," did that have anything to do with the
 6    JCPD?
 7           A.       I can't recall.
 8           Q.       Okay.  And where you noted,
 9    "Suspend without pay or with pay," did that have
10    anything to do with the JCPD?
11           A.       I can't recall.  I can't recall
12    exactly.
13           Q.       Okay.  And below that it says,
14    "Victims," and you have goal written.
15                    What is it -- what did you write
16    below that?
17           A.       I wrote -- it says, "Victims,"
18    underline, "Goal," underline.  "We want to be out in
19    the open" -- I apologize.  I can't read my own
20    writing.  I can't read it.  "Acting, air grievances,
21    let them tell me."  This is going back to having
22    listening sessions with people who had concerns
23    about Sean Williams and about what he had done in
24    the community.
25           Q.       Okay.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          A.        And then it says, "Listening
 2    sessions, one or two in August, anticipate having 25
 3    or so people attend those meetings."
 4          Q.        Okay.  And did that occur?
 5          A.        Yes, ma'am.
 6          Q.        Okay.  And if you could, turn to
 7    139818.
 8          A.        Yes, ma'am.
 9          Q.        This is a calendar entry for
10    January 19th, 2023.
11          A.        Yes ma'am.
12          Q.        Did you have a meeting with Eric
13    Daigle on this date?
14          A.        Yes, ma'am.
15          Q.        Okay.  And the next Page 139819,
16    are these notes from that meeting that you had with
17    Eric Daigle?
18          A.        Yes, ma'am.
19          Q.        Was that meeting on Zoom?
20          A.        Either Zoom or Teams.  I don't
21    recall which one.
22          Q.        Okay.  And the first item you list
23    is documentation, and you have 18/19/20.
24                    What does that refer to?
25          A.        The years 2018, 2019, and 2020.
```

Lexitas - TENNESSEE
(615) 595-0073

1      Q.      Okay.  And you wrote what appears
2  to say, "Documents are horrible, fragmented."
3              What does that mean?  What does
4  that refer to?
5      A.      As I mentioned earlier, many of the
6  conversations with Daigle were around record -- the
7  way we documented cases and the way we kept records
8  and where we stored them and that they were not
9  centrally located.  And he spent a great deal of
10  time talking about how bad the record -- our record
11  keeping of investigations was, considering we had
12  two different systems that we managed and highly
13  recommended that we consolidate and that we improve
14  that system.
15      Q.      Okay.  And going down a bit, it
16  looks like you wrote, "Late October/November."  You
17  have a little dash sign, "Interview forensic."
18              What is that about?
19      A.      I don't recall.
20      Q.      You made a note, it says, "Worst
21  ever seen."
22              What does that refer to?
23      A.      The record keeping, the interview
24  notes, the investigative reports.  It was the worst
25  he'd ever seen.

TENNESSEE
(615) 595-0073

```
 1        Q.      Daigle had ever seen?

 2        A.      Yes, ma'am.

 3        Q.      And you wrote down, "Need the rest

 4   of case file."

 5                Was he missing case files?

 6        A.      He was missing parts of case files.

 7        Q.      Okay.  And it looks like you wrote,

 8   "Really concerned about sexual assault and rape

 9   investigations."

10                What was that about?

11        A.      About getting those files intact,

12   is my recollection.

13        Q.      And at this point in time, in

14   January of 2023, he had already had access to the

15   JCPD files since 2022, right?

16        A.      I don't know if he obtained any

17   more records after we had this meeting.  So I can't

18   speak to whether or not he had all of the records at

19   that point.  I know that he came and did interviews

20   in December of 2022.  But as of this date, I don't

21   know if he received any more data.

22        Q.      Okay.  But after you hired him in

23   the mid part of 2022, Johnson City worked to give

24   him access through a VPN, I believe, to whatever

25   online documents it had.
```

```
 1                    And they also uploaded some

 2   documents that he was requesting access to, correct?

 3                    MS. TAYLOR:  Object to the form.

 4        A.         Yes.  He also obtained records when

 5   he came for a visit in December of 2022, and then I

 6   recall he still may have been trying to get records

 7   after that point.

 8        Q.         (BY MS. COLLINS) Okay.  So where it

 9   says, "Cannot get data," and you have that in a

10   parenthetical, what is -- what is that about?

11        A.         He continued to emphasize that he

12   could not get all of the data --

13        Q.         Okay?

14        A.         -- on the investigations.

15        Q.         And you wrote down, "Most

16   concerning cases."  You wrote, "John, victim

17   interviews."

18                    What does that mean?

19        A.         I don't remember.

20        Q.         And then you had in quotation

21   marks, "This is terrible, case files are

22   damaging/pulling together."

