1    lot of police departments around how to do this.

2    And so, yes, he talked a lot about how he went

3    across the country, provided training, and a lot of

4    it was around teaching police departments the

5    correct way to be able to understand people who have

6    been traumatized because of assault.  And there was

7    a lot of discussion around being able to work with

8    people to do that.

9         Q.       (BY MS. COLLINS) And, in fact, he

10   suggested that the officers needed to take training

11   on being trauma informed, right?

12                 MS. TAYLOR:  Object to the form.

13        A.       Yes, ma'am.

14        Q.       (BY MS. COLLINS) Okay.  And as a

15   result of Mr. Daigle's report, the department did

16   that.  They changed, I guess, its way of doing

17   business, and some of the officers went through that

18   trauma informed training so that they could talk to

19   victims in a more compassionate way.

20                 MS. TAYLOR:  Object to the form.

21        A.       So there is a thing called POST

22   certification that every police officer is required

23   to get.  Some of that includes trauma -- trauma

24   informed training, but we supplemented that.  So the

25   department had a budget for training.  That training

```
 1    was supplemented by the Commission after this

 2    recommendation to the tune of another $100,000 to

 3    supplement that training.

 4         Q.      (BY MS. COLLINS) Okay.  If you

 5    could turn to the next page, 139827, and this was

 6    also from your discussion, I guess, on 2/15 with

 7    Mr. Daigle; is that correct?

 8         A.      Yes.

 9         Q.      Okay.  And these are some of the

10    recommendations that he made with respect to things

11    that needed to be fixed.

12                 Is that a fair summary?

13                 MS. TAYLOR:  Object to the form.

14         A.      Yes.

15         Q.      (BY MS. COLLINS) Now, if you could

16    turn to Page 139828, you wrote down at the bottom --

17    it looks like it says, "Chief walking out the door,

18    plans for next chief before we release the report."

19                 What is that -- what is that about?

20    What does that refer to?

21         A.      By this time, I knew that Chief

22    Turner had planned to retire, and he asked the

23    question of whether -- we were talking about the

24    timing of releasing the report, and he asked the

25    question about what the plans were for the next
```

```
 1    chief and wanted to know whether or not we wanted to

 2    release the report before the chief -- the new chief

 3    was hired.

 4          Q.      Okay.  Who made the decision when

 5    the report was going to be released?

 6          A.      Daigle.

 7          Q.      Okay.  Did he make a

 8    recommendation, or how did that come about?

 9          A.      He recommended that -- and I'm

10    trying to recall.  There was a lot of conversation

11    around the release of the report.  A lot of the

12    meetings from this point forward were requesting

13    where he was on the report, what the timing was of

14    the report, and as we move forward, he talked about

15    different scenarios in which it could be released.

16          Q.      Okay.  Did you all have anyone with

17    like public relations within the City that also

18    worked on this?

19          A.      Yes.  The name that you saw before,

20    Keisha Shoun.

21          Q.      Okay.

22          A.      She is the Director of Public

23    Affairs, and she leads the department of

24    communications and marketing.

25          Q.      Okay.  Was she involved in that
```

1    aspect as to when the report would be released to

2    the community?

3           A.        Yes, ma'am.

4           Q.        Okay.  And now, on the next page,

5    139829, you wrote in a box.  It says, "Challenging

6    situation, stay with me."

7                     What is -- what does that refer to?

8           A.        I can't recall.

9           Q.        What is IACP?  It looks like an I.

10          A.        It's an acronym that the police

11   officers will be able to tell you, but I cannot -- I

12   don't know what it stands for.

13          Q.        Okay.  And you wrote down the

14   words, "loyalty, transparent."

15                    What was that about?

16          A.        My recollection is that we were

17   talking about what we wanted in the next police

18   chief.  We were then moving to the discussion of

19   hiring the next police chief.

20          Q.        Okay.  Was the current police

21   chief, Chief Turner, not perceived as loyal and

22   transparent?

23                    MS. TAYLOR:  Objection to form.

24          A.        That is not what that meant.

25          Q.        (BY MS. COLLINS) Okay.  When you

```
 1    write, "Success/ " it looks like, "clients/did not
 2    do what he was supposed to do," what does that refer
 3    to?
 4           A.      I don't -- I don't recall.
 5           Q.      Okay.  Now, it looks like the next
 6    meeting, based on your calendar entry, is March 8th,
 7    2023; is that right?
 8           A.      Yes, ma'am.
 9           Q.      Okay.  The same people appear to be
10    involved, Sunny, Joy, Keisha, and you.
11                   And these are your handwritten
12    notes again?
13           A.      Yes, ma'am.
14           Q.      Okay.  It and looks like this
15    meeting was about the RMS system, correct?
16                   MS. TAYLOR:  Object to form.
17           Q.      (BY MS. COLLINS) Is that right?
18           A.      I don't know that the whole meeting
19    was, but this topic of conversation was about the
20    records management system.
21           Q.      Okay.  And you wrote down, "No
22    system Dropbox, paper files being destroyed."
23                   Where -- did Mr. Daigle discuss
24    that paper files were being destroyed?
25           A.      I'm sorry.  Your question was where
```

```
 1   did he describe?
 2        Q.        No.  No.
 3                  Did he discuss that paper files
 4   were being destroyed?
 5        A.        He discussed that in the meeting
 6   that we had on January 19th.
 7        Q.        Okay.  And he discussed it again on
 8   this date?
 9        A.        I don't know the context that --
10   whether it was revisiting that conversation, I don't
11   remember.
12        Q.        Okay.  Do you recall if he
13   discussed what evidence he had that paper files were
14   being destroyed, or had officers just told him that
15   that was their practice?
16                  MS. TAYLOR:  Object to the form.
17        A.        My recollection is that officers
18   had told him that.
19        Q.        (BY MS. COLLINS) If you could, turn
20   to the next page.
21        A.        So we're on 0139832?
22        Q.        139832, yes.
23                  If you could, go to the bottom of
24   the page.  You write, "In interviewing folks with
25   department," and then down below that you write,
```

Cordia A. S. TENNESSEE
(615) 525-0073
5295

```
 1    "lawsuit different than audit."

 2                    What did you mean by that?

 3                    MR. RADER:  Which page are you

 4         reading from?

 5                    MS. COLLINS:  139832.

 6                    MR. RADER:  Thank you.

 7         A.         Can you refer me back to which

 8    section you're talking about?

 9         Q.         (BY MS. COLLINS) Down at the bottom

10    of the page.

11                    Do you see where I've highlighted

12    it?

13         A.         Oh, I'm sorry.

14         Q.         Right there at the bottom of the

15    page.

16         A.         "In interviewing folks in

17    department, lawsuit different than audit."

18         Q.         What do you mean lawsuit different

19    than audit?

20         A.         I don't recall.

21         Q.         Okay.  And down below that it looks

22    like you wrote the word, "Damaging."

23                    Is that what that word is?

24         A.         It looks like that to me.

25         Q.         Okay.  You wrote, "Damaging, did
```

Lexitas TENNESSEE
(615) 255-0073
5235

```
 1    not/IA affairs, that the officers did not do what."
 2                     Is that what that says?
 3         A.        It appears to read that way.
 4         Q.        Okay.  So is it fair to say that
 5    Mr. Daigle discussed that it was damaging that there
 6    was not an internal affairs investigation into what
 7    the officers did not do?
 8                     MS. TAYLOR:  Object to the form.
 9         A.        I don't recall the context around
10    that sentence at all.
11         Q.        (BY MS. COLLINS) Okay.  But
12    Mr. Daigle did discuss with you and other people on
13    that phone call that something was damaging with
14    respect to an IA investigation.
15                     MS. TAYLOR:  Object to the form.
16         A.        I do not recall that being the
17    case.
18         Q.        (BY MS. COLLINS) Okay.  What do you
19    recall about this then?
20         A.        I don't recall the -- if you read
21    me the question again.
22         Q.        Well, you can read what you wrote
23    in your own handwriting.
24         A.        Yeah.  I don't recall that he ever
25    said that there was a problem with internal affairs
```

1    that had been completed.

2           Q.        Okay?

3           A.        I never recall any words about any

4    internal affairs that had been completed and there

5    being any problem with them.

6           Q.        Okay.  What did you mean by what

7    you wrote here, "Damaging, did not/IA affairs, that

8    the officers did not," not do what?  What did you

9    mean by that?

10                    MS. TAYLOR:  Object to the form.

11          A.        I don't recall.

12          Q.        (BY MS. COLLINS) Was there a

13   discussion on this phone call about internal

14   affairs?

15          A.        I would assume so, since I wrote

16   internal affairs.

17          Q.        Okay.  But you just don't know what

18   it was about.

19          A.        The only --

20                    MS. TAYLOR:  Object to the form.

21          A.        The only conversation we had about

22   internal affairs is that -- that's in the report,

23   that he felt like a lawsuit was a complaint and that

24   an internal affairs should be opened when there was

25   a lawsuit.  That is my only recollection of him

Lexitas - TENNESSEE
(615) 255-0073

1      talking about internal affairs.

2            Q.      Okay.  If you could turn to the

3      next page, 139833, you wrote -- it appears that you

4      wrote, and you put a box around it at the top of the

5      page, "Should have done an IA," correct?

6            A.      Uh-huh.

7            Q.      So it's -- so Mr. Daigle stated

8      that you should have done an internal affairs

9      investigation.

10           A.      That it was his opinion that when a

11     lawsuit was filed, that that was the same as a

12     complaint, and that an internal affair -- and again,

13     I'm not going to know the terminology, should be

14     opened, and that is written in his report.

15           Q.      Okay.  And where you write down,

16     "Pattern and practice Monell," what does that refer

17     to?

18           A.      I don't recall.

19           Q.      Do you know what Monell refers to?

20           A.      No, I do not.

21           Q.      Do you know that that's a legal

22     standard for a plaintiff to demonstrate a claim

23     against a municipality for a constitutional

24     violation?

