# Exhibit 24

# B.P.

## vs.

# City of Johnson City, Tennessee, et al,

---

## ERIC DAIGLE

## June 10, 2024



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TENNESSEE
2                      GREENEVILLE DIVISION

3

4    B.P., H.A., and S.H.,          )
     individually, and on behalf of)
5    all other similarly           )
     situated,                      )
6                                   )
                                    )
7                   Plaintiffs,     )
                                    )
8                                   )
                                    )
9    v.                             )   No. 2:23-CV-00071
                                    )          TRM-JEM
10                                  )
     City of Johnson City,          )
11   Tennessee, et al,              )
                                    )
12                                  )
                    Defendants.     )
13

14

15            * * * * * * * * * * * * * * * *

16               DEPOSITION OF ERIC DAIGLE
                      (Via Zoom)

17

18                    June 10, 2024

19

20   ===================================================
                      LEXITAS LEGAL
21

22        Jeffrey D. Rusk, RPR, LCR, CLVS

23

24              Jeff@JeffRusk.com

25
```

Case 2:23-cv-00071-TRM-JEM   Document 335-2 TENNESSEE 10/28/24   Page 3 of 167   PageID #:
(615) 595-0073

```
1    APPEARANCES:

2    FOR THE PLAINTIFFS:

3    Vanessa Baehr-Jones, Esq.
     4200 Park Boulevard No. 413
4    Oakland, California  94602
     Vanessa@AdvocatesForSurvivors.com
5

6    Elizabeth A. Kramer
     Erickson Kramer Osborne, LLP
7    44 Tehama Street
     San Francisco, California  94105
8    Elizabeth@eko.com

9    Heather M. Collins, Esq.
     Collins & Hunter
10   7000 Executive Center Drive
     Suite 320
11   Brentwood, Tennessee  37027
     heather@hmccivilrights.com
12

13   FOR THE DEFENDANTS:

14   For Johnson City, Tennessee, Karl Turner, Kevin
     Peters, and Toma Sparks in their official
15   capacities:

16   Emily Taylor, Esq.
     Watson Roach Batson & Lauderback
17   1500 Riverview Tower
     900 South Gay Street
18   Knoxville, Tennessee  37902
     ETaylor@WatsonRoach.com
19

20   K. Erickson Herrin, Esq.
     Herrin McPeak & Associates
21   515 East Unaka Avenue
     Johnson City, Tennessee  37605
22   Lisa@hbm-lawfirm.com

23

24

25
```

```
 1    For Kevin Peters in his individual capacity:

 2    Daniel H. Rader, IV, Esq.
      Moore Rader Fitzpatrick & York
 3    46 North Jefferson Avenue
      Cookeville, Tennessee  38501
 4    Danny@MooreRader.com

 5

 6    For Justin Jenkins, Brady Higgins, and Jeff Legault

 7    in their individual capacities:

 8    Keith H. Grant, Esq.
      -- and --
 9    Laura B. Rufolo, Esq.
      Robinson Smith & Wells
10    Republic Centre
      633 Chestnut Street
11    Suite 700
      Chattanooga, Tennessee  37450
12    KGrant@rswlaw.com
      LRufolo@rswlaw.com
13

14    For City of Johnson City, Tennessee:

15    Jonathan P. Lakey, Esq.
      Burch, Porter & Johnson, PLLC
16    130 North Court Avenue
      Memphis, Tennessee  38103
17    JLakey@bpjlaw.com

18

19    For Toma Sparks in his individual capacity:

20    Kristin Ellis Berexa
      Farrar Bates Berexa
21    12 Cadillac Drive
      Suite 480
22    Brentwood, Tennessee  37027
      KBerexa@fbb.law
23

24    Videographer:  Chris Rusk

25
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                          I N D E X

 2     EXAMINATION BY                                   PAGE

 3     ERIC DAIGLE

 4     Ms. Kramer                                          8

 5     NO.           INDEX OF EXHIBITS                  PAGE

 6
       Exhibit 113  24.06.06 Updated Daigle Subpoena      32
 7
       Exhibit 114  Topics for Spreadsheet    SA          65
 8                  Invest, CITY-0066604-1 through
                    6604-3
 9
       Exhibit 115  Handwritten Notes of Interviews,      92
10                  CITY-0066641 through 6655

11     Exhibit 116  Email from Sgt. John Hames,          153
                    CITY-0066593-1 through 6593-5
12
       Exhibit 117  8.24.22 Ball Letter to Baldwin       222
13
       Exhibit 118  9.1.22 DA Finney Letter to Ball      222
14
       Exhibit 119  Spreadsheet Key, CITY-0066601-1      235
15                  through 6601-2

16     Exhibit 120  2018 Rape Cases (DLG                 236
                    Spreadsheet), CITY-0066430
17
       Exhibit 121  2019 Rape Cases (DLG                 243
18                  Spreadsheet), CITY-0066434

19     Exhibit 122  11A Rape Offense Reports             248
                    spreadsheet, CITY-0004932-1
20                  through 4932-2

21     Exhibit 123  2019 Rape Report Case Notes,         250
                    CITY-0066433-1 through 6433-3
22
       Exhibit 124  Sexual Assault Training              264
23                  Spreadsheet, CITY-0070596
                    through CITY-0070615
24

25
```

```
                    D E P O S I T I O N,

         The deposition of ERIC DAIGLE, taken at the
request of the Plaintiffs, pursuant to the Federal
Rules of Civil Procedure, on the 10 day of June,
2024, at the Keyston Community Center, Johnson City,
Tennessee, before Jeffrey D. Rusk, Registered
Professional Reporter and Notary Public at Large for
the State of Tennessee.

         It is agreed that the deposition may be
taken in machine shorthand by Jeffrey D. Rusk,
Registered Professional Reporter and Notary Public,
and that he may swear the witness and thereafter
transcribe his notes to typewriting and sign the
name of the witness thereto, and that all
formalities touching caption, certificate, filing,
transmission, etc., are expressly waived.

         It is further agreed that all objections
except as to the form of the questions are reserved
to on or before the hearing.
```

```
 1              (Proceedings began at 9:30 a.m.)

 2                   VIDEOGRAPHER:  Okay.  We are on the

 3         record.  Today's date is June 10th, 2024.

 4         The time is 9:30 a.m. Eastern time.

 5                   This is the video-recorded

 6         deposition of Eric Daigle in the matter of

 7         B.P., et al, versus Johnson City, et al,

 8         Case 2-23-CV-0071 in the U.S. District Court

 9         for the Eastern District of Tennessee.

10                   This deposition is being held via

11         Zoom video conference.  The reporter's name

12         is Jeff Rusk.  My name is Chris Rusk.  I am

13         the certified legal videographer.  We are

14         with Lexitas Legal.

15                   Would the attorneys present -- or

16         would the attorneys present please introduce

17         themselves and the parties they represent?

18                   MS. KRAMER:  Good morning.  My name

19         is Elizabeth Kramer from Erickson Kramer

20         Osborne, and I'm here representing the

21         plaintiffs.

22                   MS. COLLINS:  Heather Collins, as

23         well, and Julie Erickson also.

24                   MR. LAKEY:  Jon Lakey here for the

25         City of Johnson City.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1                    MR. GRANT:  Keith Grant and Laura
 2        Beth Rufolo here for Justin Jenkins, Jeff
 3        Legault, and Brady Higgins.
 4                    MR. RADER:  This is Danny Rader
 5        here for Kevin Peters.
 6                    VIDEOGRAPHER:  Okay.  Thank you.
 7                    Would the court reporter please
 8        swear in the witness?
 9                    COURT REPORTER:  Okay.  Mr. Daigle,
10        I'm going to go ahead and swear you in.
11                    Would you raise your right hand,
12        please?
13                    THE WITNESS:  Yes, sir.
14                    COURT REPORTER:  Do you swear or
15        affirm the testimony you're about to give
16        will be the truth, the whole truth, and
17        nothing but the truth?
18                    THE WITNESS:  I do.
19                    COURT REPORTER:  Okay.  Thank you.
20                    ERIC DAIGLE,
21   called as a witness at the instance of the
22   Plaintiffs, having been first duly sworn, was
23   examined and deposed as follows:
24
25
```

```
                      EXAMINATION

BY MS. KRAMER:

         Q.      Good morning, Mr. Daigle.

         A.      Good morning, ma'am.

         Q.      Would you give me your full name

and title please?

         A.      My name is Eric Daigle,

D-a-i-g-l-e.  I'm an attorney.

         Q.      And tell me about your business,

the Daigle Law Group.

         A.      Daigle Law Group is a law firm

incorporated here in the state of Connecticut.

It's -- the best way to describe it is a law firm

that doesn't do much law.  We're a consulting

practices firm, management organizational firm for

government entities across the country.  Our

specialty mainly -- our main specialty is law

enforcement operations.  We also obviously get into

corrections and fire a little bit, but our -- we

have a whole host of services here from policy

development, to training, to consulting services, to

applicant testing.  Kind of like a one-stop shopping

for our municipal clients across the country.

         Q.      What is applicant testing?

         A.      When you are -- when you want to be
```

Coxton & Associates, LLC · TENNESSEE
(615) 595-0073
#: 6295

```
 1    a police officer, you have to take a test.  So for
 2    both applicant testing and promotional testing, part
 3    of our services render the -- assist the agency in
 4    testing candidates.
 5          Q.      I see.  Thank you.
 6                  What did you do to prepare for your
 7    deposition today?
 8          A.      Just read a bunch of stuff.  I went
 9    through my -- my testimony in the Dahl matter, my
10    deposition transcript that was taken in December,
11    and I went through my report to just try and get
12    myself familiar with the facts and circumstances
13    that you would be asking about today.
14          Q.      Anything other than the Dahl
15    transcript and the report that you reviewed before
16    today?
17          A.      Yes.  I went through the -- just a
18    general review of the file that you should have
19    obtained as part of the discovery here.  I'll call
20    it our consulting file or our assessment file which,
21    you know, had our working documents and stuff that
22    we obtained throughout the investigation, and also
23    specifically some reports that were drilled down
24    in -- during the Dahl deposition as to, you know,
25    sample or examples that I utilized in the report
```

Lexitas - TENNESSEE
(615) 595-0073

```
1    that was asked, you know, specifically what report

2    was this and who was the victim and who was the

3    suspect in that area.

4              Q.        Do you know what an errata is?

5              A.        An errata sheet?

6              Q.        Yes.

7              A.        Yes.

8              Q.        Do you -- do you recall, did you

9    make any changes to your testimony given in the Dahl

10   deposition that would be reflected on an errata

11   sheet?

12             A.        No, because I didn't even get a

13   copy of the deposition until last week.  I had

14   realized that no one had ever sent me one.  And as I

15   was preparing for this deposition, I reached out to

16   all the parties and said, "I'd really kind of like

17   to get a copy of that," and so I received it last

18   week.  So I did not ever complete an errata.

19             Q.        Based upon your review, did you see

20   any items of testimony that you believe need to be

21   corrected?

22             A.        Nothing -- nothing jumped out, no.

23             Q.        Did you speak to anybody in

24   preparation for your deposition today?

25             A.        Yes.  I did speak with you briefly
```

1   on Friday to set up the -- just to let me know that

2   you guys were coming into town, and then I spoke to

3   an attorney, Danny Rader, on Saturday.  He'd been

4   trying to just contact me last week, and I spoke to

5   him on Saturday for about 15 or 20 minutes during

6   that time.

7          Q.      And what was your discussion with

8   Danny Rader about on Saturday?

9          A.      You know, usual deposition

10  preparation.  The fact to tell the truth.  And then

11  specifically he was reviewing some of my previous

12  testimony in the Dahl matter and asking whether I

13  still felt the same way that I testified to before,

14  specifically on topics of whether there was any

15  corruption that I located during the course of

16  the -- of my assessment and, if I did, would I bring

17  it to people's attention.  And as I had testified in

18  the prior deposition, obviously, that's something

19  that we would do.

20                  And also specifically questions

21  about the fact that the investigations had gotten

22  better over the -- over the years, and so it was

23  basically, "Hey, here's what you said in your

24  deposition.  Do you still agree with that?"  And

25  obviously, if I said it in my deposition, I still

```
 1    agree with it, so --

 2         Q.        And so it's your understanding that

 3    Danny Rader had a copy of the transcript of the

 4    deposition that you gave in the Kat Dahl case?

 5         A.        Well, he's asking me questions

 6    about it.  So I can -- I don't know for sure, but I

 7    can assume so.

 8         Q.        Did he refer to specific testimony

 9    as if he were reading it off the document itself?

10         A.        I don't know.

11         Q.        You didn't record that conversation

12    with Danny Rader, did you?

13         A.        I did not.

14         Q.        Did you take any notes?

15         A.        I did not.  I was actually in my

16    car taking my child to get Jersey Mike's.  So it was

17    a -- it was -- that wasn't an in-depth conversation.

18         Q.        But you said Danny asked you some

19    questions about corruption.

20                   Can you tell me what you remember

21    from that portion of your conversation?

22         A.        Yeah.  I had made a statement that

23    I saw in my deposition that said obviously -- that

24    said during the course of my assessment if I had

25    come up -- if I had identified any corruption within
```

1    the Johnson City Police Department, would I have

2    brought it to the attention of the people that

3    retained me.

4                    And I said, as I said in the

5    deposition, obviously the way I do business, I'm

6    integrity based.  If I found something that -- in

7    the assessment that had led to corruption, I would

8    have -- I would have addressed it.  But also I was

9    just doing an assessment, not an investigation.  So

10   that wasn't the scope of my analysis.

11                   So I just stayed consistent to my

12   previous statement, which is if I see something that

13   I would classify as corruption in my world, I would

14   bring it to somebody's attention.

15          Q.       But the evaluation that you did for

16   your report did not include any -- you were not

17   asked to look for corruption in the context of the

18   report that you did for Johnson City; is that right?

19          A.       I was not.

20          Q.       Did you -- in connection with your

21   report, did you ask whether there had been

22   allegations of corruption against the Johnson City

23   Police Department?

24          A.       I didn't ask.  I've known since I

25   completed the investigation over two years ago, you

```
 1    know, there's been media reports of different things
 2    occurring with different individuals.  Not my issue.
 3    It's interesting to read, but not part of my
 4    assignment.  So I'm aware that, through media
 5    reports, that there's been additional allegations
 6    and other lawsuits filed, but that's the scope of my
 7    knowledge.
 8         Q.       And so you haven't tested any of
 9    those allegations regarding corruption?
10         A.       I have not, no.
11         Q.       Did anybody other than Danny Rader
12    reach out to you in advance of your deposition
13    today?
14         A.       No.  There were different -- I
15    think someone from your office sent me my subpoena,
16    and there were emails, but I think everybody was on
17    the emails that were there.  I don't remember
18    anything specific other than those general emails to
19    schedule and address the deposition.
20         Q.       No other counsel for a defendant in
21    this case reached out to speak to you ahead of your
22    deposition; is that --
23         A.       No.
24         Q.       -- correct?
25                  Looking back at the Dahl
```

```
1    deposition, were you contacted by Danny Rader ahead
2    of your deposition in the Dahl case?
3          A.      I don't believe so.
4          Q.      Were you contacted by any of the
5    defense counsel in the Dahl matter ahead of your
6    deposition in that case?
7          A.      I don't believe so.  I -- you know,
8    I don't really like to have conversations with
9    people prior to my depositions.  And I tell them
10   very clearly that if you choose to have this
11   conversation, you know the rules of the
12   conversation, so -- but I believe, even in reviewing
13   my testimony, I think I testified that I hadn't
14   talked to anybody before that.
15         Q.      Did you advise Danny Rader that you
16   preferred not to speak substantively about your
17   testimony ahead of giving a deposition?
18         A.      I don't think I said that to him.
19                 Listen, I'll take a phone call from
20   anybody.  The attorneys know the rules of the game.
21   So I don't have to -- I shouldn't have to explain it
22   to them.
23         Q.      I agree.
24                 Going back to that conversation
25   that you had with Danny, you mentioned that he asked
```

```
 1   you about some specific conclusions that you had
 2   made in the Dahl transcript and asking if you had
 3   changed those.
 4                   Can you recall with any more
 5   specificity what those were?
 6        A.        No, it was just those two issues.
 7                  MR. RADER:  I'm just objecting to
 8        the form of that question.
 9        A.        Just it was those two topics,
10   corruption and then a topic -- the second part, it
11   was -- I just said it, and I can't remember it.
12                   The one was about corruption and,
13   you know, is that what you had testified to?  Oh,
14   and the other was about in my assessment I had said
15   that the investigations had gotten better over the
16   years, in looking at data sets from '18, '19, and
17   '20 versus data sets from '21 and '22, and that the
18   investigations seemed to be more -- developing a
19   little better than they were back in '18, '19.  And
20   he asked me if that was still my opinion.  It didn't
21   change.
22        Q.        (BY MS. KRAMER) Have you received
23   any additional data or information from Johnson City
24   since the information that was provided to you in
25   connection with publishing your report?
```

Lexitas - TENNESSEE
(615) 595-0073
#: 6595

```
 1          A.      No.
 2          Q.      Have you received data or
 3  information from anybody that would alter any of the
 4  conclusions that you made in your report?
 5          A.      Well, once I completed this
 6  investigation, I have heard from nobody and received
 7  nothing regarding this -- the assessment that we did
 8  here.
 9          Q.      Can you tell me a little bit about
10  your educational background?
11          A.      Sure.  I have a sociology degree
12  from Central Connecticut State University and a
13  juris doctorate degree from Quinnipiac University
14  School of Law.
15          Q.      And what did you do immediately
16  following law school?
17          A.      So, unfortunately, my world is not
18  that simple.  I've done many things at the same
19  time.  So I think the best bet is just to kind of go
20  over, if you want my history up to this point, if
21  you'd like me to.
22          Q.      Sure.
23          A.      Okay.  So I started in the
24  military.  I started as an Army reservist while I
25  was in high school.  I was a military police
```

(615) 595-0073

```
 1    officer.  I then went active duty as a military

 2    police for Desert Shield/Desert Storm.  I toured

 3    overseas.  I came back from my deployment.

 4                 At this point, I hadn't started

 5    college yet.  I actually started taking some classes

 6    at a community college, and then I was hired by the

 7    Connecticut State Police in 1992.  I started my

 8    career with the Connecticut State Police in the

 9    summer of '92.  And once I got on the state police,

10    you know, I got on the job.  I started my -- so I

11    did both my undergrad and my juris doctorate degree

12    at night while working night, days, whatever.  I was

13    working shift work.  So I did my education along

14    with my career with the state police, where I spent

15    about a decade with the state police.

16         Q.      What kinds of work were you doing

17    with the state police?

18         A.      So I've always been an investigator

19    at heart.  So when I started here, you know, a lot

20    of people don't understand.  Connecticut is a unique

21    state.  We don't have sheriffs' offices.  We only

22    have state police and local law enforcement.  And

23    because of the size of the state, the state police

24    often, in the New England areas, are the entity that

25    you call when you need anything above resources
```

Lexitas - TENNESSEE
(615) 595-0073

```
1     available to you.

2                    A lot of departments here are

3     small, 30, 40 members.  And so state police, which

4     at the time was about 1250 strong, we are pretty

5     much the supporting law enforcement for the state.

6                    So I came on, and I started my

7     career in patrol, and did patrol for two years.  And

8     then once I was able to get patrol under my belt, I

9     took an assignment at the Department of Corrections

10    as a state police liaison investigator, spent

11    two years there.

12                    Basically, in that job, there are

13    state troopers assigned to correctional facilities

14    in the state of Connecticut, and your job is to

15    obviously investigate criminal acts that occur

16    inside a correctional facility.  And once I did that

17    for two years, I finally got to where I wanted to,

18    which was what we call major crime squad.

19                    In the state of Connecticut there's

20    three major crime squads; central, east, and west.

21    We are a really easy state.  And I spent the rest of

22    my career working major crime, which is basically a

23    felony investigation unit.  As you work your way up,

24    you work -- you know, with experience you get better

25    and investigations.  So I spent the remainder of my
```

```
1    career and at the end of my career working homicide
2    and cold case homicide, until I took a vested
3    retirement in 2002, when I went over to a law firm
4    to practice law.
5              Q.      In your tenure with the state
6    police, did you see robberies?
7              A.      Yes.
8              Q.      Rape?
9              A.      Yes.
10             Q.      Murder?
11             A.      Yes.
12             Q.      Was there a type of crime that was
13   what you would consider low level that generally did
14   not get to the state patrol?
15             A.      Well, you know, the troopers
16   themselves would have, you know, burglaries and
17   larcenies, low-level crimes.  The troopers working
18   patrol could come up to major crime and ask for
19   assistance if they needed assistance with some type
20   of evidence processing or something like that, so --
21   and a lot of times towns, like even here, a lot of
22   problems like they have now across the country is
23   stolen vehicles.  A lot of times the town and the
24   state police will work together to deal with
25   low-level crime, the crimes that are more frequent
```

```
 1   and have a more direct effect on operations.

