```
 1          Q.        (BY MS. KRAMER) And the City
 2   pointed you to this General Order, correct?
 3          A.        They gave it to me, yes.
 4          Q.        And this General Order was issued
 5   in 1993; is that right?
 6          A.        Well, that's what it says, yes.
 7          Q.        And this was provided to you for
 8   your audit of sex-related crimes from January 2018
 9   to July 2022; is that right?
10                    MR. LAKEY:  Object to form.
11          A.        Yes.
12          Q.        (BY MS. KRAMER) Was there no more
13   recent policy that the City provided for you?
14          A.        No.
15          Q.        Based on your experience, should
16   JCPD have updated this policy at some point over the
17   30-year period?
18          A.        You would -- I would like to see a
19   department update a policy from 1993, you know,
20   specifically because it's -- there probably has --
21   some changes have occurred in the collection of
22   evidence for forensic analysis or something.
23                    But, you know, this is not a --
24   this is not a policy that usually stays within the
25   past couple of years, but I would have liked to have
```

```
1    seen an updated version of this.  And I think that's
2    what we addressed in our findings with things that
3    could be updated in the policy or in the General
4    Order.
5              Q.       Following the A through N list on
6    Page 16 of your report, it states, "Our audit of
7    case files found multiple investigations where the
8    officers failed to document their preliminary
9    investigation or did not sufficiently conduct a
10   preliminary investigation."
11                       Did I read that correctly?
12             A.       Yes, ma'am.
13             Q.       Did you find that, in practice,
14   JCPD investigations violated General Order 600.02?
15                       MR. LAKEY:  Object to form.
16             A.        No.  I found that some were good
17   and some were bad.  It's not -- it wasn't like
18   everyone was a failure, but there was -- it was a --
19   and that's the reason why I used the language that I
20   used, was that, you know, whether -- you can't give
21   people credit for things they do unless they
22   don't -- they do them, right?  So even if an officer
23   did a proper preliminary investigation but didn't
24   write it down in the report, I can't give them
25   credit for it.
```

Lexitas TENNESSEE
(615) 595-0073

1          So did I find evidence in the
2    assessment of the 326 where the officer did a good
3    preliminary?  Yes.  But I also found cases where
4    there was not a good preliminary investigation done
5    or a documentation of a good preliminary
6    investigation, which is why I -- we identified
7    those.
8          Q.      (BY MS. KRAMER) Of the case files
9    where there was documentation for you to evaluate
10   the quality of the preliminary investigation, how
11   often did those meet the criteria set forth in
12   General Order 600.02?
13         A.      I don't know sitting here.  I mean,
14   it's in the data sets that we provided, but the
15   problem is that we're -- you know, you have to go
16   back through all -- there's a lot here to get -- to
17   do an assessment, we're talking about eight months
18   worth of data analysis and reading and detail.  So,
19   you know, the information's there.  But I don't know
20   as I sit here today, you know, how many were done,
21   this one little preliminary investigation, how many
22   were done correctly or not correctly.  I came to the
23   conclusion that a percentage of them, a significant
24   percentage of them, were not done correctly, which
25   is why I made the finding.

```
 1              MS. KRAMER:  Okay.  It's one minute
 2         before 1:30.  So I think we'll take a break
 3         here for lunch, and we can go off the
 4         record.
 5              VIDEOGRAPHER:  Okay.  We are now
 6         off the record.  The time is 1:29 p.m.
 7         Eastern time.
 8           (Off the record at 1:29 p.m.)
 9           (On the record at 2:37 p.m.)
10              VIDEOGRAPHER:  Okay.  We are now
11         back on the record.  The time is 2:37 p.m.
12         Eastern time.
13   BY MS. KRAMER:
14         Q.      Mr. Daigle, before the break we
15   were talking about preliminary investigation
16   portions of sex-related crimes, and I'd like to draw
17   your attention to Page 17 of your report.
18              And can you read the first two
19   sentences of the full paragraph at the top of
20   Page 17, please?
21         A.      "Experienced investigators
22   understand that physical evidence is located,
23   collected, and analyzed for the investigation and
24   prosecution of a criminal act.  This is extremely
25   important in sex-related crimes since physiological
```

```
 1    fluids, DNA, trace evidence, and drugs can be

 2    difficult to locate and secure."

 3         Q.        Mr. Daigle, do you stand by that

 4    statement?

 5         A.        I do.

 6         Q.        And looking down at Recommendation

 7    3(a), the report states, "JCPD should develop a

 8    checklist for all sex-related investigations by

 9    responding officers and supervisors to ensure

10    consistency in collecting and documenting evidence."

11                   Do you stand by that

12    recommendation?

13         A.        I do, yes.

14         Q.        Do you know if JCPD ever developed

15    a checklist for all sex-related investigations?

16         A.        I do not.

17         Q.        Looking at Part B of your finding

18    No. 3, the report states, "JCPD's securing of crime

19    scenes and using search warrants to document

20    evidence were found to be insufficient."

21                   Do you see that?

22         A.        Yes, ma'am.

23         Q.        And what led you to make this

24    finding?

25         A.        The audit, reviewing of the
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    reports, and the actions identified on the reports.

 2           Q.        And is this finding a finding based

 3    on your overall review of the case files?

 4           A.        Yes, ma'am.

 5           Q.        And you would not reach this

 6    finding based on one failure to use a search

 7    warrant, correct?

 8           A.        No.

 9           Q.        And you wouldn't base this finding

10    on a single instance of failure to secure a crime

11    scene, correct?

12           A.        No, ma'am.

13           Q.        You have a reference on this page

14    in Footnote 4 to an IACP Model Policy for

15    Investigating Sexual Assaults.

16                     Do you see that?

17           A.        Yes, ma'am.

18           Q.        And sitting here today, do you know

19    how that Model Policy compares to the policy in

20    place at JCPD when you were conducting your audit?

21                     MR. LAKEY:  Objection to the form.

22           A.        Not on a line-by-line analysis.  It

23    would just be that that -- we're supporting the --

24    supporting the finding that industry standards

25    express detailed considerations for evidence
```

Lexitas TENNESSEE
(615) 595-0073
5645

```
1    collection and crime scene response and utilizing

2    the International Chiefs of Police's Model Policy on

3    investigating sexual assaults as an example of that.

4           Q.       (BY MS. KRAMER) And so is it fair

5    to say that your finding is that JCPD's securing of

6    the crime scene fell below that industry standard?

7                    MR. LAKEY:  Objection to form.

8           A.       In cases that we looked at yes.

9           Q.       (BY MS. KRAMER) And is it fair to

10   say that JCPD's use of search warrants to document

11   evidence also fell below industry standards?

12                   MR. LAKEY:  Objection to form.

13          A.       Based on our review of some of the

14   cases, yes.

15          Q.       (BY MS. KRAMER) We talked earlier

16   about the words policy and practice, and you

17   described the -- well, I won't ask you that same

18   question.

19                   But how do you -- how do you

20   define -- sorry.  Strike that.

21                   I asked you before about policies

22   and procedures, and you described how that has sort

23   of changed over time in the industry, the

24   understanding of those two words.

25                   Is that fair?
```

Lexitas - TENNESSEE
(615) 525-0073

```
 1                    MR. LAKEY:  Object to the form.
 2          A.        Yes, that's fair.
 3          Q.        (BY MS. KRAMER) Can you summarize
 4    again how you view the use of the words policy and
 5    procedure?
 6          A.        The industry is all across the
 7    board.  At one point there was policy, which was
 8    theory-based application, and procedures, which was
 9    operations-based application.  Everybody uses it
10    intra -- integrate it back and forth.
11                    So we've tried to make some clarity
12    in that by going to something other than policies
13    and procedures to identify the book or the manual
14    that guides the practice.
15          Q.        So it would be your preference to
16    have a specific reference point, for example, a
17    General Order?
18                    MR. LAKEY:  Object to form.
19          A.        That's what we do here, is we build
20    General Orders.  That's how we do things at Daigle
21    Law Group.
22          Q.        (BY MS. KRAMER) And how do you
23    define a practice?
24          A.        A practice is something that -- I
25    think we basically defined it this morning when we
```

Lexitas - TENNESSEE
(615) 595-0073
4679

1    talked about taking multiple external sources that

2    we would use as guidance, and that would be a

3    recommended practice.

4                     That recommended practice would

5    come from utilizing sources that are leading in the

6    industry and providing them as guidance or practice

7    and what we should do based on consistency.

8         Q.        And aside from what would be

9    recommended practice, is a practice also just

10   something you observe as the -- I think it's quoted

11   in your as how we do it here?

12                    Is that fair?

13                    MR. LAKEY:  Object to form.

14        A.        Now, that practice could be the

15   agency's practice, right?  The agent.  And in that

16   situation I would use the word custom.  The agency

17   has a custom of doing things a certain way.  And

18   whether that custom -- there's a lot of words used

19   for the same theory, but a lot whether that custom

20   is in form with industry standards is part of the

21   analysis for it.

22        Q.        (BY MS. KRAMER) Understood.

23                    And looking again at the

24   recommendation that you just read, and it applies to

25   both responding officers and supervisors, why is it

Lexitas  TENNESSEE
(615) 595-0073

1   important that both responding officers and

2   supervisors would utilize a checklist for all

3   sex-related investigations?

4                   MR. LAKEY:  Object to form.

5           A.         All investigations, specifically

6   those that have physiological fluids and evidence

7   that needs to be collected in a timely manner, you

8   know, that's where we want people to pay attention

9   to securing and seizing evidence.

10                      In sexual assault investigations,

11  that evidence -- that evidence can be easily removed

12  and can be moved to another area or -- and can be

13  contaminated.  So you want to -- it's kind of like,

14  you know, there's an old saying, you know, like in

15  homicide the first 24 hours are the most important

16  because if you don't -- if you don't collect the

17  evidence, then sometimes you can lose the evidence.

18                      So we like to make sure that with

19  responding officers and the supervisors that are

20  supervising them, that they -- that they pay

21  attention to the things that are -- that can be

22  lost.  And sometimes evidence, forensic type

23  evidence, can be easily lost.

24          Q.         (BY MS. KRAMER) Forensic type of

25  evidence that would exist in a sex crime, correct?

```
 1              A.        Yes.  Yes.

 2              Q.        Looking at your Recommendation 3(b)

 3     on Page 18 of your report, Recommendation 3(b) is,

 4     "Officers, supervisors, and investigators must be

 5     retrained on department policy related to the

 6     investigation of sex-based crimes and the District

 7     Attorney's Sex-Related Crimes Protocol.  There must

 8     be collaboration and teamwork between the patrol and

 9     the Criminal Investigations Divisions."

10              Did I read that correctly?

11              A.        Yes, ma'am.

12              Q.        Do you stand by that

13     recommendation?

14              A.        Yes, ma'am.

15              Q.        Do you know if JCPD retrained

16     officers, supervisors, and investigators on

17     investigation of sex-based crimes?

18              A.        I do not.  No, ma'am.

19              Q.        Do you know if officers,

20     supervisors, and investigators at JCPD were

21     retrained on the District Attorney's Sex-Related

22     Crimes Protocol?

23              A.        I do not.

24              Q.        Sorry.  I'm missing a page here.

25              Okay.  Let's look at Page 19 of
```

```
1    your report, please.

2                    And we touched on this, earlier,

3    but in the second paragraph on Page 19 you note

4    that, "During our interviews, we were advised that

5    investigators would maintain paper files and take

6    notes regarding investigatory steps.  Once the case

7    was closed, the file would be destroyed.

8    Investigators said they would usually only scan

9    their cases into the system if they were 'going

10   anywhere'.  The investigators complained that doing

11   it correctly meant duplicating efforts on the

12   written case log and entering information into the

13   computer-based system."

14                    Did I read that correctly?

15        A.        Yes, ma'am.

16        Q.        Is that a correct finding that you

17   made in connection with your audit?

18        A.        That's my finding, yes.

19        Q.        And in terms of the complaint that

20   maintaining paper records was duplicating efforts,

21   did you find that to be a legitimate rationale for

22   destroying records?

23                    MR. LAKEY:  Objection to form.

24        A.        The -- I don't know that it was

25   their rationale for destroying records.  What they
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    were saying is that the case management system is
 2    there for you to go in and put in incident reports.
 3    And basically what they were saying is they would
 4    have to write reports in two different locations;
 5    one in their file folder, and then they would have
 6    to write it again and place it into the computer
 7    system.
 8                    Some investigators actually did
 9    that, and you can see that occur, but that's what
10    they were talking about in the duplicating efforts,
11    which is you'd have to write it as a report and then
12    put it into the case management system in addition
13    to writing it as a report.
14            Q.      (BY MS. KRAMER) And in your
15    recommendation 3(c), "Supervisors, officers, and
16    investigators must be held accountable for
17    documenting criminal investigations and maintaining
18    the proper case files."
19                    Do you stand by that
20    recommendation?
21            A.      Yes, ma'am.
22            Q.      In practice, what does it look like
23    for supervisors to be held accountable for
24    documenting criminal investigations?
25                    MR. LAKEY:  Object to form.
```

```
 1            A.      What I mean by accountable is that
 2    if they're not following -- in the operations world
 3    of law enforcement, if they're not following policy
 4    and training, the way they're supposed to be doing
 5    it, they should be disciplined and action should be
 6    taken to correct the -- what they're doing.  So when
 7    we talk about accountability, we talk about, you
 8    know, discipline.
 9            Q.      (BY MS. KRAMER) Are you aware of
10    any JCPD officers that were disciplined as a result
11    of failing to document criminal investigations?
12            A.      No, ma'am.
13            Q.      Are you aware of any JCPD
14    investigators that were disciplined for failing to
15    maintain proper case files?
16            A.      No.
17            Q.      Your finding 3(d), and this is on
18    the bottom of Page 19 is that, "The case file
19    records were deficient in the documentation of
20    witness interviews."
21                Do you see that?
22            A.      Yes, ma'am.
23            Q.      And do you stand by that finding?
24            A.      Yes, ma'am.
25            Q.      And your focus here is on a failure
```

```
1    to document; is that correct?

2           A.      Yes.

3           Q.      And that's different from a failure

4    to do the interviews, right?

5           A.      Yes.

6           Q.      Did you make a finding on whether

7    interviews were, in fact, conducted?

8           A.      No.

9           Q.      Did you interview officers about

10   whether they were consistently interviewing

11   witnesses?

12          A.      No.

13          Q.      Did you talk to D.A. Finney ever

14   about JCPD investigators interviewing witnesses?

15          A.      No, I don't -- no, I did not.

16          Q.      In recommendation 3(d) you state,

17   that, "Supervisors, officers, and investigators must

18   be held accountable for fully investigating the

19   allegation, including interviewing known witnesses."

20                  Do you stand by that

21   recommendation?

22          A.      Yes, ma'am.

23          Q.      In your experience, how many times

24   have you had to make a recommendation to a police

25   department that they interview known witnesses?
```

```
 1                    MR. LAKEY:  Objection to form.
 2          A.        I'm not capable of giving that
 3   opinion, because every -- every assessment or
 4   investigation is different, a different scope of
 5   analysis, so --
 6          Q.        (BY MS. KRAMER) Can you think of a
 7   single time that you've had to make a recommendation
 8   to a police department that they should interview
 9   known witnesses in sex-related crimes?
10                    MR. LAKEY:  Objection to form.
11          A.        Well, not sex-related crimes, but I
12   also haven't done, you know, a lot of audits on
13   departments for sex-related crimes, but -- so
14   usually where I do deal with this is like -- where
15   we do most of our audits is use of force.  And
16   oftentimes, in our use of force audits or our
17   internal affairs audits, were recommending that, you
18   know, witnesses be interviewed to document what
19   happened.
20          Q.        (BY MS. KRAMER) Why is it important
21   for a witness in a sex crime to be interviewed?
22          A.        Well, I think a witness in anything
23   is important to be interviewed solely for the fact
24   that they are usually an independent source, with --
25   you know, I think I put in the report -- no dog in
```

