IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

B.P.
, H.A., and S.H., individually, and on )
Behalf of all others similarly situated, )
                                         )
      Plaintiffs,              )
                                         )
VERSUS                                   )        No. 2:23-cv-00071-TRM-CRW
                                         )
CITY OF JOHNSON CITY, TENNESSEE,         )
et al,                                   )
      Defendants.              )

<u>RESPONSE IN OPPOSITION</u>
<u>TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER ON BEHALF OF
DEFENDANTS PETERS AND SPARKS</u>

Defendants Peters and Sparks join in the Responses filed by the City and other

individual Defendants, and adopts those Responses by reference. Defendant Peters and

Sparks also submit this additional response to address the allegations concerning the

previous questioning of the named Plaintiffs, and the appropriateness of same, as relates

to the ongoing need to depose Female 8, Female 9, and Female 12. The three individuals

from whom discovery is sought by all Defendants in this case are all individuals

specifically listed by Plaintiffs in their Rule 26 disclosures, supplemented as recently as

April 3, 2024 (after the Second Amended Complaint was filed). These individuals are

listed as individuals "that the disclosing party may use to support its claims or defenses."

Fed. R. Civ. P. 26(a)(1)(A)(i). In other words, these are individuals that may well submit

testimony in support of Plaintiffs' claims in this lawsuit. Defendants have a right to discover the facts known by these likely witnesses, specifically Females 8, 9 and 12.

Moreover, there is a specific need for this discovery aside from the Plaintiffs' voluntary injection of these individuals into the case. The claims in this case are broader than the individuals. The claim is that the Defendant police officers should have charged Sean Williams sooner or differently than they did. The evidence potentially available to these officers concerning these individuals and their allegations is highly and independently relevant to those issues.

The timeline is a key issue, and testimony from the named Plaintiffs H.A. and B.P. do not aid in establishing the timeline—the testimony makes it even less clear. B.P.'s deposition testimony was almost entirely inconsistent with the contemporaneous records, including a third-party medical record. And as already noted for the Court, (DE 212, 214), Plaintiffs failed to provide B.P.'s contemporaneous text messages prior to her deposition, which when eventually produced further contradicted her testimony.

With respect to H.A., Peters counsel spent approximately 20 minutes and Sparks' counsel spent approximately 38 minutes asking H.A. questions, as Plaintiffs were strictly enforcing the seven (7) hour rule to the minute. Fed. R. Civ. P. 30(d). H.A.'s testimony established that she has no first-hand factual information concerning the claims against Defendants Sparks and Peters.

Plaintiff H.A. stated that Plaintiffs' lawyers are the ones with the relevant

knowledge:[1]

Q.  Do you know who Kevin Peters is?

A.  I believe he's the officer here, one of the officers here.

Q.  All right.  Do you know anything that he has done with respect to Sean Williams at all?

A.  Specifically him?

Q.  Yeah.

A.  I do not know.  **That's not my job to know, so I would say that would be something <u>my lawyers would know</u>.**  I don't specifically know that information, those details about him.

Q.  All right.  As we sit here today, you can't say anything about Mr. Peters as to what he has done or hasn't done, what he should have done, anything about him personally, can you?

MS. KRAMER:  Objection.

A.  I'm sorry, can you repeat that question?

Q.  Sure.  You can't -- as we sit here today, you can't say anything about Mr. Peters, what he did do, what he didn't do, what he should have done, anything about him personally.  Is that correct?

MS. KRAMER:  Objection.

---

[1] This testimony by H.A., coupled with the numerous, (purportedly) substantive-fact declarations submitted in this case by Plaintiffs' counsel, Ms. Baehr-Jones, creates the serious concern that Ms. Baehr-Jones is herself a critical witness in this case, as she is evidently the one with purported knowledge of the allegations of Plaintiffs' operative complaint.  Tenn. Sup. Ct. R. 8, RPC 3.7.  This Defendant is making every proper effort to obtain the factual information from the litigants and witnesses, trying to avoid the apparent conflict of requesting the deposition of Plaintiffs' attorney.  Plaintiffs' attorneys had to get whatever knowledge they had from somewhere.  The individuals identified in Plaintiffs' Rule 26(a)(1)(A)(i) supplemental disclosures *should* be the ones with that knowledge (since that is what that Rule requires to be disclosed), hence discovery sought from the individuals.  Even after the initial draft of this Response was prepared, and during the deposition of DA Steven Finney <u>today</u>, Ms. Baehr-Jones asked Mr. Finney dozens of questions about her own conduct involving the underlying facts (as opposed to this litigation) – the investigation and potential prosecution of Mr. Williams, including her own alleged interference in the DA's attempt to prosecute Mr. Williams, the DA's concerns about the ethics of her own conduct in that context, and many other matters involving the underlying facts.  Ms. Baehr-Jones asking a third-party witness dozens of questions about herself and her own actions is peculiar and somewhat concerning.

