# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE

JANE DOE, *et. al.*,               )
           *Plaintiffs*,        )     Case No. 2:23-cv-71
                     )
v.                                 )     Judge Travis R. McDonough
                     )
JOHNSON CITY, TENNESSEE, *et al.*, )     Magistrate Judge Jill E. McCook
                     )
           *Defendant*.         )
                     )

## ORDER

Before the Court are the following five motions: (1) Defendant Justin Jenkins's motion to dismiss (Doc. 129); (2) Defendant Toma Sparks's motion to dismiss (Doc. 132); (3) Defendant Kevin Peters's motion to dismiss (Doc. 138); (4) Defendant Jeff Legault's motion to dismiss (Doc. 145); and (5) Brady Higgins's motion to dismiss (Doc. 147). For the reasons that follow, the Court will: **GRANT** Defendant Jenkins's motion to dismiss (Doc. 129); **GRANT IN PART** and **DENY IN PART** Defendant Sparks's motion to dismiss (Doc. 132); **GRANT** Defendant Peters's motion to dismiss (Doc. 138); **DENY** Defendant Legault's motion to dismiss (Doc. 145); and **GRANT** Defendant Higgins's motion to dismiss (Doc. 147).

## I.     BACKGROUND

According to the allegations in the second amended complaint, Sean Williams and his partner, Alvaro Fernando Diaz-Vargas, drugged, raped, and exploited women and children over the course of years in Johnson City, Tennessee. (Doc. 121, at 1–2.) This case is brought by those women and children, hereafter "Plaintiffs," against Johnson City, Tennessee ("City"), and various Johnson City Police Department ("JCPD") officials, hereafter "Defendants," for their

alleged roles in enabling Williams and Diaz-Vargas's conduct. (*Id.* at 4.) Defendant Kevin

Peters was JCPD Captain during the relevant time period, and Defendants Toma Sparks, Justin

Jenkins, Jeff Legault, and Brady Higgins were JCPD Investigators during that time. (*Id.* at 5–6.)

Beginning in 2018, Williams allegedly lured women and children to his downtown loft in

Johnson City, Tennessee, where he provided them with laced drugs or alcohol, sexually assaulted

them, and, sometimes, photographed or recorded the assault. (*Id.* at 7.) Oftentimes, he would

then manipulate these individuals to recruit more women and children. (*Id.*) This behavior

continued until 2022, even though the JCPD received numerous reports of Williams's sexual

misconduct. (*Id.* at 2.)

According to Plaintiffs, JCPD officers were in on Williams's scheme. (*Id.* at 12–39.)

Victims[1] who came forward to report the assaults were met with indifference by JCPD. For

instance, when Plaintiff B.P. told two JCPD officers that she had been assaulted by Williams and

pointed out his apartment on a map, she "did not hear anything more from JCPD for a year and a

half." (*Id.* at 19–20.) Over the next two years, JCPD continued to receive reports of Williams

sexually assaulting and drugging women. (*Id.* at 20.) No charges related to these complaints

were ever brought, and, in many cases, JCPD never even undertook an investigation. (*Id.* at 20–

25.)

One of the few instances JCPD did investigate involved a woman, Female 3, falling out

of Williams's apartment window on September 20, 2019. (*Id.* at 14.) Defendants Jenkins and

Sparks arrived on the scene and "took control of interviewing Williams and securing any digital

---

[1] Though Williams has yet to be convicted for these crimes, the Court will refer to the individuals alleging Williams sexually assaulted them as "victims." *See Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (quoting *JPMorgan Chase Bank, N.A. v. Winget,* 510 F.3d 577, 581 (6th Cir. 2007)) ("[A]ll well-pleaded material allegations of the pleadings of the opposing party must be taken as true" at the motion-to-dismiss stage.").

2

evidence stored on Williams'[s] cellphone, which linked to cameras located throughout Williams'[s] apartment." (*Id.*) Without safeguarding Williams's apartment or confiscating his cell phone, Jenkins and Sparks escorted Williams to JCPD headquarters. (*Id.* at 14–15.) It was not until after Williams erased all data, including video surveillance footage from his apartment and images of Williams sexually assaulting women and minor children, that Sparks seized Williams's cellphone and applied for a search warrant for his apartment. (*Id.* at 15.) That day, JCPD officers also located a handwritten note on Williams's nightstand with the word "Raped" written atop a list of twenty-three women's first names. (*Id.* at 16.) Williams continued to assault women and children for over a year following this encounter. (*Id.*)

In addition to ignoring reports of Williams's assaults, JCPD officers financially gained from interactions with Williams. In one instance, JCPD officers seized Williams's safe, which contained "$500,000.00 in cash," and returned it with only $81,000.00. (*Id.* at 17.) Williams later sent a message to a co-conspirator stating that he "was paying officials at JCPD with money from [his] company for years because [his former business partner] got caught selling cocaine and the corrupt officers targeted her for extortion probably due to her association to me." (*Id.* at 13.) He specifically mentioned one JCPD investigator, Defendant Toma Sparks, in the message: "[A co-conspirator] made $2,000 a week payments to Sparks and other unnamed officers using bogus fraudulent 1099 names and forged owner's draws." (*Id.*)

On November 13, 2020, amidst Williams's foregoing activity and despite allegedly receiving payment from Williams, Sparks presented a potential felon-in-possession-of-ammunition case against Williams to Special Assistant United States Attorney Kateri Dahl for review. (*Id.* at 26.) In investigating the charge, Dahl uncovered "multiple reports of sexual assault against Williams," none of which had been investigated. (*Id.* at 26–27.) This discovery

led Dahl to inform Sparks that she intended to "build a broader case against Williams based on the substantial evidence of the more serious charges, including the conduct of drugging and raping women." (*Id.* at 27.)

