# Exhibit 2

```
            IN  THE  UNITED  STATES  DISTRICT  COURT
         FOR  THE  EASTERN  DISTRICT  OF  TENNESSEE
                    GREENEVILLE  DIVISION
```

```
B.P., H.A., and S.H.,            )
individually, and on behalf      )
of all others similarly          )
situated,                        )
                                 )
              Plaintiffs,         )
                                 )
                                 )
v.                               )    No. 2:23-CV-00071
                                 )           TRM-JEM
City of Johnson City,            )
Tennessee, et al,                )
                                 )
              Defendants.         )
```

```
         *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

VIDEO DEPOSITION OF DAVID HILTON

August 8, 2024

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
=====================================================
           JEFF RUSK COURT REPORTING & VIDEO

           Jeffrey D. Rusk, RPR, LCR, CLVS
                805 Eleanor Street, N.E.
              Knoxville, Tennessee  37917
                    (865) 246-7656
                  Jeff@JeffRusk.com
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3    Vanessa Baehr-Jones, Esq.
      4200 Park Boulevard No. 413
 4    Oakland, California  94602
      Vanessa@AdvocatesForSurvivors.com
 5

 6    Elizabeth A. Kramer, Esq.
      Kevin Osborne, Esq.
 7    Julie Erickson, Esq (via Zoom)
      Erickson Kramer Osborne, LLP
 8    44 Tehama Street
      San Francisco, California  94105
 9    Elizabeth@eko.com

10

11    FOR THE DEFENDANTS:

12    For Johnson City, Tennessee, Karl Turner, Kevin
      Peters, and Toma Sparks in their official
13    capacities:

14    Emily Taylor, Esq.
      Watson Roach Batson & Lauderback
15    1500 Riverview Tower
      900 South Gay Street
16    Knoxville, Tennessee  37902
      ETaylor@WatsonRoach.com
17

18    K. Erickson Herrin, Esq.
      Herrin McPeak & Associates
19    515 East Unaka Avenue
      Johnson City, Tennessee  37605
20    Lisa@hbm-lawfirm.com

21

22

23

24

25
```

```
 1   For Kevin Peters in his individual capacity:

 2   Andre Greppin, Esq.
     -- and --
 3   Daniel H. Rader, IV, Esq. (via Zoom)
     Moore Rader Fitzpatrick & York
 4   46 North Jefferson Avenue
     Cookeville, Tennessee  38501
 5   Danny@MooreRader.com

 6

 7   For Justin Jenkins, Brady Higgins, and Jeff Legault

 8   in their individual capacities:

 9   Aaron Wells, Esq.
     Robinson Smith & Wells
10   Republic Centre
     633 Chestnut Street
11   Suite 700
     Chattanooga, Tennessee  37450
12   AWells@rswlaw.com

13

14   For City of Johnson City, Tennessee:

15   Jonathan P. Lakey, Esq. (via Zoom)
     Burch, Porter & Johnson, PLLC
16   130 North Court Avenue
     Memphis, Tennessee  38103
17   JLakey@bpjlaw.com

18

19   For Toma Sparks in his individual capacity:

20   Kristin Ellis Berexa
     Farrar Bates Berexa
21   12 Cadillac Drive
     Suite 480
22   Brentwood, Tennessee  37027
     KBerexa@fbb.law

23

24   Videographer:  Chris Rusk

25
```

1    the case notes, search warrants.

2         Q.        Were they your case notes?

3         A.        Some were.

4         Q.        Were they search warrants that you

5    executed?

6                   MR. GREPPIN:  Object to the form of

7         the question.

8                   Go ahead.

9                   By you, do you mean him personally

10        or the department?  When you said you --

11                  MR. OSBORNE:  I understand.  It

12        seems pretty clear.  I was talking about

13        you, him.  Nobody else would --

14                  MR. GREPPIN:  Okay.

15        Q.        (BY MR. OSBORNE) Was it you

16   individually that executed the search warrants that

17   you looked at?

18        A.        I was present when some of them

19   were executed.

20        Q.        Are you distinguishing between

21   being present and executing?  Are those two

22   different things?

23                  MR. GREPPIN:  I'll object to the

24        form to the extent that it calls for legal

25        conclusions.

1            the record.  The time is 11:17 a.m. Eastern

2            time.

