**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION**

**B.P., et al.,**

       **Plaintiffs,**

**v.**                                      **No: 2:23-cv-00071-TRM-JEM**

**CITY OF JOHNSON CITY, TENNESSEE, et al.,**

       **Defendants.**

_____/

<u>**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION;
MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## <u>NOTICE OF MOTION AND MOTION</u>

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

COME NOW Plaintiffs B.P., H.A., and S.H., ("Plaintiffs"), through their undersigned counsel, to respectfully request an order certifying the following class pursuant to Federal Rule of Civil Procedure 23(b)(3): All women, including minors, who reported crimes of sexual violence by any person to JCPD from January 1, 2018 to December 31, 2022 ("Reporter-Survivor Class").

Plaintiffs also seek an order certifying the following issues pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the following class: All individuals, including minors, who were sexually abused, drugged, or trafficked by Sean Williams or Alvaro Fernando Diaz-Vargas ("Sex Trafficking Survivor Class"):

1. Whether the Williams sex-trafficking venture violated the Trafficking Victims Protection Act, 18 U.S.C. § 1591.

2. Whether any Defendant knew (or recklessly disregarded) that Williams was engaged in a sex-trafficking venture in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591.

3. Whether any Defendant knowingly benefitted (or attempted or conspired to benefit) from participation in the Williams sex-trafficking venture.

4. Whether any Defendant obstructed, attempted to obstruct, or in any way interfered with or prevented the enforcement of the Trafficking Victims Protection Act, 18 U.S.C. § 1591.

Finally, Plaintiffs seek an order certifying the following issue pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the following subclass: All members of the Sex Trafficking Survivor Class who were sexually assaulted by Sean Williams following the first report to the JCPD of Sean Williams' alleged sexual violence on or about November 7, 2019 ("Williams Survivor Subclass"):

5. Whether any of the following alleged conduct shocks the conscience in violation of the Due Process Clause of the United States Constitution:

a.  Any Defendant sharing in the proceeds of Williams' sex-trafficking scheme by accepting money or items of value from Sean Williams directly or indirectly through a co-conspirator.

b.  Any Defendant soliciting a bribe from Williams or a co-conspirator in exchange for insulating Williams from investigation or prosecution;

c.  Any Defendant concealing evidence of Williams' crimes.

This Motion is made pursuant to Federal Rule of Civil Procedure 23 and is based upon this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Declaration of Vanessa Baehr-Jones in Support of Plaintiffs' Motion and all exhibits thereto, all other pleadings and papers on file, and such other arguments and materials as may be presented before the Motion is taken under submission.

Dated: October 15, 2024                    Respectfully submitted,

*/s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones CABN # 281715
*Pro Hac Vice*
Advocates for Survivors of Abuse PC
4200 Park Boulevard No. 413
Oakland, CA 94602
(510) 500-9634
vanessa@advocatesforsurvivors.com

*/s /Julie C. Erickson*
Julie C. Erickson (California Bar # 293111)
Elizabeth A. Kramer (California Bar # 293129)
Kevin M. Osborne (California Bar #261367)
*Pro Hac Vice*
Erickson Kramer Osborne LLP
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

*/s/ Heather Moore Collins*
Heather Moore Collins (# 026099)

Ashley Shoemaker Walter (#037651)
HMC Civil Rights Law, PLLC
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

*Attorneys for Plaintiffs and Proposed Classes*

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................. 1

II.   Relevant Factual Background ......................................................................................... 2

   A.   Summary of Lawsuit and Plaintiffs' Claims ............................................................ 2

   B.   Sex-Trafficking Venture, Beneficiary Liability, and Obstruction ............................. 3

      1.   Williams' Sex Trafficking Venture ................................................................... 3

      2.   TVPA Violations, Defendants' Obstruction, Beneficiary Liability ..................... 3

   C.   The Daigle Report ................................................................................................ 7

   D.   JCPD's Discriminatory Investigative Practices ........................................................ 9

III.  Argument ................................................................................................................... 13

   A.   The Proposed Classes Meet the Four Prerequisites of Rule 23(a): Numerosity, Commonality, Typicality, and Adequacy of Representation .................................... 13

      1.   Numerosity ................................................................................................. 13

      2.   Commonality ............................................................................................... 14

      3.   Typicality ................................................................................................... 17

      4.   Adequacy of Representation ......................................................................... 18

   B.   Certification of the Reporter-Survivor Class Under Rule 23(b)(3) ......................... 19

      1.   Predominance .............................................................................................. 19

      2.   Superiority ................................................................................................... 25

      3.   Ascertainability ........................................................................................... 26

   C.   Certification of Issues Classes .............................................................................. 26

      1.   Sex-Trafficking Survivor Issues Class ............................................................ 27

      2.   Williams Survivors Issues Class .................................................................... 29

      3.   Rule 23(c)(4) Predominance, Superiority, and Trial Plan ................................ 30

IV.   Conclusion ................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

Bacon v. Honda of America Mfg., Inc.,
370 F.3d 565 (6th Cir. 2004) ............................................... 14

Balistreri v. Pacifica Police Dep't,
901 F.2d 696 (9th Cir. 1988) ............................................... 21

Beattie v. CenturyTel, Inc.,
511 F.3d 554 (6th Cir. 2007) ............................................... 25

Card v. City of Cleveland,
270 F.R.D. 280 (N.D. Ohio 2010) ............................................... 23

Carter v. Dist. of Columbia,
795 F.2d 116 (D.C. Cir. 1986) ............................................... 20, 24, 25

Chase v. Nodine's Smokehouse,
2019 WL 1469412 (D. Conn. Apr. 3, 2019) ............................................... 21

Chrisner v. Complete Auto Transit, Inc.,
645 F.2d 1251 (6th Cir. 1981) ............................................... 21

City of Canton v. Harris,
489 U.S. 378 (1989) ............................................... 15

Cole v. City of Memphis,
839 F.3d 530 (6th Cir. 2016) ............................................... 26

Connick v. Thompson,
563 U.S. 51 (2011) ............................................... 20, 22, 23

Daffin v. Ford Motor Co.,
458 F.3d 549 (6th Cir. 2006) ............................................... 19

Dahl v. Turner, et al.,
Case No. 2:22-cv-00072-KAC-JEM ............................................... 7

Davidson v. Henkel,
302 F.R.D. 427 (E.D. Mich. 2014) ............................................... 14

Doe 1 v. JPMorgan Chase Bank, N.A.,
2023 WL 3945773 (S.D.N.Y., June 12, 2023) ............................................... 27, 29, 30

Doe v. Claiborne Cnty.,
103 F.3d 495 (6th Cir. 1995) ............................................... 24

Garner Prop. & Mgmt., LLC v. City of Inkster,
333 F.R.D. 614 (E.D. Mich. 2020) ............................................... 14

Gen. Tel. Co. v. EEOC,
446 U.S. 318 (1980) ............................................... 14

General Tel. Co. of Southwest v. Falcon,
457 U.S. 147 (1982) ............................................... 17

*Gregory v. City of Louisville*,
    444 F.3d 725 (6th Cir. 2006) ................................................................. 15

*Hicks v. Frey*,
    992 F.2d 1450 (6th Cir. 1993) ............................................................... 24

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) ................................................. 14, 17, 19

*In re Flint Water Cases*,
    558 F.Supp.3d 459 (E.D. Mich. 2021) ................................................. 30

*International Broth. Of Teamsters v. U.S.*,
    431 U.S. 324 (1977) ........................................................................ 21, 24

*Leach v. Shelby County Sheriff*,
    891 F.2d 1241 (6th Cir. 1989) ............................................................... 15

*Martin v. Behr Dayton Thermal Products LLC*,
    896 F.3d 405 (6th Cir. 2018) .......................................................... passim

*Mata-Cuellar v. Tennessee Dep't of Safety*,
    2010 WL 3732172 (M.D. Tenn. Sept. 20, 2010) ................................ 23

*Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*,
    361 F.3d 898 (6th Cir. 2004) ................................................................. 15

*Miller v. Sanilac Cnty.*,
    606 F.3d 240 (6th Cir. 2010) ................................................................. 15

*Mississippi Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) ............................................................................... 15

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978) .......................................................................... passim

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ................................................................. 17

*Phillips v. Sheriff of Cook Cnty.*,
    828 F.3d 541 (7th Cir. 2016) ........................................................... 14, 23

*Powers v. Hamilton Cnty. Pub. Def. Comm'n*,
    501 F.3d 592 (6th Cir. 2007) ........................................................... 21, 23

*Senter v. Gen. Motors Corp.*,
    532 F.2d 511 (6th Cir. 1976) ........................................................... 18, 19

*Snead v. CoreCivic of Tennessee, LLC*,
    2018 WL 3157283 (M.D. Tenn. June 27, 2018) ........................ 17, 23, 26

*Snead v. Corecivic of Tennessee, LLC*,
    2020 WL 6469995 (M.D. Tenn. Apr. 6, 2020) ................................... 20

*Sprague v. Gen. Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) ......................................................... 14, 17, 18

*Sterling v. Velsicol Chem. Corp.*,
    855 F.2d 1188 (6th Cir.1988) ............................................................... 19, 21, 25

*Stout v. J.D. Byrider,*
    228 F.3d 709 (6th Cir. 2000) ................................................................ 19

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................................ 20, 21

*United States v. Virginia*,
    518 U.S. 515 (1996) ................................................................................ 21

*United States v. Williams*,
    No. 2:23-cr-00111-JRG-CRW ............................................................... 2

