```
            IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TENNESSEE AT GREENEVILLE
```

| | |
|---|---|
| B.P., H.A., and S.H., individually, and on behalf of all others similarly situated, <br>    Plaintiffs, <br><br>VS. <br><br>CITY OF JOHNSON CITY, TENNESSEE; <br>KARL TURNER, individually, and in his official capacity as Chief of the Johnson City Police Department; <br>KEVIN PETERS, individually, and in his official capacity as Captain in the Johnson City Police Department; <br>TOMA SPARKS, individually, and in his official capacity as Investigator in the Johnson City Police Department; <br>JUSTIN JENKINS, individually, and in his official capacity as Investigator in the Johnson City Police Department; <br>JEFF LEGAULT, individually, and in his official capacity as Investigator in the Johnson City Police Department; <br>BRADY HIGGINS, individually, and in his official capacity as Investigator in the Johnson City Police Department; <br>and DOES 8-20, inclusive, <br>    Defendants. | CASE NO. <br>2:23-cv-00071-TRM-JEM |

```
                PRETRIAL DISCOVERY DEPOSITION OF

                            B. P.

                     (Taken May 23, 2024)


                 ***THIS STYLE PAGE CONTINUES***
```

---

*COURT REPORTING AND VIDEO SERVICES*

P. O. Box 7481                                **TELEPHONE:** (423) 230-8000 <br>
Kingsport, TN 37664                         REBECCA@COURTREP.NET

1  Q. What did you have there?
2  A. A blueberry lemonade.
3  Q. Okay. What happened next?
4  A. We ran into Alvie there.
5  Q. All right. Keep going. What happened after that?
6  A. He was very friendly. He bought us our drinks actually.
7     Him and ▮▮▮▮▮ kind of started hitting it off, and I was
8     kind of hanging out with my friend, just standing there
9     hanging out.
10 Q. Okay. Keep going. What happened next?
11 A. Well, they started kind of -- it was getting a little
12    later. He invited us up to the loft. I told ▮▮▮▮▮ I
13    didn't know if I wanted to go up there, that I had work
14    early, but she really liked Alvie, and she told me she
15    thought he was really hot and she really wanted to go up
16    there. I didn't want to let her go by herself, so I
17    decided to go with her.
18 Q. And what was happening in Williams' loft at that time?
19 A. It was just the two of them. There wasn't anything
20    happening. There wasn't a party.
21 Q. So the people present on this occasion was you, ▮▮▮▮▮,
22    Williams, and Alvie?
23 A. Yes.
24 Q. Let's look at Paragraph 34, your allegations. When B. P.
25    arrived, Williams handed her an already opened beer.

B. P.                                                DIRECT - HERRIN

38

|   |    |                                                                    |
|---|----|--------------------------------------------------------------------|
| 1 |    | After taking a sip, she immediately began to feel the same         |
| 2 |    | physical and mental incapacitation as she had felt on the          |
| 3 |    | prior occasion and was unable to move her body properly.           |
| 4 |    | Is that accurate?                                                  |
| 5 | A. | Yes.                                                               |
| 6 | Q. | So you took one sip from a beer provided you by Williams,          |
| 7 |    | right?                                                             |
| 8 | A. | Poured into a cup, yes.                                            |
| 9 | Q. | Okay. You took one sip and immediately started feeling             |
| 10|    | woozy or how would you describe it?                                |
| 11| A. | So I fought him on drinking a beer because by this point I         |
| 12|    | have had two or three drinks and I have work at seven              |
| 13|    | o'clock in the morning. I was just hanging out up there            |
| 14|    | with ▇▇▇▇, so I told him I didn't want to drink. He                |
| 15|    | said he had this new, like, beer, a beer I had never seen.         |
| 16|    | It was in a blue can. It wasn't Bud Light. Nothing you             |
| 17|    | would recognize, weird. He was, like, you've got to try            |
| 18|    | this. I kept fighting him on it. And he was, like, just            |
| 19|    | try it. So finally I gave in and was, like, okay, I'll             |
| 20|    | try the beer. He gave it to me in a glass, and I took a            |
| 21|    | sip, and I immediately felt sick, and my head hit the              |
| 22|    | counter, so...                                                     |
| 23| Q. | Your head hit the couch as in you...                               |
| 24| A. | Counter.                                                           |
| 25| Q. | ...laid down or you fell?                                          |

