**In the Matter of:**

B.P.

vs.

City of Johnson City, Tennessee, et al,

**DEBORAH DUNN**

*July 18, 2024*



www.LexitasLegal.com

Ph.(615) 595-0073

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F. California Firm Registration #179

1    homicides, as well, but my specialization was crimes

2    against children.

3                    The last year that I was there I

4    had three really tough cases that, for some reason,

5    I wasn't able to shake right away, which was

6    concerning to me.  So between both of those, that

7    was a reason to do something else.

8         Q.        I would imagine that would be a

9    heavy load working those cases.

10        A.        Absolutely.

11        Q.        Who was your then lieutenant?

12                  You said you didn't have a great

13   relationship with your then lieutenant.

14        A.        Kevin Peters.  And to correct, it

15   wasn't that I didn't have a good relationship.  We

16   had kind of a falling out.  I had worked with him

17   for many years.

18        Q.        How many years would you say?

19        A.        I tried to think of that.  I want

20   to say that he came to CID as a sergeant maybe

21   two years after I was in investigations, but I

22   couldn't say for sure.  But I knew him throughout my

23   career prior to that.

24        Q.        He had been at JCPD in a different

25   role before that?

(815)599-0233        Lexitas Corporate HQ.  All 50 states and territories serviced.  Nevada Registration #116F
www.lexitaslegal.com                                    California Firm Registration #179

1           A.      Yes.

2           Q.      So he came in as a sergeant.

3                   Did you report to him at that

4    point?

5           A.      I did not.  I reported to the other

6    sergeant.

7           Q.      Who was that?

8           A.      At that time it was -- my first

9    sergeant back there was Brian Ross, who is no longer

10   with the department.

11                  And then there was a promotion and

12   one of the investigators, Billy Church, was my

13   sergeant for many years.  And then there were

14   others.

15          Q.      Who was your lieutenant when you

16   first became a CID investigator?

17          A.      Matt Howell.

18          Q.      And who after that?

19          A.      I guess that's when it was -- no.

20   Oh, my gosh.  I just -- it's been a lot of years.

21                  Oh, Steve Sherfey.

22          Q.      Do you know how to spell his last

23   name?

24          A.      S-h-e-r-f-e-y, I believe.

25          Q.      And after Lieutenant Sherfey, who

1    was your lieutenant?

2          A.        Kevin Peters.

3          Q.        Any idea when Kevin Peters became

4    your lieutenant?

5          A.        I really don't.

6          Q.        Let's try to do the math.

7                    I think you said it was a couple of

8    years after you started as an investigator.

9          A.        That he was promoted to sergeant.

10         Q.        Oh, right.

11         A.        And so he was a sergeant in the

12   Criminal Investigation Division and then several

13   years later, I believe, was promoted to lieutenant.

14         Q.        Okay.  So would it be fair to say

15   that he was your lieutenant for around ten years?

16         A.        That would be a good guesstimate, I

17   guess.

18         Q.        Okay.  Who was your sergeant at the

19   time that you requested the transfer back to patrol?

20         A.        Matt Gryder.

21         Q.        Can you explain for me the -- what

22   word do I want to use -- level of involvement -- or

23   how much is your sergeant -- when you were an

24   investigator in the CID, how much did your sergeant

25   interact with you about your cases?

```
1          A.        Constantly.  I mean, that's -- that
2   was his job, to review your cases as they came in.
3   That's who you would go to per chain of command.  If
4   you had questions about the case or issues of any
5   kind, that's who your -- that's your direct.  And so
6   their job should be constant, constantly monitoring
7   your cases.
8          Q.        Okay.  Did you interact with your
9   lieutenant, whoever it was, about specifics on your
10  cases?
11         A.        Maybe in conversation.
12         Q.        Not in a formal sense?
13         A.        Could.  You know, you could be
14  called into the lieutenant's office asking about a
15  particular case or cases or lack of productivity or
16  great job, you know.  I mean, so -- that wasn't
17  uncommon.
18         Q.        How many investigators were in CID
19  when you were there?
20                   I'm sure it changed over the years,
21  but what would you say on average?
22         A.        Again, I'm going around the room.
23  Five or six on each squad.  There's a Squad A, Squad
24  B, which explains why there were two sergeants and I
25  didn't report to Sergeant Peters initially.
```

1          Q.          Okay.  And sorry, how many did you

2     say per squad?

