# B.P.

## vs.

## City of Johnson City, Tennessee, et al,

## BRADY HIGGINS

## May 22, 2024



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073

1    Q.     So your supervisors were aware that
2  there was a report of child sexual exploitation?
3    A.     They seen the statement.
4    Q.     So they reviewed A.A.'s statement?
5    A.     Yes.
6    Q.     Who reviewed her statement?
7    A.     It would have been the supervisor
8  that was on back in CID at that time.  Whenever we
9  would sit down and review the case, we had the ADA
10 review it.  And according to here, whenever I spoke
11 with ADA, Toma Sparks was the acting sergeant at
12 that time, which went with me to -- to meet with ADA
13 Ray.  And then I'd say David Hilton was the sergeant
14 at that time, Don Shepard and Captain Ken Peters.
15   Q.     So they were all aware that A.A.
16 had reported a child sexual exploitation.
17          MS. TAYLOR:  Object to the form of
18      the question.
19   Q.     (BY MS. BAEHR-JONES) Based on your
20 conversations -- let me -- let me ask you this.
21          How often were you updating your
22 supervisors about the cases you were investigating?
23          MR. GRANT:  Object to form.
24   Q.     (BY MS. BAEHR-JONES) How often did
25 you have updates with your supervisors about your

```
 1   working to see how they -- we don't know where we're
 2   going to.  We don't -- sometimes the witnesses are
 3   not the most cooperative.  So it's just a common
 4   practice to take somebody as a witness or to -- they
 5   may think of stuff that you don't while you're
 6   talking to them.
 7            Q.       What about when someone comes in to
 8   interview at JCPD?  Is it common practice to have at
 9   least two people there to do the interview?
10            A.       Sometimes it's one; sometimes it's
11   two.
12            Q.       When you were interviewing A.A.,
13   there was a video camera recording, correct?
14            A.       Yes.
15            Q.       Was anyone watching from outside
16   the room?
17            A.       Yes, I assume so.  My supervision
18   was.
19            Q.       Who was watching?
20            A.       I believe Captain Peters.  I
21   can't -- I don't recall who the other sergeant was.
22   The lieutenant was off that day, since
23   Captain Peters was working.  I do not recall who the
24   sergeant was that had been on duty.
25            Q.       When you stepped out to take breaks
```

1  during the interview, did you talk to the people who
2  were watching the video?
3      A.    Most likely.  Let them know, inform
4  them what's going on, what's being said.
5      Q.    Did they give you advice on what to
6  ask?
7      A.    Sometimes, yes.
8      Q.    Did Captain Peters give you advice
9  on what to ask?
10     A.    Most likely, yes.
11     Q.    Did that typically happen that
12 Captain Peters was watching on video when you
13 interviewed somebody at JCPD headquarters?
14     A.    He -- for the most part he was
15 invested in the cases that came in.  He would watch.
16 Because sitting in a squad room just down the
17 hallway, you could hear people's monitors.  A lot of
18 times -- it wouldn't be just this case.  It would be
19 other cases, and you would hear monitors from the
20 supervision or from other investigators where
21 they're watching and listening to assist each other.
22     Q.    To your memory, did you ever have
23 an interview of a sexual assault victim who you went
24 out to get advice from Captain Peters on how to ask
25 questions?

```
 1                    MR. GRANT:  Object to form.
 2          A.        Not to my knowledge.
 3          Q.        (BY MS. BAEHR-JONES) Other than
 4   this case.
 5          A.        Not other than this one.
 6          Q.        You mentioned you worked on --
 7   actually, I didn't ask you this.
 8                    What types of cases do you work on
 9   in CID?
10          A.        Now I work motor vehicle thefts,
11   and I get assigned a lot of the violent crime stuff.
12          Q.        What about fugitive cases?  Do you
13   work fugitive cases?
14          A.        I've attempted -- I mean, we -- if
15   I'm assigned to go find somebody, I'll do my
16   diligence to do that.
17          Q.        Have you ever been assigned to
18   somebody who absconded to a fugitive case?
19          A.        No.
20          Q.        Is there a special unit in JCPD
21   that handles fugitive cases?
22          A.        No.
23          Q.        Do you typically hand those off to
24   the marshals, if you have a fugitive in one of your
25   cases?
```

```
 1          Q.       To your knowledge, did any of those
 2   supervisors have experience working on child
 3   pornography cases?
 4          A.       I do not know.
 5          Q.       Did -- at any point during those
 6   conversations, did you talk about what a collector
 7   of child pornography would do?
 8          A.       No.
 9          Q.       Are you aware that for those
10   devices DA Investigator Mike Little got a search
11   warrant in June -- July of 2023?
12          A.       Not aware.
13          Q.       Are you aware of what was found on
14   those devices?
15          A.       Not aware.
16          Q.       Would it surprise you to know that
17   there was child pornography production found on
18   those devices?
19                   MULTIPLE ATTORNEYS:  Object to
20         form?
21                   MR. GRANT:  Same objection.
22          A.       Not aware of that.
23          Q.       (BY MS. BAEHR-JONES) I don't see
24   you taking any notes during that time.
25                   Did you write this down anywhere in
```

