# B.P.

## vs.

## City of Johnson City, Tennessee, et al,

---

## ERIC DAIGLE

## June 10, 2024



Lexitas Legal TENNESSEE | 1015 Avery Park Dr | Smyrna, TN 37167 | (615) 595-0073

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

B.P., H.A., and S.H.,             )
individually, and on behalf       )
of all others similarly           )
situated,                         )
                                  )
              Plaintiffs,         )
                                  )
                                  )
v.                                )    No. 2:23-CV-00071
                                  )         TRM-JEM
City of Johnson City,             )
Tennessee, et al,                 )
                                  )
              Defendants.         )


        * * * * * * * * * * * * * * *


        VIDEO DEPOSITION OF ERIC DAIGLE

                (VOLUME II)


             August 20, 2024


     CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


===================================================
        JEFF RUSK COURT REPORTING & VIDEO

        Jeffrey D. Rusk, RPR, LCR, CLVS
           805 Eleanor Street, N.E.
          Knoxville, Tennessee  37917
              (865) 246-7656
             Jeff@JeffRusk.com

1    that correct?

2                    MR. LAKEY:  Object to form.

3            A.        Well, that's all I got.  So that's

4    all -- I can't -- that was the totality of the data

5    set to my understanding.

6            Q.        (BY MS. KRAMER) In other words, as

7    far as you know, for the time period January 2018 to

8    July 2022, the total number of sex-related crimes

9    that JCPD had a case number for was 326.

10                   MR. LAKEY:  Object to form.

11           A.        That fit into these

12   classifications, yes.

13           Q.        (BY MS. KRAMER) Understood.

14                   Did you feel comfortable using 326

15   cases to do the assessment that you did that

16   resulted in your Audit of Sex-Related Crimes?

17           A.        I did, and the good part is that,

18   you know, any audit is based on the volume of the

19   audit.  Anybody who does an audit wants to have a

20   strong volume to be able to show -- you know, if

21   you're auditing two things, you've got a 50 percent

22   chance of failure.  So the more cases that you can

23   audit, the more you can see patterns, which is

24   really what we look for when auditing.

25                   And so specifically with the

1    forcible rapes and having 133 of those and -- you
2    know, it was the cornerstone of this audit and those
3    numbers in totality.  Because, you know, the
4    statutory rape, the forcible fondling, you know,
5    those are, "Okay, what did we do?"  But the real
6    issue on the table was the significant victim crimes
7    and the response to significant victim crimes.
8              So all of them are terrible.  All
9    of them are crimes, but the lower level might not
10   need as much of an investigation as a forcible rape,
11   for example, that could have forensics involved in
12   it and, you know, different levels, additional
13   levels of investigation needed.
14        Q.      In your experience as compared to
15   an assessment you may have performed for another
16   police department, would 326 cases be a number
17   you're comfortable with drawing conclusions from?
18              MR. LAKEY:  Object to form.
19        A.      I can't answer that, just because I
20   don't -- you know, I've done audits on different
21   things with less numbers, and I've done audits with
22   more numbers.  You know, the number is the number.
23   That's what I have to work with.  I don't really --
24   whether I like it or not doesn't matter.  It's what
25   I've got.  So I do think it's a number that will be

1    significant enough to show what I was looking for,

2    which was patterns.

3                    And, for me, the purpose of the

4    audit is -- it's all -- it's not negative or

5    positive.  It's just what happened.  So I want to

6    make sure that when I'm doing an audit that I can

7    also give people credit for the things they do

8    right, along with identify things that they may fail

9    then.  So a volume -- the bigger the volume and the

10   more significant the volume, obviously the better

11   you can go through and say, "Okay, well, they did it

12   right in these areas and they didn't do it right in

13   these areas."  So I was -- I think it was

14   sufficient.

15           Q.       (BY MS. KRAMER) You answered that

16   question much better than I asked it.  Thank you.

17                    How did you land on the time period

18   2018, January 2018 to July 2021?

19           A.       That was a discussion with the City

20   in a couple of different realms.  Number one, they

21   were looking at a specific time frame because of the

22   allegations in the Dahl complaint.  And not --

23   that's not part of my world, but obviously I would

24   want to include those years in the assessment,

25   because the City was -- you know, Ms. Ball was

1    crimes and juvenile crimes.

2                     And there's a very important need

3    to begin to understand some of the scientific

4    aspects of the psychological world as it applies to

5    victim interaction.

6          Q.       The last bullet says -- or let's

7    start with the second to last bullet.  It says,

8    "Impact of officers' attitude towards victim on

9    investigation outcomes."

10                   Can you describe what that means?

11         A.       Well, it's kind of similar to the

12   last bullet point, too, which is, you know, as I

13   talked about in the report, human beings have

14   biases.  And whether they're explicit or implicit

15   biases, you know, whether it goes as far as, you

16   know, sexism and racism in an explicit bias or it's

17   just an implicit bias that they -- we have to -- we

18   have to make sure that we're training our officers

19   to understand their biases and to address their

20   biases.

21                   They're human beings and so, you

22   know, biases affect attitude towards people and how

23   they respond to people.  And it's something that we

24   take very seriously, and so we're going to train

25   them on it.

