IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| B.P., H.A., and S.H., INDIVIDUALLY, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF JOHNSON CITY, TENNESSEE a government entity, *et. al.* | ) ) ) ) ) ) No: 2:23-cv-00071-TRM-JEM ) ) ) ) ) |

**DEFENDANT CITY OF JOHNSON CITY'S RESPONSE TO PLAINTIFF'S MOTION FOR RELIEF FROM LOCAL RULE 83.2 [DOC. 366]**

Defendant City of Johnson City (hereinafter, "Johnson City" or "the City"), hereby appears, by and through counsel, and responds in opposition to the Plaintiffs' request to "issue a statement in accordance with Tennessee Rule of Professional Conduct 3.6(c)… regarding the real estate deal between Ball and Sean Williams." [Doc. 366, PageID#: 9004-5].

The basis for Johnson City's opposition is due to past abuse by Plaintiffs' counsel when previously granted relief by this Court from Local Rule 83.2. The City asks the Court to deny the Plaintiffs' Motion for that reason. Alternatively, the City asks the Court to explicitly limit the relief granted to Plaintiffs' counsel to statements related to Cathy Ball's real estate contract, and specifically order Plaintiffs' counsel to not make any public statements involving Johnson City Police Department's investigation of Sean Williams, their clients' sexual assaults, or an alleged public corruption investigation.

I. **Background Information: given an inch, the Plaintiffs take a mile**

On December 6, 2023, this court granted the plaintiffs' prior request to "make a statement in accordance with Tennessee Rule of Professional Conduct 3.6(c)." [Doc. 91, PageID#: 1043].

1

In granting the Plaintiffs the relief requested, the court directed:

> Counsel for Plaintiffs seek to respond to public statements made by a Johnson City representative suggesting that Plaintiffs were, to some extent, responsible for their assaults due to drug use. (Doc. 63, at 2.) As such, Counsel's response must be carefully limited to what is "required to protect [their] client[s] from the substantial undue prejudicial effect" of the publicity, taking care only to include information "necessary to mitigate the recent adverse publicity." Tenn. Sup. Ct. R. 8, RPC 3.6(c). With these limitations in mind, the Court **GRANTS** Plaintiffs' motion for relief from Local Rule 83.2 (Doc. 63).

Without regard to the Court's order requiring the statement to be "carefully limited," Plaintiffs' counsel seized the opportunity to stage a full media event. Plaintiffs' counsel held a televised press conference in Knoxville, Tennessee on February 6, 2024, that included lengthy introductory statements from all three lawyers representing the plaintiffs, followed by speeches from a podium of six anonymous "Jane Does".[1] See, [Press Conference held in Knoxville, TN on Feb. 6, 2024](#). This included victims who never reported their alleged assaults to the Johnson City Police Department. To this day, because they never reported their assaults, Johnson City has no idea when these victims' sexual assaults occurred, but there clearly was a collaborative theme expressed by all: "had the Johnson City Police Department done their job and protected me I never would have been assaulted." These statements did not fall within the Court's express limitations. Moreover, this false narrative undermines the public's confidence in law enforcement and discourages victims from coming forward.

Jumping at the opportunity to go much further than the topic of the city manager's public reference to "comparative fault", Plaintiffs' counsel went far afield of the Court's instruction to "carefully limit" the responsive statement. In their orchestrated media event, these attorneys advanced not only their litigation theories, but also took the opportunity to damage the reputation

---

[1] A transcript of this media event is provided, Exhibit "A". It very much appeared that the statements matched, such as if they were written by Plaintiffs' counsel.

of the Johnson City Police Department with unsupported factual allegations and inflammatory rhetoric. By way of example:

> i. Attorney Baehr-Jones, who made it clear she was "lead counsel" stated: "One of the great tragedies of this case is that the very institutions and individuals who are supposed to be protecting and serving these women continue to fail them again and again, continue to breach their trust, and instead of protecting them, continue to do them harm."

Exhibit "A", page 2, lines 17-22; 2/6/24 Press Conference.

