IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

B.P., H.A., and S.H., individually, and on
behalf of all others similarly situated,

      Plaintiffs,

v.

CITY OF JOHNSON CITY, TENNESSEE,
a government entity,

KARL TURNER, individually and in his
official capacity as Chief of the
Johnson City Police Department,

KEVIN PETERS, individually and in his
official capacity as Captain in the
Johnson City Police Department,

TOMA SPARKS, individually and in his
official capacity as Investigator in the
Johnson City Police Department,

JUSTIN JENKINS, individually and in his
official capacity as Investigator in the
Johnson City Police Department,

JEFF LEGAULT, individually and in his
official capacity as Investigator in the
Johnson City Police Department, and

DOES 7-20, inclusive,

      Defendants.

**No: 2:23-cv-00071-TRM-JEM**

**PLAINTIFFS DEMAND JURY TRIAL**

1

## <u>THIRD AMENDED CLASS ACTION COMPLAINT</u>

For years, Sean Williams drugged and raped women and sexually exploited children in Johnson City, Tennessee, and for years, officers of the Johnson City Police Department ("JCPD") let him get away with it. From November 2019 – July 2022, JCPD received numerous reports alleging Williams had drugged and sexually assaulted women in his apartment in downtown Johnson City. JCPD also had in its possession evidence that Williams had raped nearly two dozen women and children. Instead of arresting Williams, however, JCPD officers treated Williams as though he were, in the words of Investigator Toma Sparks, "untouchable." In exchange for turning a blind eye to Williams' crimes, JCPD officers, including Sparks and Investigator Justin Jenkins, among others, took hundreds of thousands of dollars in cash and other items of value from Williams, all while refusing to take meaningful steps to protect the women and children of Johnson City. It was later revealed that JCPD was not only turning a blind eye to Williams' crimes but also engaging in a pattern and practice of discriminatory conduct towards women who reported rape and sexual assault by Williams *and other perpetrators*.

On June 23, 2022, former federal prosecutor Kateri Dahl filed a civil complaint against Johnson City, revealing JCPD's institutionalized policy to ignore complaints of sexual violence, including allegations of rape and drug activity by Williams and his accomplices, made by multiple women under Johnson City's jurisdiction. Not only were the complaints of women being ignored or minimized, JCPD personnel, including then-Chief Karl Turner, then-Captain Kevin Peters, Investigator Sparks, Investigator Jenkins, and Investigator Jeff Legault, affirmatively refused to investigate Williams' crimes against women; affirmatively refused to refer charges for prosecution and referred charges in a piecemeal and incomplete manner to undermine potential prosecution; knowingly conspired to destroy and conceal evidence, including evidence of Williams' rapes; knowingly intimidated and dissuaded women from pursuing criminal charges; and, in the case of

2

Investigator Sparks, knowingly made false statements to women with the intent to obstruct and interfere with criminal investigations. Turner, Peters, Sparks, and Legault also intentionally interfered with Dahl's efforts to investigate Williams' sex trafficking venture, conspiring to terminate her contract under false pretenses to stop her investigation.

Most egregiously, Turner, Peters, Sparks, and Jenkins intentionally interfered with the lawful search of Williams' seized digital devices, which were in the custody and control of JCPD beginning on September 19, 2020. These devices contained images and videos of Williams raping women whom he had drugged and sexually exploiting children. Despite having evidence in their possession supporting that Williams was a child sex predator and had raped nearly two dozen victims, including children (officers found a baby doll with a hole in her genitals inside Williams' safe and a handwritten "Raped list" with dozens of names on Williams' nightstand), Sparks and Jenkins—at the direction of Turner and Peters—intentionally suppressed the evidence on Williams' digital devices by failing to draft a search warrant in September 2020. Turner then discouraged Dahl from obtaining a warrant and Sparks delayed sending Dahl a draft affidavit for months, finally emailing her a draft that was so deficient it would never support probable cause to secure a search warrant. Williams' digital devices sat in JCPD custody for two and a half years. Defendants' decision not to search them was intentional: the goal was to protect Williams, so that the corrupt scheme through which the officers had enriched themselves off Williams was not uncovered. On information and belief, Turner, Peters, Sparks, and the officers in the Special Investigations Section who worked narcotics offenses also had another motivation: to protect Williams' status as a confidential source in federal drug investigations. In return, and as payment, JCPD officers, including Sparks and Jenkins, also took hundreds of hundreds of thousands of dollars in cash and a gold necklace from Williams' safe.

3

Had Turner, Peters, Sparks, and Jenkins followed basic police procedure and searched Williams' devices in September 2020 and arrested Williams for his sex trafficking crimes then, countless crimes at Williams' hands would have been prevented, including the rape of Female 12; the sexual exploitation of nine-month-old Minor Victim 1; and the drugging and loss of Female 10's life. Instead, they continued to obstruct Dahl's investigation, and when Williams was charged with the paltry offense of felon-in-possession of ammunition, JCPD officers intentionally botched his arrest, allowing him to evade justice for years. Defendants' intentional conduct shocks the conscience.

In April-May 2022, there was yet another opportunity to arrest Williams and stop his predatory behavior. Then a fugitive on the felon-in-possession of ammunition charge, Williams could not participate in normal commercial transactions. Johnson City Manager Cathy Ball attempted an off-market purchase of Williams' penthouse apartment that would allow Williams to close the deal either remotely or through a power-of-attorney. Ball had Turner use JCPD systems to research the area around Williams' apartment—the same apartment where Williams had raped dozens of women. At the time, Ball knew that Williams was a fugitive, and either knew (or should have known) that Williams' criminal conduct involved acts of sex trafficking. At the last minute, Williams pulled out of the deal. Ball disclosed her role in this attempted real estate purchase only after evidence came to light in discovery, and she has yet to admit publicly that she intended to close the deal notwithstanding knowing that Williams was a fugitive.

In August 2022, after public outcry, Defendant Johnson City retained an independent policing expert to conduct a review of JCPD's sexual assault investigations from 2018 to 2022. Rather than exonerating JCDP, however, the resulting report was damning. Released by the City on July 18, 2023, four weeks after the filing of the initial complaint in this case, the report from

the City's own expert found that JCPD's overall handling of women's reports of sexual assault and rape was severely deficient and rife with discriminatory conduct based on hostility and bias towards women. According to the report, this unlawful and unconstitutional conduct discouraged victims from pursuing their cases. JCPD supervisors further permitted investigators to close sexual assault cases improperly, based on the purported reluctance of the victims, even when prosecution would have otherwise been possible.

In November 2022, the U.S. Department of Justice ("DOJ") Human Trafficking Prosecution Unit and the Federal Bureau of Investigation ("FBI") opened a federal sex trafficking investigation into Williams. The evidence the FBI collected in the sex trafficking investigation proved to be overwhelming: on Williams' digital media, seized at the time of his arrest in North Carolina, the FBI found images and videos that Williams had taken of himself sexually assaulting unconscious women, including Plaintiffs and Class Members in this case. Williams saved these images in labeled folders and titled them with the women's first names and the word "drugged." The FBI also found evidence that Williams was sexually exploiting children. To date, law enforcement has identified at least 67 women victims of Williams and an unknown number of children. In August 2023, the DOJ and FBI opened a federal public corruption investigation into JCPD for alleged officer misconduct with respect to Williams. This investigation remains ongoing.

## JURISDICTION AND VENUE

1.     Plaintiffs bring this Trafficking Victims Protection Act and civil rights action pursuant to 18 U.S.C. §§ 1591(a)(1), (2), 1591(d), 1594, and 1595; 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution; the Tennessee Governmental Tort Liability Act, T.C.A. 29-20-205; and the common law.

2.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

5

3.      Venue is proper under 28 U.S.C. § 1391 as Defendants are located in Washington County, in the Greeneville Division of the Eastern District of Tennessee.

## PARTIES

4.      Plaintiff B.P., a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

5.      Plaintiff H.A., a female, was a citizen and resident of Johnson City, Washington County, Tennessee, during the operative time.

6.      Plaintiff S.H., a female, was a citizen and resident of Gainesville, Georgia, and was visiting Johnson City, Washington County, Tennessee, during the operative time.

7.      Defendant Johnson City, Tennessee, ("Defendant City"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee. Defendant City has substantial control over the Johnson City Police Department and its employees.

8.      Defendant Chief Karl Turner is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

9.      Defendant Captain Kevin Peters is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

10.      Defendant Investigator Toma Sparks is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

11.      Defendant Investigator Justin Jenkins is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

12.      Defendant Investigator Jeff Legault is an individual residing in Johnson City, Tennessee, and was an employee of Defendant City during the operative time.

13.     Defendant Officers John Does 7 through 20 are Johnson City Police Officers. Plaintiffs name them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.

14.     Plaintiffs are informed and believe and thereon allege that each of the Defendants is responsible individually and as an agent, contributor, and co-conspirator in a single enterprise with and as the alter ego of all other Defendants.

15.     At all relevant times, the unlawful conduct against Plaintiffs and Class Members as described herein was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, on information and belief, the unlawful conduct described herein was committed under actual or apparent authority granted by Defendants such that all the unlawful conduct of all Defendants is legally attributable to all other Defendants.

16.     At all relevant times, all Defendants were and are legally responsible for all the unlawful conduct, policies, practices, acts, and omissions as described herein, unless otherwise indicated, and that Plaintiffs' and Class Members' damages as herein alleged were proximately caused by their conduct.

## **FACTUAL BACKGROUND**

I.     **JCPD Officers Benefited Financially from Sean Williams' Conspiracy to Drug and Rape Women and Sexually Exploit Children in Johnson City, Tennessee**

17.     Beginning in at least 2018 and continuing to at least May 2021, Sean Williams, a known drug dealer and convicted felon, conspired with Alvaro Fernando Diaz-Vargas and others to drug and rape women and sexually exploit children in his apartment in downtown Johnson City, in violation of 18 U.S.C. §§ 1591(a), 1594(c).

7

**A.** **The Sex Trafficking Conspiracy**

18.     At all relevant times, Williams resided in a loft apartment in downtown Johnson City, Tennessee, and operated the business Glass and Concrete Contracting LLC ("GCC"), along with coconspirators Female 4 and Female 5 and others.

19.     On information and belief, in addition to any legitimate business, GCC also served as a front for Williams to engage in narcotics trafficking in Tennessee and other states. This included facilitating his interstate travel to buy and sell narcotics.

20.     On information and belief, GCC had annual revenue in the millions of dollars.

21.     Williams used three primary means and methods to recruit, entice, harbor, provide, obtain, maintain, and solicit women and children, including children under the age of 14, including but not limited to: (1) providing benefits in the form of drugs, cash, and free lodging to coconspirators, including Diaz-Vargas, Female 1, and others, to recruit, obtain, transport, maintain, and provide women; (2) using drugs to addict and control women who would then recruit, obtain, transport, maintain, and provide other women; and (3) offering something of value to women, including free lodging and money, at times under the guise of hiring women for purportedly legitimate purposes, so that he could obtain and gain access to the women and their minor children.

### *Recruitment and Sexual Assault of B.P.*

22.     In the fall of 2019, Female 1 befriended B.P. and introduced her to Diaz-Vargas and Williams. Female 1 invited and encouraged B.P. to party at Williams' apartment numerous times.

23.     Williams' apartment was only accessible by entering a certain code; Williams only provided the code to people who recruited victims into his apartment.

24.     B.P. often observed Female 1 enter the code into Williams' apartment before leading B.P. and other women up.

8

25.     On or about October 29, 2019, Female 1 invited B.P. and another female friend, Female 6, back to Williams' apartment.

26.     B.P. was invited back to Williams' apartment several times by Female 1.

27.     On one occasion, B.P. was offered cocaine by Williams. Williams poured lines of cocaine on a black tray that was only offered and used by the female partygoers. The male partygoers, including Williams, used cocaine from a different tray.

28.     After using the cocaine, B.P. began to feel woozy and physically and mentally incapacitated.

29.     Concerned, she attempted to leave the apartment, but Williams tried to prevent her. He told B.P. that she could not leave and if she did, she would be pulled over for a "DUI." He told her to stay in his apartment and sleep on his couch.

30.     In an attempt to get away, B.P. lied to Williams, saying she had to work the next day and that her dog needed to be let out at her house.

31.     Eventually, B.P. was able to leave and tried to drive home. During the drive, she felt increasingly confused and dizzy and became alarmed when her vision began to blur. She pulled into a parking lot and passed out.

32.     On November 6, 2019, B.P. was out with a friend in downtown Johnson City. While she was out, Diaz-Vargas sought her out and invited B.P. and her friend back to Williams' apartment.

33.     When B.P. arrived, Williams handed her an already opened beer. After taking a sip, she immediately began to feel the same physical and mental incapacitation as she had felt on the prior occasion and was unable to move her body properly. At some point after this, B.P. became unconscious.

9

34. While B.P. was unconscious, Williams sexually assaulted her. Williams took photographs and/or videos of the assault.

35. The photographs and/or videos Williams took depicting the sexual assault of B.P. are now in the custody and control of the FBI.

36. On information and belief, these photographs and/or videos were also contained on the digital devices that JCPD seized from Williams' apartment on September 19, 2020, which remained in JCPD custody unlawfully for years.

### *Recruitment and Sexual Assault of Female 13*

37. In or about the summer of 2019, Female 13 was out with a friend, Female 7, in downtown Johnson City when Female 7 received a phone call from Williams. Female 13 could hear Female 7 speaking to Williams and heard Williams ask something to the effect of, "Do I need to use a condom?" Female 7 responded with something to the effect of, "Unless you want to have babies." Female 13 asked what Female 7 was talking about with Williams and Female 7 dismissed the comments as nothing.

38. Later that night, Female 7 invited Female 13 to come back to Williams' apartment with her. After a short time in the apartment, Female 7 told Female 13 that she was leaving. Female 13 asked Female 7 not to go. Female 7 and Williams assured Female 13 that "nothing was going to happen."

39. As Female 7 was leaving, Williams gave her an eighth of an ounce of cocaine, which is referred to as an "eight-ball."

40. On information and belief, Williams provided the eight-ball of cocaine in exchange for Female 7 obtaining, recruiting, and providing Female 13 to Williams, so that Williams could sexually assault Female 13.

10

41.     On information and belief, Williams had provided cocaine to Female 7 in the past, effectively addicting her to the drug. Over the course of her addiction, Female 7 went from being a practicing doctor to losing her medical license.

42.     Williams gave Female 13 a pill that he claimed was Klonopin, medicine commonly used to treat anxiety, but was in fact a substance that was strong enough to render her unconscious.

43.     Once Female 13 was drugged and fully unconscious, Williams proceeded to sexually assault her. Williams took photographs of himself forcibly sexually assaulting her.

44.     The next morning, Female 13 left Williams' apartment, unaware that she had been sexually assaulted by Williams.

45.     On or about September 13, 2023, Female 13 was contacted by a law enforcement agent working with the District Attorney's Office for the First Judicial District of Tennessee. During subsequent meetings with law enforcement agents, she was informed that there were photographs of her which depicted her sexual assault by Williams. Female 13 has no memory of the sexual assaults and is clearly unconscious in the photographs.

46.     The photographs Williams took depicting the sexual assault of Female 13 are now in the custody and control of the FBI.

47.     On information and belief, these photographs were also contained on the digital devices that JCPD seized from Williams' apartment on September 19, 2020, which remained in JCPD custody unlawfully for years.

### *Recruiting Female 8; Obtaining Minor Victim 1*

48.     Starting in or around October 2020, Williams asked Female 8 if she would help clean his apartment in exchange for cash. Female 8 agreed and began cleaning Williams' apartment and in return received money from Williams.

49.     A couple weeks later, Williams told Female 8 she was "too pretty" to just clean for him and asked her to do other tasks for him as well. Williams asked Female 8 to hang out at his apartment and run errands. In exchange, he would provide her with cash, as well as other benefits like drugs and alcohol while they were hanging out.

50.     Sometime later, Williams told Female 8 that he was going to hire her as an employee of his company, GCC. Female 8 received payments directly from GCC for a period of time.

51.     On at least one occasion, Female 8 drove Williams to Asheville, North Carolina for a purported business meeting for GCC. In fact, it did not appear to Female 8 that Williams was traveling to participate in a legitimate business meeting. When Female 8 dopped Williams off at what appeared to be an upscale hotel in Asheville, he seemed high on drugs, extremely anxious, and fidgety. Williams did not tell her the purpose of the meeting and told her to stay in the car. She waited for approximately two hours in the parking lot before he returned and she drove him back to Johnson City, Tennessee.

52.     Female 8 continued to run errands for Williams until around the end of December 2020.

53.     During the time Williams had access to Female 8 through her work for him, Williams drugged and sexually assaulted Female 8. Williams took videos of these sexual assaults.

54.     The videos Williams took depicting the sexual assaults of Female 8 are now in the custody and control of the FBI.

55.     On or about December 23, 2020, Female 8 went to Williams' apartment and brought her infant son, Minor Victim 1. Later that day, Williams sexually exploited Minor Victim 1 by

taking photographs of himself engaged in a sex act with Minor Victim 1. These photographs are also in the custody of the FBI.

56.     On September 12, 2023, Williams was indicted on charges of production of child pornography, based on his sexual exploitation of three minor victims. *United States v. Williams*, Case No. 2:23-cr-00111-JRG-CRW. Minor Victim 1 is one of the victims in that case.

**B.     JCPD Investigators Sparks and Jenkins Benefited Financially from Participation in Williams' Sex Trafficking Venture**

57.     Beginning on an unknown date and continuing until at least April 2023, Defendant JCPD investigators Sparks and Jenkins conspired with Williams to participate in a venture, the purpose of which was to recruit, entice, harbor, provide, obtain, maintain, and solicit women and children, who had not attained the age of 14 years, for the purpose of engaging in commercial sex acts.

58.     Defendants Sparks and Jenkins engaged in a pattern of conduct that created a tacit agreement between themselves and Williams and/or his coconspirators the purpose of which was to support, facilitate, or otherwise further the victimization of Plaintiffs and all similarly situated class members. This conduct included a de facto continuous business relationship, through an extortion scheme, in which Williams' company GCC paid money to JCPD officers in exchange for facilitation of the sex trafficking venture.

59.     Defendants Sparks and Jenkins also effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of a search warrant for Williams' safe and other unlawful collection efforts. The warrant was, on its face, obtained and used to seize unlawfully obtained currency or narcotics assets. In fact, the seizure was a quid pro quo payment made to Sparks and Jenkins with either the implied or explicit understanding that, in exchange,

13

they would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity.

60. Defendants Sparks and Jenkins knew or should have known that their participation in such a venture was for the purpose of facilitating or supporting Williams' sex trafficking crimes.

61. Defendants Sparks and Jenkins took overt acts in furtherance of the sex trafficking venture as set forth below.

### *JCPD Extortion Scheme*

62. In or around August and September 2023, Williams began posting messages to Facebook through a female coconspirator. According to the posts, Williams wrote these statements himself from jail, using a contraband cellphone to send them to his coconspirator who would then post them to his Facebook page.

63. On or about September 2, 2023, Williams wrote a message describing an extortion scheme involving JCPD officers. According to the post, beginning on an unknown date, and continuing until at least September 2020, JCPD officers, including Defendant Sparks, extorted cash from Williams through his coconspirator, Female 4, at the rate of $2,000.00 per week. To facilitate the extortion scheme, Williams' company GCC used false Internal Revenue Service ("IRS") 1099 Forms to pay the money out of the business. Williams' coconspirator then made "owner draws" from these separate business entities to obtain the cash to pay the JCPD officers:

14

The corruption....

