

**ADVOCATES FOR SURVIVORS OF ABUSE**
Seeking and Securing Justice for Survivors

| | |
|---|---|
| **Vanessa Baehr-Jones** | **Michael E. Horowitz** |
| Founder and Principal | Inspector General |
| | U.S. Department of Justice |
| 4200 Park Boulevard No. 413 | Office of the Inspector General |
| Oakland, California 94602 | Investigations Division |
| 510.500.9634 | 950 Pennsylvania Ave., NW |
| vanessa@advocatesforsurvivors.com | Washington, DC 20530 |

September 26, 2024

VIA CERTIFIED U.S. MAIL

    Re:    OIG Complaint Regarding FBI Public Corruption Investigation into the Johnson City Police Department

**Dear Michael E. Horowitz,**

    Along with co-counsel, I represent the survivors of serial rapist Sean C. Williams in a civil rights class action lawsuit against the City of Johnson City, Tennessee, and police officers of the Johnson City Police Department ("JCPD") in their official and individual capacities. *See B.P., et al. v. City of Johnson City, Tennessee, et al.*, No: 2:23-cv-00071-TRM-JEM (EDTN). I also represent these survivors in pending criminal investigations relating to Williams,

including, among others, the above-referenced federal public corruption investigation into JCPD.[1] I am writing to ask your office to open an investigation into the handling of this investigation to determine whether conflicts of interest have undermined its integrity.[2] Specifically, it appears that actions and decisions of U.S. Department of Justice ("DOJ") personnel, including Special Agents in the Federal Bureau of Investigation ("FBI") and federal prosecutors in the Eastern District of Tennessee ("EDTN") U.S. Attorney's Office ("USAO") have compromised the thoroughness and impartiality of the public corruption investigation. I therefore am filing this complaint on behalf of my clients to initiate an OIG investigation into potential DOJ misconduct.[3]

### I. Factual Background[4]

Beginning as early as 2008 and continuing until at least November 2020, Williams raped and sexually exploited women and children in Johnson City, Tennessee, as part of a sex trafficking conspiracy.[5] Images and

---

[1] I also represent minor victim ▮▮▮ in the federal criminal case, *United States v. Williams*, Case No. 2:23-cr-00111-JRG-CRW, and I represent the survivors in the ongoing federal sex trafficking investigation into Williams.

[2] This investigation is being overseen by the U.S. Attorney's Office ("USAO") for the Eastern District of Tennessee ("EDTN"). I previously raised concerns about potential conflicts this office may have with any investigation involving Williams in August 2023, given the office's role in the civil lawsuit of Kateri Dahl, a former Special Assistant U.S. Attorney ("SAUSA") who was effectively terminated after pushing JCPD to investigate Williams' rapes. *See* Exh. 1, Aug. 10, 2023, Letter to U.S. Attorney Francis M. Hamilton III. I received a letter in response from U.S. Attorney Hamilton, indicating that recusal of his office was determined not to be necessary at that time. Exh. 2, Sept. 15, 2023, Letter to Advocates for Survivors of Abuse. Separately, my co-counsel Heather M. Collins sent a letter to the District Attorney for the First Judicial District of Tennessee, Steven Finney, in August 2023, also requesting that he consider whether conflicts of interest warranted his recusal from Williams' investigations. Exh. 3, Aug. 16, 2023, Letter to Finney. He did not respond.

[3] I am providing a copy this complaint and the attached exhibits to the General Counsel's Office for the FBI. I have also raised these issues separately in letters to the DOJ's Office of Professional Responsibility and the General Counsel for the Executive Office for United States Attorneys, who are both copied on this complaint as well.

[4] This letter and its contents represent my mental impressions, conclusions, opinions, and legal theories, and are therefore attorney work product. I am providing this letter to your office with the understanding that this letter and its contents will not be disseminated outside of DOJ. All referenced exhibits in this letter will be transmitted under separate cover. Pursuant to the terms of the Protective Order, defense counsel in the civil case will be copied on the transmittal letter of exhibits.

[5] As set forth in the Second Amended Complaint, Williams used three primary means and methods to recruit, entice, harbor, provide, obtain, maintain, and solicit women and children, including but not limited to: (1) providing benefits in the form of drugs, cash, and free lodging to coconspirators, and other third parties, to recruit, obtain,

videos obtained from his digital devices at the time of his arrest in April 2023 show that he sexually assaulted <u>at least 67 women</u>. Exh. 4, Decl. of Inv. Michael Little. In November 2022, the DOJ's Human Trafficking Prosecution Unit ("HTPU") and the FBI opened a federal sex trafficking investigation into Williams. My understanding is that this investigation is ongoing. Additionally, Williams currently faces federal criminal charges for production of child pornography in EDTN based on his sexual exploitation of three children, including then-nine-month-old infant C.A. *See United States v. Williams*, No. 2:23-cr-00111-JRG-CRW. Williams also collected and transported child pornography, which forms the basis for additional child pornography charges brought in the Western District of North Carolina. *See United States v. Williams*, No. 1:23-cr-00083-MR-WCM.

The Plaintiffs in the survivors' class action lawsuit against Johnon City allege that JCPD allowed Williams to perpetrate his crimes with impunity, intentionally obstructing investigations into Williams' rapes and child sex crimes by conspiring to destroy and suppress evidence and discouraging victims from pursuing their cases, among other obstructive misconduct. *See B.P., et al. v. City of Johnson City, Tennessee, et al.*, No: 2:23-cv-00071-TRM-JEM, Doc. No. 121, SAC ¶¶ 64-80, 143-83. The Plaintiffs also allege that JCPD officers benefitted financially from their participation in covering up Williams' sex trafficking conspiracy. *Id.* ¶¶ 57-63, 81-87. In August 2023, the FBI opened a federal public corruption investigation into JCPD's potential misconduct relating to Williams. My understanding is that this investigation is ongoing.

