# Exhibit 2

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TENNESSEE
                  GREENEVILLE DIVISION



B.P., H.A., and S.H.,          )
individually, and on behalf of )
all others similarly           )
situated,                      )
                               )
                               )
               Plaintiffs,     )
                               )
                               )
v.                             )   No. 2:23-CV-00071
                               )        TRM-JEM
                               )
City of Johnson City,          )
Tennessee, et al,              )
                               )
                               )
               Defendants.     )



        *  *  *  *  *  *  *  *  *  *  *  *  *  *



           DEPOSITION OF STEVEN FINNEY
     (Confidential - Subject to Protective Order)



                  July 17, 2024


==================================================
                 LEXITAS LEGAL



          Jeffrey D. Rusk, RPR, LCR, CLVS
             805 Eleanor Street, N.E.
             Knoxville, Tennessee  37917
```

```
 1              Q.      You conferred with the Tennessee

 2    Board of Professional Responsibility about speaking

 3    directly to my clients and not going through their

 4    lawyer.

 5              A.      Right.

 6              Q.      Did you confer with them about your

 7    statement that my representation of my clients was

 8    potentially improper?

 9              A.      No.

10              Q.      Did you --

11              A.      You saw exactly what I asked them

12    about.

13              Q.      Did you confer with any other

14    lawyer about your representation to me that my

15    representation of my own clients could be improper?

16              A.      No.  I conferred with one person on

17    the Board and asked them, unofficially, if --

18    because they were a former United States Attorney,

19    if -- if -- if ad hac vice for federal court also

20    applied for state court.  That's -- that's the only

21    thing I asked.  Guy Blackwell.

22              Q.      Who?

23              A.      Guy Blackwell.

24              Q.      And when was that?

25              A.      When was that?  Sometime prior to
```

```
 1              It is confidential at this point.

 2                   MR. RADER:  And I'll just join in

 3         that, and I'm designating the entire

 4         deposition as confidential until such time

 5         as I've had an opportunity to review the

 6         written transcript.

 7                   And I am specifically designating

 8         as confidential any portions of the

 9         testimony that relate to the digital

10         evidence at this time.

11                   MR. WELLS:  Are we ready?  Can you

12         hear me okay?

13                   COURT REPORTER:  Yes.

14                   EXAMINATION

15   BY MR. WELLS:

16         Q.      Okay.  All right, Mr. Finney.  I

17   know it's been a long day, but I've just got just a

18   few questions, okay?

19         A.      Okay.

20         Q.      My name is Aaron Wells.  I

21   represent Jeff Legault, Justin Jenkins, otherwise

22   known as J.P. Jenkins, and Brady Higgins in this

23   case.

24                   First of all, do you know Jeff

25   Legault?
```

(615) 595-0073 litigation services in all 50 states and is licensed where required, Nevada Registration #16F    348
www.lexitaslegal.com                              California Firm Registration #179

Case 2:23-cv-00071-TRM-JEM   Document 457-10   Filed 11/21/24   Page 4 of 26
PageID #: 10606

```
 1              A.         Yeah.  I haven't seen him in

 2    forever.

 3              Q.         Okay.  Have you --

 4              A.         Yeah.  I mean, through law

 5    enforcement.  And I've spent a lot of hours with all

 6    these guys.  Brady.  But it's all through law

 7    enforcement.  Never had lunch with them.  Never had

 8    dinner but, yes, I've known Legault, and that's what

 9    everybody just calls him, probably 15 years, maybe,

10    however long he's been with the department.

11                         Justin -- Justin, I can remember

12    when he was in patrol and he was after on patrol.

13    He was kind of an adversary, you know, when I was a

14    defense attorney, because he brought a lot of cases,

15    and I was going against him.

16                         Brady I've known probably the

17    shortest amount of time, but we had this shooting on

18    New Year's Eve that I keep talking about, and I

19    spent a lot of time with my chief homicide

20    investigator.  We spent a lot of time with Brady

21    during that time, there in that time period.

22              Q.         Your perception of those three men,

23    is it that they're good police officers?

