# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

S.H., individually, and on behalf
of all others similarly situated,

       Plaintiff,

v.                           **No: 2:23-cv-00071-TRM-JEM**

                               **PLAINTIFFS DEMAND JURY TRIAL**

CITY OF JOHNSON CITY, TENNESSEE,
a government entity,

       Defendant.

## [PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT

1.     Plaintiff S.H. brings this Third Amended Class Complaint alleging violations under the Equal Protection Clause, pursuant to 42 U.S.C. § 1983, against Defendant City on behalf of herself and all others similarly situated, namely, the class of all women, including minors, who reported sexual abuse or trafficking by any person to the Johnson City Police Department ("JCPD") from January 1, 2018 to December 31, 2022.

## JURISDICTION AND VENUE

2.     Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

3.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

4.     Venue is proper under 28 U.S.C. § 1391 as Defendant is located in Washington County, in the Greeneville Division of the Eastern District of Tennessee.

1

## PARTIES

5.     Plaintiff S.H., a female, was a citizen and resident of Gainesville, Georgia, and was visiting Johnson City, Washington County, Tennessee, during the operative time.

6.     Defendant Johnson City, Tennessee, ("Defendant City"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee. Defendant City has substantial control over the Johnson City Police Department and its employees.

## FACTUAL BACKGROUND

### I.     S.H.'s Factual Allegations

7.     In November 2021, S.H. was a 17-year-old high school student who lived with her parents in Gainesville, Georgia.

8.     The weekend before Thanksgiving, S.H. traveled to Johnson City, Tennessee, and stayed with the family of a young girl whom she regularly babysat. Specifically, she stayed with the grandparents of this girl, Male 1 and Female 14, who had full custody of the child. She planned to care for the girl over the following week and spend Thanksgiving with the family.

9.     On or about November 22, 2021, the Monday before Thanksgiving, Male 2, the son-in-law to Male 1, brought his four children over to the house of Male 1 and Female 14. Female 14, along with Male 2's wife and others, went out, while Male 1, Male 2, and S.H. stayed at home to watch the five children.

10.     Before that night, from approximately 2019 – 2020, Male 2 had worked as the dean of the high school which S.H. attended. Male 2 had previously been inappropriately physically affectionate with S.H., giving her full body hugs and kissing her on the forehead. S.H. had never reported this conduct to anyone, as she had been confused by his actions and unsure whether they constituted sexual abuse.

11.     Male 2 is approximately two decades older than S.H.

2

12.     During the evening of November 22, 2021, Male 1 and Male 2 drank several glasses of bourbon. Male 1 and Male 2 offered S.H. bourbon as well. Male 1 even poured her a glass and handed it to her, but S.H. did not drink any.

13.     At one point in the evening, Male 1, Male 2, and S.H. were all sitting inside on the couch talking while the children played outside. S.H. got up to go to the kitchen to get some water and Male 2 followed her.

14.     When S.H. got to the kitchen, Male 2 approached her from behind and hugged her tightly against him so that S.H. could feel his erect penis pressing into her back.

15.     Male 2 began kissing S.H.'s neck and rubbing his hands all over S.H.'s body, touching her breasts, and then moving his hands down to her vagina. S.H. froze in shock.

16.     For several minutes, Male 2 continued to grope S.H., touching her vagina through her clothing.

17.     After some time, S.H. was able to move away from Male 2. She began walking towards the children outside to get away from him.

18.     The next morning, S.H. called her older sister and told her what happened. S.H. then called her parents and told them about the sexual battery as well.

19.     S.H.'s parents insisted they come and get her immediately, but S.H. did not want to leave the little girl for whom she was caring. S.H.'s parents instructed her to let Male 1 and Female 4 know about what had happened.

20.     S.H. then told Male 1 and Female 14 about the sexual battery. After hearing S.H.'s account, Male 1 told S.H. that this explained a text message he had received that morning from Male 2 which stated that something might have happened the night before with S.H.

3

21.     Male 1 initially told S.H. that he would not allow Male 2 to be around her anymore. S.H. therefore told her parents she wanted to stay for the remainder of the week.

22.     S.H.'s mother immediately called a rape crisis center, Rape Response in Gainesville, Georgia, after learning of the sexual battery of her daughter. Rape Response told S.H.'s mother that they would call the relevant Tennessee agency, the Tennessee Department of Children's Services to report the crime.

23.     On Thanksgiving, S.H. was eating Thanksgiving lunch when she learned that Male 2 would be coming over to the residence again, despite what Male 1 had told her. She immediately called her parents and her father drove to come get her and bring her home.

24.     When S.H.'s father arrived, he noted that Male 1 and Female 14 seemed supportive of S.H. and appeared to believe S.H. that she had been groped by their son-in-law, Male 2.

25.     On December 10, 2021, S.H.'s mother received a phone call from JCPD Investigator Kara Lowe. Investigator Lowe explained that she had received the report about S.H.'s sexual battery and would be investigating the complaint.

26.     On December 29, 2021, a Hall County Sheriff's Deputy interviewed S.H. at the Edmonton Telford Center for Children, a Child Advocacy Center ("CAC") in Gainesville, Georgia. S.H. recounted the sexual battery to the Deputy.

27.     The Gainesville CAC mailed a copy of the recording of S.H.'s interview to JCPD.

28.     S.H.'s parents waited weeks to hear anything from JCPD. Approximately a month later, S.H.'s parents had another conversation with Investigator Lowe to ask whether she had received the copy of the forensic interview.

29.     S.H.'s parents then waited several more weeks before hearing anything further from Investigator Lowe. Finally, Investigator Lowe called S.H.'s parents and told them she did not

anticipate that the District Attorney's Office for the First Judicial District in Tennessee would be pursuing charges against Male 2.

30.     Investigator Lowe offered several reasons, none of which appeared to S.H.'s parents to be proper reasons to close the case. Investigator Lowe explained that when she had interviewed Male 1 and Female 14, the perpetrator's parents-in-law, they had told her about S.H.'s past as a rape survivor. Investigator Lowe seemed to imply that because S.H. was a survivor of rape, she would be less credible and/or able to testify in the sexual battery case. Investigator Lowe also told S.H.'s parents that she had learned about S.H.'s mental health struggles following her rape, also suggesting that this was a reason to decline prosecution.

31.     Investigator Lowe stated that the District Attorney did not want to put S.H. through the difficult process of testifying. S.H.'s parents insisted, however, that it was not appropriate to close the case. This case was important both for their daughter and because Male 2 was in a position of authority around children.

32.     Investigator Lowe then explained that Male 2 had hired an expensive, high powered defense attorney from Knoxville, TN, who was arguing that S.H. lacked credibility based on her past. Investigator Lowe then stated that this would make bringing a criminal case difficult.

33.     S.H.'s parents were surprised and disappointed as this did not seem like a legitimate reason to close the case and decline prosecution.

34.     S.H.'s parents explained that they had learned from S.H. that Male 1 likely possessed a text message which would be an admission by Male 2 that something had happened that night and would corroborate S.H.'s testimony. They asked Investigator Lowe to use criminal process to obtain the text message, and again insisted it was not right to close the case without trying to get this critical evidence first.

5

35.     Investigator Lowe implied that she would not be able to obtain this text message without the District Attorney's permission. Investigator Lowe told S.H.'s parents she would call them back if the DA decided to pursue charges.

36.     After this conversation, S.H.'s parents waited several more weeks to hear back from Investigator Lowe, but never received another phone call. Both parents left voicemails for Investigator Lowe imploring her to use criminal process to obtain the text message and to continue to investigate their daughter's case. They never heard anything further from JCPD.

37.     S.H.'s father has over five years of law enforcement training and has himself investigated hundreds of cases as a law enforcement officer. He was shocked and surprised by Investigator Lowe's actions in his daughter's case, including: 1) JCPD's failure to use criminal process to obtain a critical piece of evidence; 2) JCPD's failure to interview S.H.'s older sister, whose testimony could corroborate S.H. and lend credibility to S.H.'s account; 3) JCPD's failure to promptly interview the suspect; 4) JCPD's refusal to pursue charges, purportedly, based on S.H.'s past rape; and 5) JCPD's decision to decline prosecution based, in part, on the fact that the perpetrator had hired an expensive defense attorney.

38.     The circumstances of S.H.'s sexual battery by Male 2 meet the elements of a criminal offense under Tennessee Code § 39-13-527, Sexual battery by an authority figure.

39.     To date, no charges have been brought in S.H.'s case against Male 2.

40.     Male 2 is now a pastor at a church.

## II.    Johnson City's Internal Investigation Reveals JCPD Had a Pattern and Practice of Discriminating Against Women Sexual Assault and Abuse Victims

41.     In August 2022, in response to a lawsuit, Defendant City initiated an independent third-party review of JCPD's handling of sexual assault investigations. Defendant City hired the

6

Daigle Law Group (DLG) to review JCPD's processes and procedures specific to sexual assault investigations during the period of January 2018 through July 2022.

42.     Nearly a year later, on July 18, 2023, Defendant City released DLG's findings, which were summarized by DLG in a 45-page report. This report is attached hereto as Exhibit 1.

43.     According to the report, DLG considered JCPD's practices and procedures to determine whether the agency's "pattern and practice" or "custom" with respect to sexual assault investigations met Constitutional standards of policing. It found they did not.

44.     To reach this conclusion, DLG reviewed case files for more than 325 reports of sexual assault made to the JCPD between January 2018 and July 2022. DLG also conducted an onsite inspection in December 2022, and interviewed JCPD officers.

45.     DLG found that JCPD's practices discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault. The DLG investigation revealed that no legitimate law enforcement purpose—or any other reason—justified these inadequacies. Instead, the JCPD's practice of discouraging women from pursuing sexual assault charges stemmed from misconceptions and stereotypes about women and victims of sexual assault—in other words, sex-based bias.

46.     DLG further found that JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD had failed to train officers to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

7

47.     DLG specifically noted JCPD's deficiency in responding to non-stranger and alcohol or drug-facilitated sexual assault.

48.     DLG concluded: "JCPD's investigative practices were found to compromise the effectiveness of their response to sexual assault and lead to under-enforcement of sexual assault laws in Tennessee. At times, JCPD failed to employ key investigative practices that, if properly implemented, would safeguard potential evidence, protect the rights of victims and suspects, and facilitate a thorough investigation. For instance, our review found that JCPD too often fails to collect evidence and does not take proper steps to obtain timely, credible statements from suspects and witnesses. Our review revealed instances where JCPD officers likely would have obtained statements and facts to support a prosecution if they had used the investigative tactics known to be effective and essential in sexual assault investigations, especially investigations of non-stranger sexual assault. These investigative deficiencies compromise the investigative process and unnecessarily place victims at an increased risk of harm."

49.     DLG also found that JCPD's investigations into sexual assault reports were inconsistent, ineffective, and incomplete. JCPD often failed to collect evidence or failed to document the collection of evidence. JCPD also failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers failed to document their statements, even though the investigative files indicated that such statements had been taken.

50.     From 2018 – 2022, of the 133 cases where rapes had been reported to JCPD, 105 cases had an identified suspect, but only 36 of these suspects (or 34% of the known suspects) were ever interviewed. In the rare cases where JCPD officers did interview suspects, their practice was to call to schedule the interview, sometimes weeks in advance, providing the suspects the

8

opportunity to modify or coordinate their stories. DLG found this practice "baffling," as it "undermine[d] the integrity of sexual assault investigations."

51.     DLG found that JCPD practices actively discouraged sexual assault victims from pursuing charges and participating in investigations.

52.     The report also identified JCPD practices which made reporting sexual assaults "unnecessarily burdensome" to the victims, including practices motivated by gender bias and discriminatory animus against women, such as the following:

a.   Reluctance of the officers/investigators to continue investigative steps unless the victim comes to the Department to give a statement.

b.   JCPD required that victims and witnesses be interviewed at the police station, rather than at the location most convenient and comfortable for the victim.

c.   The interview rooms at the JCPD were suspect oriented with visible restraining devices.

d.   JCPD investigators asked victims whether they wished to seek criminal prosecution early in the investigation and whether they would testify against the accused. Statements by JCPD investigators focused on the emotional toll of prosecution and the victim's unwillingness to participate in the prosecution.

e.   JCPD's sexual assault investigations were sometimes compromised by an investigator's unwarranted gender-based assumptions and stereotypes about women.

f.   JCPD generally did not invite advocates to be present during victim interviews. Instead, two JCPD detectives typically interviewed a victim without advocate participation. This practice was more appropriate for an interrogation of a suspect

9

than an interview of a crime victim and sometimes prevented detectives from developing the necessary rapport with women victimized by sexual assault.

g.  Reporting a sexual assault, including the time spent at hospitals and with JCPD, could take many hours.

h.  JCPD too often did not follow up with victims to document evolving injuries, such as bruises.

53.  DLG further found that JCPD failed to secure crime scenes in responding to reports of sexual assault.[1] Specifically, the report concluded, "JCPD's securing of crime scenes and using search warrants to document evidence were found to be insufficient."

54.  JCPD's systemic failures of improperly documenting sexual assault investigations not only violated their own internal orders, but also standard police practice which are intended to protect and serve their community.

55.  DLG found that JCPD's interactions with women reporting sexual assault "reflect reliance on gender-based stereotypes and bias, and that this discrimination is responsible in part for the deficiencies in JCPD's response to sexual assault."

56.  This conduct included "overtly discriminatory statements from JCPD officers, investigators, or leadership."

57.  JCPD investigators also improperly relied on a woman's sexual history in evaluating the veracity of the sexual assault report.