23        A.         So he said if he were trying to

24   just walk in and say I want a case file for this

25   case, he would not be able to successfully pull all
```

Lexitas TENNESSEE
(615) 595-0073

1    the data he needed together to be able to have

2    complete information.

3        Q.        And at that time, was that a

4    practice of the JCPD, to keep files in that manner?

5                    MS. TAYLOR:  Object to the form.

6        A.        The only knowledge that I had of

7    this was what he was saying to me that day.  I had

8    no prior knowledge of any -- any way that the City

9    stored records, kept records, nor did I have a

10   comparable from any other city that I had worked in

11   to know if what he was saying was practice or not.

12       Q.        (BY MS. COLLINS) Okay.  Did you

13   discuss with anyone in leadership at the JCPD

14   whether or not that was their practice, to keep

15   files in that manner?

16       A.        I did not ask that specific

17   question.  I asked questions about -- about how can

18   we improve and what can we do to make it better.

19       Q.        Okay.  But you did describe earlier

20   a practice of keeping the CID files segregated from

21   the regular files, correct?

22       A.        I came to learn that there was two

23   different record keeping systems.

24       Q.        Okay.  And, in fact, some files

25   were kept in a paper file, right?

```
 1                    MS. TAYLOR:  Object to form.
 2          A.        I don't -- I assumed, based upon
 3    what Daigle provided, that there was files in every
 4    form.
 5          Q.        (BY MS. COLLINS) And some of the
 6    paper files were shredded; isn't that correct?
 7                    MS. TAYLOR:  Object to the form.
 8          A.        The information I have is what
 9    Daigle provided.  I don't know if that was after
10    they were scanned in.  I don't have enough
11    information to know at what point in time after they
12    had been scanned in.  I don't know enough about
13    that.
14          Q.        (BY MS. COLLINS) Okay.  So the
15    comment that, "This is terrible, case files," that
16    is a quote made by Daigle; is that correct?
17          A.        That's correct.
18          Q.        And on the next page, 139820, you
19    have, "Shred files."
20                    What is that about?
21          A.        I think I just shared with you that
22    he said that some files were shredded.  I didn't
23    know the context of at what point in the case they
24    were shredded.
25          Q.        At the top of the page it says,
```

Lexitas - TENNESSEE
(615) 691-7307

1    "Five or six years paperless files."

2                         What does that mean?  What does

3    that refer to?

4           A.      I don't -- I don't know, other than

5    what it exactly says.

6           Q.      Okay.  Do you know what you -- in

7    the statement above that, it looks like it says,

8    "Facture or fractured files."

9                         Do you know what that means or

10   refers to?

11          A.      I think that files were in

12   different locations and were fractured, in terms of

13   being stored in evidence, being stored some in CID.

14          Q.      And going down on the page a little

15   bit, you had a note to, "Invest in infrastructure

16   right away, protocol, best practices, state

17   statute."

18                        Does that say underage?

19          A.      Where are you at?

20          Q.      Sure.  I'm about midway down

21   through the page.

22          A.      I can't read my writing.

23          Q.      Okay.  And you have,

24   "Accreditation?  National police."

25                        What does that refer to?

LEXITAS - TENNESSEE
(615) 595-0073

```
 1          A.      I was writing down words that he
 2   was saying.
 3          Q.      Okay.  Was accreditation an issue
 4   at this point in time?  Did he raise that as an
 5   issue?
 6          A.      No.  We were accredited.
 7          Q.      Do you know if accreditation can be
 8   lost?
 9          A.      Yes.
10          Q.      Okay.  At any point in time, has
11   that been in jeopardy, that you know of?
12          A.      Not that I know of.
13          Q.      And it looks like you wrote,
14   "C-l-o-s and victim did not want to participate."
15                  What does that refer to?
16          A.      Again, I was taking notes as he was
17   talking.  This was a year and three months ago.  I
18   think he was giving us an overview of his findings,
19   and I was taking notes.  I don't know if you notice,
20   but when my notes tend to be in sentences, it's
21   because I'm just writing down what somebody else is
22   saying, as opposed to what you see with some of my
23   other notes, which is just words.  So I was writing
24   down words that he was saying.
25          Q.      Okay.  Down at the bottom of the
```

Lexitas-TENNESSEE
(615) 595-0073

```
 1    page, you have a one and training beside it.

 2                      What was that about?

 3         A.         He recommended that we provide

 4    additional training.

 5         Q.         Okay.  And No. 2, it says, "Case

 6    files by officers and."

 7                      What is that word beside it?

 8         A.         I don't know.

 9         Q.         Okay.  Do you know what it says

10    down below it on -- does it say, "On bias"?

11         A.         I'm not the best speller either.  I

12    don't know if it's basis, bias.

13         Q.         Do you know what the word below

14    that is?

15         A.         I don't.

16         Q.         Okay.  These are your notes.  You

17    just can't read your handwriting.

18         A.         That's right.

19         Q.         Okay.  You have in parentheses

20    bias.

21                      Did he -- did Mr. Daigle discuss

22    bias with you?