25                   MS. TAYLOR:  Object to the form.

Lexitas TENNESSEE
(615) 595-0073
5255

```
 1          A.      I did not know that at the time.

 2          Q.      (BY MS. COLLINS) Do you know it

 3   now?

 4          A.      You just said it.

 5          Q.      Okay.  So when he -- when you wrote

 6   down, "Pattern and practice/Monell," did you ask him

 7   what he meant by that?

 8          A.      I don't recall asking him what he

 9   meant by that.

10          Q.      Okay.  And down below that you

11   wrote -- it looks like you wrote, "Biggest challenge

12   not doing IA."

13                  Is that what that says?

14          A.      Yes, ma'am.

15          Q.      Okay.  Does that challenge still

16   exist?  You haven't done an IA with respect to the

17   claims in this litigation.

18                  MS. TAYLOR:  Object to the form.

19          A.      We've opened up investigations on

20   all of the officers named in the lawsuit pending the

21   outcome of the civil lawsuit.

22          Q.      (BY MS. COLLINS) Okay.  So you've

23   opened them.  And I think earlier the words you used

24   was you put them in abeyance.

25          A.      Yes, ma'am.
```

Lexitas - TENNESSEE
(615) 595-0073
12515

```
 1          Q.      Who made the decision to move
 2   Officer Hilton to internal affairs?
 3          A.      That was a joint decision by the
 4   command staff and myself.
 5                  Oh, excuse me.  What -- can you ask
 6   that question again?  I was thinking of a different
 7   person.
 8          Q.      Okay.  Who made the decision?
 9          A.      The person who was in that role was
10   put into an interim role of major of operations,
11   following the deputy chief's retirement.  So there
12   was a number of moves on the -- in the interim that
13   were made.  So the internal affairs was being done
14   by Scott Jenkins.  Scott Jenkins moved into Interim
15   Mayor, and then there was a recommendation on the
16   part of the command staff to move Officer Hilton
17   into IA, internal affairs.
18          Q.      Okay.  Who in command staff made
19   that decision?
20          A.      There were recommendations by all
21   of the members of the command staff, which include
22   the chief, the deputy chief, the two majors, and
23   myself.
24          Q.      When was that?
25          A.      On or around March, April 2023.
```

LexitasⓇ TENNESSEE
(615) 595-0073
5205

```
 1        Q.        Okay.  Was it after this phone call
 2   on March 8th?
 3        A.        I can't recall.
 4        Q.        And if you could turn to
 5   Page 139835, at the top of the page you wrote,
 6   "D.A.'s office is not at" -- does that say fault or
 7   fail?
 8        A.        I can't read it.
 9        Q.        Okay.  And you wrote, "Scorched
10   earth."
11                  What does that refer to?
12        A.        I can't remember.
13        Q.        Okay.  And it looks like you had a
14   meeting on April 25th, if you could turn to the next
15   page, 139836, with Eric Daigle on that day,
16   April 25th; is that correct?
17        A.        Yes.
18        Q.        Okay.  And on the next page -- or
19   the next couple pages you have meeting notes.  The
20   first you have 4/24/23 on them.  The next couple of
21   pages have 4/25.
22                  Are all of these notes from 4/25?
23        A.        I don't recall.
24        Q.        Okay.  If you could turn to
25   Page 139838, and you drew a diagram.
```

Lexitas - TENNESSEE
(615) 595-0073
9044
10225

```
 1                      What is this from?

 2          A.          This is from a diagram that

 3   Mr. Daigle showed us and said would be contained in

 4   the report.

 5          Q.          Okay.  And down on that page, you

 6   have it starred, and it says, "Failed in all three."

 7                      Is that something that Mr. Daigle

 8   said that you failed -- that the Johnson City Police

 9   Department failed in all three?

10          A.          That's my recollection.

11          Q.          And that refers to policy,

12   training, and supervision.

13                      It was his opinion that the Johnson

14   City Police Department failed in those three areas?

15                      MS. TAYLOR:  Object to the form.

16          A.          That's what I recall.

17          Q.          (BY MS. COLLINS) Okay.  If you

18   could turn to 139839, these are your notes from the

19   meeting on 4/25/23.

20          A.          Yes, ma'am.

21          Q.          It looks like you wrote, "Record,"

22   out to the side under department policy.

23                      What does that refer to?

24          A.          I can't recall.

25          Q.          Is that record?
```

Lexitas - TENNESSEE
(615) 595-0073
5225

```
 1          A.      I can't recall.

 2          Q.      For operational it lists lack of

 3   something in record keeping.

 4                  Do you know what that says?

 5          A.      I don't.

 6          Q.      Okay.  And did he say that, again,

 7   the case files are a disaster, where you wrote that

 8   down?

 9                  MS. TAYLOR:  Object to the form.

10          A.      That's correct.

11          Q.      (BY MS. COLLINS) And down below it

12   says, "Attorney has more than we do, unless for

13   patrol, complicated, investigate."

14                  What does that mean?

15          A.      He was giving a situation that

16   could occur.  He was talking about, in some cases,

17   you may have attorneys that actually have more than

18   we do at that point in time.  He was giving a

19   hypothetical.

20          Q.      Okay.  Where there is a notation to

21   Watson, do you recall what that is?

22          A.      Watson is the name of the computer

23   system that we use -- we use now for everything,

24   because since -- since then we have converted all of

25   our -- all of our records to the same filing system,
```

LEXITAS - TENNESSEE
(615) 595-0073
9285
10325

and the name of that filing system is Watson.

Q. Okay. Now, down below that you also wrote, "All departments share information," and you write, quote, "Ted Bundy."

What is that about?

A. I don't recall.

Q. Okay. And then down below that you starred, "Policies," and then you circled, "D.A. not innocent."

What is that about?

A. He was speaking to the fact that the prior D.A., by not providing protocol, was not innocent in all of this.

Q. Okay. And on the next page, 139840, you wrote, "Policy/criminal investigation, rape crisis policy."

What is that next word? Sub something.

Supervisor, is that what that word is?

A. It looks like it to me.

Q. "Supervisor cannot discipline unless it is written down."

Does that mean that there were not written policies in some instances where there

```
 1    needed to be written policies?

 2                    MS. TAYLOR:  Object to the form.

 3         A.         I don't remember what he was

 4    speaking to.

 5         Q.         (BY MS. COLLINS) And you had

 6    training with a box around it, and it looks like you

 7    wrote, "Sexual assault for patrol."

 8                    Had it been a practice that the

 9    Johnson City Police Department did not train patrol

10    on sexual assault cases?

11                    MS. TAYLOR:  Object to the form.

12         A.         Can you ask the question again?

13         Q.         (BY MS. COLLINS) Sure.

14                    You noted that with respect to

15    training -- do you see that on the page?

16         A.         I do.

17         Q.         And you wrote, "Sexual assault for

18    patrol."

19                    Do you agree that that's what that

20    says?

21         A.         Yeah.

22         Q.         Okay.  What did you mean by that?

23         A.         He was educating me that the

24    training starts all the way from -- not just from

25    the investigative side, but that training needed to
```

Lexitas TENNESSEE
(615) 255-0073
10225

```
 1    be done.  So a lot of the conversation was around
 2    him being a teacher, and we were learning.  So he
 3    was -- he was explaining training to me that when
 4    you do this training, it needs to -- we need to make
 5    sure that we include how the first contact is made
 6    with the victim.  And so it begins with making sure
 7    that we're also including, in the training that
 8    we're doing, our patrol officers.
 9         Q.      Okay.  Prior to Mr. Daigle
10    examining the policies and practices of the police
11    department, had patrol officers been trained in
12    sexual assault, how to handle sexual assault?
13         A.      I mentioned earlier there's POST
14    certification requirements of 40 hours, and that is
15    for all police officers.  And my understanding is
16    that includes sexual assault training.
17         Q.      Okay.  Do you know how much of the
18    POST certification includes sexual assault training?
19         A.      I don't.
20         Q.      Going down below that, it looks
21    like you wrote, "Bias in investigation."
22             What does that refer to?
23         A.      Where?  I'm sorry.
24             He was talking about best practices
25    and he -- I remember he was saying that the process
```

```
 1    is that you go find the evidence.  So I specifically

 2    remember go find the evidence, that there's the

 3    requirement that the officer go find the evidence.

 4              Q.        And down at the bottom of the page,

 5    what does that say, those last two lines on the

 6    page?

 7              A.        "Investigator, control bias, go

 8    find evidence."

 9                        Is that what you're referring to?

10              Q.        Yeah.  I just can't tell what that

11    says.  It looks like it starts off saying

12    investigator, and I can't really read the rest.

13              A.        I can read words, but I can't put

14    them together in a sentence.

15              Q.        Okay.  What is the second word?  Is

16    that, "Control bias," or what?

17              A.        "Control/bias," or, "control bias."

18              Q.        Okay.  And then below that it says,

19    "Truth is" --

20              A.        I don't know what that word says.

21              Q.        And then beside that it says,

22    "Bias, something off page."

23                        Does that look right?

24              A.        The "bias" and "off page", I can

25    read that.  I can't read the word in between.
```

Lexitas - TENNESSEE
(615) 255-0073

```
 1         Q.       Okay.  And below that it looks like
 2    you have an acronym TPRM; is that right?
 3         A.       Yes, but I don't know if it's TPRN
 4    or TPRM, but I can't recall what that means.
 5         Q.       Okay.  And then it looks like he
 6    goes through the different points, starting on
 7    Page 139841, that are contained in his report, the
 8    bullet points.
 9              The first one on the bottom of that
10    page is, "Limited investigation, always" -- it looks
11    like, "always," what, "of the victim"?
12         A.       Where are -- where are you?
13         Q.       139841 at the bottom of the page.
14         A.       I can't tell if the word says
15    credible or critical.  Credible of victim.
16         Q.       And then did you write out, "Crime
17    scene first, search warrant"?
18         A.       Yes.  That looks like crime scene.
19    And I can't read that word.  Crime -- I can't read
20    scene --
21         Q.       Okay.
22         A.       -- actually.
23         Q.       And if you turn to the next page,
24    does the first sentence say, "Underage, state blames
25    victim"?
```