 2           Q.        In your time with the major crime

 3   squad, you mentioned homicide and cold case

 4   homicide.

 5                     Did you also deal with sex-related

 6   crimes?

 7           A.        I did, yes.

 8           Q.        And can you describe the scope and

 9   the frequency of those types of cases that you dealt

10   with?

11           A.        So it really started -- you would

12   get it as a patrol trooper.  But then obviously as a

13   patrol trooper, you're not qualified to handle that.

14   So you would take the initial complaint and move it

15   over to major crime.  So my first two years, you

16   just -- you know, you're kind of the first

17   responder.

18                     Once I went over to the prisons,

19   unfortunately, I got a lot of them in the prisons

20   and -- from all just low level to, you know, sexual

21   assaults, to violent sexual assaults for the

22   two years I was with the prisons.

23                     And then in major crime, we would

24   get, you know, sexual assault investigations,

25   whether they involve juveniles or ladies or males
```

DorAnn L. Ferguson, RPR, LCR #658
(615) 605-0073

```
1    and, you know, it was just an ordinary -- you get

2    them as an ordinary course of business.

3             Q.      You said you moved over to a law

4    firm after your work in law enforcement.

5                     What type of law firm did you move

6    to?

7             A.      So I went to a firm here in

8    Connecticut called Halloran & Sage.  Halloran & Sage

9    has offices in the East Coast, and they're pretty

10   much an insurance defense firm.  It's a bigger sized

11   firm, but the reason why I went there was that there

12   was an opportunity to specialize in municipal

13   defense and law enforcement defense, you know.  The

14   defense of law enforcement agencies, at least here

15   in New England, is insurance based.  And so outside

16   counsel is usually hired for 1983 claims that come

17   into allegations.

18                     So the opportunity was there to

19   bring my knowledge and expertise over while learning

20   law.  And back in those days, the good part was, you

21   know, we were litigators and we actually did

22   litigate.  So I did that for -- I was at Halloran &

23   Sage for approximately eight years, where not only

24   was I responsible for, you know, litigating cases,

25   but I also ran an investigative team and started to
```

1    do consulting work while I was with that firm.

2              Q.        So did you work on 1983 cases

3    specifically since the start of your work at the law

4    firm?

5              A.        Yeah.  That's all I did, yeah.

6              Q.        And you tried Section 1983 cases?

7              A.        Yes.

8              Q.        Approximately how many Section 1983

9    cases do you think you tried?

10             A.        Back in those days, 2002, we tried

11   cases.  And when you were a new associate -- there's

12   not a lot of insurance settlement back then, and I

13   feel bad for the young attorneys of today that

14   aren't getting that skill set.

15                       But back in those days, you walked

16   in the office, they handed you a file, and you were

17   in court the next day, whether you knew what you

18   were doing or not.  But we tried a lot of cases back

19   in the early 2000's.

20             Q.        Do you think you tried more than

21   ten?

22             A.        Oh, yeah, clearly more than ten.

23   Yes, more than ten.  I would say it had to be in

24   the -- I mean, I was there for eight years.  I tried

25   a lot.  In the main portions, I mean, we would

TENNESSEE
(615) 595-0073

```
 1    average -- somebody on the team could have a trial,
 2    let's say, maybe three to four a year, if you have
 3    big ones, you know, officer-involved shootings or
 4    excessive force cases.  And I would sit sometimes
 5    second chair, first chair, as you're starting to go
 6    through.  So, you know, maybe 30, 20 to 30 would be
 7    a fair number.
 8             Q.       In each of these cases, you were
 9    representing a defendant police officer; is that
10    correct?
11             A.       Yes.
12             Q.       Or a defendant police department;
13    is that correct?
14             A.       Yes.  Except I did have, every once
15    in a while, a unique criminal matter with a police
16    officer that was being represented outside of the
17    civil world, but the majority of it was civil.
18    Every once in a while we would get a criminal matter
19    that would come in, too, but they were all for the
20    defense of law enforcement.
21             Q.       And you've never worked on behalf
22    of a plaintiff against a police officer, right?
23             A.       As a litigator, I have not.  I've
24    never tried a case against a police department.
25                      Well, I take that back.  I have
```

(615) 595-0073

```
 1   sued police departments for officers I guess it's
 2   just a big -- yeah, so that's very few, but I have
 3   done that, not as an external citizen suing a
 4   municipal entity.
 5            Q.       Understood.
 6                     So in that context it would be a
 7   police officer who is suing their own police
 8   department, for example, for wrongful termination.
 9            A.       Yes.
10            Q.       Let's move forward in time to when
11   you start consulting.
12                     Do you remember what year that was?
13            A.       So I started doing it during the
14   course of my time with Halloran & Sage as the era of
15   what we call legal advising for municipal
16   organizations started to get a little bit more
17   developed at that time.  And that would be just, you
18   know, giving law enforcement executives or city
19   councils advice on different items, different
20   weapons, different implementations, while also at
21   the same time, you know, assisting them in drafting
22   policy, and a lot of training.  It was at that time
23   I started building training courses to enhance skill
24   sets of our clients.
25            Q.       I forgot to ask.
```

```
 1          A.      Sure.

 2          Q.      In the approximately 30 trials that

 3    you litigated on behalf of a police officer or

 4    police department, what was your success rate?

 5          A.      Well, the interesting part of

 6    defense work is you don't like to ever lose.  So you

 7    either win or settle.  So I don't think I have a

 8    loss under my belt, but I probably have a lot of

 9    settlements.

10          Q.      What would you estimate is the

11    number of settlements versus jury verdicts in

12    approximately 30 trials?

13          A.      That's a hard number.

14              MR. LAKEY:  Object to form.

15          A.      Yeah, that's a hard number.  I

16    mean, we settled.  I mean, remember, we're

17    talking -- the confusion is that we also settled the

18    cases that didn't go to trial.  And you would -- you

19    know, in the world of municipal litigation, there's

20    a lot of cases.  So I don't -- I wouldn't be

21    comfortable answering the question.

22          Q.      Okay.  So going back to consulting,

23    you mentioned developing policies, assisting with

24    training.

25              At what point did your -- did you
```

```
1    open Daigle Law Group?

2              A.        I opened Daigle Law Group in 2010,

3    May of 2010.   There was an opportunity at that time.

4    We were under President Obama's administration, and

5    during that time a lot of scrutiny was being placed

6    into law enforcement agencies.   Department of

7    Justice was becoming very active in investigations

8    of municipal entities across the country.   And it

9    kind of took off to a whole nother level, which

10   is -- with consent decrees and settlement agreements

11   and DOJ investigations that there was an opportunity

12   to focus on working with or through or even against

13   departments to get them through the struggles they

14   were having.

15             Q.        So Daigle Law Group -- obviously

16   you will prepare a report for a client, just as a

17   matter of ordinary business function, like the

18   report that you produced for Johnson City Police

19   Department, correct?

20                       MR. LAKEY:  Object to form.

21             Q.        (BY MS. KRAMER) And then you also

22   produce, I expect, reports in connection with

23   litigation; is that right?

24                       MR. LAKEY:  Object to form.

25             A.        We don't really do much litigation.
```

TENNESSEE
(615) 595-0073

```
 1    So the only -- I don't know if you're referring to
 2    like expert witness reports.
 3            Q.      (BY MS. KRAMER) Correct.
 4            A.      Yeah.  Yeah.  So I do have a heavy
 5    caseload of expert witness work.  And so expert
 6    witness report would be where you're working for one
 7    side versus the other, and that -- yes, we have a
 8    lot.  We -- I would do those, too.
 9            Q.      And I know it's hard to estimate
10    going back to 2010, but do you know approximately
11    how many times you've been engaged to produce an
12    expert report in litigation?
13            A.      Yeah.  I actually do this because I
14    get asked this question every single time, and so I
15    keep a little note sheet to keep myself active.
16                    So currently I have 73 expert
17    witness cases, and the breakdown on the expert
18    witness cases and deposition -- the depositions we
19    just continue to add.  So I have six plaintiffs
20    cases 45 defendant cases, five labor arbitrations,
21    16 criminal cases, 13 are for prosecution and three
22    are for defense, and one POST, which is the Police
23    Officer Standards and Training, revocation for the
24    State of Vermont.
25            Q.      When you said 73 currently, is that
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   73 -- these are totals from the inception of Daigle

 2   Law Group; is that correct?

 3         A.      Since 2000 -- since I started doing

 4   expert witness work in 2010, yes.

 5         Q.      Okay.  And you mentioned six

 6   plaintiff reports.

 7                 Were those plaintiffs citizens

 8   suing a police officer or police department?

 9         A.      Yes.

10         Q.      How were you engaged in those

11   matters generally?

12         A.      A good -- most of them were early

13   in my career, and that would be an attorney looking

14   for an expert's opinion on a type of police

15   interaction, whether it was a -- a lot of my work is

16   excessive force allegations.  Every once in a while

17   we'll have an investigation case or a, you know,

18   pursuit or a false arrest claim, something to that

19   regard.

20                 And so the attorney would just

21   reach out to you and, you know, the way -- the way

22   that we do this is very structured, or at least the

23   way you should do it is very structured, which is

24   you will talk to the attorney.  And then the way I

25   take a case is, if I choose to take it, you know,
```

```
1    you don't know what you're getting until I do my
2    work.  And then I'll tell you what you're getting,
3    and sometimes you might not like that, but it's just
4    the way it goes.
5          Q.      Where any of these six plaintiff
6    cases in the last ten years?
7          A.      Just one, I think.  I think it
8    doesn't count, but I think I've been noticed as an
9    expert in the Dahl matter for the plaintiff.  So
10   I -- obviously I did not write a report specific to
11   that area, so -- but I get to put that on my list, I
12   guess.
13               But the last one that I did, I want
14   to say, was -- it definitely was within the last
15   ten years because -- yes.  The answer is yes.  So I
16   think it was about 2015 is the last specific case
17   for plaintiff.
18               I'll take calls from anybody, you
19   know, and I get a lot of calls from both plaintiff's
20   and defense counsel.  I'm pretty straightforward.  I
21   let them know how it's going to be.  If they want to
22   engage and pay the fee, I'll tell them what I think
23   of their case.  A lot of times I don't get a lot of
24   calls back after that, but I'm not against taking
25   the cases.  It just has to be a case that I'm
```

1    willing to testify about.

2         Q.      How many times have you testified

3    at trial?

4         A.      So a lot.  I'll just -- because

5    that's a question I get.  So I started my career,

6    obviously, with state police and in major crime.

7    And in major crime, especially later in my career

8    where I was working homicide, you testify a lot.

9    You know, you -- all of your homicides, you know,

10   pretty much most of them go to trial.  So you end up

11   testifying there.

12              Once I started the consulting work

13   and the expert witness work, I have testified in

14   one, two, three, four, five, six, seven, eight -- I

15   have been noticed in eight states as an expert.  And

16   that would be Connecticut, Tennessee, California,

17   Wyoming, Massachusetts, Utah, and Maine.  I think

18   that's everyone.

19              There's a -- and it's a broad

20   range, because now it's not just expert witness

21   work.  It could be -- it could be -- we do a lot of

22   internal affairs investigations, and a lot of times

23   you're testifying at a labor board or at a civil

24   rights lawsuit when someone is terminated for either

25   side.

```
 1          Q.       Do you ever interact with a police
 2    officer unions?
 3          A.       Well, what do you mean by interact?
 4          Q.       Do you -- are you ever engaged by a
 5    police officer union to conduct an investigation?
 6          A.       Never for -- I do -- so up here in
 7    the northeast and in your neck of the woods, the
 8    west coast, are strong union areas.  So we engage
 9    with the union a lot on policy development and
10    operations.
11                   I have never been retained by a
12    union to do an investigation.  I have been retained
13    by a union, and my latest one was Henderson, Nevada,
14    to give an opinion on, you know, something that the
15    chief was doing.  So it's very rare, but it has
16    occurred.
17          Q.       Do you remember if you testified at
18    trial in any of the six cases that you mentioned
19    where you were working for the plaintiff?
20          A.       I did not, no.
21                   MS. KRAMER:  What I will mark as
22              Exhibit 113?
23                   COURT REPORTER:  Yes, that's
24              correct.  113 is our next exhibit number.
25                   (Exhibit 113 marked).
```

```
 1                    MS. KRAMER:  Great.

 2                    Oh, I'm sorry.  This is just the

 3          subpoena.  I did not -- I did not bring you

 4          a copy.  I'm sorry, Jon.

 5          Q.      (BY MS. KRAMER) Have you seen that

 6  before?

 7          A.      Yes.  I believe I received this on

 8  Friday from your office.

 9          Q.      Okay.  Great.

10                    And then I'm also going to direct

11  you to what's been previously marked as Exhibit 56,

12  which is what we call very fondly the Daigle report.

13                    MR. LAKEY:  We want to have one

14          that says 56 on it.

15          Q.      (BY MS. KRAMER) For you.

16          A.      Thank you, ma'am.

17          Q.      Have you seen that document before?

18          A.      Yes, I have.

19          Q.      Does that look to you to be a

20  correct copy of your report?

21          A.      Yes.  It's got some new stuff on

22  it, like a Bates number and an exhibit sticker.  But

23  other than that, it looks like the same thing.

24          Q.      And you prepared that report,

25  correct?
```

```
 1          A.        I did, yes.
 2          Q.        Do you remember approximately when
 3     you were engaged by the Johnson City Police
 4     Department to prepare that report?
 5          A.        So I wasn't engaged by the police
 6     department.  I was engaged by the City and through
 7     the City Attorney's office.  And I think there is a
 8     document -- there is an actual retainer agreement,
 9     and I'm sure you'll show me, but I want to say in
10     the summer of 2002.
11          Q.        And you said you were contacted by
12     someone in the legal department.
13                    Do you remember who that was?
14          A.        Yeah.  Attorney Sunny Sandos.
15          Q.        Was it only Attorney Sunny Sandos
16     that was on the initial phone call with you for the
17     City?
18          A.        So I think as they usually do
19     start, and if I remember correctly on this one, it
20     starts as, "Hey," as an email, "Would you be
21     interested in having a conversation about this," and
22     then you have a conversation.
23                    I believe I had my first
24     conversation with her, but then I knew there was --
25     there was definitely other, you know, interviews
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    with the City Manager and other people in the room
 2    specifically about, you know, whether they want to
 3    choose to retain Daigle Law Group for this
 4    assessment or not.
 5              Q.      You mentioned the City Manager.
 6                      Was that Cathy Ball?
 7              A.      Yes.
 8              Q.      Do you remember anybody else from
 9    these initial conversations that you had?
10              A.      No.  There's -- there was another
11    paralegal down there.  There was -- sometimes -- I
12    don't know in the first one.  And, again, I
13    apologize, number one, everything blends together
14    and, number two, unfortunately, we keep doing these.
15    So I -- the key part is that sometimes the -- Sunny
16    or an outside attorney would be in those meetings.
17    I don't think they were in the initial.  I think it
18    was just -- you know, Cathy Ball was very
19    straightforward, and she just wanted to feel
20    comfortable with making the decision on who to hire
21    in that area and for this responsibility.
22              Q.      Do you remember if an attorney
23    named Erick Herrin was involved in those early
24    conversations?
25              A.      I don't believe so.  I don't think
```

```
1    I met him until later in the investigation.
2         Q.        You mentioned your Professional
3    Services Agreement.
4                   Do you recall a provision in that
5    document that says the client is required to provide
6    you adequate data for you to conduct your
7    assessment?
8         A.        Yes.
9         Q.        Is that standard in all of your
10   Professional Services Agreements?
11        A.        Yes.
12        Q.        And why is that important?
13        A.        Well, because in -- you know, it's
14   an interesting realm from when you enter into an
15   assessment.  And, again, I want to clarify it,
16   because I'm going to use these words and I may even
17   interchange them myself, but there's a difference
18   between an assessment and an investigation.
19                  In an investigation, I get to do
20   whatever I want to and however I want to, to come up
21   with my end results.  In an assessment, you're
22   assessing something.  So it's a controlled
23   environment, in the aspect of they hand you things
24   and you assess them.
25                  The challenge with any
```

1    investigation in my history in doing these is

2    there's always parties involved, and sometimes you

3    have open access to things, and sometimes you think

4    you have open access to things and you don't.  And

5    as you can imagine as attorneys, there's oftentimes,

6    as I learned in my early days when I'm sitting in a

7    deposition or in trial testimony later, that they

8    didn't give me everything that they were supposed to

9    give me.

10                   So that -- over the years that

11   morphed into putting it in my agreement to say, you

12   know, I'm going to ask you for it and, if you don't

13   give it to me, then that's on you.  And so that is a

14   general -- that is a general stipulation.

15        Q.       Did Johnson City agree to that

16   stipulation?

17        A.       Yes.

18        Q.       And just to repeat your

19   clarification, you were asked to do an assessment,

20   which is fundamentally client controlled, for

21   Johnson City, not an investigation which, in your

22   words, are unrestricted.

23                   MR. LAKEY:  Object to form.

24        Q.       (BY MS. KRAMER) So for this

25   assessment that you did for Johnson City, did you

1    feel that you were given adequate data to conduct
2    your assessment of the JCPD?
3                    MR. LAKEY:  Object to form.
4            A.        Yeah, to the best of their ability
5    to the -- to the key that I could, you know,
6    determine.  And as you can see in the report, the
7    challenges were ones that we see sometimes in the
8    fact that, you know, data is data.  The quality of
9    data is, if it's not good, then it really hampers
10   your assessment and your analysis.
11                    The key part here in Johnson City,
12   I'm sure you'll get into, is obtaining the records.
13   When you're doing an assessment of something like
14   sexual assault investigations, it is -- you would
15   expect certain things and just that's why you're
16   getting asked to do it, right?  You're used to
17   reading these things.  You're used to seeing them.
18                    And, you know, I will say that
19   their challenges were real challenges that was
20   beyond, I think, the people who were responsible for
21   providing me the documents.  They worked very hard
22   and diligently to get me what I needed but, in the
23   end, it just was not enough.
24           Q.        When you say it just was not
25   enough, what do you mean by that?

```
 1          A.        Well, I take seriously the aspect
 2    of doing an assessment.  And just like any of us,
 3    you don't want to give a conclusion that doesn't
 4    have the true foundation to form that conclusion.
 5                    In my world, unfortunately, I find
 6    myself in depositions and litigation often on my
 7    conclusions, and I want to make sure that my
 8    conclusions are legitimate.  And also, as you would
 9    expect, I want to make sure that if I'm going to
10    give a conclusion that is negative, that it's taking
11    into account all the work that the men and women did
12    in the department to get the job done.
13                    And unfortunately, one of the
14    things, like I said in the report is that, I can't
15    give them the full amount of credit because I don't,
16    I don't know what they did or didn't do.  I just
17    know what I received.  In looking at what I
18    received, there's things missing.  There's gaps.
19    And so I have to assume, unfortunately, we hate that
20    word, but I have to assume that if there's gaps,
21    then it wasn't done.
22                    And I made many efforts to go back
23    to them and say, "You know, come on, guys.  I know
24    you've got to have something somewhere."  Like this
25    is -- there's expectations that we would have in
```

1    these investigations.

2              Q.        Setting aside that some of the

3    documentation was unavailable from Johnson City, for

4    each of the findings in your report, you made those

5    only after believing that you had a true foundation

6    for those findings; is that correct?

7                       MR. LAKEY:  I want to interject an

8              objection, Ms. Kramer, or maybe we can make

9              it a standing one.  But to the degree that

10             you're questioning calls for opinion

11             testimony from the plaintiff, I'm going to

12             note for the record that plaintiffs have not

13             identified Mr. Daigle as an expert witness

14             in their discovery responses, including the

15             initial disclosure submitted in the case.

16                       If the plaintiffs seek opinion

17             testimony from this undisclosed expert,

18             defendant objects and further objects on the

19             basis that such testimony would not be

20             within the permissible scope of a lay

21             witness opinion testimony.

22                       Now, every time you ask for an

23             opinion from him, I'm going to interject it.

24             So I'm glad to just have a standing

25             objection to that if you -- if you agree to

```
 1              it or, otherwise, I can make it each time.
 2                   MS. KRAMER:  No need to make it
 3              each time.
 4                   MR. LAKEY:  Thank you.
 5                   MR. RADER:  I will join in that
 6              objection and, unless there's an objection
 7              from plaintiffs' counsel, I'm going to join
 8              in the objections of Mr. Lakey today so as
 9              not to disrupt this on Zoom.
10                   MS. KRAMER:  Noted.
11                   MR. RADER:  Is there -- do you
12              agree that I can do that, or do I need to do
13              it every time?
14                   MS. KRAMER:  You do not need to put
15              your objection on the record if you are
16              joining in the objections of Mr. Lakey.
17                   MR. RADER:  Thank you, ma'am.
18                   MR. GRANT:  I will join those also.
19              This is Keith Grant for Jenkins, Legault,
20              and Higgins.
21                   MS. KRAMER:  Understood.
22                   Anybody else?
23                   MR. ALLEN:  Might as well join,
24              too.  Thank you.
25              Q.      (BY MS. KRAMER) Okay.  So let's go
```

Lexitas  TENNESSEE
#: 6585
(615) 595-0073

```
 1   back.