Lexitas - TENNESSEE
(615) 595-0073

```
1    the fight.  And they can -- you know, witnesses can
2    give you information about, you know, what happened.
3    And they're not the accused, and they're not the
4    victim.  So they might give you, you know, better
5    information.  So witnesses are just valuable in all
6    investigations.
7              Q.       Would you agree that they're
8    particularly valuable in sex-based investigations
9    where there may be only the allegations of the
10   victim and the denial of the perpetrator?
11             MR. LAKEY:  Objection to form.
12             A.       Sure.  If there -- if there is a
13   witness to some parts of the alleged act, you know,
14   to be able to evaluate the credibility of the
15   statements, that may assist in an investigation.
16             I think my biggest criticism here
17   was there were places where allegations of sexual
18   assault had occurred and multiple witnesses were at
19   a party and nobody was interviewed.  You have to do
20   some form of witness interviews, and that's most
21   important, especially for first responders that are
22   going to the scene initially and, you know,
23   identifying at least who is at the party and who's
24   there and getting names so that the investigators
25   can follow up with them later if they need to.
```

```
1          Q.        (BY MS. KRAMER) And it's important
2   for the investigators to actually follow up and
3   conduct those witness interviews, right?
4                    MR. LAKEY:  Objection to form.
5          A.        I believe so, yes.
6          Q.        (BY MS. KRAMER) Moving on to
7   conclusion -- or sorry.  This is actually 3(e),
8   Finding 3(e).  "JCPD has a practice of not
9   conducting suspect interviews."
10                   Do you stand by that finding?
11         A.        Yes.
12         Q.        The first sentence states that this
13  was, quote, "the most concerning."
14                   Do you remember -- do you
15  remember -- strike that.
16                   What -- when you use the language
17  most concerning here, what does that mean?
18         A.        That means of the deficiencies that
19  I was addressing in the audit report, the fact that
20  suspects were not being contacted was concerning to
21  the audit.
22         Q.        Can you read the following two
23  sentences starting with, "Our review"?
24         A.        "Our review showed that JCPD
25  detectives often did not make sufficient efforts to
```

```
 1    obtain statements from suspects and witnesses

 2    quickly, and at times not at all.  In fact, in

 3    reviewing cases regarding rape allegations between

 4    2018 and 2022, it was found that in 133

 5    rape-reported cases, 105 cases had an identified

 6    suspect."

 7         Q.       Two more sentences, please.

 8         A.       Okay.

 9                  "Of significant concern is that of

10    the 105 known suspects identified, the suspect was

11    interviewed in only 36 cases.  Therefore, in the 133

12    rape-related cases between 2018 and 2022, only

13    34 percent of the known and identified suspects were

14    interviewed or even contacted."

15         Q.       Why is it detrimental to an

16    investigation to not make sufficient efforts to

17    obtain statements from suspects and witnesses in

18    sex-related crimes?

19                  MR. LAKEY:  Objection to form.

20         A.       So to this point, we talked about

21    witnesses.  We talked about evidence selection, you

22    know, all of those things that might not be possible

23    in a criminal case.  Like, you know what, you

24    could -- you could lose a witness.  You could not

25    document.
```

1          But when we get to the suspect, and

 2     when we have an identified suspect, what was very --

 3     I would just use the word intriguing to myself and

 4     my team, who was experienced, was that we just

 5     couldn't understand why you would not contact the

 6     suspect since it is normal for criminal

 7     investigators to, at least at some point, make

 8     contact with the suspect and let them know they're

 9     being alleged of a crime of such significance and

10     see if they're willing to talk to you.

11                    You know, obviously, they have

12     their rights.  They don't have to talk to you.  But

13     my experience has been that individuals being

14     accused of such a crime are sometimes more often

15     willing to have a conversation with you, even with

16     an attorney, just because they want to get their

17     side on the record of what happened.

18          Q.     (BY MS. KRAMER) You mentioned

19     earlier when we were talking about sex-based crimes

20     that there may be issues of credibility.

21                    Would you agree that suspect

22     admissions or statements are going to be

23     particularly valuable in that context?

24                    MR. LAKEY:  Object to form.

25          A.     I think -- I do agree that locking

```
 1    in a suspect and locking in a witness is important

 2    in the investigation, because everything that occurs

 3    from that point on is going to be dealing with

 4    credibility assessment.

 5            Q.      (BY MS. KRAMER) The report states

 6    that during your interviews, "Investigators

 7    confirmed that it was a practice at JCPD not to

 8    contact the alleged suspect until they were

 9    convinced that the assault reasonably did occur.

10    This is baffling to the DLG team."

11                   Did I read that correctly?

12            A.      You did, yes.

13            Q.      Is baffling the word that you were

14    looking for before?

15                   MR. LAKEY:  Object to form.

16            A.      I'll go with it.

17            Q.      (BY MS. KRAMER) And what does it

18    mean -- what is your take on the fact that these

19    investigators needed to be convinced that the

20    assault reasonably did occur before they would

21    interview a suspect?

22                   MR. LAKEY:  Object to form.

23            A.      Well, what do you mean by what does

24    it mean?  I don't understand that.

25            Q.      (BY MS. KRAMER) How do you evaluate
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1   that?
 2              I mean, you noted it in your
 3   report, so it seems important to you, right, that
 4   the -- that the investigators needed to be
 5   "convinced that the assault reasonably did occur"
 6   before contacting the suspect.
 7        A.      Yeah.  My interpretation of that
 8   was that if they believed a sexual assault had
 9   occurred, that they were -- therefore, they would
10   reach out to the suspect because it had occurred,
11   meaning they believed -- the investigator believed
12   that there was sufficient evidence that the assault
13   had occurred.
14        Q.      Right.
15              So your understanding is
16   investigators did not go out and try to get an
17   interview with the suspect unless and until they had
18   concluded that an assault reasonably did occur; is
19   that right?
20              MR. LAKEY:  Object to form.
21        A.      That was my understanding, yes.
22        Q.      (BY MS. KRAMER) And did you ask the
23   investigators about that in your interviews?
24        A.      I did.  I asked everybody that we
25   had talked to about that and whether it was
```

Coomber & Associates, LLC
(615) 595-0073

1   partially a custom of the agency that it had

2   occurred over a period of time or an understanding

3   of the way -- I think one of the -- one of the

4   statements was made, "Well, we're not going to --

5   you know, if it's not -- if it's not -- if the

6   assault didn't occur, then why would you go do that

7   to a suspect?"

8              And part of our response was,

9   "Because there's a criminal allegation.  You have

10  to -- whether the allegation is correct or

11  incorrect, but you have to do the investigation."

12  And so that was -- you know, that's why I used the

13  word baffling, because I don't think anybody had a

14  really good -- really good explanation for why they

15  didn't contact suspects.

16       Q.       Is it possible that an

17  investigator's belief in the alleged assault can be

18  impacted by bias?

19              MR. LAKEY:  Objection to form.

20       A.       Oh, absolutely.

21       Q.       (BY MS. KRAMER) Do you think that's

22  especially true in this context specifically,

23  meaning for sex-related crimes?

24              MR. LAKEY:  Object to form.

25       A.       I think it has its place.  That's

1   why I dealt with it in the report.  I don't know

2   that -- you know, there's a lot of crimes that could

3   involve bias.  Obviously, the sexual-related crimes

4   are unique enough that I addressed it in the report

5   because of the possible biases that leads to that

6   conclusion.

7           Q.      (BY MS. KRAMER) So Recommendation

8   3(e) states, "Identifiable suspects in a criminal

9   investigation will be interviewed."

10                  Do you stand by that

11  recommendation?

12          A.      Yes.

13          Q.      Have you ever had to make that

14  recommendation to a police department before?

15                  MR. LAKEY:  Object to form.

16          A.      I have not.

17          Q.      (BY MS. KRAMER) And why is that?

18                  MR. LAKEY:  Object to form.

19          A.      There's never been a -- I don't

20  think I've had an audit that was unique to that

21  specific issue.

22          Q.      (BY MS. KRAMER) Have you

23  encountered another police department that

24  demonstrated a failure to interview suspects in

25  criminal investigations, along the lines of what you

1   observed in your audit of the JCPD Police
2   Department?
3                   MR. LAKEY:  Object to form.
4           A.      This was a unique audit, you know,
5   to the specifics of what we're auditing here.  So
6   I've never looked at any other department to whether
7   or not they've interviewed suspects or not.
8           Q.      (BY MS. KRAMER) In your career in
9   law enforcement, did you ever observe a police
10  department that failure -- failed to interview known
11  criminal suspects?
12                  MR. LAKEY:  Object to form.
13          A.      That's a pretty totality situation.
14  I will tell you that it's been my experience and
15  custom and practice in this -- across the country
16  that if you have a known suspect to a sexual assault
17  crime that you're going to -- you're going to
18  attempt contact with that person at some point.
19          Q.      100 percent of the time?
20                  MR. LAKEY:  Object to form.
21          A.      I'm not going to 100 percent
22  anything, because there's always a nuance issue that
23  could come up.  Sometimes you can't find them, but
24  that's a whole other issue.
25          Q.      (BY MS. KRAMER) Does a failure to

Lexitas - TENNESSEE
(615) 595-0073

```
 1    even attempt to contact a known suspect 60 percent

 2    of the time fall below industry standards?

 3                    MR. LAKEY:  Object to form.

 4         A.        I would say yes.

 5         Q.        (BY MS. KRAMER) And you've

 6    identified this as a JCPD practice.

 7                    Is it fair to say that that

 8    practice is depriving rape victims of the same

 9    protection by law enforcement that you think is

10    constitutionally sound?

11                    MR. LAKEY:  Object to form.

12         A.        During the years that we saw this

13    occurring, I would say that it is depriving the

14    victims of their rights, yes.

15         Q.        (BY MS. KRAMER) Let's look at

16    Finding -- this is 3(f) that says, "JCPD's

17    investigative processes discourage victim

18    participation."

19                    What information do you recall went

20    into this finding?

21         A.        It would be the review of case

22    files and the interview of the -- specifically -- I

23    probably talked to everybody about it, but

24    specifically the two female investigators that we

25    spoke with.
```

TENNESSEE
(615) 595-0073

```
 1          Q.       And you don't recall their names,
 2    do you?
 3          A.       Yeah.  Dunn and Cara -- Carol.
 4          Q.       Carol Lowe, does that sound right
 5    to you?
 6          A.       Yes.
 7          Q.       And why was it specifically the
 8    conversations with the female investigators that
 9    gave you information to make this finding?
10          A.       Well, I think it was twofold.  I
11    think, first, is it Lowe?  Cara -- Carol was a
12    victim centric individual based on her experience,
13    and so she had a lot of knowledge of victims.  I
14    think it was really good for JCPD having her in that
15    role, because she was very in tune to victims and
16    the atmosphere that you dealt with a victim in.  And
17    she would see things that she didn't think were as
18    open to a victim.
19                   And then there was Debbie Dunn who,
20    you know, expressed her opinions on the fact that
21    the victim was -- you know, this was not a victim --
22    a victim centric process, meaning you have to -- in
23    these types of crimes, as we've discussed, you have
24    to understand what surrounds the sexual assault, the
25    trauma, the victimization of it, and take additional
```

```
 1   steps in the way you do an interview and where you

 2   do the interview and how you keep the victim

 3   updated.

 4                It's a lot more of a hands-on

 5   approach than a lot of crimes where, you know, like

 6   you get your car stolen or you get, you know, a TV

 7   stolen out of your house is a lot different than a

 8   victim crime of sexual assault.

 9        Q.      Is it fair to say that Investigator

10   Dunn alerted you to criticisms that she found within

11   the police department regarding discouraging victims

12   of sex crimes from participating in investigations?

13                MR. LAKEY:  Object to form.

14        A.      Yeah, she did.  There was some

15   credibility challenges to what she was saying.  She

16   was obviously not happy with the police department

17   and the people that worked there.  It was pretty

18   obvious, so --

19        Q.      (BY MS. KRAMER) Do you know if

20   Ms. Dunn can still --

21                MR. LAKEY:  Can you just let him

22           finish his statement before you start your

23           next question?

24        A.      Can you ask the question again?

25   I'm sorry.
```

```
 1          Q.        (BY MS. KRAMER) I'm going to move
 2   on.
 3                    Do you know if Ms. Dunn is still
 4   employed by JCPD?
 5          A.        When I met with Ms. Dunn, she was
 6   over at the sheriff's office already.  She had
 7   already left.
 8          Q.        Do you know if Ms. Lowe is still
 9   with the Johnson City Police Department?
10          A.        When we interviewed her, she was
11   talking about going to a state job.  I don't know if
12   she did do that.
13          Q.        Did either -- or did Ms. Dunn
14   express to you that her desire to leave JCPD was
15   because of sex bias?
16                    MR. LAKEY:  Objection to form.
17          A.        I don't know.  I mean, she was --
18   she was very eager to talk to us.  She had a lot
19   of -- she had a lot of complaints, and I don't know
20   whether she retired and took another job or why she
21   left.  I don't remember if that was the number one
22   reason.  I know she was not happy at the department,
23   and that was pretty clear to me.
24          Q.        (BY MS. KRAMER) If we move on to
25   Page 22 --
```

```
 1                     COURT REPORTER:  Hey, Jon, when you
 2            object, can you object just a little bit
 3            louder?  I'm struggling to hear every one of
 4            them.
 5                     MR. LAKEY:  Yep, I sure will.
 6            Q.       (BY MS. KRAMER) The first full
 7   paragraph on Page 22 says, "Experience has shown
 8   that victim participation can significantly increase
 9   the success of investigations, as well as a
10   successful prosecution."
11                     Did I read that right?
12            A.       Yes, ma'am.
13            Q.       And we talked earlier about the
14   issue of a victim not wishing to pursue her case.
15                     Do you remember that?
16            A.       Yes.
17            Q.       But it's true that the D.A. can
18   still prosecute a case, even if the victim does not
19   want to participate; is that correct?
20                     MR. LAKEY:  Objection to form.
21            A.       I don't think that's correct for
22   all age victims in Tennessee.  I don't know that
23   your victim specific rules -- I don't know that in
24   Tennessee that if the victim doesn't want to
25   prosecute over the age of 18 that they can.
```

```
1                     I do know that that's -- because

2        that was a big part of what I looked at.  In some

3        states there's rules that the State can take over as

4        the victim.  I did not understand that to be the

5        case over the age of 18 in Tennessee.  So that would

6        be the only thing that would cause challenges there.

7              Q.        (BY MS. KRAMER) Your understanding

8        is that if somebody over the age of 18 and they do

9        not wish to participate in a criminal investigation

10       of a sex crime, the police cannot continue

11       investigation and the D.A. cannot prosecute.

12                     Is that your understanding?

13             A.        What am I understanding --

14                     MR. LAKEY:  Object to form.

15             Q.        (BY MS. KRAMER) Let me restate

16       that.

17                     Is it your understanding that if a

18       victim of a sexual assault is over 18 and states

19       that she does not wish to pursue her case that the

20       D.A. cannot pursue the case?  Is that your

21       understanding?

22             A.        That's my understanding, because

23       you need a victim, unless it's a child.  There's

24       victim rights laws in this country about criminal

25       acts and having a victim.  That's why we talked
```

1  about earlier about the right -- that,

2  unfortunately, victims are victimized a lot in the

3  criminal justice system.

4            Again, I was trying to get some

5  clarity of that from D.A. Finney and -- but it's my

6  understanding that -- it wasn't clear to me.  I

7  don't -- I didn't do any legal research on it, but

8  that was --

9       Q.      Did D.A. -- sorry.

10              MR. LAKEY:  Ms. Kramer, please let

11         him finish.

12              MS. KRAMER:  I said sorry.

13              MR. LAKEY:  But it's like the third

14         time it's happened.

15              THE WITNESS:  We're both very --

16              MR. LAKEY:  I know, but she -- for

17         the record, let's please try to let him

18         finish answering before asking the next

19         question.