3

A.  In regards to what?

Q.  About Sean Williams or any of the allegations in the second amended complaint.

MS. KRAMER:  Objection.

A.  Again, I feel like the question is too broad for me to provide an answer to.

Q.  Can you identify a single thing that Kevin Peters did wrong?

A.  Broke the law.

Q.  All right.  What law do you say that Kevin Peters broke?

A.  I don't know the law.

Q.  What is it that you say that Kevin Peters did that you say broke the law?

A.  As I stated earlier, the extortion involving Sean Williams with the money issues.

Q.  All right.  What is the basis for you to say that Kevin Peters was involved in any extortion involving Sean Williams, that individual?

A.  **That is not my job to explain.  <u>That is my lawyers' job</u>.**

Q.  Do you have any basis that you can say as you sit here today as the Plaintiff in this lawsuit to say that Kevin Peters personally was involved in any extortion scheme?

MS. KRAMER:  Objection.

A.  I can say that the Johnson City Police Department did.

Q.  Okay.  Can you identify any witness to say that Kevin Peters personally did anything to be involved in any extortion scheme or otherwise did anything wrong as alleged in your complaint?

MS. KRAMER:  Objection.

A.  Okay, the question one more time.  I apologize.

4

Q. Can you identify any witness as you sit here today who can say that Kevin Peters did anything personally wrong, or was involved in an extortion scheme, or did anything that's improper as described in your second amended complaint?

MS. KRAMER: Objection.

Q. Any witness at all? Can you name one?

MS. KRAMER: Objection.

A. At this time, I'm not certain.

Q. When are you going to be certain?

MS. KRAMER: Objection.

A. When the evidence is provided and through discovery.

Q. So you don't -- you can't name a single witness today. Can you provide a single document today?

MS. KRAMER: Objection.

A. **That is not my responsibility. <u>It is the responsibility of my lawyers</u>.**

Q. Okay. So the answer is no, you can't identify a single document today. Is that correct?

MS. KRAMER: Objection.

A. I would not say that's factual. I can say that I'm not certain at this time.

Q. Can you identify any individual, a Johnson City Police Department officer, who -- who was involved in an extortion scheme? Can you name one?

A. The men sitting here that have been -- we have claimed in the statements.

Q. Do you even know who these people are?

A. I know who the Johnson City Police Department is.

5

Q.  So your -- your allegations are broad against the Johnson City Police Department, but you can't name anything about any individual person.  Is that right?

MS. KRAMER:  Objection.

A.  I believe there is evidence that provides that identification for those crimes.

Q.  And I'm asking you, Ms. [H.A], as the Plaintiff in this lawsuit, can you identify any fact about any individual Johnson City Police officer that that person did something wrong, was involved in an extortion scheme, or did anything improper as in your second amended complaint?

MS. KRAMER:  Objection and this...

Q.  Can you name them?

MS. KRAMER:  ...this has gone on -- this has been asked and answered so many times, I will instruct the witness not to answer.

Q.  There's a specific court order that says that you cannot do that.  Do you want to violate that court order?

MS. KRAMER:  I know exactly the court order.

Q.  And it says the only instruction that you can give is if it's privileged.

MS. KRAMER:  It's a short -- well, okay, I can go to the court if you want to do that.  I can call.

Q.  Are you going to terminate the deposition?

MS. KRAMER:  We can...

Q.  Just answer the question, Ms. [H.A.].

MS. KRAMER:  If you would like to -- you have asked the same question ten times.

Q.  No, I have broadened it.

MS. KRAMER:  And you're asking it improperly on a number of bases, so if you -- you can answer one more time.  If you want me to terminate, then we can deal with that when we do.