As part of her investigation, Dahl asked JCPD officers, including Chief Turner and JCPD investigators, "to take investigative steps related to the complaints of Williams'[s] sexual assaults." (*Id.* at 28.) JCPD officers took a different route. One JCPD investigator, Defendant Higgins, "failed to investigate Williams, refer all reports of his criminal activity to the District Attorney's Office, or provide protection" for individuals who alleged that Williams sexually assaulted them. (*Id.* at 71–72.) In another instance, then-JCPD Captain, Defendant Peters, "ridicule[ed] and ma[de] jokes about a victim's appearance prior to the victim providing a statement about Williams'[s] sexual assault to JCPD and Dahl." (*Id.* at 27–28.) Dahl continued to investigate Williams up until her employment was terminated on June 25, 2021. (*Id.* at 29.) At that time, no federal law-enforcement agency had opened a sex-trafficking investigation against Williams. (*Id.* at 27.)

On June 23, 2022, Dahl filed a civil complaint in the United States District Court for the Eastern District of Tennessee, Case No. 2:22-cv-72, against JCPD Chief Karl Turner, various JCPD officers, and the City for alleged civil-rights and state-law violations stemming from her termination. (*See generally* Doc. 15 in Case No. 2:22-cv-72.) Dahl's complaint describes JCPD's practices and attitudes towards investigating reports of sexual assault, including specific examples of JCPD officers' investigative failures. (*Id.*)

In response to public outcry following the filing of Dahl's complaint, in August 2022, the City retained a third-party expert—the Daigle Law Group ("DLG")—to review JCPD's sexual-assault investigations from 2018 to 2022. (Doc. 121, at 32.) DLG stated in its report that

JCPD's practices as to sexual-assault investigations failed to meet industry standards and discouraged female sexual-assault victims from working with law-enforcement officers to pursue charges. (*Id.*)

In November 2022, the FBI opened a federal sex-trafficking investigation against Williams. (*Id.* at 39.) As part of that investigation, on December 8, 2022, Female 9 met with an FBI Special Agent to provide a statement about Williams's sexual assault of her.[2] (*Id.* at 30.) A few months later, on April 19, 2023, Female 9 had an encounter with JCPD. (*Id.*) While she was waiting for her ride with a male companion outside a pub in downtown Johnson City, JCPD officers drove up and "approached the male to handcuff him." (*Id.*) Female 9 attempted to record the encounter with her phone because she saw no legitimate law-enforcement purpose for it. (*Id.*) A JCPD officer then took hold of her arm. (*Id.*) After Female 9 pulled her arm back, the officer "proceeded to physically assault her." (*Id.*) She fell to the ground with enough force to cause her to urinate herself. (*Id.*) Once on the ground, "several officers pinned her down while other officers continued to assault her." (*Id.*)

According to a report by JCPD, which Defendant Legault approved, police intervention was prompted by an argument between Female 9 and the male companion—an interaction Female 9 denies having. (*Id.*) The report does not supply any other justification for why JCPD officers immediately arrested the male companion. (*Id.*) The report also states that officers arrested Female 9 based on her "disorderly conduct and resisting arrest" and that they found a bag of cocaine in her backpack after conducting a search incident to arrest. (*Id.* at 31.) But Female 9 "did not possess any narcotic substance in her backpack and JCPD officers planted the

---

[2] For the next few months, the FBI continued to interview Williams's alleged victims and to investigate the sex-trafficking conspiracy. (Doc. 121, at 30.)

evidence." (*Id.*)  Later that same day, Female 9 received an eviction letter from the Johnson City Housing Authority stating that the Department of Community Safety had "completed an investigation" into her arrest and would be terminating her lease.  (*Id.*)  The arrest and eviction caused Female 9 to be without stable housing and to lose custody of her minor children.  (*Id.*)

On June 21, 2023, Plaintiffs filed a complaint against the City and various JCPD officers in this Court, alleging civil-rights claims under the Equal Protection and Due Process Clauses of the Constitution, as well as claims under Title IX of the Education Amendments Act of 1972 and the common law.  (*See* Doc. 1.)  Plaintiffs later amended their complaint to include claims under the Trafficking Victim Protection Reauthorization Act ("TVPA"), 18 U.S.C. § 1595, *et seq.*, as well as Obstruction of Enforcement of the TVPA pursuant to 18 U.S.C. §§ 1591, 1595, at 1591(d).  (*See* Doc. 21.)  On December 12, 2023, Plaintiffs again moved to amend their complaint to include class-action claims, factual allegations based on newly discovered facts, and claims against two Defendants—JCPD investigators Jeff Legault and Brady Higgins—based on such facts.  (Doc. 93-1, at 1.)  The Court granted in part and denied in part that motion, allowing for the addition of TVPA obstruction claims against both Defendants, as well as class-action claims.  (Doc. 119.)  Plaintiffs filed their second amended complaint shortly thereafter.  (Doc. 121.)  Defendants Jenkins, Sparks, Legault, Higgins, and Peters now move to dismiss various claims against them.  (Docs. 129, 132, 138, 145, 147.)  The motions are ripe for review.