3                      MR. OSBORNE:  Okay.  Back on the

4            record.

5    BY MR. OSBORNE:

6            Q.      Let's talk about phone bills.

7            A.      Okay.

8            Q.      Do you use your personal phone for

9    work calls?

10           A.      Occasionally.

11           Q.      As far as you know, does that

12   violate any policies, or is that allowed?

13           A.      It's allowed.

14           Q.      Do you delete work calls from your

15   call logs on your personal cell phone?

16           A.      Not that I know of.  I don't recall

17   ever doing that.

18           Q.      Okay.  Do you know if you've ever

19   deleted text messages that relate to work from your

20   personal cell phone?

21           A.      Not that I'm aware of.

22           Q.      Do you know if doing that would be

23   a violation of JCPD policy?

24                   MR. GREPPIN:  I'll object to the

25           form of the question.

1     A.       I don't know.

2     Q.       (BY MR. OSBORNE) Okay.  Looking at

3   Exhibit 211 -- actually taking a step back.

4                    Have you ever had any training with

5   respect to your work at JCPD about what you're

6   supposed to keep and what you're allowed to delete

7   from your own devices?

8     A.       Not that I can recall.

9     Q.       I'm going to go through some

10  people.

11                   Do you have any of these people --

12  we'll just go one by one -- as contacts in your

13  personal cell phone?

14                   Karl Turner?

15    A.       Current?  Like now or ever?

16    Q.       Ever.

17    A.       Yes.

18    Q.       Okay.  Now?

19    A.       I think the number is -- the

20  contact is probably still there.  I'm sure -- I

21  don't know what number I had for him.

22    Q.       Okay.  Kevin Peters?

23    A.       Yes.

24    Q.       Presently?

25    A.       Yes.

```
 1            Q.        Toma Sparks?

 2            A.        Yes.

 3            Q.        Justin Jenkins?

 4            A.        Yes.

 5            Q.        Officer Higgins?

 6            A.        Yes.

 7            Q.        Legault?

 8            A.        Yes.

 9            Q.        Cathy Ball?

10            A.        Don't think so.

11            Q.        John -- sorry?

12            A.        I don't think so.

13            Q.        Okay.  John Hames?

14            A.        I don't know.

15            Q.        Steve Finney?

16            A.        Yes.

17            Q.        Jeff Keeling?

18            A.        Jeff who?

19            Q.        Keeling.

20            A.        No.

21            Q.        Journalist?

22            A.        No.

23            Q.        Erick Herrin?

24            A.        We're' on my personal phone,

25     correct?
```

1        Q.        Personal phone.

2        A.        No.

3        Q.        Okay.  Exhibit 211 is a three-page

4  document.

5                Could you turn to Page 3?

6                Would you say you use your personal

7  phone for your official calls, your work-related

8  calls, more than you use your JCPD-issued phone?

9        A.        I don't know that I would say it's

10  more.  I don't know how to answer that.  I don't --

11        Q.        So I'm looking at this little

12  section of time here on Page 3.

13                From October 1st to October 15th,

14  this is your work line.

15        A.        Uh-huh.

16        Q.        There's only five phone calls --

17        A.        Uh-huh.

18        Q.        -- on your work line.

19                MR. HERRIN:  What year are we

20  talking about here?

21                MR. OSBORNE:  Oh, this is, as I

22  understand it -- and that's a good question,

23  because this bill doesn't actually say.

24                I understand that this was back in

25  2019 or '20?

1                    MS. BAEHR-JONES:  2020.

2                    MR. OSBORNE:  2020.

3        A.        Okay.

4        Q.        (BY MR. OSBORNE) Okay.  We'll come

5   back to this one.  So just keep it handy.

6                    Do you know what the -- what ICAC

7   is, Internet Crimes Against Children Task Force

8   Program, ICAC?

9        A.        Heard of it.

10        Q.        Okay.  What can you tell me about

11   it?  What do you know about it?

12        A.        That it's the -- from my

13   understanding, they send agencies -- I don't know.

14   I don't know how to explain it.  I think they would

15   forward information that they might think is

16   suspicious to agencies, to law enforcement agencies.

17        Q.        Okay.  Do you know what ICAC COPS

18   is?

19                    And the COPS is C-O-P-S, standing

20   for Child Online Protection Program.