*Vassalle v. Midland Funding LLC*,
    708 F.3d 747 (6th Cir. 2013) ................................................................ 26

*West v. Atkins*,
    487 U.S. 42 (1988) .................................................................................. 14

*Young v. Nationwide Mut. Ins. Co*,
    693 F.3d 532 (6th Cir. 2012) ................................................................ 25, 26

**Statutes**

18 U.S.C. § 1591 ......................................................................................... 2, 27

18 U.S.C. § 1595 ......................................................................................... 2

42 U.S.C. § 1983 ......................................................................................... 3

Fed. R. Civ. P. 23 ........................................................................................ passim

**Treatises**

Manual for Complex Litigation, Fourth, § 21.24 ...................................... 30

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ...................................................................... 21

# I.  **INTRODUCTION**

This case involves grave allegations of sex trafficking, the sexual assaults of dozens of women and children, and perhaps most disturbing, public corruption at the hands of the Johnson City Police Department that enabled the perpetrator of these heinous acts, Sean Williams, to terrorize his victims over the course of years. Plaintiffs, three survivors of sexual violence, allege two primary theories of liability against the City of Johnson City in this putative class action. First, on behalf of all women who were trafficked by Williams, Plaintiffs allege that JCPD officers obstructed investigations into Williams' sex-trafficking venture to avoid discovery of the fact that the officers were engaged in a conspiracy to extort and bribe Williams, a known drug dealer. A subclass of these victims who were assaulted by Williams allege this conscience-shocking conduct violated their constitutional right to substantive due process. Second, on behalf of all women who reported sexual abuse to JCPD, Plaintiffs allege that JCPD violated their constitutional right to equal protection of the law by customarily discriminating against women through certain well-established investigative practices.

Much has transpired in this litigation since Plaintiffs finalized their Second Amended Complaint. Over the past nine months, Plaintiffs have obtained an overwhelming amount of evidence confirming their factual allegations and legal theories. However, due to the nature of their allegations relating to Williams' sex trafficking scheme—specifically, allegations regarding causation and damages—Plaintiffs advance herein a carefully crafted approach to certification under Rule 23(c)(4). Through this much less frequently used mechanism, Plaintiffs request the Court certify only certain issues common to all members of the Sex Trafficking Survivor Class. This approach allows the Court and the parties to enjoy the efficiencies and benefits of the class action vehicle as appropriate, while providing for streamlined individualized proceedings to resolve the remaining issues.

Additionally, Plaintiffs have confirmed through discovery the existence, prevalence, and impact of the various practices JCPD officers regularly employed when investigating cases of sexual assault reported by women. These practices were previously identified by police practices

1

expert Eric Daigle, but Plaintiffs have now independently verified his conclusions by obtaining and reviewing the source documents on which he relied, among others. Thanks to this evidence and the nature of the legal issues involved in a Section 1983 claim, Plaintiffs are well-suited in seeking certification of the Reporter-Survivor Class under Rule 23(b)(3).

## II.     RELEVANT FACTUAL BACKGROUND

### A. Summary of Lawsuit and Plaintiffs' Claims

For over a decade, Sean Williams raped and sexually exploited women and children in Johnson City, Tennessee, as part of a sex trafficking conspiracy. Images and videos obtained from his digital devices at the time of his arrest show that he sexually assaulted at least 67 women. Baehr-Jones Decl., Ex. 1.[1] In November 2022, the U.S. Department of Justice and the Federal Bureau of Investigation ("FBI") opened a sex trafficking investigation into Williams based on these crimes, which remains ongoing. ECF 121, Second Am. Compl. ("SAC"), at 3.[2]

Plaintiffs allege that the Johnson City Police Department ("JCPD") allowed Williams to perpetrate these crimes for years with impunity, and bring claims against Defendant Johnson City and JCPD officers under three theories of liability: First, under the Trafficking Victims Protection Act ("TVPA"), Plaintiffs allege that JCPD officers intentionally obstructed investigations into Williams' rapes and child sex crimes in violation of 18 U.S.C. §§ 1595, 1591(d). SAC, ¶¶ 64-80, 143-83, 327-37. Under the TVPA, Plaintiffs also allege that JCPD officers benefitted financially from their participation in covering up Williams' sex trafficking conspiracy, in violation of 18 U.S.C. §§ 1595, 1591(a). *Id*. at ¶¶ 57-63, 81-87, 311-26.[3] Specifically, JCPD officers, including Defendant Toma Sparks, allegedly extorted cash from Williams through his coconspirator Female 4. *Id.* at ¶ 63. Second, Plaintiffs allege Constitutional violations under the Equal Protection and

---

[1] All exhibits cited herein are attached to the Declaration of Vanessa Baehr-Jones.

[2] Williams also faces federal criminal charges for production of child pornography based on his sexual exploitation of three children, including then-nine-month-old infant C.A. *See United States v. Williams*, No. 2:23-cr-00111-JRG-CRW.

[3] In August 2023, the FBI opened a federal public corruption investigation into JCPD's potential criminal misconduct relating to Williams, which also remains ongoing. Baehr-Jones Decl. ¶ 5.

Substantive Due Process Clauses, pursuant to 42 U.S.C. § 1983, for JCPD officers' discriminatory treatment of female reporters of sexual violence; and for officers engaging in unconstitutional conduct that shocks the conscience. *Id.* at ¶¶ 231-50, 367-88.

### B. Sex-Trafficking Venture, Beneficiary Liability, and Obstruction

*1. Williams' Sex Trafficking Venture*

Williams used three primary means and methods to recruit, entice, harbor, provide, obtain, maintain, and solicit women and children, in furtherance of the sex trafficking conspiracy, including: (1) providing benefits in the form of drugs, cash, and free lodging to coconspirators, and other third parties, to recruit, obtain, transport, maintain, and provide women; (2) using drugs to addict and control women who would then recruit, obtain, transport, maintain, and provide other women; and (3) offering something of value to women, including free lodging and money, at times under the guise of hiring them for purportedly legitimate purposes, so that he could obtain and gain access to them and their minor children. SAC, ¶ 22.

Evidence in Plaintiff B.P.'s case demonstrates how Williams carried out the conspiracy. B.P. testified that on the night of her rape, Williams' coconspirator, Alvaro Diaz-Vargas, enticed her and her friend back to Williams' apartment and she went reluctantly. Ex. 2, B.P. Tr., 38:4-17. Once B.P. was in Williams' apartment, Williams gave her a beer that was laced with a drug that rendered B.P. unconscious. *Id.* at 39:11-24. B.P. recalled waking up with Williams on top of her, knowing she had been violated. *Id.* at 63:17-24; 64:5-25; 65:1-3. She immediately went to urgent care and then a hospital to get a drug test, a rape kit, and give a statement to the police. *Id.* at 41:16-18. In April 2023, law enforcement recovered digital evidence from Williams at the time of his arrest that included images/videos depicting B.P.'s sexual assault. Ex. 1, ¶ 4. To date, there has been no indictment in B.P.'s case.

*2. TVPA Violations, Defendants' Obstruction, Beneficiary Liability*

Evidence supports that JCPD officers, including then-chief Karl Turner, then-captain Kevin Peters, and Investigators Toma Sparks and Justin Jenkins engaged in intentional acts that

violated the TVPA. These intentional acts were not limited to a single case but are evidenced by the totality of the officers' conduct over the course of the alleged conspiracy.

JCPD efforts to obstruct the sex crimes investigations into Williams began as early as December 2019 when JCPD supervisor Matthew Gryder closed B.P.'s case <u>before</u> the rape kit results came back; <u>before</u> any interview of Williams or Diaz-Vargas; and <u>before</u> JCPD took any other investigative steps. Ex. 3, Gryder Tr., 115:6-25. In fact, once B.P.'s rape kit results did come back showing male DNA was present, the evidence sat in JCPD custody from July 2020 to March 2021 before B.P. was ever informed. Ex. 4. By the time Sparks finally called B.P. in March 2021, JCPD had evidence Williams had raped nearly two dozen women and children. *See* Ex. 5. Yet, instead of encouraging B.P. to pursue the case, Sparks told her Williams was "untouchable," and nothing would ever "stick" against him. B.P. Tr., 115:23-25. Sparks further discouraged B.P. by telling her that JCPD could not guarantee her safety. *Id.* at 116:1-10. B.P. nevertheless called Sparks and told him she still wanted to press charges. *Id.* at 168:20-24. Rather than obtain a warrant for Williams' DNA at that point, however, Sparks did nothing to further investigate. Ex. 6.

Just six months after B.P.'s report, in June 2020, another victim of Williams, Female 2, attempted to report her sexual assault to JCPD. By then, Peters, who was Gryder's supervisor and the overall supervisor of CID, was aware of <u>both</u> B.P.'s rape case and Female 2's case. *See* Exs. 7, 8. Despite both Gryder and Peters knowing that Williams was now accused of two sexual assaults under similar circumstances, neither informed the investigating officer in Female 2's case, Deborah Dunn, and Dunn did not run a background check or take any other steps to learn that Williams was a repeat offender. Ex. 9, Dunn Tr., 195:10-12; 207:4-7, 25; 208:1-4. Female 2's case was closed <u>before</u> JCPD conducted any interviews of Williams or Diaz-Vargas, <u>before</u> any interviews of any percipient witnesses, and <u>before</u> the collection of physical evidence. *See* Ex. 10.