B. P.                                                        DIRECT - HERRIN

39

```
 1        of us are Pages 8, 9, 19, and 20 of the second amended
 2        complaint.  Go ahead.
 3   Q.   These are allegations.  You can see at the top on Page 19,
 4        B. P., that's you, correct?
 5   A.   Yes.
 6   Q.   Reports Williams sexual assault.  Okay.  Looking at 96,
 7        Paragraph 96, upon leaving Williams' apartment the morning
 8        of her assault, B. P. asked a friend to drive her to an
 9        urgent care so she would receive a rape kit.  That friend
10        is ▮▮▮▮▮▮, correct, because the two of you were together?
11   A.   Uh-huh (Affirmative).
12   Q.   And so did ▮▮▮▮▮▮ drive your car?
13   A.   Yes, I couldn't drive.
14   Q.   And you went to an urgent care, and did you receive a rape
15        kit at the urgent care?
16   A.   I believe they couldn't administer it at the urgent care,
17        so they gave me a drug test, and I got the rape kit at
18        JCMC.
19   Q.   Were the police called to the urgent care?
20   A.   Yeah.
21   Q.   Okay.  And did police officers show up at the urgent care?
22   A.   [Shakes head yes]
23   Q.   Do you know who that was?
24   A.   I don't recall.
25   Q.   Male, female?
```

B. P.                                              DIRECT - HERRIN

41

Case 2:23-cv-00071-TRM-JEM   Document 391-3   Filed 10/16/24   Page 4 of 14
                              PageID #: 9241

```
 1  MS. KRAMER:  Let's make sure that...
 2  Q.  Oh, yeah.  I'm sorry, yeah.
 3  MS. TAYLOR:  While the attorneys are out...
 4  Q.  Yeah, yeah, yeah.
 5  MS. TAYLOR:  If that's okay, just to get this out of the
 6      way.
 7  MS. KRAMER:  That's fine.
 8                          ******
 9  DIRECT EXAMINATION BY MS. KRISTIN BEREXA:
10  Q.  Just to get it out of the way, yeah.  And I just have,
11      I think, one or two very quick questions for you.
12  A.  Sure.
13  Q.  I believe -- and if I state this incorrectly, just
14      correct me, but I believe you stated to Mr. Herrin that
15      you thought you should take some antibiotics for a
16      possible STD, correct?
17  A.  Well, my belief at the time was that someone I did not
18      know nor wanted to have sex with had sex with me, so
19      yes, I don't know where they've been, so my fear was
20      that that person could give me something.
21  Q.  So that's sort of my next question.  I just want to
22      make sure I understand.  So at this point in time, you
23      don't know for sure, but you were thinking you had been
24      raped by or sexually assaulted by Sean Williams,
25      correct?
```

```
 1   A.   Yes.
 2   Q.   And that was based upon the fact that your shirt was
 3        pulled apart or stretched, and you were in the bed with
 4        him?
 5   A.   Yes.  I woke up, and he's in the bed with me.  I'm
 6        laying there, and he is staring in my eyes, looking at
 7        me, and has this grin on his face.
 8   Q.   At that point, you were fully clothed.
 9   A.   I was when I woke up, yes.
10   Q.   Anything else that makes you think you had been
11        sexually assaulted?
12   A.   Yes.
13   Q.   Okay.
14   A.   I looked at him.  I'll have to curse.
15   Q.   Sure.
16   A.   I mean, I'm just going to be blunt with what I said.
17   Q.   Sure.
18   A.   I looked at him and said, what am I doing here and what
19        the fuck did you do to me?  And he just looked at me,
20        he wouldn't answer me, and was laughing.
21   Q.   And that was while you were still in the bedroom?
22   A.   Yes.  And I was fleeing at that point, but I just -- I
23        was in shock that I woke up next to him.  I was, like,
24        how did I get here, because last I recall, I was
25        sitting there with ▓▓▓▓, and him, and Alvie, and
```

```
 1         everything was normal.  So to me, that made me feel
 2         like something happened, because why won't you answer
 3         me, why are you laughing at me.
 4    Q.   Anything else that you want to -- that made you think
 5         you had been raped at that point?
 6    A.   No, I believe that's it.
 7    Q.   Thank you.
 8                              ******
 9    DIRECT EXAMINATION BY MR. DANNY RADER:
10    Q.   Ma'am, my name is Danny Rader.  I represent one of the
11         Defendants.  I just have a couple of follow-up
12         questions.  You told us about the Victoria's Secret
13         hoodie that you were wearing.  What were -- what was
14         your other attire?  Were you wearing slacks, or a
15         skirt, or what kind of...
16    A.   Leggings.
17    Q.   Leggings, okay.  The urgent care records say that you
18         arrived there, as I understand it, at 11:45 in the
19         morning.  What time did you leave Mr. Williams'
20         apartment that day?
21    A.   I'll be honest with you, I don't know what time it was.
22         ████████ was driving.  I was still very discombobulated.
23         I was distraught.  I didn't check the time.
24    Q.   You went directly to the urgent care, you did not go
25         home, you didn't stop to get something to eat, or
```