3          A.          Five or six.  Five or six of them.

4          Q.          Per squad?

5          A.          Uh-huh, and it would fluctuate.

6          Q.          You said that you worked a lot of

7     the child cases.

8          A.          Yes.

9          Q.          Was there any other investigator

10    that also did primarily child cases?

11         A.          No.

12         Q.          And you also worked sexual assault

13    cases?

14         A.          Some.  The same -- the chance would

15    be the same as any other investigator.  Like on

16    call, if you were on call and responded to a sexual

17    assault.  They weren't automatically assigned to me.

18         Q.          Would you say you worked more

19    sexual assault cases than the other investigators?

20         A.          Probably, for the simple fact that

21    I was the only female and not all, but most victims

22    of sexual assault are female, and not all, but most

23    victims of sexual assault would prefer to sit down

24    with a female.

25         Q.          Why do you think that is?

1          Q.        Okay.  Did you have any specific

2    training through JCPD when you were patrol about

3    securing crime scenes?

4          A.        That would have been part of the

5    field training, collecting evidence, those things.

6          Q.        Were there any documents that you

7    were given, like training manuals or --

8          A.        Yes.

9          Q.        Do you know what they were called?

10          A.        No, I don't recall.

11          Q.        Do you recall the --

12          A.        Are you asking me specific to FTO?

13          Q.        Sure.  Yes.

14                    Were there FTO documents or

15    policies or manuals?

16          A.        Yes, and then there's also general

17    orders that are shared with the PPO, which is a

18    Probationary Police Officer.  A trainee, that's what

19    they're called.

20          Q.        And you don't remember what the FTO

21    documents were?

22          A.        Field training?  No, I don't.  The

23    header, I don't recall.

24          Q.        Were they -- if you remember, was

25    it specific like step-by-step type instruction?

1          A.          Checkoff, right.  Like there would

2     be certain things that as an FTO you had to cover

3     and, as a PPO in that phase, you had to have an

4     understanding of.

5          Q.          I see.

6                      So it was more like training about

7     this particular procedure.  It wasn't -- or I'll

8     just ask.

9                      Did it describe the steps you were

10    supposed to take when you were securing a crime

11    scene, or that was just told to you by the FTO?

12         A.          I don't recall, but the general

13    orders would have covered it.

14         Q.          I see.

15                      And you were an FTO for a while.

16         A.          Correct.

17         Q.          So when you're training a PPO and

18    you want to train them on, for example, securing a

19    crime scene, would you take the applicable general

20    order and go over it with the PPO?

21         A.          Yes, and then -- I mean, it

22    depended on the training or the teaching technique.

23    They share experiences with them and things like

24    that.

25         Q.          Do you give -- did you give a copy

1   of the general order to the PPO?

2           A.      At that time we had very large

3   volumes of books that you were given.  Now, with

4   technology, you can -- they're all given through a

5   Guardian Tracking System, I think is what it's

6   called.  And you have to kind of accept that you

7   received that general order.

8           Q.      So it was accessible on some

9   database that they could go and review it again if

10  they wanted.

11          A.      Yes.

12          Q.      Besides the FTO documents and

13  general orders, were there any other documents that

14  you either received as a PPO or -- well, we'll just

15  start with that, that you received as a PPO.

16                  Any other documents besides the FTO

17  documents and the general orders?

18          A.      I mean, none that I could just name

19  specifically.  It's been a long time.

20          Q.      As an FTO, were there any other

21  categories of documents besides the FTO documents

22  and the general orders that you would give to PPOs?

23          A.      I don't recall.  I mean --

24          Q.      Those are -- would you say it's

25  primarily the FTO documents and the general orders?

     1          A.       To the best of my recollection.  It

     2    was a very long time ago that I was a PPO, and a

     3    long time ago that I was an FTO.

     4          Q.       Understood.

     5                   Okay.  I'm going to give you this

     6    document, which we will mark as Exhibit --

     7                   COURT REPORTER:  149.

     8                   (Exhibit 149 marked).

     9                   MS. ERICKSON:  Thank you.  Thank

    10          you.  This is Bates CITY-0006294.