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | your report?                                                 |
| 2   | A.     I do not recall.  I know it was in                    |
| 3   | her statement.                                               |
| 4   | Q.     I believe what you wrote in your                      |
| 5   | report is that she saw Williams and children on the          |
| 6   | phone, correct?                                              |
| 7   |        And let's take a look at that                         |
| 8   | section.  So this would be on Page 1.                        |
| 9   | A.     Yes.  I said -- I stated that in                      |
| 10  | January of 2021, she had opened Williams' phone that         |
| 11  | was in the bed and observed several photos of                |
| 12  | Williams that appear to have children.                       |
| 13  | Q.     But you don't put in that they                        |
| 14  | appeared that Williams's penis was in the children's         |
| 15  | mouth, do you?                                               |
| 16  | A.     I do not.                                             |
| 17  | Q.     Do you think there's a big                            |
| 18  | difference between seeing Williams with children and         |
| 19  | seeing Williams with his penis in children's mouths?         |
| 20  | A.     I would -- I just left the report                     |
| 21  | vague.                                                       |
| 22  | Q.     Would that be the difference                          |
| 23  | between nothing at all and a felony offense?                 |
| 24  | A.     No.                                                   |
| 25  |        MR. GRANT:  Object to form.                           |

```
 1              Q.     (BY MS. BAEHR-JONES) Why didn't you
 2    put that in the report?
 3              A.     It was in her statement.
 4              Q.     So you didn't think it was
 5    important enough to make it into the report?
 6              A.     It was in her statement that was
 7    connected to the report.
 8              Q.     Well, does she put -- let's look at
 9    that.
10                     At the time that she's talking to
11    you, you don't know what's going to be in her
12    statement yet, right, because she hasn't written it?
13              A.     I'm just listening to what she says
14    at the time.
15              Q.     But you don't take any notes about
16    that fact.
17              A.     I'm listening to what she's having
18    to say, so I'm not distracted.
19              Q.     Do you think that this part of your
20    report may have been changed?
21              A.     I do not think so.
22              Q.     Do you remember putting in more
23    details at some point about Williams putting his
24    penis in children's mouths into your narrative
25    statement of the case?
```

```
 1          A.      Not that I recall.
 2          Q.      Okay.  Let's see the next clip.
 3   Let's look at 11:40.
 4                  MR. RADER:  The same video Bates
 5          number?
 6                  MS. BAEHR-JONES:  It's the same
 7          exhibit.
 8                      (Video playing).
 9                  VIDEO INTERVIEWEE:  That when he
10          was 10 years old, he crawled in his
11          babysitter's window and got her pregnant.
12          So he has a daughter that's more or less his
13          age, and she was bringing all six of her
14          grandchildren to see him and he acted really
15          weird about it.
16                  They were coming up from Florida,
17          and he acted so weird about it, and he
18          didn't want me there.  And I was like,
19          "Okay.  Well, you know, we're like so close
20          or whatever, like why don't you want me to
21          meet your family?"  And it just felt really
22          weird that he wouldn't let me come over
23          until later, like already left.  Everything
24          about that felt so weird to me, like the
25          album.
```

| | |
|---|---|
| 1 | Q. But you also asked her about the |
| 2 | sexual assaults again, correct? |
| 3 | A. Yes. |
| 4 | Q. Repeatedly, correct? |
| 5 | MR. GRANT: Object to form. |
| 6 | A. About any consensual and about the |
| 7 | whole incident again, to see if her memory had -- |
| 8 | anything else had sparked her memory. |
| 9 | Q. (BY MS. BAEHR-JONES) Whose idea was |
| 10 | that? |
| 11 | A. We spoke with it and -- pretty much |
| 12 | supervision. We just went over it again. |
| 13 | Q. Who was -- when you say |
| 14 | supervision, who do you mean? |
| 15 | A. It probably, most likely, been my |
| 16 | immediate supervisor at the time and the lieutenant |
| 17 | and captain. |
| 18 | Q. And who were those people? |
| 19 | A. Captain Peters, Lieutenant Don |
| 20 | Shepard, probably Sergeant Hilton. And I don't |
| 21 | recall at that time if Toma Sparks was involved or |
| 22 | not with the acting sergeant role. |
| 23 | Q. Who was there the day that A.A. |
| 24 | came back for the second interview? |
| 25 | A. I believe I was the only one in the |

```
1    right?  It was a court order, correct?
2         A.      A court order of no contact.
3         Q.      Correct.
4                 Based on a violent physical
5    assault.
6                 MR. GRANT:  Object to form.
7         Q.      (BY MS. BAEHR-JONES) Did you ever
8    find that out?
9         A.      I did not research it.
10        Q.      Before you went and spoke to him?
11        A.      No.
12        Q.      Did your supervisors know that you
13   were going to be going to speak to Mr. ████████?
14        A.      It was at the request of ADA Ray to
15   speak with any family members.
16        Q.      Including the estranged father of
17   her child?
18                MS. BEREXA:  Object to form.
19        A.      Yes, about the welfare.
20                MS. BAEHR-JONES:  Let's go to
21        19:34.
22                   (Video playing).
23                VIDEO INTERVIEWER:  Sleeping over
24        at his house.  You wake up to him having sex
25        with you is what -- what's in the statement.
```