1          Q.        And this specifically references
2    the impact on investigation outcomes.
3                    Do you see that?
4          A.        Yes.
5          Q.        And what does that refer to?
6          A.        Well, if you -- if you don't
7    believe the victim because of a bias or you don't
8    believe that what the victim is saying is credible
9    because of a bias, then you're going to affect the
10   whole outcome of the investigation.  Because if the
11   investigator doesn't believe the victim, then
12   they're going to focus on evidence that is -- that's
13   going to support their biases, and there won't be a
14   full, fair, and unbiased investigation.
15         Q.        In the last bullet point, I just
16   want to clarify that the use of LE there, is that
17   short for law enforcement?
18         A.        Yes, ma'am.
19         Q.        Okay.  And you did review Johnson
20   City Police Department's training in the course of
21   your assessment, right?
22         A.        We were able to review the types of
23   training that they received, the topics.  They were
24   using an online system called Virtual Academy, which
25   I think is a Tennessee-based operation and is known

1           A.      That's my term, but that's what we
2    use, ex-cleared, but it's exceptional means.
3           Q.      And is that term, exceptional
4    means, is the source of that term from TIBRS?
5           A.      It's for -- the short answer is
6    yes.
7           Q.      Okay.
8           A.      So you have to remember that each
9    of the state entities fit into a federal database.
10   So everybody's pretty consistent.
11          Q.      Did anybody at Johnson City Police
12   Department -- strike that.
13                  Did anybody from the City, in
14   connection with your assessment, provide to you a
15   written description of what it means to clear for
16   exceptional means?
17                  MR. LAKEY:  Object to form.
18          A.      Yes, because it's on the -- it's on
19   the manual for TIBRS, which is -- I think I put
20   it -- I even put it in the report.  In the initial
21   phase, it was -- I think it was sent by the sergeant
22   I was working with.  And then I just went and pulled
23   the manual myself and started looking at the TIBRS
24   manual.
25          Q.      (BY MS. KRAMER) And what was your

1    understanding of how JCPD investigators were using

2    the exceptional means code for case clearances?

3                    MR. LAKEY:  Object to form.

4          A.        Not very consistently.

5          Q.        (BY MS. KRAMER) Can you say more

6    about that?

7          A.        It just -- you know, the challenge

8    was that there just wasn't consistency.  So I

9    couldn't figure out, you know, how it should be used

10   correctly, right?  And that's where I was drilling

11   down on when should -- what is TIBRS's view of how

12   it should be used correctly.

13                   We just found, as you saw the

14   number of cases, that a large percentage of the

15   cases were being closed by exceptional means.  And I

16   just wanted to make sure that they're being closed

17   correctly.

18         Q.        Did you find JCPD officers had a

19   clear understanding of the correct use of clearing

20   by exceptional means?

21                   MR. LAKEY:  Object to form.

22         A.        I can conclude that they did not,

23   because I couldn't get consistency in asking that

24   question.

25         Q.        (BY MS. KRAMER) Did you ask whether

```
 1                    But when we get to the suspect, and
 2      when we have an identified suspect, what was very --
 3      I would just use the word intriguing to myself and
 4      my team, who was experienced, was that we just
 5      couldn't understand why you would not contact the
 6      suspect since it is normal for criminal
 7      investigators to, at least at some point, make
 8      contact with the suspect and let them know they're
 9      being alleged of a crime of such significance and
10      see if they're willing to talk to you.
11                    You know, obviously, they have
12      their rights.  They don't have to talk to you.  But
13      my experience has been that individuals being
14      accused of such a crime are sometimes more often
15      willing to have a conversation with you, even with
16      an attorney, just because they want to get their
17      side on the record of what happened.
18           Q.      (BY MS. KRAMER) You mentioned
19      earlier when we were talking about sex-based crimes
20      that there may be issues of credibility.
21                    Would you agree that suspect
22      admissions or statements are going to be
23      particularly valuable in that context?
24                    MR. LAKEY:  Object to form.
25           A.      I think -- I do agree that locking
```

1  in a suspect and locking in a witness is important

2  in the investigation, because everything that occurs

3  from that point on is going to be dealing with

4  credibility assessment.

5  Q.      (BY MS. KRAMER) The report states

6  that during your interviews, "Investigators

7  confirmed that it was a practice at JCPD not to

8  contact the alleged suspect until they were

9  convinced that the assault reasonably did occur.

10  This is baffling to the DLG team."

11           Did I read that correctly?

12  A.      You did, yes.

13  Q.      Is baffling the word that you were

14  looking for before?

15           MR. LAKEY:  Object to form.

16  A.      I'll go with it.

17  Q.      (BY MS. KRAMER) And what does it

18  mean -- what is your take on the fact that these

19  investigators needed to be convinced that the

20  assault reasonably did occur before they would

21  interview a suspect?

22           MR. LAKEY:  Object to form.

23  A.      Well, what do you mean by what does

24  it mean?  I don't understand that.

25  Q.      (BY MS. KRAMER) How do you evaluate

1    the only case that you reviewed relating to Sean

2    Williams?

3            A.        It's my understanding there were

4    others.  I don't know which ones they are without

5    going through the spreadsheet.

6            Q.        Your audit did include more than

7    one case relating to Sean Williams?

8            A.        I don't know as I sit here today.

9    This was the only one that was egregious that popped

10   up, you know, in the 300 -- my -- I want to say that

11   I was -- there's more out there, but I don't know of

12   them.  This is the one that was egregious enough.

13   That was one of the examples.  I used multiple cases

14   as examples in this report, and that was one of

15   them.

16           Q.        And why was it so egregious, in

17   your view, to -- I think this example is one of

18   failure to secure a crime scene.

19                     Why would it have been important

20   to -- I guess why is it important generally to

21   secure a crime scene?