This statement disregard's the Court's instruction to "carefully limit" the response to the statements that formed the basis for the prior motion.

> ii. Attorney Heather Collins: "There's videos, there's images, and Johnson City had a lot of this information in their possession for a long time until the FBI obtained the information again. By doing this, Johnson City, sitting on evidence for years, they ineffectively dealt with a serial rapist.."

Exhibit A p. 6, Lines 3-8; 2/6/24 Press Conference

This calculated statement by Plaintiffs' counsel went much further than what the Court ordered. Plaintiffs' counsel ignored the clear guidelines from this Court and used their media event to advance their yet-to-proven legal theories, which had nothing to do with "comparative fault," which had been the basis for the prior Rule 83.2 motion.

> iii. Attorney Elizabeth Kramer: "Does Johnson City have so many women who have reported they were raped by Sean Williams without investigation for years that the City really does not know who the Plaintiffs are in this case? The fact is Johnson City does know, and they had evidence in graphic detail for years, but chose not to act on it."

(Exhibit A, Page 7, Lines 5-11; 2/6/24 Press Conference).

This statement was false when it was made. In fact, Johnson City did not know who several of the women in the press conference were until an image of the press conference was shown to a plaintiff in her deposition, so that she could identify them. Furthermore, at the time of the Press Conference, Plaintiffs had only recently provided a list of the names of the "Jane Does" despite months of effort and significant motion practice to get them. Regardless, this statement by

3

Plaintiffs' counsel runs afoul with the Court's directive that counsel "…tak[e] care only to include information necessary to mitigate the recent adverse publicity." [Doc. 91, PageID # 1044].

  iv. Attorney Baehr-Jones: "This is truly a momentous day for the women you see in front of you…today is a special day, for today it is finally their turn to speak." Exhibit A, page 8, Lines 21-22, 24-25; 2/6/24 Press Conference

It is Plaintiffs' counsel, not Plaintiffs, who are the problem. Plaintiffs' counsel has peddled a false narrative, claiming corruption without proof and other unsupported claims, under the guise of court proceedings. Plaintiffs' counsel's response to the Court's prior Order requiring a "carefully limited" statement reflects that Plaintiffs' counsel is capable of no such thing.

**II. Plaintiffs' recent false, reckless and misleading court filings have already triggered the adverse media publicity they now seek to continue with their Motion for Relief [Doc. 366]**

Plaintiffs' Renewed Motion to Enjoin Extrajudicial Conduct [Doc. 236, Page ID#: 6729] contains the following commentary in support of the relief requested:

  i. The place for this information to be made public is through the court and through the filing of legal pleadings. This is because counsel must sign their filings, signify that their representations of the facts are true, and, as officers of the court, they have a duty of candor.

But consider Plaintiffs' counsel's professed duty of candor and signifying as officers of the court the representations of facts being presented as true. *Id*.:

  ii. The circumstances of the deal—an off-market real estate purchase between a wanted fugitive and the City official in charge of the police force for a below-market price—is <u>on its face</u> corrupt. (emphasis is in original) See ECF 235, at 10-11 (discussing Ball's deposition testimony regarding the off-market purchase price of $416,000); Id., Exh. 23 (tax records for Williams' penthouse apartment, Unit 5, 200 E. Main Street, showing a listing price of $725,00 and sale price of $800,000).

[Doc. 236, PageID# 6728]

Compare this to the actual facts provided by Shannon Castillo, the real estate broker involved in the aborted Williams transaction. (Depo. Castillo p. 151-153):