_____, my ex and business partner, was paying officials at JCPD with money from my company for years because she got caught selling cocaine and the corrupt officers targeted her for extortion probably due to her association to me. When _____ fell, it created a problem. The corruption could potentially be exposed.

_____ made $2000 a week payments to Sparks and other unnamed officers using bogus fraudulent 1099 names and forged owner's draws.

Above: Part of Sean Williams' September 2023 Facebook post written from jail.

### JCPD Cover-Up

64. On September 19, 2020, at approximately 2:34 a.m., Mikayla Evans fell, or was pushed, out of Williams' fifth-story apartment window, suffering life-threatening injuries. First responders, including JCPD officers, arrived at Williams' apartment between approximately 2:34 - 2:45 a.m.

65. According to the above-referenced Facebook post, the incident involving Evans had the potential to reveal evidence of the officers' extortion scheme. Indeed, as set forth below, by September 2020, both Sparks and Jenkins had already been making deposits into their financial accounts above their known sources of income for years. They had deposited these funds into their accounts either in cash or by laundering the payments through multiple bank and loan accounts.

66. On September 19, 2020, sometime after the first JCPD officers arrived at the scene of Evans' fall, Defendants Sparks and Jenkins arrived at Williams' apartment. The two officers shouted up to Williams' apartment from the street, asking to be let in, and eventually obtained the passcode to enter the apartment from one of the patrol officers on the scene.

67. As the investigators from the Criminal Investigations Division ("CID"), Sparks and Jenkins took control of the crime scene once they arrived in Williams' apartment, with the patrol

15

officers deferring to their decisions. Sparks and Jenkins then proceeded to obstruct the investigation into Williams by making decisions which ran counter to JCPD protocol for securing and searching a crime scene. These were intentional overt acts in furtherance of the conspiracy with Williams.

68. For instance, the officers never tested Williams' bloody hands to determine whether this was Evans' blood, despite the fact that the crime under investigation was attempted homicide:





Above: Crime scene investigation photo taken by JCPD of Sean Williams' hands with blood on them.

69. At Sparks and Jenkins' direction, JCPD officers left the apartment unsecured without seizing or securing the Arlo video cameras which pointed towards the center of the room from which Evans fell:



Above: Crime scene investigation photo taken by JCPD of Sean Williams' apartment shortly after Evans' fall showing an Arlo video camera mounted on the wall of the kitchen pointing toward main living room.

17



Above: Crime scene investigation photo taken by JCPD of Sean Williams' apartment shortly after Evans' fall showing an Arlo video camera mounted on the wall of the main living room.

70.     Despite knowing that Williams was accessing the Arlo video camera footage remotely from his cellphone, Sparks and Jenkins intentionally permitted Williams to maintain control of his phone, enabling him to destroy evidence:



Above: Crime scene investigation photos taken by JCPD in Sean Williams' apartment shortly after Female 3's fall showing Williams holding his cell phone in his hand.

19

71.     Sparks and Jenkins also failed to seize a handwritten note stating, "Call Arlo!!!" which could have been evidence of Williams' efforts to delete the video footage and obstruct justice. Officers seized the phone which belonged to Evans, but left the note:



Above: Crime scene investigation photo taken by JCPD in Sean Williams' apartment shortly after Evans' fall showing Evans' cell phone and a handwritten note stating, "Call ARLO!!"

72.     Diaz-Vargas was present in Williams' apartment during the investigation. Sparks and Jenkins intentionally left Diaz-Vargas in the unsecured apartment alone while they brought Williams to JCPD headquarters, enabling Diaz-Vargas to destroy and conceal evidence.

73.     Video footage shows that Jenkins was the last officer to interact with Diaz-Vargas before all the JCPD officers left that morning. On the video, Jenkins pauses and watches as Diaz-Vargas turns and re-enters Williams' apartment. Only then does Jenkins turn and walk down the stairs.

74.     Jenkins is also wearing a camera in the video footage as he leaves the apartment. On information and belief, Jenkins took the photographs of Williams' apartment which are included above.

75.     On information and belief, Peters was aware of the actions Sparks and Jenkins took on September 19, 2020, to obstruct the investigation into Williams. Call logs show that David Hilton, the CID supervisor on scene, called Peters three times between 4:37 a.m. and 5:40 a.m., for six minutes, four minutes, and two minutes, respectively. Peters continued to receive regular updates from Hilton throughout the day, including while Hilton, Sparks, Jenkins, and Keith Sexton were executing a search warrant of Williams' apartment. For instance, Peters spoke Hilton for 4 minutes at 11:28 a.m. and 14 minutes at 3:05 p.m. According to dispatch logs, Hilton was at Williams' apartment from 10:42 a.m. to 4:19 p.m.

76.     Once at JCPD headquarters, Sparks and Jenkins placed Williams in an interview room. For the next 30 minutes, while Jenkins interviewed him—and then left him alone in the room—Williams maintained custody and control of his cellphone. Williams continued to manipulate his cellphone and made phone calls from his cellphone during this time. By the end of the interview, Williams had been able to erase all the data from his cellphone. Only then did Sparks seize Williams' cellphone and apply for a search warrant for Williams' apartment.

77.     During this time, Williams' apartment was left unsecured and Diaz-Vargas was able to move and/or destroy evidence. By the time Sparks and Jenkins returned with a search warrant for Williams' apartment later that morning, Diaz-Vargas had taken down the video cameras and hid them in a closet under a pile of paper towels:



Above: Crime scene investigation photo taken by JCPD of Sean Williams' apartment during the execution of the Sept. 19, 2020, search warrant showing Arlo video cameras, which were discovered under a pile of paper towels.

78.    At 8:52 a.m. on September 19, 2020, Sparks applied for a warrant for Williams' apartment to search for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide, as part of the investigation into Evans' fall from Williams' window.

79.    Beginning at 10:08 a.m., JCPD officers Jenkins, Sparks, Hilton, and Sexton executed the search warrant on Williams' residence. According to dispatch logs, Sparks and Jenkins remained at Williams' apartment for the next nine hours, leaving at 7:44 p.m. Rather than conduct a thorough search according to JCPD protocol, however, Sparks and Jenkins intentionally failed to secure, seize, and inventory key pieces of evidence. Instead, they seized Williams' safe, which contained hundreds of thousands of dollars in cash and a gold Cartier necklace. This was part of either an implied or explicit understanding with Williams as part of the conspiracy.

80.    Sparks and Jenkins intentionally failed to secure, seize, and inventory a rifle located just inside Williams' front door, despite knowing that Williams was a felon:

22



Above: Crime scene investigation photo taken by JCPD in Sean Williams' apartment during the execution of the Sept. 19, 2020, search warrant showing a rifle leaning against a table in the foyer.

81.     Sparks and Jenkins also failed to seize and inventory a handwritten note from Williams' nightstand with the word "Raped" written atop a list of 23 female names, including names which appeared to describe children or babies:



Above: Crime scene investigation photo taken by JCPD in Sean Williams' apartment during the execution of the Sept. 19, 2020, search warrant, showing a handwritten list of names found on Williams' nightstand with "Raped" written across the top.

82.     This list included the first names of some of the Plaintiffs and class members in this case.

83.     On information and belief, none of the sexual assault victims who had reported Williams to JCPD were informed of this list, nor told whether their names appeared therein.

84.     Throughout the time that Sparks, Jenkins, Hilton, and Sexton were executing the search warrant in Williams' apartment on September 19, 2020, Peters was receiving regular

updates from Hilton. Call logs show Hilton called Peters for 4 minutes at 11:28 a.m. and 14 minutes at 3:05 p.m.

85.     Sparks and Jenkins waited in Williams' apartment for additional JCPD officers to arrive with a dolly to cart out the large safe. The safe had no evidentiary value in Evans' attempted homicide case, was not an item for which the officers had probable cause based on the search warrant, and was only seized because Sparks and Jenkins had an agreement with Williams that they would obtain cash and other things of value from inside.

86.     Sparks and Jenkins did seize the following digital devices:



Above: Part of the JCPD inventory list describing some of the items seized by JCPD from Sean Williams' apartment on Sept. 19, 2020.

87.     The devices seized on September 19, 2020, remained in the custody of JCPD unlawfully for over two years without being properly searched for evidence.

88.     Had JCPD officers properly secured, seized, and searched the digital evidence in Williams' apartment on September 19, 2020, they would have found the following evidence: images and videos that Williams had taken of himself sexual assaulting women whom he had

rendered unconscious, including class members in this case. Williams had saved these files to folders on his computer which he had labeled with the victims' first names and the word "drugged." JCPD officers also would have found images of Williams sexually assaulting minor children, as well as other child sexual abuse material ("CSAM"). On information and belief, this evidence would have shown that Williams was a "collector" and "trader" of CSAM, receiving and distributing child pornography materials online, including trading his own produced images/videos to obtain CSAM from other "collectors."

89.     Sparks and Jenkins did not arrest Williams before leaving on September 19, 2020.

90.     On information and belief, Evans later reported to JCPD that she believed she had been drugged by Williams on September 19, 2020, prior to falling or being pushed out of the window.

91.     To date, the attempted homicide investigation has yielded no charges against Williams.

92.     Because of Sparks and Jenkins' overt acts to cover up their extortion scheme, Williams was able to continue to perpetrate his sex trafficking crimes with impunity and continue to victimize class members, including, on December 23, 2020, Minor Victim 1.

*JCPD Officers Take Cash from Williams' Safe*

93.     As set forth in detail below, neither Sparks nor Jenkins ever secured a search warrant for the digital devices seized on September 19, 2020, despite the fact that this was the evidence sought by the original residence warrant. Instead, within days, Sparks had applied for and obtained a second search warrant to search Williams' safe, purportedly for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide. There was no legitimate investigative purpose for securing this warrant—Sparks and Jenkins were investigating an

26

attempted homicide that had no connection to possible narcotics stored in the safe. The real purpose behind obtaining this warrant was to seize Williams' cash.

94. Female 9 had previously seen large amounts of cash (hundreds of thousands of dollars) kept within the safe.

95. In support of this search, Sparks explained that a narcotics-trained police canine had alerted on the safe for the presence of narcotics. Sparks applied to seize, among other items, "any currency" found in this safe.[1]

96. There were no facts stated in Sparks' warrant which connected "any currency" with the offense under investigation, the attempted homicide of Mikayla Evans, or showed how "any currency" was evidence or fruits of this crime. The warrant therefore lacked probable cause to justify seizure of "any currency."

97. Although Diaz-Vargas, Williams, and/or other coconspirators had time to move and/or destroy other evidence in Williams' apartment, they left hundreds of thousands of dollars in cash in the safe which JCPD officers seized:

---

[1] JCPD officers did not have court approval to use a narcotic sniffing dog. Sparks' September 19, 2020, warrant did not seek authority to use this investigative technique, nor would it have been appropriate given the scope of the first warrant which only included seizing video surveillance equipment, video surveillance storage devices, electronic devices capable of connecting to a camera system, and any trace evidence that would suggest an assault or struggle occurred.

27



Above: Crime scene investigation photo taken by JCPD of cash found inside Williams' safe on Sept. 23, 2020.

98.     According to a Facebook post made by Williams, the safe held $500,000.00 in cash when JCPD officers seized it, but only $81,000.00 remained when the safe was returned to him:

> Sparks and other unnamed officers are now a half
> million dollars richer after taking my safe with 500k in
> it and returning it with only 81k.

99.     JCPD officers also took a Cartier gold necklace from the safe, never inventorying the necklace and never returning it to Williams.

100.    JCPD officers also found, but did not inventory, a girl baby doll which had a hole in the genitals area and two dildos:





Above: Crime scene investigation photos taken by JCPD of items found inside Williams' safe on Sept. 23, 2020.

101. On information and belief, in exchange for the cash and gold necklace Sparks and

Jenkins seized and illegally took from Williams, there was an agreement that they would take

overt acts in furtherance of Williams' sex trafficking conspiracy, namely, they would facilitate

Williams' evasion of any criminal accountability for his unlawful sex acts by (1) intimidating and

threatening victims and potential witnesses; (2) making false statements to victims to discourage them from pursuing their claims; (3) assisting in the destruction or concealment of evidence; (4) retaliating against victims who attempted to report Williams; (5) interfering with the federal criminal investigation into Williams' sexual assaults; (6) retaliating against Kateri Dahl, a former Special Assistant United States Attorney ("SAUSA"), for her attempts to investigate Williams' sexual assaults; and (7) assisting in Williams' efforts to evade arrest and incarceration.

102.    By the time Sparks and Jenkins took cash and other items of value from Williams' safe, they knew or should have known that these acts were in furtherance of Williams' sex trafficking conspiracy based on the evidence they observed in Williams' apartment (the "Raped" list), the evidence found in the safe (the Baby doll), and the overwhelming evidence of Williams' sex trafficking crimes which was contained on the digital devices which they seized but intentionally did not search.

### Sparks and Jenkins—at the Direction of Turner and Peters—Fail to Obtain a Search Warrant for Williams' Digital Devices in September 2020

103.    On September 19, 2020, at 7:46 p.m., CID supervisor Hilton sent an email to JCPD leadership, including Chief Turner and Captain Peters, setting forth the details of Evans' case and the investigative steps taken by JCPD that day. Hilton explained that JCPD would need to obtain additional search warrants for the digital devices and safe seized from Williams' apartment.

104.    The most senior leaders in charge of this investigation, namely, Chief Turner and Captain Peters, who headed CID, made the decision not to obtain a search warrant in response to Hilton's email in September 2020.

105.    Over the next four months, Turner actively discouraged Dahl from obtaining a search warrant for these devices, and Peters would receive updates about the status of these devices from Sparks (presumably, that they remained in JCPD custody, unsearched). This demonstrates

that both Turner and Peters knew about and were in positions to control whether JCPD submitted a completed search warrant for these devices. Ultimately, Sparks delayed sending an affidavit to Dahl until January 2021 and never sent her a version that was adequate to submit to a magistrate judge.

### *Sparks and Jenkins Launder Ill-Gotten Gains from the Extortion Scheme*

106. On information and belief, between 2018 and 2022, Jenkins engaged in a money laundering scheme to launder the ill-gotten cash he received from Williams and Female 4 by paying off a series of auto, construction, and home loans totaling over $400,000. On information and belief, this amount represented the funds he received from his participation in the conspiracy with Williams. The following table represents auto, construction, and home loans Jenkins took out and/or paid off during this period based on records from his financial institutions:

Table 1: Summary of Jenkins' Loan Payments

| Loan # | Date Issued | Amount Financed | Date Paid Off & Amount Paid | Collateral | Bates |
|---|---|---|---|---|---|
| | 11/5/2018 | $20,750 | 1/13/2020 $18,536.90 | 2012 Toyota Tacoma | Eastman 000013 |
| | 1/7/2020 | $36,815.90 | 9/25/2020 $34,308.89 | 2016 Toyota Tacoma | Eastman 000046 |
| | | $158,222.45 | 1/4/2021 $158,036.98 | | Eastman 000064 |
| | 6/30/2021 | $22,900 | 7/02/2021 $ 22,903.44 | 2021 Salem 179DBKX | Eastman 000088 |
| | 8/13/2021 | $27,550.62 | 1/18/2022 $26,899.59 | 2021 Salem M-178BHSKX | Eastman 000118 |
| | 6/30/2021 | $18,350 | 1/24/2022 $17,239.62 | 2006 Fourwinn Horizon | Eastman 000080 |
| | 9/22/2020 | $45,236.22 | 1/25/2022 $37,946.91 | 2018 Toyota Tundra | Eastman 000118 |
| | 12/20/2021 | $90,000 | 4/27/2022 $33,746.53; 4/28/2022 $30,834.00 | | Eastman 000131 |
| | 5/31/2022 | $77,855.00 | | | |

Case 2:23-cv-00071-TRM-JEM    Document 419-2    Filed 11/02/24    Page 31 of 118
PageID #: 9962

| | | | | | |
|---|---|---|---|---|---|
| | 6/2/2022 | $11,000 | 8/31/2022 $10,679.81 | 2006 Toyota Tundra | Eastman 000152 |
| | 8/13/2022 | $15,189.04 | (bank records end before payoff) | 2012 Toyota Tundra | |
| | 10/27/2022 | $14,500 | (bank records end before payoff) | Used RV (EASTMAN000165) | |
| | **TOTALS:** | **$538,369** | **$391,133** | | |

107.    Within days of the search of Williams' apartment on September 19, 2020, for instance, Jenkins paid off one loan worth $34,308.89 and opened a new loan for $45,236.22. On information and belief, Jenkins used these loan payments to launder cash obtained from the safe.

108.    On June 1, 2022, Female 4 withdrew $11,800 in cash from a GCC account which she controlled. At the time, Female 4 was in regular communication with JCPD officers, and JCPD was providing her with protection. The next day, as depicted in Table 1, Jenkins opened a new car loan for $11,000 with a total amount financed of $11,855.79. On information and belief, Jenkins opened this car loan to launder the cash from Female 4 as part of the conspiracy. As set forth in the above summary chart, this was one of nine auto loans Jenkins took out within four years, purportedly for a 2006 Toyota Tundra despite having just paid off a loan for a 2018 Toyota Tundra in January 2022. Jenkins paid off the new loan for $11,000 within two months.

109.    By June 2022, Jenkins knew or should have known that the financial benefits he received from Williams' company GCC through Female 4 were in furtherance of Williams' sex trafficking conspiracy.

110.    Jenkins also deposited smaller sums of cash during this time in amounts which, on information and belief, reflected the cash payments he received from Williams through Female 4:

Table 2: Summary of Jenkins' Cash Deposits

| Date | Cash Deposit Amount | Account | Bates for Jenkins' Bank Statement | Bates for Receipt |
|---|---|---|---|---|
| 1/27/20 | $103.04 | | Eastman 000011 | Eastman 000201 |
| 7/13/20 | $885 | | Eastman 000036 | Eastman 000207 |
| 7/23/20 | $2,000 | | Eastman 000036 | Eastman 000191 |
| 9/14/20 | $5,000 | | Eastman 000044 | Eastman 000217 |
| 1/29/21 | $2,000 | | Eastman 000062 | Eastman 000230 |
| 5/7/21 | $1,000 | | Eastman 000077 | Eastman 000198 |
| 5/27/21 | $2,000 | | Eastman 000077 | Eastman 000191 |
| 6/14/21 | $2,000 | | Eastman 000081 | Eastman 000228 |
| 6/28/21 | $620 | | | Eastman 000213 |
| 8/16/21 | $2,000 | | Eastman 000091 | Eastman 000229 |
| 8/20/21 | $380 | | | Eastman 000199 |
| 9/10/21 | $1,000 | | Eastman 000096 | Eastman 000193 |
| 11/02/21 | $1,000 | | Eastman 000106 | Eastman 000227 |
| 11/18/21 | $2,000 | | | Eastman 000215 |
| 12/20/21 | $4,000 | | | Eastman 000195 |
| 1/24/22 | $400 | | Eastman 000116 | Eastman 000246 |
| 1/24/22 | $400 | | | Eastman 000247 |
| 5/31/22 | $140 | | | Eastman 000242 |
| 10/27/22 | $5,500 | | Eastman 000162 | Eastman 000240 |
| | TOTAL: $32,428.04 | | | |

111. On information and belief, Sparks also used elaborate means to conceal the illicit funds he received from Williams, moving money through multiple savings, checking, and loan accounts which he held or controlled with at least four different financial institutions. He did this to disguise the deposit, transfer, and withdrawal of funds which surpassed his legitimate sources of income.