II. <u>Opening of the Federal Public Corruption Investigation</u>

I was involved in the referral of JCPD's alleged misconduct to the DOJ's Public Integrity Section ("PIN") in August 2023. On August 11, 2023, I spoke by phone with PIN Principal Deputy Chief John Keller. Among other topics discussed, I summarized allegations in the survivors' civil rights complaint which described a letter exchange between the City Manager for Johnson City, Cathy Ball, and JCPD Chief Karl Turner, and the District Attorney ("DA") for the First Judicial District of Tennessee, Steven Finney. Specifically, Ball and Turner wrote a letter addressed to the outgoing DA, Kenneth Baldwin, dated August 24, 2022, asking his office or the Tennessee Bureau of Investigation ("TBI") to "conduct a preliminary investigation to determine whether there was a basis to open a public corruption investigation" into the allegations in the civil complaint of former SAUSA Kateri Dahl ("Dahl

---

transport, maintain, and provide women; (2) using drugs to addict and control women who would then recruit, obtain, transport, maintain, and provide other women; and (3) offering something of value to women, including free lodging and money, at times under the guise of hiring women for purportedly legitimate purposes, so that he could obtain and gain access to the women and their minor children. *B.P., et al. v. City of Johnson City, Tennessee, et al.*, No: 2:23-cv-00071-TRM-JEM, Doc. No. 121, Second Amended Complaint ("SAC"), ¶ 22.

Complaint").[6] *See* SAC ¶¶ 217-27. DA Elect Finney, who already had an office at the DA's office, was copied on this letter. Exh. 5, Aug. 24, 2022, Ball/Turner Letter to DA Baldwin. On September 1, 2022—Finney's first day in office—he wrote back and explained that there was no such thing as a "preliminary investigation," and that he did not have "enough information to request a TBI investigation at this point." Exh. 6, Sept. 1, 2022, Finney Letter to Ball.

After this letter exchange, JCPD did not open an internal affairs ("IA") investigation in response to the serious allegations of misconduct in the Dahl Complaint. Instead, Ball forwarded Finney's letter to the Johnson City Commissioners, informing them that Finney "[did] not have enough information to move forward on an investigation," and indicating that a local news station would be reporting on this that night. Exh. 7, Sept. 7, 2022, Ball Email. Evidence suggests that this failure to conduct an IA investigation may have resulted in the loss or destruction of records relating to the Williams' investigations.[7] SAC ¶¶ 226-27. The timing of Ball and Turner's letter to Finney also appears planned. Rather than sending a letter to the then-active DA Kenneth Baldwin immediately following the filing of the Dahl Complaint in June 2022, Ball and Turner waited until the end of August, just days before Finney took office and after Finney was receiving mail at his new office.[8] Similarly, the timing of Finney's response—on the first day he took office—indicated planning and coordination. In other words, based on the timing, one could fairly conclude that Ball and Turner waited until Finney was about to take office to send the letter, knowing that Finney would respond and state that there was no basis to refer the allegations to TBI (and that he could rely on a dearth of information, having just taken office), and that Ball could then use Finney's letter to create positive PR for the City and reassure the Johnson City Commissioners.

Based on my summary of the above allegations to Dep. Chief Keller on August 11, 2023, my understanding was that the conduct of DA Finney—at least in part—could be the subject of any public corruption investigation

---

[6] Dahl alleged that JCPD impeded her efforts to investigate Williams' sex crimes and then declined to renew her SAUSA contract in retaliation. *See Dahl v. Turner, et al.*, Case No. 2:22-cv-00072-KAC-JEM. Her lawsuit is pending.

[7] These allegations were based on the report of Eric Daigle, a police practices expert retained by Johnson City to review JCPD's handling of the department's sex crimes investigations. His July 2023 report includes a summary of the Ball, Turner, and Finney letter exchange, as well as his criticism that there should have been an IA investigation initiated at that time and that records may now be missing because of the lack of such an investigation. Exh. 8, Report of Eric Daigle at 32. Daigle reiterated this criticism during his deposition. Exh. 9, Trans. of Daigle Dep., at 223:21-25; 224:1-17; *see also id.* at 213:13-16; 214:3-12.

[8] In fact, in discovery, Plaintiffs have obtained text messages between Finney and JCPD Captain Kevin Peters which show that Finney and Turner held a meeting on August 23, 2022, one day between the Ball/Turner letter. *See* Exh. 10, Peters Text Messages to Finney, at KP2001-KP2002.

which his office opened into JCPD. My understanding is that PIN discussed opening an investigation shortly thereafter with prosecutors in EDTN and the Civil Rights Division. At some point in August or September 2023, the decision was made that the EDTN USAO would run the public corruption investigation and PIN would serve in an advisory capacity only.

### III. DA Finney Has Undermined the Integrity of the Federal Public Corruption Investigation

Following the letter exchange between Ball, Turner, and Finney in August-September 2022, Finney made no criminal referral based on the Dahl allegations. Nor did Finney open any investigation following the filing of the survivors' lawsuit in June 2023, which set forth additional allegations of public corruption on the part of JCPD. On August 16, 2023, however—just five days after my call with Dep. Chief Keller—Finney received a text message from TBI Special Agent ("SA") ███████████████, a TBI supervisor, asking Finney to call him. Exh. 11, Trans. of Finney Dep., at 79:1-4. SA ██████ then called Finney on August 18, 2023. Exh. 12, Finney Call Records, at 000043. According to Finney's testimony, they discussed opening a state investigation into "the corruption angle," and which TBI agent to assign to the investigation. Exh. 11, at 71:12-15, 22-23; 72:7-13. Finney spoke with SA ██████ again on August 21 and 22. Exh. 12, at 000043-45. During this same time, Finney was also speaking with Ball. *See id.* at 000045-46.

On August 30, 2023, Finney officially requested that TBI open a "theft" investigation into JCPD officers' opening of Williams' safe, listing Williams as the "victim."[9] Exh. 13, Letter and Email Opening TBI Investigation.