24              A.         Yes.

25                         MS. BAEHR-JONES:  Objection.
```

(615) 595-0073                                                                    349
www.lexitaslegal.com

1          Q.   (BY MR. WELLS) Based on your

2    experience?

3          A.        Yes.

4                    MS. BAEHR-JONES:  Objection.

5          Q.   (BY MR. WELLS) Have you ever

6    communicated with Justin Jenkins on your cell phone?

7          A.        Oh, I'm sure I probably have, but I

8    don't have everybody I've ever come in contact with,

9    like putting their name in and things of that

10   nature.  I'm not big on that.  I have my friends and

11   like Billy Church, you know.  I can look and see but

12   I don't --

13         Q.        And that's fine.  I'm not asking

14   you to do that right now.

15                   Is there anything specific that you

16   would have recalled communicating with Justin

17   Jenkins about on your cell phone?

18         A.        It would be a case, if I did.

19         Q.        You mentioned a few times a

20   daylight kidnapping and rape case that happened when

21   you -- when you first were sworn in.

22         A.        Yes.

23         Q.        Was Justin Jenkins the investigator

24   on that case?

25         A.        I think they had all hands on deck.

1          Q.          Okay.  I believe you said they went

2     above and beyond on that.

3          A.          It was incredible, the speed and

4     what they did.  It was great police work.  The whole

5     department was on that case.

6          Q.          All right.  The TBI investigation

7     into the safe, you said that seven officers were

8     interviewed as part of that --

9          A.          Yes.

10          Q.          -- investigation; is that correct?

11          A.          Yes.

12          Q.          Okay.  Do you recall whether or not

13     Justin Jenkins was interviewed?

14          A.          I don't.

15          Q.          You don't recall or --

16          A.          I don't recall.  I don't -- I don't

17     recall it today.

18          Q.          How about Jeff Legault?

19          A.          I don't -- I don't recall.  I just

20     flat out don't recall.  I'd have to look at.

21                     Yes, I remember.  Yes.  Yeah.  I'm

22     sorry.  Epiphany.  I remember because I did legal

23     pad notes from all their statements, and I do

24     remember Jeff's name because I remember spelling it

25     out.

1        Q.        Okay.

2        A.        It's okay.

3        Q.        Does anything stand out to you

4    about that interview?

5        A.        No.

6        Q.        Okay.  And then going back on you a

7    little bit, do you have experience with Legault,

8    Jenkins, and Higgins both in your role as a

9    prosecutor and in your former role as a defense

10   attorney?

11       A.        I do Justin.  I want to say yes

12   with Legault, because he was -- he was in SIS or a

13   drug agent and -- but I do not remember Brady from

14   my defense practice.

15       Q.        Okay.  Do you know Scott Jenkins?

16       A.        Yes.

17       Q.        Okay.  How long have you known

18   Scott Jenkins?

19       A.        Longer than -- much longer than

20   Justin, because he's been with the department a lot

21   longer.

22       Q.        Okay.  Do you know what his current

23   title is?

24       A.        He's like assistant chief at this

25   point.

1          Q.          Okay.  Do you ever -- did he -- do

2    you know whether or not he ever worked drugs or any

3    kind of those cases?

4          A.          You know, with his career he's

5    probably worked a little bit of everything, but I

6    can't quote what he's done.

7          Q.          Okay.  Do you ever communicate --

8    or have you ever communicated with Scott Jenkins on

9    your cell phone?

10         A.          I -- once he started getting rank,

11   as a defense attorney, you never -- you never hear

12   from those guys.  You never have an occasion to talk

13   to them.  It was probably months into my becoming

14   the DA before I ever had any conversation with

15   Scott, Scotty Jenkins, and that was at these bigger

16   meetings or introductions and things of that nature.

17         Q.          So it's fair to say, once he gets

18   in sort of a more administrative type role, your

19   communications with him lessen at that point.

20         A.          Absolutely.

21         Q.          Okay.  All right.  And you

22   testified today that you've got a lot of experience

23   working drug cases; is that fair?

24         A.          Drug cases.  Yes, sir.

25         Q.          Had a lot of experience with money

(615) 595-0073  Litkenhous Reporters, LLC  Page 416
www.lexitaslegal.com  Lexitas operates in all 50 states and is licensed where required.  Nevada Registration #16F
California Firm Registration #179

1      being seized; is that fair?

2            A.        Yes.

3            Q.        Okay.  I'm not sure what exhibit

4    number it is, but the picture of the money that was

5    taken from the safe --

6            A.        Yeah.

7            Q.        Do you have that with you?

8            A.        It's -- yes.  I see the corner of

9    it right here.

10                     Oh, that was quick.