_____

[1] The purpose of securing a crime scene while precuring a warrant is to ensure evidence is not destroyed, manipulated, or lost.

58.     DLG found that JCPD supervisors were allowing sexual assault cases to be closed even when prosecution was still possible. The report concluded that the "JCPD process of closing [sexual assault] investigations is flawed and inaccurate."

59.     The report found that JCPD investigators were improperly using the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, often where the requirements for closure under this basis were not met.

60.     For instance, the report cited closure of rape cases: Of 133 rape cases reported during 2018 – 2022, 66 (nearly 50%) were closed based on "exceptional circumstances." Of these 66, 25% were based on JCPD's claim that the victim was reluctant to participate, 31% were based on the reporting officer's claim that the victim was uncooperative (based on non-returned phone calls or messages, and/or the inability of the officer to contact the victim), and 40% were based on the prosecutor's office declining to prosecute. However, of those declinations, the reason usually provided was that the victim was declining to participate in the prosecution. But closure based on a victim's cooperation or reluctance to participate in the prosecution is not a proper basis for closure under JCPD's own internal reporting requirements.

61.     Thus, according to the DLG report, JCPD officers engaged in discriminatory and biased conduct to discourage women from pursuing cases of sexual assault and rape and then used the resulting reluctance on the part of victims to close rape cases improperly and in violation of department rules and requirements.

62.     As a result, between 2018 – 2022, only 11.27% of reported rape cases ended in arrest of the suspect. It is not clear from the DLG report how many—or if any—of these arrests resulted in convictions.

63. Upon information and belief, JCPD's failure to protect S.H. was consistent with an institutional practice and policy of JCPD of failing to protect female victims of sex crimes, which was motivated by JCPD officers' actual discriminatory animus towards women.

64. Upon information and belief, these practices and policies were known and ratified by JCPD policy makers.

65. Upon information and belief, Defendant City failed to prevent JCPD from engaging in the policy and practices that disproportionately affected women.

66. Upon information and belief, Defendant City approved an institutional practice of discrimination toward women by, among other actions:

    a. Failing to properly supervise JCPD;

    b. Failing to properly train JCPD;

    c. Failing to forward to the District Attorney's Office for the First Judicial District of Tennessee evidence of criminal acts committed in Washington County;

    d. Failing to protect and ensure evidence was not discarded;

    e. Failing to protect and ensure evidence was not lost or mishandled; and

    f. Failing to discipline, restrict, and control JCPD employees for failing to investigate crimes of sexual assault against women.

## III.   JCPD's Policy and Procedures Were Motivated by Discriminatory Animus Towards Women

67. JCPD's failure to protect victims of sexual violence was consistent with an institutional practice and policy of JCPD, and was motived, in part, by the officers' discriminatory animus towards women.

68. As outlined in the DLG report, JCPD investigators routinely take steps which discourage victims of sexual assault from pursuing charges based on "an investigator's

unwarranted gender-based assumptions and stereotypes about women," thereby compromising the investigations.

69.     On November 21, 2022, District Attorney General Steven R. Finney formally issued the Adult Sexual Assault Protocol and the Child Sexual Abuse Protocol for First Judicial District, which reflected material improvements to policies and procedures relating to the investigation and prosecution of sex crimes. By December 31, 2022, JCPD had implemented the new protocols.

**IV.     Plaintiff S.H. and the Reporter Class Learned of JCPD's Pattern and Practice of Discriminatory Animus Towards Women Victims of Sexual Violence No Earlier than July 18, 2023**

70.     S.H., and other members of the Reporter Class, were devastated, confused, and shocked by JCPD's failure to properly investigate their cases. However, they had no reason to know that this conduct was part of a pattern and practice of discriminatory conduct towards female victims of sexual violence, until, at the earliest, the release of the DLG Report on or about July 18, 2023, and the resulting national press coverage relating to JCPD's handling of the Sean Williams rape cases.

71.     On or about August 26, 2023, S.H.'s mother first learned of JCPD's misconduct in investigating sexual assault complaints when she read an article on the Fox News website about the Sean Williams case. The article described how the Williams case was not investigated properly in a similar way to how JCPD failed to investigate S.H.'s sexual battery. Shortly after, S.H.'s mother shared this information with S.H.

72.     Similarly, other members of the Reporter Class could not have become aware of JCPD's pattern and practice of not helping women who came forward with their cases of sexual assault, sexual battery, and rape, until the publication of the DLG Report.

13

73. The statute of limitations for the causes of action brought by S.H. and members of the Reporter Class did not begin to run until July 18, 2023, at the earliest, and their claims are therefore timely. To the extent any earlier date could be asserted, the statutes of limitation were tolled, and Defendant is equitably estopped from asserting the statute of limitations as a defense, by reason of its wrongful conduct.

## V. Plaintiff S.H. and Class Experienced Harm

74. Plaintiff and class members have been harmed by Johnson City Officials and JCPD's policy and practice of discriminating against their complaints of sexual violence. Plaintiff and class members' injuries include, but are not limited to:

    a. Bodily injury;

    b. Extreme psychological harm;

    c. Economic harm; and

    d. Emotional distress.

## CLASS ACTION ALLEGATIONS

75. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23. Plaintiff proposes certification of the following class pursuant to Federal Rule of Civil Procedure 23(b)(3): All women, including minors, who reported sexual abuse or trafficking by any person to JCPD from January 1, 2018, to December 31, 2022 ("Reporter Class").

76. The Reporter Class asserts the following claim: Equal Protection, 42 U.S.C. § 1983, Unconstitutional Pattern or Practice as to Women Reporters of Sexual Assault.

77. **Numerosity and ascertainability**. Joinder of the class members in a single litigation is not practicable. There are at least 325 members in the Reporter Class. Their identities can be determined from JCPD records.

14

78. **<u>Commonality and predominance – Reporter Class</u>**. Questions of law and fact common to members of the Reporter Class predominate over any questions that may affect only individual class members. Questions of law and fact common to the Reporter Class include:

a. whether JCPD's practices relating to investigating and responding to reports of sexual assault discriminated on the basis of sex;

b. whether JCPD's investigative practices were sufficiently widespread and pervasive so as to constitute a "custom" under *Monell v. Department of Social Services*, 436 U.S. 658 (1978);

c. whether Defendant Johnson City had actual or constructive notice of JCPD's practice;

d. whether Reporter Class Members were deprived of a federal or constitutional right by virtue of being subjected to JCPD's systemic sex-based discrimination and, if so, whether those deprivations were caused by a person acting under color of state law;

e. whether JCPD adequately trained officers on the elimination of bias, the proper procedures for investigating reports of sexual violence and clearing such cases by "exceptional means," and how to conduct victim-centric interviews of female victims of sexual assault;

f. whether any inadequacies in training on the aforementioned topics resulted in practices that deprived Reporter Class Members of equal protection of the law on the basis of sex in violation of the Fourteenth Amendment;

15

g.  whether the City had actual or constructive notice of the inadequacies of JCPD's training and, if so, whether the City responded with acquiescence or deliberate indifference; and

h.  whether JCPD's practices relating to female reporters of sexual assault violated the Equal Protection Clause.

79.  Common evidence that supports class treatment for Plaintiff's equal protection claims includes JCPD case files and interviews showing that JCPD's interactions with women reporting sexual assault regularly relied on gender-based stereotypes and bias, resulting in discriminatory outcomes and a tendency to respond to women's allegations of sexual assault with undue skepticism. The case files demonstrate that investigators systematically relied on women's sexual history in evaluating the veracity of their reports of sexual assault, which hindered what should have been objective investigation processes.

80.  Additional common evidence supporting class treatment for Plaintiff's equal protection claims includes training records for JCPD officers, investigators, and supervisors. These records establish JCPD personnel were not trained in conducting objective and unbiased investigations. Consequently, investigations were conducted through the lens of gender-based stereotypes and bias, resulting in discriminatory outcomes and a tendency to respond to women's allegations of sexual assault with undue skepticism.

81.  **Typicality**. Plaintiff S.H.'s claims are typical of the Reporter Class. S.H. alleges that, when she reported her sexual assault to the JCPD, officers failed to properly investigate her claim, made derogatory comments about her based on the fact she is a female, and intimidated and discouraged her from prosecuting her claims. On this basis, she alleges her constitutional rights to equal protection of the law were violated. The Reporter Class Members' claims arise from the

16

same set of practices by JCPD and are based on the same legal theory. There is nothing about S.H. or her allegations that give rise to a conflict between her and the Reporter Class.

82. **Adequacy of representation**. Plaintiff will fairly and adequately protect the interests of the class she seeks to represent. Plaintiff's interests align with the interests of class members; S.H. has no interests antagonistic to the interests of other class members; and S.H. is committed to vigorously prosecuting this action on their behalf. Plaintiff has retained counsel experienced in prosecuting class actions, including class actions involving sexual misconduct, and who have the qualifications and expertise to adequately and fairly represent Plaintiff and the class members in this case.

83. **Superiority**. A class action is superior to all other available methods for the fair and efficient adjudication of the respective controversies and will promote consistency of adjudication. Common issues, such as the constitutionality of JCPD's customs and practices with respect to handling reports of sexual abuse by women and girls, predominate over individual ones. More importantly, because the allegations in this case elicit severe emotional distress, fear, shame, and re-traumatization, many class members are unlikely to pursue legal redress individually for the violations detailed in this complaint.

**COUNT I**
**Equal Protection, 42 U.S.C. § 1983**
**Unconstitutional Pattern and Practice as to Women Reporters of Sexual Assault**
**(on behalf of S.H. and the Reporter Class against Defendant City)**

84. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

85. At all relevant times, JCPD officers acted under the color of state law and pursuant to an adopted policy or a longstanding practice or custom of the JCPD and Defendant City.

86. Defendant maintained the following unconstitutional customs, practices, or policies:

17

a. Not documenting reports of sexual assault made by women under Defendant City's jurisdiction;

b. Not investigating reports of sexual assault made by women under Defendant City's jurisdiction;

c. Failing to test or delaying testing of the rape kits of women who made complaints of sexual assault;

d. Not seizing or retaining evidence in response to women who made complaints of sexual assault;

e. Blaming, shaming, or otherwise discouraging victims from prosecuting their assaults;

f. Ceasing investigations unless the victim immediately agreed to prosecute;

g. Improperly closing cases pursuant to "exceptional means"; and

h. Refusing to credit women's accounts of sexual assault within Defendant City's jurisdiction.

87. The above policies and practices were motived by actual discriminatory animus towards women.

88. Defendant City developed, ratified, and enforced these longstanding customs and practices.

89. Defendant City perpetuated these unconstitutional customs and practices by allowing, and at times encouraging, JCPD officers to engage in unconstitutional conduct, and by failing to train and supervise JCPD officers to address and act upon evidence of unconstitutional conduct.

18

90. JCPD policies and procedures violated legal requirements to investigate sexual assault investigations demonstrating the failure to train officers to ensure effective and unbiased responses to allegations of sexual assault.

91. JCPD's practices resulted in ineffective, and incomplete sexual assault investigations, wherein officers routinely did not collect evidence or interview suspects and witnesses during sexual assault investigations.

92. JCPD's practices discouraged female victims of sexual assault from working with law enforcement to participate in investigations and pursue charges, such that biased policing prevented thorough and impartial investigations into the victims' reports of sexual assault. No legitimate law enforcement purpose—or any other reason—justified these inadequacies.

93. JCPD officers allowed sexual assault cases to be closed even when prosecution was still possible, including by improperly using the "exceptional circumstances" justification in the TIBRS reporting system to justify closing sexual assault cases, where the requirements for closure under this basis were not met.

94. Defendant City and its employees denied law enforcement services to Plaintiff and class members with reckless disregard for their constitutional rights.

95. By reason of the conduct described herein, Defendant deprived Plaintiff and class members of the rights, immunities, and privileges guaranteed to every person in the United States, in violation of 42 U.S.C. § 1983, including rights guaranteed by the Fourteenth Amendment of the United States Constitution.

96. On or after June 23, 2022, Plaintiff learned that JCPD had a custom, policy and practice of failing to investigate sexual assault reports made by women.

19

97. At all times relevant hereto, sexual assault was perpetrated almost entirely against females. According to federal crime statistics, females constitute over 90% of sexual assault victims.

98. By reason of the aforementioned acts, Plaintiff and class members have suffered bodily injury, psychological harm, emotional distress, and economic harm.

99. Defendant had either actual or constructive knowledge of the unconstitutional policies, practices and customs alleged above. Despite having knowledge, Defendant condoned, tolerated, and ratified such policies. Defendant acted with deliberate indifference to the foreseeable effects of these policies with respect to the constitutional rights of Plaintiff, class members, and all women under its jurisdiction.

100. In committing the acts and/or failures as alleged herein, JCPD personnel were acting under color of state law. The constitutional injury inflicted by Defendant was caused by a person(s) with final policymaking authority at the Defendant City. Defendant City knew or should have known about the above-described conduct and facilitated it, approved it, condoned it, and/or was deliberately indifferent to it.

101. The above-described conduct of Defendant constitutes a violation of 42 U.S.C., Section 1983. Plaintiff and class members are entitled to compensatory damages, including for emotional pain, suffering, mental anguish and other harms and losses pursuant to 42 U.S.C. Section 1983 for violations of their civil rights under the U.S. Constitution directly and proximately caused by Defendant.