23         A.         He said that word.

24         Q.         Okay.  You also wrote down,

25    "Laziness.  Arrest them.  No reason to blame process
```

Lexitas-TENNESSEE
(615)595-0073

1    not doing justice."

2                    Did he raise the fact with you that

3    he thought the JCPD officers were lazy?

4                    MR. RADER:  Object to the form.

5                    MS. TAYLOR:  Object to form.

6         A.        Can you repeat the question?

7         Q.        (BY MS. COLLINS) Well, I was asking

8    you about the word you wrote, laziness, and it has

9    out beside it, "Arrest them.  No reason to blame

10   process not doing justice."

11                   So did Mr. Daigle raise with you

12   that he felt like the officers were being lazy?

13                   MS. TAYLOR:  Object to the form.

14        A.        I don't recall the context.

15   He's -- I don't recall the context.  He said -- the

16   word is laziness.

17        Q.        (BY MS. COLLINS) Okay.  And on the

18   next page, 139821, he wrote -- or you wrote,

19   "Closed," and then something, "victim."

20                   Does that say convinced?

21        A.        I don't -- I don't know.  I

22   apologize.  I can't read my writing.

23        Q.        Okay.  And down below that you

24   wrote, "Leadership problem, investigate/close case.

25   Not to participate.  Who are you to decide this?"

Lexitas  (615)595-0073

1        A.        I was writing down words that he

2    was saying.

3        Q.        Okay.  So was there a discussion

4    about that it wasn't the officer's decision to close

5    the case?

6        A.        There was no discussion in this

7    meeting.  Mr. Daigle was just talking.  So when you

8    say was there a discussion, he was just talking.  So

9    there was no -- it wasn't as if we were asking

10   questions back of him.  The people in the room were

11   not police officers, didn't know anything about --

12   other than just him saying words.  And so I was

13   taking notes of the words that he was saying.

14       Q.        Okay.  So Mr. Daigle was talking

15   about that because victims were not participating in

16   their cases, and he said, "Who are you to decide

17   this?"

18                 Those are his words, right?

19                 MS. TAYLOR:  Object to the form.

20       A.        That's what I wrote down as his

21   words yes.

22       Q.        (BY MS. COLLINS) And then you wrote

23   down, "Love/victim was treated, cultural issues."

24                 What is that about?

25       A.        That's words that Daigle said.

Lexitas - TENNESSEE
(615) 595-0073

```
1        Q.      What do you recall it being about?
2        A.      I think love is not the right word.
3   I think it's Lowe.
4        Q.      Okay.
5        A.      And he was reciting what another
6   investigator had said.
7        Q.      Okay.  Who was the investigator
8   that said that?
9        A.      If I recall, it would be Cara Lowe.
10       Q.      Okay.  Do you know which victim in
11  particular she was talking about?
12       A.      We never talked about victims, and
13  we never exchanged names of victims within any
14  discussion with Daigle.
15       Q.      You wrote down that he said, "No
16  training."
17               Was it his perception that officers
18  were not well trained at the JCPD?
19               MS. TAYLOR:  Objection to form.
20       Q.      (BY MS. COLLINS) Was that what was
21  conveyed?
22       A.      I don't know.
23       Q.      What do you recall?
24       A.      I don't recall if he was talking
25  specifically about a case or that she had said this,
```

Lexitas - TENNESSEE
(615) someone-0073
(615) 595-0073

```
 1   that she specifically had said she received no
 2   training.  I don't recall.
 3           Q.      You also wrote down, "Victim as
 4   accused."
 5                   What does that refer to?
 6           A.      I don't recall.
 7           Q.      Well, these are your notes.
 8           A.      I agree.
 9           Q.      Do you -- you don't recall
10   anything, even looking at your own notes, of what
11   was discussed a little over a year ago?
12                   MR. RADER:  Object to form.
13                   MS. TAYLOR:  Object to the form.
14           A.      I don't recall.
15           Q.      (BY MS. COLLINS) Did Mr. Daigle
16   eventually put in his report that the victims of
17   sexual assault cases were treated the same as the
18   suspects or as the accused?
19                   MS. TAYLOR:  Object to the form.
20           A.      Without looking through the entire
21   report, I would not be able to verify that.
22           Q.      (BY MS. COLLINS) Well, you would
23   agree that that would be a problem if a victim is
24   being treated as if they were accused of doing
25   something wrong.
```

LEXITAS - TENNESSEE
(615) 515-0073

```
1            A.       Absolutely.

2                     MS. TAYLOR:  Object to the form.

3            Q.       (BY MS. COLLINS) And you also wrote

4    operation, "O-p-e-r-a," it looks like, "t/structural

5    problem."

6                     Did he discuss that operationally

7    the JCPD had a structural problem?

8                     MS. TAYLOR:  Object to the form.

9            A.       I don't know the context.  I see

10   the words written on the piece of paper, but I can't

11   remember the context.

12           Q.       (BY MS. COLLINS) Okay.  You also

13   wrote, "Good old boys."

14                    Do you recall what that refers to?

15           A.       I recall him saying that.

16           Q.       Okay.  What is your understanding

17   when someone is referring to a good old boy system,

18   what that refers to?

19                    MS. TAYLOR:  Object to the form.

20                    MS. BEREXA:  Same objection.

21                    MR. RADER:  Same objection.

22           A.       Doing it the same way all the time,

23   following along with whatever somebody did before,

24   not questioning the system.