Lexitas - TENNESSEE
(615) 255-0073
5225

```
 1            A.       No.

 2            Q.       What does it say?

 3            A.       Becomes.  He was educating me about

 4    what happens in different cases, and he said the

 5    state becomes the victim.

 6            Q.       Okay.  And the rest of this looks

 7    like what's contained in his report.

 8                     No. 2 is victim interviews, and it

 9    talks about the soft interview rooms; is that right?

10            A.       Yes.

11            Q.       Okay.  And turning to the last page

12    of the document it says, "Redo policy, statute of

13    limitations, federal."

14                     What is that referring to?

15            A.       Can you show me where you're at?

16            Q.       I'm on the last page of the

17    document.

18                     MS. TAYLOR:  Bate stamp

19        No. 0139844.

20            A.       What was your question?

21            Q.       (BY MS. COLLINS) What does that

22    refer to?

23            A.       "Redo policy, statute of

24    limitations, federal."  I don't recall.

25            Q.       Now, going back to the Daigle
```

Lexitas - TENNESSEE
(615) 595-0073
5225

1    report, and this was Exhibit No. 56, are there any

2    recommendations in here that Johnson City disagreed

3    with or did not follow?

4                    MS. TAYLOR:  Object to the form.

5           A.        Yeah, I would have to break that

6    down.  You've asked me two questions.  One is what

7    we disagreed with; one is what we did not follow.

8                    I don't think we ever sat down and

9    said -- and had a conversation with our command

10   staff to be able to have a discussion back and forth

11   with Daigle.

12                   What we did is we set out to

13   improve the department, to be able to show them the

14   report and to show them how we would make

15   recommendations to improve the Johnson City Police

16   Department.

17          Q.        (BY MS. COLLINS) Okay.

18          A.        So when you say we disagree with, I

19   don't think we ever had the discussion about

20   disagreeing with him.  I think the one that we

21   said -- and again, I think I'm moving into a

22   situation where I had communications with

23   attorney/client privilege protected around handling

24   internal investigations.

25          Q.        Okay.  So he issued a finding on

```
 1    Page 14 of his report that sexual assault

 2    investigations conducted by the JCPD have material

 3    deficiencies and can hinder the ability to collect

 4    necessary evidence for a complete and accurate

 5    investigation.

 6                    MS. TAYLOR:  Is that a question?

 7          Q.        (BY MS. COLLINS) Did you take steps

 8    to address that?  Did the City take steps to address

 9    that finding?

10          A.        We did not debate what he wrote and

11    found.  What we did is lay out a plan moving forward

12    of providing training that would address any of

13    these issues that any of the citizens would read.

14    But we did not go back and forth with him on

15    challenging anything that he put in writing.  What

16    we did was lay out a plan of things that we could do

17    to move forward to improve the department.

18                    MS. COLLINS:  Okay.  I'm going to

19            provide you another document we're going to

20            mark as Exhibit No. 58.

21                    All right.  Ready?

22                    (Exhibit 58 marked).

23                    MS. COLLINS:  Sorry.  I've tried to

24            warn you.

25                    MR. RADER:  You gave me sufficient
```

```
 1              warning.

 2      Q.          (BY MS. COLLINS) Here you go.

 3      A.          Oh, thank you.

 4              MS. COLLINS:  All right.  And there

 5          were Bates numbers, I think, on this but I

 6          didn't print it correctly.  So sorry.

 7              MR. RADER:  I don't know.

 8          Elizabeth made me redo it when I did that

 9          during the last deposition.

10              MS. TAYLOR:  Do you want me to grab

11          my Bate stamped copy?  Well, I'm going to

12          grab my Bate stamped copy so we can at least

13          note the Bate stamps on the record.

14              MS. COLLINS:  Yeah, let's go off

15          the record.

16              VIDEOGRAPHER:  Off the record at

17          4:04.

18          (Off the record at 4:04 p.m.)

19           (On the record at 4:06 p.m.)

20              VIDEOGRAPHER:  We're back on the

21          record at 4:06.

22      BY MS. COLLINS:

23      Q.          Okay.  Now, if you could turn to

24      Page 4 of the Exhibit No. 58.

25              MR. LAKEY:  Can we just on the
```

Lexitas TENNESSEE
(615) 595-0073
9245

```
1           record not the -- not the -- not as you go
2           through it, but just the whole range for the
3           record.
4                    MS. TAYLOR:  So the document that
5           the witness is looking at is Ball 1 through
6           Ball 46.
7           Q.       (BY MS. COLLINS) Okay.  If you
8  could turn to Page 4 of the document, this looks
9  like a note from 6/2/22, and you write Scott Pratt
10 and then you have three names below that.
11                   What is this in reference to?
12          A.       The first, Scott Pratt, I don't
13 recall.  So I don't know who Scott Pratt is right
14 now.  I can't recall that name.  The other three, I
15 was in a meeting with Chief Turner, and he was
16 providing me with a list of the assessment of who
17 would -- assessment of major of operations.  And so
18 he was providing me with a list of three names of
19 people who tested for major of operations at that
20 time period.
21          Q.       Okay.
22          A.       And the date, just to make sure
23 we're correct, is June 2nd, 2022.
24          Q.       Okay.  And you have an arrow
25 pointing under Kevin Peters' name.
```

Lexitas TENNESSEE
(615) 595-0073
5285

```
 1              And does that say bully?

 2      A.      It does.

 3      Q.      Okay.  What does that refer to?

 4      A.      In my conversations with Chief

 5  Turner, when we were looking at the three, that was

 6  the order that they scored in.  And so I had listed

 7  the order that they scored in.  So we were having a

 8  discussion about what those three candidates.  And

 9  under civil service guidelines, any of the top five

10  can be promoted.  So he and I were talking about

11  those three candidates, and I feel like I recall

12  saying, "I've heard people say that Kevin Peters can

13  be a bully."

14      Q.      Okay.  And on -- if you could turn

15  to Page 9 of your document, this looks like a note

16  from 7/26/22.

17              This is a note about 42 U.S.C., and

18  you wrote, "1933, municipal liability," and you

19  wrote, "Monell liability policy, pattern, and

20  practice."

21              Do you recall what that's about?

22      A.      I'm trying to think of the time

23  frame.  I don't know if, before this, I have the

24  meeting that I was in.

25              Oh, I recall.  So when we were in
```

Lexitas TENNESSEE
10225
(615) 595-0073

```
1    the process and I had recommended that we bring in
2    an outside independent party to be able to help with
3    continuous process improvement within the department
4    and to address the concerns that the public had at
5    that point in time, on this day we did a
6    meet-and-greet via Zoom or Meets with Daigle.  And
7    so he's telling us about his experience and things
8    that he's worked on and things that he's been
9    involved in.
10              So this is the first time that I
11   met him via Zoom.  And so I -- while I can't go
12   through here, I know the intent of this whole
13   meeting was for him to talk about the work that he
14   had done, what he had worked in, how long -- he was
15   really telling us his credentials in this meeting.
16        Q.      Okay.  And the rest of just
17   flipping through the next couple pages, all this is
18   your handwriting from meetings, correct?
19        A.      What are you asking me?
20        Q.      This -- this whole document is your
21   handwriting, correct?
22        A.      Yes, ma'am.
23        Q.      If you could turn to Page 30 --
24   well, it starts on Page 29.  This looks to be from
25   September -- or July 10th, 2023.
```

Lexitas TENNESSEE
(615) 595-0073
5325
8448

```
 1                    And you wrote, "Bias, gender bias
 2    is not interviewing suspects, not gathering
 3    evidence, shredding evidence, record keeping,
 4    training."
 5                    And then on the next page it looks
 6    like you wrote, "Reasons for cases, Turner was
 7    Chief, corruption, Sparks, Jenkins."
 8                    What does that refer to?
 9         A.       I was reviewing the report that had
10    come in that day.  That was the day we received the
11    report from Daigle, and so I was looking through
12    that report and taking notes.
13         Q.       Did Daigle specifically mention
14    corruption and Sparks and Jenkins?
15                    MS. TAYLOR:  Object to the form.
16         A.       No.  That was from the lawsuit that
17    had been filed.
18         Q.       (BY MS. COLLINS) Okay.  So did you
19    talk with Daigle on September 10th, 2023 --
20    July 10th, 2023 about Sparks and Jenkins and
21    corruption?
22         A.       No, ma'am.
23         Q.       Okay.  Why did you write that down?
24         A.       I was making notes of information
25    that had come from both the lawsuit and from the
```

```
 1    report.
 2             Q.        Okay.
 3             A.        Sorry.
 4                       But I was -- I was just taking
 5    notes for my own purpose.
 6                       MS. COLLINS:  Okay.  I'm going to
 7             mark this next document as Exhibit 59.
 8                       (Exhibit 59 marked).
 9             Q.        (BY MS. COLLINS) Was the Daigle
10    audit report issued to the community?
11             A.        I'm sorry.  I just blanked a little
12    bit.  Was --
13             Q.        It's okay.
14                       Was the Daigle audit report issued
15    to the community?
16                       MS. TAYLOR:  Object to the form.
17             A.        I wouldn't say issued.  It was
18    provided.
19             Q.        (BY MS. COLLINS) Okay.  And who
20    drafted this?
21             A.        Communications, our Public Affairs
22    Director Keisha Shoun.
23             Q.        Okay.  And it listed the eight main
24    findings of the report, correct?
25             A.        Yes, ma'am.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          Q.       And it has a quote from you that
 2    you wanted, "to acknowledge that victims of sexual
 3    assault have not always received the best possible
 4    treatment and care from our police department.  The
 5    department's new leadership is dedicated to continue
 6    changes toward compassionate and effective service,
 7    so that all citizens know they are safe and
 8    protected."
 9                   Was that a statement that you made
10    at this point in time on July 18th, 2023?
11                   MS. TAYLOR:  Object to the form.
12          A.       Yeah.  Will you read the statement
13    again, ma'am?  And maybe if you could say the
14    question -- it sounded like you asked two different
15    questions to me.
16          Q.       (BY MS. COLLINS) In the third
17    paragraph, do you see it?
18          A.       Yes.
19          Q.       Okay.  It's got a quote that's
20    attributed to you.
21                   Did you make that statement?
22          A.       I reviewed the statement and made
23    it in conjunction with our staff.
24          Q.       Okay.  So you acknowledge that
25    victims of sexual assault have not always received
```