 2                    So in your work on this report,

 3   Mr. Daigle, you have a number of what you call

 4   findings; is that correct?

 5        A.        Yes, ma'am.

 6        Q.        And you just mentioned that for

 7   each of your findings you like to make sure that you

 8   have what you said is a true foundation; is that

 9   correct?

10        A.        To the best of my ability, yes.

11        Q.        Having reviewed your report just

12   yesterday, do you believe that you had a true

13   foundation for the findings that you made in your

14   report?

15        A.        I do.

16        Q.        So the report is titled Audit of

17   Sex-Related Crimes.

18                    How did you determine the scope of

19   the sex-related crimes that would be the subject of

20   this audit?

21        A.        So starting with just identifying

22   what are classified as sex-related crimes involving

23   a victim in Tennessee utilizing the TIBRS

24   notification, the TIBRS numbers, and getting data

25   sets to try to reflect what they are.  Obviously,
```

TENNESSEE
(615) 595-0073

```
1    the rape is pretty easy one.  And then we went down

2    through the sex-related offenses in the -- in

3    Tennessee.

4              Q.      The report notes a comparison

5    between the number of JCPD cases you identified and

6    the number that were logged with TIBRS.

7                      Do you remember that?

8              A.      Yes.

9              Q.      And your report says, quote, "The

10   purpose was to ensure that the data provided by JCPD

11   was consistent with the data discovered in the TIBRS

12   system."

13                     Can you explain what that means?

14             A.      Yeah.  So, you know, like any data

15   analysis that anybody does, you want to have some

16   checks and balances to the data.  I mean, just

17   because I'm asking the department how many of 11B's

18   did you have doesn't mean the department's going to

19   tell me the truth.  So I need to have a way to

20   independently audit that.

21                     And since there is -- that is

22   reported to the state on an annual basis, that

23   reporting number is a way for me to audit the fact

24   that the numbers that they were giving me versus the

25   numbers that they reported to the State were
```

1    accurate.

2          Q.       So the check, in other words, is

3    just that the number that the City reported to you

4    is the same as the number of the City reported to

5    the State.

6          A.       Yes.

7          Q.       And you found that that number was

8    consistent?

9          A.       Yes.  There's always -- just for

10   the record, there's always going to be a little bit

11   of inconsistency.  TIBRS is, you know, sometimes the

12   numbers may just fluctuate by one or two based on

13   when the case was closed or how it was operated, but

14   when I was deep into it, there was a direct

15   correlation between the TIBRS numbers and the

16   numbers that the City had given me.

17         Q.       And do you recall what the

18   approximate number was of the cases that you looked

19   at?

20         A.       I want to say there was 326 of my

21   recollection, but --

22         Q.       That is what --

23         A.       -- I felt like I was studying for

24   the bar again last night.

25         Q.       That is what I see reflected here

(615) 555-0073

```
 1   on Page 7 of your report.  So good memory.

 2        A.        Well, it's short term.

 3                  MR. LAKEY:  Is that Bates 66547,

 4        Bates number?

 5                  MS. KRAMER:  Yes.

 6                  MR. LAKEY:  Let me try and --

 7        Q.        (BY MS. KRAMER) Mr. Daigle, do you

 8   know how many of these 326 cases involve women

 9   victims?

10        A.        I don't.

11        Q.        Do you recall whether any involved

12   male victims?

13        A.        It wouldn't be surprising that

14   there was one or two.  I would expect it to be a low

15   number but, you know, I think just in general, in my

16   experience in the country, that in -- from the time

17   frame here, 2018 to 2022, '23, that there was -- I

18   think in all departments we have seen an increase in

19   male victims, in that male victims feeling

20   comfortable enough to report the crime.  But I did

21   not -- it may be in our spreadsheets, but I don't

22   remember a specific number.

23        Q.        In working with these 326 cases,

24   you concluded that that data set would be

25   representative for purposes of your assessment; is
```

Lexitas - TENNESSEE
(615) 595-0073

1    that correct?

2                    MR. LAKEY:  Object to form.

3         A.        Well, that's all I got.  So that's

4    all -- I can't -- that was the totality of the data

5    set to my understanding.

6         Q.        (BY MS. KRAMER) In other words, as

7    far as you know, for the time period January 2018 to

8    July 2022, the total number of sex-related crimes

9    that JCPD had a case number for was 326.

10                   MR. LAKEY:  Object to form.

11        A.        That fit into these

12   classifications, yes.

13        Q.        (BY MS. KRAMER) Understood.

14                   Did you feel comfortable using 326

15   cases to do the assessment that you did that

16   resulted in your Audit of Sex-Related Crimes?

17        A.         I did, and the good part is that,

18   you know, any audit is based on the volume of the

19   audit.  Anybody who does an audit wants to have a

20   strong volume to be able to show -- you know, if

21   you're auditing two things, you've got a 50 percent

22   chance of failure.  So the more cases that you can

23   audit, the more you can see patterns, which is

24   really what we look for when auditing.

25                   And so specifically with the

Lexitas - TENNESSEE
(615) 595-0073

1    forcible rapes and having 133 of those and -- you
2    know, it was the cornerstone of this audit and those
3    numbers in totality.  Because, you know, the
4    statutory rape, the forcible fondling, you know,
5    those are, "Okay, what did we do?"  But the real
6    issue on the table was the significant victim crimes
7    and the response to significant victim crimes.
8              So all of them are terrible.  All
9    of them are crimes, but the lower level might not
10   need as much of an investigation as a forcible rape,
11   for example, that could have forensics involved in
12   it and, you know, different levels, additional
13   levels of investigation needed.
14        Q.       In your experience as compared to
15   an assessment you may have performed for another
16   police department, would 326 cases be a number
17   you're comfortable with drawing conclusions from?
18              MR. LAKEY:  Object to form.
19        A.       I can't answer that, just because I
20   don't -- you know, I've done audits on different
21   things with less numbers, and I've done audits with
22   more numbers.  You know, the number is the number.
23   That's what I have to work with.  I don't really --
24   whether I like it or not doesn't matter.  It's what
25   I've got.  So I do think it's a number that will be

significant enough to show what I was looking for,
which was patterns.

And, for me, the purpose of the
audit is -- it's all -- it's not negative or
positive.  It's just what happened.  So I want to
make sure that when I'm doing an audit that I can
also give people credit for the things they do
right, along with identify things that they may fail
then.  So a volume -- the bigger the volume and the
more significant the volume, obviously the better
you can go through and say, "Okay, well, they did it
right in these areas and they didn't do it right in
these areas."  So I was -- I think it was
sufficient.

Q.       (BY MS. KRAMER) You answered that
question much better than I asked it.  Thank you.

How did you land on the time period
2018, January 2018 to July 2021?

A.       That was a discussion with the City
in a couple of different realms.  Number one, they
were looking at a specific time frame because of the
allegations in the Dahl complaint.  And not --
that's not part of my world, but obviously I would
want to include those years in the assessment,
because the City was -- you know, Ms. Ball was

(615) 555-0073

1    looking to make sure things were being done

2    correctly, and so those had to be part of the

3    assessment years.

4              When you're doing an assessment,

5    with the -- with the changes -- and I hate that

6    word, but with the progression in the way the world

7    works, technology and scientific studies, and really

8    just investigative practices, you have to get a

9    workable time frame, right?

10             You can't go back ten years,

11   because ten years ago they might not have done

12   something that we do as a normal course of business

13   nowadays, because technology is different.  So

14   adding all of those things together and looking at

15   the numbers, I was comfortable with this -- with the

16   range of years that we had come to an agreement on.

17        Q.     Do you recall who at Johnson City

18   you had these discussions with regarding the time

19   period?

20        A.     They would have definitely involved

21   Sunny Sandos, Attorney Sandos, and either directly

22   or indirectly the City Manager.

23        Q.     Cathy Ball?

24        A.     Yes.

25        Q.     Do you remember anybody else

1    involved in those discussions?

2           A.      There may have been other City

3    Attorneys or paralegals that worked in the City.  At

4    this point, when we're doing all this, there's no

5    outside involvement.  It's just me and the City

6    coming up with our scope of work, because that's

7    something that's very important to me, for the

8    protection of my team, is that we have to identify

9    very clearly what the scope is, and set expectations

10   so that later on, after we spend, you know,

11   municipal money, you know, they don't come back and

12   say, "Well, we wanted something else or we didn't

13   expect to get this."  So we do spend a lot of time

14   setting expectations.

15          Q.      Did you consider starting from an

16   earlier date?

17          A.      I don't recall, but I don't think

18   so.

19          Q.      And how about the end date being

20   July 2022?  How was that time selected?

21          A.      That was the time in which we

22   started this investigation, this assessment.  So

23   that's how the end date occurred, and it kind of

24   even -- it kind of actually spread out a little bit

25   more as the assessment continued on, but that was --

1    you know, I like to have hard numbers, and so the

2    number was at the point of being retained.

3           Q.      Did you review any documents from

4    the City relating to sex-related crimes from before

5    January 2018?

6           A.      I don't -- I don't believe so.

7           Q.      Did you find out anything about the

8    City's record management system from before

9    January 2018?

10          A.      Yeah.  It was the same one that we

11   had in 2018.  That Watson system had been something

12   that was around for them for a while.

13          Q.      Do you know how long a while is?

14          A.      Not off the top of my head, no.

15          Q.      Do you think it was more than

16   five years?

17                  MR. LAKEY:  Object to form.

18          A.      Well, just knowing municipal

19   government the way I know it, in operations, is that

20   when we get something that works, we keep it for a

21   long time.  So I assume it's probably been there for

22   a while, but I don't know the exact -- when they put

23   it in play.

24          Q.      (BY MS. KRAMER) There's a section

25   of your report that discusses methodology, and I

1    invite you to take a look at that section.  It's at
2    the bottom of Page 4 of your report.

3         A.         I do see that.  Thank you, ma'am.

4         Q.         Can you describe for me generally
5    what methodology you used in preparing this report?

6         A.         So it's really -- the first part is
7    going to be the methodology of the assessment, how
8    it's going to occur.  And the easiest way I explain
9    to individuals is the way that normal people would
10   do this would be broken down into three phases, you
11   know.

12             The first phase would be a data
13   collection phase, which is where you pull in the
14   data that you need, and you begin to assess it and
15   try to get an understanding of what's there, what's
16   good, what you need more of, and where you're going.
17   And, you know, one of the things, especially for us
18   working for a lot of municipalities, money is a lot
19   of times an issue.  So we're trying to do this in as
20   frugal a way as possible, and -- but at the same
21   time to make sure it's effective.  So the first
22   phase would be the data collection phase.

23             Once we get through the data
24   collection phase, or we realize that we need more,
25   we would then go into the assessment phase.  And the

```
 1    assessment phase would be where we start to assess
 2    the data, and then we might need some clarity.  And
 3    that's when we would probably -- that's when we
 4    do -- usually do on-site interviews for the purposes
 5    of trying to understand what we're trying to
 6    understand.
 7                     And then once we get through the
 8    second phase, which is the assessment phase, then we
 9    go to the report-writing phase.  And the third phase
10    is putting the report together, coming up with what
11    the findings are going to be, what our
12    recommendations to the clients are going to be, and
13    then putting it together.
14         Q.        And the methodology that you
15    describe in this report is one that you stand by
16    today; is that right?
17         A.        Yes.
18         Q.        Is it consistent with the
19    methodologies that you use when you prepare reports
20    for other clients?
21         A.        Yes.
22         Q.        And is it consistent with what
23    other professionals in your space use in terms of
24    methodology for evaluating a police department?
25                     MR. LAKEY:  Objection to form.
```

TENNESSEE
(615) 595-0073

```
 1          A.        I do believe so.
 2                    MR. LAKEY:  Sorry.
 3                    THE WITNESS:  My fault.
 4          Q.        (BY MS. KRAMER) Was part of your
 5     methodology to look at how JCPD's policies
 6     compare -- sorry.  Let me say that again.
 7                    Was part of your assessment to look
 8     at how JCPD investigates sex-related crimes versus
 9     other serious crimes?
10          A.        No, because that would be a much
11     deeper assessment.  It would take more time and more
12     resources.  So we were very -- we were very focused
13     on solely sex-related crimes.
14                    I'm sure, you know, there is a --
15     there is a spillover that occurs, and the spillover
16     is when you're -- like, for example, the JCPD policy
17     is not a investigating sex-related crimes policy.
18     It's a criminal investigation policy.
19                    So, you know, the skill set of
20     sex-related crimes is no different -- I won't say no
21     different, but it's pretty much an investigation, an
22     investigation, an investigation.  Meaning that, you
23     know, we're going to expect to do certain things.
24     And then, you know, 90 percent of the investigation
25     is going to be just like any other crime, but
```

```
 1    there -- but because of the topic of the

 2    investigation, there might be a more focused

 3    discipline that needs to be attached to that type of

 4    crime.

 5           Q.      So, for instance, in any of your

 6    interviews, did you ask how an officer would handle

 7    a sex-related crime with respect to, say, evidence

 8    collection versus a serious but not sex-related

 9    crime?

10           A.      No.

11           Q.      Part of your methodology is what's

12    referred to as an assessment tool.

13           A.      Yes.

14           Q.      It's also a spreadsheet.

15                   If I call it the assessment tool,

16    do you know what I'm talking about?

17           A.      It's a fancy word for spreadsheet.

18    Yes, I got that.

19           Q.      Can you describe how that works?

20           A.      So assessing things are -- you

21    know, is, for those of us that do this for a living

22    and -- you know, it's not -- it's not rocket

23    science.  It's just very -- you have to be very

24    meticulous and very methodical.

25                   So the way that I have always been
```

TENNESSEE
(615) 595-0073

```
 1    trained and the way that I do assessments is that
 2    you want to run all of the things you're assessing
 3    through the same scrutiny, right?  So whether it's
 4    use of force or whether it's IA or whether it's
 5    sex-related crimes, you're building an assessment
 6    tool that allows you to take data and run it through
 7    the assessment tool for the purposes of asking very
 8    specific questions related to very specific things
 9    that you would expect.
10                      And then once you do that, the
11    assessment tool provides you the basis of
12    assessment, because as you go through individual
13    incidents and you fill out the assessment tool,
14    you're going to find areas where there's failure or
15    there's -- where there's something different, or
16    it's going to allow you to compare one thing versus
17    another.
18                      Anybody who would just take one of
19    these investigations, read it, put it down and take
20    the next investigation, read it and put it down,
21    none of us are that good.  It has to be -- if I'm
22    going to come to a conclusion and tell an agency
23    that we have a good or a bad, I want to make sure
24    that the tool represents the outcome, that this is
25    why I came to this conclusion.  It's not my opinion.
```

```
 1   It's the evidence analysis.

 2           Q.       And when you say a good or a bad,

 3   what are you talking about?

 4           A.       Like you want to give credit for

 5   where they do it the way they're supposed to and

 6   identify where there might be failures.  And then

 7   that leads us to the next level, which is why is

 8   this a failure?  Why are we not doing what we --

 9   what the industry would expect you to do in this

10   area, but -- so it's both good and bad.

11                   Like at the end of the time, I can

12   come out of the assessment and say to the client,

13   "Hey, we're good.  You're -- you're doing everything

14   that you're supposed to do," and -- or I can come

15   out of the assessment and say, "Hey, there's some

16   holes here, and I'm not really sure why because I'm

17   not investigating it, but this is something that

18   you, as an agency, should take a look at and figure

19   out what the issue is."

20           Q.       You mentioned the word industry.

21                   And is the assessment tool looking

22   at an industry standard?

23                   MR. LAKEY:  Object to form.

24           A.       Yes, in my opinion, and so the way

25   that -- I want to be able to defend my work.  I want
```

1    to be able to defend my team's work, and credibility

2    obviously in our game is very important.  And so I

3    try to be very broad, but I also try to be very

4    particular.

5                        And what I mean by that is -- so

6    law enforcement is an industry.  Doing police work

7    is an industry.  We are professionals.  Just like

8    any other industry, you learn your task, you learn

9    your skill set, and you do your job.

10                       And so in coming up with our

11   assessment tool, I took things that were industry

12   standards, such as accreditation standards, or model

13   policies, or investigative, you know, knowledge,

14   things that those of us who do these investigations

15   are trained to do, and made those part of the

16   assessment tool for which I could put the cases

17   through and evaluate the good and the bad.

18        Q.        (BY MS. KRAMER) Can you give me a

19   short definition for industry standard?

20        A.        Yeah.  Well, I mean, the

21   interesting part is every industry is different.

22   The law enforcement -- that's actually a great

23   question, because law enforcement is the only

24   industry in this country, and not many people know

25   this, but the only industry in the country that does

not have a national set of standards.  There's no
book out there.

The reason why there's a -- that
law enforcement doesn't have a national set of
standards is not a failure.  It's because law
enforcement is the only industry where law guides
what we can do every day.  And so, you know, as you
all know, courts issue decisions every day that
affect the way we can do things, how we can stop a
car, how we can search a car, how we can arrest a
person.

And so those of us that work in the
industry as, you know, guidance counselors, for lack
of a better term, we're just taking these
industry -- these court cases, CALEA standards,
accreditation standards, model policies, national
organizations like the IACP, and what I did for this
is, you know, kind of took them all and laid them
all on top of each other and said, "Okay, what is
consistent?  What can we make, an industry
standard?"

So there's no book that you can
buy, because the book doesn't stay viable for long
enough.  But those of us that have done this for a
while, you know, you know what you have to do to

1    achieve the end result and, you know, to do what we

        2    call a full, fair, unbiased investigation.

        3            Q.      The sources that you listed, let's

        4    walk through those.

        5            A.      Sure.

        6            Q.      So you mentioned the law.

        7                    So you're looking at -- in this

        8    context you're looking at Tennessee law.

        9            A.      Yeah.  So obviously this is

       10    Tennessee.  So you're going to start with state

       11    statutes.  If there's any guidance in the state

       12    statute as to what's supposed to occur, that's the

       13    most important because that's what they're working

       14    under.

       15                    And then I would go to any

       16    interpretations of Fourth Amendment applications,

       17    search and seizure, through both -- you know,

       18    usually we try to keep it at the state supreme court

       19    level, or some cases are appellate court level

       20    cases.  But, you know, when they're changing what we

       21    can do and how we can do it, we've got to be very

       22    cautious that it's not just some judge having a bad

       23    day, but it's actually something that the court is

       24    going to uphold.

       25                    And then we look around the

Case 2:23-cv-00071-TRM-JEM   Document 235-2   Filed 03/28/24   Page 62 of 167   PageID
                            #: 6595

industry.  And around the industry, one of the
things that is -- that are valuable are
accreditation standards, both national and local.
That's a big thing nowadays.  You know, basically
they're not going to tell you everything you're
supposed to do, but they're going to have some
standards which the industry believes should be
consistent, if that makes sense.  But that's what an
accreditation standard is.  It's a bunch of people
got together and said, "Hey, we would like all our
cops to do X., and so we're going to make it a
standard."

        And then the last one would be
either external research or, more importantly -- and
a lot of times I use Department of Justice
settlement agreements across the country, because
it's pretty clear from settlement agreements that
when the Department of Justice comes in and changes
what a department does, everybody else should pay
attention to what they're doing.  It doesn't mean
you have to do it, but at least there's some basis
for it.

        Q.    And did you also collect and review
Johnson City Police Department policies and
procedures?

(615) 555-0073

```
 1          A.      Yes.

 2          Q.      Do those policies and procedures go

 3   into your evaluation of the industry standard that

 4   you are going to apply in your assessment?

 5          A.      So the answer is yes.  And as you

 6   saw in the report, the first thing we're going to do

 7   is assess the policy to make sure it's giving the

 8   members of the department the proper guidance that

 9   they need.

10                  I mean, policies are -- you know,

11   policies are important, and people don't fully

12   understand the purpose of policies.  And the purpose

13   of policies is to teach young police officers how to

14   do the job, right?  It's why we require them through

15   policies.

16                  And so you first evaluate the

17   policy to make sure that it is up to speed, and then

18   you -- and then you also, if it's up to -- if it --

19   if it's up to speed, and I use that those words, if

20   it's up to speed, it usually means it's already in

21   line with what we would see in other areas.

22          Q.      Do you recall any instance in which

23   the JCPD policy that you reviewed was already in

24   line with industry standards?