20       A.      So that's why in the notes you see

21  I asked those questions and, as I was talking about,

22  because I was trying to get clarity of what the

23  victim laws were in the State of Tennessee.  Because

24  there are some places in the country where you

25  cannot prosecute if the victim over a certain age

```
1   does not -- is not willing to participate.
2            Q.      (BY MS. KRAMER) Did D.A. Finney
3   tell you that a sexual assault victim over the age
4   of 18 who expresses an unwillingness to participate
5   in the prosecution will not have a case proceed by
6   the District Attorney?
7            A.      No.
8                    MR. LAKEY:  Object to form.
9            A.      He did not.  Like I said, I told
10  you I don't -- I don't recall what even the outcome
11  was, but that was the issue on the table.  Is it
12  possible?
13           Q.      (BY MS. KRAMER) You asked him and
14  he did not have an answer; is that correct?
15                   MR. LAKEY:  Object to form.
16           A.      I don't remember what his answer
17  was, to be honest with you.
18           Q.      (BY MS. KRAMER) Are you aware of
19  cases involving sexual assault where, let's say,
20  it's between spouses, and the D.A. intends to
21  prosecute and can have a victim appear through
22  subpoena power?  Are you aware of that?
23                   MR. LAKEY:  Object to form.
24           A.      Sure, in certain parts of the
25  country.
```

1      Q.        (BY MS. KRAMER) And is it your

2  understanding that's not possible in Tennessee?

3      A.        Like I said, I don't know.  I

4  didn't -- that's not part of my analysis.  This

5  doesn't matter whether it's possible or not.  That's

6  the prosecutor's problem.  It's not JCPD's problem.

7              JCPD has one issue, and that is to

8  do the investigation.  The prosecutor's office has

9  to decide who they're going to prosecute and whether

10  they can prosecute.

11      Q.        I guess what I'm trying to

12  understand is if we're looking at a victim's

13  unwillingness to participate in a prosecution, is it

14  your understanding that that alone can preclude the

15  D.A. from pursuing a case in Tennessee?

16              MR. LAKEY:  Object to form.

17      A.        You're asking it the same way you

18  just asked it where I said I don't know the answer

19  to that.  I don't know whether that's the case or

20  not.

21      Q.        (BY MS. KRAMER) Did it seem -- did

22  you encounter anyone within the Johnson City Police

23  Department who believed that a victim's

24  unwillingness to participate in the prosecution was

25  a lone reason that the D.A. could not pursue a case?

Lexitas - TENNESSEE
(615) 595-0073

```
 1              MR. LAKEY:  Object to form.

 2       A.        I would say that, based on if you

 3  read a lot of the cases and interview the

 4  investigators, they will say that when the

 5  prosecutors were advised that the witness was -- or

 6  the victim was not willing to participate in the

 7  investigation or testify in court, that we found

 8  cases where the prosecutors closed the case for no

 9  prosecution based on that -- on that reason.  And so

10  that was part of the analysis here.

11       Q.        (BY MS. KRAMER) If we look on --

12  you have a numbered list here on Page 22 of your

13  report.  And if you look at No. 5, you find, "JCPD's

14  sexual assault investigations are sometimes

15  compromised by an investigator's unwarranted

16  gender-based assumptions and stereotypes about

17  women."

18              Do you stand by that finding?

19       A.        Yes, ma'am.

20       Q.        And what were the sources of

21  information that went into that finding?

22       A.        So it would -- the first part is

23  when you're looking at reports and you're expecting

24  things to be done in the investigation and you have

25  a -- and you have a victim who might be a
```

1    prostitute, a well-known -- identifies her as a

2    prostitute, a drug addict, or someone who has been a

3    victim of sexual assault before, and then there

4    is -- the normal steps aren't followed in the

5    investigation, it leads to the conclusion of why?

6    Why did that occur?

7                      And you start to see some patterns

8    with certain females that were in certain -- that

9    were, you know, classified in certain ways, where

10   their cases, you know, were just not given the

11   amount of work that was necessary.

12                     And then talking to, you know,

13   Investigator Dunn, she had a lot of opinions as to

14   the biases in the office.  But for me, it's about --

15   it's about the work, right?  And if I see a case

16   where the victim is, you know, a female and she's

17   not a drug addict and she's not known to be a

18   prostitute, and they go through and they do

19   everything the way that they're supposed to

20   investigate that case, I'm like, "Okay.  Perfect."

21                     But then you see the same type of

22   case and the female is placed into a category with a

23   bias, and the same steps aren't followed.  It leads

24   you to ask some questions, which is, you know, why?

25   Why were those steps not followed?  Same victim.

```
 1    Same situation.  The only difference is the apparent

 2    biases that could come with the basis -- with the

 3    victim's category.

 4             Q.      On Recommendation 3(f), this is on

 5    Page 23.  Sorry.  Let me skip that.  Move on to

 6    3(g).

 7                     Can you read recommendation 3(g),

 8    please?

 9             A.      Yes, ma'am.  Page 24.

10                     "Non-stranger and alcohol or

11    drug-facilitated sexual assault investigation shall

12    be assigned only to those investigators with the

13    demonstrated skills, interest, and training to

14    conduct those investigations effectively and without

15    bias."

16             Q.      What does it mean to have an

17    interest?  In the context of investigators at JCPD,

18    what does it mean to have an interest in conducting

19    investigations without bias?

20             A.      I mean, it is as simple as it

21    states, meaning that, you know, cops are human

22    beings.  In both male and female officers, some are

23    just good at some things, and some are just not good

24    at some things.  And you have to -- and you have

25    to -- if you're the supervisor and you go to assign
```

(615) 595-0073

```
 1    investigations, you have to take in the person's

 2    skill set, their ability, and their desire.

 3                    You know, you just don't -- you

 4    don't want to take a victim crime like a rape

 5    crisis -- or like a rape and assign it to somebody

 6    who does not -- does not care, is just kind of

 7    pushing the wheel down the road, not really caring

 8    about being a good cop, just surviving.

 9         Q.       Did you find that investigators in

10    JCPD, or at least some of them, were disinterested

11    in conducting sex crime investigation without bias?

12                    MR. LAKEY:  Objection to form.

13         A.       No.  What I found is actually the

14    alternative, which is there was some really good sex

15    crime investigations, but then there were some

16    investigations that nothing was done.

17                    I don't know why the nothing was

18    done.  I didn't do an investigation and bring them

19    in and ask them why nothing was done.  But when you

20    have good ones that do really good investigations,

21    then you have ones that are just not -- not up to

22    par, that's part of the reasoning, which is, "Hey,

23    why?  Why is it not up to par?"

24         Q.       (BY MS. KRAMER) And so your

25    recommendation here is that if you have a sexual
```

Cenicita & TENNESSEE #: 2099
(615)595-0073

```
 1   assault that's non-stranger and alcohol or
 2   drug-facilitated, you need to find an officer that
 3   can conduct that investigation without bias; is that
 4   fair?
 5                    MR. LAKEY:  Object to form.
 6        A.         It's not really fair, because
 7   you're focusing on the bias portion.  But if you
 8   are -- there's a reason why we have special
 9   investigation units and we have sexual assault units
10   and we have child crime units.  It's because, you
11   know, when I'm working in major crime and I have
12   three little kids, I might not be the right guy to
13   do the child crime investigation.  The child --
14   somebody else should get that crime, because I might
15   not be able to -- I might not be able to separate my
16   professional and my personal beliefs, because I'm a
17   human being.
18                    So what we do in departments is we
19   find people who are -- who are good at certain
20   things and skill sets and actually, you know,
21   appreciate doing these investigations.  In more of
22   the modern day law enforcement, instead of just
23   taking the next guy up to do the case, you're going
24   to make sure that the people that you assign it to
25   are better -- the best qualified to do the
```

Exhibit 235-25 TENNESSEE
(615) 595-0073

1    investigation.

2         Q.        (BY MS. KRAMER) And your finding

3    was that JCPD had not consistently found the right

4    people to do these investigations, correct?

5                   MR. LAKEY:  Object to form.

6         A.        My conclusion was that the

7    investigations at JCPD were so inconsistent that I

8    want to know why they're so inconsistent.  Why do

9    some do such a good job and some of them don't do

10   such a good job.

11        Q.        (BY MS. KRAMER) Did any of the

12   investigators that you interviewed in connection

13   with your audit demonstrate skills, interest, and

14   training needed to conduct sexual assault

15   investigations without bias?

16                  MR. LAKEY:  Object to form.

17        A.        Well, I only interviewed two female

18   detectives.  So that's kind of not fair to answer

19   that question, because I didn't go through the whole

20   investigative ranks and interview every investigator

21   at JCPD, you know.  So I don't know about them.

22                  I mean, I learned about Cara

23   through sitting down with her and asking her about

24   her background, her history, her education, which it

25   looks like she would be a very good sex -- sex and

```
 1    child investigator.  I don't know enough about the
 2    other ones that work there.
 3              Q.      (BY MS. KRAMER) You didn't ask the
 4    male JCPD investigators -- sorry.
 5                      You didn't determine whether the
 6    male JCPD investigators that you interviewed had the
 7    skills, interest, and training to conduct a
 8    sex-related crime without bias?
 9              A.      Well, if you remember the list of
10    people I interviewed, I didn't interview any male
11    investigators.  I interviewed male supervisors.
12              Q.      And what's your view of those male
13    supervisors in terms of their skill, interest, and
14    training to conduct a sexual assault investigation
15    without bias?
16                      MR. LAKEY:  Object to form.
17              A.      I don't know enough, except the
18    sergeants seemed like they were very well
19    experienced investigators, but I hadn't -- I hadn't
20    seen any of their work and whether there was any
21    issues with their work.
22              Q.      (BY MS. KRAMER) Would you expect --
23    or shouldn't we expect that every police officer is
24    able to investigate a case without exhibiting bias?
25                      MR. LAKEY:  Object to form.
```

TENNESSEE
(615) 595-0073

```
 1          A.      No.  I think that would be naive.

 2          Q.      (BY MS. KRAMER) What about for

 3   sex-based bias specifically?

 4          A.      I don't know that I can answer that

 5   any different than being naive, because it's just

 6   like attorneys and judges and doctors.  Everybody's

 7   got biases.  So you don't know what will be

 8   triggering that bias.

 9          Q.      In your opinion, how do we control

10   for the possibility of sex-based bias existing in

11   investigators?

12                  MR. LAKEY:  Object to form.

13          A.      It's a great question, actually,

14   which is we -- we in -- we clearly interview to find

15   skill sets of the individuals who choose to do that

16   job.  We get them additional training in victim

17   advocacy and interaction with victims.  And then we

18   closely monitor them as they start doing these

19   investigations and, you know, checks and balances to

20   make sure they're doing it correctly.

21          Q.      (BY MS. KRAMER) Is it fair to say

22   those are institutional safeguards?

23          A.      Well, what do you mean by

24   institutional?

25          Q.      I mean that what you're describing
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    seems to be that the department as a whole needs to

 2    take certain actions to guard against sex-based bias

 3    impairing effective investigation of sex-related

 4    crimes.

 5                    MR. LAKEY:  Object to form.

 6         A.        Well, I think every investigative

 7    unit in the country has to do that.  I think it's

 8    part of the -- it's part of the job of being an

 9    investigator nowadays.

10         Q.        (BY MS. KRAMER) And it's the

11    department as a whole that has that responsibility.

12                    Would you agree?

13                    MR. LAKEY:  Object to form.

14         A.        I would say that there's -- it's

15    the responsibility of each members of the department

16    to check each other, and it's the responsibility of

17    the supervision to hold them accountable to it.

18         Q.        (BY MS. KRAMER) Where do -- where

19    does training fit into that assessment?

20         A.        Training is a normal course of

21    getting any professional.  No matter what you do in

22    your life, and in law enforcement, like whatever you

23    want to do as a specialty you have to get training

24    in it.

25                    So I think in the area of
```

1    investigations, we see a lot more training now than

2    we ever did on victim interaction and cognitive

3    interviewing and, you know, trying to get victims

4    through the forensic examinations without trauma.

5            Q.      Would you agree that sound training

6    is essential for a police department to have

7    unbiased investigations of sex crimes?

8                    MR. LAKEY:  Object to form.

9            A.      Training is one of my cornerstones.

10   So I would say yes.

11           Q.      (BY MS. KRAMER) Would you agree

12   that supervision is essential to ensure that police

13   departments can conduct investigations of

14   sex-related crimes without bias?

15                   MR. LAKEY:  Object to form.

16           A.      Yes, but I'd like to qualify that

17   to say that it is also the importance of supervision

18   to make sure that proper documentation occurs so

19   that it doesn't get misperceived as a bias that does

20   not exist.

21           Q.      (BY MS. KRAMER) Your findings with

22   respect to bias, they're not based on an absence of

23   documentation, are they?

24                   MR. LAKEY:  Object to form.

25           A.      They're supported by an absence of

```
 1    documentation, yes.

 2           Q.      (BY MS. KRAMER)  The bias itself,

 3    you're saying, is supported by the fact --

 4           A.      Yeah.

 5                   I'm sorry.  I cut you off.

 6           Q.      It's okay.

 7                   Did you review the case files for

 8    the victims of Sean Williams?

 9                   Let me -- let me take a step back.

10                   Do you know who Sean Williams is?

11           A.      I do now, yes.

12           Q.      When did you learn who Sean

13    Williams is?

14           A.      Well, through the Dahl deposition

15    and news stories that had come out after -- out

16    around that time in late 2023 -- no, late 2024.

17    When was I deposed?

18                   2024.  No way.  It is 2024.  So

19    2023.  I'm sorry.

20           Q.      So you think you learned of who

21    Sean Williams is through your deposition in the Dahl

22    litigation.

23                   Is that what you said?

24           A.      Yeah.  So when I got the case, I

25    was aware of a litigation case, but I didn't -- I
```

Cametra Edwards, RMR, CRR
TENNESSEE
(615) 595-0073

1    didn't -- I'm not here investigating those aspects.

2    So I knew that there was a lawsuit, and I had seen a

3    copy of the Complaint.  But other than that, I did

4    not know about the -- in-depth how much involvement

5    was with JCPD.  And because of the litigation that

6    was out there, and because I was clear with JCPD of

7    my scope was, you know, I didn't focus on those

8    cases in addition to -- any different than any other

9    cases that I took.

10           Q.        Did you have a discussion with

11   Cathy Ball specifically about whether you would

12   review the case files for victims of Sean Williams?

13           A.        I'm sure I did.  I don't -- what I

14   remember is this:  The case files that oftentimes,

15   like I said, were incomplete, the ones that I was

16   given.  So one of the questions that I was dealing

17   with was with the department and saying, "You know,

18   we should do an investigation, because an

19   investigation is going to allow me to figure out

20   more of why things occurred the way they were."

21                     And also, I was made aware that

22   there was more case files that were in the

23   litigation process, but I don't have access to them

24   because I'm not -- I'm not taking external

25   documents.  I'm only taking what's in the system,

1    you know, whatever is in the case files for these

2    reports.  So I don't -- I don't have these external

3    documents or external explanations.

4                    And so I just made sure that

5    they -- that the town knew this, knew that I

6    couldn't do more than what I had.  And so that's how

7    we left it.

8         Q.        Did you -- so you advised Johnson

9    City that you were willing to do an investigation

10   into how JCPD handled allegations against Sean

11   Williams?

12                   MR. LAKEY:  Objection to form.

13        A.        Yeah.  First, I don't advise,

14   because I'm not their advisor, but I -- during the

15   course of my analysis here, and I think even as I

16   addressed in the report, I suggested that they had a

17   lot of unanswered questions.  I don't like

18   unanswered questions.  Like -- and so I advised they

19   might want to consider doing an investigation and

20   determine why things are the way they are.  So

21   that -- and that was where I left it.