6

Q.  Can you -- can you identify any fact personally about any Johnson City Police officer that you claim that these individuals did wrong, or were involved in an extortion scheme, or anything else as alleged in your complaint?

MS. KRAMER:  Objection.

A.  Again, I believe that the facts are in the filing that has been provided.

Q.  And there are no facts that are not in the filing that you know of.

A.  False.  That's false.

Q.  And so that's the question.  What facts do you know of that are not in the filing that you claim that any of these individuals, not just some broad scattershot Johnson City Police Department, but any of these individuals, can you tell me any facts that are not in your filing?

MS. KRAMER:  Objection.

A.  **I cannot tell you any facts that are not in the file.  <u>That is the responsibility of my lawyers</u>** as well as other Defendants in this case.

Q.  Okay.  And can you identify any witnesses about any of these facts that you've said are not in the filing?

A.  It's possible.

Q.  I'm asking you right now can you name a single witness?

A.  At this time, no, I cannot name them at this time.

Q.  Okay.  Can you identify a single document at this time?

MS. KRAMER:  Objection.

A.  I'm not certain.

[Deposition of H.A., p. 276 line 19 through 282 line 9]

With respect to her knowledge of the claims against Sparks, HA testified as

follows:

Q. So the answer to that is you don't know what Turner did to

7

participate or in furtherance of this sex trafficking venture?

A. That would be accurate, yes.

Q. What about Toma Sparks?

MS. KRAMER: Object to form.

A. Again, I would -- my statement would be the same.

Q. Which is you don't -- you don't have any information regarding his participation in the sex trafficking venture.

A. Correct.

(H.A. Depo p. 51: line 4-14)

Q. You never saw – let's be very specific.  You never saw my client, Toma Sparks, receive money from Sean Williams, correct?

Ms. Kramer:  Objection.

Q.  Okay. Well, let me ask it this way. Until today, you didn't know what Toma Sparks looked like, correct?

A. I think that's a fair statement.

Q. Okay. So if you didn't know what he looked like, you would not have known that Toma Sparks was receiving money at any point in time from JCPD officers or, I mean, from Sean Williams, correct?

A. Correct.

Q. So you have no firsthand knowledge of that.

MS. KRAMER: Objection.

A.  To my recollection, no.

8

(H.A. Depo P. 236: lines 12-22)

These questions are simply trying to get to the facts and witnesses concerning the serious allegations of this case. Of course, none of these questions are even remotely improper (certainly not "bizarrely confrontational and veered into bullying" as Plaintiffs falsely stated in their Motion), despite the repeated objections by Plaintiffs' counsel in their attempts to obfuscate the testimony and/or run out the clock.[2] Simply trying to identify what facts are being offered against the individual Defendants, and what witnesses there might be, are generally routine and typical questions. This is particularly significant considering the legal claims in this case, as the individual Defendants can only be liable for their own conduct.

With respect to the questions of B.P., her testimony flatly and irrefutably contradicted the contemporaneous medical record prepared by a non-party convenient care clinic. B.P. was given every opportunity to clarify her position, and counsel for

---

[2] Plaintiffs' Motion takes two more potshots at the undersigned, first criticizing that counsel <u>asked permission</u> to ask a single additional question after H.A. requested a break, and second for "standing" during a short portion of H.A.'s deposition while passing her exhibits. Both criticisms are truly ridiculous. As to the latter, it is not reflected in the transcript at all because not a word was said as it was a complete non-issue, but the undersigned did stand very briefly while handing exhibits to the witness, simply trying to very quickly conclude his extremely short examination at the tail end of the deposition due to the Plaintiffs' insistence on the time constraints. Plaintiffs' attorney was smiling and laughing about this after the deposition.