## II.    LEGAL STANDARD

According to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(c). A Rule 12(c) motion for judgment on the pleadings is analyzed using the same standards that apply to 12(b)(6) motions for failure to state a claim. *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007). Thus, on a Rule 12(c) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. For purposes of this determination, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Tucker*, 539 F.3d at 549 (quoting *JPMorgan Chase Bank, N.A.,* 510 F.3d at 581). This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This factual matter must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader

7

is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III.  ANALYSIS

### A.  OBSTRUCTION OF TVPA

Plaintiffs allege Defendants Jenkins, Peters, Legault, and Higgins each obstructed enforcement of the TVPA by knowingly blocking investigation into Williams's sex-trafficking scheme.  Defendants argue they were unaware of efforts to enforce the TVPA and did not attempt to obstruct any such investigation.[3]

Section 1591(d) of the TVPA deems it unlawful to "obstruct[], attempt[] to obstruct, or in any way interfere[] with or prevent[] the enforcement of" the TVPA, which serves to promote the prosecution of sex-trafficking activities.  Section 1595 provides a civil remedy for victims of such unlawful acts.  Elements of a TVPA-obstruction claim are as follows:  (1) a defendant must "know of an effort to enforce the TVPA"; and (2) "intentionally obstruct or attempt to obstruct that enforcement effort."  *Aktiengesellschaft*, 671 F. Supp. 3d at 409 (citing *United States v. Farrah*, 766 F.3d 599, 612 (6th Cir. 2014)).  To state a TVPA obstruction claim, a plaintiff must allege the defendants knew of the existence of an investigation into sex trafficking, not some other sex-based crime.  Sex trafficking under the TVPA is defined by certain characteristics.  *See id.* at 405 (listing the elements of sex trafficking in the context of a TVPA claim:  "First, the defendant must have participated in a commercial sex-trafficking venture.  Second, the defendant must have known (or recklessly disregarded) that force, fraud, or coercion would be used in the sex-trafficking venture.  Finally, the defendant must have benefited from its participation in the

---

[3] Peters also argues there is no private right of action for a TVPA obstruction claim.  (Doc. 186, at 4–5.)  He is wrong.  *See,* e.g., *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 387, 409 (S.D.N.Y. 2023) (dismissing the same argument and noting that the TVPA "cannot be read in [such a] cramped fashion").

venture.").

It is unclear from the statute what constitutes an "enforcement effort" for purposes of the TVPA, and there is no controlling authority clarifying the phrase. The Sixth Circuit has, however, fleshed out the scope of a comparable provision of the statute. *See United States v. Kernell*, 667 F.3d 746 (6th Cir. 2012); *see also Marinello v. United States*, 2018 S. Ct. 1101, 1109 (2018) (finding "highly instructive" its own cases interpreting other federal obstruction statutes as a guide to interpreting Internal Revenue Code's obstruction provision). In *United States v. Kernell*, 667 F.3d 746 (6th Cir. 2012), the court engaged in a close read of 18 U.S.C. § 1519, which, like 18 U.S.C. 1591, proscribes the obstruction of a federal investigation. Following the lead of the Eighth Circuit, the *Kernell* court held that a formal federal investigation need not to have commenced for a defendant to be liable under the statute. *Id.* at 753. Rather, liability attaches when a defendant acts with the intent to impede or influence a foreseeable federal investigation. *See id.* ("[Section 1519] "does not allow a defendant to escape liability [for engaging in obstructive conduct] with intent to obstruct a foreseeable investigation of a matter within the jurisdiction of a federal agency just because the investigation has not yet commenced.") (citation and quotation marks omitted). A defendant foresees a federal investigation when he believes "that a federal investigation directed at the defendant's conduct might begin at some point in the future." *Id.* at 755 (citation omitted). This means that a defendant can be liable for obstructive conduct under § 1519 even if that conduct took place sometime before a federal investigation was initiated. *Id.*

At least one district court has applied case law interpreting § 1519 to a case involving § 1591, resulting in an expansive understanding of "enforcement effort." In *Robinson v. United States*, the court found "[t]he rationale in [] cases interpreting § 1519 [] persuasive" and, tracking

with that rationale, held that "§ 1591(d) does not require that the defendant specifically know of the federal nature of the investigation to be convicted of obstruction."  No. 114CR176, 2022 WL 19001971, at *17 (N.D. Ga. Nov. 30, 2022), *report and recommendation adopted*, No. 1:14-cr-176 (1), 2023 WL 2186433 (N.D. Ga. Feb. 23, 2023), *certificate of appealability denied*, No. 23-10799, 2023 WL 5835796 (11th Cir. June 14, 2023).  The *Robinson* court also approvingly cited an Eleventh Circuit decision upholding jury instructions on obstruction under § 1519 that stated "[t]he government is not required to prove that the defendant knew his conduct would obstruct a federal investigation, or that a federal investigation would take place, or that he knew the limits of federal jurisdiction."  *Id.* (citing *United States v. Fontenot*, 611 F.3d 734, 736 (11th Cir. 2010)).

The plain language of § 1591 also supports an expansive reading of "enforcement effort." The relevant provision, § 1591(d), makes no explicit mention of an investigation or formal proceeding.  It states, in full, that:

> (d) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.