21        A.        Can you say that again?

22        Q.        Yeah.

23                    Do you know what ICAC COPS is?

24        A.        I don't think so.

25        Q.        Okay.

1    and we'll look at some documents.  This is not a

2    memory test.

3                   But before we look at the

4    documents, what can you remember about how you found

5    out about the fall that night?

6         A.        I received a phone call.

7         Q.        Okay.  Do you know who from?

8         A.        I believe it was Investigator

9    Sparks.

10        Q.        Any idea like what time it was?

11   Did it wake you up?

12        A.        Yes.

13        Q.        Okay.  Let's do this.  We're going

14   to -- I'm going to play A911 phone call recording.

15   It's a little long.  A lot of it is what you would

16   expect, just lots of chatter and things.  I'll ask

17   you some questions about it.  If you need to go back

18   at any point to listen to something again, just let

19   me know.  We'll listen to the whole thing.

20                   And one thing that I'd like you to

21   do is, if you can, if you can identify any of the

22   people who are speaking by their voice, just try to

23   make a note of it, and I'll ask you some questions.

24        A.        Okay.  It could have been 911 who

25   called me.  I do not -- I believe it was

1    Investigator Sparks.

2         Q.        Yeah.  You've made it very clear

3    that you don't have a real sharp memory on that, and

4    that's perfectly understandable.

5         A.        Okay.

6                   MR. OSBORNE:  All right.  And what

7              we'll do is we'll mark this -- so we'll mark

8              this piece of paper as Exhibit 213.

9                   (Exhibit 213 marked).

10        Q.        (BY MR. OSBORNE) That's going to

11   represent the phone call, and this is Bates

12   CITY-77349.

13                  MR. OSBORNE:  I don't need you to

14             transcribe the recording.

15                  COURT REPORTER:  Okay.  Yeah, I'll

16             just put it was played for The witness.

17                  MR. OSBORNE:  Thank you.

18                  (Audio playing).

19                  MR. OSBORNE:  I'm stopping the

20             recording just because it seems like there's

21             some loss.

22                             (Audio playing).

23                  MR. OSBORNE:  We're going to play

24             it, play the whole thing.

25        Q.        (BY MR. OSBORNE) Do you want to

1    pause?

2          A.          Are you wanting me to say if I

3    recognize a voice?

4          Q.          Do you?

5          A.          Yeah.

6          Q.          Go for it.

7          A.          That was Mike Adams.

8          Q.          Okay.

9          A.          Captain Adams.

10         Q.          Okay.  That was the person who

11    said, "The number I have is not answering," that was

12    Mike Adams?

13         A.          Yes.

14         Q.          Okay.  I think we're -- I think he

15    may still be speaking.  So I'm going to play again.

16                            (Audio playing).

17         A.          I believe that's Officer Jeff

18    Stork, K-9 Officer Stork.  K-91.

19                     MS. TAYLOR:  I'm sorry.

20                     THE WITNESS:  I believe that was

21           K-91, Officer Jeff Stork.

22         Q.          (BY MR. OSBORNE) And that was --

23    actually, I didn't catch anything that he said.  I'm

24    going to play back like a couple of seconds just to

25    get a blurb so we can pinpoint where in the call

1    that is for the record.

2                        (Audio playing).

3            Q.         (BY MR. OSBORNE) He said, "120 to

4    K-91."

5            A.         That's -- Captain Adams is 120, to

6    K-91.  K-91 is Officer Stork.

7            Q.         And the voice that you hear there,

8    do you believe that's Mike Adams or Officer Stork?

9            A.         That's Adams.

10           Q.         Got it.

11           A.         And was there a response from --

12   can we play that again?

13           Q.         Sure.

14                       (Audio playing).

15           Q.         (BY MR. OSBORNE) "Go ahead" is

16   Stork?

17           A.         Yes.

18           Q.         Got it.  Thank you.

19                       MR. OSBORNE:  And just for the

20                record, in the recording we're at about six

21                minutes and 50 seconds at that point.  The

22                prior voice that was identified as Mike

23                Adams was at around five minutes and 35

24                seconds into the recording.

25                       Okay.  Let's go ahead and finish.

1                              (Audio playing).

2              Q.        (BY MR. OSBORNE) Do you know who

3    those two people are?  Was that Stork and Adams

4    again?

5              A.        I believe so.

6              Q.        Okay.  And that, for the record,

7    again, is about seven minutes, ten seconds.