The most direct evidence of obstruction comes from JCPD's actions on September 19, 2020, and afterwards, in responding to an active crime scene at Williams' apartment. Sparks and Jenkins arrived after Mikayla Evans (Female 3) fell five stories from Williams' penthouse apartment window to the cement sidewalk below. Ex. 11. Instead of securing the crime scene,

however, these two experienced CID investigators facilitated evidence destruction: Williams' blood-covered hands were never tested. Ex. 12. Video cameras were never secured. Ex. 13. They also permitted Williams to maintain custody of his cellphone. By the time they finally seized the phone at the end of his interview at headquarters, Williams had wiped it. *See* Ex. 11.

Later that same morning, Jenkins, Sparks, and JCPD officers Keith Sexton and David Hilton executed a residential search warrant on Williams' apartment. *Id.*; Ex. 14. Inexplicably, the officers left a large rifle unsecured during the search, neither seizing nor inventorying it, despite knowing Williams was a felon. Ex. 15. Instead, the officers seized Williams' safe, and digital devices, including five computers, three cellphones, and six video cameras. Ex. 16. The officers never obtained a follow-on search warrant for any of the digital devices—even though that was the evidence their original warrant sought—but within days, they had obtained a search warrant for the safe. Ex. 17.

On September 23, 2020, a group of JCPD officers filmed the opening of the safe, which contained, among other items, large amounts of cash and a baby doll with a hole in her genitals. Ex. 18. The officers never counted or inventoried the cash before the safe was returned; the money simply disappeared. *See* Ex. 16. According to Williams, JCPD stole approximately $420,000 from the safe. SAC ¶ 86. Nor did officers seize the baby doll and two dildos as potential evidence of child sexual exploitation. *See* Ex. 16. JCPD officers also disregarded a list found in Williams' apartment entitled, "Raped," which included 23 female names, including names that appeared to reference babies or children, neither seizing nor inventorying it. *See id.*

JCPD leadership, including Turner and Peters, were aware as of September 19, 2020, of the seized digital devices and the need for a follow-on warrant but took no action to secure one. *See* Ex. 19. Beginning in or around November 2020, former Special Assistant U.S. Attorney Kateri Dahl tried to convince Turner, Peters, and Sparks to obtain a search warrant for the devices, but Turner discouraged her from trying to obtain one, and Sparks failed to send her a draft affidavit for months. *See, e.g.*, Ex. 20, at 9; Exs. 21-23. In May 2023, a search warrant was finally obtained for the digital devices, which by then had sat in JCPD custody unlawfully for two and a half years.

Ex. 24. Inv. Little found images and videos of Williams raping women and sexually exploiting children. Ex. 25, Finney Tr., 274:9-12; 277:16-20. Had JCPD acted on the evidence that Williams was sexually exploiting children in September 2020, they could have prevented the sexual exploitation of minor victim C.A. in December 2020, among other horrific crimes Williams perpetrated with impunity.

Thus, by December 2020, Turner and Peters knew that Williams had likely raped nearly two dozen women; that there was a commercial element to his victimization (paying women to bring other women to his apartment); and that Dahl was investigating Williams' sex crimes as potentially part of a human trafficking conspiracy. *See* Ex. 20 at 14, 31-32. Notwithstanding this knowledge, Peters and Turner obstructed Dahl's federal investigation into Williams and effectively terminated her under false pretenses. *See id.* at 9, 131-44; Exs. 19, 21-23. Another two years would pass before JCPD re-initiated investigations into Williams' rapes—and only after Williams was arrested with videos and images of over 67 women he had violated. By then, the FBI had opened its own sex trafficking investigation into Williams.

In July 2022, Peters and Sparks supervised Inv. Brady Higgins during the investigation into Female 8's report of rape by Williams. Peters watched Higgins interview her from another room and provided advice during breaks; Peters also reviewed Female 8's statement. Ex. 26, Higgins Tr., 96:6-14; 114:12-25; 115:1-10, 22-25; 116:1-5. The resulting report omitted the critical fact that Female 8 told Higgins she saw photographs of Williams putting his penis <u>in the mouths of children</u>. Instead, the report stated only that she saw photographs of Williams <u>with children</u>. Ex. 27; Higgins Tr., 152:23-25; 153:1-21; 154:1-25; 155:1. Ultimately, Gryder closed Female 8's case in March 2023, just weeks before Williams was apprehended in possession of files depicting Female 8's rape. Ex. 28. There have still been no charges in her case.

Finally, as to Plaintiffs' allegations regarding JCPD's extortion of Williams, evidence in the form of bank records supports that Williams' coconspirator Female 4 made payments to JCPD officers Sparks and Jenkins. For instance, bank records for Williams' company, Glass and Concrete Contracting LLC, show cash being withdrawn during the time of the conspiracy, in

amounts similar to what is alleged in the SAC. *See* ECF 235 at 5-7. Similarly, financial records for Sparks and Jenkins show deposits into their accounts for amounts which appear to be above any known sources of legitimate income. *See, e.g.*, ECF 346 at 5-6 (evidence that Jenkins engaged in a money laundering scheme to hide approximately $400,000 of additional income); *id.* at 5 (evidence of payment from Female 4 to Jenkins on June 1-2, 2022). For example, the records for just one of Sparks' accounts show ███████████████████████████ during the alleged conspiracy. Baehr-Jones Decl. ¶ 6. Sparks' bank records also reveal evidence tying Sparks to a payment of $14,000 to Female 4 on January 22, 2024. By this time, Female 4 was a witness in the federal public corruption investigation—an investigation in which Sparks had also been interviewed as a potential target. Ex. 29, Female 4 Tr., 153:9-16; Ex. 30 at 6. Sparks' bank records show $21,200 in outgoing checks within seven days of when a consignment shop, Luxury Label, deposited $21,000 in cash from a purported buyer—about whom no records exist—and then wired $14,000 to Female 4. *See* ECF 330-11; Ex. 31.

### C. The Daigle Report

In July 2022, Dahl filed a lawsuit against Johnson City, alleging that JCPD impeded her efforts to investigate Williams' sex crimes and then declined to renew her contract in retaliation. *See Dahl v. Turner, et al.*, Case No. 2:22-cv-00072-KAC-JEM. In response to the ensuing community outrage at news of the allegations, Johnson City hired police practices expert Eric Daigle to conduct an audit of JCPD's practices with respect to investigating sexual assault cases. The City gave Daigle access to nearly four years' worth of police reports and records of sexual assault cases—about 325 files. *See* Ex. 33, Daigle Report, 6-7. He and his team analyzed each investigation using an assessment tool developed based on the requirements outlined in JCPD policies, Daigle Law Group Policy Center Model Policies, and several other sources of law enforcement model policies and guidelines. *Id.* at 7. JCPD officers and supervisors, including Turner and Peters, also sat for interviews with Daigle to answer questions about JCPD handling of victims' reports, as well as department practices and culture. *Id.* at 5.

Daigle's audit also involved analyzing JCPD's policies and procedures known as "General Orders." Throughout the relevant period, JCPD maintained a comprehensive set of General Orders that governed how department personnel were to carry out their job duties. Ex. 34, 30(b)(6) Tr., 31:8-34:12. The GOs, which are organized by topics like "Interview & Interrogation" and "Crime Scene Unit," were provided to all officers either during their probationary training period or at the time they were created. Ex. 34, 30(b)(6) Tr., 56:22-62:4; Ex. 9, Dunn Tr., 54:1-57:3. They were uniform for all officers throughout the relevant period, and all officers were required to comply with them. Ex. 34, 30(b)(6) Tr., 56:22-60:25; Ex. 9, Dunn Tr., 57:5-58:25. Of note is General Order 600.13, which sets forth JCPD's protocol for investigating "Sexually Oriented Crimes." Ex. 35. Under this GO, officers "shall use appropriate communication skills when interacting with victims" and "shall be trained and knowledgeable about investigation of sexually oriented crimes and its impact on victims." *Id*. at 1. The policy instructs officers "to be mindful of the impact of trauma on memory," specifically that victims may "experience difficulty with memory storage and recall" and, as a result, "may be inconsistent or unclear in their descriptions." *Id.* Officers are directed to assess credibility with that in mind. *Id.* The GO requires the responding officer to preserve the crime scene, obtain detailed information, obtain statements from the victim and witnesses, and other steps aimed at identifying and locating a suspect. *Id.; see also* Ex. 36, GO 600.07, Interview & Interrogation (requiring officers to interview and obtain a statement from the suspect if one is identified).

While Daigle's methodology included analysis of individual case files, his conclusions were drawn as to JCPD <u>as a department</u>, not about any specific investigation or officer. Ex. 32, Daigle Tr., 388:4-11 ("Q: With regard to your audit, you are looking at process issues and you're reviewing investigation information, but you're not making findings about any particular investigation, that that investigation was good or bad. A: Correct.); *id*. at 46:13-48:2 (purpose of auditing over 325 case files was to identify "patterns" at JCPD). Daigle's evaluation yielded extensive findings and recommendations aimed at bringing JCPD in line with the "policies, procedures, and operational practices" necessary "to ensure constitutional policing." Ex. 33,

Daigle Report, 3; *see also id.* at 4 (the point is to "hold the department accountable" for constitutional policing). The key findings of the report are: 1) JCPD policies and procedures are insufficient to meet industry standards and legal requirements for sexual assault investigations; 2) JCPD officers need training to ensure effective and unbiased responses to allegations of sexual assault; 3) JCPD should immediately implement the District Attorney's Sexual Assault protocol; 4) JCPD should improve investigations of non-stranger and alcohol or drug-facilitated sexual assault; 5) JCPD should ensure a more victim-centered response to sexual assault; 6) JCPD should ensure close supervision and internal oversight of sexual assault investigations; and 7) JCPD should ensure that sexual assault investigations are properly closed. *Id.* at 11-12.