B. P.                                              DIRECT - RADER
ATTORNEY EYES ONLY
                                   65

| | | |
|---|---|---|
| 1 | A. | I didn't. |
| 2 | Q. | Do you recall that you had agreed to do so? |
| 3 | A. | I don't recall. |
| 4 | Q. | Do you recall that you had agreed to come in at some |
| 5 | | point, whether it's on the 20th of April or not? |
| 6 | A. | I don't recall that, no.  I remember telling him I |
| 7 | | already gave my statement, and also going through |
| 8 | | everything from start to finish over the phone with |
| 9 | | him.  That's what I recall. |
| 10 | Q. | Did you -- do you recall talking to ▓▓▓▓ about this, |
| 11 | | another request to bring her in to give her statement? |
| 12 | A. | I do not. |
| 13 | Q. | You don't recall or it didn't happen? |
| 14 | A. | I don't recall. |
| 15 | Q. | April 22nd, 2021, I tried to contact ▓▓▓▓▓▓, but |
| 16 | | no contact was made, and I left a message.  Did you |
| 17 | | receive a message on that date? |
| 18 | A. | I'm not sure if it's that date, but I do believe I have |
| 19 | | a message for April. |
| 20 | Q. | Okay.  Did you return the call? |
| 21 | A. | Yes. |
| 22 | Q. | And what occurred during that call? |
| 23 | A. | I believe that's the call where Sparks had told me that |
| 24 | | Sean was untouchable, that they had been trying to get |
| 25 | | things to stick and they just couldn't seem to get him. |

1     And I kind of asked, like, where do we go from here,
2     what's our next steps, I don't know how this works, are
3     you going to be able to protect me, I'm scared of this
4     guy, he's a very powerful businessman in this area,
5     he's hurt people that I've heard from other people.  He
6     told me he couldn't guarantee that I would be
7     protected, and that was the gist of the conversation.
8     I was kind of waiting to see what our next steps were
9     at this point.  I didn't know where we were going from
10    here.
11  Q.  When you said you needed to be protected, what did you
12    have in mind that that meant?  What were you -- what
13    were you requesting?
14  A.  So, I guess what that meant is some sort of guarantee
15    that whatever was necessary to keep me safe would be
16    done, and also that I would have someone in my corner
17    helping me through this incident and helping me get the
18    justice that I felt I deserved and putting him in jail.
19  Q.  How would somebody protect you in your view?  What
20    would they do to make you feel protected?
21  MS. KRAMER:  Objection.
22  A.  Arrest the person responsible and charge them with the
23    crime.  And also, if anyone bothers you, intimidates
24    you, I would assume that there would be some sort of
25    protection, someone that could come out to my house if

B. P.                                              DIRECT - HERRIN

116

1      trying to get a time frame here.
2  A.  So that was told to me after my assault.
3  Q.  Okay.  Soon after, months after, years after?
4  MS. KRAMER:  Objection.
5  A.  I believe it was a few weeks or months after.
6  Q.  And at no point did you ever provide that information
7      to JCPD, correct?
8  A.  I did not.
9  Q.  Okay.  Paragraph 17, it says, a few days after speaking
10     with Officer Sparks, and I'm assuming you're referring
11     to the first time you ever talked to him.  Is that
12     right?
13 A.  Yeah.
14 Q.  Okay.  And after talking with my family and friends, I
15     called Officer Sparks back to tell him I wanted to
16     proceed with pressing charges against Williams.  I
17     never received a response.  Is that your testimony
18     today that you called, told him I want to proceed with
19     charges, and he never called you back?
20 A.  So I did call him and let him know that I talked to my
21     family, and that they agreed that he should be behind
22     bars, so I called and said yes, I would like to press
23     charges.  And then after that, yeah, I mean, we didn't
24     have any more communications.
25 Q.  During that phone call where you told him you wanted to

B. P.                                              DIRECT - BEREXA

168

Case 2:23-cv-00071-TRM-JEM   Document 391-3   Filed 10/16/24   Page 10 of 14
PageID #: 9247