    11          Q.    (BY MS. ERICKSON) Ms. Dunn, have you

    12    seen this document before?

    13          A.       Yes.

    14          Q.       Can you tell me what it is?

    15          A.       Criminal investigative procedures,

    16    general order, CID operations.

    17          Q.       On CID operations.

    18                   Okay.  And this is -- there's a few

    19    dates at the top there.

    20                   Do you know what those dates refer

    21    to?

    22          A.       I assume that's when it was

    23    established, when this general order was

    24    established, and then I don't know why it has it

    25    twice.  Then it's reviewed annually.

(615) 595-0073                 Lexitas Relatis — in all 50 States and also licensed where required: Nevada Registration #116F                                  57
www.lexitaslegal.com                                           California Firm Registration #179

Case 2:23-cv-00071-TRM-JEM   Document 484-5   Filed 10/16/24   Page 10 of 34
PageID #: 9269

1          Q.          And under annually it says --

2    what's the date there?

3          A.          January 27th, 2016.  I'm not sure

4    if that was the last time.  I mean, I never worked

5    to build general orders.  Perhaps that's the last

6    time a change was made.  I'm not sure.

7          Q.          Can you just take a look through

8    this document and see if it looks familiar to what

9    you remember from your time as an investigator at

10   CID and the JCPD specifically?

11                    I don't need you to read it word

12   for word.

13         A.          I didn't know if you were going to

14   ask me something specific about it.  So I was going

15   to be ready.

16         Q.          Does this look like the general

17   order you've seen before as an investigator?

18         A.          Looks like it.

19         Q.          Okay.  And so the procedures here

20   on the first page, there's -- it says Criminal

21   Investigation Procedures.

22                    Are these steps that you were

23   expected to follow?

24         A.          Yes, if it's part of the general

25   order.

(615) 595-2073        Lexitas Reporting in all 50 States and is licensed where required for all Registration #16F
www.lexitaslegal.com                          California Firm Registration #179

1          Q.        Was it your practice to follow the

2    general orders?

3          A.        That was the goal.  It's going to

4    be different for different cases, but yes.

5          Q.        So the second one on the first

6    page, "Investigators shall contact victims and

7    witnesses promptly upon receiving an investigation

8    and will make every effort to apprehend the

9    perpetrators and recover stolen property."

10         A.        Yes.

11         Q.        That was your practice.

12         A.        That would be the goal.

13         Q.        Did you meet your goal?

14         A.        Did my best.  Tried to.

15         Q.        Are there -- what circumstances

16    would lead to deviating from, for example, No. 2

17    here?

18         A.        Well, there wouldn't be -- I mean,

19    there wouldn't be a reason on that one.  You make

20    every effort to apprehend the perpetrator and

21    recover stolen property.

22         Q.        And contacting victims and

23    witnesses promptly?

24         A.        Yes.  And there's going to be

25    circumstances that could hamper that, just extreme

1    caseload, vacation, training.

2                    You may be assigned a case your

3    first day of training and it's, unfortunately, going

4    to sit there until you come back.

5           Q.      On the second page, under the

6    heading B, Preliminary Investigations, are these

7    steps that the patrol officer would take?  Or I

8    guess this is also applicable to investigators.

9           A.      Since it's in the CID operations, I

10   would think it was -- you know, when you're called

11   to a crime scene, that is going to be handed over to

12   the Criminal Investigation Division, but yes.

13          Q.      Okay.  So --

14          A.      It could apply to both.

15          Q.      If you were called to a sexual

16   assault case, you would follow these steps.

17          A.      Yes.

18          Q.      "Protecting the crime scene to

19   ensure that evidence is not lost or contaminated,"

20   Subsection B there, that was something you would do

21   when you would arrive to the scene?

22          A.      Yes.

23                  And in some crime scenes, it

24   wouldn't be what I did.  You could have crime scene

25   investigators that were there, and that was what

(615) 595-0073   Lexitas Legal - All 50 States and Licensed Where Required Nevada Registration #16F
www.lexitaslegal.com                        California Firm Registration #179                              60

1    if you knew the location?

2              A.        No.  Somebody would go, I'm sure.

3              Q.        Do you know what it means by major

4    cases?