1        What -- what was the conversation with that
2        night prior, or what was -- what was going
3        on the night prior?  Do you remember the
4        conversation?  Was it any -- anything that
5        would make him believe that it was
6        consensual, that you --
7                   (Video stopped).
8        Q.        (BY MS. BAEHR-JONES) Why would her
9   conversation from the night prior have anything to
10  do with her waking up, being unconscious and waking
11  up to being raped?
12                  MR. GRANT:  Object to form.
13                  MR. RADER:  Same objection.
14       A.        Just seeing if there was any kind
15  of consensual sex the night prior, so I could let
16  the ADA know.
17                  MS. BAEHR-JONES:  Let's go to
18       21:44.
19                  Okay.  We're at 21:43.
20                    (Video playing).
21                  VIDEO INTERVIEWER:  Now, whenever
22       it says you woke up to him having sex with
23       you, you told him no, and he get off of you.
24                    (Video stopped).
25       Q.        (BY MS. BAEHR-JONES) So this is the

```
 1    third time that you've literally brought up you woke
 2    up to him having sex with you, right, in this one
 3    interview?
 4                    MR. GRANT:  Object to form.
 5         A.         I believe.
 6         Q.         (BY MS. BAEHR-JONES) Do you think
 7    that might have been traumatizing for her?
 8         A.         I'm just trying to get it straight
 9    in my head as I go.
10         Q.         Is it possible that asking a rape
11    survivor three different times in an interview the
12    circumstances of her rape would discourage her from
13    pursuing her case?
14                    MR. GRANT:  Object to form.
15         A.         I don't know.
16                    MS. BAEHR-JONES:  Let's go to
17         24:35.
18                         (Video playing).
19                    VIDEO INTERVIEWER:  So he's trying
20         to pull your clothes back off.  So and
21         then -- I mean, what was the conversation?
22         You came -- you come back.  Why?  Why would
23         you come back after this?  Why didn't you
24         call 911?
25                         (Video stopped).
```

```
 1          Q.      (BY MS. BAEHR-JONES) Did you hear
 2   in this clip you asked her why did she come back
 3   after that, why didn't you call 911, right?
 4          A.      Yes.
 5          Q.      And this is counter to the protocol
 6   that you reviewed earlier from District Attorney
 7   Finney that says you should not ask victim-blaming
 8   questions, correct?
 9                  MR. GRANT:  Object to form.
10          A.      Yes.
11          Q.      (BY MS. BAEHR-JONES) And avoid
12   victim-blaming questions such as why did you or why
13   didn't you, correct?
14          A.      Yes.
15          Q.      You then asked her -- well, let's
16   keep going.
17                       (Video playing).
18                       VIDEO INTERVIEWER:  Why didn't
19          you -- did you reach out to anybody?  Your
20          mom?  Your friend that introduced you two?
21          Did you tell anybody about it?  Did you tell
22          ███?
23                       VIDEO INTERVIEWEE:  I don't have no
24          kind of personal relationship.
25                       VIDEO INTERVIEWER:  Not at all?  Is
```

```
 1                  it just a --
 2                          VIDEO INTERVIEWEE:  Strictly
 3             parenting.
 4                          VIDEO INTERVIEWER:  Just parenting.
 5             Just dropping the kid off.
 6                          VIDEO INTERVIEWEE:  Like not even
 7             any jokes or anything.  Nothing.
 8                          VIDEO INTERVIEWER:  Okay.  What
 9             about your relationship with your mother?
10             Do you -- did you tell her anything about
11             it?
12                          (Video stopped).
13             Q.      (BY MS. BAEHR-JONES) So you then
14      ask her six different times if she told anyone about
15      it, correct?
16                          MR. GRANT:  Object to form.
17             A.      Trying to find anybody that she
18      may -- may be a witness, confided it to.
19                          MS. BAEHR-JONES:  26:15.
20                             (Video playing).
21                          VIDEO INTERVIEWER:  So I'm
22             guessing -- I mean, whenever you said you
23             wake up to him having sex with you, is it
24             vaginally or what?  Were all your clothes
25             off?
```

```
 1                        (Video stopped).
 2              Q.       (BY MS. BAEHR-JONES) So this is --