22           A.        I mean, based on if you just read

23   the report in and of itself, it makes no sense

24   whatsoever.  Like any brand new rookie out of the

25   Academy should be able to look at this and say,

```
 1    "Well, wait.  Why?  I don't understand."

 2                    You have a victim running out of a

 3    building.  Why didn't you secure a -- why didn't you

 4    secure an apartment?  Why didn't you get a

 5    supervisor?  Why didn't you -- why didn't you call a

 6    detective?  Why didn't you go upstairs and knock on

 7    the door?  I don't know if any of those things were

 8    done.

 9                    I just know what's in the report,

10    and the report is very vague and not a lot of

11    information.  And that's why it was brought out as

12    an example.

13         Q.       And when you were reviewing this

14    case, do you -- there was no documentation of, for

15    example, collection of DNA.

16         A.       Yeah.  There's not much of anything

17    in this case documentation wise.  So it's a pretty

18    straightforward -- you know, I was really focused

19    mainly as -- I use it as a suggestion in this case,

20    demonstrating that there was no crime scene

21    security.  There was no processing.  There was no

22    witness interviews.  There was no nothing.

23                    MS. KRAMER:  Okay.  Let's take a

24         short break.  Let's do until 3:50 Eastern,

25         please.
```

1    have established the identity of at least one

2    offender.  This means the agency knows at least one

3    offender's sex, race, age, ethnicity, and resident

4    status."

5                    No. 2, "Sufficient probable cause

6    must have been developed to support the arrest,

7    charging, and prosecution of the offender."

8                    No. 3 is, "The exact present

9    location of the offender must be known so that an

10   arrest could be made."

11                   And No. 4 is, "There must be a

12   reason outside of law enforcement control preventing

13   offender's arrest.  The valid reasons and

14   explanations are provided below."

15                   Did I read that correctly?

16        A.        Yes.

17        Q.        Did you have any way to determine

18   whether a case closed by exceptional means by the

19   Johnson City Police Department met all four of the

20   conditions reflected here in Exhibit 116?

21        A.        No, and that's why I had concerns

22   with the manner and mechanism of them closing these

23   cases by exceptional clearances.  Often a lot of

24   this wasn't met.

25                   By the way, just for the record,

1    there is -- this is just a snippet taken out of the

2    TIBRS Manual.  There is a whole section in the TIBRS

3    Manual about exceptional clearances, which goes into

4    way more detail of what this all means and how.

5    Unfortunately, I spent way too much time trying to

6    figure it out.

7                 But on its face, this is the rule.

8    But the TIBRS Manual actually has additional

9    information as to how to consider different things.

10                But the answer to your question is

11   a lot of times, in our review of the documents, the

12   elements were not in the document that led to a

13   conclusion or a close by an exceptional clearance.

14        Q.      The portion of the TIBRS Data

15   Collection Manual that you see in Exhibit 116, this

16   is all that Johnson City provided to you; is that

17   correct?

18        A.      Yeah, but I have Google.

19        Q.      And then so you went and

20   independently found the other portions of the TIBRS

21   Data Collection Manual relating to exceptional

22   clearances; is that correct?

23        A.      Yeah.  I mean, as we talked about

24   today, it was a subject of all of my sit-downs with

25   people, because I was really trying to understand

1    the nuances which allows the investigators to close

2    it by this means.

3              Q.       And is it your understanding

4    that -- let's take, for example, victim refused to

5    cooperate.

6              Is your -- is it your understanding

7    that if that's the clearance code, that for that to

8    be correctly used to close a case, all four of the

9    conditions identified in Exhibit 116 have to be met?

10             MR. LAKEY:  Objection to form.

11        A.       Yes, which is what makes it so

12   difficult to understand.

13        Q.       (BY MS. KRAMER) And when you say

14   makes it so difficult to understand, what are you

15   referring to?

16        A.       Well, basically what this

17   exceptional clearance is identifying is that it's

18   telling you you have all authority under the law --

19   sorry to you guys.  I put my piece of paper up

20   there.

21             All authority under the law to

22   arrest the individual for the crime, but there is

23   something that's allowing a clearance of that.  And

24   as I identified in my report, often that clearance

25   was lumped into either prosecution declined or

```
1   victim uncooperative without the justification to
2   support it.

3              You know, what does that mean?
4   It's just, "I had a conversation with the prosecutor
5   and they said drop it.  Okay.  Well, there's not
6   enough here to support that."  And that was -- it is
7   very confusing.  I'm going to tell you, we spent a
8   lot of time trying to understand how it works.

9              And I'll be honest with you, I
10  think you asked me this question before, I don't
11  think the Johnson City Police Department understands
12  how it works because of the -- because of the
13  inconsistencies that they had in the manner to close
14  it, so --
15     Q.      But you agree it's their
16  responsibility to understand why they're closing a
17  case, correct?
18              MR. LAKEY:  Objection to form.
19     A.      Yes, because they have to submit it
20  to the State.
21              MS. KRAMER:  Okay.  I don't have
22          any more questions right now.  I will
23          reserve the rest of my time for follow up.
24              And thank you very much for your
25          time today, Mr. Daigle.
```

LexitasLegal TENNESSEE
(615) 595-0073

1           A.          In general.  I mean, I ask

2     questions.  What they tell me, they tell me.

3           **Q.          I mean, yeah.**

4                 **I mean, so in essence here, and**

5     **maybe I'm oversimplifying it, but with regard to**

6     **your audit, you are looking at process issues and**

7     **you're reviewing investigation information, but**

8     **you're not making findings about any particular**

9     **investigation, that that investigation was good or**

10    **bad.**

11          A.          Correct.  I'm identifying outliers

12    that help -- that led to our conclusion.  And that

13    was very difficult in this case, too, because an

14    outlier is somebody's case.