Page 151

4

1      Q.     (BY MR. HERRIN) You indicated in
          2   one of your emails that we looked at that the tax
          3   value of the single fifth floor condo was 287,800.
          4             Do you recall that?
          5      A.     I do.
          6      Q.     And so are there public documents
          7   that show the tax appraised values of all three
          8   condos?
          9      A.     Yes.
         10      Q.     And so to make a -- considering the
         11   public information that's available, is it reckless
         12   to suggest that Cathy Ball's offer of $416,000 was
         13   in some way a corrupt attempt on her part to
         14   purchase an $800,000 piece of property from Sean
         15   Williams?
         16      A.     No.
         17             MS. KRAMER:  Objection.
         18      Q.  (BY MR. HERRIN) No?
         19      A.     It was not reckless.  That's what
         20   your question was.
         21      Q.     I'm saying is it reckless for
         22   somebody to suggest that --
         23      A.     Oh, that is reckless.  Yes.
         24      Q.     That the condo would be worth
         25   $800,000 and that Cathy Ball was in some
Page 152
          1   conspiratorial way trying to purchase a half price
          2   condo from Sean Williams.
          3             MS. KRAMER:  Objection.
          4      Q.  (BY MR. HERRIN) Do you think that is a
          5   reckless undertaking to say that?
          6             MS. KRAMER:  Objection.
          7      A.     Yes, I think that's reckless.  We
          8   have an appraisal that shows how much the property
          9   was worth.

         20      Q.     I'm sorry.
         21             The three condos sold as a unit.
         22      A.     They sold -- yes, they sold
         23   together.  Correct.
         24      Q.     And you -- are you aware -- do you
         25   have any information that the purchase price of all
Page 153
          1   three condos was around 800,000?
          2      A.     Yes, I am aware of that through the
          3   public documents.

5

```
         4     Q.    Okay.  And would it be reckless for
         5  someone to see the purchase of three condos and then
         6  attribute to Cathy Ball's purchase of one condo for
         7  800,000?
         8     A.    Yes, that would be reckless.
```

Consider plaintiffs' counsel's additional unsupported allegations "made public" through their plaintiffs' legal counsel in their pleadings:

> iii. "Thus, it defies logic and common sense that Ball would have no knowledge of the City's number one fugitive, while living directly across the street from his notorious penthouse apartment and heading up the City's police force for months."

[Doc. 226, Page I.D.# 6728]

The actual facts, again provided by Shannon Castillo who knew Sean Williams for many years and was active in the downtown community (Castillo Depo. p. 154-157), are:

```
Page 154
         9     Q.  (BY MR. HERRIN) Your testimony, as I
        10  recall it, when you learned that Williams was a
        11  fugitive, I think you said you were shocked; is that
        12  right?
        13     A.    Yes.  I had no idea.
        14     Q.    You had engaged with Sean Williams
        15  off and on for how many years?
        16     A.    Many.
        17     Q.    So during those many years, did you
        18  have information, meaning rumor, hearsay, gossip,
        19  that he was a rapist?
        20     A.    I did not.
        21     Q.    Okay.  Did you learn of these
        22  allegations only after the arrest in North Carolina
        23  and in the newspaper or media coverage?
        24     A.    Yes.
        25     Q.    So fair to say that even though you
Page 155
         1  considered him to be squirrely --
         2     A.    Yes.
         3     Q.    -- you did not consider him to be a
         4  criminal.
         5     A.    No, not at that time.
Page 156
         7     Q.    Considering your contact with Sean
```

6

```
        8   Williams over whatever number of years it was as
        9   part of the downtown community, did you have any
       10   information that Sean Williams was a drug dealer or
       11   involved in drug trafficking?
       12       A.    I had no knowledge, nor -- of any
       13   of that.  None at all.
       14       Q.    Do you have any information, again,
       15   over the same time period and the amount of time
       16   engaging with him in the downtown community, we'll
       17   call it, that he was involved in sex trafficking?
       18       A.    No.
       19       Q.    Child pornography?
       20       A.    No.
       21       Q.    Child pornography trafficking?
       22       A.    No.
       23       Q.    Any information that you gathered
       24   on the street that he was in a conspiratorial
       25   relationship with Johnson City Police officers,
   Page 157
        1   paying police officers bribes, anything like that?
        2       A.    No.
        3       Q.    If you had even any information
        4   about that, is that the type of thing you would
        5   report to authorities who could do something about
        6   it?
        7       A.    Absolutely.
        8       Q.    If you had any notion of anything
        9   like that, would you have even attempted to put
       10   together a property transaction with Sean Williams?
       11       A.    Absolutely not.
```

Despite the testimony from Ms. Castillo, the Plaintiffs have created a media frenzy with their recent public filings, including the following headline that ran in the local newspaper: "*Legal filing: Cathy Ball Lied about Sean Williams Condo*," Johnson City Press, August 13, 2024. Plaintiffs have already saturated the local media market with their commentary regarding the aborted condominium purchase. Any additional media statements, at this time, are not warranted. Thus, the Plaintiffs' Motion for Relief should be denied[2].