112. On information and belief, Sparks also deposited smaller sums of cash directly into his checking account, with unexplained deposits totaling approximately $68,000 during the alleged

33

conspiracy in one of his accounts. On information and belief, these amounts reflected the cash payments he received from Williams through Female 4.

### *Williams Continues to Sexually Assault Women and Children*

113.    Throughout the time that Sparks and Jenkins benefitted financially from participating in Williams' sex trafficking conspiracy, Williams and his coconspirator Diaz-Vargas recruited, enticed, harbored, provided, obtained, maintained, and solicited women and children, including children under the age of 14, for the purpose of drugging and raping them or sexually exploiting them. Williams' sex trafficking conspiracy resulted in the victimization of at least 67 women, and three children.

114.    Around September or October 2020, H.A. was invited to Williams' apartment with a group of acquaintances. Both Williams and Diaz-Vargas were present. H.A. was offered both alcohol and cocaine by Williams and, shortly after, lost consciousness. While she was unconscious, Williams sexually assaulted her. Williams took photographs of her sexual assault.

115.    H.A. woke up twice during the assault, the first time to find Williams pressing his penis and testicles into her face. She tried and failed to push Williams off, as she could not properly move her limbs. She again lost consciousness.

116.    When she awoke the second time, she was able to push Williams off her. She questioned Williams, asking if she had dreamed of the assault. Williams responded, saying she had not been dreaming and that he had needed to use her because he didn't have his blow dryer and had to "make do." Upon information and belief, Williams regularly uses a blow dryer to stimulate himself sexually.

117.    Immediately following the assault, H.A. told her sister, her fiancé, and multiple friends about it.

34

118. H.A. did not feel safe reporting the assault to JCPD, as she had been told that the police would take no action, as they never did when women reported assault by Williams, and/or would "slut shame" her if she reported.

119. The photographs Williams took depicting the sexual assault of H.A. are now in the custody and control of the FBI.

**C.** **Sparks and Jenkins Knew or Should Have Known that They Were Benefiting from a Sex Trafficking Venture; Turner, Peters, and Legault Knew They Were Obstructing a Federal Investigation into Crimes of Sex Trafficking**

*B.P. Reports Williams' Sexual Assault to JCPD*

120. JCPD officers, including supervisor Matthew Gryder, were aware of rape complaints against Williams at least as early as November 7, 2019, when B.P. reported her sexual assault by Williams to JCPD.

121. Immediately upon leaving Williams' apartment the morning after her assault, B.P. asked a friend to drive her to an urgent care facility so she could receive a rape kit.

122. At urgent care, B.P. told the nurse that she believed she had been raped and wanted to report the rape to the police.

123. B.P. also took a drug test which showed she had benzodiazepines in her system. B.P. would never have taken benzodiazepines voluntarily.

124. B.P. then went to a hospital where a rape kit was administered. She also provided a statement to JCPD officer Sarah Proffit and another officer, stating she had been assaulted by Williams and pointing out Williams' apartment on a map.

125. In response, the JCPD officers mentioned that they had heard of women complaining of sexual assault by Williams before.

126. The JCPD officers took B.P.'s clothes and placed them in a garbage bag. They did not provide her with any type of evidence receipt.

35

127.     B.P. told the police she wanted to press charges against Williams.

128.     B.P. did not hear anything more from JCPD for a year and a half.

129.     On information and belief, both Turner and Peters were involved in the premature closure of B.P.'s case in December 2019.

130.     On December 2, 2020, Chief Turner transferred the investigating officer assigned to B.P.'s case, Bret Richardson, out of CID and reassigned him to serve as a school resources officer. Richardson was a highly capable CID investigator and had successfully investigated rape cases previously. According to Richardson, he loved his job as an investigator. On information and belief, Turner knew about B.P.'s case and directed the transfer of Richardson out of CID in order to thwart a thorough investigation into B.P.'s case.

131.     The next day, December 3, 2020, Richardson's supervisor, Matthew Gryder, approved the closure of B.P.'s case, despite that (1) B.P.'s rape kit results had not yet come back; (2) B.P. had stated she wished to pursue charges; and (3) the initial drug test showed there were benzodiazepines in B.P.'s system immediately after her rape.

132.     Over the next two years, JCPD received at least six more complaints relating to Williams and his alleged attempts to drug and/or sexually assault women. These reports include, but are not limited to, the following:

133.     **Female 2:** On or around June 2, 2020, Female 2 woke up in Williams' apartment to discover that she had been sexually assaulted. Female 2 fled Williams' apartment in great distress, shoeless and screaming.

134.     Female 2 encountered JCPD officers in the lobby of Williams' apartment building and told them what had happened in Williams' apartment.

36

135.     The JCPD officers drove her to her parents' house but declined to help her seek medical attention. The officers also failed to assist her in getting a rape kit done; never bothered to go to Williams' apartment to collect physical evidence; interviewed no percipient witnesses; and never took a statement from Williams.

136.     During his deposition in this case, Eric Daigle, a police practices expert retained by the City, described JCPD's response to Female 2's case as "egregious," explaining that the type of investigative steps which should have been taken in this case would have been obvious to "any brand new rookie out of the Academy."

137.     Over the next several days after her June 2, 2020, assault, Female 2 received phone calls from JCPD officers, including Peters. The officers asked her to repeat the details of her sexual assault multiple times. These phone calls were not done at the direction of, or with the knowledge of, the investigating officer, Deborah Dunn and served no apparent investigative purpose. On information and belief, Peters and other unknown JCPD officers forced Female 2 to recount her rape in an effort to intimidate and discourage her, and to obstruct the investigation into Williams.

138.     On June 24, 2020, at the request of Investigator Dunn, Female 2 came to JCPD headquarters to provide a written statement. During that meeting, Female 2 recounted the details of her assault differently than she had reported them on June 20, 2020, characterizing it as an attempted assault only. She explained she did not want to pursue charges because she had "learned her lesson."

139.     On July 1, 2020, Dunn closed Female 2's case. Her supervisor in CID, Hilton, approved the closure on August 17, 2020. On information and belief, Peters was aware that Dunn was closing Female 2's case and, as the head of CID, had ultimate authority over its closure.

Despite knowing about the circumstances of both B.P.'s and Female 2's sexual assaults, Peters took no further action to investigate and never told Dunn about B.P.'s rape report.

140. In July 2020, Dunn requested a transfer out of CID and stopped working on sexual assault cases.

141. On December 15, 2020, Female 2 again reported the attempted sexual assault by Williams to JCPD, providing a statement to Dahl and to another prosecutor at JCPD offices. Female 2 did not appear to Dahl to be reluctant to pursue her case against Williams.

142. To date, no charges have been brought against Williams for Female 2's sexual assault.

143. **Female 9:** On or about October 23, 2020, Female 9 attempted to report her rape by Williams to JCPD. While she was receiving a rape kit, the nurse administering the exam told Female 9 that other women had also reported sexual assaults by Williams and gave her the number for Defendant Sparks so she could report the assault.

144. Shortly thereafter, Female 9 called Sparks and reported the sexual assault by Williams.

145. Sparks told Female 9 she should wait to make a police report until she received the rape kit results.

146. Female 9 followed up with Sparks by phone at least two more times, but she never heard anything further about her report.

147. In or around August 2023, Female 9 learned from the FBI that Williams had taken images and/or videos of himself sexually assaulting her. These images were found on Williams' digital devices at the time of his arrest in April 2023.

148. To date, no charges have been filed against Williams for Female 9's sexual assault.

149.     To date, Female 9 has not received the results of her rape kit.

150.     **<u>Female 10</u>:** On November 10, 2020, Female 10 was in downtown Johnson City when Williams invited her to his apartment. There, he offered her alcohol. Upon information and belief, Williams laced the drink(s) he gave Female 10 with a substance that was intended to render her unconscious.

151.     Female 10 managed to leave Williams' apartment and attempted to drive home.

152.     As Female 10 was driving, both of her sisters spoke to her over the phone. Her sisters urged her to pull over the car when it became clear that Female 10 was completely incoherent, using slurred speech and not making sense.

153.     At approximately 2:29 a.m., Female 10's car hit a concrete base of a light pole in Carter County, the county next to Washington County where Johnson City is located. Female 10 died on impact.

154.     Several days later, one of Female 10's sisters, Female 11, contacted JCPD to report that Female 10's crash was suspicious, and that Female 10 had last been seen entering Williams' apartment. She expressed concern that a crime may have occurred and asked the police to look into it.

155.     When the JCPD officer learned that the crash occurred in Carter County, he told Female 11 she needed to contact their Sheriff's Department, as JCPD could not help her because it was a "Carter County problem."

156.     A JCPD officer further told Female 11 that JCPD had no jurisdiction to investigate the circumstances of the crash.

157.     Conversely, the Carter County Sheriff's Department told Female 11 that JCPD had jurisdiction over an investigation because Williams' apartment was located in Johnson City.

39

158.    In or around January 2021, Female 11 called JCPD again and asked to speak with a detective.

159.    By this point, Female 11 had spoken with Williams and Diaz-Vargas and had learned that Williams had given Female 10 a drink on the night of her death, shortly before Female 10 left Williams' apartment and attempted to drive home.

160.    Female 11 related everything she knew to the JCPD detective and explained that she suspected something had happened to Female 10 while she was in Williams's apartment.

161.    The JCPD detective asked no follow up questions and did not invite Female 11 to come in person to give a statement. The detective also failed to disclose to Female 11 that JCPD had already received multiple complaints from other women who had been drugged and raped by Williams while in his apartment.

162.    JCPD failed to return any of Female 11's calls or queries into Female 10's death.

163.    Upon information and belief, JCPD has never investigated the circumstances of Female 10's death.

164.    **Female 12:** In or around November 24, 2020, Female 12 was sexually assaulted by Williams after he provided her with a substance that rendered her unconscious. She woke up with Williams naked and pressed against her.

165.    Williams then moved Female 12 onto her back, put his knees on her shoulders, pushed his genitals into her face, spread her legs apart, and proceeded to rape Female 12 with his fist.

166.    Female 12 told him to stop, but Williams continued to assault her. Williams then tried to push his fingers inside her anus, at which point, Female 12 screamed and was able to push Williams off her. Female 12 fled Williams' apartment.

40

167.	Shortly thereafter, Female 12 reported the assault to the FBI. She decided to report her assault to the FBI rather than JCPD because she did not trust JCPD to take the sexual assault seriously.

168.	A Washington County task force officer, Mike Adams, who at the time also served as a Task Force Officer at the Johnson City FBI field office, witnessed Female 12's arrival at the FBI field office and called JCPD Officer Matthew Gryder, who was also an FBI Task Force Officer, to alert him about Female 12. Gryder in turn called Sparks, who immediately drove to the FBI office and took control of Female 12's investigation.

169.	Gryder was not Sparks' supervisor and Sparks was not on duty that day. There was no legitimate reason for Gryder to call Sparks, who was not a special victim's investigator, to tell him about Female 12's report of rape. On information and belief, Gryder called Sparks in furtherance of the conspiracy to obstruct the sexual assault investigations into Williams.

170.	Once in control of the investigation, Sparks then accompanied Female 12 to the hospital, where she received a rape kit, and provided a statement to JCPD officer Vanessa McKinney, a special victim's investigator. Sparks asked Female 12 to come to JCPD headquarters to answer more questions and to meet with Special Investigations Squad, JCPD's narcotics unit.

171.	Later that day, Female 12 went to JCPD offices where she spoke with Dahl. At all times, Female 12 was clear that she wished to press charges.

172.	Sparks told her falsely that she was the first woman who wished to go forward with charges, claiming the other women were too scared.

173.	Female 12 never received the results from her rape kit. To date, no charges have been brought against Williams for Female 12's sexual assault.

41

174.    In or around August 2023, Female 12 learned from the FBI that Williams had taken images and/or videos of himself sexually assaulting her. These images were found on Williams' digital devices at the time of his arrest in April 2023.

175.    Accordingly, beginning at least as early as November 2019, JCPD officers were aware of rape complaints against Williams. These officers were not limited to those within the Special Victims Unit, the unit responsible for sex crimes. For instance, although Defendant Sparks was not a Special Victims Investigator assigned to sex crimes, numerous complaints involving Williams were routed to him.

176.    On information and belief, by the fall of 2020, JCPD officers in SIS, including Defendant Jeff Legault, among others, were aware of the allegations that Williams was drugging and raping women. By December 2020, as set forth below, Legault was also aware that Dahl was attempting to coordinate her investigation into Williams' rapes with the TBI.

177.    Sparks and Jenkins knew or should have known of, and were in reckless disregard of, Williams' sex trafficking conspiracy at the latest by September 19, 2020, when they seized Williams' digital devices which contained overwhelming evidence of Williams' years of sex trafficking women and children.

178.    Furthermore, as set forth below, by December 2020, Turner and Peters knew that Williams had likely raped nearly two dozen women; that there was a commercial element to his victimization (paying women to bring other women to his apartment); and that Dahl was investigating Williams' sex crimes as potentially part of a human trafficking conspiracy.

**D.    Defendants' Overt Acts in Furtherance of the Sex Trafficking Conspiracy and to Obstruct the Federal Criminal Investigation into Williams' Sexual Assaults**

179.    Defendant JCPD officers Turner, Peters, Sparks, Jenkins, and Legault took overt acts in furtherance of Williams' sex trafficking venture, and/or to obstruct any federal investigation

42

into Williams' sex trafficking venture. These acts facilitated and supported Williams' continued victimization of class members by assisting Williams in perpetrating and concealing his crimes and obstructing the investigation and prosecution of Williams for these crimes.

*Witness Intimidation*

180.    Defendant Sparks engaged in witness intimidation of Williams' victims to facilitate and support Williams' sex trafficking venture.

181.    **Intimidation of B.P.:** On March 25, 2021, B.P. received a call from Defendant Sparks. Although Sparks was not assigned to the Special Victims Unit, the JCPD unit which handled sex crimes, he nevertheless had taken over the investigation of B.P.'s rape case.

182.    On information and belief, Sparks took over her case for the purpose of derailing the investigation in order to protect Williams, as part of the JCPD officers' continuous business relationship with Williams and his business GCC.

183.    Defendant Sparks told B.P. that the results from her rape kit showed that she had benzodiazepine (benzos) in her system the night of the assault. The rape kit also showed that the DNA of another person was present in the sample collected.

184.    By the time Sparks called B.P. in March 2021, JCPD had sat on B.P.'s rape kit results without taking any action for eight months, ever since receiving the results on or about July 15, 2020. On information and belief, Sparks only called B.P. in March 2021 in response to increasing pressure from Dahl to investigate the reports of rape made against Williams. By then, Dahl had requested Sparks send her all past police reports documenting victims' reports against Williams. Dahl had also begun re-interviewing Williams' victims, lacking confidence in JCPD officers' representations that the victims were reluctant to pursue charges.

43

185.    After relaying the rape kit results to B.P., Defendant Sparks discouraged B.P. from pursuing charges against Williams. He told B.P. that even if he was able to get a warrant to collect and test Williams' DNA, Williams would have to willingly submit to the testing, and he would never do that. In fact, this statement was false as a warrant would require Williams to submit to testing. Defendant Sparks described Williams as "untouchable."

186.    Defendant Sparks went on to say that he did not know if JCPD would be able to do anything if B.P. did press charges, and JCPD would probably not be able to protect B.P. from retaliation if she did.

187.    B.P. asked Sparks whether any images or videos might exist of her assault given the number of video cameras she had seen in Williams' apartment. Sparks told her there was no such evidence.

188.    In fact, JCPD had seized digital devices from Williams' apartment in September 2020, which contained images and videos of Williams' sexually assaulting his victims. In or around August 2023, B.P. learned from the FBI that Williams had taken photographs of her sexual assault and stored these images on his digital devices.

189.    B.P. called Sparks back to tell him she wanted to proceed with pressing charges against Williams.

190.    Sparks documented his phone calls with B.P. in his police report, stating that he asked B.P. to come to JCPD headquarters with her medical paperwork and to provide an additional statement. This case note was a pretext, however, for taking no further action in B.P.'s case. In fact, B.P. had described her rape in detail to Sparks again over the phone during their phone calls in March 2021, at Sparks' request. Thus, by that time, B.P. had given multiple statements describing her rape to multiple JCPD officers; JCPD had received the results of her rape kit with male DNA

44

and the results from her drug test which showed benzos in her system; JCPD had evidence supporting that Williams was a serial rapist and child sex predator (e.g., the "Raped" list and baby doll); and JCPD also had in its custody and control images and videos of Williams' rapes on the unsearched devices. Nevertheless, for the next two years, Sparks intentionally took no further steps to investigate B.P.'s case.

191.     On or about June 1, 2023, over two years after Sparks called B.P. about the results from her rape kit, Sparks authored a search warrant for Williams' DNA based on the facts in B.P.'s case. By then, the FBI was actively investigating Williams for engaging in a sex trafficking conspiracy and had seized Williams' digital devices.

192.     No one from JCPD ever informed B.P., or counsel for B.P., that Sparks was drafting an affidavit for a search warrant in her case. By then, Sparks was a named defendant in Dahl's civil rights case—a case which included allegations that he had corruptly mishandled the Williams' sexual assault investigations—and had been in litigation of that case for nearly a year.

193.     On information and belief, Sparks authored the search warrant for Williams' DNA in June 2023 to cover up his intentional obstruction of the investigations into Williams in the face of mounting allegations of police misconduct. Approximately two months later, a federal public corruption investigation, in which Sparks was a potential target, was opened into these allegations.

194.     On June 23, 2023, JCPD finally stopped its involvement, or the involvement of its officers, in the investigations into Williams "[t]o avoid any possible appearance of impropriety," according to counsel for Defendant City.

195.     On information and belief, the DNA results from B.P.'s rape kit match Williams' DNA.

45

*Interference with the Federal Criminal Investigation of Williams*

196.    On November 13, 2020, Sparks presented a potential felon in possession of ammunition case against Williams to Dahl for her review. This was an unusual charge to bring because of the minimal federal sentence available under the U.S. Sentencing Guidelines. It was also inexplicable given that Sparks and Jenkins had failed to seize the rifle in Williams' apartment, which could have formed the basis for the more serious charge of felon in possession of a firearm.

197.    Once Dahl began her investigation into Williams, JCPD officers Turner, Peters, and Sparks took numerous steps to obstruct, attempt to obstruct, and/or to interfere with her investigation into Williams' sex trafficking conspiracy, as set forth below.

198.    According to the complaint in her civil rights case, *Dahl v. Turner*, 2:22-cv-00072-KAC-JEM ("the Dahl Complaint"), as Dahl began to investigate Williams, she became aware of the multiple reports of sexual assault against him, which had not resulted in any prosecutions, and grew concerned that a felon in possession of ammunition was not the appropriate charge.

199.    Dahl expressed these concerns to Sparks, explaining that she would bring the charge of felon in possession of ammunition, but that she also intended to build a broader case against Williams based on the substantial evidence of the more serious charges, including drugging and raping women.

200.    Although crimes of rape and sexual assault are typically prosecuted by local prosecutors, the crime of sex trafficking is a federal offense, enforced under 18 U.S.C. § 1591. The conduct Dahl began to investigate—the conspiracy between Williams, Diaz-Vargas, Female 1, and others to recruit, entice, obtain, transport, and maintain women who were drugged and forced to engage in sex acts on account of which something of value was exchanged—constituted sex

46

trafficking violations, although at the time, no federal law enforcement agency had yet opened a sex trafficking investigation.