---

[9] On September 19, 2020, JCPD officers executed a residential search warrant on Williams' apartment to search and seize video surveillance equipment and any digital devices which could store video surveillance footage as part of an attempted homicide investigation into a woman (Female 3) who had fallen from Williams' penthouse apartment window. Exh. 14, Sept. 19, 2020, Search Warrant. Officers seized numerous digital devices, including five computers, three cellphones, and six video cameras. Exh. 15, Property Receipts. They also seized a large safe. *Id.* While officers never obtained a follow-on search warrant for the digital devices, they did obtain a search warrant for the safe. Exh. 16, Sept. 23, 2020, Search Warrant. JCPD leadership, including then-Chief Karl Turner were aware as of September 19, 2020, of the seized digital devices and the need for a follow-on warrant but took no action to secure one. *See* Exh. 17, Sept. 19, 2020, Hilton Email to JCPD Leadership.

On September 23, 2020, a group of JCPD officers (the targets of the "theft" investigation) filmed the opening of the safe, which contained, among other items, large amounts of cash and a child sex doll with a hole in the genitals. Exh. 18, Photograph of Cash. The officers never counted or inventoried the cash before the safe was returned; the money simply disappeared. *See* Exh. 15. Williams has claimed JCPD stole approximately $420,000 from the safe. SAC ¶ 86. Nor did officers seize the child sex doll and two dildos as potential evidence of child sexual exploitation. Exh. 15; Exh. 19, Photograph of Child Sex Doll and Dildos. JCPD officers also disregarded a list found in Williams'

5

By then, TBI SA ███ had been assigned to the investigation. *See id.* By September 2023, Finney's "theft" investigation had become a joint state-federal investigation with EDTN's public corruption investigation into JCPD, allowing Finney access to, and direction over, the federal public corruption investigation. Throughout this time, Ball remained in contact with Finney, calling him and emailing him about the allegations in the survivors' civil rights case which concerned their conduct and coordinating the City's responses to civil discovery.[10]

I began to suspect that Finney might be attempting to undermine the federal public corruption investigation in March 2024, when my clients were interviewed by FBI SA ███, TBI SA ███, AUSA ███, and AUSA ███ at the EDTN USAO Knoxville office. At the conclusion of the interviews, my co-counsel and I met with the prosecution team. Among other topics discussed, I raised the issue that it seemed DA Finney was interfering with civil discovery in the class action civil rights case to prevent my clients from accessing their own police records. I also noted that the only reason I had become aware of the EDTN public corruption investigation was that someone in the DA's office, Inv. Michael Little, had provided their contact information to me. I stressed that this meant the DA's office had known about the federal public corruption investigation since as



apartment entitled, "Raped," which included the name "Anna baby," among 23 other female names. Exh. 20, Photograph of Raped List. Officers failed to seize and inventory the list. *See* Exh. 15.

In May 2023, a search warrant was obtained for the digital devices which by then had sat in JCPD custody for two and a half years unsearched. Child pornography and images and videos of Williams' rapes were found. Exh. 11, at 274:9-12; 277:16-20. These devices are now in FBI custody. Exh. 15. Had JCPD acted on the evidence that Williams was sexually exploiting children in September 2020, they could have prevented the sexual exploitation of minor victim C.A. in December 2020, among other horrific crimes Williams continued to perpetrate with impunity.

[10] For example, according to Ball's June 22, 2023, email to Finney, she spoke with him concerning the survivors' complaint the day after it was filed. Exh. 21, June 22, 2023, Ball Email. Phone records for Finney show the two spoke again the next day for thirty minutes. Exh. 12, Finney Call Records_000036. Ball also spoke with Finney specifically about the allegations relating to their letter exchange which were contained in the SAC. On December 11, 2023, she emailed Finney a copy of the draft complaint which had been provided to defense counsel in advance of its filing. She included attorney-client communications with counsel for the City, Erick Herrin, and referenced her conversation with Finney of that day concerning these allegations. Exh. 22, Dec. 11, 2023, Ball Email. On December 13, 2023, she emailed him the final version of the SAC and the motion to amend after its filing. Exh. 23, Dec. 13, 2023, Ball Email. Call logs show Finney and Ball also spoke in January and March 2024, including on the date (March 18) by which Johnson City had been ordered to produce Plaintiffs' police reports in the civil case. Exh. 12, Finney Call Records_000065, Finney Call Records_000080; Exh. 24, March 18, 2024, Ball Text to Finney. Until then, Finney's intervention in the civil case had enabled counsel for Johnson City to withhold <u>all</u> JCPD reports for Williams' survivors from Plaintiffs' counsel. *See* Exhs. 25-26, Letters between Emily Taylor and Finney.

early as September 2023. Assuming their investigation had still been covert, I wondered how Finney's office could have had this knowledge.

After leaving their office that day, I received a phone call from AUSA ▓▓▓. She brought up my comment about how I had learned about the federal public corruption investigation from the DA's office and stated that the DA's office would also have a right to open an investigation into public corruption. I was surprised and responded that DA Finney had specifically decided <u>not</u> to refer any corruption allegations to the TBI in September 2022 in his letter to Ball and Turner, and that I was not aware that he had opened any public corruption investigation since then. She sounded confused about whether Finney had opened an investigation and stated something to the effect of they were trying to get to the bottom of this. I never heard back from AUSA ▓▓▓ about the DA's involvement after that phone call. As set forth below, I was particularly troubled by AUSA ▓▓▓'s response given that she had previously reviewed a letter DA Finney had sent me as potential evidence of corruption and had never disclosed that his office was jointly investigating the public corruption case involving this same evidence.

In June 2024, Plaintiffs received a sworn interrogatory response from Johnson City, as well as written discovery, which further raised my concerns about potential interference with the federal public corruption investigation. According to the City, FBI SA ▓▓▓▓▓▓ and TBI SA ▓▓▓ had informed JCPD Chief Billy Church in March/April 2024 that the public corruption investigation was "almost complete." Exh. 40, Johnson City's Response to Interrogatories, at 8. Given the timing (my clients had just sat for interviews in March), I was concerned that these actions might not have been at the direction of the AUSAs assigned to the matter. I therefore called AUSA ▓▓▓, and when I could not reach her, AUSA ▓▓▓▓▓▓, to alert them to my growing suspicion that Finney might be running a separate public corruption investigation that was acting to undermine their investigation. After relaying these concerns to AUSA ▓▓▓▓▓▓, I never heard back.