11           Q.        And you said -- what exhibit is

12   that?

13           A.        145.

14           Q.        145?  Okay.

15                     And you said that, in your

16   experience, law enforcement counts every dime of

17   this money.

18           A.        I've never been in a -- yes.

19           Q.        Okay.  What's the most amount of

20   money you've ever seen out of a law enforcement

21   investigation?

22           A.        State wise, I can't tell you.

23           Q.        Is it more or less than $500,000?

24           A.        Oh, yeah.  It's less.

25           Q.        Less than $500,000?

(415) 655-0073        Lexitas - All States and Where Required - Nevada Registration #115F
www.lexitaslegal.com                                      California Firm Registration #179

1          A.          Yeah.

2          Q.          Well --

3          A.          In a state-level case.  Yes.

4          Q.          Okay.  And the exhibit that you're

5    looking at, that is what was pulled out of the safe

6    from Williams's apartment.

7                      That's correct?

8          A.          Yes.

9          Q.          Okay.  Does that look like $500,000

10   to you?

11         A.          No.  Not even close.

12         Q.          And in your review of the TBI

13   investigation, there was no indication in those

14   materials that that safe was opened at any time

15   prior to what we saw on the video.

16         A.          That is correct.

17                      MS. BAEHR-JONES:  Objection.  And

18             I'm going to object to the, "Does that look

19             like $500,000."

20         Q.    (BY MR. WELLS) Okay.  And again, in

21   your experience as a prosecutor, and even as a

22   defense attorney, and we've talked about this a

23   little bit today, in rape investigations, sexual

24   assault investigations, is it a fair statement to

25   say that time is of the essence in those

(855) 595-2073   Lexitas TX Registered DBA and licensed where required. Nevada Registration #116F.   355
www.lexitaslegal.com            California Firm Registration #179

1    investigations?

2         A.        Yes.

3         Q.        Okay.  And why is that?

4         A.        Because you lose evidence.  The

5    perpetrator, suspect, has a chance to talk to

6    witnesses, coerce witnesses.

7                   And again, I'm talking about

8    primarily what we have in this jurisdiction is the

9    date rape type of situation, either by physical or

10   drugs, and to let those sit and linger causes major

11   prosecution problems.

12        Q.        Okay.  You mentioned some of those

13   problems.

14                  What could some other of those

15   problems be?

16                  Would credibility be one of those

17   problems?

18        A.        Well --

19                  MS. BAEHR-JONES:  Could you be more

20        specific?

21        A.        Yeah.

22        Q.   (BY MR. WELLS) Credibility of a report.

23        A.        Well, anytime someone delays

24   reporting, and there's reasons that the -- in a date

25   rape that a woman would delay reporting.  She can

1    actually go to the hospital, not the police, but

2    still have a rape kit put on file.  And it's -- it

3    sits there.  If she changes her mind, then it would

4    be processed.

5                    We have like the SART boards, and

6    there's even -- there is like the reports that I get

7    from Branch House who is running all of our SANE

8    nurses and everything, they do reports on ones

9    that -- I'm trying to put it the best way I can,

10   that ladies that -- again, there's time ladies don't

11   want -- just want it on file, and they'll put a stat

12   of how many of those there are.

13                   Not everyone wants to come in and

14   proceed immediately.  As a prosecutor, I would --

15   you know, we've got the evidence there.  Tell us to

16   push it forward, and -- but that's the individual's

17   call.  If they want to push it forward, the

18   earlier -- and we've had that, because generally

19   they go that night before they've showered or

20   anything along those lines.  So the swabs can be

21   done, the pelvic can be done, and we can collect the

22   DNA.

23                   So yes, again, every answer I've

24   got, it's got to provide -- because not every woman

25   wants to do it immediately.  And I'm -- there is --

(855) 952-0073        Lexitas Office Ext. #50 states and is licensed where required. Nevada Registration #11B
www.lexitaslegal.com                        California Firm Registration #179

 1   there are cases of sodomy, male on male.  But I'm

 2   going from the basis of what we have, as far as the

 3   number, the number of reported are female by male.

 4          Q.       Okay.  In a situation where, we'll

 5   just say a female in this case, does not go and have

 6   that rape kit done --

 7          A.       It makes -- it makes it difficult,

 8   because we're always, always in a prosecution.  And

 9   prosecutors always want more and more and more.  I'm

10   as guilty at that as anybody.  Okay.  Go do this.

11   We want more and more and more.  A delay in your,

12   you know, reporting is a problem.  It is a -- can be

13   and is a problem in an effective prosecution.  But I

14   do understand, as I said earlier, why they do that.