## RELIEF REQUESTED

Plaintiff, individually and behalf of the Class, respectfully request that this Court:

1. Certify the Reporter Class under Federal Rule of Civil Procedure 23(b)(3), appoint

20

Plaintiff S.H. as class representative, and appoint her attorneys as class counsel;

2.    Enter judgment against Defendant and in favor of Plaintiff and the Class;

3.    Award compensatory damages for emotional distress, mental anguish, and disruption to each Plaintiff's and Class Member's family life, physical injury, pain and suffering, medical expenses, and all compensatory damages and or economic damages caused by the actions of Defendant.

4.    Award reasonable attorney's fees and costs;

5.    Award prejudgment interest and, if applicable, post-judgment interest; and

6.    Any further relief the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

*s/ Heather Moore Collins*
Heather Moore Collins (#026099)
Ashley Shoemaker Walter (#037651)
**HMC Civil Rights Law, PLLC**
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

*—and—*

*s/ Vanessa Baehr-Jones*
Vanessa Baehr-Jones (California Bar #281715)
*Pro Hac Vice*
**Advocates for Survivors of Abuse PC**
4200 Park Boulevard No. 413
Oakland, CA 94602
510-500-9634
vanessa@advocatesforsurvivors.com

21

*—and—*

<ins>*s/ Elizabeth A. Kramer*</ins>
Julie C. Erickson (California Bar # 293111)
Elizabeth A. Kramer (California Bar # 293129)
Kevin M. Osborne (California Bar #261367)
*Pro Hac Vice*
**Erickson Kramer Osborne LLP**
44 Tehama St.
San Francisco, CA 94105
415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

*Attorneys for the Plaintiff and the Proposed Class*

22

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been served via the court's electronic filing system on February 13, 2025 to counsel of record:

K. Erickson Herrin
HERRIN, McPEAK & ASSOCIATES
515 East Unaka Avenue
P. O. Box 629
Johnson City, TN 37605-0629
rachel@hbm-lawfirm.com

Emily C. Taylor
Maria Ashburn
WATSON, ROACH, BATSON &
LAUDERBACK, P.L.C.
P.O. Box 131
Knoxville, TN 37901-0131
etaylor@watsonroach.com
mashburn@watsonroach.com

Jonathan P. Lakey
Burch, Porter, & Johnson, PLLC
130 N. Court Ave.
Memphis, TN 38103
901-524-5000
jlakey@bpjlaw.com

*Attorneys to Defendant City of Johnson City, Tennessee*

/s/ Elizabeth A. Kramer
Elizabeth A. Kramer

# Exhibit 1



Office of the City Manager
City of Johnson City
601 E. Main St.
Johnson City, TN 37601
citymgr@johnsoncitytn.org
423.434.6002 | JohnsonCityTN.org

July 18, 2023

Dear Community Member,

After hearing concerns from residents in the summer of 2022, City administration determined that it must improve how the Johnson City Police Department (JCPD) handles sexual assault cases.

In August 2022, the City sought the assistance of the Daigle Law Group, an independent third party and national expert, to review the department's processes and procedures specific to sexual assault investigations spanning the period of January 2018 to December 2022. The review included the opportunity for community members to submit their concerns regarding how JCPD handles sexual assault cases directly to the Daigle firm.

What follows this letter is Johnson City's *Audit of Sex-Related Crimes*, by the Daigle Law Group, which details eight key findings and presents recommendations for remediation.

On behalf of City administration and the police command staff, we acknowledge that victims of sexual assault have not always received the best possible treatment and care from our police department. The department's new leadership team is dedicated to continued changes toward compassionate and effective service so that all citizens know they are safe and protected.

While awaiting the audit report, Johnson City prioritized this issue and changed how JCPD approaches sexual assault cases. City management met regularly with Mr. Daigle to learn what improvements could be made – along with what investments should be prioritized in the FY24 budget – so that action could be taken prior to the completion of the audit.

Steps implemented include:

1. Full implementation of, and training on, the District Attorney's new sexual assault investigation protocol, which has changed our criminal justice system significantly, making it better equipped to deliver justice for victims
2. Complete review of investigative policies and procedures
3. Creation of a comfortable space for use by victims as interviews are conducted
4. An additional $100,000 invested for training to ensure police officers are knowledgeable and understanding of the unique nature of sexual assault cases
5. $50,000 allocated for a new records management system that will help ensure that all cases are handled efficiently and expediently
6. Assessment of additional staffing needs



We believe these steps to be significant, but only the beginning. We commit to demonstrating improvements in the areas where we have fallen short. We will report our progress to the Board of Commissioners in six months.

Feedback on this report is welcomed and may be directed to: citymgr@johnsoncitytn.org.

Sincerely,


Cathy D. Ball, city manager
City of Johnson City



# AUDIT OF SEX RELATED CRIMES

## Johnson City Police Department



DLG   DAIGLE LAW GROUP

WORK PRODUCT NOT SUBJECT TO FOIA

# TABLE OF CONTENTS

I.   INTRODUCTION ………………………......………………….2.

II.  EXECUTIVE SUMMARY…………….…………………….3.

III. DISCLAIMER AND DISCLOSURE…….………………….9.

IV. BACKGROUND AND METHODOLOGY..……………….34.

V.  DATA COLLECTION AND ANALYSIS………………….36.

      1.  Data Collection

      2.  Investigative Report Assessment

      3.  Case Clearances

VI. SUMMARY – FINDINGS AND RECOMMENDATION………..11.

      1.  JCPD's Records Management System……………………..12.

      2.  JCPD's Response to Sexual Assault……………………….14.

      3.  JCPD's Internal Affairs Process……………………………31.

      4.  JCPD's Command and Supervision………………………..33.

      5.  JCPD's Policies and Procedures…………………….…...33.

      6.  JCPD's Training and Supervision………………………....34.

VII.   CONCLUSION………………………………………….....36.

      APPENDIX A – Summary of Findings and Recommendations……37.

      APPENDIX B – CALEA Standards……………………….…...…42.

      APPENDIX C – TLEA Standards…………………………….…...45.

*Intentionally Left Blank*

*NOTE: The ideas, concepts, techniques, inventions, designs (whether ornamental or otherwise), computer programs and related documentation, other works of authorship, and the like prepared for or submitted to The City of Johnson City or the Johnson City Police Department in connection with this project and performed pursuant to this agreement, and all copyright, patent, trade secret, trademark and other intellectual property rights associated therewith, (collectively "developments"), are and shall be the exclusive property of Daigle Law Group, LLC.*

**DLG**
DAIGLE LAW GROUP, LLC

# I.   INTRODUCTION

The Johnson City Police Department (hereinafter "JCPD" or "Department") retained Daigle Law Group (hereinafter "DLG") to conduct an audit of criminal investigations regarding Sexual Assault and Sexual Assault-related allegations ("Audit").   The scope of the project included extensive document analysis, conducting interviews with command staff and personnel, and preparing a written report of our findings.    It is well-established that effective, complete, and timely investigations of sexual assault allegations are paramount for maintaining agency effectiveness and public trust. A well-functioning criminal investigation is critical to the legitimacy of the Johnson City Police Department and should be a priority of the Department. Deficiencies in response to sexual assaults compromise the effectiveness of sexual assault investigations from the outset, challenge the ability of the investigator to uncover evidence, and could deprive the sexual assault victims of basic legal protections.   The goal of this Audit is to review and, if applicable, identify challenges and impediments that may affect the ability of JCPD officers to effectively investigate sexual assault crimes and continue to increase community confidence in JCPD's response to sexual assault.

During our audit, we received full cooperation from the Police Department and the City Administration. During the process, we were informed of ongoing litigation against the JCPD and the City regarding the alleged mishandling of sexual assault cases. It's important to note that our audit did not involve investigating the specific details of this litigation. Our focus was solely on conducting an independent analysis of the JCPD's operational strengths and weaknesses when conducting fair, thorough, and unbiased criminal investigations. Although we were aware of the ongoing litigation and reviewed the complaints, our audit was not influenced by it.  Our Audit, however, revealed issues in the JCPD response, documentation, categorization, and investigation of sexual assault complaints.   JCPD has committed to conducting high-quality investigations, and we found several generally good investigations.  JCPD and the City have an opportunity not only to ensure improvement in the mechanism of conducting sexual assault investigations but to serve as a model for police departments desiring to implement an effective system for responding to sexual assault investigations.

**DLG**
DAIGLE LAW GROUP, LLC

## II.   EXECUTIVE SUMMARY

Daigle Law Group, through its team of highly qualified experts, has extensive experience with comprehensive reviews of law enforcement policing operations.  The City of Johnson City ("City") engaged DLG services to enhance its commitment to practicing effective, efficient, and equitable police practices while building trust with the community members.  DLG Team members have spent multiple decades evaluating and examining policies, procedures, and operational practices of police agencies to ensure constitutional policing.

In all projects, DLG utilizes proven methodologies, based on the principle of constitutional policing, accountability, and community trust.  These three principles are intended to act as and promote, a system of checks and balances.  Each principle is designed to identify failures in the others to ensure a strong foundational approach to monitoring.  Informal, or "non-written" policies, procedures, and practices exist in nearly every police department and inhibit a department's ability to engage constitutional police practices fully.  As such, DLG consultants have been repeatedly tasked with identifying a department's informal policies, procedures, and practices, and have developed multiple mechanisms for completing this task.  These informal standards are often referred to as an agency's "custom" or "pattern and practice," or better described as "this is the way we do it here."  Our experience in litigation, evaluation of Consent Decrees, and conducting operational studies of police departments, has shown that an agency's "custom" is the most direct and likely way to impose significant liability on an agency.  These pillars, as demonstrated by the image below, illustrate the concept that to combat "custom" and ensure constitutional policing, a department must have sound policies and procedures, must provide comprehensive training to officers on the department policies and core tasks, and must properly train supervisors to ensure close and effective supervision of officers to ensure they follow department policy and training.

*Intentionally Left Blank*

*Image #1*



A proper evaluation of JCPD policing must be focused on ensuring linkage between the three pillars. If one of the pillars is lacking, the department's commitment to effective policing fails. The job of the evaluation team is to initially audit and hold the department accountable for implementing the three pillars.

## III.    DISCLAIMER AND DISCLOSURE

The City of Johnson City requested that Daigle Law Group, LLC conduct an audit and issue a report at the conclusion of our evaluation. The opinions, findings, conclusions, and recommendations provided in this report are intended solely for the use and benefit of the City of Johnson City. We expressly disclaim any warranties, whether expressed or implied. It should be noted that any statements, opinions, and recommendations in this report should not be regarded as a governing policy or decision unless specified by other documentation. Our report is based on the most accurate data available during the assessment and presentation, and any changes to the data may affect our recommendations.

## IV.    BACKGROUND AND METHODOLOGY OF OUR REVIEW

The process of conducting an effective organizational audit requires multiple facets of review. The Daigle Law Group's audit of the Johnson City Police Department's response to Sexual Assault investigations included an extensive review of reports and investigative-related materials, interviews with command staff, criminal investigators, and the District Attorney's Office. Our interviews included conversations with JCPD Chief Karl Turner, Commander Kevin

Peters, and Six members of the JCPD, specifically Criminal Investigations Detectives and Sergeants. We reviewed policies, procedures, training materials, court filings, and other data and documentary evidence, including the available material for case fi1es for more than 325 reports of sexual assault received by JCPD between January 2018 and December 2022. We made every effort to confirm witness accounts, where possible, with other evidence, including police reports, transcripts, and video recordings of investigative interviews, and gave weight only to those statements we could corroborate or otherwise deem credible. In addition, we reviewed model sexual assault policies and procedures from law enforcement agencies nationwide.

The audit of the Johnson City Police Department's criminal investigation process commenced in September 2022 with a review of extensive investigative files. The review was hampered by the outdated and archaic records management system used by the Department. The JCPD records management system challenged the way the JCPD collects and stores investigative reports and supporting evidence. Over the next six months, DLG worked with JCPD to attempt to locate and review supplementary material such as warrant affidavits, evidence records, interview recordings, transcripts, and forensic reports.

On August 22, 2022, in partnership with the city, a secure portal was opened for the public to submit information or concerns regarding the JCPD's handling of sexual assault cases. The purpose of this portal was to ensure that if the community or victims wanted to contact DLG, they had the ability to do so. This was released by the city and covered by different media outlets.

The initial review of investigative files, training records, and policies resulted in an onsite inspection conducted in December 2022. The purpose of the onsite inspection was to attempt to clarify some of the outstanding records and conduct interviews to learn about the JCPD's operational customs. In early 2023, Chief Karl Turner and Commander Kevin Peters retired from JCPD; and as such, the audit review was paused while the city determined how to move forward with filling the command roles at the Department. On April 25, 2023, DLG presented a list of verbal findings to the city and interim police department command staff. Attorney Daigle has met with the City Manager and City officials to identify the needs of the JCPD as budget preparations and the City's budget approval process were concluded.

**DLG**
DAIGLE LAW GROUP, LLC

## V. DATA COLLECTION AND ANALYSIS

### 1. Data Collection

During this audit, DLG obtained and reviewed data in the custody of the JCPD assigned to a specific case number and associated with a sexual-based crime for the dates January 2018 through July 2022. The data came from multiple sources, including Computer Aided Dispatch (CAD) entries, Investigative Reports, Supplemental Reports, Affidavits, interview videos, investigator notes, supervisory reviews, and forensic reports. Initially, DLG obtained data from the Tennessee Incident-Based Reporting System (TIBRS) and the JCPD internal case management system. The purpose was to ensure that the data provided by the JCPD was consistent with the data discovered in the TIBRS system. The Tennessee Incident-Based Reporting System (TIBRS) is the method used to collect crime statistics in Tennessee. TIBRS is based on collecting data on crime incidents and the elements associated with each incident. The ability to precisely identify when and where crime occurs, what form it takes, and the characteristics of victims and perpetrators is an indispensable tool for law enforcement.[1]

The identification of the data sets was the most streamlined portion of this assessment since JCPD, like all police departments in the country, is required to report numbers annually for crime statistical analysis purposes. The records identified in *Image #2* below identify the number of sexual-related crimes that were reported in the City of Johnson City for the years 2018 through July 22, 2022.