25           Q.       (BY MS. COLLINS) Can it also refer
```

LexitasTENNESSEE
(615) 595-0073

```
 1    to a pattern of ingrained sexism?

 2                    MS. TAYLOR:  Object to the form.

 3                    MR. RADER:  Same objection.

 4         A.         That would absolutely not be the

 5    way that I would take it.

 6         Q.         (BY MS. COLLINS) And you have

 7    listed training as a -- with a ONE beside it.  Two,

 8    policies and procedures.

 9                    And three, what does that say with

10    D.A.?

11         A.         I don't see "with" at all.

12                    Do you see -- can you tell me on

13    the page --

14         Q.         Sure.  Down at the bottom by the

15    three in a circle.

16         A.         So which question are you asking

17    me?

18         Q.         Sure.

19                    What is that?  What does that word

20    say?  It says something with D.A.

21         A.         Interact.

22         Q.         Okay.  And then you have out beside

23    that, "D.A. told us to close the case, not want to

24    cooperate."

25                    And then what is the word out
```

```
 1    beside that?  Is it affidavit?

 2            A.        I don't know.

 3            Q.        Okay.  Do you recall who did not

 4    want to cooperate, where you say, "D.A. told us to

 5    close the case, not want to cooperate"?

 6                      MS. TAYLOR:  Object to form.

 7            A.        Do I recall who was -- he was

 8    talking about?

 9            Q.        (BY MS. COLLINS) Yes.

10                      MS. TAYLOR:  Object to the form.

11            A.        This conversation was very general

12    in nature.

13            Q.        (BY MS. COLLINS) Okay.

14            A.        So I don't recall specifically.

15            Q.        Do you recall generally where it

16    says, "D.A. told us not -- D.A. told us to close the

17    case, not want to cooperate."?

18            A.        My recollection of that is that he

19    said in some cases our investigators would call the

20    D.A., they would say close the case because the

21    victim did not want to cooperate.

22            Q.        Okay.  And where it says, "Just

23    called the D.A.," what is -- is that referring to

24    the same scenario?

25            A.        I believe so.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1        Q.        Okay.  And by the number four with

 2   the circle around it, it looks like you wrote,

 3   "Absolute immunity, closed system, X, cleared

 4   guidelines," what does that refer to?

 5        A.        He said the guidelines helped us --

 6   he -- you know, he would go back and forth with the

 7   fact that the guidelines were very helpful in terms

 8   of providing protocol around how to clear cases.

 9        Q.        Okay.  Do you recall who has

10   absolute immunity, what that refers to?

11        A.        You know, I'm sorry that I can't

12   read my own notes, and I was jotting -- as I

13   mentioned before, I take notes, but a lot of that is

14   for my -- the way that I pay attention and not

15   because I go back and refer to them for the purposes

16   of any other reason.

17        Q.        And going to the next page, 139822,

18   in Section No. 5 you wrote, "Not/pre in view rooms,"

19   and then you had in parentheses, "Go to them," and

20   then you wrote out, "Victim needs to come."

21                  What does that refer to?

22        A.        He was recommending that the

23   interview rooms that we interview victims in was not

24   adequate.  My recollection of all of that is that we

25   need to improve the space that we provide victims
```

Lexitas - TENNESSEE
(615) 595-0073

1    when they come in --

2              Q.        Okay.

3              A.             -- to tell us about their assault.

4              Q.        Okay.  At that time, the victims

5    were being interviewed in the same room that was

6    being used to interrogate suspects; isn't that

7    correct?

8              A.        That's my understanding.

9              Q.        Okay.  And so the recommendation

10   was that there's a softer room for victims, as

11   opposed to the harder room, which has shackles and

12   all that other stuff for suspects.

13             A.        Yes.

14             MS. TAYLOR:  Object to the form.

15             Q.        (BY MS. COLLINS) Now, where you

16   wrote, "Go to them, victim needs to come," did he

17   recommend that the investigating officers go to the

18   victims, rather than requiring the victims to come

19   in to the department, if they felt more comfortable

20   doing that?

21             A.        I don't recall.  I don't recall.

22             Q.        Okay.  And you also wrote down in

23   No. 6, "Suspect interviews closed without talking to

24   suspect, case is not strong, and always interview

25   the suspect.  Are you kidding me?"

```
 1                    So did Daigle say that cases were
 2      closed without talking to the suspect?
 3              A.       Yes, ma'am.
 4              Q.       And did he make that statement
 5      that's in quotation marks, "Are you kidding me,"
 6      with respect to closing a case without interviewing
 7      the suspect?
 8              A.       I can't remember if he made that
 9      statement or if he said one of the folks that he
10      talked -- one of our investigators that he talked to
11      said that.
12              Q.       Okay.  And then you wrote down
13      below that, "Damaging."
14                    Is that -- did he convey that that
15      was a damaging thing to do, to close a case without
16      even talking to the suspect?
17                    MS. TAYLOR:  Object to the form.
18              A.       I couldn't -- I mean, I want to --
19      I want to be more helpful.  But when I look at this
20      and I am under oath, I can't swear to something that
21      I can't remember.  And I -- I want to -- I want to
22      provide information, be truthful.  But when I read
23      words and I can't remember the context in which they
24      said, I can't swear under oath to them.  That is a
25      road -- a word I wrote down.  I can't remember what
```