LexitasLEGAL TENNESSEE
(615) 255-0073

```
 1    the best possible treatment and care from the police
 2    department, right?
 3              A.        Yes.
 4                        MS. COLLINS:  Okay.  I'll mark the
 5              next document as Exhibit No. 60.
 6                        (Exhibit 60 marked).
 7                        MS. TAYLOR:  I don't think we got
 8              60.
 9                        Oh, he has it.  Okay.  Sorry.  I
10              didn't know that he had it.
11              Q.        (BY MS. COLLINS) Ms. Ball, it looks
12    like you sent an email saying that the press
13    coverage of Sean Williams' case has not been fair
14    and thorough with respect to its representation of
15    the police department.
16                        What was not fair or thorough about
17    it?
18                        MS. TAYLOR:  Do you have a copy of
19              the reference to the attached letter to
20              WJHL?
21                        MS. COLLINS:  I'll mark the next
22              document as Exhibit No. 61, and this is --
23              starts at CITY-73636.
24                        MR. RADER:  Thank you.
25                        What number?
```

Lexitas - TENNESSEE
(615) 595-0073

1      MS. COLLINS:  Exhibit No. 61.

2      (Exhibit 61 marked).

3      Q.      (BY MS. COLLINS) So do you see the

4  letter?

5      A.      Uh-huh.

6      Q.      All right.  So what about what WJHL

7  was reporting was not a fair and thorough

8  representation of the police department?

9      A.      They reported that the files, the

10 video files that had been found regarding -- in Sean

11 Williams' possession were in the City of Johnson

12 City's position following ██████████ fall from

13 the window, and that that was the documents that

14 were retrieved when, in fact, the documents and the

15 photos that were retrieved were from -- were

16 confiscated when he was arrested in western North

17 Carolina.

18      And so I called them immediately to

19 tell them that that was inaccurate information and

20 had not been the case.  They redacted it

21 immediately, but they did not specifically say that

22 they redacted it because we called and told them to.

23      Q.      Okay.  You never reviewed the

24 digital evidence that was in the Johnson City's --

25 that they had in custody as a result of the ██████

1    ██████ fall, right?

2          A.        I have never seen that.

3          Q.        Okay.  And that was what we went

4    through with the search warrant that had remained

5    with Johnson City since her fall, and it had not

6    been reviewed.

7          A.        Correct.

8          Q.        Okay.  So sitting here today, you

9    have no basis upon which to state whether or not

10   some of those files were the same as what the FBI

11   recovered when they got the information in 2023 when

12   he was apprehended.

13                   MS. TAYLOR:  Object to the form.

14         Q.        (BY MS. COLLINS) I think I gave the

15   wrong year, but when he was apprehended in North

16   Carolina.

17                   MS. TAYLOR:  Object to the form.

18         A.        I would ask if I could take a

19   break.

20         Q.        (BY MS. COLLINS) You can't take a

21   break in the middle of a question.

22         A.        Okay.  Can you ask the question

23   again, because I'm confused about your question?

24         Q.        Okay.  When you issued this

25   statement to the press, you didn't know what was

1    actually on the files that had been in Johnson

2    City's custody since the ████████ fall, did

3    you?

4            A.       No.

5            Q.       And some of that same digital

6    evidence could have been on the thumb drives that

7    was recovered -- or the evidence that was recovered

8    when he was apprehended in North Carolina, correct?

9                    MS. TAYLOR:  Objection to form.

10           A.       To my knowledge, there's been no

11   evidence of what was found in the Johnson City

12   when -- in the ██████████ -- when we confiscated

13   that information.

14           Q.       (BY MS. COLLINS) Right.  You don't

15   know what was on that because it was never looked

16   at, correct?

17           A.       I don't and, to my knowledge, WJHL

18   didn't either.

19           Q.       Then what was your basis for saying

20   it was false?

21                    MS. TAYLOR:  Object to the form.

22           A.       The information that was provided

23   stated that it was -- that was provided -- and all

24   of the information we had was that the information

25   was obtained through the D.A. was from the files

```
 1    that were confiscated when he was arrested in

 2    Western Carolina University -- at Western Carolina

 3    University.

 4                    MS. TAYLOR:  Let's take a break.

 5                    MS. COLLINS:  Okay.

 6                    VIDEOGRAPHER:  Going off the record

 7         at 4:22.

 8              (Off the record at 4:22 p.m.)

 9              (On the record at 4:39 p.m.)

10                    VIDEOGRAPHER:  Okay.  We're back on

11         the record at 4:39.

12    BY MS. COLLINS:

13         Q.        Ms. Ball, when did you first meet

14    Detective Sparks?

15         A.        The first time I recall meeting

16    Detective Sparks, to know him personally, was after

17    the lawsuit was filed.

18         Q.        After which lawsuit was filed?

19         A.        The Doe lawsuit.

20         Q.        Okay.  What do you mean by to know

21    him personally?

22         A.        I had met many officers.  We have

23    150 some, but I could not recall them by name.  But

24    I'd been in a lot of meetings with different folks,

25    but I did not individually or personally know
```

Lexitas TENNESSEE
(615) 595-0073
9285

```
 1    people, and I had not yet had that opportunity to be
 2    able to meet with him.
 3              Q.        Okay.  And you said that you met
 4    him and got to know him personally after this
 5    lawsuit was filed.
 6              A.        And I should say professionally.  I
 7    don't know that I've ever personally -- never had
 8    any dealings with him personally, but through his
 9    work.
10              Q.        All right.  After the lawsuit was
11    filed and you said you got to know him through his
12    work, did you talk with him?
13              A.        Yes, ma'am.
14              Q.        Okay.  About what?
15              A.        I met with him to inform him about
16    the lawsuit and provide him a copy of the lawsuit
17    and to be able to make him aware that we were going
18    to do an internal -- we were going to open an
19    internal investigation.
20              Q.        An internal affairs investigation?
21              A.        Yes, ma'am.
22              Q.        Okay.  And that's the one that's
23    still open?
24              A.        Yes, ma'am.
25              Q.        When you met with him, was anyone
```

1    else present?

2          A.      Yes, ma'am.

3          Q.      Who?

4          A.      Chief of Police Billy Church,

5    Deputy Chief Jenkins, █████████████, and Major

6    Carrier.  I believe all four were present, and I

7    think also our staff attorney, Blake Watson.  That's

8    the best of my recollection.

9          Q.      Okay.  Have you been in touch with

10   Detective Sparks since that initial meeting?

11               MS. TAYLOR:  Object to the form.

12         A.      I have talked to him.  I've checked

13   on him.  I've met his wife.  I've brought bagels

14   into the department.  I went and worked with the

15   police department on a case that they did, a murder

16   case, and he was working on that case as well.  So

17   during the course of my job, I had interactions with

18   Investigator Sparks.

19         Q.      (BY MS. COLLINS) And when you say

20   you've checked on him, what do you mean by that?

21         A.      I've checked on his welfare, on his

22   well-being, to see how he's doing.

23         Q.      And what was the situation where

24   you met his wife?

25         A.      I was at our clinic.  We have a

```
 1    City clinic.  I was walking out of it, and she was
 2    behind me, and she called my name and said that -- I
 3    didn't know who she was, but I talked to her there.
 4    And she was emotional and had -- I was able to talk
 5    to her, and she appreciated the level of support
 6    that had been provided.
 7            Q.      Okay.  Do you have occasion to text
 8    with him?
 9            A.      I have before.
10            Q.      About what?
11            A.      Checking on his well-being, making
12    sure he's okay.  He's lost a considerable amount of
13    weight, and I just wanted to make sure that he
14    wasn't in a situation where there was some state of
15    mental well-being on his behalf.
16                    MS. COLLINS:  Okay.  I'll mark the
17            next document as Exhibit No. --
18                    COURT REPORTER:  62.
19                    MS. COLLINS:  -- 62.  And this is
20            SPARKS 42.
21                    (Exhibit 62 marked).
22            Q.      (BY MS. COLLINS) Have you seen
23    these texts before?
24            A.      I don't know if you know the date
25    of the first one.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    Do you have a date on that one?

 2          Q.        I do not.

 3          A.        I'm struggling with the first one,

 4   because I'm just not recalling it and the context.

 5   I'm not debating it.  I just don't know the date

 6   or -- and the part at the top, it doesn't make sense

 7   to me that I would send a text -- I would never text

 8   the whole department.  So I'm just having trouble

 9   understanding that text.

10          Q.        Okay.  All right.  So you don't

11   recall when the one on the first page was sent.

12          A.        I don't.

13          Q.        Okay.  If you could turn to the

14   second page, this one has a date of December 19th

15   and December 27th.  It looks like you sent the one

16   that says, "Checking on you to see how you're

17   doing."

18                    Does that sound right?

19          A.        Yeah.

20          Q.        Okay.  And he said, "Just stressed

21   out and hoping I did good."

22                    What does that refer to, "hoping I

23   did good"?  Do you know?

24          A.        I -- so why do you think that mine

25   is the first one?  Is that the way that you have it
```

Lexitas - TENNESSEE
(615) 255-0073
5265

1   recorded?  Because I'm -- I just want to make sure

2   if you're saying that --

3           Q.      Well, if you look at the one on

4   December 27th, it says, "Toma, please let me know if

5   there's anything I can do."