25                  MR. LAKEY:  Object to form.
```

1    A.    Yeah.

2          MR. LAKEY:  Sorry.  Object to form.

3          Go ahead, please.

4    A.    You know, the majority of the

5    criminal investigation policy was -- you know, the

6    concept of criminal investigation is not a new one.

7    You know, it just develops over the years with

8    technology.  And so there is a -- there is a finding

9    in here specific to the policy that there was some

10   recommendations that I thought could be used to

11   enhance the policy, but their criminal investigation

12   policy was kind of a one-on-one policy and, you

13   know, was enough to make sure a base -- an officer

14   coming out of the department knew enough about what

15   they were required to do.

16   Q.    (BY MS. KRAMER) For your assessment

17   tool, was there any standard that you used in your

18   assessment tool that was based solely on an existing

19   JCPD policy?

20   A.    I don't believe so.

21   Q.    In your view, what's the difference

22   between an industry standard and a best practice?

23   A.    They're pretty much the same.  I

24   don't like the term best practice, because my

25   question is always, "Whose best practice?  Is it

```
 1    your best practice, or can you point to a

 2    consistency of that best practice?"

 3                    I'm not a big fan when people in

 4    this industry, law enforcement, use the term best

 5    practice, because it could be opinion-based.  I want

 6    to -- I want to know where it comes from.  Where did

 7    you get it from?  So I would say they're consistent,

 8    just not as significant.

 9         Q.     Would you tell a client, "It's

10    really important for you to not perform lower than

11    best practices"?

12                    MR. LAKEY:  Object to form.

13         A.        I would tell a client that you

14    would not perform below industry standards, because

15    that would increase your liability.

16         Q.        (BY MS. KRAMER) In your assessment

17    of --

18                    MS. KRAMER:  Actually, maybe this

19           is a good time to take a break.

20                    Has it been an hour?

21                    THE WITNESS:  Sure.  I could use a

22           break.

23                    MS. KRAMER:  Okay.  Great.  Thank

24           you.  Let's take it -- let's take a --

25                    MR. LAKEY:  That's always a good
```

```
 1            cue.

 2                      COURT REPORTER:  Okay.  Do you guys

 3            want to go off the record?

 4                      MS. KRAMER:  Let's take -- let's

 5            take ten.

 6                      VIDEOGRAPHER:  Okay.  We are now

 7            off the record.  The time is 10:44 a.m.

 8            Eastern time.

 9               (Off the record at 10:44 a.m.)

10                (On the record at 11:02 a.m.)

11                      VIDEOGRAPHER:  Okay.  We are back

12            on the record.  The time is 11:02 a.m.

13            Eastern time.

14                      MS. KRAMER:  I'm going to hand you

15            another document, Mr. Daigle, that I will

16            mark as Exhibit 114, and the Bates is

17            CITY-0066604.

18                   (Exhibit 114 marked).

19      BY MS. KRAMER:

20            Q.      Sir, have you had a chance to look

21      at that document?

22            A.      Yes, ma'am.

23            Q.      Do you recognize this document?

24            A.      Yes, ma'am.

25            Q.      Did you prepare this document?
```

```
 1          A.       I was involved in the preparation.
 2    This is my team going back through, trying to
 3    determine what we were going to -- what we were
 4    going to use as assessment points for the purpose of
 5    filling -- making that spreadsheet.  This is -- the
 6    first way that we'll do it is we'll kind of gather
 7    information and then kind of start building
 8    assessment points off of something like this into
 9    the document.
10          Q.       So this document was used for the
11    development of the assessment tool; is that correct?
12          A.       Yes, ma'am.
13          Q.       Let's look at the first heading.
14    The first is Policy, and it says in parentheses, "to
15    include the following topics."
16                   Can you describe what policies you
17    are referring to here?
18          A.       This is not a policy in respect of
19    a specific policy, but looking at things in policy
20    that we would expect to find in an investigation.
21    So we're pulling out assessment points, like you
22    would expect to see the first responding officer
23    assess a victim and preserve evidence and crime
24    scene and locate witnesses.  That was what we would
25    expect to find in a policy, but that -- as an
```

```
 1   assessment tool, that's where the first questions
 2   come from.
 3                   Did the officer, you know, assess
 4   the victim.  Did the officer secure the crime scene?
 5   Did -- you know, in that area.  So it's not a --
 6   it's policy topics, not a policy itself.
 7        Q.       Understood.
 8                   And when you say assessment points,
 9   do you mean the assessment point is something that a
10   police officer either did or did not do?
11                   MR. LAKEY:  Object to form.
12        A.       It's something -- I think the
13   answer -- your question is -- I'm going to just spin
14   it another way, which is where we expect to see
15   these things, did the officer do it or not do it?
16                   So I think that's a yes to your
17   question, but with that clarification.
18        Q.       Okay.  The assessment point is
19   where you would expect to see a police officer do
20   something.
21        A.       Do something.
22        Q.       And then when you apply the
23   assessment tool, the answer is yes, no, or --
24        A.       Unknown.
25        Q.       -- unknown.  Okay.  Thank you.
```

TENNESSEE
(615) 595-0073

```
 1                    And do you recall how you developed
 2    this document?
 3             A.        Like I said to you before, you
 4    know, we're using these industry standards, our own
 5    experience, our own knowledge, you know, and so
 6    that's why the first step is to put together a
 7    document like this, a heading for the spreadsheet,
 8    and basically sit around the table and say, "Okay,
 9    here's what this says.  Here's what that says.
10    Here's what this says," of those items.
11                    Because there's a lot of things
12    that have to be done in an investigation, and not
13    every one of them is critical to the outcome of the
14    investigation, but really looking at the reasonable
15    ones, you know, that would make -- that would either
16    make or break an investigation are the points that
17    we're looking for here.
18             Q.        Moving down to No. 8 under Policy,
19    you have role of supervisor.
20                    Where are you getting assessment
21    points pertaining to the role of a supervisor?
22             A.        So that would be in the aspect of
23    supervision in general, failure to supervise, what
24    we would expect a supervisor to do under their legal
25    obligation.  And that is -- you know, if the policy
```

```
 1    says the officer should do X, the job of the
 2    supervisor is to make sure that the officers did X.
 3    So that's -- it's not like it's own special
 4    standards.  It's basically what it's -- for me, it's
 5    the legal standard of failure to supervise versus
 6    not something that a supervisor needs to do
 7    different than an officer, right?  It's just about
 8    that the purpose of a supervisor, as you saw in the
 9    report, is to make sure that the employees do what
10    they're supposed to do.
11         Q.        Understood.
12                   No. 9 says procedures for blind
13    reporting of sexual assault.
14                   What does that mean?
15         A.        So blind reporting could be where
16    the victim doesn't come in.  It could be multiple
17    things.  It could be where you just get a telephone
18    call.  So you're not dealing -- you're not
19    interacting with a victim.  You're just getting a
20    story.  Then you've got to work on trying to get
21    them to come in.
22                   Sometimes you get what we call
23    third-party complaints.  "I was at a party.  I saw
24    Sarah go into the back room.  I heard things I
25    didn't like."  That's not Sarah giving you the
```

TENNESSEE
(615) 555-0073

```
1    complaint.

2              So there's, you know, different --

3    there's ways that a complaint can come in that would

4    not involve the victim coming to the department and

5    telling you a story.  And we call those blind

6    investigations, because you're really -- you've

7    really got an uphill battle from the beginning

8    there.

9         Q.     Blind reporting is when the initial

10   complaint about a sexual assault is coming to the

11   police department not through face-to-face contact.

12                  MR. LAKEY:  Object to --

13        Q.     (BY MS. KRAMER) Is that accurate?

14                  MR. LAKEY:  Object to form.

15        A.     If you add also it could not be

16   coming from the victim either.  It could be a third

17   party.  We call it a third-party complaint.  It

18   could be the parent.  It could be -- you know, it

19   could be many things.

20        Q.     (BY MS. KRAMER) Blind reporting

21   encompasses a report coming from a third party.

22                  MR. LAKEY:  Object to form.

23        A.     It does, yes.

24        Q.     (BY MS. KRAMER) And so having this

25   under the Policy heading means that there are some
```

(615) 555-0073

1    considerations from a policy standpoint for how to

2    deal with blind reporting of sexual assault.

3                    MR. LAKEY:  Object to form.

4         A.        I want to see in a policy a

5    procedure for handling that so that the officer just

6    can't say, "Well, there's no victim.  The victim's

7    not calling me.  So we're not dealing with it."  And

8    that's why we would put it in the policy.

9         Q.        (BY MS. KRAMER) Moving up to No. 7,

10   investigative considerations regarding alcohol and

11   drug facilitated sexual assault.

12                    What does that mean?

13        A.        It means that criminal

14   investigations, in this case specifically sexual

15   assault investigations that occur with the use of

16   drugs or alcohol, are going to take -- there's going

17   to be additional steps that are going to need to be

18   taken by the investigator specifically as to, you

19   know, medical treatment and maybe getting a tox

20   screening, making sure that -- you know, seeing

21   evidence.

22                    When you have alcohol and drugs,

23   the victim may not remember exactly what happened,

24   and you've got a little more of an uphill battle to

25   clarify, through evidence, what actually occurred at

Cumberland Court Reporting - TENNESSEE
(615) 651-0073

1    that location.

2         Q.        And you have two bullet points

3    there, evidence collection and forensic examination.

4              And I think you touched on this,

5    but can you explain more on what you would expect to

6    see in a policy relating to sex crimes where alcohol

7    and drugs are present?

8              MR. LAKEY:  Objection.

9         A.        Well, in a lot of these cases,

10   including alcohol and drug present cases, the

11   processing of the crime scene is a very important

12   part of this, because you have a version of -- the

13   victim is not capable of 100 percent giving the

14   information.  So you're going to need to, you know,

15   collect clothing, collect, you know, bed sheets.

16   You're going to need to send them for forensic

17   evaluation.

18              If the test kit comes back and, you

19   know, there's questions, if you don't properly

20   handle that crime scene, you could lose the evidence

21   that would either support or negate what occurred.

22        Q.        (BY MS. KRAMER) We mentioned

23   assessment points earlier.

24              What are the assessment points that

25   you would describe in connection with processing a

1   crime scene where there's been a sexual assault and

2   drugs or alcohol are present?

3           A.      I don't think it even gets that

4   detailed.  I think it was to the point of all crime

5   scenes.  Was it secured so that it wasn't -- so that

6   the evidence doesn't get tainted?  Did you do a

7   search warrant?  Did you collect evidence?  Did you

8   use -- did you have to do a forensic test?  Did you

9   have to use a blue light?  Did you -- any blood

10  swabs?  Any DNA swabs?  Fingerprints?  You know,

11  that's Evidence Collection 101, but in the area

12  of -- and it should not be that way for all cases,

13  but it's going to be more important in a case where

14  the victim, male or female, doesn't recall because

15  of alcohol or drug usage.

16          Q.      Moving up to contacting and

17  interviewing suspects, what type of policies would

18  you expect to see for contacting and interviewing

19  suspects?

20          A.      Right.  Well, I mean, we would

21  expect just that in a full functioning criminal

22  investigation that if somebody is making a serious

23  allegation against somebody that you're going to go

24  knock on their door and, you know, advise them of

25  the allegation, give them the right to use their

```
1    constitutional protections, if they want it.  But,

2    you know, we expect to see attempts to locate anyone

3    who is alleged to have committed any crime, let

4    alone a crime of this magnitude.

5              Q.     And how soon would you expect that

6    to happen, according to policy?

7                    MR. LAKEY:  Object to form.

8              A.     I don't know that we would put that

9    in policy.  Sometimes that would be a little bit too

10   much for policy, because they're -- you know, there

11   has to be -- every case is different.  Every case

12   has unique situations.  I mean, there's probably

13   some that we haven't even thought of yet because of

14   the way the world is evolving.

15                   So we don't want to really tie down

16   an officer to say, "You must do it within X hours."

17   We're just going to say, you know, "Hey, if

18   you're -- at some point in this criminal

19   investigation the suspect should be contacted.  You

20   should give them an opportunity to prevent their --

21   to present their side of the story."

22             Q.     (BY MS. KRAMER) Can you tell me

23   your understanding of the difference between a

24   policy and a procedure?

25             A.     A misconception.  In the old school
```

days as -- unfortunately, those of us that have been
around for old school days, we had a lot of
different manuals that would guide things. We've
gotten away from that nowadays. You know, in the
old school days you would have a policy which would
be a theory on the way you're supposed to do
something. Like we're going -- so let's say we're
going to respect the constitutional rights of
citizens. That's a policy. It's a theory-based
application.

A procedure is, "Well, this is how
you're going to make a traffic stop or write a
ticket or do an investigation." In some agencies
over the years in an attempt to -- I think it was
actually to manipulate the litigation system for a
while, would separate policy and procedure because
most attorneys don't know what's the difference
between the two anyway.

So those days are over pretty much.
Nowadays we call them General Orders. And a General
Order is just going to have obviously a policy in
it, which is, "Hey, this department respects the
constitutional rights of citizens," or in sexual
assault should say, "This department will fully,
fairly, unbiasedly conduct investigations into

Gentile & Associates
(615) 595-0073

1    allegations of blah."

2                    But -- and then it's going to go on

3    to identify procedures, things that -- procedures

4    are things that you have to do or should do,

5    depending on what the word is.  Policy is theory.

6         Q.        So one of your findings in your

7    report was that JCPD officers often took far too

8    long to interview a suspect.

9                    Do you remember that finding?

10        A.        Yes.  Yes.

11                  MR. LAKEY:  Object to form.

12                  THE WITNESS:  Sorry.

13                  MR. LAKEY:  That's okay.

14        Q.        (BY MS. KRAMER) And you just

15   explained that you don't recommend a specific number

16   of hours by which a police officer should go find a

17   suspect, right?

18        A.        Yeah.  I think that would be

19   unreasonable for anybody to tell an officer working

20   an investigation that it should be done within X

21   number.  You never -- you never know what situations

22   you're being faced.  It could be a holiday weekend.

23   Detectives could be -- they could have a homicide

24   going on at the same time.  So we don't do that.  We

25   shouldn't do that in policy, but the philosophy of

Exhibit 35 - TENNESSEE #7735

1   getting that done should be something that we

2   address.

3           Q.      And you were able to make a finding

4   that it was not timely, irrespective of whether you

5   were applying a specific number of hours.

6                   MR. LAKEY:  Object to form.

7           A.      I think my conclusion was actually

8   not even on the timely side.  It was that it wasn't

9   occurring.

10                  I think there's a big difference

11  between did they do it two months from now or five

12  months from now or two days, or did they close the

13  case without ever doing it?  That's -- that's, I

14  think, the -- if I recall correctly -- these object

15  to form, I'm just not used to in person anymore.  I

16  don't know.  I can't -- people are sitting here.  I

17  don't know what to do with that.

18                  So -- but I think it comes down to

19  the fact that I would not scrutinize as to how long

20  it took them unless it was, you know, something

21  really egregious.  But scrutinizing whether they do

22  it at all was the -- was what we did in the

23  investigation.

24          Q.      (BY MS. KRAMER) Moving down to

25  training.

1          And, again, I want to just go back

2     and try to understand what was -- what was the

3     purpose for this section of this document?

4          How are you using this in terms of

5     the assessment tool with training specifically?

6          A.     So this document is kind of like a

7     shotgun document.  It's kind of like let's put

8     everything on the document that we should consider

9     to put into the assessment tool, right?  Like this

10    is using me and my experience and my investigator

11    and his experience and the other members of the team

12    that were involved to just kind of dump information,

13    you know, from policy, to operational knowledge, to

14    just that sounds like a good idea.

15         But, you know, we want to make sure

16    that we kind of throw it all in here first and then

17    go back through it later and say, "Okay, of all of

18    this information, I'm going to select out these as

19    assessment points."  I mean, you're never going to

20    be -- you're never going to have it completely

21    perfect, but this is just like phase one of coming

22    up with the assessment point document.

23         Q.     Do you recall if you created this

24    with any input from Johnson City?

25         A.     Well, I did not.  Once I start an

1    investigation -- and I am very strict on this.
2    Once -- I'm sorry.
3                    Once I start an assessment,
4    investigation, once I start anything, I don't take
5    input from anybody.  I'm a little bit of a pain in
6    the butt in that way.  This is -- you know,
7    credibility is too hard to -- so I -- I may go back.
8    I may need to go back and clarify things.  Maybe I
9    need to make sure that I'm seeing them the way I'm
10   supposed to be seeing them.
11                   For example, I may have an
12   assessment tool in here, but it may be the law in
13   the state of Tennessee, that often happens, that's
14   different.  And so obviously that would be a unique
15   to their area.  And so I have to make sure that
16   that's not the case because, you know, there are
17   parts of the country that are -- that have different
18   laws that may go against our national standards or
19   our industry standards.  So it's just clarifying,
20   but input from the outside doesn't occur.
21        Q.      Did you find anything specific to
22   the state of Tennessee that was contrary to a
23   national standard?
24        A.      No.  And Tennessee is unique in the
25   fact that I have a very good working knowledge of

1    Tennessee, solely because I've been working there
2    for so long.  And we wrote the model manual, policy
3    manual that is used in the state of Tennessee.
4    So -- in 2016.  So we're pretty -- this office is
5    pretty up to speed with what goes on in Tennessee.
6    But other places in the country, where we might not
7    have as much experience, we would need to check
8    things a little differently.
9             Q.      Did you see any instances where the
10   model manual that DLG prepared had been incorporated
11   by the Johnson City Police Department?
12            A.      Not specific to the policies that I
13   had looked at, which were the policies -- it was a
14   narrow focus of only looking at policies directly
15   related to the criminal investigation of sexual
16   assault.  So that's really only -- I only looked at
17   those policies, and I did not see our language in
18   there.
19            Q.      But DLG does have a model manual
20   specific to criminal investigations of sexual
21   assault?
22            A.      Not of sexual assaults.  We
23   don't -- we don't have -- no department has a --
24   unless you've had -- well, I won't say no
25   department.  But unless you've really failed over

```
 1    the years, you might have a specific policy that was

 2    governed through the District Attorney's Office or

 3    through operations.  But for the most part when we

 4    do -- when we do policy manuals, we try to keep them

 5    to the overarching criminal investigation, unless

 6    there's some unique issue that has to be addressed

 7    with the topic.

 8         Q.        Looking in training, there's a

 9    number of bullet points under No. 1.  No. 1 says,

10    "Agency provides annual in-service training in

11    response to sexual assault to include the

12    following."

13         What is -- what does it mean to

14    have an in-service training?  Does that just mean in

15    person?

16         A.        Yeah.  In the area of law

17    enforcement, probably other agencies, too,

18    in-service means like continuing education.  That's

19    what they call their continuing education.  So every

20    year police departments will provide continuing

21    education.  Some required by law or by POST

22    accreditation, and some just to give the personnel

23    some skill set enhancement.

24         Q.        So in-service is not a reference to

25    where you are physically when you do the training.
```

(615) 691-0073

```
 1         A.        It was at one point.  Now
 2    it's computer-based, too.  So it's just actually
 3    training itself.
 4         Q.        Would you expect for training on
 5    response to sexual assault to require any aspect of
 6    in-person training?
 7         A.        You know, I think that a lot of
 8    these bullet points dealt with the -- it's written
 9    SA here, because we have states attorneys, but
10    you've got -- down in Tennessee they have District
11    Attorneys.
12              The fact that the District Attorney
13    had produced a specific protocol, we would probably
14    want that training to come directly from the
15    District Attorney's Office, and it would probably be
16    best done in person so that questions can be
17    answered and understanding could occur.  But there's
18    no -- this is not the type of training that requires
19    in-person training.
20         Q.        And correct me if I'm wrong, and
21    please take a minute to look at this, but my reading
22    of the words -- of the letters SA here was to be
23    short for sexual assault.
24         A.        Oh, absolutely.  I'm sorry.  You
25    are correct.
```

```
 1          Q.        Okay.  Thank you for clarifying
 2   that.
 3          A.        Yes.
 4          Q.        And one of the bullet points, this
 5   is the fourth, it says, "Dynamics of scientific
 6   concepts related to SA, counterintuitive behavior,
 7   tonic immobility, and effects of trauma on memory."
 8                    Do you know what that means?
 9          A.        Yes.
10          Q.        What does that mean?
11          A.        So in the area of victim-related
12   crimes, you know, the good thing is the industry has
13   started to include inter-operational conversations
14   with psychologists and those who specialize in
15   victim response on the psychological aspect, you
16   know, trauma and why someone remembers somebody,
17   something, but might not remember it the right way.
18                    And so this is -- this is something
19   that we have started to train officers all over the
20   country in so that they have a little bit of
21   understanding more of just the old style, you know,
22   tell me the facts.  But now we're getting into --
23   you know, not as much with officer officers, general
24   officers responding to calls for service, but
25   definitely our investigators who are working sex
```

```
1    crimes and juvenile crimes.

2                    And there's a very important need

3    to begin to understand some of the scientific

4    aspects of the psychological world as it applies to

5    victim interaction.

6         Q.       The last bullet says -- or let's

7    start with the second to last bullet.  It says,

8    "Impact of officers' attitude towards victim on

9    investigation outcomes."