22        Q.        (BY MS. KRAMER) And what did the

23   City say when you suggested an investigation into

24   JCPD's handling of Sean Williams?

25                   MR. LAKEY:  Objection to form.

TENNESSEE
(615) 595-0073

```
 1          A.       I didn't have -- they took my
 2    suggestion, and I didn't have any further
 3    conversation with them about that.
 4          Q.       (BY MS. KRAMER) They did not engage
 5    you to conduct that investigation, right?
 6                   MR. LAKEY:  Objection to form.
 7          A.       They did not, no.
 8          Q.       (BY MS. KRAMER) Are you aware if
 9    they engaged anyone to conduct that investigation?
10          A.       I am not, no.
11          Q.       You mentioned that reviewing -- or
12    sorry.
13                   You mentioned that in this
14    discussion with the City concerning Sean Williams
15    that there were case files that you had not had
16    access to; is that correct?
17                   MR. LAKEY:  Objection to form.
18          A.       Yes.
19          Q.       (BY MS. KRAMER) And what were
20    those?
21          A.       Well, I didn't have access to them.
22          Q.       Is it your understanding that those
23    were case files?
24                   MR. LAKEY:  Object to form.
25          A.       I don't know what they --
```

```
 1                    THE WITNESS:  I'm sorry.

 2                    MR. LAKEY:  That's okay.

 3          A.        I don't know what they were.  I

 4    know that, during the course of my interview, I sat

 5    down with Chief Turner at the time and explained

 6    that, "Hey, you know, there's -- there's too much

 7    missing here.  What are we going to do about that?"

 8    And he said, "Well, there's more, but it's all in

 9    the litigation."  I said, "Well, if it's -- if it's

10    not case files that I can get my hands on, like I'm

11    doing everything else, then it's not -- it's not

12    something that I want to -- I wanted to add."

13                    Because it -- it would -- the

14    problem is that when we're assessing, we have to

15    assess consistently, right?  Now, if I assess these

16    325 cases consistently, and you give me a whole box

17    for one case, that's not -- that's not going to help

18    the assessment part.  So the end result was I didn't

19    get it, I didn't ask for it, and it wasn't part of

20    my analysis.

21          Q.        (BY MS. KRAMER) And when you say

22    you didn't get it, you are referring to some

23    documents, you don't know what they are, but you

24    know they exist because of your conversation with

25    Chief Turner; is that correct?
```

```
 1                    MR. LAKEY:  Object to form.

 2         A.         That is correct.

 3                    Let me put it more a little

 4    clearer, and that's this:  In one of the Sean

 5    Williams case, the actions of the officers just -- I

 6    don't understand.  Like why?  Why did the officer

 7    not secure the residence?  Why did the officer not

 8    do this?  I really wanted to know the answers to

 9    those questions, because there's no report that

10    tells me why this didn't occur, and these are

11    significant.

12                    And when that conversation came up,

13    the answer was there may be more case reports that I

14    don't have.  And I said, "Okay.  Well, if they're

15    not part of this case file, then I don't -- I'm not

16    going to take them.  If they're part of a

17    litigation, whatever that may be, it's not part of

18    the case file."

19         Q.         (BY MS. KRAMER) And by case file,

20    you mean it's not part of the 326 files and related

21    documents that you were given to conduct this audit;

22    is that correct?

23         A.         Yeah.  That's fair, yes.

24         Q.         And do you remember anything else

25    about that Sean Williams case that you just
```

1    referenced that you were particularly interested in?

2         A.        No.  The only reason I don't -- the

3    only reason I remember that one is because it's a

4    part of the -- it's part of the report.  It's an

5    example in the report here.

6                   And so when I was reviewing my

7    report, I actually reviewed the case file for that.

8    And so that's the only reason why I remember that

9    one.

10        Q.        Do you know -- you can refer to

11   your report.

12                  Do you know where you are making

13   reference to what you believe is a Sean Williams

14   case in your report?

15        A.        I know I messed it up in my depo,

16   and I'm going to have to look.

17                  On Page 18, the third example on

18   Page 18.  I forget the -- it refers to a case and,

19   you know, obviously we don't use names or anything

20   in the report.

21                  But the third example on Page 18

22   was a significant example.  We're talking about the

23   big paragraph in the middle of Page 18.  That was a

24   Sean Williams case.  Report No. W20006424.

25        Q.        As far as you know, was this case

1    the only case that you reviewed relating to Sean
2    Williams?
3            A.      It's my understanding there were
4    others.  I don't know which ones they are without
5    going through the spreadsheet.
6            Q.      Your audit did include more than
7    one case relating to Sean Williams?
8            A.      I don't know as I sit here today.
9    This was the only one that was egregious that popped
10   up, you know, in the 300 -- my -- I want to say that
11   I was -- there's more out there, but I don't know of
12   them.  This is the one that was egregious enough.
13   That was one of the examples.  I used multiple cases
14   as examples in this report, and that was one of
15   them.
16           Q.      And why was it so egregious, in
17   your view, to -- I think this example is one of
18   failure to secure a crime scene.
19                   Why would it have been important
20   to -- I guess why is it important generally to
21   secure a crime scene?
22           A.      I mean, based on if you just read
23   the report in and of itself, it makes no sense
24   whatsoever.  Like any brand new rookie out of the
25   Academy should be able to look at this and say,

TENNESSEE
(615) 595-0073

1    "Well, wait.  Why?  I don't understand."

2                    You have a victim running out of a

3    building.  Why didn't you secure a -- why didn't you

4    secure an apartment?  Why didn't you get a

5    supervisor?  Why didn't you -- why didn't you call a

6    detective?  Why didn't you go upstairs and knock on

7    the door?  I don't know if any of those things were

8    done.

9                    I just know what's in the report,

10   and the report is very vague and not a lot of

11   information.  And that's why it was brought out as

12   an example.

13        Q.        And when you were reviewing this

14   case, do you -- there was no documentation of, for

15   example, collection of DNA.

16        A.        Yeah.  There's not much of anything

17   in this case documentation wise.  So it's a pretty

18   straightforward -- you know, I was really focused

19   mainly as -- I use it as a suggestion in this case,

20   demonstrating that there was no crime scene

21   security.  There was no processing.  There was no

22   witness interviews.  There was no nothing.

23                    MS. KRAMER:  Okay.  Let's take a

24        short break.  Let's do until 3:50 Eastern,

25        please.

```
 1              VIDEOGRAPHER:  Sounds good.

 2              We are now off the record.  The

 3         time is 3:43 p.m. Eastern time.

 4         (Off the record at 3:43 p.m.)

 5         (On the record at 3:53 p.m.)

 6              VIDEOGRAPHER:  Okay.  We are now

 7         back on the record.  The time is 3:53 p.m.

 8         Eastern Time.

 9  BY MS. KRAMER:

10         Q.    Mr. Daigle, I'm going to direct you

11  to the second full paragraph on Page 32 of your

12  report.

13              So in this paragraph it says, "When

14  the allegations were made in the above-referenced

15  lawsuit," and that lawsuit is, if you look up, a

16  civil lawsuit filed by former Special Assistant U.S.

17  Attorney Dahl; is that right?

18              COURT REPORTER:  Hey, Elizabeth.

19         I'm having a really hard time hearing you.

20              MR. ALLEN:  Yes.  Same.  I can

21         barely hear a word you're saying.

22              MS. KRAMER:  Is that -- is that

23         better?

24              COURT REPORTER:  I don't know yet.

25         You'll have to talk a little more.
```

```
 1              MS. KRAMER:  Okay.  Talking.
 2         Talking.  Leaves are green.
 3              COURT REPORTER:  Okay.  That's a
 4         little better.  It's still soft but --
 5              MS. KRAMER:  Okay.
 6              COURT REPORTER:  -- it wasn't
 7         nearly as soft as that question.
 8    BY MS. KRAMER:
 9         Q.       Okay.  So, Mr. Daigle, this second
10    full paragraph on Page 32 of your report, there's a
11    reference to a lawsuit.
12              We've confirmed that was a civil
13    lawsuit filed by Kat Dahl, correct?
14         A.       Yes, ma'am.
15         Q.       And then the report says, "The
16    department was concerned that the complaint involved
17    criminal conduct by department members."
18         A.       Yes, ma'am.
19         Q.       How did -- how did you know that?
20         A.       Through Cathy Ball.
21         Q.       What did Cathy Ball say to convey
22    to you that the department was concerned that the
23    complaint involved criminal conduct by department
24    members?
25              MR. LAKEY:  Objection to form.
```

Louvierre - TENNESSEE
(615) 595-0073
#: 5515

```
 1          A.      Yeah.  I think it's just in the
 2    allegation of the Complaint.  They are serious in
 3    nature and, you know, when you have -- when you're
 4    in government operations, your first initial
 5    reaction is, "Okay.  Does this involve criminal
 6    allegations?  Does it have the possibility of
 7    involving criminal allegations?"  And they perceived
 8    it to have criminal allegations to it.
 9          Q.      (BY MS. KRAMER) With respect to
10    members of the department, correct?
11          A.      That was my --
12              MR. LAKEY:  Object to the form.
13          A.      That was my understanding, yes.
14          Q.      (BY MS. KRAMER) So you note here,
15    "an August 24th, 2022 letter to District Attorney
16    Kenneth Baldwin," and you attached that to your
17    report, correct?
18          A.      Yes, ma'am.
19          Q.      And then you later mention a
20    September 1st, 2022 letter from District Attorney
21    Finney responding to Ms. Ball.
22              Do you see that?
23          A.      Yes, ma'am.
24              MS. KRAMER:  I'm going to mark my
25              next exhibit.
```

```
 1                    COURT REPORTER:  I'm sorry.  Did
 2          you say you want to -- you're still soft.
 3                    Do you want to mark that as an
 4          exhibit?
 5                    MS. KRAMER:  Yes.  I'm marking the
 6          next exhibit.
 7                    COURT REPORTER:  Okay.  This will
 8          be Exhibit 117.
 9                    (Exhibit 117 marked).
10                    MS. KRAMER:  Thank you.
11                    Exhibit 117.  This is Bates
12          CITY-00066634.
13                    And I'll also mark the next
14          exhibit, Exhibit 118, and this is Bates No.
15          CITY-0066618.
16                    (Exhibit 118 marked).
17                    MR. LAKEY:  His copies -- or I
18          don't know.  Well, I just want to make sure
19          he doesn't get confused.
20                    THE WITNESS:  I can -- I can make
21          it work.  That's fine.  Thank you.  Yeah.
22          I'm good.
23          Q.      (BY MS. KRAMER) Okay.  Mr. Daigle,
24   what prompted you to attach these two letters to
25   your report?
```

```
 1          A.       Well, I was -- obviously we have a

 2   section in the recommendation here dealing with the

 3   Complaint.  And so I wanted to document the steps

 4   that the City -- that Johnson City had taken.  A lot

 5   of times this is the type of work that I do get

 6   involved in, and I think the fact that this

 7   documentation --

 8                    COURT REPORTER:  Okay.  We've lost

 9          you completely now, Mr. Daigle.

10                    VIDEOGRAPHER:  Should we go off the

11          record?

12                    MS. KRAMER:  No.  Hold on one

13          second.

14                    COURT REPORTER:  Yeah.  It was soft

15          before, but then it completely cut out.

16                    THE WITNESS:  Okay.  How about

17          that?

18                    COURT REPORTER:  Now I can hear you

19          fine, if it can stay that loud.

20                    MS. KRAMER:  Okay.  Great.

21          Q.       (BY MS. KRAMER) So in -- we're

22   looking at Page 32 of your report.  And about the

23   third line down you say, "While the department

24   should have opened an internal affairs

25   investigation, it is industry standard to initially
```

TENNESSEE
(615) 595-0073

1   address any criminal allegations through the

2   prosecutor's office."

3               Does that relate to your decision

4   to attach these two letters to your report,

5   Mr. Daigle?

6       A.      Yes, and the fact that when I had

7   met with Chief Turner, you know, his response to my

8   questioning as to why there weren't taking

9   additional action was, "Well, there was a criminal

10  overview, and so we did what we're supposed to do."

11              And I want to acknowledge that

12  there was a criminal audit or a criminal review,

13  which is fine, but that doesn't alleve the

14  department of adjusting the alleged misconduct.

15      Q.      And so in your view, an internal

16  affairs investigation should have been opened?

17      A.      Yes.

18      Q.      And to your knowledge, was an

19  internal affairs investigation ever opened?

20      A.      I don't know.

21      Q.      I can represent to you that in this

22  case City Manager Cathy Ball testified that the City

23  was holding in abeyance the internal affairs

24  investigation pending this lawsuit.

25              Does it make sense to you to hold

1    an internal affairs investigation in abeyance due to

2    a civil lawsuit?

3              A.       It does --

4                       MR. LAKEY:  Objection to form.

5              A.       It does not.

6              Q.       (BY MS. KRAMER) And what's the

7    problem with waiting to conduct an internal affairs

8    investigation?

9              A.       So the purpose of an internal

10   affairs investigation is for departments to

11   determine bias.  A lot of times the fact that

12   departments hold those IA's is because attorneys

13   make recommendations to them, but they don't

14   understand the big picture.

15                      And the big picture is that you

16   have an obligation as a department to investigate

17   misconduct and deal with the misconduct.  And,

18   unfortunately, if you hold misconduct out into

19   abeyance, then the people that may or may not have

20   done the misconduct either don't get identified

21   and/or don't get cleared.

22                      You know, somebody could be

23   alleging misconduct that is not -- just falsely, and

24   they have the right to have it cleared, too.

25                      Unfortunately, this is something

```
 1   that I do a lot of and, you know, it is very

 2   important for departments to identify the issue and

 3   investigate the issue and let litigation go its own

 4   track, the way it's supposed to.

 5           Q.      And so it's below industry standard

 6   to hold an internal affairs investigation in

 7   abeyance during the course of a civil lawsuit; is

 8   that correct?

 9           MR. LAKEY:  Objection to form.

10           A.      It is not -- it is not industry

11   standards to hold an administrative investigation in

12   abeyance unless there is a pending criminal

13   investigation.

14                   A lot of states have a criminal

15   toll which will toll the administrative

16   investigation until the completion of the criminal.

17   But now that this is completed, which is why I

18   brought it up, there is no reason to delay it.

19           Q.      (BY MS. KRAMER) What types of

20   things would you do in conducting an internal

21   investigation into the JCPD's handling of Shawn

22   Williams' cases?

23           A.      As I sit here today, I don't

24   remember all of the allegations that were in the

25   Complaint, but I would use the allegations as a
```

1    roadmap to try and identify the cases that were in

2    there.  And I would then attempt to identify the

3    officers or the supervisors or the investigators.  I

4    would place them under Garrity and interview them

5    and get down to the bottom of what actually

6    occurred, bring more light onto the allegations.

7                   Like I said, it could be -- it

8    could be good or it could be bad.  It could be

9    somebody just didn't write something correctly, or

10   it could be that it was, you know, intentional.  And

11   I think the department has an obligation to find

12   that.

13        Q.      The last sentence of this paragraph

14   states, "The purpose of the investigation may have

15   assisted us in locating or identifying documents

16   specific to the JCPD's investigation of

17   sexual-related cases that were not discovered during

18   the DLG audit."

19                   Can you explain what you mean by

20   that?