As to the former, there was a portion of the deposition where all parties had been asked to leave the deposition room for an "attorneys' eyes only" portion by agreement. The transcript clearly reflects that undersigned simply wanted to try and conclude that portion so all could return and <u>asked as courteously as one could, for permission</u> to ask one more question to end that portion of the deposition so that after the requested break, all parties would be permitted to return rather than disruptively moving everyone around and around again. And when the witness said no, the break proceeded as requested without any fuss. This is absolutely not abusive or problematic at all:

A.      Can I take a break?
MR. RADER:  Before you do, can I just as you one more question, please?  So, while we've got everybody out…
A.      I'm sorry, but aren't I allowed to ask for a break?  And If you ask me a question, I have to answer it, and I would like a break now, please.
MS. BAEHR-JONES:  Yes.
COURT REPORTER:  It's 5:14, and we're off the record.
[Depo of H.A., p. 189, line 20 through p. 190 line 2].

Peters even specifically <u>and respectfully</u> suggested in a question to B.P. the possibility that perhaps her memory was less accurate some years later. But B.P. insisted on her testimony that her deposition version was true notwithstanding the incompatibility with the contemporaneous records in multiple respects, about both things that matter a lot, and things that matter somewhat. But it all matters. (See, e.g., Deposition of B.P., p. 70 line 24 to p. 71 line 25[3]) There are numerous other examples in the transcript of B.P. contradicting these contemporaneous records, including questions by all attorneys.

As to counsel for Sparks, Plaintiffs' Motion contends that some of her questions were attempts at victim blaming and unnecessary because all counsel supposedly know that videos and images corroborate the alleged assault. D.E. 245, Page ID3 6908-6909.[4] First, the line of inquiry regarding the hoodie B.P. was wearing and how many drinks B.P. had the evening of the assault are relevant and completely appropriate. The number of drinks and alcohol consumed is relevant as to her ability to recall the events of the evening. As to the hoodie B.P. was wearing, B.P. discusses that the condition of the hoodie made her think that maybe she had been assaulted. There were other questions with respect to any lasting physical effects of the assault. These questions were appropriate and respectfully asked. These questions also occurred with only attorneys present, the defendants themselves were out of the room. D.E. 244, Motion to file Exhibits under Seal, and Exhibits 1 and 2 attached.

---

[3] The parties are still discussing whether the B.P. excerpts can be filed in the public record or under seal.
[4] Plaintiffs allege multiple times in their motion that video and photographic evidence corroborate the alleged assaults. However, defense counsel does not have this evidence or the details of any supposed evidence at this time, or even specifically who might be reflected by such evidence, if anyone related to this case. The earliest actual testimony that confirmed that such videos existed came <u>today</u> from DA Finney; but no names or details were revealed.

10

The facts, circumstances, and timeline matter significantly, as B.P. claims that the contemporaneous statements in the police investigative reports are simply not true, including the fact that the police and even B.P.'s own friend tried to get B.P. to cooperate in the investigation, but B.P. ghosted them. Deposition of B.P., p. 267 line 23 through 270 line 23 (filed under seal because it relates to potential criminal prosecution of Sean Williams).

This version of facts that B.P. now asserts to have occurred, versus the version of facts contemporaneously recorded by disinterested non-party witnesses and by B.P.'s own text messages that she failed to produce until after her deposition, go directly to whether the police should have been able to do anything different. This is essential to determine prior to trial.[5]

And of course, Plaintiffs later provided text messages with B.P. after the deposition, which further contradict B.P.'s story at the time, and her story in the deposition. DE 212, 214. It is B.P.'s contradiction of her own texts, her own non-party records, and all other contemporaneous materials that has Plaintiffs' attorneys so agitated, not the questions that B.P. was asked by defense counsel.

Plaintiffs' counsel may not like the questions because they do not want their clients to be pinned down on their testimony prior to the trial; but it is essential to lock in this important testimony, particularly where it is contradicted by the contemporaneous

---

[5] On May 24, 2024, the day after B.P.'s deposition on May 23, 2024, when it became clear that neither H.A. nor B.P. had any evidence to support their claims against the defendants, Peters' counsel wrote Plaintiffs' counsel concerned about B.P.'s misstatements and requesting that the frivolous suit against Mr. Peters be dismissed. The undersigned posits that perhaps it is this letter that has so incensed Plaintiffs' counsel to result in the flurry of *ad hominem* attacks that followed thereafter. See attached Exhibit.

11

documents prepared by non-parties with no reason to lie. It goes to the individual Plaintiff's credibility and the reliability of their self-serving testimony, which is especially important where they admit that they have no facts or witnesses to support their claims against these individual Defendants.