18 U.S.C. § 1591.  The statute's lack of reference to an investigation or proceeding is meaningful.  Other provisions that impose liability for obstruction, such as 18 U.S.C. § 1505, specifically discuss efforts to impede or influence a "pending proceeding."  The absence of such language here suggests there need not be an existing federal proceeding for liability to attach under the TVPA.  *See United States v. Ionia Mgmt., S.A.*, 526 F.Supp.2d 319, 329 (D. Conn. 2007) ("In comparison to other obstruction statutes, § 1519 by its terms does not require the defendant to be aware of a federal proceeding, or even that a proceeding be pending."); *see also United States v. Freeman*, No. CR.A. 06-205-03, 2008 WL 879966, at *3 (E.D. Pa. Mar. 31,

2008) (noting that the Whole Act Rule of statutory interpretation "instructs that subsections of a statute must be interpreted in the context of the whole enactment") (citing *United States v. Cooper*, 396 F.3d 308, 313 (3d Cir. 2005)); *Ross v. R.A. North Dev., Inc. (In re Total Realty Mgmt., LLC)*, 706 F.3d 245, 251 (4th Cir. 2013) (quoting *PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004)) ("Principles of statutory construction require 'a court to construe all parts to have meaning' and, accordingly, avoid constructions that would reduce some terms to mere surplusage.").

Considering the statute's language, purpose, and the relevant case law, civil liability pursuant to § 1591(d) can attach so long as a defendant engaged in obstructive conduct at a time when a federal investigation was reasonably foreseeable, even if no investigation had begun.

### a. Jenkins

Plaintiffs have not sufficiently alleged a TVPA obstruction claim against Jenkins, because they have not alleged he reasonably foresaw a federal investigation into Williams's sex trafficking at the time he engaged in obstructive conduct. The alleged obstructive conduct occurred on September 20, 2019, when Jenkins and Sparks arrived at Williams's apartment after Female 3 fell from the window. (Doc. 121, at 14.) The two "took control of interviewing Williams and securing any digital evidence stored on Williams'[s] cellphone, which linked to cameras located throughout Williams'[s] apartment." (*Id.*) Without securing Williams's apartment or confiscating his cell phone, Jenkins and Sparks escorted Williams to JCPD headquarters. (*Id.* at 14–15.) It was not until after Williams erased all data, including video surveillance footage from his apartment and images of Williams sexually assaulting women and minor children, that Sparks seized Williams's cellphone and applied for a search warrant for his apartment. (*Id.* at 15.) Regardless of whether this conduct was obstructive, Plaintiffs have not

alleged facts suggesting Jenkins had reason at that time to foresee that a federal sex-trafficking investigation would take place. It would be another month until AUSA Dahl would begin investigating Williams and Diaz-Vargas's behavior, and nothing in the second amended complaint indicates Jenkins knew Williams's phone contained "digital evidence that showed Williams raping unconscious women whom he had drugged." (Doc. 121, at 59.)

Plaintiffs argue Jenkins "knew Williams was using Diaz-Vargas to recruit and obtain women for forced sex acts" back in November, 2019, when B.P. reported her assault to JCPD officers. (Doc. 176, at 16.) But, as alleged, B.P.'s barebones report could not have clued Jenkins in on the existence of a sex-trafficking enterprise. (Doc. 121, at 19.) Per the second amended complaint, B.P. told "two JCPD officers" that she "had been assaulted by Williams" and proceeded to point out Williams's apartment on a map. (*Id.*) This statement does not indicate the presence of a sex-trafficking scheme, for two reasons. First, B.P. only told two JCPD officers about the assault. There are nearly 200 officers in JCPD. Nothing in the second amended complaint suggests communications to a few JCPD officers should be imputed to all JCPD officers—or even those within a particular unit. So, a broad-stroke reference to "JCPD officers" is not enough to allege a specific officer—here, Jenkins—knew about Williams's actions. *See Miller v. Collins*, No. 23-3191, 2023 WL 7303305, at *1 (6th Cir. Nov. 6, 2023) (affirming a district court's dismissal of a § 1983 claim based on the plaintiff's failure to "allege specific facts about specific defendants") (quoting the district court); *see also MSP Recovery Claims, Series LLC v. Nationwide Mut. Ins. Co.*, 594 F. Supp. 3d 947, 959 (S.D. Ohio 2022) ("Nonetheless, in order to state a claim under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must allege that their injury was caused by a specific Defendant. Plaintiffs cannot rely on discovery to provide the facts necessary to satisfy *Iqbal* and *Twombly*.") (citations omitted).

Second, the content of B.P.'s communication—that Williams assaulted her—contained no references to or suggestions of sex-trafficking activity. For Jenkins to be liable for obstructing a sex-trafficking investigation, he must have suspected that an investigation into sex-trafficking— not sexual abuse in general—would take place. For a sexual assault to amount to sex trafficking, some commercial element must be present. *See Aktiengesellschaft*, 671 F. Supp. 3d at 405. There is no allegation that Jenkins had reason to know of an investigation into sex-trafficking.

Because Plaintiffs did not allege Jenkins contemplated that a later sex-trafficking investigation would occur, they did not state a TVPA obstruction claim against him. Accordingly, the Court will grant Jenkins's motion to dismiss Plaintiffs' TVPA obstruction claim.

### b. Peters

Plaintiffs also have not sufficiently alleged Peters knowingly obstructed a TVPA investigation. According to Plaintiffs, then-JCPD Captain Peters waved off accounts of Williams's abuse by claiming victims lacked credibility and "ridiculing and making jokes about a victim's appearance prior to the victim providing a statement about Williams'[s] sexual assault to JCPD and Dahl." (Doc. 121, at 27–28.) But for this behavior to fall under the TVPA, Plaintiffs must have alleged that it served to obstruct a *sex-trafficking* investigation, and they did not. At the time of Peters's comments, Dahl had begun investigating "the conspiracy between Williams, Diaz-Vargas, and others," which included asking JCPD officers "to take investigative steps related to the complaints of Williams'[s] sexual assaults." (*Id.* at 26–28.) Plaintiffs do not allege Dahl or, by proxy, Peters, suspected Williams's actions amounted to something beyond sexual assault. There was no mention of a commercial transaction or enlistment of others to propagate a sex-trafficking venture. Without the ability to infer Williams was engaged in sex-

trafficking as opposed to a series of sexual assaults, Peters could not have foreseen that a federal sex-trafficking investigation into his conduct would occur. Therefore, Plaintiffs have not alleged that Peters obstructed a sex-trafficking investigation by deriding a witness's physical appearance. The Court will grant Peters's motion to dismiss Plaintiffs' TVPA obstruction claim against him.