8                              (Audio playing).

9              A.        So some of the -- one number -- I

10   don't know the numbers.  I would be speculating, I

11   think, if I said who I thought they were.

12             Q.        (BY MR. OSBORNE) Okay.  120 was

13   Mike Adams.

14             A.        Yes.

15             Q.        164?

16             A.        I don't know.  I've got an idea who

17   I might think it is, but I can't --

18             Q.        Who do you think it is?

19             A.        I think it is officer Paul Miller.

20             Q.        Okay.  There's also a repeated

21   number that I heard, 123, and that could be -- I

22   interpreted that, maybe I'm wrong, as a sick or

23   injured person, just police code.

24                              Is that --

25             A.        123?

1      Q.      Uh-huh.

2      A.      No.

3      Q.      Is 123 an officer?

4      A.      Yes. So, yes, the way our -- I

5 don't know what you would call it. Our call signs

6 are set up is 110 -- each platoon -- there's five

7 platoons. But the four, one through four are the

8 main platoons that work patrol. And so each

9 platoon, Platoon 1 starts with a 1. The first

10 number is the platoon, and then the second number is

11 the zone, and then the third number is the unit in

12 that zone.

13      We used to have what's called -- I

14 think it's called DPA's, Designated Patrol Areas,

15 and that's the way dispatch would dispatch us.

16      So -- but supervisors, 110 is the

17 captain on the shift. 120 would be the lieutenant

18 on the shift. 130 and 140 would be the sergeants on

19 the shift, and then you have K-91. I know that to

20 be Jeff Stork.

21      But as far as the other numbers, I

22 don't -- they're hard to put voices with numbers,

23 and I don't know their -- their numbers. But that

24 person sounded like Paul Miller.

25      Q.      Paul Miler.

1          A.          I don't -- I don't know for sure.

2          Q.          Thank you.

3                      All right.  We've only got like a

4    minute or so left.  So let's just wrap it up.  And,

5    of course, tell me if you need me to stop.

6                          (Audio playing).

7          A.          I couldn't hear.

8          Q.          (BY MR. OSBORNE) Do you want to

9    hear it again?

10         A.          Yeah, I couldn't -- I couldn't hear

11   it.

12                         (Audio playing).

13         A.          That, I don't -- whatever that was,

14   I couldn't hear it.

15                               (Audio playing).

16         Q.          (BY MR. OSBORNE) All right.  One

17   thing I did want to ask you about, Mike Adams -- and

18   I typed what he said.  He says, "The number I have

19   is not answering," which I think is in reference to

20   you, "if you've got a work cell."  And then the

21   response is █████4815.

22                      So █████4815, that is your work

23   cell, right?

24         A.          Correct.

25         Q.          Do you know, did Mike Adams only

1    have your personal cell at that point?

2              A.       I don't know what he had.

3              Q.       Okay.  And then I also noticed --

4    and this may have been Stork or someone else,

5    someone says, "Keep the phone as evidence."

6                       I think that's a conversation

7    between Stork and Adams.  And he says, "Don't let

8    him be talking on the phone."

9                       Did you hear that?

10             A.       Yes.

11             Q.       Okay.  And then the response, which

12   I believe comes from Stork, is, "I've secured the

13   phone."

14                      Did you hear that, too?

15             A.       Something to that effect.

16             Q.       All right.  Let's take a look at

17   this phone bill.

18                      We've got numbers.  Here on the

19   first page there is the first call, 2:42 a.m., 9/19.

20   The number is ██████████5891.  And I'll just

21   represent to you that we have records that show that

22   that was Mike Adams.

23                      So if that lines up with what

24   you're saying, there was an incoming call from Mike

25   Adams at 42 -- pardon me -- 2:42 a.m.

1                          Can you see that?

2              A.         I do.

3              Q.         Okay.  Do you remember if Mike

4    Adams called you around 2:42 a.m.?

5              A.         I don't know who called me.  I

6    thought it was Toma.

7              Q.         Okay.  That's fine.  The only

8    reason that I'm asking is because it seems like

9    these line up with what you're saying.  I just want

10   to confirm.

11                        The next few calls there are made

12   at 4:37 a.m. 4:49 a.m., 4:50 -- sorry, 5:40 a.m.,

13   all to the same number, the number ending in 5896.