### D. JCPD's Discriminatory Investigative Practices

Plaintiffs allege that, in response to reports of sexual assaults, JCPD engaged in a pattern of investigative practices that discriminated on the basis of sex. This pattern was comprised of a set of department-wide practices carried out consistently during the relevant period.

First, JCPD had "a practice of not conducting suspect interviews" in sexual assault cases. Ex. 33, Daigle Report, 20. Of all rape cases from 2018-2022 in which a suspect was identified (105 out of 133), <u>66% of the time JCPD did not contact the suspect, let alone get a statement</u>. *Id.* at 20-21.[4] This statistical evidence is corroborated by officer testimony and statements to Daigle in interviews "confirming that it was a practice at JCPD not to contact the alleged suspect until they were convinced that the assault reasonably did occur." *Id.* at 21; *see also, e.g.,* Ex. 9, Dunn Tr., 65:17-69:2 (if victim did not want to prosecute, practice was to close the case and move on, regardless of the status of the investigation), 203:3-208:19, 213:24-216:13 (ceased Female 2's rape investigation prior to interviewing identified witness or suspect because victim had "learned her lesson" and did not want to prosecute but had also changed her story to say she was not raped).

---

[4] Whether an identified suspect was interviewed can be determined based on the case narrative in the case file. *See* Ex. 9, Dunn Tr., 117:13-24 (department policy and practice for investigators writing case narratives was to document "every single thing" done in the investigation).

In Daigle's words, this practice is "baffling." *Id.* Interviewing an identified suspect is basic investigative work that is required under JCPD General Order 600.07. *See* Ex. 36; Ex. 33, Daigle Report, 20 ("Experienced investigators would and should contact the suspect as soon as possible. While there may be some kind of delay based on the situational response, getting the suspect's version of events is an imperative step to conducting a full and complete investigation."). JCPD's practice of not interviewing suspects uniquely "undermines the integrity of sexual assault investigations." *Id.* For one, due to the nature of sexual assault, physical evidence is typically going to be at the crime scene or on the victim's and/or suspect's person. Ex. 35, GO 600.13, Sexually Oriented Crimes, 4-7. Additionally, if there is no physical evidence, the investigation (and any future prosecution) will often come down to a test of credibility, making timely interview of the suspect even more important, so they have less time to manufacture an alibi. Ex. 32, Daigle Tr., 185:18-186:4. As 90% of sexual assault reporters are females, this practice disproportionately affected women. *Compare* Ex. 9, Dunn Tr., 59:5-60:4 (in discussing CID generally, Dunn testified that "no circumstances" would justify failing to promptly contact witnesses, visit crime scenes, attempt arrests) *with id.* at 203:3-208:19, 213:24-216:13 (in investigating female-reported rape case, officer chose not to interview identified suspect and witness and did not visit crime scene).

Second, JCPD had a clear practice of intimidating female sexual assault victims in a way that discouraged prosecution. On paper, it was the department's policy to "assist victims of sexually oriented crimes in a supportive manner, using appropriate crisis intervention skills." Ex. 35, GO 600.13. To accomplish this goal, the GO required special training on the "realities, dynamics and investigations" of such crimes, and emphasized the larger goal of instilling "[p]ublic confidence in the reporting and investigative process" in order to "encourage all victims of sexually oriented crimes to report the crime." *Id.* Daigle echoed this sentiment, explaining the importance of walking survivors through the stages of the investigation in order to build their trust and educate them about the process so they feel safe enough to press charges. Ex. 32, Daigle Tr., 418:15-420:5.

In practice, JCPD officers committed rampant violations of this policy. Based on Daigle's review of 325 cases, "JCPD's investigative processes discourage victim participation" and "create

10

unnecessary barriers to building trust and rapport with women reporting sexual assault and make reporting unnecessarily burdensome for the victim." Ex. 33, Daigle Report, 21-22 (emphasis added). Examples of these practices include requiring the victim to come to the department to provide a statement and give interviews (rather than at a location where the victim feels more comfortable), conducting victim interviews in rooms set up for suspect interviews with visible handcuffs and restraints, asking victims early in the investigation if they wished to seek criminal prosecution and if they would testify against the accused, while also making statements about the emotional toll of prosecution, and allowing unwarranted gender-based assumptions and stereotypes about women to compromise the investigation. *Id.* at 22.

In addition to the JCPD records Daigle relied on, other evidence corroborates that this practice was well established within JCPD. *See, e.g.,* Ex. 37 (screenshot of Higgins interviewing Female 8 in interrogation room with handcuffs on ground); Ex. 26, Higgins Tr., 202:1-12; 209:23-217:6 (asking Female 8 to recount her sexual assault at least four times until she broke down); Ex. 2, B.P. Tr., 169:4-12; 169:20-21; 181:17-183:20 (JCPD had B.P. recount her assault multiple times, and repeatedly called her back to the station); Ex. 9, Dunn Tr., 203:3-208:19, 213:24-216:13 (ceased Female 2's rape investigation prior to interviewing identified witness or suspect because victim had "learned her lesson" and did not want to prosecute but had also changed her story to say she was not raped).

"Being involved in a sexual-related crime is emotionally and physiologically challenging." Ex. 33, Daigle Report, 29. Many survivors "are fearful of being victimized again in the courtroom, and so they don't want to participate." Ex. 32, Daigle Tr., 419:25-420:5. Rather than working with victims to build trust and rapport, JCPD did the opposite, creating an "uninviting and difficult" process for victims that "overemphasized the emotional toll of prosecution and minimized the seriousness of the rape in their communication with the victim." Ex. 33, Daigle Report, 29; *see also* Ex. 32, Daigle Tr., 84:6-85:14 (officer bias impairs investigations). JCPD's practice violated its own policies and contravenes basic principles of fair treatment for trauma survivors that law

enforcement has long known are necessary to protect their participation in the justice system. *Id.* at 416:9-418:14.

Finally, JCPD had a practice of improperly closing cases of sexual assault involving female victims using "exceptional means." JCPD is mandated to report crime data to the Tennessee Bureau of Investigation via the Tennessee Incident Based Reporting System ("TIBRS"). Ex. 33, Daigle Report, 6. Once a case is opened, an officer cannot close it without providing a basis for doing so. *Id*. at 25. For example, "arrest" is one basis for case closure under TIBRS. TIBRS also allows closure by "exceptional means" when a qualifying element beyond law enforcement control prevents an arrest. Use of this category requires all the following conditions be met: 1) the offender's identity is known; 2) there is sufficient probable cause to support the arrest, charging, and prosecution of the offender; 3) the location of the offender is known; and 4) a reason beyond law enforcement control prevents the arrest. The officer must then specify one of the following reasons that no arrest can be made: A) offender deceased; B) district attorney declined prosecution; C) offender in custody of another agency or jurisdiction; D) victim refused to cooperate; or E) the offender is a juvenile. Ex. 38.

Daigle found that an alarming percentage of sexual assault cases reported to JCPD between 2018-2022 were closed by exceptional means, including nearly <u>half</u> (49.62%) of all rape cases. Ex. 33, Daigle Report, 26; Ex. 32, Daigle Tr., 150:25-151:24. For other types of sexual assaults, exceptional means were used to close, on average, over 40% of reported cases. Ex. Daigle Report at 26-28. The percentages were so high that Daigle undertook a deeper review of JCPD's case closure practices. He found that JCPD, as a department, was improperly using exceptional means to dispose of sexual assault cases and consistently violated TIBRS requirements. Ex. 32, Daigle Tr. 151:18-24; 285:17-286:13; 287:3-288:20. Of the rape cases closed by exceptional means, <u>over half</u> were attributed to victim non-participation. Ex. 33, Daigle Report at 28 (25% for "victim being unwilling to prosecute" and 31% for "victim being uncooperative").

These case closures—both the sheer number of exceptional clearances and the fact that the category was systematically misused—create an inference of discrimination. As an initial matter,

had JCPD adhered to the TIBRS requirements, sexual assault investigations impaired by officer bias could not have been closed so quickly and incompletely, and further investigation would have increased prosecutions. Ex. 32, Daigle Tr., 84:6-85:14. Consider, for example, officers who believe that women who allege sexual assault against a non-stranger, or who were under the influence of drugs or alcohol during their attack, are not credible or sympathetic and thus conclude that those cases are unlikely to yield a successful prosecution. JCPD officers had a practice of closing those cases by exceptional means in violation of TIBRS rules. That JCPD cited victim non-participation as the rationale for most exceptional clearances is also consistent with officer bias—as described above, JCPD's victim blaming and shaming caused unwillingness among survivors to immediately and fully cooperate. In sum, JCPD, spurred by widespread officer bias, misused the exceptional clearance category to shut down sexual assault cases prematurely.

While any one of the above three practices on their own is highly improper, they operated in tandem to yield a discriminatory custom borne out of animus toward and stereotypes about women. Officers systematically failed to interview suspects while simultaneously blaming, shaming, and intimidating female victims through sexist remarks and harassing conduct, thereby discouraging their participation. With no suspect statement and a sufficiently re-traumatized victim, the officers then (improperly) cleared the cases by exceptional means when the victims unsurprisingly could not immediately commit to prosecuting the case. Having successfully cleared the case with minimal-to-no investigation, the officers were off the hook. The victims, meanwhile, were "placed at increased risk of harm," Ex. 33, Daigle Report, 14, and deprived of justice, dignity, and equal protection of the law.