1     press charges, didn't he tell you you need to come in
2     and give a written statement or come in and give a
3     statement?
4  A. We had discussed that. I did let him know that I had
5     already given one in the hospital, and this was a
6     painful thing that I did not like to constantly have to
7     relive. I did give him start to finish over the phone.
8     He said, okay, let's start from the beginning. I went
9     through my entire rape over the phone already, so I let
10    him know -- I didn't give him any push back or say I
11    didn't want to, but I said I already gave one and we
12    also already just went through this entire thing, so...
13 Q. Did he ask you to come into the police department and
14    provide a statement? He did, correct?
15 A. I don't recall.
16 Q. You don't recall whether he specifically said you need
17    to come into the PD and give a statement?
18 MS. KRAMER: Objection.
19 Q. You don't recall that?
20 A. I know I gave one over the phone and had already
21    provided one.
22 Q. Right.
23 A. Yeah, so I don't recall being asked to give one again.
24 Q. Okay. So when you say you don't recall, is that you
25    don't recall or he never told you that?

B. P.                                        DIRECT - BEREXA

169

1   A.   Yes, I did.
2   Q.   And called Officer Sparks back that same day and said
3        you wanted to prosecute, correct?
4   A.   Yes.
5   Q.   And during that phone call, Officer Sparks asked you to
6        come in and give a statement, correct?
7   MS. KRAMER:  Objection.
8   A.   I don't recall that.
9   Q.   Is it your testimony then that he didn't say that or
10       you just don't remember it?
11  MS. KRAMER:  Objection.
12  A.   I don't recall that.
13  Q.   So does that mean -- are you saying Toma Sparks didn't
14       say that?
15  A.   I don't recall that.
16  Q.   So he may have said it, you just don't remember?
17  A.   I don't believe he said that.  I do remember expressing
18       that I had already given my statement.  And again, I
19       went through the entire experience from start to finish
20       with him already, step by step, so I did tell him that
21       personally I didn't want to have to relive that again.
22       But I was not against it, and I did not deny doing
23       that.
24  Q.   Okay.
25  A.   But I vocalized that I have relived this multiple times

B. P.                                          DIRECT - BEREXA

181

Case 2:23-cv-00071-TRM-JEM   Document 391-3   Filed 10/16/24   Page 12 of 14
                              PageID #: 9249

1     already.
2  Q. Sure, and I understand.  You have testified to that.
3     But now I am confused a little bit because I think you
4     just said you explained to him why you didn't want to
5     come in and give a statement, that you had already done
6     all of this, but I thought you didn't even remember if
7     he had asked you to come in and give a statement.
8  MS. KRAMER:  Objection.
9  Q. So which is it?  Do you remember telling him why you
10    didn't want to come in and give a statement?  And if
11    you told him that, wouldn't that assume that he had to
12    ask you for a statement?
13 MS. KRAMER:  Objection.
14 Q. Do you see why I'm confused?
15 A. I see why you're confused.  I don't remember that part
16    of the conversation, so...
17 Q. You don't remember him asking you about the statement,
18    but you remember telling him that you don't -- why you
19    don't want to come in and give a statement, that you've
20    already -- already done all of this?
21 MS. KRAMER:  Objection.
22 A. So what I'm meaning is, when were talking on the phone
23    and he said let's go through this from start to finish,
24    I kind of was like, okay, like, I didn't want to have
25    to relive it again.  But I went through it anyway and

B. P.                                          DIRECT - BEREXA

182

Case 2:23-cv-00071-TRM-JEM   Document 391-3   Filed 10/16/24   Page 13 of 14
                              PageID #: 9250

1    gave -- went through all of the information.  So that
2    is what I am meaning is I didn't want to necessarily go
3    through that again, even over the phone, because I had
4    -- I was trying to put my life back together, put this
5    behind me, move forward.
6  Q. Sure.  But my question is more about did Toma Sparks
7    tell you you needed to come into the police department
8    and give a statement?
9  A. I don't remember being asked that, no.
10 Q. But at some point, Toma must have said something about
11   coming back in to give a statement because you're
12   explaining to him how you don't want to do -- how you
13   don't want to do that, right?
14 MS. KRAMER:  Objection.
15 A. So we had discussed that if Sean got prosecuted, if we
16   did go to court, that I would have to do these things
17   and go possibly relive this again.  And I was -- I had
18   said, I've already given a statement.  I went through
19   it with you on the phone.  I've went through this
20   multiple times.  I would prefer to not have to do that.
21 Q. All right.  3/25/21 at 13:20 -- oh, I'm sorry.
22 A. Am I looking at the right thing?  I'm sorry.
23 Q. 3/25/21.
24 A. Oh, '21, I'm sorry.
25 Q. Yeah.  I may -- did I say something?  What did I say?

B. P.                                              DIRECT - BEREXA

183