5              A.        I know that there was like a list

6    that was specific that -- and I don't know if it's

7    in this one, that you would -- you were to respond

8    to.

9              Q.        Do you know what's considered a

10   major case?

11             A.        Sexual.  Assault.  Homicide.

12   Robbery.  Kidnapping.  And then, as an investigator,

13   if you're on call and you're called by a supervisor,

14   you're -- you go.  It doesn't have to be, "Oh, well,

15   it's not on that list."  If you're told, "We're

16   calling you out," then you came out.

17             Q.        On the next page under little I, it

18   says, "Determine involvement of suspects in other

19   crimes."

20                       How might you do that?

21             A.        Check criminal history.  Check

22   reporting history.

23             Q.        Was there a way to like search

24   someone's name?

25             A.        Yes.

1          Q.          If there was a criminal history or

2    other reports against that person, that would show

3    up?

4          A.          Yes.  The criminal history would be

5    specific to arrests and convictions.

6          Q.          Okay.  Would there also be records

7    if they were named in an offense report but not

8    arrested?

9          A.          Yes.  You could search the agency

10   reporting system, and it would show anytime a person

11   is listed as anything, witness, victim, suspect,

12   other.

13         Q.          Got it.  Thank you.

14                     And was that your practice to

15   search names of suspects to see if they --

16         A.          Yes.  At some point, yes.

17         Q.          Is there any reason why you

18   wouldn't run their name through the system?

19         A.          Well, it would depend on where I

20   was at in the investigation.  Sometimes -- or the

21   type of investigation or what I had in the

22   investigation.  I mean, there's just so many

23   elements that like I didn't check list down and say

24   we'll do this.  Why I wouldn't check for someone's

25   name is if I met with a victim and they didn't --

(615) 595-0073          Lexitas Reporting in all 50 States and is licensed where required. No Firm Registration #161          66
www.lexitaslegal.com                                    California Firm Registration #179

1    they didn't want to pursue anything further.  Then I

2    would not have searched a suspect at that time.

3            Q.        Why not?

4            A.        At that time, I don't have a case.

5            Q.        It seems like these are pretty

6    specific procedures that are to be carried out in

7    your follow-up investigation.

8                      Do you know if it says anywhere

9    that you wouldn't follow these procedures if a

10   victim didn't want to pursue charges?

11           A.        No.

12           Q.        It doesn't say that anywhere?

13           A.        I didn't read it all, but no.  I

14   would say no.

15           Q.        Were you ever told that that was

16   how you were supposed to do things, that if a victim

17   didn't want to pursue charges, then --

18           A.        I don't -- I don't know that I was

19   told, but I was -- at that point, when the victim

20   doesn't want to continue with the case, then I don't

21   have a case.  I close it, and I go to the next one.

22                     I was never told that that was

23   inadequate in my years.  Those -- my case notes go

24   to supervisors.

25           Q.        And the supervisor would look at

1    those case notes?

2          A.        And approve or disapprove.

3          Q.        I see.

4                    Do you know if other investigators

5    did the same thing?

6          A.        I couldn't say.  I would assume.

7          Q.        You were in CID for 20 years.  Not

8    quite.  16.

9          A.        Yes.  16, 17.

10         Q.        Was that -- was that always your

11   practice as an investigator in CID?

12                    MR. HERRIN:  Object to the form of

13         the question.

14         A.        I would -- there was never always a

15   practice.  Every case is different.

16         Q.        I meant more as throughout the

17   years, as opposed to each individual case .

18                    For example, when you started as

19   CID, was it your practice to close a case if a

20   victim did not want to press charges?

21         A.        Yes.

22         Q.        And that continued the same

23   throughout your tenure as an investigator?

24         A.        Yes.

25         Q.        And so your supervisor was aware

(615) 595-0073  Lexitas Legal — In all 50 States and where licensed Nationally / Registration #116T
www.lexitaslegal.com                                    California Firm Registration #179

1    that that was your practice?

2              A.        Yes.

3              Q.        So under small K, this says,

4    "Contact the victim."  That comes lower in the list

5    than determining the involvement of suspects and

6    other crimes, little I that we talked about.

7              A.        Uh-huh.  Yes.

8              Q.        Do you know if these are written in

9    order of like chronologically how you would conduct

10   your investigation?