 3   now you're asking her for the fourth time about
 4   waking up to him raping her, correct?
 5              A.       Yes, details of the incident.
 6                       MS. BAEHR-JONES:  Okay.  Let's go
 7              to 27:30.
 8                        (Video playing).
 9                       VIDEO INTERVIEWER:  You talked --
10              talked to him at some point.  So -- and then
11              it says that you continue -- obviously
12              continue doing cocaine, drinking.
13                       What all did you drink?
14                       VIDEO INTERVIEWEE:  Mostly like
15              1800 was my drink, but his drink was the
16              vodka.  So like sometimes if I didn't have
17              like --
18                       VIDEO INTERVIEWER:  Okay.
19                       VIDEO INTERVIEWEE:  -- I just drank
20              his.
21                       VIDEO INTERVIEWER:  But the drug
22              use was cocaine and alcohol.
23                       VIDEO INTERVIEWEE:  And the tox
24              screen shows that I was on like something
25              else, too, but I never took anything else at
```

```
 1                 all.
 2                         VIDEO INTERVIEWER:  Have you ever
 3                 taken anything else at all?
 4                         VIDEO INTERVIEWEE:  Yeah.
 5                         VIDEO INTERVIEWER:  What else would
 6                 you take?
 7                         VIDEO INTERVIEWEE:  I've taking
 8                 pain pills before.
 9                         VIDEO INTERVIEWER:  Pain pills?
10                         VIDEO INTERVIEWEE:  Yeah.
11                         VIDEO INTERVIEWER:  During this
12                 time that you was with him, was you taking
13                 them?
14                         VIDEO INTERVIEWEE:  No.  I was like
15                 two years clean at that point.
16                         VIDEO INTERVIEWER:  Okay.
17                         (Video stopped).
18                         MS. BAEHR-JONES:  Then we're going
19                 to go to 30:10.
20                         INTERVIEWER:  So you go back, you
21                 continue all this drug use, the drinking.
22                 [unintelligible].  You still stay the night
23                 at his house at that time?
24                         INTERVIEWEE:  Yeah.  We started
25                 going on the couch and stuff
```

```
 1                [unintelligible].
 2                          INTERVIEWER:  Okay.
 3           Q.        (BY MS. BAEHR-JONES) Does it appear
 4   to you that the victim is getting increasingly
 5   discouraged during your questioning?
 6           A.        When watching it now she's -- yes.
 7                          INTERVIEWER:  When you say the
 8           other one, what?  What other one?
 9           Q.        (BY MS. BAEHR-JONES) It looks like
10   right here you're actually reading from her
11   statement again, is that right?
12           A.        Yes.
13           Q.        And you're just re-asking her about
14   the other incident of sexual assault?
15           A.        Correct.
16                          INTERVIEWEE:  [unintelligible].
17                          INTERVIEWER:  Squatting over your
18           face, doing what?
19                          INTERVIEWEE:  Rubbing himself on
20           the --
21           Q.        (BY MS. BAEHR-JONES) Does it appear
22   the victim is now breaking down?
23           A.        Yes.
24                          INTERVIEWER:  And did you tell him
25           to quit?
```

```
 1                  INTERVIEWEE:  I don't really
 2         remember.  I pushed him off of me.  I don't
 3         know what happened.
 4         Q.        (BY MS. BAEHR-JONES) And the victim
 5   is now crying, correct?
 6         A.        Yes.
 7         Q.        And I want to refer you to what
 8   we're going to mark as Exhibit 32.  I don't think
 9   I've given this to you yet.
10                  So do you recognize this?
11                  MR. RADER:  Do you have a Bates
12         stamp number?
13                  MS. BAEHR-JONES:  Yes.  Sorry.
14         I'll read that into the record, and there
15         are copies for everyone.  So this is
16         CITY-76094.
17                  Oh, we're just going to do the
18         first -- well, we'll divide this up.  I'm
19         only going to have the first -- I think you
20         gave them the full copy.  This is just --
21         what the witness has is.
22                  MR. RADER:  Sorry.
23                  MS. BAEHR-JONES:  That's okay.
24                  So just for everyone -- counsel,
25         you've actually been given three exhibits in
```