15          **Q.          Yeah.  Sure.**

16          A.          That's somebody -- that's a victim,

17    and we're -- you have to put outliers in there to

18    prove your point.  But at the same point, you have

19    to keep in mind that there are real victims that may

20    be reading this report someday.  It's not just the

21    town and the litigation, but it's -- it's victims.

22    It's people that have been victimized and people

23    have been accused.  So there's both sides of that,

24    right?  So I think you're --

25          **Q.          Yeah.  I mean, I think it's -- I'm**

```
 1          A.        No, because that's -- that's local.
 2   It depends upon what services are available in the
 3   area that the department has.
 4                    As I sit outside the sheriff's
 5   department and I was investigating -- when I was
 6   interviewing Lieutenant Dunn, there was all these
 7   brochures on the wall for victims advocate services
 8   and services that are available to victims.
 9                    At every police department,
10   officers carry with them and have knowledge of
11   victim services and for full -- for full range of
12   cases, domestic violence, child abuse, sexual
13   assault.
14                    When a police department -- when a
15   police officer is meeting with a victim and an
16   investigator meets with a victim and they understand
17   victim methodology, they should at least offer the
18   victim the opportunity to speak to a non-police
19   personnel to make the correct decisions.
20                    You could say to a victim, "Listen,
21   ma'am, I know you've been through a lot of trauma
22   right now, and I'm the last to add more trauma to
23   your plate.  You may not want to deal with the
24   police.  You may not know how to deal with me, but I
25   would ask you for an opportunity to just sit down
```

 1   with -- or just let it -- let a -- let a victim

 2   advocate or a psychologist meet with you for a

 3   second, and then whatever you want to decide, that's

 4   fine to do."

 5                 Human beings -- that's the process

 6   that every victim-related crime in this country is

 7   supposed to follow.

 8        Q.        Is there a national standard issued

 9   by IACP, CALEA, or any other organization that

10   you're aware of that mandates that's what a police

11   law enforcement agency is supposed to do?

12        A.        I don't know, because it's very

13   nuanced, but I would say that one of the challenges

14   is that there is no mandate for a department to have

15   that system.  It's recommended, and most systems in

16   the country have recognized the failures of not

17   having that system and do have the system.  And my

18   understanding is Tennessee has victim services

19   related to that.

20        Q.        What police departments in -- and

21   again, are you -- let me just ask it a different

22   way.

23                 Are you aware of any police

24   department in the state of Tennessee that when a

25   victim declines to -- declines to submit to an SAK,

1    says, "Ma'am, I'm going to get you an advocate or a

2    psychologist to talk to you"?

3            A.        First of all, we never say it like

4    that, but I would -- I don't -- I did not -- I did

5    not assess any other department.

6                      But the industry has focused in the

7    past two decades on victim-related services and the

8    importance of victim-related services in

9    victim-related crimes.

10                     And if you go to IACP on a

11   national -- at their national conference every year,

12   more than half of the classes being offered are

13   classes specializing in victim and mental health

14   application.  It's been a trend for two decades.

15           Q.        Is it unusual for victims of sexual

16   assaults directly to convey to law enforcement that

17   they do not want to pursue prosecution of a suspect?

18           A.        I don't know.

19           Q.        Did that ever happen when you were

20   investigating sexual assaults?

21           A.        It did not.

22           Q.        In every -- so every single victim

23   you encountered of a sexual assault wanted to

24   prosecute?

25           A.        No, they didn't want to prosecute.

1    But as a good investigator, working with them and

2    recognizing the significance of the incident and

3    giving them time to go through their trauma and

4    giving them the appropriate resources that they need

5    to -- you know, it's done in stages.

6                        The first stage is, "Listen, you

7    don't have to make this decision right now.  Let's

8    just go and get a sexual assault kit done, and then

9    we'll meet in a couple days and talk about it."

10   Like it's not a -- it's not, "Oh, this happened.

11   You have to sign on right now."  It's a -- it's an

12   investigation.  It takes a long time.

13                       So you have to guide the victim

14   through the ups and downs that the victim is going

15   to go through, and most good investigators are going

16   to be very good at that.  They're going to

17   understand that and also understand when they're not

18   good at it.

19                       The fact that if I'm not making a

20   connection with this victim, maybe she just doesn't

21   want to talk to a male officer, I'm going to get a

22   female officer or vice versa.  It's a skill set.

23   It's a -- it's a profession.  There's no A equals B

24   in any of this.

25                       I will tell you a lot of sexual

1    assault victims don't -- are fearful of being

2    victimized again in the courtroom, and so they don't

3    want to participate.  But after a long process of

4    trust and understanding, they do.  And some of them

5    don't.

6              Q.      If a victim refuses to cooperate

7    with the investigation, do you agree that the case

8    may be closed?

9              A.      If the victim signs a refusal, yes.

10             Q.      You do?

11                     Is that what you're calling the --

12   the what -- how did you phrase it?

13             A.      Declination.

14             Q.      Declination to --

15             A.      That's a local thing for you.  I

16   don't know.  I think it was called a prosecutorial

17   declination or something like that.  We just -- if

18   the -- if the -- the way that it would go, because

19   I've never seen that form.  It's unique to your

20   area.  But what we would do is we would just have

21   them fill out an affidavit and say, "I do no longer

22   wish to prosecute this case," and then have them

23   sign it under oath.  That way, if it came back

24   later, we were protected.