---

[2] Plaintiffs' counsel's reckless public filings include false and defamatory filings regarding a former defendant, Justin Jenkins, including the inflammatory claim that Jenkins' financial records show that he deposited $1 million dollars into his bank account. [*See* Doc. 359, PageID #: 8877]. To refute this false claim, counsel for Jenkins filed a Motion

7

Case 2:23-cv-00071-TRM-JEM   Document 398   Filed 10/18/24   Page 7 of 10   PageID #: 9723

**III. Alternatively, Plaintiffs should be required to make a fully accurate account limiting their media statement to Cathy Ball's real estate deal, and specifically disallowed from including any statements pertaining to the public corruption claims, the investigation of Sean Williams, or their sexual assaults.**

As shown above, Plaintiffs' counsel abused this Court's prior ruling and held a media event that went far beyond responding to the City's statements regarding "comparative fault." Their media event created a media firestorm and led to state-wide media coverage that included slanderous statements about the Defendants, Plaintiffs' counsel's theories in this case and specific information about the Sean Williams' investigations. Plaintiffs' counsel will do the same if given the opportunity to make another public statement. Plaintiffs' counsel's public statements (and filings) not only affect the ability to impanel an impartial jury in this case. Such statements will likely influence the jury pool in Sean Williams' next criminal trial, which is scheduled to begin in approximately one month. To protect all parties' right to a fair trial, should this Court grant Plaintiffs' Motion, Plaintiffs' counsel should be required to limit their statement to Ms. Ball's aborted real estate contract. Any such statement in fairness should include the undisputed facts that neither Ms. Ball nor her real estate agent knew that Williams would later be accused of possession of child pornography, sex trafficking, or being a horrendous serial rapist. The City specifically asks that Plaintiffs' counsel be precluded from discussing any other allegations in this case, including Johnson City Police Department's investigation into Sean Williams, the alleged public corruption investigation, and the Plaintiffs' sexual assaults.

**IV.        Conclusion**

Plaintiffs' Motion for Relief [Doc. 366] should be denied, given counsel's past abuse of

---

to Strike and produced a Declaration from the records custodian for the bank, who testified that the amount on the check is not associated with the transaction of Mr. Jenkins, but is instead the balance of an Eastman Credit Union corporate check clearing account after the deposit was made. [Doc. 359-1, PageID #:8890, ¶ 1-4].

the leave this Court granted.  Alternatively, the City asks the Court to limit Plaintiffs' counsel's public statements to include accurate and factual information concerning Cathy Ball's terminated real estate deal, with specific instructions to make no statements concerning Johnson City Police Department's investigation into Sean Williams, the alleged public corruption investigation, and the Plaintiffs' sexual assaults.

Respectfully submitted,

*s/K. Erickson Herrin*
K. Erickson Herrin, BPR # 012110
**HERRIN, McPEAK & ASSOCIATES**
515 East Unaka Avenue
P. O. Box 629
Johnson City, TN  37605-0629
Phone: (423) 929-7113
Fax: (423) 929-7114
Email: rachel@hbm-lawfirm.com

Emily C. Taylor, BPR # 027157
**WATSON, ROACH, BATSON
& LAUDERBACK, P.L.C.**
P.O. Box 131
Knoxville, TN 37901-0131
Phone: (865) 637-1700
Email: etaylor@watsonroach.com

Jonathan P. Lakey, BPR # 016788
**BURCH, PORTER & JOHNSON, PLLC**
130 North Court Avenue
Memphis, TN 38103
Phone: (901) 524-5024
Email: jlakey@bpjlaw.com

## CERTIFICATE OF SERVICE

       I hereby certify that a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.