201. By December 2020, Dahl suspected that Williams' sex crimes might be part of a human trafficking conspiracy that was being investigated by the Tennessee Bureau of Investigation ("TBI"). She explained this to Chief Turner during a conversation on December 8, 2020, which she surreptitiously recorded, describing the similarities between the Williams' cases and the "rape slash human trafficking" case which the TBI was investigating. Both involved victims who had provided statements about a "cult like environment" involving "satanism," similarities which struck Dahl as too "bizarre" to ignore. The TBI investigation also involved one of Williams' co-conspirators, Female 1, who had recruited B.P. and other victims as part of the sex trafficking investigation. Dahl further connected Williams to a report of a rape on the Western Carolina University campus through a victim whose uncommon name appeared on the "Raped" list. (Dahl's investigative work proved prescient: Williams would ultimately be arrested on the Western Carolina University campus in April 2023.)

202. In response to Dahl's theory, Turner represented to Dahl that he and Peters had met with the TBI and Peters could "fill in some blanks and stuff" for Dahl.

203. Just four days before Dahl's conversation with Turner, on December 4, 2020, Peters had canceled a meeting that was scheduled between Dahl, JCPD, and the TBI regarding Williams, in an effort to thwart Dahl's efforts to investigate Williams' human trafficking crimes. In an email to JCPD officer Will Saulsbury, Peters stated, "This meeting will be cancelled as of right now." Peters further explained that he would be meeting with TBI alone "to go over everything regarding this case," and that he and Turner had "expressed their concerns" to Wayne Taylor, Dahl's supervisor in the U.S. Attorney's Office. Saulsbury responded, saying he would let "the others

know." The others included Legault and Sparks, who were copied on Saulsbury's original email about the TBI meeting.

204.     At some point during the meeting between Turner and Dahl on December 8, 2020, Peters joined the meeting. At that point, Turner explained that Dahl had been briefing him on the TBI investigation. Thus, Peters knew by then that Dahl had made the connection between Williams and the TBI human trafficking investigating, despite his efforts to impede her working with the TBI.

205.     During the recorded conversation on December 8, 2020, Peters discussed details about the Williams' investigation which demonstrated that Peters knew the case involved conduct amounting to commercial sex trafficking. For example, Peters discussed that one victim had sent "another girl" for Williams "to have sex with" and had then been paid by Williams. Peters also discussed invoices he had found on a victim's cellphone.

206.     Also during the December 8, 2020 conversation, Turner discouraged Dahl from pursuing a search warrant for Williams' digital devices, which by then had sat unsearched in JCPD custody since Mikayla Evans fall on September 19, 2020, nearly three months earlier. The following is a transcription of a portion of the December 8, 2020 conversation between Turner and Dahl:

MS. DAHL: Right, right. Well, you know, I was kind of trying, you know, to push for them to get a search warrant on the computer because if he does have, you know, something, you know, of the nature of, like, child porn or whatever, you know, that would be a kind of ace in the hole type of situation, you know. At that point, I think, you know, we could go after him for a significant amount of time depending on what's on there. The other thing that I had explored...

MR. TURNER: The probable cause on the search warrant, just I think where we ran into some issues...

207.    Dahl was correct: If JCPD officers had searched Williams' digital devices, they would have found images and videos of Williams' sexually exploiting children.

208.    During the same conversation, Dahl also raised with Turner a new basis for probable cause that could support a search warrant for Williams' digital devices, namely, that one of Williams' rape victims had reported that Williams "likes to photograph women." Dahl also expressed concern that the "baby doll" with a hole in her genitals, which officers had found inside Williams' safe, might be evidence that Williams was a "serial" offender. Both Turner and Peters were dismissive of Dahl's concerns.

209.    Turner's claim that there were "issues" with probable cause was pretextual: the original search warrant for Williams' apartment had already established probable cause to seize any "Cell phones, computers, tablets, and personal digital assistants"; the probable cause to search those devices was coextensive under the Fourth Amendment. The evidence that Williams was acting on his sexual interest in children (the baby doll and the "Raped" list with names of children

49

or infants), combined with victim statements that he liked to photograph women, as well as the sheer number of video recording devices throughout his apartment, also provided additional probable cause to search for evidence specifically relating to the sex trafficking conspiracy, including child sexual abuse material and videos/images of the sexual assaults. Turner, however, intentionally decided against seeking the follow-on warrant for the seized digital devices in order to obstruct Dahl's investigation into Williams for conduct which she believed—and which she explained to Turner—could be part of a human trafficking case.

210. By December 8, 2020, Peters had already been receiving updates from Sparks regarding Dahl's efforts to investigate Williams and obtain search warrants for evidence tied to Williams' sex trafficking venture. On December 3, 2020, for example, Sparks drafted a memorandum to Peters setting forth the details of Dahl's interview with Female 12 and Dahl's request that Sparks try to draft a search warrant for Williams' garage. Sparks further reported to Peters that Sparks and another JCPD officer, Will Saulsbury, had informed Dahl that they did not have probable cause for this search warrant. On information and belief, Sparks provided updates to Peters because Sparks was acting at the direction of Peters, his supervising officer, in the conspiracy to obstruct Dahl's investigation.

211. Additionally, on December 7, 2020, Peters texted Hilton to confirm that JCPD still had Williams' computer and micro-SD card.

212. On December 8, 2020, Defendant Turner dismissed the "Raped" list, claiming that it did not demonstrate evidence of nonconsensual sex.

213. Turner and Peters also dismissed victims' accounts, claiming that the victims were not credible despite the overwhelming evidence that Williams was drugging and raping women. By this time, Peters had reviewed B.P.'s and Female 2's reports and knew that any additional

50

victims' reports could be corroborated. Peters also knew about the "Raped" list; the baby doll; and the TBI's human trafficking investigation. On information and belief, his dismissal of other victims' reports as not "credible" was pretextual and a means of obstructing Dahl's efforts to investigate Williams.

214.    At the end of the December 8, 2020, conversation between Turner, Peters, and Dahl, Peters told Dahl to work with Sparks on obtaining the search warrant for Williams' digital devices. On information and belief, Peters planned to take further action to obstruct Dahl's efforts to obtain the warrant.

215.    Sparks intentionally delayed drafting an affidavit for another month and a half. When Sparks finally did send Dahl the draft affidavit on January 13, 2021, it was obviously deficient and did not provide adequate probable cause. Sparks omitted details about the "Raped" list; the baby doll; and the report that Williams had photographed women. Sparks even omitted details which he had included in the original September 19, 2020, warrant to search Williams' residence, which established probable cause to seize the digital devices in the first place. Dahl never obtained a workable draft from Sparks which she could submit to a magistrate judge.

216.    Peters continued to receive updates from Sparks about the status of the search warrant. For instance, on January 26, 2021, Sparks forwarded to Peters his emails with Dahl about the search warrant, including his deficient draft affidavit.

217.    On May 5, 2021, at 1:16 p.m., Sparks emailed Turner the following message:

**From:** "Sparks, Toma" <tsparks@johnsoncitytn.org>
  **To:** "Turner, Karl" <kturner@johnsoncitytn.org>
  **Subject:** Kat Dahl
  **Date:** Wed, 05 May 2021 13:16:00 +0000
  **Importance:** Normal
  **Inline-Images:** image001.png; image002.png

On 11/12/2020, I spoke with Kat Dahl about getting an federal indictment on Sean Christopher Williams for the ammunition that was inside his safe after a search warrant was executed. Sean Williams is a convicted felon on charges out of North Carolina. On 04/13/2021, I presented the case to a federal grand jury.

We also spoke about doing a search warrant on a computer that was seized during a search warrant. I sent a copy of the search warrant to Kat Dahl on 01/12/2021 for her to look at and help with any other information that needed to be added. Sometime had past and Kat called me stating that the information was too old to get a search warrant on the computer.

218.    In Sparks' email to Turner, he stated that, on April 13, 2021, he presented to a federal grand jury a case against Williams for felon in possession of ammunition. Sparks obtained an arrest warrant for Williams that same day.

219.    Approximately eight hours after the above email, at 9:50 p.m., JCPD officer Jason Lewis knocked on Williams' door and informed him that there was a federal warrant for his arrest. Lewis and two other JCPD officers then left the building without attempting to gain entry and arrest Williams. It is unknown whether Williams actually fled Johnson City after this event or whether he continued to live in his apartment, unmolested, knowing JCPD would not attempt to apprehend him. After May 5, 2021, there were no further efforts by JCPD to execute the arrest warrant and Williams remained a fugitive from justice for another two years.

220.    On information and belief, Sparks' email to Turner was intended to provide "cover," *i.e.*, an explanation for why JCPD had failed to search Williams' devices, which continued to remain in JCPD custody unlawfully until June 1, 2023.

221.    On information and belief, by May 5, 2021, Turner either knew or strongly suspected that contraband videos and images, including child sexual abuse material, would be

52

found on Williams' devices. Rather than direct his officers to attempt to secure a search warrant, however, he continued to conspire with Peters, Sparks, Jenkins, Legault, and other JCPD officers to obstruct Dahl's investigation.

222.    On May 11, 2021, Sparks attempted to return Williams' digital devices, sending an email to Dahl asking whether he could give Williams' property to Don Spurrell whom Sparks stated he "assum[ed]" was Williams' attorney. Dahl instructed him not to do so, explaining that they had not located Williams and did not know whether Spurrell was, in fact, retained by Williams. On information and belief, by May 11, 2021, Sparks knew that contraband videos and images, including child sexual abuse material, would be found on Williams' devices. Rather than securing a search warrant, however, he continued to obstruct Dahl's investigation by attempting to return Williams' devices.

223.    Between December 2020 and May 2021, Dahl continued to press Turner and JCPD officers to take investigative steps related to the complaints of Williams' rapes as part of her efforts to investigate Williams' sex trafficking conspiracy. Instead of investigating Williams, however, officers continued to question the credibility of victims and make harassing comments to Dahl.

224.    For instance, Sparks falsely indicated to Dahl that a victim was uncooperative, when in fact the victim wished to pursue charges against Williams.

225.    Sparks failed to inform Dahl of Female 10's death and her sister's efforts to initiate an investigation into Williams' culpability.

226.    Defendant Peters also ridiculed and made jokes about a victim's appearance prior to the victim providing a statement about Williams' sexual assault to JCPD and Dahl.

227.    Shortly after Dahl initiated JCPD taking a second statement from one of Williams' victims—a victim JCPD had previously ignored and maligned—Turner called Dahl's supervisor

to complain about her job performance. Turner knowingly took this action to intimidate Dahl, interfere with her investigation into Williams, and to attempt to stop the investigation.

228. One male investigator stated to Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour."

229. JCPD officers, including Sparks, unreasonably delayed producing requested documents to Dahl; failed to alert Dahl when yet another victim of Williams made a report to JCPD; and failed to provide a certified copy of Williams's felony conviction.

230. JCPD officers, including Sparks, refused to execute a valid federal arrest warrant for Williams approximately 30 times in the weeks after Dahl obtained the warrant on April 13, 2021. Finally, on May 5, 2021, as set forth above, JCPD officers failed to arrest Williams, improperly alerting him to the arrest warrant and allowing him to remain inside his apartment. JCPD officers then left the premises. The failure to arrest Williams for the next two years was only possible because of JCPD's knowing interference and obstruction.

231. After JCPD's botched arrest attempt, Dahl continued to investigate Williams, taking statements from eight witnesses who corroborated the accounts of the victims that Williams was drugging and raping women in Johnson City. Dahl also heard directly from another victim whose account mirrored the other victims of Williams. In May 2021, Dahl reported her concerns about Williams' history of predation and JCPD's inaction to an FBI agent. On reasonable inference, Chief Turner learned of Dahl's efforts to investigate Williams and her report to the FBI.

232. When it became clear to Turner and Peters that they would not be able to deter Dahl from investigating Williams, they conspired with Legault and other JCPD officers to create a

54

pretext to terminate her contract. (Although Dahl worked for the U.S. Attorney's office as a SAUSA, her contract was paid for by Defendant City through a Memorandum of Understanding.)

233. Peters, Legault, and Saulsbury conspired with Turner to fabricate claims that Dahl had failed to communicate with them about certain drug and gun cases. Legault, working with Saulsbury, also created a list of Dahl's cases shortly after she began investigating Williams, emailing this list to Turner and Peters on December 11, 2020. Turner and Peters ultimately used this list as a pretext to fire Dahl, claiming she had not charged enough of the cases.

234. On June 25, 2021, Turner terminated Dahl's employment.

### Destruction of Evidence

235. As set forth above in paragraphs 64-89, Defendants Sparks and Jenkins conspired with Williams to destroy and conceal evidence following Female 3's fall from Williams' apartment on September 19, 2020. These overt acts by Sparks and Jenkins facilitated and supported Williams' continued victimization of class members, all in furtherance of the sex trafficking venture, and as part of the ongoing scheme in which Williams' business paid money to JCPD officers.

### Witness Intimidation and Harassment of Female 8

236. On July 15, 2022, Female 8 reported her rape to JCPD officer Brady Higgins. According to Higgins, Peters and Sparks were watching and listening to Higgins interview Female 8 in a separate room and Higgins reported back to them during breaks in his interview. Peters also reviewed Female 8's written statement. At that time, Peters was the Captain in charge of CID, and Sparks was a supervisor, and Higgins took their direction during his interview of Female 8.

237. The resulting report from Higgins' interview of Female 8 omitted the critical fact that Female 8 told Higgins she saw photographs of Williams putting his penis in the mouths of children. Instead, the report states only that she saw photographs of Williams with children. A

narrative audit trail of this same report is missing the first edit to these case notes. On information and belief, this first edit—which is now missing from the City's audit system—materially changed the report to omit the evidence that Williams was sexually exploiting children.

238.     Rather than investigating Female 8's case, Higgins brought Female 8 back into JCPD headquarters in September 2022 for a second interview during which he forced her to recount the details of her sexual assault at least four times until she broke down crying. These actions were taken at the direction of Peters and Sparks, and were for the purpose of intimidating and harassing Female 8 so that she would not pursue her case against Williams.

239.     Gryder closed Female 8's case on March 22, 2023, just weeks before Williams was apprehended in possession of videos/images of Female 8's rape.

240.     To date, there have been no charges against Williams for Female 8's sexual assaults.

### *Retaliation Against Female 9*

241.     On information and belief, on December 7, 2022, JCPD officers obtained information that Female 9 was meeting with civil rights attorneys at her public housing unit in Johnson City.

242.     The next day, on December 8, 2022, Female 9 met with an FBI Special Agent to provide a statement about her sexual assault at the hands of Williams as a witness in the FBI's sex trafficking investigation into Williams.

243.     Over the next several months, the FBI continued to interview additional victims of Williams and investigate the conspiracy.

244.     Either late at night on April 18 or early in the morning on April 19, 2023, Female 9 was standing outside Tipton's Street Pub in downtown Johnson City with a male companion, waiting for her ride in an otherwise empty parking lot, when at least two JCPD patrol cars drove

56

up and stopped. JCPD officers approached the male to handcuff him. Female 9 pulled out her cellphone to start videoing as there appeared to be no legitimate law enforcement purpose for this encounter. One of the officers took hold of her arm. When she pulled her arm back, the officer proceeded to physically assault her. Her head hit the ground so hard, she urinated herself. While she was on the ground, several officers pinned her down while other officers continued to assault her. The next day, she had bruises all over her body.

245.    The JCPD police report documenting the incident stated that a security guard for Tipton's reported that the male had refused to leave Tipton's and that the male and Female 9 were arguing in the parking lot. In fact, by the time JCPD officers arrived, neither Female 9 nor the male were inside Tipton's, nor were they arguing. The police report provides no additional facts (i.e., any evidence of physical violence) which would justify the officers' immediate arrest of the male. In other words, even based on the version of the facts contained in the police report, it appears that the officers' arrest of Female 9's companion lacked probable cause and constituted an unlawful arrest.

246.    According to the police report, JCPD officers justified their arrest of Female 9 based on her "disorderly conduct and resisting arrest." Once the officers had arrested Female 9, they conducted a search incident to arrest of her backpack. The report claims that a small baggy containing a white substance, which a preliminary field test showed to be cocaine, was found in the backpack. In fact, Female 9 did not possess any narcotic substance in her backpack and JCPD officers planted the evidence.

247.    Later that same day, on April 19, 2023, Female 9 received an eviction letter from the Johnson City Housing Authority stating that the Department of Community Safety had "completed an investigation" into her arrest and would be terminating her lease. She was given

four days to vacate the premises. She also received notice that if she was seen on the property after the four days, she would be arrested for trespassing.

248. Female 9 fought the eviction unsuccessfully. She has been without permanent housing since in or around July 2023. As a result of her eviction, she was unable to maintain custody of her minor children.

249. Defendant Legault was the supervisory patrol officer who signed off on the police report documenting Female 9's arrest. Upon information and belief, the unlawful arrest, physical assault, and subsequent eviction of Female 9 was part of an effort by JCPD officers, including Defendant Legault, to retaliate against and intimidate Female 9, who was a witness in an ongoing federal sex trafficking investigation.

### Sparks Bribes Female 4 to Secure her Silence in the Public Corruption Investigation

250. Evidence obtained in discovery ties Sparks to a $14,000 payment made to Female 4 in January 2024. On information and belief, and as set forth below, this payment was a bribe intended to buy Female 4's silence in the public corruption investigation and ensure she would not inculpate Sparks or other JCPD officers through her testimony in this case.

251. In or about August 2023, the FBI opened a criminal public corruption investigation into JCPD based on the allegations of JCPD misconduct relating to Williams. This investigation was conducted with the TBI as a joint federal-state investigation.

252. Sometime during the Fall of 2023, as part of this investigation, TBI Investigator Gerald Ray interviewed Female 4. By then, Williams' Facebook post had named Female 4 as the coconspirator who provided cash to Sparks and other JCPD officers as part of the extortion scheme.

253. On November 16, 2023, Sparks was interviewed by FBI and TBI agents as a potential target in the federal public corruption investigation. Thus, by November 2023, Sparks

knew that he might be under criminal investigation for conduct relating to the extortion scheme. Other than Williams, Female 4 was one of the only individuals who could inculpate Sparks in the scheme.

254.     On December 7, 2023, Defendants' counsel received the draft Second Amended Complaint in this case with the allegations regarding Female 4 facilitating payments to JCPD officers, including Sparks, on behalf of Williams.

255.     By then, Plaintiff H.A. was communicating with Female 4. Female 4 and H.A. had been friends years earlier and had reconnected via Facebook in or around early December 2023. During their conversations over the next month, H.A. attempted to gain Female 4's trust and to encourage her to speak candidly about her involvement in JCPD corruption. H.A. also encouraged Female 4 to obtain counsel, stressing that Female 4 should protect her own interests.

256.     On December 20, 2023, and January 3, 2024, two deposits from unknown sources of $12,098.10 each, cleared Sparks' checking account with Truist Bank.

257.     On January 11, 2024, Plaintiffs' counsel spoke by phone with Female 4 to discuss, among other things, Female 4 telling the truth about what happened, the possibility that Female 4 was a class member, and Female 4 obtaining counsel.

258.     That same day, a check was written for $20,000 from Sparks' Truist checking account. The check purported to be to an individual affiliated with a construction company that had done work on Sparks' deck in October-November 2023.

259.     The next day, on January 12, 2024, $20,000 was transferred from Sparks' Truist savings account to his checking account.