I learned for the first time during Finney's deposition on July 17, 2024, that the federal public corruption investigation had, in fact, been conducted <u>in coordination with the DA's office</u>. Finney testified that the only prosecutor involved in this joint investigation from his office was himself and that he personally received updates about, and evidence from, the joint federal-state public corruption investigation. Exh. 11, at 84:17-23. I was shocked to learn of Finney's role given my understanding that he was a potential target or subject of the federal public corruption investigation and given that he appeared to be communicating directly with Ball about topics relating to the investigation. (He denied providing her information about the investigation but admitted that she called him repeatedly to ask for updates. *Id.* at 69:22-25; 70:1-10.)

Following Finney's deposition, I have attempted again to reach out to the federal prosecutors involved in the public corruption investigation to express my concerns but have not heard back. Thus, it remains unclear (1) how the federal investigation became a joint federal and state investigation involving Finney's office; (2) why an investigation into federal public corruption violations would be investigated jointly with a state "theft" investigation;

and (3) who made the decision to merge these two investigations and for what, if any, legitimate purpose.[11] I am concerned that Finney's involvement presents a serious conflict, that he may have improperly opened the state investigation for the corrupt purpose of learning information about the federal public corruption investigation, and that he has actively taken steps to try to impede and shut down the federal investigation. I am also concerned that federal prosecutors assigned to the public corruption investigation have failed to consider the conflict posed by a joint federal-state investigation involving Finney's office and have failed to take basic steps to ensure that their own investigation is not compromised by Finney's interference, or the interference of others with local ties to JCPD. The AUSAs also failed to inform me of this conflict when reviewing potential evidence of corruption on Finney's part (Finney's November 11, 2023, letter to me). *See infra* p. 16; Exh. 35, Nov. 13, 2023, Finney Letter.

Critically, decisions made in the federal public corruption investigation appear to have undermined the integrity and thoroughness of the investigation. It appears Finney was involved in at least some of these decisions. What remains unclear is whether Finney coordinated any of these decisions with EDTN U.S. Attorney Hamilton, the FBI agents involved, or any prosecutors within the EDTN USAO, and the extent that the USAO and the FBI were aware of the steps which Finney was taking to impede the federal investigation.

    a.  **Assignment of Case Agents with Clear Conflicts**

For instance, the assignment of FBI SA ▮▮▮▮ as the lead case agent in the public corruption investigation presented a clear conflict of interest. SA ▮▮▮▮ worked in the Johnson City FBI field office, along with her ▮▮▮▮ SA ▮▮▮▮▮▮, during the relevant time period of the corruption allegations (2018-2021). Exh. 27, Trans. of Gryder Dep., at 102:7-10. This was a small field office of approximately seven agents. *Id.* One of the targets of the public corruption investigation, JCPD Officer Matthew Gryder,[12] was assigned to this same office as a Task Force Officer ("TFO") during the relevant time. *Id.* at 19:2-25. He testified during his deposition that he was friends with SA ▮▮▮▮ and her ▮▮▮▮. *Id.* at 167: 1-11. A personal relationship between the case agent and one of the targets of the investigation is a clear conflict and SA ▮▮▮▮ should have been recused from the



---

[11] For instance, Finney testified that he discussed Williams' case with "Trey," the nickname for EDTN U.S. Attorney Hamilton, after Williams escaped from federal custody, but denied ever speaking to "Trey" on any other occasion during his tenure as DA. Exh. 11, at 109:5-13; 110:2-25; 111:1. This statement struck me as odd and highly unusual, as well as inconsistent with the familiar way in which he had previously referred to the U.S. Attorney.

[12] Officer Gryder was present for the opening of Williams' safe. In the video, an officer can be seen holding a phone which contains the code that another officer uses to open the safe. Exh. 38, Video of Safe Opening, at 30:28. The City has represented that this officer was Gryder. Exh. 39, City Response to Plaintiffs' Third Set of Interrogatories, at 2. Thus, not only was Gryder one of the officers present, but he was also likely communicating with either Williams or a third party and played a key role in how JCPD was able to access the safe.

investigation. At the very least, it raises an appearance of impropriety that should warrant reassignment to a different case agent.

SA ▓▓▓ may also have been a percipient witness to events underpinning one of the survivors' misconduct allegations. On November 24, 2020, Female 12 was raped by Williams. SAC ¶¶ 130-32. That same day, she attempted to report her rape to the local FBI field office because she did not trust JCPD. *Id.* ¶¶ 133. This report did not remain confidential to the FBI, however. A Washington County Sheriff's Deputy Mike Adams, who was also a TFO at the time in the FBI field office, called Officer Gryder to alert him that a Williams' victim was reporting her rape. Exh. 27, at 16:3-9; 98:16-25; Exh. 28, JCPD Case Notes for Female 12 Rape Investigation. Officer Gryder then called JCPD Officer Toma Sparks, one of the defendants in the survivors' civil rights case who allegedly received weekly payments from Williams of $2,000 and who authored both the Sept. 19, and Sept. 23, 2020, search warrants. Sparks immediately went to the FBI field office and took control of the investigation into Female 12's report. *See id.*

It remains unknown (1) which FBI special agent received Female 12's initial report that day; (2) how TFO ▓▓▓ found out about a confidential victim report of rape; and (3) why ▓▓▓ called Gryder to alert him to the report. During Gryder's deposition, he could provide no clear explanation for why he called Sparks specifically, an officer whom he did not supervise, to alert him to Female 12's report, claiming he did not remember. Exh. 27, at 100:6-25; 101:1-25; 102:1-4. By this time, it is alleged that Sparks had already conspired with Williams to destroy evidence and intentionally impeded the investigation into the attempted homicide of Female 3. SAC ¶¶ 64-80. Thus, the fact that Gryder called Sparks to intervene does not appear to be coincidental.