15   It's emotionally the trauma.  Everybody reacts

16   differently.

17          Q.       Sure.  Sure.

18                   So is it fair to say in this

19   scenario, say a person doesn't report a sexual

20   assault or rape for a year, a year and a half, and

21   in the interim there was no rape kit, there was

22   nothing else other than a report a year and a half

23   later.

24                   Does that make a case less

25   prosecutable, if that's a word?

1          A.       Yes.

2          Q.       Okay.  And why is that?

3          A.       Because you've lost evidence.

4 You've lost witnesses, if there is witnesses.  We've

5 talked a lot about witnesses.  A lot of times

6 there's not witnesses, and that's where you need the

7 corroborated proof of what the house looked like or

8 drinking.  I'm a big proponent of collect the beer

9 cans, collect evidence that may seem like nothing,

10 but nothing builds into something.  And if you wait

11 over a year, all of that is gone.  People may move.

12 There's a multitude of reasons that that causes

13 massive problems.

14          Q.       Okay.  And along the same lines of

15 evidence, collecting evidence, this protocol that we

16 discussed today, do you know when that protocol

17 became effective?

18          A.       November 21st, 2022.

19          Q.       Okay.  All right.  And a big part

20 of that protocol, in general, generally speaking, is

21 early and often involvement by a prosecutor.

22          A.       Yes.

23          Q.       Is that important?

24          A.       Yes, and that's -- that's something

25 that I don't know that other jurisdictions do, as

(415) 595-2073    Lexitas Operates in all 50 states and is licensed where required. Nevada Registration #105B<br>www.lexitaslegal.com    California Firm Registration #179

1   far as the on-call, because I bet -- I wanted to

2   really set a standard of communication for more

3   effective prosecution, not just close by arrest.

4            Q.        And do you think a prosecutor is in

5   a better position than a police officer or an

6   investigator to determine whether or not there's

7   probable cause to bring the charge?

8            A.        Yes.

9                      MS. BAEHR-JONES:  Objection.

10          That's vague.

11           A.        But it's based on what the law

12  enforcement brings to the prosecutor and how they

13  bring it.

14           Q.  (BY MR. WELLS) Okay.  So if an officer

15  consults a prosecutor, gets guidance from a

16  prosecutor during the course of a rape investigation

17  or sexual assault investigation, that's the right

18  thing to do.

19                     MS. BAEHR-JONES:  Objection.

20           A.        Yes, especially following this

21  protocol.

22           Q.  (BY MR. WELLS) And is it reasonable for

23  a police officer to not pursue charges of sexual

24  assault or rape if a prosecutor tells them that they

25  don't have enough?

(415) 595-2073          Lexitas Legal. Exam in all 50 states and is licensed where required. Nevada Registration Number 115F
www.lexitaslegal.com                                    California Firm Registration #179

1                  MS. BAEHR-JONES:  Objection.

2          A.        Yes.  But, again, this protocol is

3    different than what I believe was the standard,

4    because there wasn't records or wasn't things kept

5    that -- and how it would be couched to a prosecutor.

6    And now I have people that are specialized more so

7    that know the questions to ask.  And it's -- it's a

8    non-judgmental basis when they are consulted.

9          Q.        Okay.  But in any event, whether or

10   not the protocol is in place or was not in place,

11   it's totally reasonable for a police officer to rely

12   on the advice of a prosecutor.

13         A.        Yeah.

14                  MS. BAEHR-JONES:  Objection.

15         A.        Yes.

16                  MR. WELLS:  Okay.  All right.

17         That's all the questions I have for you,

18         Mr. Finney.  I appreciate your time.

19                  THE WITNESS:  Thank you.

20                      EXAMINATION

21   BY MR. RADER:

22         Q.        My name is Danny Rader.  Of course,

23   I introduced myself to you earlier today, and I

24   represent Kevin Peters.  I've got just a few

25   questions for you.  I won't take very much time.

     1                    First of all, when you took office

     2    in September of 2022, you worked with my client,

     3    Kevin Peters, among others, in developing this new

     4    protocol; is that correct?

     5         A.        We did.

     6         Q.        And Mr. Peters cooperated with you

     7    in doing that.

     8         A.        Yes.

     9         Q.        And helped to try to make

    10    suggestions to improve it in an interactive process

    11    with your team; is that correct?

    12         A.        And that was in group -- group

    13    meetings with other investigators and some of the

    14    rank that -- and I took my assistants to it, and we

    15    had a rough draft.  There were some differences of

    16    opinions and things.  And, honestly, there are a

    17    couple of things that law enforcement brought to us

    18    that we implemented.

    19         Q.        And Mr. Peters helped do that; is