The summary identified as *Image #2* displays six categories of crimes identified as 11A Forcible Rape, 11B Forcible Sodomy, 11C Sexual Assault W/ Object, 11D Forcible Fondling, Incest, and Statutory Rape. As the data identifies, in 2018, there were 72 total sexually related offenses; in 2019, there were 68 sexually related offenses; in 2020, there were 69 sexually related offenses; in 2021, there were 70 sexually related offenses; and in 2022, as of July 22, there were 47 sexually related offenses.

---

[1]https://www.tn.gov/content/dam/tn/tbi/documents/tibrs/TIBRS%20Data%20Collection%20Manual%2014th%20Edition%20Final.pdf

**DLG**
DARKE LAW GROUP, LLC

Data Summary Chart
*Image #2*

| Offense Type | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|
| 11A Forcible Rape | 27 | 28 | 35 | 29 | 14 | 133 |
| 11B Forcible Sodomy | 3 | 2 | 1 | 2 | 8 | 16 |
| 11C Sex Assault W/ Object | 4 | 3 | 3 | 3 | 2 | 15 |
| 11D Forcible Fondling | 33 | 30 | 29 | 32 | 22 | 146 |
| Incest | 0 | 0 | 0 | 0 | 0 | 0 |
| Statutory Rape | 5 | 5 | 1 | 4 | 1 | 16 |
| Total | 72 | 68 | 69 | 70 | 47 | 326 |

**2.** Investigative Report Assessment

Once the numbers for the data sets were identified, we transitioned to an individual analysis of each investigation. As part of the process, we created a spreadsheet as an assessment tool to aid in reviewing the documents related to the case file. The assessment tool was developed based on the requirements outlined in the JCPD policies, DLG Policy Center Model Policies, IACP Law Enforcement Policy Center Model policies, CALEA standards, TLEA standards, and the District Attorney's Protocol. The evaluation categories included the following:

1. Responding officer obtains the initial facts/location of the assault:
    a. Responding officer determines the location and condition of the victim.
    b. Responding officer called for medical assistance if needed.
    c. Responding officer obtains suspect info from the victim – description /location/direction of flight.
    d. Responding officer obtains facts from the victim - including the location of the assault,
2. Notify the Supervisor
3. Investigator actions and responsibilities:
    a. Secure the crime scene and arrange for the collection of evidence.
    b. Preliminary Victim Interview.
    c. Document crime scene - photos/video.

**DLG**
DARLE LAW GROUP, LLC

    d.  Transport the victim to the hospital for examination.

    e.  Victim Advocate contacted?

    f.  Interview Witness(es) and identify persons with knowledge.

    g.  Evidence collection / Search Warrant.

    h.  Suspect interviewed.

    i.  Notify the victim of investigative steps.

    j.  Advise the victim of available support services.

    k.  Complete and incident/ arrest report.

**3.** <u>Case Clearances</u>

Aside from assessing the measures implemented throughout the JCPD investigation, concluding the investigation is crucial in guaranteeing that appropriate actions were exercised by thoroughly probing the claims of sexual assault. There are several ways to close a criminal investigation through the TIBRS system. It is imperative for the Department to thoroughly examine the justification and process involved in closing a significant criminal investigation. We have categorized and recorded complaints by year and how they were resolved. During our examination, we confirmed whether the case was adequately investigated and appropriately closed. It is essential to note that investigators must request case closure, which requires approval from their supervisor. Additionally, a department representative must verify the clearance reason for accuracy when submitting to TIBRS.

*Intentionally Left Blank*

July 10, 2023

**DLG**
DANIE LAW GROUP, LLC

Page **8** of **45**

Case 2:23-cv-00071-TRM-JEM      Document 490-1      Filed 02/13/25      Page 36 of 73
PageID #: 11329

## 2018-2022 Rape Cases
*Image #3*

| 2018 Rape Cases | |
|---|---|
| Closed by Arrest | 4 |
| Cleared by Exceptional Means | 11 |
| Unfounded | 8 |
| Inactive | 2 |
| Pending | 2 |
| Administratively Closed | 0 |
| TOTAL | 27 |

| 2019 Rape Cases | |
|---|---|
| Closed by Arrest | 1 |
| Cleared by Exceptional Means | 15 |
| Unfounded | 7 |
| Inactive | 2 |
| Pending/Active | 3 |
| Administratively Closed | 0 |
| TOTAL | 28 |

| 2020 Rape Cases | |
|---|---|
| Closed by Arrest | 4 |
| Cleared by Exceptional Means | 20 |
| Unfounded | 5 |
| Inactive | 3 |
| Pending | 3 |
| Administratively Closed | 0 |
| TOTAL | 35 |

| 2021 Rape Cases | |
|---|---|
| Closed by Arrest | 3 |
| Cleared by Exceptional Means | 15 |
| Unfounded | 6 |
| Inactive | 0 |
| Pending | 5 |
| Administratively Closed | 0 |
| TOTAL | 29 |

| 2022 Rape Cases | |
|---|---|
| Closed by Arrest | 3 |
| Cleared by Exceptional Means | 5 |
| Unfounded | 0 |
| Inactive | 1 |
| Pending / Active | 5 |
| Administratively Closed | 0 |
| TOTAL | 14 |

*Image #4*

*Image #5*

*Image #6*

| 2018 - 2022 Statutory Rape Cases | |
|---|---|
| Closed by Arrest | 6 |
| Cleared by Exceptional Means | 6 |
| Unfounded | 3 |
| Inactive | 0 |
| Pending | 1 |
| Administratively Closed | 0 |
| TOTAL | 16 |

| 2018 - 2022 Sodomy Cases | |
|---|---|
| Closed by Arrest | 1 |
| Cleared by Exceptional Means | 5 |
| Unfounded | 3 |
| Inactive | 2 |
| Pending | 4 |
| Administratively Closed | 0 |
| TOTAL | 15 |

| 2018 -2022 Sex Assault With Object | |
|---|---|
| Closed by Arrest | 2 |
| Cleared by Exceptional Means | 6 |
| Unfounded | 6 |
| Inactive | 0 |
| Pending | 0 |
| Administratively Closed | 0 |
| TOTAL | 14 |

**DLG**
DARDLE LAW GROUP, LLC

*Image # 7*

| 2018 Fondling Cases | |
| --- | --- |
| Closed by Arrest | 7 |
| Cleared by Exceptional Means | 18 |
| Unfounded | 4 |
| Inactive | 2 |
| Pending | 0 |
| Administratively Closed | 0 |
| TOTAL | 31 |

| 2019 Fondling Cases | |
| --- | --- |
| Closed by Arrest | 1 |
| Cleared by Exceptional Means | 12 |
| Unfounded | 11 |
| Inactive | 3 |
| Pending / Active | 3 |
| Administratively Closed | 0 |
| TOTAL | 30 |

| 2020 Fondling Cases | |
| --- | --- |
| Closed by Arrest | 4 |
| Cleared by Exceptional Means | 18 |
| Unfounded | 7 |
| Inactive | 1 |
| Pending | 0 |
| Administratively Closed | 0 |
| TOTAL | 30 |

| 2021 Fondling Cases | |
| --- | --- |
| Closed by Arrest | 3 |
| Cleared by Exceptional Means | 22 |
| Unfounded | 5 |
| Inactive | 0 |
| Pending | 2 |
| Administratively Closed | 0 |
| TOTAL | 32 |

| 2022 Fondling Cases | |
| --- | --- |
| Closed by Arrest | 1 |
| Cleared by Exceptional Means | 8 |
| Unfounded | 3 |
| Inactive | 2 |
| Pending / Active | 8 |
| Administratively Closed | 0 |
| TOTAL | 22 |

**DLG**
DARKLE LAW GROUP, LLC

## VI.  SUMMARY - FINDINGS AND RECOMMENDATIONS

Johnson City Police Department is responsible for the investigation of sexual assaults that occur in Johnson City.  We recognize that JCPD has expressed a commitment to conducting high-quality investigations.  Based on our audit, we discovered that certain investigative practices authorized by JCPD could negatively affect the quality and efficiency of their response to sexual assault cases. The JCPD sometimes struggles to gather the required evidence and testimony, which can be attributed to practices that hinder their ability to conduct thorough and impartial investigations into reports of sexual assault. We discovered certain practices that discourage female victims of sexual assault from collaborating with law enforcement, ultimately damaging the investigative process. Our investigation revealed that no legitimate law enforcement purpose, or any other reason, justifies these inadequacies. These investigative shortcomings seem to stem from misconceptions and stereotypes about women and victims of sexual assault.

We recognize that the City and JCPD are committed to conducting high-quality investigations and improving its response to sexual assault. Some aspects of JCPD's sexual assault investigations are generally quite good. Our review found that JCPD does not have the widespread problem with underreporting, misclassifying, or downgrading reports of sexual assault that we have observed in other law enforcement agencies. In addition, in the wake of public attention to the issue, the JCPD and the City of Johnson City have recently taken several affirmative steps to improve their response to sexual assault. These include budget implementations for technology, training, and policy development to modify practices, to further improve its response to sexual assault.

Our findings will be explained in the Recommendation section[2] below but can be summarized in the following categories:

    a.  Department policies and procedures are insufficient to meet industry standards and legal requirements to investigate sexual assault investigations.

    b.  Department members need training to ensure effective and unbiased responses to allegations of sexual assault.

    c.  Immediate implementation of the District Attorney's Sexual Assault protocol.

---

[2] A detailed summary of the Recommendations and Findings section can be found attached to the report as **Appendix A**.



    d.   Improving investigations of non-stranger and alcohol or drug-facilitated sexual assault.

    e.   Ensuring a more victim-centered response to sexual assault.

    f.   Ensuring close supervision and internal oversight.

    g.   Ensuring that the investigation is properly closed


## VII.   FINDINGS AND RECOMMENDATIONS

### 1.   JCPD's RECORDS MANAGEMENT SYSTEM

<u>**Finding #1**</u>   *The Records Management System and records process at JCPD is inadequate to support the effective operation of the Department.*

The JCPD's Records Management System was the most significant failure found during the audit process. An inadequate records management system makes conducting an audit very challenging. As identified in the methodology and data collection sections above, conducting an audit requires that the DLG team first identify the data set available for inspection. The data set of cases is identified through TIBRS and case management software. Once the data set of cases is identified with the case numbers assigned to each investigation, the next step is to obtain the complete investigative report assigned to that case number. While the audit of the Johnson City Police Department's criminal investigation process commenced in September 2022 with a review of extensive investigative files, the review was hampered by the Department's outdated and archaic records management system. The JCPD records management system challenged how JCPD collects and stores investigative reports and supporting documentation or evidence. Over the next six to eight months, DLG worked with JCPD to attempt to locate and review supplementary material such as warrant affidavits, evidence records, interview recordings, transcripts, and forensic reports.

An example of how the archaic system challenges the investigative process is demonstrated in a 2019 case where a female victim flagged down an officer to report sexual assault by a suspect after drinking with several people, including the suspect. The victim stated she passed out and, when she awoke, believed that she had been sexually assaulted. The victim was transported to the hospital for evaluation and a sexual assault kit. Patrol officers located the victim's property at the location where she said that the assault occurred. The suspect was

interviewed and denied the allegation. The Sexual Assault kit was sent to the lab in 2019, and the results were returned to JCPD almost a year later in 2020, indicating the presence of DNA from an individual identified in the CODIS system. The new suspect was never questioned, and there is no follow-up or case status indication. During the review process, JCPD was able to locate and provide additional documentation. JCPD advised that the assigned investigator had been promoted and returned to patrol during this time and has since left the employment of JCPD and that the investigation was reassigned in January 2023. In fact, the case has been dormant since 2020 and was reassigned based on our review. Documents had to be located outside of the record management system, which was not referenced in the system, and there was no accountability in the management system.

When requesting case files for review, downloads were obtained through the online records management system provided by JCPD. During our review, it was determined that the online system often did not contain the necessary information to evaluate the completeness of the investigation. While the data showed relevant information such as date, time, location, and the initial response report prepared by the responding officer, often that was all. That is to say, DLG could not verify if the investigation were complete because the necessary investigatory information was not contained in the case file. This presents an issue in that significant work could have been done on the investigation, but since the information is not in the file, the investigator could not get credit for completing the work.

During our interviews with JCPD personnel and criminal investigators, we asked how the report-writing system works in the Department. We learned that the current records management system is the WATSON™ Incident Reporting. This system allows the responding officer to utilize a PDA and/or a desktop app to prepare investigator notes. There appear to be inconsistencies, however, once the investigation is turned over to the Criminal Investigation Division ("CID"). We discovered that the CID has a separate server, and investigative folders are in that system. Statements taken, forensic reports, supplemental documents, and investigative work conducted are supposed to be scanned into that file, and updates should be put in the RMS. There was confusion about who was responsible for completing those tasks. Some investigators were thorough and ensured a complete file, but this did require additional work that would place investigative material in different areas. In addition, video evidence, such as

interview videos, was contained on a video server completely separated from the investigative files. As the DLG team was auditing files, we would look at the severity of the alleged offense and the information contained in the file. We would then ask the department to attempt to locate the missing information. This process could include looking at different servers and files, along with, at one point, a hand search of paper files that were contained in the basement of the Department. The most significant concern was that investigators advised that they kept paper files at their desks specifically related to the investigation. When the investigation was closed, the file folder would be shredded. The file folder should have been scanned prior to shredding, but very few files reviewed included a scanned folder. It is imperative to the success of investigation and prosecution that the JCPD has a complete, manageable, self-contained system that allows all documents to be contained in the case file for review.