```
1    I was thinking.  I can't remember.
2         Q.        (BY MS. COLLINS) So if you can't
3    remember, it's subject to interpretation that it
4    would have been damaging to close an investigation
5    without interviewing the suspect.
6                   MS. COLLINS:  Object to the form.
7                   MR. RADER:  Object to the form.
8                   MS. BEREXA:  Object to the form.
9         A.        Would you ask the question again?
10        Q.        (BY MS. COLLINS) Sure.
11                  What you just stated, since you
12   can't remember what you meant by writing the word
13   damaging, that's an issue of fact as to whether or
14   not it's damaging to close a case without even
15   interviewing a suspect.
16                  MR. RADER:  Object to the form.
17                  MS. TAYLOR:  Object to form.
18                  MS. BEREXA:  Object to the form.
19        A.        I think that's what he thought.  I
20   didn't know enough about it to know.
21        Q.        (BY MS. COLLINS) Okay.  So Daigle
22   did think that it was damaging to close a case
23   without interviewing a suspect.
24                  MS. TAYLOR:  Object to the form.
25                  MS. BEREXA:  Objection to form.
```

LEXITAS - TENNESSEE
(615) 595-0073

```
 1                    MR. RADER:  Same objection.
 2         A.         That is what I would imagine that
 3    would mean.  I did not know enough to write that
 4    down, because I don't know police protocol.
 5         Q.         (BY MS. COLLINS) And Daigle, who
 6    does know police protocol, said that it was damaging
 7    to close a case without even interviewing the
 8    suspect.
 9                    MS. BEREXA:  Object to the form.
10                    MR. RADER:  Object to the form.
11                    MS. TAYLOR:  Object to the form.
12         A.         That is what I wrote down.
13         Q.         (BY MS. COLLINS) And in number
14    seven you have, "Search warrant/, " it looks like,
15    "crimes."
16                    Is that it?  Is that what that
17    looks like to you?
18         A.         The word is crime.
19         Q.         Okay.  And then you wrote,
20    "Roofie."
21                    Is that what that says down below
22    that, roofie?
23         A.         I cannot spell.  So I don't --
24         Q.         Okay.  And you wrote, "Test
25    positive or does a search warrant, norm."
```

LEXITAS - TENNESSEE
(615) 595-0073

```
 1                    So did Mr. Daigle say something to
 2      the effect that you need to get a search warrant to
 3      see if someone tests positive for being roofied and
 4      that's the normal procedure.
 5                    MS. TAYLOR:  Object to the form.
 6           A.       I don't recall.
 7           Q.       (BY MS. COLLINS) And down below
 8      that it says, "Test for roofie, not once."
 9                    Did he say that not one single time
10      did he find evidence that the JCPD issued a warrant
11      to test to see if someone had been roofied?
12                    MS. TAYLOR:  Object to the form.
13           A.       I don't recall.
14           Q.       (BY MS. COLLINS) Have you gone back
15      to look and see if at this -- at the time of
16      January 19th, 2023, if the JCPD had ever tested for
17      roofies?
18           A.       No, ma'am.
19           Q.       Wouldn't that be important to know?
20                    MS. TAYLOR:  Object to the form.
21           Q.       (BY MS. COLLINS) If you're
22      evaluating whether or not people that have reported
23      sexual assault have gotten justice or received any
24      form of justice from the JCPD, wouldn't that be
25      important to know whether the JCPD had tested for
```

LexitasTENNESSEE
(615) 595-0073

```
1    roofies?

2                    MS. TAYLOR:  Object to the form.

3         A.        The purpose of the report was to

4    find ways that we could improve processes moving

5    forward.  I was not in the mindset, nor did I feel

6    like it was my responsibility -- my mindset was

7    around making sure that we were following protocol,

8    procedures to the best of our ability moving

9    forward.  When you see the notes taken throughout

10   the conversations, they always refer to what can we

11   do moving forward to improve.

12                    The reason for getting the

13   assessment done was to develop standard practices

14   and protocols so that we could improve the Johnson

15   City Police Department.

16        Q.        (BY MS. COLLINS) Okay.  Do you

17   think testing for roofies is a way to improve the

18   Johnson City Police Department?

19                    MS. TAYLOR:  Object to the form.

20        A.         I honestly don't know, and I'd -- I

21   have to tell you that working with police officers,

22   there is so much information that I don't know what

23   best practices are.  I have to rely on the experts.

24   I have to rely upon our investigators.  And so when

25   I'm asked questions about best practices, I am
```

```
1    not -- I don't know enough about this area on what

2    should and shouldn't be done.  I'm taking

3    information, running it by our staff, trying to put

4    together a plan to improve the way things are done,

5    as I've done throughout my whole career.

6             Q.       (BY MS. COLLINS) And hiring

7    Mr. Daigle was a way to improve on the way things

8    are being done, correct?