6                   MS. TAYLOR:  She's talking about

7           this page.  See?

8                   THE WITNESS:  I don't think she is.

9           She's talking about the second page.

10          Q.      (BY MS. COLLINS) Page 43.

11          A.      Yeah.  I understand your logic now.

12          Q.      Okay.  So on December 19th, what

13   did he do good at?

14          A.      I'm not sure.  The only thing I can

15   think of is maybe that's when he did his deposition

16   for the Dahl case, but I'm guessing at that.

17          Q.      Okay.  And you asked for a minute

18   for a call.

19                  Do you recall if you talked to him?

20          A.      I don't recall.  I mean, it seems

21   like I logically would have if he said yes.

22          Q.      What exhibit number was that?

23          A.      62.

24                  MS. COLLINS:  All right.  I'm going

25          to mark the next document as Exhibit 63, and

```
 1              this is SPARKS 4 through 5.
 2                   (Exhibit 63 marked).
 3         Q.        (BY MS. COLLINS) And at the top of
 4   the page on Page 5, which is the second page of the
 5   document, it looks to be a text conversation between
 6   you and Detective Sparks.
 7                   Does that look familiar at all?
 8         A.        It's in a different format.
 9                   Is that what you're asking me?
10   Does it look --
11         Q.        Does this text thread look familiar
12   to you?
13         A.        It doesn't look unfamiliar, but I
14   don't recall it specifically.
15         Q.        Okay.  What do you mean, "it
16   doesn't look unfamiliar"?
17         A.        I -- my leadership style is that I
18   will check on people that I have concerns about or
19   I'm concerned about their well-being.  And I have
20   reason to be very worried about Toma Sparks, and it
21   is not unreasonable for me to read this and think
22   that I would have sent it.
23         Q.        Okay.  All right.  This number
24   that's on here, is that your personal number or your
25   work number?
```

Lexitas - TENNESSEE
(615) 595-0073
5259

```
 1          A.       My work number.

 2          Q.       Okay.  And this is the one that you

 3   sent from your -- you have both of them on your

 4   phone.

 5          A.       Yes, ma'am.

 6          Q.       Okay.  Do you know what your Apple

 7   ID is?

 8                   MS. TAYLOR:  Object to the form.

 9          Q.       (BY MS. COLLINS) Okay.  What's your

10   Apple ID?

11          A.       It is Cathy, with a C, Ball --

12                   MR. LAKEY:  Can we go attorney's

13            eyes only on this, if we're going to do

14            this?

15                   MS. TAYLOR:  Sure.

16                   MR. RADER:  So can everyone leave

17            the room?

18                   MS. COLLINS:  Sure.  Let's go off

19            the record.  Off the record.

20                   VIDEOGRAPHER:  Going off the record

21            at 4:53.

22            (Off the record at 4:53 p.m.)

23            (On the record at 4:53 p.m.)

24                   VIDEOGRAPHER:  Okay.  We are back

25            on the record at 4:53.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    BY MS. COLLINS:
 2         Q.        What is your Apple ID?
 3         A.        ████████████████████.   That's off
 4    the record.
 5                   MS. TAYLOR:  Are you going to ask
 6         her any other like sensitive personal
 7         information?  I mean, if we need to go
 8         attorney's eyes only again, we can, but
 9         might as well do it while we --
10                   MS. COLLINS:  Go back off the
11         record.
12                   MR. LAKEY:  Well, we have a
13         question.
14                   MS. TAYLOR:  Yeah, it's a question.
15                   MS. COLLINS:  Okay.
16                   MS. TAYLOR:  Well, she was looking
17         through --
18                   MS. COLLINS:  We'll go back off the
19         record.
20                   VIDEOGRAPHER:  Going off the record
21         at 4:54.
22              (Off the record at 4:54 p.m.)
23              (On the record at 4:59 p.m.)
24                   VIDEOGRAPHER:  We're back on the
25         record at 4:59.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    BY MS. COLLINS:
 2         Q.      Okay.  Ms. Ball, at one of the
 3    press conferences you mentioned you had a daughter,
 4    but when I was asking you about family in the area
 5    you didn't mention her.
 6                 Is she under the age of 18?
 7         A.      Yes.
 8         Q.      Okay.  How old is she?
 9         A.      17.
10         Q.      Okay.  Does she live in the area?
11         A.      She lives in Asheville.
12         Q.      Okay.  Does she have any plans to
13    move back to the Greenville/Johnson City area?
14                 MS. TAYLOR:  Object to the form.
15         A.      It depends on where she goes to
16    college.
17         Q.      (BY MS. COLLINS) Okay.  Is she
18    looking at ETSU?
19         A.      She's looking everywhere right now.
20         Q.      Okay.  Good for her.
21                 MS. COLLINS:  All right.  Let's go
22         back off the record.
23                 VIDEOGRAPHER:  Okay.  Going off the
24         record at 4:59.
25            (Off the record at 4:59 p.m.)
```

```
 1              (On the record at 5:01 p.m.)

 2                  VIDEOGRAPHER:  We're back on the

 3          record at 5:01.

 4                  MS. COLLINS:  I'm going to mark the

 5          next document as Exhibit No. 64.  It's

 6          CITY-73481.

 7                  (Exhibit 64 marked).

 8   BY MS. COLLINS:

 9          Q.      Okay.  Have you seen this email

10   before?

11          A.      Yes, ma'am.

12          Q.      All right.  It looks like you sent

13   an email to General Finney on December 11th.

14                  Do you recall what allegation you

15   were discussing?

16          A.      I was sending him our response to

17   the Second Amended Complaint from the Doe case

18   and -- or excuse me.  I don't recall if I was

19   sending him our Amended Complaint.  I was sending

20   him the Second Amended Complaint that was filed by

21   the Does.

22          Q.      Okay.

23          A.      And it mentioned his name.  And as

24   a professional courtesy, I was providing it to him.

25          Q.      Okay.  And when you reference in
```

Lexitas - TENNESSEE
(615) 595-0073
5295

```
 1    this email that -- Page 37.  You talked about on a
 2    phone call on Page 37.
 3                        Was that an allegation about both
 4    of you, or did that page contain allegations about
 5    both of you?
 6           A.      I would have to see, if I could,
 7    the Amended Complaint, because I don't -- I don't
 8    recall right now what Page 37 was.
 9           Q.      Okay.  Do you recall what you
10    talked about on the phone call?
11           A.      I was giving him a heads up that it
12    was included in the filing.
13           Q.      That what was included in the
14    filing?
15           A.      I would have to look at the filing
16    in order to recall my memory on that.  Excuse me.
17           Q.      Do you recall that it was about --
18    that there were allegations on Page 37 that had to
19    do with both of you?
20                   MS. TAYLOR:  Object to the form.
21           A.      I don't.
22           Q.      (BY MS. COLLINS) At this time, did
23    you talk to him about any discovery or production of
24    documents in the case?
25           A.      No.
```

Lexitas - TENNESSEE
(615) 255-0073
5225
2670

```
 1                    MS. COLLINS:  I'll mark the next
 2          document is Exhibit 65.  This is CITY-73263.
 3                    COURT REPORTER:  Exhibit 65.
 4                    (Exhibit 65 marked).
 5          Q.        (BY MS. COLLINS) Okay.  With
 6   respect to this letter, was it your understanding
 7   that -- that all of the cases, the sexual assault
 8   cases, were still being investigated and were active
 9   at that time?
10          A.        Which sexual assault cases are you
11   referring to?
12          Q.        The ones alleged in the Doe
13   lawsuit.
14          A.        Yes.
15          Q.        Okay.  And the fact that they were
16   still active, did that have anything to do with
17   whether or not the City could provide that
18   information, considering they were active
19   investigations?
20                    MS. TAYLOR:  Object to the form of
21          the question.
22          A.        I would say the ability to provide
23   records is a legal question that I'm not able to
24   answer.
25          Q.        (BY MS. COLLINS) Did District
```

Lexitas TENNESSEE
(615) 595-0073
11585

1  Attorney Finney instruct the City not to produce any

2  documents that had to do with the Jane Does in this

3  lawsuit whose cases were being investigated?

4              MS. TAYLOR:  Object to the form.

5       A.       Can you repeat the question?

6       Q.       (BY MS. COLLINS) To your knowledge,

7  did District Attorney General Finney instruct the

8  City not to provide documents that had to do with

9  the Jane Does in this case who had cases that were

10  actively being investigated?

11             MS. TAYLOR:  Object to the form.

12      A.       To my knowledge, he -- we directed

13  any media or any inquiries to him because he was

14  investigating them.  But I'm not aware that he

15  directed us in any way not to release them.  We

16  would have known not to do that.

17      Q.       (BY MS. COLLINS) What about

18  providing them in discovery in this lawsuit to the

19  plaintiffs?

20             MS. TAYLOR:  Object to the form.

21      Q.       (BY MS. COLLINS) Did he have any

22  say over that?

23      A.       Not to my knowledge.  I wasn't a

24  part of those conversations.