10                   Can you describe what that means?

11        A.       Well, it's kind of similar to the

12   last bullet point, too, which is, you know, as I

13   talked about in the report, human beings have

14   biases.  And whether they're explicit or implicit

15   biases, you know, whether it goes as far as, you

16   know, sexism and racism in an explicit bias or it's

17   just an implicit bias that they -- we have to -- we

18   have to make sure that we're training our officers

19   to understand their biases and to address their

20   biases.

21                   They're human beings and so, you

22   know, biases affect attitude towards people and how

23   they respond to people.  And it's something that we

24   take very seriously, and so we're going to train

25   them on it.
```

LexitasLegal
TENNESSEE
(615)595-0073

```
 1          Q.       And this specifically references

 2    the impact on investigation outcomes.

 3                   Do you see that?

 4          A.       Yes.

 5          Q.       And what does that refer to?

 6          A.       Well, if you -- if you don't

 7    believe the victim because of a bias or you don't

 8    believe that what the victim is saying is credible

 9    because of a bias, then you're going to affect the

10    whole outcome of the investigation.  Because if the

11    investigator doesn't believe the victim, then

12    they're going to focus on evidence that is -- that's

13    going to support their biases, and there won't be a

14    full, fair, and unbiased investigation.

15          Q.       In the last bullet point, I just

16    want to clarify that the use of LE there, is that

17    short for law enforcement?

18          A.       Yes, ma'am.

19          Q.       Okay.  And you did review Johnson

20    City Police Department's training in the course of

21    your assessment, right?

22          A.       We were able to review the types of

23    training that they received, the topics.  They were

24    using an online system called Virtual Academy, which

25    I think is a Tennessee-based operation and is known
```

1    to have good training.

2              But the problem is we couldn't get

3    the actual training to look at because it was in an

4    online portal.  So I would -- you know, they had

5    training topics which I would expect to see specific

6    to rape crisis and victim -- I did identify that in

7    the report as to what types of training that they

8    received.  But how that training was delivered and

9    by who we weren't able to give an opinion on.  We

10   didn't know whether it was a good training or not

11   because I didn't -- I didn't assess that.

12       Q.       Did you ask for the underlying

13   training materials?

14       A.       We did, and it was -- it was not

15   the fact that -- this is not a negative to them, but

16   we really didn't want to get into, you know,

17   evaluating another company as to whether or not

18   they're doing things correctly or not.  This is what

19   you need to train your people on.  It's your job to

20   determine whether that's sufficient.  It's not my

21   job.  I try to stay -- we're all competitors in this

22   field and, you know, I don't really want a

23   credibility issue by having an opportunity to jump

24   on another competitor and say it's not accurate,

25   so --

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      And Johnson City did not ask you to

 2   evaluate the quality of the training they were

 3   providing.

 4          A.      They did not.

 5          Q.      Did you learn the content of that

 6   training through your interviews with anyone at

 7   JCPD?

 8                  MR. LAKEY:  Object to form.

 9          A.      Yes.  Initially when we do these

10   assessment tools, we would sit down with the -- in

11   this case Attorney Sandos, or do it through Zoom at

12   that point, and say, "Here's" -- like we basically

13   do it in like a production request.  I basically

14   give them a production request and say, "Listen, we

15   want all of these cases.  We want all of this

16   training.  We want all of this."

17                  And then we allow them to respond

18   to the production request.  And then we go through

19   it, and then we figure out what we still need or

20   what we didn't get and what we can drill down on.

21                  So as part of the request, we would

22   always ask for training.  And then they would give

23   us -- the department would give us what they had as

24   training.  In this case they gave us, you know, kind

25   of like this was the topics the officers took over
```

Lexitas - TENNESSEE
(615) 595-0073

1    the -- over the course of time that was under

2    analysis.

3          Q.       (BY MS. KRAMER) And you did

4    interview JCPD officers, correct?

5          A.       I did not interview officers.  I

6    interviewed investigators that were -- that were

7    responsible for investigation.  Not -- when I mean

8    officers, I mean those out on patrol that would be

9    called for calls of service.  I did not interview

10   the officers.

11         Q.       Did you ask any of the

12   investigators that you interviewed about the content

13   of the training that they had received with respect

14   to sex-related crimes?

15         A.       I did, but I think it was -- to the

16   best of my recollection, it was more specifically,

17   because when you're in that investigative capacity,

18   you shouldn't be getting just the basics anymore.

19   You should be getting advanced training.  And so we

20   would ask the investigators and the people what type

21   of sex-related training they received outside of

22   what every officer should receive, right?  Because

23   they're specialists.  They need to be qualified.

24                  And they did testify that they had

25   gone to training classes and done -- you know, they

```
1    did tell us -- I hate to use the word testified.

2    They did tell us that they had provided -- they had

3    had additional training programs.

4           Q.      Did you receive any documentation

5    of the advanced training that these investigators

6    described to you?

7                   MR. LAKEY:  Object to form.

8           A.      Not to my recollection.

9           Q.      (BY MS. KRAMER) In terms of the

10   advanced training, what does that look like?  I

11   mean, is it just that the content is different or

12   would it be, for example, you're more likely to go

13   to a conference or to have an in-person session or

14   do role play?

15                  MR. LAKEY:  Object to the form.

16          A.      It could be all of those things.

17   You know, when you're getting into specialties and

18   investigations, you start to go to training classes

19   that enhance your specialties.

20                      For example, my specialty was

21   homicide.  So you go to a lot of fingerprint and DNA

22   class, Toolmark class, right?

23                      If your specialty is sex

24   investigations or juvenile investigations, you're

25   going to probably go to, you know, external and
```

1    you're going to go to external training programs

2    probably taught by psychologists or victim advocates

3    and legal in those areas.

4                    And you also can receive training

5    internal, too.  When you're working in a unit, you

6    know, you get trained by the people that you come up

7    with.  So when you join the unit, you might not know

8    anything about how to do this type of investigation.

9    But as you're a rookie investigator, you start to

10   work with senior investigators and you get knowledge

11   and a skill set from them, too.

12        Q.      (BY MS. KRAMER) Do you remember the

13   names of the investigators that you interviewed?

14        A.      So there was a Deborah Dunn, I

15   believe was one.  And then I did -- I knew this was

16   one of the questions that was going to be asked,

17   because it was asked in the last one.  So I did

18   write the names down somewhere, if I can find them

19   myself.

20        Q.      I can remind you, but just to start

21   so we're more specific on these questions, did

22   Investigator Dunn tell you that she had advanced

23   training on investigating sex-related crimes?

24        A.      I don't recall.  I believe so.

25   When I -- just for knowledge, when I interview --

(615) 595-0073

1    this is not an investigation.  This is an
2    assessment.  And the big difference between the two
3    is that if it was an investigation, we'd be on the
4    record, right?  We'd be compelling them to answer
5    questions.  We'd be asking them questions.
6                        Because it is an assessment, I want
7    them to talk freely.  And, unfortunately, sometimes
8    when you turn the recorder on, people don't talk
9    freely.  So we really just have general
10   conversations and then try to memorialize them to
11   the best we can, as quick as we can, in the report
12   to be accurate.
13                       So I would have expected -- again,
14   this is over two years ago now, and just getting
15   worse, but I would have expected some of that based
16   on her years in that unit and having done this type
17   of investigation for a period of time.  I would
18   expect that she probably had some training, but I
19   don't recall as we sit here.
20        Q.        As we sit here, do you recall if
21   Detective Carol Lowe had any advanced training on
22   investigation of sex-related crimes?
23                  MR. LAKEY:  Object to form.
24        A.        Carol was interesting because she
25   had a background in -- whether it was her education,

background, I think it was sociology and was really
into the psychological and physiological aspects of
victim trauma.  And so I know that she came to the
table with external knowledge from her -- you know,
from her own continuing education, and I would
expect that if she's in that situation.

One thing I know about her, she was
not in that role for a long time.  So I don't know
if it -- you know, if in time she was doing sex
assault cases that she did get to go to training or
not, but she did bring to the table some victim
advocacy as part of her history.

MS. KRAMER:  Okay.  I'm going to
mark our next exhibit.  This will be 115.

(Exhibit 115 marked).

Q.       (BY MS. KRAMER) I'll give you some
time to look through this document, and some of the
pages are upside down.  That's how it was produced
to us.  But I don't think we'll -- since this is
your handwriting, I'm hoping you can talk us through
it.

A.       Good luck.

MS. KRAMER:  And for the record,
the Bates on this document is CITY-0066641.

MR. LAKEY:  Through 655.

```
 1            Q.       (BY MS. KRAMER) Do you recognize
 2   this document, Mr. Daigle?
 3            A.       I do.
 4            Q.       Is this your handwriting?
 5            A.       It is, yes.
 6            Q.       Are these notes that you took in
 7   connection with your assessment done for Johnson
 8   City?
 9            A.       Notes.  Scribbling.  All the above.
10            Q.       So I'm hoping you can, looking at
11   these notes, help me determine which of the
12   investigators that you interviewed --
13            A.       Okay.
14            Q.       -- who had advanced training for
15   sex-related investigations that we discussed.
16                     So I see on Bates ending 647, at
17   the top that looks to me like Lieutenant Dunn.
18                     Do you see that?
19            A.       Yep.
20            Q.       And then about three lines down I
21   see Kevin Peters.
22                     Do you see that?
23            A.       Yep.
24            Q.       I'm not sure if anyone else is on
25   this specific page.
```

Cametras - TENNESSEE
(615) 595-0073

```
1                      But looking back at these notes,
2        does this refresh your recollection as to the
3        advanced training that may have been given for
4        Lieutenant Dunn?
5                A.        It looks like she did make some
6        comments to me that I wrote down that there was --
7        you know, in her 24 years at Johnson City there was
8        no specific training in child abuse except the
9        academy.  Tons of training on child sexual abuse.
10       So she was -- the difference between just child
11       abuse versus child sexual abuse.  Her specialty was
12       child sexual abuse.  So she had received a lot of
13       training on that.
14               Q.        And let me -- let me -- sorry to
15       interrupt, but I mentioned Kevin Peters' name is
16       here.
17                      But your understanding is that this
18       set of notes is with respect to Investigator Dunn,
19       and that the note that says Kevin Peters is that he
20       was her lieutenant at that time, right?
21                      MR. LAKEY:  Object to form.
22               A.        Right.
23                      THE WITNESS:  Sorry.
24                      MR. LAKEY:  It's okay.
25               A.        From 2004 to 2020.
```

```
 1          Q.          (BY MS. KRAMER) Okay.  And is your
 2   recollection that all of these notes are from your
 3   interview with Investigator Dunn?
 4          A.          All of these notes --
 5          Q.          On this page ending in 647.
 6          A.          Yes.  It looks like it goes --
 7   because there's a two on the next page.  So it looks
 8   like the next two pages, 647 and 648, are from Dunn
 9   .
10          Q.          About halfway through the page
11   there is -- you have two arrows that are sort of
12   called out to the right side of the page.  One says,
13   "Shredded," and the other one says,
14   "Non-prosecution."
15                      Do you see that?
16          A.          Uh-huh.
17          Q.          Do you remember why you took those
18   notes?
19          A.          Yeah, because I was -- I was -- I
20   learned in here that -- so at this point we're in
21   December 8th, 2022.  So we had already looked at and
22   assessed all the documents and was finding that
23   we're missing a lot of stuff.  So when we went down
24   to Johnson City in early December 2022, part of our
25   discussion was, "Well, where is everything?"  Like,
```

```
 1    you know, because as you can see in the notes there,
 2    I'm asking her, you know, "What would you expect to
 3    see in a report?  You know, a statement from a
 4    victim, written.  A statement from a nurse,
 5    specifically the triage nurse, and information about
 6    the investigator would contact the victim."
 7                      And that's when I learned that
 8    the -- outside of the system that was using for
 9    record management, that the detectives would
10    maintain their own files and that -- what would --
11    at the end of the investigation, which I understood
12    that.  As a detective, you maintain your own file
13    and you keep all of your notes and all of your
14    evidence together.  And then, you know, you move
15    that case forward to prosecution.
16                      At the end of that is when I
17    learned that one of the -- one of the interviews
18    that said that the detectives would either scan it
19    and put it into the system, if they thought the case
20    was going somewhere, or they would shred it if it
21    was -- if they didn't think there was any
22    prosecution for it.  And obviously that was -- that
23    was not good in my eyes.  I was concerned about
24    that, which is why you got arrows.
25              Q.      What -- help me understand what it
```

1     means by not -- a case not going anywhere.

2                     Does that just mean the officer,

3     the investigator, doesn't have confidence that it

4     will be prosecuted?

5                     MR. LAKEY:  Object to form.

6          A.        I would have to agree with your

7     assumption.  I don't know the answer to that.  I

8     took it to mean, just as you stated, that somewhere

9     along the way, the investigator didn't think the

10    case had the ability to be prosecuted or was going

11    to be prosecuted.  And there could be multiple

12    reasons why that was the case, but that was my

13    assumption on that.

14                    You know, it depends.  It depends

15    by investigator, too, right?  What each investigator

16    assumes, I can't say.  But the question that -- the

17    only thing that concerned me was when I'm looking

18    for data, looking for evidence, victim statements,

19    other things, and there is none.

20                    The question is, "Well, we shred

21    it."  So I say, "Okay.  Well, you know, why?  Why

22    would we do that?  Why wouldn't we just put it back

23    in the report records room or why wouldn't we just

24    scan it into the system?"  And they said, "Well, it

25    wasn't -- if it wasn't going anywhere, then it

```
 1    wouldn't -- we wouldn't do that."  And I was like,
 2    "Well, that's obviously a concern.  That's a
 3    problem."
 4         Q.        (BY MS. KRAMER) Why is it important
 5    to maintain case records even for a case that the
 6    investigator does not believe is going anywhere?
 7              MR. LAKEY:  Object to form.
 8         A.        Well, I mean, you never know when
 9    scrutiny is going to come.  And it can be scrutiny
10    in something like we're doing here, or it could just
11    be scrutiny where, yeah, maybe a case you had didn't
12    have enough.  And sometimes it happens, right?
13    There's not enough to prosecute or the prosecutor
14    doesn't want to prosecute it.
15              But that doesn't mean that later
16    down the road, this individual goes to another
17    state, another location, and you're getting a call
18    from an investigator saying, "Hey, we're
19    investigating so and so.  What have you got on
20    them?"  Well, if you don't have it anymore, then you
21    don't have it anymore.  And so, you know, I think in
22    the world of what we do, it is important for us to
23    maintain our files and our documentations for
24    scrutiny, for lawsuits, for future for criminal
25    investigations.  You never know.
```

LEXITAS TENNESSEE
(615) 595-0073

```
 1          Q.          (BY MS. KRAMER) And so one of the
 2    reasons that you just described is because someone
 3    may be a repeat offender; is that correct?
 4                      MR. LAKEY:  Object to form.
 5          A.          Possible.
 6          Q.          (BY MS. KRAMER) And so can you
 7    explain more why it would be relevant to be able to
 8    look back at a previous case file and need that case
 9    file to be complete?
10                      MR. LAKEY:  Object to form.
11          A.          Other than my own experience, the
12    only advice I can give to this is I did -- I did,
13    you know, cold case homicide, which involved serial
14    killers.  And when you're doing that type of
15    investigation, you know, there's a lot of places
16    where the case -- an individual may have done an act
17    and it didn't get -- it didn't get investigated
18    fully or completely or properly, and it was just not
19    enough for prosecution.
20                      But when you're starting to build
21    that up, you build that up as a history of where
22    this guy or gal was, what they were doing, and all
23    of that becomes very important, you know.  And when
24    we were doing cold case homicides, you know, it was
25    individuals, they get in their car and they travel.
```

Lexitas - TENNESSEE
(615) 595-0073

```
1    And they leave victims all over the country.  And
2    we've seen that from some of the -- you know, the
3    significant, you know, serial killers we've had in
4    history.  So it's just -- it's just having that
5    information available.
6              Q.      (BY MS. KRAMER) When you asked why
7    it was -- I'm trying to remember.
8                    MS. KRAMER:  Can we go back, Jeff,
9         to Mr. Daigle's answer to my last question?
10                   COURT REPORTER:  Which answer?
11                   MS. KRAMER:  To my last question,
12        where part of his response was, "I asked the
13        investigators why they would shred certain
14        documents."
15                   COURT REPORTER:  Let's see.  It's
16        not just this latest answer he did?  It's
17        before that?
18                   MS. KRAMER:  Right.  One before.
19        Correct.
20                   COURT REPORTER:  Let's see.
21                   Well, I mean, you know, when
22        scrutiny is -- you never know when scrutiny
23        is going to come.  It can be scrutiny in
24        something like we're doing here or it could
25        just be scrutiny where, yeah, maybe a case
```

```
 1          you didn't have enough and sometimes it just
 2          happens, right?
 3                    Is that the answer you want?
 4                    MS. KRAMER:  No.  One before that.
 5                    COURT REPORTER:  Okay.  Let's see.
 6                    Help me understand what it means by
 7          a case not going anywhere.  Does that just
 8          mean the officer, the investigator, doesn't
 9          have confidence that it will be prosecuted?
10                    The answer to that one?
11                    MS. KRAMER:  Yes.
12                    COURT REPORTER:  Okay.
13                    I would have to agree with your
14          assumption.  I don't know the answer to
15          that.  And I took it to mean, just as you
16          stated, that somewhere along the way the
17          investigator didn't think the case had the
18          ability to be prosecuted or was going to be
19          prosecuted.  And there could be multiple
20          reasons why that was the case, but that was
21          my assumption on that.  You know, it
22          depends.  It depends -- let's see -- on the
23          investigator, too, right?  What each
24          investigator assumes, I can't say.
25                    But the question -- the only thing
```

Lexitas TENNESSEE
(615) 595-0073

```
1          that concerned me was when I'm looking for
2          data, I'm looking for evidence, victim
3          statements, other things, and there is none.
4          And the question is, "Well, we shred it?"
5          So, "Okay.  Well, you know, why?  Why would
6          we do that?  Why wouldn't we just put it
7          back in the report records room or why
8          wouldn't we just scan it into the system?
9          And they said, "Well, if it wasn't -- if it
10         wasn't going anywhere, then we wouldn't do
11         that."  And I was like, "Well, that's
12         obviously a concern.  That's a problem."
13                  MS. KRAMER:  Thank you.
14         Q.       (BY MS. KRAMER) So what I was
15   trying to understand there, and I didn't know if you
16   had answered it before, is whether you got an
17   explanation for the shredding.
18                  You just described in that answer,
19   "Why not put it back in the records room?  Why not
20   just scan it?"
21                  Did you ever get an answer to that
22   question from the investigators that you
23   interviewed?
24         A.       Like I said, my understanding was
25   they shredded it because the case wasn't going
```

LEXITAS - TENNESSEE
(615) 595-0073

```
1    anywhere.  That's what they said.  There was no --
2    there was no prosecution or didn't -- it wasn't
3    going to go anywhere.  So they would just shred it.
4    It was the way they did it in the office.
5              Q.      Did you ask whether it was
6    difficult to shred -- or sorry -- difficult to scan
7    a document?
8                      MR. LAKEY:  Object to form.
9              A.      No.  I just took their answer.
10   They're not scanning it.  They're not saving it.
11   They're shredding it.  That obviously is a
12   challenge.  But I didn't go any -- I didn't dive
13   down a little further into it.
14             Q.      (BY MS. KRAMER) They didn't say,
15   "It takes too long to scan a document.  That's why I
16   don't want to do it."
17                     MR. LAKEY:  Object to form.
18             A.      I don't recall that.
19             Q.      (BY MS. KRAMER) So I think you
20   noted that the conversation with Investigator Dunn,
21   these notes continue on to the second page.
22                     Is that your understanding, that
23   the document ending 648 is a continuation of your
24   notes of your conversation with Investigator Dunn?
25             A.      Yes, ma'am.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          Q.        Is it possible for you to read,
 2     just from the top, if you can decipher your
 3     handwriting?  And if you can't --
 4          A.        Hopefully it's not as bad as the
 5     read back of my answer, which makes me -- all right.
 6                    So to close sergeant -- or to close
 7     sergeant review, they can kick back unfounded, did
 8     not happen, no crime occurred, victim says -- put
 9     the word opinion.  Exceptional clearances.  Victim
10     did not wish -- did not wish -- not cooperate in
11     prosecution.  With applicable prosecution, identify
12     suspect specifically.  Trained.  Last line,
13     document.  Manipulate ADA.  Prosecution declined.
14     Already been -- I have no idea.  I have no idea.
15     Cannot be TIBRS.
16          Q.        Okay.  Let's stop there for a
17     minute, please.
18                    Do you recall generally what you
19     were discussing in this interview?
20          A.        Yes.  Something unique to Tennessee
21     is obviously their TIBRS system, and one of the
22     things that I was trying to get an understanding of
23     is how you can close out cases.  Because different
24     parts of the country, different areas, there are
25     different standards in how an investigator is
```

```
 1    allowed to close a case.  You just don't get to

 2    close it when you want to.  There has to be -- there

 3    has to be a reason to close it, and that reason has

 4    to be well identified.

 5                     So in this situation I was trying

 6    to understand a little bit more of the clearance

 7    that they use.  The closure that they use in TIBRS

 8    is called exceptional clearances.

 9                     And I was just asking her to kind

10    of walk me through that.  This, what's written

11    after, is not going to be a good example of what the

12    outcome is.  But it's just my first attempts to

13    understand this.

14         Q.     Do you know what you were referring

15    to when you wrote, "Manipulate ADA"?

16         A.     So what I was referring to there

17    was a conversation.  I do remember this part because

18    I wrote it in the report, which is investigators can

19    have conversations with the prosecutor.  Those

20    conversations aren't recorded.  So you don't have

21    any idea what the investigator is saying to the

22    prosecutor.

23                     And I think that's both dangerous

24    for the investigator and for the prosecutor, because

25    there's no documentation.  Because if I'm calling
```

Lexitas TENNESSEE
(615) 595-0073

1  you as the prosecutor and saying, "Hey, I got a

2  case.  It's not going anywhere.  I want to close it.