21        A.      That's directly to what I had said

22   to you before, which is there's allegedly other

23   documents.  I don't know what these other documents

24   are or why there is other documents.  Why are they

25   not contained in the case files, you know?

```
 1                    And I say this over and over again,
 2      but I truly believe it.  The audit is not -- it is
 3      not an intended negative consequence.  It is to give
 4      credit where credit is due and to find failures
 5      where failures are identified.  And, unfortunately,
 6      if you don't -- if you don't have all the
 7      information, then you can't give credit where credit
 8      is due.
 9           Q.      If we look at Exhibit 118, this is
10      the letter from D.A. Finney.
11                    Do you see that?
12           A.      Yes.
13           Q.      And were you aware that this was
14      sent by D.A. Finney on his first day in office?
15           A.      No.
16           Q.      And you cite to this letter as --
17      I'll read from the paragraph in your report that
18      starts on September 1st, 2022.  And the report
19      states, "On September 1st, 2022, District Attorney
20      General Steven R. Finney responded to Ms. Ball,
21      stating that after a review of the Complaint, he
22      does not have enough information to request a TBI
23      investigation."
24                    Did you make an assessment as to
25      whether there was enough information to request the
```

Cecil & TENNESSEE
(615) 595-0073

```
 1   TBI investigation?
 2          A.        I did not.
 3          Q.        In your view, if this is District
 4   Attorney Finney's first day in office, does that
 5   seem like sufficient time for him to have determined
 6   that a TBI investigation is not warranted?
 7                    MR. LAKEY:  Objection to form.
 8          A.        I don't know.
 9          Q.        (BY MS. KRAMER) Is one day
10   typically enough time to make that determination,
11   based on your experience?
12                    MR. LAKEY:  Objection to form.
13          A.        I don't know.
14          Q.        (BY MS. KRAMER) What kind of
15   evaluation would you expect to go into the
16   determination by District Attorney Finney that he
17   does not have enough information to request a TBI
18   investigation?
19          A.        I would -- if I was in his
20   position, it would be a review of the Complaint and,
21   you know, as we know, there's no -- there's no
22   requirement for truth in a Complaint, but I would
23   review the Complaint and see if, on its face, there
24   appeared to be any criminal -- significant criminal
25   allegations.
```

```
 1                  I don't know what the protocol is
 2      in Tennessee to activate TBI and get a TBI
 3      investigation.  So that's completely outside of my
 4      knowledge, world, and expertise in that.
 5           Q.     Do you know if D.A. Finney ever
 6      requested that the TBI open an investigation?
 7           A.     I don't know.
 8           Q.     What occasioned you to do an
 9      interview with Chief Karl Turner in December of
10      2022?
11           A.     Interesting way you asked that
12      question, what occasioned me.
13                  Are you asking why I did the
14      interview or --
15           Q.     Yes.
16           A.     Because, you know, he's the CEO of
17      the organization.  So if you're doing an assessment,
18      you know, you want to -- you want to involve the
19      chief of police.  It's his department, even
20      though -- and ask him, you know, for some
21      clarification on certain areas and to explain where
22      my concerns were.
23           Q.     Did anything happen in
24      December 2022 that prompted you to request this
25      meeting with Chief Turner?
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          A.      No.  I was -- if you -- if you kind
 2   of see the dates, I was in the city that week
 3   interviewing everybody.  So that was the -- that was
 4   that the week that I was there doing interviews.
 5   And so I kind of met with everybody while I was
 6   there across the board.
 7          Q.      Did you tell Chief Turner that you
 8   believed that an internal investigation should have
 9   been initiated?
10          A.      I did.
11          Q.      And how did he respond?
12          A.      He -- I don't remember.  Basically
13   I think he said we had a criminal analysis, and
14   I actually don't remember whether -- what his
15   reasoning was, whether it was attorney -- whether
16   the attorney said no, or I don't know.
17          Q.      But looking at this, the timing
18   here, the criminal investigation.
19                  So it looks like here you've noted,
20   right, that following the denial of a criminal
21   investigation, the department should have moved
22   forward with an internal investigation.
23                  So at that point, in September, you
24   already know that a criminal investigation is not
25   holding up the internal affairs investigation,
```

```
 1   right?

 2           A.        Correct.

 3           Q.        And then now it's --

 4           A.        I don't know that I know at that

 5   point, because I'll just say that I don't know when

 6   I got these letters.  It might have been in response

 7   to that meeting, but I don't know when I actually

 8   got these letters.

 9           Q.        Understood.

10                     But regardless, if you're meeting

11   with Chief Turner in December of 2022, he could not

12   have believed that the criminal investigation was

13   still the reason for holding up the internal affairs

14   investigation; isn't that right?

15                     MR. LAKEY:  Objection to form.

16           A.        No, and I don't think he did.  I

17   don't think I said that.  I think -- I don't -- I

18   think he -- because he said that a criminal review

19   had occurred and was rejected, based on my

20   recollection.  So I don't think he -- he didn't make

21   any statements to me that that was why he hadn't

22   moved forward.

23           Q.        I see.  Maybe I misheard you.

24                     So he -- that's not the reason that

25   he gave for no internal affairs investigation for
```

(615) 595-0073

1    being opened, and he did not offer any other

2    explanation to you as to why an internal affairs

3    investigation had not been opened.

4                    MR. LAKEY:  Objection to form.

5          A.        Not that I recall, no.

6          Q.        (BY MS. KRAMER) Do you believe that

7    there are records relating to Sean Williams'

8    criminal conduct that fell within the time period of

9    January 2018 to July 2022 that were not provided to

10   you?

11         A.        I don't know.

12         Q.        You don't know either way?

13         A.        No.  Because, like I said, the

14   response to me was, "There's other records," but I

15   don't know what they are or whether they should have

16   been in the case files or not in the case files.  So

17   I don't know.

18         Q.        And, again, when you're saying case

19   files here, you're saying the files that were

20   provided to you to do your audit, right?

21         A.        Yes, ma'am.

22         Q.        And sitting here today, you don't

23   have any additional information about these other

24   materials relating to Sean Williams --

25                   MR. LAKEY:  Object to the form.

1        Q.       (BY MS. KRAMER) -- that you did not

2  have the opportunity to review?

3                  MR. LAKEY:  Objection to form.

4        A.       I didn't review them.  So I don't

5  know.

6        Q.       (BY MS. KRAMER) You don't know

7  anything about them beyond what is reflected in your

8  report; is that right?

9        A.       That's accurate.

10        Q.       Did you have any discussions with

11  anybody else at the City, other than Chief Karl

12  Turner, about these additional documents?

13        A.       I may have brought it to the

14  attention of Sunny Sandos just to say, "Hey, this

15  is -- this is what was said to me during the

16  meeting.  Is there anything -- you know, I just want

17  to let you know."

18                  She was my point of contact.  So I

19  tried to keep her apprised and, you know, keep her

20  apprised that there was an issue, but that was as

21  much as I know.

22        Q.       Do you remember sending an email to

23  her asking about the --

24        A.       No, because I was there.

25        Q.       So you may have had a verbal

```
 1    conversation with her, but you can't remember any
 2    details.
 3            A.        No.  When I left the office, I sat
 4    down with her and said, "Okay.  This is what we did
 5    this week.  We interviewed a bunch of people.  We
 6    interviewed this and, by the way, I just met with
 7    the chief and he said there's a statement -- this
 8    was his statement.  Take that for what it's worth.
 9    But if there's anything you need to get me, please
10    let me know."
11            Q.        And how did Sunny react to that?
12            A.        She said, "I don't know what you're
13    talking about, but let me see.  Let me -- if there's
14    something that you need to know, I will -- I will
15    get it to you."
16                    MS. KRAMER:  I'll mark another
17            exhibit, and this will be Exhibit 119.  And
18            the Bates is CITY-0066601-1.
19                    (Exhibit 119 marked).
20            Q.        (BY MS. KRAMER) Do you recognize
21    this document, Mr. Daigle?
22            A.        I don't, actually.  It looks like
23    it's an index of some sort.
24                    MS. KRAMER:  Why don't we mark the
25            spreadsheet, also referred to as assessment
```

TENNESSEE
(615) 525-0073

```
 1                tool, and this will be Exhibit 119.

 2                     COURT REPORTER:  Let's see.  The

 3           next one will be 120.

 4                     MS. KRAMER:  Thank you.  This is

 5           Exhibit 120.  The Bates is CITY-006643 --

 6           430.  Excuse me.

 7                     (Exhibit 120 marked).

 8           Q.        (BY MS. KRAMER) Mr. Daigle, does

 9      this clarify for you what Exhibit 119 is?

10           A.        It makes sense.  One of my

11      teammates must have made it for a template, and I

12      don't remember it, so --

13           Q.        Okay.  Can we take a look at

14      Exhibit 20, please?

15           A.        Sure.

16                     120, you mean?

17           Q.        120.  Thank you.

18                     And do you recognize this document?

19           A.        Yes.

20           Q.        What is this?

21           A.        So this would be an example or is

22      the -- is an assessment tool.  And so it's a

23      spreadsheet, for lack of a better term.  It's an

24      Excel spreadsheet, and across the top are going to

25      be categories.  And then each individual row is
```

1    going to be an independent case.

2                    And, you know, as I think I

3    explained to you before, we just kind of -- I sit

4    there with the case file and I put in the case

5    number and answer the questions, if I can, along the

6    way as a way to -- as a way to assess some of the

7    very important information that's in there.  And

8    then we -- I think there's a couple more documents

9    that were provided to you, which kind of -- some of

10   the outliers we would actually summarize in a little

11   paragraph just to -- just because when you're going

12   through volumes and volumes of documents, you're not

13   going to remember and you have to be able to try and

14   make it easy to go back to get things later.

15       Q.       Is it accurate that Exhibit 119 is

16   a key for the acronyms used on Exhibit 120?

17       A.       Is it accurate that my team is more

18   squared away than I am?  Yes.  It looks to be that

19   somebody -- I don't know whether we did this or

20   somebody else did this.  I don't remember seeing

21   this 119.  So I don't know if that was made

22   somewhere else, but --

23       Q.       I can represent that it was

24   produced from your case file.

25       A.       Okay.

1          Q.        But I understand you did not
2     personally prepare this; someone from your team did.
3                    Sitting here today, is it fair to
4     say that using this key shown on Exhibit 119 allows
5     the reader to understand the inputs on Exhibit 20?
6                    MR. LAKEY:  Object to form.
7          A.        Yes.  That was probably the reason,
8     because the -- at the top of the page, they're so
9     little that you can't -- I know I can't see them.
10    So that would be what is at the top of the page per
11    column.
12         Q.        Certain of these entries are
13    highlighted on Exhibit 120.
14                   Do you see that?
15         A.        Yes.
16         Q.        Do you know why certain entries are
17    highlighted?
18         A.        Yes, because one of the last things
19    that we did with these tools was to go back and
20    identify which ones had arrests made for the
21    evaluation and the report.  And so it appears that
22    the ones that are highlighted are because an actual
23    arrest was made in the case .
24         Q.        You testified earlier that the term
25    unfounded, as you understood it from your interviews

1    with JCPD, meant that the crime occurred outside of
2    the jurisdiction.
3                    Do you remember that?
4         A.        That was what I had written.  That
5    was what was on that -- on my notes from my
6    interviews with Captain Peters, I believe.  It was
7    actually on the notes.  Unfounded equals --
8         Q.        Outside of jurisdiction; is
9    that correct?
10        A.        Yeah.  That's what was on my notes.
11        Q.        And is that -- based on your
12   conversations with JCPD officers and investigators
13   or supervisors, you believe that unfounded was the
14   word they used to indicate outside of jurisdiction.
15        A.        Yeah.
16                  MR. LAKEY:  Objection to form.
17        A.        Yeah.  It's pretty -- it's pretty
18   clear I'm wrong, as I look at this, as there's a lot
19   of unfounded in that area.
20        Q.        So why don't we look at one of
21   those.  If you go to the top, this is Case
22   No. W18000532.  If we look all the way to the right,
23   the case outcome -- or sorry.  Let's go to the notes
24   first.
25                  Are you able to follow me on that?

Lori Lea STEPHENS
(615) 525-0073

```
 1            A.        I just want to clarify.  I'm
 2    listening to you.  Go ahead.  I'll be with you.
 3            Q.        The notes say, "No follow-up.
 4    Unable to locate victim.  Suspect interview?  Victim
 5    12.  Suspect 16."  And then the case outcome it's
 6    noted, "Closed.  Unfounded???"
 7                      Looking at this, do you have any
 8    recollection of the assessment of this case?
 9            A.        What do you mean by that?
10            Q.        Like do you remember looking at
11    this, seeing these like multiple --
12            A.        I don't remember.  I'd have to --
13    the purpose of this assessment is not because I'm
14    going to memorize the case, but I would go back and
15    pull the case.
16                      But basically what it's telling me
17    is that we don't know why it's closed unfounded,
18    because that would be the kind of question mark,
19    question mark, which is closed unfounded, and why?
20    We don't -- there's not enough information in the
21    file to explain to us why it's closed unfounded,
22    especially if I can just take -- just taking there,
23    I guess one of the reasons why I would have added
24    closed unfounded there is I have a 12-year-old
25    victim and a 16-year-old suspect, and that attracts
```

```
 1    my attention just for the fact that it's a

 2    12-year-old victim.

 3                    So, again, this is -- this is kind

 4    of a great example of what I had to deal with.

 5    That's all the information that we have.  That's the

 6    full case file, and there's just not enough

 7    information there to come to a conclusion.

 8         Q.        And if you look at -- it's right

 9    above the first bar of highlighting, but it's Case

10    W18007303.

11                    Are you following me there?

12         A.        I am, yes.

13         Q.        Okay.  And this is another

14    unfounded, correct?

15         A.        Yes, ma'am.

16         Q.        On this one the notes say, "Unable

17    to locate," and then the case outcome says,

18    "Unfounded????"

19                    Do you see that?

20         A.        Yes.  "Suspect interview, unable to

21    locate."

22         Q.        And so is this another instance

23    where you could not determine what basis JCPD had

24    for having an unfounded disposition of this case?

25         A.        Yes.
```

Lexitas - TENNESSEE
(615) 595-0073
#: 6591

1        Q.        Looking at Exhibit 20, and I'll

2    call this the assessment tool, is this the same tool

3    that you applied across the entire time period that

4    you conducted your audit?

5        A.        Yes, I believe so.  I don't know

6    what category of -- I assume this is rape under 11A.

7    So I just don't know which -- pretty much they

8    should all be pretty consistent.  There might be a

9    few -- there might be a category or two for the rape

10   one versus the -- you know, like fondling or

11   something, that would require the same steps.  There

12   would be less steps.

13       Q.        So in other words, this reflects

14   the methodology you used, correct?

15       A.        Yes.

16       Q.        There may be some minor alterations

17   based on the nature of the crime --

18       A.        Yes.

19       Q.        -- but it's the same methodology.

20       A.        Yes.

21       Q.        Does looking at this document

22   refresh any memories about conversations you had

23   with JCPD relating to the unfounded status for

24   closing a case?