With respect to the "unnamed class members," who are listed by Plaintiffs as witnesses with knowledge likely to testify, it is likewise essential to pin down their testimony about their experience with the JCPD, in addition to the other substantive facts in the case. For if the named Plaintiffs admit they have no evidence, someone must somewhere in order to sustain a claim. One is left with no option but to conclude those "someones" are the individuals named in Plaintiffs' Rule 26 disclosures.

And these individuals have specific knowledge that directly contradicts the testimony of the named Plaintiffs. For instance, Female 9 is the sister of H.A.[6] Concerning the timeline, Female 9 is also Jane Doe 5 in the Original Complaint (DE 1), Female 9 claims that she was a victim of Sean Williams "in mid-October 2020" (¶ 90), and reported it immediately (¶ 93) and had a rape kit on October 23, 2020 (¶ 94). But in H.A.'s deposition, H.A. testified that she was assaulted by Williams in "September or October 2020" (H.A. depo p. 30), but that it had to be before October 18, 2020 which was the last day she was ever at Sean Williams's condo, (H.A. depo p.40), (which date she

---

[6] This relationship was not revealed to the Court during the May 2, 2024 hearing, when Plaintiffs' counsel directly told the Court that the victims did not know each other (in arguing against the search for text messages between them). They revealed this sister relationship for the very first time in a meet and confer email (as required by the Court in the hearing) on May 7, 2024. Further, Plaintiff B.P. testified in her own deposition that she was friends with Female 9 and testified that she visited Female 9 at her apartment, where Female 9 lived with H.A., and B.P. also knew H.A. (despite Plaintiffs' counsel's representation to the Court on May 2 that they did not know each other).

12

had to testify to because contemporaneous text messages prove a falling out with Sean Williams that suggest a different factual reason). Critically, H.A. also testified that immediately after her assault, H.A. called her sister Female 9 and told her about the sexual assault (H.A. depo p. 78).

So H.A.'s testimony is flatly incompatible with Female 9's allegations in the Original Complaint, because Female 9 surely did not get sexually assaulted by Sean Williams on October 23, 2020, some five (5) days after the last day H.A. was there, and after H.A. had warned Female 9 that the sister H.A. herself had been sexually assaulted by him there.

Similarly, Female 8 has become a central player in this case. Female 8 reported in July 2022 (after the *Dahl* lawsuit was filed) that she had been assaulted years earlier. Her interview was videoed. The allegations in the lawsuit relating to Female 8 are flatly incompatible with the statements that Female 8 made on this recording. Moreover, Plaintiffs' attorney Ms. Baehr-Jones asked DA Finney numerous questions about the Female 8 investigation as well as the Female 12 investigation, in DA Finney's deposition occurring the very same day this Response is filed. The DA specifically determined not to charge the crimes alleged by Female 8 and Female 12 (at least until video evidence was discovered in North Carolina when Williams was eventually arrested much later, at which time the cases were reopened). But this goes directly to what the City could have done and when.

Plaintiffs are simply incorrect insofar as they argue that the Defendants may not have discovery from other individuals simply because they might be members of a class,

13

especially where most of whom were original Plaintiffs in the case. And Plaintiffs cannot establish good cause necessary for the entry of a protective order.  Fed. R. Civ. P. 26(c).

This question has previously been briefed:  The <u>only</u> unusual fact in this entire dispute is that these named Plaintiffs elected to shift (after receiving written discovery in November 2023) from being named Plaintiffs to putative class members, and apparently only because they received such discovery.  But this single unusual factor has been squarely addressed by cases discussed by this Defendant in his Motion to Compel and memorandum (Docket Entry 152 and 153) and prior briefing.  *See In re Drassinower*, 2021 WL 3772328 (S.D. Cal. 2021) (holding "she also 'injected herself into the litigation' as a named plaintiff, who agreed to participate in the case in a representative capacity, and now cannot avoid discovery by withdrawing from the case."); *Burnett v. Ford Motor Co.*, 2015 WL 3540886 (S.D. W.Va. 2015); *Alliance For Global Justice v. District of Columbia*, 2005 WL 469593, at *3 (D.D.C. 2005).

There is simply no basis to deny this important discovery simply because these original Plaintiffs now choose to hide behind other Plaintiffs, <u>particularly where the now-named Plaintiffs refuse to substantively answer the most basic questions about facts and witnesses</u>.