### c. Higgins

Plaintiffs have also failed to plead a TVPA obstruction claim against Higgins. They allege that Higgins, then a JCPD investigator, was "aware of numerous complaints of sexual assault and drugging by Williams" and yet "failed to investigate Williams, refer all reports of his criminal activity to the District Attorney's Office, or provide protection for the Plaintiffs in this case." (Doc. 121, at 71–72.) Again, knowledge that Williams was repeatedly drugging and sexually assaulting women does not equate to knowledge of a potential sex-trafficking scheme. Allegations of the latter kind of knowledge is required to plead a TVPA obstruction claim. The Court will grant Higgins's motion to dismiss Plaintiffs' TVPA obstruction claim against him.

### d. Legault

Conversely, Plaintiffs adequately allege Legault obstructed the TVPA investigation by signing off on the police report that documented Female 9's arrest after she met with an FBI Special Agent to provide a statement about Williams's sexual assault of her. (Doc. 121, at 30–31.) Even if Legault was not present at the time of Female 9's arrest, the report he signed off on raised questions as to the legitimacy of the encounter. The only reason the report offers as justification for JCPD officers' intervention is that Female 9 and her male companion were arguing inside a pub.[4] (*Id.*) Based on this observation, which makes no mention of any physical

---

[4] Plaintiffs allege that "by the time JCPD officers arrived, neither Female 9 nor the male were inside Tipton's, nor were they arguing." (Doc. 121, at 30.)

violence or threat thereof, JCPD officers arrested the male companion. (*Id.*) The officers also arrested Female 9 due to "disorderly conduct." (*Id.*) Legault signed off on the report, which functioned to legitimize the arrests of Female 9 and her companion. Legault's role as supervisory patrol officer was to serve as a stopgap for improper stops and arrests, and the plain language of the report suggests the arrest of Female 9's male companion lacked probable cause. (*Id.* at 31.) But instead of questioning the arresting officers or flagging the report for higher-ups, Legault allowed the illegitimate arrests to stand. This, in turn, enabled Female 9 to perceive the improper arrest as retaliation for testifying in the Williams investigation. Therefore, Plaintiffs sufficiently alleged that Legault attempted to obstruct an ongoing investigation into Williams's sex-trafficking scheme by ratifying a facially unconstitutional arrest against the associate of a witness to that investigation.

Plaintiffs also sufficiently allege that Legault knew of an effort to enforce the TVPA at the time of this obstruction. Legault was an officer in JCPD's Special Victims Unit, the unit responsible for investigating sex crimes. (*Id.* at 24.) By the time of Female 9's arrest and eviction, which occurred on April 19, 2023, AUSA Dahl had already begun investigating and ordering JCPD officers to investigate reports that Williams was systemically drugging and raping women with Diaz-Vargas. (*Id.* at 26–27, 30–31, 39.) The FBI had also at that time opened a federal sex-trafficking investigation. (*Id.* at 26–27, 39.) Given Legault's station in the unit charged with investigating sex crimes, it would be reasonable to infer that either AUSA Dahl or the FBI (or both) enlisted his help in investigating Williams's sex crimes, or, at a minimum, informed him of their investigations. Therefore, based on the facts alleged, Legault knew or should have known of the existence of an investigation into sex-trafficking conduct at the time

he retaliated against a witness in that investigation.  Accordingly, Plaintiffs have sufficiently alleged a TVPA obstruction claim against Legault.

## B.     SUBSTANTIVE DUE PROCESS

Plaintiffs also bring substantive due process claims under the Fourteenth Amendment and 42 U.S.C. § 1983 against Defendants Jenkins, Peters, Legault, Higgins, and Sparks.  (Doc. 121, at 71.)

> Under 42 U.S.C. § 1983:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To succeed on a claim under § 1983, a plaintiff must show:  "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law."  *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citations omitted).

The Fourteenth Amendment to the United States Constitution provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law."  Substantive due process "specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citations omitted), and freedom from arbitrary government action that "shocks the conscience and violates the decencies of civilized conduct." *Cnty. of Sacramentio v. Lewis*, 523 U.S. 833, 846–47 (internal quotation marks omitted).

There are a couple of paths a plaintiff pursuing a substantive due process claim can travel. One is a "conscience-shocking" theory of liability. To avoid contorting due process into a "font of tort law," courts have erected a high bar for this kind of claim: to state a substantive due process claim, the at-issue conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8; *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020) (citations omitted). Courts have also described the standard as covering actions "generally so brutal and offensive that they do not comport with traditional ideas of fair-play and decency." *Meyers v. Cincinnati Bd. of Educ.*, 343 F. Supp. 3d 714, 726 (S.D. Ohio 2018), *aff'd*, 983 F.3d 873 (6th Cir. 2020). Additionally, the Sixth Circuit has provided three factors courts may consider in determining whether deliberately indifferent actions shock the conscience: "1) the voluntariness of the plaintiff's relationship with the government, 2) whether there was time for the government actor to deliberate, and 3) whether the government actor was pursuing a legitimate governmental purpose." *Range*, 763 F.3d at 590.