14                        And, again, I'll just represent for

15   the record, that's Peters' number.

16                        So do you recall calling Captain

17   Peters that night?

18             A.         I recall -- yeah, I recall making

19   phone calls to him.

20             Q.         What were you talking to Captain

21   Peters about?

22             A.         Telling him what was going on.

23             Q.         Okay.

24             A.         I can't -- I don't remember

25   specific details from the conversation.

```
 1            Q.        All right.  Do you -- do you recall

 2    talking to him at all about the video cameras that

 3    were in Williams' home, in his apartment that night?

 4            A.        I don't recall specifically talking

 5    about those.

 6            Q.        Okay.  Do you know what an Arlo

 7    camera is?

 8            A.        Yes.

 9            Q.        All right.  Do you know if you

10    talked to Peters that night about Arlo cameras?

11                      I'm just seeing if this refreshes

12    your recollection.  If it doesn't, it doesn't.

13            A.        I can't say that I remember that.

14            Q.        Okay.  Oh, there was one other

15    thing I wanted to ask you.

16                      Was Toma Sparks on duty that night?

17            A.        He was the on-call investigator, is

18    what I remember.

19            Q.        Do you know if Justin Jenkins was

20    also on call that night?

21            A.        I do not.  Only one investigator is

22    on call at a time.

23                      I can speculate as to why if he

24    was, what that was.

25            Q.        You can explain why that might have
```

1    been the case, but I don't want you to guess about

2    things you don't know.

3                    Can you say why that might have

4    been the case?

5         A.        Yes.  Investigator Jenkins was new

6    to -- fairly new to CID, and he was -- we would

7    normally have new investigators be on call with

8    another investigator.

9         Q.        Was Adams on duty that night?

10        A.        Who?

11        Q.        Mike Adams.

12        A.        I believe he was on patrol.

13        Q.        On patrol.

14                  Do you recall hearing somebody say

15    in the phone call, "I'm up in the apartment"?

16        A.        Yes, I believe so.  Something to

17    that -- to that effect.

18        Q.        Do you know if Stork at any point

19    entered up into the apartment?

20        A.        That sounds familiar.  I can't -- I

21    think that was him on there that said that.

22        Q.        All right.  There was also a

23    reference to a change in policy on phones.

24                  Do you remember that in the early

25    part?  It was around the time Mike Adams was asking

1    for your work phone.

2                    Did you hear that?

3         A.       A change in policy?

4         Q.       Yeah.

5                    MR. OSBORNE:  Let's -- so can you

6         play it again?  It's about 5:20 or so.

7                    (Audio playing).

8         Q.       (BY MR. OSBORNE) Did you hear that?

9                    "There's a change in policy, they

10    want us calling them to you."

11                   Did you hear that?

12        A.       I couldn't understand.

13        Q.       That's how I heard it.  It's tough

14    to hear it.

15                   Was there a change in policy,

16    insofar as you know, around that time about the

17    dispatch contacting CID supervisors?

18        A.       Yes.

19        Q.       What was the change in policy?

20        A.       I think they were supposed --

21    rather than calling the -- it was around that time.

22    I'm speculating as to what she's talking about, if

23    that -- if that's what you want.

24        Q.       No.  I want to know what the change

25    of policy was, not what she was talking about.

1          A.          That a supervisor was supposed to

2     be called before, instead of just calling the

3     investigator in.

4          Q.          Okay.  Do you know why that policy

5     was changed?

6                      I'm going to rephrase the question.

7                      What is your understanding of why

8     the policy was changed?

9          A.          I think some investigators were

10    called out on maybe some things that maybe they

11    shouldn't have been called out on.  And to keep from

12    that happening, I think that's -- that was the

13    purpose.

14         Q.          So they changed the policy.

15                     MR. OSBORNE:  All right.  We'll

16         mark this Exhibit 214.

17                     (Exhibit 214 marked).

18         Q.          (BY MR. OSBORNE) Okay.  214 is an

19    email from you to a number of people.  I think we

20    handwrote the Bates up in the top of this one just

21    because it didn't appear in every law production we

22    printed.

23                     Go ahead and take a minute and read

24    it.

25                     And I'll just ask, before we get

 1    started, was this one of the documents that you read

 2    to prepare for today's deposition?

 3           A.      Yes.

 4           Q.      Okay.  Do you need to read it, or

 5    are you already familiar with it?