## III.    ARGUMENT

### A.  The Proposed Classes Meet the Four Prerequisites of Rule 23(a): Numerosity, Commonality, Typicality, and Adequacy of Representation

#### 1.  *Numerosity*

To satisfy the numerosity requirement, Plaintiffs must demonstrate that the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There are "no strict numerical test[s] for determining impracticability of joinder." *In re Am. Med. Sys., Inc.*, 75

F.3d 1069, 1079 (6th Cir. 1996). Rather, numerosity "requires examination of the specific facts of each case and imposes no absolute limitations." *Id.* However, "when class size reaches substantial proportions, [] the impracticability requirement is usually satisfied by the numbers alone." *Id.* (quoting *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980)).

Here, the Reporter-Survivor Class has approximately 325 members, *see* Ex. 33, Daigle Report, 5, and the Williams Survivor and Sex Trafficking Survivor Issues Classes include more than 40 individuals, *see* Ex. 1, ¶ 5. These figures satisfy Rule 23(a)(1)'s numerosity requirement. *See Garner Prop. & Mgmt.*, *LLC v. City of Inkster*, 333 F.R.D. 614, 622 (E.D. Mich. 2020) (40 or more members is sufficient to satisfy numerosity); *Davidson v. Henkel*, 302 F.R.D. 427, 436 (E.D. Mich. 2014) (numerosity is satisfied by a class of at least "between 21 and 40" members).

### 2. Commonality

Plaintiffs must demonstrate that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Though the rule "speaks of 'questions' in the plural, [the Sixth Circuit has] said that there need only be one question common to the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (emphasis added). "Variations in the circumstances of class members are acceptable, as long as they have at least one issue in common." *In re Am. Med. Sys., Inc.,* 75 F.3d at 1080; *Bacon v. Honda of America Mfg., Inc.,* 370 F.3d 565, 570 (6th Cir. 2004). This common issue must be one "the resolution of which will advance the litigation." *Sprague,* 133 F.3d at 397.

### a) Reporter-Survivor Class: §1983 Claim

Determining commonality requires a precise understanding of the nature of the underlying claims presented by the plaintiffs. *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 552–53 (7th Cir. 2016). Here, S.H. and the Reporter-Survivor Class assert a claim against the City pursuant to 42 U.S. § 1983, which provides a private right of action when there has been a "violation of a right secured by the Constitution and laws of the United States…committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), police departments and the cities they serve may be liable under

§1983 when, *inter alia*, their policies, customs, or practices cause constitutional deprivations and are sufficiently pervasive and widespread that the municipality's failure to act amounts to tacit approval ("custom theory"); or when a municipality has been deliberately indifferent to known deficiencies in the training of its employees resulting in constitutional violations ("failure to train theory"). *Id.* at 701, 707-08; *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245-48 (6th Cir. 1989) (discussing custom and failure to train theories); *Miller v. Sanilac Cnty.,* 606 F.3d 240, 254-55 (6th Cir. 2010) (analyzing failure to train theory).

Under either theory, a plaintiff must show either actual or constructive notice on the part of the municipality and either acquiescence or deliberate indifference to the practice/inadequate training. *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004); *Gregory v. City of Louisville,* 444 F.3d 725, 752 (6th Cir. 2006) ("A city's custom…can be unconstitutional [if it is] consistently implemented to result in constitutional violations with…implicit ratification by city policymakers."). Finally, a plaintiff must show the municipality's failure to act or train was the "moving force" behind the constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). At this point in the analysis, the burden shifts to the municipality to satisfy heightened scrutiny by showing an "exceedingly persuasive justification" for the action. *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724 (1982).

The Reporter-Survivor Class's claim under § 1983 is alleged on both the "custom" theory and "failure to train" theory. First, Plaintiffs alleged JCPD had a deeply-embedded practice of unconstitutionally discriminating on the basis of sex when responding to and investigating reports of sexual assault by blaming, shaming, or otherwise discouraging victims from prosecuting their assaults, ceasing investigations unless the victim immediately agreed to prosecute, and improperly closing cases pursuant to "exceptional means." *See* Sec. I(D), *supra*. Plaintiffs allege that JCPD consistently engaged in this department-wide practice, despite officer turnover, from at least 2018 to 2022. *See* SAC, ¶¶ 188-216; Ex. 9, Dunn Tr., 33:11-37:5 (describing turnover of CID personnel). Due to the pervasive and widespread nature of this custom, Plaintiffs allege the City

knew or should have known about it yet consistently responded pursuant to a policy of inaction. SAC, ¶¶ 368-381.

Under their second theory, Plaintiffs allege that the City is liable due its failure to train its employees to ensure constitutional policing. Specifically, Plaintiffs allege that JCPD's failure to train and supervise its officers proximately resulted in constitutional violations of class members' right to equal protection of the law and that the inadequacies of this training were so obvious that the City knew or should have known about them yet did nothing. *Id.* at ¶¶ 371, 396-399, 403.

There is significant overlap between the elements of these two theories and numerous questions of law and fact are ripe for class wide determination, including: whether JCPD's practices relating to investigating and responding to reports of sexual assault discriminated on the basis of sex; whether JCPD's investigative practices were sufficiently widespread and pervasive so as to constitute a "custom" under *Monell*; whether the City had actual or constructive notice of JCPD's practice; whether Reporter-Survivor Class Members were deprived of a federal or constitutional right by virtue of being subjected to JCPD's systemic sex-based discrimination and, if so, whether those deprivations were caused by a person acting under color of state law; whether JCPD adequately trained officers on the elimination of bias, the proper procedures for investigating reports of sexual violence and clearing such cases by "exceptional means," how to conduct victim-centric interviews of female victims of sexual assault; whether any inadequacies in training on the aforementioned topics resulted in practices that deprived Reporter-Survivor Class Members of equal protection of the law on the basis of sex in violation of the Fourteenth Amendment; whether the City had actual or constructive notice of the inadequacies of JCPD's training; and, if so, whether the City responded with acquiescence or deliberate indifference.

These questions of law and fact will be answered based on common evidence of the Defendants' conduct—JCPD's uniform policies and training and class-wide practices; the City's knowledge (actual or constructive); the City's actions (or lack thereof); and evidence that these violations were motivated by discriminatory animus on the part of police officers. Because this evidence is "common" to all class members, answering these questions as to one class member,

answers them as to all. *See General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ("proof that an employer operated under a general policy of discrimination" warrants class certification where "discrimination manifested itself in hiring and promotion practices in the same general fashion"); *Snead v. CoreCivic of Tennessee, LLC*, 2018 WL 3157283, at *18 (M.D. Tenn. June 27, 2018) ("class members are as one in their exposure to a particular and sufficiently well-defined set of allegedly illegal policies and practices") (citing *Parsons v. Ryan*, 754 F.3d 657, 679-80, 683 (9th Cir. 2014)). These questions more than satisfy commonality for the Reporter-Survivor Class. *See Sprague*, 133 F.3d at 397 (one common question satisfies commonality).

> b) Proposed Issues for Sex-Trafficking Survivor Class and Williams Survivor Subclass Satisfy Commonality

Plaintiffs propose below five issues for certification under Rule 23(c)(4). These issues are common because each one focuses on legal or factual questions that are central to the claims advanced by all class members: all elements of the TVPA violations (except causation and damages) and whether certain JCPD officer conduct in relation to Sean Williams' sex-trafficking venture "shocks the conscience" in violation of the Due Process Clause (again, with causation and damages reserved for later proceedings). The same evidence of defendant or third-party knowledge and conduct will control the outcome of each issue adjudicated, and none will turn on class-member specific evidence. *See Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405, 414 (6th Cir. 2018) (finding commonality "where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof").

> 3. *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A class representative's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys. Inc.*, 75 F.3d at 1082. It follows that, where typicality is found, "the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the

named plaintiff will also advance the interests of the class members." *Id.* In *Sprague,* the Sixth Circuit summarized the "premise" typicality: "as goes the claim of the named plaintiff, so go the claims of the class." 133 F.3d at 399.

Plaintiff S.H.'s claims are typical of the Reporter Class. S.H. alleges that, when she reported her sexual assault to the JCPD, officers failed to properly investigate her claim, made derogatory comments about her based on the fact she is a female, and intimidated and discouraged her from prosecuting her claims. On this basis, she alleges her constitutional rights to equal protection of the law were violated. *See* SAC, ¶¶ 259-292. The Reporter Class Members' claims arise from the same set of practices by JCPD and are based on the same legal theory. *See* SAC, ¶¶ 184-216, 231-250, 301(a), 367-381. There is nothing about S.H. or her allegations that give rise to a conflict between her and the Reporter Class.

Plaintiff B.P. is typical of the Sex-Trafficking Survivor Class because, like all other members of that class, she alleges Defendants facilitated Williams' sex-trafficking venture, which in turn harmed her. SAC, ¶¶ 23-27. Plaintiff B.P. and the class she represents base their TVPA-related claims on the same set of facts relating to JCPD officer knowledge and conduct. Plaintiff H.A. is typical of the Williams Survivor Subclass because, like all other members of that class, she alleges that Sean Williams assaulted her after JCPD received a report of Williams' sexual violence on November 7, 2019, (SAC, ¶¶ 89-94), and that Defendants are a but-for cause of the class members being assaulted and the resulting harm. Plaintiff H.A. and the class she represents allege civil rights violations based on instances of JCPD conduct that "shocks the conscience."