11             A.        I couldn't -- I couldn't say.  I --

12   I'm not sure how they organized it.

13             Q.        When we were talking about running

14   a suspect's name through the database, was it always

15   your practice to not do that search if the victim

16   had already said that they didn't want to pursue

17   charges?

18                       MR. HERRIN:  Object to the form of

19             the question.

20                       MS. ERICKSON:  I just ask that you

21             let me finish the question before you

22             object.

23             A.        Can you repeat it?

24                       MS. ERICKSON:  Can you read that

25             back, Jeff?

1        Q.       Do you know if he edited your case

2    notes from this case?

3        A.       Unless I was looking at the audit

4    trail, I wouldn't know.

5        Q.       You have no reason to believe that.

6        A.       No.  I've never -- I've never --

7    aside from the example I gave you of editing someone

8    else's case notes, it would be just to put what you

9    did on a case, and that was expected.

10       Q.       So Lieutenant Peters didn't assist

11   you in investigating this case.

12       A.       No.

13       Q.       Okay.  Okay.  So going back to

14   KP 45, there's several entries discussing you trying

15   to get in contact with K.B.  And then there's an

16   entry on June 24th, 2020, "Case reviewed by Sergeant

17   Hilton."

18                Was he your sergeant at the time?

19       A.       I assume so, or my sergeant could

20   have been gone.  Could have been on vacation.  Could

21   have been in court all day, and so he was just

22   assisting him.  I mean, that really isn't a standout

23   of why is Hilton -- I mean, I wouldn't have thought

24   why is Hilton in my case.

25       Q.       Sure.

out on a form, put in an envelope, and put in Chief Turner's box.

Q.      Okay.  So in your description here on 6/24/20 of your interview with ▨▨▨▨▨▨▨▨▨▨▨▨▨, you're saying at this point the COVID restrictions had lifted and you were allowed to have suspects -- or sorry -- victims come into the station for interviews?

A.      Obviously, or it wouldn't have -- I couldn't have told -- I don't know what date that was pulled that we could have people.  But if I met with her at police headquarters, then we were allowed to at that point.

Q.      Okay.  And I'm not going to read this all out, but in Officer Austin's report he says that she reported she was raped.  And then in your report she says that --

A.      It says attempted rape on his.

Q.      Well, I'm talking about the supplemental narrative at the top of your case notes, that first paragraph.  It says that she stated she was naked and that the suspect had vaginally penetrated her with his penis.

A.      Correct.

Q.      That's pretty specific.

```
 1            A.      Correct.

 2            Q.      And then when you met with her, she

 3    told you something different; is that right?

 4            A.      Yes.

 5            Q.      And what did she tell you?

 6            A.      That any -- she denied penetration

 7    had occurred and said that her pants were really

 8    tight and that she woke up when he was trying to

 9    pull them down, where he was unable to pull them

10    down.

11            Q.      Is that something that you've seen

12    before where -- I think we talked about this

13    earlier, that victims of sexual assault crimes can

14    change their story.

15            A.      Yes.

16            Q.      So did you have any reason to

17    believe what she was telling you on 6/24 as opposed

18    to what she told Officer Austin on 6/2?

19            A.      My assumption -- I can't -- you

20    know, I can't read her mind.  But, to me, what she

21    told me is what she wished had happened.  And that's

22    the story that she wanted in her mind, as opposed to

23    being -- waking up to being digitally -- or being

24    vaginally penetrated.

25            Q.      Okay.  So you think she was trying
```

(615) 595-0073    Lexitas Relatives in all 50 States and is licensed where required. Nevada Registration #16F
www.lexitaslegal.com                                   California Firm Registration #179

1    to convince herself that it didn't happen?

2           A.        Correct.  And that's a huge

3    assumption, a huge psychological assumption.

4           Q.        It's also based on many years of

5    experience.

6           A.        But she would rather that be her

7    story.

8           Q.        What is minimization?

9                     I think you said she wanted to

10   minimize what happened.

11          A.        Did I say that?  I mean, that makes

12   sense, but I don't remember saying it.

13          Q.        Okay.  So you had this interview

14   with K.B. on that day.  And then in the next

15   paragraph it says, "Request case be closed by

16   exceptional means as the victim does not wish to

17   cooperate in the investigation against the

18   following:  Sean Williams."