25             Q.      Right.

1    and of itself could be probable cause.  So a victim

2    is alleging that she was sexually assaulted.  That

3    is 52 percent.  That's probable cause.  The --

4    without a victim, you know, there -- the victim is

5    the key area to the sexual assault.  I mean,

6    obviously you can get supporting documents -- you

7    can get supporting evidence through a sex kit or

8    through a crime scene, a forensic evaluation,

9    witness statements, but the victim is the key part

10   of the crime.

11          Q.       Would you agree that it is

12   important for the police department to try to get as

13   thorough an interview from the victim as possible?

14          A.       Absolutely.  If not one, multiple.

15          Q.       And that was going to be my next

16   question.

17                   In order to complete the interview

18   process, it's not unusual for there to be more than

19   one interview of the victim.

20          A.       Yeah.  I mean, everybody puts the

21   interview in the static position of her coming in

22   and being interviewed.  But if you are a victim in

23   my crime, we're going to have a lot of conversations

24   long before and after we have an actual interview

25   for the purposes of recording the evidence, right?

1           That's how you build a rapport.

2   That's how you -- that's how you, you know, try to

3   get the victim to be more confident with the police

4   and with the investigation.  And that's -- that's

5   the one of the successes to making victims willing

6   to testify later on.  It's relationship building.

7           **Q.      And the interview process can be --**

8   **can and often should begin with the responding**

9   **officer; is that right?**

10          A.      Well, sure.  I mean, that's --

11  everybody that has interaction with her, including

12  the forensic nurses, the doctors, the crime scene

13  techs, everybody is building that -- that rapport of

14  trust in order to get her -- her or him to fully

15  participate in the process and feel safe in the

16  process.

17          **Q.      But focusing on the responding**

18  **officer, under IACP guidelines it notes that the**

19  **responding officer is responsible for conducting the**

20  **initial preliminary interview.**

21                  **Would you agree that would be**

22  **something you would expect and hope to see?**

23          A.      Yes, and that would just be a --

24  you know, again, the words and the policy are

25  structured, but a preliminary interview would be,

1    "Hey, how are you?  What happened?  What can we get

2    you?  Would you come with us to the hospital?"  I

3    mean, that's a preliminary interview.  It's not a

4    sit down and interview; that's just an interaction

5    with her.  "What happened?"

6         **Q.        Depending on how much the victim**

7    **might want to share at that particular moment.**

8         A.        Sure.

9         **Q.        And in that preliminary interview,**

10   **by the responding officer, the responding officer**

11   **might tell the victim that a second interview might**

12   **be necessary, and probably will be necessary, to be**

13   **conducted by a trained investigator.**

14                **Would that be something that should**

15   **be conveyed to the victim?**

16        A.        We would call it a handoff.  So the

17   job of the first responding officer is to begin the

18   rapport building and then hand off that rapport

19   building to the investigator who responds.

20                So basically you're going to be

21   with them.  You walk them through the initial

22   phases, which could be the most damaging to them

23   because of, you know, what they've just been

24   through, and now you're going to go to the hospital

25   and, you know, it's a lot.

1    **detective in that interview?**

2            A.        Well, if you follow the cognitive

3    interviewing theory for victim-dedicated interviews,

4    you are starting with just a general discussion of

5    what happened.  You know, asking her or him to tell

6    you a story about that night, that evening, that

7    party, wherever they were.  And you're allowing them

8    to give you a full version of events uninterrupted,

9    and you're asking them to focus on their

10   cognitive -- their cognitive interpretations of what

11   did they see, what did they hear, what did they

12   smell, what did they know.

13                   And once you get the first version

14   of events out, you're going to need to go back

15   through and clarify very specific things.  Obviously

16   the location.  Obviously the identity of the alleged

17   accuser.  Information specific to the alleged

18   accuser.  Clothing.  Tattoos.  Marks.  Anything that

19   would be unique to identify her to the -- to the

20   accuser that would help identify them.  How they

21   knew him.  What their relationship was.  Where they

22   began to interact with each other.

23                   You're looking for the location,

24   because you have a crime scene.  You have physical

25   evidence.  So, you know, where was it?  You're

1    looking to ask questions about whether things were

2    laundered, clothing was laundered, undergarments

3    were laundered, sheets and towels, things were

4    laundered.  If not, where are they?  Where would

5    they be currently to be collected?

6                    You're looking for witnesses,

7    people that may have been in the area that will

8    witness, you know, any parts of her story for

9    corroboration.

10                   And then in today's world, you're

11   getting into electronic media, text messages, DM

12   messages, connection on social media.

13                   You're looking for locations so

14   that you can connect the phone to Bluetooth in

15   a residence or Wi-Fi in a residence.  You're looking

16   for, you know, technology that have on them so that

17   you can get CLSI information as to the towers and

18   the location.

19                   So there's -- there's a lot here.

20   But it's all dependent upon the story that the

21   victim tells you.  And then you just dive in to

22   start finding things that you can corroborate with

23   evidence.

24        Q.        You ask the victim -- well, let me

25   ask this.

1    it's just not paying attention to the times, which

2    is, you know, every -- I would expect -- the

3    industry would expect departments to have different

4    types of rooms, if available; a soft room for

5    victims and for children and another interview room

6    for accused.  And, you know, it's just a progression

7    of the knowledge, of experience, and the way that

8    things go.

9                    Do I -- do I want the recording

10   over the handcuffs on the floor?  I always want the

11   recording, but you could have just put a recorder on

12   the table.  The handcuffs on the floor are not going

13   to help in the perception of the victim that she is

14   feeling supported in the process.