260.     Also on January 12, 2024, Female 4 received a phone call from a consignment shop in Nashville where she had consigned a piece of jewelry (a Cartier gold necklace).

261.     On January 17, 2024, the $20,000 check from Sparks' Truist checking account was deposited or cashed at what appears to be another Truist Bank branch.

262.     Records obtained in discovery show that the following day, on January 18, 2024, the consignment shop in Nashville deposited $21,000 in cash into its bank account. According to the shop's records, an unknown buyer purchased Female 4's necklace through an intermediary jewelry store at a tradeshow in Miami, Florida. No records, receipts, or invoices for the transaction exist.

263.     Four days later, on January 22, 2024, the consignment shop wired $14,000 to Female 4's bank account.

264.     On January 24, another check for $1,200 from Sparks' Truist checking account was cashed or deposited.

265.     Thus, Sparks' bank records show a total of $21,200 in outgoing checks within seven days of when the consignment shop deposited $21,000 in cash from a purported buyer—about whom no records exist—and then wired $14,000 to Female 4.

266.     The totality of the above evidence supports that Sparks directed this payment to Female 4 at a time when he knew she was a witness in the ongoing public corruption investigation, in which he was a potential target, and after Female 4 had become aware that she might benefit from the Plaintiffs' class action lawsuit against Defendant City.[2]

---

[2] Female 4 is also a victim of Williams and a potential class member.

60

## II. City Manager Cathy Ball Attempted to Benefit Financially from the Off-Market Purchase of Williams' Penthouse

267. Ball moved to Johnson City in October 2021 and initially rented an apartment downtown across the street from Williams' building. By 2022, Ball was considering purchasing a residence in Johnson City and preferred to stay downtown.

268. On March 31, 2022, Ball texted Johnson City realtor S.C., asking whether she had any residential condos for sale downtown.

269. S.C. texted Williams that same day, "Wanted to chat about the condo you called me about."

270. On April 4, 2022, Ball and S.C. toured Williams' apartment. Ball texted S.C. afterwards, stating, "I think I want it!" S.C. then confirmed with Williams by text: "Showed the fifth floor. I think it went well."

271. Around this same time, Ball also communicated with Chief Turner about her property search. Ball provided Turner with the address for one of the units she was considering: Unit 5 on 200 E. Main Street. Turner knew that this unit belonged to Williams, who had now been a fugitive for nearly a year. As set forth in detail above, Turner also knew that Williams had engaged in conduct which amounted to sex trafficking and had intentionally obstructed Dahl's investigation into these crimes. JCPD was also in custody of evidence which would prove beyond any doubt that Williams had engaged in a sex trafficking conspiracy and had possessed this evidence since September 2020.

272. In a text exchange with Turner dated April 6, 2022, Ball told Turner she had decided to purchase Unit 5 on Market Street in Johnson City, but did not state the exact address. Turner knew which unit she was referencing based on their prior coordination. Later that day, Turner emailed Ball the crime report on the radius surrounding 200 E. Main Street.

61

273.    On April 7, 2022, Ball texted S.C., "Let me know when you hear from Mr. Williams."

274.    That same day, S.C. texted back: "Talked to sean. W your offer. He is Going to call meTomorrow." [sic] But she warned Ball that Willilams seemed "squirrelly."

275.    S.C. also texted the offer to Williams on April 7: "The buyer of the 5th floor will make an offer of $416,000. (I will only take 4% - so you will clear $400,000) Would you accept that?"

276.    On April 8, 2022, Williams accepted Ball's offer and the two entered into a real estate contract for his apartment. Ball paid an earnest money deposit on or about April 19 of $5,000.

277.    At the time Ball entered the real estate contract with Williams, Ball knew or should have known that the apartment she was purchasing had been used by Williams to perpetrate his sex trafficking crimes, and that Williams was a fugitive from justice based on charges brought by the police department which she oversaw as City Manager.

278.    Throughout this time, texts between Ball, S.C., and Williams tend to show that Ball and S.C. were aware that Williams could not participate directly in a commercial transaction. For instance, on April 9, 2022, S.C. inquired with Williams about getting a "working email address" for him and meeting his sister in person so that she could act as power of attorney. S.C. also recommended Ball use an attorney for the sale and explained that same day to Ball: "The seller is increasingly agitated. Regarding the x-girlfriend. He's convinced she is going to gain control over the condo even though it is only in his name. I've encouraged him to get his sister as the POA so she can sign for him if he can't be at closing. [wink emoji]"

279.    On April 20, S.C. texted Ball again about obtaining an attorney for the deal: "Let me know when you have called Marcy Walker and engaged her to do the title work. I will fill her in on all the details regarding the seller."

280.    On April 22, S.C. did an in person showing of Williams' apartment with Ball. During the tour, S.C. noticed a koi pond which contained live fish. S.C. later left paperwork for Williams on the floor inside the apartment, texting him to let him know what she had left.

281.    Williams was regularly accessing Unit 5. On information and belief, he continued to access the apartment even though there was an active warrant for his arrest, knowing that JCPD—at the direction of Turner—would not attempt to apprehend him again.

282.    On April 25, 2022, Ball texted S.C. that she had found an inspector to do the home inspection: "I think Michael confirmed that he will be doing the home inspection tomorrow morning. I did not tell him the story behind Sean."

283.    S.C. then let Williams know that the inspector and appraiser would be in his apartment: "Sean! Wanted you to know that the inspector and appraiser for the fifth floor will be at the condo Tuesday and Wednesday."

284.    On April 27, the appraisal was completed. It was prepared by Patrick M. O'Neal, the husband of a Johnson City Commissioner, who appraised Unit 5 at a value within $10,000 of Ball's offered purchase price: $426,000.

285.    On April 27, S.C. spoke with Williams' criminal defense attorney, Don Spurrell, regarding information she needed for the power of attorney for Williams.

286.    On information and belief, Spurrell and Turner are friends and long-time tennis partners.

287.     Over the next several weeks, Ball and S.C. worked to finalize the closing but ran into difficulties because of Williams' status. On May 6, 2022, S.C. texted Williams, instructing him to call Ball's attorney and "tell her you want to do a remote closing." This plan did not work, however. On May 10, Ball texted S.C. and said her attorney had indicated she could not do a remote closing—likely after speaking with Williams and learning of his status as a fugitive.

288.     On May 25, S.C. texted Williams: "Please call Renasant and get the following to Marcy Walker….Also Marcy needs the original limited power of attorney on Thursday so she can communicate w that person…" The "Thursday" referenced in this text message was May 26, 2022, the day before the anticipated date of closing.

289.     At the last minute, Williams backed out of the deal. On May 26, S.C. texted Ball: "I've checked email and called the seller multiple times … no response. I'm afraid closing will not take place tomorrow. I'm terribly sorry..."

290.     Instead, on May 27, 2022—the date that he was supposed to close with Ball—Williams sold the apartment to Blount Investments. According to S.C., the sale between Williams and Blount Investments was an all-cash sale, which purportedly also involved agreements regarding Williams' other outstanding mortgages.

291.     According to Washington County tax records, when Unit 5 was listed in 2022, it was offered at $725,000, and ultimately sold for $800,000 on May 27, 2022. Tax records show its current appraisal value at $629,800.

292.     During her deposition in this case, Ball falsely claimed that she terminated the deal with Williams when she learned he could not appear at the closing because he was a fugitive:

```
Q.        Did you buy that condominium?

A.        No ma'am.

Q.        Why not?

A.        Because I found out that he was a
```
fugitive.  I had a realtor and I had an attorney,
and when we were setting the closing date, he
contacted my attorney and asked if he could do a
remote closing, and he disclosed to my attorney that
he was a fugitive.

293.    Ball's text messages with S.C., as well as S.C.'s deposition testimony, demonstrate
that this statement was false. It was Williams who backed out of the deal, not Ball.

## III.    Johnson City's Internal Investigation Reveals JCPD Had a Pattern and Practice of Discriminating Against Women Sexual Assault Victims and that this Practice Compromised Sexual Assault and Rape Prosecutions

294.    In August 2022, responding to community protest following the Dahl Complaint,
Defendant City initiated an independent third-party review of JCPD's handling of sexual assault
investigations. Defendant City hired the Daigle Law Group (DLG) to review JCPD's processes
and procedures specific to sexual assault investigations during the period of January 2018 through
December 2022—the same period within which Plaintiffs suffered sexual assaults at the hands of
Williams and during which JCPD knowingly failed to investigate Williams' crimes.

295.    Nearly a year later, on July 18, 2023, Defendant City released DLG's findings,
which were summarized by DLG in a 45-page report. This report is attached hereto as Exhibit 1.

296.    According to the report, DLG considered JCPD's practices and procedures to
determine whether the agency's "pattern and practice" or "custom" with respect to sexual assault
investigations met Constitutional standards of policing. It found they did not.

297. To reach this conclusion, DLG reviewed case files for more than 325 reports of sexual assault made to the JCPD between January 2018 and December 2022. DLG also conducted an onsite inspection in December 2022, and interviewed Defendants Turner and Peters, as well as six JCPD officers, left unidentified in the report.

298. DLG found that JCPD's practices discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault. The DLG investigation revealed that no legitimate law enforcement purpose—or any other reason—justified these inadequacies. Instead, the JCPD's practice of discouraging women from pursuing sexual assault charges stemmed from misconceptions and stereotypes about women and victims of sexual assault—in other words, sex-based bias.

299. DLG further found that JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD had failed to train officers to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

300. DLG specifically noted JCPD's deficiency in responding to non-stranger and alcohol or drug-facilitated sexual assault—exactly the type of reports Plaintiffs had made to JCPD about Williams.

301. DLG concluded: "JCPD's investigative practices were found to compromise the effectiveness of their response to sexual assault and lead to under-enforcement of sexual assault laws in Tennessee. At times, JCPD failed to employ key investigative practices that, if properly implemented, would safeguard potential evidence, protect the rights of victims and suspects, and

66

facilitate a thorough investigation. For instance, our review found that JCPD too often fails to collect evidence and does not take proper steps to obtain timely, credible statements from suspects and witnesses. Our review revealed instances where JCPD officers likely would have obtained statements and facts to support a prosecution if they had used the investigative tactics known to be effective and essential in sexual assault investigations, especially investigations of non-stranger sexual assault. These investigative deficiencies compromise the investigative process and unnecessarily place victims at an increased risk of harm."

302.    DLG also found that JCPD's investigations into sexual assault reports were inconsistent, ineffective, and incomplete. JCPD often failed to collect evidence or failed to document the collection of evidence. JCPD also failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers failed to document their statements, even though the investigative files indicated that such statements had been taken.

303.    From 2018 – 2022, of the 133 cases where rapes had been reported to JCPD, 105 cases had an identified suspect, but only 36 of these suspects (or 34% of the known suspects) were ever interviewed. In the rare cases where JCPD officers did interview suspects, their practice was to call to schedule the interview, sometimes weeks in advance, providing the suspects the opportunity to modify or coordinate their stories. DLG found this practice "baffling," as it "undermine[d] the integrity of sexual assault investigations."

304.    DLG found that JCPD practices actively discouraged sexual assault victims from pursuing charges and participating in investigations.

305.    In one example provided in the report, a JCPD investigator insisted that a sexual assault victim come to JCPD headquarters to provide a written statement of her assault. When she came in and provided a 15-page written statement describing her assault, the investigator required

her to re-write the statement on a JCPD form, and then called her back into the office one month later to question her about purported inconsistencies between the two statements. After questioning the victim on "numerous suspicious and inconsistent statements," the victim changed her mind and said she no longer wished to pursue the case. There was no suspect interview and no mention of sexual assault kit results.

306. The report also identified JCPD practices which made reporting sexual assaults "unnecessarily burdensome" to the victims, including practices motivated by gender bias and discriminatory animus against women, such as the following:

307. Reluctance of the officers/investigators to continue investigative steps unless the victim comes to the Department to give a statement.

308. JCPD requires that victims and witnesses be interviewed at the police station, rather than at the location most convenient and comfortable for the victim.

309. The interview rooms at the JCPD are suspect oriented with visible restraining devices.

310. JCPD investigators asked victims whether they wished to seek criminal prosecution early in the investigation and whether they would testify against the accused. Statements by JCPD investigators focus on the emotional toll of prosecution and the victim's unwillingness to participate in the prosecution.

311. JCPD's sexual assault investigations are sometimes compromised by an investigator's unwarranted gender-based assumptions and stereotypes about women.

312. JCPD generally does not invite advocates to be present during victim interviews. Instead, two JCPD detectives typically interview a victim without advocate participation. This practice is more appropriate for an interrogation of a suspect than an interview of a crime victim

and sometimes prevents detectives from developing the necessary rapport with women victimized by sexual assault.

313.    Reporting a sexual assault, including the time spent at hospitals and with JCPD, can take many hours.

314.    JCPD too often does not follow up with victims to document evolving injuries, such as bruises.

315.    DLG further found that JCPD failed to secure crime scenes in responding to reports of sexual assault.[3] Specifically, the report concluded, "JCPD's securing of crime scenes and using search warrants to document evidence were found to be insufficient."

316.    The report cites an example that appears to match the facts alleged herein describing Female 2's interaction with JCPD officers immediately following her assault by Williams. The report faults JCPD for failing to respond to the apartment in question and failing to secure the apartment and search for additional evidence.

317.    In fact, had JCPD officers conducted an effective search of Williams' apartment in June 2020, they likely would have discovered critical evidence proving—beyond any doubt—that he was drugging and raping women, namely, as described above, images of him sexually assaulting victims while they were unconscious which he had saved to folders on this computer titled with the victims' first names and the word "drugged."

318.    JCPD's systemic failures of improperly documenting sexual assault investigations not only violated their own internal orders, but also standard police practice which are intended to protect and serve their community.

---

[3] The purpose of securing a crime scene while precuring a warrant is to ensure evidence is not destroyed, manipulated, or lost.

319.    DLG found that JCPD's interactions with women reporting sexual assault "reflect reliance on gender-based stereotypes and bias, and that this discrimination is responsible in part for the deficiencies in JCPD's response to sexual assault."

320.    This conduct included "overtly discriminatory statements from JCPD officers, investigators, or leadership."

321.    JCPD investigators also improperly relied on a woman's sexual history in evaluating the veracity of the sexual assault report.

322.    DLG found that JCPD supervisors were allowing sexual assault cases to be closed even when prosecution was still possible. The report concluded that the "JCPD process of closing [sexual assault] investigations is flawed and inaccurate."

323.    The report found that JCPD investigators were improperly using the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, often where the requirements for closure under this basis were not met.

324.    For instance, the report cited closure of rape cases: Of 133 rape cases reported during 2018 – 2022, 66 (nearly 50%) were closed based on "exceptional circumstances." Of these 66, 25% were based on JCPD's claim that the victim was reluctant to participate, 31% were based on of the reporting officer's claim that the victim was uncooperative (based on non-returned phone calls or messages, and/or the inability of the officer to contact the victim), and 40% were based on the prosecutor's office declining to prosecute. However, of those declinations, the reason usually provided was that the victim was declining to participate in the prosecution. But closure based on a victim's cooperation or reluctance to participate in the prosecution is <u>not</u> a proper basis for closure under JCPD's own internal reporting requirements.

325. Thus, according to the DLG report, JCPD officers engaged in discriminatory and biased conduct to discourage women from pursuing cases of sexual assault and rape, and then used the resulting reluctance on the part of victims to close rape cases improperly and in violation of department rules and requirements.

326. As a result, between 2018 – 2022, only 11.27% of reported rape cases ended in arrest of the suspect. It is not clear from the DLG report how many—or if any—of these arrests resulted in convictions.

## IV. According to the DLG Report, Evidence in the Williams' Sexual Assault Investigations Is Now Missing

327. The DLG report also considered the JCPD internal review process following the Dahl Complaint and found it violated industry standards, accreditation standards, and model policies.

328. Significantly, the DLG report states that reports and documentation concerning the sexual assault investigations of Williams were missing or unidentified because JCPD failed to initiate an internal affairs ("IA") investigation in response to the allegations of JCPD corruption in the Dahl Complaint.

329. According to the DLG report, this failure was inexplicable since "[JCPD] was concerned that the [Dahl] complaint involved criminal conduct on the part of Department members."

330. The DLG report also recognizes the role of the office of the First Judicial District Attorney ("DA") General Steven Finney in its failure to investigate properly Dahl's claims of criminal corruption on the part of JCPD.

331. Specifically, on August 24, 2022, City Manager Cathy Ball delivered a letter to the newly-elected DA Finney asking his office or the Tennessee Bureau of Investigation ("TBI") to

71

"conduct a preliminary investigation to determine whether there was a basis to open a public corruption investigation" based on Dahl's allegations.

332.    Eight days later, on September 1, 2022, DA Finney replied. He stated—incorrectly—that as DA, he was the "only person" who could request a TBI investigation into this conduct. He further stated—also incorrectly—that there was no such thing as a "preliminary investigation."

333.    In fact, according to the DLG report, DA Finney should have inquired whether JCPD had conducted an Internal Affairs ("IA") investigation into the allegations.

334.    DA Finney then concluded that he did not have "enough information to request a TBI investigation at this point."

335.    DA Finney had no basis to conclude the allegations were unfounded because, by his own admission, there had been no internal investigation.

336.    According to the DLG report, the failure to conduct an IA investigation had grave consequences for any subsequent investigation to uncover what happened in JCPD's sexual assault investigations of Williams. The DLG report notes that because of the lack of any IA investigation, there are now documents that cannot be located or identified relating to the sexual assault investigations of Williams, documents which "were not discovered during the DLG audit."

337.    In other words, in response to the Dahl Complaint, JCPD violated "industry standards, accreditation standards, and model policies" by failing to investigate her allegations, and as a result, key documents have gone missing.

## V.    The DOJ and FBI Open a Criminal Sex Trafficking Investigation of Williams

338.    On June 23, 2021, Dahl filed a public complaint outlining her allegations against JCPD, and Chief Turner. For the first time, Plaintiffs learned of the number of similar complaints

72

of sexual assault against Williams and of JCPD's efforts to obstruct and interfere with Dahl's investigation.

339.    In or about November 2022, the FBI opened a federal sex trafficking investigation, investigating possible violations of 18 USC § 1591, into Williams.

340.    JCPD's actions to obstruct, attempt to obstruct, and to interfere with Dahl's federal investigation effectively delayed the sex trafficking investigation by at least two years.

## VI.    Johnson City Police Department – Deprivation of Constitutional Right to Equal Protection under the Law

341.    Beginning in at least November 2019, JCPD had knowledge that Williams was drugging and raping women.

342.    Following B.P.'s report of sexual assault and attempt to press charges against Williams in November 2019, the JCPD failed to conduct an investigation of sexual assault against Williams, failed to properly document B.P.'s report, failed to test her rape kit timely, and failed to retain or preserve evidence properly.

343.    JCPD followed this pattern with at least Females 2, 3, 9, 10, and 12.

344.    Defendant Sparks had vast knowledge of Williams' sexual assaults.

345.    Sparks spoke with B.P., Female 9, Female 10's family members, and Female 12, all of whom told Sparks that they wanted to report Williams for drugging and sexual assault or possible drugging and attempted sexual assault.

346.    By not investigating multiple complaints of sexual assault by Williams and discouraging female reporters of sexual assault from pursuing charges against Williams, JCPD failed to believe or address women's accounts of crime within its jurisdiction.