Again, this was a small office of seven agents. SA ▓▓▓ or her ▓▓▓ may have been present on November 24, 2020. *See id.* at 102:5-10. One of them may have received Female 12's report or they may have been percipient witnesses to events which inculpate TFO ▓▓▓ and JCPD officers in the cover-up of Female 12's case. Notably, Sparks closed Female 12's case on October 5, 2021. Exh. 28, at CITY-0076366. Following Williams' arrest in April 2023, images of Female 12's rape were found on Williams' digital devices. There have still been no charges in her case.

Another FBI SA assigned to the public corruption investigation—or at least, who appears to be coordinating aspects of the investigation, including its closure—is Supervisory SA ▓▓▓. He also has a conflict with Officer Gryder, as he is his <u>current supervisor</u> in the FBI Johnson City field office where Gryder remains a TFO. Exh. 27, at 146:2-25; 147:1-18. Gryder also testified that SA ▓▓▓ was his friend. *Id.* at 167:4-5. SA ▓▓▓ also may be a percipient witness to the events of November 24, 2020, and was the office supervisor at that time. *Id.* at 102:5-10. Again, it is unclear what review process—if any—was implemented to ensure that federal agents assigned to the public corruption investigation did not have conflicts with targets of the investigation. The extent of these conflicts gives rise to serious concerns that justice is not being done and that the FBI and EDTN USAO's oversight of their own investigation is grossly lacking.

b. Inadequacy of the Public Corruption Investigation

Also concerning is the lack of investigatory steps taken in the public corruption investigation, as well as the apparent mishandling of the investigation. This suggests that the conflicts outlined above have undermined the integrity of the investigation, thereby denying the survivors a chance at justice. The actions—and inaction—of the assigned AUSAs and FBI agents have enabled this unjust outcome.

To highlight a few examples:

- **Target Interviews:** JCPD Officer Don Shepard, one of the targets / subjects, testified that he was interviewed as part of the public corruption investigation. Exh. 29, Trans. of Shepard Dep., at 72:17-22. According to his testimony, this interview lasted "less than three minutes." *Id.* at 74:12-15. He was not provided with *Garrity* warnings. *Id.* at 73:3-8. Thus, any statements he made would likely be inadmissible in any public corruption case against him. Nor was he provided with an 18 U.S.C. § 1001 instruction, which would put him on notice that making a materially false statement to a federal agent is a crime. *Id.* at 73:13-17. (All the survivors who sat for interviews with SA [redacted] were given § 1001 instructions. Thus, perversely, Williams' victims could be charged with making a false statement whereas the target officers of the public corruption investigation might not be.)

    Officer Gryder also testified that his interview lasted 15 minutes and covered only the opening of the safe. Exh. 27, at 141:11-25; 142:1-3. He also was not provided with *Garrity* warnings. Exh. 27, at 137:14-25; 138:1-9. Similarly, Officer David Hilton testified that he was only asked about the opening of the safe and was not asked about any bribery allegations, any sexual assault investigations, any evidence relating to child pornography, whether Williams was a confidential source or informant, or about any of the audit trails. Exh. 30, at 225:10-25; 226:1-10.

    I have also learned that the interviews of the target officers were all held on the same day at the same location, such that some of the officers saw each other. This setup makes it less likely that any officer would choose to cooperate against any of the other target officers as that officer could easily be identified. In sensitive cases involving potential cooperation, my experience is that investigating agents would not allow such a setup.

- **Subpoenas to Targets' Financial Institutions:** One of the allegations in the civil rights case is that JCPD officers took cash from Williams and his co-conspirator Fem. 4 [redacted] (Female 4). SAC ¶ 63. In February 2024, I was contacted by a source with personal knowledge that one of the Defendant officers, Justin P. Jenkins, had purchased luxury items (boats, RVs, new home) which appeared to be for amounts above his legitimate sources of income. The source also identified Eastman Credit Union as Jenkins' bank. Shortly thereafter, I contacted TBI SA [redacted] and provided a

summary of this information as well as the name of the bank. Plaintiffs also issued a subpoena to Eastman Credit Union in the civil case. This subpoena resulted in evidence showing that Jenkins repaid approximately $391,132.67 worth of loans between January 2020 and August 2022 and engaged in a pattern of auto loan repayments indicative of money laundering, as shown in the below chart. In total, during the time of the alleged corruption conspiracy, Jenkins received over half a million dollars' worth of loans from Eastman Credit Union. *See B.P., et al.*, No: 2:23-cv-00071-TRM-JEM, Doc. No. 346 ("ECF 346") at 6.

## LOANS

| Loan # | Date Issued | Amount | Date Paid Off & Amount | Collateral | Bates |
|---|---|---|---|---|---|
| ▇ (car) | 11/5/2018 | $20,750 | 1/13/2020 $18,536.90 | 2012 Toyota Tacoma | Eastman 000013 |
| ▇ (car) | 1/7/2020 | $36,815.90 | 9/25/2020 $34,308.89 | 2016 Toyota Tacoma | Eastman 000046 |
| ▇ (30-year fixed mortgage) | | $158,222.45 | 1/4/2021 $158,036.98 | | Eastman 000064 |
| ▇ (car) | 6/30/2021 | $22,900 | 7/02/2021 $ 22,903.44 | 2021 Salem 179DBKX | Eastman 000088 |
| ▇ (car) | 8/13/2021 | $27,550.62 | 1/18/2022 $26,899.59 | 2021 Salem M-178BHSKX | Eastman 000118 |
| ▇ (car) | 6/30/2021 | $18,350 | 1/24/2022 $17,239.62 | 2006 Fourwinn Horizon | Eastman 000080 |
| ▇ (car) | 9/22/2020 | $45,236.22 | 1/25/2022 $37,946.91 | 2018 Toyota Tundra | Eastman 000118 |
| ▇ (ARM Mortgage) | 12/20/2021 | $90,000 | 4/27/2022 $33,746.53; 4/28/2022 $30,834.00 | | Eastman 000131 |
| ▇ (construction loan) | 5/31/2022 | $77,855.00 | | | |
| ▇ (car) | 6/2/2022 | $11,000 | 8/31/2022 $10,679.81 | 2006 Toyota Tundra | Eastman 000152 |
| ▇ (car) | 8/13/2022 | $15,189.04 | (bank records end before payoff) | 2012 Toyota Tundra | |
| ▇ (car) | 10/27/2022 | $14,500 | (bank records end before payoff) | Used RV (EASTMAN000165) | |
| | | TOTALS: $538,369 | $391,133 | | |

Notably, Jenkins opened a $11,000 auto loan (total financing of $11,855) for a 2006 Toyota Tundra on June 2, 2022, <u>one day after</u> Rutherford withdrew $11,800 in cash from one of the accounts she

controlled linked to Williams' company, Glass and Concrete Contracting LLC. *See* Exh. 32, Renasant Bank Records, at RENASANT000018. This was Jenkins' seventh auto loan in three years, and he had just paid off a loan for a 2018 Toyota Tundra in January 2022.