    20    that correct?

    21         A.        Yes.

    22         Q.        And when the protocol was adopted

    23    on November 21st, 2022, for the remainder of his

    24    time before his retirement, Mr. Peters saw to it

    25    that the protocol was implemented.

(845) 695-0073                                                                                www.lexitaslegal.com

1          A.        Yes.

2          Q.        And the process improved, correct?

3          A.        Yes.

4          Q.        Did you see any indication during

5    your time as DA or otherwise that Mr. Peters was

6    anything other than a law enforcement officer who

7    wanted to prosecute bad guys?

8                    MS. BAEHR-JONES:  Objection.

9          Q.   (BY MR. RADER) Did you have any --

10         A.        I believe he -- no.  I believe he

11   was.

12         Q.        All right.  And he wanted to catch

13   bad guys --

14         A.        Yes.

15         Q.        -- and put them in jail, didn't he?

16         A.        Yes.

17                   MS. BAEHR-JONES:  Objection.

18         A.        Yes.

19         Q.   (BY MR. RADER) You didn't see any

20   indication that he didn't respect any victims, did

21   he -- did you?

22                   MS. BAEHR-JONES:  Objection.

23         A.        Not -- no.

24         Q.   (BY MR. RADER) All right.  And now

25   you've talked about you have cases where it's male

(415) 695-7073          Lexitas Legal          Nevada Firm Registration #115B
www.lexitaslegal.com                            California Firm Registration #179

1    on male sexual assault or even female on male sexual

2    assault.

3              A.        Right.

4              Q.        It's not just male and female

5    sexual assault in Johnson City.

6              A.        No.

7              Q.        Prior to your protocol in November

8    of 2022, were the investigations of male on male

9    sexual assault and female on male sexual assault

10   treated essentially like male on female sexual

11   assault?

12             A.        Yes.

13             Q.        So in other words, if there were

14   deficiencies in the process, it was deficiencies

15   regardless of gender; is that correct?

16             A.        Yes.

17                       MS. BAEHR-JONES:  Objection.

18             Q.   (BY MR. RADER) All right.  And after

19   the policy was introduced, the improvements were

20   also improvements regardless of gender; is that

21   correct?

22             A.        Yes.  I believe so.

23             Q.        All right.  Now, with respect to

24   the safe and with your investigation of the

25   potential for theft and other things like that,

(415) 595-0073          Lexitas Operates in all 50 states and is licensed where required. Nevada Registration #157B          364
www.lexitaslegal.com                              California Firm Registration #179

1    Mr. Peters wasn't present when that safe was opened,

2    was he?

3         A.      I do not remember him being one of

4    the seven.

5         Q.      All right.  And no reason to

6    believe that he had anything to do with that

7    process.

8         A.      No.

9         Q.      All right.  When the safe was

10    investigated, I understand that you determined that

11    there was no prosecution to go forward; is that

12    correct?

13         A.      That is correct, based on what the

14    TBI brought to me.

15         Q.      And you did not suspect and your

16    team did not suspect that there had been any actual

17    theft; is that correct?

18         A.      No.  No, I didn't think there was

19    any theft at all.

20         Q.      Okay.  And whether you could

21    prosecute theft or not, if you thought there had

22    been theft, even if you couldn't identify the thief,

23    you still would have done something to say, "Hey,

24    there's a problem in the police department," right?

25         A.      Yes.  The fact they didn't count

Case 3:23-cv-00071-DCLC-JEM   Document 51-2   Filed 11/14/25   Page 21 of 26
PageID #: 10623

1    that money is ridiculous.

2            Q.        And maybe even negligent, right?

3            A.        Yes.

4            Q.        But no evidence of any intentional

5    theft or taking of any money.

6            A.        No.

7            Q.        All right.  And certainly no

8    indication that Mr. Peters received any money.

9            A.        Correct.

10           Q.        You've seen the Facebook post where

11   Mr. Williams said that it was $500,000, that he only

12   received 81,000.

13           A.        I've read that somewhere.  I don't

14   know.  I think it's from a pleading.  One of the

15   federal pleadings, I think, is where I got that.

16           Q.        And you don't have any reason to

17   believe that the amount of cash that's shown in that

18   video is any more than the amount of cash that

19   Mr. Williams received back; is that correct?

20           A.        No.

21           Q.        All right.  As far as you know,

22   everything that was in the safe was properly

23   returned to the owner.

24           A.        Everything other than what was

25   seized as evidence.

(865) 595-0073                Lexitas - All 50 states and all cities where required. Nevada Registration #179