**Recommendation 1:** *The JCPD shall research, identify and implement an effective Records Management System.*

## 2. JCPD's RESPONSE TO SEXUAL ASSAULT

**Finding #2**     *The sexual assault investigations conducted by JCPD have material deficiencies that can hinder the ability to collect necessary evidence for a complete and accurate investigation.*

JCPD's investigative practices were found to compromise the effectiveness of their response to sexual assault and lead to under-enforcement of sexual assault laws in Tennessee. At times, JCPD failed to employ key investigative practices that, if properly implemented, would safeguard potential evidence, protect the rights of victims and suspects, and facilitate a thorough investigation. For instance, our review found that JCPD too often fails to collect evidence and does not take proper steps to obtain timely, credible statements from suspects and witnesses. Our review revealed instances where JCPD officers likely would have obtained statements and facts to support a prosecution if they had used the investigative tactics known to be effective and essential in sexual assault investigations, especially investigations of non-stranger sexual assault. These investigative deficiencies compromise the investigative process and unnecessarily place victims at an increased risk of harm.

JCPD has stated a commitment to conducting thorough investigations and enhancing its response to sexual assault. We observed that certain aspects of JCPD's sexual assault investigations are commendable. Furthermore, we have not discovered any issues of underreporting, misclassification, or downgrading of sexual assault reports that are commonly found in other law enforcement agencies. JCPD has taken positive steps to enhance its response to sexual assault following public attention to the issue. They have secured funding to provide training on sexual assault to officers, investigators, and leadership; disseminated and trained staff on the District Attorney's Sexual Related Crimes Protocol; and requested recommendations for further improvement. With the implementation of appropriate mechanisms, JCPD can efficiently address the shortcomings in their response to reports of sexual assault. Additionally, City-wide support for a new Records Management System further reinforces their commitment to improving their response.

**<u>Finding #3</u>** *JCPD's Investigations were found to be Inconsistent, Ineffective, and Incomplete*

While many of the investigations reviewed were good, the audit produced concern that key investigative practices were not properly completed. Our review found that JCPD too often fails to collect evidence and does not take proper steps in conducting interviews to obtain timely, credible statements from suspects and witnesses. This included the following:

> **a.** ***JCPD often did not attempt to collect evidence or failed to document the collection of evidence.***
>
> In reviewing case files, we identified cases where officers initially responding to a scene of an alleged sex-related investigation did not identify and collect available evidence. General Order 600-02 CID Operations states that
>
> *Preliminary Investigations:[3]*
>
> > *1. The preliminary investigation begins when an officer arrives at the scene of an incident or first makes contact with the complainant, or becomes aware that a crime may have been or is being committed. The investigation shall continue until such time as the postponement of the investigation or transfer of responsibility will not jeopardize the successful completion of the investigation. The investigation usually includes:*

---

[3] JCPD General Order 600.02, CID Operations, March 16, 1993, (B)

**DLG**
DANIEL LAW GROUP, LLC

a. *Providing aid to the injured.*
b. *Protecting the crime scene to ensure that evidence is not lost or contaminated.*
c. *Determining if an offense has actually been committed and if so, the exact nature of the offense.*
d. *Observing all conditions, events, and remarks surrounding the complaint.*
e. *Locating and identifying witnesses. This should include separate witnesses before and during interviews.*
f. *Obtaining written statements from complainants and victims, when applicable, as well as witnesses.*
g. *Obtaining complete identification of all victims, complainants, and witnesses.*
h. *Cordon off the crime scene and maintain a Crime Scene Entry Log (Form #1394).*
i. *Collecting and preserving any and all evidence.*
j. *Furnishing other sworn Department personnel, through communications, descriptions of suspects and/or suspect vehicle, direction and method of flight, or any other relevant information concerning wanted person(s) or vehicles.*
k. *Determining in detail the exact circumstances of the offense.*
l. *Accurately and completely recording all pertinent information in the proper form.*
m. *Interviewing or interrogating suspects, if appropriate.*
n. *Effecting the arrest of the suspect whenever possible.*

Our audit of case files found multiple investigations where the officers failed to document their preliminary investigation or did not sufficiently conduct a preliminary investigation. For example, in one file, we found that a female victim stated that she was sexually assaulted by a male suspect, a roommate of her ex-boyfriend. The victim declined to go to the hospital for examination but did allow responding officers access to her residence to retrieve the clothes she was wearing at the time of the assault. There was no indication of the scene being photographed or screened for additional items of evidentiary value. In another case, a female victim stated that she was sexually assaulted in the apartment of a friend by a male suspect. The victim stated that she passed out on the suspect's couch after consuming only soda. Investigator responded to the scene after meeting with the victim and met with the suspect. The investigator reports that the suspect invited him in and pointed out numerous empty beer cans, which the suspect

stated that he and the victim had consumed. There was no indication that any other items of evidentiary value were identified or collected.

Experienced investigators understand that physical evidence is located, collected, and analyzed for the investigation and prosecution of a criminal act. This is extremely important in sex-related crimes since physiological fluids, DNA, trace evidence, and drugs can be difficult to locate and secure. It is also essential to help eliminate uninvolved parties. To be of value, the evidence must first be recognized and identified. In addition, all aspects of evidence handling must be meticulously documented. Essential evidence includes developing evidence regarding whether the victim was incapacitated by alcohol or drugs and whether the suspect knew this. Industry standards express detailed considerations for evidence collection and crime scene response.[4]

**Recommendation #3a**     *JCPD should develop a checklist for all sex-related investigations by responding officers and supervisors to ensure consistency in collecting and documenting evidence.*

   **b.** *JCPD's securing of crime scenes and using search warrants to document evidence were found to be insufficient*.

In response to the allegation of a sexual-related crime, it is imperative to secure and collect evidence. During our review of the case files, we were surprised to find limited references to a location being secured and the investigators documenting a scene. While access to the scene could be obtained by consent, for purposes of protecting the evidence, we would expect to see the execution of a search warrant to document the scene and collect evidence. In one case, a female victim reported that she was sexually assaulted at the residence of a male suspect. The victim went to the hospital by ambulance to have a sexual assault kit completed and report the assault. There is no mention in the report of anyone responding to the location of the incident to secure the scene or that a search was conducted for additional items of evidence. Another example is a case where a female victim states that she was sexually assaulted by a male suspect

---

[4] IACP Model Policy, Investigating Sexual Assaults, October 2017 Pg.3

while visiting friends at an apartment complex. The victim, who is homeless, was asked by the suspect if she wanted to use the shower at a friend's apartment, and she agreed. The victim reported that the assault occurred in the bathroom of the apartment. The victim left the apartment after the assault and contacted JCPD from a nearby business. Responding officers never went to the apartment to secure the scene or locate the suspect. Investigators met with the victim at the hospital and requested officers return to the scene to identify witnesses; however, there is no indication that the scene was ever secured or searched.

In a third example, a female victim states that while intoxicated/passed out, the male suspect sexually assaulted her. Officers responded to the apartment complex for a report of an unknown disturbance. Upon arrival, the victim ran from the building crying and stating she was scared. The victim stated that she fell asleep at a friend's apartment, and when she woke up, she was naked, and the suspect was sexually assaulting her. There is no indication in the report that the on-scene officers responded to the apartment in question and no indication that the apartment was ever secured or searched for additional evidence. As stated, sexual-related investigations involve physiological fluids, DNA, hairs, fibers, and transfer evidence that must be preserved. This would also include photographic and video documentation of the scene where the alleged act occurred. The JCPD policy 600.13, Sexually Oriented Crimes (May 19, 2016), states that the responding officer has certain immediate responsibilities, specifically "*Preserve the crime scene.*"[5]

**Recommendation 3b**: *Officers, supervisors, and investigators must be retrained on Department policy related to the investigation of sexual-based crimes and the District Attorney's "Sex Related Crimes Protocol". There must be collaboration and teamwork between the Patrol and the Criminal Investigations Divisions.*

---

[5] JCPD General Order 600.13, Sexually Oriented Crimes, May 19, 2016, (D,1,b)

July 10, 2023

**DLG**
DANIE LAW GROUP, LLC

Page **18** of 45

Case 2:23-cv-00071-TRM-JEM     Document 490-1     Filed 02/13/25     Page 46 of 73
PageID #: 11339

### c. The case file records were deficient in the documentation of investigative steps.

The cornerstone of effective investigations is documentation, documentation, and documentation. Law enforcement training focuses on ensuring timely and detailed documentation of facts and circumstances that identify steps taken by the investigator. In fact, General Order 600-02 states that "*all complaints of a criminal nature received by the Department which occurs within Johnson City, will be recorded on the proper incident form, even if the complainant does wish to file charges or have a report made.*"[6] In fact, the General Order states that an incident report is a proper method for documentation, and in the more complex investigation, there is a Department Criminal Investigations Checklist (Form #1311)[7] Even though a sexual assault can be a complex investigation, we did not find any reference to a Form #1311 in the case file documents.

Experienced investigators know that for complex investigations, it is essential to document investigative steps. In some reports, we found detailed supplementary entries to document the steps taken by the investigator. During our interviews, we were advised that investigators would maintain paper files and take notes regarding investigatory steps. Once the case was closed, the file would be destroyed. Investigators said they would usually only scan their cases into the system if they were "going anywhere." The investigators complained that doing it correctly meant duplicating efforts on the written case log and entering information into the computer-based system.

<u>**Recommendation 3c:**</u>   *Supervisors, officers, and investigators must be held accountable for documenting criminal investigations and maintaining the proper case files.*

### d. The case file records were deficient in the documentation of Witness Interviews.

Witnesses are essential to the successful prosecution of a case. Timely interviews are paramount to the collection of independent information. In a criminal investigation, a witness could have first-hand knowledge about a crime. The effective part of the process is obtaining a written statement to lock the witness into what they recall, which should be

---

[6] JCPD General Order 600.02, CID Operations, March 16, 1993, (B,3)
[7] JCPD General Order 600.02, CID Operations, March 16, 1993, (D, 1&2)



done contemporaneously to the alleged conduct. Our conclusion that JCPD was deficient in the documentation of witnesses is supported by two findings. During our audit, we did find investigative files where the investigator added witness data to the report and summarized the witness interviews in the report. This supported the finding that witnesses were interviewed, and statements were taken. A few times, the actual statements were found scanned into the case file. Often, we found that witness data was placed into an investigative report with no reference to a statement being taken or a summary of the statement. In addition, no external documented statement was discovered.

As an example of what was often found in a case file, the matter where a female victim stated that she was sexually assaulted by a male at her residence, there was no indication that witnesses were interviewed, even though the victim advised officers that there were two other people at the residence at the time of the incident.

**Recommendation 3d:** *Supervisors, officers, and investigators must be held accountable for fully investigating the allegation, including interviewing known witnesses. These interviews shall be documented as they occur and preferably recorded in writing or with Body-worn cameras.*

### e. JCPD has a practice of not conducting Suspect Interviews

The evaluation of the suspect interviews was the most concerning during our audit. Our review showed that JCPD detectives often do not make sufficient efforts to obtain statements from suspects and witnesses quickly, and at times not at all. In fact, in reviewing cases regarding rape allegations between 2018-2022, it was found that in the 133 rape-reported cases, 105 cases had an identified suspect. Of significant concern is that of the 105 known suspects identified, the suspect was interviewed in only 36 cases. Therefore, in the 133 rape-related cases between 2018 and 2022, only 34% of the known and identified suspects were interviewed or even contacted. This is detrimental to the investigation in many ways. Experienced investigators would and should contact the suspect as soon as possible. While there may be some delay based on the situational response, getting the suspect's version of events is an imperative step to conducting a full and complete investigation.

**DLG**
DANIEL LAW GROUP, LLC

Timely collection of evidence is essential in sex-related crimes. This includes physical and verbal clarification of facts and allegations early in the investigation and the evaluation of the credibility of the alleged suspect. During our interviews, investigators confirmed that it was a practice at JCPD not to contact the alleged suspect until they were convinced that the assault reasonably did occur. This is baffling to the DLG team. For example, instead of conducting field interviews in sexual assault cases, JCPD detectives generally call to make appointments with suspects, scheduling them sometimes weeks or more in advance. They do not attempt to conduct telephone or field interviews to obtain preliminary interviews in the interim. This practice undermines the integrity of sexual assault investigations by denying investigators the ability to compare the suspect's and victim's accounts early in the investigation, and by allowing suspects too much time to modify or coordinate their stories. What is more concerning is that investigators did not even contact 66% of the identified suspects, let alone get a statement as to what happened. This undermines the effectiveness, and likely success rate, of the investigations.

*Recommendation 3e:* **Identifiable suspects in a criminal investigation will be interviewed. The suspect has constitutional protection governed by the 5th Amendment, but attempts should be made in a timely manner to identify the suspect's version of events.**

### f. JCPD's investigative processes discourage victim participation

The deficiencies outlined above make it challenging to conduct complete and accurate sexual assault investigations. Our audit of the available files found investigative practices that discourage victims from participating in the investigation. For example, in one case a female victim stated that she was sexually assaulted by a male suspect known to the victim. The investigator made several attempts to get the victim to headquarters to provide a written statement. The victim finally came in with a 14-page handwritten statement that she had prepared, and the investigator requested a new statement on the Department form. The victim complied and provided an 18-page statement. The victim returned one month later to review both statements with an investigator, who believed there were inconsistencies. The investigator also indicated that it appeared that the victim

**DLG**
DANIEL LAW GROUP, LLC

and suspect had been in a dating relationship leading up to the complaint. The investigator reported that after questioning the victim on "numerous suspicious and inconsistent statements," the victim changed her mind and said she no longer wished to pursue the case. There was no suspect interview and no mention of sexual assault kit results.