9             A.       Yes, ma'am.

10                      MS. TAYLOR:  Object to the form.

11                      MR. RADER:  Same objection.

12            Q.       (BY MS. COLLINS) Okay.  Down below

13   that you wrote, "Organizationally not operating at

14   the level, internal/alleged misconduct."

15                      What does that refer to?

16            A.       I don't -- I can't recall the

17   context that he said that in.  Those are words that

18   he said.

19            Q.       Okay.  So Mr. Daigle said, on

20   January 19th, 2023, that internally there was

21   alleged misconduct; is that right?

22            A.       Those are the words that I wrote

23   down that he said.  He would have to testify to

24   those words.

25            Q.       What is that word below that?  Is
```

```
 1    that Libby?  Lobby?  What is that?

 2         A.        It looks like lobby to me.

 3         Q.        And you wrote, "Department of

 4    Justice litigates, what was -- what was need has not

 5    provided."

 6                   What did -- what did you -- what

 7    did that refer to?  What did you mean by that?

 8         A.        I don't know.  I can't recall.

 9         Q.        And the last statement on that page

10    says, "Stuff that is bad is bad."

11                   Is that something that Mr. Daigle

12    said?

13         A.        Yes, ma'am.

14         Q.        Okay.

15         A.        He made a comment that he was

16    sampling the files at that time.  He was not doing

17    all of the files that had been provided.  Based on

18    what we had provided him, which was from the

19    beginning of Chief Turner's career as chief, January

20    of 2018, that there were good reports.  But he said

21    what was bad was bad.

22         Q.        Okay.  And on the next page you

23    wrote, "No one guided or lead or led."

24                   What was that about?

25         A.        If you look at the two sentences
```

Lexitas TENNESSEE
(615) 595-0073

```
1    above, he says, "Not bad intentionally, not doing

2    bad things intentionally, no one guided or led, did

3    not feel like people were waking up and wanting to

4    do bad."

5         Q.    Okay.  Is that something that

6    Mr. Daigle said?

7         A.    Yes, ma'am.

8         Q.    Okay.  And there were three things

9    that you listed -- well, above that you wrote,

10   "Policy and procedures needed an overhaul," and

11   three things:  "Policy."  Two:  "Training."  Three:

12   "Leadership."

13              What do you have written out by

14   policy?

15        A.    I can't read that word.  I know

16   that I came to learn that our general orders were

17   very thick, and some of them had overlap of

18   information, one that was conflicted with the other.

19   As a result, we hired an attorney, a staff attorney,

20   to go in and to resolve those issues.

21        Q.    Who is the staff attorney you

22   hired?

23        A.    Blake Watson, not to be confused

24   with Blake Shelton.

25        Q.    Got it.
```

```
 1                   MS. TAYLOR:  They don't even look
 2         alike.
 3         Q.        (BY MS. COLLINS) On the next page,
 4   139824, you have Cara Lowe's name written; is that
 5   right?
 6         A.        That's right.
 7         Q.        Did you speak with her?
 8         A.        I did.
 9         Q.        Okay.  Was anyone else present?
10         A.        No.
11         Q.        Where did you speak with her?
12         A.        My office.
13         Q.        Now, where you have CID, what does
14   that say out beside CID?
15         A.        It says, "CID held."
16         Q.        Okay.  And then you wrote out
17   beside that, "Told what to say."
18                   What does that refer to?
19         A.        So do you understand that this is a
20   separate meeting than the Daigle meeting?
21         Q.        Yes.
22         A.        Okay.
23         Q.        You just said that you met with her
24   by yourself in your office.
25         A.        Yeah.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1        Q.      So I figured that out.

 2                So what does that refer to?

 3        A.      She had said that she was leaving

 4   the department and going to work for the TBI, and

 5   she wanted to do an exit interview.  So this -- to

 6   put it in context, this is the notes that I took

 7   from her exit interview.

 8        Q.      Okay.

 9        A.      So I'm sorry.  What was your

10   question again?

11        Q.      Sure.

12                As to where it says, "CID held,

13   told what to say," what does that refer to?

14        A.      She -- she was telling me about a

15   specific incident that had occurred where a victim

16   was being held in a hotel, and she was interviewing

17   them in -- in the hold room.

18        Q.      Okay.  What was -- what did she --

19   did she have a problem with them being interviewed

20   in the hold room?

21        A.      Yes.  That was -- that was what my

22   takeaway was from it.