25             MS. COLLINS:  I'm going to mark the

Lexitas TENNESSEE
(615) 595-0073

```
 1              next document as Exhibit No. 66.  It's
 2         CITY-73260.
 3                   (Exhibit 66 marked).
 4         Q.        (BY MS. COLLINS) Do you recall what
 5    you discussed with Steve Finney about on March 18th?
 6         A.        I do.
 7         Q.        Okay.  What?
 8         A.         I mentioned earlier that we were in
 9    the process of helping fund a position for a
10    forensic -- for a forensic interviewer for the Child
11    Advocacy Center.  As part of that, the money had
12    been funded, but it required that a Memorandum of
13    Understanding be developed between the City and the
14    Child Advocacy Center.  There had been some
15    discussion in a meeting about how that money would
16    be allocated.  There was a disagreement, or at least
17    a conversation, from their Executive Director that
18    they would prefer that it go in a different
19    direction.
20                   I was going to send him the
21    memorandum, the draft Memorandum of Understanding
22    for his review, and I wanted him to know that it was
23    coming his way, and that they had asked to get it
24    back so that it could be executed.
25         Q.        Okay.  Did you take any notes from
```

```
 1    that meeting?

 2         A.        I did not.

 3         Q.        Do you know or do you have any sort

 4    of -- do you have any regular meeting or discussions

 5    with Inspector Finney?

 6                   MS. TAYLOR:  Objection to form.

 7                   MS. COLLINS:  Not Inspector.  I'm

 8         sorry.  It's the end of the day.  I'm tired.

 9         General.

10         Q.        (BY MS. COLLINS) Do you have any

11    sort of regular meeting with General Finney?

12         A.        No, ma'am.

13         Q.        Okay.  About how many times have

14    you spoken with him?  Is it a regular occurrence or

15    what?

16                   MS. TAYLOR:  Object to the form.

17         A.        I would say I've either met or

18    spoke to him around 10 times.  10, that's

19    ballpark-ish.

20         Q.        (BY MS. COLLINS) Okay.  Of those

21    discussions, have any of them been about this case?

22         A.        They've been about Sean Williams.

23         Q.        Okay.  Have we already discussed

24    the ones that -- where you met with him and

25    discussed Sean Williams?
```

```
 1                    I know we went through the letter
 2    that he sent, and it pretty much encapsulated the
 3    discussion that you all had.
 4                    Anything else that we haven't
 5    already discussed that had to do with Sean Williams
 6    or the allegations in this case?
 7         A.        Not that I can recall.  If there's
 8    anything else, I would have minutes that have been
 9    produced and given to you, but not that I can recall
10    right now.
11         Q.        All right.  Ms. Ball, do you recall
12    giving a press conference about this case?
13         A.        Yes, ma'am.
14         Q.        Okay.  Why did you do that?
15         A.        The City was preparing and had
16    filed a response the day that the news -- the media
17    release was done.
18         Q.        Okay.  What media release are you
19    talking about?
20         A.        The one that you asked me about.
21    "Do you remember speaking to the media?"
22         Q.        Well, luckily I don't have to
23    answer questions today.
24                    The -- I'm talking about giving a
25    press conference after the Jane Does filed their
```

Lexitas TENNESSEE
(615) 595-0073
9647
10259

lawsuit and the Second -- in the Second Amended
Complaint.

No.  Strike that.

After the Jane Does filed their
lawsuit, do you recall giving a press conference
about the Jane Doe lawsuit?

A.      Yes.

Q.      Okay.

A.      On August 25th, 2023.

Q.      And you stated that the Does were
to some degree at fault for their rapes because they
consumed and partook of illegal drugs during the
course of that time period and visit.

What did you mean by that?

A.      Do you have a copy of that for me
to be able to look at?

MS. COLLINS:  Sure.  I have a
transcript of it.  We'll mark it as Exhibit
No. 67.

(Exhibit 67 marked).

A.      And which page are you referring
to, ma'am?

And I should be -- I should speak
louder.  I'm sorry.  I asked her which page she was
referring to.

```
 1          Q.      (BY MS. COLLINS) And it's on
 2    Page 6.
 3          A.      And which -- can you tell me where
 4    you're referring to in the document?
 5          Q.      Line 4 through Line 9 and into Line
 6    11.
 7                  MS. TAYLOR:  Can you refer us to a
 8          page?
 9                  MS. COLLINS:  Sure.  6.
10                  MS. TAYLOR:  6.
11          A.      I say within the lawsuit, the Jane
12    Doe -- the Jane Doe lawsuit, as we refer to it,
13    there are allegations that are made by Jane Does.
14    And in that factual information that they provided,
15    it indicated that they consumed and partake --
16    partook of illegal drugs during the course of the
17    time period within that visit.  And that is
18    contained within the information they provided in
19    the lawsuit, meaning the Does.
20                  Is that what you're asking me?
21          Q.      (BY MS. COLLINS) Yes.
22                  Now, what did you base your
23    statement on that they were comparatively at fault?
24          A.      The attorneys filed a response to
25    the lawsuit, as well as I read the entire lawsuit.
```

```
 1        Q.        Okay.  Why was it necessary to call
 2   a press conference about this?
 3        A.        As I mentioned, part of my ethical
 4   responsibility is to inform the public when
 5   information is provided.
 6                  I had the intentions of really
 7   making sure that there was a difference between a
 8   civil lawsuit and the allegations that -- or the
 9   response the City provided within the civil
10   litigation was very different than how our criminal
11   system handled them.
12                  My intent was to make sure that
13   victims of sexual assault felt comfortable and
14   understood that the difference between those two and
15   in two different cases -- two different times within
16   it, I repeated that in no case under criminal law is
17   it okay for a victim to be raped.
18        Q.        Okay.  So you're excusing it based
19   on the fact that it's a civil lawsuit, is that what
20   you're saying?
21                  MS. TAYLOR:  Object to the form of
22        the question.
23        A.        No.
24        Q.        (BY MS. COLLINS) Okay.  Then why
25   did you do it?
```

TENNESSEE
(615) 595-0073

```
 1              MS. TAYLOR:  Object to the form of
 2         the question.
 3         A.        Why did I do what?
 4         Q.        (BY MS. COLLINS) Say that they were
 5    comparatively at fault.
 6              MS. TAYLOR:  Object to the form of
 7         the question.
 8         A.        I did not say that.  The response
 9    to the lawsuit said that.
10         Q.        (BY MS. COLLINS) Okay.  But you got
11    up and held a press conference about it, right?
12         A.        I did not hold a press conference
13    about that.
14         Q.        Well, that's what this transcript
15    is from.
16              You did have a press conference to
17    explain that, right?
18              MS. TAYLOR:  Object to the form of
19         the question.
20         Q.        (BY MS. TAYLOR) That that defense
21    was being asserted.
22              MS. TAYLOR:  Object to the form of
23         the question.
24         Q.        (BY MS. COLLINS) Isn't that true?
25              You stood up there and said that
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    they were comparatively at fault.
 2                    MS. TAYLOR:  Object to the form of
 3         the question.
 4         A.        That was not the purpose of the
 5    lawsuit or the intent --
 6         Q.        (BY MS. COLLINS) Okay.
 7         A.         -- of the press conference.  Excuse
 8    me.
 9         Q.        And their civil lawsuit was a
10    lawsuit brought against the City because the
11    plaintiffs alleged that the City didn't take steps
12    to protect them, right?
13                    MS. TAYLOR:  Object to the form of
14         the question.
15         A.        My understanding is that that was
16    their -- that they -- what they alleged.
17         Q.        (BY MS. COLLINS) Okay.  And you
18    agree that people have a right to file a civil
19    lawsuit if they feel like their civil or
20    constitutional rights have been violated, correct?
21                    MS. TAYLOR:  Object to the form.
22                    MR. RADER:  Object to the form of
23         that one, especially.
24         A.         I don't know that I know enough
25    about the law, to be honest with you, as to when
```

1   somebody has the right to do that and when they

2   don't.

3                    What I -- I was actually attempting

4   to soften the blow of it coming out in the lawsuit,

5   in the response to the lawsuit.

6        Q.       (BY MS. COLLINS) You were softening

7   the blow by getting up there and -- and saying that

8   because they partook of illegal drugs that the City

9   was using a defense of comparative fault?

10                   MS. TAYLOR:  Object to the form of

11           the question.

12       A.       I was saying that was included

13   within our response.

14       Q.       (BY MS. COLLINS) How does that

15   encourage other victims to come forward if JCPD

16   mishandles their cases?

17                   MS. TAYLOR:  Object to the form of

18           the question.

19       A.       The intent was to separate the

20   difference between a civil lawsuit versus a criminal

21   lawsuit.

22       Q.       (BY MS. COLLINS) Well, at this

23   point in time, you knew that JCPD had gotten

24   evidence from Sean Williams' apartment back in 2020,

25   correct?

Lexitas TENNESSEE
(615) 595-0073

```
 1                    MS. TAYLOR:  Object to the form of
 2          the question.
 3          A.        I did.
 4          Q.        (BY MS. COLLINS) At this point in
 5    time, when you gave the press conference, you knew
 6    that multiple women had made allegations of rape
 7    against Sean Williams, correct?
 8                    MS. TAYLOR:  Object to the form of
 9          the question.
10          A.        I knew -- I knew multiple women --
11    I'm sorry.  I knew that there was a lawsuit that
12    alleged --
13          Q.        (BY MS. COLLINS) When you gave the
14    press conference, you knew that multiple women --
15                    MS. TAYLOR:  Let her answer.
16                    MR. RADER:  Object --
17                    MS. TAYLOR:  Let her answer.
18          Q.        (BY MS. COLLINS) You knew that
19    multiple women had alleged they had been raped by
20    Sean Williams.
21                    MS. TAYLOR:  I'm going to direct
22          the witness to answer the last question.
23                    Will you read back the last
24          question that she was interrupted in her
25          answer on?
```

Case 2:23-cv-00071-TRM-JEM   Document 235-22   Filed 05/28/24   Page 58 of 79   PageID #:

```
 1                    MS. COLLINS:  It's the same thing I
 2          just said.
 3                    COURT REPORTER:  At this point in
 4          time, when you gave the press conference,
 5          you knew that multiple women had made
 6          allegations of rape against Sean Williams,
 7          correct?
 8          A.        We had three to four reports
 9   reported to the Johnson City Police Department.
10          Q.        (BY MS. COLLINS) Okay.  And none of
11   those three to four reports had been fully
12   investigated, had they?
13                    MS. TAYLOR:  Object to the form
14          question.
15          A.        I don't have the answer to that
16   question.
17          Q.        (BY MS. COLLINS) Okay.  And at this
18   point in time, when you gave this press conference,
19   the City also had the Daigle report in its hands,
20   right?
21          A.        Yes, ma'am.
22          Q.        And the City also knew the extent
23   of the failures that it had, based on the Daigle
24   report, that claims of sexual assault had not been
25   properly investigated, right?
```