3  Will you say no prosecution, so I can close it?"

4  The prosecutor saying, "Okay, tell

5  me the story."  And I tell you the story.  Well, it

6  doesn't mean that -- you know, I would hope and, as

7  I put in the report, I would believe in that and

8  hope that the investigator would follow their oath

9  of office and tell the truth.

10  But just like anything, you can

11  explain things -- you can explain one thing multiple

12  different ways.  And it really gets into, you know,

13  the game of playing telephone, you know.  And so,

14  for me, the concern was, and I wrote down there, you

15  know, you can manipulate the process.  You can --

16  you can strengthen one thing versus another in order

17  to get the prosecutor to say, "Okay, close it.  No

18  prosecution."

19  That's not done that way in other

20  parts of the country because that could happen to

21  prevent manipulation.

22  Q.    Are you aware of any other police

23  departments where the communication that you

24  described occurs between the investigator and the

25  ADA and there's no record of the conversation?

TENNESSEE
(615) 595-0073

```
 1          A.        Oh, yeah.  It happens all the time.
 2    I mean, it happens all over the country.
 3    Investigators and prosecutors work closely with each
 4    other.  And you often call the prosecutor to say,
 5    "Hey, this is what I've got to do.  What do you
 6    think," or that way.  So that often happens.
 7                    But we're -- the industry has tried
 8    to crack down -- because we want our investigators
 9    to talk to the prosecutors.  We want the prosecutor
10    to give them guidance because, in the end, the
11    prosecutor has got to prosecute the case.  So the
12    more guidance that the prosecutor has, the better it
13    is.
14                    But the question at the end is when
15    you go to close the case because of -- and you
16    allege that you're closing the case because of a
17    lack of prosecution.  Well, that -- there has to be
18    some documentation for that, or there should be some
19    documentation for that.
20                    So, for example, in some parts of
21    the country, like what we do here, is you have to
22    submit an affidavit to the prosecutor with all of
23    the facts, and then the prosecutor will review it
24    and sign off on it and say, "Not enough."  Good.
25    But at least everybody knows there's a record of
```

```
 1    that.  Everybody -- it protects the investigator if

 2    somebody turns around and sues them for failure to

 3    do a good investigation, and it protects the

 4    prosecutor in case somebody says they weren't doing

 5    their job.

 6              Q.        So, in other words, it's not the

 7    unrecorded conversations that is of concern; it's a

 8    lack of documentation when the rationale for closing

 9    a case is lack of prosecution, but there isn't

10    documentation for that reason, for example, the

11    affidavit that you described.

12                        MR. LAKEY:  Objection to form.

13              A.        Yeah.  I mean, I would agree with

14    my -- my analysis is specific to supporting closure.

15              Q.        (BY MS. KRAMER) Understood.

16                        And that closure should be

17    documented, correct?

18                        MR. LAKEY:  Objection to form.

19              A.        My opinion, it should be

20    documented.  I mean, I'm sure there may be others

21    that don't agree with, but I wouldn't want to put my

22    investigators in that -- in that situation of if

23    somebody turned around and sued them that they

24    didn't have the proper documentation to protect

25    them.
```

```
1          Q.         (BY MS. KRAMER) And you also
2    described the verbal communication about the
3    likelihood of prosecution between the investigator
4    and the ADA.  And you said explanations can be --
5    and you kind of paused.
6                      Can you explain what you were
7    getting at there?
8                      MR. LAKEY:  Objection to form.
9          A.         Yeah.  I was just trying to figure
10   out how to best talk about human nature.  I mean, if
11   I want to tell you a story, I can tell you the story
12   in multiple different ways.  And if I'm really good
13   at it, I can tell you a story which can manipulate
14   the way you perceive the information that I'm giving
15   to you.  And so if I've got a case and it's a --
16   it's just a case that's dragging, I can't get rid of
17   it, there's probably a benefit for me to get the
18   prosecutor to say, "You know, listen, it's not going
19   anywhere, and so just get rid of it," right?
20                      I just don't -- you know, I
21   don't -- I don't think that it's -- I don't think it
22   could be identified as much as ill will or ill
23   intent as it is, you know, just human nature, right,
24   on how you tell -- how you tell stories.
25         Q.         (BY MS. KRAMER) Would that human
```

Lexitas - TENNESSEE
(615) 595-0073

1    nature include bias?

2                    MR. LAKEY:  Objection to form.

3         A.        It could.

4         Q.        (BY MS. KRAMER) I see on the

5    document -- again, we are still on CITY-0066648.

6                    About three quarters of the way

7    down, I see your note of a non-prosecution form,

8    written statement.

9                    Do you see that?

10        A.        Yes.

11        Q.        Do you know what you're referring

12   to there?

13                   MR. LAKEY:  Object to form.

14        A.        Yes.  So as I was trying to work my

15   way through, one of the things that is truly a

16   challenge is where victims decide that they do not

17   want to prosecute their offender.  And I know to

18   most people looking at it from the outside, people

19   will be like, "Well, how is that possible?"  It is

20   possible.  It's -- you know, being a victim has

21   trauma.  And we live in a society that I think

22   victimizes its victims.  So, there are times where a

23   victim will decide, "I just don't want to do this.

24   I don't want to look at my offender or I don't want

25   to -- I just want to move on with my life and don't

1    want to go through the next ten years in the
2    criminal justice system."
3                        So there are mechanisms to do that,
4    right?  One of the mechanisms is what they call a
5    non-prosecution form.  It's where the victim can
6    sign the form saying they do not want to prosecute,
7    right?
8                        What I'm looking for here is that I
9    agree that I expect to find harassment -- sexual
10   assault cases where a victim has chosen just not to
11   be involved.  It's very normal.  But what is the
12   department doing to protect itself in that regard?
13                       You know, because, unfortunately,
14   victims who at one point say, "I don't want to
15   prosecute," then come back later and say, "Well,
16   wait.  I did want to prosecute it."  You know, we're
17   better than this in the industry now.  So if we're
18   going to even consider not prosecuting, I'm going to
19   take a written statement from the victim or have the
20   victim sign a non-prosecution form and then go to
21   the prosecutor and say, "Hey, here's what I got.
22   Here's what happened.  Here's the form they signed.
23   What do you want to do about it?  Do you want me to
24   drop -- do you want to drop the case?"
25                       And then when somebody comes back

1    later and challenges it, at least there's some

2    evidence that it wasn't the -- it wasn't the

3    incompetence of the investigator.  It was something

4    that was clearly a decision made by the victim.

5         Q.     (BY MS. KRAMER) Do you know if JCPD

6    used a non-prosecution form?

7         A.     JCPD had a non-prosecution form and

8    did not use it often.  I did find cases where a

9    non-prosecution form was signed, but this is -- I

10   was getting into having a discussion with her about

11   the non-prosecution form and like, "Hey, why?  Why

12   don't we see this used more?"  And it was really not

13   part of -- some investigators knew about it, and

14   some investigators didn't know about it.

15             I was really trying to work off of,

16   "Why wasn't this -- if the victim has chosen not to

17   prosecute and that victim wants that decision, why

18   didn't -- why don't we have this form?  Why didn't

19   we just sign it?"  And sometimes it's because they

20   couldn't find the victim, or they didn't know where

21   the victim was, or the victim wouldn't talk to them.

22   That's fair.  But you've got to do the work.  You

23   have to -- you have to protect yourself in that

24   regard.

25        Q.     (BY MS. KRAMER) So JCPD has the

Lexitas TENNESSEE
(615) 595-0073
#: 6595

1    non-prosecution form.  You find that, in practice,
2    it is not being used regularly.
3                         And did you attribute that to
4    anything?
5                         MR. LAKEY:  Objection to form.
6         A.         Well, I think what I said is I was
7    asking questions as to why.  Why wasn't it be using
8    regularly?  And, you know, the information that I
9    got is that some people didn't know, didn't -- it
10   just wasn't part of the practice.  To some people it
11   was, and to some people it wasn't.
12                        And, you know, I can't dig down any
13   more than that, which is -- I would think that that
14   would be maybe not the investigator's
15   responsibility, but definitely the supervisor's
16   responsibility to make sure that that was done
17   before signing off on the case, but they had the
18   means.  It just was not being used regularly.
19        Q.         (BY MS. KRAMER) Did you see any
20   training materials that discussed use of a
21   non-prosecution form?
22        A.         No.
23        Q.         So if we turn the page, this is
24   Bates 0066649.  At the top here, I see the name
25   Kevin Peters, and the date 1/18/2022.

Lexitas - TENNESSEE
(615)595-0073

```
 1                    Do you see that, Mr. Daigle?
 2        A.          Yes, ma'am.
 3        Q.          Are these your notes from your
 4   interview with Kevin Peters?
 5        A.          Yes.
 6        Q.          To the right, it looks like it says
 7   lieutenant.
 8                    Do you know what name that is?
 9        A.          I do not.  I do not.  Sorry.
10        Q.          And then underneath Kevin Peters'
11   name, I see 32 years.  It looks like investigate '94
12   to 2002, 2007 to 2016, sergeant.  2016 to 2022,
13   lieutenant captain.
14                    Is that right?
15        A.          Yes.
16        Q.          Okay.
17        A.          Spelled incorrectly.
18        Q.          And then below, can you decipher
19   what your notes say there?
20        A.          So it says training, evidence,
21   tech, every year, six months to one year.
22                    So I was probably reviewing
23   training that was given to the members of his unit
24   or -- and he said that evidence techs get -- or the
25   individuals that are going to go out and collect
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    evidence get training on a yearly basis on evidence
 2    collection.  And then I don't know what the six
 3    month to a year means.
 4                    Two squads.  And special victim
 5    squad on day shift means the investigative unit
 6    worked with two squads of officers.  Usually a squad
 7    is a group of officers with six to eight.  I think
 8    they had days and evenings, but then they also had a
 9    special victim squad.  That would be an investigator
10    specifically assigned to victim crimes like sexual
11    assault.
12                    Interview panel, two years, I think
13    this was -- if I recall correctly, you had to have
14    two years on the department in order to become an
15    investigator.  You had to go through an interview
16    panel to become an investigator.  Not a ton of
17    training, and specifically not a ton of training on
18    child-related crimes.
19                    Investigators are carrying about 30
20    cases a month, that there was not a protocol before
21    the recent one.  And what we're speaking of there is
22    the D.A.'s protocol that was issued.
23                    There I talked to him about his
24    case file management.  And what I mean by that is
25    investigators are OCD issue people, and that means
```

LexiLaw TENNESSEE
(615) 595-0073

1    we have to -- they have to have structure.  And so a
2    lot of effort in investigations is spent on tracking
3    a file.  They just can't go away.  It has to be
4    clean.  It has to be completely followed.
5                    So let's say, you know, today a
6    case comes in.  I'm next up on the list.  I get the
7    case assigned to me.  It goes into the tracking
8    software as assigned to me.
9                    And then what I took from this one
10   is that the tracking software is going to require
11   updates.  And usually what was normal, as they did
12   here, is a 28 day initial.  So like every month you
13   have to provide an update into the system as to what
14   you're doing on the case.  You just can't -- these
15   cases just can't sit.  You have to investigate them.
16        Q.      Do you know what the tracking
17   software was that JCPD used at this time?
18        A.      I don't know if it was involved in
19   the Watson system or something separate.  I don't
20   know.  I don't recall.
21                    Everything that they do in the case
22   is supposed to be in the timeline.  And what I'm
23   getting into in this area is, as you started
24   going -- as you've gone through the cases, you'll
25   see that an officer comes in and puts in a summary,

LexitasⓇ TENNESSEE
(615) 595-0073

```
 1    you know, "I called the victim.  I called the
 2    witness.  I called this."
 3                    Well, that's done for the purposes
 4    of maintaining the tracking.  So my gut would tell
 5    me it's probably in the Watson system that they're
 6    supposed to keep updates.  But because I didn't see
 7    that as consistent throughout the investigations, I
 8    was asking, "Okay, tell me about what you expect
 9    from an investigator."
10                    MR. LAKEY:  And I'm not trying
11            to --
12                    THE WITNESS:  Sure.
13                    MR. LAKEY:  I am going to just --
14            it's not an objection to the form,
15            Ms. Kramer, because your question was, "Do
16            you know what it says?"  But the witness is
17            giving just kind of long, uninterrupted
18            testimony about all the notes.
19                    And so I will object as
20            non-responsive, and some of it mixed with
21            improper opinion testimony, but that's just
22            for the record.
23            Q.      (BY MS. KRAMER) And you are -- in
24    responding to my questions, you're speaking from
25    your memory of this conversation with Mr. Peters; is
```

Lexitas TENNESSEE
(615) 595-0073

```
 1   that correct?

 2          A.      Yes, ma'am.

 3          Q.      And so you just described asking

 4   Mr. Peters a question about the maintenance of his

 5   case file and how frequently it was updated.

 6                  Do you remember how he responded to

 7   that question?

 8                  MR. LAKEY:  Object to form.

 9          A.      From the notes here, that basically

10   the timelines are maintained 28 days.  Extensions

11   have to be given by the supervisor.  It was -- in

12   the normal world of investigations, there's a very,

13   very detailed process that occurs to keep the

14   timeline of a case moving forward.

15          Q.      (BY MS. KRAMER) Would it be -- just

16   in your experience understanding some of these

17   tracking softwares, is it -- would you see in the

18   data that an extension was granted to these imposed

19   28-day timelines?

20          A.      I don't know.  There's so many

21   different softwares out there.  If I was using a

22   software, I would want a software that showed that

23   right there.

24                  And I'll give you -- in the

25   Connecticut State Police, every 30 days we had to
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    submit a summary report, a supplemental report
 2    saying what we've done in the case.  And it may just
 3    be waiting for evidence back from forensics, nothing
 4    else to do.  But there was something in the file
 5    that documented what occurred.
 6                     For example, what if I get
 7    transferred tomorrow, and now a new investigator
 8    comes in?  All they've got to do is open the case
 9    file, and they know everything that has been done
10    and they just pick up where I left off.  And that's
11    why we do this, because there's a lot of movement.
12    There's a lot of other things that get in the way.
13         Q.        When you're logging into a tracking
14    software -- or what would you call it?  What do you
15    call it, tracking software?
16         A.        I think that's the safest thing.
17         Q.        Okay.  When you're logging in, do
18    you -- you log in as Mr. Daigle and you -- you could
19    access any case.
20                     Is that what your experience is
21    with this software?
22                     MR. LAKEY:  Object to form.
23         A.        So with case management software,
24    depending on your level in the department, it also
25    has your level of access.  So if you're -- if you're
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   an officer or an investigator, you log into your
 2   cases.  If you're the supervisor, you log into the
 3   cases of the people that you supervise, and all the
 4   way up the food chain.  So that's usually the way
 5   these things work.
 6            Q.        (BY MS. KRAMER) All right.  Let's
 7   move on.
 8                      THE WITNESS:  While you're doing
 9            that, can we take five minutes?
10                      MS. KRAMER:  Absolutely, yes.
11                      MR. LAKEY:  My hero.
12                      COURT REPORTER:  Going off the
13            record?
14                      THE WITNESS:  Yes, please, if
15            that's okay.
16                      COURT REPORTER:  Okay.
17                      VIDEOGRAPHER:  We are now off the
18            record.  The time is 12:15 p.m. Eastern
19            time.
20                (Off the record at 12:15 p.m.)
21                 (On the record at 12:25 p.m.)
22                      VIDEOGRAPHER:  Okay.  We are now
23            back on the record.  The time is 12:25 p.m.
24            Eastern time.
25
```

```
 1   BY MS. KRAMER:

 2         Q.        Mr. Daigle, if I could have you

 3   continue looking at Exhibit 115, and I'm going to

 4   direct your attention to the page with Bates ending

 5   652.

 6         A.        Okay.

 7         Q.        Do you recall a telephone

 8   conversation with D.A. Steve Finney on or about

 9   December 9th?

10         A.        This was an actual in-person

11   discussion.  I went to his office.

12         Q.        An in-person discussion?

13         A.        Yes.

14         Q.        Okay.  Thank you.

15                   So you recall an in-person meeting

16   with D.A. Steve Finney on December 9th; is that

17   correct?

18         A.        Yes, ma'am.

19         Q.        And these are the notes that you

20   took during that meeting?

21         A.        Yeah.  These are some of my

22   thoughts that I was going through with him.  You

23   know, the purpose of the meeting was to get his

24   thoughts on -- he was aware that I was doing an

25   assessment.  He was new to the -- as the District
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    Attorney.  He had made some changes in the District
 2    Attorney's Office.  He had issued a new protocol for
 3    these investigations, and so it was just making sure
 4    that I -- I just wanted to touch base with him.
 5              Q.      You asked for this meeting?
 6              A.      I did.
 7              Q.      And do you know what year this is?
 8              A.      This is '22, 2022.
 9              Q.      Do you remember if D.A. Finney was
10    taking notes during this meeting?
11              A.      I don't think so.  I don't recall.
12    I don't think so, though.
13              Q.      Where did the meeting take place?
14              A.      In his office.
15              Q.      Did you ever speak to the previous
16    D.A.?
17              A.      No.
18              Q.      So looking at your notes here, the
19    first line reads, "New protocol 11/21."  It looks
20    like that's 2022.
21                      Do you have any -- do you have any
22    recollection on what this is referencing?
23              A.      Yeah.  It is '22.  That was the
24    D.A.'s protocol that was issued in November of 2022.
25              Q.      And it looks like these are a
```

Lexitas - TENNESSEE
(615) 595-0073

1    series of questions that you asked D.A. Finney; is
2    that correct?
3         A.      I was just -- yeah, just kind of my
4    thoughts as I was going through here.  Like I said,
5    I don't take notes verbatim.  I'm just kind of
6    scratching so I don't forget the conversation.
7         Q.      One of the questions on here is,
8    "Was there a protocol before this one?"
9                 Did you get an answer that you
10   recall from D.A. Finney at this meeting?
11                MR. LAKEY:  Objection to form.
12        A.      My recollection is that, obviously,
13   he had just taken over.  So he doesn't -- he
14   didn't -- the reason why there was a new one is
15   because there wasn't one that he liked or that he
16   had when he took over.
17        Q.      (BY MS. KRAMER) You were never
18   provided with a protocol from the City that predated
19   this December -- or sorry -- November 2022 protocol
20   that's referred to here; is that correct?
21                MR. LAKEY:  Object to form.
22        A.      I guess the question is protocol.
23   There could be a lot of protocols.  Was it a
24   protocol specifically related to sexual assault
25   investigations?