25                 MR. LAKEY:  Objection to form.

Lexitas - TENNESSEE
(615) 595-0073

```
 1          A.      No.  Actually, as I sit here right

 2    now, I have no idea what that means, right, because

 3    I can't remember.

 4                   So I was looking on what you

 5    provided before to see if there was a definition of

 6    unfounded, but I don't -- I do not remember it as I

 7    sit here.

 8                   MS. KRAMER:  I'm going to mark

 9           another exhibit.  This will be Exhibit 121.

10                   COURT REPORTER:  Yes.

11                   (Exhibit 121 marked).

12                   MS. KRAMER:  And the Bates is

13           CITY-0066434.

14          Q.      (BY MS. KRAMER) Looking on the left

15    side column of Exhibit 121, Mr. Daigle, I'll draw

16    your attention down to, it looks like, the eighth

17    number from the bottom.

18                   This is -- it's November 7th, 2019,

19    and the case number is W19013728.

20          A.      I see that.

21          Q.      And the fact that this is included

22    here, you did -- let me ask it this way.

23                   If this case is included on your

24    spreadsheet, you must have gotten something from

25    JCPD for this case; is that right?
```

```
 1          A.      Yeah.  Usually a one or two-page
 2   incident report, computer-generated incident report.
 3          Q.      And when you say usually a one or
 4   two-page incident report, is that because usually
 5   that's all that existed for a case file?
 6          A.      Yes.
 7          Q.      And it looks like this case, in the
 8   case outcome there's a note that says, "Active,"
 9   with five question marks.
10                  Do you see that?
11          A.      Yes.
12          Q.      Why would you have entered,
13   "Active???"
14          A.      I like question marks.
15          Q.      Does that mean --
16          A.      The question was it appeared to be
17   still active, even though it was a 2019 -- I'm
18   sorry.  Yeah, a '19 case.  There didn't appear to be
19   a closing on the case.  It was just still in limbo.
20          Q.      And that means, when you're doing
21   this analysis, the case is in limbo in 2022?
22          A.      2022 and into 2023.
23          Q.      Did you make any attempt to follow
24   up with JCPD on the status of this case as you
25   recall?
```

Lexitas - TENNESSEE
(615)595-0073

```
 1              A.      No.
 2              Q.      Was it unusual for you to find a
 3      case that was still open, or at least potentially
 4      active, dating back to 2019?
 5              A.      Well, it was unusual.  The only
 6      thing I will tell you is that because there's --
 7      sometimes in sexual assault-related cases, they do
 8      stay open for a long period of time waiting for a
 9      CODIS hit or a sex assault kit to be processed by
10      the forensic laboratory.  That sometimes, depending
11      on backlog, can take a while.  Sometimes cases are
12      open for longer because of that.  But it is a long
13      time.  It's a couple of years.
14              Q.      In the notes, again, for this same
15      case, it says, "Suspect interview?  Investigation
16      dropped."
17                      Was it clear to you whether this --
18      whether any active investigation was happening on
19      this case?
20              A.      It was not clear, and it didn't
21      look like the suspect was ever interviewed, and it
22      didn't look like anybody had been doing anything on
23      the case.  At least there was no -- there was no --
24      there was no reports or anything that showed -- no
25      supplemental reports that showed continuous
```

Lexitas - TENNESSEE
(615) 595-0073

```
1    activity.

2              Q.        In conducting the audit, do you --

3    did you have direct access to JCPD's case management

4    system?

5              A.        Initially I did.  Their system was

6    so convoluted that the only way that I -- because I

7    don't really like people drawing my data sets.  I

8    want to draw my own data sets.  I want my team to go

9    there and draw the data sets.  This way we -- it

10   can't be manipulated in any way.  And we started to

11   do that, but we were having challenges because the

12   only way we could access the JCPD's administrator

13   was do it through a VPN tunnel with a computer in

14   their network.  And it just became very, very

15   taxing.  It became a waste of resources.  So we had

16   to subsequently request documents from them.

17             Q.        So in other words, you could not

18   have just gone into JCPD's computer system and

19   pulled up this case and seen if there was any

20   activity in the case.  That was not something you

21   were able to do.

22             A.        Not once we got away from the VPN

23   access.

24             Q.        And were you provided any -- I

25   don't know what the -- if there's a correct term for
```

```
1    this, but I'll call it an audit trail.  It's a way
2    to see whether a case file has been accessed through
3    the case record system.
4                        So, for example, you could see if
5    some -- if an officer has gone in and updated notes,
6    these audit trails would show entries into the case
7    system.
8                        Have you seen anything like that in
9    connection with your work on this case?
10           A.        No.
11           Q.        Just in your experience generally,
12   are you aware of something called an audit trail
13   that allows for reviewing what activity has been
14   made on an electronic case file?
15           A.        Yes.
16           Q.        In what context would you be
17   looking at one of these audit trails?
18                     MR. LAKEY:  Objection to form.
19           A.        I use the audit trails a lot in
20   doing misconduct investigations.  Meaning, you know,
21   I can go in there and see who has accessed it, who
22   has used it.  We use audit trails a lot on body-worn
23   cameras to see who has gone in and viewed it and who
24   has looked at it.  And so it really would be to
25   verify whether someone has done what they're
```

```
 1   supposed to do, and it's an audit trail.  So it
 2   gives you the ability to audit.
 3           Q.       (BY MS. KRAMER) Would you expect
 4   that an internal investigation by JCPD relating to
 5   Sean Williams would include a review of the audit
 6   trails for the relevant members of the police
 7   department?
 8                   MR. LAKEY:  Objection to form.
 9           A.       I would -- I would expect that if
10   the system has the ability to articulate who had
11   accessed specific case files, and we were doing an
12   investigation specific to the allegations made
13   involving Sean Williams, that that would have been
14   something that you would look at.
15                   MS. KRAMER:  I'll mark another
16           exhibit.
17                   COURT REPORTER:  This will be 122.
18                   MS. KRAMER:  This is Exhibit 122,
19           and it's Bates No. CITY-0066593-1.
20                   (Exhibit 122 marked).
21           Q.       (BY MS. KRAMER) Mr. Daigle, do you
22   recognize this document?
23           A.       Yes.
24           Q.       What is it?
25           A.       So this is how -- this is basically
```

a printout of all case files under a category.  So
as you see, this is 11A, forcible rape.  This is a
printout of all the case files that are in the
system under UCR Code 11A for the purpose of us to,
you know, have it -- now we -- now I have something
to sit here and make sure I'm getting every single
case file based on the cases that are listed in this
document.

Q.        Where was this printed out from?

A.        The department printed it out.  I
don't -- I don't know where it was printed.  I
assume it's part of their record management system
to provide a summary report, because what we're
looking for is just a few basic information, which
would be the case number in the left margin, you
know, the date, a little -- the unfounded, the
disposition, and the investigators.

And so before I started what you
see on 120 and 121, the first thing that we would
get would be 122 and then we would ask -- we would
go in and get case files for every one of these
cases to do our assessment on 120 and 121.

Q.        Okay.  So this is a City-provided
document?

A.        Yes, ma'am .

(615) 595-0073

```
 1              MS. KRAMER:  The next exhibit,
 2         Exhibit 122 --
 3              COURT REPORTER:  123.
 4              MS. KRAMER:  123.  Thank you.
 5              The Bates is CITY-0066433-1.
 6              (Exhibit 123 marked).
 7         Q.      (BY MS. KRAMER) Do you recognize
 8    this document, Mr. Daigle?
 9         A.      Yes.
10         Q.      And what is this document?
11         A.      This is a summary document that we
12    would put together as going through different cases,
13    you know, that were going to be highlighted.  So you
14    would use the assessment tool and you would review
15    the case.
16              Once we got to the end of the case,
17    if the case had some concerns or something that we
18    wanted to highlight in there, I then make a little
19    summary sheet of the case.  We're basically
20    continuing to build our way up to drafting the
21    report and trying to keep things organized in the
22    audit and assessment.
23         Q.      And you prepared this document,
24    correct?
25         A.      I was involved in it.  Multiple
```

1    team members would go through it, and so we would

2    add to it and evaluate it, yes.

3              Q.       And that's under your supervision,

4    correct?

5              A.       Yes.

6              Q.       And did you prepare report case

7    notes for each of the types of crimes and each of

8    the years that are included in your audit?

9              A.       I don't think we did it for the

10   lower -- we definitely did it for all the rape

11   cases, because those were very significant.  I don't

12   remember.  I don't think we did very much on the

13   lower-level cases, like the -- there was no incest

14   cases, but there was a handful of forcible

15   fondlings.  But basically we're -- what we're doing

16   here in the summaries is we're identifying things

17   that are causing us some concern with the way they

18   were handled.  So it's just a way to kind of

19   continue to boil down information.

20             Q.       We're going to return to a

21   previously marked exhibit, which is Exhibit 115.

22   That's right here for you.

23                      Just on the first page of this

24   exhibit, Mr. Daigle, this reflects your meetings

25   with Town Manager, and that's Cathy Ball, right?

```
 1          A.        Yes, ma'am.

 2          Q.        Do you remember how many meetings

 3    you had with Cathy Ball?

 4          A.        A couple.  Three or four.  This one

 5    was significant.  It was towards the end of the

 6    audit.  And the reason why I know that is it's an

 7    old lawyer's trick.  You never write on the first

 8    page of the notebook so that when you leave the

 9    notebook out, people can't read your notes, right?

10                    So when it was time to sit down at

11    the end, I put my thoughts on the first page in

12    order to give Cathy Ball an update.  This was at her

13    request, because of -- they were going into -- they

14    were going into budget time and they needed -- they

15    needed to make some budget concessions to deal with

16    some of the things that I would be finding.

17                    I kind of knew what my findings

18    were at this point, but I hadn't finalized my report

19    yet.  And so this was -- these were -- these, what

20    you're seeing here, is kind of a just a summary of

21    my conclusions that I was -- that I shared with her

22    for consideration when she was thinking about what

23    she was going to do for the budget year.

24          Q.        Do you recall the date?

25          A.        I don't know.  I assume it's --
```

(615) 595-0073

```
1    just because budgets are usually March, it's

2    probably early 2023.

3              Q.      And you'll notice here that this is

4    a photocopy, obviously, and the bottom of the page

5    is folded.

6              Do you have these documents still

7    in regular hard copy?

8              A.      Yeah, somewhere.  Yes.

9              Q.      Do you remember a Teams meeting

10   with Cathy Ball on January 9th, 2023?

11             A.      We would all -- we would have Teams

12   meetings, and that would be -- so if you're saying

13   that's the date, it doesn't seem unusual.

14             Q.      Let's just -- without reference to

15   this document, do you remember, sitting here today,

16   a Teams meeting with Cathy Ball in January of 2023?

17             A.      I don't know, without looking at

18   it.  Unfortunately, in the world we live in, I have

19   a lot of those.  So it's not -- it doesn't seem

20   unusual to me, but I don't know.  I'm not going to

21   say yes unless I look at my calendar.

22             Q.      Okay.  And you can't tell from

23   these notes whether these notes reflect that phone

24   call, right?

25             A.      I cannot.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1        Q.       Okay.  Generally, when you would
 2   speak with Cathy Ball, was somebody else on the
 3   phone?
 4        A.       Usually when we would have a Teams
 5   meeting, they would be in their conference room, and
 6   there would be a handful of people in the room.
 7   Sometimes more than others.
 8                 In this meeting, there was a --
 9   there was more people in the room than in other
10   meetings.  Sometimes it was just her and Sunny and
11   the paralegal.  And we probably had, you know, two
12   or three Teams meetings as status updates.
13                 But when we went over this, I do
14   remember that the then interim chief and the new
15   captain of investigations was also in the room.  I'm
16   not sure who else was in the room.
17        Q.       Do you know if the Teams meetings
18   were recorded?
19        A.       I didn't record them.  So I don't
20   know.
21        Q.       We're going to look at -- this is a
22   previously marked exhibit.
23                 Okay.  This is previously marked as
24   Exhibit 57.  The Bates number is CITY-0139814.
25                 So if you turn to the -- a few
```

```
 1    pages in, it's the page Bates ending 0139819.

 2                    Do you see that page?

 3         A.        Yes, ma'am.

 4         Q.        And I can represent to you that

 5    these documents were produced by the City, and

 6    specifically from the City Manager, Cathy Ball.

 7                    Do you see your -- do you see the

 8    date at the top of the page?

 9         A.        Yes, ma'am.

10         Q.        What's the date there?

11         A.        January 19th, 2023.

12         Q.        And you see below your name,

13    Daigle, right?

14         A.        Yes.

15         Q.        And below that she notes,

16    "Documentation '18, '19, '20.  Documents are

17    horrible.  Fragmented.  Staffing?"

18                    Does it -- does this look to

19    correspond with a phone call that you had with Cathy

20    Ball on January 19th, 2023?

21                    MR. LAKEY:  Objection to form.

22         A.        The topics seem reasonable.  And if

23    she wrote them down, I'm not going to --

24         Q.        And then so it looks like she has

25    some general notes.  "Late October/November,
```

Lexitas - TENNESSEE
(615) 595-0073

interview, forensic." And then below that are the
words, "Worst ever seen. Need rest of case file."

Does that make you recall any
content of the conversation that you had with Cathy
Ball on January 19th, 2023?

MR. LAKEY: Object to form.

A. Well, I mean, I think it's pretty
consistent to what we've talked about all day, which
is, you know, documents are horrible and fragmented
and we're missing documents.

Q. (BY MS. KRAMER) And so you believe
you conveyed these words to Cathy Ball, and that's
what's reflected in her notes here?

MR. LAKEY: Object to form.

A. Yeah, I definitely would -- would
agree with the fact that I said it's the worst I've
ever seen.

Q. (BY MS. KRAMER) And if you look at
the -- a little further down, I think she's got this
actually in quotes. It says, "This is terrible."

Do you think she's quoting you
there?

MR. LAKEY: Object to form.

A. I don't know. It's possible.

Q. (BY MS. KRAMER) There's also a note

1    right above what I -- what I just read.  It says,
2    "John victim interviews."
3                    Do you have any idea what that's
4    referring to?
5         A.        I don't.  I mean, I can -- I don't.
6         Q.        It looks like it says above, "Most
7    concerning cases," and then it says, "John victim
8    interviews."
9                    That doesn't ring any bells for you
10   on what you might have been discussing during this
11   phone call?
12                   MR. LAKEY:  Object to form.
13        A.        Only that John was the sergeant
14   over records, and I'm still looking for victim
15   interviews.
16        Q.        (BY MS. KRAMER) Is it possible that
17   John there is referring to a john, as in the context
18   of potential prostitution?
19                   MR. LAKEY:  Object to form.
20        A.        Doesn't really fit with victim
21   interviews.  So I don't -- I wouldn't use that
22   terminology.  So I don't know.
23        Q.        (BY MS. KRAMER) If we turn to the
24   next page it says, "Five or six years," and I think
25   it's, "Paperless files."

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    Does that look right to you?

 2                    MR. LAKEY:  Object to form.

 3          A.        It looks like it says that, yes.

 4          Q.        (BY MS. KRAMER) Did you discuss

 5    with Cathy Ball taking the JCPD department to a --

 6    to a paperless file system?

 7          A.        No.  I think it's actually the

 8    opposite.  I think that they were some form of a

 9    paperless file system, just don't know where the

10    paper went.

11          Q.        I see.  Okay.

12                    Because about two lines down it

13    says, "Shred files."

14                    So do you think this is a

15    conversation that you had with Cathy Ball reflecting

16    the issue of officers shredding paper documents?

17          A.        Yeah.

18                    MR. LAKEY:  Object to form.

19          A.        You can go paperless, but you've

20    got to make sure everything is in it before you --

21    that would probably be --

22          Q.        (BY MS. KRAMER) If you turn to the

23    next page, at the bottom the note says -- it says

24    next to -- next to the No. 3 it says, "Interact with

25    D.A.  D.A. told us to close the case, not want to
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1    cooperate.  Affidavit standard.  Just called D.A."
 2               Is this in reference to what you
 3    testified to earlier in terms of having -- the
 4    importance of having documentation on whether a
 5    victim does not want to cooperate in a prosecution
 6    and having that go to the D.A.?
 7               MR. LAKEY:  Object to form.
 8          A.        I think it's what I talked about
 9    before, but it was more the fact that the D.A. has
10    absolute immunity.  So it's up to the investigators
11    to document.  It was more into that realm, which is
12    you just can't -- you've got to have documentation
13    so that if it comes back, you know what the outcome
14    is.
15          Q.        (BY MS. KRAMER) And so you conveyed
16    to Cathy Ball that the D.A. has absolute immunity;
17    is that correct?
18               MR. LAKEY:  Object to form.
19          A.        Well, I mean, all D.A.'s have
20    absolute immunity.  So the key is that it's very
21    difficult when -- in municipal operations it's
22    usually the officer that gets sued, and we have to
23    make sure there's some protections in play.
24          Q.        (BY MS. KRAMER) Is it correct that
25    you told Cathy Ball that the District Attorney has
```

TENNESSEE
(615) 595-0073
Page 93

```
 1   absolute immunity, yes or no?

 2                    MR. LAKEY:  Object to the form.

 3          A.        I probably did.  I don't recall.

 4   But if she wrote it down, I probably did.

 5                    MS. KRAMER:  Okay.  Let's take a

 6          short break.  Let's resume at 5:00.

 7                    Can we go off the record?

 8                    COURT REPORTER:  Okay.  Yeah, we're

 9          going to go off the record.

10                    MS. KRAMER:  Yes, please.

11                    VIDEOGRAPHER:  Okay.  We are now

12          off the record.  The time is 4:53 p.m.

13          Eastern time.

14               (Off the record at 4:53 p.m.)

15               (On the record at 5:02 p.m.)

16                    VIDEOGRAPHER:  We are now back on

17          the record.  The time is 5:02 p.m. Eastern

18          time.

19   BY MS. KRAMER:

20          Q.        Mr. Daigle, if I can direct your

21   attention back to Exhibit 57, these are Cathy Ball's

22   notes of a conversation that she had with you that

23   we were reviewing earlier.

24                    Did I take your copy?

25          A.        I don't --
```

```
 1          Q.        Oh, there it is.

 2                    And if I could direct you to the

 3     page with Bates ending 839.  And these notes are

 4     dated April 25th, 2023.