The standard is well-settled, that a party seeking a protective order must show "good cause," by showing specific facts:

> The rule requires that good cause be shown for a protective order. **This puts the burden on the party seeking relief to show some plainly adequate reason therefore. <u>The courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements, in order to establish good cause</u>.** This recognizes that the existence of good cause for a protective order "is a factual matter to

14

be determined from the nature and character of the information sought by deposition or interrogatory weighed in the balance of the factual issues involved in each action."

If a protective order is denied, the court, under a provision added by the 1970 amendment, may go a step farther and issue an affirmative order compelling the discovery that was sought.

§ 2035 Procedure for Obtaining Protective Orders, 8A Fed. Prac. & Proc. Civ. § 2035 (3d ed.) (footnotes omitted, emphasis added).

This Court, following Sixth Circuit precedent, has cautioned that there must be a showing of "specific harm" in order to grant a protective order.  In *Maxchief Investments Ltd. V. Plastic Development Group, LLC*, 2017 WL 710956 (E.D.Tenn. 2017), the Court held that "thumbnail, generic characterizations do not amount to manifestation of a protectable" interest under the facts of that case.  The Court held:

> Even in patent-infringement suits, when parties fail to show good cause under Rule 26(c), the Federal Circuit has, in multiple cases, refused their requests for protective orders. See, e.g., *Iris Corp. Berhad v. United States*, 84 Fed. Cl. 489, 492–94 (Fed. Cir. 2008) (denying the plaintiff's motion for protective order because the plaintiff failed to show good cause under Rule 26(c)); *AG-Innovations, Inc. v. United States*, 82 Fed. Cl. 69, 78–79 (Fed. Cir. 2008) **("[B]road allegations of harm, unsubstantiated by specific examples, are insufficient to justify issuance of a protective order."** (citations omitted)); *Northbrook Dig., LLC v. Vendio Servs., Inc*., 625 F. Supp. 2d 728, 737 (D. Minn. 2008) (stating that "many courts recognize that patent prosecution can pose the type of competitive threat that justifies a protective order" but "[t]his is not to say that courts have universally prohibited lawyers and inventors involved in patent prosecution from having access to opposing parties' confidential information"). More importantly, the Sixth Circuit—whose case law, again, governs the parties' request for a protective order here—has underscored the point that Rule 26(c)'s legal standard, though not insurmountable, is far from a mere technicality.
>                     *                     *                     *
> In this case, the parties fall short of making even a tepid illustration of good cause, having failed to identify any actual confidential information or articulate specific facts as to any particularized harm they would suffer without a protective order. The parties' motion is three sentences long, contains no mention of Rule 26(c)'s legal standard, and is unaccompanied

15

by affidavits or declarations. The parties state that a protective order is necessary to safeguard information concerning their "sales," "customers," and "other things," which they consider to be confidential, [Mot. for Protective Order at 1], but these thumbnail, generic characterizations do not amount to a manifestation of a protectable trade secret or other commercial information that falls within Rule 26(c)(1)(G)'s domain, see *Nemir*, 381 F.3d at 550 (**stating that Rule 26(c) calls upon parties to make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements"** (quotation omitted)); see also *AmerGen Energy Co., LLC v. United States*, 115 Fed. Cl. 132, 140–41 (Fed. Cir. 2014) (stating that the plaintiff, in citing the need to protect its "cost structures, business opportunities, and market situations," made "no effort to identify specific information ... that would cause specific harm to its competitive interests" under Rule 26(c)); *Forest Prods. Nw., Inc. v. United States*, 62 Fed. Cl. 109, 114 (Fed. Cir. 2004) (concluding that the plaintiff's statement that its "business and competitive position" would suffer without a protective order did not satisfy Rule 26(c) because it was "conclusory," "self-serving," and "nothing more than a mere ipse dixit"); *Wall Indus., Inc. v. United States,* 5 Cl. Ct. 485, 487–88 (Ct. Cl. 1984) (**stating that "it is axiomatic that nebulous and conclusory allegations of confidentiality ... are insufficient to carry the movant's burden."** (citations omitted)).