Another path is the state-created-danger theory. Generally speaking, the Fourteenth Amendment does not compel a state actor to affirmatively intervene to protect individuals. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (citation omitted) ("Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference, it does not confer an entitlement to such governmental aid as may be necessary to realize all the advantages of that freedom."). But, in limited circumstances, an individual may nevertheless be entitled to affirmative government intervention under the Due Process Clause. *See Sexton v. Cernuto*, 18 F.4th 177, 186 (citing *DeShaney*, 489 U.S. at 200). This exception—the "state-created-danger" exception— applies "when 'the state

takes an affirmative act that increases the victim's risk of harm' from private acts of violence." *Sexton*, 18 F.4th at 23 186 (quoting *Lipman v. Budish*, 974 F.3d 726, 733 (6th Cir. 2020)). The elements of a state-created-danger claim are: (1) "an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party"; (2) "a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large"; and (3) "the state knew or should have known that its actions specifically endangered the plaintiff." *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (citations omitted).

Here, Plaintiffs pursue substantive due process claims under the conscience-shocking and state-created-danger theories of liability. Plaintiffs argue that the first theory applies to Defendants Jenkins, Peters, Legault, Higgins, and Sparks, and the second applies only to Defendants Jenkins and Sparks.

### i. Statute of Limitations

Defendants first argue Plaintiffs' substantive due process claims are time-barred because claims brought under § 1983 in Tennessee are subject to a one-year statute of limitations, and Plaintiffs should have been aware of JCPD officers' unconstitutional conduct before June 22, 2022—one year before the date on which they filed this action.[5] (Doc. 130, at 5–9; Doc. 139, at 21–25; Doc. 146, at 4–8; Doc. 148, at 4–7.)

Because 42 U.S.C. § 1983 does not contain its own statute of limitations, courts look to state law to determine the appropriate limitations period. *Sharpe v. Cureton,* 319 F.3d 259, 266

---

[5] This is an odd position to take given Defendants' insistence in the TVPA-obstruction context that they had no reason to suspect there would be any investigation into the sex-trafficking enterprise. *See supra* Section III.A. In essence, Defendants argue in the same breath that JCPD officers could not have known about Williams's scheme but that Plaintiffs should have known JCPD officers were covering up that scheme.

(6th Cir.2003); *Sevier v. Turner,* 742 F.2d 262, 272 (6th Cir. 1984).  Tennessee provides for a

one-year limitations period for civil rights actions under § 1983.  *See* Tenn. Code Ann. § 28-3-

104(a)(3) (2004); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 547 (6th Cir. 2000), citing *Berndt v.*

*Tennessee*, 796 F.2d 879, 883 (6th Cir. 1986).  The limitations period commences "when the

plaintiff knows or has reason to know of the injury which is the basis of [her] action.  A plaintiff

has reason to know of [her] injury when [s]he should have discovered it through the exercise of

reasonable diligence." *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005) (citation

omitted).  The date on which the period begins is not counted.  *Id.* (citation omitted).

 This action was brought in Tennessee, so a one-year limitations period applies.  Because

Plaintiffs filed the case on June 23, 2024, their § 1983 claims are untimely if the limitations

period began to run on or after June 23, 2023.

 Plaintiffs' claims are timely.  Plaintiffs are women who survived sexual assault and, in

many cases, put trust in JCPD officers' ability and willingness to protect them from further harm.

While, according to Plaintiffs' allegations, those officers were not always responsive and, at

times, were patently dismissive, it is not reasonable to expect Plaintiffs to suspect this behavior

was symptomatic of an intricate sex-trafficking conspiracy between public officials and a serial

rapist.  In fact, according to Plaintiffs' allegations, JCPD officials made every effort to ensure no

such connection could be drawn.  (*See generally* Doc. 121 (alleging JCPD officers went to great

lengths, over the course of years, to cover up the conspiracy).)  Thus, the one-year statute of

limitations for claims brought under 18 U.S.C. § 1983 would only begin accruing when AUSA

Dahl filed a complaint on June 23, 2022, detailing JCPD's alleged misconduct.  (Doc. 101, at 8–

9.)  Because the present complaint was filed on June 23, 2023,[6] it was brought within the one-year time frame.  Therefore, Plaintiffs' § 1983 claims are not time-barred.

### ii.      *Shocks Conscience*

Plaintiffs contend Defendants engaged in behavior that violated the Fourteenth Amendment because it was so egregious so as to shock the contemporary conscience.  The Court found above, *see supra* Section III.A., that Plaintiffs sufficiently alleged that Defendant Legault knowingly obstructed a sex-trafficking investigation.  Plaintiffs also allege that at least one investigator, Defendant Sparks, shared in the proceeds from the sex-trafficking scheme.  (Doc. 121, at 13–14.)