 6           A.      I may refer to it after your

 7    question.

 8           Q.      That's fine.

 9           A.      If you want to give me a minute, I

10    will read it.

11           Q.      Go ahead.

12           A.      Okay.

13           Q.      We're not in a hurry.

14           A.      Okay.

15           Q.      Okay.  So did you write this email?

16           A.      I believe so.

17           Q.      Thanks.  Let's go on and confirm --

18    the time stamps on email sometimes are bizarre.

19    They might use like Greenwich Mean Time or

20    Universal.

21                   Do you actually know what time you

22    sent this email, ballpark?

23           A.      It was in the afternoon, I believe.

24           Q.      All right.

25           A.      And I'm just trying to do the math

1    here.

2           Q.      Sure.

3           A.      It's not computing.

4           Q.      And it was on the 19th of

5    September, 2020, right?

6           A.      Yes.

7           Q.      Which was a Saturday?

8           A.      Correct.

9           Q.      Okay.  I'm going to go through some

10   of the content and just ask you some questions about

11   it.

12                  The first is, "Platoon 1 officers

13   were flagged down in reference to a female that

14   fell."

15                  What does that mean, flagged down?

16          A.      Like they were like, "Hey, help."

17   Somebody waved them down.

18          Q.      Was that the -- insofar as you

19   know, was that the way that any law enforcement

20   first found out about this?

21          A.      As far as I know.  I mean, I

22   don't -- I can't go back in my memory and see and

23   think how did they find out.

24          Q.      I'm going to -- I'm going to ask

25   sort of a preface question about this email.

1                          The things you put in this email,

2      insofar as you knew, they were true, right?

3              A.      Yes.

4              Q.      You weren't making stuff up.  You

5      weren't guessing.  At the time that you wrote the

6      email, you were writing it to the best of what you

7      knew at the time.

8              A.      Correct.

9              Q.      And the information that you put in

10     here, you did your best to make sure that it was

11     accurate, correct?

12             A.      Yes.

13             Q.      Okay.  So I apologize.  Platoon 1,

14     you said there were ten different platoons or four

15     platoons?

16             A.      There are four patrol platoons, and

17     then there's a Platoon 5 that does different

18     functions.

19             Q.      And the different platoons -- let's

20     see.

21                     Were you, at the time -- let's see.

22     You were a sergeant, right?

23             A.      Yes.

24             Q.      Were you sergeant for Platoon 1 at

25     the time?

```
1        A.        No.

2        Q.        What were you?

3        A.        I was a sergeant in CID.

4        Q.        In CID.  I see.  Okay.  Thank you.

5                  And were there officers on Platoon

6   1 who were your reports?  You were there

7   supervisors.

8        A.        No.

9        Q.        Okay.  Your reports were all CID

10  also, correct?

11       A.        What do you mean by my reports?

12       Q.        The people you had direct

13  supervision over.

14       A.        They were all CID.

15       Q.        Okay.  And we've already gone

16  through who you believe those people were.

17       A.        Yes.

18       Q.        And they included Toma Sparks and

19  Justin Jenkins, who show up later in here, right?

20       A.        Correct.

21       Q.        Okay.  Do you know which officers

22  you're referring to when you say that Platoon 1

23  officers were flagged down?

24                 Is the best of your memory that it

25  was Mike Adams and Jeff Stork?
```

1          A.          I have no idea who was flagged

2     down.

3          Q.          Was Mike Adams in Platoon 1?

4          A.          He was.

5          Q.          Was Jeff Stork?

6          A.          Yes.

7          Q.          Okay.  Based on what you heard in

8     the phone call, and to the best of your memory, were

9     Mike Adams and Stork, were they two of the officers

10    who were there on the scene that evening?

11         A.          Yes.  I would say that Jeff Stork

12    was there, and it sounded as though Captain Adams

13    was there, as well.

14         Q.          Okay.  About this email, did

15    somebody actually instruct you to write this email?

16    Did somebody ask for this?

17         A.          No.  It's a typical of whenever

18    we're called out that -- that we send an email.

19         Q.          And the information that you've got

20    in here, was this information that you got from

21    asking folks questions?

22         A.          Yes, and them briefing me, letting

23    me know what happened.

24         Q.          Okay.  Did you actually do a --

25    besides this email, did you do any other report that