### 4. Adequacy of Representation

Rule 23(a)(4) requires that the proposed class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "There are two criteria for determining whether the representation of the class will be adequate: (1) the representatives must have common interests with unnamed members of the class; and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir. 1976). The common interest criterion ensures that the

plaintiff has a strong incentive to represent the interests of the class. *In re Am. Med. Sys.*, 75 F.3d at 1083. The second criterion looks at the competency of counsel. *Id.*

As set forth above, the class representative's interests align with the interests of class members they seek to represent, satisfying the "common interests" requirement. *See Senter*, 532 F.2d at 524-25. Additionally, Plaintiffs have exercised good faith and sound judgment in developing and prosecuting this case for over two years and have dedicated significant time sitting for depositions, responding to discovery, and supervising the litigation while retaining and working with Class Counsel. Baehr-Jones Decl., ¶ 3. As such, Rule 23(a)(4)'s requirement is satisfied. *Daffin v. Ford Motor Co.,* 458 F.3d 549, 553 (6th Cir. 2006). Plaintiffs' counsel will also adequately represent class members, as they have demonstrated the qualifications, experience, and expertise to adequately and fairly represent their clients in this case. *Stout v. J.D. Byrider,* 228 F.3d 709, 717 (6th Cir. 2000); *see* Baehr-Jones Decl. ¶ 3, Exs. 39-41.

### B. Certification of the Reporter-Survivor Class Under Rule 23(b)(3)

Federal Rule of Civil Procedure 23(b)(3) authorizes class certification for damages when three requirements are met: common questions of law or fact must "predominate" in the litigation; collective action must be "superior" to other methods of adjudicating the claims; and plaintiffs must demonstrate that the class members are "ascertainable." *See* Fed. R. Civ. P. 23(b)(3). Plaintiffs propose certification of the following Reporter-Survivor Class under Rule 23(b)(3):

> All women, including minors, who reported crimes of sexual violence by any person to JCPD from January 1, 2018, to December 31, 2022.[5]

*1. Predominance*

Numerous factual and legal issues are common to all members of the Reporter-Survivor Class. *See* Sec. III.A.2.a. Because at least one of these issues go to "the heart" of their § 1983 claim, predominance is met. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988).

---

[5] Plaintiffs propose an end date of December 31, 2022 in light of evidence that a new protocol for investigating sexually oriented crimes was implemented starting on January 1, 2023. Ex. 34, 30(b)(6) Tr., 148:10-148:16.

The common question of whether JCPD's alleged discriminatory practices were sufficiently widespread to be a "custom" under *Monell* is an essential element of the Reporter-Survivor Class's § 1983 claim. *See Monell*, 436 U.S. at 694; *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (evidence of a custom or pattern is ordinarily necessary to prove deliberate indifference under *Monell*). To determine whether a practice constitutes a "custom" under *Monell*, courts in the Sixth Circuit look at the duration, frequency, and consistency of the conduct, which may be informed by statistical evidence, anecdotal evidence, police reports, and officer testimony, among other things. *See e.g.*, *Snead v. Corecivic of Tennessee, LLC*, 2020 WL 6469995, at *18 (M.D. Tenn. Apr. 6, 2020) (plaintiffs established a sufficiently pervasive "custom" through statistical evidence of the high rate at which prison employees violated official policy for screening and treating scabies in inmates, corroborated by anecdotal testimony from plaintiffs and other inmates as to the prevalence of scabies within one year and testimony from former employee supporting obvious policy violations). There is no "numerical standard [that] controls the determination whether incidents of wrongful behavior cumulatively show a pattern amounting to a custom or policy." *Carter v. Dist. of Columbia*, 795 F.2d 116, 124 (D.C. Cir. 1986). Rather, the sufficiency of the evidence is weighed based on the totality of the case-specific facts and circumstances. For example, a relatively small number of instances of misconduct may establish a custom where they are egregious and highly similar. *See id*.

Here, Plaintiffs will present empirical evidence provided by Eric Daigle of the duration, frequency, and consistency of the conduct. *See* Sec. II.D.*, supra* (summarizing statistical findings); Ex. 33; *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458-59 (2016) (statistical evidence may be used to prove liability in a class action where an individual plaintiff pursuing the same claim would be allowed to use statistical evidence to prove liability). To further show the similarity of the incidents of misconduct, Plaintiffs will also rely on police records (*e.g.,* Exs. 6, 10, 27) and officer testimony (Exs. 9, 26, 34). This is precisely the type of evidence used to prove the "custom" element in other § 1983 claims.

Because this analysis involves reviewing and comparing details of <u>individual</u> incidents, defendants will argue that "individualized inquiries" stand in the way of predominance. Not so. The same analysis is required whether the claim is asserted on behalf of a class or by an individual plaintiff. In other words, it is not a product of this case proceeding as a class action and cannot be a basis for denying certification. *Tyson Foods*, 577 U.S. at 458-59. Because this evidence is objective and not specific to any particular class member, class-wide adjudication is appropriate. *See Sterling,* 855 F.2d at 1197 (common course of conduct well-suited to certification); *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (dispositive facts and law are the same as to each class member, satisfying both commonality and predominance).

Another core question of Plaintiffs' §1983 claim is whether JCPD's custom violated the Equal Protection Clause ("EPC"). For a custom to violate the EPC, Plaintiffs must show the custom treated class members differently and that the unequal treatment was borne out of a discriminatory animus toward women. U.S. Const. amend. XIV, § 1; *United States v. Virginia*, 518 U.S. 515, 531-33 (1996). In many cases in which the plaintiff is found to have sufficiently established that a police department custom was motivated by a discriminatory animus toward women, the courts have relied on statistical evidence, anecdotal evidence of remarks by police officers, and evidence from police reports. *See, e.g., International Broth. Of Teamsters v. U.S.*, 431 U.S. 324, 336-339 (1977) (discriminatory intent can be established by statistical evidence and anecdotal evidence); *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1259 fn. 7 (6th Cir. 1981) (statistical evidence may establish a prima facie case of discrimination in both individual and class actions); *Appleton v. Deloitte & Touche L.L.P.*, 168 F.R.D. 221, 226 (M.D. Tenn. 1996) (statistical evidence can show discriminatory intent, and be bolstered with historical, individual, or circumstantial proof); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701-02 (9th Cir. 1988) (officer remarks that plaintiff's husband was entitled to hit her because she was "carrying on" suggested "an intention to treat domestic abuse cases less seriously than other assaults, as well as an animus against abused women"); *Chase v. Nodine's Smokehouse*, 2019 WL 1469412, at *2 (D. Conn. Apr. 3, 2019) (discriminatory intent shown with evidence of officer demeanor and statements that

mocked the victim's complaint of sexual assault and harassed her by "recharacterizing [her] allegations . . . as 'flirting'").

Thus, whether JCPD's custom discriminates on the basis of sex will turn largely on the same type of objective evidence discussed above regarding Defendants' conduct, namely, statistical evidence reflecting the outcomes of female-reported sexual assault cases (Ex. 33), records documenting biased and overtly discriminatory statements by JCPD officers and unfounded stereotype-based assumptions (Ex. 20, at 16-17), police records showing a discriminatory impact of the relevant practices (Exs. 6, 10, 27), and expert findings that JCPD officers relied on stereotypes of female survivors of sexual assault that systematically interfered with their obligation to conduct objective investigations (Ex. 33). *See* Sec. I(D), *supra*.

Plaintiffs will also rely on officer testimony as to their training, directives, and customary practices with respect to the alleged discriminatory practices (Exs. 9, 26, 34), as well as their own testimony and that of putative class members to corroborate both the pervasiveness and permanence of JCPD's custom throughout the class period and its discriminatory impact.

While not necessary for purposes of class certification, Daigle has already done the work for Plaintiffs on both the pervasiveness and permanence of JCPD's practices and their discriminatory nature. The Daigle Report serves as a data compilation and expert analysis of hundreds of other incidents of what Daigle concludes was biased policing that discriminated on the basis of sex. The hundreds of cases of similar constitutional violations by JCPD officers is more than sufficient to constitute a "pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to constitutional dictates.'" *Connick*, 563 U.S. at 63 n. 7. Daigle also concluded that JCPD's investigative practices with respect to female-reported sexual assaults were biased and resulted in victims being deprived of information necessary for well-informed decisions, most importantly, whether to participate in the investigation and pursue prosecution. Ex. 33, at 11, 23-24.