19                    And what -- is that also on the

20   same date, 6/24/20?

21          A.        Probably more likely the --

22   whatever date that was on the front.

23          Q.        Well, the exceptional clearance

24   date on the front is August 17th.  So you would have

25   been --

1           A.        Well, at this time I can't say for

2     sure because -- but post-COVID, it would not

3     surprise me that that waited and I went on to

4     another case.

5           Q.        Say that again.

6           A.        That this could have been --

7     without the closure, it could have been sitting in

8     my cases and I could have been working on other

9     cases, and then get back to this one to close it

10    out.

11          Q.        Is there --

12          A.        It doesn't have to be an immediate

13    thing.  Sometimes it is.  Sometimes I'd go straight

14    in and go through the closure process, and then

15    other times I may have had an interview right after

16    this or something.

17                     Do you know what I'm saying?

18          Q.        If there was any other

19    investigation done, it would be in your notes,

20    correct?

21          A.        Yes.

22          Q.        So there was no other investigation

23    done.

24          A.        No.

25          Q.        Did you ever contact Mr. Alvaro

1    Diaz Vargas?

2            A.       No.  My investigation stopped when

3    she asked that it did.

4            Q.       Did you ever run the name Sean

5    Williams?

6            A.       My investigation stopped when she

7    told me she didn't want to pursue anything.

8                     And I know what you're getting at,

9    but I do it as a service to her, the investigation.

10   It she doesn't want me to pursue it, I'm not

11   pursuing it.  And I have no regrets about that

12   whatsoever.

13           Q.       Even though you had a hunch that

14   she actually was raped?

15           A.       That's her choice.  She has to

16   testify.  Not me.  She has to be brutalized on the

17   stand.  Not me.  So that's her choice.  I stood by

18   it then --

19           Q.       If you had run the name --

20           A.       -- and I stood by it now.

21                    MR. RADER:  I object, ma'am.  You

22           continue to interrupt this witness's answer.

23           You continue to talk over.  Please stop

24           doing that.

25           Q.   (BY MS. ERICKSON) If you had run the

1    name Sean Williams in the database and saw that

2    there were other --

3              A.     I don't know to this day that there

4    were prior --

5              Q.     I just want to finish the question

6    real quick.

7              A.     Go ahead.

8              Q.     If you had run the name Sean

9    Williams in the database and seen that there were

10   other reports of sexual assault against Sean

11   Williams involving alcohol and involving that same

12   address, do you think you would have done something

13   different?

14                   MR. HERRIN:  Object to the form of

15        the question.

16             A.     If, when she came in and said, "I

17   don't want you to contact him, I just want -- I want

18   this to be done, I want this to be over," no, I

19   would not have.  And that's what she did.

20             Q.   (BY MS. ERICKSON) Do you know if any

21   other JCPD officers or investigators tried to

22   contact K.B. at the same time, in that time period

23   when you were trying to reach her?

24             A.     I wouldn't think so, no.

25             Q.     Okay.  Is there any reason why

1    someone other than yourself, as the assigned

2    investigator, would be trying to contact her?

3              A.      I wouldn't think so.  I mean, they

4    may have a legit reason on another end, that she

5    could be a suspect in something.  So I wouldn't say

6    that -- no, because that does happen.

7              Q.      Okay.  I'll give you another

8    document here.

9                      MS. ERICKSON:  We'll mark this as

10         Exhibit 1.

11                     COURT REPORTER:  This will be 153.

12                     MS. ERICKSON:  -- 153, which is

13         Bates CITY-0076260.

14                     (Exhibit 153 marked).

15             Q.   (BY MS. ERICKSON) Have you seen this

16   document before, Ms. Dunn?

17             A.      Yes.

18             Q.      And what is it?

19             A.      It was when a second interview was

20   conducted with K.B. by -- at the -- by, it looks

21   like, Investigator Toma Sparks at the behest of Kat

22   Dahl.

23             Q.      Okay.  How do you know that it was

24   at the behest of Kat Dahl?

25             A.      Well, because when I was shown this

1    and read it, I said, "Oh, my gosh, I read the

2    lawsuit.  That's what she's talking about in the

3    lawsuit when she says, well, they said she wouldn't

4    cooperate, but we called her and she came right in."