15        **Q.        Do you know whether Johnson City**

16   **conducted victim interviews in those same rooms in**

17   **other types of crime like, for instance, aggravated**

18   **assaults?**

19        A.        Well, I was told that they

20   conducted all of their interviews in that room.  So

21   I'm going to have to conclude yes.

22        **Q.        Interviews of murder victim's**

23   **families in those rooms?**

24        A.        I would have to conclude.  They

25   don't have any other room.  So that's a good start.

1       A.        So you're saying the word

2   interview, but let's take a -- you know, one of the

3   cases, as we all have talked about over and over

4   again, the female running out of the house.  You

5   know, what prevents the officer from going and

6   knocking on the door and saying, "What's going on

7   here?  Why did this just happen?"  That's -- it

8   doesn't have to be a -- it doesn't have to be a

9   sit-down, "Did you do it" interview.  But there is

10  nothing preventing you from contacting someone

11  accused of sexual assault in the early stages of the

12  investigation.

13           In fact, I don't know that I would

14  ever do a sexual assault, unless there was some real

15  crisis issue going that would prevent -- because of

16  the possible harm or threat to the victim, where I

17  wouldn't reach out to the victim right away -- with

18  the accused and say, "Hey, we just got a complaint.

19  You're alleged to do X.  Do you want to talk about

20  it?"  What's -- what's the harm in that?  What's

21  the -- there is none.

22       **Q.        Well, do you believe that sometimes**

23  **it's better for the suspect to not know that he or**

24  **she is a target of a criminal investigation?**

25       A.        It's possible.  Like I said, in the

1   situations I talked about, which is where there's a

2   threat to harm to the victim, that might be possible

3   because you don't want retaliation.

4                   But I'm also like the -- I also

5   like surprise.  And as investigators, we work on the

6   element of surprise often.  And when you knock on

7   the door of somebody's house, it's the ultimate --

8   it's the ultimate surprise.  And you can read

9   physiological responses and body language and you

10  can -- you can start to let them know.

11                  And you're going to get a true

12  reactionary response from the suspect at that time.

13  If it was a -- if it was a situation where he

14  doesn't believe it's true, he's going to tell you

15  right then and there.  And if not, you're going to

16  read the reactionary response, and he's going to

17  give you a -- he's going to give you a statement as

18  to why he thinks she said that.  Those are all great

19  investigative tools to be right at the beginning of

20  your investigation.

21        Q.        **So you believe that contact between**

22  **either the responding officer or the investigator**

23  **should occur immediately after the report of a**

24  **sexual assault.**

25        A.        Unless there's a mitigating factor,

1    I think it's necessary because everything stems from

2    that.  Crime scene security.  Search warrants.

3    Crime scene processing.  All of that stems from the

4    contact with the suspect.  You can't get any of

5    those without your initial contact, and you're going

6    to want all of that so that you can put it in a

7    search warrant affidavit.  So, yeah, I think unless

8    there's mitigating circumstances, which do occur, I

9    think it's an important step.

10          **Q.          Do you know investigators or**

11    **persons who investigate crime who believe otherwise,**

12    **that you should have more information before you try**

13    **to interview the suspect the first time?**

14          A.          All of the guys and gals that I've

15    worked with over the years and have interacted with,

16    that was the way we did business, unless there was a

17    mitigating circumstance.

18                       I mean, there are -- there are

19    mitigating circumstances, but unless there was a

20    reason not, you know, we're going to be -- we're

21    going to be hitting this guy's house with a search

22    warrant in a -- if there's alleged acts of sexual

23    assault occurring in the house, we're going to want

24    to get in that house and secure it as soon as

25    possible.  So we have to make contact with them.

1          Q.          Is a mitigating circumstance that a

2    victim has reported what happened but said she

3    doesn't want to move forward with the investigation

4    or the prosecution?

5                      Is a mitigating factor being

6    concerned about them confronting the suspect?

7          A.          I don't know.  It's possible.  I

8    don't know.

9          Q.          Okay.  One of the mitigating

10   factors I think you mentioned is being concerned

11   that it might put the victim into harm's way.

12         A.          Yep.

13         Q.          Any other mitigating factors?

14         A.          Well, you gotta remember, the one

15   thing that's clear is we have to balance the

16   mitigating factor with the loss of evidence.  You

17   know, DNA evidence, physiological evidence does not

18   last long.  Sperm.  Blood.  Hairs.  Feces.  That

19   stuff does not last long.

20                      So it is literally important to --

21   if somebody -- if a victim says, "I was in this

22   house at this time and this happened," your window

23   of opportunity is very limited.  So you're going

24   to -- you're going to have to get in there, and

25   you're going to have to make contact with the

1    suspect to get in there.

2            **Q.        Do you try to go get to a judge and**

3    **get a search warrant when the victim says, "I don't**

4    **want to prosecute, I don't want to pursue this"?**

5                    **Do you think you can get a search**

6    **warrant?**

7            A.        Yeah, I think you can, because you

8    have a complaint, you know.  So the challenge is I

9    don't see too many victims, and I haven't -- even in

10   your investigative reports, I don't see in City of

11   Johnson, I didn't see a lot of victims who reported

12   it and then recanted it within five minutes.  They

13   reported and recanted a period of time down the

14   road -- or not recanted, but say, "I don't want to

15   prosecute."

16                   That's a big difference from --

17   they did report it.  So once you have that report,

18   now you have to do an investigation.  And most

19   victims don't report it and say, "I don't want to

20   prosecute" the minute the cop walks up.  They give a

21   version of events.  The investigation begins, and

22   then along the way the victim decides or is asked by

23   an officer, "Are you willing to go through

24   prosecution?"  They say, "No."  So to put that at

25   the beginning is just -- it's inaccurate.