347.    As a direct result of JCPD's discriminatory policies and practices towards women, Williams was able to continue to victimize women after B.P.'s report, including H.A. and Females

73

2, 3, 6, 9, 10, and 12, and other class members, resulting in their bodily injury, extreme emotional distress, psychological harm, and, in the case of Female 10, death.

348.    Upon information and belief, JCPD's failure to protect female victims of Williams' sexual assault was consistent with an institutional practice and ongoing policy of JCPD of failing to protect female victims of sex crimes, which was motivated by JCPD officers' actual discriminatory animus towards women.

349.    Upon information and belief, these practices and policies were known and ratified by JCPD policy makers.

350.    Upon information and belief, Defendant City failed to prevent JCPD from engaging in the policy and practices that disproportionately affected women.

351.    Upon information and belief, Defendant City approved an ongoing institutional practice of discrimination toward women by, among other actions:

    a.    Failing to properly supervise JCPD;

    b.    Failing to properly train JCPD;

    c.    Failing to forward to the District Attorney's Office for the First Judicial District of Tennessee evidence of criminal acts committed in Washington County, and/or forwarding reports of rape in a piecemeal fashion so as to undermine the larger case against Williams;

    d.    Failing to protect and ensure evidence was not discarded;

    e.    Failing to protect and ensure evidence was not lost or mishandled; and

    f.    Failing to discipline, restrict, and control JCPD employees for failing to investigate crimes of sexual assault against females.

## VII. JCPD's Policy and Procedures Were Motivated by Discriminatory Animus Towards Women

352.    JCPD's failure to protect victims of Williams' sexual assaults was consistent with an institutional practice and ongoing policy of JCPD, and was motived, in part, by the officers' discriminatory animus towards women.

353.    As outlined in the DLG report, JCPD investigators routinely take steps which discourage victims of sexual assault from pursuing charges based on "an investigator's unwarranted gender-based assumptions and stereotypes about women," thereby compromising the investigations.

354.    As alleged above, JCPD officers, and in particular, Sparks, deployed these practices here in attempting to discourage and dissuade Williams' victims from reporting Williams' crimes. Specifically, JCPD officers failed to record victim statements properly—or at all, in the case of Female 9; required victims to provide multiple statements or to come in to JCPD headquarters to report their assaults even after already providing a statement (B.P. and Female 12); and failed to obtain search warrants or properly secure crime scenes (B.P., Female 2, 3, and 12), among other investigative failures.

355.    As set forth in the Dahl Complaint, JCPD officers made statements to her which evidenced their discriminatory animus towards women victims of sexual assault, including, among other statements, the following:

356.    Chief Turner cast doubt on the credibility of Williams' victims even after their names appeared on the "Raped" list, dismissing their cases as potentially "consensual sex."

357.    On another occasion, JCPD Captain Peters made jokes about Williams' victims' clothing and appearances.

358.    One JCPD investigator stated in response to the rape complaints against Williams, "In my 20 years on the force, I've only encountered one real rape."

359.    JCPD officers made statements questioning the credibility of victims and made harassing comments to Dahl.

360.    One male investigator stated to Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour."

## VIII.    Plaintiffs B.P. and H.A. and the Williams Survivor Subclass Could Not Have Learned of JCPD's Discriminatory Animus Towards Women Victims of Williams Until June 23, 2022

361.    Plaintiffs B.P. and H.A. and members of the Williams Survivor Subclass learned of JCPD's policy and practice of discrimination towards women victims of Williams no earlier than the filing of the Dahl Complaint on June 23, 2022.

362.    Although Plaintiff B.P., and class members, including Females 2, 9, and 12, among others, were aware before this date that JCPD had failed to file charges based on their individual sexual assault and/or attempted sexual assault and/or drugging complaints against Williams, they had no knowledge that this was part of an unwritten policy and practice of JCPD motivated by discriminatory animus towards women.

363.    Plaintiffs and class members were not aware of the number of complaints of sexual assault filed with JCPD by other victims of Williams, nor of JCPD's inaction in response to these other complaints.

364.    The Dahl Complaint revealed for the first time that Chief Turner, Det. Sparks, and other JCPD officers had a policy and practice of failing to process and investigate complaints of sexual assault against Williams, and that this failure was motivated by their actual discriminatory animus towards women.

365.     Before this, Plaintiffs and class members did not know, nor did they have reason to know, the constitutional injury they had suffered on the basis of their sex, nor of the state actions that shocked the conscience and constituted a state created danger, which deprived them of life, liberty, or property.

366.     It is now known, in part through subsequent news reports about the various state and federal investigations, that there are at least 52 victims of sex-based crimes perpetuated by Williams. Since July 2023, Plaintiffs B.P. and H.A. as well as numerous class members have been informed Williams kept images and videos of their sexual assaults. Additionally, Plaintiff H.A. and class members learned that they were identified on Williams' "Raped" list.

367.     Prior to the allegations in the Dahl Complaint, Plaintiff B.P. and class members, including Females 9, and 12, among others, had no reason to doubt Sparks' statements to them regarding the status of JCPD's investigations into their assaults. B.P., for instance, had no reason to know that Sparks' discouraging statements to her were part of a pattern and practice of discriminatory conduct towards women victims of sexual violence. Similarly, Female 12 had no reason to doubt Sparks' false statement that she was the only victim who wished to pursue charges. Moreover, all Williams Survivor Subclass members had no way to know, prior to the filing of the Dahl Complaint, that Defendant City had negligently, and in violation of their constitutional rights, permitted a serial rapist to remain at large for years, thereby proximately causing their injuries.

368.     The statute of limitations for the causes of action brought by Plaintiffs B.P. and H.A. and members of the Williams Survivor Subclass did not begin to run until June 23, 2022, at the earliest, and their claims are therefore timely. To the extent any earlier date could be asserted, the statutes of limitation were tolled, and Defendants are equitably estopped from asserting the statute of limitations as a defense, by reason of their wrongful conduct.

77

## IX. S.H.'s Factual Allegations

369.    In November 2021, S.H. was a 17-year-old high school student who lived with her parents in Gainesville, Georgia.

370.    The weekend before Thanksgiving, S.H. traveled to Johnson City, Tennessee, and stayed with the family of a young girl whom she regularly babysat. Specifically, she stayed with the grandparents of this girl, Male 1 and Female 14, who had full custody of the child. She planned to care for the girl over the following week and spend Thanksgiving with the family.

371.    On or about November 22, 2021, the Monday before Thanksgiving, Male 2, the son-in-law to Male 1, brought his four children over to the house of Male 1 and Female 14. Female 14, along with Male 2's wife and others, went out, while Male 1, Male 2, and S.H. stayed at home to watch the five children.

372.    Before that night, from approximately 2019 – 2020, Male 2 had worked as the dean of the high school which S.H. attended. Male 2 had previously been inappropriately physically affectionate with S.H., giving her full body hugs and kissing her on the forehead. S.H. had never reported this conduct to anyone, as she had been confused by his actions and unsure whether they constituted sexual abuse.

373.    Male 2 is approximately two decades older than S.H.

374.    During the evening of November 22, 2021, Male 1 and Male 2 drank several glasses of bourbon. Male 1 and Male 2 offered S.H. bourbon as well. Male 1 even poured her a glass and handed it to her, but S.H. did not drink any.

375.    At one point in the evening, Male 1, Male 2, and S.H. were all sitting inside on the couch talking while the children played outside. S.H. got up to go to the kitchen to get some water and Male 2 followed her.

376.    When S.H. got to the kitchen, Male 2 approached her from behind and hugged her tightly against him so that S.H. could feel his erect penis pressing into her back.

377.    Male 2 began kissing S.H.'s neck and rubbing his hands all over S.H.'s body, touching her breasts, and then moving his hands down to her vagina. S.H. froze in shock.

378.    For several minutes, Male 2 continued to grope S.H., touching her vagina through her clothing.

379.    After some time, S.H. was able to move away from Male 2. She began walking towards the children outside to get away from him.

380.    The next morning, S.H. called her older sister and told her what happened. S.H. then called her parents and told them about the sexual battery as well.

381.    S.H.'s parents insisted they come and get her immediately, but S.H. did not want to leave the little girl for whom she was caring. S.H.'s parents instructed her to let Male 1 and Female 4 know about what had happened.

382.    S.H. then told Male 1 and Female 14 about the sexual battery. After hearing S.H.'s account, Male 1 told S.H. that this explained a text message he had received that morning from Male 2 which stated that something might have happened the night before with S.H.

383.    Male 1 initially told S.H. that he would not allow Male 2 to be around her anymore. S.H. therefore told her parents she wanted to stay for the remainder of the week.

384.    S.H.'s mother immediately called a rape crisis center, Rape Response in Gainesville, Georgia, after learning of the sexual battery of her daughter. Rape Response told S.H.'s mother that they would call the relevant Tennessee agency, the Tennessee Department of Children's Services to report the crime.

385.     On Thanksgiving, S.H. was eating Thanksgiving lunch when she learned that Male 2 would be coming over to the residence again, despite what Male 1 had told her. She immediately called her parents and her father drove to come get her and bring her home.

386.     When S.H.'s father arrived, he noted that Male 1 and Female 14 seemed supportive of S.H. and appeared to believe S.H. that she had been groped by their son-in-law, Male 2.

387.     On December 10, 2021, S.H.'s mother received a phone call from JCPD Investigator Kara Lowe. Investigator Lowe explained that she had received the report about S.H.'s sexual battery and would be investigating the complaint.

388.     On December 29, 2021, a Hall County Sheriff's Deputy interviewed S.H. at the Edmonton Telford Center for Children, a Child Advocacy Center ("CAC") in Gainesville, Georgia. S.H. recounted the sexual battery to the Deputy.

389.     The Gainesville CAC mailed a copy of the recording of S.H.'s interview to JCPD.

390.     S.H.'s parents waited weeks to hear anything from JCPD. Approximately a month later, S.H.'s parents had another conversation with Investigator Lowe to ask whether she had received the copy of the forensic interview.

391.     S.H.'s parents then waited several more weeks before hearing anything further from Investigator Lowe. Finally, Investigator Lowe called S.H.'s parents and told them she did not anticipate that the District Attorney's Office for the First Judicial District in Tennessee would be pursuing charges against Male 2.

392.     Investigator Lowe offered several reasons, none of which appeared to S.H.'s parents to be proper reasons to close the case. Investigator Lowe explained that when she had interviewed Male 1 and Female 14, the perpetrator's parents-in-law, they had told her about S.H.'s past as a rape survivor. Investigator Lowe seemed to imply that because S.H. was a survivor of

rape, she would be less credible and/or able to testify in the sexual battery case. Investigator Lowe also told S.H.'s parents that she had learned about S.H.'s mental health struggles following her rape, also suggesting that this was a reason to decline prosecution.

393. Investigator Lowe stated that the District Attorney did not want to put S.H. through the difficult process of testifying. S.H.'s parents insisted, however, that it was not appropriate to close the case. This case was important both for their daughter and because Male 2 was in a position of authority around children.

394. Investigator Lowe then explained that Male 2 had hired an expensive, high powered defense attorney from Knoxville, TN, who was arguing that S.H. lacked credibility based on her past. Investigator Lowe then stated that this would make bringing a criminal case difficult.

395. S.H.'s parents were surprised and disappointed as this did not seem like a legitimate reason to close the case and decline prosecution.

396. S.H.'s parents explained that they had learned from S.H. that Male 1 likely possessed a text message which would be an admission by Male 2 that something had happened that night and would corroborate S.H.'s testimony. They asked Investigator Lowe to use criminal process to obtain the text message, and again insisted it was not right to close the case without trying to get this critical evidence first.

397. Investigator Lowe implied that she would not be able to obtain this text message without the District Attorney's permission. Investigator Lowe told S.H.'s parents she would call them back if the DA decided to pursue charges.

398. After this conversation, S.H.'s parents waited several more weeks to hear back from Investigator Lowe, but never received another phone call. Both parents left voicemails for

81

Investigator Lowe imploring her to use criminal process to obtain the text message and to continue to investigate their daughter's case. They never heard anything further from JCPD.

399.     S.H.'s father has over five years of law enforcement training and has himself investigated hundreds of cases as a law enforcement officer. He was shocked and surprised by Investigator Lowe's actions in his daughter's case, including: 1) JCPD's failure to use criminal process to obtain a critical piece of evidence; 2) JCPD's failure to interview S.H.'s older sister, whose testimony could corroborate S.H. and lend credibility to S.H.'s account; 3) JCPD's failure to promptly interview the suspect; 4) JCPD's refusal to pursue charges, purportedly, based on S.H.'s past rape; and 5) JCPD's decision to decline prosecution based, in part, on the fact that the perpetrator had hired an expensive defense attorney.

400.     The circumstances of S.H.'s sexual battery by Male 2 meet the elements of a criminal offense under Tennessee Code § 39-13-527, Sexual battery by an authority figure.

401.     To date, no charges have been brought in S.H.'s case against Male 2.

402.     Male 2 is now a pastor at a church.

X.   **Plaintiff S.H. and the Reporter Survivor Class Learned of JCPD's Pattern and Practice of Discriminatory Animus Towards Women Victims of Sexual Violence No Earlier than July 18, 2023**

403.     S.H. was not a victim of Williams. S.H., and other members of the Reporter Survivor Class who were not victims of Williams, were devastated, confused, and shocked by JCPD's failure to properly investigate their cases. However, they had no reason to know that this conduct was part of a pattern and practice of discriminatory conduct towards female victims of sexual violence, until, at the earliest, the release of the DLG Report on or about July 18, 2023, and the resulting national press coverage of the Williams' civil rights cases.

404.     On or about August 26, 2023, S.H.'s mother first learned of JCPD's misconduct in investigating sexual assault complaints when she read an article on the Fox News website about

the Sean Williams case. The article described how the Williams case was not investigated properly in a similar way to how JCPD failed to investigate S.H.'s sexual battery. Shortly after, S.H.'s mother shared this information with S.H.

405. Similarly, other members of the Reporter Survivor Class who were not victims of Williams could not have become aware of JCPD's pattern and practice of not helping women who came forward with their cases of sexual assault, sexual battery, and rape.

406. The statute of limitations for the causes of action brought by S.H. and members of the Reporter Survivor Class did not begin to run until July 18, 2023, at the earliest and their claims are therefore timely. To the extent any earlier date could be asserted, the statutes of limitation were tolled, and Defendants are equitably estopped from asserting the statute of limitations as a defense, by reason of their wrongful conduct.

## XI.    Plaintiffs Experienced and Continue to Experience Severe Harm and Damages

407. At all times material hereto, Plaintiffs and class members have been and are continuously harmed by Johnson City Officials and JCPD's ongoing policy and practice of refusing to believe, investigate, or address their complaints of sexual assault by Williams and others, and continuing a public campaign to dissuade victims from coming forward. Plaintiffs and class members' ongoing injuries include, but are not limited to:

   a. bodily injury;

   b. death;

   c. extreme psychological harm;

   d. deprivation of property;

   e. economic harm;

   f. deprivation of a right to privacy; and

   g. emotional distress.

## CLASS ACTION ALLEGATIONS

408.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23. Plaintiffs propose certification of the following class pursuant to Federal Rule of Civil Procedure 23(b)(3): All women, including minors, who reported sexual abuse or trafficking by any person to JCPD from January 1, 2018, to December 31, 2022 ("Reporter Survivor Class") (represented by S.H.).

409.    Plaintiffs also seek to certify issues pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the following class: All individuals, including minors, who were sexually abused, drugged, or trafficked by Sean Williams or Alvaro Fernando Diaz-Vargas ("Sex Trafficking Survivor Class") (represented by B.P.), including:

      a.  whether the Williams sex-trafficking venture violated the Trafficking Victims Protection Act, 18 U.S.C. § 1591;

      b.  whether any Defendant knew (or recklessly disregarded) that Williams was engaged in a sex-trafficking venture in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591;

      c.  whether any Defendant knowingly benefited (or attempted or conspired to benefit) from participation in the Williams sex-trafficking venture and conspiracy; and

      d.  whether any Defendant obstructed, attempted to obstruct, or in any way interfered with or prevented the enforcement of the Trafficking Victims Protection Act, 18 U.S.C. § 1591.

410.    Plaintiffs also seek to certify issues pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the following subclass: All members of the Sex Trafficking Survivor Class who were sexually assaulted by Sean Williams following the first report to the JCPD of Sean

Williams' alleged sexual violence on or about November 7, 2019 ("Williams Survivor Subclass") (represented by H.A.), including:

    a.  Whether any of the following alleged conduct shocks the conscience in violation of the Due Process Clause of the United States Constitution:

    b.  Any Defendant sharing in the proceeds of Williams' sex-trafficking scheme by accepting money or items of value from Sean Williams directly or indirectly through a co-conspirator;

    c.  Any Defendant soliciting a bribe from Williams or a co-conspirator in exchange for insulating Williams from investigation or prosecution; and

    d.  Any Defendant concealing evidence of Williams' crimes.

411.    The <u>Reporter-Survivor Class</u> asserts the following:

    a.  Equal Protection, 42 U.S.C. § 1983, Unconstitutional Pattern or Practice as to Women Reporters of Sexual Assault against Defendant City;

412.    The <u>Sex Trafficking Survivor Class</u> asserts the following:

    a.  Sex Trafficking, 18 U.S.C. §§ 1591, 1594, and 1595 against Defendants City, Turner, Sparks, and Jenkins;

    b.  Obstruction of Enforcement of 18 U.S.C. § 1591, 18 U.S.C. §§ 1594, 1595 and 1591(d) against all Defendants;

    c.  Aiding and Abetting a Sex-Trafficking Venture, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595 against Defendants City, Turner, Peters, Sparks, and Jenkins;

    d.  Conspiracy to Commit Violations of the TVPA, 18 U.S.C. §§ 1594(c), 1591, 1595 against Defendants City, Turner, Peters, Sparks, and Jenkins;

413.    The <u>Williams Survivor Subclass</u> asserts the following:

a. Equal Protection, 42 U.S.C. § 1983, Violation of Substantive Rights to Due Process against all Defendants;

414. Plaintiffs reserve the right to seek modification of these classes and issues, including expanding the relevant time period for the Reporter-Survivor Class, upon further investigation and discovery.

415. **Numerosity and ascertainability**. Joinder of the class members in a single litigation is not practicable. There are at least 67 individuals in the Sex Trafficking Survivor Class, at least 67 in the Williams Survivor Subclass, and at least 325 in the Reporter Survivor Class. Their identities can be determined from JCPD records, evidence obtained by law enforcement, or by self-identification.

416. **Commonality and predominance – Reporter Survivor Class**. **Commonality and predominance – Reporter Survivor Class**. Questions of law and fact common to members of the Reporter Survivor Class predominate over any questions that may affect only individual class members. Questions of law and fact common to the Reporter Survivor Class include:

a. whether JCPD's practices relating to investigating and responding to reports of sexual assault discriminated on the basis of sex;

b. whether JCPD's investigative practices were sufficiently widespread and pervasive so as to constitute a "custom" under *Monell v. Department of Social Services*, 436 U.S. 658 (1978);

c. whether Defendant Johnson City had actual or constructive notice of JCPD's practice;

d. whether Reporter Survivor Class Members were deprived of a federal or constitutional right by virtue of being subjected to JCPD's systemic sex-

86

based discrimination and, if so, whether those deprivations were caused by a person acting under color of state law;

e. whether JCPD adequately trained officers on the elimination of bias, the proper procedures for investigating reports of sexual violence and clearing such cases by "exceptional means," and how to conduct victim-centric interviews of female victims of sexual assault;

f. whether any inadequacies in training on the aforementioned topics resulted in practices that deprived Reporter Survivor Class Members of equal protection of the law on the basis of sex in violation of the Fourteenth Amendment;

g. whether the City had actual or constructive notice of the inadequacies of JCPD's training and, if so, whether the City responded with acquiescence or deliberate indifference; and

h. whether JCPD's practices relating to female reporters of sexual assault violated the Equal Protection Clause.