Jenkins' Eastman Credit Union Records also show cash deposits of $32,428.04 between 2020 and 2022, as set forth in the below summary chart. *See* ECF 346 at 4-5. Notably, most of these cash deposits were for amounts either identical to, or in the same range, as those Plaintiffs allege Rutherford made to JCPD officers: $2,000. *See* SAC ¶ 63.

**CASH DEPOSITS**

| Date | Cash Deposit Amount | Account | Bates for Jenkins' Bank Statement | Bates for Receipt |
|---|---|---|---|---|
| 1/27/20 | $103.04 | ■ | Eastman 000011 | Eastman 000201 |
| 7/13/20 | $885 | ■ | Eastman 000036 | Eastman 000207 |
| 7/23/20 | $2,000 | ■ | Eastman 000036 | Eastman 000191 |
| 9/14/20 | $5,000 | ■ | Eastman 000044 | Eastman 000217 |
| 1/29/21 | $2,000 | ■ | Eastman 000062 | Eastman 000230 |
| 5/7/21 | $1,000 | ■ | Eastman 000077 | Eastman 000198 |
| 5/27/21 | $2,000 | ■ | Eastman 000077 | Eastman 000191 |
| 6/14/21 | $2,000 | ■ | Eastman 000081 | Eastman 000228 |
| 6/28/21 | $620 | ■ | | Eastman 000213 |
| 8/16/21 | $2,000 | ■ | Eastman 000091 | Eastman 000229 |
| 8/20/21 | $380 | ■ | | Eastman 000199 |
| 9/10/21 | $1,000 | ■ | Eastman 000096 | Eastman 000193 |
| 11/02/21 | $1,000 | ■ | Eastman 000106 | Eastman 000227 |
| 11/18/21 | $2,000 | ■ | | Eastman 000215 |
| 12/20/21 | $4,000 | ■ | | Eastman 000195 |
| 1/24/22 | $400 | ■ | Eastman 000116 | Eastman 000246 |
| 1/24/22 | $400 | ■ | | Eastman 000247 |
| 5/31/22 | $140 | ■ | | Eastman 000242 |
| 10/27/22 | $5,500 | ■ | Eastman 000162 | Eastman 000240 |
| | TOTAL: $32,428.04 | | | |

Finally, on January 25, 2022, Jenkins' credits reflect a total check deposit amount of $981,284.67, a sum far above any known legitimate source of income. ECF 346 at 7.

It is unclear whether the public corruption investigation has subpoenaed any of these financial records, or whether they have followed up on the information regarding Jenkins which I provided.[13] Finney testified that the only investigative steps taken in the "theft" investigation of which he was aware were the interviews of the target officers to ask whether they had taken any cash from Williams' safe. Exh. 11, at 251:12-19. Of course, they denied this.

- **Audit Trails:** Audit trails are documents police reporting systems generate that show which officers have viewed, printed, or edited a police report, as well as the date and time of each activity, among other information. Exh. 9, at 247:19-25; 248:1-2. They are useful in determining whether there has been misconduct on the part of an officer because they can show an officer taking steps to cover up what happened, either by editing another officers' case notes, accessing reports for cases to which they are not assigned, or accessing reports after they have been removed from a case. *Id.* The JCPD audit trails for Williams' sexual assault investigations show that all the above happened here. The records have also demonstrated which JCPD officers and supervisors were involved in, and improperly closed, the Williams' investigations, among other useful information.

  In June 2024, I reached out to the public corruption team to offer to share these records which I obtained in the civil case. My understanding is that as of June 2024—nearly a year into the public corruption investigation—the investigating agents had never obtained these records.

- **Subpoena to Real Estate Agent Shannon Castillo:** Evidence subpoenaed in the civil case demonstrates that Ball perjured herself during her deposition regarding her attempted off-market purchase of Williams' penthouse apartment in April-May 2022 for a below-market offer. Specifically, Ball testified that at the time she entered the contract she had no idea that Williams was a fugitive from justice and as soon as she knew this, she pulled out of the deal. Exh. 31, Trans. of Ball Dep. at 129:6-13. Text messages between Ball and Castillo, and Castillo and Williams, however, demonstrate that this was not true. In fact, Ball continued to pursue the purchase, and it was ultimately Williams who did not appear at the set closing date. Exh. 32, Ball Castillo Texts, at Castillo_0102-0103. This is material because it concerns Ball's knowledge and intent in pursuing a real estate deal with a

---

[13] Jenkins made the following shockingly candid representation to the Court in a recent filing: "Interestingly, it appears the USDOJ has taken much less interest in this matter than counsel for Plaintiffs have, as there has been no indication that the USDOJ has attempted to obtain [Jenkins' bank records.]" *B.P., et al.*, Case No. 2:23-cv-00071-TRM-JEM, Doc. No. 319, at 4.

13

Case 2:23-cv-00071-TRM-JEM    Document 42    Filed 11/06/24    Page 13 of 19
Pl. Response to City's Stay RFP    EXHIBIT P-000287
PageID #: 10258

fugitive, who was wanted by the same police department which she was overseeing. Just one month after this aborted real estate deal, Ball was the city official in charge of deciding whether to open an IA investigation into Dahl's allegations concerning JCPD corruption with respect to Williams. Ball declined. Instead, she waited until August 2022, and engaged in the letter exchange with Finney, discussed above.