www.lexitaslegal.com                          California Firm Registration #179

1              Q.        All right.  And talking about the

2       items that were seized as evidence, you've told us

3       today about the devices that had some data on them.

4              A.        Right.  Uh-huh.

5              Q.        If any of the Johnson City Police

6       officers had access to those devices to see what was

7       on them without a warrant, would that have violated

8       Mr. Williams' Fourth Amendment rights?

9              A.        Yes.

10             Q.        And would that evidence then be

11      excluded in any prosecution of him?

12             A.        Yes.

13             Q.        All right.  And, of course, you

14      testified today that you don't have any information

15      as to whether or not they had enough information to

16      get a warrant or not; is that correct?

17                      MS. BAEHR-JONES:  Objection.

18             A.        I do not.

19             Q.    (BY MR. RADER) All right.  Now, as far

20      as you know, if there was an investigation of any

21      corruption by any Johnson City Police officers that

22      involved your office or the TBI or FBI, as far as

23      you know, that investigation is over.

24                      MS. BAEHR-JONES:  Objection.

25             A.        Yes.

(615) 595-0073                Lexitas - Tennessee                    367
www.lexitaslegal.com    Firm Registration #179

 1                Q.    (BY MR. RADER) And as far as you know,

 2      that investigation found that there was no

 3      malfeasance.

 4                          MS. BAEHR-JONES:  Objection.

 5                A.          Correct.  No criminal offenses,

 6      malfeasance.

 7                          MR. RADER:  All right.  I don't

 8          have any further questions for you.  Thank

 9          you.

10                          VIDEOGRAPHER:  Are we off the

11          record?

12                          MS. BAEHR-JONES:  No.  We have one

13          more, two more.

14                          EXAMINATION

15      BY MR. ALLEN:

16                Q.      I just have a few questions.  My

17      name is Ben Allen.  I represent Toma Sparks.

18                          I think I know this based off your

19      earlier testimony, but I want to just clarify.

20                          Is it fair to say that you never

21      spoke to Toma Sparks about Sean Williams or any of

22      those cases?

23                A.      Never.

24                Q.          Okay.  Do you recall if Toma Sparks

25      was interviewed by the TBI?

1          A.          I'd have to look at my notes.  I'd

2     have to look.

3          Q.          Okay.  So you sitting here today,

4     you don't have a memory of that.

5          A.          I just don't remember that.

6          Q.          Okay.  And do you know if a victim

7     can receive a rape kit from an urgent care or a

8     walk-in clinic?

9          A.          I have never heard of that.  I have

10    personally never heard of that.

11         Q.          And earlier I know you testified

12    about some cases that you believed had a higher

13    closure rate than other types of cases.

14         A.          Uh-huh.

15         Q.          Is it fair to say that different

16    types of cases are harder -- some are harder than

17    others to prove and prosecute?

18         A.          Yes.

19         Q.          And in your experience, would it be

20    abnormal that some types of cases would have a lower

21    closure rate because maybe they're a more difficult

22    type of case?

23                    MS. BAEHR-JONES:  Objection.

24         A.          I agree with that.

25         Q.    (BY MR. ALLEN) In your experience,

(415) 595-0073                  Lexitas Licensed in all 50 states and licensed where required. Nevada Registration #115F                  369
www.lexitaslegal.com                  California Firm Registration #179

1    would cases involving sexual assault or sexual

2    violence be a more difficult case to prosecute?

3             A.      Depends on the factual scenario.

4                     MR. ALLEN:  Okay.  That's all I

5             have.  Thank you.

6                     MS. BAEHR-JONES:  I have a couple

7             follow-ups.

8                     Are you going to go, Mr. Herrin?

9                     VIDEOGRAPHER:  Can we move the

10            water bottle back?

11                    MS. BAEHR-JONES:  Oh, it's

12            migrated.  I know.  I know.  It keeps

13            wanting its moment in the spotlight.

14                    Did you say you were, or no?

15                    VIDEOGRAPHER:  We're still on the

16            record, right?

17                    MR. HERRIN:  You're still on the

18            record?

19                    COURT REPORTER:  Yes.

20                    MR. HERRIN:  Okay.  Mr. Finney, I

21            have several hours of questioning for you.

22                    THE WITNESS:  Thanks.

23                    MR. HERRIN:  Considering that

24            you've been here more than seven hours, and

25            considering the rules that we're going by

(645) 595-2073   Lexitas Operates in all 50 states and is licensed where required.  Nevada Registration #128F
www.lexitaslegal.com                    California Firm Registration #179