Experience has shown that victim participation can significantly increase the success of investigations as well as a successful prosecution. Our investigation identified other JCPD practices that create unnecessary barriers to building trust and rapport with women reporting sexual assault and make reporting unnecessarily burdensome for the victim. For example:

1. Reluctance of the officers/investigators to continue investigative steps unless the victim comes to the Department to give a statement.

2. JCPD requires that victims and witnesses be interviewed at the police station, rather than at the location most convenient and comfortable for the victim.

3. The interview rooms at the JCPD are suspect oriented with visible restraining devices.

4. JCPD investigators asked victims whether they wished to seek criminal prosecution early in the investigation and whether they would testify against the accused. Statements by JCPD investigators focus on the emotional toll of prosecution and the victim's unwillingness to participate in the prosecution.

5. JCPD's sexual assault investigations are sometimes compromised by an investigator's unwarranted gender-based assumptions and stereotypes about women.

6. JCPD generally does not invite advocates to be present during victim interviews. Instead, two JCPD detectives typically interview a victim without advocate participation. This practice is more appropriate for an interrogation of a suspect than an interview of a crime victim and sometimes prevents detectives from developing the necessary rapport with women victimized by sexual assault.

7. Reporting a sexual assault, including the time spent at hospitals and with JCPD, can take many hours. Efforts should be made to expedite the process.

**DLG**
DANIEL LAW GROUP, LLC

8. JCPD too often does not follow up with victims to document evolving injuries, such as bruises.

Based on our review of the manner and mechanisms used by JCPD while interviewing victims, the Department should develop a much more integrated approach with victim advocates and experts who specialize in trauma. Other departments in the area have victim/witness distribution pamphlets that identify victims' rights and the overview of the steps that will occur during the investigation. Victims need to be provided unbiased information about their rights and the process to ensure that they make well-informed decisions.

<u>**Recommendation 3f:**</u>   *The JCPD should be committed to implementing victim-centered practices in sexual assault response, interviews, and investigations. To achieve this, they will enhance and improve policies, training, and oversight. This approach aims to increase the likelihood of victims' continued cooperation with law enforcement, improve their overall experience, and strengthen sexual assault investigations.*

*These practices shall include the following:*

1. *Inviting and encouraging advocates to be present during interviews, if consistent with the victim's wishes.*

2. *Conducting interviews at times and locations convenient to the victim, whenever possible.*

3. *Introducing particularly sensitive lines of questioning by explaining why those questions are important to the investigation.*

4. *Instruct investigators and officers not to ask victims whether they wish the assailant to be prosecuted.*

5. *Ensuring that officers describe the process of taking forensic exams and working with law enforcement and the courts in a manner that is both sensitive to the needs of victims and supports their participation in the criminal justice process.*

6. *Documenting reports of sexual assault using the language of non-consensual sex, as appropriate, and using the victim's own language as much as possible; and*

**DLG**
DANILE LAW GROUP, LLC

7. *Transporting the victim to the designated medical facility for a forensic exam where such an examination is warranted and the victim consents.*

**g. JCPD's response to sexual assault was challenged based on gender-based stereotypes and bias.**

Based on our review of JCPD case files and interviews, we found that JCPD's interactions with women reporting sexual assault all too often reflect reliance on gender-based stereotypes and bias, and that this discrimination is responsible in part for the deficiencies in JCPD's response to sexual assault. Statements by JCPD investigators and Department leadership to women reporting sexual assault frequently reflect assumptions that women reporting non-stranger sexual assault are lying, and that such assaults are less severe and traumatic to victims than other serious crimes. These assumptions appear to be based at least in part on stereotypes of female victims of sexual assault and interfere with the objective investigative process. Women reporting sexual assault are unlikely to trust or cooperate with law enforcement, or to report future crimes if they encounter skepticism or overtly discriminatory statements from JCPD officers, investigators, or leadership. Our review of JCPD case files supports the conclusion that investigators improperly rely on a woman's sexual history in evaluating the veracity of the sexual assault report.

**Recommendation 3g:** *Non-stranger and alcohol or drug-facilitated sexual assault investigations shall be assigned only to those investigators with the demonstrated skills, interest, and training to conduct those investigations effectively and without bias.*

**Finding #4** *JCPD process of closing investigations is flawed and inaccurate.*

The mechanism of closing a criminal investigation is an integral part of the process. It requires explanation, authorization, and scrutiny. There must be a clear accountability and supervision aspect to allowing closure of a case other than an arrest. The closing of sex-related cases at JCPD is flawed and inaccurate, leading to the conclusion that cases are closed while prosecution is still possible, and supervisors are allowing the cases to be closed. Currently, cases are closed in multiple categories governed by the TIBRS system.

July 10, 2023        Page **24** of 45
Case 2:23-cv-00071-TRM-JEM     Document 490-1     Filed 02/13/25     Page 52 of 73
PageID #: 11345

The JCPD General Order 600.01 identifies that when a case is closed – this indicates that it has been concluded. *When closing a case, specific dispositions are required. They include Unfounded, Exceptional Clearances, Arrest, or Administrative Cleared.*[8] As identified below, many cases at JCPD are closed by exceptional means. An Exceptional Clearance has the following requirements:[9]

> *Exceptional Clearances - an incident is cleared exceptionally when an element beyond law enforcement control prevents a physical arrest. The following are valid reasons for exceptional clearance:*
>
> > *a. Death of Offender*
> > *b. Prosecution Declined - Non-prosecution, Section D, Form #1064 must be completed by the officer.*
> > *c. Extradition Denied*
> > *d. Victim Refused to Cooperate*
> > *e. Juvenile/No Custody*
>
> *All of the following conditions must be met to clear an offense by exceptional. means:*
>
> > *a. Investigations must have established the identity of at least one offender.*
> > *b. Sufficient probable cause must have been developed to support the arrest, charging, and prosecution of the offender.*
> > *c. The exact location of the offender must be known so that an arrest could be made.*
> > *e. There must be a reason outside the control of law enforcement which prevents the arrest.*

*Intentionally Left Blank*

---

[8] JCPD General Order 600.01, CID Administration, March 16, 1993, (C,c)
[9] https://www.tn.gov/content/dam/tn/tbi/documents/tibrs/TIBRS%20Data%20Collection%20Manual%2014th%20Edition%20Final.pdf



During our audit, we conducted an analysis of the percentages specific to the reason for closing a case. In evaluating 133 Rape cases, we found that 15 were closed by arrest (11%), 66 were closed by Exceptional Clearance (49%), 26 were closed by Unfounded (19%), and 26 remained Inactive or Pending (19%).

*Image #8*

| 2018 - 2022 Rape Cases | | |
|---|---|---|
| Closed by Arrest | 15 | 11.27 % |
| Cleared by Exceptional Means | 66 | 49.62% |
| Unfounded | 26 | 19.54% |
| Pending / Active/ Inactive | 26 | 19.54% |
| Administratively Closed | 0 | 0% |
| TOTAL | 133 | 99.97 % |

In evaluating 145 Fondling cases, we found 16 were closed by arrest (11%), 78 were closed by Exceptional Clearance (53%), 30 were closed by Unfounded (20%), and 21 remained Inactive or Pending (14%).

*Image #9*

| 2018 - 2022 Fondling Cases | | |
|---|---|---|
| Closed by Arrest | 16 | 11.03 % |
| Cleared by Exceptional Means | 78 | 53.79 % |
| Unfounded | 30 | 20.68 % |
| Pending / Active / Inactive | 21 | 14.48 % |
| Administratively Closed | 0 | 0% |
| TOTAL | 145 | 99.98% |

In evaluating 16 Statutory Rape cases, we found that 6 were closed by arrest (37%), 6 were closed by Exceptional Clearance (37%), 3 were closed by Unfounded (18%), and 1 remained Inactive or Pending (6%).

*Image #10*

| 2018 - 2022 Statutory Rape Cases | | |
|---|---|---|
| Closed by Arrest | 6 | 37.5% |
| Cleared by Exceptional Means | 6 | 37.5% |
| Unfounded | 3 | 18.75% |
| Inactive/Pending | 1 | 6.25% |
| Administratively Closed | 0 | 0% |
| TOTAL | 16 | 100% |

In evaluating 15 Sodomy cases, we found that 1 was closed by arrest (6%), 5 were closed by Exceptional Clearance (33%), 3 were closed by Unfounded (20%), and 0 remained Inactive or Pending (0%).

*Image #11*

| 2018 - 2022 Sodomy Cases | | |
|---|---|---|
| Closed by Arrest | 1 | 6.66% |
| Cleared by Exceptional Means | 5 | 33.33% |
| Unfounded | 3 | 20% |
| Inactive/Pending | 6 | 40% |
| Administratively Closed | 0 | 0% |
| TOTAL | 15 | 99.99% |

**DLG**
DARBLE LAW GROUP, LLC

In evaluating 14 Sex Assault with Object cases, we found 2 were closed by arrest (14%), 6 were closed by Exceptional Clearance (42%), 6 were closed by Unfounded (42%), and 0 remained Inactive or Pending (0%).

*Image #12*

| 2018 -2022 Sex Assault With Object | | |
|---|---|---|
| Closed by Arrest | 2 | 14.28% |
| Cleared by Exceptional Means | 6 | 42.85% |
| Unfounded | 6 | 42.85% |
| Inactive/Pending | 0 | 0% |
| Administratively Closed | 0 | 0% |
| TOTAL | 14 | 99.98% |

Reviewing the TIBRS manual finds that each of the above exceptional clearance codes has a definition and example section. During our review, we found significant cases closed as Exceptional Clearance, specifically Prosecution Declined and Victim Refused to Cooperate.

We conducted a deeper analysis of exceptional clearances related to the closure of Rape cases. In evaluating 2018–2022 Rape cases, the total number of exceptional clearances was 66. Of the 66 cases, in 17 cases or 25%, the investigator cited the reason for the exceptional clearance as the victim being unwilling to prosecute or move forward with the investigation. In 21 cases or 31%, the investigator cited the reason for the exceptional clearance as the victim being uncooperative. Most of these involved the investigator not being able to contact the victim or the victim not returning phone calls and messages. In 27 cases or 40%, the investigator cited the reason for the exceptional clearance as the prosecution declined based upon a conversation between the investigator and the prosecutor. A few had email exchanges: however, most were verbal conversations. In 1 case or 1%, the exceptional clearance was based on the fact that the suspect was deceased.

TIBRS describes Prosecution Declined as identified in image #13.

July 10, 2023

DLG
DARLE LAW GROUP, LLC

Page **28** of **45**

Case 2:23-cv-00071-TRM-JEM      Document 490-1      Filed 02/13/25      Page 56 of 73
PageID #: 11349

*Image #13*

> **PROSECUTION DECLINED:** Prosecution declined by the *prosecutor* for reasons other than lack of probable cause, e.g., offense falls outside prosecution guidelines by virtue of value of loss, first-time offender, etc. *Only applicable when you have established the identity of at least one offender, have probable cause to arrest that offender, and you know the exact (present) location of that offender.*

Multiple cases reviewed alleged "Prosecution Declined." This usually occurred when the investigator identified a reservation by the victim to participate in the prosecutorial process. Our interpretation of the TIBRS requirement does not allow for closure because of the victim's reluctance or refusal to participate in the prosecutorial process. Once the suspect is identified, a basis for probable cause exists to support an arrest. The prosecution must be "*declined by the prosecutor for reasons other than lack of probable cause.*" The case files often reflected a simple statement by the investigator that they had contacted the prosecutor and "reviewed the case." Based on that review, the report stated that the prosecutor would verbally advise that they would not move on with the prosecution. The challenge for JCPD is that there is no evidence, verbal or documentation, of what specifically was conveyed to the prosecutor. It would be more effective if an affidavit were prepared, or a report was prepared and sent to the prosecutor for review. That would ensure that a full, fair, and complete investigation was conducted. The Exceptional Clearance rate for JCPD is high. Using the Exceptional Clearance code by JCPD appears not to meet the requirements required by TIBRS.

Additional cases identify closure based on the victim's refusal to cooperate. This is not surprising. Being involved in a sexual-related crime is emotionally and physiologically challenging.[10] The sections above identify a process that can be uninviting and difficult for a victim. This includes overemphasizing the emotional toll of prosecution and minimizing the seriousness of the rape in their communication with the victim. The process must demonstrate the recognition by JCPD personnel of the unique needs of a sexual assault victim. Small steps such as building a rapport with the victim through non-evasive interviews and walking them through the system may assist in victims being willing to participate.

---

[10] https://www.verywellmind.com/sexual-trauma-causes-symptoms-consequences-and-treatments-5217579



TIBRS describes Victi Refused to cooperate as identified in image #13.