23        Q.      Okay.  What was -- what did she

24   discuss about the victim being interviewed in the

25   hold room?
```

Lexitas - TENNESSEE
(615) 595-0073

```
1           A.      That she felt like it was not a
2   good place to interview them.
3           Q.      Okay.  What does that refer to
4   where it says, "Told what to say"?
5           A.      My recollection from the
6   conversation was that, when she came out from
7   interviewing the lady, that some of her supervisors
8   had talked to her about what questions she should go
9   back in and ask.
10          Q.      Did she say who the supervisors
11  were?
12          A.      I can't recall if she did.
13          Q.      Did she say that -- did she recall
14  the victim's name in this case?
15          A.      No, and I don't know that she would
16  have told me the name.
17          Q.      Okay.  Where you wrote down, "Not
18  priority and not taken seriously," what does that
19  refer to?
20          A.      That's the words that she said to
21  me.
22          Q.      About?
23          A.      Victims.
24          Q.      And where you wrote down, "Don't
25  care, evil man, never," what does that refer to?
```

LEXITAS - TENNESSEE
(615) 595-0073
#: 6195

```
 1          A.        Kevin Peters.
 2          Q.        Ms. Lowe thought that Kevin Peters
 3     was an evil man?
 4                    MS. TAYLOR:  Objection to form.
 5                    MR. RADER:  Same objection.
 6          A.        That is what she said.
 7          Q.        (BY MS. COLLINS) What does the word
 8     "never" refer to?  What was the context of that?
 9          A.        I don't recall.
10          Q.        Okay.  And you wrote down, "Needed
11     help, no training, wanted to be good, story was
12     heard."
13          A.        These are things that she said to
14     me that I wrote down.
15                    MS. TAYLOR:  Let her ask a question
16          before you answer a non-question.
17          Q.        (BY MS. COLLINS) Okay.  So did
18     Officer Lowe say that she needed help and she didn't
19     receive training and she wanted to be a good
20     officer?
21          A.        That's what she said to me.
22          Q.        Okay.  And where you wrote down,
23     "Not recommend anyone coming here," was that
24     something that Officer Lowe stated, that she would
25     not recommend anyone coming to work for the JCPD, or
```

```
 1   was she referring to victims?

 2              MS. TAYLOR:  Object to the form.

 3        A.        I recall not recommending that

 4   anybody come work in CID.

 5        Q.        (BY MS. COLLINS) Okay.  And when

 6   you wrote -- when you wrote down, "Disregard

 7   victim," was that Officer Lowe's opinion that she

 8   relayed to you, that victims were disregarded?

 9              MS. TAYLOR:  Object to the form.

10        A.        That's my recollection.

11        Q.        (BY MS. COLLINS) Okay.  And where

12   you wrote, "Victim oriented/fail people," what did

13   you mean by that?

14        A.        I didn't mean anything.  I was

15   writing down her words.

16        Q.        Okay.  Well, what was your

17   impression of what her context was --

18              MS. TAYLOR:  Object to form.

19        Q.        (BY MS. COLLINS) -- when you wrote,

20   "Victim oriented/fail people."

21        A.        I'm sorry.  What was my --

22        Q.        What was your impression or

23   recollection as to what that means?

24              MS. TAYLOR:  Object to form.

25        A.        That was how she felt.
```

Lexitas - TENNESSEE
(615)595-0073

```
 1        Q.        (BY MS. COLLINS) That the JCPD

 2   fails people?

 3                   MS. TAYLOR:  Object to the form.

 4        A.        I'm sorry.  That the JPD fails

 5   people.

 6        Q.        (BY MS. COLLINS) That the JCPD

 7   fails people.

 8        A.        What was the question?

 9        Q.        Did Ms. Lowe, Officer Lowe, tell

10   you on her exit interview that it was her opinion,

11   after working in the CID, that the JCPD fails

12   people?

13                   MR. RADER:  Objection.

14                   MS. TAYLOR:  Object to the form.

15        A.        She -- my recollection is she was

16   not specifically talking about the Johnson City

17   Police Department as a whole.

18        Q.        (BY MS. COLLINS) What was she

19   talking about that failed people?

20                   MS. TAYLOR:  Object to form.

21                   MR. RADER:  Same objection.

22        A.        My impression was CID.

23        Q.        (BY MS. COLLINS) Okay.  So CID

24   fails people, was her opinion.

25                   MS. TAYLOR:  Object to the form.
```

Lexitas  TENNESSEE
(615) 595-0073
#6595

```
 1                     MR. RADER:  Object to the form.
 2          A.        That's the question I just
 3   answered.
 4          Q.        (BY MS. COLLINS) So the answer is
 5   yes?
 6                     MS. TAYLOR:  Object to the form.
 7                     MR. RADER:  Same objection.
 8          A.        I just said yes --
 9          Q.        (BY MS. COLLINS) Okay.
10          A.        -- in the prior question.
11          Q.        Appreciate it.
12                     Where you wrote, "Don Shepard," who
13   is Don Shepard?
14          A.        Don Shepard was a lieutenant in CID
15   for a while, and then he moved into another position
16   in the department under administration as a
17   lieutenant.
18          Q.        Does he still work there?
19          A.        No, ma'am.
20          Q.        Did he retire?
21          A.        I believe he retired on disability.
22          Q.        Okay.  And you wrote, "Don
23   Shepherd," and out beside that you wrote, "evil."
24                     Did Ms. Lowe state that she felt
25   Don Shepherd was evil?
```

```
 1           A.       Yes, ma'am.

 2           Q.       She also -- you also wrote here,

 3      "Kevin and Don hate each other."

 4                    Who does Kevin refer to?

 5           A.       Kevin Peters.

 6           Q.       Okay.  Is that something that she

 7      stated to you, that Kevin Peters and Don Shepherd

 8      hate each other?