Lexitas  TENNESSEE
(615) 595-0073
10260

```
 1              MS. TAYLOR:  Object to the form of
 2          the question.
 3          A.      I knew there was opportunity for
 4   improvement in the way that the City handled sexual
 5   assault claims.
 6          Q.      (BY MS. COLLINS) And you also knew
 7   at this time, based on the Daigle report, that
 8   victims were not listened to and it was because of
 9   bias against them, right?
10              MS. TAYLOR:  Object to the form of
11          the question.
12          A.      I did not know that.
13          Q.      (BY MS. COLLINS) Okay.  All the
14   things that are listed in the Daigle report you had
15   in your possession, correct?
16          A.      Correct.
17              MS. TAYLOR:  Object to the form.
18          Q.      (BY MS. COLLINS) And he
19   specifically raised the issue with the City that it
20   had a problem with bias and the reason why sexual
21   assault investigations were not properly
22   investigated, right?
23              MS. TAYLOR:  Object to the form of
24          the question.
25          A.      That was his opinion.
```

```
1          Q.        (BY MS. COLLINS) And he's the
2     person that the City hired to get it on a better
3     track with respect to sexual assault investigations,
4     correct?
5          A.        That's correct.
6                    MS. TAYLOR:  Object to the form of
7          the question.
8          Q.        (BY MS. COLLINS) And despite
9     knowing that Sean Williams had raped multiple women
10    in the City and that he had been arrested and found
11    with videos and pictures of those sexual assaults in
12    North Carolina, despite knowing that things sat in a
13    vault at the JCPD, despite knowing that there was a
14    raped list that the JCPD had been in possession of,
15    and despite having its own expert report saying that
16    they had not done a good job with respect to sexual
17    assault investigations, you still got up at a podium
18    and blamed the victims in this case because they
19    filed a lawsuit.
20                   MS. TAYLOR:  Object to the form of
21         the question.
22         A.        I did not blame the victims.
23         Q.        (BY MS. COLLINS) Isn't that what
24    you said, because they took partook of illegal drugs
25    and alcohol that the City was -- because the City
```

1    was raising a comparative fault defense, that's

2    blaming them.

3                    MS. TAYLOR:  Object to the form of

4            the question.

5            A.      I did not blame the victims.

6            Q.      (BY MS. COLLINS) If they feel

7    differently, do you have any basis to contest that?

8                    MS. TAYLOR:  Object to the form of

9            the question.

10           A.      I am sorry if that hurt them.  I

11   would never do that, and that was not the intent,

12   and I never said that they were at fault for being

13   raped.

14           Q.      (BY MS. COLLINS) Do you think that

15   the people that -- the women that reported their

16   claims to the JCPD deserved to have their cases

17   investigated?

18                   MS. TAYLOR:  Object to the form of

19           the question.

20           A.      I believe they had their cases

21   investigated.

22           Q.      (BY MS. COLLINS) What about ████

23   rape kit?

24                   MS. TAYLOR:  Object to the form of

25           the question.

```
 1          A.      I don't think it is appropriate for
 2    me to respond to something I heard in deposition,
 3    and so I feel at this point in time, I am very
 4    reluctant to speak to what I believe that I heard in
 5    deposition about that rape kit.
 6          Q.      (BY MS. COLLINS) Well, you're the
 7    City Manager, right?
 8                  You have the authority to hire and
 9    fire people who aren't doing their job, right?
10                  MS. TAYLOR:  Object to the form of
11          the question.  This is argumentative, has
12          been for quite a while.
13          Q.      (BY MS. COLLINS) You have the
14    authority to hire and fire people who aren't doing
15    their job.
16          A.      Based on what I heard, the rape kit
17    was tested and her number had been changed, and they
18    tried to reach her.  That is what I thought I heard.
19    I very much want the facts of this case to come out.
20          Q.      Was it compared to Sean Williams?
21                  MS. TAYLOR:  Object to the form of
22          the question.
23          Q.      (BY MS. COLLINS) Her rape kit, when
24    her rape kit was done, was it compared with any DNA
25    evidence from Sean Williams?
```

```
 1           A.        I don't know the answer to that.

 2           Q.        If I told you that DNA evidence

 3    wasn't gotten from Sean Williams until 2023 when he

 4    was arrested in North Carolina, would that seem

 5    pretty egregious to you?

 6                     MS. TAYLOR:  Object to the form of

 7           the question.

 8           A.        If that were true, it would be.

 9           Q.        (BY MS. COLLINS) Do you know that

10    it's not true?

11                     MS. TAYLOR:  Object to form of the

12           question.

13           A.        I don't.

14           Q.        (BY MS. COLLINS) Do you agree that

15    the victims in this case have a right to pursue

16    accountability for letting a person with a raped

17    list continue to roam free for years?

18                     MS. TAYLOR:  Object to the form of

19           the question.

20           A.        Can you repeat the question,

21    please?

22                     MS. COLLINS:  Can you repeat the

23           question, please?

24                     COURT REPORTER:  Do you agree that

25           the victims in this case have a right to
```

```
 1              pursue accountability for letting a person

 2              with a raped list continue to roam free for

 3              years?

 4                        MS. TAYLOR:  Same objection.

 5         A.        I have no reference to answer that

 6    question.  I don't fully understand the question,

 7    and I don't understand how it relates to this

 8    lawsuit.  I feel like asking me to answer it means

 9    that there are facts out there that indicate that

10    there was some accountability on the part that I'm

11    not able to speak to.

12         Q.        (BY MS. COLLINS) Who told you to

13    have that press conference?

14         A.        No one.

15         Q.        That was your decision?

16         A.        Yes, ma'am.

17         Q.        Who told you to say that -- to

18    discuss that the plaintiffs were comparatively at

19    fault?

20                        MS. TAYLOR:  Objection to form.

21         A.        I was not saying that they were.  I

22    was saying that it was included in the response.

23         Q.        (BY MS. COLLINS) Why did you single

24    that out from the response?

25                        MS. TAYLOR:  Object to the form.
```

Lexitas - Tennessee
(615) 595-0073
5255

```
 1          A.        My goal was to explain that because

 2    that was filed in the report, in anticipation of it

 3    being released to the media, I still wanted to

 4    encourage women that in a criminal case, the Johnson

 5    City Police Department as well as -- if they did not

 6    feel comfortable coming to them that they would come

 7    to somebody else, and that it would not hit the

 8    media in a way that would discourage women from

 9    coming forward when they were raped.

10          Q.        (BY MS. COLLINS) So by highlighting

11    this one issue that they were comparatively at

12    fault, you were trying to encourage other women to

13    come forward?  Is that what you're saying?

14                MS. TAYLOR:  Object to the form of

15          the question.

16          A.        I was anticipating the headlines to

17    read City Blames Women, and I was trying to provide

18    some context prior to that being a headline to a

19    story so that women would not feel like the City was

20    blaming them.  That was my goal.

21          Q.        (BY MS. COLLINS) Do you think you

22    achieved your goal?

23                MS. TAYLOR:  Objection to the form

24          of the question.

25          A.        Based on hearing from Jane Does, I
```

```
 1    don't.  And I'm very sorry for that.
 2            Q.        (BY MS. COLLINS) Now, if you could
 3    turn to Page 13 of the -- it looks like a
 4    question -- somebody posed a question that asked you
 5    to speak to when you found out what's allegedly on
 6    the thumb drives that North Carolina recovered with
 7    potentially 52 different women that have been
 8    victims, and they asked for your thoughts in
 9    discovering that.
10            Do you remember that question?
11            A.        Will you show me which sentence
12    you're referring to?
13            Q.        Sure.  It starts on -- Line 9 was
14    the question.
15            A.        Yes, ma'am.
16            Q.        And then your response is on 15
17    through 25.
18            Just let me know when you've had a
19    moment to review that.
20            A.        Yes, ma'am.
21            Q.        Okay.  And you acknowledge that
22    you've not done a good job of educating the public
23    on how you get probable cause.
24            Do you know how you get probable
25    cause?
```