LexitasTENNESSEE
(615)595-0073

```
 1          Q.        (BY MS. KRAMER) Here.  Let me --
 2   let me ask the question better.
 3               Were you provided a sex-related
 4   crimes investigation protocol that preceded the one
 5   referred to here in your meeting with D.A. Finney in
 6   2020?
 7          A.        Not that I recall.
 8          Q.        This question I see written down
 9   here is, "What guidance do you expect from your
10   office on sexual assault investigation now/before?"
11               Did I read that correctly?
12          A.        Yes, ma'am.
13          Q.        Do you recall D.A. Finney's
14   response on this question?
15          A.        Well, the -- I do.  The protocol
16   was a direct response, my understanding, of kind of
17   a changing of the guards at that date.  At the
18   District Attorney's Office, he had hired two new
19   prosecutors or brought new prosecutors on board to
20   be a little more structured in the sexual assault
21   investigations.
22          Q.        Do you remember who those new
23   prosecutors are?
24          A.        I don't know.
25          Q.        So you mentioned you thought it was
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    a, quote, "changing of the guard."

 2                    Can you explain what you mean by

 3    that?

 4         A.        Well, I was focusing on, you know,

 5    what is expected of the D.A.'s Office, right?  What

 6    do you -- you know, because the investigators work

 7    for the D.A., right?  That's the key.  And, you

 8    know, in any investigative unit, you work for the

 9    prosecutor.  And so I was kind of looking at, you

10    know, getting an understanding from him of what he

11    expects from the investigators.  How often does he

12    expect them to check in?  What is -- what does --

13    what types of topics does he expect them to get

14    guidance on and, you know, what availability does

15    his office have to provide that?  That was -- that

16    was the part that we were looking for.

17                    And I don't remember exactly what

18    was going on before, but I do know that when he

19    was -- when he put this new protocol in play that he

20    had two attorneys that would -- that were doing his

21    will in sexual assault investigation cases and child

22    abuse cases.

23         Q.        You just mentioned information

24    going from investigators to the District Attorney's

25    Office.
```

1              Did you speak with D.A. Finney on
2  guidance that would go from the District Attorney's
3  Office to the investigators?
4         A.      Well, yes, and that's the same --
5  the same conversation, meaning that the prosecutors
6  are going to have to provide guidance to the
7  investigators as to when the case was going to be
8  closed and when it wasn't going to be closed.  So,
9  you know, the -- if the investigator calls up and
10 says, "Hey, I have a case.  It's not going anywhere.
11 The victim is uncooperative.  What do you want me to
12 do?"
13             I asked him, what do you -- what do
14 you expect out of your prosecutors?  Do you expect
15 them just to say, "Okay.  Well, we're not
16 prosecuting or, you know, go make a second effort,
17 put that in writing, send it to me."  What do you --
18 what do you expect?
19             And I think what the outcome was is
20 that it -- and again, we had seen some improvement
21 in investigations in 2021, '22.  And I think that
22 this was part of the continued improvement of more
23 communications and documentation in the form of
24 emails going back and forth from the prosecutors to
25 the investigators.

Lexitas TENNESSEE
(615) 595-0073

1    Q.    You mentioned sort of a specific
2    example there in your answer, which is if an
3    investigator is coming to you and saying, "This
4    victim doesn't want to prosecute," and your question
5    to him is, "What do you do?  What do you say in
6    response to an investigator that says that?"
7         Did you get an answer from D.A.
8    Finney?
9         MR. LAKEY:  Object to form.
10   A.    The one thing that he said is what
11   I had testified before, was he was in the same vein
12   as what I would expect, is that there just needed to
13   be some documentation as to why.  And maybe he said,
14   "Maybe the prosecutors should try to reach out to
15   the victim.  Maybe we should get a statement or a
16   non-prosecutorial form, something that clarifies
17   that the victim is truly not interested in moving
18   forward with the case."
19   Q.    (BY MS. KRAMER) Did you discuss
20   with D.A. Finney the non-prosecution form that you
21   found existed that was not regularly used at the
22   JCPD?
23        MR. LAKEY:  Object to form.
24   A.    My recollection is that I did ask
25   him about it, and my recollection -- and the reason

```
 1    why I recall is because my recollection is that he

 2    had no idea what I was talking about, but that was

 3    my recollection.  I didn't -- I didn't -- there's no

 4    notes here that directly relate to that.

 5         Q.        (BY MS. KRAMER) The next bullet

 6    point says, "What reports can your office see, case

 7    notes, interviews," and I think the last one on --

 8    I'm not sure.

 9              Can you --

10         A.        Forensic.

11         Q.        Forensic?  Okay.

12              What are -- what are the -- why are

13    you listing these here in your meeting with D.A.

14    Finney?

15         A.        The advent of body-worn cameras has

16    led to an integration of databases and -- where

17    before paper was paper.  If I needed to send my case

18    file over to the prosecutor, I would go make a copy

19    and fax it over to them, right?  But in the world of

20    technology today, now it's oftentimes where

21    prosecutors' offices are in the same databases as

22    the investigators.

23              So they can see everything that the

24    investigators do.  They have access to the body-worn

25    cameras.  They have access to reports, and it just
```

```
 1    kind of -- it was just a waste of time for people
 2    just to make copies and bring things over when all
 3    you've got to do is open the database up for
 4    everybody.  So my question to them was where were
 5    they in this?
 6                    Because I'm also dealing with an
 7    archaic record management system.  You know, where
 8    do you get your stuff from?  How do you get your
 9    stuff?  And my recollection was the archaic records
10    management system was in play at Johnson City,
11    meaning that they didn't have online access to the
12    case files, and that it was just coming into play
13    with other agencies around Johnson City.
14                    So, you know, and really body-worn
15    cameras was a big push of this because of just
16    making it so prosecutors could view it.
17         Q.      So when you -- you know, at the
18    time you're taking these notes, that there is not a
19    fully-integrated database between the District
20    Attorney's Office and the Johnson City Police
21    Department, correct?
22                    MR. LAKEY:  Objection to form.
23         A.      Well, I don't know.  That's why I'm
24    asking the question.  I don't think there is, but I
25    know from what I'm looking at on the police
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   department side is not pretty strong.  So I wanted

 2   to see whether -- you know, maybe they had access to

 3   what the -- the minimal database that was available.

 4   I didn't know.  So I wanted to figure that out.

 5           Q.       (BY MS. KRAMER) Did you find that

 6   out?

 7           A.       Yes.

 8           Q.       And did the District Attorney's

 9   Office have access to the case management system

10   that JCPD was using?

11           A.       To my understanding, no.

12           Q.       So when you're asking here what

13   reports can your office see, presumably the answer

14   is none of these.

15           A.       Unless they're -- the answer is

16   none of these, yes, unless they're given to the

17   prosecutor in paper form or faxed over, I guess, or

18   emailed over, because we're in the transition period

19   there.

20           Q.       Did you ask D.A. Finney about the

21   frequency with which JCPD investigators would send

22   case notes to the District Attorney's Office?

23                 MR. LAKEY:  Object to form.

24           A.       What do you mean by case notes?

25           Q.       (BY MS. KRAMER) My understanding
```

Lexitas   TENNESSEE
(615) 595-0073

1   from some of the documents in this case is that when
2   you're looking at the computer system, there's --
3   maybe it's called a case summary or a note summary.
4   It's a narrative that the investigator has written.
5       A.      Right.
6       Q.      Did you ask -- so I'll call that --
7   what makes sense to you for me to refer to that?  A
8   narrative?
9               MR. LAKEY:  Well, I think I'll
10          object to that.
11      A.      I would call it an incident report.
12      Q.      (BY MS. KRAMER) Okay.
13      A.      Because when you say case notes,
14  I'm thinking about what we're looking at right now.
15  The officer's, you know, notebook or whatever he or
16  she would take notes in.
17      Q.      That's much better.  Okay.  So
18  let's say incident report.
19              Did you talk to D.A. Finney about
20  the frequency with which JCPD investigators would
21  send an incident report to the District Attorney's
22  Office?
23      A.      No.
24      Q.      Did you ask D.A. Finney about the
25  frequency with which JCPD investigators would send

```
 1    interviews to the District Attorney's Office?

 2                   MR. LAKEY:  Object to form.

 3         A.        No, but I would qualify by saying

 4    this is -- usually you don't send any of that stuff

 5    unless the grand jury has sat and you need to

 6    prepare it for trial.  Like it's just -- every case

 7    file doesn't go to the prosecutor's office.  It

 8    usually goes to the prosecutor's office, you know,

 9    if a grand jury is going to be seated or if there's

10    a -- or if there's an arrest made.  Then you would

11    send it over, unless you needed their opinion.

12    Unless, let's say, you had a victim interview and

13    you say, "Hey, can you watch this and let me know

14    what you think?"  But it's just not normal course of

15    business to send everything over there.

16         Q.        (BY MS. KRAMER) Would you expect

17    that in the process of getting a case closed that

18    there would be some form of information sent from

19    the investigator to the District Attorney's Office?

20                   MR. LAKEY:  Object to form.

21         A.        If I understand your question, it's

22    specific that it matters how the case is closed,

23    right?

24         Q.        (BY MS. KRAMER) Let me rephrase.

25         A.        Okay.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1         Q.        If a case is being closed for this
 2   non-prosecution reason, would you expect that the
 3   investigator would send materials to the District
 4   Attorney's Office?
 5         A.        I would expect to find some type of
 6   review.  The question is materials.  We know what
 7   was occurring, and that was a telephone call was
 8   being made and information was being shared.  But --
 9   and I -- and I don't think that's a viable way to do
10   that, just because of like what we talked about
11   already.
12              I didn't see, other than a handful
13   of cases where the non-prosecutorial form was filled
14   out, I didn't see anything.  I'm not looking at the
15   data sets that the prosecutors have.  So I don't
16   know exactly what's being sent to them.  But I do
17   know from my interactions and from reading reports
18   where it says, "I contacted or I emailed the
19   prosecutor."  Then I'm giving them credit for what
20   they put in the report.
21         Q.        Well, let's move down to your next
22   bullet point.  I think it says, "What training does
23   D.A. Office offer for investigators?"
24              Did I read that correctly?
25         A.        Yes.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Did D.A. Finney provide an answer
 2   for that?
 3          A.      Well, he had said that he was going
 4   to -- now that the protocol -- because this is, you
 5   know, beginning of December, and the protocol had
 6   just come out a few weeks earlier, that he was going
 7   to work with the department to get some training out
 8   on the protocol.
 9          Q.      Do you know -- aside from what D.A.
10   Finney said in this meeting, do you know what
11   additional training was put in place at the Johnson
12   City Police Department?
13          A.      I do not.
14          Q.      Clarify something for me.
15                  So there's the idea of
16   non-prosecution where the victim is saying, "I do
17   not want to prosecute this case," correct?
18          A.      Correct.
19          Q.      And then there's a different
20   decline to prosecute, I'll call it, where the D.A.
21   says, "I decline to prosecute this case," correct?
22          A.      Where the D.A. decides that there
23   is not sufficient probable cause to move forward,
24   correct.
25          Q.      And those are two distinct reasons
```

1    for case closure from a law enforcement perspective?

2              MR. LAKEY:  Object to form.

3         A.         They may be one and the same, you

4    know, meaning that probable cause without a victim

5    testifying may be a difficult uphill battle, if that

6    makes sense.  Meaning if you don't have somebody to

7    put on the stand who was victimized, then you may

8    not have probable cause in and of itself.  So I

9    think they can go either way or could they actually

10   be contained?  I don't know that.

11             Basically the way that the TIBRS

12   system puts it is that, you know, refuse to

13   prosecute.  You know, that was part of the issue,

14   which is why are they refusing to prosecute, and

15   what information is being conveyed to the prosecutor

16   that leads to that conclusion?

17        Q.         (BY MS. KRAMER) Right, and so -- I

18   see what you're saying, that they can be related,

19   but you could have a victim that absolutely wants to

20   prosecute but, nevertheless, the D.A. declines to

21   prosecute for whatever reason, right?

22        A.         Absolutely.  Yeah.  It's the D.A.'s

23   decision.

24        Q.         And so is that why it's important

25   to have this underlying level of detail so that you

```
 1    know whether it was because the victim did not want

 2    to prosecute versus the D.A. determining that the

 3    case could not be prosecuted?

 4                   MR. LAKEY:  Object to form.

 5         A.        For myself, as a consultant and as

 6    a legal advisor, my problem is really more direct

 7    than that.  And that is prosecutors have absolute

 8    immunity.  They can't be sued.  So police officers

 9    end up taking the beating sometimes on lawsuits that

10    they didn't have anything to do with.  And so the

11    key is that, you know, you want to protect -- your

12    investigators should want to protect themselves by

13    documenting what that is, whether it's a

14    conversation or whether it's -- whether it's sending

15    something over, whether getting a -- you know,

16    getting an email back.  But the documentation has to

17    be there, because there's very limited accessibility

18    to the prosecutor's office in most states and,

19    therefore, the officers are the ones that often have

20    the liability.

21                   MS. KRAMER:  Can you read back that

22         answer, please, Jeff?

23                   COURT REPORTER:  Okay.  Give me a

24         second here.

25                   For myself, as a consultant and as
```

Lexitas TENNESSEE
(615) 595-0073

```
 1              a legal adviser, my problem is really more
 2              direct than that, and that is prosecutors
 3              have absolute immunity.  They can't be sued.
 4              So police officers end up taking the beating
 5              sometimes on lawsuits that they didn't have
 6              anything to do with.  And so the key is
 7              that, you know, you want to protect -- your
 8              investigators should want to protect
 9              themselves, and by documenting what that is,
10              whether it's a conversation or whether
11              it's -- whether it's sending something over,
12              whether getting a -- you know, getting an
13              email back, but the documentation has to be
14              there, because there's very limited
15              accessibility to the prosecutor's office in
16              most states and, therefore, the officers are
17              the ones that often have the liability.
18                   That's it.
19                   MS. KRAMER:  Thank you.
20         Q.      (BY MS. KRAMER) So is your
21    testimony that the investigator, to protect
22    themselves, should document that it was the D.A.'s
23    decision to close a case?
24                   MR. LAKEY:  Object to form.
25         A.      I would say yes.  And I would --
```

```
 1   like if I sent over a warrant affidavit to -- here
 2   they are states attorneys, but I send it over and
 3   they call up and say, "We're not prosecuting."  I'm
 4   like, "All right.  Write do not -- you know, not
 5   prosecuting and send it back to me."  And then I'm
 6   going to write a supplemental report that says, "On
 7   this date, at this time, I talked to prosecutor
 8   so-and-so and this is what they said.  See
 9   attached."  And I'm going to close the case, and my
10   bosses should be expecting that when it comes
11   through the case file system.
12           Q.      (BY MS. KRAMER) In the situation
13   that we talked about where the victim is saying he
14   or she or they do not want to prosecute, how should
15   that information then be evaluated by the District
16   Attorney if they are being requested to close a
17   case?
18               MR. LAKEY:  Object to form.
19           A.      I don't -- I don't know that I can
20   answer that question, because I'm not the D.A.  A
21   D.A. has a different hurdle to overcome, and that's
22   prosecuting the case.  I don't know.  I can assume,
23   but I don't want to testify as to how to do the
24   D.A.'s job because I'm not -- I'm not a D.A.
25                   So that is -- you know, what does
```

```
1    the effect of a victim saying, "I don't want to

2    prosecute," what does that do to your overall case?

3    I can imagine it's not good, but I don't know.

4         Q.        (BY MS. KRAMER) If you have an

5    investigator who is going to the D.A. and the

6    investigator says, "Oh, we have fantastic evidence

7    in this case, but the victim does not want to

8    prosecute," in that instance, is the case closure

9    going to be categorized as the victim doesn't want

10   to prosecute or the D.A. doesn't want to prosecute?

11                  MR. LAKEY:  Object to form.

12        A.        I believe the category is the same

13   either way.

14        Q.        (BY MS. KRAMER) In TIBRS?

15        A.        Yeah.  It just says

16   non-prosecutorial.  It doesn't -- you know, a lot of

17   things fit into that category, if I remember

18   correctly.

19        Q.        Okay.  So your evaluation of the

20   documents in this case, there was not a clear

21   distinction between whether it was the D.A.

22   determining not to prosecute and to close a case,

23   versus a victim not wishing to pursue the case, and

24   that being the reason for case closure.

25                  MR. LAKEY:  Object to form.
```

Lexitas - TENNESSEE
(615) 595-0073

1    A.        I would expect that -- I would

2    expect to find that when an officer -- when a victim

3    says, "I don't want to prosecute," the officer is

4    probably going to be very clear about that and -- if

5    we have a report, right?  Because that just solves

6    the issue right there.  "I don't want to prosecute,"

7    so write it down.  "I don't want to prosecute."

8              I would expect to see that, if that

9    was the reason that the individual said it.  I would

10   expect to see an officer say, you know, "I brought

11   in the victim, and the victim said I don't want to

12   do this."  So unless there's an extenuating or a

13   legal reason why they can continue the case without

14   a victim, then I expected that to be documented.

15        Q.        (BY MS. KRAMER) And you did not see

16   that in your assessment; is that correct?

17        A.        I did not see what?

18        Q.        You did not see clear documentation

19   with respect to the victim declining to prosecute

20   versus the D.A. declining to prosecute.

21             MR. LAKEY:  Object to form.

22        A.        I did see cases where there was

23   documentation, truthful or not truthful, that said,

24   "The victim doesn't want to prosecute."  There was a

25   lot of those cases in the assessment.  I just don't

LEXITAS TENNESSEE
(615) 595-0073

```
 1    know.  I don't know.
 2                   There were some questions as to why
 3    they didn't want to cooperate, right?  And that's a
 4    whole other threshold, which is how did we -- how
 5    was the victim treated, you know, what concessions
 6    were made to the victim?  But there were cases where
 7    it said clearly that, "I don't want to.  You know, I
 8    don't -- I don't want to do this.  I don't want to
 9    prosecute."
10         Q.       (BY MS. KRAMER) Okay.  Let's
11    continue down on the -- on your notes here of your
12    meeting with D.A. Finney.
13                   The next question is, "What
14    resources do you provide directly?"  I think
15    that's what --
16         A.       It's D.A.
17         Q.       D.A.  Okay.  Sorry.
18                   Why don't you read that?
19         A.       "What resources do you provide D.A.
20    for the victim -- for victims."
21         Q.       Do you remember asking that
22    question to D.A. Finney?
23         A.       Yes.
24         Q.       And what did you learn?
25         A.       So this was just occurring at the
```

Case 2:23-cv-00071-TRM-JEM   Document 335-27   Lexitas TENNESSEE   Filed 10/28/24   Page 143 of 167   PageID
(615) 595-0073
#: 6595

```
1    time that we were there.  But what we mean by this
2    is that across the jurisdictions, the psychological
3    aspect of these investigations has started to lead
4    to having independent places where you can interview
5    victims that are more comfortable, non-hospital
6    basis, you know, the psychological aspects.  And a
7    lot of District Attorney's Offices and S.A.'s have
8    victim services like, you know -- like a -- in a lot
9    of states nowadays, and even in Tennessee, you
10   can -- you know, if you have a victim of a crime,
11   there are services that you can call to get the
12   victim counseling and, you know, to talk to
13   somebody.  And so I was looking at, you know, what
14   does the D.A. have?  What is available?
15             Q.      At the time that you asked this
16   question, what resources was the JCPD providing to
17   victims of sex crimes?
18                     MR. LAKEY:  Object to the form.
19             A.      Ask that again.  I'm sorry.
20             Q.      (BY MS. KRAMER) Are you aware at
21   this time, so late 2022, were you aware of what
22   resources JCPD already had in place for victims of
23   sex crimes?
24             A.      Well, they already had in place --
25   and I want to make sure I clarify, because I know
```

```
1    there was discussions and there was attempts with
2    regional services and victim services to put in play
3    a third-party location where sexual assault
4    examinations by nurses could be conducted and that
5    resources could be made available to a victim.
6                   I don't know exactly when that went
7    into play.  I know that before -- during the time I
8    was looking at JCPD's responses that it got better
9    over the years, but there was -- there was still
10   work being done to ensure that victims were treated
11   in a better manner.
12        Q.      Do you know if in 2021 victims of
13   sex crimes were interviewed in the same room as
14   suspects of sex crimes?
15        A.      Yeah, I -- it's -- I want to go
16   with yes.  I know leading up to that point they
17   were -- that was one of my recommendations in the
18   report, was that the interview room was a general
19   interview room that had handcuffs on the floor and
20   wasn't really attuned to a victim interview room.
21   And that was something that was occurring in the
22   industry of law enforcement, where we were starting
23   to recognize making better rooms to interview
24   children and victims of crimes that were less, you
25   know --or less criminal like, I guess, is probably
```

```
 1   the best way to.

 2        Q.       All right.  Let me move on here.

 3                 So at the end there's a question

 4   that says, "Who has final authority to close a case

 5   if it's 18 or over, 13 to 18, or under 13?"

 6                 Do you remember what, if any,

 7   policy existed at this time?

 8                 MR. LAKEY:  Object to form.

 9        A.       Policy for --

10        Q.       (BY MS. KRAMER) Do you know what

11   was happening at this time in terms of who had the

12   final authority to close a case for -- let's just

13   start with the first one -- victims 18 and over?

14        A.       So it wasn't policy.  It's law.  It

15   was -- what I was getting at in these -- in my

16   questions here was in the overall world of a victim,

17   there are points where a victim doesn't have their

18   own authority, right?  Meaning that I was trying to

19   figure out which victims the State could take over

20   as the victim for.  And in different jurisdictions

21   it's treated differently.

22                 Meaning below the age of 13, in

23   most states, whether the victim wants to participate

24   or not, it may not be the victim's choice because

25   the State may come over.  The State may take over as
```

```
 1   the victim.

 2             Then obviously the next block is 13

 3   to 18 and then 18 and over.  Meaning that 18 and

 4   over, the victim can make a decision, you know,

 5   because they're an adult.  13 to 18 was a question,

 6   was an unknown.  Under 13 -- because if I'm looking

 7   at reports and I see under 13 as a victim, just

 8   because the victim doesn't want to cooperate, does

 9   that mean we can't prosecute this case?  I'm just

10   trying to understand the law.

11        Q.      Okay.  Let's move on to Bates

12   ending in 654.  And I just want to understand what

13   I'm seeing here in your notes.  It looks to me to

14   say, "Complex IA."

15             Do you know what that is?

16        A.      No.  It's captain of IA.

17        Q.      Oh, captain of IA.  Okay.

18             And that's Scott Jenkins; is that

19   right?

20        A.      I could have been a doctor.

21             Yes.  And so --

22        Q.      Did you -- did you interview Scott

23   Jenkins?

24        A.      I did.

25        Q.      And I don't see many notes.
```

Lexitas - TENNESSEE
(615) 595-0073
#: 5195

1    Do you recall your interview with
2  Scott Jenkins?
3    A.    Yes.  I was only interested in one
4  thing, and that was during the period of 1999 to
5  2003, had Johnson City Police Department received
6  any internal affairs complaints specific to sexual
7  assault investigations.
8    Q.    And what did you learn?
9    A.    No.
10    Q.    Why was it -- why was 1999 to 2003
11  the relevant time period for you for that question?
12    A.    It was the same years I was doing
13  my assessment in.
14    Q.    1999?
15    A.    I'm sorry.  2000.  It probably
16  should have been 2019, but I was looking for the
17  same period of time that I was doing my assessment
18  in to determine if there was any internal affairs
19  complaint.  I must have wrote it down wrong.
20    Q.    I see.
21          Okay.  And it looks to me like
22  maybe you were -- you were making a note on his
23  tenure.
24    A.    Oh, that's possible.  Yes.
25    Q.    But you remember, sitting here

1  today, that your question to him was about internal

2  investigations related to sex crime investigations.