 5                    Do you have any recollection of a

 6     call with Cathy Ball on April 25th, 2023?

 7                    MR. LAKEY:  Ms. Kramer, I'm just

 8              going to say I think it may be 4/24.

 9                    MS. KRAMER:  4/24.

10          Q.        (BY MS. KRAMER) Okay.  On or

11     about -- on or about April 24th, 2023, do you have

12     a -- do you recall having a conversation with Cathy

13     Ball on that date?

14          A.        I don't recall, but there's no

15     reason to doubt that I did.

16          Q.        Okay.  And I know these are not

17     your notes, but at the bottom, near the bottom,

18     there's a note here that says, "All departments

19     share information, quote Ted Bundy."

20                    Do you have any recollection of

21     making a reference to Ted Bundy with Cathy Ball?

22                    MR. LAKEY:  Objection to form.

23          A.        Yeah.  Actually, I probably was --

24     one of the things that -- I think the conversation

25     here was RMS systems, and the way the RMS systems
```

Lead & Witness Court Reporting
(615) 555-0073

```
 1    are set up nowadays is so that all departments can

 2    see each other's.  And, you know, it's well known

 3    that obviously in my past history as serial -- doing

 4    serial investigations is that Ted Bundy has always

 5    said that all you have to do to beat the system is

 6    kidnap in one jurisdiction, kill in another, and

 7    dump in a third.

 8                     And, unfortunately, departments

 9    weren't talking to each other well enough and,

10    therefore, a lot of homicides went unsuccessfully

11    completed.

12                     So what I was telling them was

13    that -- the point of it wasn't supposed to be about

14    Ted Bundy, but the point of it was that nowadays RMS

15    systems are built so that departments are online

16    with each other.  So you can see information, and

17    you can search each other's information for

18    investigative purposes and --

19                     COURT REPORTER:  Excuse me.

20                     Can you say -- what kind of system

21         was that?

22                     THE WITNESS:  I'm sorry, sir.  RMS.

23         Roger, Mike, Sam.

24                     COURT REPORTER:  RMS.  Okay.  Thank

25         you.
```

```
 1          Q.        (BY MS. KRAMER) And does RMS stand
 2    for records management system?
 3          A.        It does, yes.
 4          Q.        And beneath that reference to Ted
 5    Bundy, the notes show, "Policies," underlined, and
 6    then in a circle, "D.A. not innocent."
 7                    Did you say anything to Cathy Ball
 8    that you can recall about the D.A. not being
 9    innocent?
10          A.        My recollection was that, you know,
11    there's -- we don't know -- we don't -- when our --
12    when JCPD investigators are talking to the D.A.'s
13    Office over the '18, '19, '20, we don't know what
14    they're being told also from the D.A. side, right?
15                    Like this is not -- this may not
16    just be a JCPD issue.  It may actually be a D.A.
17    issue, too.  We don't know what's going on.  The
18    only unfortunate part is that there's no
19    documentation.  So we don't know what guidance and
20    direction the D.A.'s office is giving to JCPD
21    investigators.  They might just be saying, "Hey,
22    close the case," but that's still -- the obligation
23    is still on JCPD investigators to document why.
24          Q.        Okay.  Let's put this aside for the
25    moment, and we're going to mark another exhibit.
```

```
 1           A.        You are going back on the plane
 2    lighter.
 3           Q.        You have a shredder here, right?
 4           A.        We'll make it go away.
 5                     MS. KRAMER:  I'll mark this
 6           Exhibit 124.  The Bates number is
 7           CITY-0070596.
 8                     (Exhibit 124 marked).
 9                     MR. LAKEY:  Ms. Kramer, has he
10           signed --
11                     MS. KRAMER:  We have it here today
12           for his signature, yes.
13                     MR. LAKEY:  So you all will return
14           it signed.
15                     MS. KRAMER:  Absolutely.
16                     THE WITNESS:  I did have to sign
17           one in the other matter, too.
18                     MR. LAKEY:  Different orders in the
19           cases.
20           Q.        (BY MS. KRAMER) Do you know what
21    this document is, Mr. Daigle?
22           A.        It looks like a training ledger.
23           Q.        Does this appear to you to be what
24    you described earlier in your testimony where you
25    could see the topic of a training?
```

Lexitas - TENNESSEE
(615) 555-0073

```
 1              A.       I don't know if I got it in this
 2    way, but it seemed like -- so basically what it's
 3    showing is here's the course, the officer that took
 4    it, the rank, the date they started and ended it,
 5    the date they completed it, the grade.  So it's a
 6    training ledger for purposes of identifying what
 7    training courses officers took.
 8              Q.       And was this provided by the City
 9    to you for purposes of your audit?
10              MR. LAKEY:  Objection to form.
11              A.       I believe so.
12              Q.       (BY MS. KRAMER) Did you evaluate
13    this document in connection with your audit of the
14    Johnson City Police Department?
15              A.       No.
16              Q.       Have you seen documents like these,
17    something that you called a training ledger, in your
18    experience?
19              A.       Yes.
20              Q.       If you look at the -- all the way
21    to the right, there's a grade and a percentage.
22              Do you see that?
23              A.       Yes.
24              Q.       I'm noticing that almost every
25    person has a 90 out of 100.
```

```
 1                    Do you see that?

 2        A.         Yes.

 3        Q.         Does that seem odd to you?

 4        A.         It might be an easy course, but not

 5   easy enough to get 100.

 6                    MS. KRAMER:  Okay.  We're going to

 7             mark another exhibit.  This will be

 8             Exhibit 125.

 9                    All right.  We'll hold off on

10             marking the exhibit.

11        Q.         (BY MS. KRAMER) So, Mr. Daigle, you

12   testified to an on-site visit to JCPD; is that

13   correct?

14        A.         Yes, ma'am.

15        Q.         Did you do that more than once?

16        A.         Yes.  I was there for multiple days

17   in December.

18                    Like more than one going there

19   or --

20        Q.         I see.  Good -- fair clarification.

21                    How many visits did you -- or I

22   guess tell me what -- you took a trip to do an

23   on-site visit to the police department in Johnson

24   City, correct?

25                    MR. LAKEY:  Object to form.
```

Lexitas TENNESSEE
(615) 595-0073

```
 1          A.      Yes.

 2          Q.      (BY MS. KRAMER) And you were there

 3   for multiple days; is that right?

 4          A.      Yes.

 5          Q.      And over that time period, you made

 6   more than one visit to the department; is that

 7   right?

 8          A.      Yes.

 9          Q.      Approximately how many days were

10   you there?

11          A.      Four.

12          Q.      And approximately how many visits

13   did you make to the department at that time?

14                  MR. LAKEY:  Object to form.

15          A.      We actually -- we actually took

16   over a room there, and we were working in and out of

17   there all day for the time we were there.  So we had

18   a -- we took over the training room and made it our

19   office.  And so we were in and out of the building

20   all day long.

21          Q.      (BY MS. KRAMER) And is it your

22   understanding that JCPD knew in advance that you

23   were coming to do your audit, do a portion of your

24   audit during this visit?

25                  Is that fair?
```

```
 1                    MR. LAKEY:  Object to form.
 2          A.        I would assume they did, yeah.   I
 3    mean, I was having conversations.  We weren't trying
 4    to surprise them.  We were trying to set up
 5    interviews and get additional information.
 6          Q.        (BY MS. KRAMER) You weren't trying
 7    to surprise them.
 8                    What do you mean by that?
 9          A.        I mean, it wasn't -- sometimes we
10    do inspections.  When you do an inspection, you just
11    show up, and you don't tell anybody you're coming.
12    But in this case, we were trying to make good use of
13    our time there to meet with different members of the
14    department and to get the documents that we need.
15    So they did know.  I believe they knew we were
16    coming.
17          Q.        When you're doing an investigation
18    of a police department and you just show up, what's
19    the benefit of just showing up unannounced?
20                    MR. LAKEY:  Object to form.
21          A.        In certain situations, it's to do
22    an audit without preparation, you know.  You just --
23    in organizational studies or in different
24    operational -- when we show up, you kind of get it
25    in raw form.  You see what's going on every day, but
```

```
 1    that's not what we were doing here.

 2            Q.      (BY MS. KRAMER) Would it concern

 3    you to have a JCPD captain advise investigators to

 4    update their case files in anticipation of your

 5    arrival?

 6                    MR. LAKEY:  Objection.

 7            A.      What was the question?  Would it

 8    surprise me?

 9                    MS. KRAMER:  Jeff, can you read

10            back my question, please?

11                    COURT REPORTER:  Okay.  Hang on a

12            second.

13                    Let's see.  Okay.

14                    Would it concern you to have a JCPD

15            captain advise investigators to update their

16            case files in anticipation of your arrival?

17            A.      It would concern me, yes.

18            Q.      (BY MS. KRAMER) Why would it

19    concern you?

20            A.      Well, it just -- I'm an

21    investigator at heart, and it's kind of like when

22    you -- when you prepare for the inspection, you

23    know -- I guess what I take from that is you weren't

24    doing that already if you had to -- if you had to

25    tell your people to get their stuff in order before
```

Lexitas TENNESSEE
(615) 595-0073

```
 1    I got there versus, "Hey, just to let you know."
 2                    You know, I have no problem if he
 3    said, "Hey, just to let you know, Daigle's team will
 4    be here next week.  They may want to talk to you."
 5    That's okay.  That's fine.  But, you know, "Get your
 6    stuff together before Daigle gets there," that's a
 7    whole different ball game.  That's telling me that
 8    the captain didn't believe his people had his stuff
 9    together, so --
10         Q.      What if the captain said, "Eric
11    Daigle will be looking, and I don't want him to find
12    that there are cases that nothing has been done in a
13    while"?
14                    MR. LAKEY:  Object to form.
15         A.      I don't think --
16                    COURT REPORTER:  Jon, can you make
17          your objections a little bit louder?  I'm
18          still not sure exactly when you object.
19                    MS. KRAMER:  I hear you, Jeff.
20                    MR. LAKEY:  Object to form.
21         Q.      (BY MS. KRAMER) I will -- I will
22    restate.
23                    Would it concern you for a captain
24    to say to investigators, "Update cases that have
25    sexual assaults or rapes, because I don't want
```

Lexitas - TENNESSEE
(615) someplace-0073

```
 1    Daigle to find out that nothing has been done in

 2    those cases for a while"?

 3                    MR. LAKEY:  Object to form.

 4         A.        That would concern me, yes.

 5         Q.        (BY MS. KRAMER) For the same

 6    reasons you described before?

 7         A.        Yeah.  I mean, your house isn't in

 8    order.

 9         Q.        Now, I want to look back at some of

10    these summary tables that you created in your

11    report, Mr. Daigle.

12                    Let me direct you to the page.  So

13    this -- let's start with Page 9.

14                    I'm sorry.  Go back two pages,

15    please.  Let's go to Page 7, and at the top there is

16    a data summary chart.

17                    Do you see that?

18         A.        Yes.

19         Q.        And that represents the total

20    number of cases, the 326 that we've been talking

21    about today, right?

22         A.        Yes, ma'am.

23         Q.        And then if you move forward to

24    Page 9, you have Image 3.

25         A.        I see that, yes.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1        Q.        And Image 3 reflects for different

 2    years how the number of rape cases were closed.

 3                  Let me restate that.

 4                  Image 3 reflects rape cases and

 5    shows by year what the reason for closure was; is

 6    that correct?

 7                  MR. LAKEY:  Objection to form.

 8        A.        Yes.

 9        Q.        (BY MS. KRAMER) And did you prepare

10    these tables?

11        A.        Yes.  And so just to bring it full

12    circle for you, this should be -- we had previously

13    given Exhibit 122, and basically this takes

14    Exhibit 122 and makes it into a chart for purposes

15    of better analysis, just to make it very clear.

16                  Instead of having to go through and

17    count all these up, this -- you know, wherever this

18    fit, this would be -- you know, you would take the

19    years, and so '18, and then you would come over to

20    the '18 rape cases, and that's how you would break

21    down those cases into -- top left, the first one

22    would show -- top left of the side.

23        Q.        Understood.

24                  And looking down and looking at

25    Image No. 4, Image No. 5, Image No. 6, are these,
```

Lexitas  TENNESSEE
(615) 661-0073

```
 1    likewise, summary tables that you prepared using

 2    information from Johnson City?

 3             A.       Yes.  And these would be instead

 4    of -- the first five are the individual years with

 5    rape cases, but then the rest of them are summarized

 6    in totality.

 7             Q.       And turning to Page 10, I'm looking

 8    at Image No. 7, this is, again, summary tables

 9    prepared by you based on data provided by Johnson

10    City; is that correct?

11             A.       Yes.

12             Q.       Sitting here today, you have no

13    reason to believe that those summary charts are

14    inaccurate in any way, do you?

15             A.       No.

16             Q.       If we go to Page 28, there's -- I'm

17    sorry.  Page 26 of your report, there's Image No. 8.

18             A.       Yes.

19             Q.       And you prepared this chart,

20    correct?

21             A.       Yes.

22             Q.       And this is based on the data

23    provided to you by Johnson City, correct?

24             A.       Yes.

25             Q.       And is the same true for Image No.
```

Lexitas TENNESSEE
(615) 595-0073

```
1    9?
2           A.        Yes.
3           Q.        Turning the page, on Page 27 we
4    have Image 10.
5                     Is this table prepared by you based
6    on data provided by Johnson City?
7           A.        Yes.
8           Q.        Is the table in Image 11 prepared
9    by you based on the data provided to you by Johnson
10   City?
11          A.        Yes.
12                    And just to clarify, the
13   percentages in the last row are our math.  So if
14   they're wrong, it's on us.
15          Q.        Moving to Page 28, the table in
16   Image 12, is this a table prepared by you based on
17   data provided by Johnson City?
18          A.        Yes, ma'am.
19          Q.        If you look at Page 24 of your
20   report, Finding No. 4 states, "JCPD's process of
21   closing investigations is flawed and inaccurate."
22                    Do you see that?
23          A.        Yes.
24          Q.        Do you stand by that finding?
25          A.        Yes.
```

```
 1          Q.          If we move ahead to Page 31,
 2    Finding No. 5, "JCPD needs to ensure that all
 3    complaints of misconduct against the department,
 4    including anonymous complaints, are timely
 5    investigated."
 6                    Do you stand by that finding?
 7          A.          Yes, ma'am.
 8          Q.          Did you find instances where
 9    complaints of misconduct against the department were
10    not timely investigated?
11          A.          Yeah, just what we've talked about
12    here today regarding the complaint made by Ms. Dahl.
13          Q.          The only complaint of misconduct
14    against the department that you are aware of is the
15    complaint made by Ms. Dahl; is that correct?
16          A.          That is correct.
17          Q.          And in this finding you say,
18    "including anonymous complaints."
19                    Do you know why you would have
20    included anonymous complaints, if you're referring
21    to a complaint that took the form of a federal civil
22    lawsuit?
23          A.          Well, I mean, I think that's a
24    general statement that says that departments should
25    take all complaints.  The practice across the
```

Lexitas TENNESSEE
(615) 595-0073

1   country is that we take complaints, whether they're
2   made by someone, whether they're anonymous or
3   third-party. I don't know. That right there, I'm
4   not dealing with specifically the Dahl case or any
5   complaint, because we know -- we know who those
6   people are. But just as a general practice, all
7   complaints should be taken, whether you know who the
8   complainant is or not.
9        Q.      And that's true whether the
10  complaint is -- or that remains true if a complaint
11  is coming from a citizen; is that correct?
12       A.      True.
13       Q.      Moving to Page 33, Finding No. 6
14  is, "Supervision was insufficient to ensure full,
15  fair, and complete investigations."
16               Do you stand by that finding?
17       A.      Yes.
18       Q.      Looking at Recommendation No. 6, it
19  says, "PD" -- I think that's police department,
20  right?
21       A.      Yes.
22       Q.      "Police department supervisors
23  shall conduct a periodic review of closed cases and
24  cases where victims declined to participate in the
25  investigation identifying any systemic problems.