　　　　The parties also do not describe—not even in conclusory fashion—any type of harm that would result from discovery of any of the numerous materials that are subject to their Stipulated Protective Order. Operating under a standard that requires them to identify "specific facts" indicating that they would suffer a "clearly defined and serious injury," they have made no headway in demonstrating to the Court that particularized harm awaits them without a protective order. *Nix*, 11 Fed.Appx. at 500; see *AmerGen Energy*, 115 Fed. Cl. at 141 (finding that the plaintiff failed to demonstrate good cause under Rule 26(c) because it made "no effort to identify ... specific harm to its competitive interests"). In short, the parties have made only conclusory statements that the documents subject to their Stipulated Protective Order will contain confidential information and have made no assertion at all of particularized harm that would befall them absent a protective order. As a result, they have not established good cause for a protective order under Rule 26(c)(1)(G).

*Id*. at *2-*3 (emphasis added).

　　　Here, Plaintiffs have not articulated any actual harm that would come from these

Plaintiffs providing routine discovery, particularly in light of the existing protective order.

In cases with similar facts, where Plaintiffs drop from a "named" status to a putative class

16

member status, the caselaw consistently holds that these individuals are still obligated to face the ordinary burdens of discovery. *In re Drassinower*, 2021 WL 3772328 (S.D. Cal. 2021), *supra*.

Even if the "*Clark* factors" apply (from cases broadly discussing discovery from unnamed class members generally where the unnamed class members had never been parties themselves), these factors are clearly met in this case. The *Clark* case stated:

> In *Brennan v. Midwestern United Life Ins. Co*., 450 F.2d 999 (7th Cir. 1971), cert. denied, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972), we held that in appropriate circumstances absent class members may be propounded written interrogatories on a showing that the information requested is necessary to trial preparation and that the interrogatory is not designed 'as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants.' 450 F.2d at 1005.

*Clark v. Universal Builders, Inc*., 501 F.2d 324, 340 (7th Cir. 1974).

More recent cases, and more on point considering this factual and procedural context, (and as quoted by Defendant in his own Motion to Compel (Docket Entry 152)), have articulated the same principles in enumerated factors:

> Other courts have articulated standards that are similar to, or overlap with, the factors set forth in Clark. For example, in *Tierno*, the court held that the proponent of the deposition must demonstrate three factors to justify discovery on absent class members: **(1) the information sought is relevant; (2) the information is not readily obtainable from the representative parties or other sources; and (3) the request is not unduly burdensome and made in good faith.** 2008 WL 2705089, at *6. Similarly, in *Arredondo*, the court summarized the types of factors used in other courts in the absence of a clear Ninth Circuit standard, and held that, **"as a general rule, discovery from absent class members may be permitted when reasonably necessary, not conducted for an improper purpose, and not unduly burdensome in the context of the case and its issues."** 2014 WL 5106401, at *5.

*In re Drassinower*, 2021 WL 3772328 (S.D. Cal. 2021)(emphasis added).

17

These factors are clearly met.  The information is relevant as discussed in detail, *supra*.  The information concerning these unnamed class members own communications is not readily obtainable from the named Plaintiffs, B.P, H.A., and, S.H,  behind whom these unnamed class members now hide., because these alleged events concerning their involvement with Sean Williams are peculiarly individual to them.

The request is not unduly burdensome in light of the fact that these individuals are already represented by Plaintiffs' counsel.

In short, no factors preponderate against the discovery from these appropriate individuals.

Likewise, Plaintiffs' proposed restrictions are unworkable.  First, Plaintiffs have made a habit of trying to "run out the clock."  The Plaintiffs and their counsel take extremely, extremely lengthy breaks. Second, Plaintiffs' request that the topics be limited is also entirely unworkable.  Plaintiffs have suggested the possibility of an "issue class" rather than a conventional class, which limits further the nature of the class element of the case, and increases the individualized inquiry, which Defendants must discover.  The discovery plan agreed upon by the parties does not stagger discovery in this regard, and Defendants must be prepared for trial whichever path Plaintiffs select, which selection will not come until much later.  While it seems like there is plenty of time left for discovery, with the number of attorneys involved in the case, the deadlines are very quickly approaching.  Judge McDonough would have to move the trial in order to stagger discovery at this late stage.  But that would not be workable regardless, as the core issues

in the case -- what the police should have done and when – revolve around what they were told, when they were told, and what other information they knew.