If any conduct clears the high bar of "conscience-shocking" behavior, it is this.  It is difficult to conceive of the possibility that public servants were cashing in on the sexual exploitation of the very citizens they are charged to protect; such alleged conduct so brazenly transgresses all standards of care we impose on those servants.  But that is what Plaintiffs allege.  The Court will address each Defendant's role:

---

[6] When Plaintiffs moved to amend the complaint on December 12, 2023, they added Defendants Jenkins, Higgins, and Legault.  (Doc. 93.)  The claims against these Defendants are not time-barred, because Plaintiffs did not have reason to know of their participation in the sex-trafficking cover up until after they filed the initial complaint.  Plaintiffs only became aware of Jenkins' role when the Government filed a response in the lawsuit Dahl filed, *United States v. Williams*, 2:21-cv-27, on July 28, 2023 (Doc. 38).  Higgins and Legault's participation became evident sometime between September and December 2023, after Plaintiffs obtained eviction records for Female 9 and learned of Higgins's retaliatory acts.  (Doc. 176, at 19.)  Therefore, Plaintiffs' § 1983 claims against these later-added Defendants were brought within a year of the date on which they knew or had reason to know of their involvement in the alleged injury.

a.　　Sparks

　　The second amended complaint is replete with conduct by Sparks that shocks the conscience:  Plaintiffs allege he solicited a bribe from Williams in exchange for insulating his criminal activities, refused to investigate Williams's sex-trafficking crimes, failed to execute Williams's arrest warrant, intimidated and lied to victims, and concealed evidence of Williams's crimes.  (*See* Doc. 121.)

　　Sparks argues that a Sixth Circuit case requires that the conscience-shocking behavior be directed towards a plaintiff, not some third party.  (Doc. 133, at 7 (citing *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000).)  It does not.  Sparks cherry-picked the following line from the opinion:  "Accordingly, conduct of a law enforcement officer towards a citizen which 'shocks the conscience' denies the victim fundamental substantive due process."  (*Id.* (quoting *Claybrook*, 199 F.3d at 359).)  Rather than impose a requirement, the court merely frames its analysis using language mirroring the factual scenario at issue in the case—a law enforcement officer's interaction with a citizen.  The *Claybrook* court does not even discuss this issue; the focus is instead on the varying standards of proof that apply in due-process claims based on the presence of exigent circumstances.  199 F.3d at 359–60.  Sparks's argument therefore fails.  The Court will deny Sparks's motion to dismiss this claim.

　　　　　b.　　Jenkins

　　Plaintiffs, however, have not alleged that Jenkins engaged in conscience-shocking behavior.  They point to the same conduct as in the TVPA-obstruction claim—Jenkins's decision to allow Williams custody of his phone at JCPD headquarters on September 20, 2019.  *See supra* Section III.A.  Plaintiffs argue this conduct was not the product of negligence but of an intention to enable a cover-up of Williams's criminal activity.  (Doc. 176, at 23.)  But, as discussed above,

*see supra* Section III.A., Plaintiffs have not alleged that Jenkins knew or had reason to know of Williams's sex-trafficking scheme at that time. AUSA Dahl had not yet begun her investigation, and any reports of Williams's behavior were to a couple of unnamed JCPD officers. (Doc. 121, at 59.) Plaintiffs also do not allege that Jenkins knew Williams's phone contained "digital evidence that showed Williams raping unconscious women whom he had drugged." (*Id.*) For that reason, Plaintiffs do not allege that Jenkins's failure to timely confiscate Williams's phone amounted to anything beyond mere negligence. The Court will dismiss this claim.

      c.     Peters & Higgins

Plaintiffs have not alleged Peters and Higgins engaged in conscience-shocking behavior. Peters, then Captain of the JCPD, undermined the credibility of a witness to Dahl's investigation of Williams by "ridiculing and making jokes about [her] appearance prior to the victim providing a statement about Williams's sexual assault to JCPD and Dahl." (Doc. 121, at 27–28.) This came at a time when there was "overwhelming evidence that Williams was drugging and raping women," and after Dahl had begun her investigation into "the conspiracy between Williams, Diaz-Vargas, and others." (*Id.* at 26–26.) He also repeatedly declined to investigate Williams despite orders from Dahl "to take investigative steps related to the complaints of Williams'[s] sexual assaults." (*Id.* at 28.) Similarly, though Higgins was allegedly "aware of numerous complaints of sexual assault and drugging by Williams," he nonetheless "failed to investigate Williams, refer all reports of his criminal activity to the District Attorney's Office, or provide protection for the Plaintiffs in this case." (*Id.* at 71–72.) This behavior is, at minimum, unprofessional. The public entrusts its law-enforcement officers with investigating reports of harm in the community, and, by Plaintiffs' accounts, Peters and Higgins abdicated this duty. But, as with Jenkins, Plaintiffs have not alleged either officer's failure to do his job amounted to

more than carelessness. Carelessness does not shock the conscience. *See, e.g.*, *Elfers v. Varnau*, 101 F. Supp. 3d 753, 764 (S.D. Ohio 2015) (finding that a coroner's failure to investigate inconsistencies in an individual's death "may have been negligent" but did not "shock the conscience"). The Court will grant Peters and Higgins's motions to dismiss Plaintiffs' substantive due-process claims against them.

> d.     Legault

Finally, Plaintiffs sufficiently allege Legault acted in a way that shocks the conscience. The Court found above, *see supra* Section III.A., that Plaintiffs alleged Legault knowingly attempted to obstruct an ongoing investigation into Williams's sex-trafficking scheme by ratifying a facially unconstitutional arrest of the associate of a witness to that investigation. Such an egregious abuse of authority plainly does not comport with traditional ideas of fair-play and decency. *See Meyers*, 343 F. Supp. 3d at 726 (S.D. Ohio 2018).

The Court will deny Legault and Sparks's motions to dismiss the Fourteenth Amendment claims brought pursuant to a shock-the-conscience theory. It will grant Higgins, Peters, and Jenkins's motions to dismiss these claims.