The merits of these arguments, however, is for another day. For purposes of this motion, the Court need only determine that this issue is one that turns on common evidence—that is,

Defendants' conduct—and is apt to drive the litigation of this claim. *See Mata-Cuellar v. Tennessee Dep't of Safety*, 2010 WL 3732172, at \*5, n. 4 (M.D. Tenn. Sept. 20, 2010) (improper to consider the merits of the parties' arguments at the class certification stage).

    a)  <u>Other Key Issues</u>

Once Plaintiffs prove JCPD's practices were sufficiently widespread and pervasive to be deemed a "custom" in the *Monell* sense, the remaining key issues are readily determined on a class wide basis. For example, once Plaintiffs establish JCPD was engaged in systemic sex-based discrimination, the Court may presume all members of the Reporter-Survivor Class were subjected to that discrimination. *See Snead*, 2018 WL 3157283, at \*18 ("Class members are as one in their exposure to a particular and sufficiently well-defined set of allegedly illegal policies and practices."); *Phillips*, 828 F.3d at 550 (same). And, as this Court has acknowledged, "being subjected to systemic sex-based discrimination <u>is an injury</u>." ECF 119, Order on Motion for Leave to Amend, p. 13 (emphasis added) (citing *Card v. City of Cleveland*, 270 F.R.D. 280, 293 (N.D. Ohio 2010) ("Allegations of…gender discrimination resulting from polic[i]es or practices are often 'by their very nature class suits, involving classwide wrongs' and 'common questions or law or fact are typically present.'")). Additionally, if Plaintiffs establish this set of practices constitutes a "custom," the Court can then determine whether that "custom" was unconstitutionally discriminatory and this determination will apply class-wide. *See Powers*, 501 F.3d at 619 (constitutionality of challenged practice is the same for every class member); *Mata-Cuellar*, 2010 WL 3732172, at \*6 (being subject to the improper conduct is a "common circumstance" that allows court to decide, class-wide, "the constitutionality of the policies used" and sufficiency of training).

The elements of the City's notice and indifference are also at the heart of the Reporter-Survivor's § 1983 claim. These elements turn significantly on the same evidence Plaintiffs' will use to establish JCPD's "custom" of discriminatory investigative practices, *see supra*, and evidence of City policymakers' conduct (or lack thereof). The more obvious JCPD's constitutional violations, the clearer the constructive notice to the City, and the easier it is to show that inaction constitutes deliberate indifference. *See Connick*, 563 U.S. at 61-62 (if shown to be on notice,

municipality can be deemed deliberately indifferent if no action is taken); *Carter*, 795 F.2d at 124 ("Egregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question."). At trial or in opposing a potential motion for summary judgment, Plaintiffs will put forth evidence that the City was not simply negligent in its oversight on a handful of "accidental" or sporadic discriminatory acts but rather acted consistent with a policy of always being deliberately indifferent. *Teamsters*, 431 U.S. at 336-37. If Plaintiffs are successful in that showing, resolution of the deliberate indifference element will apply classwide. *See Hicks v. Frey*, 992 F.2d 1450, 1456–57 (6th Cir. 1993) (if plaintiff advances sufficient evidence to create a genuine issue of material fact as to the existence of a custom or policy of inaction, then the question of "deliberate indifference" is one for the jury to decide); *Martin v. Behr Dayton Thermal Products, LLC*, 896 F.3d 405, 414 (6th Cir. 2018) (issues that turn on defendant's knowledge and conduct "need only be answered once because the answers apply in the same way to each [class member]").  If not, Defendants may move to de-certify the Reporter-Survivor Class.

Either way, this is a determination for a later date. *See, e.g., Doe v. Claiborne Cnty.*, 103 F.3d 495, 504-05, 507-08 (6th Cir. 1995) (weighing sufficiency of evidence as to alleged deliberate indifference at summary judgment stage). What is important in deciding the present motion is that whether the City's conduct amounts to a "policy of inaction" will necessarily be based on the totality of evidence of its response to notice of many years' worth of constitutional violations. *See Martin*, 896 F.3d at 414 (issues turning on defendant's conduct are "capable of resolution with generalized, class-wide proof"). As with the "custom" analysis, the fact that Plaintiffs must present evidence of a series of instances in order to establish notice and deliberate indifference is not a function of this case being brought as a class action. It is what any plaintiff asserting a claim of municipal liability under §1983 has to show. This is not a bar to certification.

Finally, Plaintiffs must show the City's policy of inaction was the "moving force" of the constitutional violations. Under *Monell*, municipal liability attaches if the City's "toleration of a custom within the [JCPD] leads to, causes, or results in the deprivation of a constitutionally

protected right." 436 U.S. at 690-91. Like the elements of notice and deliberate indifference, causation can be resolved based on common evidence that JCPD was engaged in a discriminatory "custom." In fact, the jury can infer that the City's "tolerance of the practice in question" was a but-for cause of the constitutional violations if it finds the instances of misconduct, even if relatively few, were egregious and followed a common design. *See Carter*, 795 F.2d at 124. Common evidence of JCPD's behavior will establish a pattern amounting to a custom.

Plaintiffs will have to prove their theory at trial, but, for class certification, there are predominant issues central to each of Plaintiffs' claims and subject to generalized proof. The Court is free to revisit these issues at a later time if discovery shows, for example, that the number of class members whose cases were closed by exceptional means or otherwise not investigated properly due to matters unrelated to JCPD's discriminatory practices is more significant than it appears now. *Young v. Nationwide Mut. Ins. Co*, 693 F.3d 532, 544-45 (6th Cir. 2012).

b)  Potential Individual Issues Will Not Eclipse Common Issues

Predominance does not require the absence of individual issues; it requires only that common issues predominate over individual ones. *See Young*, 693 F.3d at 544 ("The fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.") (quoting *Beattie v. CenturyTel, Inc.,* 511 F.3d 554, 564 (6th Cir. 2007)). Plaintiffs have detailed how the core issues of their § 1983 claim will be resolved using class-wide evidence. Any other issues that might require individual analysis, such as damages, can be dealt with manageably and do not undercut a finding of predominance. *See* Sec. III.C.3 (trial plan); *Beattie*, 511 F.3d at 563 (individualized damages not a bar to class certification); *Sterling,* 855 F.2d at 1197 (presence of questions peculiar to each class member was not a bar to certification when liability arose from single course of conduct). Predominance is met.

2.  *Superiority*

To certify their 23(b)(3) action, Plaintiffs must also satisfy the superiority requirement. The Court may look to the following factors in deciding whether this requirement is met: "(1) the interest of members of the class in individually controlling the prosecution or defense of separate

actions; (2) the existence of pending litigation concerning the same controversy; (3) the desirability of concentrating the litigation of the claims in this forum; [and] (4) the difficulties likely to be encountered in the management of the class action." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757-58 (6th Cir. 2013). Here, superiority is met for many of the same reasons predominance is met. Common issues predominate over individual ones, which means members of the Reporter-Survivor Class do not have a strong interest in controlling their individual actions. More importantly, in light of the sensitive subject matter of this case—claims of police misconduct in response to reports of sexual assault—it is highly unlikely that many members of the class will choose to bring individual lawsuits. *See Young*, 693 F.3d at 545. Plaintiffs also propose a streamlined way of managing the litigation. *See* Sec. III.C.3 (trial plan).

### 3. Ascertainability

Ascertainability is "an implied requirement" that the putative class members can be readily identifiable. *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016). "For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young*, 693 F.3d at 538. Like in *Snead*, "the members of the [Reporter-Survivor Class] should be objectively ascertainable based on the defendant's records—assuming the [class members made reports] and assuming the defendant maintained such [reports] among its records." 2018 WL 3157283, at *16; *see also Young*, 693 F.3d at 539 (identifying class members "with reasonable accuracy using Defendants' electronic records"). Members of the Reporter-Survivor Class can be identified from JCPD records, and likely, Daigle has already done so. *See* Sec. I(D); *see also Young*, 693 F.3d at 540 (approving of expert help to identify class members).

### C. Certification of Issues Classes

Plaintiffs demonstrated above that all proposed classes meet the Rule 23(a) prerequisites to class certification. In addition to certification of the Reporter Survivor Class under Rule 23(b)(3), Plaintiffs seek certification of two issues classes under Rule 23(c)(4), which provides that "an action may be brought or maintained as a class action with respect to particular issues."

Fed. R. Civ. P. 23(c)(4). Issue certification is appropriate "where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution." *Martin*, 896 F.3d at 413. Courts may certify issues under Rule 23(c)(4) even if "important matters such as actual injury, causation, and damages will have to be tried separately," so long as class-wide adjudication of certified issues will materially advance the litigation and conserve party and judicial resources. *Id*. at 414 (cleaned up), 416.

     *1. Sex-Trafficking Survivor Issues Class*

     Plaintiffs identify the following issues appropriate for certification for the Sex Trafficking Survivor Class:

> **Issue 1**: Whether the Williams sex-trafficking venture violated the Trafficking Victims Protection Act, 18 U.S.C. § 1591.
>
> **Issue 2**: Whether any Defendant knew (or recklessly disregarded) that Williams was engaged in a sex-trafficking venture in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591.
>
> **Issue 3**: Whether any Defendant knowingly benefitted (or attempted or conspired to benefit) from participation in the Williams sex-trafficking venture.
>
> **Issue 4**: Whether any Defendant obstructed, attempted to obstruct, or in any way interfered with or prevented the enforcement of the Trafficking Victims Protection Act, 18 U.S.C. § 1591.

     Particularly instructive here is Hon. Jed S. Rakoff's opinion granting class certification of TVPA claims asserted against J.P. Morgan Chase on the theory that the bank facilitated Jeffrey Epstein's sex trafficking scheme. *Doe 1 v. JPMorgan Chase Bank, N.A.*, 2023 WL 3945773 (S.D.N.Y., June 12, 2023) ("*Doe 1*"). The issues Plaintiffs propose for certification hew closely to the common, predominate questions Judge Rakoff identified:

> An analysis of predominance must begin with the elements of the plaintiff's claims. To prove her claim that JP Morgan knowingly benefited from participating in Jeffrey Epstein's sex-trafficking venture, in violation of the TVPA, Jane Doe must show that: (a) Jeffrey Epstein conducted a sex-trafficking venture; (b) JP Morgan participated in that venture; (c) JP Morgan benefited from participating in that venture; and (d) JP Morgan either knew or recklessly disregarded the fact that Jeffrey Epstein's sex-trafficking venture existed. To prove her claim that JP Morgan obstructed the enforcement of the TVPA with respect to Jeffrey Epstein's sex-trafficking venture, Jane Doe must show that (a) JP Morgan knew of an effort to enforce the TVPA and that (b) JP Morgan intentionally obstructed, interfered with,

or prevented the enforcement of the TVPA....**These claims rest on a core of questions that are common to the class**.