5    And I thought to myself, "You idiot.  I didn't say

6    she wouldn't cooperate.  I spoke to her.  Did you

7    read my case notes?  They say what yours said."

8    Like she -- this is -- that's how I took it.  No one

9    has told me this, but it says in the lawsuit

10   investigator said the victims -- the victim wouldn't

11   cooperate, but when I called her she came right in

12   and provided a statement.  And so when he showed me

13   that, I said, "Oh, wow, that's the one in the

14   lawsuit."

15            Q.       The code for exceptional clearance

16   about the victim refused to cooperate, that's --

17            A.       That's --

18            Q.       That's for pressing -- doesn't want

19   to press charges.

20            A.       Does not wish to cooperate in the

21   prosecution of the following.  And I made the

22   assumption, and I could be completely wrong, "Oh, my

23   gosh.  That's -- I didn't say she wouldn't

24   cooperate."  I know that's how it reads, but TIBRS

25   says -- they use that verbiage, does not wish to

(615) 595-0073  Lexitas Reliable in all 50 States and is licensed where required. Nevada Registration #167
www.lexitaslegal.com                California Firm Registration #179

1    cooperate, and that's how my case closure was.

2                    I didn't say the victim wouldn't

3    cooperate.  She wouldn't call me back, wouldn't

4    answer the phone, wouldn't -- wouldn't keep an

5    appointment.

6                    Do you see what I'm saying?  This

7    is --

8         Q.        But it can also be true that she --

9    I'll just leave that alone.

10                   Okay.  Is what's in this statement

11   the same as what she told you when you talked to her

12   in June?

13        A.        I couldn't say verbatim.

14        Q.        If she had provided this type of

15   detail about being at Numan's and -- is the

16   statement that's documented in your case notes on

17   KP 45, the document we were looking at last, that's

18   the entirety of what you discussed with her, what

19   she provided to you.

20        A.        I only remember based on my own

21   notes.  So I don't know.  This looks like it's

22   pretty similar to what I typed up.

23        Q.        Well, she makes a reference to that

24   Sean was -- Sean said he was looking for his DMT.

25   That's on her written statement.

```
 1          A.       I see it, yeah.

 2          Q.       Is that in your statement?

 3          A.       I didn't see it.  I don't know what

 4   a DMT is.

 5          Q.       I had to Google it.  I didn't know

 6   what it was either.

 7                   At the end of her written statement

 8   it says, "The officer contacted my mother."  You

 9   pointed out that she's not a minor.

10                   Do you know why the officer --

11   well, do you know who this is referring to, "the

12   officer contacted my mother"?

13          A.       Can I see that narrative?

14                   MR. HERRIN:  Object to form of the

15          question.  Calls for speculation.

16          A.       If I was with an adult person as a

17   police officer and they asked me to call their

18   mother, I would call their mother.  I mean, it's

19   not --

20          Q.   (BY MS. ERICKSON) Does it say that she

21   asked the officer to call her mother?

22          A.       "The officer contacted my" -- I

23   don't know.  I wasn't there.  I don't know if he --

24   if she requested it or he -- I don't know who he was

25   or she.  The officer could have been a female.  I
```

1    have no clue.

2           Q.        Okay.  But we know the officer was

3    Officer Austin, right?  And you said he was a male.

4           A.        Uh-huh, if that's the officer she's

5    referring to.  In this kind of situation, I would

6    assume there's a couple officers down there.

7           Q.        Okay.  Is there anywhere in all of

8    these -- the case file documents we've looked at

9    where it would indicate if there was more than one

10   responding officer?

11          A.        No.  I said I was assuming.

12          Q.        But if there was more than one

13   officer, would that be in the case file somewhere?

14          A.        No.  No one -- one would have who

15   was dispatched or who checked out there.

16          Q.        There's only -- if there's two

17   patrol officers that respond, does only one have to

18   do case notes?

19          A.        He's the reporting officer, yes.

20   There might be a time when another patrol officer

21   would do a supplement, if he was a different part of

22   an offense or something, but one person does the

23   report.

24          Q.        In your narrative, at the end of

25   that second to last paragraph, it says, "She stated

(615) 595-0073                Texas Registered in all 50 States and is licensed where required. Nevada Registration #165                213
www.lexitaslegal.com                              California Firm Registration #179

1    she did not wish to pursue any applicable charges

2    and had learned her lesson."