1   be issued under the McCarthy Rule.  So the law

2   allows us to secure the house for the prevention of

3   destruction of evidence.  So if we knock on his door

4   and he -- whether he talks to us or not, that house

5   is going to get secured, and he's not going to have

6   the ability to go in for a reasonable time while we

7   go and apply for a search warrant.

8           Q.      How about the time to develop

9   alibis?  Is that a concern?

10          A.      Well, it's alibi development.  I

11  mean, I guess it could be.

12          Q.      Threaten the victim, is that a

13  concern?

14          A.      Well, no, because you're going to

15  get charged with more crimes if you do that.  And so

16  I want to call him.  I want to talk to him directly

17  and tell him that he shouldn't do that, because

18  you're going to get charged with more crimes if you

19  do that.

20          Q.      But you also explained earlier that

21  a mitigating factor might be not wanting to put the

22  victim in harm's way.

23          A.      Yeah.  Like if you look at the

24  history and the individual has tried to, you know,

25  commit harm to an individual, you know, you just --

1    you're talking in generalities and the difficulty is

2    we don't know.  There is a situation where we

3    cannot -- we have to be concerned about threat

4    assessment and maybe getting the victim relocated

5    for a period of time before we contact the victim,

6    but -- before we contact the accused, but that's --

7    you know, that is just a mitigating factor.  It

8    doesn't happen very often.

9          **Q.        It's the particulars of the actual**

10   **investigation matter, the details of the**

11   **investigation matter for making those**

12   **determinations, right?**

13         A.        Yes.

14         **Q.        And you -- I think you said in your**

15   **prior portion of your deposition that the timing of**

16   **when a suspect is interviewed is something you**

17   **typically would leave to the discretion of an**

18   **investigator.**

19         A.        Yes, but I would have already

20   expected that there would be -- you know, depending

21   on the involvement of the investigator, how quickly

22   the investigator gets involved, the securing of

23   evidence by the initial responders may also involve

24   interaction with the suspect, right?  If a lady

25   comes running out of a house and says, "I was just

1    sexually assaulted," well, we have to go knock on

2    that door and secure that house until the

3    investigators show up.

4         **Q.      What if the -- what if that woman**

5    **then gets in a car and leaves the scene and won't**

6    **provide any additional information?**

7         A.      Well, you can't do that in a

8    hypothetical, because I don't know what she's

9    already told.  Has she -- has she identified the

10   suspect?  Has she identified the room?  Has she

11   identified the act?  Has she -- you know, what do we

12   have?  Like the facts matter.

13        **Q.      Yeah.  Right, they do.**

14        A.      So in a hypothetical, I can't

15   answer that question.

16        **Q.      And with regard to that particular**

17   **situation you're referring to, the facts that you**

18   **have is what you saw in the paperwork that you**

19   **received to review.**

20             **You didn't have an opportunity to**

21   **talk to any of the officers on the scene, right?**

22        A.      Oh, for that one incident?  No, I

23   did not.

24        **Q.      I realize your prior testimony on**

25   **this issue is that it's important to build a rapport**

1    with the victim to try to get the victim to want to

2    participate in the investigation of a sexual assault

3    investigation.

4                   But ultimately, I presume you agree

5    that how much a victim wants to cooperate in an

6    investigation is up to them.

7         A.        Yeah, that's fair.

8         Q.        **Victims cannot be compelled by law**

9    **enforcement to cooperate in the investigation of**

10   **their allegation.**

11        A.        You can't be made to cooperate.

12        Q.        **Yes, and you shouldn't -- you**

13   **shouldn't be.**

14        A.        Well, you know, that's not true all

15   the time.  Children, individuals that are

16   incapacitated, you might have to -- you might have

17   to do more compelling than you would in a normal,

18   you know, he said/she said adult interaction.

19        Q.        **You might have a legal obligation**

20   **to pursue the investigation, but you're not going to**

21   **certainly compel that child to provide information**

22   **that the child doesn't want to provide.**

23                  **You might work with them, but**

24   **you're not --**

25        A.        I mean, you use the word compel,

1    but that's not the way this works.  We don't compel

2    anybody to do anything.  If the person feels safe

3    and the person feels that you're treating them with

4    respect, I don't -- I mean, there are times where a

5    victim might not talk to you, but everybody will

6    talk to you in that situation.

7                    They may say to you, "I don't want

8    to do anything about this," but if you are treating

9    them as an experienced investigator with skill sets

10   of talking to people and treating them fairly, you

11   can have an open and honest discussion about the

12   case.

13         **Q.      With all respect, the last time you**

14   **investigated a sexual assault or a rape was in**

15   **the -- was 20 years ago, I think is how you're going**

16   **to put it, right?**

17         A.      I agree, but I investigate things

18   all the time.

19         **Q.      Right.**

20                 **And when is the last time you**

21   **investigated a rape?**

22         A.      Over 20 years ago.

23         **Q.      Okay.  And so --**

24         A.      But, counsel, I don't get to sit

25   here today with my industry experience where we

1    train these people how to do it.  The concepts that

2    you're talking about is that it is a -- it is a --

3    it is that you're talking about a concept that

4    you're taking out the humanization of these

5    investigations.  That has been a skill set.  That

6    doesn't change.

7                    I don't care whether you

8    investigated it 30 years ago, the ability to treat

9    people with respect so they talk to you is a skill

10   set that can overcome a lot of barriers with

11   victims.