417. Common evidence that supports class treatment for Plaintiffs' equal protection claims includes JCPD case files and interviews showing that JCPD's interactions with women reporting sexual assault regularly relied on gender-based stereotypes and bias, resulting in discriminatory outcomes and a tendency to respond to women's allegations of sexual assault with undue skepticism. The case files demonstrate that investigators systematically relied on women's sexual history in evaluating the veracity of their reports of sexual assault, which hindered what should have been objective investigation processes.

87

418. Additional common evidence supporting class treatment for Plaintiffs' equal protection claims includes recorded statements made by JCPD investigators and Department leadership to women reporting sexual assault. These documented statements establish JCPD personnel frequently made assumptions that women reporting non-stranger sexual assault were lying, and that such assaults were less severe and traumatic to victims than other serious crimes. These documented statements support the conclusion that JCPD personnel relied on stereotypes of female survivors of sexual assault that systematically interfered with their obligation to conduct objective investigations, causing women who were reporting sexual assault to mistrust or refuse to cooperate with law enforcement or refuse to report crimes if they had previously encountered skepticism or knew of women whose reports met with skepticism. These statements also include overtly discriminatory statements from JCPD officers, investigators, or leadership towards women.

419. Additional common evidence supporting class treatment for Plaintiffs' equal protection claims includes training records for JCPD officers, investigators, and supervisors. These records establish JCPD personnel were not trained in conducting objective and unbiased investigations. Consequently, investigations were conducted through the lens of gender-based stereotypes and bias, resulting in discriminatory outcomes and a tendency to respond to women's allegations of sexual assault with undue skepticism.

420. Additionally, for the Sex Trafficking Class and Williams Survivor Subclass, Plaintiffs seek certification of issues under Rule 23(c)(4). These issues are common (and predominate within each issue) because each one focuses on legal or factual questions that are central to the claims advanced by all members of the respective class or subclass: all elements of the TVPA violations (except causation and damages) and whether certain JCPD officer conduct in relation to Sean Williams' sex-trafficking venture "shocks the conscience" in violation of the Due

Process Clause. The same evidence of defendant or third-party knowledge and conduct will control the outcome of each issue (without the need for class-member specific evidence), and each issue is highly significant to adjudicating the claims at trial.

421. **Typicality**. Plaintiffs' claims are typical of the claims of the class(es)/subclass they seek to represent.

422. Plaintiff S.H.'s claims are typical of the Reporter Survivor Class. S.H. alleges that, when she reported her sexual assault to the JCPD, officers failed to properly investigate her claim, made derogatory comments about her based on the fact she is a female, and intimidated and discouraged her from prosecuting her claims. On this basis, she alleges her constitutional rights to equal protection of the law were violated. The Reporter-Survivor Class Members' claims arise from the same set of practices by JCPD and are based on the same legal theory. There is nothing about S.H. or her allegations that give rise to a conflict between her and the Reporter-Surivor Class.

423. Plaintiff B.P. is typical of the Sex Trafficking Survivor Class because, like all other members of that class, she alleges Defendants facilitated Williams' sex-trafficking venture, which in turn harmed her. Plaintiff B.P. and the class she represents base their TVPA-related claims on the same set of facts relating to JCPD officer knowledge and conduct.

424. Plaintiff H.A. is typical of the Williams Survivor Subclass because, like all other members of that class, she alleges that Sean Williams assaulted her after JCPD received a report of Williams' sexual violence on November 7, 2019, and that Defendants are a but-for cause of the class members being assaulted and the resulting harm. Plaintiff H.A. and the class she represents allege civil rights violations based on instances of JCPD conduct that "shocks the conscience."

425. **Adequacy of representation**. Plaintiffs will fairly and adequately protect the interests of the respective class(es)/subclass they seek to represent. Plaintiffs' interests align with

the interests of class members they seek to represent, have no interests antagonistic to the interests of other class members, and are committed to vigorously prosecuting this action on their behalf. Plaintiffs have retained counsel experienced in prosecuting class actions, including class actions involving sexual misconduct, and who have the qualifications and expertise to adequately and fairly represent Plaintiffs and the class members in this case.

426. **Superiority**. With respect to the Reporter Survivor Class, a class action is superior to all other available methods for the fair and efficient adjudication of the respective controversies and will promote consistency of adjudication. Common issues, such as the constitutionality of JCPD's customs and practices with respect to handling reports of sexual abuse by women and girls, predominate over individual ones, which means members of the Reporter-Survivor Class do not have a strong interest in controlling their individual actions. More importantly, because the allegations in this case elicit severe emotional distress, fear, shame, and retraumatization—and considering the financial and political power of the Defendants—many class members are unlikely to pursue legal redress individually for the violations detailed in this complaint.

427. With respect to the Sex Trafficking Survivor Class and Williams Survivor Subclass, utilizing Rule 23(c)(4) is superior to requiring each plaintiff to separately and individually litigate each legal and factual issue. Plaintiffs are proposing bifurcated proceedings where the certified issues are tried first, followed by small group or individual trials on questions such as proximate causation and damages. Certifying the proposed issues will streamline litigation at both phases by allowing the parties to dispute common legal and factual questions in one fell swoop and thereby materially advance the litigation while conserving both Court and party resources. This approach comports with the efficiency imperatives of Rule 23 while protecting the Plaintiffs' individual interests and protecting each Defendant's fairness and due process rights.

90

## COUNT I
## Sex Trafficking, 18 U.S.C. §§ 1591, 1594, and 1595
## (on behalf of B.P. and the Sex Trafficking Survivor Class against Defendants City, Turner, Sparks, and Jenkins)

428.    Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count I are made against Defendants City, Turner, Sparks, and Jenkins.

429.    B.P. and the Sex Trafficking Survivor Class  bring claims under 18 U.S.C. §§ 1591(a)(1), (2), and 1595 based on the Defendants' respective financial benefits and attempted financial benefits, garnered from participating in a venture in which Williams, Diaz-Vargas, and other known and unknown coconspirators knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited by any means B.P. and the Sex Trafficking Survivor Class, where Williams' use of force, *i.e.*, drugging women to render them unconscious, was used to cause them to engage in commercial sex acts.

430.    Defendants City, Turner, Sparks, and Jenkins knowingly participated in a sex trafficking venture by benefiting financially. Defendants effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts, including an extortion scheme. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid pro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

431.    Defendant JCPD officers knew multiple women had reported Williams' forced sex acts, including, at least, B.P., Females 2, 9, and 12. JCPD also had in its possession overwhelming evidence of Williams' sex trafficking conspiracy. Defendants further knew, based on these

women's reports, that Williams used Diaz-Vargas and other coconspirators to recruit and obtain women in exchange for things of value, including among other things, illicit drugs, and free lodging. Instead of arresting Williams and pursuing charges against him, Defendants knowingly and corruptly mishandled women's rape reports in exchange for payments, all in furtherance of the sex trafficking venture.

432.    The reason JCPD and Defendant officers engaged in a uniform practice that ignored, dismissed, and diminished the numerous reports of sexual assault about Williams was to receive financial benefits from Williams and his sex trafficking venture. JCPD officers knew that they would gain financial benefits by ignoring the women victims' complaints associated with Williams and by participating in his sex-trafficking venture.

433.    City Manager for Defendant City, Cathy Ball, attempted to benefit financially from participating in Williams' ongoing sex trafficking conspiracy in or around March – May 2022, through the off-market real estate deal with Williams for the purchase of his penthouse apartment—the same apartment in which Williams perpetrated his sex trafficking conspiracy—for a below-market price. Ball knew or should have known that she was attempting to benefit financially from participating in a sex trafficking venture at the time she entered the deal with Williams, based on, among other things, Dahl and JCPD officer's statements concerning Williams' involvement in commercial sex acts, multiple reports about Williams to JCPD, and the evidence of Williams' sex crimes on digital devices then in JCPD custody. Defendant Turner assisted in Ball's efforts despite knowing that Williams was a fugitive from justice and that JCPD was in possession of overwhelming evidence of Williams' sex trafficking crimes, and that Williams was a serial sex offender.

92

434. As a result of Defendants' participation in a sex trafficking venture by receiving currency and cash and other items of value from Williams, or attempting to receive something of value, Williams was able to continue to perpetrate his sex trafficking crimes for years, and remain at large for two years following the warrant for his arrest, resulting in the damages to B.P. and the Sex Trafficking Survivor Class, including economic harm, bodily harm, psychological and psychiatric harm, emotional pain and suffering, and mental anguish.

435. Each of the Defendants knew or should have known that it received value for its respective ongoing law enforcement practices that allowed Williams and his coconspirators to engage in the sex trafficking conspiracy, and either knew, or was in reckless disregard to the fact that, Williams would use means of force, *i.e.*, drugging women to render them unconscious, to cause the women to engage in commercial sex acts.

436. Each of the Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1), (2) and 1595(a) occurring within the territorial jurisdiction of the United States.

437. The conduct of each of the Defendants was in or affected interstate and/or foreign commerce.

438. Each of the Defendants knowingly benefited from participation in what it knew or should have known was a sex trafficking venture in violation of 18 U.S.C. §§ 1591(a)(2) and/or 1595(a).

439. Each Defendant knowingly benefited from, and/or received value for participation in the venture in which Defendant knew that B.P. and the Sex Trafficking Survivor Class would be forced to engage in commercial sexual acts by use of force.

440. Defendant JCPD officers had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of raped women.

441. Each of the Defendant JCPD officers knowingly benefited financially from the sex-trafficking venture.

442. Defendants' conduct caused B.P. and the Sex Trafficking Survivor Class serious harm including, without limitation, physical, psychological, financial, and reputational harm.

443. The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

444. B.P. and the Sex Trafficking Survivor Class demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### COUNT II
### Obstruction of Enforcement of 18 U.S.C. § 1591, 18 U.S.C. §§ 1594, 1595 and 1591(d)
### (on behalf of B.P. and the Sex Trafficking Survivor Class against Defendants City, Turner, Peters, Sparks, and Legault)

445. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

446. B.P. and the Sex Trafficking Survivor Class bring claims under 18 U.S.C. § 1595 based on each of the Defendants' actions to obstruct, attempt to obstruct, and in any way interfere with and prevent the enforcement of 18 U.S.C. §§ 1591(a)(1), (2), in violation of 18 U.S.C. § 1591(d).

94

447.     Defendants City, Turner, Peters, Sparks, and Legault took the following actions knowingly, all in violation of 18 U.S.C. § 1591(d):

448.     Defendants Sparks effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid pro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

449.     Defendants Turner, Peters, Sparks, and Legault affirmatively refused to initiate formal investigations into Williams' crimes against women.

450.     Defendants Turner, Peters, Sparks, and Legault affirmatively refused to refer charges for prosecution and/or referred charges in a piecemeal and incomplete manner so as to undermine the prosecution.

451.     Defendants Turner, Peters, Sparks, and Legault affirmatively intimidated and dissuaded Plaintiffs and other class members from pursuing criminal charges.

452.     Defendant Sparks made knowingly false statements to obstruct and interfere with the criminal investigation.

453.     Defendant Sparks—at the direction of Defendants Turner and Peters— knowingly conspired with Williams to destroy and conceal evidence, including digital evidence that showed Williams raping unconscious women whom he had drugged. This evidence included images of Plaintiffs in this case.

454. Defendant Legault and other JCPD officers knowingly retaliated against Female 9, a Williams' survivor and a witness in the federal sex trafficking investigation, physically assaulting her, arresting her, and ultimately causing her eviction from Johnson City Public Housing.

455. At the time of each of the Defendants' obstructive acts, each Defendant had actual knowledge, based on rape victims' reports, including, at least, the reports of B.P, and Females 2, 9, and 12, and based on the overwhelming evidence in JCPD's possession, that Williams was drugging and raping women, that Williams' sex crimes included a commercial element, and that Williams used Diaz-Vargas, and other coconspirators, to recruit and obtain women in exchange for things of value, in furtherance of this conspiracy.

456. Each of the Defendants knew or should have known that their obstructive acts would have the effect of interfering with and preventing the enforcement of 18 U.S.C. §§ 1591(a)(1), (2).

457. Each of the Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(d) and 1595(a) occurring within the territorial jurisdiction of the United States.

458. The conduct of each of the Defendants was in or affected interstate and/or foreign commerce.

459. Defendant JCPD officers had actual knowledge that they were obstructing, attempting to obstruct, and interfering in any way and preventing the enforcement of 18 U.S.C. §§ 1591(a)(1), (2).

460. The conduct of each Defendant caused B.P. and the Sex Trafficking Survivor Class serious harm including, without limitation, physical, psychological, financial, and reputational harm.

461. The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

462. B.P. and the Sex Trafficking Survivor Class demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT III**
**Aiding and Abetting a Sex-Trafficking Venture,**
**18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595**
**(on behalf of B.P. and the Sex Trafficking Survivor Class against Defendants City, Turner, Peters, Sparks, and Jenkins)**

463. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count III are made only against Defendants City, Turner, Peters, Sparks, and Jenkins.

464. B.P. and the Sex Trafficking Survivor Class bring claims under 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595.

465. Acting through its officers and supervising officers (including Defendants Turner, Peters, Sparks, and Jenkins), Defendant City aided and abetted Williams' sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

466. Under 18 U.S.C. § 2, Defendants are punishable as principals under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18,

97

U.S. Code, when they aided and abetted Williams' sex-trafficking venture and the sex trafficking of B.P. and members of the Sex Trafficking Survivor Class.

467.     Under 18 U.S.C. § 2, Defendants committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding and abetting Williams' and his conspirators' sex-trafficking venture and sex trafficking of B.P. and other members of the Sex Trafficking Survivor Class. As a consequence, B.P. and other members of the Sex Trafficking Survivor Class are victims of Defendants' criminally aiding and abetting Williams' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2). These actions were in and affecting interstate and foreign commerce.

468.     The crimes that Defendants aided and abetted are (1) Williams' perpetrating of sex trafficking by force, in violation of 18 U.S.C. § 1591(a)(1), and (2) Williams' co-conspirators' knowingly benefitting from sex trafficking by force, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate and foreign commerce.

469.     Williams' co-conspirators benefitted financially and received things of value from their participation in the Williams sex trafficking venture, including payments, illicit drugs, free lodging, and other compensation from Williams. The co-conspirators who benefitted include Diaz-Vargas, Female 1, and other unknown coconspirators.

470.     Acting through its officers and supervising officers (including Defendants Turner, Peters, Sparks, and Jenkins), Defendant City itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding and abetting a sex trafficking venture and the sex trafficking of B.P., as well as other Sex Trafficking Survivor class members. Defendant City itself directly violated Chapter 77 by committing and perpetrating these violations.

471.    Among other things, Defendants aided and abetted Williams' sex trafficking venture and sex trafficking of B.P. and other members of the Sex Trafficking Survivor Class, knowing that Williams would use means of force, *i.e.*, drugging, to cause B.P. and other members of the Sex Trafficking Survivor Class, to engage in commercial sex acts.

472.    By aiding and abetting Williams' sex-trafficking venture and sex trafficking of B.P. and other members of the Sex Trafficking Survivor Class, Defendants knowingly benefited, both financially and by receiving things of value, from participating in Williams' sex-trafficking venture.

473.    Defendant JCPD officers knew multiple women had reported Williams' forced sex acts, including, at least, B.P., and Females 2, 9, and 12, and the overwhelming evidence in JCPD's possession, and therefore had actual knowledge that they were aiding and abetting Williams' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide B.P. and other members of the Sex Trafficking Survivor Class, to engage in commercial sex acts, through the means of force. Defendants knew, and should have known, that Williams had engaged in acts in violation of the TVPA.

474.    Despite such knowledge, Defendants intentionally aided and abetted Williams' and his co-conspirators' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), through their corrupt and unlawful law enforcement practices, which constituted perpetrating violations of those laws under 18 U.S.C. § 2. Defendants knew, and acted in reckless disregard of the fact that, Williams would force B.P. and other members of the Sex Trafficking Survivor Class, to engage in commercial sex acts.

475.    Defendants' affirmative conduct of aiding and abetting Williams' and his co-conspirators' violations were committed knowingly, and in reckless disregard of the facts, that

99

Williams used his position of impunity as a means to further the sex trafficking venture. Defendants' conduct was outrageous and intentional.

476. Acting within this District and in attempting to further the Williams' sex-trafficking venture, Defendants knowingly and intentionally took substantial and significant steps to aid and abet Williams' sex trafficking venture, including:

    a. Defendants effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid pro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

    b. Defendants affirmatively refused to initiate formal investigations into Williams' crimes against women.

    c. Defendants affirmatively refused to refer charges for prosecution and/or referred charges in a piecemeal and incomplete manner so as to undermine the prosecution.

    d. Defendants affirmatively intimidated and dissuaded Plaintiffs and other class members from pursuing criminal charges.

    e. Defendant Sparks made knowingly false statements to obstruct and interfere with the criminal investigation.

477. Defendants Sparks and Jenkins—at the direction of Defendants Turner and Peters—knowingly conspired with Williams to destroy and conceal evidence, including digital evidence that showed Williams raping unconscious women whom he had drugged. This evidence included images of Plaintiffs in this case.

478. Defendants' knowing and intentional conduct of aiding and abetting Williams' violations has caused B.P. and other members of the Sex Trafficking Survivor Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

479. The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

480. B.P. and the Sex Trafficking Survivor Class demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT IV
### Conspiracy to Commit Violations of the TVPA, 18 U.S.C. §§ 1594(c), 1591, 1595
### (on behalf of Plaintiffs and the Sex Trafficking Survivor Class against Defendants City, Turner, Peters, Sparks, and Jenkins)

481. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in Count IV are made only against Defendants City, Turner, Peters, Sparks, and Jenkins.

482. Plaintiffs and the Sex Trafficking Survivor Class bring claims under 18 U.S.C. §§ 1594(c), 1591, 1595.

483.    Defendants City, Turner, Peters, Sparks, and Jenkins intentionally conspired with others, including Williams and his other co-conspirators, by agreement and understanding, to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2) & 1591(d), and to further Williams' sex-trafficking venture to force commercial sex acts from Plaintiffs and members of the Sex Trafficking Survivor Class, all in violation of 18 U.S.C. § 1594(c). Defendant Sparks directly conspired with Williams himself to further the sex-trafficking venture.

484.    Defendants' conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Plaintiffs and members of the Sex Trafficking Survivor Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Plaintiffs and members of the Sex Trafficking Survivor Class.

485.    Defendants' conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Plaintiffs and members of the Sex Trafficking Survivor Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Plaintiffs and members of the Sex Trafficking Survivor Class.

486.    Defendants conspired with Williams and his other co-conspirators to further the Williams sex-trafficking venture and with the purpose of facilitating Williams' illegal sex trafficking. Defendants had actual knowledge of Williams' sex-trafficking venture based on the reports of, at least, B.P. and Females 2, 9, and 12, and the overwhelming evidence in JCPD's possession. Defendants acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2),

that is, with consciousness of the nature of Williams' sex-trafficking venture and with the specific intent to further the venture. Defendants and Williams had a meeting of the minds as to the essential nature of the plan.