After Ball's deposition, the City turned over additional discovery that further undermined the credibility of Ball and her claim that she did not know Williams' identity during the real estate deal and had not discussed Williams with JCPD Chief Karl Turner in April 2022. Text messages between Ball and Turner show that Ball asked Turner specifically about Williams' penthouse apartment, Unit 5, on April 6, 2022, referring to the unit number and the street:

| | |
|---|---|
| Ball (3:15 PM): | Any chance you could run me a crime report for East Main Street #5 in downtown. I am looking at buying it.[14] |
| Turner (3:16 PM): | Yes, ma'am. |
| Turner (4:22 PM): | Cathy, I will email you the crime stats you asked for. Don't be alarmed by the number. All incidents that were reported are listed. Many are not criminal acts. We can reduce the distance from one mile to a lesser range if you desire. You can also drill down to list only specific crimes as well. Let me know if we need to provide additional information. Karl |
| Ball (6:43 PM): | This is good. Thanks. |

Exh. 37, Text messages between Ball and Turner.

By the time of this text exchange, Turner was well aware of Williams, his activities, and the notorious Unit 5 penthouse apartment. In an email dated September 19, 2020—the date of Female 3's fall from the window of this penthouse—Turner, and other senior JCPD leadership, received a detailed update from JCPD Officer David Hilton about the incident. Exh. 17. The update included information about Williams' apartment, including the address and floor number. Thus, there is no doubt that Turner knew where Williams lived by April 2022. Either Ball lied under oath when she

---

[14] Ball never provided Turner with a full address in the text messages, and yet, Turner appeared to know the address for the unit Ball was referencing (200 East Main Street) and pulled crime statistics based on this address. This suggests that Ball and Turner had prior conversations about the units which Ball was considering purchasing.

14

stated that Turner never alerted her that she was planning to buy Williams' apartment, or Turner deliberately withheld this information from the City Manager. Given all the other evidence—including Ball's admission that she talked about this transaction with the Mayor and a City Commissioner, and that she lived directly across from the apartment—the former is the more likely explanation.

During Castillo's deposition, she testified that a law enforcement agent had reached out to her to ask for records relating to the Ball / Williams real estate contract. Exh. 33, Trans. of Castillo Dep., at 158:3-8; 159:20-22. She told the agent that he would need to issue a subpoena for her to produce those records. *Id.* Inexplicably, no subpoena was ever issued to her. *Id.* Nor has the public corruption investigation served a subpoena on Plaintiffs' counsel to obtain the deposition transcripts of Ball and Castillo which could support a perjury charge against Ball. In fact, the public corruption investigation has <u>not sought any deposition transcripts in the civil case, including that of Finney</u>.

- **Digital Devices Seized from Williams' Apartment:** As set forth above, the devices seized from Williams' apartment sat in JCPD custody for two and a half years unsearched. What remains unknown, however, is whether they were accessed or tampered with during that time. There is circumstantial evidence suggesting Williams' payments to officers may have increased following September 19, 2020, and that JCPD officers may have coordinated liquidating Williams' assets with [Fem. 4] in March-June 2022. This suggests that JCPD officers may have been aware of the incredibly damning evidence against Williams in their custody and used this as leverage to extort him further.

  The May 31, 2023, affidavit in support of the search of the Apartment Devices states that the devices had not been "tampered with, viewed, downloaded, or otherwise examined" during the time that they were in JCPD custody, but the affidavit does not set forth the basis of knowledge supporting this statement. Exh. 34, ¶ 4. Indeed, without forensically reviewing the devices—which would not have been lawful prior to the issuance of the warrant—there could be no way to confirm that no one had accessed the devices between September 19, 2020, and May 31, 2023. My understanding is that these devices have <u>not</u> been forensically examined as part of the federal public corruption investigation.[15] This is concerning as any evidence demonstrating these devices were

---

[15] In or around September 2023, I had a phone conversation with AUSA [redacted] during which I asked whether these devices had been examined forensically to determine if JCPD had tampered with the evidence. When I explained why I thought this could be important, AUSA [redacted] said something to the effect of, "Don't tell me how to do my

15

accessed between September 19, 2020, and May 31, 2022, would be powerful evidence as to JCPD corruption.

### c. EDTN Review of Finney Letter in Public Corruption Case

It remains unclear whether the EDTN prosecutors were aware that Finney was running the state portion of their own joint investigation. My interactions with the AUSAs on the federal investigation suggest they were not.

For instance, on November 28, 2023, I called AUSA ▮▮▮▮ to tell her about a letter I had received from DA Finney which threatened me professionally, implying—incorrectly—that I was behaving unethically in representing my clients in a criminal investigation in the State of Tennessee, a state in which I am not barred, but where I am admitted *pro hac vice* in the U.S. District Court for the Eastern District. Exh. 35, Nov. 13, 2023, Finney Letter. The letter also denied my clients access to victim compensation funds, claiming—again, incorrectly—that I was impeding Finney's criminal investigations. *Id.* On the phone with AUSA ▮▮▮▮, I provided background on my interactions with DA Finney. According to my notes of this call, it did not sound as though AUSA ▮▮▮▮ knew who Finney was. She also seemed unaware of the section of the Daigle Report which documented the exchange between Ball, Turner, and Finney. She said I could send her the letter I had received from Finney, and she would forward it to SA ▮▮▮▮ to be placed in the "circumstantial evidence" pile.[16] I emailed her the letter later that day.

On January 10, 2024, I spoke to AUSA ▮▮▮▮ again about this letter, among other topics. She represented to me that she had reviewed the letter with her criminal chief, and they had decided it did not merit criminal charges. At the time of this conversation, I had no idea that the public corruption investigation which she was conducting—and in which this letter might be relevant evidence—was being run <u>jointly with DA Finney</u>, and that Finney was receiving updates about the investigation through TBI SA ▮▮▮▮. It remains unclear whether AUSA ▮▮▮▮ disregarded this conflict, or simply had no knowledge that Finney's office was running the state portion of her own public corruption investigation. Either seems improbable; both suggest the EDTN USAO has failed to take basic steps to preserve the integrity of the federal public corruption investigation.