*Image #14*

**VICTIM REFUSED TO COOPERATE:** Victim refused to cooperate in the prosecution of the offender. This code is only applicable when a *victim* has actually stated or made it known to the agency that they refuse to cooperate or pursue the prosecution of the offender. This code is NOT used simply because an agency is unable to contact a victim. *Only applicable when you have established the identity of at least one offender, have probable cause to arrest that offender, and you know the exact (present) location of that offender.*

Multiple cases reviewed alleged "Victim Refused to Cooperate" as the reason for closure. Again, this usually occurred when the investigator identified a reservation by the victim to participate in the prosecutorial process. We found multiple examples of cases being closed because a victim refused to cooperate. In the first example, a female victim stated that while intoxicated/passed out, a male suspect sexually assaulted her. The victim was interviewed by responding officers and the investigator, at which time she provided a verbal statement. The victim was advised to go to the police department upon leaving the hospital so that the investigator could further interview her. The victim provided a detailed verbal statement but then was asked by the investigator to provide a written statement. The investigator reported that the victim wrote about twenty words and then stopped. The investigator reported that he requested that the victim contact him later. The investigator interviewed the suspect, who denied sexual contact with the victim. The investigator spoke with an ADA, who advised the investigator to obtain the victim's medical records from the night she was at the hospital. The investigator went to the hospital records department and asked if the victim could get a copy of her own records and was advised that she could. The investigator advised the victim to go and obtain her medical records for the investigator. The victim and her mother contacted the Department and stated that they were not happy and requested that the case be re-assigned to a female detective. A Sergeant advised both that would not happen. The investigator informed the Captain that he was receiving little cooperation from the victim. Our primary concerns with this case are why it was not reassigned upon the request of the victim and her mother, and why the victim was requested to obtain her own records. The lab results of the victim indicated the presence of male DNA, but it is unclear whether suspect swabs were completed. This case was closed, indicating victim's refusal to cooperate, yet a full investigation had not been completed.

Multiple cases identify that the case was closed because the victim was not responsive. As identified above, in 21 Rape cases or 31% closed by exceptional clearance, the investigator cited the reason for the exceptional clearance as the victim being uncooperative, and the majority of these were the investigator not being able to contact the victim or the victim not returning phone calls and messages. A case closure, for this reason, must only occur when the victim has actually stated or made it known to the agency that they refuse to cooperate or pursue the prosecution of the offender,  The code is not used simply because the agency is unable to contact a victim.

*Recommendation  #4:*  *JCPD command staff and supervisors must provide oversight and be held accountable for the manner in which cases are closed.*

## 3.     JCPD's INTERNAL AFFAIRS PROCESS

Finding #5     *JCPD needs to ensure that all complaints of misconduct against the Department, including anonymous complaints, are timely investigated.*

Fair, impartial, and timely internal review of allegations of law enforcement officer misconduct is paramount for maintaining agency integrity and public trust. A robust and well-functioning accountability system in which officers are held to the highest standards of integrity is critical to the legitimacy of the Johnson City Police Department and should be a priority of the Department.   To achieve these outcomes, the Department must ensure that complaints are received and investigated fully and that investigations are conducted in a complete and comprehensive manner, following established standards and procedures.

Industry standards, accreditation standards, and model policies provide that all complaints, including anonymous complaints, are to be recorded and investigated.  The current JCPD General Order 300.08-13 (4.1.7) provides, "*Officers with the rank of Sergeant or above, shall courteously and promptly accept and document all citizen's complaints of misconduct made in person, by writing, by telephone or anonymously. The complaint shall be documented on Department form #1001, titled "Complaint and Inquiry Form," and shall be immediately forwarded to the Chief of Police and the Internal Investigation Unit*."   The Department should ensure that <u>all</u> complaints are investigated, regardless of the source.

**DLG**
DARLE LAW GROUP, LLC

On June 23, 2022, a civil lawsuit was filed by a former Special Assistant U.S. Attorney alleging that the police department ignored repeated allegations of rape and allowed the suspect to escape.[11] This lawsuit was covered by the media in the subsequent weeks. Once the Department has become aware of an intended complaint, either through an "intent-to-sue" letter or a civil lawsuit, an Internal Affairs investigation should be commenced. At the very least, this would be an anonymous complaint; but with a civil action, the individual making the complaint is known. A proper investigation and collection of cases filed in this matter may have assisted in identifying documentation that would have been beneficial in this audit.

When the allegations were made in the above-referenced lawsuit, the Department was concerned that the complaint involved criminal conduct by Department members. While the Department should have opened an internal affairs investigation, it is industry standard to initially address any criminal allegations through the prosecutor's office. The City acknowledged the lawsuit and the seriousness of the allegations against Department members in their August 24, 2022, letter to District Attorney General Kenneth Baldwin. The City, through City Manager Cathy Ball, reported the allegations of "police corruption" and requested that either the District Attorney's Office or the Tennessee Bureau of Investigation ("TBI") investigate.[12] On September 1, 2022, District Attorney General Steven R. Finney responded to Ms. Ball, stating that after a review of the complaint, he does not have enough information to request a TBI investigation.[13] Following the denial of a criminal investigation, the Department should have moved forward with an internal investigation to address the misconduct allegations. Since September 1, 2022, we have received no information that JCPD is conducting an internal investigation into the allegations. During our interview with Chief Karl Turner in December 2022, he confirmed that an investigation had not been initiated. The purpose of the investigation may have assisted us in locating or identifying documents specific to the JCPD's investigation of sexual-related cases that were not discovered during the DLG audit.

---

[11] https://tennesseelookout.com/2022/06/30/johnson-city-police-sued-by-former-special-assistant-u-s-attorney/
[12] https://www.wjhl.com/wp-content/uploads/sites/98/2022/08/letterDA.pdf
[13] https://www.wjhl.com/wp-content/uploads/sites/98/2022/09/DA-Letter-to-Johnson-City.pdf

**DLG**
DANIEL LAW GROUP, LLC

*Recommendation #5*  *JCPD needs to follow its General Orders and Accreditation standards and initiate a complaint of misconduct in a timely manner*.

## 4.  JCPD's COMMAND AND SUPERVISION

*Finding #6:*  *Supervision was insufficient to ensure full, fair, and complete investigations*.

Proper supervision provides officers with the direction and guidance necessary to improve and develop as police officers; ensures that officers follow department procedure; and identifies, corrects, and prevents officer misconduct. Departments must ensure that supervisors have the necessary knowledge, skill, and ability to provide close and effective supervision to each officer under the supervisors' direct command. Our review of the sex-related investigations found a lack of adequate supervision. Supervisors should review officers' response practices to ensure that officers are complying with Department policy, and to evaluate the impact of officer activity on police legitimacy and community trust.

*Recommendation #6:*  *PD supervisors shall conduct a periodic review of closed cases and cases where victims declined to participate in the investigation identifying any systemic problems. Periodic reviews shall include a review of case files, recorded interviews, and victim and advocate feedback for investigative comprehensiveness and indications of bias*.

## 5.  POLICIES AND PROCEDURES

*Finding #7*  *Department policies and procedures do not meet industry standards and legal requirements to investigate sexual assault investigations.*

The administrative and operational effectiveness of a police department depends on sound policy, adequate training, and competent supervision.  A police department's policies and procedures provide the agency with core liability protection. Policies that are comprehensive and current are the backbone of effective and constitutional policing. It is not enough, however, to simply have sound policies.  Officers must be trained on the policies, supervisors must hold officers accountable, and, when the policies are violated, a sound disciplinary process should be engaged.  A police department's policies and procedures shall reflect and express the Department's core values and priorities, while providing clear direction to ensure that officers lawfully, effectively, and ethically carry out their law enforcement responsibilities.

**DLG**
DARLE LAW GROUP, LLC

**Recommendation 7a:** *The JCPD shall implement the Sex Related Crimes Protocol issued by District Attorney General Steven R. Finney on November 21, 2022.*

**Recommendation 7b:** *The JCPD shall review and update its policies and procedures to improve its response to sexual assault. The policies will align with best practices, accreditation standards, and current professional standards. They will revise the Department's policy on "Sexually Oriented Crimes (600-13)" and incorporate the Sex Related Crimes Protocol[14], International Association of Chiefs of Police Model Policy on Investigating Sexual Assaults[15], TLEA[16] and CALEA[17] Accreditation Standards on key topics.*

*These key topics include the following:*

a. *Initial officer response to a report of sexual assault, including requirements specific to assisting the victim, evidence collection, and the identification and location of witnesses.*

b. *Response to stranger and non-stranger sexual assault.*

c. *The preliminary victim interview, including the development of a victim interview protocol, and the comprehensive, follow-up victim interview.*

d. *Contacting and interviewing suspects.*

e. *Medical forensic examinations and coordination with the forensic examiner.*

f. *Participation of victim advocates.*

g. *Investigative considerations regarding alcohol and drug-facilitated sexual assault, including requirements specific to evidence collection and the forensic examination of victims.*

h. *The role of the supervisor; and*

i. *Procedures for blind reporting of sexual assault.*

## 6.    JCPD's TRAINING

**Finding #8**        *Department Training is insufficient to effectively conduct unbiased sexual assault and related investigations.*

---

[14] Sex Related Crime Protocol developed and issued by District Attorney General Steven R. Finney, dated November 21, 2222.
[15] IACP LAW ENFORCEMENT POLICY CENTER, Investigating Sexual Assaults, (Updated: October 2017)
[16] Exhibit B
[17] Exhibit C

**DLG**
DANIEL LAW GROUP, LLC

In order to enhance the handling of sexual assault allegations, it is essential to provide additional training to all personnel in the JCPD. The effectiveness of a police department, both administratively and operationally, relies on solid policies, adequate training, and competent supervision. Policies and supervision cannot achieve their objectives without proper personnel training, which should include the Chief, command and supervisory staff, police officers, and support staff. To facilitate training across the department, JCPD makes use of an online platform. While the system is well known, of JCPD is required to ensure the training classes provide effective instruction of State statutes, the DA's Sex Related Crimes Protocol and JCPD policies.

*__Recommendation #8a__*   *The JCPD shall be committed to providing comprehensive training to all officers and investigators regarding the appropriate response to sexual assault. This includes both initial training and ongoing annual in-service training. The training will cover all relevant laws, best practices, and professional standards, and will be updated as needed. Additionally, any identified training needs will be addressed in the annual in-service training. The training will be thorough and cover a range of topics, including JCPD's new or revised sexual assault policy, developed pursuant to these recommendations.*

    a.   *Effective law enforcement response to reports of sexual assault.*
    b.   *Effective law enforcement response to non-stranger sexual assault; alcohol and drug-facilitated sexual assault; and sexual assault where the victim is incapacitated or otherwise unwilling or unable to clearly describe the assault.*
    c.   *The dynamics of, and relevant core scientific concepts related to sexual assault, including counterintuitive behavior, tonic immobility, and the effects of trauma on memory.*
    d.   *Taking statements from individuals reporting sexual assault.*
    e.   *Forensic examinations of sexual assault victims, including understanding, interpreting, and documenting medical forensic reports; communicating and coordinating with medical staff involved in forensic exams; and using forensic exams in the development of investigations and referrals for prosecution.*
    f.   *The impact of officers' and detectives' attitudes toward victims on investigative outcomes.*
    g.   *The impact of bias in law enforcement agency's response to sexual assault and strategies to ensure that bias does not undermine investigations, damage rapport with victims reporting sexual assault, or re-traumatize victims. This training shall include presentations by victims of sexual assault and victims' advocates to provide officers with the unique perspectives of those who have been victimized by sexual assault and/or those who work with sexual assault survivors.*



**Recommendation #8b**   *The JCPD will offer comprehensive training on sexual assault investigations to all investigators responsible for cases involving sexual offenses. This training will include:*

   a.  *The elements of sexual assault offenses under Tennessee law.*
   b.  *Forensic and investigative steps to be taken in response to sexual assault allegations, including focused training on the forensic and investigative steps specific to non-stranger sexual assault, alcohol and drug-facilitated sexual assault, and sexual assault involving victims who are incapacitated or otherwise unable or unwilling to clearly describe the assault.*
   c.  *Taking statements from and interviewing individuals reporting sexual assault and*
   d.  *Taking statements from, interviewing, and interrogating suspects in non-stranger and alcohol and drug-facilitated sexual assault.*

**Recommendation #8C**   *JCPD personnel who oversee officers responding to sexual assault reports and investigators handling sexual assault allegations must undergo training to review response and investigation procedures thoroughly and identify any biases. The training will also cover how to implement supervisory reviews and responsibilities.*

**Recommendation #8D**   *Training also shall include testing and/or writings that indicate that JCPD personnel taking the training comprehend the material taught.*

## VII.    CONCLUSION

In Johnson City, constitutional policing and effective law enforcement are typically intertwined. However, discrimination in law enforcement's handling of sexual assault reports can harm public trust in the criminal justice system, endanger victims, and perpetuate negative stereotypes about them. We look forward to working cooperatively with Johnson City and JCPD to develop durable and comprehensive remedies to address the concerns identified in this report. We believe that JCPD and the City of Johnson City have the ability and commitment to resolve these findings.

**DLG**
DANIEL LAW GROUP, LLC

July 10, 2023               Page **36** of 45
Case 2:23-cv-00071-TRM-JEM     Document 490-1     Filed 02/13/25     Page 64 of 73
PageID #: 11357

# APPENDIX A
## SUMMARY
## FINDINGS AND RECOMMENDATIONS

## 1. JCPD's RECORDS MANAGEMENT SYSTEM

<u>Finding #1</u>  The Records Management System and records process at JCPS is inadequate to support the effective operation of the Department

<u>Recommendation 1:</u> *The JCPD shall research, identify and implement an effective Records Management System.*

## 2. JCPD's RESPONSE TO SEXUAL ASSAULT

<u>Finding #2:</u>  **The sexual assault investigations conducted by JCPD have material deficiencies that can hinder the ability to collect necessary evidence for a complete and accurate investigation.**

<u>Finding #3:</u>  **JCPD's Investigations were found to be Inconsistent, Ineffective, and Incomplete**

    a. **JCPD either often did not attempt to collect evidence or failed to document the collection of evidence.**

<u>Recommendation #3a:</u> *JCPD should develop a checklist for all sex-related investigations by responding officers and supervisors to ensure consistency in collecting and documenting evidence.*

    b. **JCPD's securing of crime scenes and using search warrants to document evidence were found to be insufficient**.