 9           A.       Yes, ma'am.

10                    MS. TAYLOR:  Can we take a break

11              now that we're at the end of that?

12                    MS. COLLINS:  Let me just finish

13              the one sentence at the bottom.

14                    MS. TAYLOR:  Okay.

15           Q.       (BY MS. COLLINS) The last two

16      statements at the bottom, one looks like major

17      something or another, and street naming policies, is

18      that unrelated to, you know, what we've been talking

19      about with respect to the JCPD?

20           A.       Correct.  It's about Mayor Grandy.

21           Q.       Okay.  It's Mayor, not major.

22           A.       Yeah.

23                    MS. COLLINS:  All right.  Yeah, we

24              can take a break.

25                    VIDEOGRAPHER:  Off the record at
```

LexitasLegalTENNESSEE
(615)595-0073

```
 1            3:04.

 2                  (Off the record at 3:04 p.m.)

 3                  (On the record at 3:21 p.m.)

 4                  VIDEOGRAPHER:  Okay.  We're back on

 5            the record, and it is 3:21 on the fourth

 6            DVD.

 7   BY MS. COLLINS:

 8            Q.      Okay.  Ms. Ball, before the break,

 9   we were going over Exhibit No. -- whatever it is --

10   57, I believe; is that right?

11            A.      Yes.

12            Q.      I can write it down.

13                    Okay.  We are on Page 139825.

14                    Did you have another meeting with

15   Eric Daigle on February 15th, 2023?

16            A.      February 15th?

17            Q.      That's what your calendar --

18            A.      Oh, I thought you said

19   February 18th.

20            Q.      15th.

21            A.      Okay.  Yes, ma'am.

22            Q.      And the next page, are these your

23   notes from that meeting with Mr. Daigle?

24            A.      Yes, ma'am.

25            Q.      And you wrote down Sunny, Keisha,
```

Lexitas - TENNESSEE
(615) 595-0073
#: 6995

```
1    Cathy, that's you.
2                    Who was the other person that was
3    in attendance?
4         A.       Joy Baker.
5         Q.       Okay.  Now, what did you write?  It
6    looks like, "Walk a fine line," and it says,
7    "re-victimize."
8                    What did -- what was that about?
9         A.       I don't recall.
10        Q.       Okay.  Up above that it says -- you
11   wrote, "Department take measures to address and
12   meet."
13                   What measures was the department to
14   take?  Do you recall?
15        A.       I do not.
16        Q.       Okay.  It looks like it was also
17   discussed how the department closes cases and
18   victims interviews; is that right?
19        A.       Those are the words that I wrote
20   down.  Yes, ma'am.
21        Q.       Okay.  Do you understand that for a
22   victim of a crime of sexual violence, that the way
23   that they're talked to can be very re-traumatizing
24   and re-victimizing for that person?
25                   MS. TAYLOR:  Object to the form.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1                    MR. RADER:  Object to the form.

 2        A.        Yes, ma'am.

 3        Q.        (BY MS. COLLINS) Okay.  And, for

 4   example, if they're blamed for their assault, that

 5   can be very re-traumatizing for them.

 6                    MS. TAYLOR:  Object to the form.

 7                    MR. RADER:  Same objection.

 8                    Let me stop for just a second,

 9            because the court reporter asked me during

10            the break about these objections.  And when

11            we're speaking at the same time, I'm going

12            to just join in all of Emily Taylor's

13            objections for the rest of the day without

14            talking over her, so that we don't have to

15            do that, if that's okay for the court

16            reporter.

17                    Does anybody have a problem with

18            that?

19                    MS. BEREXA:  Can we say that for

20            all the defense, because I know sometimes

21            I'll throw it out there, and I'm sure you

22            can't get it all.

23                    MS. BAEHR-JONES:  I'm fine with

24            that, too.  That way we don't have five

25            people jumping in.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              MS. TAYLOR:  So if we do a unison
 2         objection and I'm objecting, you can just
 3         note that I'm objecting, correct?
 4              Is that what you meant?
 5              MR. RADER:  Yes.  Yes.
 6              MS. TAYLOR:  Any problem with that?
 7              MS. COLLINS:  No.  I thought that's
 8         how we were going to do it.  That's great.
 9              Can you repeat the question?
10              COURT REPORTER:  Sure.
11              MS. COLLINS:  I can't remember.
12              COURT REPORTER:  And, for example,
13         if they're blamed for their assault, that
14         can be very traumatizing for them.
15              MS. TAYLOR:  Object to the form.
16    A.         I understand how that could be the
17    case.
18    Q.         (BY MS. COLLINS) Isn't that an
19    issue that Mr. Daigle discussed with you all on
20    these phone calls, that the way a victim of sexual
21    violence or sexual assault is talked to can be very
22    re-traumatizing and triggering for them?
23              MS. TAYLOR:  Object to the form.
24    A.         He explained a lot about training
25    and opportunity and that he provided training for a
```

Lexitas - TENNESSEE
(615) 595-0073