Lexitas TENNESSEE
(615) 725-0073
5275

1          MS. TAYLOR:  Object to the form of
2     the question.
3          A.      I could not speak to that, as I'm
4     not an expert in that area.
5          Q.      (BY MS. COLLINS) Okay.  What were
6     you talking about there when you say, "We've not
7     done a great job of educating the public about
8     probable cause"?
9          A.      I would say that the general public
10    does not understand, as well as myself, when there
11    is the ability to be able to -- and, for example,
12    when you have the right to seize property, when you
13    have the right to arrest someone, when you have the
14    right to search someone, that what may seem
15    reasonable to the general public may not legally be
16    allowed.  So I was referring to the fact that,
17    generally speaking, a lot of folks, unless
18    they're --
19          Q.      Go ahead.  I'm listening.
20          A.      Unless they're knowledgeable about
21    what rights people have, and unfortunately even
22    sometimes really bad people have, that there hasn't
23    been a lot of education around that.  So it was an
24    attempt to say that sometimes we don't fully
25    understand why information can't be taken or can't

```
 1   be used in a case.

 2          Q.       What information are you talking

 3   about?

 4          A.       If I recall correctly, there were a

 5   lot of -- there were questions about the computers

 6   that were taken from Sean Williams after  ███████

 7   ███████ fell out the door -- or the window.  Excuse

 8   me.

 9          Q.       Okay.  And why those devices were

10   not searched at that time, correct?

11          A.       Yeah.

12          Q.       Okay.  And were you aware that at

13   that time they also recovered the raped list?

14                   MS. TAYLOR:  Object to the form of

15          the question.

16          A.       I generally recall that.

17          Q.       (BY MS. COLLINS) Okay.  So in

18   addition to being in possession of all of this

19   electronic evidence that wasn't looked at, the JCPD

20   was also in possession of a raped list --

21                   MS. TAYLOR:  Object to the form of

22          the question.

23          Q.       (BY MS. COLLINS) -- correct?

24          A.       A raped list, when you say that,

25   are you -- you're referring to --
```

```
 1          Q.       A list that has people's names on
 2   it.  The word raped at the top.
 3          A.       Yes ma'am.
 4          Q.       Okay.  So the JCPD was in
 5   possession of that at that same time.
 6                   MS. TAYLOR:  Object to the form of
 7          the question.
 8          A.       Yes, ma'am.
 9          Q.       (BY MS. COLLINS) Okay.  So there
10   really was no excuse for those devices not to have
11   been searched at that time, was there?
12                   MS. COLLINS:  Object to the form of
13          the question.
14          A.       I have no ability to answer that
15   question.  I was not here at the time, nor do I
16   understand the laws associated with it.
17          Q.       (BY MS. COLLINS) Who was your
18   realtor when you were looking to buy Sean Williams'
19   condominium?
20          A.       Shannon Castillo.
21          Q.       When did you begin negotiating that
22   contract?
23          A.       The beginning of April 2022.
24          Q.       Do you have any records of that
25   contract?
```

```
 1              A.       Yes, ma'am.

 2              Q.       Okay.  Where are they?

 3              A.       They're in my office.

 4              Q.       Why did you need a lawyer for that

 5      deal?

 6              A.       Why did I need a lawyer to buy real

 7      estate?  Is that your question?

 8              Q.       Yes.

 9              A.       I always use a lawyer to buy real

10      estate.

11              Q.       Do you own a lot of real estate?

12              A.       I own two homes.

13              Q.       What happened to the deposit, or

14      did you make a deposit?

15              A.       It was held in escrow by the

16      attorney and returned to me.

17              Q.       What basis did you have to pull out

18      of the contract?

19              A.       The fact that the seller was a

20      fugitive, and it was not questioned.

21              Q.       Okay.  Where is your other home?

22              A.       Asheville, North Carolina.

23              Q.       Who lives there?

24              A.       My husband and my daughter.

25              Q.       Okay.  What's your husband's name?
```

Lexitas TENNESSEE
(615) 595-0073
5275

```
 1        A.      ███████████████.

 2        Q.      What's the address?

 3        A.            ████████████████████

 4   ████████████████████.

 5                MS. COLLINS:  Okay.  Let's go off

 6        the record.  I just need to review my notes.

 7                VIDEOGRAPHER:  Going off the record

 8        at 5:38.

 9            (Off the record at 5:38 p.m.)

10            (On the record at 5:54 p.m.)

11                VIDEOGRAPHER:  We're back on the

12        record at 5:54.

13   BY MS. COLLINS:

14        Q.      Earlier I asked you if you dealt

15   with Tessier & Associates in your prior role as

16   Assistant City Manager in Asheville.

17                Who did you deal with at Tessier?

18        A.      Chuck Tessier.

19        Q.      Oh, it's Tessier?

20        A.      Tessier, yeah.

21        Q.      Okay.  Chuck.

22        A.      His wife owned a company, and also

23   she did some publishing and stuff and did some work

24   for the City.

25        Q.      Who was the lawyer that helped you
```

```
1    with the sale of your home in Asheville?

2          A.      Oh, my goodness.  I would have to

3    find that information.  That's been a long time ago.

4          Q.      Okay.  Did Pete Peterson, your

5    predecessor, assist you with any sort of transition

6    when you took over the role as City Manager?

7          A.      He did.  I met with him several

8    times before I -- I accepted the position in late

9    October.  I think that's when the Commission voted

10   on it.  And so there was a couple of months that I

11   came over, met with different folks in the

12   organization.  So I had about a two-month kind of

13   opportunity to talk to him and to meet with staff

14   before I transitioned into the role.

15         Q.      Okay.  Were there any discussions

16   with Mr. Peterson about the Kat Dahl case?

17         A.      No.

18         Q.      Were there any discussions with

19   Mr. Peterson about the police department?

20         A.      No.

21         Q.      Did you take any notes from your

22   transition conversations with Mr. Peterson?

23         A.      I did.

24         Q.      Do you still have those notes?

25         A.      Yes.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          Q.        Have you given those notes to your
 2   attorney?
 3          A.        I can.  None of those notes pertain
 4   to anything related to Sean Williams or related to
 5   this case, but I'm happy to provide them.
 6          Q.        Okay.  Did you deal with anyone
 7   else at Tessier & Associates besides Chuck and his
 8   wife?
 9          A.        Not that I can recall.
10          Q.        What was his wife's name?
11          A.        Karen.
12          Q.        Also Tessier?
13          A.        Yes, ma'am.
14          Q.        What was the nature of the dealings
15   you had with Tessier & Associates?
16          A.        We had -- we had proposed and had a
17   study completed that showed the need for parking
18   downtown, and so we had located a piece of property
19   and were in the -- was in the process of
20   determining -- it was adjacent to the Grove Arcade
21   building that you mentioned before.  And so we did
22   design work with a consulting firm.  He was a
23   developer.  He worked to help acquire the property,
24   because he also worked in a -- as a -- in a real
25   estate kind of capacity, but worked on a
```

Lexitas TENNESSEE
(615) 255-0073

1 redevelopment plan for that area.

2 Q. Which consulting firm are you

3 talking about?

4 A. Kimley-Horn & Associates, I

5 believe. I'm not -- I'm not 100 percent sure, but

6 it's a consulting firm that did parking garages.

7 Q. Do you know the address for the

8 Grove -- for the property that they were working on,

9 rather?

10 A. It's on Haywood Road.

11 Q. Okay.

12 A. Across from the Harris Cherokee

13 Center -- Arena.

14 Excuse me. It's Haywood Street,

15 not Haywood Road.

16 Q. How long have you known Chuck

17 Tessier?

18 A. Probably since the early 2000's.

19 Middle 2000's. I don't recall exactly.

20 Q. Do you still have any contact with

21 him?

22 A. No.

23 Q. And did you meet him through the

24 course of your job duties?

25 A. Yes, ma'am.

```
 1          Q.      Okay.  Any other projects that you
 2   can think of that involved --
 3          A.      He was a regular developer in town
 4   that would meet with me about different projects he
 5   was working on, but there was no -- there was never
 6   any that developed into the level of detail that
 7   that one did.
 8          Q.      And why was he meeting with you?
 9          A.      I was in a role of being the City
10   Engineer, and then I also was over our planning and
11   permitting process.  So any time there was a meeting
12   that would involve the planning department that was
13   a large scale, what we would consider a
14   transformational project, I would meet with -- I
15   would be a part of those meetings to discuss that.
16          Q.      Did you ever work with him or make
17   any money from him?
18          A.      No, ma'am.
19          MS. COLLINS:  Okay.  That's all we
20          have.
21                  EXAMINATION
22   BY MR. RADER:
23          Q.      I just want to ask you, Ms. Ball
24   briefly, on behalf of my client, when you were asked
25   today by Ms. Collins about these handwritten
```

Lexitas TENNESSEE
(615) 595-0073

1   notebooks that you prepare, it's my understanding --
2   and I want to be sure I'm clear.
3                   It's my understanding that you take
4   notes when people are talking as part of your effort
5   to focus and listen; is that correct?
6          A.      That's correct.
7          Q.      You're not trying to
8   stenographically record everything that happens,
9   like our court reporter here or some of us writing
10  notes down to keep that record.
11                  That's not your purpose; is that
12  right?
13         A.      Yes, sir.
14         Q.      And so when you write things down,
15  it might be comments that people have or words
16  they've made.
17                  It's not your conclusions; is that
18  correct?
19         A.      That's correct.
20         Q.      So there were a couple of comments
21  about my client, Mr. Peters.  You did not reach
22  those conclusions and record those in your notebook.
23                  Those are just words that somebody
24  might have said to you; is that correct?
25         A.      Correct.

LexitasLEGAL  TENNESSEE
(615) 525-0073
10285

```
 1          Q.      Okay.  Do you have any reason to

 2   believe that Mr. Peters was anything other than

 3   somebody who wanted to do a good job as a captain in

 4   the police department?

 5                  MS. COLLINS:  Objection to form.

 6          A.      I never personally experienced

 7   that.

 8          Q.      (BY MR. RADER) That he was anything

 9   other than wanting to do a good job?

10          A.      That's correct.

11                  MR. RADER:  All right.  Thank you,

12          ma'am.

13                  MS. COLLINS:  Anything else?

14                  All right.  You're done.

15                  THE WITNESS:  All right.

16                  VIDEOGRAPHER:  We're going off the

17          record at 6:02.

18                  FURTHER THIS DEPONENT SAITH NOT.

19              (Deposition ended at 6:02 p.m.)

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2    STATE OF TENNESSEE:

 3    COUNTY OF KNOX:

 4

 5              I, Jeffrey D. Rusk, Registered

 6    Professional Reporter and Notary Public, do hereby

 7    certify that I reported in machine shorthand the

 8    foregoing proceedings; that the foregoing pages,

 9    inclusive, were prepared by me using computer-aided

10    transcription and constitute a true and accurate

11    record of said proceedings.

12              I further certify that I am not an

13    attorney or relative of any attorney or counsel

14    connected with the action, nor financially

15    interested in the action.

16              Witness my hand and official seal

17    this the 3rd day of June, 2024.

18

19

20    _____

21    Jeffrey D. Rusk, RPR, CLVS
      Notary Public at Large
22    My Commission Expires:  4/29/2026
      TCRB License No. 212

23

24

25
```

STATE
OF
TENNESSEE
NOTARY
PUBLIC
KNOX COUNTY, TN
JEFFREY D. RUSK