3                    MR. LAKEY:  Object to form.

4        A.        Yes.  So anybody make a complaint

5  against --

6                    THE WITNESS:  Sorry.

7                    MR. LAKEY:  It's okay.

8        A.        Did anybody make a complaint for

9  misconduct during this period of time?

10       Q.        (BY MS. KRAMER) During the time

11  period January 2018 through July 2022, you were told

12  by Scott Jenkins that there had been zero internal

13  affairs investigations relating to sex crimes; is

14  that correct?

15       A.        There had been no complaints made

16  that led to an IA investigation during that time,

17  yes.

18       Q.        Okay.  On the very last page of

19  this exhibit there is -- we have some names here.

20                    Can you just read those names down?

21       A.        I believe it's Sergeant Gary Wills

22  and Sergeant Shane Williams, and they were the

23  Criminal Investigation Division sergeants.

24       Q.        And you have another note that

25  says, "Caseload, 25," and then it says, "Unfounded -

LEXITAS - TENNESSEE
(615) 595-0073

```
1    not in their jurisdiction."
2                    Do you know what that's referring
3    to?
4         A.        I was asking what would the term
5    unfounded be if you used it.  I'm trying to get
6    their interpretation as supervisors, and they said
7    unfounded, meaning the crime did not occur in their
8    jurisdiction, which is legitimate.  I mean, you have
9    to send it to somebody else's jurisdiction.
10        Q.        In your experience, is the term
11   unfounded in this context generally used to mean not
12   in our jurisdiction?
13        A.        We didn't -- I wouldn't see it that
14   way, but I do understand the concept that you can't
15   prosecute it.  You can't investigate a crime not in
16   your jurisdiction.  It has to go to the jurisdiction
17   whose -- where the crime is committed.
18        Q.        Does TIBRS have a category of
19   unfounded?
20        A.        I don't -- I don't know.  I don't
21   remember as I sit here today.
22        Q.        Does TIBRS have a category for
23   outside of jurisdiction?
24        A.        No, because you wouldn't take -- if
25   it was outside of your jurisdiction, you wouldn't
```

Lexitas - TENNESSEE
(615) 595-0073

1    take the case number because you can't.  So you

2    would have to send it to the other jurisdiction.

3              Q.        Understood.

4                        Did you find, in the course of your

5    interviews or in reviewing documents, any other

6    understanding of the word unfounded as used by the

7    JCPD?

8                        MR. LAKEY:  Object to form.

9              A.        Not that I recall, unless it's in

10   my report somewhere.

11             Q.        (BY MS. KRAMER) Going down a couple

12   lines, you have a note that says, "Exceptional

13   means."

14                       Sitting here today and looking back

15   at these notes, do you know what you were referring

16   to here by writing exceptional means?

17             A.        I'm still trying to drill down on

18   what everybody understands the TIBRS's exceptional

19   means to get rid of a case.  I'm still trying to

20   figure out what everybody interprets this to be.  So

21   I'm just kind of asking everybody the same questions

22   like, "What do you -- what do you expect closed by

23   exceptional means or ex-cleared?  What do you expect

24   it to be?"

25             Q.        Ex-cleared means exceptional means?

Lexitas TENNESSEE
(615)595-0073

```
 1          A.        That's my term, but that's what we

 2    use, ex-cleared, but it's exceptional means.

 3          Q.        And is that term, exceptional

 4    means, is the source of that term from TIBRS?

 5          A.        It's for -- the short answer is

 6    yes.

 7          Q.        Okay.

 8          A.        So you have to remember that each

 9    of the state entities fit into a federal database.

10    So everybody's pretty consistent.

11          Q.        Did anybody at Johnson City Police

12    Department -- strike that.

13                    Did anybody from the City, in

14    connection with your assessment, provide to you a

15    written description of what it means to clear for

16    exceptional means?

17                    MR. LAKEY:  Object to form.

18          A.        Yes, because it's on the -- it's on

19    the manual for TIBRS, which is -- I think I put

20    it -- I even put it in the report.  In the initial

21    phase, it was -- I think it was sent by the sergeant

22    I was working with.  And then I just went and pulled

23    the manual myself and started looking at the TIBRS

24    manual.

25          Q.        (BY MS. KRAMER) And what was your
```

Lexitas - TENNESSEE
(615) 595-0073

1   understanding of how JCPD investigators were using

2   the exceptional means code for case clearances?

3                    MR. LAKEY:  Object to form.

4        A.        Not very consistently.

5        Q.        (BY MS. KRAMER) Can you say more

6   about that?

7        A.        It just -- you know, the challenge

8   was that there just wasn't consistency.  So I

9   couldn't figure out, you know, how it should be used

10  correctly, right?  And that's where I was drilling

11  down on when should -- what is TIBRS's view of how

12  it should be used correctly.

13                    We just found, as you saw the

14  number of cases, that a large percentage of the

15  cases were being closed by exceptional means.  And I

16  just wanted to make sure that they're being closed

17  correctly.

18       Q.        Did you find JCPD officers had a

19  clear understanding of the correct use of clearing

20  by exceptional means?

21                    MR. LAKEY:  Object to form.

22       A.        I can conclude that they did not,

23  because I couldn't get consistency in asking that

24  question.

25       Q.        (BY MS. KRAMER) Did you ask whether

```
1    supervisors at JCPD -- or let me rephrase that.
2                        Did you find that there was a
3    consistent understanding by JCPD supervisors as to
4    the use of exceptional means for clearing a case?
5                        MR. LAKEY:  Object to form.
6         A.        I can only answer that specific to
7    what the assessment was, which would have been the
8    Criminal Investigation Division.
9                        And so they -- since they were
10   the -- since the cases were closed and they -- the
11   cases should have been reviewed by them on closing,
12   and they're looking at the same thing I'm looking
13   at, that there was not -- there's not a clear
14   application of that exceptional means category.
15        Q.        (BY MS. KRAMER) Did you look at the
16   use of a clearance by exceptional means for any
17   crimes other than sex-related crimes?
18        A.        No.
19        Q.        Let me put in the last few
20   sentences you have here on Bates 66655.
21                        It says, "Exceptional means," and
22   then there's two bullet points.  One says, "I don't
23   want to move forward," and then the second one says,
24   "D.A. by" -- do you know what that says?
25                        MR. LAKEY:  Object to form.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          A.        D.A. by contact.
 2          Q.        (BY MS. KRAMER) What do you -- what
 3   do you understand this note to mean?
 4          A.        That the sergeants told me that the
 5   exceptional means applies to when a victim doesn't
 6   want to move forward or when they've contacted the
 7   D.A. for closure for non-prosecution.
 8          Q.        And then there's just one word, and
 9   I can't tell what it is.  It says, "Exceptional
10   means," and there's a space and then a word.
11          A.        Suspect.
12          Q.        Suspect?  Okay.
13                    All right.  We can put this aside.
14                    MS. KRAMER:  I'm going to mark
15            another exhibit for the Exhibit 116.  This
16            is Bates number CITY-0066593.
17                    (Exhibit 116 marked).
18                    MS. KRAMER:  What time did we go
19            back on the record?
20                    MR. LAKEY:  Jeff?
21                    COURT REPORTER:  I'm sorry?
22                    MS. KRAMER:  What time did we go
23            back on the record?
24                    VIDEOGRAPHER:  What time did we go
25            back on the record, you asked?
```

```
 1                    COURT REPORTER:  I'm sorry.  We
 2          went back on at 12:25.
 3                    MS. KRAMER:  Okay.  So we'll go to
 4          1:30.
 5          Q.        (BY MS. KRAMER) Do you recognize
 6   this document?
 7          A.        Yes.
 8          Q.        Did you prepare this document?
 9          A.        No.
10          Q.        Where did it come from, if you
11   know?
12          A.        So when I -- when we first started
13   the assessment, we were put in contact with a
14   Sergeant John Hames, who was the records coordinator
15   for JCPD, and an Officer Steve Bowman was his kind
16   of assistant.  And these were the individuals who
17   were going to be providing us with our information
18   we needed to do the assessment.
19                    And so this was like one of the
20   first emails that we got -- I got from Sergeant
21   Hames.  And basically he kind of sent some contact
22   information, some basic information about what we
23   expect to find, and some basic information about
24   TIBRS, the TIBRS system.
25          Q.        If you look on the third paragraph
```

LexitasLEGAL TENNESSEE
(615) 595-0073

1    of this email from Sergeant Hames, it says, "Our

2    Crim Inv Division reports that a case file is not

3    routinely completed unless an arrest is made."

4                    Do you see that?

5         A.        Yes.

6         Q.        Do you interpret that to mean that

7    the case file itself is not completed at all unless

8    there's an arrest in the case?

9                    MR. LAKEY:  Objection to form.

10        A.        I interpret him saying it's not

11   routinely completed, which means that what I

12   found -- this is even before we started looking at

13   anything.  So he was basically saying, "I've got to

14   go find some stuff.  It's not in the case file."

15        Q.        (BY MS. KRAMER) And this was with

16   respect to the entire Criminal Investigations

17   Division.

18                    Is that your understanding?

19                    MR. LAKEY:  Object to form.

20        A.        That's what it says.

21                    THE WITNESS:  I'm sorry.

22        Q.        (BY MS. KRAMER) Okay.  So this is

23   just a -- this is an email with information provided

24   to you in the course of you conducting your

25   assessment, and this describes what I think you

```
 1   referred to before.
 2                   So on the third page, Bates ending
 3   66593, the TIBRS Data Collection Manual for
 4   exceptional clearance, right?
 5                   MR. LAKEY:  Ms. Kramer, just
 6           because there are several documents that are
 7           Bates numbered the same, I think we have to
 8           say that I think you're talking about
 9           66593-3.
10                   MS. KRAMER:  You are correct, and
11           we can -- we'll be able to clarify this when
12           we provide exhibits.  The way they were
13           produced, the documents weren't separated
14           with separate Bates.  So we used a dash.  So
15           that's actually an added dash.  They all
16           had -- these separate documents had the same
17           Bates.  So --
18                   MR. LAKEY:  Okay.
19                   MS. KRAMER:  That's how we received
20           them, and we'll be able to make it clear
21           when we're marking --
22                   MR. LAKEY:  Yeah.  So the dashes
23           that are in the exhibits that have been used
24           today, where they have dashes, have been
25           added by you all to differentiate between
```

Lexitas-TENNESSEE
(615) 595-0073
#: 6095

```
 1              documents that had just a single Bates
 2         number.
 3                   MS. KRAMER:  Correct.
 4                   MR. LAKEY:  Okay.
 5                   MS. KRAMER:  They were produced in
 6         Word.
 7                   MR. LAKEY:  Yeah.
 8                   MS. KRAMER:  So --
 9                   MR. LAKEY:  Gotcha.
10                   MS. KRAMER:  So yes, important
11         clarification.
12         Q.      (BY MS. KRAMER) But where we are on
13    this page is the TIBRS Data Collection Manual.
14                   Do you see that, Mr. Daigle?
15         A.      Yes.
16         Q.      And this is what was provided to
17    you to explain the meaning of when an incident is
18    cleared by exceptional means.
19         A.      Yes.
20                   MS. KRAMER:  Did we mark this?
21                   MR. LAKEY:  This is 116.
22         Q.      (BY MS. KRAMER) Okay.  Let's turn
23    to previously marked Exhibit 56, which is your
24    audit.  If we turn to Page 14, please.
25                   So on Page 14, I'm looking at
```

Lexitas - TENNESSEE
(615) 595-0073
#: 5075

```
 1    Finding No. 2, which says, "The sexual assault
 2    investigations conducted by JCPD have material
 3    deficiencies that can hinder the ability to collect
 4    necessary evidence for a complete and accurate
 5    investigation."
 6                    Did I read that correctly?
 7    A.        Yes, ma'am.
 8    Q.        Do you stand by this finding?
 9    A.        Yes.
10              MR. LAKEY:  So the only other
11         objection I'll raise, and just keep it for
12         the record, is that to the degree that
13         you're eliciting an opinion from him that go
14         to the ultimate issue.
15              I also have an objection that that
16         is not appropriate opinion testimony by any
17         witness because it invades the province of
18         the Court and, of course, directions to the
19         jury in case this goes to trial.
20              So I'd like to have a standing
21         objection on that, as well, Ms. Kramer.
22              MS. KRAMER:  Noted.
23              MR. LAKEY:  Is that agreeable that
24         I don't have to make it each time?
25              MS. KRAMER:  You do not.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    MR. LAKEY:  Thank you so much.
 2          Q.        (BY MS. KRAMER) So this finding,
 3    Mr. Daigle, you stand by this finding; is that
 4    correct?
 5          A.        Yes, ma'am.
 6          Q.        And this finding was made as a
 7    result of your audit performed on sex-related crimes
 8    from January 2018 to July 2022; is that correct?
 9          A.        Yes, ma'am.
10          Q.        Have you received any additional
11    information from the City that would alter this
12    finding?
13          A.        No.
14          Q.        Have you received additional
15    information from anyone that would alter this
16    finding?
17          A.        No, ma'am.
18          Q.        And in this finding you note
19    material deficiencies.
20                    What are you using to compare JCPD
21    to?
22          A.        As we talked about in building the
23    assessment tool, that was coming from, you know,
24    accreditation standards, Department of Justice
25    consent decrees, from operational knowledge, and
```

```
 1    from their own policy as to things that should be
 2    done.
 3            Q.      All of those sources that you just
 4    listed go into the assessment tool, and that forms
 5    the basis for this finding; is that correct?
 6            A.      Yes.
 7                    MR. LAKEY:  Object to form.
 8            Q.      (BY MS. KRAMER) Your second to last
 9    sentence in this paragraph starts, "Our review."
10                    Can you read that?
11            A.      "Our review revealed instances
12    where JCPD officers likely would have obtained
13    statements and facts to support a prosecution if
14    they had used the investigative tactics known to be
15    effective and essential in sexual assault
16    investigations, especially investigations of
17    non-stranger sexual assaults."
18            Q.      And do you stand by that finding?
19            A.      Yes.
20            Q.      And was that finding based on, as
21    we discussed, the sources that go into your
22    assessment tool and then the application of that
23    assessment tool to the cases that you reviewed?
24            A.      Yes.
25                    MR. LAKEY:  Object to form.
```

Lexitas - TENNESSEE
(615) 555-0073

```
1        Q.        (BY MS. KRAMER) Did you find, in
2    your review, specific cases where you concluded that
3    the investigative deficiencies actually resulted in
4    non-prosecution?
5        A.        I don't know that I can make that
6    conclusion.
7                  THE WITNESS:  I'm sorry.  15.
8        A.        I don't know that I can make that
9    conclusion.  We were finding the deficiencies and
10   the problem is deficiencies lead to an incomplete
11   investigation.  You often -- you often can't
12   prosecute an incomplete investigation.
13                 So I'm not going as far as to say
14   that these were the direct results of
15   non-prosecution, because I can't do that.  I don't
16   know what the investigators told the prosecutors.  I
17   don't know what the prosecutors used as the form of
18   their analysis.  So I can't make that conclusion.
19       Q.        But you did find that JCPD's
20   investigative practices lead to under-enforcement of
21   sexual assault laws in Tennessee, didn't you?
22                 MR. LAKEY:  Object to form.
23       A.        No, I did not make that conclusion.
24   What I said is that JCPD's tactics of not doing
25   the -- doing investigations the way we'd expect them
```

```
 1   to, specifically with the collection of evidence and
 2   the interview of suspects and witnesses, has a
 3   detrimental effect on victim rights.
 4                   I can't -- I can't get to that last
 5   part.  I didn't do enough research to know whether
 6   or not these cases are prosecuted, not prosecuted,
 7   or failed as a result of it.
 8           Q.        (BY MS. KRAMER) Can you read the
 9   first sentence in that paragraph, please?
10           A.        Are you talking about Finding 3,
11   ma'am?
12           Q.        No.  Sorry.  The first sentence on
13   page -- under Finding No. 2 on Page 14.
14                   MR. LAKEY:  Page 14?
15                   MS. KRAMER:  Correct.
16           A.        "JCPD's investigative practices
17   were found to compromise the effectiveness of the
18   response to sexual assault and lead to an
19   under-enforcement of sexual assault laws in
20   Tennessee."
21           Q.        (BY MS. KRAMER) Do you stand by
22   that finding?
23           A.        I stand by that finding, yes.
24           Q.        You also note at the end of this
25   paragraph, "These investigative deficiencies
```

1    compromise the investigative process and

2    unnecessarily place victims at an increased risk of

3    harm."

4                    Can you explain what you mean by

5    placing victims at an increased risk of harm?

6         A.      So especially in the area of

7    non-stranger sexual assault, which is, you know,

8    with individuals that may be -- have been in a prior

9    relationship or in a relationship or might even be

10   married, you know, by not fully investigating it and

11   enforcing it, you're -- you might be leaving the

12   victim in a situation that could increase the risk

13   to harm for the victim .

14        Q.      At Finding No. 3, this is Page 15,

15   Finding No. 3 says, "JCPD investigations were found

16   to be inconsistent, ineffective, and incomplete."

17                   Do you stand by that finding?

18        A.      Yes.

19        Q.      Did you receive any information

20   after completing this report that would alter that

21   finding?

22        A.      No, ma'am.

23        Q.      If we look at Finding 3 (a), here

24   we're getting into the -- well, let me ask you.

25                   So you have the finding, and then

Lexitas - TENNESSEE
(615) 555-0073

```
 1    we're in 3 (a).  So these subparts, is it fair to

 2    say that these are the underlying findings to

 3    Finding 3?

 4                A.       These are the support --

 5                         MR. LAKEY:  Objection to form.

 6                A.       This is the support for the

 7    conclusions.

 8                Q.       (BY MS. KRAMER) The support?  Okay.

 9                         So if we look at (a), "JCPD often

10    did not attempt to collect evidence or failed to

11    document the collection of evidence."

12                         Here in Footnote 3, you're citing a

13    JCPD General Order.

14                         Do you see that?

15                A.       Yes, ma'am.

16                Q.       And it looks like the General Order

17    is incorporated into your report, and you have

18    included here under the heading Preliminary

19    Investigations, and then there's an A through N

20    list.

21                         Is that accurate?

22                A.       Yes.

23                Q.       And you are -- is it accurate that

24    you've included here what you obtained from JCPD

25    General Order 600.02?
```

Lexitas - TENNESSEE
(615) someth-0073

```
 1              A.      Yes.

 2              Q.      Okay.  Did JCPD provide to you

 3    General Order 600.02 as the relevant policy for

 4    investigating sex-related crimes?

 5              A.      Yes.

 6                      MR. LAKEY:  Object to form.

 7              Q.      (BY MS. KRAMER) This policy was

 8    issued in -- sorry.  Would you call -- I mean, we

 9    talked about this a little bit before, but you've

10    incorporated here this General Order.

11                      Would you -- should we call it a

12    General Order?  Would you call it a policy?  Would

13    you call it a procedure?

14              A.      They call it a General Order.  So I

15    think, for clarity, it should be a General Order.

16              Q.      Okay.  And is this the General

17    Order that JCPD provided to you as relevant for

18    purposes of a preliminary investigation of a

19    sex-related crime?

20                      MR. LAKEY:  Object to form.

21              A.      It's specific to all criminal

22    investigations but, you know, a crime is a crime.

23    The processes must occur no matter what the criminal

24    investigation is, so -- but this is their criminal

25    investigation policy.
```

Lexitas - TENNESSEE
(615) 595-0073