```
 1    Periodic reviews shall include a review of case
 2    files, recorded interviews, and victim and advocate
 3    feedback for investigate comprehensiveness and
 4    indications of bias."
 5                    Do you stand by that
 6    recommendation?
 7            A.      Yes.
 8            Q.      Do you know if JCPD has accepted
 9    this recommendation?
10            A.      I don't.
11            Q.      Let me phrase that differently.
12                    Do you know if JCPD has implemented
13    this recommendation?
14            A.      I don't.
15            Q.      Finding No. 7 says, "Department
16    policies and procedures do not meet industry
17    standards and legal requirements to investigate
18    sexual assault investigations."
19                    Do you stand by that finding?
20            A.      Yes.
21            Q.      Finding No. 8 on Page 34 says,
22    "Department training is insufficient to effectively
23    conduct unbiased sexual assault and related
24    investigations."
25                    Do you stand by that finding?
```

```
 1           A.       Yes.
 2           Q.       Following the -- well, let me ask
 3    you this.
 4                    Once you completed your report,
 5    what did you do with respect to communicating to the
 6    City?
 7           A.       I sent it to them, and there was --
 8    there was a handful of errors that they identified,
 9    scrivener's errors with spellings and people's names
10    were wrong.  We got back those.  We made corrections
11    and respond -- we returned back the report to them,
12    because they were looking to release it.
13           Q.       Did anyone at the City express
14    disagreement with your findings?
15           A.       Not to my --
16                    MR. LAKEY:  Objection to form.
17           Q.       (BY MS. KRAMER) Let me restate
18    that.
19                    Did anybody from Johnson City
20    express disagreement with any of the findings in
21    your audit?
22                    MR. LAKEY:  Objection to form.
23           Q.       (BY MS. KRAMER) Sorry.  I did it
24    again.
25                    Did anybody express to you -- did
```

Lexitas - TENNESSEE
(615) 595-0073

1    anybody express to you -- no.  Trying it again.

2                       Did anybody from the City express

3    to you disagreements with the findings that you made

4    in your audit of sex-related crimes?

5           A.       No.

6           Q.       When was the last time you spoke

7    with Cathy Ball?

8           A.       Probably -- probably either right

9    before release of the report or after or while the

10   report was being released.  I don't even remember

11   speaking with her then, but that would -- I haven't

12   had any contact with anybody since the report was

13   released.

14          Q.       How about D.A. Finney?

15          A.       I haven't spoken to him since our

16   interview in December of 2022.

17          Q.       Have any members of the media

18   reached out to you regarding your audit of

19   sex-related crimes?

20          A.       They call, but I don't take their

21   calls.

22          Q.       Are you aware of being contacted

23   specifically for the audit of sex-related crimes you

24   did for Johnson City?

25          A.       Well, it made national -- it made

```
 1    news all over the place.  So I'm -- I'm -- we get
 2    phone calls all the time and, you know, I don't
 3    remember exactly who or when, but people do call.
 4    And we have a -- I have a no comment policy, so --
 5                    MS. KRAMER:  Chris, can you tell me
 6           what the time is?
 7                    COURT REPORTER:  I'm sorry.
 8                    MS. KRAMER:  Chris, can you give me
 9           the time, please?
10                    COURT REPORTER:  Yeah, we have
11           right about --
12                    VIDEOGRAPHER:  We're at --
13           actually, we're at 27 minutes right now.
14                    MS. KRAMER:  So the total time?
15                    VIDEOGRAPHER:  27 plus -- five
16           hours and 37 minutes is where we're at.
17                    So 37 plus 27 is -- hold on.
18           Sorry.  I can't do it on the fly.
19                    So basically six hours, five
20           minutes -- four minutes.  Six hours, four
21           minutes; is that right?
22                    COURT REPORTER:  Yeah, that's what
23           I've got.
24                    MS. KRAMER:  Okay.  Let me take a
25           few minutes to go over my notes and see if
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1            there are any additional exhibits that I
 2            want to mark.  So let's take a --
 3                      VIDEOGRAPHER:  Off the record?
 4                      MS. KRAMER:  Thank you.
 5                      VIDEOGRAPHER:  Are we off the
 6            record right now?
 7                      COURT REPORTER:  Yes.
 8                      VIDEOGRAPHER:  Okay.  We are off
 9            the record.  The time is 5:31 p.m. Eastern
10            time.
11                (Off the record at 5:31 p.m.)
12                (On the record at 5:42 p.m.)
13                      VIDEOGRAPHER:  Okay.  We are back
14            on the record.  The time is 5:42 p.m.
15            Eastern time.
16     BY MS. KRAMER:
17            Q.        Mr. Daigle, can I direct you to
18     Page 28 of your report, please?
19            A.        Yes, ma'am.
20            Q.        And under the table reflected in
21     Image 12, the report states, "During our review, we
22     found significant cases closed as exceptional
23     clearance, specifically prosecution declined and
24     victim refused to cooperate."
25                      Could you read the next paragraph
```

1    for me, please?

2            A.        "We conducted a deeper analysis of

3    exceptional clearances related to the closure of

4    rape cases.  In evaluating 2018 to 2022 rape cases,

5    the total number of exceptional clearances was 66.

6    Of the 66 cases, in 17 cases, or 25 percent, the

7    investigator cited the reason for the exceptional

8    clearance as the victim being unwilling to prosecute

9    or move forward with the investigation.  In 21

10   cases, or 31 percent, the investigator cited the

11   reason for exceptional clearance as the victim being

12   uncooperative.  Most of these involve the

13   investigator not being able to contact the victim or

14   the victim not returning phone calls or messages.

15   In 27 cases or 40 percent, the investigator cited

16   the reason for the exceptional clearance as the

17   prosecution declined based upon a conversation

18   between the investigator and the prosecutor.  A few

19   had email exchanges, however, most were verbal

20   conversations.  In one case or one percent, the

21   exceptional clearance was based on the fact that the

22   suspect was deceased."

23           Q.        Do you stand by the findings that

24   are reflected in that paragraph, Mr. Daigle?

25           A.        Yes, ma'am.

```
 1          Q.        And what information did you obtain

 2    from the City in order to calculate these

 3    percentages?

 4          A.        So we've gone through a lot of

 5    things to include the documents, 120, 121 and, more

 6    importantly, 122, which are the -- you know, the

 7    case conclusions that was identified in Exhibit 122.

 8    And that's where that information would come from.

 9          Q.        Did you review any emails as part

10    of your investigation -- or sorry.

11                    In connection with your audit, did

12    you review any emails from JCPD?

13          A.        Emails and -- just any email?  I'll

14    just don't know what category.  Emails sent from who

15    to who?

16          Q.        Did you have the opportunity to

17    look at any emails, for example, between an

18    investigator and prosecutor?

19          A.        If they were contained in the case

20    file.

21          Q.        Aside from an email being contained

22    in the case file, did you have an opportunity to

23    review any emails from Johnson City?

24          A.        No.

25          Q.        You didn't see any emails, for
```

```
1    example, between members of the department.
2                    MR. LAKEY:  Objection to form.
3            A.      Unless they were contained in the
4    disclosure of case files, no.
5            Q.      (BY MS. KRAMER) Did you ask to see
6    any emails to or from investigators?
7            A.      No, because it's really not part
8    of -- you know, if it -- if it's going to be
9    audited, it should be part of the case file.
10           Q.      If you can look back at
11   Exhibit 116, and specifically I'm looking at Bates
12   CITY-0066593-3.  And this is the TIBRS Data
13   Collection Manual exceptional clearances document
14   that we reviewed earlier.
15           A.      Yes, ma'am.
16           Q.      Do you see that?
17           A.      Yes.
18           Q.      It says, "An incident is cleared
19   exceptionally when a qualifying element beyond law
20   enforcement control prevents a physical arrest.  All
21   four of the following conditions must be met to
22   clear an offense by exceptional means."
23                   Did I read that correctly?
24           A.      Yes.
25           Q.      No. 1 is, "The investigation must
```

Lexitas - TENNESSEE
(615) 595-0073

have established the identity of at least one offender.  This means the agency knows at least one offender's sex, race, age, ethnicity, and resident status."

No. 2, "Sufficient probable cause must have been developed to support the arrest, charging, and prosecution of the offender."

No. 3 is, "The exact present location of the offender must be known so that an arrest could be made."

And No. 4 is, "There must be a reason outside of law enforcement control preventing offender's arrest.  The valid reasons and explanations are provided below."

Did I read that correctly?

A.       Yes.

Q.       Did you have any way to determine whether a case closed by exceptional means by the Johnson City Police Department met all four of the conditions reflected here in Exhibit 116?

A.       No, and that's why I had concerns with the manner and mechanism of them closing these cases by exceptional clearances.  Often a lot of this wasn't met.

By the way, just for the record,

1     there is -- this is just a snippet taken out of the
2     TIBRS Manual.  There is a whole section in the TIBRS
3     Manual about exceptional clearances, which goes into
4     way more detail of what this all means and how.
5     Unfortunately, I spent way too much time trying to
6     figure it out.
7                     But on its face, this is the rule.
8     But the TIBRS Manual actually has additional
9     information as to how to consider different things.
10                    But the answer to your question is
11    a lot of times, in our review of the documents, the
12    elements were not in the document that led to a
13    conclusion or a close by an exceptional clearance.
14         Q.      The portion of the TIBRS Data
15    Collection Manual that you see in Exhibit 116, this
16    is all that Johnson City provided to you; is that
17    correct?
18         A.      Yeah, but I have Google.
19         Q.      And then so you went and
20    independently found the other portions of the TIBRS
21    Data Collection Manual relating to exceptional
22    clearances; is that correct?
23         A.      Yeah.  I mean, as we talked about
24    today, it was a subject of all of my sit-downs with
25    people, because I was really trying to understand

Lexitas TENNESSEE
(615) 595-0073

```
 1    the nuances which allows the investigators to close

 2    it by this means.

 3            Q.       And is it your understanding

 4    that -- let's take, for example, victim refused to

 5    cooperate.

 6                     Is your -- is it your understanding

 7    that if that's the clearance code, that for that to

 8    be correctly used to close a case, all four of the

 9    conditions identified in Exhibit 116 have to be met?

10                     MR. LAKEY:  Objection to form.

11            A.       Yes, which is what makes it so

12    difficult to understand.

13            Q.       (BY MS. KRAMER) And when you say

14    makes it so difficult to understand, what are you

15    referring to?

16            A.       Well, basically what this

17    exceptional clearance is identifying is that it's

18    telling you you have all authority under the law --

19    sorry to you guys.  I put my piece of paper up

20    there.

21                     All authority under the law to

22    arrest the individual for the crime, but there is

23    something that's allowing a clearance of that.  And

24    as I identified in my report, often that clearance

25    was lumped into either prosecution declined or
```

1   victim uncooperative without the justification to

2   support it.

3                    You know, what does that mean?

4   It's just, "I had a conversation with the prosecutor

5   and they said drop it.  Okay.  Well, there's not

6   enough here to support that."  And that was -- it is

7   very confusing.  I'm going to tell you, we spent a

8   lot of time trying to understand how it works.

9                    And I'll be honest with you, I

10  think you asked me this question before, I don't

11  think the Johnson City Police Department understands

12  how it works because of the -- because of the

13  inconsistencies that they had in the manner to close

14  it, so --

15           Q.      But you agree it's their

16  responsibility to understand why they're closing a

17  case, correct?

18                    MR. LAKEY:  Objection to form.

19           A.      Yes, because they have to submit it

20  to the State.

21                    MS. KRAMER:  Okay.  I don't have

22           any more questions right now.  I will

23           reserve the rest of my time for follow up.

24                    And thank you very much for your

25           time today, Mr. Daigle.

Lexitas - TENNESSEE
(615) 595-0073

```
 1                    THE WITNESS:  Thank you.

 2                    MR. LAKEY:  And just for the

 3           record, this is Jon Lakey.  We've met during

 4           the -- during the course of the day.  I

 5           represent Johnson City.

 6                    MS. KRAMER:  I'm sorry, Jon.

 7                    COURT REPORTER:  Hey, Jon, can you

 8           make your microphone a little bit louder?

 9                    MR. LAKEY:  Yes, I will.

10                    MS. KRAMER:  I do have one more

11           question.  I'm sorry.  It's going to be

12           fast.  I'm sorry about that.

13  BY MS. KRAMER:

14           Q.     Sorry, Mr. Daigle.  I almost let

15  you go, but I realized I asked you earlier if you

16  had spoken with any defense counsel prior to your

17  deposition today, and you told me about your

18  conversation with Danny Rader, correct?

19           A.     Yes.

20           Q.     And I didn't actually ask you by

21  name if you had had any other conversations.  So

22  I'll do that just to make that question more clear.

23                    Did you talk to Erick Herrin prior

24  to your deposition today?

25           A.     No.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1          Q.      Have you talked to Erick Herrin
 2    ever?
 3          A.      I believe I have at some point.  I
 4    just I don't know whether it was to set up -- I
 5    don't -- it wasn't a substantive conversation.  I
 6    might be completely wrong, but the name sounds
 7    familiar to me.
 8          Q.      You didn't interview him in
 9    connection with the audit that you did of the
10    Johnson City Police Department sex crimes
11    investigations, correct?
12          A.      I did not interview any attorneys,
13    no.
14          Q.      Have you spoken to Emily Taylor
15    prior to your deposition today?
16          A.      No.  I'm only getting confused
17    because there's so many emails.  We talked about the
18    emails.  So other than -- but physical talking, I
19    don't think so.
20          Q.      About Kristen Berexa, did you speak
21    with Kristen Berexa prior to your deposition today?
22          A.      Not to my knowledge.
23          Q.      And how about Keith Grant?  Did you
24    speak to him prior to your deposition today?
25          A.      No.
```

Lexitas - TENNESSEE
(615) 595-0073

```
 1              MS. KRAMER:  Okay.  Now I'm done.
 2      Thank you.
 3              THE WITNESS:  Thank you.
 4              MR. LAKEY:  Just real quick, what
 5      time are we at, total time used?
 6              COURT REPORTER:  Let's see.  5:42.
 7              VIDEOGRAPHER:  That's 12 minutes
 8      for this.
 9              MR. LAKEY:  That's six hours and
10      16 minutes by my math.
11              Does that sound right?
12              VIDEOGRAPHER:  Yes, I think so.
13              MR. LAKEY:  Okay.  So just so we're
14      clear on the record, Mr. Daigle, I'm Jon
15      Lakey.  I represent the City of Johnson
16      City, and we're reserving our questioning
17      until -- I think we're set to come back to
18      your beautiful area on August 19th for your
19      deposition when the defendants will depose
20      you.
21              And, as Ms. Kramer said, she's
22      reserved some follow up.  And if we don't
23      use up all our time, we may just follow up
24      right after she's done.
25              Is that acceptable?
```

Lexitas TENNESSEE
(615)595-0073

```
 1                    THE WITNESS:  Yes, sir.

 2                    MR. LAKEY:  Okay.  Thank you.

 3                    COURT REPORTER:  Is that it?

 4                    MS. KRAMER:  That's all she wrote.

 5                    VIDEOGRAPHER:  Okay.  We are off

 6         the record.  The time is 5:55 p.m. Eastern

 7         time.

 8                    FURTHER THIS DEPONENT SAITH NOT.

 9             (Deposition ended at 5:55 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                C E R T I F I C A T E

 2   STATE OF TENNESSEE:

 3   COUNTY OF KNOX:

 4

 5              I, Jeffrey D. Rusk, Registered

 6   Professional Reporter and Notary Public, do hereby

 7   certify that I reported in machine shorthand the

 8   foregoing proceedings; that the foregoing pages,

 9   inclusive, were prepared by me using computer-aided

10   transcription and constitute a true and accurate

11   record of said proceedings.

12              I further certify that I am not an

13   attorney or relative of any attorney or counsel

14   connected with the action, nor financially

15   interested in the action.

16              Witness my hand and official seal

17   this the 10th day of June, 2024.

18

19

20   _____

21   Jeffrey D. Rusk, RPR, CLVS
     Notary Public at Large
22   My Commission Expires:  4/29/2026
     TCRB License No. 212

23

24

25
```