CONCLUSION

The Defendants also join in the Responses filed by the other Defendants. For the foregoing reasons, Plaintiffs' Motion for Protective Order should be denied.

Respectfully submitted,

MOORE, RADER AND YORK, P. C.

s/DANIEL H. RADER IV, BPR #025998
    DANIEL H. RADER IV / BPR #025998
    P. O. Box 3347
    Cookeville, TN  38502
    Phone: (931) 526-3311
    Fax: (931) 526-3092
    danny@moorerader.com
    Attorneys for Kevin Peters in his
    individual capacity

*/s/Kristin E. Berexa*
Kristin E. Berexa, BPR# 14833
Benjamin C. Allen, BPR #35923
**FARRAR | BATES | BEREXA**
12 Cadillac Drive, Suite 480
Brentwood, Tennessee 37027
(615) 254-3060
kberexa@fbb.law
ballen@fbb.law
*Counsel for Toma Sparks in his individual capacity*

19

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

Ashley Walter
HMC Civil Rights Law, PLLC
7000 Executive Center Dr.
Brentwood, TN 37027
615-724-1996
Email: ashley@hmccivilrights.com

Heather Moore Collins
HMC Civil Rights Law, PLLC
7000 Executive Center Dr.
Suite 320
Brentwood, TN 37027
615-724-1996
Email: heather@hmccivilrights.com

Ms. Elizabeth A. Kramer
Mr. Kevin M. Osborne
Erickson, Kramer Osborne LLP
44 Tehama Street
San Francisco CA 94105
(415-635-0631)
Email: elizabeth@eko.law
Email: kevin@eko.law

Emily C. Taylor
Watson Roach Batson & Lauderback
P. O. Box 131
Knoxville, TN 37901-0131
865-637-1700
Email: etaylor@watsonroach.com
*Attorney for the City of Johnson City, Tennessee, and Karl Turner, in his Individual Capacity*

Caroline Drinnon
HMC Civil Rights Law, PLLC
7000 Executive Center Dr.
Brentwood, TN 37027
615-724-1996
Email: caroline@hmccivilrights.com

Vanessa Baehr-Jones
Advocates for Survivors of Abuse
4200 Park Blvd., No. 413
Oakland, CA 94602
Email: vanessa@advocatesforsurvivors.com
*Pro Hac Vice Attorney for Plaintiff*

Mr. Keith H. Grant
Mr. Philip Aaron Wells
Ms. Laura Beth Rufolo
Robinson, Smith & Wells
633 Chestnut Street
Suite 700 Republic Centre
Chattanooga, TN 37450
Email: kgrant@rswlaw.com
Email: awells@rswlaw.com
Email: lrufolo@rswlaw.com

K. Erickson Herrin
Herrin McPeak & Associates
515 E. Unaka Avenue
P. O. Box 629
Johnson City, TN 37605-0629
(423-929-7113)
*Attorney for the City of Johnson City, Tennessee, Karl Turner, in his individual and official capacities, Toma Sparks, in his official*

20

Thomas J. Garland, Jr.
Milligan & Coleman, PLLP
230 W Depot St.
Greeneville, TN 37743
Email: tgarland@milligancoleman.com
*Attorney for the City of Johnson City,*
*Tennessee, and Karl Turner, in his*
*Individual capacity*

*capacity, and Kevin Peters, in his*
*official capacity*

Ms. Kristin E. Berexa
Mr. Benjamin C. Allen
Farrar Bates Berexa
12 Cadillac Drive, Suite 480
Brentwood, TN 37027
615-254-3060
*Email: kberexa@fbb.law*
*ballen@fbb.law*
*Attorneys for Toma Sparks*

Vanessa Baehr-Jones
Advocates for Survivors of Abuse PC
4200 Park Boulevard No. 413
Oakland, CA 94602
510-500-9634
Email: vanessa@advocatesforsurvivors.com

This 17th day of July, 2024.

MOORE, RADER AND YORK, P. C.

s/DANIEL H. RADER IV, BPR 025998
DANIEL H. RADER IV / BPR #025998
P. O. Box 3347
Cookeville, TN 38502
(931-526-3311)
danny@moorerader.com