> ### iii.     *State-created Danger*

Plaintiffs also bring due process claims under a state-created-danger theory against Defendants Sparks and Jenkins, arguing that "numerous affirmative acts committed by [them] increased the risk of danger" specifically to Plaintiffs. (Doc. 176, at 26–27.)

Plaintiffs' state-created-danger claims against Sparks and Jenkins fail because they have not alleged the pair's actions heightened the existing risk Williams posed, as is required to state a claim. *See Jones*, 438 F.3d at 690 (listing as an element of a state-created danger claim: "an affirmative act by the state which *either created or increased the risk* that the plaintiff would be

exposed to an act of violence by a third party") (emphasis added). Sparks and Jenkins's behavior—destroying evidence, interfering with the investigation into and arrest of Williams, intimidating victims, and receiving money from Williams—did not create a new risk or increase an existing risk; rather, it allowed an existing risk to continue unchecked.

Plaintiffs protest that one Plaintiff—B.P.—was put in "special danger of violent retaliation by Williams" by Sparks because he knew B.P. reported Williams and should have been able to infer "that Williams was similarly aware . . . that B.P. had reported him." (Doc. 176, at 28.) There is no reason to assume Williams knew B.P. reported him or that he intended to retaliate against her for doing so. The second amended complaint does not contain these allegations. (*See generally* Doc. 121.) Therefore, Plaintiffs do not allege Sparks or Jenkins took affirmative actions that heightened the risk of harm Williams posed to them. Accordingly, the Court will grant Jenkins and Sparks's motion to dismiss the state-created danger claims against them.

### iv. *Qualified Immunity*

Defendants also argue that the Court should dismiss Plaintiffs' § 1983 claims against them because they are entitled to qualified immunity.

The doctrine of qualified immunity shields individual government officials from damages under § 1983 "as long as their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks omitted) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). In deciding whether a defendant is entitled to qualified immunity at the summary-judgment stage, the Court employs a two-part test. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). First, a court determines whether

the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right. *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2012) (citations omitted). Second, if a constitutional right was violated, a court determines whether the right was clearly established at the time the violation occurred. *Id.* (citations omitted). The plaintiff bears the burden of "satisfy[ing] both inquires in order to defeat the assertion of qualified immunity." *Sumpter*, 868 F.3d at 480 (citing *Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015)). "[I]f the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013)).

A right is clearly established when, "at the time of the challenged conduct, the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations omitted). Courts should not attempt to define a particular right at a high level of generality. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742). Instead, they should assess whether it is clearly established that the particular conduct is unconstitutional. *Id.* ("This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (citations and internal quotation marks omitted)). Still, "[i]t is not necessary[] . . . 'that the very action in question has previously been held unlawful.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (quoting *Anderson*, 483 U.S. at 640); *see also id.* at 1867 ("[A]n officer might lose qualified immunity even if there is no reported case 'directly on point.'" (citations omitted)).

That is, "[t]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts," as long as the defendants had "fair warning" that their conduct violated the plaintiff's rights. *Goodwin v. City of Painsville*, 781 F.3d 314, 325 (6th Cir. 2015) (citations omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

The burden is on the plaintiff to show a defendant is not entitled to qualified immunity, but that burden is modest at the motion-to-dismiss stage: reading the complaint in the light most favorable to the plaintiff, it need only be plausible that an official's acts violated a clearly established constitutional right. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (citing *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 562 (6th Cir. 2011)). And although qualified immunity is available at the motion to dismiss stage, "it is generally inappropriate . . . to grant a 12(b)(6) motion-to-dismiss on the basis of qualified immunity." *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)). Rather, the issue is usually resolved at summary judgment to allow for "development of the factual record," which is "frequently necessary to decide whether the official's actions violated clearly established law." *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023) (citations and quotations omitted).

Here, Plaintiffs allege that Defendants knowingly obstructed or attempted to obstruct criminal investigations to cover up police participation in an extortion scheme to rake in cash from a sex-trafficking venture. (Doc. 121, at 58–60, 71–71.) If true, there is no colorable argument Defendants were ignorant to the patent unconstitutionality of their actions; it is surely at least "plausible" that Defendants' acts violated a clearly established constitutional right. *See*

*Courtright*, 839 F.3d at 518 (citation omitted).  Plaintiffs have demonstrated Defendants are not entitled to qualified immunity at this stage.  *See MacIntosh*, 69 F.4th at 315 (noting that an officer's entitlement to qualified immunity is generally not determined until the summary-judgment stage, because "development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law") (citations and internal quotation marks omitted).

## IV.     CONCLUSION

For the aforementioned reasons, the Court will:  **GRANT** Defendant Jenkins's motion to dismiss (Doc. 129); **GRANT IN PART** and **DENY IN PART** Defendant Sparks's motion to dismiss (Doc. 132); **GRANT** Defendant Peters's motion to dismiss (Doc. 138); **DENY** Defendant Legault's motion to dismiss (Doc. 145); and **GRANT** Defendant Higgins's motion to dismiss (Doc. 147).  Accordingly, Plaintiffs' state-created danger claims against Defendants Sparks and Jenkins are **DISMISSED**.  Plaintiffs' TVPA obstruction claims against Jenkins, Peters, and Higgins are **DISMISSED**.  Plaintiffs' TVPA beneficiary-liability claim against Peters and Jenkins are **DISMISSED.**[7]

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[7] Plaintiffs concede in their omnibus response that "the facts in the [second amended complaint] are insufficient to allege a beneficiary theory of liability under § 1595, 1591(a) as to Peters and Jenkins."  (Doc. 176, at 3 n.3.)