*Id*. at *8 (emphasis added).[6]

As in *Doe 1*, the proposed issues focus on "elements [] resolved with class-wide arguments" and "factual questions [] resolved with generalized proof" (2023 WL 3945773, at *8)—specifically, through evidence about Sean Williams's TVPA violation (Issue 1), or about a defendant's knowledge or conduct in relation to that TVPA violation (Issues 2 through 4), that applies uniformly to the class without reference to any individual class-member. Issue 1 will turn on evidence adduced in this case and in federal and state criminal investigations of Williams' alleged TVPA violations. Issue 2 focuses on defendant knowledge of Williams' TVPA violations, based, for example, on the number and nature of reports to JCPD of Williams' criminal activity, evidence in JCPD custody, and on related statements among JCPD officers and Dahl. Ex. 20, Dahl Rec. Tr. 13:22-14:24 (Dahl noting to Turner similarities between evidence in the Williams investigation and a "rape / human trafficking case"); *id*. at 31:22-31:3 (Peters describing to Dahl and Turner commercial transactions and enlistment of others while investigating Williams' rape of Female 12: "There's text messages back and forth between her and Sean, her wanting to buy drugs off of him. She had sent evidently another girl down there for him to have sex with. Then there are some invoices that she had wrote up to where she has charged Sean and some other people with her services."); Ex. 5.

Similarly, issues 3 and 4 will turn on evidence of defendant conduct, irrespective of any class member's individualized issues. Whether a JCPD officer obtained a benefit in connection with Williams' sex-trafficking scheme will be proved through financial records and through testimony by JCPD officers and individuals with knowledge of their income and expenditures,

---

[6] Notably, Judge Rakoff found these questions supported class certification under the stricter requirements of Rule 23(b)(3). Therefore, the similarly framed issues Plaintiffs propose here under Rule 23(c)(4) are on an even stronger foundation for certification. *See*, *Martin*, 896 F.3d at 411 (permitting issue certification under Rule 23(c)(4) where Rule 23(b)(3)'s predominance requirement "has not been satisfied for the cause of action as a whole").

Williams and his co-conspirators, and experts. *See Doe 1*, 2023 WL 3945773, at *8 (whether JP Morgan provided Epstein "material banking services," and the attendant legal and factual consequences, established by "generalized proof"). Whatever conclusions the factfinder draws—for instance, from evidence of payments among two JCPD officers and Williams' co-conspirator Female 4 (*See* Sec. II. B. 2)—will apply to the class as whole. The same is true as to whether JCPD officers engaged in obstruction. Where established, conduct that obstructed a TVPA investigation is obstructive across the class. For instance, the events described in Sec. II. B. 2 are alleged to have obstructed investigation of Williams: refusal to investigate and prosecute Williams, including through witness intimidation and destruction of evidence, and terminating Dahl because of her investigation in Williams' sex trafficking. Whether and to what degree the obstructive conduct caused damages would be determined in later proceedings.

2. *Williams Survivors Issues Class*

These questions are appropriate for certification for the Williams Survivor Subclass:

**<u>Issue 5</u>**: Whether any of the following alleged conduct shocks the conscience in violation of the Due Process Clause of the United States Constitution:

a) Any Defendant sharing in the proceeds of Williams' sex-trafficking scheme by accepting money or items of value from Sean Williams directly or indirectly through a co-conspirator.

b) Any Defendant soliciting a bribe from Williams or a co-conspirator in exchange for insulating Williams from investigation or prosecution;

c) Any Defendant concealing evidence of Williams' crimes.

This issue is appropriate for certification because whether officer behavior "shocks the conscience" is answered under an objective standard that will not change based on any class-member specific facts. A single jury can evaluate the conduct under the relevant legal standards only once, rather than having each member the Williams' Survivor Class present the same evidence over and over to separate juries. *In re Flint Water Cases*, 384 F.Supp.3d 802, 840 (E.D. Mich. 2019), *aff'd and remanded* 960 F.3d 303, (6th Cir. 2020) (elements of class claim of "conscience shocking" behavior focus on what defendants knew and how they acted based on that

knowledge). As with the other proposed issues, whether and to what degree the conscience-shocking conduct caused damages would be determined in later proceedings.

### 3. Rule 23(c)(4) Predominance, Superiority, and Trial Plan

The six proposed issues satisfy predominance and superiority in the manner that the Sixth Circuit applies those requirements in the context of Rule 23(c)(4). All six issues are central to the action and "are questions that need only be answered once because the answers apply in the same way to each [plaintiff] within the [issue class]." *Martin*, 896 F.3d at 414. There are no "individualized inquiries that outweigh the common questions prevalent *within each issue*." *Id.* (emphasis in original). Moreover, certifying the proposed issues will streamline litigation at both the class and individual levels by allowing the parties to dispute common legal and factual questions "in one fell swoop" and thereby "materially advance the litigation" while conserving both Court and party resources. *Id*. at 416.

Here, Plaintiffs are proposing bifurcated proceedings where the certified issues are tried first, followed by small group or individual trials on questions such as proximate causation and damages. *See*, Manual for Complex Litigation, Fourth, § 21.24. A myriad of case management tools, as well as the Court's broad discretionary powers under Rule 23, will make the fair and effective adjudication of both phases manageable. *E.g.*, Fed. R. Civ. P 23(c)(1)(C) (authority to alter or amend the class certification order, including modifications to certified issues). Utilizing certified issues in this case comports with the efficiency imperatives of Rule 23 while protecting the Plaintiffs' individual interests and protecting each Defendant's fairness and due process rights. *In re Flint Water Cases*, 558 F.Supp.3d 459, 521 (E.D. Mich. 2021) (class member's interests in controlling their own case are preserved because each will get their day in court once certified issues are resolved); *Doe 1*, 2023 WL 3945773, at *6 (primary defenses to TVPA claims are "well-addressed on a class-wide basis" and those that are not can be segregated and asserted separately).

### IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant the requested certification orders.

Dated: October 15, 2024

Respectfully submitted,

*/s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones CABN # 281715
*Pro Hac Vice*
Advocates for Survivors of Abuse PC
4200 Park Boulevard No. 413
Oakland, CA 94602
(510) 500-9634
vanessa@advocatesforsurvivors.com

*/s /Julie C. Erickson*
Julie C. Erickson (California Bar # 293111)
Elizabeth A. Kramer (California Bar # 293129)
Kevin M. Osborne (California Bar #261367)
*Pro Hac Vice*
Erickson Kramer Osborne LLP
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

*/s/ Heather Moore Collins*
Heather Moore Collins (# 026099)
Ashley Shoemaker Walter (#037651)
HMC Civil Rights Law, PLLC
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

*Attorneys for Plaintiffs and Proposed Classes*

31

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been filed and served via the court's electronic filing system on October 15, 2024 to counsel of record:

| | |
|---|---|
| K. Erickson Herrin<br>HERRIN, McPEAK & ASSOCIATES<br>515 East Unaka Avenue<br>P. O. Box 629<br>Johnson City, TN 37605-0629<br>rachel@hbm-lawfirm.com<br><br>Emily C. Taylor<br>Maria Ashburn<br>WATSON, ROACH, BATSON &<br>LAUDERBACK, P.L.C.<br>P.O. Box 131<br>Knoxville, TN 37901-0131<br>etaylor@watsonroach.com<br>mashburn@watsonroach.com<br><br>*Attorneys to Defendants, Johnson City, Tennessee, Karl Turner, in his individual and official capacities, and Investigator Toma Sparks, in his official capacity*<br><br>Jonathan P. Lakey<br>Burch, Porter, & Johnson, PLLC<br>130 N. Court Ave.<br>Memphis, TN 38103<br>901-524-5000<br>jlakey@bpjlaw.com<br>mchrisman@bpjlaw.com<br><br>*Attorney to Defendant City of Johnson City, Tennessee* | Kristin Ellis Berexa<br>Ben C. Allen<br>FARRAR BATES BEREXA<br>12 Cadillac Drive, Suite 480<br>Brentwood, TN 37027-5366<br>kberexa@fbb.law<br>ballen@fbb.law<br>jdowd@fbb.law<br>msutton@fbb.law<br>gpatton@fbb.law<br><br>*Counsel for Toma Sparks in his individual Capacity*<br><br>Keith H. Grant<br>Laura Beth Rufolo<br>Robinson, Smith & Wells, PLLC<br>633 Chestnut Street, Suite 700<br>Chattanooga, TN 37450<br>kgrant@rswlaw.com<br>lrufolo@rswlaw.com<br>awells@rswlaw.com<br><br>*Counsel for Jeff Legault in his individual capacity*<br><br>Daniel H. Rader IV<br>MOORE, RADER & YORK PC<br>46 North Jefferson Avenue<br>P. O. Box 3347<br>Cookeville, TN 38501<br>danny@moorerader.com<br><br>*Counsel for Defendant Karl Turner in his individual Capacity* |

*/s/ Julie C. Erickson*
Julie C. Erickson