3                    Do you -- is that -- are those her

4    words or are you --

5            A.        Absolutely.  Yeah.  That's not

6    my -- that would have been -- there are little

7    things that you include in your notes that she would

8    have either said I've learned my lesson or lesson

9    learned or something.  I would have put in what she

10   said.

11           Q.        Do you know what she meant by she

12   had learned her lesson?

13           A.        I don't, but in her mind she did.

14   That was never anything I would have put in there,

15   had she not said it.  Typically it would have been

16   in a statement.  The fact that I don't have a

17   statement written out tells me that -- and again,

18   just from my own experience, that as soon as we sat

19   down she said, "You're not going to -- I don't want

20   to do anything.  I don't want to do anything.

21   You're not going to contact him, are you," or I

22   would have had a statement.  Because I've taken many

23   a statement and then I receive a call from a victim

24   saying, "I don't want -- I don't want to do

25   anything," and I would have already had a written

(615) 595-0073                Lexitas Reporting - Nationwide in all 50 States and is licensed where required. Nevada Registration #165                214
www.lexitaslegal.com                                    California Firm Registration #179

1    statement.

2                        So the fact that I didn't makes me

3    at least assume that she immediately said, "I don't

4    want to do anything.  You're not going to call him,

5    are you?"  And then we sit there.  "No, ma'am.

6    That's your -- that's your choice if you don't want

7    to do anything."

8            Q.        Your standard practice was to have

9    a written statement by the victim?

10           A.        Typically that's -- that was what

11   my goal was, was to have her come in so I could get

12   a detailed written statement from her.  So the fact

13   that there isn't, in my mind, makes me think that

14   immediately that's -- and that wasn't unusual for

15   that panicked look of the whole reason they came to

16   meet with me was to make sure I was not going to

17   tell him that she reported it or try to talk to him

18   in any way.  I saw that face enough to know it as

19   soon as I saw it.

20           Q.        So did she give you all of this

21   information after she told you she didn't want to

22   pursue any charges?

23           A.        We were discussing it.  I mean, we

24   don't -- I don't just sit down and say, "Tell me

25   what happened."  We talked about rapport.  We talk.

(615) 595-2073    Texas Registered in all 50 States and is located where required. No I.D. Registration #165
www.lexitaslegal.com                California Firm Registration #179                              215

1    Then I would put it on paper.

2                    Do you know what I'm saying?

3                    So we would have had a discussion

4    about what happened during that incident, but the

5    fact that I didn't start writing a written statement

6    leads me to believe that she instantly told me she

7    didn't -- she didn't want to pursue anything.

8         Q.        Did you have K.B. sign a

9    non-prosecution form?

10        A.        No.

11        Q.        Why not?

12        A.        I wasn't in the practice of doing

13   that.

14        Q.        The written statement here on

15   Exhibit 153, is this -- is it the practice that the

16   investigator writes out what the victim said, and

17   then the victim signs it?

18        A.        Yes.

19        Q.        So this is Toma Sparks'

20   handwriting?

21        A.        Yes, I assume.

22        Q.        If you turn the page, on the third

23   page under Notes & Documents, there's an entry here,

24   9/21/2020, September 21st, 2020, John Hames, and

25   then it says, "Additional investigation revealed

1    that there was no actual rape.  The case is changed

2    in RMS to an attempt."

3                    Do you know why this would have

4    been added to this case when the exceptional

5    clearance date was dated August 17th?

6         A.       You would have to talk with John

7    Hames.

8         Q.       In any of your cases, when a case

9    has been cleared by exceptional means, would you go

10   back and make additional notes at that point?

11        A.       I didn't make that note.

12        Q.       Right.

13                 I'm just saying in your practice,

14   would there be a reason to do this?

15                 If the case had already been

16   cleared for exceptional means in August, on

17   August 17th of 2020, is there any reason that you

18   can think of that there would be additional

19   investigation being done on this case after that?

20                 MR. HERRIN:  Object to the form of

21        the question.

22        A.       My assumption would be that he read

23   the narrative that says -- her second version, that

24   he was trying to pull down her pants but they were

25   too tight.