12        Q.       **Do you have any data that would**

13   **support an argument that if you just do a**

14   **victim-centric approach, every woman of rape is**

15   **going to want to pursue prosecution and cooperate**

16   **with the investigation?**

17        A.       I do not.

18        Q.       **Of course, that's impossible to**

19   **say, because it's going to depend on the victim; is**

20   **that right?**

21        A.       It's going to depend on a lot of

22   things.

23        Q.       **Including the victim.**

24        A.       Including the victim, yes.

25        Q.       **And just like the victim can't be**

1          A.         Yes, but I think the challenge is

2     when they happen.

3          **Q.         The timing of those**

4     **conversations --**

5          A.         Yes.

6          **Q.         -- relative to what stage of the**

7     **investigation.**

8          A.         Yeah.  I don't know that I'm going

9     to bring a victim in and tell her right away, "Oh,

10    you know, it's not going to go well for you on the

11    stand."  And I'm going to -- I'm going to want to

12    investigate the case, find -- get all my evidence,

13    put it all together, and then come back and have a

14    real conversation with a victim advocate in the room

15    or somebody else, with their family members in the

16    room and say, "Okay.  Here's where we're at.  This

17    is what we're ready to do.  Are you ready?"

18         **Q.         Yeah.  I mean, because, you know,**

19    **for instance, in IACP one thing that is discussed is**

20    **officers explaining to victims the limits of**

21    **confidentiality, possible media coverage,**

22    **information regarding sexual assault crimes being**

23    **available to the media.  Those are conversations**

24    **that had to be had.  Your point is it's about when**

25    **you have it.**

1          A.          About when you have it.  You

2    shouldn't start out with that conversation.  It

3    would be bad investigative practice.

4          **Q.          When a victim is waffling about or**

5    **deciding about whether to continue an investigation,**

6    **it is important to let them know that if they change**

7    **their mind, they can come back in to the police**

8    **department, isn't it?**

9          A.          Yeah, and it's also not only that,

10   you know, in the world of the new generation, it's

11   not unusual for victims to ghost you.  And it's a --

12   that's a young kid term to go -- you know, to

13   disappear on you.  And really that comes back with

14   how open the victim feels communicating with you.

15   And if they feel open, then you could have real

16   communication, but that's the -- yes.  The short

17   answer is yes.

18         **Q.          With regard to -- on Page 22, with**

19   **regard to Points 1, 2 and 3 numbered paragraphs, do**

20   **you see that?**

21         A.          I do.

22         **Q.          With regard to those points, those**

23   **things are not unique to Johnson City -- as far as**

24   **you know, to Johnson City's investigation of sexual**

25   **assaults.  Those hold true to their investigation --**

1    at least during this period, their investigation of

2    aggravated assaults.

3              A.       I can assume so.  I didn't read

4    those reports.  So I don't know if they required the

5    victims to come in or they wouldn't take the case.

6    I don't know if they required only interviews to be

7    conducted at the police department, or they -- and I

8    assume they use those interview rooms, but I don't

9    know.

10             Q.       And in fairness, you weren't asked

11   to come in and take a look at whether they were

12   investigating sexual assault allegations different

13   than they were other major crimes.

14             A.       No.

15             Q.       So you did not do that as part of

16   your review.

17             A.       No.

18             Q.       So in addition to IACP and the

19   Tennessee Association of Chief of Police 6.7, which

20   I think is related to sexual assault investigations,

21   the policy suggests that victims need to be advised

22   of the steps they'll have to undergo as part -- have

23   to undergo as part of the investigation, including

24   in-depth interviews with specific and personal

25   questions, right?

1                    And that actually happens in the

2    initial interview, right?

3          A.      Yeah.  I mean, the way I would

4    train investigators to do it would be come in, have

5    a conversation with them, you know, focus that, and

6    then -- you know, and then as -- once I have all the

7    evidence down, let's have a real conversation with

8    them and say, "Okay.  I want to let you know the

9    steps that we're going to take here.  We're going

10   to, you know, seize your clothing.  We're going

11   to -- you know, we're going to take pictures of your

12   injuries, your bruises.  We're going to contact the

13   suspect.  We're going to attempt -- we're going to

14   submit all this to the prosecutor's office for

15   review."  And so, you know, it's really just setting

16   expectations.

17         Q.      Right.

18                 And so that conversation that you

19   just described has to be done -- it would have to be

20   done fairly early on.  If you want to take pictures

21   of the bruises, you're going to talk about

22   submitting to a medical examination, all of that has

23   to occur on the front end.

24         A.      Yeah.  I mean, you might not get

25   the first two done before like -- because oftentimes

1    it takes investigators time to get out to the scene.

2    So the sexual assault kit may already be done.

3                    But when I'm taking -- when I would

4    recommend to investigators is when they're taking an

5    in-depth interview, once they have that interaction,

6    that's your opportunity to explain the process to

7    the victim.

8            Q.        In looking at your deposition, your

9    prior deposition about potential basis for why --

10   for gender bias in investigations, one thing you

11   started to talk about was Deborah Dunn, but it

12   seemed like you certainly didn't finish that.

13                   Would it surprise you to learn that

14   Deborah Dunn denied ever witnessing gender bias in

15   how JCPD investigated sexual assault allegations in

16   her deposition?

17           A.        It would, yes.

18           Q.        And do you have anywhere in your

19   notes with -- do you have anywhere in the notes with

20   your interview of Dunn where she told you that she

21   witnessed gender bias in how JCPD investigated

22   sexual assaults?

23           A.        I think we've been through that.  I

24   don't think there is.

25           Q.        Okay.