487.    Defendants' conspiracy with Williams was part of their participation in his sex-trafficking venture. Without Defendants agreeing to facilitate the venture (by, for example, conspiring to receive payments in return for turning a blind eye to Williams' forced sex acts), Williams would not have been a position to move forward with his sex-trafficking venture and to recruit and obtain victims of the venture.

488.    Defendants also conspired with Williams and his other co-conspirators to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d). The conspiracy included an agreement to keep Williams' sex-trafficking venture secret or, at least, concealed to the greatest extent possible. Among the means for keeping the venture secret were affirmatively refusing to investigate and prosecute Williams' sex trafficking crimes, concealing and/or destroying evidence, intimidating witnesses/victims, and making false statements to witnesses/victims. In exchange, Defendants effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of search warrants and other unlawful collection efforts. Said warrants were facially obtained and used to seize unlawfully obtained currency or narcotics assets but were in fact quid Peterspro quo payments made to Defendants with either the implied or explicit understanding that Defendants would shield Williams, permitting him to continue his practice of abuse and trafficking with impunity in exchange for the payments.

489. Defendants knew, acted in reckless disregard of the fact, and should have known, that their conspiracy would directly and proximately lead to unlawful forced commercial sex acts by Williams with women, including Plaintiffs and members of the Sex Trafficking Survivor Class.

490. Defendants' knowing and intentional conduct of conspiring with Williams has caused Plaintiffs and members of the Sex Trafficking Survivor Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

491. The conduct of each Defendant JCPD officer, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of its constituents, Johnson City residents—whom they had taken an oath to protect—and warrants an award of punitive damages in an amount sufficient to punish each of the Defendants and deter others from like conduct.

492. Plaintiffs and members of the Sex Trafficking Survivor Class demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

<u>**COUNT V**</u>
<u>**Equal Protection, 42 U.S.C. § 1983**</u>
<u>**Unconstitutional Pattern and Practice as to Women Reporters of Sexual Assault**</u>
<u>**(on behalf of S.H. and the Reporter Survivor Class against Defendant City)**</u>

493. Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

494. Defendant City and Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, and Investigator Legault acted under the color of state law and pursuant to an adopted policy or a longstanding practice or custom of the JCPD and Defendant City.

495. Defendants maintained the following unconstitutional customs, practices, or policies:

104

a.  Not documenting reports of sexual assault made by women under Defendant City's jurisdiction;

b.  Not investigating reports of sexual assault made by women under Defendant City's jurisdiction;

c.  Failing to test or delaying testing of the rape kits of women who made complaints of sexual assault;

d.  Not seizing or retaining evidence in response to women who made complaints of sexual assault;

e.  Blaming, shaming, or otherwise discouraging victims from prosecuting their assaults;

f.  Ceasing investigations unless the victim immediately agreed to prosecute;

g.  Improperly closing cases pursuant to "exceptional means"; and

h.  Refusing to credit women's accounts of sexual assault within Defendant City's jurisdiction.

496.  The above policies and practices were motived by actual discriminatory animus towards women.

497.  Defendant City developed, ratified, and enforced these longstanding customs and practices.

498.  Defendant City perpetuated these unconstitutional customs and practices by allowing, and at times encouraging, JCPD officers to engage in unconstitutional conduct, and by failing to train and supervise JCPD officers to address and act upon evidence of unconstitutional conduct.

499. JCPD policies and procedures violated legal requirements to investigate sexual assault investigations demonstrating the failure to train officers to ensure effective and unbiased responses to allegations of sexual assault.

500. JCPD's practices resulted in ineffective, and incomplete sexual assault investigations, wherein officers routinely did not collect evidence or interview suspects and witnesses during sexual assault investigations.

501. JCPD's practices discouraged female victims of sexual assault from working with law enforcement to participate in investigations and pursue charges, such that biased policing prevented thorough and impartial investigations into the victims' reports of sexual assault. No legitimate law enforcement purpose—or any other reason—justified these inadequacies.

502. JCPD officers allowed sexual assault cases to be closed even when prosecution was still possible, including by improperly using the "exceptional circumstances" justification in the TIBRS reporting system to justify closing sexual assault cases, where the requirements for closure under this basis were not met.

503. Pursuant to the Defendants' persistent, widespread practices, Defendant City and its employees denied law enforcement services to Plaintiffs and class members with reckless disregard for their constitutional rights.

504. By reason of the conduct described herein, Defendants deprived Plaintiffs and class members of the rights, immunities, and privileges guaranteed to every person in the United States, in violation of 42 U.S.C. § 1983, including rights guaranteed by the Fourteenth Amendment of the United States Constitution.

505. On or about June 23, 2022, Plaintiffs learned that Defendants and the JCPD had a custom, policy and practice of failing to investigate sexual assault reports made by women.

106

506. At all times relevant hereto, sexual assault was perpetrated almost entirely against females. According to federal crime statistics, females constitute over 90% of sexual assault victims.

507. By reason of the aforementioned acts, Plaintiffs and class members have suffered bodily injury, emotional distress, deprivation of property, economic harm, deprivation of the right to privacy, and, in the case of Female 10, death.

508. Defendants had either actual or constructive knowledge of the unconstitutional policies, practices and customs alleged above. Despite having knowledge, Defendants condoned, tolerated, and ratified such policies. Defendants acted with deliberate indifference to the foreseeable effects of these policies with respect to the constitutional rights of Plaintiffs, class members, and all women under their jurisdiction.

509. Defendants had a duty to diligently investigate *all* crimes. Defendants breached this duty by routinely and systemically failing and/or refusing to do so in female-reported cases of sexual assault and rape. Defendants' deliberate indifference to sexual assault crimes against women, which was an institutional policy so pervasive as to rise to the level of intentional conduct, served to deprive Plaintiffs and class members of equal protection under the law on the basis of their gender.

510. In committing the acts and/or failures as alleged herein, Defendants were at all times relevant hereto acting under the color of the State. The constitutional injury inflicted by Defendants was caused by a person(s) with final policymaking authority at the Defendant City. Defendant City knew or should have known about the above-described conduct and facilitated it, approved it, condoned it, and/or was deliberately indifferent to it.

511. But for the longstanding unconstitutional policy of Defendant City described above, JCPD officers would have taken reasonable steps to investigate and respond to the first known report of Sean Williams' sex crimes, which, due to circumstances surrounding that report, would have resulted in arrest.

512. The above-described conduct of Defendants constitutes a violation of 42 U.S.C., Section 1983. Plaintiffs and class members are entitled to compensatory damages, including for emotional pain, suffering, mental anguish and other harms and losses pursuant to 42 U.S.C., Section 1983 for violations of their civil rights under the U.S. Constitution directly and proximately caused by Defendants.

### COUNT VI
### Equal Protection, 42 U.S.C. § 1983
### Violation of Substantive Rights to Due Process
### (on behalf of B.P. and the Williams Survivor Subclass against all Defendants)

513. Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

514. B.P. and members of the Williams Survivor Subclass have a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience.

515. The aforementioned actions of JCPD, including but not limited to the actions of Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, and Investigator Legault, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of B.P. and members of the Williams Survivor Subclass with a purpose to harm that was unrelated to any legitimate law enforcement objective.

516. The aforementioned actions of JCPD, including but not limited to the actions of Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, and

Investigator Legault, compromise affirmative acts that caused an increased risk to Plaintiffs and class members, specifically, of being exposed to an act of violence by a third party, as well as police violence in the case of Female 9.

517. The conduct of Defendants was willful, knowing, wanton, malicious, and done with reckless disregard for the rights and safety of all Plaintiffs and class members.

518. As a direct and proximate result of Defendants' actions, B.P. and members of the Williams Survivor Subclass experienced extreme pain and suffering in the form of economic harm, bodily injury, emotional distress, and in the case of Female 10, death. Defendants deprived B.P. and members of the Williams Survivor Subclass of their right to be protected and safeguarded from actions that risked their lives, as well as physical and emotional injury.

519. But for the aforementioned actions of JCPD, including but not limited to the actions of Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, and Investigator Legault, JCPD officers would have taken reasonable steps to investigate and respond to the first known report of Sean Williams' sex crimes, which, due to circumstances surrounding that report, would have resulted in arrest. Defendants are therefore responsible for the harm suffered by members of the Williams Survivor Subclass, who would not otherwise have been assaulted by Sean Williams.

520. The above-described conduct of Defendants constitutes a violation of 42 U.S.C., Section 1983. B.P. and members of the Williams Survivor Subclass are entitled to compensatory damages for emotional pain, suffering, mental anguish and other harms and losses pursuant to 42 U.S.C., Section 1983 for violations of their civil rights under the U.S. Constitution directly and proximately caused by Defendants.

## COUNT VIII
### Tennessee Governmental Tort Liability Act, T.C.A. 29-20-205
### (on behalf of Plaintiffs individually against Defendant City)

521.     Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

522.     Chief Turner, Captain Peters, Investigator Sparks, and Investigator Jenkins were aware of numerous complaints of sexual assault and drugging by Williams, including those made by B.P., and Females 2, 3, 9, and 12, and Female 10's surviving family member as early as 2019.

523.     Despite this knowledge, Chief Turner, Captain Peters, Investigator Sparks, and Investigator Jenkins failed to investigate Williams, refer all reports of his criminal activity to the District Attorney's Office, or provide protection for the Plaintiffs in this case. These actions do not exercise the care that a reasonable or prudent individual in their capacities would hold.

524.     Chief Turner, Captain Peters, Investigator Sparks, and Investigator Jenkins' negligent actions were the proximate cause of the Plaintiffs' injuries, including but not limited to bodily injury, emotional distress, deprivation of property, economic harm, deprivation of right to privacy, and, in the case of Female 10, death.

525.     Defendant City is liable for the injuries proximately caused by the negligent acts or omissions of Chief Turner, Captain Peters, Investigator Sparks, and Investigator Jenkins.

526.     As a direct and proximate consequence of the negligent acts and omissions with regard to the aforementioned events caused by Defendants, Plaintiffs have suffered damages and Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violation of law.

110

## COUNT IX
### Negligence, Failure to Train
### (on behalf of Plaintiffs individually against Defendant City)

527.    Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

528.    Defendant City had a duty to train its Police Department officers and employees to not discriminate against citizens on the basis of sex, as well as to properly investigate legitimate complaints of criminal activity and protect citizens under its jurisdiction from criminal activity.

529.    Defendant City breached its duty of care to Plaintiffs when JCPD officers and employees were made aware by women of numerous complaints of sexual assault by Williams, failed to investigate those complaints, and failed to protect female citizens of Johnson City from further criminal activity by Williams.

530.    Defendant City breached its duty of care to Plaintiffs by negligently failing to investigate and refer for prosecution cases of sexual violence against women victims, who reported their cases to JCPD, out of discriminatory animus towards women victims of sexual violence as a class.

531.    JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD negligently failed to train officers to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

532.    JCPD's investigations into sexual assault reports were negligently inconsistent, ineffective, and incomplete. JCPD negligently failed to collect evidence or failed to document the collection of evidence. JCPD also negligently failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers negligently failed to

111

document their statements, even though the investigative files indicated that such statements had been taken.

533.     JCPD's practices negligently discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault. No legitimate law enforcement purpose—or any other reason—justified these inadequacies.

534.     JCPD supervisors negligently allowed sexual assault cases to be closed even when prosecution was still possible.

535.     JCPD investigators negligently and improperly used the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, where the requirements for closure under this basis were not met.

536.     JCPD's investigative deficiencies compromised the investigative process and negligently placed all Plaintiffs at an increased risk of harm.

537.     The culture of impunity caused and ratified by Defendant City resulted in Plaintiffs to suffer increased risk of harm, retraumatization, and emotional distress. These damages were a result of Defendant City's unjust law enforcement system where sexual violence was not punished or deterred.

538.     Further, in the specific case of Williams, Defendant City's negligence resulted in the failure to apprehend, prosecute, and imprison a serial rapist, thereby allowing Williams to perpetrate his crimes for years. By breaching its duty of care, Defendant City proximately caused Plaintiffs to suffer bodily injury, emotional distress, the deprivation of property, the deprivation of the right to privacy, and in the case of Female 10, death.

539. Plaintiffs suffered actual, psychological, and physical damages due to Defendant City's breach of care, including retraumatization and emotional distress as a result of negligent investigative practices, botched investigations, and improperly declined prosecutions.

540. As a direct consequence of Defendant City's acts and omissions described herein, Plaintiffs have suffered damages and the Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violations of law.

**COUNT X**
**Negligence, Failure to Supervise**
**(on behalf of Plaintiffs individually against Defendant City)**

541. Plaintiffs restate and incorporate herein the allegations in the above paragraphs.

542. Defendant City had a duty to supervise its Police Department officers and employees to ensure they were not discriminating against citizens on the basis of sex, as well as properly investigating legitimate complaints of criminal activity and protecting citizens under its jurisdiction from criminal activity.

543. Defendant City had a duty to maintain and enforce policies and procedures that ensured all of its citizens, regardless of sex, were protected from criminal activity.

544. Defendant City breached its duty of care to Plaintiffs by negligently failing to investigate and refer for prosecution cases of sexual violence against women victims, who reported their cases to JCPD, out of discriminatory animus towards women victims of sexual violence as a class.

545. JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD negligently failed to train officers to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

113

546. JCPD's investigations into sexual assault reports were negligently inconsistent, ineffective, and incomplete. JCPD negligently failed to collect evidence or failed to document the collection of evidence. JCPD also negligently failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers negligently failed to document their statements, even though the investigative files indicated that such statements had been taken.

547. JCPD's practices negligently discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault. No legitimate law enforcement purpose—or any other reason—justified these inadequacies.

548. JCPD supervisors negligently allowed sexual assault cases to be closed even when prosecution was still possible.

549. JCPD investigators negligently and improperly used the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, where the requirements for closure under this basis were not met.

550. JCPD's investigative deficiencies compromised the investigative process and negligently placed Plaintiffs at an increased risk of harm.

551. The culture of impunity caused and ratified by Defendant City resulted in Plaintiffs suffering increased risk of harm, retraumatization, and emotional distress. These damages were a result of Defendant City's unjust law enforcement system where sexual violence was not punished or deterred.

552.	Further, in the specific case of Williams, Defendant City breached its duty of care to Plaintiffs when the JCPD officers and employees were made aware of the numerous complaints of Williams' sexual assault, failed to investigate those complaints, and failed to protect female citizens of Johnson City from further criminal activity by Williams. By breaching its duty of care, Defendant City proximately caused Plaintiffs to suffer bodily injury, emotional distress, the deprivation of property, the deprivation of the right to privacy, and in the case of Female 10, death.

553.	Plaintiffs suffered actual emotional and physical damages due to Defendant City's breach of care, including retraumatization and emotional distress as a result of negligent investigative practices, botched investigations, and improperly declined prosecutions.

554.	Plaintiffs suffered actual, emotional, and physical damages due Defendant City's breach of care.

555.	As a direct consequence of Defendant City's acts and omissions described herein, Plaintiffs have suffered damages and the Defendant City is liable for all injuries sustained by Plaintiffs proximately caused by its violations of law.

## **RELIEF REQUESTED**

Plaintiffs, individually and behalf of the Classes, respectfully request that this Court:

1.	Certify the Reporter-Survivor Class under Federal Rule of Civil Procedure 23(b)(3), appoint Plaintiffs B.P., H.A., and S.H. as class representatives, and appoint their attorneys as class counsel;

2.	Certify the above set forth issues on behalf of the Sex Trafficking Survivor Class under Federal Rule of Civil Procedure 23(c)(4), appoint Plaintiffs B.P. and H.A. as class representatives, and appoint their attorneys as class counsel;

3.     Certify the above set forth issue on behalf of the Williams Survivor Subclass under Federal Rule of Civil Procedure 23(c)(4), appoint Plaintiff H.A. as class representative, and appoint their attorneys as class counsel;

4.     Enter judgment against Defendants and in favor of Plaintiffs and the Classes;

5.     Award compensatory damages for emotional distress, mental anguish, and disruption to each Plaintiffs' and Class Member's family life, physical injury, pain and suffering, medical expenses, and all compensatory damages and or economic damages caused by the actions of Defendants.

6.     Award punitive damages;

7.     Award reasonable attorney's fees and costs;

8.     Award prejudgment interest and, if applicable, post-judgment interest;

9.     Injunctive relief; and

10.    Any such general relief to which Plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

*s/ Heather Moore Collins*
Heather Moore Collins (#026099)
Ashley Shoemaker Walter (#037651)
**HMC Civil Rights Law, PLLC**
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

*—and—*

116

*s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones (California Bar #281715)
*Pro Hac Vice*
**Advocates for Survivors of Abuse PC**
4200 Park Boulevard No. 413
Oakland, CA 94602
510-500-9634
vanessa@advocatesforsurvivors.com


—*and*—


*s/ Elizabeth Kramer*
Julie C. Erickson (California Bar # 293111)
Elizabeth A. Kramer (California Bar # 293129)
Kevin M. Osborne (California Bar #261367)
*Pro Hac Vice*
**Erickson Kramer Osborne LLP**
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law


*Attorneys for the Plaintiffs and the Proposed Classes*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been filed and served via the court's electronic filing system on November 1, 2024 to counsel of record:

| | |
|---|---|
| K. Erickson Herrin<br>HERRIN, McPEAK & ASSOCIATES<br>515 East Unaka Avenue<br>P. O. Box 629<br>Johnson City, TN 37605-0629<br>rachel@hbm-lawfirm.com<br><br>Emily C. Taylor<br>Maria Ashburn<br>WATSON, ROACH, BATSON &<br>LAUDERBACK, P.L.C.<br>P.O. Box 131<br>Knoxville, TN 37901-0131<br>etaylor@watsonroach.com<br>mashburn@watsonroach.com<br><br>*Attorneys to Defendants, Johnson City,*<br>*Tennessee, Karl Turner, in his individual and o*<br>*capacities, and Investigator Toma Sparks, i*<br>*official capacity*<br><br>Jonathan P. Lakey<br>Burch, Porter, & Johnson, PLLC<br>130 N. Court Ave.<br>Memphis, TN 38103<br>901-524-5000<br>jlakey@bpjlaw.com<br>mchrisman@bpjlaw.com<br><br>*Attorney to Defendant City of Johnson City,*<br>*Tennessee* | Kristin Ellis Berexa<br>Ben C. Allen<br>FARRAR BATES BEREXA<br>12 Cadillac Drive, Suite 480<br>Brentwood, TN 37027-5366<br> kberexa@fbb.law<br> ballen@fbb.law<br> jdowd@fbb.law<br> msutton@fbb.law<br> gpatton@fbb.law<br><br>*Counsel for Toma Sparks in his individual*<br>*Capacity*<br><br>Keith H. Grant<br>Laura Beth Rufolo<br>Robinson, Smith & Wells, PLLC<br>633 Chestnut Street, Suite 700<br>Chattanooga, TN 37450<br>kgrant@rswlaw.com<br>lrufolo@rswlaw.com<br>awells@rswlaw.com<br><br>*Counsel for Justin Jenkins and Jeff Legault in*<br>*individual capacity*<br>Daniel H. Rader IV<br>MOORE, RADER & YORK PC<br>46 North Jefferson Avenue<br>P. O. Box 3347<br>Cookeville, TN 38501<br>danny@moorerader.com<br><br>*Counsel for Defendant Karl Turner in his indiv*<br>*Capacity* |

*/s/ Elizabeth A. Kramer*
Elizabeth A. Kramer