//

---

job." I was taken aback by this response as it did not seem to me controversial that determining whether JCPD had accessed these devices unlawfully would be an important step in the public corruption investigation.

[16] I took contemporaneous notes of this phone call; the quotations are taken from those notes.

### d. Pressure from Finney to Close the Federal Public Corruption Investigation

Finney admitted during this deposition that other than conducting interviews of the target JCPD officers to ask whether they had taken any cash from Williams' safe—which, of course, they denied—Finney had taken no other investigative steps before closing the state investigation. Exh 11, at 251:12-19. After closing the state investigation, he appears to have attempted to put pressure on the federal agents to close the federal investigation as well. In June 2024, Finney called a meeting with SA ▇▇▇▇ and SA ▇▇▇▇ in which he asked why the federal investigation had not been closed. *Id.* at 323:10-25; 324:1-3 ("Because it just keeps -- it kept going on, and I knew the TBI was finished with the safe. And I was like, 'Where are you all now?' And that was the -- that was what the meeting was about."). According to Finney, ▇▇▇▇ and ▇▇▇▇ told him that they were not finding any evidence of corruption. *Id.* at 324: 10-18. As set forth above, however, it does not appear that basic investigative steps, such as issuing subpoenas to financial institutions or obtaining audit trails, were ever taken. The lack of any investigation in this case raises serious concerns that the conflicts of SA ▇▇▇▇, SA ▇▇▇▇, and Finney have undermined the investigation and denied the survivors justice, and that the EDTO USAO prosecution team has enabled this outcome.

### e. FBI Supervisor ▇▇▇▇ Preemptively Tells JCPD Chief that Public Corruption Investigation Will Close

Johnson City has represented in sworn responses to interrogatories that SA ▇▇▇▇ and FBI Supervisory SA ▇▇▇▇ told JCPD Chief Billy Church over the phone that the public corruption investigation was "almost complete" in March/April 2024. Exh. 40, at 8. Attached as Exhibit 36 are text messages which Johnson City represents show when Chief Church and ▇▇▇▇ and ▇▇▇▇ held these conversations. It is bizarre that an FBI supervisor would advise the chief of the target police department of the closure of a public corruption investigation into his department in such a manner. Equally bizarre, it appears that SA ▇▇▇▇ inaccurately informed Chief Church that the federal public corruption investigation was closing before it ever did. To my knowledge, it remains open. Again, these interactions raise serious concerns that SA ▇▇▇▇'s local ties to JCPD may have undermined the independence of the federal public corruption investigation. It is also unclear how—or even whether—SA ▇▇▇▇ was ever assigned to the public corruption investigation which involved one of his own supervisees (Officer Gryder) as a potential target, and how SA ▇▇▇▇ was now in a position to close this same investigation. It is also baffling that prosecutors in the public corruption investigation took no apparent steps to investigate what happened and have made no effort to obtain the deposition transcripts for DA Finney or Ball, nor any other documentation in the civil case which could help show what transpired in their own investigation.

### IV. Institutional Motivation to Engage in a Cover-Up

While there is now evidence supporting Plaintiffs' allegations that certain JCPD officers extorted Williams for money, it also appears that there may have been a broader institutional motivation for protecting Williams: Williams served as a confidential source ("CS") for federal law enforcement, acting as a CS in joint federal-state

investigations. This could explain why the FBI and USAO conducted a less-than-thorough investigation into JCPD's misconduct. Any serious inquiry into JCPD misconduct risked jeopardizing convictions and exposing agents—and even AUSAs—to potential internal misconduct reviews, among other consequences of discovering that a long-used CS was concurrently terrorizing the community as a serial rapist.

The evidence that we have gathered to support this conclusion thus far is highly circumstantial. However, we request that the OIG investigate whether this was one of the motives underpinning the obstructive conduct of the JCPD officers outlined above, and, if so, determine (1) whether any DOJ personnel (federal law enforcement agents or federal prosecutors) knew or should have known about Williams' crimes while he was acting as a CS in any federal investigation; (2) what agency oversight—if any—was conducted of Williams' activities while he acted as a CS; (3) when DOJ personnel first became aware of Williams' crimes of sexual violence; and (4) the actions DOJ agencies took following confirmation that Williams was a serial rapist and child sex predator, including whether proper disclosures to criminal defendants and crime victims were made.

V.      **Conclusion**

The Johnson City community deserves a federal public corruption investigation that is not tainted by local ties and relationships which undermine a thorough, rigorous, and impartial investigation into serious allegations of corruption on the part of the City's police department and officials. Due to my concern that the integrity of the public corruption investigation has been undermined by the actions of SA ███████ and SA ███████, and others within DOJ, I am asking your office to open an investigation into potential misconduct on the part of DOJ personnel. As set forth above, I am asking your office to review how two agents with clear conflicts of interest with one of the targets of a public corruption investigation could have been staffed to such a matter and permitted to undermine it. I also request that your office determine what—if any—measures FBI and USAO personnel have taken since learning of these conflicts, including whether the public corruption investigation has been reassigned to offices which are not conflicted or tainted by the actions outlined above. Finally, I am forwarding this complaint to the General Counsel's Office for the FBI to ask their office to review this matter as well.

Thank you for your time and attention. We would appreciate hearing back from you confirming your receipt of this letter. As noted above, the referenced exhibits will be provided under separate cover. Pursuant to 18 U.S.C. § 3771(5), we request the opportunity to confer with your office regarding this letter. We look forward to your response at your earliest convenience.

**Sincerely,**

*/s/*

**Vanessa Baehr-Jones**

CC:

**Bradley Brooker**
General Counsel
Federal Bureau of Investigation
U.S. Department of Justice

**Jeffrey Ragsdale**
Counsel
Office of Professional Responsibility

**Jay Macklin**
General Counsel
Executive Office for United States Attorneys
U.S. Department of Justice