<u>Recommendation #3b</u>:  *Officers, supervisors, and investigators must be retrained on Department policy related to the investigation of sexual-based crimes and the District Attorney's "Sex Related Crimes Protocol". There must be collaboration and teamwork between the Patrol and the Criminal Investigations Divisions.*

    c. **The case file records were deficient in the documentation of investigative steps.**

<u>Recommendation 3c:</u> *Supervisors, Officers, and Investigators must be held accountable for documenting criminal investigations and maintaining the proper case files.*



    **d. The case file records were deficient in the documentation of Witness Interviews.**

**_Recommendation 3d:_**   *Supervisors, Officers, and Investigators must be held accountable for fully investigating the allegation, including interviewing known witnesses. These interviews shall be documented as they occurred and preferably recorded in writing or with Body-worn cameras.*

    **e. JCPD has a practice of not conducting Suspect Interviews**

**Recommendation 3e:**   *Identifiable suspects in a criminal investigation will be interviewed. The suspect has constitutional protection governed by the 5th Amendment, but attempts should be made in a timely manner to identify the suspect's version of events.*

    **f. JCPD's investigative processes discourage participation by victims.**

**Recommendation 3f:**   *The JCPD should be committed to implementing victim-centered practices in sexual assault response, interviews, and investigations. To achieve this, they will enhance and improve policies, training, and oversight. This approach aims to increase the likelihood of victims' continued cooperation with law enforcement, improve their overall experience, and strengthen sexual assault investigations.*

*These practices shall include the following:*

8. *Inviting and encouraging advocates to be present during interviews, if consistent with the victim's wishes.*
9. *Conducting interviews at times and locations convenient to the victim, whenever possible.*
10. *Introducing particularly sensitive lines of questioning by explaining why those questions are important to the investigation.*
11. *Instruct investigators and officers not to ask victims whether they wish the assailant to be prosecuted.*
12. *Ensuring that officers describe the process of taking forensic exams and working with law enforcement and the courts in a manner that is both sensitive to the needs of victims and supports their participation in the criminal justice process.*
13. *Documenting reports of sexual assault using the language of non-consensual sex, as appropriate, and using the victim's own language as much as possible; and*
14. *Transporting the victim to the designated medical facility for a forensic exam where such an examination is warranted and the victim consents.*



g.  **JCPD's response to sexual assault was challenged based on gender-based stereotypes and bias.**

*Recommendation 3g:*   *Non-stranger and alcohol or drug-facilitated sexual assault investigations shall be assigned only to those investigators with the demonstrated skills, interest, and training to conduct those investigations effectively and without bias.*

<u>**Finding #4**</u>   **JCPD process of closing investigations is flawed and inaccurate.**

*Recommendation  #4:*   *JCPD command staff and supervisors must provide oversight and be held accountable for the manner in which cases are closed.*

## 3.  JCPD's INTERNAL AFFAIRS PROCESS

<u>**Finding #5**</u>   **JCPD needs to ensure that all complaints of misconduct against the Department, including anonymous complaints, are timely investigated.**

*Recommendation #5*   *JCPD needs to follow its General Orders and Accreditation standards and initiate a complaint of misconduct in a timely manner.*

## 4.  JCPD's COMMAND AND SUPERVISION

<u>**Finding #6:**</u>   **Supervision was insufficient to ensure full, fair and complete investigations.**

*Recommendation #6:*   *PD supervisors shall conduct a periodic review of closed cases and cases where victims declined to participate in the investigation identifying any systemic problems. Periodic reviews shall include a review of case files, recorded interviews, and victim and advocate feedback for investigative comprehensiveness and indications of bias.*

## 5.  POLICIES AND PROCEDURES

<u>**Finding  #7**</u>   **Department policies and procedures do not meet industry standards and legal requirements to investigate sexual assault investigations.**

*Recommendation 7a:*   *The JCPD shall implement the Sex Related Crimes Protocol issued by District Attorney General Steven R. Finney on November 21, 2022.*

*Recommendation 7b:*   *The JCPD shall review and update its policies and procedures to improve its response to sexual assault. The policies will align with best practices, accreditation standards, and current professional standards. They will revise the Department's policy on "Sexually Oriented Crimes (600-13)" and incorporate the Sex Related Crimes Protocol, International Association of Chiefs of Police Model Policy on Investigating Sexual Assaults, TLEA and CALEA Accreditation Standards on key topics.*



*These key topics include the following:*

j. *Initial officer response to a report of sexual assault, including requirements specific to assisting the victim, evidence collection, and the identification and location of witnesses.*
k. *Response to stranger and non-stranger sexual assault.*
l. *The preliminary victim interview, including the development of a victim interview protocol, and the comprehensive, follow-up victim interview.*
m. *Contacting and interviewing suspects.*
n. *Medical forensic examinations and coordination with the forensic examiner.*
o. *Participation of victim advocates.*
p. *Investigative considerations regarding alcohol and drug-facilitated sexual assault, including requirements specific to evidence collection and the forensic examination of victims.*
q. *The role of the supervisor; and*
r. *Procedures for blind reporting of sexual assault.*

## 6.   JCPD's TRAINING

**Finding #8**   **Department Training is insufficient to effectively conduct unbiased sexual assault and related investigations.**

*Recommendation #8a*   *The JCPD shall be committed to providing comprehensive training to all officers and investigators regarding the appropriate response to sexual assault. This includes both initial training and ongoing annual in-service training. The training will cover all relevant laws, best practices, and professional standards, and will be updated as needed. Additionally, any identified training needs will be addressed in the annual in-service training. The training will be thorough and cover a range of topics, including JCPD's new or revised sexual assault policy, developed pursuant to these recommendations.*

a. *Effective law enforcement response to reports of sexual assault.*
b. *Effective law enforcement response to non-stranger sexual assault; alcohol and drug-facilitated sexual assault; and sexual assault where the victim is incapacitated or otherwise unwilling or unable to clearly describe the assault.*
c. *The dynamics of, and relevant core scientific concepts related to sexual assault, including counterintuitive behavior, tonic immobility, and the effects of trauma on memory.*
d. *Taking statements from individuals reporting sexual assault.*
e. *Forensic examinations of sexual assault victims, including understanding, interpreting, and documenting medical forensic reports; communicating and coordinating with medical staff involved in forensic exams; and using forensic exams in the development of investigations and referrals for prosecution.*
f. *The impact of officers' and detectives' attitudes toward victims on investigative outcomes.*
g. *The impact of bias in law enforcement agency's response to sexual assault and strategies to ensure that bias does not undermine investigations, damage rapport with victims reporting sexual assault, or re-traumatize victims.   This training shall include*



*presentations by victims of sexual assault and victims' advocates to provide officers with the unique perspectives of those who have been victimized by sexual assault and/or those who work with sexual assault survivors.*

**Recommendation #8b**    *The JCPD will offer comprehensive training on sexual assault investigations to all investigators responsible for cases involving sexual offenses. This training will include:*

a. *The elements of sexual assault offenses under Tennessee law.*
b. *Forensic and investigative steps to be taken in response to sexual assault allegations, including focused training on the forensic and investigative steps specific to non-stranger sexual assault, alcohol and drug-facilitated sexual assault, and sexual assault involving victims who are incapacitated or otherwise unable or unwilling to clearly describe the assault.*
c. *Taking statements from and interviewing individuals reporting sexual assault and*
d. *Taking statements from, interviewing, and interrogating suspects in non-stranger and alcohol and drug-facilitated sexual assault.*

**Recommendation #8C**    *JCPD personnel who oversee officers responding to sexual assault reports and investigators handling sexual assault allegations must undergo training to review response and investigation procedures thoroughly and identify any biases. The training will also cover how to implement supervisory reviews and responsibilities.*

**Recommendation #8D**   *Training also shall include testing and/or writings that indicate that JCPD personnel taking the training comprehend the material taught.*



**APPENDIX B**

<u>**CALEA Standards**</u>

While CALEA does not provide law enforcement standards specifically related to sexual assault investigations, the general standards related to criminal investigations are applicable to these investigations. The applicable standards include investigative procedures involving: (1) preliminary investigations; (2) follow-up investigations; (3) victim/witness assistance – agency's role; (4) victim/witness assistance – preliminary investigations; (5) victim/witness assistance – follow-up investigations; and (6) collection and preservation of evidence.

The CALEA standards referenced above provide the specific procedures or language a police department must provide in its written directives related to criminal investigations. The specific CALEA standards related to criminal investigations are included below.

- o 42.2.1: Preliminary Investigations
    - ▪ *A written directive establishes steps to be followed in conducting preliminary investigations, to include:*
        - ▪ *observing all conditions, events, and remarks;*
        - ▪ *locating and identifying witnesses;*
        - ▪ *maintaining and protecting the crime scene and arranging for the collection of evidence; and*
        - ▪ *interviewing the complainant, witnesses, and suspects.*

- o 42.2.2: Follow-Up Investigations
    - ▪ *A written directive establishes steps to be followed in conducting follow-up investigations to include, at a minimum:*
        - ▪ *reviewing and analyzing all previous reports prepared in the preliminary phase, departmental records, and results from laboratory examinations;*
        - ▪ *conducting additional interviews and interrogations;*
        - ▪ *seeking additional information;*
        - ▪ *planning, organizing, conducting searches, and collecting physical evidence;*
        - ▪ *identifying and apprehending suspects;*
        - ▪ *determining involvement of suspects in other crimes;*
        - ▪ *checking suspects' criminal histories; and*
        - ▪ *preparing cases for court presentation.*

- o 55.1.1: Victim/Witness Assistance
    - ▪ *A written directive describes the agency's role in victim/witness assistance, to include:*
        - ▪ *the implementation and delivery of victim/witness assistance services by agency personnel;*
        - ▪ *the confidentiality of victims/witnesses and their role in case development to the extent consistent with applicable law;*



- agency efforts to inform the public and media about the agency's victim/witness assistance services;
- relationships with other service providers; and
- a summary of victim and witness rights.

- 55.2.3: Assistance – Preliminary Investigation
  - *A written directive defines victim/witness assistance services to be rendered during the preliminary investigation to include:*
    - *providing information to the victim/witness about applicable services;*
    - *advising the victim/witness about what to do if the suspect or the suspect's companions or family threatens or otherwise intimidates him or her;*
    - *informing victims/witnesses about the case number, if known by the agency, and subsequent steps in the processing of the case; and*
    - *providing a telephone number that the victim/witness may call to report additional information about the case or to receive information about the status of the case.*

- 55.2.4: Assistance – Follow-Up Investigation
  - *A written directive defines victim/witness assistance services to be provided during the follow-up investigation, if any, to include:*
    - *re-contacting the victim/witness within a reasonable period of time to determine whether further assistance is required, if in the opinion of the agency, the impact of a crime on a victim/witness has been unusually severe and has triggered above-average need for victim/witness assistance;*
    - *explaining to victims/witnesses the procedures involved in the prosecution of their cases and their role in those procedures, if not an endangerment to the successful prosecution of the case;*
    - *scheduling line-ups, interviews, and other required appearances at the convenience of the victim/witness and, at the option of the agency providing transportation;*
    - *returning promptly victim/witness property taken as evidence where permitted by law or rules of evidence;*
    - *assigning a victim advocate, if available, to the victim/witness during follow-up investigation; and--*
    - *ensure copies of incident and supplemental reports are forwarded to local prosecutor's office, if required.*

- 83.2.1: Guidelines and Procedures re: Evidence
  - *A written directive establishes guidelines and procedures used for collecting, processing, and preserving physical evidence in the field, and includes;*
    - *first responder responsibilities and precautions;*



- *procedures for the collection, storage, and transportation of evidence;*
- *evidence collection training requirements for persons collecting evidence; and*
- *procedures for transfer of custody of physical evidence.*



## APPENDIX C

**TLEA (Tennessee Law Enforcement Accreditation Standards)**

The TLEA does not include separate standards specifically related to sexual assault investigations; however, it also provides general standards related to criminal investigations. The exception is TLEA Standard 21.1, which mandates: "*A written directive establishes procedures for preservation, collection, processing, and storage of physical evidence, to include, but not limited to… the statutory protocol for sexual assault evidence collection kits, and other crime scene information.*"

As with the CALEA Standards, the TLEA Standards provide the specific procedures or language a police department must include in its written directives related to criminal investigations. The specific TLEA standards related to criminal investigations are as follows:

- *TLEA – Chapter 15: Criminal Investigations*
  - *15.2: Investigator Duties*
    - *A written directive shall specify investigator responsibilities for conducting preliminary and follow-up criminal investigations.*
  - 15.7: Investigative Checklist
    - *A written directive requires the agency to have a checklist to assist investigators in criminal investigations.*

- TLEA – 21.1: Collection and Preservation of Evidence
  - *A written directive establishes procedures for preservation, collection, processing, and storage of physical evidence, to include, but not limited to: taking photographs, collecting fingerprints, DNA collection, the statutory protocol for sexual assault evidence collection kits, and other crime scene information.*

**DLG**
DABLE LAW GROUP, LLC